**MATTHEW C. ELLIS, OSB No. 075800**
matthew@employmentlawpdx.com
**Matthew C. Ellis, PC**
621 SW Morrison St Ste 1025
Portland OR  97205
Telephone: 503/345-5407

**STEPHEN L. BRISCHETTO, OSB No. 781564**
**DEZI RAE ROBB, OSB No. 151777**
slb@brischettolaw.com
drobb@brischettolaw.com
**Law Office of Stephen L. Brischetto**
621 SW Morrison St Ste 1025
Portland OR  97205
Telephone:  503 223-5814

Of Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **DR. RUPA BALA**,<br><br>                    Plaintiff,<br><br>            v.<br><br>**OREGON HEALTH AND SCIENCE UNIVERSITY, an Oregon public corporation; DR. CHARLES HENRIKSON, an individual; DR. JOAQUIN CIGARROA, an individual.**<br><br>                    Defendants. | **CASE NO. 3:18-CV-00850-YY**<br><br>*FIRST AMENDED* **COMPLAINT FOR DEPRIVATION  OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**<br><br>**Jury Trial Demand** |

### I.  JURISDICTION AND VENUE

1. This is an action for damages for violations of the United States Constitution brought under 42 U.S.C. **§** 1983**.** This court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and 28 USC § 1343(3) and (4).

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that the claims

and events giving rise to this action alleged herein occurred in Portland, Oregon, in the County of Multnomah.

## II.  PARTIES

3. Plaintiff, Dr. Rupa Bala, is a citizen of the United States and a resident of the State of Georgia. Dr. Bala is a cardiac electrophysiologist who specializes in complex ablations. She is amongst a small group of female electrophysiologists in the US who perform complex ablations, specifically congenital ablations and ventricular tachycardia ablations. She was heavily recruited to join OHSU from the University of Pennsylvania, where she successfully trained and practiced for 12 years.

4. Defendant OHSU is a duly organized public corporation that operates a public university and hospital in Multnomah County, Oregon.  Defendant OHSU is a "person" for purposes of 42 U.S.C. § 1983.

5. At all material times, Defendant Dr. Charles Henrikson was the Chief of Electrophysiology at OHSU.  Defendant Henrikson is named in his individual capacity and is a "person" for purposes of 42 U.S.C. § 1983.

6. At all material times, Defendant Joaquin Cigarroa was the Clinical Chief of Cardiology at OHSU. Defendant Cigarroa is named in his individual capacity and is a "person" for purposes of 42 U.S.C. § 1983.

## III.  FACTUAL ALLEGATIONS

7. Throughout Dr. Bala's employment with OHSU, Dr. Bala was subjected to ongoing sex discrimination / sex stereotyping and retaliation by Defendants. This included different treatment and backlash by the Defendants for being a strong, confident and outspoken woman in how she communicated with staff and colleagues.  This also included different treatment and retaliation for making ongoing, serious complaints of substandard quality of care in the Electrophysiology/Cardiology department and for opposing sex discrimination. Men in the department who had similar communication styles or reported substandard quality of care were not treated the same way. Ultimately, because of the Plaintiff's sex and race, for opposing sex

discrimination and for being a woman of color who reported substandard medical practices, Plaintiff's employment was set to be terminated. Plaintiff chose to resign in lieu of termination.

8. On or about January 5, 2015, Dr. Bala began working at OHSU as the Director of Complex Ablation / Associate Professor of Medicine. She reported to Defendant Dr. Charles Henrikson, Chief of Electrophysiology, who in turn reported to Defendant Dr. Joaquin Cigarroa, Clinical Chief of Cardiology.

9. Soon after starting at OHSU, Dr. Bala noted that many of the clinical practices and protocols at OHSU were unsafe for patients and failed to meet an appropriate standard of care. She reported these practices and opposed these practices both in person and in writing throughout her employment. In June 2015, Plaintiff met with Judi Workman, the Cardiology Service Line Manager, to discuss some of her concerns, including concerns regarding substandard patient preparation for device implantation and patient care. Ms. Workman opined that many of the problems were probably caused by Plaintiff's personality, which some allegedly perceived as too strong and direct. However, men were not routinely criticized by staff for being strong and direct.

