# Report to the Board of Directors of Oregon Health & Science University



**OHSU**

Eric H. Holder, Jr.

Nancy Kestenbaum

Covington & Burling LLP

## COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG   LONDON   LOS ANGELES

NEW YORK   PALO ALTO   SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

www.cov.com

EXHIBIT 1 TO HICKS DECL. P. 1 of 51

# Contents

Executive Summary ........................................................................................................... 2

Methodology .................................................................................................................... 6

Background to Covington's Findings and Recommendations ................................................ 11

OHSU's Institutional Culture Challenges .............................................................................. 18

Investigative Findings: Issues Contributing to Culture Challenges ..................................... 24

    Finding #1: OHSU's actions and communications with respect to DEI, misconduct, and HR issues are sometimes misaligned with its stated values ............... 26

    Finding #2: OHSU has not established clear DEI priorities, an institution-wide strategy to drive change, or policies that effectively address DEI ................................... 27

    Finding #3: OHSU's policies and procedures addressing misconduct and reporting are inconsistent and lack clarity and precision ............................................................ 29

    Finding #4: OHSU lacks a consistent process for addressing and documenting concerns about misconduct, resulting in employee dissatisfaction and disciplinary outcomes that are not always fully informed or effectively implemented ..................... 35

    Finding #5: OHSU has historically devalued and marginalized the HR function through its failure to provide it with sufficient resources, experienced leadership, or adequate authority....................................................................................................... 37

Recommendations ............................................................................................................ 41

**COVINGTON**
EXHIBIT 1 TO ELLIS DECL. P. 2 of 51

# Executive Summary

**COVINGTON**
EXHIBIT 1 TO ELLIS DECL. P. 3 of 51

## Introduction

Oregon Health & Science University ("OHSU") is a leading academic health center and, as described on its website, "one of the only universities in the U.S. devoted exclusively to educating doctors, dentists, nurses, pharmacists, and public health professionals." OHSU is Portland's largest employer, with over 19,000 employees. The OHSU community also includes approximately 4,000 students. OHSU consists of a network of hospitals and clinics; schools of medicine, nursing, pharmacy, dentistry, and public health; and several research institutions and centers. Colloquially, OHSU refers to its separate divisions as "missions," chiefly referring to healthcare, research, and the School of Medicine. OHSU is governed by a nine-member board of directors.

OHSU enjoys a reputation for excellence in delivering high-quality care and pioneering research. For example, OHSU Hospital and OHSU Doernbecher Children's Hospital are ranked as the best hospital and best children's hospital in the state, respectively. However, prompted by recent concerns related to gender and racial discrimination as well as certain specific incidents, such as those alleged in the recent *A.B. v. Campbell* lawsuit, OHSU decided to undertake a broad review of its institutional culture.

To do this, OHSU retained the law firm Covington & Burling LLP ("Covington") and asked Eric Holder, the 82nd Attorney General of the United States, and his partner Nancy Kestenbaum to lead an independent and thorough investigation regarding "inequitable treatment, discrimination, harassment, bullying, or intimidation [at OHSU] based on race, color, religion, national origin, disability, age, marital status, sex (including pregnancy), sexual orientation, gender, gender identity or gender expression" (the "protected characteristics"), principally by assessing whether OHSU's current policies, procedures, and practices are optimally-designed to ensure that individuals are treated equitably, to prevent misconduct,[1] and to ensure best practices.

OHSU also asked Covington to address "how OHSU has handled, and how it should handle in the future, reports of inequitable treatment, discrimination, or harassment based on these protected characteristics, or based on other differences due to power dynamics, or retaliation for reporting these types of improper conduct," including whether community members[2] feel comfortable reporting these issues and whether they are appropriately investigated and addressed; whether existing data suggests disparities in reporting or outcomes; and whether OHSU acts in accord with best practices regarding communication of reports, investigations, and outcomes.

---

[1] This report uses the term "misconduct" to refer to inequitable treatment, discrimination, harassment, bullying, or intimidation based on protected characteristics and retaliation for reporting any of these types of improper conduct.

[2] This investigation assessed the "OHSU community," or "community," which included what OHSU refers to as "community members" – employees, faculty, researchers, affiliated healthcare providers, medical residents, fellows, and other learners – but due to patient privacy and other concerns, did not include patients.

2

EXHIBIT 1 TO ELLIS DECL. P. 4 of 51

**Institutional Culture Challenges and Findings**

Covington's review identified a series of institutional culture challenges that OHSU is facing, which are described in greater detail on pages 18 to 23 of this report:

1. OHSU has failed to create an environment which community members feel values diversity, equity, and inclusion ("DEI") and makes them feel welcome and safe.

2. Community members report differing experiences at OHSU based on protected characteristics, status, or position within the institution.

3. Community members perceive significant risks and few benefits from reporting misconduct.

4. Community members believe that OHSU does not hold people equally accountable for misconduct.

5. Community members perceive that OHSU tends to view reports of misconduct with skepticism and doubt.

Covington made the findings below, which flow from, contribute to, or exacerbate these cultural challenges. These findings are explained in greater depth on pages 24 to 40.

1. ***OHSU's actions and communications with respect to DEI, misconduct, and Human Resources ("HR") issues are sometimes misaligned with its stated values.*** Community members believe that OHSU sometimes fails to take meaningful action to further its values and commitments. Moreover, certain of OHSU's communications conflict with its values and commitments and fail to take into account the perspective of relevant stakeholders.

2. ***OHSU has not established clear DEI priorities, an institution-wide strategy to drive change, or policies that effectively address DEI.*** Personnel at OHSU's Center for Diversity and Inclusion ("CDI") have lacked an understanding of OHSU's DEI priorities, leading to a failure of execution. Without a clear and cohesive DEI strategy across the institution, diversity efforts have been siloed and disjointed. Furthermore, OHSU's Code of Conduct and other policies do not effectively address DEI.

3. ***OHSU's policies and procedures addressing misconduct and reporting are inconsistent and lack clarity and precision.*** OHSU's Code of Conduct and policies relevant to this review inconsistently address discrimination, harassment, and retaliation. OHSU also provides inconsistent guidance about how to report and investigate misconduct, its mandatory reporting policies and procedures are unclear, and its complaint investigation procedures lack sufficient detail and are applied inconsistently.

4. ***OHSU lacks a consistent process for addressing and documenting concerns about misconduct, resulting in employee dissatisfaction and disciplinary outcomes that are not always fully informed or effectively implemented.*** OHSU has not adopted a formal policy establishing a clear division of responsibility over misconduct complaints, which has led to dissatisfaction with the handling of complaints and mistrust of HR and OHSU's Affirmative Action and Equal Opportunity ("AAEO") function. In addition, OHSU has not maintained

3

EXHIBIT 1 TO ELLIS DECL. P. 5 of 51

adequate records or data related to complaints, dispositions, and employee departures, resulting in some disciplinary outcomes based on incomplete information.

5. ***OHSU has historically devalued and marginalized the HR function through its failure to provide it with sufficient resources, experienced leadership, or adequate authority.*** OHSU has not provided HR or AAEO with sufficient resources to address the volume of complaints they receive. HR has lacked experienced and sustained leadership and has been hampered by significant leadership turnover for more than a decade. HR lacks the authority to make binding disciplinary decisions. The inability of HR to implement discipline, and the ease with which its recommendations can be disregarded, marginalizes the function.

## Recommendations

OHSU also asked Covington to provide recommendations for addressing our findings, including modifications to policies or practices to ensure that everyone in the OHSU community feels safe reporting misconduct and has confidence that such incidents will be handled appropriately.

The final section of this report (pages 41 to 47) sets forth those recommendations. They can serve as a blueprint to drive positive change in creating a more diverse, equitable, and inclusive workplace while preventing misconduct, encouraging reporting, and appropriately responding to complaints when they arise. Covington's recommendations fall into three broad categories: Tone from the Top, Resources and Staffing, and Policies and Procedures.

### *Tone from the Top*

1. Affirm resolute commitments to diversity, equity, inclusion, and anti-racism.
2. Elevate diversity, equity, and inclusion throughout the institution by fully and cohesively incorporating these concepts into OHSU's policies, practices, and culture.
3. Strengthen accountability and ensure that all OHSU community members understand the importance of meeting the institution's expectations regarding conduct and culture.

### *Resources and Staffing*

1. Conduct a rigorous, competitive, and nationwide search for a highly qualified candidate for a Vice President ("VP") or Senior Vice President ("SVP") of HR, with relevant and sustained leadership experience, and ensure that this individual acts as a strategic partner to the executive leadership team, bringing professionalism to the HR function and supporting achievement of OHSU's DEI goals and objectives.[3]
2. Centralize HR functions so that all HR professionals across the institution ultimately report up to the VP (or SVP) of HR.
3. Provide HR and AAEO personnel who conduct investigations sophisticated mandatory training on investigative procedures, including Title IX procedures.
4. Restructure, increase, and diversify staffing in HR and AAEO.

---

[3] The term "executive leadership team" is used throughout the report to refer to OHSU's senior executive leaders who report to OHSU's President.

4

EXHIBIT 1 TO ELLIS DECL. P. 6 of 51

*Policies and Procedures*

1. Clearly define prohibited conduct throughout OHSU's policies and explain how the institution addresses such misconduct.

2. Revise and streamline reporting and investigation procedures to ensure more clear and consistent processes for reporting parties, mandatory reporters, and investigators.

3. Streamline the channels listed in policies and guidance documents related to reporting

4. Strengthen mandatory reporter provisions in all relevant policies.

5. Incorporate strong non-retaliation provisions throughout OHSU's policies, and communicate broadly the institution's prohibition on retaliation.

While many of the cultural challenges identified in this report are concerning, they can serve as a catalyst for significant transformation of OHSU's institutional culture. Guided by this report's findings and recommendations, OHSU has the opportunity to create a culture where all community members can thrive.

5

EXHIBIT 1 TO ELLIS DECL. P. 7 of 51

# Methodology

EXHIBIT 1 TO ELLIS DECL. P. 8 of 51

**Investigative Independence**

Covington has not previously represented OHSU.  The Human Resources Committee ("HR Committee") of OHSU's Board of Directors oversaw Covington's work.  The HR Committee and OHSU management did not impose any limits on Covington's work, other than specifying the issues within Covington's scope, as listed above.  Within those parameters, Covington alone determined which issues to investigate, what conclusions to draw, and what recommendations to propose.

**Investigation Components**

Covington began this independent review in spring 2021.  Covington undertook to understand OHSU's institutional culture by: (1) setting up a hotline through which community members could communicate directly with the investigative team; (2) conducting interviews of current and former community members; (3) convening anonymous virtual focus groups facilitated by Willis Towers Watson ("WTW"), a leading HR consulting firm; (4) reviewing documents and data provided to Covington by OHSU (including records of past complaints related to issues within scope of this review), and by individual interviewees, as well as publicly available information; and (5) engaging WTW to analyze OHSU HR and survey data.

Covington aimed to incorporate the observations and experiences of as many members of the OHSU community as possible.  We recognize that those who contacted our hotline or chose to participate in focus groups may disproportionately be those with experiences touching upon the issues germane to this review.  In some ways, this dynamic is inherent to the nature of a review where participation is voluntary.  When community members reported experiencing misconduct, we did not attempt to verify the accuracy of each report or to determine what happened in each case.  Instead, Covington used these reports to pursue areas to investigate and to distill themes relating to both OHSU's institutional culture and how OHSU has handled and responded to reports of misconduct.

We greatly appreciate the cooperation we received while engaging with community members from across OHSU.  OHSU's leadership actively encouraged community members to participate in our investigation and we received valuable support and input from a wide variety of individuals and functions across the institution, including physicians and other health care providers, the Legal Department, HR, AAEO and CDI, as well as union and Employee Resource Group ("ERG") leadership.

**Interviews**

Covington interviewed nearly 300 current and former community members who contacted us through the investigation hotline or whom we contacted to gather information.  We interviewed a number of people more than once.

***Hotline Interviews:*** In April 2021, OHSU announced to its community that Covington had established its own dedicated e-mail address, phone number, and mailing address (collectively, the "hotline") through which community members could contact Covington to share their experiences or perspectives related to OHSU's institutional culture.  Community members were notified about the hotline via several announcements through OHSU Now, OHSU's internal messaging system.  To further encourage participation, Covington contacted the leaders of all active Employee and Student Resource Groups.  Approximately 450 community members contacted the hotline.

***Additional Interviews:*** In addition to the hotline interviews, Covington contacted and interviewed 75 current and former employees across the organization, including the executive leadership team, the AAEO investigators, 18 HR professionals, CDI personnel, and dozens of other administrators and senior leaders.[4]  Covington also contacted representatives of all of the active ERGs and met with those who responded.  Additionally, Covington contacted the leadership of each major OHSU union: AFSCME Local 328, the Oregon Nurses Association, the House Officers Union, Graduate Researchers United, and the OHSU Police Association.  With one exception, leadership for these unions responded to this outreach and spoke with Covington.  Collectively, the union leaders with whom Covington met represent more than 8,000 employees.