10. On or about June 2015, Plaintiff performed an atrial lead upgrade (pacemaker implantation) on a heart transplant patient. Plaintiff observed a junior Medtronic representative struggling with the case and Plaintiff recommended she ask her senior partner and lead Medtronic representative with more experience.  Plaintiff was reported by the Electrophysiology lab staff to Workman for being insensitive in her interaction during the case. However, men who asked the representative questions, who recommended that the representative call in their senior partner for additional help  were not reported by staff or investigated by OHSU for being insensitive.

11. In August 2015, Plaintiff  performed a complex ablation on a patient. After the procedure, the patient was sent to the procedural care unit (PCU). Plaintiff recommended specific post-operative orders for the patient and suggested checking ACTs and giving protamine in the PCU to allow sheaths to be removed earlier and heparin to be started earlier for optimal

patient care. She indicated that she would be creating a new protocol that more appropriately focused on patient safety because the status quo negatively impacted patient care. The PCU nurse wrote a Patient Safety Incident (PSI) regarding the initial orders entered for this patient and told her nursing supervisor that the Plaintiff intended to write a new protocol addressing her concerns. The nursing supervisor requested a meeting with Dr. Bala to discuss the PSI event.

12. On or about August 2015, Plaintiff performed an implantable cardioverter defibrillator (ICD) procedure on a patient. During the procedure, Dr. Bala passed a wire into the venous system and heart and there were extra beats on the monitor that Dr. Bala was aware of. The nurse notified the Plaintiff and she said she was aware and would follow the monitor herself as it was quite common to have extra beats during this type of procedure. During the procedure, the nurse kept speaking to the radiology tech about their weekend, which, during critical portions of the procedure, Plaintiff found distracting. Plaintiff asked that they keep it down, but they continued to speak about casual matters at improper times. Plaintiff then instructed the radiology tech to move to the other side of the room so Plaintiff could focus on the procedure. After the procedure, the nurse reported Plaintiff to supervisors for being rude and threatened reporting the Plaintiff to the Professional Board.

13. In August 2015, Plaintiff was working on a ventricular tachycardia radiofrequency ablation. Plaintiff learned that the nurse anesthesiologist had potentially made a significant medication error, providing ten times the requested amount of medicine and asked that she call her attending physician to the lab for help. Plaintiff was also surprised during the procedure when the main Electrophysiology nurse was unaware of the type of procedure being performed or what side of the heart the procedure was being performed on and did not plan accordingly. Plaintiff reported to Defendants this failure to meet the standard of care. Defendants opined that the problem was probably caused by Plaintiff's communication style, not the clinicians' clinical practices.

14. On or about August 2015, Kathy Heitman-Allen RN, the new Cath/ Electrophysiology lab manager, met with Plaintiff to discuss program support. Plaintiff reported

concerns that the Electrophysiology staff lacked proper training and experience and that the lack of properly trained staff caused substandard patient care. She also discussed a recent medication administration error from the nurse anesthetist that was concerning with regard to the patient's safety. Ms. Heitman-Allen acknowledged that she needed to continue to search for qualified EP Techs and RNs and that she needed to better train and hold accountable existing employees to meet an appropriate standard of care. She also asked that the Plaintiff inform her of her high complexity cases moving forward. She said she would meet with Anesthesiology to discuss Plaintiff's concerns and would request cardiac anesthesia for higher complexity cases. She also asked that the Plaintiff be more respectful in her communications and criticized the manner in which she communicated her concerns. Men who communicated in the same or similar manner were not blamed for their communication styles.

15.     On or about August 2015, Plaintiff met with Defendant Dr. Charles Henrikson. He informed Plaintiff that people were complaining about her personality style and manner of communication, and that he would need to escalate these issues to Dr. Cigarroa and Dr. Kaul. However, these criticisms of Plaintiff were sex stereotypical comments that were not well founded. Men who had similar traits, if they were reported at all, were not escalated to senior management to remedy their communication style.