***Confidentiality:*** Covington took steps to maintain the confidentiality of the information shared by community members.  Covington informed hotline interviewees that, upon request, it would protect their identity to the fullest extent permitted by law.  Covington also told other interviewees that if they wanted to provide certain information on a confidential basis, Covington would take steps to accommodate such a request.

**Focus Groups**

Covington retained WTW to facilitate seven anonymous online focus groups for community members and to analyze the results.  OHSU informed community members about the focus groups via multiple announcements on OHSU Now.  Covington also provided information about the focus group sessions to the union leaders with whom it had previously met and asked them to encourage participation by their members.

All 19,000 members of OHSU's workforce were invited to attend any of the five workforce focus groups.  To accommodate varying work schedules, the 50-minute sessions were held on four weekdays at different times in the day or evening.  A total of approximately 700 employees participated, which WTW considered to be a statistically representative sample size.  Charts comparing the demographics of the employee focus group participants and the OHSU community as a whole appear below.

| Gender | OHSU Population | Focus Group Participants |
|---|---|---|
| Female | 68% | 76% |
| Male | 32% | 18% |
| Non-binary | -- | 2% |
| Prefer not to say | -- | 4% |

---

[4] The term "senior leaders" is used throughout the report to refer to those at the VP level or above, and also to department chairs and heads of offices/components within the institution.

| Race/Ethnicity | OHSU Population | Focus Group Participants |
|---|---|---|
| White | 68% | 75% |
| Asian | 12% | 9% |
| Hispanic | 7% | 6% |
| Black | 3% | 5% |
| Native American/Pacific Islander | <1% | 2% |
| Prefer not to say/Unknown | 8% | 7% |

WTW also conducted two student focus group sessions, to which the entire student body was invited.  As with the workforce focus groups, the student sessions were held at different times to accommodate student schedules.  Only a small number of students chose to participate, however, and WTW concluded that the number of student participants did not provide a representative sample that could be included in WTW's focus group analysis.

The virtual focus group sessions were anonymous and conducted on a web-based platform that enabled participants to answer written quantitative and open-ended qualitative questions and see and react to each other's written responses.  Participants did not identify themselves and no information was collected that could identify individual participants.  Each workforce focus group began with a set of standard demographic questions which allowed WTW to analyze various aspects of OHSU's institutional culture, segmented by demographic groups such as race, gender, or job function.

**Document Review**

Covington collected and reviewed thousands of documents.  Covington obtained from OHSU documents and data relevant to workforce demographics and statistics; workplace policies and procedures relevant to this review; select personnel files related to employee hiring, promotion, discipline, or separation; select complaints from members of the community; and data from community engagement or climate surveys.  Covington reviewed more than a thousand complaints formally filed through OHSU reporting channels regarding misconduct within the scope of our investigation.  Covington also analyzed documents provided by individuals, publicly available materials, OHSU's website, and court filings.

**Labor Flow Analysis**

Using OHSU's Human Resources Information System ("HRIS") data for the entire OHSU workforce for the past five years, WTW conducted a labor flow analysis assessing racial and gender disparities in OHSU's workforce demographics, career progression and seniority, promotion, and attrition.  WTW evaluated data on hiring, promotions, representation in management positions, and terminations with respect to gender and race/ethnicity across the overall OHSU workforce as well as by job classification.

**Community Engagement Analysis**

WTW analyzed data from workforce engagement surveys OHSU previously commissioned to explore linkages between employee experience and job classification, race, and gender, among other variables.  The data set included two annual engagement surveys OHSU commissioned in 2018 and 2019 undertaken by healthcare survey company Press Ganey ("Press Ganey Survey") with 10,233 and 11,301 participants, respectively, and a 2018 Climate Survey conducted by OHSU ("OHSU 2018 Climate Survey") with 5,303 faculty, employee, and student respondents.  The survey questions addressed a broad range of topics, including diversity, engagement, safety, recognition, tolerance, and reporting.

# Background to Covington's Findings and Recommendations

### *A.B. v. Campbell*

In February 2021, an anonymous plaintiff, A.B., filed a lawsuit asserting various claims against OHSU and Dr. Jason Campbell, a former anesthesiology resident. In her Complaint, A.B. described numerous concerns about how OHSU handled the complaints against, and investigation of, former OHSU Head of Emergency Medicine Dr. John Ma and how OHSU handled concerns raised about, and the investigation of, Dr. Campbell.

As noted above, Covington did not attempt to verify the accuracy of each report and complaint it received. However, because A.B.'s allegations led to such significant concerns across the community and was one reason OHSU retained Covington to undertake this review, Covington conducted a more in-depth investigation into some OHSU-related issues raised in that lawsuit.

Certain of the issues raised by A.B. illustrate some of our broader findings, described below. For example, there is widespread consensus at OHSU that the institution did not appropriately handle the complaints against Dr. Ma. That investigation lasted more than a year and many people, including AAEO leadership, OHSU senior leaders, and other senior faculty, noted that the investigation took too long. As described below in Finding 5, this comports with our view that AAEO is understaffed and a widespread perception that complaints are not handled in a timely manner.

A.B.'s Complaint also raised issues regarding reporting concerns under OHSU's Complaints of Discrimination, Harassment, and Retaliation Policy (the "Mandatory Reporting Policy" or "Reporting Policy"). A.B. alleged that numerous individuals were required by the Mandatory Reporting Policy to report concerns raised by her and another individual about Dr. Campbell's conduct and failed to do so. At least eleven individuals at OHSU heard concerns about Dr. Campbell's conduct towards four women, but did not report those concerns for various reasons. As described in greater detail in Finding 3 below, however, OHSU's Mandatory Reporting Policy is not clear, did not necessarily apply to each of these situations, and had never been previously enforced. This report sets forth recommendations below for how the Mandatory Reporting Policy can be improved.

Once A.B. reported to OHSU about Dr. Campbell, AAEO conducted its investigation promptly, especially in light of additional allegations against Dr. Campbell that arose during the course of that investigation. A.B. decided not to speak with us, so we do not have the benefit of her perspective, other than from her complaint and other communications that were part of OHSU's file. From the evidence we did see, however, we believe that AAEO thoroughly and expediently handled the investigation of Dr. Campbell.

AAEO provided A.B., among others, with a draft report of its findings. Although that report was generally clear and cogent, in it, AAEO said that A.B. made a "false statement" in her AAEO interview regarding whom she had told about Dr. Campbell's misconduct and when. A.B. emailed AAEO and explained why she believed that characterization to be wrong and unfair, but AAEO did not change its characterization in its final report. Covington found that AAEO's "false statement" characterization was an overstatement.

A.B.'s Complaint also asserted that OHSU shamed her in connection with the reporting and investigations process. In connection with the issues concerning Dr. Campbell, we heard from four people who attended a meeting of senior leadership to discuss what discipline to impose on him that two senior leaders made statements that several people who were present described as "victim-blaming." One of those individuals has since retired and the other is no longer in a leadership position. As noted below, others also told us about

instances in which those who made reports of misconduct were doubted and their credibility was too reflexively called into question.

## Title VII and Title IX

By way of background and as a framework for best practices, the Equal Employment Opportunity Commission ("EEOC"), which enforces the prohibitions on discrimination in employment found in Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act, has issued Enforcement Guidance addressing the standards of liability for harassment by supervisors based on sex, race, color, religion, national origin, age, disability, or protected activity.  The Enforcement Guidance sets out best practices for investigating claims of harassment that are equally applicable to claims of discrimination, generally obligating employers to establish, publicize and enforce policies that are "written in a way that will be understood by all employees in the employer's workforce," and establish complaint procedures designed to encourage victims to come forward, by clearly explaining the process and ensuring there are "no unreasonable obstacles to making complaints." Employers are also directed to set up a process for a "prompt, thorough, and impartial investigation," whereby, if a fact-finding investigation is necessary, it is launched "immediately."   Investigators of complaints should be well-trained in the "skills that are required for interviewing witnesses and evaluating credibility."  Employers are also directed to make clear that immediate and appropriate corrective action, including discipline, will be undertaken whenever it is determined that harassment has occurred in violation of the employer's policy, and inform both parties about these measures.  Finally, employers are advised to keep records of all complaints.  Without such records, the employer could be unaware of a pattern of conduct by the same individual, which would be relevant to credibility assessments and disciplinary measures.

Title IX of the Education Amendments of 1972, applicable to universities, is enforced by the U.S. Department of Education's Office for Civil Rights, and protects students, faculty, and staff from discrimination based on sex in education programs.  A recent Title IX rule recognizes that sexual harassment, including sexual assault, is unlawful sex discrimination, and, similar to the EEOC Enforcement Guidance, calls for institutions to "promptly" respond to and "investigate and adjudicate formal complaints of sexual harassment using a grievance process that incorporates due process principles, treats all parties fairly, and reaches reliable determinations" concerning responsibility.  Trained Title IX personnel must conduct investigations and objectively evaluate all relevant evidence.  Additionally, institutions should have a consistent, transparent grievance process for resolving formal complaints of sexual harassment, treat complainants and respondents equitably, make materials used to train Title IX personnel available for the public to inspect, and include reasonably prompt time frames for conclusion of the grievance process.

The legal framework set forth by Title VII and Title IX is generally a reactive one, requiring assessment of conduct that has already occurred in order to determine whether law or policy has been violated.  This is distinct from efforts concerning diversity, equity, and inclusion, which are proactive and aspirational, and attempt to ensure that the employee population and student body include individuals of different races, ethnicities, gender identities, sexes, sexualities, abilities, and other protected characteristics; that those individuals are fully included in the community; and that all have the specific tools and support they need to be successful, given their different backgrounds and protected characteristics.  Employers and schools are not legally obligated to pursue DEI efforts, but the manner in which they do so provides important insight into their commitment to ensuring equal access to all.  As evidenced in this report, anti-discrimination and DEI are different concepts, and achieving goals for each requires different skill sets and a different focus, but they are not entirely

unrelated—a lack of confidence in how the institution is handling one can contribute to mistrust or lack of confidence in its efforts as to the other.

**Key Personnel Functions**

OHSU's "Central Services" include departments that provide critical services across the institution and are meant to offer coordinated support for employees and visitors. HR, AAEO, the Integrity Office ("Integrity") and CDI are all part of OHSU's Central Services and are relevant to the findings identified in this report.

## Human Resources

HR is responsible for supporting all employees across OHSU. The HR Department consists of approximately 130 employees who fulfill traditional HR responsibilities such as recruiting new hires, negotiating with unions, maintaining benefits and compensation, engaging in training and development, and mediating conflict. The HR Department employs 18 Human Resource Business Partners ("HRBPs") who serve as the bridge between HR and the missions—specifically between management and employees within their assigned client group—on issues related to staffing, employee and labor relations, leave administration, and performance management. As explained by several members of HR, HRBPs act as the first-line HR professionals for the client groups they support and are therefore often the first people to receive complaints from employees. As described more fully below, depending on the nature of a complaint brought by an employee, HRBPs either handle the complaint themselves or send it to another department to handle.

OHSU has alternated between decentralizing and centralizing HR functions. In 2009, during the recession, OHSU decided that each mission should fund its own HR personnel. In 2017, OHSU attempted to recentralize services such as HR, but this centralization is not complete. For example, HR support for OHSU's School of Medicine was only reintegrated into the institution-wide HR Department in March 2021. As of October 2021, OHSU still had 13 HR Managers "embedded" in specific departments rather than being housed in the HR Department. Although these embedded HR employees carry out HR functions, including complaint investigations, they work for, and are funded by, the department they support; they report to their department administrator; they are not trained or overseen by the central HR Department; and they do not necessarily follow the same operational standards as the rest of HR. The impacts of this decentralization continue to be felt across the institution, including in HR.

As further described below, HR also has gone through a series of leadership changes since 2009, when OHSU's VP of HR, Rick Bentzinger, left the institution. That role remained vacant for the succeeding five years, until 2014, when Daniel Forbes, who managed enterprise-wide employee benefits administration, was appointed VP of HR. In 2019, Forbes resigned abruptly in the midst of union negotiations when it came to light that he used a Twitter alias account to "like" and engage with anti-union posts by another OHSU employee using alias accounts on AFSCME Local 328's social media channel. This "trolling" incident damaged HR's relationship with AFSCME and the other unions at OHSU. As one longstanding HR employee noted, "trust was obliterated" between HR and the OHSU community. The event occurred in the midst of a hiring freeze, which caused OHSU to consider only internal candidates to fill the role of VP of HR. An executive leader at OHSU told Covington that no one within the HR Department was capable of filling the role; ultimately, Greg Moawad, former Head of Campus Safety at OHSU, was appointed to the role on an interim basis. Moawad was told the position would last six to nine months; however, due to the hiring freeze, he remained in the position for nearly two years, stepping

down in June 2021. Under Moawad's leadership, the HR Department was not expected to, and did not assess or seek to, address its own diversity.