16.     On or about August 2015, a male Electrophysiology nurse introduced Dr. Bala to the female Anesthesiology physician whom she was working with that day. The male nurse introduced the Plaintiff as a "nurse" and said she liked being called that title. The Plaintiff told the Electrophysiology male nurse that he was being disrespectful to her in front of colleagues and they should meet with Dr. Kaul, the Chief of Cardiology, to discuss the matter further. Male physicians who worked in the Electrophysiology/Cardiology department were not subject to disrespectful behavior from the lab staff and not referred to as "nurses."

17.     In September 2015, Plaintiff met with Dr. Kaul, the Chief of Cardiology. They discussed many of the problems referenced above regarding Plaintiff's concerns about poor quality of care and Plaintiff's concern that she was being picked on for being an outspoken,

direct woman. Plaintiff also told him that the Electrophysiology nurse, who was a male, referred to the Plaintiff as a "nurse" in the lab in a belittling manner. Dr. Kaul and the Defendants did not investigate the Plaintiff's concerns of discrimination. Dr. Kaul recommended bringing in donuts to the lab staff to help improve their relationship.

18. On or about September 17, 2015, Plaintiff met with Joaquin Cigarroa, Charles Henrikson, and Albert Camacho to discuss her interactions on the Cardiology Consult Service with a first-year Cardiology fellow due to complaints that the Plaintiff was too "tough" on her. Cigarroa accused the Plaintiff of having too high of standards and noted that the fellows at OHSU were not as competent as those at the University of Pennsylvania and that the Plaintiff needed to adjust her expectations and standards. Cigarroa, Henrikson, and Camacho accused the Plaintiff of not doing consults—which Plaintiff denied—and asserted that people complained about Plaintiff's practices and communication style. These criticisms were false and constituted sex stereotypes as men with similar communication styles were not criticized in the same manner.

19. On October 7th, 2015, Dr. Henrikson organized an "EP discussion" with him and the nurse managers Judi Workman, Tara Menon, and Kathy Heitman-Allen. The meeting was led by Judi Workman in an abrasive and hostile manner to review prior complaints against the Plaintiff. These complaints included asking the Junior Medtronic Representative to call her Senior Colleague to the lab and the Plaintiff's suggestions regarding changes in the post-operative protocol in the PCU with a new protocol. Those who attended also discussed that Plaintiff's communication style was too "east coast." However, men who had similar attributes were not discussed during this meeting. There were no new complaints presented and the Plaintiff felt harassed by the nurse managers in this meeting which was supposedly called to document these complaints formally.

20. On October 21, 2015, Plaintiff was informed by Dr. Kaul that he and Dr. Henrikson were placing her on a formal Performance Expectation Plan ("PEP"), a common precursor to termination, for having too much of an "east coast" communication style. However,

the reasons for the PEP are sex stereotypes which focused on Plaintiff's communication style, which was unfairly characterized as being overly "abrupt" and "abrasive." Men with similar styles were not only not put on improvement plans for such behaviors, but complemented for such behaviors.  It also falsely criticized her for not "taking the time to teach" during procedures and for refusing to "work cooperatively."  It also made false statements about Plaintiff refusing to take electrophysiology weekend call.  During the meeting. Dr. Kaul and Dr. Henrikson could not provide any examples of Plaintiff not taking time to teach or not taking weekend call. Ultimately, Dr. Kaul admitted that many of the concerns were not warranted and the main issue was people "bristling" at Plaintiff's direct communication style. Plaintiff also told Defendants that the main issues were caused by the Defendants lacking staff who were dedicated to quality and safety concerns. Plaintiff told the Defendants that if problems with poor patient care continue, she would continue to speak up.

21.	On November 12, 2015, Plaintiff received an email from Dr. Jeffrey Kirsch, Chief of Anesthesia.  In his email, he accused her of bullying and harassing the anesthesiology staff over the last few months, and requested that the director of EEO at OHSU investigate "the reason for your apparent feeling that you need to continuously bully and harass the anesthesiology staff."  This harassing email was a result of Plaintiff failing to conform to sex stereotypes and for being too direct in her interactions with staff.  Defendants' sex stereotyping of Plaintiff was a substantial factor in Defendants' decision to terminate Plaintiff's employment.