In July 2021, OHSU appointed Serilda Summers-McGee, an external HR consultant, to fill the VP of HR role, again only on an interim basis. A month later, Summers-McGee proposed a reorganization of the HR Department designed to address staffing and structural issues within HR. Among other objectives, her reorganization plan increased the number of HRBPs and also initially called for the AAEO function, described in more detail below, to be disbanded and subsumed into HR with a new reporting line to the Director of Labor Relations. Further, the plan proposed a "ticketing" system that would assist with triaging complaints to the appropriate HR personnel. Summers-McGee's plan also included efforts to increase the diversity of the HR Department. Multiple members of HR and AAEO agreed that changes to HR and AAEO were warranted but, as described further in Finding 5, criticized the process for developing and implementing the plan.

### Affirmative Action and Equal Opportunity

AAEO is responsible for overseeing programs and procedures relating to affirmative action and Title IX, investigating complaints of discrimination and harassment for all employees and students, and assessing accommodation requests for OHSU employees. Over the years, AAEO, an independent office, has been housed in various areas within OHSU. In 2010, AAEO reported to the Chief Administrative Officer, who also served as the Chief Diversity Officer. With the departure of the Chief Administrative Officer in or around 2014, AAEO was placed under the Provost. In 2017, AAEO was moved to report to the VP of Campus Safety. When Moawad was appointed as the Interim VP of HR in October 2019, AAEO continued to report to him in that role and thus, it came under the umbrella of HR for the first time.

The August 2021 reorganization proposed to dissolve AAEO as an independent department and embed AAEO's functions further within HR. OHSU ultimately decided not to make this change, but the question of where to place AAEO in the OHSU organizational structure remains. Several executive leaders suggested to Covington that AAEO should be affiliated with CDI, though this does not necessarily comport with best practices, considering the differing objectives of the two functions and the widely accepted view, supported by the EEOC Enforcement Guidance and Title IX rules, that investigators who handle discrimination and harassment complaints should be neutral and independent, similar to a compliance function. For example, peer institutions have similar offices that often report up to the Compliance Department.

### Integrity

Integrity is located within the Legal Department and has eight employees. Integrity has three primary roles relevant to this review: (1) maintaining and revising the Code of Conduct and providing related training; (2) managing a 24/7 phone hotline available for making complaints concerning violations of the Code of Conduct or OHSU policies, including anonymously, and an Integrity inbox mailing system where complaints are sometimes submitted; and (3) in rare instances where HR and AAEO cannot investigate a complaint due to an internal conflict, conducting investigations. As part of managing the reporting hotline, Integrity is responsible for deciding which complaints received through the hotline will be directed, as an initial matter, to AAEO and to HR. Generally, Integrity sends the vast majority of the complaints it receives—reports of minor employee disputes and concerns—to HR, and reports of harassment or discrimination to AAEO.

**Center for Diversity and Inclusion (CDI)**

CDI is tasked with leading and supporting institution-wide initiatives to create an environment of respect and inclusion for all, and helping OHSU achieve its goal "to be a great organization, diverse in people and ideas." CDI started as the Office of Multicultural Student Affairs within the School of Medicine, serving as a resource for students. CDI has nine employees and is led by an anesthesiologist, Dr. Derick Du Vivier, who is also Senior Vice President and Chief Diversity Officer, reporting to the President of OHSU, Dr. Danny Jacobs. CDI's work is managed by three Program Managers, for Diversity Education, Diversity Student Recruitment and Retention, and Staff and Faculty Diversity Recruitment and Retention, the latter of which also sponsors the workforce ERGs. CDI has recently adopted an "Anti-Racism Plan," reflecting the work of members of HR and CDI, among others. In that plan, OHSU resolved to become a "truly anti-racist and multicultural institution." OHSU has launched several initiatives aiming to address its anti-racism objectives, including conducting institution-wide unconscious bias training and placing posters around campus condemning racism.

**OHSU's Complaint Reporting and Investigation Processes**

OHSU maintains four core policies and guidance documents that address the definition and reporting of the types of misconduct relevant to this investigation. The Discrimination, Harassment and Retaliation Policy ("Discrimination and Harassment Policy") defines various forms of misconduct, including discrimination, harassment, and retaliation, sets forth OHSU's prohibition on such misconduct, and describes member expectations with respect to refraining from engaging in misconduct. OHSU uses the Reporting Policy, described above, to explain the process for reporting on and investigating complaints of misconduct. OHSU's Respect for All Guidebook (the "Guidebook"), and related summary flyers (the "Reporting Cases Flyer" and the "Reporting Flow Chart"), are designed to inform the OHSU community about "how to recognize, confront and . . . prevent discrimination, harassment and bullying" and provide "resources for . . . responding to incidents of discrimination, harassment and bullying," and were described to Covington as tools for understanding OHSU's policies. OHSU's Code of Conduct "provides the guidelines and expectations for conducting business on behalf of OHSU." As noted in the Reporting Policy, community members can raise complaints or concerns about conduct that violates OHSU policies by contacting the Integrity Hotline; by contacting "any supervisor, manager, department head, faculty, executive or administrator most directly involved;" by contacting their HRBP; by contacting AAEO, the Office of the Provost, or the Department of Patient Relations; or by contacting the Department of Public Safety. The nature of the complaint typically determines who will handle it, as noted above. However, references to OHSU's many reporting channels are not consistent across policies and communications, which is described in more detail in Finding 3.

Once a complaint is made through one of these channels, an investigation is commenced, by either HR, AAEO, or, in rare cases, by Integrity. Although no single standard for investigation is followed in all cases, the policies that set out investigation overviews for HR and AAEO call for witnesses to be interviewed and documents reviewed. If a complaint is handled by HR, the HRBP often consults with the manager of the employee involved. Following investigation, an outcome is determined—that is, the complaint is either found to be substantiated or unsubstantiated. HR or AAEO then makes a recommendation as to how, if at all, the affected party should be disciplined. The supervisor of the affected person then makes the ultimate decision about what discipline, if any, should occur.

OHSU does not maintain reports of misconduct in a centralized database, and, as described above, different functions use different systems to track reports. For example, AAEO uses a

third-party platform called STARS, but complaints investigated by HR and Integrity are not maintained in STARS and neither HR or Integrity can access it.  Integrity uses a separate third-party platform, EthicsPoint, to receive and track reports that are initiated through the Integrity Hotline, but complaints that originate in and are investigated by AAEO and HR are not maintained in EthicsPoint, and HR staff that handle complaints cannot access it.  HR does not use a database; instead, individual HRBPs maintain complaint and investigation files on an ad hoc basis, typically only for the reports with which they are personally involved.

Around 2018, AAEO, HR, and Legal, in consultation with OHSU's executive leadership team and management, began drafting a Discipline and Remediation Guideline ("Disciplinary Matrix").  As described by the former Director of AAEO, Laura Stadum, the goal of the Disciplinary Matrix was to "create a singular vision around discipline" to bring consistency to discipline and accountability.  The Disciplinary Matrix itself states that it is a "tool to help managers in each of OHSU's missions evaluate and respond to employee performance problems and workplace issues in a fair and effective manner and to enhance transparency and the consistent applications of [OHSU's] expectations for employees."  The Disciplinary Matrix also requires that documentation of the discipline imposed by the manager be shared with HR.  Several members of the executive leadership team told Covington that at the start of 2021, when disputes over the appropriate level of discipline occurred between the manager and HR, Dr. Jacobs would step in and act as a "tie-breaker."

In the beginning of 2021, the Disciplinary Matrix was set to be widely rolled out to the institution and incorporated into the Code of Conduct, but this has not yet happened.  HR and AAEO leaders said that HRBPs have access to it and some appear to be using it, although not consistently.

# OHSU's Institutional Culture Challenges

**COVINGTON**

EXHIBIT 1 TO ELLIS DECL. P. 20 of 51

**OHSU Has Failed to Create an Environment Which Community Members Feel Values Diversity, Equity, and Inclusion and Makes Them Feel Welcome and Safe**

More than 60% of employee focus group participants said that they are proud to work at OHSU and plan to stay at OHSU for three years or more.  Participants also praised OHSU for communicating about diversity, equity, and inclusion issues.  But participants have not seen these communications result in actual change to the culture, and a only a small percentage (42%) of the focus group participants feel that OHSU actually values DEI.

As background, according to WTW's labor flow analysis, women, Hispanic, and Black or African American employees are underrepresented in OHSU's labor force compared with their representation in the Portland, Oregon healthcare labor force as of 2018, the most recent date for which this data is available, though the representation of female and Hispanic employees appears to be increasing (hiring is outpacing termination of employment for these groups).  Male, white, and Asian employees are more likely to be salaried than female, Hispanic, and Black or African American employees.  While promotion data reflects gender-proportionate promotions, male employees are slightly more likely to be supervisors than female employees when compared to the percentage of the OHSU labor force that they make up.  Furthermore, while promotion percentages are relatively close to active employee percentages for white, Asian, and Hispanic employees, the promotion percentage for Black employees has fluctuated over the years, with percentages significantly lower than the percentage of Black employees in both 2018 and 2020.  Lastly, when compared to the active employee population, white employees are more likely to be supervisors than are Hispanic, Black, or Asian employees.

Within this context, many community members also believe that OHSU has failed to create an environment in which all feel welcome and safe.  Sixty percent of focus group participants believe that OHSU treats patients and their families with dignity and respect; only 30% believe that OHSU treats its employees that way.  Moreover, only 42% of participants agreed that OHSU is committed to the fair treatment of all members of the workforce regardless of race, color, religion, national origin, disability, age, sex, LGBTQ+ status, or pregnancy status.  Two-thirds of focus group participants reported that they have witnessed and/or personally experienced unfair or differential treatment at OHSU within the last three years, and 41% indicated they have experienced and/or witnessed sexual misconduct at OHSU in the last three years.

The volume of hotline contacts describing misconduct reinforce the focus group data.  The hotline received hundreds of reports, with the largest number of reports describing issues of sexual harassment, gender harassment, bullying, and racial discrimination or relating to OHSU's failure to hold accountable those who commit these acts of misconduct.[5]  And the findings from Covington's review of community members' past complaints regarding misconduct within the scope of the investigation are consistent with the hotline reports: bullying, race discrimination, sexual harassment, and racial harassment were the most

---

[5] The following types of reports were made to the hotline: 48 Sexual Harassment; 45 Leadership or Accountability; 34 Gender Harassment; 33 Bullying; 25 Racial Discrimination; 23 Pregnancy or Motherhood Discrimination; 21 Racial Harassment; 15 Disability Discrimination; 13 Religion Harassment; 11 Sexual Orientation or Gender Identity Discrimination; 9 Disability Harassment; 8 Gender Discrimination; 8 Viewpoint Suppression; 4 Age based Discrimination; and 2 Sexual Orientation or Gender Identity Harassment.

frequent forms of misconduct that were reported by OHSU community members through OHSU's formal reporting channels over the period reviewed.[6]

**Community Members Report Differing Experiences at OHSU Based on Protected Characteristics, Status, or Position Within the Institution**

In many cases, reported experiences varied depending on community members' protected characteristics. For example, less than a third of all employee focus group participants said that OHSU is a place where they belong (31%), but less than a quarter of participants of color (24%) and LGBTQ+ respondents (20%) reported the same—a meaningful difference according to the WTW analysis. Additionally, an overwhelming majority of participants (83%) indicated that the culture at OHSU excludes or diminishes certain groups of people, with the highest number of participants indicating that the OHSU culture excludes women, people of color,[7] and people with disabilities.

More than half (54%) of female focus group participants agreed that OHSU's culture excludes or diminishes them; 37% of male participants believe that OHSU's culture excludes or diminishes women. Relatedly, 29% of female focus group participants indicated that they had personally experienced unwelcome or inappropriate sexual remarks or advances, requests for sexual favors, inappropriate gender-based remarks, or any other verbal or physical harassment of a sexual nature within the three years prior to participating in the focus group, and 12% of male focus group participants indicated having experienced similar sexual misconduct. The OHSU 2018 Climate Survey demonstrated that 40% of female survey respondents indicated they had experienced at least one form of sexual misconduct at OHSU in the five years prior to taking the survey, and, as of the date of the surveys, 56% of female respondents believed sexual misconduct was problematic at OHSU.

Reported experiences also differed on the basis of race and ethnicity. Approximately one-quarter (23%) of the focus group participants identified themselves as people of color, 80% of whom reported witnessing or personally experiencing unfair or differential treatment at OHSU within the last three years. An even higher percentage (89%) reported experiencing microaggressions, such as having colleagues underestimate their education level or job experience, assuming them to be younger or more junior than is the case, and failing to support their contributions in meetings. In addition, the percentage of people of color who reported that OHSU's culture excludes or diminishes them (75%) significantly exceeded the percentage of white employees who reported that OHSU's culture excludes or diminishes people of color (53%). Further, the Press Ganey Survey results analyzed by WTW demonstrate that Black or African American employees' workplace experiences declined from 2018 to 2019 at eleven times the magnitude of decline for white employees.