22.	On November 13, 2015, Dr. Henrikson told the Plaintiff he had learned that the catalyst for Dr. Kirsch's email was Plaintiff's communications with a nurse regarding a procedure on November 12 that involved a complex ventricular tachycardia ablation on an advanced heart failure patient with a left ventricular assist device (LVAD). Dr. Henrikson indicated that he had spoken with witnesses and all the staff and doctors confirmed that the procedure went well and that there were no issues with Plaintiff.  Nonetheless, Dr. Cigarroa and Dr. Henrikson informed Plaintiff that she would be investigated by Human Resources and that she would not be able to do any cases while under investigation. No investigation was done to

determine whether the complaints against the Plaintiff were caused by sex stereotyping or whether she was otherwise a victim of sex discrimination.

23. The Human Resources investigation was completed and the complaints against the Plaintiff were unsubstantiated. Nonetheless, all individually named Defendants determined that the Plaintiff should be subject to different sex-based treatment and that her conduct should be closely scrutinized. For example, starting December 9, 2015 and continuing for the next 9 months, anesthesia staff working with the Plaintiff were required to meet with the Plaintiff in advance of every procedure and also ordered to immediately contact Dr. Henrikson or Dr. Shulman (Associate Professor of Medicine - Anesthesiology) if they had any issues with the Plaintiff. Anesthesia staff working with men who communicated in a similar manner as the Plaintiff were not required to report to Dr. Henrikson and Dr. Shulman immediately if they had issues with them, nor were they required to meet with male physicians in advance of every and all procedures. Plaintiff reported this sex-based different treatment to Human Resources.

24. From December 2015-March 2016, Plaintiff continued to be subjected to bad faith complaints, including complaints for not immediately responding to a page, for not saying hello to an Electrophysiology nurse who allegedly said hello to the Plaintiff when she had headphones on, and for sitting at a computer workstation during clinic in a room occupied by the Hypertrophic Cardiomyopathy Team. Men who engaged in similar actions were not similarly targeted.

25. Plaintiff was subjected to exclusion from workplace events by Defendant Henrickson. Defendant Henrikson excluded Plaintiff from recruitment dinners for potential new faculty. Male faculty members were invited to these dinners, but not Plaintiff. Plaintiff reported her discriminatory exclusion to Human Resources. After making her report to Human Resources, Defendant Henrickson finally started including Plaintiff in these dinners.

26. On or about March 21, 2016, Defendants modified the Performance Expectation Plan (PEP) and downgraded the document to a "coaching document." However, they continued to reinforce that the problems were with Plaintiff's communication style, not Defendants quality

of care or sex discrimination. Their plan to have people report to Dr. Henrikson or Dr. Shulman, if there were issues with her communication style remained in place.

27. In May 2016, an internal survey was conducted that reported high levels of dissatisfaction by OHSU faculty and rampant unreported harassment and discrimination. For example, the survey reported that over 50% of the faculty have thought about leaving OHSU in the last three years, that 23.5 % had observed harassment and 13.9% had experienced harassment. It further noted that 19.7% had observed discrimination and 14% had experienced discrimination. However, only 5% of those who responded to the survey stated they had reported what they had witnessed to a supervisor.

28. In late May 2016, Human Resources informed Plaintiff that Dr. Henrikson and others had decided that they were leaning toward terminating her employment as of June 2017 because of her communication style. On information and belief, Defendant Dr. Cigarroa made the preliminary decision, as well. On or about late May or early June 2016, Plaintiff met with Human Resources and Dr. Henrikson to inquire specifically why they were considering terminating her contract. Dr. Henrikson identified a list of minor, unsubstantiated complaints against her that had arisen over the last few months, including not saying "hi" to a staffer on one occasion and a complaint that Plaintiff had called her own patient to check on her which had already been done by the Electrophysiology nurse. He also said that the Electrophysiology Physician Assistant had complained about the Plaintiff in an offhand manner because the Plaintiff saw her own patient in the procedural care unit (PCU) the morning after an implantable cardiac defibrillator (ICD) procedure and performed a device interrogation and gave the data to the Electrophysiology Physician Assistant to write the daily note and discharge summary. Dr. Henrikson claimed that the Electrophysiology Physician Assistant had her own way of doing things and the Plaintiff interfered. Plaintiff responded that her performance was being scrutinized in a manner that other male employees were not subjected to. Plaintiff's sex was a factor in the individual defendants' preliminary decision to terminate her contract as well as in their final decision to terminate her contract.