In addition, results from the OHSU 2018 Climate Survey demonstrated that 46% of Black or African American employees, and 37% of Asian or Pacific Islander employees, agreed with the statement "I have to work harder than my colleagues do in order to achieve the same

---

[6] The following types of reports were made through OHSU's formal reporting channels: 310 Disability Accommodation; 271 Bullying; 122 Race Discrimination; 80 Sexual Harassment; 69 Race Harassment; 51 Gender-Based Harassment; 40 Disability Discrimination; 34 Gender Discrimination; 31 Pregnancy Accommodation; and 29 Sexual Assault.

[7] Throughout this report, "people of color" is used to refer to participants in the focus groups who self-identified as Asian, Black, Hispanic, Middle Eastern and/or North African, Native American or Alaskan Native, or Pacific Islander.

recognition/rewards" as compared to 22% of white employees.  WTW's review of termination data also demonstrated that Hispanic and Black or African American employees are more likely to be involuntarily terminated compared to any other demographic category.  Hotline reporters raised concerns consistent with this data.  One hotline reporter indicated that colleagues who are non-native English speakers face greater scrutiny of their work and are staffed on less-desirable shifts.  Another interviewee asserted that a "Black employee with a 24-year-history at OHSU" and "no discipline history" was terminated for conduct that only resulted in a "coaching" when committed by a "white employee."

Many in the OHSU community believe that employment decisions such as hiring, promotion, and firing are made based on factors other than merit, such as connections, power, status, position, and influence in the organization.  As one executive leader described, "academic health centers have too much tolerance for brilliant jerks" and tolerate egregious behavior from those most well-respected professionally.  Consistent with this observation, only 21% of employee focus group participants agreed that hiring decisions at OHSU are based on merit, and only 16% agreed that career progression is merit-based.  A tiny percentage (4%) agreed that career paths at OHSU are clear and approximately three-quarters (77%) indicated that opportunities for advancement and growth at OHSU depend on who you know.  A member of OHSU's executive leadership team also raised this issue, noting that certain people are in roles "because they are well-liked with position leaders."

### Community Members Perceive Significant Risks and Few Benefits From Reporting Misconduct

Community members identified significant risks to, and few benefits from, reporting misconduct.  Only 37% of focus group participants indicated that they would feel comfortable reporting misconduct, and only 28% of participants who indicated that they had experienced misconduct actually reported it.

Focus group participants cited fear of retaliation, limiting career advancement, and general lack of trust as the primary deterrents to reporting misconduct.  Slightly more than half of the focus group participants (55%) indicated that they fear retaliation or other negative consequences from reporting, with participants noting fears of "personal backlash for reporting" and explaining that "the process tends to only make things worse for the reporter.  It would be career damaging and wouldn't prevent anything similar from happening again or to others."  Many people who contacted the hotline also conveyed that fear of retaliation and professional repercussions deterred reporting.  Further, the OHSU 2018 Climate Survey indicated that only 50% of the overall population agreed with the statement "If I were to make a report about discrimination, harassment or retaliation, OHSU would support me and protect my safety."  This number was even lower for Black or African American employees (38%) and employees with disabilities (33%).

While many people described examples of retaliation after making reports, such as receiving undesirable work projects or exclusion from important meetings, others cited retaliation fears even if they were not personally aware of examples of retaliation.  Although employees at many institutions fear retaliation for reporting misconduct, OHSU faces its own specific risks.  For example, job market dynamics such as the limited ability to transfer medical residency programs and OHSU's status as the only public academic medical center and one of the largest employers in Oregon could restrict the ability of some to seek alternative employment.  These factors may heighten the perceived risks from retaliation for reporting misconduct.  Describing the market dynamics, a medical resident remarked, "Residents are in many ways held hostage by the institutions they work for," and another physician asserted, "There's no other academic show in town."

Community members likewise see few benefits of reporting misconduct, and many expressed significant doubts that OHSU would appropriately address reports if they were made—indeed, only 14% of participants agreed that HR and AAEO appropriately address reports of misconduct. Nearly half of employee focus group participants (48%) indicated that they do not trust HR or AAEO to investigate or effectively address reports of misconduct, perhaps because only 8% of employee focus group participants agreed that HR and AAEO are adequately staffed and trained. Of those participants who did report misconduct they witnessed or experienced, only 14% felt satisfied with how their report was handled. More than 40 hotline reporters asserted that their formal complaints to OHSU were handled inappropriately.

Community members described several ways in which they believe OHSU inappropriately handles complaints of misconduct. First, they expressed reservations about HR's and AAEO's ability to maintain confidentiality. Thirty percent of focus group participants cited this reason as deterring their reporting of misconduct. Second, community members recounted a lack of visibility into the complaint investigation process and conveyed doubt that their concerns would be addressed in a timely manner. For example, two-thirds of respondents to the OHSU 2018 Climate Survey indicated that they did not "know what happens at OHSU when a report is made about discrimination, harassment, or retaliation." A focus group participant described receiving "[t]errible communication" from HR, which contributed to the decision not to report misconduct. Many community members were displeased with how long it took OHSU to investigate their complaints. Third, community members described HR as management-friendly and indicated this as a reason they were deterred from reporting experienced misconduct. For example, 51% of focus group participants said they believe the "function of HR and AAEO is to protect [OHSU]," not its employees. Many employees who contacted the hotline echoed this sentiment, with one observing that employees do not feel comfortable with HR handling issues involving management because HR is "on . . . management's side." As one HR leader noted, "I do think that the observations of HRBPs being more loyal to managers is an accurate one . . . For a young HRBP, you think this is how it is and you have to be that way, we are management and the employees are union."

### Community Members Believe That OHSU Does Not Hold People Equally Accountable for Misconduct

The widely-held belief that individuals at OHSU are not held equally accountable for misconduct also may deter reporting, reflecting a view that little will come from a report. Only 6% of focus group participants believe that individuals at OHSU are held equally accountable for misconduct regardless of their status, position, performance, or level within OHSU. Similarly, only 13% of focus group participants agreed that individuals are held equally accountable for misconduct regardless of their race, color, religion, national origin, disability, age, sex, LGBTQ+ status, or pregnancy status at OHSU.

When focus group respondents were asked in a free response question what OHSU could do to make it more likely for them to report misconduct, the most common responses related to accountability. Responses indicated a perception that there is no accountability and therefore it is not worth undertaking the risks of reporting misconduct; responses suggested that if reporting an incident led to some form of change such as punishment of those responsible, then respondents may be more likely to undertake the risks of reporting. For example, one respondent explicitly noted they would be more likely to report if OHSU "show[ed] that there are consistent consequences for individuals who are reported on so it feels like it's worth the risk of reporting," and another respondent declared, "I would like for OHSU to hold these people accountable." One executive leader described discipline as a

"real breakdown," remarking that OHSU has lacked "uniformity in how people are adjudicated within the institution, depending on where [the employee] sits and what [the employee's] job was." Another respondent noted, "I think physicians, who bring in the revenue for the organization, are given more chances to correct behaviors than others in the organization." Covington also heard that physicians "rule the world," as one focus group participant noted, and that those within the School of Medicine are not always held to the same standards of conduct. In addition, the OHSU 2018 Climate Survey demonstrated that only 44% of the overall population agreed with the statement "If someone were to report discrimination, harassment or retaliation at OHSU, it would result in a fair investigation." Less than one-third of Black or African American employees and employees with disabilities agreed with this statement. This perceived lack of equal accountability emerged in our review as a recurring theme.

**Community Members Perceive That OHSU Tends to View Reports of Misconduct With Skepticism and Doubt**

Many community members described the tendency for OHSU to doubt those who come forward and report misconduct, which deters others from reporting. One focus group participant remarked, "I have made reports in the past that were not taken seriously and I was forced into a meeting where I was told I was imagining the problem." Another participant noted, "I have reported a discriminatory report before and [HR] stated that it was not [discrimination], when in fact it was." Union leaders, managers, and faculty drew Covington's attention to this issue, describing their views that HR "gaslights" people. One manager told Covington that when she reported sexual harassment to AAEO, she was asked a series of questions about her clothing, which she understood as an effort by AAEO to see what she did to elicit the sexual harassment of which she was the victim.

# Investigative Findings: Issues Contributing to Culture Challenges

**COVINGTON**

EXHIBIT 1 TO ELLIS DECL. P. 26 of 51

Institutional culture is the product of many factors and addressing any individual issue may not remedy all cultural challenges. Below, however, we set forth findings, which we believe flow from, contribute to, or exacerbate the cultural challenges described above, relating to "tone from the top," institutional priorities and strategy, policies and procedures, complaint processes, and inattention to the HR function.

Multiple academic articles describe how these types of factors present challenges to an institution's culture. For example, a 2019 study by Sarah Jensen Clayton published in Harvard Business Review conducted a national survey of 1,000 full-time adult employees at companies with 500 employees or more. The study identified key factors that "together account for the majority of cultural risk" in the workplace. In response to the finding that one-third of survey respondents did not believe that their company consistently holds people accountable for misconduct, the study noted: "When employees are under the impression that there are no consequences, or that consequences are handed out unevenly, they may use it [] as a justification for not reporting poor behavior . . . ." The study also identified lack of diversity, equity, and inclusion in the workplace as a significant predictor of cultural risk. This finding is consistent with a 2020 McKinsey & Company report describing "over a decade of empirical research [that] shows that more diverse companies outperform less diverse companies" but "in order for a diverse workforce to flourish, companies must also enhance inclusion, or the degree to which employees are embraced and enabled to make meaningful contributions." In addition, a 2018 study of Gallup data found that "HR leaders play a central role in creating and sustaining the culture their organization aspires to have."

More specifically and as described in greater detail in the following pages, we find that:

1. OHSU's actions and communications with respect to DEI, misconduct, and HR issues are sometimes misaligned with its stated values.

2. OHSU has not established clear DEI priorities, an institution-wide strategy to drive change, or policies that effectively address DEI.

3. OHSU's policies and procedures addressing misconduct and reporting are inconsistent and lack clarity and precision.

4. OHSU lacks a consistent process for addressing and documenting concerns about misconduct, resulting in employee dissatisfaction and disciplinary outcomes that are not always fully informed or effectively implemented.

5. OHSU has historically devalued and marginalized the HR function through its failure to provide it with sufficient resources, experienced leadership, or adequate authority.

> ### Finding #1: OHSU's actions and communications with respect to DEI, misconduct, and HR issues are sometimes misaligned with its stated values

OHSU has in recent years expressed in its public statements a clear commitment to diversity, equity, inclusion, and anti-racism.  In "Vision 2020," the strategic plan adopted by the Board of Directors in 2014, OHSU resolved to "be a great organization, diverse in people and ideas."  The first goal of OHSU's current strategic plan, "OHSU 2025," is to "build a diverse, equitable environment where all can thrive and excel."  OHSU has also recently expressed a commitment to becoming a "truly anti-racist and multicultural institution" in its Anti-Racism Plan.  OHSU's Code of Conduct and the Discrimination and Harassment Policy assert a zero tolerance policy for prohibited discrimination and harassment; the Code of Conduct notes, "We do not tolerate harassment or bullying," and the Discrimination and Harassment Policy declares, "Any form of prohibited discrimination or harassment has no place at OHSU and shall not be tolerated."

Despite this clear public commitment, community members noted that some of OHSU's communications and actions are not aligned with the institution's commitments and policies.  Below are a few examples.

### Community members believe that OHSU fails to take meaningful action to further its values and commitments

Covington heard throughout its investigation that OHSU's pronounced commitments to DEI often do not correspond to meaningful action.  Focus group participants indicated that while they have seen more activity around DEI issues in recent years, the activity is "just words and not action."  This sentiment emerged as a key theme in the focus groups.  Several interviewees offered similar observations, particularly with respect to DEI initiatives.  One interviewee noted: "They say all the right things.  They write policies saying the right things.  But they don't do it."  Another senior leader remarked: "We need to start walking the walk.  No more talk.  We need to start doing stuff."

Many people, including some of OHSU's executive leaders, also criticized OHSU's failure to take action when employees, particularly high-profile or influential individuals, are accused of misconduct or found to have engaged in it.  One executive leader commented, "It appears we have a different set of standards [for high-profile individuals].  That is unacceptable."  Another executive leader took issue with the practice of "just talk[ing]" to faculty accused of misconduct: "The community can't withstand that philosophy.  People can either meet our standards or not work for OHSU."  Regarding highly-regarded or influential members, another senior leader noted: "OHSU claims to have a zero tolerance policy for certain behavior but then repeatedly tolerates this behavior."  Failure to undertake meaningful, decisive, and consistent actions related to DEI and issues of misconduct, especially for influential employees, undermines OHSU's stated commitments in these areas.