29.     In July 2016, Plaintiff met with Dr. Kaul and informed him that she disagreed with the proposed termination. Plaintiff reported that she was subjected to different treatment and that men with the same traits were not being subjected to the same treatment. She told Dr. Kaul that Anesthesia staff were required to meet with her in advance of all procedures and were instructed to contact Dr. Henrikson or Dr. Schuman if they had issues with her during each and every procedure. Dr. Kaul was appalled and said that the practice must stop. On August 3, 2016, Dr. Henrikson informed Plaintiff that there would be no more need for the Anesthesia staff to meet with the Plaintiff before each and every procedure and they did not have to contact him or Dr. Schuman. Dr. Henrikson told the Plaintiff that the "special treatment" that she was subject to was no longer needed.

30.     In July 2016, the Plaintiff escalated her concerns regarding unfair treatment and discrimination to Dr. Sharon Anderson, Chairman of the Department of Medicine. She reviewed Plaintiff's concerns regarding harassment, hostile work environment, compromised patient care, and reasons given by Dr. Henrikson regarding her communication style and her contract nonrenewal and termination. Dr. Anderson stated that she had heard of some of these complaints and felt they were unfair to the Plaintiff and lacked any basis. Dr. Anderson stated that she would meet with Human Resources to discuss these concerns further and also with Dr. Kaul and Dr. Cigarroa.

31.     In July and August 2016, the Plaintiff notified Dr. Henrikson and Electrophysiology management about procedures that were complicated due to medical errors by inexperienced staff or due to inadequate staffing. Staff continued to complain about Plaintiff's efforts to provide appropriate care. In August 2016, a radiology technician reported the Plaintiff to Cath/EP lab manager Kathy Heitman-Allen and Dr. Henrikson for bullying and harassing because the Plaintiff asked the technician and the rest of the staff to be quiet and focus on a critical part of an ablation procedure on a young patient.

32.     On August 12, 2016, Plaintiff provided additional information to Human Resources in defense of the complaints against her, and raised concerns about the radiology

technician talking during the critical part of the procedure and compromising patient safety. Plaintiff asked Human Resources to investigate the allegations against her. Dr. Henrikson had performed his own investigation and found the Plaintiff at fault. After a prolonged time, Human Resources investigated this complaint and found the allegations against the Plaintiff to be unsubstantiated, though one Electrophysiology nurse did mention that the Plaintiff was direct in her request to be quiet so the team could focus on the critical part of the procedure. Plaintiff reported ongoing gender discrimination at OHSU including being subjected to a double standard because of her sex. She reported that she did not get "equal and fair treatment" as male attending physicians in her division. Male physicians in the Cath/EP laboratory routinely asked for silence in a similar manner during critical portions of technical procedures and the lab staff obliged. Male Physicians were not reported for bullying and harassing for asking for a quiet room during critical portions of the procedure as witnessed by the Plaintiff and other members of the lab staff. She reported that she had never before experienced this level of sexist behavior in the workplace. Defendants failed to take reasonable steps to stop the unequal and unfair treatment of Plaintiff.

33.     In September 2016, Plaintiff again reported substandard care. This included a patient "coding" in the Electrophysiology lab and going into intractable ventricular tachycardia during an ablation procedure. Despite being nearby, no members of the Electrophysiology team came to help the Plaintiff during the code event. Plaintiff reported this grossly deficient quality of care to the Defendant, Dr. Henrikson. Instead of investigating her concerns, Dr. Henrikson complimented her on managing the patient successfully, yet failed to take her concerns regarding patient care seriously.