### Certain of OHSU's communications conflict with its values and commitments and fail to take into account the perspective of relevant stakeholders

OHSU has, at times, issued statements praising the contributions of high-profile or influential individuals, particularly physicians, who left the institution amid an ongoing investigation into credible allegations of misconduct or after OHSU found that they had engaged in misconduct.  Many community members expressed concerns with these statements.  One individual described one such statement as failing to address the "elephant in the room," namely that the departing employee, a physician, had engaged in sexual

harassment.  Another interviewee described the same statement as "push[ing] [the issue] under the rug" and "pav[ing] the way" for other misbehavior.  OHSU's senior leaders similarly took issue with these statements, referring to a statement issued in connection with the departure of another physician who was found to have violated numerous OHSU policies as "inappropriate" and sending the message that OHSU does not support those who come forward to report misconduct.

Laudatory statements such as these may explain why only 6% of focus group participants feel that OHSU holds people equally accountable for their conduct without regard for their status or position within the institution.  These laudatory statements undercut efforts OHSU may have devoted to investigating allegations of misconduct facing departing employees.  While confidentiality concerns may limit OHSU from offering detailed comments about certain personnel decisions, these statements contradict OHSU's stance on prohibited misconduct and may discourage reporting by suggesting that those found in violation of OHSU policy will nonetheless be praised on their way out rather than held accountable in any visible way for their conduct.

OHSU's response to several incidents involving nooses or noose images found on campus also illustrates the failure to engage with relevant stakeholders in a manner that furthers the organization's anti-racism pronouncements and DEI commitments.  At least four noose incidents have occurred at OHSU in the past five years.  These incidents include a noose being displayed in an employee breakroom in 2016; a noose found in OHSU's Lamfrom Biomedical Research Building in 2019; an employee posting an image of a noose in an internal online chat room in April 2020; and a noose being found in a construction site on the Marquam Hill campus in July 2020.

In August 2020, the Black Employee Resource Group ("BERG") wrote to OHSU's executive leadership asserting that "OHSU has dealt with 4 noose incidents and not one substantial action item has taken place. . . .  To make matters worse OHSU never prosecuted or terminated the employment of these perpetrators."  Before responding to BERG's letter, OHSU responded to media inquiries about the nooses.  Members of BERG remarked that this response "showed concern for media as opposed to what was going on."  The lack of engagement with affected stakeholders in responding to such incidents has undermined confidence in OHSU's commitment to anti-racism and DEI.

> **Finding #2: OHSU has not established clear DEI priorities, an institution-wide strategy to drive change, or policies that effectively address DEI**

### CDI personnel have lacked an understanding of OHSU's DEI priorities, leading to a failure of execution

To drive meaningful action, the institution must establish clear priorities and a strategy for executing those priorities.  However, CDI employees tasked with leading and supporting OHSU's institution-wide initiatives told Covington that they do not know what initiatives they should be leading and supporting.

Despite well-meaning intentions from CDI's leader, several CDI employees asserted that CDI lacks a strategic vision.  For example, one CDI employee could not explain CDI's purpose and had trouble describing its recent Anti-Racism Plan, calling it a "hodgepodge" and noting that it is "not really a plan at all."  This same employee expressed a desire for CDI to set enterprise-wide goals regarding DEI, noting "we should know what our goals are, what our five-year goals are, but we don't."  Another CDI employee noted that CDI should be a

strategic advice system that can move campus-wide initiatives forward, having touch points in every single unit and department at OHSU, but it currently is not fulfilling that role. A CDI leader noted that accountability for executing on OHSU's commitments regarding DEI does not lie with CDI. Instead, CDI is a support system for others in the institution undertaking DEI-related work.

Others indicated that the purpose of CDI is not clear, either within CDI or to the community. For example, a long-tenured CDI employee explained that before he started working for CDI, he viewed it as "an anomaly. . . I didn't know what it did." He noted significant room for improvement with respect to communicating CDI's role to the community. Another CDI employee highlighted the same issue, stating that as an employee, she avoided CDI and viewed it as "ineffective, bumbling, [a] jack of all trades [but] a master of none, [and] more presentation and performative." A CDI leader said that the community has the misimpression that CDI is focused solely on unconscious bias training. Several CDI personnel and ERG leaders described CDI as an organization tasked with "ask[ing] Black and Latino employees to go to events and show their face."

### *Lacking a clear and cohesive DEI strategy implemented across the institution, individual diversity efforts have been siloed and disjointed*

Covington heard repeatedly that OHSU lacks a clear DEI strategy, which should be established by CDI leadership and then executed consistently across OHSU. For example, there are a variety of different functions and roles across the institution that are school- and department-specific engaged in DEI efforts, including diversity navigators, diversity officers, diversity partners, and deans of diversity; but as a senior leader described, "There's too much stuff going on. All the initiatives, departments, the [CDI] office having a laundry list . . . I'm not sure how we're actively managing all of these things." Another CDI employee declared that "there are too many cooks in the kitchen." Although CDI employees described an effort by CDI to understand what these school- and department-specific functions and roles are doing, others noted that there has been very little cross-collaboration, emphasizing that CDI does not maintain adequate insight into activities across the institution. A CDI leader acknowledged that CDI has been unable to calculate how much OHSU spends towards DEI initiatives on an annual basis because of its lack of insight into activities across the institution. The lack of a vision and control over how that vision is being carried out negatively impacts OHSU's effective and efficient progress on DEI initiatives.

The failure of a centralized, institution-wide approach to DEI has resulted in an inability to maintain metrics against which to measure progress toward a diverse, equitable, and inclusive environment, for example, improving diversity in the workforce or specific departments within the workforce, or tracking retention and promotion of different demographic groups. One CDI employee explained simply that "systemically there has not been a mechanism to track quantifiable impact." Another stated that there is a lack of "vision" and few points of "connectivity" with ongoing projects—that is, OHSU is doing a lot with respect to DEI through school- and department-specific roles but there is no communication with CDI about this.

Without measurement on progress, it is easy to see why a perception exists that OHSU is not actively engaged or listening to its community members on DEI-related issues. As one focus group participant noted, the community wants "more action," not just statements about commitment to DEI. Similarly, internal hiring requirements and inability to hire from outside of OHSU have limited departments' abilities to hire diverse candidates. One HR employee noted, "I'm unable to hire external to OHSU until I don't know when. If we are trying to increase the diversity of the university and I'm only allowed to hire within the

university, we are not going to increase the diversity of the university. . .  I've had to do a lot of hiring and haven't had the recruiting support to hire diverse candidates."  Another high-level member of OHSU Health stated: "We couldn't increase diversity if we couldn't hire from the outside."

***OHSU's Code of Conduct and policies relevant to this review do not effectively address DEI***

OHSU's Code of Conduct lists diversity as a central framing principle in Dr. Jacobs's introduction to the document.  However, the Code of Conduct does not address DEI in sufficient detail, failing to provide a comprehensive statement of OHSU's approach to DEI or explain how these concepts are incorporated into policies and practices or woven into the culture more generally.  While the Code of Conduct lists diversity as a core OHSU value, the section on diversity, inclusion, and equal opportunity defines diversity in terms of anti-discrimination principles only.  The concepts of equity and inclusion are not adequately and consistently addressed.  The Code contains a few paragraphs related to diversity, but only a few stray sentences referencing a "culture" and "community" of inclusion, and the section on diversity, inclusion, and equal opportunity does not actually define or elaborate on the concept of inclusion at all.  Equity is not referenced anywhere in the Code of Conduct.  Proposed revisions to the Code of Conduct that are currently slated for adoption in late February 2022 attempt to weave concepts related to DEI into the text more generally, but they do not address all the issues identified in this report.

Beyond the Code of Conduct, no other OHSU policy contains sufficiently detailed information on DEI at OHSU so as to define its strategic purpose and goals.  For example, the Guidebook briefly references diversity and inclusion in the introduction but does not describe those issues, or how they are embraced, further in the main text.  The Anti-Racism Plan sets forth a basic outline for an approach to institutional anti-racism, but does not focus on the larger DEI strategy.  This underscores that OHSU effectively has no written roadmap describing its approach to DEI.

> **Finding #3: OHSU's policies and procedures addressing misconduct and reporting are inconsistent and lack clarity and precision**

***OHSU's Code of Conduct and policies relevant to this review inconsistently address discrimination, harassment, and retaliation***

Several OHSU policies contain unclear and differing definitions and examples of discrimination, harassment, and retaliation.  For example, the Discrimination and Harassment Policy contains incomplete and inconsistent descriptions of the full scope of conduct that can violate the Policy.  Recent revisions to the Discrimination and Harassment Policy (which are incorporated into other policies by reference) have added concepts such as microaggressions, misgendering, and racism in a definitions list, but these concepts are not otherwise woven into the policies, suggesting that they are an afterthought.  There is no explanation of whether these concepts are forms of discrimination or harassment or something different, and there is no mention of them elsewhere in the Discrimination and Harassment Policy or in any other polices.

Policies that would appear to cover all three concepts also vary significantly in how they refer to them.  For example, the Code of Conduct contains a specific section on "Harassment and Bullying," but makes no mention of discrimination.  Bullying is briefly defined in this section but not clearly connected to other related forms of misconduct; moreover, it does not appear

at all in the Discrimination and Harassment Policy. The Guidebook highlights discrimination, harassment, and bullying in its introduction, but bullying is referenced less than other concepts elsewhere in the Guidebook, making it unclear how that concept fits into the larger purpose of the document.

The concept of retaliation is also not given careful or consistent treatment. Retaliation is not addressed to the same extent as harassment and discrimination throughout the policies. For example, the Reporting Policy devotes several paragraphs to describing both the reporting and investigations processes, but there is only one paragraph addressing retaliation, which is not defined anywhere else in the Policy. The Discrimination and Harassment Policy defines retaliation, but the concept is not otherwise addressed or described (such as with examples) in the Policy (even though the Policy's full title is the "Discrimination, Harassment, and Retaliation Policy"), whereas discrimination and harassment are explicitly prohibited and expectations regarding non-discriminatory and non-harassing conduct are explained in detail. Similarly, two brief paragraphs describe retaliation in the Code of Conduct's reporting section without any examples, while other sections devote several paragraphs to various forms of misconduct, including examples of prohibited conduct and responsibilities for avoiding such conduct.

### *OHSU provides varying guidance about how to report and investigate misconduct*

Although it is optimal to provide more than one channel to report potential misconduct, OHSU's policies list an unusually high number of reporting channels. Moreover, those channels are inconsistently described across OHSU's policies and communications to its community giving rise to confusion. As reflected in the table on the following page, the Reporting Policy lists three channels for reports of Title IX issues and eight different channels for non-Title IX matters, including two of the three channels listed for Title IX reports. Although the Code of Conduct identifies the Integrity Line as a means to report all issues covered by the Code of Conduct, the Integrity Line is listed as an option for Title IX complaints, but not other complaints, in the Reporting Policy. The Guidebook lists two other, different sets of reporting channels. One section of the Guidebook, titled "Responding to Discrimination and/or Harassment," lists eight reporting channels. A later section of the Guidebook called "Reporting" includes these channels, plus three others. The Guidebook also has a "Responding to a Report or Accusation" section, which directs someone who learns about an issue to encourage the affected party to report to AAEO and does not mention any alternative reporting channels. These three sections of the Guidebook are separated from one another by other policies addressing other topics, making the guidance on reporting especially difficult to follow.

| | Reporting Policy (Title IX reports) | Reporting Policy (Non-Title IX reports) | Code of Conduct (Title IX and non-Title IX complaints) | Guidebook ("Responding to Discrimination and/or Harassment" sections) | Guidebook ("Reporting" section) |
|---|---|---|---|---|---|
| AAEO | ● | ● | ● | ● | ● |
| Title IX Office | ● | ● | | | ● |
| Integrity Hotline | ● | | ● | ● | ● |
| Integrity Office | | ● | ● | ● | ● |
| Any supervisor, manager, department head, faculty, executive, or administrator most directly involved | | ● | | | ● |
| Supervisor or manager | | | ● | ● | ● |
| Any high-level authority, such as a department head/chair or area lead | | | ● | ● | |
| Any academic or administrative official | | | | | ● |
| The Administrator on Duty | | | | | ● |
| Human Resources | | ● | ● | | ● |
| Human Resources business partner assigned to your department or education program | | | | ● | ● |
| Office of the Provost | | ● | | | |
| Department of Patient Relations | | ● | | | |
| Department of Public Safety | | ● | ● | ● | ● |
| Legal | | | ● | ● | |

Perhaps not surprisingly, almost half (45%) of focus group participants indicated they did not "understand the methods for reporting concerns pursuant to the Reporting policy" and 55% of focus group participants did not agree that "OHSU effectively publicizes the Respect for All [Guidebook]." The high number of additional OHSU resources and tools designed to clarify and guide reporting may exacerbate this confusion. For example, the AAEO page on the OHSU website contains tabs called "Responding to Concerns" and "Policies and Resources," both of which contain numerous hyperlinks to overlapping policies, guides, flyers, and other webpages addressing misconduct reports and investigations. The AAEO website also includes links to policies with reporting or investigation provisions that appear to be outdated and/or no longer in use. Further, OHSU maintains a Respect for All mobile app that can be used to make a report, but which is oriented towards sexual misconduct rather than the broader range of misconduct detailed in various policies and AAEO publications/platforms.