34.     In approximately November and December 2016, Plaintiff continued to report serious substandard patient care and staffing both through her chain of command and through the clinical complaint line at OHSU, Patient Safety Incident (PSI) reporting. Plaintiff indicated that due to the lack of response to her prior complaints, including her complaints about the patient who "coded" and the ongoing risks to patient safety, that she needed to "escalate [her] concerns until we find a solution and the lab is run safely."

**Page 11 – First Amended Complaint**

35. In approximately January 2017, Plaintiff met with OHSU Chief Medical Officer Charles Kilo to address her concerns. Plaintiff told Dr. Kilo that she was being discriminated against based on her sex by Defendants; that male physicians with similar communication styles were not being similarly scrutinized for their communication style; and that OHSU was seriously compromising patient care in the Electrophysiology lab. He indicated he would look into the matter further but acknowledged that, at that point, "The well has been poisoned." In February 2017, Dr. Kilo followed up with Plaintiff, noting that she was very talented but that her communication style was perceived by others as too intense and needed to be toned down. Plaintiff reinforced that while she had been constantly criticized and will likely be terminated on account of her "intense" personal style that men with the same style were not similarly criticized. She pointed out to Dr. Kilo that a newly hired Cardiology attending who was similarly direct and confident in his communication style was accepted, acknowledged, and respected for his style. Further complaining about the double standard of discrimination, she reported, "From my experience as a female physician in the EP lab, I have not been treated equally compared to the male attending physicians. In short, my experience here is that male and female attendings are not equal." Plaintiff also responded that she believed others agreed with her concerns about substandard patient care in the Cardiology department, but were "too scared to voice their concerns or fear of patient care/safety" because "If they do, they will be dismissed as I was."

36. As a result of the Plaintiff's concerns and three PSI (Patient Safety Incident) events filed, a Quality Improvement and Management committee evaluated the direct concern of inadequate training of the lab staff during complex ablations and device cases. This committee substantiated the Plaintiff's concerns and found that the lab staff were not appropriately being trained and sought to define parameters for adequate training.

37. Over the next several months, the issues with the lab continued. People continued to complain about Plaintiff's communication style, but not about men who had the same communication style. On May 16, 2017, the Plaintiff was referred to as the "B word" by the Lead Electrophysiology Technician during an ablation procedure. When Plaintiff confronted

him, he initially denied using the term and later stated he was referring to someone else as the "B word" and apologized to the Plaintiff for his language.

38. Because all Defendants planned to not renew Plaintiff's contract on account of Plaintiff's sex, for failing to conform with sex stereotypes, and for her complaints of quality of care and discrimination, the Plaintiff was forced with the decision to either resign or be terminated. Plaintiff resigned in lieu of employment termination with her last day at OHSU being on or about June 19, 2017.

39. The individual Defendants' actions were intentional or in deliberate disregard of Plaintiff's Fourteenth Amendment rights, were under color of state law and deprived Plaintiff of her Constitutional rights.

40. Even after Plaintiff's employment was terminated, Defendants took steps to retaliate against Plaintiff and interfere with her attempts to secure subsequent employment by, in bad faith, providing prospective employers with negative employment recommendations and verifications.

41. As a direct and proximate result of Defendants' violations of the United States Constitution, Plaintiff has suffered loss of employment, substantial emotional distress, mental anguish, injury to her personal and professional reputation, loss of self-esteem and dignity. Plaintiff is entitled to economic and non-economic damages in an amount to be proved at trial.

42. Plaintiff is entitled to reasonable attorney fees and costs, pursuant to 42 U.S.C. § 1988.

43. Defendants' conduct was carried out with wanton or reckless disregard for Plaintiff's civil rights. Punitive damages should be assessed against all individual Defendants to deter individual Defendants from such conduct in the future.

44. Plaintiff has dual- filed claims with BOLI and EEOC relating to the same acts alleged above and has received right to sue letters from BOLI authorizing her to proceed on her claims. Plaintiff has filed this amended complaint within 90 days of receipt of her right to sue letter from BOLI. In addition, pursuant to ORS 30.275 Plaintiff provided Defendant OHSU with

notice of tort claims for her claims alleged herein on December 15, 2017.