Anti-racism posters recently posted around the OHSU campus present another recent example of inconsistent information about reporting channels. The posters contain the important message: "OHSU does not tolerate racism or discrimination of any kind." The posters also state that "Employees can contact their manager, the administrator on duty or Social Work via SmartWeb." Of those three options, only reporting to a supervisor is specified in the Reporting Policy. The Reporting Policy does not mention reporting to the administrator on duty or "Social Work," and Covington was told that these are not accurate reporting channels. The poster further states: "Regardless of how you decide to respond to

an incident in the moment, report the situation to Affirmative Action and Equal Opportunity," suggesting that AAEO is a preferred or predominant reporting channel. The other reporting channels that are specified in the Reporting Policy or other policies are omitted entirely from the poster.

Even members of the executive leadership team recognized that there is a lack of reporting awareness among the community, stating that reporting is "unclear." Long-standing HR personnel noted that "some [community members] are not sure which [reporting options] to use and others might use them all." Hotline reporters also relayed similar confusion. One reporter stated, "I wasn't aware I could make a report and ask that it be investigated." Another reporter remarked, "I think it's really hard for people to understand where to report." An Integrity Officer also made a striking point, stating that after the confusion about reporting comes the confusion about who should be "holding the ball" on the complaint, an issue described more fully in Finding 5.

### *OHSU's mandatory reporting policies and procedures are unclear and conflict with one another*

Community members are unclear as to who is a so-called "mandatory reporter" under the Reporting Policy—i.e., a person with an obligation to report certain potential misconduct that they witness or hear about. Even those who are closest to the Policy, such as the former AAEO Director, Stadum, and the current Deputy General Counsel in charge of employment issues, Emily Shults, acknowledged that the policy does not provide clear guidance regarding reporting obligations in various complex circumstances. These leaders also told us that the Policy has never been formally enforced, meaning individuals have not been disciplined for failing to report pursuant to the Policy.

The Reporting Policy contains only one line about supervisors' obligation to report and elevate misconduct, in a context that is confusing. Under the heading "Reporting a Concern," the Policy lists several "reporting avenues" for those who have complaints to report, including "[a]ny supervisor, manager, department head, faculty, executive or administrator *most directly involved*" (emphasis added). The Policy then goes on to instruct that "[a]ny person or department listed above" [i.e., in the prior list of reporting avenues] "who receives a complaint shall promptly notify the AAEO department, Title IX coordinator, or Human Resources of the Complaint." The structure of the Policy suggests that only the supervisor, manager, department head, faculty, executive, or administrator "most directly involved" has a reporting obligation, and not others who may know about the conduct but are not "most directly involved." Moreover, the phrase "most directly involved" is not defined, nor does it appear in any other relevant policy. Many employees, including those closest to the Policy, as described above, reported that they read the Policy to mean that only those with direct supervision over the employees involved in a misconduct situation have a reporting obligation.

The mandatory reporting language in the Reporting Policy also differs from the Guidebook. The Guidebook contains a separate "Mandatory reporting" section (confusingly appearing at the end of the Guidebook, several pages past the "Reporting" section) with a more explicit description of the obligation and no reference to supervisors "most directly involved." Later in the Guidebook, the "Reporting Flowchart" includes a more broadly worded "reminder" to "faculty and staff, including supervisors, managers, and leads" that "if someone reports prohibited sex or gender discrimination or harassment, including sexual violence, to you, you must report the incident(s) to AAEO or the Title IX Coordinator." This directive is not limited to those "most directly involved." OHSU also maintains a separate "Respect for All" document, the Reporting Cases Flyer, titled, "Reporting cases of prohibited discrimination,

harassment, sexual misconduct, sexual assault/violence, stalking, and retaliation" that describes the mandatory reporting obligation in clearer terms than the Reporting Policy and without reference to the supervisor "most directly involved." It is not clear, though, how the Reporting Cases Flyer, which is hyperlinked on several of OHSU's webpages and described as a tool for community members to assess reportable conduct, is disseminated throughout the institution or how widely it is known. It is not part of the Guidebook or hyperlinked in the Guidebook or any other policy. And as noted above, the Guidebook and flyers were described to Covington as "tools," as distinguished from policies.

The Reporting Policy is unclear in other ways. It does not clarify whether it applies to potential misconduct that occurs outside of OHSU's campuses or to incidents in which the perpetrator is an OHSU community member, but the victim is not. As explained above, the Policy requires certain listed categories of employees who "receive[] a complaint" to promptly notify AAEO/HR/Title IX, but does not define "complaint," presenting the question whether information about misconduct, not in the form of a "complaint," must be reported. The Reporting Policy does not explain whether a potential mandatory reporter should consider victim preferences regarding whether, and to whom, a report should be made. And finally, the Policy does not address whether a mandatory reporter must act if the reporter understands that AAEO already knows, or will soon know, about the incident.

These gaps became evident in connection with allegations against Dr. Campbell. In addition to six OHSU employees who were aware of allegations of sexual misconduct by Dr. Campbell, and whom A.B. claimed did not report what they learned, we identified at least five other employees who may have known about possible misconduct by Dr. Campbell but did not report those allegations. After reviewing the Policy carefully, and interviewing each of these individuals or reviewing evidence from OHSU's file, Covington concluded that only one individual violated the letter of the Policy because she was Dr. Campbell's direct supervisor and, despite being aware of allegations of improper conduct by Dr. Campbell towards four women, including A.B., did not report any of these allegations. She instead independently assessed and addressed these individual situations. In April 2021, OHSU removed this individual from her supervisory position.

As described by those closest to the Policy, and as suggested by the Reporting Cases Flyer, the Policy was intended to require every OHSU supervisor or manager to report all misconduct relating to discrimination or harassment involving any OHSU community member. These groups are supposed to report no matter how they learned of the misconduct or whether the victim urged them not to report, and then have those with training, expertise, and potential to see the broader picture determine whether or not the misconduct needs to be investigated. However, five individuals, who are OHSU supervisors, managers, or faculty but not necessarily "most directly involved" as either direct supervisors of or faculty for the parties involved, did not report allegations they heard about Dr. Campbell. They said this was in part because they believed the victims were going to report the misconduct themselves, or because they wanted to leave the decision regarding whether to report up to the victims themselves, and they thought they were being told as a "friend," not as an OHSU employee, about "off-campus" conduct.

### OHSU's complaint investigation procedures lack sufficient detail and are applied inconsistently

The investigation procedures for HR and AAEO lack sufficient detail. For example, the AAEO Investigations Protocol, which attempts to describe the investigations process AAEO investigators are meant to follow, lacks details on key topics, such as best practices for interviews or for explaining the investigation process to reporting parties at the outset of the

investigation.  The Protocol also does not clarify whether it applies only to AAEO investigations or if it also applies to joint investigations with HR (or investigations conducted by others at OHSU).  The scope of conduct investigated pursuant to the AAEO Investigations Protocol is also unclear.

The HR Investigations Process Summary, which attempts to describe the investigations process to be followed by HRBPs, similarly lacks detail.  It does not discuss key investigation best practices, such as taking an initial complaint, interview practices, or explaining the process to reporting parties at the outset of an investigation.  Some HR personnel who are responsible for conducting investigations said that they were not aware of OHSU's investigations procedures and thus had not followed them.  For example, when asked whether HR follows investigative procedures, an HR Business Partner asserted, "No, unfortunately, and I have never received training on how to do investigations."

The investigations procedures do not detail how complaints should be reviewed and assigned for further investigation as among HR, AAEO, Legal, or other departments, or describe the process only in general terms.  For example, the AAEO Investigations Protocol states that upon receiving a complaint, AAEO should "[t]riage the complaint to determine whether the matter should be prioritized as a 'high level' matter more appropriate for investigators who have significant experience, in-depth Title IX or civil rights training and expertise to address the more complex and high risk matters," but gives no demonstrative examples or further explanation as to how this should be determined.  The HR Investigation Process Summary states that HR will "resolve Code of Conduct complaints and some complaints of Discrimination, Harassment and/or Retaliation," and AAEO "investigates the majority of complaints regarding Discrimination, Harassment and/or Retaliation."  It also explains that HR and AAEO will occasionally work together on investigations, but it does not provide any details concerning when that may happen.  This lack of consistency in process may in turn create inconsistent outcomes in responding to and investigating complaints across the institution.

OHSU also has not effectively shared information on the investigations process with the greater OHSU community.  In fact, two-thirds of respondents in the OHSU 2018 Climate Survey reported that they did not "know what happens at OHSU when a report is made about discrimination, harassment, or retaliation."  A lack of transparency about what happens when a report is made can contribute to a perception that the investigating body is ineffective.  For example, as noted above, 86% of the focus group participants who indicated that they reported misconduct to OHSU stated that their complaint was not handled effectively.  When asked what AAEO and HR could do to better support those who report misconduct, participants suggested increasing transparency about the complaint process.  One participant explained that HR and AAEO need to "[p]rovide updates on the process and keep the lines of communication open."  Another participant reported that they received "[t]errible communication" from HR, which contributed to their decision not to report.

 The Reporting Policy contains a cursory overview of investigations but does not include clear and standardized reporting protocols or provide reporting parties with sufficient information to understand what will happen during an investigation.  OHSU maintains an additional informational flyer about investigations on the AAEO website ("Investigating Discrimination, Harassment, and Retaliation Complaints"), but it is unclear which investigations the document applies to, it is not referenced in any other policy, and it is not clear whether it accurately reflects the investigations process.

Compounding this issue, hotline reporters indicated that they did not consistently receive clear or accurate information about what to expect in the course of an investigation from

supervisors, HR, or AAEO personnel in terms of timing, process, or communications.  For example, one reporter said that she was told that she would receive biweekly updates regarding her sexual assault complaint and she received none.  Another hotline reporter indicated that HR informed him that his complaint had been referred to Public Safety for investigation but Public Safety later told him that it had never been notified of his complaint.  Another hotline reporter, who had been accused of sexual misconduct, remarked that she was not informed of the allegations against her or the outcome of that investigation.  An individual who reported sexual misconduct indicated that the lack of communication from investigators prevented her from taking necessary precautions when her abuser was informed of the allegations.  Although there may be confidentiality concerns restricting the ability to discuss specific complaint outcomes or disciplinary decisions with complainants, reporters should understand the process that will be followed to investigate their concerns and be kept informed of the status and outcome of the issues they raised.  In fact, Title IX and EEOC guidance note that it is best practice for both parties to be informed of the investigation's progress.  In sum, hotline reporters' experiences suggest that community members receive incomplete and, at times, conflicting information about how reports are investigated and what to expect in the process.

> **Finding #4: OHSU lacks a consistent process for addressing and documenting concerns about misconduct, resulting in employee dissatisfaction and disciplinary outcomes that are not always fully informed or effectively implemented**

### *OHSU has not adopted a formal policy establishing a clear division of responsibility over misconduct complaints, which has led to dissatisfaction with the handling of complaints and mistrust of HR and AAEO*

OHSU's AAEO and HR departments appropriately see each other as distinct bodies, but in practice, due to the lack of a clear, formal demarcation between them, they have several overlapping responsibilities, particularly with respect to employee relations—that is, the handling of employee complaints and accommodation requests.  This confusion has led to the misidentification and mishandling of some misconduct complaints and accommodation requests.

AAEO's current inclusion within HR contributed to the development of some overlapping responsibilities between AAEO investigators and HRBPs, particularly the handling of employee complaints.  AAEO investigators, who have legal training, are meant to handle investigations into issues relating to harassment, discrimination, and retaliation for both employees and students, consistent with OHSU's responsibilities under Title IX.  HRBPs, consisting of HR professionals with no legal training, in theory handle more routine personnel complaints involving issues such as attendance, performance, or labor relations, and strictly deal with employees, not with students.  In practice, however, the lines are not so clear.  At similar universities, AAEO and Title IX offices are usually separate and distinct from HR departments, and are sometimes housed in Compliance offices.