**FIRST CLAIM FOR RELIEF**
**(42 U.S.C. § 1983: Equal Protection)**
**(Against all Defendants)**

45. Plaintiff realleges paragraphs 1 through 44.

46. Defendants Dr. Henrikson and Dr. Cigarroa deprived plaintiff of her Fourteenth Amendment right to be free of sex and race discrimination by forcing her termination because of her sex and for her failure to conform to sex stereotypes regarding women. These stereotypes included stereotypes about women, about women of color, and about strong women who make complaints of discrimination and substandard quality of care. Had Plaintiff not been a woman, or a woman of color, she would not have been forced to resign in lieu of termination. Likewise, Defendants Dr. Henrikson and Dr. Cigarroa deprived Plaintiff of her Fourteenth Amendment right to be free of sex and race discrimination by subjecting Plaintiff to a hostile work environment because of her sex and race; and by failing to take reasonable steps to stop the harassing, unwarranted and stereotypical treatment of Plaintiff. Lastly, Defendants Dr. Henrikson and Dr. Cigarroa deprived plaintiff of her Fourteenth Amendment right to be free of sex and race discrimination by retaliating against her for opposing sex discrimination and opposing substandard quality of care.

47. Plaintiffs race was a factor in the unlawful treatment alleged herein. Had Plaintiff not been a woman of color she would not have been ignored, harassed, retaliated against, and forced to resign in lieu of termination.

48. Defendant OHSU is liable for the deprivation of Plaintiff's Fourteenth Amendment rights because the deprivation was pursuant to an OHSU custom, policy or practice of having a double standard as it pertains to sex and race, of retaliating and against and belittling women and women of color who are perceived as not conforming with sex stereotypes. This includes, for example, women and women of color who report discrimination, report patient

care, and generally communicate in a manner that doesn't conform to sex stereotypes. Also, the deprivation was pursuant to an OHSU custom, policy or practice of having an ineffective complaint mechanism that permits continued discrimination and retaliation against individuals who make complaints.

49. At all material times, Defendant Dr. Henrikson and Dr. Cigarroa had final policy making authority for the OHSU Cardiology department and engaged in the acts alleged herein while acting as a final policymaker for OHSU. As a result, Defendant OHSU is liable for the deprivation of Plaintiff's Fourteenth Amendment Rights because the unlawful decisions were made or approved by persons in policymaking positions for Defendant OHSU.

50. Defendant OHSU is liable for the deprivation of Plaintiff's Fourteenth Amendment rights because persons in policy-making positions ratified the unlawful conduct alleged herein knowing the basis of the unlawful conduct.

## SECOND CLAIM FOR RELIEF
### (42 U.S.C. § 1981)
### (Against all Defendants)

51. Plaintiff realleges paragraph 1 through 50 as though fully set forth herein.

52. Defendants interfered with Plaintiff's ability to make and enforce contracts because of her race and ethnicity in violation of 42 USC §1981. Had Plaintiff not been a woman of color she would not have been retaliated against and subject to contract nonrenewal for opposing Defendants' unlawful and illegal practices.

## THIRD CLAIM FOR RELIEF
### (ORS 447.057)
### (Against Defendant OHSU)

53. Plaintiff realleges paragraphs 1 through 46 as though fully set forth herein.

54. Defendant denied Plaintiff renewal of her contract and retaliated against Plaintiff in violation of ORS 447.057(2) because Plaintiff in good faith brought forward evidence of

inappropriate and substandard medical care.

**FOURTH CLAIM FOR RELIEF**
**(ORS 659A.199)**
**(Against Defendant OHSU)**

55.   Plaintiff realleges paragraphs 1 through 46 as though fully set forth herein.

56.   Defendant denied Plaintiff renewal of her contract and retaliated against Plaintiff in violation of ORS 659A.199 because Plaintiff in good faith reported information that the she believed was evidence of a violation of a state or federal law, rule or regulations governing substandard medical care and sex discrimination.