As more fully described in Finding 3 above, there is no written policy that clearly delineates when complaints should be investigated by one body or the other.  The lack of a formal policy establishing a clear division of responsibility leads to a lack of consistency in how complaints are actually assigned.  HRBPs are often the first to formally receive employee complaints that are not reported through the Integrity Hotline and are tasked with identifying the type of complaint and triaging complaints appropriately, including escalating discrimination and

harassment complaints to AAEO.  However, numerous interviewees reported that HR is not sufficiently trained on how to accurately identify these types of complaints.  HRBPs themselves acknowledged this.  One noted, "It would have been great if I could have been able to learn how to be an HRBP.  I never had any formal training."  Another noted, "A lot of my training was on the job.  I think I attended one investigatory meeting and was leading my own [investigations] after that."

These concerns were echoed by several reports from AAEO employees that HR had misidentified discrimination and harassment complaints and therefore failed to send them to AAEO for investigation.  Instead, HRBPs, who do not generally have the same level of investigations expertise as AAEO employees, investigated these complaints.  An HR leader recognized their lack of expertise, noting that "[t]here were times when I would have preferred if AAEO took the lead on the investigations."

The lack of clear demarcation of responsibility means that similar reports may be handled differently—indeed, by entirely different departments—and result in inconsistent outcomes. This inconsistency, as noted elsewhere, contributes to a lack of trust in the process.

### OHSU has not maintained adequate records or data related to complaints, dispositions, and employee departures, resulting in some disciplinary outcomes based on incomplete information

OHSU does not maintain a centralized database to house reports of misconduct and, as described above, different functions use different third-party systems to track reports.  When Covington asked for records of historic complaints, one HR employee shared that she needed to "go into the office and [manually] pull out files."

The lack of a centralized database creates significant risk that complaints are not processed or are lost.  This may explain a number of hotline reports from individuals who said that they never received a response to their reports of misconduct.  Such a risk is exacerbated by the understaffing of HR described below.  It is especially acute when an HR employee leaves the institution, as they must manually "hand off" complaint files to their colleagues.  The lack of a centralized database also increases the risk that disciplinary outcomes will not account for an actor's past misconduct.  For example, a physician was repeatedly disciplined for misconduct, but because not all of those incidents were documented in a centralized file, AAEO could not factor in all of the physician's prior misconduct when making disciplinary recommendations.  An HRBP acknowledged, "If there's an official discipline, that would be in [an] official personnel file, but there are lots of things that don't rise to the level of discipline.  The 20 'coachings' about a variety of issues don't get captured . . . it's just been too much for too long, not having a central system, things fall through the cracks."

OHSU also does not consistently track demographics of reporters, victims, or perpetrators of alleged misconduct.  For example, in its review of complaint files from 2018 through early 2021, Covington was able to identify the race of the reporter, the victim, and/or the perpetrator in less than 20% of case files, and there is no evidence that OHSU uses its HRIS data for this purpose.  Over a quarter of these files did not clearly identify the gender of the reporter or the victim.  This lack of tracking makes it is more difficult for OHSU to identify trends based on protected characteristics, such as whether community members of color are the disproportionate reporters or victims of certain types of misconduct.

The lack of data also makes it difficult to track key investigation metrics.  In about half of the complaint files, Covington was unable to determine the date the associated investigation closed and therefore was unable to determine how long it typically took OHSU to resolve

complaints, or whether any disparities in investigation length existed as between different types of reports. Furthermore, for the complaints Covington could determine had been closed, nearly half of them did not indicate a clear investigation outcome. The lack of data on this latter point means that OHSU cannot determine whether any disparities exist between the discipline assessed for perpetrators in different demographic categories, such as whether community members of color or community members in lower-status job categories are subject to harsher discipline than their white or higher-status colleagues.

OHSU also does not sufficiently document the reasons that individuals leave the institution in its files. For example, OHSU tracks the general reasons people leave OHSU through a set of categories or codes such as "Resignation – In Lieu of Termination" or "Resignation – Job/Organization Dissatisfaction;" however, the files of separated personnel do not include documents, such as exit interview notes or other survey documentation, sufficient to establish precisely what caused the employee to leave. This lack of information makes it difficult to assess trends in disparate treatment or experiences that lead to departures which OHSU may wish to address.

> **Finding #5: OHSU has historically devalued and marginalized the HR function through its failure to provide it with sufficient resources, experienced leadership, or adequate authority**

### *OHSU has not provided HR with sufficient resources to address the volume of complaints it receives*

The size of OHSU's HR Department has not kept up with OHSU's steady employee population growth; in fact, the size of the HR Department has decreased in recent years. In 2017, more than 16,000 OHSU employees were supported by 19 HRBPs. On average, each HRBP supported about 846 employees. A number of HRBPs have left the organization since then, but those positions have not been promptly filled, in part due to budget concerns arising from the COVID-19 pandemic. Today, OHSU has more than 19,000 employees, supported by only 18 HRBPs. Each HRBP now supports between 1,100 and 1,400 employees, which an HRBP described as an "untenable number." These figures are significantly higher than industry benchmarks. According to a nationwide 2020 benchmarking report on the design and structure of the HRBP role, the average number of employees assigned to an HRBP was 207, with a range of 83 to 572 employees per HRBP. Using this benchmark, OHSU should have three to four times the number of HRBPs it currently employs to adequately support its employee population. The proposed HR reorganization plan discussed elsewhere in this report calls for the hiring of more HRBPs, and we understand that the plan, as envisioned, even without additional HRBPs, would reduce the number of employees supported by each HRBP to approximately 800 employees. This reduction is critical but still leaves each HRBP supporting significantly more employees than industry benchmarks would suggest is ideal.

Every HR member interviewed noted that HR is understaffed and that the HR Department headcount has always felt "extremely light" compared to the heavy volume of work. Notably, former VP of HR, Moawad, felt that HR was "unmanageable" as the volume of work was "unbelievable" and the team was "short staffed." Moawad explained that this left HR in a constant state of "firefighting." As one HRBP recognized, "If you are surplus staffing, you have enough time and mental space to improve things, but with [the] way we've been [staffed], we've been hanging on by seat of our pants." Several HR employees noted that they have "asked for more staff" but that the request has not been fulfilled.

AAEO, like HR, does not have enough staff to adequately fulfill its responsibilities. The caseload handled by AAEO has increased significantly over recent years, but the size of the department has not grown with it. In 2017, AAEO had 10 staff members and 457 reports and requests, resulting in a caseload of approximately 46 reports per AAEO employee. By 2020, AAEO was handling over 800 reports, including accommodation requests and civil rights matters, or matters into prohibited discrimination and harassment based on any protected class, but the number of employees remained the same, increasing the caseload to approximately 81 reports per AAEO employee. AAEO's case management system projects that ratio will increase even further in 2021.

Every AAEO employee who spoke with Covington noted that the AAEO Department is not adequately resourced and staffed to properly carry out its mission. One employee noted that AAEO has "always felt understaffed" due to the increasing caseload. As with HR, AAEO personnel have also proposed staff expansions, to no avail. In June 2021, Stadum submitted a proposal to Moawad and Dr. Jacobs, requesting an increase in AAEO staffing, but the proposal was not implemented.

Additionally, AAEO's handling of accommodation requests is one example of an area of responsibility that does not properly belong within AAEO's scope. This arrangement is a departure from industry norms, where employee accommodation requests are typically handled by HR, not the office investigating discrimination and harassment complaints. In fact, as one AAEO employee explained, handling accommodation requests and conducting investigations are "contradictory work" and do not complement each other, since the failure to properly accommodate a reasonable request or implement a reasonable accommodation are actions that could themselves give rise to complaints and investigations of potential violations of the ADA.

These staffing constraints are felt by the community, with only 8% of focus group participants believing that HR and AAEO are adequately staffed. Additionally, over two-thirds of the focus group participants who reported misconduct and many hotline reporters felt that their complaints were not handled appropriately as to timing, communication, or attention, resulting in a lack of trust of HR. Report mishandling can be caused, at least in part, by the volume of complaints these employees are managing. As one HRBP noted, "there's not enough" HR professionals responsible for the School of Medicine making it inevitable that those professionals "will fail." There are also other factors, aside from resources, that have contributed to HR's complaint mishandling. For example, several community members reported that HR had failed to maintain confidentiality over their report. This type of mishandling can be attributed to a lack of clear and consistently applied procedures regarding complaint handling and insufficiently experienced or trained investigators handling complaints of misconduct, as reflected in Finding 3 and Finding 4, respectively.

The community's confidence that complaints will be appropriately handled impacts the community's likelihood of reporting the misconduct in the first place—in other words, people need to feel like there are net benefits to speaking up in order to do so.

***HR has lacked experienced leadership and has been hampered by significant leadership turnover for more than a decade***

Over the past decade, OHSU has not handled the chief HR position in a manner consistent with the position's importance.

As described above, there has been a high level of turnover in HR leadership. One HR leader stated, "We've had no effective leader for a decade, that's one of the problems with HR." This has been particularly significant when, as described by a long-tenured HR leader, "if you are a new VP of HR, it will take you six months to figure out the organization, how it is structured, and how to get stuff done."

Moreover, the last three heads of HR have lacked broad-based, enterprise-wide, sustained HR leadership experience prior to assuming the role. Forbes had a background principally in compensation, awards, and benefits, and lacked experience in other HR areas, including employee relations. He was described by HR employees as having a "deficit in his knowledge of HR." Moawad is an attorney with a background in law enforcement; HR employees described him as a good supervisor and leader but, as even he recognized, he had no training in HR before assuming the position. Summers-McGee has held multiple HR roles and positions over the last decade since entering the field, but for the last five years has served principally as a consultant. As an HR leader described, "It is odd that we have hired a consultant [who] is acting like a consultant rather than the VP of HR, but with all of the power of the VP of HR. A consultant says here is what you do, then goes away, so it's a strange dynamic to give someone who is a consultant the power of a VP." Another HR employee explained, "She's got no skin in the game. She can give recommendations, drop the mic, and walk out and she gets no collateral damage."

Indeed, OHSU ceded extraordinary authority to Summers-McGee, considering her short tenure at the institution, allowing her to execute a significant HR reorganization plan with limited oversight. Operating under this broad power, Summers-McGee developed the plan without meaningfully consulting some of those most knowledgeable about the issues at stake or the structure of OHSU's HR function, including Moawad or members of HR management, who confirmed this to Covington. As described by an HR/AAEO manager: "The plan [] didn't seek to find any sort of buy-in" from HR or AAEO personnel and called for HR and AAEO personnel to "reapply" for new positions with the reorganized structure. Failure to take feedback from knowledgeable stakeholders resulted in a plan that was not fully informed; according to interviewees, the proposed structure showed a lack of understanding of the roles of key HR functions at OHSU and how they relate. For example, while AAEO currently sits within HR, the reorganization would have further entangled the two bodies, inconsistent with best practices which call for maintaining the independence and neutrality of AAEO or similar investigative entities.

Over the past 12 years, OHSU has not devoted time and resources to ensuring that HR is led by an effective and experienced leader, relying instead on internal or short-term personnel with narrower skill sets for this complex position. OHSU's enduring lack of an appropriately qualified and dedicated professional to lead the HR function suggests a lack of value and marginalization of the function by OHSU, resulting in an HR Department that is demoralized and feels underappreciated and overburdened. One HR employee indicated, "[HR] has been . . . underappreciated for as long as I've been at OHSU." Without leadership capable of sensitively assessing OHSU's complex history, strategically maximizing the support HR can provide, and implementing a sophisticated vision for the department, OHSU cannot effectively operationalize the function to ensure consistent and high-quality support that inspires confidence and trust.

***Management routinely disregards HR's disciplinary recommendations***

As noted above, OHSU management routinely disregards HR's disciplinary recommendations, undermining the function's authority. Although in many organizations managers communicate disciplinary decisions to employees, or work collaboratively with HR to determine an appropriate disciplinary response, at OHSU, managers have full authority to disregard the recommendations of HR, and often do. As one HR professional put it, "We do not issue discipline. Managers do. We don't fire. Managers do." This results in inconsistent outcomes across departments, which in turn leads to a perception of favoritism and lack of accountability for inappropriate behavior as described elsewhere in this report. One OHSU executive leader suggested that discretion in the disciplinary process may result in management treating some subjects of complaints like "they are a genius just having a bad day," at the expense of addressing the issue. A senior leader acknowledged the perception that issues involving influential individuals are not taken seriously, remarking: "[T]here is a great deal of tolerance of bad behavior from high-flying [or] long-standing folks. It takes a long time for stuff to happen, if anything, to these people."

The inability of HR to implement discipline, and the ease with which its recommendations can be disregarded, marginalizes the function. When complaints seemingly go unaddressed or offenders undisciplined, community members believe that nothing will happen with their reports, as we repeatedly heard, and this impacts their level of confidence in the HR function.

# Recommendations

The cultural challenges identified in this report are not unique to OHSU and, while concerning, provide OHSU with an opportunity to create a culture where all community members can thrive.  Our recommendations below provide a blueprint for OHSU to drive both immediate and long-term positive change to create a more diverse, equitable, and inclusive workplace, prevent misconduct, encourage reporting, and appropriately handle resulting complaints.  If followed, these recommendations can be the catalyst for a significant cultural transformation.