**FIFTH CLAIM FOR RELIEF**
**(ORS 659A.030: Race and Sex Discrimination.)**
**(Against Defendant OHSU)**

57.   Plaintiff realleges paragraphs 1 through 44 as though fully set forth herein.

58.   Defendants Dr. Henrikson and Dr. Cigarroa deprived plaintiff of her right to be free of sex and race discrimination by forcing her termination because of her sex and for her failure to conform to sex stereotypes regarding women. These stereotypes included stereotypes about women, about women of color, and about strong women who make complaints of discrimination and substandard quality of care. Had Plaintiff not been a woman, or a woman of color, she would not have been forced to resign in lieu of termination. Likewise, Defendants Dr. Henrikson and Dr. Cigarroa deprived Plaintiff of her right to be free of sex and race discrimination by subjecting Plaintiff to a hostile work environment because of her sex and race; and by failing to take reasonable steps to stop the harassing, unwarranted and stereotypical treatment of Plaintiff. Lastly, Defendants Dr. Henrikson and Dr. Cigarroa deprived plaintiff of her right to be free of sex and race discrimination by retaliating against her for opposing sex discrimination and opposing substandard quality of care.

59.   Plaintiffs race was a factor in the unlawful treatment alleged herein. Had Plaintiff

not been a woman of color she would not have been ignored, harassed, retaliated against, and forced to resign in lieu of termination.

### SIXTH CLAIM FOR RELIEF
**(42 U.S.C. § Title Vii of Civil Rights Act: Race and Sex Discrimination)**
**(Against Defendant OHSU)**

60. Plaintiff realleges paragraphs 1 through 44 as though fully set forth herein.

61. Defendants Dr. Henrikson and Dr. Cigarroa deprived plaintiff of her right to be free of sex and race discrimination by forcing her termination because of her sex and for her failure to conform to sex stereotypes regarding women. These stereotypes included stereotypes about women, about women of color, and about strong women who make complaints of discrimination and substandard quality of care. Had Plaintiff not been a woman, or a woman of color, she would not have been forced to resign in lieu of termination. Likewise, Defendants Dr. Henrikson and Dr. Cigarroa deprived Plaintiff of her right to be free of sex and race discrimination by subjecting Plaintiff to a hostile work environment because of her sex and race; and by failing to take reasonable steps to stop the harassing, unwarranted and stereotypical treatment of Plaintiff. Lastly, Defendants Dr. Henrikson and Dr. Cigarroa deprived plaintiff of her right to be free of sex and race discrimination by retaliating against her for opposing sex discrimination and opposing substandard quality of care.

62. Plaintiffs race was a factor in the unlawful treatment alleged herein. Had Plaintiff not been a woman of color she would not have been ignored, harassed, retaliated against, and forced to resign in lieu of termination.

**WHEREFORE**, Plaintiff requests a trial by jury and requests the Court should grant judgment in favor of Plaintiff and against all Defendants and grant the following relief:

1. On all Plaintiff's Claims for relief, an award of economic damages including lost wages, lost fringe benefits, and pre-judgment interest in an amount to be determined at trial;

2. On all Plaintiff's Claims for relief, an award of damages for mental and emotional distress, damage to reputation, and other compensatory damages in an amount to be determined at trial;

3. On all Plaintiff's Claims for relief, an award of attorney fees, costs and disbursements;

4. On all Plaintiff's Claims for relief against the individual Defendants, punitive damages in an amount to be proved at trial;

5. On all Plaintiff's Claims for relief, a Declaration that all Defendants violated Plaintiff's constitutional rights to equal protection;

7. Such further or alternative relief in favor of Plaintiff as the Court deems appropriate.

DATED this 15th day of May, 2018.

By   s/Matthew C. Ellis
**MATTHEW C. ELLIS**
OSB No. 075800
(503) 345-5497

**STEPHEN L. BRISCHETTO**
OSB No. 781564
(503) 223-5814

Of Attorneys for Plaintiff

Plaintiff demands a trial by jury.

By   s/Matthew C. Ellis
**MATTHEW C. ELLIS**
OSB No. 075800
(503) 345-5497