Because the tone set by senior leaders is one of the primary drivers of workplace culture, our recommendations begin with a focus on ways Dr. Jacobs, the Board of Directors, and the executive leadership team can reaffirm OHSU's commitment to DEI.  We then address potential changes to resources and staffing and conclude with possible changes to policies and procedures.

We recommend that OHSU establish an oversight committee to be responsible for the implementation of Covington's recommendations across the institution.  We are aware that these recommendations will require significant resources by an institution centered on making major contributions to medicine and charged with providing the highest level of care and safety to its patients.  OHSU should consider this when developing a plan for achieving the objectives reflected below, including in identifying metrics for measuring its progress towards meeting these objectives.  These recommendations intentionally vary in specificity, and it may be that there are other means to achieving them.  We leave to OHSU the task of implementing the recommendations in a manner that is prompt, feasible, and achievable.

**Tone from the Top**

    A.  Affirm resolute commitments to diversity, equity, inclusion, and anti-racism.

        1.  Develop ambitious, concrete, and measurable plans for organizing and operationalizing commitments to DEI and anti-racism guided by these findings and recommendations.  Dr. Jacobs, the Board of Directors, and the executive leadership team should communicate these plans to the OHSU community, including implementation timelines and mechanisms for holding designated leaders accountable and should provide periodic progress updates.

        2.  Continue to conduct employee engagement surveys and to include DEI-focused questions; continue to monitor trends in employee engagement and disaggregate the data by select demographics such as race, gender, and tenure; and have Dr. Jacobs, the Board of Directors or the executive leadership team report to the OHSU community on trends and efforts to address them.

        3.  Consider a schedule of regular meetings between the executive leadership team, CDI leadership, and all relevant affinity groups to identify and discuss issues related to DEI and anti-racism.  Ensure that these meetings incorporate a formal mechanism for members of inclusion networks to communicate feedback to the executive leadership team.

    B.  Elevate diversity, equity, and inclusion throughout the institution by fully and cohesively incorporating these concepts into OHSU's policies, practices, and culture.

        1.  Develop a strategic institution-wide DEI vision with actionable, meaningful, and prioritized initiatives to be led by CDI.

2. Ensure effective collaboration between CDI and all DEI-focused functions, groups, and roles across the various missions, including periodic meetings with the head of CDI to ensure actions are aligned with the institution-wide DEI vision.

3. Address DEI with similar detail and clarity across the Code of Conduct, Discrimination and Harassment Policy, and Reporting Policy.

4. Increase the diversity of OHSU's workforce by (1) assessing OHSU's requirements to hire internal candidates; (2) encouraging leaders to increase the percentage of diverse candidates in the pipeline for leadership positions and holding them accountable for improvements including by considering external candidates; and (3) considering requirements concerning the diversity of applicant slates for senior positions with a goal of increasing the percentage of diverse applicants year-over-year.

5. Evaluate contributions to OHSU's culture and DEI commitment in the performance review process for all managers, deans, department chairs, and EVPs across the institution, further encouraging diversification of the workforce and improving retention of diverse employees over a specified number of years.

6. Adopt a system to consistently track diversity metrics in hiring, performance evaluations, promotion, compensation, discipline, retention, and attrition. Implement a process to regularly review these metrics and take action to identify and improve disparities.

7. Respond to nationwide and internal events implicating inequity with clear, consistent, and timely communications.

8. Develop and conduct additional community-wide trainings on DEI-related issues, in addition to unconscious bias training. Develop targeted trainings focused on DEI principles for HR, AAEO, Integrity, and managers/supervisors.

C. Strengthen accountability and ensure that all OHSU community members understand the importance of meeting the institution's expectations regarding conduct and culture.

1. Dr. Jacobs and the executive leadership team should communicate widely and often that any individual found to have engaged in misconduct will be held accountable, no matter what position they hold at OHSU.

2. Appropriately revise and finalize the proposed Disciplinary Matrix to ensure consistent consequences for engaging in misconduct. Make clear that HR's disciplinary recommendations, in consultation with stakeholders, are presumptively followed by managers across the missions, including the School of Medicine, and remove managerial discretion to override HR's recommendation without approval from an independent body or advisory board, comprised of various stakeholders, assigned to resolve these disagreements.

3. Inform the OHSU community about the Disciplinary Matrix and reinforce that it is intended to ensure consistent disciplinary outcomes regardless of status within the institution or protected characteristics. Clarify how certain behaviors,

including microaggressions or other disrespectful conduct, will be treated under the Disciplinary Matrix.

4. Consider establishing an advisory board, comprised of representatives from HR, AAEO, Legal, and CDI, to periodically review and make recommendations for revisions to the Disciplinary Matrix.

5. Adopt guidance and processes applicable to all missions, including the School of Medicine, regarding communications for departing employees who have engaged in conduct that violates OHSU policies.

## Resources and Staffing

A. Conduct a rigorous, competitive, and nationwide search for a highly qualified candidate for a VP or SVP of HR, with relevant and sustained leadership experience, and ensure that this individual acts as a strategic partner to the executive leadership team, bringing professionalism to the HR function and supporting achievement of OHSU's DEI goals and objectives.

B. Centralize HR functions so that all HR professionals across the institution ultimately report up to the VP (or SVP) of HR.

C. Provide HR and AAEO personnel who conduct investigations sophisticated mandatory training on investigative procedures, including Title IX procedures.

D. Restructure, increase, and diversify staffing in HR and AAEO.

1. Establish AAEO as a separate, neutral, independent investigative and compliance function with responsibility for investigation of conduct that potentially violates Title VII or Title IX. To maintain its independence and neutrality, and ensure accessibility to students, separate AAEO from HR or CDI, which have fundamentally different objectives and goals. Instead, we recommend that AAEO report to Integrity, itself a compliance function, which reports to OHSU Legal. AAEO should report the outcomes of its investigations to HR, which, as explained above, would be tasked with making a disciplinary recommendation in accordance with the Disciplinary Matrix.

2. Develop a multi-year plan to increase the number of HRBPs so that individual HRBPs are responsible for fewer employees. When hiring these HRBPs, focus on increasing the diversity of HRBPs.

3. Increase the number of AAEO investigators to support recent caseload increases. When hiring these investigators, focus on increasing the diversity of AAEO investigators.

4. To reduce and focus the workload of AAEO investigators, consider transferring, with an appropriate transition and training plan, the handling of ADA employee accommodation requests from AAEO to HR (for the full lifecycle of a request through implementation of the accommodation). HR should consult Legal when questions arise in assessing or implementing accommodations. The current ADA Coordinator could be transferred from AAEO to HR to facilitate this change and help train others in HR to assess and implement accommodation requests.

**Policies and Procedures**

A. Clearly define prohibited conduct throughout OHSU's policies and explain how the institution addresses such misconduct.

    1. Provide clear definitions of all forms of prohibited conduct so that OHSU community members understand and can identify it. Specific examples of discrimination, harassment, and retaliation should be added to relevant policies as needed. Fully explain the details regarding how such misconduct (1) should be reported and (2) will be handled.

    2. Provide additional information on the concepts of "microaggressions," "misgendering," and "racism" that were recently added to these policies, which explains how those concepts may materialize as discrimination and harassment and the consequences for engaging in those actions.

    3. Decide whether to add concepts such as "bullying" to relevant policies or reduce and define such concepts into a single category such as "disrespectful treatment."

B. Revise and streamline reporting and investigation procedures to ensure more clear and consistent processes for reporting parties, mandatory reporters, and investigators.

    1. Revise the complaint reporting and investigation procedures so that OHSU members understand how to report issues and mandatory reporters understand the type of issues that need to be elevated and their obligations to elevate them. Ensure that all policies and publications that explain these procedures, including resources available on the AAEO page of OHSU's website, are internally consistent and consistent with each other.

    2. Promulgate clearer guidance concerning which investigations are to be conducted by AAEO and which are to be conducted by HR, as well as guidelines for when other departments, such as Legal, should be consulted in connection with investigations.

    3. Adopt a single investigations policy for all investigations into misconduct relevant to this assessment and ensure that policies thoroughly address all aspects of investigations. This policy would be utilized by both AAEO and HR, as well as any other department that conducts investigations.

    4. Describe the reporting and investigation process clearly in the Reporting Policy as well as in a resource available on the AAEO page of OHSU's website so that community members understand what happens when a report is made.

    5. Require investigators to explain to reporters at the beginning of the investigation process that investigators may not be able to disclose any resulting discipline due to confidentiality concerns. Public-facing policies related to reporting and investigations should explain this limitation.

6. Require investigators to consistently notify affected parties about the status of complaints. Standardize close-out procedures, including how and when an outcome is communicated to affected parties.

7. Disclose to the community de-identified and aggregated data about complaints involving misconduct during a given reporting period, including the volume of different categories of complaints, the types of resolutions reached, and how long they took to resolve.

C. Streamline the channels listed in policies and guidance documents related to reporting.

1. Consider designating the Integrity EthicsPoint Hotline as the central channel for receiving all reports made under OHSU policies rather than suggesting different reporting channels for Title IX and non-Title IX matters. Consider reducing the overall number of reporting channels. All other reporting channels should be listed as alternative options to the Integrity EthicsPoint Hotline, and all recipients of complaints made through those other channels should be trained either to make or transfer the report to the Integrity EthicsPoint Hotline for triage, tracking, and follow-up so that all complaints across the institution, no matter which channel they come through, are funneled into one system. Ensure that guidance clarifies how to appropriately direct reports to relevant teams for follow-up and investigation.

2. Develop a standardized and consistent approach to complaint and investigations recordkeeping. Rather than adopting a third tracking or triage system for HR, maintain all complaints in Integrity's EthicsPoint database, and grant relevant AAEO and HR personnel full access to records for personnel they are investigating. Continue to provide reporters with the ability to periodically check on the status of their reports.

3. Ensure that reporting channels are described consistently throughout policies and in communications to the community, including on websites, in flyers, brochures, and posters on reporting.

D. Strengthen mandatory reporter provisions in all relevant policies.

1. Clearly describe the mandatory reporter obligation in the Reporting Policy, the Discrimination and Harassment Policy, and the Respect for All Guidebook and related flyers, and remove any language that suggests or implies that only supervisors "most directly involved" are mandatory reporters.

2. Add a provision on mandatory reporting obligations in the section of the Code of Conduct relating to supervisor obligations.

3. Review other OHSU policies and procedures relating to discrimination and harassment, including proposed policies, and ensure that mandatory reporting obligations are addressed when appropriate.

E.  Incorporate strong non-retaliation provisions throughout OHSU's policies, and communicate broadly the institution's prohibition on retaliation.

1.  Ensure that references to OHSU's prohibition on retaliation are clear, robust, include examples, and are highlighted in any policy touching on reporting or misconduct.

2.  Modify provisions of other policies that may inhibit reporting.  For example, in the Code of Conduct, OHSU should clarify that good faith complaints will be taken seriously even if the underlying conduct is not found to violate the law or OHSU policy, and the Guidebook should make clear that the concept of "free speech" cannot be used as a shield for engaging in prohibited misconduct.

3.  Implement system for monitoring potential retaliation against complainants, including potentially the following:

    a.  Investigators should check with complaining parties whose complaints they investigated at regular intervals (e.g., three months, six months, one year) following the complaint to determine if there are any potential retaliation concerns or issues.

    b.  In appropriate circumstances and with complainant consent, investigators should consider informing the complainant's supervisor about the issue reported (unless it involves the supervisor) and ask the supervisor to monitor for potential retaliation.

4.  Analyze attrition and promotion data to identify potential trends affecting individuals over time who make complaints or participate in investigations.

# Covington Team

EXHIBIT 1 TO ELLIS DECL. P. 50 of 51

| | |
|---|---|
| Edith Antezana | Michelle L. Kuang |
| Nabiha Aziz | Belinda N. Lamptey |
| Nathan G. Bolduc | Feiruz H. K. Macon |
| Lindsay B. Burke | Kassandra D. Maldonado |
| Ellen Y. Choi | James W. McNinch |
| Jason P. Criss | Jorge R. Moyano |
| Jessica M. Gerson | Kiley Naas |
| Merri S. Godlin | Katherine P. Onyshko |
| Desiree D. Gonzalez | Danielle A. Parker |
| Joshua González | Thomas I. Plotkin |
| Carole A. Harris | Shira M. Poliak |
| Karen Kiley Haughton | Marco A. Ramos |
| Tyler E. Holbrook | Sharline Rojo Reyes |
| Eric H. Holder, Jr. | Komal S. Shah |
| Ryan A. Hussey | Stephanie Shropshire |
| Tyler Jansen | Nandini Singh |
| Angela A. Jones | Katri A. Stanley |
| Brian E. Kempfer | Kathryn A. Ward |
| Nancy Kestenbaum | Matthew S. Zimnick |