BRENDA K. BAUMGART, OSB No. 992160
brenda.baumgart@stoel.com
ANDREA H. THOMPSON, OSB No. 084923
andrea.thompson@stoel.com
SOPHIE SHADDY-FARNSWORTH, OSB No. 205180
sophie.shaddy-farnsworth@stoel.com
MEGAN S. BRADFORD, OSB No. 222711
megan.bradford@stoel.com
STOEL RIVES
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  503.224.3380
Facsimile:  503.220.2480

Attorneys for Defendants


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DR. RUPA BALA,<br><br>        Plaintiff,<br><br>    v.<br><br>OREGON HEALTH AND SCIENCE UNIVERSITY, an Oregon public corporation; DR. CHARLES HENRIKSON, an individual; DR. JOAQUIN CIGARROA, an individual,<br><br>        Defendants. | Case No.: 3:18-CV-00850-HZ<br><br>**DEFENDANTS' EXPERT WITNESS NARRATIVES** |

Defendants may call the following expert witnesses at trial in this case.  All expert witnesses may also provide testimony in response or rebuttal to issues raised by Plaintiff or Plaintiff's experts in her case in chief.


Page   1   - DEFENDANTS' EXPERT WITNESS NARRATIVES

1.  **Jennifer Prager, CPA/ABV, CFE, CVA, MAFF**
    **Morones Analytics**
    **625 SW Broadway, Suite 200**
    **Portland, OR 97205**

    **Estimated length of direct examination: 1 hour**

    Ms. Prager's Expert Report (dated Oct. 27, 2023) and Rebuttal and Supplemental Expert Report (dated Dec. 15, 2023) are attached as Exhibit 1 and Exhibit 2. These reports set forth Ms. Prager's qualifications, the substance of her opinions expressed in detail, and the facts, data, and assumptions upon which her opinions are based. Ms. Prager will also respond to issues raised in rebuttal or supplemental expert reports submitted by Plaintiff's experts.

2.  **Jennifer L. Moody**
    **ECG Management Consultants**
    **13355 Noel Road, Suite 1100**
    **Dallas, TX 75240**

    **Estimated length of direct examination: 1.5 hours**

    Ms. Moody's Expert Report (dated Nov. 1, 2023) and Expert Supplemental and Rebuttal Report (dated Dec. 15, 2023) are attached as Exhibit 3 and Exhibit 4. These reports set forth Ms. Moody's qualifications, the substance of her opinions expressed in detail, and the facts, data, and assumptions upon which her opinions are based. Ms. Moody will also respond to issues raised in rebuttal or supplemental expert reports submitted by Plaintiff's experts.

3.  **Leonard J. Henzke**
    **ECG Management Consultants**
    **1111 Third Avenue, Suite 2500**
    **Seattle, WA 98101**

**Estimated length of direct examination: 2 hours**

Mr. Henzke's Expert Report (dated Nov. 1, 2023), Expert Rebuttal and Supplemental Report (dated Dec. 8, 2023), and Second Expert Rebuttal and Supplemental Report (dated Jan. 16, 2024) are attached as Exhibit 5, Exhibit 6, and Exhibit 7. These reports set forth Mr. Henzke's qualifications, the substance of his opinions expressed in detail, and the facts, data, and assumptions upon which his opinions are based. Mr. Henzke will also respond to issues raised in rebuttal or supplemental expert reports submitted by Plaintiff's experts.

4.  **DT North, MS, CRC, CDMS, ABVE/D**
    **Achieve Consulting Team, Inc.**
    **1222 State Ave., NE, Suite 101**
    **Olympia, WA 98506**

**Estimated length of direct examination: 30 minutes**

Mr. North's Vocational Evaluation Report (dated Nov. 1, 2023) is attached as Exhibit 8. This report sets forth Mr. North's qualifications, the substance of his opinions expressed in detail, and the facts, data, and assumptions upon which his opinions are based. Mr. North will also respond to issues raised in rebuttal or supplemental expert reports submitted by Plaintiff's experts.

DATED: March 11, 2024  STOEL RIVES LLP

         _s/ Brenda K. Baumgart_
        BRENDA K. BAUMGART, OSB No. 992160
        brenda.baumgart@stoel.com
        ANDREA H. THOMPSON, OSB No. 084923
        andrea.thompson@stoel.com
        SOPHIE SHADDY-FARNSWORTH, OSB No. 205180
        sophie.shaddy-farnsworth@stoel.com
        MEGAN S. BRADFORD, OSB No. 222711
        megan.bradford@stoel.com
        Telephone: 503.224.3380

        Attorneys for Defendants



Forensic Accounting   |   Damages Analysis   |   Valuation

Dr. Rupa Bala v. Oregon Health and Science University et al.

Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF

October 27, 2023

Exhibit 1
Page 1 of 14

Dr. Rupa Bala v. Oregon Health and Science University et al.
Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
October 27, 2023

## *Table of Contents*

*I.* *Description of Assignment* ........................................................................ 1

*II.* *Expert Qualifications* ............................................................................. 1

*III.* *Information Considered* .......................................................................... 1

*IV.* *Case Background* .................................................................................. 1

*V.* *Summary of Conclusions* ....................................................................... 2

*VI.* *Methodology and Assumptions* ............................................................... 2

*VII. Conclusion* .......................................................................................... 3

**Attachments and Supporting Schedules**

- Attachment A – Jennifer Prager CV
- Attachment B – Documents Considered
- Schedules – Supporting Calculations

Exhibit 1
Page 2 of 14

Dr. Rupa Bala v. Oregon Health and Science University et al.
Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
October 27, 2023

### I.    Description of Assignment

1.  Counsel for Stoel Rives LLP, acting on behalf of Oregon Health and Science University ("OHSU"), Dr. Charles Henrikson, and Dr. Joaquin Cigarroa (collectively, "Defendants" or "OHSU") retained me to analyze Plaintiff Dr. Rupa Bala's potential economic damages in the form of lost earnings resulting from her alleged claims against Defendants. I have completed my analysis and set out my findings in this report.

2.  Amendments or additions to this report and the accompanying schedules may be required as a result of developments prior to or at trial, including but not limited to the discovery of new evidence, expert discovery, and the testimony of any other witness in deposition or at trial. I render no opinion as to liability, but for the purposes of my analysis, I assumed Dr. Bala will prevail on her liability claim.

### II.    Expert Qualifications

3.  I am a Director of Morones Analytics, LLC, a Portland, Oregon based firm specializing in economic damage analysis, forensic accounting, data analytics and fraud investigation. I have over 20 years of accounting experience including nearly 18 years specializing in analyzing commercial damages and business valuation. I have been qualified as an expert in damage assessment matters in Oregon state court, as well as arbitration and mediation.

4.  I graduated from the University of California, Davis with a Bachelor of Science in Managerial Economics.

5.  I am a Certified Public Accountant (CPA), licensed in Oregon. I have two professional designations in business valuation as an Accredited in Business Valuation (ABV) through the American Institute of Certified Public Accountants, and Certified Valuation Analyst (CVA) through the National Association of Certified Valuators and Analysts. I am also a Certified Fraud Examiner (CFE) and Master Analyst in Financial Forensics (MAFF). I hold membership in the Association of Certified Fraud Examiners, the American Institute of CPAs, and the National Association of Certified Valuators and Analysts. A copy of my curriculum vitae is attached to this report as **Attachment A**.

### III.    Information Considered

6.  Information and documents that were considered in this analysis are listed at **Attachment B** to this report.

### IV.    Case Background

7.  According to the Second Amended Complaint,[1] Dr. Rupa Bala began working for OHSU as the Director of Complex Ablation and Associate Professor of Medicine on or about January 5, 2015.

8.  In May 2016, Dr. Bala received a one-year contract renewal from OHSU and was told that she was not likely to receive a further renewal.[2] Dr. Bala ultimately resigned, with her last day of employment at OHSU on or about June 19, 2017.[3]

---

[1] Second Amended Complaint dated February 11, 2019, paragraph 8.
[2] Deposition of Dr. Rupa Bala dated July 28, 2020, pages 264-265.
[3] Second Amended Complaint dated February 11, 2019, paragraph 38.

Exhibit 1
Page 3 of 14

Dr. Rupa Bala v. Oregon Health and Science University et al.
Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
October 27, 2023

9. Dr. Bala made claims against OHSU and two OHSU physicians for economic and non-economic damages related to her employment and separation there, including a claim for wrongful termination, race and sex discrimination, and retaliation. Counsel for OHSU asked me to calculate Dr. Bala's potential economic damages if she were to prevail on her economic damage claims in this matter. I am not providing any opinion about her job search mitigation efforts. Rather, this assumes Dr. Bala made her best efforts to obtain mitigating employment after leaving OHSU and is therefore her maximum economic loss.

### V.    Summary of Conclusions

10. Based on my analysis, Dr. Bala's maximum potential economic damages total $358,100. I describe my assumptions and analysis in the remainder of this report.

### VI.    Methodology and Assumptions

11. To calculate economic damages, I compared Dr. Bala's but-for earnings, or expected earnings had she continued to work for OHSU, to her actual earnings after leaving OHSU. If the but-for earnings are higher than actual earnings, the difference represents lost earnings.

12. As noted earlier in this report, Dr. Bala began working for OHSU on approximately January 5, 2015, and her final date of work with OHSU was approximately June 19, 2017. The following table summarizes Dr. Bala's compensation from OHSU:

| Dr. Bala Compensation | OHSU | | |
| --- | --- | --- | --- |
| | 2015 | 2016 | Year to Date 6/19/2017 |
| Wages | $390,180 | $380,597 | $258,194 |
| Employer Contributions to Retirement | $33,654 | $30,779 | $30,198 |
| Employer Paid Health Insurance | $6,962 | $7,164 | $3,442 |
| Total Compensation | $430,796 | $418,539 | $291,835 |

**Sources:** Dr. Bala's W2s and OHSU annual "Emp Labor Dist Summary by Work Date" reports.

13. On March 28, 2018, Dr. Bala signed a contract to begin working for Banner-University Medical Group ("Banner").[4] According to Dr. Bala's contract with Banner, her annual base compensation was set at $450,000, including $409,500 in salary and $40,500 in annual guaranteed productivity payments, plus a signing bonus of $30,000.[5] In addition, according to Dr. Bala's 2018 through 2020 annual W2s from Banner, Dr. Bala received employee sponsored health benefits.[6] Based on payroll data provided to me, Dr. Bala began working for Banner in early July 2018.[7]

14. Given that Dr. Bala's base compensation at Banner (excluding benefits) was higher than her total compensation package from OHSU demonstrated in the table above, Dr. Bala ceased to incur any further economic damages once she began working for Banner. As a result, Dr.

---

[4] BANNER000557-577.
[5] BANNER0005776.
[6] Dr. Bala has not provided information regarding whether she received any employer-paid retirement contributions during her employment at Banner.
[7] BANNER000532-50.

Exhibit 1
Page 4 of 14

Dr. Rupa Bala v. Oregon Health and Science University et al.
Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
October 27, 2023

Bala's maximum potential economic damages are limited to the period of unemployment between June 19, 2017 and early July 2018.[8]

15. At **Schedule A**, I calculated Dr. Bala's lost earnings over years 2017 and 2018 while unemployed. I first calculated Dr. Bala's but-for compensation at OHSU based on the actual average wages and benefits received from OHSU for the full years 2015 and 2016, as analyzed at **Schedule B**. I then adjusted these amounts to reflect expected annual growth at a rate of 2.7%, based on the average earnings growth rate from 2016 to 2018 per the Bureau of Labor Statistics *TABLE B–30. Hours and earnings in private nonagricultural industries, 1977–2022*.

16. I then compared the but-for OHSU compensation to actual compensation Dr. Bala received in 2017 and 2018, including amounts earned through June 19, 2017 at OHSU and amounts earned beginning in July 2018 at Banner, as analyzed at **Schedule B** and summarized at **Schedule A**.

17. The difference between but-for compensation and actual earnings is lost earnings of $358,100, as shown at **Schedule A** and summarized in the table below.

| Year | But-For Earnings | Actual Earnings | Difference = Lost Earnings |
|------|------|------|------|
| 2017 | $436,150 | $291,835 | $144,315 |
| 2018 | $447,943 | $234,131 | $213,811 |
| **Total** | **$884,092** | **$525,966** | **$358,126** |

### VII.    Conclusion

18. My opinions may be supplemented or amended upon receipt of additional information.

Yours Sincerely,

Jennifer Prager, CPA, CFE, ABV, CVA, MAFF

---

[8] Dr. Bala's initial disclosures describe a loss of future earnings but do not articulate with specificity the amount or calculation of any potential lost future earnings. Based on the materials provided to me, for my expert review, Dr. Bala's damage period ends with her employment by Banner in July 2018. I reserve the right to review and update my report or opinion based on Dr. Bala's specific calculation of losses.

Exhibit 1
Page 5 of 14

Dr. Rupa Bala v. Oregon Health and Science University et al.
Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
October 27, 2023

**_Statement of Compensation_**

Morones Analytics, LLC was compensated at a rate of $425 per hour for work performed by Jennifer Prager on this analysis.  Compensation related to other associates employed by Morones Analytics ranged from $225 to $625 per hour.

**_Prager Testimony - Past Four Years_**

James Martin v. John Babikian, Middlebay Trade LTD et al. & John Babikian, Middlebay Trade
     LTD v. Sunshine Mountain Vineyards, Circuit Court State of Oregon, Wasco County,
     Case No. 21CV48763, September 2023

Berrey Family LLC v. MWIC Pringle Corp., Lawrence Tokarski, and South Park Mixed Use LLC,
     Arbitration, August 2023

Donald Annotti & Kelly Annotti Dissolution, Circuit Court State of Oregon, Marion County, Case
     No. 20DR16083, March 2023

Julia Stenersen & Anthenie Stenersen Dissolution, Arbitration, August 2022

Integrity Structures, LLC v. DirtEx LLC, Arbitration, February 2022

Sarah L. Strain, Elizabeth L. Potter, Jennifer L. Isenhart, and Mary L. Kistner on behalf of
     Bussmann Cranberries LLC v. George P. Bussmann, James A. Bussmann, Peter D.
     Bussmann and Diane Bussmann, and Bussmann Cranberries (nominal defendant),
     Circuit Court State of Oregon, Coos County, Case No. 20CV22959, November 2021

Richard Barker and Kelly Barker v. Westwood Capital, LLC et al., Circuit Court State of Oregon,
     Washington County, Case No. 19CV10067, September 2021

Marianne Sharp v. Joseph Elroy Sharp, Circuit Court State of Oregon, Yamhill County, Case
     No. DO110162, September 2021

Delahunt Homes, Inc. v. Michael & Kari Lubitz, Arbitration, October 2019

# Attachments

Exhibit 1
Page 7 of 14



Attachment A



## Jennifer Prager

CPA, CFE, CVA, ABV, MAFF, Director

jprager@moronesanalytics.com

503-906-1586

LOST PROFITS DAMAGES

FORENSIC ACCOUNTING & FRAUD INVESTIGATION

DATA ANALYTICS

**Jennifer Prager has specialized in financial damages analysis and forensic accounting for 20+ years. She is a testifying expert who brings deep experience at CPA firms and on large forensic cases in Portland and San Francisco.**

Attorneys turn to Jennifer for a thorough financial analysis so they can enter trial or mediation with a credible calculation. Jennifer brings clarity in a financial dispute to provide clients with realistic expectations and a solid understanding of the facts so they can make better decisions along the way. Given her extensive forensic accounting background, she has a grasp on the needs of clients and can alert them to potential pitfalls.

Jennifer's case experience includes a number of nationally known accounting investigations and litigation matters. She has analyzed complex litigation cases involving construction disputes, shareholder disputes, divorce, securities lawsuits, fraud and embezzlement, employment issues, commercial contracts and insurance.

Jennifer had an early interest in economics and in identifying money relationships and trends. She enjoys digging into the messy financial data, untangling multiple assets and pulling the evidence together into a powerful story to be part of a solution.

### Professional Credentials & Education

- Certified Public Accountant, Oregon (CPA)

- Accredited in Business Valuation (ABV), American Society of CPAs

- Certified Valuation Analyst (CVA)

- Master Analyst in Financial Forensics (MAFF), National Association of Certified Valuators and Analysts

- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners

- Bachelor of Science in Managerial Economics, University of California, Davis

Jennifer Prager CPA, CFE, CVA, ABV, MAFF, Director                     Morones Analytics

**Selected Professional Engagements**

- Analyzed plaintiffs' claims of breach of contract and breach of fiduciary duty against the member managers of a family-owned farm and crop cleaning company. Ms. Prager quantified the damages and testified in support of her opinion. The jury awarded Ms. Prager's damage opinion.
- Quantified the total amount overpaid on a subcontract related to a large government project. Ms. Prager testified in support of her opinion to a panel of arbitrators that awarded damages equal her calculation.
- Appointed by a mediator to serve as a neutral in a shareholder dispute involving allegations of self-dealing by the manager of two closely held ranches. Prepared a report for the mediator summarizing the accounting of related party transactions together with the entities' Board Minutes that recorded the Board's contemporaneous understanding of the related party relationships.
- Calculated a business loss claim for a winery that delayed production of a vintage due to a malfunction of equipment during fermentation. Calculated the winery's losses caused by the delay. The claim was settled in mediation.
- Analyzed a construction company's accounting records to determine appropriate costs on the disputed project and testified in support of opinion.
- Analyzed plaintiff's lost profits claim against an Oregon county. Through investigation and analysis of publicly available information, identified unrecorded revenue as well as collection of sales tax not remitted to the taxing authority.
- Analyzed economic damages stemming from an investment advisor's embezzlement of client funds.
- Analyzed lost personal income from an accident. Through forensic analysis was able to identify other reasons for the decrease in income.
- Analyzed and reconciled internal accounting records in a business dispute to calculate the amounts due to the parties under the governing agreements.
- Analyzed the financial records of a partnership that alleged fraud by one of its members. Prepared a report identifying and quantifying suspicious transactions and explaining the unusual accounting.
- Analyzed the potential economic damages resulting from a breach of a non-compete agreement and testified in support of opinion.
- Analyzed a company's accounting records to determine income available for spousal support. Through forensic analysis identified transactions that indicated possible unrecorded revenue and provided expert testimony.

**Professional Associations**

- Oregon Society of Certified Public Accountants, Member
- American Institute of Certified Public Accountants, Member
- Association of Certified Fraud Examiners, Oregon Chapter Board Member and Treasurer, 2016 – current
- Association of Certified Fraud Examiners, Member
- National Association of Certified Valuators and Analysts, Ethics Oversight Board, 2012-2015; Chair 2014 – 2015

**Professional Recognition**

- Standing Ovation Award, American Institute of Certified Public Accountants, Forensic and Valuation Services, November 2015
- Outstanding Member – National Association of Certified Valuators, Second Quarter 2015

**Presentations**

- How to Frame Conclusions in a Fraud Investigation (From a CPA Perspective), OACFE Annual Conference, June 2018
- Identifying and Limiting Your Risks in an FVS Engagement, AICPA Webcast, June 2016

**Rupa Bala, MD v. OHSU**
Documents Considered

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 1 | | | Defendants' Answer and Affirmative Defenses to Second Amended Complaint for Deprivation of Civil Rights |
| 2 | | | July 28, 2020 Deposition of Dr. Rupa Bala (pages 264-316) |
| 3 | | | Plaintiff's Initial Disclosures (pages 12-13) |
| 4 | | | Second Amended Complaint for Deprivation of Civil Rights |
| 5 | | | 9/12/18: 408 Communication |
| 6 | BANNER000557 | BANNER000577 | Banner-University Medical Group Physician Employment Agreement |
| 7 | BALA 2728 | BALA 2744 | Citrus Cardiology Consultants P.A. Physician Services Employment Agreement |
| 8 | OHSU_RB 000050 | OHSU_RB 000073 | Oregon Health & Science University Clinician Employment Agreement |
| 9 | BAAA 2692 | BAAA 2710 | United Medical Associates PC Employment Agreement (8/6/21) |
| 10 | BAAA 2674 | BAAA 2691 | United Medical Associates PC Employment Agreement (2/8/21) |
| 11 | UPENN000450 | UPENN000455 | Clinical Practices of the University of Pennsylvania Department of Medicine Member Practice Agreement [Hospital Based Physician] |
| 12 | UPHS000194 | UPHS000195 | MOU for Joint Faculty Appointments at the Philadelphia Veterans Administration Medical Center and the University of Pennsylvania Schools of Medicine and Dentistry |
| 13 | UPHS000038 | UPHS000040 | Academic Plan for Rupa Bala, MD |
| 14 | OHSU_RB 000026 | OHSU_RB 000048 | Rupa Bala, MD CV: 2014 |
| 15 | BANNER000579 | BANNER000604 | Rupa Bala, MD CV: 2015-2017 |
| 16 | ADVOCATE000004 | ADVOCATE000029 | Rupa Bala, MD CV: 2017 |
| 17 | BALA 000770 | BALA 000793 | Rupa Bala, MD CV: 2020 |
| 18 | BALA 2440 | BALA 2464 | Rupa Bala, MD CV: 2021 |
| 19 | BALA 2485 | BALA 2509 | Rupa Bala, MD CV: May 2022 |
| 20 | OHSU_RB 000098 | OHSU_RB 000098 | 7/1/16: Appointment as Associate Professor effective January 1, 2016 (OHSU) |
| 21 | OHSU_RB 000614 | OHSU_RB 000620 | Employee History Detail: Rupa Bala |
| 22 | | | OHSU Monthly Benefit Contribution (Benefits.xlsx) |
| 23 | | | OHSU Emp Labor Dist Summary by Work Date (Compensation.xlsx) |
| 24 | OHSU_RB 000099 | OHSU_RB 000099 | 7/1/16: Effective salary as of July 1, 2016 |
| 25 | OHSU_RB 000015 | OHSU_RB 000016 | OHSU Position Description Unclassified Academic Personnel |
| 26 | BALA 000625 | BALA 000628 | 7/16/14: OHSU Offer Letter |
| 27 | OHSU_RB 000609 | OHSU_RB 000613 | 1/1/16-5/3/19: Rupa Bala Fidelity Investments OHSU Pension Plan, Retirement Savings Statement |
| 28 | OHSU_RB 000383 | OHSU_RB 000385 | 5/3/17-5/2/19: Retirement Account Summary (OHSU) |
| 29 | OHSU_RB 000380 | OHSU_RB 000382 | OHSU Oregon Group Dental Plan effective 1/1/17 |
| 30 | OHSU_RB 000386 | OHSU_RB 000472 | OHSU Group Medical Plan effective 1/1/17 |
| 31 | OHSU_RB 000605 | OHSU_RB 000608 | 1/1/16-5/3/19: Rupa Bala Fidelity Investments OHSU Tax Deferred Investment Plan, Retirement Savings Statement |
| 32 | BANNER000079 | BANNER000080 | 4/11/18: Banner Health Position Description |
| 33 | BANNER000087 | BANNER000087 | Banner New Hire Paperwork |
| 34 | BANNER000532 | BANNER000550 | Banner Payroll Report |
| 35 | BANNER000130 | BANNER000130 | Physician Recruitment - BUMG Physician Request Form |
| 36 | BALA 2778 | BALA 2825 | Citrus Cardiology Consultants P.A. Benefit Enrollment Guide, 2023 Plan Year |
| 37 | BALA 2727 | BALA 2727 | 10/14/22: Citrus Cardiology Consultants P.A. Offer Letter |
| 38 | BALA 1290 | BALA 1470 | Rupa Bala 2015-2018 Tax Returns |
| 39 | BALA 2551 | BALA 2622 | Rupa Bala 2019-2021 Tax Returns |
| 40 | OHSU_RB000324 | OHSU_RB000324 | OHSU 2015 W-2 |
| 41 | OHSU_RB000323 | OHSU_RB000323 | OHSU 2016 W-2 |
| 42 | BALA 2876 | BALA 2877 | Bala 2017 1099-MISC (Medtronic Logistics & Quality Conferences) |
| 43 | OHSU_RB000325 | OHSU_RB000325 | OHSU 2017 W-2 |
| 44 | BANNER000500 | BANNER000501 | Banner Univ Med Grp 2018 W-2 |
| 45 | BANNER000502 | BANNER000503 | Banner Univ Med Grp 2019 W-2 |
| 46 | BAAA 2719 | BAAA 2720 | Banner Univ Med Grp 2020 W-2 |
| 47 | BAAA 2721 | BAAA 2721 | United Medical Associates, PC 2021 W-2 |
| 48 | BAAA 2283 | BAAA 2284 | United Medical Associates, PC 2022 W-2 |
| 49 | | | Rule 26. Duty to Disclose General Provisions Governing Discovery Rule Text and Notes of Decisions.pdf |
| 50 | | | Amended Stipulated Protective Order |

# Schedules

Exhibit 1
Page 11 of 14

**Rupa Bala, MD v. OHSU**
**Summary of Losses**

|  | Schedule A | | |
|---|---|---|---|
|  | **But-For** | **Actual** | **Difference = Lost Earnings** |
| **Earnings** | $884,100 | $526,000 | $358,100 |


Morones Analytics
Exhibit 1

Schedule A

**Rupa Bala, MD v. OHSU**
**Lost Earnings**

| Period Ended | Age at End of Period | Pd in Years | But-For Base Wages[1] | But-For Employer Paid Benefits[1] | Total But-For Earnings Base Rate | But-For Earnings, Adj for Growth[2] | Actual Wages[3] | Actual Employer Paid Benefits[3] | Total Actual Earnings | Lost Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/31/17 | 44.8 | 1.0 | $385,388 | $39,279 | $424,668 | $436,150 | $258,194 | $33,640 | $291,835 | $144,315 |
| 12/31/18 | 45.8 | 1.0 | $385,388 | $39,279 | $424,668 | $447,943 | $230,846 | $3,286 | $234,131 | $213,811 |
| **Total (Rounded)** | | | | | | **$884,100** | **$489,000** | **$36,900** | **$526,000** | **$358,100** |

**Note:** Dr. Bala was hired by Banner-University Medical Group in 2018 at a base minimum annual compensation rate of $450,000 plus a sign-on bonus of $30,000, which fully mitigates any potential lost earnings from OHSU (BANNER000576). As a result, I calculated damages over the years 2017 and 2018 to capture the period when Dr. Bala was unemployed prior to working for Banner.

**Assumptions:**

| | | |
|---|---|---|
| Date of Birth | 2/27/1973 | *Per 2015 Oregon Tax Return* |
| OHSU Contract End Date | 6/19/2017 | |
| Age at OHSU Contract End Date | 44.3 | |
| Base Wage Rate | $385,388 | [1] |
| Base Employer-Paid Benefits | $39,279 | [1] |
| Estimated Annual Earnings Growth | 2.7% | [2] |

**Footnotes:**

[1] The but-for base earnings rate and employer-paid benefits are the average of Dr. Bala's 2015 and 2016 gross OHSU wages and employer-paid benefits as detailed at **Schedule B**.

[2] Average earnings growth rate from 2016 to 2018 per the Bureau of Labor Statistics *TABLE B–30. Hours and earnings in private nonagricultural industries, 1977–2022*.

[3] Per **Schedule B**. Note that Dr. Bala did not provide information sufficient to determine whether she received retirement benefits as part of her compensation package at Banner-University Medical Group. If Dr. Bala was eligible for any employer-paid retirement benefits as part of her compensation package, the lost earnings and benefits calculated above would need to be reduced.



Morones Analytics

Exhibit 1
Page 13 of 14

Schedule B

**Rupa Bala, MD v. OHSU**
Contract Termination Date   6/19/2017

| | 2015 | 2016 | 2017 (1) | 2018 (1) | 2019 (2) | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| Wages | | | | | | | | |
| OHSU | $390,180 | $380,597 | $258,194 | | | | | |
| Banner University Med Group | | | | $246,231 | $387,714 | $130,060 | | |
| Less: Moving Exp Reimbursement | | | | ($15,385) | | | | |
| United Medical Associates, PC | | | | | | | $340,979 | $199,400 |
| **Total Wages** | **$390,180** | **$380,597** | **$258,194** | **$230,846** | **$387,714** | **$130,060** | **$340,979** | **$199,400** |
| **Average Wages (2015 & 2016)** | **$385,388** | | | | | | | |
| | | | | | | | | |
| Employer Contributions to Retirement | $33,654 | $30,779 | $30,198 | *Unknown* | | | | |
| Employer-Paid Health Insurance | $6,962 | $7,164 | $3,442 | $3,286 | $5,907 | $1,871 | $7,009 | $4,304 |
| Total Employer-Paid Benefits | **$40,616** | **$37,942** | **$33,640** | **$3,286** | **$5,907** | **$1,871** | **$7,009** | **$4,304** |
| **Avg Employer Paid Benefits (2015-2016)** | **$39,279** | | | | | | | |

**Source:** Dr. Bala's W-2s, OHSU annual "Emp Labor Dist Summary by Work Date" reports for 2015-2017, Banner Health Pay Records for 2018 and 2019 (BANNER000532-550), 1099s and Dr. Bala tax returns.

**Footnotes:**

(1) Wages reflect approximately half a year of employment in 2017 and 2018. Dr. Bala was unemployed from June 19, 2017 to early July 2018.

(2) According to the Banner Health Pay Records, Dr. Bala did not receive her contracted base salary from the pay date November 7, 2019 through pay date January 16, 2020. I understand this may have been due to Family Medical Leave taken by Dr. Bala (Dr. Rupa Bala deposition, p. 315).



Morones Analytics
Exhibit 1
Page 14 of 14



Forensic Accounting  |  Damages Analysis  |  Valuation

Dr. Rupa Bala v. Oregon Health and Science University et al.

Rebuttal and Supplemental Expert Report of
Jennifer Prager, CPA, CFE, ABV, CVA, MAFF

December 15, 2023

Exhibit 2
Page 1 of 39

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

### *Table of Contents*

*I.    Description of Assignment* ...................................................................... *1*

*II.   Expert Qualifications* ............................................................................. *1*

*III.  Information Considered* .......................................................................... *2*

*IV.   Supplement to My Affirmative Opinions* .................................................. *2*

*V.    Rebuttal Analysis - Summary of Ostrofe Methodology and Assumptions* ........ *4*

*VI.   Summary of Rebuttal Conclusions* ......................................................... *5*

*VII.  There is no basis for Ms. Ostrofe's concluded losses in periods beyond Dr. Bala's worklife expectancy.* ...................................................................... *6*

*VIII. Ms. Ostrofe's actual earnings calculations include several periods of unpaid time after Dr. Bala left OHSU in addition to unreasonably low earnings projections, resulting in understated actual earnings and overstated potential damages.* ......................................................................................... *7*

*IX.   In her Scenario I loss calculation, Ms. Ostrofe significantly overstated Dr. Bala's but-for earnings and benefits for work in an academic setting, resulting in a $10,962,300 overstatement of potential damages.* ....................... *9*

*X.    In her Scenario II loss calculation, Ms. Ostrofe again significantly overstated Dr. Bala's but-for earnings and benefits for work in an academic setting, resulting in a $9,121,200 overstatement of potential damages.* ...................... *12*

*XI.   In her Scenario III loss calculation, Ms. Ostrofe overstated Dr. Bala's but-for earnings and benefits for work in a private practice setting, resulting in a $6,305,200 overstatement of potential damages.* .............................................. *13*

*XII.  Conclusion* ......................................................................................... *15*

### <u>Attachments and Supporting Schedules</u>

- Attachment A – Jennifer Prager CV
- Attachment B – Documents Considered
- Schedules – Supporting Calculations

Exhibit 2
Page 2 of 39

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

### I.     Description of Assignment

1.  Counsel for Stoel Rives LLP, acting on behalf of Oregon Health and Science University ("OHSU"), Dr. Charles Henrikson, and Dr. Joaquin Cigarroa (collectively, "Defendants" or "OHSU") retained me to analyze Plaintiff Dr. Rupa Bala's potential economic damages in the form of lost earnings resulting from her alleged claims against Defendants. I completed my initial analysis and set out my findings in a report dated October 27, 2023 ("Prager Affirmative Report").

2.  I have since received the report of Dr. Bala's expert on damages, Nora C. Ostrofe, MBA, CEA, CVA dated November 1, 2023 ("Ostrofe Affirmative Report") and the report of Dr. Bala's vocational expert, E. Lisa Broten, LCSW, ABVE-D, IPEC dated October 27, 2023 ("Broten Affirmative Report"). Counsel for the defendants asked me to evaluate Ms. Ostrofe's opinions regarding Dr. Bala's claimed economic damages. I have summarized my opinions related to Ms. Ostrofe's conclusions of damages related to Dr. Bala's claims in this expert report.

3.  I have also received affirmative reports issued by experts for the defendants, including the reports of Leonard J. Henzke and Jennifer L. Moody of ECG Management Consultants. Mr. Henzke and Ms. Moody were hired by defendants to provide opinions related to Dr. Bala's earning capacity and Dr. Bala's efforts and impacts related to the physician job search market. Mr. Henzke and Ms. Moody each issued an expert report dated November 1, 2023 describing their analysis and conclusions ("Henzke Affirmative Report" and "Moody Affirmative Report," respectively).

4.  Finally, I received the rebuttal and supplemental report of Mr. Henzke dated December 8, 2023 ("Henzke Rebuttal and Supplemental Report") including updated opinions related to Dr. Bala's earning capacity.

5.  Amendments or additions to this report and the accompanying schedules may be required as a result of developments prior to or at trial, including but not limited to the discovery of new evidence, expert discovery, and the testimony of any other witness in deposition or at trial. I render no opinion as to liability, but for the purposes of my analysis, I assumed Dr. Bala will prevail on her liability claim.

### II.     Expert Qualifications

6.  I am a Director of Morones Analytics, LLC, a Portland, Oregon based firm specializing in economic damage analysis, forensic accounting, data analytics and fraud investigation.  I have over 20 years of accounting experience including nearly 18 years specializing in analyzing commercial damages and business valuation. I have been qualified as an expert in damage assessment matters in Oregon state court, as well as arbitration and mediation.

7.  I graduated from the University of California, Davis with a Bachelor of Science in Managerial Economics.

8.  I am a Certified Public Accountant (CPA), licensed in Oregon. I have two professional designations in business valuation as an Accredited in Business Valuation (ABV) through the American Institute of Certified Public Accountants, and Certified Valuation Analyst (CVA) through the National Association of Certified Valuators and Analysts. I am also a Certified Fraud Examiner (CFE) and Master Analyst in Financial Forensics (MAFF). I hold membership in the Association of Certified Fraud Examiners, the American Institute of CPAs, and the National Association of Certified Valuators and Analysts. A copy of my curriculum vitae is attached to this report as **Attachment A**.

Exhibit 2
Page 3 of 39

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

### III.    Information Considered

9.  Information and documents that were considered in this analysis beyond what was identified in the Prager Affirmative Report are listed at **Attachment B** to this report.

### IV.    Supplement to My Affirmative Opinions

10. After I issued the Prager Affirmative Report, I discovered that certain payments made to Dr. Bala in 2017 identified in underlying documentation as "One Time Payment Clinical Income Related" were not actually one-time payments related to her final pay at OHSU but were instead part of her ongoing incentive pay. I excluded these payments from 2017 pay for purposes of assessing Dr. Bala's earning capacity at OHSU based on my assumption that they were one-time payments related to final pay at the end of her employment, which in turn led me to conclude that Dr. Bala's average pay in 2015 and 2016 was higher than my assessment of her ongoing 2017 pay. As a result, in the Prager Affirmative Report, I relied on the average of Dr. Bala's 2015 and 2016 pay as a base for projecting her expected earnings in 2017 and beyond.

11. To correct my assessment of 2017 annual earnings, I assumed a base salary equal to $361,000 as stated in a letter from Sanjiv Kaul, MD, Professor and CEO of OHSU Knight Cardiovascular Institute to Dr. Bala, plus the $72,200 Clinical Income Payout per the "OHSU Other YTD Amounts Listed on Pay Period 13 2017 Paystub.xlsx," for total annualized earnings of $433,200 as shown at **Schedule B**.

12. I also updated actual employer contributions to retirement and employer-paid insurance for the years 2018 through 2022 for additional information identified in pay stubs and retirement plan statements at **Schedule B**.

13. Based on these revisions, I reanalyzed Dr. Bala's lost earnings since she would potentially continue to incur economic damages until 2024.

14. At **Schedule A**, I projected but-for earnings of the revised $433,200 for 2017. For the years 2018 through 2023, I updated but-for earnings to reflect the higher annualized earnings assumption which is reflected in the benchmark but-for analysis at Exhibit II in the Henzke Rebuttal and Supplemental Report. I also updated but-for employer paid health benefits and retirement contributions based on the assumptions stated for years 2017 through 2023 in the Henzke Rebuttal and Supplemental Report Exhibit II analysis.

15. In my analysis of revised damages through 2023, I noted that Dr. Bala had several unpaid time periods of non-work or unemployment after leaving OHSU in 2017 and finding employment with Banner Medical Group in 2018, including the following periods following her termination from Banner Medical Group:

Exhibit 2
Page 4 of 39

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| Past Unpaid Time Periods | Start | End | Days |
|---|---|---|---|
| Voluntary Family Leave* | 10/24/2019 | 1/2/2020 | 70 |
| Unemployed After Termination from Banner Medical Group | 4/20/2020 | 3/29/2021 | 343 |
| Unemployed After Voluntary Resignation from United Medical Assoicates | 5/13/2022 | 1/29/2023 | 261 |

*Dates estimated based on dates of impacted pay checks*

**Sources:** Banner Payment Detail Listing (BANNER000545-547) and Expert
Report of E. Lisa Broten, LCSW, ABVE-D, IPEC dated October 27, 2023

16. I am not aware of any support for attributing the unpaid time to alleged harm by OHSU.

17. In order to calculate lost earnings for the period between 2017 and 2023, I revised Dr. Bala's past actual earnings and benefits assuming she had continued working in her then-current position, as shown at **Schedule A** and described below.

   **A.** For the years 2019 and 2020, I assumed Dr. Bala could have earned her Banner Medical Group 2019 annual rate of pay of $450,714 adjusted for 3.0% annual growth,[1] annual employer paid health benefits of $5,907, and employer contributions to retirement of 4.0% of wages, on an uninterrupted basis.

   **B.** For the years 2021 through January 29, 2023, I assumed Dr. Bala could have earned her United Medical Associates annual pay and benefits rates of $500,000 adjusted for 2.4% annual wage growth,[2] annual employer paid health benefits of $7,000, and employer contributions to retirement of 4.0% of wages, on an uninterrupted basis.

   **C.** For the period from January 30 to December 31, 2023, I relied on Dr. Bala's actual wages and employer paid health benefits as stated in Schedule 3.0 of the Ostrofe Affirmative Report, and employer contributions to retirement of 4.0% of wages, the amount she would have earned at UHS had she not volunatraily resigned.

18. Based on these revisions, I calculated Dr. Bala's lost earnings for the period 2017 through 2023 totaling $486,600, as shown at **Supplemental Summary** and in the table below.

---

[1] Compensation growth rate: Academic Benchmarks per Exhibit II of the Henzke Rebuttal and Supplemental Report, based on the 2017 to 2022 compound average growth rate of the underlying benchmark compensation.
[2] Compensation growth rate: Community Benchmarks per Exhibit I of the Henzke Rebuttal and Supplemental Report, based on the 2017 to 2022 compound average growth rate of the underlying benchmark compensation.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| Year | But-For Earnings | Actual Earnings | Difference = Lost Earnings |
|------|------|------|------|
| 2017 | $472,800 | $364,868 | $107,932 |
| 2018 | $479,500 | $234,131 | $245,369 |
| 2019 | $502,400 | $459,546 | $42,854 |
| 2020 | $519,300 | $481,542 | $37,758 |
| 2021 | $534,200 | $518,609 | $15,591 |
| 2022 | $545,300 | $531,209 | $14,091 |
| 2023 | $567,600 | $544,610 | $22,990 |
| Total | $3,621,100 | $3,134,500 | $486,600 |

19. Assuming Dr. Bala prevails on her economic damages claims, her maximum potential economic damages total $486,600.

### V.   Rebuttal Analysis - Summary of Ostrofe Methodology and Assumptions

20. In the Ostrofe Affirmative Report, Ms. Ostrofe calculated Dr. Bala's alleged economic damages under the following three but-for scenarios:

   **A. Advances to Professor** – Ms. Ostrofe assumed that had Dr. Bala not terminated her employment with OHSU, she would have advanced to the position of Professor in 2023.

   **B. Advances to Chief** – Ms. Ostrofe assumed that had Dr. Bala not terminated her employment with OHSU, she would have advanced to the position of Professor in 2023 and to Chief in 2029.

   **C. Goes Into Private Practice on June 19, 2017.**

21. In each of her three scenarios, Ms. Ostrofe compared but-for earnings to Dr. Bala's past actual earnings to date since her departure from OHSU from employers Banner Medical Group, United Medical Associates, and Citrus Cardiology Consultants, which reflects several unpaid time periods of non-work or unemployment, and projected future earnings equal to Dr. Bala's initial base earnings rate at current employer Citrus Cardiology Consultants adjusted for wage inflation. In each scenario, Ms. Ostrofe's calculations reflect an assumption that OHSU's alleged actions caused permanent damage to Dr. Bala's earning capacity that will have an impact on her through the remainder of her career.

22. Ms. Ostrofe's conclusions are summarized in the table below.[3]

---

[3] Note that for purposes of my analysis of the Ostrofe Affirmative Report conclusions, I have excluded Ms. Ostrofe's calculations related to prejudgment interest. I understand that if the court decides Dr. Bala is entitled to past damages including prejudgment interest, those calculations will take place at the time of the court's decision.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| Ostrofe Affirmative Report | Excluding Prejudgment Interest | | |
|---|---|---|---|
| | Scenario I Advances to Professor | Scenario II Advances to Chief | Scenario III Private Practice |
| Past Economic Loss | $2,203,951 | $2,203,951 | $3,057,252 |
| Future Economic Loss | $3,825,017 | $5,141,038 | $5,602,343 |
| **Total Economic Loss** | **$6,028,968** | **$7,344,989** | **$8,659,595** |

23. Ms. Ostrofe also presented alternative conclusions of economic damages based on a theory of lost gross but-for earnings, without deducting offsetting actual earnings. Ms. Ostrofe did not offer an explanation as to why this theory should be considered. I am not aware of any basis for an award of gross but-for earnings, which do not represent Dr. Bala's actual losses and vastly overstate any potential damage Dr. Bala has incurred. As a result, I have not presented Ms. Ostrofe's gross damage opinions in my report.

## VI.    *Summary of Rebuttal Conclusions*

24. Based on my review and analysis of the concluded alleged losses in the Ostrofe Affirmative Report, along with my review of documents and information available to date, I offer the following opinions regarding the Ostrofe Affirmative Report loss conclusions:

   A. **There is no basis for Ms. Ostrofe's concluded losses in periods beyond Dr. Bala's worklife expectancy.**

   B. **Ms. Ostrofe's actual earnings calculations include several periods of unpaid time after Dr. Bala left OHSU in addition to unreasonably low earnings projections, resulting in understated actual earnings and overstated potential damages.**

   C. **In her Scenario I loss calculation, Ms. Ostrofe significantly overstated Dr. Bala's but-for earnings and benefits for work in an academic setting, resulting in a $10,962,300 overstatement of potential damages.**

   D. **In her Scenario II loss calculation, Ms. Ostrofe again significantly overstated Dr. Bala's but-for earnings and benefits for work in an academic setting, resulting in a $9,121,200 overstatement of potential damages.**

   E. **In her Scenario III loss calculation, Ms. Ostrofe overstated Dr. Bala's but-for earnings and benefits for work in a private practice setting, resulting in a $6,305,200 overstatement of potential damages.**

25. I recalculated potential lost earnings after making corrections for  Ms. Ostrofe's unsupported and unreliable assumptions, along with taking into consideration differences in opinion regarding earning capacity measures opined upon by defendant's expert Leonard J. Henzke. The results of the revised calculations indicate that Dr. Bala will not suffer an economic loss in Ms. Ostrofe's Scenarios I and II, and is instead projected to benefit by $4,933,400 and $1,776,200 respectively. The revised calculation of Ms. Ostroffe's Scenario III results in a potential loss of $2,354,400, as shown at **Rebuttal Summary** and summarized in the table below.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| Revised Analyses | Excluding Prejudgment Interest | | |
|---|---|---|---|
| | Scenario I Advances to Professor | Scenario II Advances to Chief | Scenario III Private Practice |
| Revised Past Economic Loss | $434,476 | $434,476 | $1,834,147 |
| Revised Future Economic (Benefit)/Loss | ($5,367,843) | ($2,210,714) | $520,221 |
| **Revised Total Economic (Benefit)/Loss** | **($4,933,367)** | **($1,776,238)** | **$2,354,367** |

### VII.    There is no basis for Ms. Ostrofe's concluded losses in periods beyond Dr. Bala's worklife expectancy.

26. In each of her scenarios, Ms. Ostrofe calculates lost earnings through a worklife expectancy ending at Dr. Bala's age 70. While Ms. Ostrofe also includes subtotals of projected and but-for earnings after 14.67 years, the average number of years someone at Dr. Bala's age and educational attainment level can expect to work based on worklife expectancy tables,[4] and after 15.87 years, the number of years until Dr. Bala reaches age 67, Ms. Ostrofe's loss conclusions are all based on expected retirement at age 70.

27.  Ms. Ostrofe did not provide any basis for her assumption that Ms. Ostrofe can expect to work to age 70, although plaintiff's vocational expert Ms. Broten asserted that Dr. Bala stated "[…] she would work well past 70 if she was physically and mentally able[…]".[5]

28. Due to the many uncertainties surrounding any individual's worklife expectancy, including the potential for unexpected periods of unemployment or illness outside of an individual's control, damage experts commonly rely upon worklife expectancy tables, which are based on government reported statistics reflecting the experience of a similar population, to estimate the number of years to retirement. In fact, Ms. Ostrofe did consult and rely upon exactly such a table to generate measures of future projected and but-for earnings over the next 14.67 years. However, in the end and without explanation, Ms. Ostrofe set that source aside to conclude on an unsupported and speculative retirement age of 70.

29. In order to demonstrate the impact of including periods beyond Dr. Bala's worklife expectancy, I calculated the losses attributable to periods beyond 14.67 years in the Ostrofe Affirmative Report schedules, as shown in the table below.

---

[4] Ms. Ostrofe relied on the The Markov Process Model of Labor Force Activity 2012 - 2017: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors. Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger. Journal of Forensic Economics 28 (1), pp. 15 - 108.
[5] Broten Affirmative Report, page 10.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| | | From Ostrofe Affirmative Report - Present Value of Earnings | | | |
|---|---|---|---|---|---|
| | Schedules: | 3.0 | 2.0 A | 2.0 B | 2.0 C |
| Age | Period Ended | Projected Actual | But-For Scenario I | But-For Scenario II | But-For Scenario III |
| 65.8 | 12/31/2038 | $16,675 | $23,929 | $27,428 | $27,305 |
| 66.8 | 12/31/2039 | $412,585 | $592,071 | $678,641 | $675,596 |
| 67.0 | 2/27/2040 | $65,264 | $93,656 | $107,350 | $106,868 |
| 67.8 | 12/31/2040 | $339,265 | $486,854 | $558,039 | $555,536 |
| 68.8 | 12/31/2041 | $396,581 | $569,105 | $652,317 | $649,391 |
| 69.8 | 12/31/2042 | $388,831 | $557,982 | $639,568 | $636,699 |
| 70.0 | 2/27/2043 | $61,499 | $88,253 | $101,157 | $100,703 |
| | | $1,680,700 | $2,411,851 | $2,764,499 | $2,752,098 |
| | Loss Beyond Worklife Expectancy | | $731,151 | $1,083,799 | $1,071,398 |

*Note:* *The loss is calculated by taking the difference between but-for and projected actual earnings.*

30. Based on this calculation, if the trier of fact does not find evidence to support Ms. Ostrofe's assumption that Dr. Bala will work to age 70, Ms. Ostrofe's damage conclusions are overstated by as much as $1,083,800.

**VIII.** ***Ms. Ostrofe's actual earnings calculations include several periods of unpaid time after Dr. Bala left OHSU in addition to unreasonably low earnings projections, resulting in understated actual earnings and overstated potential damages.***

31. In the Ostrofe Affirmative Report lost past earnings calculations, Ms. Ostrofe compared but-for earnings to Dr. Bala's past actual earnings since her departure from OHSU from employers Banner Medical Group, United Medical Associates, and Citrus Cardiology Consultants. As noted earlier in this report, once Dr. Bala found employment with Banner Medical Group in 2018, she had several subsequent unpaid time periods of non-work or unemployment. As a result, each of the loss scenarios in the Ostrofe Affirmative Report includes losses related to the periods of non-work or unemployment occuring after Dr. Bala found employment with Banner Medical Group.

32. By including actual periods of unpaid time between October 2019 and January 2023 in her calculations, Ms. Ostrofe is attributing the unpaid time to alleged harm by OHSU.

33. In order to calculate the impact of including periods of unpaid time as lost earnings in the Ostrofe Affirmative Report, at **Schedule 1** I revised Dr. Bala's past actual earning capacity assuming she had continued working in her then-current position, set equal to amounts in **Schedule A** of my supplemental analysis.

34. The inclusion of these periods of unpaid time as losses accounts for $955,900 of the damages calculated in each of the three scenarios in the Ostrofe Affirmative Report, as shown in the table below.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| Excerpt from Schedule 1 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| From Ostrofe Affirmative Report Schedule 3.0 | | | | | Revised Past Earnings Assumptions | | | |
| Period End Date | Pd in Years | Annual Wages | Annual Benefits | Period Amounts | Annual Wages/ Earning Capacity | Annual Benefits | Revised Period Amounts | Difference |
| 12/31/2019 | 1.00 | $383,323 | $15,832 | $399,155 | $450,714 | $17,072 | $467,786 | $68,631 |
| 12/31/2020 | 1.00 | $129,000 | $11,891 | $140,891 | $464,235 | $25,844 | $490,079 | $349,188 |
| 12/31/2021 | 1.00 | $337,379 | $15,061 | $352,440 | $500,000 | $27,463 | $527,463 | $175,023 |
| 12/31/2022 | 1.00 | $197,071 | $24,534 | $221,605 | $512,000 | $28,323 | $540,323 | $318,718 |
| 1/29/2023 | 0.08 | - | - | - | $524,288 | $30,141 | $44,354 | $44,354 |
| Ostrofe Calculated Loss Due to Unpaid Time Periods | | | | | | | | $955,914 |

35. I am not aware that Dr. Bala has alleged any interference or actions taken by OHSU that led to Dr. Bala's periods of unpaid time between 2019 and 2023. If the trier of fact finds there is no basis for Dr. Bala to claim losses for unpaid time due to voluntary leave taken by Dr. Bala or due to termination or resignation from her positions at Banner Medical Group and United Medical Associates, Ms. Ostrofe's damage calculations are overstated and not reliable.

36. In addition, Ms. Ostrofe's calculation of actual future earnings is based on an assumption that Dr. Bala's minimum initial year compensation of $525,000 at Citrus Cardiology Consultants reflects her earning capacity in private practice.

37. Leonard J. Henzke of ECG Management Consultants was hired by defendants to provide opinions related to Dr. Bala's earning capacity. Mr. Henzke issued an expert report dated November 1, 2023 describing his analysis and conclusions ("Henzke Affirmative Report").

38. According to Mr. Henzke, Dr. Bala's earning capacity was not negatively impacted by her departure from OHSU. In addition, Mr. Henzke opined that Dr. Bala can expect her wages to increase to median benchmark levels of $716,876 in 2024, and to the 75th percentile level of $977,723 in 2027,[6] or $910,576 stated in 2024 dollars.[7]

39. Ms. Ostrofe also assumed an employer retirement contribution rate of 3% of wages in her projection of actual earnings. According to Mr. Henzke in his Expert Rebuttal and Supplemental Report ("Henzke Rebuttal and Supplemental Report"), 7% represents a market employer retirement contribution rate in private practice.[8]

40. To determine the impact of these issues on Ms. Ostrofe's calculation of actual and projected actual earnings, I recreated Ms. Ostrofe's Schedule 3.0 earnings analysis, with the following adjustments:

      1. I replaced past actual earnings and benefits with the amounts described earlier in this section and shown at **Schedule A**.

---

[6] Henzke Affirmative Report, Exhibit IV.
[7] See calculation at **Schedule 1**. Since I relied on Ms. Ostrofe's methodology for applying a net discount rate in 2024 and beyond, I restated the value in 2024 to be consistent.
[8] Henzke Rebuttal and Supplemental Report, Exhibit I.

Exhibit 2
Page 10 of 39

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

2. I replaced the 2024 wage assumption with the median value of $716,876, and the 2027 wage assumption with the 75th percentile value of $910,576 described above.

3. Consistent with Mr. Henzke's opinion that Dr. Bala's earning capacity has not been negatively impacted by her departure from OHSU, I assumed an employer retirement contribution rate of 7% in 2024 and beyond, subject to the IRS annual wage limitations.

41. In order to provide a true comparison to Ms. Ostrofe's scenario, I otherwise relied on the rest of her assumptions for the purposes of my calculation. In doing so, I am not opining that I agree with Ms. Ostrofe's methodology.

42. The result of my revised calculation is shown at **Schedule 1.** The difference between my revised calculation of actual and projected actual earnings of $17,884,100 and the amount calculated by Ms. Ostrofe in her Schedule 3.0 is equal to $7,085,500, as shown in the table below.

| Actual/Projected Actual Earnings | | | |
|---|---|---|---|
| Category | Ostrofe Conclusions | Revised Analysis | Difference |
| Past Earnings | $2,024,407 | $3,414,783 | ($1,390,377) |
| Future Earnings | $8,774,208 | $14,469,286 | ($5,695,078) |
| **Total Actual/Projected Actual Earnings** | **$10,798,614** | **$17,884,069** | **($7,085,455)** |

43. Ms. Ostrofe's understatement of actual and projected actual earnings results in an overstatement of potential damages.

***IX.*** ***In her Scenario I loss calculation, Ms. Ostrofe significantly overstated Dr. Bala's but-for earnings and benefits for work in an academic setting, resulting in a $10,962,300 overstatement of potential damages.***

44. In her Scenario I, Ms. Ostrofe assumed that but-for OHSU's alleged wrongful conduct, Dr. Bala would have continued to perform clinical work and research in an academic setting as an Associate Professor and would advance to the position of Professor by 2023. Ms. Ostrofe assumed that the Associate Professor level position would earn wages at the base annual rate of $450,222 in 2017, plus health benefits valued at $7,164, and employer contributions to retirement at 12% of wages. Ms. Ostrofe assumed that the Professor level position would earn wages at the base annual rate of $652,906, plus health benefits valued at $14,103, and employer contributions to retirement at 18.8% of wages.[9]

45. Ms. Ostrofe's base annual wage rate of $450,222 for the Associate Professor level position is based on a calculation to annualize Dr. Bala's year-to-date OHSU wages as of June 19, 2017. However, the methodology used by Ms. Ostrofe resulted in the erroneous double-counting of certain components of salary, which resulted in the overstatement of but-for 2017 wages.

---

[9] Ostrofe Affirmative Report, Schedule 2.0 A.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

46. According to Exhibit 5.1 in the Ostrofe Affirmative Report, Ms. Ostrofe calculated annualized 2017 earnings of $450,222 including Dr. Bala's base salary rate of $361,000, plus $89,221.64 included on Dr. Bala's June 19, 2017 Earnings Statement as "Other YTD Amounts." However, according to documentation from OHSU, the "Other YTD Amounts" included pay for sick and vacation time used totaling $16,662 and cell/internet reimbursement payments totaling $360, as shown in the payroll excerpt below.

| Pay Element Name | Description | Amount |
|---|---|---|
| CPIa Cell Internet Pmt | Cell/Internet Pmt | 60.00 |
| SIK Sick Used | Sick Leave | 1,388.47 |
| CPIa Cell Internet Pmt | Cell/Internet Pmt | 60.00 |
| CPIa Cell Internet Pmt | Cell/Internet Pmt | 60.00 |
| CPIa Cell Internet Pmt | Cell/Internet Pmt | 60.00 |
| VAC Vacation Pay | Vacation | 8,330.82 |
| CPIa Cell Internet Pmt | Cell/Internet Pmt | 60.00 |
| VAC Vacation Pay | Vacation | 6,942.35 |
| CPIa Cell Internet Pmt | Cell/Internet Pmt | 60.00 |
| OTPCl One Time Pmt Clinical Inc Related | One Time Pay | 72,200.00 |
| | Total | 89,221.64 |

*Source: Rupa Bala EID 77241 - Other YTD Amounts Listed on Pay Period 13 2017 Paystub.pdf*

47. The pay for sick and vacation time used is already reflected in Dr. Bala's annual base salary rate, and the cell phone payments are expense reimbursements. As a result, these amounts should not be added to Dr. Bala's salary to determine annual base pay. However, as noted earlier in this section, the "One Time Pmt Clinical Inc Related" reflects incentive pay and should be included, resulting in annual earnings of $433,200 as opposed to the $450,222 calculated by Ms. Ostrofe.

48. Ms. Ostrofe then assumed Dr. Bala would be promoted to Professor at a pay rate falling within the 75th percentile.[10]

49. While Mr. Henzke agreed that Dr. Bala could have theoretically expected to advance to Professor in 2023, he opined that expected wages would be at the median level of $519,000,[11] indicating an overstatement in Ms. Ostrofe's wage assumption.

50. In addition, I observed that Ms. Ostrofe's assumption that Dr. Bala would be eligible for employer contributions to retirement at 18.8% of wages is not reasonable compared to OHSU's actual contribution rate of 12%, which neither Ms. Broten nor Ms. Ostrofe has alleged is below market value.

51. I also observed that Ms. Ostrofe significantly overstated her calculation of but-for employer retirement contributions by not taking into consideration IRS income limitations applicable to 401(k) and other similar plans. According to the IRS, retirement contributions are subject to

---

[10] Ostrofe Affirmative Report, Exhibit 5.4.
[11] Henzke Rebuttal and Supplemental Report, Exhibit II.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

an annual cap, which is set at $66,000 for 2023.[12] In addition, the IRS limits the maximum annual compensation of each employee that can be taken into account under a qualified plan as follows:[13]

| IRS Compensation Limits | |
|---|---|
| 2017 | $270,000 |
| 2018 | $275,000 |
| 2019 | $280,000 |
| 2020 | $285,000 |
| 2021 | $290,000 |
| 2022 | $305,000 |
| 2023 | $330,000 |

52. Ms. Ostrofe's use of an inflated employer retirement contribution rate of 18.8% along with her failure to apply the IRS income limitation rules resulted in an overstatement of but-for employer retirement contributions and resulting damages.

53. To determine the impact of these issues on Ms. Ostrofe's calculation of damages in Scenario I, I recreated Ms. Ostrofe's Schedule 2.0 A but-for earnings analysis, with the following adjustments:

    1. I replaced the Associate Professor level wage assumption with the 2017 annualized rate of $433,200.

    2. I replaced the Professor level wage assumption with Mr. Henzke's value of $519,000.

    3. I replaced the employer paid health benefits assumptions with the amounts at Exhibit II to the Henzke Rebuttal and Supplemental Report.

    4. I assumed an employer retirement contribution rate of 12%, subject to the limitations on employer contributions to retirement.

54. In order to provide a true comparison to Ms. Ostrofe's scenario, I otherwise relied on the rest of her assumptions for the purposes of my calculation. In doing so, I am not opining that I agree with Ms. Ostrofe's methodology.

55. The result of my revised calculation of but-for earnings under Ms. Ostrofe's Scenario I is shown at **Schedule 2.** The difference between my revised calculation of actual and but-for earnings and the amounts calculated by Ms. Ostrofe under Scenario I is equal to $10,962,300 and results in a conclusion of a net economic benefit to Dr. Bala of $4,933,400, as shown in the table below.

---

[12] https://www.irs.gov/pub/irs-drop/n-22-55.pdf.
[13] https://www.irs.gov/retirement-plans/a-guide-to-common-qualified-plan-requirements#8, https://www.pensions123.com/index.php/401k-limit-graph.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| Scenario I - Advances to Professor | | | |
|---|---|---|---|
| Category | Ostrofe Conclusions | Revised Analysis | Difference |
| Past Economic Loss | $2,203,951 | $434,476 | $1,769,475 |
| Future Economic (Benefit)/Loss | $3,825,017 | ($5,367,843) | $9,192,860 |
| **Total Economic (Benefit)/Loss** | **$6,028,968** | **($4,933,367)** | **$10,962,335** |

**X.    *In her Scenario II loss calculation, Ms. Ostrofe again significantly overstated Dr. Bala's but-for earnings and benefits for work in an academic setting, resulting in a $9,121,200 overstatement of potential damages.***

56. In her Scenario II, Ms. Ostrofe assumed that but-for OHSU's alleged wrongful conduct, Dr. Bala would have continued to perform clinical work and research in an academic setting and would advance to the position of Professor by 2023, and to Chief by 2029. Ms. Ostrofe assumed that the Professor-level position would earn wages and benefits equal to the amounts assumed for Scenario I and described in the previous section of this report. Ms. Ostrofe assumed that the Chief-level position would earn wages equal to $751,391 and employer contributions to retirement at 18.8% of wages, the same rate as Ms. Ostrofe applied for the Professor position.

57. As described in the previous section of this report, Mr. Henzke opined on lower expected wages for the Professor position, indicating an overstatement in Ms. Ostrofe's wage assumption. In addition, while Mr. Henzke stated that "[…] very few academic physicians ever attain the title of Division Chief, as many cardiology divisions are quite large and there is only one Chief per division […],"[14] he opined on an earning capacity of $830,345 assuming Dr. Bala could have become a Chief in 2027, stated in 2027 dollars.

58. As with Scenario I, I observed that Ms. Ostrofe's assumption that Dr. Bala would be eligible for employer contributions to retirement at 18.8% of wages is not reasonable compared to OHSU's actual contribution rate of 12%, and I observed that Ms. Ostrofe erred in her calculation of but-for employer retirement contributions by not applying the IRS limitations on employer contributions to retirement.

59. To determine the impact of these issues on Ms. Ostrofe's calculation of damages in Scenario II, I recreated Ms. Ostrofe's Schedule 2.0 B but-for earnings analysis, with the following adjustments:

> 1. I replaced the Professor-level wage assumption with Mr. Henzke's value of $519,000.
>
> 2. I replaced the Chief-level wage assumption with $759,883, Mr. Henzke's value of $830,345 adjusted to reflect 2024 dollars to be consistent with Ms. Ostrofe's analysis but applied in year 2027 instead of Ms. Ostrofe's assumption that Dr. Bala would be promoted in 2029.

---

[14] Henzke Affirmative Report, page 8, paragraph 23.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

       3. I replaced the employer-paid health benefits assumptions with the amounts at Exhibit II to the Henzke Rebuttal and Supplemental Report.

       4. I assumed an employer retirement contribution rate of 12%, subject to the IRS annual wage limitations.

60. In order to provide a true comparison to Ms. Ostrofe's scenario, I otherwise relied on the rest of her assumptions for the purposes of my calculation. In doing so, I am not opining that I agree with Ms. Ostrofe's methodology.

61. The result of my revised calculation of but-for earnings under Ms. Ostrofe's Scenario II is shown at **Schedule 3.** The difference between my revised calculation of actual and but-for earnings and the amounts calculated by Ms. Ostrofe under Scenario II is equal to $9,121,200 and results in a conclusion of a net economic benefit to Dr. Bala of $1,776,200, as shown in the table below.

| Scenario II - Advances to Chief | | | |
|---|---|---|---|
| Category | Ostrofe Conclusions | Revised Analysis | Difference |
| Past Economic Loss | $2,203,951 | $434,476 | $1,769,475 |
| Future Economic (Benefit)/Loss | $5,141,038 | ($2,210,714) | $7,351,752 |
| **Total Economic (Benefit)/Loss** | **$7,344,989** | **($1,776,238)** | **$9,121,227** |

### XI.　*In her Scenario III loss calculation, Ms. Ostrofe overstated Dr. Bala's but-for earnings and benefits for work in a private practice setting, resulting in a $6,305,200 overstatement of potential damages.*

62. In her Scenario III, Ms. Ostrofe assumed that but-for OHSU's alleged wrongful conduct, Dr. Bala could have obtained employment in private practice beginning on June 19, 2017. Ms. Ostrofe assumed Dr. Bala's initial wages would have been at the 50th percentile of $708,964 as stated in 2022 dollars, reduced annually for the impact of wage inflation until reaching 2017; and then at the 75th percentile rate of $824,150 beginning in 2023. Ms. Ostrofe also assumed employer contributions to retirement ranging from 8.3% to 9% of wages.[15]

63. Scenario III relies on an underlying assumption that Dr. Bala was prevented from obtaining a market-level position in private practice immediately after leaving OHSU. However, according to the opinion of Jennifer L. Moody of ECG Management Consultants in her expert report dated November 1, 2023 ("Moody Affirmative Report"), "Dr. Bala did not consistently utilize all available avenues for physicians to find employment throughout her job search and thus limited her opportunities for successful placement."[16] In addition, Ms. Moody opined that "[h]ad Dr. Bala engaged in a comprehensive and diligent job search while still employed at OHSU, the nonrenewal of her contract would have had little, if any, effect on her ability to find a new job in any practice setting."[17]

---

[15] Ostrofe Affirmative Report, Schedule 2.0 C.
[16] Moody Affirmative Report, page 8.
[17] Moody Affirmative Report, page 9, paragraph 40.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

64. In addition, Mr. Henzke opined that Dr. Bala's initial wages in private practice ranging from 75% to 77% of the median wage level for 2021 and 2022, respectively, were consistent with market level expectations.[18]

65. Finally, I observed that Ms. Ostrofe erred in her calculation of but-for employer retirement contributions by not taking into consideration IRS income limitations applicable to 401(k) and other similar plans, as observed in Scenarios I and II and described earlier in this report.

66. To determine the impact of these issues on Ms. Ostrofe's calculation of damages in Scenario III, I recreated Ms. Ostrofe's Schedule 2.0 C earnings analysis, with the following adjustments:

> 1. I replaced the 2017 level wage assumption with a value based on 77% of the 2017 median wage rate which totaled $466,591, consistent with Mr. Henzke's opinion of Dr. Bala's initial market-level wages in private practice.
>
> 2. I grew 2017 wages by the 2.4% average growth rate opined upon by Mr. Henzke for earnings in community practice from 2018 to 2021.
>
> 3. In 2022, consistent with Mr. Henzke's assumption that Dr. Bala would have an earning capacity equal to the 75th percentile after roughly 5 years in private practice, I assumed Dr. Bala would earn wages of $868,946.
>
> 4. I replaced the employer-paid health benefits with the Average Employer Contributions to Premiums, Single Coverage, based on the KFF Employer Health Benefits Survey.
>
> 5. I applied an employer retirement contribution rate of 7%, equal to the assumption relied upon in the but-for scenario for community practice, based on ECG Management Consultant's proprietary data provided by Mr. Henzke.

67. In order to provide a true comparison to Ms. Ostrofe's scenario, I otherwise relied on the rest of her assumptions for the purposes of my calculation. In doing so, I am not opining that I agree with Ms. Ostrofe's methodology.

68. The result of my revised calculation of but-for earnings under Ms. Ostrofe's Scenario III is shown at **Schedule 4.** The difference between my revised calculation of actual and but-for earnings and the amounts calculated by Ms. Ostrofe under Scenario III is equal to $6,305,200 and results in a conclusion of a net loss to Dr. Bala of $2,354,400, as shown in the table below.

---

[18] Henzke Affirmative Report, page 7.

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

| Scenario III - Private Practice on 6/19/2017 | | | |
|---|---|---|---|
| Category | Ostrofe Conclusions | Revised Analysis | Difference |
| Past Economic Loss | $3,057,252 | $1,834,147 | $1,223,105 |
| Future Economic (Benefit)/Loss | $5,602,343 | $520,221 | $5,082,122 |
| **Total Economic (Benefit)/Loss** | **$8,659,595** | **$2,354,367** | **$6,305,228** |

### XII.    Conclusion

69. The following table summarizes the results of my revised calculations of total economic benefits or losses under each of Ms. Ostrofe's scenarios.

| Revised Analyses - Lost Income (Excluding Prejudgment Interest) | Scenario I Advances to Professor | Scenario II Advances to Chief | Scenario III Private Practice |
|---|---|---|---|
| Revised Past Loss | $434,476 | $434,476 | $1,834,147 |
| Revised Future (Benefit)/Losses: | | | |
| Cut Off at Worklife Expectancy Age 65.8 | ($4,243,297) | ($1,811,653) | $518,473 |
| Cut Off at Age 67 | ($4,573,581) | ($1,928,859) | $518,986 |
| Cut Off at Age 70 | ($5,367,843) | ($2,210,714) | $520,221 |
| **Revised Total (Benefit)/Losses** | **($4,933,367)** | **($1,776,238)** | **$2,354,367** |

70. My opinions may be supplemented or amended upon receipt of additional information.

Yours Sincerely,

Jennifer Prager, CPA, CFE, ABV, CVA, MAFF

Dr. Rupa Bala v. Oregon Health and Science University et al.
Rebuttal and Supplemental Expert Report of Jennifer Prager, CPA, CFE, ABV, CVA, MAFF
December 15, 2023

### Statement of Compensation

Morones Analytics, LLC was compensated at a rate of $425 per hour for work performed by Jennifer Prager on this analysis.  Compensation related to other associates employed by Morones Analytics ranged from $225 to $625 per hour.

### Prager Testimony - Past Four Years

Robert Keller, beneficiary of the Frances M. Keller Trust v. James Keller, Daniel Keller, and Mark Riem, co-trustees of the Frances M. Keller Trust, Circuit Court State of Oregon, Multnomah County, Case No. 21PB01847, November 2023

James Martin v. John Babikian, Middlebay Trade LTD et al. & John Babikian, Middlebay Trade LTD v. Sunshine Mountain Vineyards, Circuit Court State of Oregon, Wasco County, Case No. 21CV48763, September 2023

Berrey Family LLC v. MWIC Pringle Corp., Lawrence Tokarski, and South Park Mixed Use LLC, Arbitration, August 2023

Donald Annotti & Kelly Annotti Dissolution, Circuit Court State of Oregon, Marion County, Case No. 20DR16083, March 2023

Julia Stenersen & Anthenie Stenersen Dissolution, Arbitration, August 2022

Integrity Structures, LLC v. DirtEx LLC, Arbitration, February 2022

Sarah L. Strain, Elizabeth L. Potter, Jennifer L. Isenhart, and Mary L. Kistner on behalf of Bussmann Cranberries LLC v. George P. Bussmann, James A. Bussmann, Peter D. Bussmann and Diane Bussmann, and Bussmann Cranberries (nominal defendant), Circuit Court State of Oregon, Coos County, Case No. 20CV22959, November 2021

Richard Barker and Kelly Barker v. Westwood Capital, LLC et al., Circuit Court State of Oregon, Washington County, Case No. 19CV10067, September 2021

Marianne Sharp v. Joseph Elroy Sharp, Circuit Court State of Oregon, Yamhill County, Case No. DO110162, September 2021

Delahunt Homes, Inc. v. Michael & Kari Lubitz, Arbitration, October 2019

# Attachments

Exhibit 2
Page 19 of 39



Attachment A



# Jennifer Prager

CPA, CFE, CVA, ABV, MAFF, Director

jprager@moronesanalytics.com

503-906-1586

LOST PROFITS DAMAGES

FORENSIC ACCOUNTING & FRAUD INVESTIGATION

DATA ANALYTICS

**Jennifer Prager has specialized in financial damages analysis and forensic accounting for 20+ years. She is a testifying expert who brings deep experience at CPA firms and on large forensic cases in Portland and San Francisco.**

Attorneys turn to Jennifer for a thorough financial analysis so they can enter trial or mediation with a credible calculation. Jennifer brings clarity in a financial dispute to provide clients with realistic expectations and a solid understanding of the facts so they can make better decisions along the way. Given her extensive forensic accounting background, she has a grasp on the needs of clients and can alert them to potential pitfalls.

Jennifer's case experience includes a number of nationally known accounting investigations and litigation matters. She has analyzed complex litigation cases involving construction disputes, shareholder disputes, divorce, securities lawsuits, fraud and embezzlement, employment issues, commercial contracts and insurance.

Jennifer had an early interest in economics and in identifying money relationships and trends. She enjoys digging into the messy financial data, untangling multiple assets and pulling the evidence together into a powerful story to be part of a solution.

### Professional Credentials & Education

- Certified Public Accountant, Oregon (CPA)

- Accredited in Business Valuation (ABV), American Society of CPAs

- Certified Valuation Analyst (CVA)

- Master Analyst in Financial Forensics (MAFF), National Association of Certified Valuators and Analysts

- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners

- Bachelor of Science in Managerial Economics, University of California, Davis

Exhibit 2

Page 20 of 39

Jennifer Prager CPA, CFE, CVA, ABV, MAFF, Director

**Morones Analytics**

## Selected Professional Engagements

- Analyzed plaintiffs' claims of breach of contract and breach of fiduciary duty against the member managers of a family-owned farm and crop cleaning company. Ms. Prager quantified the damages and testified in support of her opinion. The jury awarded Ms. Prager's damage opinion.
- Quantified the total amount overpaid on a subcontract related to a large government project. Ms. Prager testified in support of her opinion to a panel of arbitrators that awarded damages equal her calculation.
- Appointed by a mediator to serve as a neutral in a shareholder dispute involving allegations of self-dealing by the manager of two closely held ranches. Prepared a report for the mediator summarizing the accounting of related party transactions together with the entities' Board Minutes that recorded the Board's contemporaneous understanding of the related party relationships.
- Calculated a business loss claim for a winery that delayed production of a vintage due to a malfunction of equipment during fermentation. Calculated the winery's losses caused by the delay. The claim was settled in mediation.
- Analyzed a construction company's accounting records to determine appropriate costs on the disputed project and testified in support of opinion.
- Analyzed plaintiff's lost profits claim against an Oregon county. Through investigation and analysis of publicly available information, identified unrecorded revenue as well as collection of sales tax not remitted to the taxing authority.
- Analyzed economic damages stemming from an investment advisor's embezzlement of client funds.
- Analyzed lost personal income from an accident. Through forensic analysis was able to identify other reasons for the decrease in income.
- Analyzed and reconciled internal accounting records in a business dispute to calculate the amounts due to the parties under the governing agreements.
- Analyzed the financial records of a partnership that alleged fraud by one of its members. Prepared a report identifying and quantifying suspicious transactions and explaining the unusual accounting.
- Analyzed the potential economic damages resulting from a breach of a non-compete agreement and testified in support of opinion.
- Analyzed a company's accounting records to determine income available for spousal support. Through forensic analysis identified transactions that indicated possible unrecorded revenue and provided expert testimony.

### Professional Associations

- Oregon Society of Certified Public Accountants, Member
- American Institute of Certified Public Accountants, Member
- Association of Certified Fraud Examiners, Oregon Chapter Board Member and Treasurer, 2016 – current
- Association of Certified Fraud Examiners, Member
- National Association of Certified Valuators and Analysts, Ethics Oversight Board, 2012-2015; Chair 2014 – 2015

### Professional Recognition

- Standing Ovation Award, American Institute of Certified Public Accountants, Forensic and Valuation Services, November 2015
- Outstanding Member – National Association of Certified Valuators, Second Quarter 2015

### Presentations

- How to Frame Conclusions in a Fraud Investigation (From a CPA Perspective), OACFE Annual Conference, June 2018
- Identifying and Limiting Your Risks in an FVS Engagement, AICPA Webcast, June 2016

Exhibit 2
Page 21 of 39

Attachment B

*Rupa Bala MD v. OHSU et al*

Documents Provided to Economist Expert – for Rebuttal Report

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | **Additional documents provided by Defendants for rebuttal/supplemental report:** | | |
| 1 | | | Earning Capacity Determination Report of E. Lisa Broten LCSW, 10/27/23 |
| 2 | | | Expert Witness Report of Nora C. Ostrofe MBA, 11/1/23 |
| 3 | | | Vocational Evaluation Report of DT North MS, 11/1/23 |
| 4 | | | Expert Report of Jennifer L. Moody, 11/1/23 |
| 5 | | | Expert Report and Exhibits of Leonard J. Henzke, 11/1/23 |
| 6 | BALA 2712 | BALA 2712 | Resignation email to UHS, 2/11/22 |
| 7 | | | Other YTD Amounts Listed on Pay Period 13 2017 Paystub |
| 8 | | | Expert Rebuttal and Supplemental Report of Leonard J. Henzke, 12/8/23 |
| | **Plaintiff's experts' documents provided for rebuttal/supplemental report:** | | |
| 9 | BALA 2883 A | BALA 2891 | Banner Earnings Statements, 1/16/20-5/21/20 |
| 10 | BALA 4910 | BALA 4915 | Banner Retirement Statements, 9/29/23 |
| 11 | BALA 2909 | BALA 2909 | Citrus Earnings Statement, 9/29/23 |
| 12 | BALA 2916 | BALA 2921 | OHSU Earnings Statements, 12/31/15, 12/30/16 and 6/19/17 |
| 13 | BALA 2892 | BALA 2892 | UMA Earnings Statement, 12/23/21 |
| 14 | BALA 2901 | BALA 2901 | UMA Earnings Statement, 5/26/22 |
| 15 | BALA 2893 | BALA 2900 | UHS Retirement Statements, 12/31/21 and 3/31/22 |
| 16 | BALA 2902 | BALA 2908 | UHS Retirement Statements, 6/30/22 and 6/30/23 |
| 17 | | | Second Amended Complaint for Deprivation of Civil Rights, 2/11/19 |
| 18 | | | Defendants' Answer and Affirmative Defenses to Second Amended Complaint for Deprivation of Civil Rights, 4/15/19 |
| 19 | | | Defendants' Motion for Summary Judgment, 8/23/21 |
| 20 | | | Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Cross Motion for Summary Judgment (Corrected), 9/30/21 |
| 21 | | | Reply in Support of Defendants' Motion for Summary Judgment, 11/8/21 |
| 22 | UPENN000001 | UPENN000002 | Offer letter, 3/23/06 |
| 23 | OHSU_RB 001524 | OHSU_RB 001531 | Faculty Evaluations at UPenn |
| 24 | UPENN000676 | UPENN000684 | Teaching Evaluations |
| 25 | UPENN000563 | UPENN000564 | Overview of Teaching for previous three years |
| 26 | OHSU_RB 001726 | OHSU_RB 001727 | Letter in Support of Promotion by Dr. Kaul, 5/29/14 |
| 27 | OHSU_RB 000050 | OHSU_RB 000073 | Clinician Employment Agreement, 1/5/15 |
| 28 | OHSU_RB 000218 | OHSU_RB 000219 | Position Description |
| 29 | OHSU_RB 001704 | OHSU_RB 001705 | Letter of Recommendation by Dr. Parmacek to Dr. Henrikson, 6/20/14 |
| 30 | OHSU_RB 000423 | OHSU_RB 000423 | Letter of Recommendation by Dr. Parmacek to Dr. Kaul, 6/20/14 |
| 31 | OHSU_RB 000020 | OHSU_RB 0023 | Appointment letter, 7/16/14 |
| 32 | BALA 0874 | BALA 0875 | Analysis of Educator Performance, 8/6/15 |
| 33 | BALA 1869 | BALA 1869 | Annual Faculty Evaluation, 2014-2015 |
| 34 | OHSU_RB 001809 | OHSU_RB 001810 | Letter in support of promotion by Dr. Henrikson |
| 35 | BALA 0992 | BALA 0996 | Analysis of Education Performance, Dec. 2015 |
| 36 | OHSU_RB 001441 | OHSU_RB 001443 | Aggregate Evaluation Report – Student Evaluations, 12/17/15 |

Page 1

Exhibit 2
Page 22 of 39

Attachment B

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 37 | OHSU_RB 001797 | OHSU_RB 001797 | Letter in support of promotion by Dr. Hutchinson, 9/20/15 |
| 38 | OHSU_RB 001811 | OHSU_RB 001811 | Letter in support of promotion by Dr. Shah, 9/20/15 |
| 39 | OHSU_RB 001799 | OHSU_RB 001799 | Letter of reference for promotion by Dr. LeMond, 9/25/15 |
| 40 | OHSU_RB 001804 | OHSU_RB 001805 | Letter in support of promotion by Dr. Narayan, 9/29/15 |
| 41 | OHSU_RB 001800 | OHSU_RB 001801 | Letter in support of promotion by Dr. Marchlinski, 9/30/15 |
| 42 | OHSU_RB 001795 | OHSU_RB 001795 | Letter in support of promotion by Dr. Gerstenfeld, 10/24/15 |
| 43 | OHSU_RB 001780 | OHSU_RB 001782 | Letter recommending promotion by Dr. Fennerty, 12/5/15 |
| 44 | OHSU_RB 001807 | OHSU_RB 001808 | Letter in support of promotion by Dr. Patton, 12/11/15 |
| 45 | OHSU_RB 001735 | OHSU_RB 001738 | Letter by Dr. Anderson proposing appointment, 12/27/15 |
| 46 | OHSU_RB 001745 | OHSU_RB 001745 | Fellow Evaluations |
| 47 | BALA 1870 | BALA 1870 | Annual Faculty Evaluation, 2015-2016 |
| 48 | BALA 00193 | BALA 00195 | Personal statement in support of promotion |
| 49 | OHSU_RB 000099 | OHSU_RB 000099 | Annual salary increase, 7/1/16 |
| 50 | OHSU_RB 000010 | OHSU_RB 000010 | Appointment to Associate Professor, 7/1/16 |
| 51 | BALA 2028 | BALA 2028 | Cover of 'Tucson Lifestyle' |
| 52 | BALA 2034 | BALA 2036 | 2020 Top Doctors, 'Tucson Lifestyle,' June 2020 |
| 53 | BALA 2440 | BALA 2464 | CV of Rupa Bala |
| 54 | BALA 2469 | BALA 2470 | Exceptional Women in Medicine, 'Tucson Lifestyle,' March 2021 |
| 55 | OHSU_RB 000257 | OHSU_RB 000257 | Controlled Substance Registration Certificate, 7/21/13 |
| 56 | OHSU_RB 000258 | OHSU_RB 000258 | Medical Physician and Surgeon License, 9/24/01 |
| 57 | OHSU_RB 000259 | OHSU_RB 000259 | Certificate re Clinical Cardiac Electrophysiology, 2007-2017 |
| 58 | OHSU_RB 000260 | OHSU_RB 000260 | Certificate re Cardiovascular Disease, 2006-2016 |
| 59 | OHSU_RB 000261 | OHSU_RB 000261 | Medicinae Doctoris certificate |
| 60 | | | Revised – University of Chicago Residency Class, 1998 |
| 61 | BALA 2485 | BALA 2509 | CV of Rupa Bala, 10/2022 |
| 62 | | | Defendants' Response to Plaintiff's First Set of Interrogatories, 6/6/19 |
| 63 | | | Declaration of Dr. Rick Koch in Opposition to Defendant's Motion for Summary Judgment, 9/29/21 |
| 64 | OHSU_RB 004055 | OHSU_RB 004057 | Text messages between Dr. Dewland and Dr. Henrikson, 11/15/17-11/16/17 |
| 65 | OHSU_RB 004068 | OHSU_RB 004068 | Text messages between Ms. MacNeill and Dr. Henrikson, 9/12/17 |
| 66 | | | Excerpt of Dr. Henrikson deposition transcript, 8/7/20, pages 27-43 |
| 67 | VIRGINIAMASON 000030 | VIRGINIAMASON 000036 | Candidate notes, 8/25/17-9/25/17 |
| 68 | | | Excerpt of Dr. Bala deposition transcript, 7/28/20, pages 266-319 |
| 69 | BALA 000001 | BALA 000109 | 2016-2020 job search documents |
| 70 | BALA 1871 | BALA 2027 | August 2020 – November 2020 job search documents |
| 71 | BALA 2037 | BALA 2150 | December 2020 job search documents [BALA 2028-2036 not included] |
| 72 | BALA 1600 | BALA 1671 | February 2020 – June 2020 job search documents |
| 73 | BALA 2151 | BALA 2260 | January 2021 – February 2021 job search documents |
| 74 | BALA 2298 | BALA 2439 | September 2021 – October 2022 job search documents |
| 75 | BALA 2471 | BALA 2509 | November 2021 – June 2022 job search documents |
| 76 | BALA 2513 | BALA 2550 | January 2021 – June 2022 job search documents |
| 77 | | | List of job search efforts 2016-2022 with notes by Dr. Bala, updated 11/30/22 |
| 78 | BALA 2465 | BALA 2468 | Email string re position in Atlanta GA (Jackson Physicians), Aug. 2022 |
| 79 | BALA 1564 | BALA 1584 | Banner HR emails, Aug.-Oct. 2019 |
| 80 | BALA 1771 | BALA 1773 | Banner HR emails, 9/27/19 – 10/8/19 |

121561487.1 0027345-00065

Exhibit 2
Page 23 of 39

Attachment B

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 81 | BALA 1767 | BALA 1768 | Banner HR email string, 10/15/19 |
| 82 | BALA 1517 | BALA 1528 | Banner fellow evaluations |
| 83 | BALA 1784 | BALA 1788 | Banner comments/feedback |
| 84 | BALA 1592 | BALA 1596 | Banner emails and notice of termination |
| 85 | | | Banner Verbal discussion, typed notes (undated) |
| 86 | BALA 1481 | BALA 1483 | Banner emails/investigation |
| 87 | BALA 1484 | BALA 1513 | Dr. Bala's response to Banner verbal discussion, 7/24/19 |
| 88 | BALA 1516 | BALA 1516 | Corrective Action Guidelines for Banner Leaders |
| 89 | BANNER000272 | BANNER000275 | Typed notes of ER Consultant, 9/26/19 |
| 90 | BANNER000024 | BANNER000025 | Documented Verbal Discussion |
| 91 | BANNER000144 | BANNER000174 | Emails w/ Dr. Bala's response to verbal discussion, Aug.-Oct. 2019 |
| 92 | BANNER000337 | BANNER000340 | Dr. Bala email to Leadership, 9/2/19 |
| 93 | BANNER000175 | BANNER000194 | ER Investigation Report |
| 94 | BANNER000022 | BANNER000023 | Notice of termination, 1/17/20 |
| 95 | BANNER000001 | BANNER000021 | Physician Employment Agreement, 3/28/18 |
| 96 | BAAA 2674 | BAAA 2710 | Employment Agreements, UHS Medical Group, 2/8/21 and 8/6/21 |
| 97 | BALA 2261 | BALA 2297 | Employment Agreements, 8/6/21 and unsigned/undated |
| 98 | BALA 1322 | BALA 1322 | Form W-2, 2015 |
| 99 | BALA 1357 | BALA 1357 | Form W-2, 2016 |
| 100 | BALA 2876 | BALA 2877 | Form 1099s, 2017 |
| 101 | BALA 1412 | BALA 1412 | Form W-2, 2017 |
| 102 | BALA 1470 | BALA 1470 | Form W-2, 2018 (clean copy) |
| 103 | BALA 2879 | BALA 2879 | Form W-2, 2018 (photo) |
| 104 | BALA 2717 | BALA 2722 | Form W-2s, 2019-2021 |
| 105 | BALA 2881 | BALA 2881 | Form W-2, 2022 |
| 106 | BALA 2723 | BALA 2725 | Citrus Cardiology Employment Application, 11/14/22 |
| 107 | BALA 2726 | BALA 2727 | Citrus Cardiology offer letter, 10/14/22 |
| 108 | BALA 2728 | BALA 2744 | Physician Services Employment Agreement, Citrus Cardiology, 10/26/22 |
| 109 | BALA 2745 | BALA 2777 | Citrus Cardiology Employee Handbook |
| 110 | BALA 2778 | BALA 2825 | Citrus Cardiology 2023 Benefit Enrollment Guide |
| 111 | BALA 2826 | BALA 2854 | AAMC Faculty Salary Reports, FY 2021 |
| 112 | BALA 2855 | BALA 2873 | MGMA Physician Compensation Reports, FY 2021 |
| 113 | BALA 2623 | BALA 2673 | AAMC report: Exploring Salary Equity Among Medical School Leadership, Nov. 2022 |
| 114 | | | 2916 AAMC - 2020 Western - Compensation by Medical School Type (CS)-5 |
| 115 | | | 2917 AAMC - 2022  - Private Compensation by Medical School Type (CS)-8 |
| 116 | | | 2918 AAMC - 2022 - All schools - Compensation by Medical School Type (CS)-6 |
| 117 | | | 2919 AAMC - 2022 Public Schools - Compensation by Medical School Type (CS)-7 |
| 118 | | | 2920 AAMC 2021 - Western - Compensation by Medical School Type (CS)-4 |
| 119 | | | 2921 AAMC 2022 Western - Compensation by Medical School Type (CS)-2 |
| 120 | | | 2922 Rupa Bala CV – 2023 |
| 121 | | | Article 'Workforce in Crisis: Charting the Path Forward', in American |

Page 3

Exhibit 2
Page 24 of 39

Attachment B

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | | | College of Cardiology, 6/2/23 |
| 122 | | | Article 'Under the Radar: Visibility and the Effects of Discrimination Lawsuits in Small and Large Firms' in American Sociological Review, 2022 |
| 123 | | | Article 'By the numbers: How cardiologists have been affected by the COVID-19 pandemic' in Cardiovascular Business, 4/14/20 |
| 124 | | | 'Retaliation – Maike it Personal' on US EEOC website |
| 125 | | | Occupation profile for Cardiologists on O*Net OnLine |
| 126 | | | Occupational Outlook Handbook on US Bureau of Labor Statistics website, for Physicians and Surgeons |
| 127 | OHSU_RB000001 | OHSU_RB000002 | Notice of a Claim, 12/15/17 |
| 128 | OHSU_RB000003 | OHSU_RB000005 | Policy: A Culture of Ethics and Integrity |
| 129 | OHSU_RB000006 | OHSU_RB000006 | 4.20.17 Faculty Record Memo |
| 130 | OHSU_RB000007 | OHSU_RB000008 | E-Business Suite Termination Details |
| 131 | OHSU_RB000009 | OHSU_RB000009 | 3.9.17 E-mail Re Last Day at Work |
| 132 | OHSU_RB000011 | OHSU_RB000014 | Hiring information workflow sheet |
| 133 | OHSU_RB000015 | OHSU_RB000016 | 11.1.14 Position Description |
| 134 | OHSU_RB000017 | OHSU_RB000018 | Position Approval Request |
| 135 | OHSU_RB000019 | OHSU_RB000019 | 10.6.14 Public Safety Background Check |
| 136 | OHSU_RB000024 | OHSU_RB000024 | Confidentiality and Intellectual Property Assignment Agreement |
| 137 | OHSU_RB000026 | OHSU_RB000048 | CV of Rupa Bala |
| 138 | OHSU_RB000049 | OHSU_RB000049 | Federal and State Program Compliance Registration |
| 139 | OHSU_RB000074 | OHSU_RB000099 | Various emails and HR documents |
| 140 | OHSU_RB000100 | OHSU_RB000101 | PEP Memorandum, 10/9/15 |
| 141 | OHSU_RB000102 | OHSU_RB000105 | Email re complaints about Dr. Bala |
| 142 | OHSU_RB000106 | OHSU_RB000107 | Meeting Notes, 9/17/15 |
| 143 | OHSU_RB000108 | OHSU_RB000261 | Miscellaneous HR documents |
| 144 | OHSU_RB000262 | OHSU_RB000263 | Email string between Ms. Porreco and Ms. Strahm, 5/11/16 |
| 145 | OHSU_RB000264 | OHSU_RB000300 | Code of Conduct |
| 146 | OHSU_RB000301 | OHSU_RB000302 | Forms re open and close of investigation |
| 147 | OHSU_RB000303 | OHSU_RB000306 | Email by Ms. Shults to Mr. Ellis 9/28/18 re public records response and TCN |
| 148 | OHSU_RB000307 | OHSU_RB000322 | Emails re NAVX issue, 6/20/17-6/26/17 |
| 149 | OHSU_RB000323 | OHSU_RB000325 | W-2 forms: 2015-2017 |
| 150 | OHSU_RB000326 | OHSU_RB000337 | Policies: EEO, harassment, EEO complaints |
| 151 | OHSU_RB000338 | OHSU_RB000623 | SPDs, benefits info |
| 152 | BALA 1290 | BALA 1470 | Tax returns, 2015-2018 |
| 153 | BALA 2551 | BALA 2622 | Tax returns, 2019-2021 |
| 154 | | | Emails between Dr. Bala and Ms. Ostrofe, 10/24/23-10/26/23 |

Page 4

# Schedules

Exhibit 2
Page 26 of 39

Supplemental Summary

**Rupa Bala, MD v. OHSU**
**Supplemental Summary of Losses**

|  | Schedule A | | |
| --- | --- | --- | --- |
|  | **But-For** | **Actual** | **Difference = Lost Earnings** |
| **Earnings** | $3,621,100 | $3,134,500 | $486,600 |

Morones Analytics

**Exhibit 2**

Schedule A

**Rupa Bala, MD v. OHSU**
Lost Earnings

| Period Ended | Age at End of Period | Pd in Years | But-For Earnings[1] | | | | Actual/Projected Actual Earnings | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Wages | Employer Paid Health Benefits | Employer Contributions to Retirement | Total But-For Earnings | Employer | Wages | Employer Paid Health Benefits | Employer Contributions to Retirement | Total Actual/Proj Actual Earnings | Lost Earnings |
| 12/31/17 | 44.8 | 1.00 | $433,200 | $7,200 | $32,400 | $472,800 | OHSU | $330,394 [2] | $3,442 [2] | $31,031 [2] | $364,868 | $107,932 |
| 12/31/18 | 45.8 | 1.00 | $439,000 | $7,500 | $33,000 | $479,500 | Banner Health | $230,846 [2] | $3,286 [2] | - [2] | $234,131 | $245,369 |
| 12/31/19 | 46.8 | 1.00 | $461,000 | $7,800 | $33,600 | $502,400 | Banner Health | $450,714 [3] | $5,907 [2] | $2,925 [2] | $459,546 | $42,854 |
| 12/31/20 | 47.8 | 1.00 | $477,000 | $8,100 | $34,200 | $519,300 | Banner Health | $464,235 [5] | $5,907 [6] | $11,400 [4] | $481,542 | $37,758 |
| 12/31/21 | 48.8 | 1.00 | $491,000 | $8,400 | $34,800 | $534,200 | UHS | $500,000 [7] | $7,009 [2] | $11,600 [7] | $518,609 | $15,591 |
| 12/31/22 | 49.8 | 1.00 | $500,000 | $8,700 | $36,600 | $545,300 | UHS | $512,000 [8] | $7,009 [2] | $12,200 [7] | $531,209 | $14,091 |
| 01/29/23 | 49.9 | 0.08 | $519,000 | $9,000 | $39,600 | $45,408 | UHS | $524,288 [8] | $7,009 [2] | $13,200 [7] | $43,560 | $1,848 |
| 12/31/23 | 50.8 | 0.92 | $519,000 | $9,000 | $39,600 | $522,192 | Citrus | $525,000 [9] | $6,420 [9] | $13,200 [10] | $501,050 | $21,142 |
| Total (Rounded) | | | $3,839,200 | $65,700 | $283,800 | $3,621,100 | | $3,537,500 | $46,000 | $95,600 | $3,134,500 | $486,600 |

**Assumptions:**

| | |
|---|---|
| Date of Birth | 2/27/1973 *Per 2015 Oregon Tax Return* |
| OHSU Contract End Date | 6/19/2017 |
| Age at OHSU Contract End Date | 44.3 |
| Employer Contributions to Retirement - % of Wages | 12% [3] |
| Wage Growth Rate - Academic | 3.0% |
| Wage Growth Rate - Community | 2.4% |

**Footnotes:**

[1] The 2017 but-for earnings rate is set equal to annualized 2017 earnings as detailed at **Schedule B**. All other but-for earnings and benefits are based on the median benchmark analysis summarized in the Henzke Rebuttal and Supplemental Report at Exhibit II.

[2] Actual per **Schedule B**.

[3] Dr. Bala's actual 2019 earnings have been updated to include the compensation Dr. Bala would have earned had she not taken Family Medical Leave, which reduced her pay checks dated November 7, 2019 through January 16, 2020.

| | 2019 | |
|---|---|---|
| Actual Pay - Banner Health Records | $387,714 | Per **Schedule B** |
| Family Medical Leave Periods | $63,000 | Four 2019 pay periods that did not include Dr. Bala's regular pay of $15,750 (BANNER000532-550). |
| **Total Annual Compensation** | **$450,714** | Total compensation if Dr. Bala had not taken leave |

[4] Based on the Banner Payment Detail Listing (BANNER000532-50), Banner paid a 4% match on 401(k) contributions, which would be subject to IRS compensation limits.

[5] 2020 earnings are set equal to 2019 annual compensation as calculated above, adjusted for growth at the academic wage growth rate.

[6] 2020 employer paid health benefit set equal to 2019 amount.

Morones Analytics
Exhibit 2
Page 28 of 39

**Rupa Bala, MD v. OHSU**
**Lost Earnings**

[7] Subsequent to a period of unemployment following Dr. Bala's termination from Banner University Medical Group, on February 8, 2021, Dr. Bala signed an Employment Agreement with UHS Medical Group in New York with a clinical base salary of $500,000 (BAAA 2674-91). Since Dr. Bala's termination from Banner University, and the subsequent period of unemployment, were not caused by OHSU or the other Defendants, I have assumed that Dr. Bala's 2021 earnings capacity is equal to her base salary in the UHS Employment Agreement, and that the employer retirement contributions while at UHS would equal the actual 2022 amount at 4% of wages.

[8] Dr. Bala's 2022 W-2 from the UHS Medical Group does not include a full year of compensation. It is my understanding from counsel that Dr. Bala voluntarily resigned her position. Since Dr. Bala's voluntary separation was not caused by OHSU or the other Defendants, I have assumed Dr. Bala's 2022 to January 2023 earnings capacity (up to the point where she began working for Citrus Cardiology Consultants) is equal to the base salary in her 2021 Employment Agreement (BALA 2881) adjusted for wage growth at the community practice growth rate, above. I have also assumed that Dr. Bala's 2022 to January 2023 medical, dental and vision benefit rates would be equal to the actual 2021 benefit rate.

[9] Dr. Bala's minimum compensation per Exhibit A to the Citrus Cardiology Physician Services Employment Agreement (BALA 2728-44). Health Benefits per Schedule 3.0 to the Ostrofe Affirmative Report.

[10] Dr. Bala is not eligible for the Citrus 3% 401k match until July 2024, the open enrollment period, one year after her January 2023 start (10/26/23 email from Dr. Bala to Nora Ostrofe). However, Dr. Bala would have continued to earn the 4% retirement contribution from UHS had she not voluntarily resigned her position on February 11, 2022 (BAAA 2712). Therefore, we have included a retirement contribution at the UHS rate of 4% to account for the amount she would have earned, had she not voluntarily resigned.

Schedule B

**Rupa Bala, MD v. OHSU**
Contract Termination Date   6/19/2017

| | 2015 | 2016 | 2017 (1) | 2018 (1) | 2019 (2) | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Wages** | | | | | | | | |
| OHSU - Salary | $390,180 | $380,597 | $258,194 | | | | | |
| OHSU - Clinical Income Payout | | | $72,200 | | | | | |
| Banner University Med Group | | | | $246,231 | $387,714 | $130,060 | | |
| Less: Moving Exp Reimbursement | | | | ($15,385) | | | | |
| United Medical Associates, PC | | | | | | | $340,979 | $199,400 |
| **Total Wages** | **$390,180** | **$380,597** | **$330,394** | **$230,846** | **$387,714** | **$130,060** | **$340,979** | **$199,400** |

**Annualized Wages 2017:**

| | | |
|---|---|---|
| OHSU - Salary | $361,000 | *per July 2016 Salary Update letter* |
| OHSU - Clinical Income Payout | $72,200 | *per "OHSU Other YTD Amounts Listed on Pay Period 13 2017 Paystub.xlsx"* |
| **Total Annualized Wages 2017** | **$433,200** | |

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Employer Paid Benefits** | | | | | | | | |
| Employer Contributions to Retirement | $33,654 | $30,779 | $31,031 | - | $2,925 | $2,295 | - | $11,600 |
| % of Salary | 8.6% | 8.1% | 12.0% | *na* | 0.8% | 1.8% | *na* | 5.8% |
| Employer-Paid Insurance | $6,962 | $7,164 | $3,442 | $3,286 | $5,907 | $1,871 | $7,009 | $4,304 |
| **Total Employer Paid Benefits** | **$40,616** | **$37,942** | **$34,473** | **$3,286** | **$8,832** | **$4,166** | **$7,009** | **$15,904** |

**Earnings Sources:**

| | |
|---|---|
| **2015-2017:** | W2s, OHSU annual "Emp Labor Dist Summary by Work Date" reports for 2015-2017, OHSU Earnings Statement as of check date 6/19/2017, "OHSU Other YTD Amounts Listed on Pay Period 13 2017 Paystub.xlsx" |
| **2018-2020:** | W2s, Banner Health Pay Records for 2018 and 2019 (BANNER000532-550), Banner Earnings Statements 2020 (for pay period end 5/16/2020 showing employer 401(k) matching and contributions to insurance (BALA 2883-2891)), Banner Retirement Statements 2018-2023 (showing total employer contributions to 401(k) (BALA 4910-4915)). |
| **2021-2022:** | W2s, 2021-12-31 NY 403b statement Voya.pdf (BALA 2893), 2022-3-31 NY 403b statement Voya.pdf (BALA 2897), 2021-12-23 NY Paystub.pdf, 2022-5-26 NY final paystub.pdf. |

**Footnotes:**

[1] Wages reflect approximately half a year of employment in 2017 and 2018. Dr. Bala was unemployed from June 19, 2017 to early July 2018.

[2] According to the Banner Health Pay Records, Dr. Bala did not receive her contracted base salary from the pay date November 7, 2019 through pay date January 16, 2020. I understand this may have been due to Family Medical Leave taken by Dr. Bala (Dr. Rupa Bala deposition, p. 315).



Morones Analytics

Exhibit 2
Page 30 of 39

**Rupa Bala, MD v. OHSU**
**Summary of Ostrofe Affirmative Report Lost Income Conclusions - Calculation of Impacts**

| Excerpt from Ostrofe Report - Lost Income (Excluding Prejudgment Interest) | | | | |
|---|---|---|---|---|
| | **Projected Actual** | **Scenario I Advances to Professor** | **Scenario II Advances to Chief** | **Scenario III Private Practice** |
| Past Earnings and Benefits | $2,024,407 | $4,228,355 | $4,228,355 | $5,081,677 |
| **Ostrofe Past Projected Losses** | | **$2,203,948** | **$2,203,948** | **$3,057,270** |
| Future Earnings and Benefits | $8,774,206 | $12,599,196 | $13,915,236 | $14,376,603 |
| **Ostrofe Future Losses** | | **$3,824,990** | **$5,141,030** | **$5,602,397** |
| **Ostrofe Total Losses** | | **$6,028,939** | **$7,344,979** | **$8,659,667** |

| Revised Analyses - Lost Income (Excluding Prejudgment Interest) | | | | |
|---|---|---|---|---|
| | **Schedule 1** | **Schedule 2** | **Schedule 3** | **Schedule 4** |
| Revised Past Earnings and Benefits | $3,414,783 | $3,849,259 | $3,849,259 | $5,248,930 |
| **Revised Past Loss** | | **$434,476** | **$434,476** | **$1,834,147** |
| **Revised Future Earnings and Benefits:** | | | | |
| To Worklife Expectancy Age 65.8 | $11,603,775 | $7,360,479 | $9,792,122 | $12,122,248 |
| **Revised Future (Benefit)/Losses to Age 65.8** | | **($4,243,297)** | **($1,811,653)** | **$518,473** |
| To Age 67 | $841,614 | $511,330 | $724,408 | $842,128 |
| Total to Age 67 | $12,445,389 | $7,871,808 | $10,516,530 | $12,964,375 |
| **Revised Future (Benefit)/Losses to Age 67** | | **($4,573,581)** | **($1,928,859)** | **$518,986** |
| To Age 70 | $2,023,896 | $1,229,634 | $1,742,041 | $2,025,131 |
| Total to Age 70 | $14,469,286 | $9,101,442 | $12,258,571 | $14,989,506 |
| **Revised Future (Benefit)/Losses to Age 70** | | **($5,367,843)** | **($2,210,714)** | **$520,221** |
| **Revised Total (Benefit)/Losses** | | **($4,933,367)** | **($1,776,238)** | **$2,354,367** |

Morones Analytics
Forensic Economics | Damages Analysis | Valuation
Exhibit 2

Schedule 1

**Rupa Bala, MD v. OHSU**
Revised Actual/Projected Earnings

| | | | From Ostrofe Affirmative Report Schedule 3.0 | | | | Revised Earnings Assumptions | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period End Date | Pd in Years | Comments | Annual Wages | Annual Benefits | Period Amounts | Present Value Factor | Age | Actual Wages/ Earning Capacity[(a)] | Health Benefits [(a)] | Employer Contribs to Retirement [(a)] | SocSec (6.2% or annual max) | FNs | Revised Period Amounts | PV of Projected Actual |
| 12/31/2017 | 1.00 | | - | - | - | 1.0000 | 44.8 | $330,394 | $3,442 | $31,031 | $7,886 | | $372,754 | $372,754 |
| 12/31/2018 | 1.00 | | $242,277 | $10,568 | $252,845 | 1.0000 | 45.8 | $230,846 | $3,286 | - | $7,961 | | $242,092 | $242,092 |
| 12/31/2019 | 1.00 | | $383,323 | $15,832 | $399,155 | 1.0000 | 46.8 | $450,714 | $5,907 | $2,925 | $8,240 | | $467,786 | $467,786 |
| 12/31/2020 | 1.00 | | $129,000 | $11,891 | $140,891 | 1.0000 | 47.8 | $464,235 | $5,907 | $11,400 | $8,537 | [(b)] | $490,079 | $490,079 |
| 12/31/2021 | 1.00 | | $337,379 | $15,061 | $352,440 | 1.0000 | 48.8 | $500,000 | $7,009 | $11,600 | $8,854 | | $527,463 | $527,463 |
| 12/31/2022 | 1.00 | | $197,071 | $24,534 | $221,605 | 1.0000 | 49.8 | $512,000 | $7,009 | $12,200 | $9,114 | | $540,323 | $540,323 |
| 1/29/2023 | 0.08 | | - | - | - | 1.0000 | 49.9 | $524,288 | $7,009 | $13,200 | $9,932 | | $44,354 | $44,354 |
| 12/31/2023 | 0.92 | Begin at CCC | $525,000 | $16,352 | $498,044 | 1.0000 | 50.8 | $525,000 | $6,420 | $13,200 | $9,932 | | $510,188 | $510,188 |
| 4/14/2024 | 0.29 | | $525,000 | $24,748 | $159,427 | 1.0000 | 51.1 | $716,876 | $7,308 | $23,100 | $10,453 | [(c)] | $219,744 | $219,744 |
| | **7.29** | | | | | | | | | | | | **Past (to Trial Date)** | **$3,414,783** |
| 12/31/2024 | 0.71 | | $525,000 | $24,748 | $390,321 | 0.9930 | 51.8 | $716,876 | $7,308 | $23,100 | $10,453 | | $537,993 | $534,227 |
| 12/31/2025 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.9763 | 52.8 | $716,876 | $7,308 | $23,100 | $10,453 | | $757,737 | $739,779 |
| 12/31/2026 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.9572 | 53.8 | $716,876 | $7,308 | $23,100 | $10,453 | | $757,737 | $725,306 |
| 12/31/2027 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.9384 | 54.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $892,828 |
| 12/31/2028 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.9200 | 55.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $875,322 |
| 12/31/2029 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.9020 | 56.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $858,196 |
| 12/31/2030 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.8843 | 57.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $841,355 |
| 12/31/2031 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.8669 | 58.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $824,800 |
| 12/31/2032 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.8499 | 59.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $808,626 |
| 12/31/2033 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.8333 | 60.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $792,832 |
| 12/31/2034 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.8169 | 61.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $777,229 |
| 12/31/2035 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.8009 | 62.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $762,006 |
| 12/31/2036 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.7852 | 63.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $747,068 |
| 12/31/2037 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.7698 | 64.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $732,416 |
| 12/18/2038 | 0.96 | | $525,000 | $32,623 | $537,013 | 0.7550 | 65.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $916,271 | $691,784 |
| | **14.67** | | | | | | | | | | | | **To Worklife Expectancy** | **$11,603,775** |
| 12/31/2038 | 0.04 | | $525,000 | $32,623 | $20,610 | 0.7476 | 65.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $35,166 | $26,290 |
| 12/31/2039 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.7399 | 66.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $703,968 |
| 2/27/2040 | 0.16 | | $525,000 | $32,623 | $89,220 | 0.7315 | 67.0 | $910,576 | $7,308 | $23,100 | $10,453 | | $152,230 | $111,356 |
| | **15.87** | | | | | | | | | | | | **To Age 67** | **$841,614** |
| 12/31/2040 | 0.84 | | $525,000 | $32,623 | $468,403 | 0.7243 | 67.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $799,207 | $578,866 |
| 12/31/2041 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.7112 | 68.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $676,662 |
| 12/31/2042 | 1.00 | | $525,000 | $32,623 | $557,623 | 0.6973 | 69.8 | $910,576 | $7,308 | $23,100 | $10,453 | | $951,437 | $663,437 |
| 2/27/2043 | 0.16 | | $525,000 | $32,623 | $89,220 | 0.6893 | 70.0 | $910,576 | $7,308 | $23,100 | $10,453 | | $152,230 | $104,932 |
| | **18.87** | | | | | | | | | | | | **To Age 70** | **$2,023,896** |
| | | | | | | | | | | | | | **Total Future** | **$14,469,286** |

**Note:** The highlighted sections of the Revised Earnings Assumptions section above reflect adjustments to Ms. Ostrofe's analysis, as described further in the footnotes below. Non-highlighted fields are set equal to the Ostrofe assumptions.

Morones Analytics
Forensic | ... Analysis | Valuation

Exhibit 2
Page 32 of 39

Schedule 1

**Rupa Bala, MD v. OHSU**
Revised Actual/Projected Earnings

**Assumptions:**

| | |
|---|---|
| Date of Birth | 2/27/1973 |
| OHSU Contract End Date | 6/19/2017 |
| Age at OHSU Contract End Date | 44.3 |
| Wage Growth Rate - Academic | 3.0% |
| Wage Growth Rate - Community | 2.4% |

**Footnotes:**

(a) Earnings assumptions for 2017 through 2023 set equal to amounts presented at **Schedule A**. Note that I included full year values for 2017 to correct for the impact of Ms. Ostrofe's erroneous annualizing in that year.

(b) Social security contribution set to the maximum for the year based on the revised earning assumption.

(c) Consistent with the opinion stated in the Henzke Affirmative Report, I assumed that once Dr. Bala began her community practice at Citrus Cardiology during January 2023, she would be able to reach the median market compensation level of $716,876 in 2024, and increase to the 75th percentile of compensation in 2027, as detailed at Mr. Henzke's Exhibit IV. The compensation rate for 2027 is stated in 2027 dollars in the Henzke report. I restated it in 2024 dollars to be consistent with Ms. Ostrofe's methodology, as shown in the table below.

| Per Exhibit IV | | | |
|---|---|---|---|
| 75th Percentile in 2027 $ | Growth Rate | Years | 2024 $ |
| $977,723 | 2.4% | 3 | $910,576 |

In 2024 and beyond, employer paid health benefits are set equal to the 2023 *Average Employer Contributions to Premiums* based on the KFF Employer Health Benefits Survey, and grown by the CAGR as detailed at Exhibit I to Mr. Henzke's Rebuttal and Supplemental Report. https://www.kff.org/report-section/ehbs-2023-section-6-worker-and-employer-contributions-for-premiums/ (accessed 12/12/23)

| Per Exhibit I | | | |
|---|---|---|---|
| Health Benefits in 2023 $ | Growth Rate | Years | 2024 $ |
| $7,034 | 3.9% | 1 | $7,308 |

In 2024 and beyond, employer retirement contributions are calculated at 7%, the average median employer contribution to retirement according to ECG Management Consultant's proprietary data, as detailed at Exhibit I to Mr. Henzke's Rebuttal and Supplemental Report, subject to IRS maximum compensation limits.

Morones Analytics
Forensic | Economics Analysis | Valuation

Exhibit 2

Schedule 2

**Rupa Bala, MD v. OHSU**
Revised Earnings - Scenario I: Advances to Professor

| | | | From Ostrofe Affirmative Report Schedule 2.0 A | | | | Revised Earnings Assumptions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period End Date | Pd in Years | Comments | Annual Wages | Annual Benefits | Period Amounts | Present Value Factor | Age | Annual Wages[(a)] | Health Benefits[(b)] | Employer Contribs to Retirement[(c)] | SocSec (6.2% or annual max) | FNs | Revised Period Amounts | PV of Projected Actual |
| 12/31/2017 | 1.00 | | $450,222 | $69,001 | $519,223 | 1.0000 | 44.8 | $433,200 | $7,200 | $32,400 | $7,886 | | $480,686 | $480,686 |
| 12/31/2018 | 1.00 | Associate Professor | $469,084 | $71,337 | $540,421 | 1.0000 | 45.8 | $439,000 | $7,500 | $33,000 | $7,961 | | $487,461 | $487,461 |
| 12/31/2019 | 1.00 | | $487,947 | $73,876 | $561,823 | 1.0000 | 46.8 | $461,000 | $7,800 | $33,600 | $8,240 | | $510,640 | $510,640 |
| 12/31/2020 | 1.00 | | $506,809 | $76,433 | $583,242 | 1.0000 | 47.8 | $477,000 | $8,100 | $34,200 | $8,537 | | $527,837 | $527,837 |
| 12/31/2021 | 1.00 | | $525,672 | $79,011 | $604,682 | 1.0000 | 48.8 | $491,000 | $8,400 | $34,800 | $8,854 | | $543,054 | $543,054 |
| 12/31/2022 | 1.00 | | $544,534 | $81,531 | $626,065 | 1.0000 | 49.8 | $500,000 | $8,700 | $36,600 | $9,114 | | $554,414 | $554,414 |
| 12/31/2023 | 1.00 | Professor | $652,906 | $146,777 | $799,683 | 1.0000 | 50.8 | $519,000 | $9,000 | $39,600 | $9,932 | | $577,532 | $577,532 |
| 4/14/2024 | 0.29 | | $652,906 | $147,298 | $232,059 | 1.0000 | 51.1 | $519,000 | $9,000 | $39,600 | $10,453 | | $167,635 | $167,635 |
| | **7.29** | | | | | | | | | | | **Past (to Trial Date)** | **$3,849,259** |
| 12/31/2024 | 0.71 | | $652,906 | $147,298 | $568,145 | 0.9930 | 51.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $410,418 | $407,545 |
| 12/31/2025 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9763 | 52.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $564,353 |
| 12/31/2026 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9572 | 53.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $553,312 |
| 12/31/2027 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9384 | 54.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $542,445 |
| 12/31/2028 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9200 | 55.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $531,809 |
| 12/31/2029 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9020 | 56.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $521,404 |
| 12/31/2030 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.8843 | 57.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $511,172 |
| 12/31/2031 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.8669 | 58.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $501,114 |
| 12/31/2032 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.8499 | 59.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $491,287 |
| 12/31/2033 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.8333 | 60.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $481,692 |
| 12/31/2034 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.8169 | 61.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $472,211 |
| 12/31/2035 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.8009 | 62.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $462,963 |
| 12/31/2036 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.7852 | 63.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $453,887 |
| 12/31/2037 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.7698 | 64.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $444,985 |
| 12/18/2038 | 0.96 | | $652,906 | $147,298 | $770,628 | 0.7550 | 65.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $556,688 | $420,299 |
| | **14.67** | | | | | | | | | | | **To Worklife Expectancy** | **$7,360,479** |
| 12/31/2038 | 0.04 | | $652,906 | $147,298 | $29,576 | 0.7476 | 65.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $21,365 | $15,973 |
| 12/31/2039 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.7399 | 66.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $427,701 |
| 2/27/2040 | 0.16 | | $652,906 | $147,298 | $128,033 | 0.7315 | 67.0 | $519,000 | $9,000 | $39,600 | $10,453 | | $92,488 | $67,655 |
| | **15.87** | | | | | | | | | | | **To Age 67** | **$511,330** |
| 12/31/2040 | 0.84 | | $652,906 | $147,298 | $672,172 | 0.7243 | 67.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $485,565 | $351,694 |
| 12/31/2041 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.7112 | 68.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $411,111 |
| 12/31/2042 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.6973 | 69.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $403,076 |
| 2/27/2043 | 0.16 | | $652,906 | $147,298 | $128,033 | 0.6893 | 70.0 | $519,000 | $9,000 | $39,600 | $10,453 | | $92,488 | $63,752 |
| | **18.87** | | | | | | | | | | | **To Age 70** | **$1,229,634** |
| | | | | | | | | | | | | **Total Future** | **$9,101,442** |

**Note:** The highlighted sections of the Revised Earnings Assumptions section above reflect adjustments to Ms. Ostrofe's analysis, as described further in the footnotes below. Non-highlighted fields are set equal to the Ostrofe assumptions.

Morones Analytics
Forensic Accounting | Economic Analysis | Valuation

Exhibit 2
Page 34 of 39

Schedule 2

**Rupa Bala, MD v. OHSU**
Revised Earnings - Scenario I: Advances to Professor

**Assumptions:**

| | |
|---|---|
| Date of Birth | 2/27/1973 |
| OHSU Contract End Date | 6/19/2017 |
| Age at OHSU Contract End Date | 44.3 |

**Footnotes:**

(a) I have assumed that had Dr. Bala continued as an Associate Professor at OHSU, her 2017 wage level would have been equal to her annualized 2017 wages per **Schedule A** of my report. Ms. Ostrofe overstated annualized 2017 wages.

In years 2018 to 2023, I relied on the cash compensation projected in the Henzke Rebuttal and Supplemental Report at Exhibit II.

Projected base wages in 2024 and beyond are based on 2023 wages, consistent with the methodology in the Ostrofe Schedule 2.0A and subject to the 2.0% net discount rate.

(b) In years 2018 to 2023, I relied on the health benefits projected in the Henzke Rebuttal and Supplemental Report at Exhibit II.

Projected base health benefits in 2024 and beyond are based on 2023 health benefits, consistent with the methodology in the Ostrofe Schedule 2.0A and subject to the 2.0% net discount rate.

(c) Employer contributions to retirement are set at OHSU's rate of 12% of wages (as per Ms. Ostrofe's analysis). However, I applied the annual IRS maximum compensation limits.



Morones Analytics
Forensic | Economic Analysis | Valuation

Exhibit 2
Page 35 of 39

Schedule 3

**Rupa Bala, MD v. OHSU**
Revised Earnings - Scenario II: Advances to Chief

| | | | From Ostrofe Affirmative Report Schedule 2.0 B | | | | Revised Earnings Assumptions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period End Date | Pd in Years | Comments | Annual Wages | Annual Benefits | Period Amounts | Present Value Factor | Age | Annual Wages(a) | Health Benefits(b) | Employer Contribs to Retirement(c) | SocSec (6.2% or annual max) | FNs | Revised Period Amounts | PV of Projected Actual |
| 12/31/2017 | 1.00 | | $450,222 | $69,001 | $519,223 | 1.0000 | 44.8 | $433,200 | $7,200 | $32,400 | $7,886 | | $480,686 | $480,686 |
| 12/31/2018 | 1.00 | Associate Professor | $469,084 | $71,337 | $540,421 | 1.0000 | 45.8 | $439,000 | $7,500 | $33,000 | $7,961 | | $487,461 | $487,461 |
| 12/31/2019 | 1.00 | | $487,947 | $73,876 | $561,823 | 1.0000 | 46.8 | $461,000 | $7,800 | $33,600 | $8,240 | | $510,640 | $510,640 |
| 12/31/2020 | 1.00 | | $506,809 | $76,433 | $583,242 | 1.0000 | 47.8 | $477,000 | $8,100 | $34,200 | $8,537 | | $527,837 | $527,837 |
| 12/31/2021 | 1.00 | | $525,672 | $79,011 | $604,682 | 1.0000 | 48.8 | $491,000 | $8,400 | $34,800 | $8,854 | | $543,054 | $543,054 |
| 12/31/2022 | 1.00 | | $544,534 | $81,531 | $626,065 | 1.0000 | 49.8 | $500,000 | $8,700 | $36,600 | $9,114 | | $554,414 | $554,414 |
| 12/31/2023 | 1.00 | Professor | $652,906 | $146,777 | $799,683 | 1.0000 | 50.8 | $519,000 | $9,000 | $39,600 | $9,932 | | $577,532 | $577,532 |
| 4/14/2024 | 0.29 | | $652,906 | $147,298 | $232,059 | 1.0000 | 51.1 | $519,000 | $9,000 | $39,600 | $10,453 | | $167,635 | $167,635 |
| | 7.29 | | | | | | | | | | | | Past (to Trial Date) | $3,849,259 |
| 12/31/2024 | 0.71 | | $652,906 | $147,298 | $568,145 | 0.9930 | 51.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $410,418 | $407,545 |
| 12/31/2025 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9763 | 52.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $564,353 |
| 12/31/2026 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9572 | 53.8 | $519,000 | $9,000 | $39,600 | $10,453 | | $578,053 | $553,312 |
| 12/31/2027 | 1.00 | Henzke - Chief | $652,906 | $147,298 | $800,204 | 0.9384 | 54.8 | $759,883 | $9,000 | $39,600 | $10,453 | (d) | $818,936 | $768,490 |
| 12/31/2028 | 1.00 | | $652,906 | $147,298 | $800,204 | 0.9200 | 55.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $753,421 |
| 12/31/2029 | 1.00 | Ostrofe - Chief | $751,391 | $165,815 | $917,206 | 0.9020 | 56.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $738,681 |
| 12/31/2030 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.8843 | 57.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $724,185 |
| 12/31/2031 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.8669 | 58.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $709,936 |
| 12/31/2032 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.8499 | 59.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $696,014 |
| 12/31/2033 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.8333 | 60.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $682,420 |
| 12/31/2034 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.8169 | 61.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $668,989 |
| 12/31/2035 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.8009 | 62.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $655,886 |
| 12/31/2036 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.7852 | 63.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $643,029 |
| 12/31/2037 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.7698 | 64.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $630,417 |
| 12/18/2038 | 0.96 | | $751,391 | $165,815 | $883,305 | 0.7550 | 65.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $788,668 | $595,444 |
| | 14.67 | | | | | | | | | | | | To Worklife Expectancy | $9,792,122 |
| 12/31/2038 | 0.04 | | $751,391 | $165,815 | $33,901 | 0.7476 | 65.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $30,269 | $22,629 |
| 12/31/2039 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.7399 | 66.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $605,931 |
| 2/27/2040 | 0.16 | | $751,391 | $165,815 | $146,753 | 0.7315 | 67.0 | $759,883 | $9,000 | $39,600 | $10,453 | | $131,030 | $95,848 |
| | 15.87 | | | | | | | | | | | | To Age 67 | $724,408 |
| 12/31/2040 | 0.84 | | $751,391 | $165,815 | $770,453 | 0.7243 | 67.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $687,906 | $498,251 |
| 12/31/2041 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.7112 | 68.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $582,427 |
| 12/31/2042 | 1.00 | | $751,391 | $165,815 | $917,206 | 0.6973 | 69.8 | $759,883 | $9,000 | $39,600 | $10,453 | | $818,936 | $571,044 |
| 2/27/2043 | 0.16 | | $751,391 | $165,815 | $146,753 | 0.6893 | 70.0 | $759,883 | $9,000 | $39,600 | $10,453 | | $131,030 | $90,319 |
| | 18.87 | | | | | | | | | | | | To Age 70 | $1,742,041 |
| | | | | | | | | | | | | | Total Future | $12,258,571 |

**Note:** The highlighted sections of the Revised Earnings Assumptions section above reflect adjustments to Ms. Ostrofe's analysis, as described further in the footnotes below. Non-highlighted fields are set equal to the Ostrofe assumptions.

Morones Analytics
Forensic Economics | Analysis | Valuation

Exhibit 2
Page 36 of 39

Schedule 3

**Rupa Bala, MD v. OHSU**
Revised Earnings - Scenario II: Advances to Chief

**Assumptions:**

| | |
|---|---|
| Date of Birth | 2/27/1973 |
| OHSU Contract End Date | 6/19/2017 |
| Age at OHSU Contract End Date | 44.3 |

**Footnotes:**

(a) Wage assumptions for 2017 through 2026 are set equal to revised amounts at **Schedule 2**.

(b) Health benefits for all years are set equal to revised amounts at **Schedule 2**.

(c) Employer contributions to retirement are set at OHSU's rate of 12% of wages (as per Ms. Ostrofe's analysis). However, I applied the annual IRS maximum compensation limits.

(d) In 2027, based on the opinion of Leonard J. Henzke in his Expert Report dated November 1, 2023, I assumed that Dr. Bala would been promoted to Chief at the median compensation level of $830,345 per Mr. Henzke's Exhibit IV, as stated in 2027 dollars. In order to be consistent with the Ostrofe analysis, I valued this amount in 2024 dollars by reducing it by Mr. Henzke's assumed growth rate of 3.0% per year, as shown below.

| | |
|---|---|
| Chief Rate in 2027 $ | $830,345 |
| Growth Rate | 3.0% |
| Years to 2024 | 3.0 |
| **Chief Rate in 2024 $** | **$759,883** |


Morones Analytics
Forensic | Economic Analysis | Valuation

Exhibit 2

Schedule 4

**Rupa Bala, MD v. OHSU**
Revised Earnings - Scenario III: Private Practice as of 6/19/2017

| | | | From Ostrofe Affirmative Report Schedule 2.0 C | | | | Revised Earnings Assumptions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period End Date | Pd in Years | Comments | Annual Wages | Annual Benefits | Period Amounts | Present Value Factor | Age | Annual Wages[a] | Health Benefits[b] | Employer Contribs to Retirement[c] | SocSec (6.2% or annual max) | FNs | Revised Period Amounts | PV of Projected Actual |
| 12/31/2017 | 1.00 | Goes Into Private Practice | $561,589 | $67,937 | $629,526 | 1.0000 | 44.8 | $466,591 | $5,477 | $18,900 | $7,886 | | $498,854 | $498,854 |
| 12/31/2018 | 1.00 | | $580,189 | $69,688 | $649,877 | 1.0000 | 45.8 | $477,789 | $5,712 | $19,250 | $7,961 | | $510,712 | $510,712 |
| 12/31/2019 | 1.00 | Henzke - Median | $598,064 | $71,577 | $669,641 | 1.0000 | 46.8 | $658,522 | $5,946 | $19,600 | $8,240 | | $692,308 | $692,308 |
| 12/31/2020 | 1.00 | | $633,427 | $75,059 | $708,486 | 1.0000 | 47.8 | $674,327 | $6,193 | $19,950 | $8,537 | | $709,007 | $709,007 |
| 12/31/2021 | 1.00 | | $670,605 | $78,725 | $749,331 | 1.0000 | 48.8 | $690,510 | $6,440 | $20,300 | $8,854 | | $726,104 | $726,104 |
| 12/31/2022 | 1.00 | Henzke - 75th Percentile | $708,964 | $78,067 | $787,031 | 1.0000 | 49.8 | $868,946 | $6,584 | $21,350 | $9,114 | | $905,994 | $905,994 |
| 12/31/2023 | 1.00 | | $824,150 | $88,421 | $912,571 | 1.0000 | 50.8 | $889,801 | $7,034 | $23,100 | $9,932 | | $929,867 | $929,867 |
| 4/14/2024 | 0.29 | | $824,150 | $88,942 | $264,797 | 1.0000 | 51.1 | $911,156 | $7,308 | $23,100 | $10,453 | | $276,085 | $276,085 |
| | 7.29 | | | | | | | | | | | Past (to Trial Date) | | $5,248,930 |
| 12/31/2024 | 0.71 | | $824,150 | $88,942 | $648,295 | 0.9930 | 51.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $675,932 | $671,201 |
| 12/31/2025 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.9763 | 52.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $929,454 |
| 12/31/2026 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.9572 | 53.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $911,271 |
| 12/31/2027 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.9384 | 54.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $893,373 |
| 12/31/2028 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.9200 | 55.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $875,856 |
| 12/31/2029 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.9020 | 56.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $858,719 |
| 12/31/2030 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.8843 | 57.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $841,869 |
| 12/31/2031 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.8669 | 58.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $825,304 |
| 12/31/2032 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.8499 | 59.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $809,119 |
| 12/31/2033 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.8333 | 60.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $793,316 |
| 12/31/2034 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.8169 | 61.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $777,703 |
| 12/31/2035 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.8009 | 62.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $762,471 |
| 12/31/2036 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.7852 | 63.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $747,524 |
| 12/31/2037 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.7698 | 64.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $732,863 |
| 12/18/2038 | 0.96 | | $824,150 | $88,942 | $879,343 | 0.7550 | 65.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $916,830 | $692,206 |
| | 14.67 | | | | | | | | | | | To Worklife Expectancy | | $12,122,248 |
| 12/31/2038 | 0.04 | | $824,150 | $88,942 | $33,749 | 0.7476 | 65.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $35,187 | $26,306 |
| 12/31/2039 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.7399 | 66.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $704,397 |
| 2/27/2040 | 0.16 | | $824,150 | $88,942 | $146,095 | 0.7315 | 67.0 | $911,156 | $7,308 | $23,100 | $10,453 | | $152,323 | $111,424 |
| | 15.87 | | | | | | | | | | | To Age 67 | | $842,128 |
| 12/31/2040 | 0.84 | | $824,150 | $88,942 | $766,997 | 0.7243 | 67.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $799,694 | $579,219 |
| 12/31/2041 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.7112 | 68.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $677,075 |
| 12/31/2042 | 1.00 | | $824,150 | $88,942 | $913,092 | 0.6973 | 69.8 | $911,156 | $7,308 | $23,100 | $10,453 | | $952,017 | $663,842 |
| 2/27/2043 | 0.16 | | $824,150 | $88,942 | $146,095 | 0.6893 | 70.0 | $911,156 | $7,308 | $23,100 | $10,453 | | $152,323 | $104,996 |
| | 18.87 | | | | | | | | | | | To Age 70 | | $2,025,131 |
| | | | | | | | | | | | | Total Future | | $14,989,506 |

**Note:** The highlighted sections of the Revised Earnings Assumptions section above reflect adjustments to Ms. Ostrofe's analysis, as described further in the footnotes below. Non-highlighted fields are set equal to the Ostrofe assumptions.

Morones Analytics
Forensic Economics | Analysis | Valuation

Exhibit 2

Schedule 4

**Rupa Bala, MD v. OHSU**
Revised Earnings - Scenario III: Private Practice as of 6/19/2017

**Assumptions:**

| | |
|---|---|
| Date of Birth | 2/27/1973 |
| OHSU Contract End Date | 6/19/2017 |
| Age at OHSU Contract End Date | 44.3 |

**Footnotes:**

(a)  In 2017, I assumed Dr. Bala could have gone into private practice at a rate equal to 77% of the median, consistent with her earnings compared to the Benchmark Median in 2022 per Exhibit III in the Expert Report of Leonard J. Henzke dated November 1, 2023 ("Henzke Affirmative Report"). I assumed annual growth in 2018 at a 2.4% annual growth rate, equal to the Compensation Growth Rate: Community Benchmarks assumption in the Leonard Henze Affirmative Report, Exhibit IV. In 2019, roughly a year and a half after going into private practice, I assumed Dr. Bala would reach the median earnings rate based on the Henzke Affirmative Report, as shown in the table below.

| Henzke Affirmative Report | | | |
|---|---|---|---|
| **Data Source Blend** | **2017** | **2019** | **Source** |
| Median | $607,760 | **$658,522** | Exhibit I |
| At 77% of Median | **$466,591** | na | Exhibit III |

In years 2020 - 2021, I continued to apply the 2.4% annual growth rate.

In 2022, roughly five years after Dr. Bala would have gone into private practice, I assumed Dr. Bala would reach the 75th percentile earnings level, consistent with the assumption in the Henzke Affirmative Report, Exhibit IV. The 2022 compensation rate is equal to the 75th percentile of the Data Source Blend at Exhibit I to the Henzke Affirmative Report.

In years 2023 - 2024, I again applied the 2.4% annual growth rate.

(b)  2017-2023 employer paid health benefits are equal to the *Average Employer Contributions to Premiums, Single Covereage,* based on Figure 6.4 of the 2023 KFF Employer Health Benefits Survey, with 2018 and 2020 premiums calculated as the average of the prior and subsequent year. 2023 premiums are grown by the CAGR detailed at Exhibit I to Mr. Henzke's Rebuttal and Supplemental Report. https://www.kff.org/report-section/ehbs-2023-section-6-worker-and-employer-contributions-for-premiums/ (published October 18, 2023, accessed December 12, 2023)

| | Per Exhibit I | | |
|---|---|---|---|
| **Health Benefits in 2023 $** | **Growth Rate** | **Years** | **2024 $** |
| $7,034 | 3.9% | 1 | $7,308 |

(c)  Employer retirement contributions are calculated at 7%, the average median employer contribution to retirement according to ECG Management Consultant's proprietary data, as detailed at Exhibit I to Mr. Henzke's Rebuttal and Supplemental Report, subject to IRS maximum compensation limits.

Morones Analytics
Forensic | Economics | Analysis | Valuation

Exhibit 2
Page 39 of 39

# Expert Report of Jennifer L. Moody

**DR. RUPA BALA**

v.

**OREGON HEALTH AND SCIENCE UNIVERSITY,**
**DR. CHARLES HENRIKSON,**
**DR. JOAQUIN CIGARROA**



**MANAGEMENT CONSULTANTS**
A Siemens Healthineers Company

13355 Noel Road, Suite 1100
Dallas, TX 75240
**P (469) 729-2600**
F (469) 729-2601

800.729.7635    **ecgmc.com**

Exhibit 5
Page 1 of 51

## I.    Introduction

1. I am Jennifer L. Moody, a partner in the Strategy and Business Advisory Division at ECG Management Consultants ("ECG"). I have been retained by Stoel Rives LLP, counsel for Oregon Health and Science University ("OHSU") and Dr. Charles Henrikson and Dr. Joaquin Cigarroa, in the case of *Dr. Rupa Bala v. Oregon Health and Science University et al.*, Case No. 3:18-CV-00850-HZ (United States District Court for the District of Oregon) involving an employment discrimination dispute between Dr. Bala and OHSU, Dr. Charles Henrikson, and Dr. Joaquin Cigarroa (collectively, "Defendants" or "OHSU").

2. ECG is one of the largest consulting firms in the country that provides services exclusively to healthcare providers. In my eight years at the firm, I have worked extensively with hospitals, physician groups, and integrated health systems on business matters related to physician and advanced practice provider workforce planning and recruitment. Prior to joining ECG, I spent 10 years as the managing principal of AmeriMed Consulting, a firm focused exclusively on physician workforce planning, and 10 years with Merritt Hawkins, one of the nation's largest physician recruitment firms, where I was a senior leader in its value partnership consulting practice, which focused exclusively on physician recruitment planning for health systems, community hospitals, academic medical centers, and medical groups.

3. An area of particular focus for my practice has been assisting these hospitals and health systems with understanding physician workforce issues, including recruitment practices and the supply of and demand for subspecialty services in defined geographic markets and more broadly regionally and nationally. These projects have involved working directly with large integrated health systems, academic medical centers, and community hospitals. I regularly speak with in-house recruiters at health systems and recruitment firm professionals about provider recruitment trends and practices. In addition, I attend national and regional provider recruitment conferences, regularly read publications from recruiter professional organizations and recruitment firms, and publish on recruitment-related topics.

4. I am also a regular author for internal ECG and national publications pertaining to healthcare provider workforce planning and recruitment. A copy of my curriculum vitae ("CV") is provided in **Attachment 1**.

5. I have reviewed documents provided by legal counsel in preparing this expert witness testimony, as detailed in **Attachment 2**. The documents include pertinent facts relative to the career trajectory of Dr. Bala, including her ongoing search for employment as a cardiac electrophysiologist. I was not refused or denied access to any documents by counsel.



Exhibit 3
Page 2 of 51

6.    My hourly rate for the work on this case is $680. In developing my expert report, I utilized a project team and billed for their time at a rate of $160 to $560 per hour to assist with data analysis. I oversaw and approved all work performed.

7.    I have been retained in two other cases involving physician recruitment and other related issues in the past four years:

-    *Michael D. Black, MD, MBA, v. Cable News Network, Inc. et al.*, Case No. 502016CA001517XXXXMB (Florida Circuit Court) – retained by Plaintiff, deposed, case pending.
-    *Samir Undavia, MD, Nishant Reddy, MD, and Gregory Smith, MD v. Chetan Shah, MD, Rakesh Patel, MD, and Princeton Eye and Ear LLC*, Case No MER-C-46-22 (Superior Court of New Jersey) – retained by Defendant, not deposed, case pending.

8.    I have been retained in this matter to provide my expert opinion on the physician job search market including the recruitment market for cardiac electrophysiologists, the viability of Dr. Bala's candidacy in the job market, and Dr. Bala's job search outlined in **Exhibit I**. My conclusions are:

- There are seven paths to recruitment of a physician, and successful job searches may require effective utilization of several applicable paths.

- The job market for cardiologists, including cardiac electrophysiologists, has been steady since 2016 and provides many career opportunities for physicians.

- A candidate with strong educational and career experience would be a viable candidate for placement.
  - Based on her training pedigree and experience, Dr. Bala would be considered a highly desirable candidate for an open cardiac electrophysiology position.

- Dr. Bala did not consistently utilize all available avenues for physicians to find employment throughout her job search and thus limited her opportunities for successful placement.

  - Dr. Bala did not engage in a comprehensive and diligent job search after receiving notice of nonrenewal while employed at OHSU.

  - Dr. Bala did not engage in a comprehensive and diligent job search immediately following her last day of employment at OHSU.

  - Following her termination at Banner Health ("Banner"), although her job search became more diligent with fewer limitations, it was still inconsistent and not comprehensive.

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers

Exhibit 3
Page 3 of 51

9.      The remainder of this report provides supporting details and further summarizes my expert con-
        clusions spelled out above but does not attempt to make any legal conclusions related to Dr. Bala's
        allegations. To the extent new information becomes available prior to or during trial, I reserve the
        right to update, add to, or supplement my opinions.

**II.     There are seven paths to recruitment of a physician, and successful job searches may re-
        quire effective utilization of several applicable paths.**

10.     This section of my expert report discusses the physician recruitment process. Recruitment of phy-
        sicians is a highly structured and rigorous process due to the nature of physician practice, including
        the necessity of specific, well-honed clinical skills and a background check that is free of profes-
        sional or personal issues. The physician recruitment process will always include a review of the
        candidate's CV, including their education, training, and past employment, and an in-depth com-
        prehensive background check that often includes internet research to discover any potential repu-
        tational issues and past or ongoing lawsuits, in addition to the standard criminal background check.

11.     For a practicing physician, regardless of specialty, in my experience there are seven potential paths
        for gaining or retaining employment. The seven potential paths of gaining or retaining employ-
        ment are listed below.

- Direct recruitment from residency or fellowship training
- Personal networking based on reputation and relationships with past colleagues or classmates
- Direct application to an open position
- Direct recruitment to an open position
- Contingent recruitment
- Retained recruitment
- Locums to hire

12.     In the first path, direct recruitment from residency or fellowship, a physician who is completing a
        training program is offered a position with the training entity or an affiliated partner. Organizations
        often turn to this path first to fill open positions because the physician is known to the organization
        and the organization has had the opportunity to become familiar with the candidate's quality of
        work, temperament, and personality. A desired candidate is perceived to have a high degree of fit
        with the organization, and the residency or fellowship period serves as an extended opportunity to
        evaluate a candidate.

13.     In the second path, a physician identifies a position based on their personal network with past
        colleagues or classmates. This direct means of opportunity solicitation is heavily based on both
        existing relationships and personal reputation and often results in positions being filled without a
        broader solicitation of candidates. In a specialty with a lower number of physicians such as cardiac

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers

Exhibit 3
Page 4 of 51

electrophysiology, physicians would be well networked and known by their peers across the country, particularly a well-published physician, and likely to be aware of the career developments of their peers, including program starts and closures. These former colleagues or classmates would be willing to present a well-qualified peer to organizations based on those relationships.

14. The third path would be direct application by the physician to an open position. Hospitals and independent medical groups, such as private practice clinics, will often advertise open positions for which they have not been able to successfully identify candidates. Due to statutory requirements, some organizations (e.g., state university academic medical centers) must also advertise open positions, even if they have already identified viable candidates who are completing a training program or who have been directly referred through a personal network, so it cannot be assumed that all advertised open positions lack candidates.

15. The fourth path would be direct recruitment to an open position. The recruitment process utilized by a large academic medical center or health system, community hospital, or independent physician practice (a group directly employing physicians independently from a medical center, health system, or community hospital) that employs cardiac electrophysiologists would include the use of an experienced physician recruiter directly sourcing candidates through their own network of CVs and other physician sourcing sites including national databases such as Practice Link and Practice Match. These searches often focus on a combination of active candidates (those directly applying for an open, posted position or directly expressing interest in employment with the institution) and passive candidates (individuals who may be currently employed but meet the criteria for an open, posted position and who may have expressed an interest in the geographic region or practice setting). Physician recruiters are often members of national organizations such as the Association for Advancing Physician and Provider Recruitment, where certification is provided following specialized training in sourcing, screening, and interviewing candidates. An experienced physician recruiter would follow a methodical process to vet candidates, including researching the background of a candidate prior to contacting them.

16. The fifth path would be placement through a contingent recruitment firm. A contingent recruitment firm focuses on developing relationships with candidates who are actively or passively seeking a new position. These recruitment firms will then approach organizations where they have a contingency agreement in place to present potential candidates. A contingent introduction requires a mutual match where a candidate meets the parameters set by the recruiting organization and the candidate agrees that the recruiting organization would be a desirable match.

17. The sixth path would be placement through a retained recruitment firm. A retained recruitment firm operates in much the same way as a contingent recruitment firm, except that an organization pays a retained recruitment firm in advance to find a viable candidate. These firms maintain com-

Exhibit 3
Page 5 of 51

prehensive databases of nearly all physicians in the United States and often focus on passive candidates based on qualifications and known areas of interested (e.g., geography, practice setting). If a recruitment firm was retained to find a candidate within a specialty with as few physicians as cardiac electrophysiology, it would be a reasonable expectation that the firm would conduct outreach to identify potential interested candidates and colleague referrals. Furthermore, through the extensive physician database managed by the retained recruitment firm, physician preferences are often noted, which can limit the opportunities for which a candidate may be considered.

18.    The final path would be locums to hire. Occasionally, a medical center or health system, community hospital, or independent physician practice will temporarily employ a physician as locum tenens to fill a vacancy, cover the absence of another physician in the same specialty, or test the viability of adding an additional physician to a specialty group.

19.    In summary, there are several avenues through which a physician may find job opportunities and candidates who are serious about securing employment will utilize as many of these avenues as possible to maximize their prospects.

20.    Through any job search avenue, there will typically be several phases of communication between a candidate, the recruiting organization, and any intermediaries (such as a contingent or retained search firm or locum tenens firm). Initial communications are typically focused on fit for a position and will include considerations such as a candidate's qualifications, completing requisite training, holding board certification, ability to perform required procedures, compatibility with the candidate's stated geographic and job preferences, and willingness to obtain required credentials and state licenses. A candidate who does not meet these initial qualifications or fit will usually not progress past this phase.

21.    Candidates who meet the initial criteria will be passed on to a search committee or medical leader for additional review, which may include a more in-depth telephone interview. The top-ranked candidates after this phase may be invited for an on-site interview and professional references will typically be requested at this phase, either before or after the interview. Only the top-ranked candidate will usually receive an offer of employment, although the organization may make more than one offer if the initial candidate choice does not accept the offer.

22.    Organizations may suspend or cancel their search for candidates for a variety of reasons. Those reasons may include loss of funding for a position, lack of organizational support or internal disagreement about the position, lack of viable candidates, or a change in search parameters. Organizations may also leave a prepaid posting up on a third-party site for a position that has been filled to generate additional CVs for viable candidates if a future need arises.

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers

Exhibit 3
Page 6 of 51

III.   **The job market for physicians, particularly for cardiologists and subspecialists of cardiology such as cardiac electrophysiology, has been steady and provides many career opportunities for physicians.**

23.   As mentioned previously, I have spent my career working on projects related to physician and advanced practice provider workforce planning and recruitment, including many regarding physician subspecialty services such as cardiac electrophysiology. The market for physicians is strong due to current and projected ongoing shortage of physicians in the United States, with a projected shortage of between 37,800 and 124,000 physicians by 2034.[1]

24.   In my experience, cardiac electrophysiology is often a critical program for a hospital, health system, or academic medical center. As a component of a comprehensive cardiac program, including services encompassing heart failure, cardiac electrophysiology is a growing specialty and there is sufficient demand for cardiac electrophysiology services, such that a qualified physician should be able to find a new job.

25.   Relatively few physicians are trained to provide these hyperspecialized services in relation to other subspecialties, such as gastroenterology, orthopedics, and urology, due to the significant training and experience required to successfully practice as a cardiac electrophysiologist. According to the American Association of Medical Colleges ("AAMC"), in 2021 there were 2,632 actively practicing clinical cardiac electrophysiologists in the United States, or a national distribution rate of 1 of these subspecialists for every 124,076 persons in the United States. This compares to 118,641 family medicine/general medicine physicians, a rate of 1 physician for every 2,753 persons in the United States.[2] These statistics illustrate the scarcity of cardiac electrophysiologists.

26.   The recruitment market for cardiology (including cardiac subspecialties such as electrophysiology) has been robust for many years. In my 28 years of professional experience in physician workforce strategy and recruitment planning, jobs for cardiologists are always available for candidates without geographic limitations or narrow job criteria. Cardiology was ranked as the fifth most common physician search for in-house physician recruiters in the 2023 Association for Advancing Physician and Provider Recruitment ("AAPPR") annual survey and has ranked in the top 10 searches with that organization since 2018. In 2023, 60% of organizations recruiting physicians reported they were searching for cardiologists of some type.[3] In the 2018 Association of Staff Physician Recruiters ("ASPR") annual survey, 48.8% of responding organizations reported they were seeking cardiologists of some type.[4]

---

[1]   Press Release, American Association of Medical Colleges ("AAMC"). AAMC Report Reinforces Mounting Physician Shortage (June 11, 2021). [Tim Dell et al, IHS Markit Ltd. For American Associate of Medical Colleges ("AAMC"), The Complexities of Physician Supply and Demand: Projections from 2019-2034 at 3 (June 2021).]

[2]    AAMC 2022 Physician Specialty Data Report, 2021 Number of People per Active Physician by Specialty.

[3]    AAPPR Internal Physician and Provider Recruitment Benchmarking Report, 2023.

[4]    AAPPR, ASPR In-House Physician Recruitment Benchmarking Report, 2018. *(Note: ASPR is the predecessor organization for AAPPR)*

Exhibit 3
Page 7 of 51

27.    While subspecialization parameters (such as electrophysiology) can narrow the number of available positions, there remains a significant market for job seekers who are willing to consider a variety of geographies and practice settings. As of October 2023, there were at least 197 cardiac electrophysiology jobs listed on national job posting sites (**Exhibit II**) including NEJM Career Center, HealthECareers (including subspecialty sites run for affiliated associations), Practice Match, Practice Link, and several retained search firm sites. While it is not possible to retroactively produce a list of positions available prior to October 2023, data from the 2018 ASPR annual survey[5] and the 2023 AAPPR annual survey[6] suggests a comparable market of available positions for at least the past six years.

28.    Cardiac electrophysiology is a key component of a comprehensive cardiac program. Relatively few physicians are trained in the specialty and almost 200 job openings are available nationwide as of the date of this report. Therefore, a qualified physician searching for a new job as a cardiac electrophysiologist without limitation would have a large number of job prospects.

**IV.    A candidate with strong educational and career experience, such as Dr. Bala, would be a viable candidate for placement with many recruiting organizations, regardless of practice setting.**

29.    For physicians seeking to build a career in cardiac electrophysiology, training and experience are prerequisites for employment. Training for cardiac electrophysiologists includes at least four years of medical school; a three-year residence in internal medicine; board certification in internal medicine by the American Board of Internal Medicine, a three-year cardiology fellowship program followed by board certification in cardiovascular disease from the American Board of Internal Medicine, another two years of fellowship training in clinical cardiac electrophysiology, and board certification in clinical cardiac electrophysiology from the American Board of Internal Medicine.[7]

30.    Through my experience working in provider recruitment and workforce planning, I have learned that recruiting organizations often reference specialty-specific hospital rankings published annually by *U.S. News & World Report* to determine the strength of organizations where a candidate trained or previously worked. A candidate who trained and/or worked for a highly ranked organization would be considered particularly viable for placement for new employment. The Hospitals of the University of Pennsylvania where Dr. Bala completed her cardiology fellowship, cardiac electrophysiology fellowship, and practiced as an assistant professor of medicine in cardiac electrophysiology for eight years was ranked #11 in the United States (out of 4,515 hospitals) for Cardiology, Heart & Vascular Surgery.[8]

---

5      Id.
6      AAPPR Internal Physician and Provider Recruitment Benchmarking Report (2023).
7      "What is a Cardiac Electrophysiologist?", WebMD, written by WebMD Editorial Contributors and reviewed by Poonam Sachdev, MD, December 13, 2022.
8      U.S. News & World Report Hospital Rankings, accessed October 23, 2023.



Exhibit 3
Page 8 of 51

31.    Based on her training pedigree and experience, with a program that is nationally ranked in her specialty, Dr. Bala would be considered a highly desirable candidate for an open cardiac electrophysiology position, whether in an academic medical center setting, in a hospital or in private practice.

**V.    Dr. Bala did not consistently utilize all available avenues for physicians to find employment throughout her job search and thus limited her opportunities for successful placement.**

32.    Physicians who wish to quickly find new employment will cast a wide net by utilizing all the pathways previously described and minimizing restrictions on their future position such as narrow geographic preferences or limited job requirements.

33.    Most physicians practice under contractual arrangements, and those contracts are often short in duration and regularly reviewed for renewal or nonrenewal. A physician's contract may not be renewed for a variety of reasons – program funding, changes in program needs, changes in case volumes, market factors, changes in faculty requirements – that are often outside of the physician's control. Physicians in these contractual arrangements, like Dr. Bala, will often have notice of non-renewal and ample opportunity to find new employment while still working for the previous employer. It is not unusual for a physician to be leaving employment at one organization and seeking employment with another. The average annual physician turnover rate was 11% in the 2023 AAPPR annual survey.[9]

34.    The timeline in **Exhibit I** details my understanding based on documents I have reviewed of the efforts undertaken by Dr. Bala in her search for new employment.

    **a.    After receiving notice of nonrenewal of her contract at OHSU, Dr. Bala did not engage in a comprehensive and diligent job search while still employed at OHSU.**

35.    Dr. Bala received notice from OHSU in May 2016 that she would be given one more employment contract renewal, after which it would not likely be renewed. That contract was renewed for one year to expire in June 2017, instead of six months, to allow time for her to find a new position while still employed by OHSU.

36.    Dr. Bala had already begun reaching out to institutions prior to May 2016 with inquiries to hospitals in Bend, Oregon and Chicago, Illinois. Such inquiries from so called "passive candidates" are not uncommon, as physicians often test the waters of the job market by exploring potential open positions that meet their preferred geographic region and practice setting.

---

[9]    AAPPR Internal Physician and Provider Recruitment Benchmarking Report, 2023.



Exhibit 3
Page 9 of 51

37.     Following the notice of her contract nonrenewal in May 2016 and through the end of her employment at OHSU, Dr. Bala applied to Dartmouth Hitchcock in Lebanon, New Hampshire and again to St. Charles Medical Group in Bend, Oregon. Based on the materials I have reviewed, Dr. Bala did not apply to any additional programs during that 13-month time frame.

38.     I noted that Dr. Bala testified in her deposition that she would have preferred to stay in academic medicine but also would not have been against working in a private practice with high volume.[10] During the 13-month period while she was still employed by OHSU but had already been given notice that her contract would likely not be renewed, Dr. Bala inquired about positions in various practice settings.

39.     Importantly, it appears in the same testimony about her job search that Dr. Bala considers only two employer types, an academic medical center-based job or a job in private practice. The type of organization – a hospital, health system, academic medical center, or independent practice – for whom a physician works does not necessarily dictate the practice environment in which the physician works. For example, a physician role at an academic medical center may or may not involve academic responsibilities. On the other end of the spectrum, a physician in independent practice can take an academic appointment at an academic medical center via a contractual relationship. Put simply, the type of organization that an employing entity is does not necessarily indicate the type of physician roles available or present at that organization.

40.     In my opinion Dr. Bala did not conduct a comprehensive or diligent job search, and Dr. Bala's efforts while employed by OHSU mirrored those of an actively employed physician testing the waters with other opportunities, not that of an active job seeker. Had Dr. Bala engaged in a comprehensive and diligent job search while still employed at OHSU, the nonrenewal of her contract would have had little, if any, effect on her ability to find a new job in any practice setting.

**b.      Dr. Bala did not engage in a comprehensive and diligent job search immediately following her last day of employment at OHSU.**

41.     Dr. Bala's last day of employment with OHSU was on June 19, 2017. Dr. Bala did not apply for any additional positions until August 2017.

42.     In August 2017, Dr Bala began applying for positions with a select number of organizations. During the month of August, Dr. Bala applied to three positions (Virginia Mason, East Carolina University, and Advocate Illinois) and corresponded with professional col-

---

[10]    Bala deposition p. 274.

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers
EST 1973
50
Exhibit 3
Page 10 of 51

leagues about two others (Harvard University and University of North Carolina). An August screenshot of Dr Bala's profile on the national database Practice Link[11] shows that her profile is set to "Not Looking at the Present Time," which would indicate to recruiters that Dr. Bala is not open to hearing about new job opportunities.

43.    In September 2017, Dr. Bala applied for one additional position (Ascension Medical Group in Chicago) and corresponded with professional colleagues about two others (University of Rochester and Medical University of South Carolina) while also continuing conversations with Virginia Mason, who notified Dr. Bala that her organization was not moving forward due to other candidates who were more qualified and negative feedback. Dr. Bala proactively sent a list of several references to Medical University of South Carolina despite being told recruitment for the position was on hold.

44.    In October 2017, Dr. Bala continued her exploratory conversations with Medical University of South Carolina and began interviewing with Banner, which is the clinical affiliate of the University of Arizona College of Medicine. She also corresponded with a professional colleague about opportunities with the University of Illinois Chicago.

45.    In November 2017, Dr. Bala continued to send exploratory emails to professional colleagues about opportunities in Chicago, Washington State, Utah, Rochester, and New York City. She applied to one position in Long Island, New York. A Practice Link consultant reached out to Dr. Bala to update profile notes (which are also available to hospital in-house recruiters), and she shared she was looking for a position that was 100% electrophysiology and looking for positions in large cities in the United States or near cities in the Pacific Northwest. She also stated that geography was a deal breaker. The Practice Link consultant sent Dr. Bala three positions to consider, and she stated she was not interested in any of them.

46.    Also in November 2017, Dr. Bala spoke with other recruiters, telling one she was not interested in a position presented in Virginia and noting she was "looking at large metropolitan cities – NYC, Chicago, SF, Portland, Seattle, DC." Correspondence with another recruiter referred to her "preferred geography." Strong geographic preferences and practice limitations have a negative impact on physician job searches when working with recruiters. Recruitment firms maintain extensive notes on candidate preferences and will often decline to present new opportunities to physicians with limited search parameters. Also, in-house recruiters subscribe to aggregated candidate sourcing sites such as Practice Link and will eliminate potential candidates based on notes in their systems. Dr. Bala's communicated geographic restrictions limited the future opportunities she was considered for by recruiters reviewing her profile in those systems.

---

[11]   Job search docs_combined.pdf, pp. 41-42

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers

Exhibit 3
Page 11 of 51

47.   In December 2017, Dr. Bala applied for a faculty position with the University of Illinois Chicago and followed up on prior applications in Chicago and Long Island.

48.   In January 2018, Dr. Bala followed up on a position in Chicago noting that she is "currently interviewing and have a few offers for positions at academic centers." She applied for one new Chicago position.

49.   In February 2018, there was no reported job search activity for Dr. Bala.

50.   In March 2018, Dr. Bala signed a contract to start work at Banner in May 2018.

51.   Dr. Bala's total job search from June 2017 to March 2018 consisted of formal applications for ten positions and collegial inquiries to several organizations about possible open positions. The majority of those applications were with academic medical centers, community hospitals and health systems, or private practices and in or proximate to large metropolitan areas. Her job search leading to employment with Banner utilized only two of the possible seven pathways to employment (personal networking based on reputation and relationships with past colleagues or classmates, and direct application to an open position). Dr. Bala had an inquiry from a contingent search firm (Eskridge Associates), but it does not appear that she responded. Dr. Bala corresponded with a retained search firm (Cejka Search) about an open position, but she did not appear to be presented as a possible candidate. She was also contacted by both PracticeLink and an in-house recruiter directly recruiting to an open position, but she declined to engage due to her stated geographic limitations.

52.   In my opinion, Dr. Bala did not conduct a comprehensive and diligent job search between her last day of employment at OHSU and her first day of employment at Banner. Additionally, Dr. Bala could have filled this gap in employment by continuing to work clinically while looking for permanent employment – in locum tenens, either in cardiac electrophysiology or general cardiology, or potentially in consultative opportunities in industries tangential to clinical healthcare such as biotech or pharmaceuticals.

53.   Furthermore, based on my review of documents provided, I note that Dr. Bala claims that references from OHSU impacted her ability to secure employment. However, I found mentions of potential negative references in the documentation I received related to only three positions. Assuming those were negative, each occurred in 2017. Beyond that point, there is no evidence showing that OHSU or OHSU-aligned individuals provided negative references or that negative references impacted her job search. Although I cannot confirm that a negative reference was given or considered at any point in time, I have observed that Dr. Bala often advanced through the stages of application and recruitment process beyond the point that references would normally be reviewed. This, along with her ability to secure

Exhibit 3
Page 12 of 51

new employment in both an academic medical center and later with a private practice, confirms that potential negative references did not materially impact her job search.

**c.      Following her termination at Banner, although her job search became more diligent with fewer limitations, it was still inconsistent and not comprehensive.**

54.    Dr. Bala was employed by Banner, an academic medical center, beginning in July 2018. She was terminated on January 17, 2020.

55.    Importantly, Dr. Bala opined in her deposition testimony that a nonrenewal of an employment contract and a formal termination of an employment contract are ostensibly the same and have the same effect on future employment prospects. Based on my experience in physician recruitment and understanding of the diligence with which the industry documents physicians' career progression, such as promotions, job changes, and terminations, I disagree. The termination of an employment contract, or being "fired," often influences a physician's ability to find a new job. The nonrenewal of an employment contract, by contrast, would have less (or potentially even no) influence on a physician's ability to find a new job, especially if the physician engages in a comprehensive and diligent job search while still employed.

56.    In February 2020, Dr Bala applied to 10 positions and reached out to two organizations directly to inquire about open positions. She had follow-up communications with three organizations about additional interviews or site visits. In one communication with the Everett Clinic, Dr. Bala communicated her dissatisfaction that a Boston Scientific representative had reached out about her application as she found this process inappropriate; however, Dr. Bala offered references. The Everett Clinic passed on continuing the process with Dr. Bala, noting that she was held in high esteem by her references, but they did not feel Dr. Bala would be set up for success there and they needed a stable electrophysiology lab. Dr. Bala also had communication with a contingent recruiter about opportunities in Chicago, Northern New Jersey, New York metro, New England, and Arizona.

57.    In March 2020, Dr. Bala applied to two positions and had communication with the VA Medical Center in Washington, D.C. and a contingent recruiter asking to be submitted for a position in New York.

58.    In April 2020, Dr. Bala submitted an inquiry to Tufts Medical Center in Boston, which replied that its recruitment efforts were on hold.

59.    In May 2020, Dr. Bala reached out to a professional contact about open positions.

Exhibit 3
Page 13 of 51

60.     In June 2020, Dr. Bala communicated with a hospital in Washington State about an open position and communicated with a contingent recruiter about a position that was no longer available.

61.     In July 2020, Dr. Bala had no job search activities.

62.     In August 2020, Dr Bala applied for three positions and communicated with a contingent recruiter asking about open positions in New York City.

63.     In September 2020, Dr. Bala applied for at least three positions and had correspondence with two organizations about open positions, one of which was looking for a general cardiologist.

64.     In October 2020, Dr. Bala applied for 12 positions and communicated with a colleague about a position. She also emailed Francis Marchlinski with UPenn Medicine to ask about references for a Michigan position; Dr. Bala commented that she appreciated her training from UPenn and that "her side of the story with OHSU will come out."

65.     In November 2020, Dr. Bala applied for 20 positions and engaged in follow-up activities with several that included telephone screening interviews and discussion of potential site visits. Some positions that Dr. Bala applied for were filled or the organization moved on with other candidates, and Dr. Bala shared with Chris Gildea of UMPC that she had been applying and looking for a new opportunity since January 2020.

66.     In December 2020, Dr. Bala applied for 16 positions and continued to have follow-up discussions with several entities.

67.     In January 2021, Dr. Bala applied for 21 positions and communicated with retained search firm Jackson Physician Search about an opportunity in Nebraska. Dr. Bala also engaged in follow-up activities for at least five opportunities.

68.     In February 2021, Dr. Bala applied for the cardio-oncology clinical research fellowship with Memorial Sloan Kettering Cancer Center in New York. She received a reply that recruiting for it was finished and it would open for the next wave of applicants in September 2021.

69.     Dr. Bala signed an employment contract with UHS on February 8, 2021, a position she applied for on December 24, 2021.

70.     From March 2021 through May 2021, Dr. Bala conducted no job search activities.

Exhibit 3
Page 14 of 51

71.    In June 2021, Dr. Bala applied to two permanent positions and one locum tenens position. Dr. Bala also followed up with Rush University in Chicago to inquire about faculty positions.

72.    In July 2021, Dr. Bala applied to Yale University. She also applied to two locum tenens positions and discussed three additional locum tenens positions with a recruiter from Comp Health. The Comp Health recruiter was unable to present her to an opportunity in Minneapolis as Dr. Bala was unwilling to proactively supply references to that hospital. Dr. Bala also reached out to Piedmont Healthcare in Georgia about open electrophysiology positions.

73.    In August 2021, Dr. Bala conducted no job search activities. Dr. Bala signed her second employment contract with UHS on August 6, 2021.

74.    In September 2021, Dr. Bala received an email from a recruiter at Rush University in Chicago about a virtual interview.

75.    In October 2021, Dr. Bala applied to three positions but noted that she did not have experience in laser lead extraction as required for one position.

76.    In November 2021, Dr. Bala applied to nine positions and initiated contact with Emory Healthcare in Atlanta about possible electrophysiology openings.

77.    In December 2021, Dr. Bala replied to a sourcing inquiry from an in-house recruiter in Florida, initiated contact with Morehouse School of Medicine in Atlanta about a possible faculty position, and set up a time with a contingent recruiter to talk about opportunities.

78.    In January 2022, Dr. Bala applied to five positions and corresponded with one organization about a position that had been filled.

79.    In February 2022, Dr. Bala engaged in follow-up conversations with two organizations that she had previously applied to.

80.    Dr. Bala resigned from UHS on February 11, 2022 without having secured other employment.

81.    In March 2022. Dr. Bala engaged in correspondence with two organizations that appear to have originated from in-house recruiter sourcing.

82.    In April 2022, Dr. Bala applied to two positions. She also engaged in contact with three separate locum tenens firms about opportunities in a total of six states. Dr. Bala also had a follow-up inquiry about a faculty position in Albany, New York.

ECG MANAGEMENT CONSULTANTS
EST 1973
A Siemens Healthineers

Exhibit 3
Page 15 of 51

83.     In May 2022, Dr. Bala applied for three positions. She also initiated or responded to several recruiter emails about positions. Dr. Bala initiated contact with the University of Wisconsin, noting in her introductory email that she had filed a lawsuit against her prior employer and had not spoken out much about being "cancelled" from her profession. In another email to the University of Buffalo, Dr. Bala states that she filed a "gender discrimination lawsuit" against her former employer and also mentioned being "cancelled from the profession." These are examples of a type of communication that would not be attractive to a recruiting organization and would limit future exploration of employment early in the process.

84.     In June 2022, Dr. Bala applied for four positions. A recruiter from Merritt Hawkins informed Dr. Bala that she is no longer being considered for the University Hospitals position in Cleveland. On June 10, 2022 Dr. Bala is invited to interview with Citrus Cardiology Consultants in Florida.

85.     In July 2022, Dr. Bala conducted no job search activities.

86.     In August 2022, Dr. Bala applied to two positions. Dr. Bala received a proactive email from an in-house recruiter in North Carolina about a possible opportunity. Dr. Bala also was notified by Jackson Search Consultants that it would be unable to move forward with a possible opportunity they represented in Atlanta due to her pending lawsuit and that it would be difficult to obtain buy-in from the system as a result.

87.     In September 2022, Dr. Bala received correspondence from a contingent recruiter about jobs in Georgia.

88.     In October 2022, Dr. Bala conducted no job search activities. Dr. Bala received an offer of employment from Citrus Cardiology, a private practice in Florida, on October 14, 2022.

89.     In November 2022, Dr. Bala received an email that a scheduled visit to St. Mary's in Huntington, West Virginia was canceled due to another candidate accepting an offer.

90.     In my opinion, Dr. Bala expanded her job search parameters significantly following her termination from Banner; however, her diligence was inconsistent and erratic. Even still, once Dr. Bala eventually widened her parameters and began utilizing more of the available avenues in the job search, her opportunities increased, and she gained employment.

_____        _____
Jennifer L. Moody                        November 1, 2023
                                         Date

ECG MANAGEMENT CONSULTANTS
A Siemens Healthine

Exhibit 3
Page 16 of 51

Attachment 1



**Jennifer L. Moody**
Partner
Strategy and Business
Advisory

13355 Noel Road
Suite 1100
Dallas, TX  75240
469-729-2600 (office)
214-663-6571 (cell)
**jmoody@ecgmc.com**

Jennifer is a dynamic healthcare strategist with a wide-ranging knowledge of provider network optimization, medical staff development, community need assessment, and provider recruitment strategy. ECG clients value her guidance on health system market planning and physician staffing issues, along with the insightful, pragmatic approach she brings to all her engagements.

### Summary of Expertise
The leader of ECG's Provider Network and Community Planning practice, Jennifer has over 28 years of experience in medical staff development planning, physician recruitment, and community need assessment. During her career, she has worked with more than 400 health systems, hospitals, and physician organizations to define provider recruitment and retention goals, craft implementable solutions to workforce deficits, create alignment strategies, and expand ambulatory provider access. She has also worked closely with leadership to rightsize physician organizations, align providers with emerging care delivery models, and position hospitals and health systems for success in an evolving healthcare landscape.

Recent engagements Jennifer has led include assisting a regional health system to prioritize its physician alignment goals, conducting a state-level provider workforce analysis for a large clinically integrated network to assess network optimization, and identifying clinical expansion opportunities for several regional health systems.

During her time at ECG, Jennifer has also redesigned the internal provider recruitment process at an integrated health system to decrease the time and cost required to fill vacant positions, created a streamlined community need assessment process for a health system, assisted a health system with the geographic redistribution of its specialty service lines following the closure of a facility, developed legally compliant solutions to align with private physician practices, and conducted several succession planning risk analyses for medical groups and hospital medical staff.

### Education
Jennifer has a master of science degree in accounting from the University of North Texas and a bachelor of science degree in political science and history from Texas Tech University.

### Articles and Speeches
Jennifer speaks and publishes regularly on the subjects of provider network optimization, succession planning, workforce diversity, physician recruitment trends, and network alignment. See the following page for a full list of publications and speeches:

Attachment 1 *(continued)*

**Articles and Speeches**

**Publications While at ECG Management Consultants**

Publications:

- 7 Ways Organizations Defeat Themselves in Provider Recruitment (ECG blog, 2023)
- Developing an Integrated Approach to Workforce Planning and Physician Network Design (ECG whitepaper, 2021)
- Do You Really Need a Psychiatrist? Why Your Behavioral Health Service Line Might Benefit from a Different Strategy (ECG blog, 2021)
- Exploring the Roots of the Physician Shortage (ECG blog, 2017)
- Extend the Behavioral Health Workforce by Choosing the Right Care Model (ECG blog, 2021)
- Harness the Power of Your Community Health Needs Assessment to Address SDOH and Advance Health Equity (The Governance Institute article, 2023)
- How Healthcare Organizations are Meeting the Challenges of Physician Management: An Interview with Jennifer Moody (ECG blog, 2018)
- Preparing Your Physician Network for Surgical Migration: Three Key Considerations (ECG blog, 2021)
- Provider Recruitment: Five Insights from the 2023 AAPPR Conference (ECG blog, 2023)
- Racial Health Equity and Social Determinants of Health – What's the Difference? (ECG article, 2023)
- The Clinical and Economic Value of Rheumatology (American College of Rheumatology whitepaper, 2023)
- The Redesign of Primary Care Can No Longer Wait (ECG article, 2023)
- The Physician Succession Imperative (ECG blog/infographic, 2017)
- The Power of Workforce Planning within a Physician Alignment Strategy (Beckers, 2021)
- Transformational Drivers in the Health System of the Future (ECG whitepaper, 2019)
- We Believe Series: Future Generations Will Value "Wellness" over "Healthcare" (ECG whitepaper, 2020)
- Why Hospitals and Provider Groups Should be Thinking About Physician Succession Planning (CardioSource World News, 2016)
- Why Physician Succession Planning Can't Wait (ECG blog, 2017)
- Will Amazon's Acquisition of One Medical Force Health Systems to Reinvent Their Primary Care Delivery? (ECG blog, 2022)



Exhibit 3
Page 18 of 51

Speeches/Webinars (regional and national audiences):

- American College of Rheumatology
- Association for Advancing Physician and Provider Recruitment
- Carolinas Association of Provider Services
- ECG – We Believe Series
- Healthcare Financial Management Association
- Mid-Atlantic Physician Recruiter Alliance
- National Association of Physician Recruiters
- Southwest Physician Recruiters Association

## **Publications Prior to Joining ECG**

Publications:

- Demonstrating Community Need for Physicians (HealthLeaders, 2003)
- Developing a Sustainable Physician Staffing Plan (COR Health, 2004)
- Generational Unity – A Key to Effective Health Care Delivery (Texas Hospitals, 2002)
- Healthcare Crisis in 2012: Fact or Fiction (MGMA Connection, 2010)
- Maintain Your Viability as the Physician Workforce Dwindles (MGMA Connection, 2011)
- Physician Needs Are More Than a Matter of Ratios (HealthLeaders, 2002)
- Planning in the Midst of Reform (Journal of the Association of Staff Physician Recruiters, 2013)
- Recruiting Generation X Physicians (New England Journal of Medicine – Recruiting Physicians Today, 2002)
- Starter Kit for Creating a Medical Staff Development Committee (HealthLeaders, 2004)
- Steer Clear of Physician Recruiting Violations (HealthLeaders, 2003)
- Trend Tracker – Medicare/Medicaid Acceptance Trends Among Physicians (AmeriMed Consulting blog, 2010)
- What Every Savvy Recruiter Needs to Know about Hot Topics and Trends (National Association of Physician Recruiters, 2011)



Exhibit 3
Page 19 of 51

Speeches/Webinars (regional and national audiences):

- American Orthopaedic Association
- Association of Advancing Physician and Provider Recruitment
- Association of California Healthcare Districts
- Carolina Association of Physician Services
- Center for Physician Intelligence
- CME Conference
- Colorado Hospital Association
- First Choice
- Forum for Health Strategists
- Healthcare Financial Management Association
- Illinois Staff Physician Recruiters
- Maine Hospital Association
- Massachusetts Hospital Association
- Medical Group Management Association
- Michigan Recruitment and Retention Network
- MidAtlantic Physician Recruiters Alliance
- National Association of Physician Recruiters
- North Carolina Medical Group Managers
- Northeast Physician Recruiters Association
- Ohio Hospital Association
- Practice Match Annual Client Summit
- Society for Healthcare Strategy & Market Development
- St. Louis University – School of Medicine
- Tennessee Hospital Association
- Texas Healthcare Trustees
- University of Connecticut – School of Medicine
- University of Southern California – School of Policy, Planning, and Development
- University of Vermont – School of Medicine
- Wake Forest University/KPMG Healthcare Summit
- Wyeth Pharmaceuticals



Exhibit 3
Page 20 of 51

Attachment 2

## Documents Provided by Counsel and Reviewed in Preparation of My Report

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 1 | UPENN000450 | UPENN000455 | Clinical Practices of the University of Pennsylvania Department of Medicine Member Practice Agreement [Hospital Based Physician] |
| 2 | UPHS000194 | UPHS000195 | MOU for Joint Faculty Appointments at the Philadelphia Veterans Administration Medical Center and the University of Pennsylvania Schools of Medicine and Dentistry |
| 3 | UPHS000038 | UPHS000040 | Academic Plan for Rupa Bala, MD |
| 4 | OHSU_RB 000050 | OHSU_RB 000073 | Oregon Health & Science University Clinician Employment Agreement |
| 5 | BANNER000557 | BANNER000577 | Banner-University Medical Group Physician Employment Agreement |
| 6 | BAAA 2674 | BAAA 2691 | United Medical Associates PC Employment Agreement, 2/8/21 |
| 7 | BAAA 2692 | BAAA 2710 | United Medical Associates PC Employment Agreement, 8/6/21 |
| 8 | BALA 2728 | BALA 2744 | Citrus Cardiology Consultants P.A. Physician Services Employment Agreement |
| 9 | OHSU_RB 000026 | OHSU_RB 000048 | Rupa Bala, MD CV: 2014 |
| 10 | BANNER000579 | BANNER000604 | Rupa Bala, MD CV: 2015-2017 |
| 11 | ADVOCATE000004 | ADVOCATE000029 | Rupa Bala, MD CV: 2017 |
| 12 | BALA 000770 | BALA 000793 | Rupa Bala, MD CV: 2020 |
| 13 | BALA 2440 | BALA 2464 | Rupa Bala, MD CV: 2021 |
| 14 | BALA 2485 | BALA 2509 | Rupa Bala, MD CV: May 2022 |
| 15 | BALA 00517 | BALA 00518 | Email by Sanjiv Kaul forwarding EP job, 12/20/16 |
| 16 | BALA 1198 | BALA 1199 | Emails between Rupa Bala and colleague re Different Position, 5/1/17 |
| 17 | BALA 1257 | BALA 1262 | Text Messages re Job Hunting |
| 18 | STCHARLES000003<br>ADVOCATE000030<br>MUSC000004<br>VIRGINIAMASON000028<br>ADVOCATE000032<br>MUSC000033<br>MUSC000003<br>UNIVILLINOIS000001<br>ADVOCATE000034<br>BALA 000001<br>BALA 0155<br>BALA 1600<br>BALA 1871 | STCHARLES000008<br>ADVOCATE000031<br>MUSC00006<br>VIRGINIAMASON000038<br>ADVOCATE000033<br>MUSC000033<br>MUSC000003<br>UNIVILLINOIS000005<br>ADVOCATE000036<br>BALA 000154<br>BALA 0192<br>BALA 1671<br>BALA 2027 | Job Search Documents, 7/19/16-9/14/22 |



Exhibit 3
Page 21 of 51

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | BALA 2037 | BALA 2260 | |
| | BALA 2513 | BALA 2513 | |
| | BALA 2537 | BALA 2537 | |
| | BALA 2527 | BALA 2529 | |
| | BALA 2414 | BALA 2415 | |
| | BALA 2316 | BALA 2316 | |
| | BALA 2410 | BALA 2410 | |
| | BALA 2413 | BALA 2413 | |
| | BALA 2383 | BALA 2383 | |
| | BALA 2431 | BALA 2431 | |
| | BALA 2303 | BALA 2306 | |
| | BALA 2301 | BALA 2302 | |
| | BALA 2549 | BALA 2550 | |
| | BALA 2314 | BALA 2315 | |
| | BALA 2520 | BALA 2521 | |
| | BALA 2517 | BALA 2519 | |
| | BALA 2522 | BALA 2523 | |
| | BALA 2384 | BALA 2390 | |
| | BALA 2346 | BALA 2346 | |
| | BALA 2391 | BALA 2399 | |
| | BALA 2331 | BALA 2333 | |
| | BALA 2338 | BALA 2339 | |
| | BALA 2335 | BALA 2337 | |
| | BALA 2425 | BALA 2425 | |
| | BALA 2373 | BALA 2373 | |
| | BALA 2358 | BALA 2358 | |
| | BALA 2412 | BALA 2412 | |
| | BALA 2421 | BALA 2424 | |
| | BALA 2360 | BALA 2360 | |
| | BALA 2432 | BALA 2432 | |
| | BALA 2341 | BALA 2341 | |
| | BALA 2325 | BALA 2326 | |
| | BALA 2400 | BALA 2400 | |
| | BALA 2366 | BALA 2366 | |
| | BALA 2298 | BALA 2298 | |
| | BALA 2359 | BALA 2359 | |
| | BALA 2367 | BALA 2367 | |
| | BALA 2361 | BALA 2362 | |
| | BALA 2347 | BALA 2347 | |
| | BALA 2364 | BALA 2364 | |
| | BALA 2374 | BALA 2374 | |
| | BALA 2416 | BALA 2416 | |
| | BALA 2365 | BALA 2365 | |
| | BALA 2375 | BALA 2376 | |
| | BALA 2363 | BALA 2363 | |
| | BALA 2340 | BALA 2340 | |
| | BALA 2379 | BALA 2380 | |
| | BALA 2538 | BALA 2540 | |
| | BALA 2320 | BALA 2321 | |
| | BALA 2541 | BALA 2547 | |



Exhibit 3
Page 22 of 51

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | BALA 2299 | BALA 2300 | |
| | BALA 2548 | BALA 2548 | |
| | BALA 2307 | BALA 2313 | |
| | BALA 2334 | BALA 2334 | |
| | BALA 2318 | BALA 2319 | |
| | BALA 2479 | BALA 2480 | |
| | BALA 2429 | BALA 2430 | |
| | BALA 2438 | BALA 2439 | |
| | BALA 2477 | BALA 2477 | |
| | BALA 2329 | BALA 2330 | |
| | BALA 2344 | BALA 2345 | |
| | BALA 2401 | BALA 2402 | |
| | BALA 2433 | BALA 2437 | |
| | BALA 2481 | BALA 2481 | |
| | BALA 2524 | BALA 2524 | |
| | BALA 2327 | BALA 2328 | |
| | BALA 2404 | BALA 2405 | |
| | BALA 2471 | BALA 2473 | |
| | BALA 2322 | BALA 2323 | |
| | BALA 2525 | BALA 2526 | |
| | BALA 2381 | BALA 2382 | |
| | BALA 2530 | BALA 2532 | |
| | BALA 2377 | BALA 2378 | |
| | BALA 2419 | BALA 2419 | |
| | BALA 2475 | BALA 2476 | |
| | BALA 2426 | BALA 2428 | |
| | BALA 2420 | BALA 2420 | |
| | BALA 2324 | BALA 2324 | |
| | BALA 2403 | BALA 2403 | |
| | BALA 2533 | BALA 2536 | |
| | BALA 2417 | BALA 2418 | |
| | BALA 2474 | BALA 2474 | |
| | BALA 2342 | BALA 2343 | |
| | BALA 2482 | BALA 2483 | |
| | BALA 2515 | BALA 2515 | |
| | BALA 2484 | BALA 2484 | |
| | BALA 2406 | BALA 2406 | |
| | BALA 2372 | BALA 2372 | |
| | BALA 2348 | BALA 2348 | |
| | BALA 2465 | BALA 2468 | |
| | BALA 2368 | BALA 2371 | |
| | BALA 2349 | BALA 2357 | |
| | BALA 2407 | BALA 2409 | |
| 19 | | | Excerpt of July 28, 2020 Deposition of Dr. Rupa Bala (pages 264-316) |
| 20 | | | Second Amended Complaint for Deprivation of Civil Rights |
| 21 | | | Defendants' Answer and Affirmative Defenses to Second Amended Complaint for Deprivation of Civil Rights |



Exhibit 3
Page 23 of 51

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 22 | | | Excerpt of July 28, 2020 Deposition of Dr. Rupa Bala (pages 37-55) |
| 23 | | | Excerpt of August 11, 2020 Deposition of Dr. Sanjiv Kaul (pages 26-29) |
| 24 | BALA 000625 | BALA 000628 | OHSU Offer Letter, 7/16/14 |
| 25 | OHSU_RB 000015 | OHSU_RB 000016 | OHSU Position Description, Unclassified Academic Personnel |
| 26 | BALA 000629 | BALA 000730 | OHSU Recruitment Manual |
| 27 | BALA 0846 | BALA 0847 | OHSU Communication re Promotion, 4/13/15-4/14/15 |
| 28 | BALA 0932 | BALA 0932 | Letter of Support for Promotion, 9/20/15 |
| 29 | BALA 0942 | BALA 0942 | Letter of Reference for Promotion and Tenure, 9/25/15 |
| 30 | BALA 00193 | BALA 00195 | Personal Statement by Rupa Bala re promotion (OHSU) |
| 31 | OHSU_RB 001780 | OHSU_RB 001782 | OHSU Recommendation for Appointment to Associate Professor, 12/5/15 |
| 32 | OHSU_RB 000098 | OHSU_RB 000098 | OHSU Appointment to Associate Professor effective 1/1/16 |
| 33 | OHSU_RB 000099 | OHSU_RB 000099 | OHSU Annual Salary effective 7/1/16 |
| 34 | BALA00592 | BALA00592 | Announcement of Dr. Bala resignation, 4/29/17 |
| 35 | OHSU_RB 000852 | OHSU_RB 000852 | OHSU Total Compensation, 2015-2017 |
| 36 | | | Excerpt of August 7, 2020 Deposition of Dr. Charles Henrikson (pages 26-39) |
| 37 | | | Declaration of Dr. Rick Koch in Opposition to Defendant's Motion for Summary Judgment, 9/26/21 |
| 38 | | | Declaration of Rupa Bala MD in Opposition to Defendants' Motion for Summary Judgment, 9/27/21 |
| 39 | BANNER000130 | BANNER000130 | Physician Recruitment - BUMG Physician Request Form |
| 40 | BANNER000079 | BANNER000080 | Banner Health Position Description, signed by Rupa Bala 4/11/18 |
| 41 | BANNER000087 | BANNER000087 | Banner Health New Hire Paperwork |
| 42 | BALA 1495 | BALA 1497 | Rupa Bala's Response to Banner PIP |
| 43 | BALA 1514 | BALA 1515 | Notice of Termination of Physician Employment Agreement by Banner University Medical Group, 1/17/20 |
| 44 | BANNER000532 | BANNER000550 | Banner Health Payroll Report: 5/23/18-12/20/18 |
| 45 | BAAA 2712 | BAAA 2712 | Resignation from UHS, 2/11/22 |
| 46 | BALA 2727 | BALA 2727 | Citrus Cardiology Consultants P.A. Offer Letter, 10/14/22 |
| 47 | BALA 2723 | BALA 2725 | Citrus Cardiology Consultants P.A. Employment Application, 11/14/22 |
| 48 | | | FRCP 26. Duty to Disclose; General Provisions Governing Discovery (Rule Text & Notes of Decisions) |
| 49 | | | Amended Stipulated Protective Order, Exhibit A signed 10/13/23 |



Exhibit 3
Page 24 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|---|---|---|---|---|---|---|
| February 2016 | | Bend | OR | Aaron Pratt email correspondence - Bala says she sent CV and cover letter. | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 6-7 |
| 2/22/2016 | | Chicago | IL | Allegedly applied to job on PracticeLink on Feb 22 2016. Dr. Bala does not remember this and does not disclose the organization. | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 3-4 |
| May 2016 | OHSU | | | Bala discovers that they are not renewing contract in May 2016. OHSU gives her a one-year contract ending June 2017 instead of a 6-month one to allow her time to find a new job. | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 1 |
| July 2016 | Dartmouth Hitchcock | Lebanon | NH | Applied to Dartmouth EP position, but Bala says it fizzled out after email exchanges | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 4-5 |
| 7/19/2016 | St. Charles Medical Group | Bend | OR | Applied to job in Bend, OR on HealthECareers in correspondence with Aaron Pratt with general message of interest | Job search docs_combined.pdf | 1-5 |
| 7/22/2016 | St. Charles Medical Group | Bend | OR | Aaron Pratt emails asking for contact info for EP position | Job search docs_combined.pdf | 114 |
| 11/6/2016 | Dartmouth Hitchcock | Lebanon | NH | Reached out to Dr. Mark Kreager for interest in a position. She sent a CV and cover letter and notes that her current position at OHSU is "not a good fit" because her training and education on East Coast and Midwest. | Job search docs_combined.pdf | 42-43 |
| May 2017 | | | | Bala states she has not attended a conference since May of 2017 | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 47 |
| 6/18/2017 | Brown University | Providence | RI | Bala gets an email from Teresa Gadouas sending several EPs an opening for Brown Univ clinical EP search | Kaul Forwarding EP Job.pdf | 1-2 |
| 6/19/2017 | OHSU | | | Bala's last day at OHSU | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 24 |
| 6/30/2017 | OHSU | | | Bala contract ends with OHSU | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 35 |
| August 2017 | East Carolina University | | | Bala says she applied to ECU in August but never received a formal offer, but heavy interest, so she went forward with Banner instead. | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 12 |
| August 2017 | Virginia Mason | Seattle | WA | Bala applies to job with VM in August 2017 | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 28 |
| 8/8/2017 | Harvard University | Boston | MA | Reached out to Dr. Paul Zei at Harvard for faculty positions and sent her CV and cover letter. | Job search docs_combined.pdf | 38-39 |



Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 8/8/2017 | University of North Carolina | Chapel Hill | NC | Outreach to Paul Mounsey about UNC openings. He states leaving UNC for East Carolina Univ. Asks if she would be interested in speaking. She says yes. He connects with UNC contact. | Job search docs_combined.pdf | 123-124 |
| 8/16/2017 | University of North Carolina | Chapel Hill | NC | Email correspondence with Anil Gehi about EP at UNC. Anil says currently negotiating with an EP but if it doesn't work out he will reach out. Bala mentions that at OHSU she was doing too much general cardiology and that is not what she expected. Wants EP position only | Job search docs_combined.pdf | 125-126 |
| 8/29/2017 | Advocate Illinois | Chicago | IL | Applied for a job in Chicago with a general message of interest. | Job search docs_combined.pdf | 7-8 |
| 9/4/2017 | University of Rochester | Rochester | NY | Outreach to David Huang at U Rochester for any expansion for EP. She sent CV and cover letter and references. | Job search docs_combined.pdf | 127 |
| 9/4/2017 | Virginia Mason | Seattle | WA | Bala sets up interview for 9/12 with Dr. Fellows at VM | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 30 |
| 9/6/2017 | Medical University of South Carolina | Charleston | SC | Jeffrey Winterfield emailed Bala about her search and any interest in MUSC | Job search docs_combined.pdf | 73 |
| 9/7/2017 | Virginia Mason | Portland | OR | Interview with Michele Chacon at Virginia Mason.  Dr. Bala says she is very "actively looking and interviewing east coast and south". | Job search docs_combined.pdf | 12-13 |
| 9/8/2017 | Virginia Mason | Seattle | WA | Email about onsite interview at VM from Michele Chacon | Job search docs_combined.pdf | 133 |
| 9/11/2017 | Virginia Mason | Seattle | WA | Email from Nathaniel Higby to set up onsite interview | Job search docs_combined.pdf | 138 |
| 9/12/2017 | Ascension Medical Group | Chicago | IL | Applied for a job in Chicago (entity undisclosed) via the Heart Rhythm Society. Sends CV and cover letter. | Job search docs_combined.pdf | 23 |
| 9/12/2017 | Virginia Mason | Seattle | WA | Bala sends dates for 9/18, 9/19/, 10/2 for onsite interview | Job search docs_combined.pdf | 139 |
| 9/14/2017 | Medical University of South Carolina | Charleston | SC | Scheduled and rescheduled a call with Tom Di Salvo to talk about MUSC position | Job search docs_combined.pdf | 62 |
| 9/14/2017 | Virginia Mason | Seattle | WA | Email to Robert Rho who recently left VM for Overlake asking to speak about experience there | Job search docs_combined.pdf | 130 |
| 9/15/2017 | Medical University of South Carolina | Charleston | SC | Call with Tom Di Salvo of MUSC | Job search docs_combined.pdf | 62 |
| 9/18/2017 | Medical University of South Carolina | Charleston | SC | Outreach from Misty Daniels, recruiter for MUSC, regarding setting up site visit following a call with Tom Di Salvo. | Job search docs_combined.pdf | 66 |
| 9/19/2017 | Medical University of South Carolina | Charleston | NC | Reached out to Tom Di Salvo saying she heard about the hold on recruiting EP position. Notes she is still very interested in MUSC and sends over references from OHSU and other facilities. | Job search docs_combined.pdf | 52-53 |
| 9/25/2017 | Virginia Mason | Portland | OR | Follow up email to Michele Chacon on status of recruitment - sent more references from OHSU | Job search docs_combined.pdf | 14-16 |



Exhibit 3
Page 26 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 9/27/2017 | Virginia Mason | Portland | OR | After follow up with Michele Chacon, comment says "not moving forward due to negative feedback" and "other candidates more qualified". | Job search docs_combined.pdf | 18 |
| October 2017 | Banner Health | Tucson | AZ | Bala starts interviewing with Banner Health | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 7 |
| 10/2/2017 | Medical University of South Carolina | Charleston | SC | Set up site visit for 10/18-10/20 | Job search docs_combined.pdf | 71 |
| 10/16/2017 | Medical University of South Carolina | Charleston | SC | MUSC preparing for site interview | Job search docs_combined.pdf | 26-28 |
| 10/29/2017 | University of Illinois Chicago | Chicago | IL | Outreach to Dr. Erik Wissner about EP opportunities with UIC. Sent CV and cover letter. Steve replies completed recruitment and will reach out 2018-2019 | Job search docs_combined.pdf | 119 |
| November 2017 | | | | Jai Raman emails about search | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 11-12 |
| 11/4/2017 | Rush University | Chicago | IL | Email correspondence with Dr. Jaishankar Raman of OHSU about openings in Chicago. Noted that Northwestern, UIC, Rush, and Loyola programs are full. Jai offered to connect Bala with chief at Rush. | Job search docs_combined.pdf | 55 |
| 11/5/2017 | PeaceHealth | | WA | Bala sent email to Dr. James Reiss of PeaceHealth of any EP openings | Job search docs_combined.pdf | 91 |
| 11/8/2017 | Providence St. Joseph Health | Portland | OR | Applied to EP opening with Providence in Portland. Sent follow up email to Hansie Mathelier saying she doesn't think she will hear back - "the OHSU blacklist operation in full effect". | Job search docs_combined.pdf | 109 |
| 11/10/2017 | PeaceHealth | | WA | Dr. James Reiss replies that they just filled an EP position and no openings at the time | Job search docs_combined.pdf | 91 |
| 11/19/2017 | NEJM Career Center | West Islip | NY | Bala applies to job through NEJM for position in Long Island | Job search docs_combined.pdf | 220 |
| 11/20/2017 | Doctors Choice Placement | | | Got an email from Jarrett Alman to talk about EP opportunities. Bala replies saying that she is looking for larger metro cities: NYC, Chicago, San Francisco, Portland. Is not interested in staying in Georgia. Looking for private practice and academic jobs. | Job search docs_combined.pdf | 49-50 |
| 11/21/2017 | Hayman Daugherty Associates | New York | NY | Previous conversation with contingent recruiting company Tanya Levy about NYC position | Job search docs_combined.pdf | 95 |
| 11/22/2017 | Virginia Mason | Seattle | WA | Michele Chacon emails that they are pursuing another candidate and will be in touch if the decision changes | Job search docs_combined.pdf | 144 |
| 11/25/2017 | Intermountain Health | Salt Lake City | UT | Bala sent email to Dr. Pete Weiss at Intermountain asking about EP openings | Job search docs_combined.pdf | 93 |

ECG MANAGEMENT CONSULTANTS | EST 1973 50
A Siemens Healthineers Company

Exhibit 3
Page 27 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 11/27/2017 | Northwell Health | New York | NY | Outreach to Steve Mountantonakis for opportunities in NYC. Sent CV and cover letter. Steve replies that he will keep a look out. Bala says she applied to Nassau County Medical Center opening and Steve said not sure if the Nassau job is a good fit but will ask about the status. | Job search docs_combined.pdf | 117 |
| 11/28/2017 | Intermountain Health | Salt Lake City | UT | Pete replies - no EP openings, but institution-wide restructuring is occurring and they may hire in 2019. | Job search docs_combined.pdf | 93 |
| 11/28/2017 | PracticeLink | | | Email sent to Brandon Adkins at PracticeLink filling out recruitment questionnaire. Bala states looking for large cities and PNW near cities. Cites that location is a dealbreaker. | Job search docs_combined.pdf | 102 |
| 11/28/2017 | PracticeLink | | | Brandon Adkins sends jobs over from PracticeLink based on her responses. Bala says she saw them and is not interested. | Job search docs_combined.pdf | 105 |
| 11/28/2017 | Eskridge Associates/PracticeLink | San Diego | CA | Karl sent email to Bala about opening with San Diego VA from PracticeLink profile | Job search docs_combined.pdf | 111 |
| 11/29/2017 | Rochester Regional | Rochester | NY | Bala sent email to Sarah Taylor at Rochester asking about any openings there | Job search docs_combined.pdf | 110 |
| 11/30/2017 | Riverside Health System | Newport News | VA | Email from Nicole Laroche about EP opportunity in SE VA | Job search docs_combined.pdf | 97 |
| 11/30/2017 | Riverside Health System | Newport News | VA | Bala replies not interested about Nicole about Virginia opportunity. Adds that she is only interested in NYC, Chicago, SF, Portland, Seattle, DC. | Job search docs_combined.pdf | 99 |
| 12/14/2017 | | Long Island | NY | Reached out about EP position in Long Island, NY. Sends CV and cover letter. | Job search docs_combined.pdf | 58 |
| 12/14/2017 | Cejka Search | | NY | Bala to recruiting firm asking about status of Long Island EP position | Job search docs_combined.pdf | 227 |
| 12/15/2017 | University of Illinois Chicago | Chicago | IL | Faculty employment application | Job search docs_combined.pdf | 29-30 |
| 12/26/2017 | Ascension Medical Group | Chicago | IL | Follow up email to Andrea Turner for position at Advocate Medical Group. Sends CV and cover letter. | Job search docs_combined.pdf | 37 |
| 1/10/2018 | Advocate Illinois | Chicago | IL | Follow up email to Advocate to inquire if position has been filled or not.  Bala states that she is "currently interviewing and have a few offers for positions at academic centers". | Job search docs_combined.pdf | 34 |
| 1/13/2018 | | Chicago | IL | Applied for a job in Chicago on HealthECareers | Job search docs_combined.pdf | 35-36 |
| March 2018 | | | | Bala signs contract at Banner | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 42 |
| 5/15/2018 | OHSU | | | Bala officially files lawsuit | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 41 |



Exhibit 3

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 7/1/2018 | | | | Bala officially starts at Banner | Bala Depo Excerpt (Damages-Job Search-Subsequent Employment).pdf | 41 |
| 1/28/2019 | Northwest Medical Center | Tucson | AZ | Applied for EP job on PracticeLink | Job search docs_combined.pdf | 262 |
| 2/4/2020 | Northwest Medical Center | Tucson | AZ | Bala reaches out to Zain Khapley about availability of positions with Northwest. Stated not opposed to Locums. Zain said that he will connect her with CEO. | Job search docs_combined.pdf | 269 |
| 2/5/2020 | Ascension Health | | | Bala applies to job with Ascension (city/state unknown) | Job search docs_combined.pdf | 233 |
| 2/5/2020 | Cardiology Careers/Staff Care | Green Bay | WI | Applied for EP position in Green Bay | Job search docs_combined.pdf | 254 |
| 2/5/2020 | Northwell Health | Manhasset | NY | Applied to job with Northwell Health on Cardiology Careers | Job search docs_combined.pdf | 259 |
| 2/5/2020 | Piedmont Healthcare | Atlanta | GA | Emails Piedmont recruiter about EP position in Atlanta, states that she has ties to Atlanta and is looking to move closer to home. Also that her brother is a pulmonologist with Piedmont. | Job search docs_combined.pdf | 281 |
| 2/5/2020 | Pima Heart | Tucson | AZ | Applied to EP job in AZ | Job search docs_combined.pdf | 284-286 |
| 2/6/2020 | Trinity Health | Athens | GA | Bala applied to EP job in Athens GA | Job search docs_combined.pdf | 229 |
| 2/6/2020 | Dartmouth Hitchcock | Lebanon | NH | Submitted job application to Dartmouth | Job search docs_combined.pdf | 237 |
| 2/6/2020 | Everett Clinic | Everett | WA | Bala gets response from HealthECareers for EP position with Everett Clinic. Set time to speak the following week. | Job search docs_combined.pdf | 248 |
| 2/6/2020 | Piedmont Healthcare | Atlanta | GA | Julie Hanson from Piedmont shares info with leadership for EP position in cardiology | Job search docs_combined.pdf | 280 |
| 2/7/2020 | Northwest Medical Center | Tucson | AZ | Response back from Patrice Boston with CHS/Northwest Medical Center | Job search docs_combined.pdf | 264 |
| 2/12/2020 | Deborah Heart & Lung Center | Browns Mills | NJ | Submitted job application to Deborah in NJ for attending EP physician | Job search docs_combined.pdf | 238 |
| 2/12/2020 | Deborah Heart & Lung Center | Browns Mills | NJ | Veronica Szul set up call with Dr. Vincent Pompili and Bala for phone interview | Job search docs_combined.pdf | 239 |
| 2/12/2020 | St. John Associates | | | Email from recruiter, Carmen May, at St John for EP opportunities in Arizona, Chicago, New York. | Job search docs_combined.pdf | 274 |
| 2/12/2020 | Jackson Physician Search | Phoenix | AZ | Bala reach out to Jackson Physician Search for EP position on Heart Rhythm Society Career Center | Job search docs_combined.pdf | 276 |
| 2/13/2020 | Everett Clinic | Everett | WA | Preliminary discussions about site visit mid to end of March 2020 with Miria Svodoba | Job search docs_combined.pdf | 250 |
| 2/18/2020 | St. John Associates | | | Bala sent recruiter for more info about Chicago, Northern NJ, NY metro, New England, Phoenix, and Arizona EP jobs | Job search docs_combined.pdf | 289 |

ECG MANAGEMENT CONSULTANTS | EST 1973 50
A Siemens Healthineers Company

Exhibit 3
Page 29 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|---|---|---|---|---|---|---|
| 2/19/2020 | Everett Clinic | Everett | WA | Bala reaches out to Everett Clinic discussing application. She was unhappy that a Boston Scientific rep had reached out about her application and thought this was inappropriate. Attached references from Tucson. Rajesh Subramanian says he will check out references. | Job search docs_combined.pdf | 246 |
| 2/22/2020 | Deborah Heart & Lung Center | Browns Mills | NJ | Bala reaches out about site visit to Deborah on 3/6 for dinner | Job search docs_combined.pdf | 240 |
| 2/24/2020 | Rochester Regional | Rochester | NY | Email inquiry about Rochester General EP position | Job search docs_combined.pdf | 288 |
| 2/27/2020 | Northwell Health | Manhasset | NY | Email inquiry about Northwell Health EP position to general mailbox | Job search docs_combined.pdf | 258 |
| 2/28/2020 | Everett Clinic | Everett | WA | Rejected from Everett Clinic. Rajesh notes her high esteem by references. Says he feels she will succeed in a stable EP lab. Doesn't think she would be set up for success there. | Job search docs_combined.pdf | 245 |
| 3/3/2020 | VA Medical Center | Washington | DC | Received email from VA Kendra Wilson-Hudson about preferences - sends email back | Job search docs_combined.pdf | 294-295 |
| 3/10/2020 | Cardiology Careers/Cross County Search | Chicago | IL | Applies to EP job in Chicago | Job search docs_combined.pdf | 234 |
| 3/10/2020 | St. Johns Jobs/Bassett Healthcare | Cooperstown | NY | Bala reaches out to Carmen May, recruiter from firm, asking about listing with Bassett. Asked Carmen to submit her CV for this position. | Job search docs_combined.pdf | 236 |
| 3/10/2020 | Advocate Aurora Health | Green Bay | WI | Applied for EP position in Green Bay with AAH on Cardiology Careers | Job search docs_combined.pdf | 256 |
| 3/27/2020 | VA Medical Center | Washington | DC | Bala reaches out to Kendra about VA EP position and any questions regarding her lawsuit. Kendra replies that they are focusing on retirees to help with COVID efforts. Bala replies that she is perhaps going to volunteer for COVID herself with Philadelphia VA. | Job search docs_combined.pdf | 297 |
| 4/28/2020 | Tufts Medical Center | Boston | MA | Bala sent email to Tufts team for EP position on ACC website | Job search docs_combined.pdf | 291 |
| 4/29/2020 | Tufts Medical Center | Boston | MA | Response from James Udelson at Tufts about recruitment being on hold | Job search docs_combined.pdf | 292 |
| 5/19/2020 | | | | Bala reaches out to Dr. Erwin about EP faculty position | Job search docs_combined.pdf | 244 |
| 6/1/2020 | Southwest Medical Center | Vancouver | WA | Email from Kim Dianich to talk about EP position in WA | Job search docs_combined.pdf | 270 |
| 6/3/2020 | St. John Associates | Williamsport | PA | Bala hears back from recruiter that job in Williamsport moved forward with another candidate | Job search docs_combined.pdf | 300 |
| 8/5/2020 | St. John Associates | New York | NY | Bala reaches out to Carmen may, recruiter from firm, asking about suburbs NYC | Job search docs_combined.pdf | 301-302 |
| 8/6/2020 | NEJM Career Center | New York | NY | Applied for a job in NYC through NEJM Career Portal | Job search docs_combined.pdf | 306-307 |
| 8/15/2020 | Tufts Medical Center | Boston | MA | Applied for EP job on Cardiology Careers at Tufts | Job search docs_combined.pdf | 312 |
| 8/16/2020 | HCA Healthcare - North Carolina | Asheville | NC | Applied for a EP job in Asheville through Cardiology Careers | Job search docs_combined.pdf | 308 |

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973 50

Exhibit 3
Page 30 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 9/2/2020 | Enterprise Medical Recruiting | | NY | Applied to a job through NEJM for upstate NY EP opportunity | Job search docs_combined.pdf | 310 |
| 9/24/2020 | Enterprise Medical Recruiting | | NC | Got a job alert match for an opportunity near Raleigh through recruiting firm; not sure if she replied/applied. | Job search docs_combined.pdf | 436 |
| 9/25/2020 | Duke Cardiology | Lumberton | NC | Email correspondence with Susan Watson of DukeHealth for EP position | Job search docs_combined.pdf | 398-399 |
| 9/26/2020 | Hopedale Cardiovascular Associates | Upton | MA | Email correspondence with Dr. Scott Brownstein about job posting on NEJM. Dr. Brownstein replies that they are looking for general cardiologist but willing to speak with Bala. Set up a time to talk | Job search docs_combined.pdf | 415 |
| 9/28/2020 | Park Nicollet Health Services | Minneapolis | MN | Applied for EP job in MN on Cardiology Careers | Job search docs_combined.pdf | 433 |
| 9/28/2020 | UPMC | Altoona | PA | Applied for EP position on HealthEcareers | Job search docs_combined.pdf | 447 |
| 10/1/2020 | Baptist Health | Jacksonville | FL | Applied for EP job (medical director position) in FL through HealthECAreers | Job search docs_combined.pdf | 374 |
| 10/14/2020 | Hopedale Cardiovascular Associates | Upton | MA | Gets email back from Dr. Scott Brownstein that they are moving forward with general cardiologist | Job search docs_combined.pdf | 416 |
| 10/16/2020 | Northwestern Medicine | Huntley | IL | Applied for EP job with Northwestern Medicine through Smart Recruiters | Job search docs_combined.pdf | 426 |
| 10/16/2020 | Catholic Health Services of Long Island | Roslyn | NY | Sent CV and cover letter to Tracee Thomson for EP position | Job search docs_combined.pdf | 440 |
| 10/20/2020 | Metro Health | Wyoming | MI | Bala sends email to Francis Marchlinski of UPenn Medicine about recommendation to Metro Health/Michigan position. Notes that she has appreciated her training from UPenn and that her side of the story with OHSU will come out. | Job search docs_combined.pdf | 423 |
| 10/21/2020 | UPMC | Altoona | PA | email correspondence with Yolanda Duncan about EP position/phone call with Dr. Sandeep Jain with UPMC | Job search docs_combined.pdf | 441-445 |
| 10/23/2020 | HCA Healthcare - North Carolina | Asheville | NC | Applied for EP job in Asheville again - this time through HealthEcareers | Job search docs_combined.pdf | 314 |
| 10/23/2020 | Tenet Healthcare | Worcester | MA | Applied for EP job in MA through HealthEcareers | Job search docs_combined.pdf | 316 |
| 10/23/2020 | Tri-City Cardiology | Phoenix | AZ | Applied for EP job in AZ through HealthECareers. Partnership track opportunity. Gets a response from Sarah Tucker, HR, about US citizenship and phone number a few days later. | Job search docs_combined.pdf | 318-320 |
| 10/23/2020 | Cape Cod Healthcare | East Dennis | MA | Applied for EP job in MA through HealthECareers | Job search docs_combined.pdf | 375 |
| 10/23/2020 | First Coast Cardiovascular Institute | Jacksonville | FL | Applied for EP job in FL through HealthECareers | Job search docs_combined.pdf | 400 |
| 10/23/2020 | Northwestern Medicine | Huntley | IL | Applied for EP job with Northwestern Medicine through HealthECAreers | Job search docs_combined.pdf | 427 |
| 10/27/2020 | Andre Fremaux & Associates | Baton Rouge | LA | Applied for EP job through recruiter in Baton Rouge | Job search docs_combined.pdf | 325 |



Exhibit 3
Page 31 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 10/27/2020 | PeaceHealth | | | Applied for EP job through PracticeMatch - undisclosed location in Pacific Northwest. | Job search docs_combined.pdf | 327 |
| 10/27/2020 | First Coast Cardiovascular Institute | Jacksonville | FL | Email to speak with Noor Naseemuddin about EP opportunity in Jacksonville | Job search docs_combined.pdf | 404 |
| 10/30/2020 | WakeMed | Raleigh | NC | Applied to EP job in NC | Job search docs_combined.pdf | 329 |
| 11/1/2020 | DocCafe | Syracuse | NY | Applied for EP job (teaching opportunity) on DocCafe in Syracuse area | Job search docs_combined.pdf | 330 |
| 11/2/2020 | Andre Fremaux & Associates | | LA | Email correspondence about setting up site visit with Louisiana opportunity by the end of November/beginning of December | Job search docs_combined.pdf | 369-370 |
| 11/5/2020 | Guthrie Medical Group | Sayre | PA | Applied for EP job with Guthrie Medical Group and sent email to Krisi Van Tassel with CV and cover letter. | Job search docs_combined.pdf | 332 |
| 11/5/2020 | First Coast Cardiovascular Institute | Jacksonville | FL | Bala follows up on phone call with Noor about EP opportunity in Jacksonville | Job search docs_combined.pdf | 403 |
| 11/6/2020 | Tenet Healthcare | Birmingham | AL | Applied to EP job in Birmingham through HealthECareers | Job search docs_combined.pdf | 333 |
| 11/6/2020 | Catholic Health System | Buffalo | NY | Applied to EP job (medical director position) in Buffalo through HealtheCareers | Job search docs_combined.pdf | 335 |
| 11/6/2020 | Dartmouth Hitchcock | Lebanon | NH | Applied to EP job in NH with Dartmouth again on HealthEcareers | Job search docs_combined.pdf | 337 |
| 11/6/2020 | Community Health Systems | Fort Wayne | IN | Applied to EP job in Indiana through HealthECareers | Job search docs_combined.pdf | 339 |
| 11/6/2020 | Guthrie Medical Group | Sayre | PA | Applied to EP job in PA through HealthECareers | Job search docs_combined.pdf | 341 |
| 11/6/2020 | Providence Medical Group | Olympia | WA | Applied to EP job in WA through HealthECareers | Job search docs_combined.pdf | 343 |
| 11/6/2020 | UNC Health | Caldwell County | NC | Applied to EP job in NC through HealthECareers | Job search docs_combined.pdf | 351 |
| 11/6/2020 | Tenet Healthcare | Worcester | MA | Applied for EP job in MA through HealthEcareers again | Job search docs_combined.pdf | 353 |
| 11/6/2020 | Ochsner Health | New Orleans | LA | Applied for EP job in New Orleans with Ochsner Health. Email same day from Bob Wieland, physician recruiter with Ochsner, for preliminary phone call. | Job search docs_combined.pdf | 430-431 |
| 11/6/2020 | Catholic Health Services of Long Island | Roslyn | NY | Applied to EP job in Long Island through HealthECareers | Job search docs_combined.pdf | 438 |
| 11/10/2020 | First Coast Cardiovascular Institute | Jacksonville | FL | Bala told they are moving forward with another candidate and no longer recruiting for the position | Job search docs_combined.pdf | 402 |
| 11/18/2020 | Northwestern Medicine | Huntley | IL | Email from Beth Walker, physician recruiter for NW Medicine, about reviewing CV and reaching back out | Job search docs_combined.pdf | 429 |
| 11/19/2020 | St. John Associates | Chicago | IL | Check in with Carmen May about job search and reached out about Chicago position. Bala replies that she hasn't heard back from them. | Job search docs_combined.pdf | 496 |
| 11/20/2020 | Cape Cod Healthcare | East Dennis | MA | Email correspondence with physician recruiter, Jolia Georges, about site visit details | Job search docs_combined.pdf | 377-381 |



Exhibit 3
Page 32 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|---|---|---|---|---|---|---|
| 11/20/2020 | Ochsner Health | New Orleans | LA | Email back from Ochsner that not the ideal match at this time | Job search docs_combined.pdf | 432 |
| 11/20/2020 | Park Nicollet Health Services | Minneapolis | MN | Email back from Park Nicollet that they have filled the position | Job search docs_combined.pdf | 435 |
| 11/20/2020 | WakeMed | Raleigh | NC | Email back that application is under review | Job search docs_combined.pdf | 455 |
| 11/23/2020 | Metro Health | Wyoming | MI | Email for onsite interview with Metro Health/Univ of Michigan from Morgan Lahey | Job search docs_combined.pdf | 424 |
| 11/24/2020 | UPMC | Altoona | PA | Email correspondence with Chris Gildea, medical staff development director, about EP position. Chris asks what she has been up to lately. Says that she has been looking/applying for a new opportunity since January 2020. | Job search docs_combined.pdf | 449-453 |
| 11/25/2020 | MaineHealth | Portland | ME | Applied for EP job in Maine through HealthECareers | Job search docs_combined.pdf | 355 |
| 11/27/2020 | Cape Cod Healthcare | East Dennis | MA | Email from Jolia that they are canceling onsite interview and moving forward with another candidate | Job search docs_combined.pdf | 384 |
| 11/29/2020 | Allegheny Health Network | Erie | PA | Applied for EP job in PA through HealthECareers | Job search docs_combined.pdf | 357 |
| 11/29/2020 | HCA Healthcare - Florida | Gainesville | FL | Applied for EP job in FL through HealthECareers | Job search docs_combined.pdf | 359 |
| 11/29/2020 | Watson Clinic | Lakeland | FL | Applied for EP job in FL through HealthECareers | Job search docs_combined.pdf | 361 |
| 11/29/2020 | Catholic Medical Center | Manchester | NH | Applied for EP job in NH through HealthECareers | Job search docs_combined.pdf | 363 |
| 11/29/2020 | St. Thomas Health Services | Murfreesboro | TN | Applied for EP job in TN through HealthECareers | Job search docs_combined.pdf | 365 |
| 11/29/2020 | B.E.L. & Associates | Pittsburgh | PA | Applied for EP job in Pittsburgh through HealthECareers | Job search docs_combined.pdf | 372 |
| 11/29/2020 | Mercy Clinic | St. Louis | MO | Applied for EP job in MO through HealthECareers | Job search docs_combined.pdf | 417 |
| 11/30/2020 | St. Thomas Health Services | Murfreesboro | TN | Email from Dr. Robert Peterson to set up a call | Job search docs_combined.pdf | 517 |
| 12/1/2020 | Mercy Clinic | St. Louis | MO | Gets email back from Joan Humphries to set up call | Job search docs_combined.pdf | 419-420 |
| 12/2/2020 | HCA Healthcare | | | General phone call with Amber Holiman about EP opportunities in Southeast | Job search docs_combined.pdf | 412 |
| 12/2/2020 | Northern Light Health | Bangor | ME | Applied to EP job in Maine on Heart Rhythm Society | Job search docs_combined.pdf | 466 |
| 12/2/2020 | Staff Care | Gettysburg | PA | Applied to EP job with Staff Care on Cardiology Careers | Job search docs_combined.pdf | 504 |
| 12/2/2020 | Guthrie Medical Group | Sayre | PA | Applied for EP job with Guthrie again | Job search docs_combined.pdf | 538-540 |
| 12/2/2020 | UPMC Susquehanna | Williamsport | PA | Applied for EP job in PA through Cardiology Careers | Job search docs_combined.pdf | 568 |
| 12/3/2020 | Cape Cod Healthcare | Hyannis | MA | Site visit itinerary for Cape Cod HC Dec 3 and Dec 4 | Job search docs_combined.pdf | 371 |
| 12/3/2020 | Northern Light Health | Bangor | ME | Set up call to speak with Gavin Higgins, physician recruiter, about EP position in Maine | Job search docs_combined.pdf | 468-469 |



Exhibit 3
Page 33 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 12/3/2020 | Franciscan Physician Network | Indianapolis | IN | Sent CV and cover letter to Danielle Aschenbener of Franciscan Physician Network | Job search docs_combined.pdf | 502 |
| 12/3/2020 | Providence Southwest Washington | Olympia | WA | Email from Sarah Ledbetter about EP call | Job search docs_combined.pdf | 508 |
| 12/3/2020 | Presbyterian Healthcare Services | Albuquerque | NM | Applied for EP job in NM | Job search docs_combined.pdf | 520-524 |
| 12/3/2020 | UPMC | Altoona | PA | Email back from Christine Gildea, physician recruiter, that they are interviewing other candidates and pausing the rest of interviews | Job search docs_combined.pdf | 562 |
| 12/4/2020 | Allegheny Health Network | Erie | PA | Set up phone call to speak with Michelle Holden on from AHN on 12/7 about EP position | Job search docs_combined.pdf | 458-460 |
| 12/7/2020 | Northern Light Health | Bangor | ME | Set up call to speak with Dr. Chae Choi with Northern Light Health | Job search docs_combined.pdf | 470 |
| 12/7/2020 | Presbyterian Healthcare Services | Albuquerque | NM | Set up phone call with Jack Lawit of PHS to talk about EP position on 12/11. | Job search docs_combined.pdf | 526-527 |
| 12/11/2020 | Central Maine Healthcare | Lewiston | ME | Email correspondence for Phone Interview | Job search docs_combined.pdf | 493-495 |
| 12/13/2020 | Arizona Heart Arrhythmia Associates | Phoenix | AZ | Applied to EP job on Indeed | Job search docs_combined.pdf | 464 |
| 12/13/2020 | UNC Health | Chapel Hill | NC | Applied for EP faculty position with UNC Health | Job search docs_combined.pdf | 560 |
| 12/14/2020 | Northern Light Health | Bangor | ME | Email correspondence with Gavin Higgins about following Zoom Interview. Follows up again because she has not heard back on 12/24. | Job search docs_combined.pdf | 474-475 |
| 12/16/2020 | Presbyterian Healthcare Services | Albuquerque | NM | Email from Jack Lawit that they are moving forward with other candidate | Job search docs_combined.pdf | 530 & 537 |
| 12/17/2020 | HCA Healthcare | | | Set up call with Dr. Steven Manoukian, VP of Cardiovascular Services at HCA Healthcare for 1/7. | Job search docs_combined.pdf | 506 |
| 12/24/2020 | Carilion Clinic | Roanoke | VA | Applied for EP job in VA on Cardiology Careers | Job search docs_combined.pdf | 488 |
| 12/24/2020 | Cleveland Clinic | Cleveland | OH | Applied to EP position in OH through Cardiology Careers | Job search docs_combined.pdf | 500 |
| 12/24/2020 | Trinity Health | Livonia | MI | Applied for EP job in MI on Cardiology Careers | Job search docs_combined.pdf | 511 |
| 12/24/2020 | undisclosed | Miami | FL | Applied for EP job in Miami FL | Job search docs_combined.pdf | 515 |
| 12/24/2020 | Toledo Cardiology Consultants | Toledo | OH | Applied for EP job in OH through Cardiology Centers | Job search docs_combined.pdf | 542 |
| 12/24/2020 | CompHealth | Tucson | AZ | Applied for EP job in AZ through Cardiology Centers | Job search docs_combined.pdf | 546 |
| 12/24/2020 | Tufts Medical Center | Boston | MA | Applied to EP job with Tufts again | Job search docs_combined.pdf | 550 |
| 12/24/2020 | United Health Services | Binghampton | NY | Applied for EP job in NY on Cardiology Careers | Job search docs_combined.pdf | 554 |

ECG MANAGEMENT CONSULTANTS | EST 1973 | A Siemens Healthineers Company

Exhibit 3
Page 34 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|---|---|---|---|---|---|---|
| 1/4/2021 | Northern Light Health | Bangor | ME | Email from Dr. Chae Choi that they are not proceeding with Zoom interviews. Need someone who can participate in Echo/Nuclear study interpretations. Gavin was trying to set up a date to schedule interview beforehand. | Job search docs_combined.pdf | 572-577 |
| 1/6/2021 | Guthrie Medical Group | Sayre | PA | Reached out to Krisi Van Tassel again about Guthrie position. Sent CV and cover letter. | Job search docs_combined.pdf | 618 |
| 1/7/2021 | Bayview Physicians Group | Norfolk | VA | Applied and sent email with CV and cover letter for EP job in VA | Job search docs_combined.pdf | 578-580 |
| 1/7/2021 | Northwestern Medicine | Huntley | IL | Reached out to Beth Walker of NWM about EP position | Job search docs_combined.pdf | 632-635 |
| 1/7/2021 | Providence Medical Group | Olympia | WA | Reached out to Sarah Ledbetter again about Olympia EP position | Job search docs_combined.pdf | 653-655 |
| 1/12/2021 | CompHealth | Cedar Rapids | IA | Applied to EP job in Iowa on Cardiology Careers | Job search docs_combined.pdf | 592 |
| 1/12/2021 | CompHealth | Des Moines | IA | Applied to IA job on Cardiology Careers | Job search docs_combined.pdf | 602 |
| 1/12/2021 | Community Health Systems | Fort Wayne | IN | Applied for EP job in Fort Wayne again | Job search docs_combined.pdf | 609-610 |
| 1/12/2021 | Catholic Medical Center | Manchester | NH | Applied for EP position with CMC again | Job search docs_combined.pdf | 619 |
| 1/12/2021 | Universal Health Services | McAllen | TX | Applied to EP position in South TX through Cardiology Careers | Job search docs_combined.pdf | 621-622 |
| 1/12/2021 | Coastal Cardiology | San Luis Obispo | CA | Applied for EP job in CA on HealthECareers. Also sent CV and cover letter via email. | Job search docs_combined.pdf | 660-663 |
| 1/12/2021 | Trinity Health | Sioux City | IA | Applied for EP job in IA through HealthECareers. Also sent CV and cover letter via email | Job search docs_combined.pdf | 666-667 |
| 1/12/2021 | Tenet Healthcare | Worcester | MA | Applied to EP job in MA through Cardiology Careers | Job search docs_combined.pdf | 680 |
| 1/14/2021 | Carient Cardiovascular | Manassas | VA | Applied to job through Heart Rhythm Society. Sent email to K Powell at Carient too with CV and cover letter. | Job search docs_combined.pdf | 682-683 |
| 1/15/2021 | Hampshire Cardiology Associates | Northampton | MA | Applied to EP job in Maine through Indeed | Job search docs_combined.pdf | 627-631 |
| 1/15/2021 | Advent Health | Orlando | FL | Applied to EP job in FL through Indeed | Job search docs_combined.pdf | 636-640 |
| 1/15/2021 | UT Health | Houston | TX | Applied to EP job (assistant professor) in Houston through Indeed | Job search docs_combined.pdf | 669-672 |
| 1/18/2021 | Carilion Clinic | Roanoke | VA | Follow up with David Sane about references - receives email that they are moving in another direction | Job search docs_combined.pdf | 587 |
| 1/19/2021 | Catholic Health System | Buffalo | NY | Applied for EP job with CHS in Buffalo | Job search docs_combined.pdf | 583-586 |
| 1/19/2021 | Essentia Health | Fargo | ND | Applied to ND job on Cardiology Careers | Job search docs_combined.pdf | 604 |
| 1/19/2021 | Bon Secours Mercy Health | Paducah | KY | Applied to job in KY on HealthECareers | Job search docs_combined.pdf | 642-647 |
| 1/19/2021 | Palm Beach Cardiology Center | Riviera Beach | FL | Applied to EP job in FL through HealthECareers | Job search docs_combined.pdf | 648-650 |



Exhibit 3
Page 35 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|---|---|---|---|---|---|---|
| 1/19/2021 | Zavaro Cardiovascular Institute | San Diego | CA | Applied to EP position in San Diego and reached out to Dr. Zavaro | Job search docs_combined.pdf | 656-659 |
| 1/19/2021 | WVU School of Medicine | Morgantown | WV | Applied for EP job (Chief of Cardiology) in WV through HealthECareers | Job search docs_combined.pdf | 675-678 |
| 1/21/2021 | CHI Health | Lincoln | NE | Applied to EP job in NE | Job search docs_combined.pdf | 595-598 |
| 1/21/2021 | | Davenport | IA | Applied to IA job on Heart Rhythm Society job board | Job search docs_combined.pdf | 600 |
| 1/21/2021 | Jackson Physician Search | | NE | Sent email to Dan Morton about EP position (Medical Director) 2 hours away from Lincoln, NE | Job search docs_combined.pdf | 624-625 |
| 1/27/2021 | Carilion Clinic | Roanoke | VA | Email from Merritt Hawkins recruiter that the candidate that they moved forward with did not accept and the position is back open | Job search docs_combined.pdf | 588-591 |
| 2/2/2021 | Memorial Sloan Kettering Cancer Center | New York | NY | Applied to Cardio-Oncology clinical research fellowship. Got email back that they are done recruiting for 2021 and will be opening the next wave in Sept 2021. | Job search docs_combined.pdf | 684-685 |
| 6/12/2021 | Tufts Medical Center | Boston | MA | Applied to EP job with Tufts again | Job search docs_combined.pdf | 687 |
| 6/12/2021 | CompHealth | Seattle | WA | Applied to Locums EP job in Seattle | Job search docs_combined.pdf | 689 |
| 6/12/2021 | Trinity Health | Athens | GA | Applied to EP job in GA through Cardiology Centers. Followed up on 6/30 about the position. | Job search docs_combined.pdf | 690 |
| 6/30/2021 | Rush University | Chicago | IL | Emailed to check on faculty Rush EP position | Job search docs_combined.pdf | 692 |
| 7/1/2021 | UT Health | Houston | TX | Got email that UT Health is moving forward with other candidates for assistant professor EP position | Job search docs_combined.pdf | 693 |
| 7/12/2021 | Piedmont Healthcare | Fayetteville | GA | Reached out to Dr. Nimish Dhruva about EP position | Job search docs_combined.pdf | 700-701 |
| 7/15/2021 | Yale New Haven Health | Trumbull | CT | Applied for EP position with Yale through NEJM | Job search docs_combined.pdf | 694-697 |
| 7/15/2021 | | | IN | Applied to EP Locums position in Indiana | Job search docs_combined.pdf | 698-699 |
| 7/15/2021 | | | MN | Applied for EP Locums position in Minnesota | Job search docs_combined.pdf | 702 |
| 7/15/2021 | CompHealth | | | Kara Pape, physician recruiter, asking for CV for 3 positions they discussed | Job search docs_combined.pdf | 704-705 |
| 7/16/2021 | Phoebe Putney Memorial Hospital | Albany | GA | Email from Kara Pape of CompHealth about presentation to PPMH in Albany about credentialing for Locums position. Kara also wanted to present to other positions in MN and SD, but could not present to MN without references from Bala which she declined to provide. | Job search docs_combined.pdf | 706 |
| 9/14/2021 | Rush University | Chicago | IL | Email from Rose Sprinkle, Rush recruiter, about virtual interview set for 10/7. | Job search docs_combined.pdf | 711 |
| 10/8/2021 | Heart and Vascular Care | Atlanta | GA | Applied for EP job in Atlanta on Cardiology Careers | Job search docs_combined.pdf | 718 |

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 10/20/2021 | Arlington Healthcare | Arlington Heights | IL | Email to Nicole Skertich of Arlington Healthcare about EP position. Sent CV and cover letter, but disclosed she did not have expertise in laser lead extraction as required. | Job search docs_combined.pdf | 728-729 |
| 10/20/2021 | Duly Health and Care | Naperville | IL | Sent CV and cover letter to Madeline Mutz for Duly EP position | Job search docs_combined.pdf | 731-732 |
| 11/7/2021 | CVG Physicians Group | Lawrenceville | GA | Applied to EP job in GA on HealthECareers | Job search docs_combined.pdf | 733 |
| 11/7/2021 | Duke Cardiology | Lumberton | NC | Applied for EP job with DukeHealth again on PracticeMatch | Job search docs_combined.pdf | 734 |
| 11/7/2021 | University of Minnesota Physicians | St Paul | MN | Applied for EP job in MN on Cardiology Careers | Job search docs_combined.pdf | 736 |
| 11/7/2021 | Northwestern Medicine | Chicago | IL | Applied to EP job with NWM again | Job search docs_combined.pdf | 737 |
| 11/8/2021 | Centra Medical Group | Lynchburg | VA | Applied for EP job in VA on Cardiology Careers | Job search docs_combined.pdf | 738 |
| 11/13/2021 | Trinity Health | Hartford | CT | Applied for EP job in CT on Cardiology Careers | Job search docs_combined.pdf | 739 |
| 11/13/2021 | Umass Memorial Health | Worcester | MA | Applied for EP faculty position on Cardiology Careers with recruiting firm Cross Country Search | Job search docs_combined.pdf | 740 |
| 11/18/2021 | Umass Memorial Health | Worcester | MA | Sent CV and cover letter to Selena Dickherber from Cross Country Search | Job search docs_combined.pdf | 741-742 |
| 11/22/2021 | MedStar Heart and Vascular | Baltimore | MD | Applied for EP job in MD on Cardiology Careers | Job search docs_combined.pdf | 744 |
| 11/25/2021 | WVU Heart and Vascular | Morgantown | WV | Applied to EP job in WV again; Chief of Cardiology position. | Job search docs_combined.pdf | 745 |
| 11/25/2021 | Emory Healthcare | Atlanta | GA | Emailed Kelly Ruden from Emory about potential EP positions. Notes in the email that she is from GA and looking to move closer to home. | Job search docs_combined.pdf | 746 |
| 12/1/2021 | Baycare Medical Group | Tampa | FL | Email from Janine Bryant at Baycare about scheduling a call for EP position | Job search docs_combined.pdf | 747 |
| 12/10/2021 | St. John Associates | | | Set up a time to talk to Carmen May, physician recruiting firm, about some opportunities (locations not discussed). | Job search docs_combined.pdf | 749 |
| 12/29/2021 | Morehouse School of Medicine | Atlanta | GA | Sends email to Dr. Onwuanyi about EP faculty position. Notes that she is from Georgia and looking to move closer to home. | Job search docs_combined.pdf | 750 |
| 1/4/2022 | Mayo Clinic | | | Applied to Mayo Clinic EP | Job search docs_combined.pdf | 752 |
| 1/8/2022 | MedStar Heart and Vascular | Baltimore | MD | Email back from Dr. Glenn Meininger that they have filled EP position | Job search docs_combined.pdf | 754 |
| 1/22/2022 | Kaiser Permanente Mid-Atlantic | McLean | VA | Applied for EP position in VA through Cardiology Careers | Job search docs_combined.pdf | 756 |
| 1/22/2022 | University of Miami Uhealth | Miami | FL | Applied for EP job (Director of Electrophysiology lab) in Miami through Cardiology Careers | Job search docs_combined.pdf | 757 |
| 1/22/2022 | Northwestern Medicine | Chicago | IL | Applied to EP job with NWM again | Job search docs_combined.pdf | 758 |
| 1/22/2022 | Tufts Medical Center | Boston | MA | Applied to EP job with Tufts again | Job search docs_combined.pdf | 759 |



Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 2/3/2022 | University of Miami Uhealth | Miami | FL | Email that application is under review for Miami | Job search docs_combined.pdf | 760 |
| 2/7/2022 | Kadlec Regional Medical Center | Tri Cities | WA | Sets up call with Heather Swayze, firm recruiter, about Providence EP opp in WA | Job search docs_combined.pdf | 761 |
| 2/8/2022 | University of Miami Uhealth | Miami | FL | Preliminary call with Dr. Mitrani from Miami | Job search docs_combined.pdf | 763 |
| 3/14/2022 | Duly Health and Care | Naperville | IL | Bala spoke with Madeline Mutz from Duly about EP position. Madeline provides more details/benefits in follow up email | Job search docs_combined.pdf | 764 |
| 3/28/2022 | Riverside Heart and Vascular Institute | Kankakee | IL | Outreach from Yvonne Burnett about EP position in Chicago area | Job search docs_combined.pdf | 765 |
| 4/10/2022 | Weatherby Healthcare | Seattle | WA | Applied to Locums EP job in WA. Receives reply email same day from Megan McLamb from Weatherby Healthcare about this job posting | Job search docs_combined.pdf | 767-770 |
| 4/14/2022 | Albany Medical Center | Albany | NY | Email from Valerie D'Aloia about setting up call about faculty position. | Job search docs_combined.pdf | 779 |
| 4/20/2022 | Weatherby Healthcare | Seattle | WA | Bala asks to be presented to Seattle locums job and can be there for 6 months or longer. Presented another opportunity in Marquette, MI. | Job search docs_combined.pdf | 774-776 |
| 4/20/2022 | University of South Florida | Tampa | FL | Applied to EP position with USF | Job search docs_combined.pdf | 781 |
| 4/26/2022 | CompHealth | Duluth | MN | Bala asks to be presented to permanent opportunities in Duluth, Green Bay, and Idaho. Notes she does not read Echos. | Job search docs_combined.pdf | 782-788 |
| 4/26/2022 | Merritt Hawkins | Cleveland | OH | Applied for EP job in OH through Cardiology Centers | Job search docs_combined.pdf | 789 |
| 4/27/2022 | Hayes Locums | | MI | Sent CV and cover letter to Amy Eichelberg from Hayes Locums about an opp in MI | Job search docs_combined.pdf | 790 |
| 5/2/2022 | The Medicus Firm | | NY | Sent CV and cover letter to Brandon Gregory from recruiting firm about update NY opp | Job search docs_combined.pdf | 794 |
| 5/2/2022 | University of Wisconsin | Madison | WI | Sends email about academic position, mentioning lawsuit and her interest in WI position. Says she has not spoken out much about being "cancelled." | Job search docs_combined.pdf | 796-797 |
| 5/4/2022 | Prairie Cardiovascular Consultants | Springfield | IL | Email from Polly Pierce with HSHS about EP conversation in IL | Job search docs_combined.pdf | 799 |
| 5/4/2022 | Cardiology Consultants of Fredericksburg | Fredericksburg | VA | Set up phone meeting with Cardiology Practice in VA | Job search docs_combined.pdf | 801-802 |
| 5/4/2022 | Merritt Hawkins | Springfield | MA | Got an email from recruiter at MH about permanent opp in Springfield MA. Set up call to talk | Job search docs_combined.pdf | 803-804 |
| 5/6/2022 | WVU Medicine | Morgantown | WV | Reached out to Erin Mills from WVU about academic EP position | Job search docs_combined.pdf | 804-807 |
| 5/6/2022 | Community Health Systems | Wilkes Barre | PA | Email correspondence with Elizabeth Hemping, CHS recruiter, fill out some questions about what she's looking for | Job search docs_combined.pdf | 808-809 |
| 5/6/2022 | Cleveland Clinic | Akron | OH | Applied to EP job in OH on Cardiology Careers | Job search docs_combined.pdf | 810 |



Exhibit 3
Page 38 of 51

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|------|--------|------|-------|----------|--------|----------------|
| 5/6/2022 | Great Lakes Cardiovascular Services | Buffalo | NY | set up call with chief of Cardiology to discuss EP position | Job search docs_combined.pdf | 811 |
| 5/6/2022 | Ascension St Vincent's | Birmingham | AL | Email from Rebecca Blythe at Ascension about EP opening | Job search docs_combined.pdf | 812-813 |
| 5/8/2022 | Britt Medical | Syracuse | NY | Got an email about EP position in Syracuse and reached out to recruiting firm for more details | Job search docs_combined.pdf | 814 |
| 5/9/2022 | Case Western Reserve University | Cleveland | OH | Texts with Dr Arruda about call for OH Academic position | Job search docs_combined.pdf | 816-818 |
| 5/10/2022 | Augusta University | Augusta | GA | Email correspondence with Sherry Brown about on site interview with AU | Job search docs_combined.pdf | 819 |
| 5/12/2022 | University of Buffalo | Buffalo | NY | Bala sent email to Anne Curtis about EP position mentioning her lawsuit and being "cancelled from the profession". | Job search docs_combined.pdf | 821-822 |
| 5/15/2022 | Riverside Heart and Vascular Institute | Kankakee | IL | Set up time to speak with Yvonne Burnett at Riverside about EP position | Job search docs_combined.pdf | 823 |
| 5/15/2022 | Ascension MI | | MI | Hayes Locums presented Bala for Locums position in MI | Job search docs_combined.pdf | 825-827 |
| 5/19/2022 | UH Hospitals | Cleveland | OH | Bala sent follow up email for references | Job search docs_combined.pdf | 830 |
| 5/20/2022 | Medicus Firm | g | NY | Sent email to Brandon Gregory about upstate NY EP job | Job search docs_combined.pdf | 833 |
| 5/31/2022 | Ballad Health | Johnson City | TN | Applied to EP job in TN on Cardiology Careers | Job search docs_combined.pdf | 837 |
| 5/31/2022 | SSM Health | Madison | WI | Applied to EP job in WI on Cardiology Careers | Job search docs_combined.pdf | 838 |
| 6/2/2022 | Ascension MI | | MI | Got email from Amy Eichelberg, Hayes Locums, that she did not hear back from Michigan opp yet about moving forward | Job search docs_combined.pdf | 839 |
| 6/4/2022 | Merritt Hawkins/UH Hospitals | Cleveland | OH | Email from MH recruiter Bhavini that they are going in a different direction. Bala replies mentioning her lawsuit. | Job search docs_combined.pdf | 843 |
| 6/10/2022 | Citrus Cardiology Consultants | The Villages | FL | Site visit set up for FL cardiology practice | Job search docs_combined.pdf | 846-847 |
| 6/14/2022 | First Coast Cardiovascular Institute | Jacksonville | FL | Applied to EP job in FL on HealthECareers | Job search docs_combined.pdf | 848 |
| 6/14/2022 | University of Louisville Health | Louisville | KY | Applied to EP job in KY on Cardiology Careers | Job search docs_combined.pdf | 849 |
| 6/14/2022 | Jefferson Health | Philadelphia | PA | Applied to EP job (faculty position) in PA on Heart Rhythm Society | Job search docs_combined.pdf | 850 |
| 6/22/2022 | Novant Health | Charlotte | NC | Applied for EP job in NC on Cardiology Careers | Job search docs_combined.pdf | 851 |
| 8/14/2022 | National Health Resources | Atlanta | GA | Applied for EP job in GA on HealthECareers | Job search docs_combined.pdf | 852 |
| 8/14/2022 | Jackson Physician Search | Atlanta | GA | Applied for EP job in GA on HealthECareers | Job search docs_combined.pdf | 853 |
| 8/16/2022 | UNC Health | Lumberton | NC | Got an email from Joe Butler, recruiter for UNC, about what she's looking for lately in her searches | Job search docs_combined.pdf | 854 |

Dr. Rupa Bala v. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit I—Bala Job Search Timeline**

| Date | Entity | City | State | Activity | Source | Page Number(s) |
|---|---|---|---|---|---|---|
| 8/22/2022 | Jackson Physician Search | Atlanta | GA | Bala got email that Atlanta cardiology opportunity can't move forward with her candidacy as it would be difficult to get the overall system to buy into moving forward with lawsuit. | Job search docs_combined.pdf | 855 |
| 8/24/2022 | UNC Health | Lumberton | NC | Email correspondence with Joe Butler about site visit on 8/31. He follows up with 2022 benefits packet on 8/29. | Job search docs_combined.pdf | 863-866 |
| 9/14/2022 | St. John Associates | Carrollton | GA | Email correspondence with Shawn Williams of SJA about EP jobs in GA | Job search docs_combined.pdf | 872-874 |
| 11/7/2022 | St Marys Medical Center | Huntington | WV | Bala receives email that St Marys visit is canceled due to candidate already accepting | Job search docs_combined.pdf | 845 |

Exhibit 3
Page 40 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| PracticeMatch, PracticeLink | Cardiac EP Opportunity with Established Private Practice in Shelby County, AL | Shelby Baptist Medical Center, Alabaster | Alabaster | AL | No | Yes | Full Time |
| PracticeLink | Cardiology - Electrophysiology Physician Job with Ascension in Birmingham, AL | St. Vincent's Hospital - Birmingham, AL | Birmingham | AL | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiologist Opportunity 82 Miles from Panama City Beach | Flowers Hospital | Dothan | AL | No | Yes | Full Time |
| PracticeMatch, PracticeLink | EP Cardiology Opening Near Huntsville, AL \| Join Large, Busy Practice | Tennessee Valley Cardiovascular Center/North Alabama Medical Center | Florence | AL | Yes | Yes | Full Time |
| PracticeMatch | Electrophysiologist Needed Little Rock, Arkansas | Arkansas Cardiology/Baptist Health Medical Center | Little Rock | AR | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology Opportunity in Little Rock, Arkansas | CHI - St. Vincent Health System | Little Rock | AR | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Physician - Electrophysiologist - Rogers, AR | Mercy Cardiology | Rogers | AR | Yes | Yes | Full Time |
| HealthECareers, PracticeLink | Physician - Clinical Cardiac Electrophysiology | Community Health Systems/Northwest Medical Center | Springdale | AR | No | Yes | Full Time |
| PracticeMatch, PracticeLink | 100% Electrophysiology Cardiologist Position in Northwestern, AZ | Havasu Regional Medical Center | Lake Havasu City | AZ | No | Yes | Full Time |
| PracticeLink | Electrophysiologist -for Cardiovascular Group- Mesa, AZ Area | Steward Healthcare/Mountain Vista Medical Center | Mesa | AZ | No | Yes | Full Time |
| PracticeLink | Join the premier EP group in beautiful Phoenix, AZ | Arizona Heart Arrhythmia Associates | Phoenix | AZ | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Academic Electrophysiologist in Sunny Phoenix, Arizona | Banner University Medical Group | Phoenix | AZ | Yes | Yes | Full Time |
| PracticeMatch | Phoenix, AZ Based Electrophysiologist | Cardiovascular Consultants, LTD | Phoenix | AZ | No | Yes | Full Time |
| PracticeMatch | Electrophysiology Cardiologist | St. Joseph's Hospital and Medical Center - Arizona Heart Rhythm Center | Phoenix | AZ | No | Yes | Full Time |
| PracticeMatch | Electrophysiologist - Partnership & Equity Opportunity (J1 & H1 Available) | Southwest Cardiovascular Associates | Yuma | AZ | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology Opportunity with Established Private Practice in California's Sunny Central Valley | Doctors Medical Center of Modesto | Modesto | CA | No | Yes | Full Time |
| HealthECareers | Electrophysiologist BC/BE | Sutter East Bay Medical Group | Oakland | CA | No | No | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology Opportunity in Riverside, CA | Riverside Community Hospital | Riverside | CA | Yes | Yes | Full Time |
| PracticeLink | Electrophysiologist | Providence Medical Associates | San Fernando Valley | CA | No | Yes | Full Time |

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973 50

Exhibit 3
Page 41 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| HealthECareers | Cardiology - Electrophysiology - San Jose 2023 | Palo Alto Foundation Medical Group | San Jose | CA | No | Yes | Full Time |
| HealthECareers, PracticeMatch | Cardiology Cardiac Electrophysiology | Kaiser Permanente Northern California | Santa Clara | CA | No | Yes | Full Time |
| HealthECareers, PracticeLink | Electrophysiology Cardiologist- St. Helena | Adventist Health St. Helena | St. Helena | CA | No | Yes | Full Time |
| PracticeLink | Electrophysiology opportunity in beautiful Temecula, CA | Temecula Valley Hospital | Temecula | CA | No | Yes | Full Time |
| PracticeLink | EP Cardiologist Needed in Central California! | Kaweah Health Medical Center | Visalia | CA | No | Yes | Full Time |
| HealthECareers | EP Cardiology \| Central California \| Private Practice \| 1 Mill Income Potential | (not specified) | (not specified) | CA | No | Yes | Full Time |
| PracticeLink | Seeking Fellowship Trained BC/BE Cardiac Electrophysiologist for Wonderful Opportunity with VA Eastern Colorado Health Care System, Aurora (Denver) CO | VA Eastern Colorado Health Care System (VAECHCS) | Aurora | CO | Yes | Yes | Full Time |
| PracticeMatch, NEJM | Electrophysiology Physician | Denver Health | Denver | CO | Yes | Yes | Full Time |
| PracticeMatch | Seeking Fellowship Trained BC/BE Cardiac Electrophysiologist for Wonderful Opportunity with the VA Eastern Colorado Health Care System in Aurora (Denver) CO | Rocky Mountain Regional VA Medical Center | Denver | CO | Yes | Yes | Full Time |
| HealthECareers, NEJM | Cardiac Electrophysiologist | Hartford Healthcare | Hartford | CT | Yes | Yes | Full Time |
| PracticeMatch, PracticeLink, NEJM | Cardiac Electrophysiology Opportunity | Trinity Health of New England Medical Group | Hartford | CT | Yes | Yes | Full Time |
| HealthECareers | Electrophysiologist - Daytona Beach, FL | Cardiovascular Associates of America | Daytona Beach | FL | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Palm Beach Health Network Physician Group - Employed Electrophysiology Opportunity in a Premier Coastal Location - Delray Beach, FLA | Tenet/Delray Medical Center | Delray Beach | FL | No | Yes | Full Time |
| PracticeMatch, PracticeLink | EP Cardiologist Opportunity in Fort Walton Beach, Florida | HCA Florida Fort Walton-Destin Hospital | Fort Walton Beach | FL | No | Yes | Full Time |
| PracticeLink, NEJM | Electrophysiology Cardiologist Faculty Opportunity with the University of Florida | University of Florida Dept of Medicine | Gainesville | FL | Yes | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiologist (EP) Physician in Largo, Florida | HCA Florida Largo Hospital | Largo | FL | No | Yes | Full Time |
| HealthECareers, PracticeLink | Physician, Cardiology EP | Ascension Florida/Ascension Sacred Heart | Miramar Beach | FL | Yes | Yes | Full Time |

ECG MANAGEMENT CONSULTANTS
EST 1973
A Siemens Healthineers Company

Exhibit 3
Page 42 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| PracticeMatch | Electrophysiology Physician - AdventHealth Apopka, Florida | AdventHealth Medical Group | Orlando | FL | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology - AdventHealth Celebration, Florida | AdventHealth Medical Group | Orlando | FL | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology Cardiologist Opportunity in Pensacola, Florida | HCA Florida West Hospital | Pensacola | FL | No | Yes | Full Time |
| PracticeLink | Eletrophysiologist Wanted for Busy Practice on East Coast of Central FL | Rockledge Regional Medical Center | Rockledge | FL | No | Yes | Full Time |
| PracticeLink | AdventHealth West Florida Ambulatory Services Sebring, FL 33872 | AdventHealth Sebring | Sebring | FL | No | Yes | Full Time |
| NEJM, Medicus Firm | Cardiac EP Physician - Florida Metro | (not specified) | Tallahassee | FL | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology- AdventHealth Tampa | AdventHealth Tampa | Tampa | FL | No | Yes | Full Time |
| PracticeMatch | Electrophysiologist - Tampa, FL | Bay Area Cardiology Associates | Tampa | FL | No | Yes | Full Time |
| PracticeLink, NEJM | Join Our Cardiovascular Journey: Electrophysiology Cardiologist Opportunities Throughout the Tampa Bay Area! | BayCare Medical Group / BayCare Health System | Tampa | FL | No | Yes | Full Time |
| HealthECareers | Electrophysiologist - Tampa, FL | Cardiovascular Associates of America | Tampa | FL | No | Yes | Full Time |
| HealthECareers | Electrophysiologist | (not specified) | Tampa | FL | No | Yes | Full Time |
| PracticeLink | Electrophysiologist Opening in Sunny Central Florida | Cardiac and Vascular Consultants MD, PA | The Villages | FL | No | Yes | Full Time |
| PracticeLink | Palm Beach Health Network Physician Group - Employed Electrophysiology Opportunity in West Palm Beach, Florida | Good Samaritan Medical Center | West Palm Beach | FL | No | Yes | Full Time |
| HealthECareers | Cardiology - Electrophysiology Opportunity | Trinity Health/St. Marys Health Care | Athens | GA | Yes | Yes | Full Time |
| HealthECareers, PracticeLink | Electrophysiology Cardiologist | Piedmont Healthcare | Atlanta | GA | No | Yes | Full Time and PRN |
| HealthECareers, PracticeLink | Electrophysiology Cardiologist Opportunity in Augusta, Georgia | HCA Healthcare/Doctors Hospital of Augusta | Augusta | GA | No | Yes | Full Time |
| PracticeLink, AMN Healthcare | EP Cardiology Opportunity with Tanner Health System just west of Atlanta, GA | Tanner Medical Center | Carrollton | GA | No | Yes | Full Time |
| PracticeLink | Fantastic new EP opportunity 45 miles NE of Atlanta! | Georgia Heart Institute | Gainesville | GA | No | Yes | Full Time |
| PracticeMatch | Electrophysiologist - Greater Atlanta | Heart & Vascular Care | Johns Creek | GA | No | No | Full Time |
| PracticeMatch | Electrophysiologist in Thomasville, GA | Archbold Memorial | Thomasville | GA | No | Yes | Full Time |

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973

Exhibit 3
Page 43 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| PracticeMatch | Electrophysiologist Needed \| Georgia-Florida Line College Town Near Amelia Island-Jax Beach | South Georgia Medical Center | Valdosta | GA | No | Yes | Full Time |
| PracticeMatch | Electrophysiologist - Partnership Track (J1 & H1 Available) | Cardiovascular Medicine | Davenport | IA | No | Yes | Full Time |
| HealthECareers, PracticeMatch | Cardiology - Electrophysiology Opportunity | Trinity Health/Saint Alphonsus Medical Group | Boise | ID | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology Opportunity in Idaho Falls, ID | Eastern Idaho Regional Medical Center | Idaho Falls | ID | No | Yes | Full Time |
| HealthECareers, PracticeLink | Employed EP Cardiology Opening \| Portneuf Heart & Vascular Institute \| Pocatello, ID-Near Idaho Falls | Portneuf Medical Center | Pocatello | ID | Yes | Yes | Full Time |
| PracticeMatch | Electrophysiologist - Partnership Track (J1 & H1 Available) | Cardiovascular Medicine | Moline | IL | No | Yes | Full Time |
| HealthECareers PracticeMatch | Electrophysiologist Cardiologist Fantastic Opportunity with an Excellent Referral System :Cardiology - Electrophysiology | Heart Care Centers of Illinois Mercy Health | Palos Park Rockford | IL IL | No Yes | Yes Yes | Full Time Full Time |
| PracticeMatch | Cardiology Electrophysiologist - Springfield, IL | Springfield Clinic | Springfield | IL | Yes | Yes | Full Time |
| NEJM | Cardiology, Electrophysiologist | IU Health | Avon | IN | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiac Electrophysiologist to join thriving practice in Indiana | IU Health | Carmel | IN | Yes | Yes | Full Time |
| HealthECareers, PracticeMatch, PracticeLink | Cardiac Electrophysiologist | Ascension Indiana St Vincent | Evansville | IN | No | Yes | Full Time |
| PracticeLink | Electrophysiologist | Deaconess Health System | Evansville | IN | No | Yes | Full Time |
| HealthECareers, PracticeLink | Physician - Clinical Cardiac Electrophysiology | Community Health Systems/Lutheran Hospital | Fort Wayne | IN | No | Yes | Full Time |
| HealthECareers, PracticeMatch | Physician (Cardiology Electrophysiology) | Franciscan Physician Network/Indiana Heart Physicians | Indianapolis | IN | No | Yes | Full Time |
| HealthECareers, PracticeMatch | Physician - Clinical Cardiac Electrophysiology | Community Health Systems/Northwest Health | Valparaiso | IN | No | Yes | Full Time |
| HealthECareers | Physician-Electrophysiology | Ascension Kansas | Wichita | KS | Yes | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology in Wichita, KS | Ascension Medical Group Via Christi | Wichita | KS | Yes | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiology - Electrophysiology - Louisville, KY - Up to $200,000 in recruiting incentives | Baptist Health Louisville Hospital | Louisville | KY | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiology (Electrophysiology) - Paducah, Kentucky - Up to $200,000 in recruiting incentives | Baptist Health Paducah Hospital | Paducah | KY | No | Yes | Full Time |
| HealthECareers | Physician- Cardiac Electrophysiologist | CHRISTUS Health | Alexandria | LA | No | Yes | Full Time |

Exhibit 3
Page 44 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| PracticeMatch, PracticeLink | Electrophysiologist Opportunity in Central Louisiana | Rapides Regional Medical Center | Alexandria | LA | No | Yes | Full Time |
| HealthECareers, PracticeMatch | Electrophysiology - VT Specialist | Ochsner Health | New Orleans | LA | Yes | Yes | Full Time |
| PracticeMatch | Electrophysiology - Section Head in New Orleans | Ochsner Health | New Orleans | LA | Yes | Yes | Full Time |
| HealthECareers | Cardiac Electrophysiology Opportunity | Department of Veterans Affairs/Overton Brooks VA Medical Center | Shreveport | LA | No | No | Full Time |
| HealthECareers | Ochsner LSU Health Shreveport: Cardiac Electrophysiologist; Full-Time Academic | Ochsner Health | Shreveport | LA | Yes | Yes | Full Time |
| PracticeLink | Cardiovascular Electrophysiologist, Overton Brooks VA Medical Center | Overton Brooks Veterans Affairs Medical Center | Shreveport | LA | Yes | No | Full Time |
| PracticeMatch, PracticeLink | Cardiac EP Physician Opportunity in Fall River, MA | Steward Saint Anne's Hospital | Fall River | MA | No | Yes | Full Time |
| AMN Healthcare | Electrophysiology Physician | (not specified) | Springfield | MA | No | Yes | Full Time |
| HealthECareers | Electrophysiology- UPMC Western Maryland | UPMC Heart & Vascular Institute | Cresaptown | MD | No | Yes | Full Time |
| PracticeLink | The UPMC Heart and Vascular Institute Electrophysiology Opportunity! | UPMC Western Maryland | Cumberland | MD | No | Yes | Full Time |
| PracticeMatch | Electrophysiologist | Central Maine Healthcare | Lewiston | ME | No | Yes | Full Time |
| NEJM | Director of Electrophysiology | MaineHealth | Portland | ME | Yes | Yes | Full Time |
| HealthECareers | Grand Rapids, MI – Electrophysiology (Cardiology) – MD/DO | University of Michigan Health-West | Grand Rapids | MI | Yes | Yes | Full Time |
| PracticeLink | Electrophysiology Career - New Hospital Campus | McLaren Greater Lansing | Lansing | MI | No | Yes | Full Time |
| HealthECareers, PracticeLink | Cardiac Electrophysiologist Position with Sparrow Thoracic Cardiovascular Institute | Sparrow Health System | Lansing | MI | No | Yes | Full Time |
| PracticeLink | EP Call only \| Join a team of 4 \| Only full spectrum cardiac program in the region | UP Health System – Marquette | Marquette | MI | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Thriving Electrophysiology Practice Opportunity with a 10 minute or less commute to home | MyMichigan Medical Group | Midland | MI | No | Yes | Full Time |
| HealthECareers, PracticeMatch, PracticeLink | Cardiology - Electrophysiology Opportunity | Trinity Health/Mercy Health Physician Partners | Muskegon | MI | Yes | Yes | Full Time |
| PracticeLink | Electrophysiology Career - Top 50 Heart Hospital - Dedicated Service line | McLaren Northern Michigan | Petoskey | MI | No | Yes | Full Time |
| PracticeLink | Electrophysiologist Needed in Michigan | Ascension St. Mary's Hospital | Saginaw | MI | No | Yes | Full Time |



Exhibit 3
Page 45 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| PracticeLink | Electrophysiology Opportunity with Busy Practice in a Great Community | Corewell Health/Spectrum Health | St Joseph | MI | Yes | Yes | Full Time |
| PracticeLink | Outdoor Activities Abound - Electrophysiology Opportunity in Lakes Country | Essentia Health - St. Joseph's Medical Center - Brainerd, MN | Brainerd | MN | No | Yes | Full Time |
| PracticeLink | Exceptional Opportunity for an Electrophysiologist in awesome Duluth, MN! | St. Luke's Cardiology Associates | Duluth | MN | No | Yes | Full Time |
| HealthECareers | Cardiac Electrophysiologist | Essentia Health | East Gull Lake | MN | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiologist to join 3 EP's as part of large Heart and Vascular Center in a single hospital community one hour from Minneapolis | CentraCare Clinic | St. Cloud | MN | No | Yes | Full Time |
| PracticeLink, AMN Healthcare | Electrophysiology Opportunity with Most Trusted Cardiology Group in Southeast Missouri! | Saint Francis Healthcare System | Cape Girardeau | MO | No | Yes | Full Time |
| PracticeMatch | Academic Cardiology - Electrophysiology | University of Missouri School of Medicine/MU Health Care | Columbia | MO | Yes | Yes | Full Time |
| PracticeLink | EP needed for Heart & Vascular Institute in SWMO | Freeman Health System | Joplin | MO | Yes | Yes | Full Time |
| PracticeMatch, PracticeLink | Physician - Cardiac Electrophysiology in Joplin, MO | Mercy Clinic | Joplin | MO | No | Yes | Full Time |
| PracticeLink | Seeking EP physician who also enjoys some General Cardiology | Meritas Health/North Kansas City Hospital | Kansas City | MO | No | No | Full Time |
| PracticeLink | Electrophysiologist | Mercy Clinic Springfield | Springfield | MO | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Excellent Cardiac Electrophysiology Opportunity with Large Southeastern Group Practice | Hattiesburg Clinic Heart and Vascular | Hattiesburg | MS | No | Yes | Full Time |
| HealthECareers, PracticeMatch, PracticeLink, NEJM | Electrophysiology Cardiologist (International Heart Institute of Montana) | Providence/International Heart Institute of Montana | Missoula | MT | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Adult Electrophysiology Physician – Atrium Health Carolinas Medical Center-Charlotte, NC | Atrium Health/Sanger Heart & Vascular Institute | Charlotte | NC | No | Yes | Full Time |
| PracticeLink | EP Needed in Beautiful Western NC (just 45 mins NW of Charlotte) | Catawba Valley Health System | Hickory | NC | No | Yes | Full Time |
| PracticeMatch | Duke Cardiology Community-Based Electrophysiologist, Lumberton, NC | Duke Cardiology | Lumberton | NC | Yes | Yes | Full Time |
| PracticeLink | Electrophysiology (EP) Cardiology Physician - UNC Health Southeastern - Lumberton, NC | UNC Health Southeastern | Lumberton | NC | No | Yes | Full Time |
| PracticeLink | Water Front Community in Historical New Bern, NC | CarolinaEast Health System | New Bern | NC | No | Yes | Full Time |



Exhibit 3
Page 46 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| Curative | Cardiac Electrophysiology Only An Hour From The Queen City | (not specified) | (not specified) | NC | No | Yes | Full Time |
| HealthECareers, PracticeLink | Cardiac Electrophysiologist | Essentia Health | Fargo | ND | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiologist Opportunity with Sanford Health- Fargo, ND | Sanford Health | Fargo | ND | Yes | No | Full Time |
| PracticeMatch, PracticeLink | Cardiology - ElectroPhysiology - Sanford Health - Sioux Falls, SD | Sanford Health | Sioux Falls | ND | Yes | Yes | |
| PracticeLink | Electrophysiology Cardiology - Join a Regionally Renowned Institute | CHI Health Nebraska Heart - Lincoln 1 | Lincoln | NE | No | Yes | Full Time |
| HealthECareers | Electrophysiology Cardiologist \| Nebraska \| $700K Base Salary + Incentives | (not specified) | (not specified) | NE | No | Yes | Full Time |
| PracticeMatch, PracticeLink, NEJM | Physician, Cardiac Electrophysiology | Dartmouth Hitchcock Medical Center | Lebanon | NH | Yes | Yes | Full Time |
| HealthECareers, NEJM | Electrophysiologist | Summit Health Medical Group | Florham Park | NJ | No | Yes | Full Time |
| PracticeMatch | Rutgers Robert Wood Johnson Medical School is Seeking Cardiac Electrophysiology Faculty in New Brunswick, NJ | Robert Wood Johnson University Hospital New Brunswick | New Brunswick | NJ | Yes | Yes | Full Time |
| PracticeMatch | Electrophysiologist | RWJ Barnabas Health/Community Medical Center | Toms River | NJ | No | Yes | Full Time |
| PracticeMatch, NEJM | Electrophysiology, Physician | Intermountain Health/Clinic La Canada | Las Vegas | NV | No | Yes | Full Time |
| PracticeMatch | Cardiology – Electrophysiology Opportunity | St. Peter's Health Partners MA | Albany | NY | No | Yes | Full Time |
| HealthECareers, PracticeLink | Cardiology - Electrophysiology Opportunity | Trinity Health/St Peter's Health Partners Medical Associates | Albany | NY | No | Yes | Full Time |
| HealthECareers, PracticeLink, NEJM | Electrophysiologist – South Shore University Hospital | Northwell Health/South Shore University Hospital | Bay Shore | NY | Yes | Yes | Full Time |
| NEJM | Electrophysiologist To Join Rapidly Growing Practice | Stony Brook University | Setauket | NY | No | Yes | Full Time |
| NEJM | Cardiac Electrophysiologist - Westchester Medical Center Health Network, NY | (not specified) | Valhalla | NY | Yes | Yes | Full Time |
| PracticeMatch, NEJM | Electrophysiologist | Cleveland Clinic | Canton | OH | Yes | Yes | Full Time |
| PracticeLink | EP Partner for ROBUST EP team in Cincinnati, OH | Mercy Health Physicians - Cincinnati | Cincinatti | OH | No | Yes | Full Time |
| PracticeMatch, NEJM | Electrophysiologist | Cleveland Clinic | Cleveland | OH | Yes | Yes | Full Time |

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973

Exhibit 3
Page 47 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| HealthECareers, PracticeMatch, PracticeLink | BE/ BC Electrophysiologist | Ohio Health | Mansfield | OH | No | Yes | Full Time |
| PracticeLink | Electrophysiologist (EP) position near Columbus, OH | Licking Memorial Hospital | Newark | OH | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Physician / Cardiologist - Cardiac Electrophysiology - Toledo, OH | ProMedica Physician Cardiology | Toledo | OH | No | Yes | Full Time |
| PracticeLink | Academic-Cardiac Electrophysiologist | The University of Toledo | Toledo | OH | Yes | Yes | Full Time |
| PracticeLink, AMN Healthcare | Electrophysiologist to join growing team in Bend, Oregon | St. Charles Bend Hospital | Bend | OR | No | Yes | Full Time |
| HealthECareers, PracticeLink | Electrophysiologist - Portland, Oregon | Adventist Health Northwest Regional Heart & Vascular Center | Portland | OR | No | Yes | Full Time |
| HealthECareers, PracticeMatch, PracticeLink, NEJM | Cardiac Electrophysiology Physician (Providence St. Vincent Medical Center) | Providence St. Vincent Medical Center | Portland | OR | No | Yes | Full Time |
| AMN Healthcare | Electrophysiology (EP) Cardiology Physician | The Knight Cardiovascular Institute (KCI) at Oregon Health & Science University (OHSU) | Portland | OR | Yes | Yes | Full Time |
| HealthECareers, PracticeLink | Electrophysiology opening near the OR Coast! | Quorum Health/McKenzie Willamette Medical Center | Springfield | OR | No | Yes | Full Time |
| HealthECareers | EP Cardiology Near Portland, OR I Partnership Track I Earnings in the Top 1% | (not specified) | (not specified) | OR | No | Yes | Full Time |
| HealthECareers, PracticeLink | Electrophysiologist in PA | WellSpan Health | Chambersburg | PA | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiology EP | Penn Highlands DuBois | DuBois | PA | No | No | Full Time |
| PracticeMatch, PracticeLink | Cardiovascular Institute - Electrophysiology - Erie, Saint Vincent Hospital | Allegheny Health Network | Erie | PA | No | Yes | Full Time |
| HealthECareers, PracticeMatch, PracticeLink | Part-time Cardiologist/Electrophysiologist Needed | Department of Veteran Affairs | Erie | PA | No | No | Part Time |
| HealthECareers, PracticeMatch | Cardiac Electrophysiologist | Penn State Health | Hershey | PA | Yes | Yes | Full Time |
| PracticeLink | EP Cardiology in Johnstown, PA |Recognized Heart Program | 500-bed Level 1 Trauma Center | Conemaugh Memorial Medical Center | Johnstown | PA | No | Yes | Full Time |
| HealthECareers, PracticeLink | Cardiologist/ Electrophysiologist Needed at Pittsburgh VA | Pittsburgh VA Healthcare System | Pittsburgh | PA | Yes | Yes | Full Time |
| PracticeLink | Electrophysiology Cardiology with Penn State Health | Penn State Health St. Joseph | Reading | PA | Yes | Yes | Full Time |
| PracticeMatch, PracticeLink, NEJM | Cardiac Electrophysiology - Sayre, PA | Guthrie Robert Packer Hospital | Sayre | PA | Yes | Yes | Full Time |



Exhibit 3
Page 48 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| HealthECareers, PracticeMatch, NEJM | Electrophysiologist | Geisinger Heart & Vascular Institute | Wilkes-Barre | PA | Yes | Yes | Full Time |
| PracticeLink | Electrophysiologist | UPMC North Central PA | (not specified) | PA | No | Yes | Full Time |
| PracticeMatch | Electrophysiologist - New England | Cardiovascular Institute of New England | Cranston | RI | No | No | Full Time |
| PracticeLink | Electrophysiologist Needed in Beautiful South Carolina | (not specified) | Anderson | SC | No | Yes | Full Time |
| HealthECareers, PracticeLink | Physician - Cardiology - Bon Secours St. Francis Health System | Bon Secours St. Francis Health | Greenville | SC | No | Yes | Full Time |
| HealthECareers, PracticeLink | EP Needed for Hilton Head Island Living - Surf, Sun, Sand Await!! | Hilton Head Regional Physician Network | Hilton Head Island | SC | No | Yes | Full Time |
| HealthECareers | EP Cardiologist | Spartanburg Regional Healthcare System | Spartanburg | SC | No | Yes | Full Time |
| AMN Healthcare | EP Cardiology | (not specified) | Cookeville | TN | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology Opportunity - Join Established EP | West Tennessee Healthcare/Jackson-Madison County General Hospital | Jackson | TN | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Ballad CVA Heart Institute is seeking an Electrophysiology physician for Kingsport, Tennessee | Ballad Health CVA Heart Institute - Kingsport Meadowview | Kingsport | TN | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology in modern mid-sized west Texas city - employed | Northwest Texas Healthcare System | Amarillo | TX | No | Yes | Full Time |
| HealthECareers, PracticeMatch, PracticeLink | Cardiology - Electrophysiology Physician Job with Tenet Healthcare in Brownsville, TX | Tenet Healthcare Corporation/Valley Baptist Health System | Brownsville | TX | Yes | Yes | Full Time |
| PracticeLink | Electrophysiologist | Coastal Cardiology | Corpus Christi | TX | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiology Electrophysiology Opportunity in Corpus Christi, Texas | Corpus Christi Medical Center | Corpus Christi | TX | Yes | Yes | Full Time |
| HealthECareers, PracticeMatch, PracticeLink | Cardiac Electrophysiologist | US Heart & Vascular/HeartPlace | Dallas/Fort Worth | TX | No | Yes | Full Time |
| PracticeLink | Exciting Opportunity for EP to Join an Established and Growing Private Practice in Sunny, Tropical South Texas…Earn $650,000.00+! | South Heart Clinic | Harlingen | TX | No | Yes | Full Time |
| PracticeLink | Cardiac Electrophysiology opportunity at Houston, VA | Michael E. DeBakey Veterans Affairs Medical Center | Houston | TX | No | Yes | Full Time |
| PracticeLink | Part Time Electrophysiologist neededin Laredo, TX | Doctors Hospital of Laredo | Laredo | TX | No | Yes | Part Time |
| PracticeLink | Electrophysiologist Opportunity in Laredo, TX | Laredo Medical Center | Laredo | TX | No | Yes | Full Time |



Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

## Exhibit II - Advertised Electrophysiology Jobs as of October 2023

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| PracticeMatch | Nationally Recognized Heart Institute of East Texas is Seeking an Electrophysiologist | CHI - St. Luke's Health Memorial Lufkin | Lufkin | TX | No | Yes | Full Time |
| PracticeLink | Employed Cardiac EP opportunity in San Antonio, TX | Baptist Health System/Tenet Health | San Antonio | TX | No | Yes | Full Time |
| HealthECareers | PhysSlry MTE S EP Cardiology CTC WestoverHills | CHRISTUS Health | San Antonio | TX | No | Yes | Full Time |
| HealthECareers, PracticeLink | Electrophysiologist Cardiology Opportunity in San Antonio, TX | HCA Healthcare/Methodist Health | San Antonio | TX | No | Yes | Full Time |
| PracticeLink | Electrophysiology Position with the all-new UT Health East Texas | UT Health Tyler | Tyler | TX | Yes | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiology Opportunity in Orem, UT | Timpanogos Regional Hospital | Orem | UT | No | Yes | Full Time |
| PracticeLink | Utah's largest independent multi-specialty group is seeking an EP Cardiologist with interests in a rapid track to partnership. | Revere Health Cardiology | Provo | UT | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiovascular EP Opportunity in Fredericksburg, VA | Spotsylvania Regional Medical Center | Fredericksburg | VA | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiac Electrophysiology Opportunity in Richmond, Virginia | Chippenham Hospital | Richmond | VA | No | Yes | Full Time |
| PracticeLink | Work-life balance opportunity while providing the best care to our Veterans and their families!! | Richmond VA Medical Center | Richmond | VA | Yes | Yes | Full Time |
| PracticeLink | Employed Electrophysiologist Cardiology Opportunity with Carilion Clinic – Roanoke, VA | Carilion Roanoke Memorial Hospital | Roanoke | VA | Yes | Yes | Full Time |
| HealthECareers, PracticeLink | Physician - Cardiology - Bon Secours Cardiovascular Specialists | Bon Secours Mercy Health | Suffolk | VA | No | Yes | Full Time |
| NEJM | Virginia Beach Electrophysiology-Cardiologist Opening - Built-In Referrals | (not specified) | Virginia Beach | VA | No | Yes | Full Time |
| HealthECareers | Electrophysiologist | Bayview Physicians Group/Bayview Cardiovascular Associates | Virginia Beach/Chesapeake | VA | No | Yes | Full Time |
| PracticeMatch | Cardiologist – Electrophysiology at The Everett Clinic | Optum (The Everett Clinics) | Everett | WA | No | Yes | Full Time |
| PracticeMatch | Electrophysiologist - Seattle | Virginia Mason Franciscan Health | Seattle | WA | No | Yes | Full Time |
| NEJM | EP Electrophysiologist - 1.5 Months off per year!! | (not specified) | Appleton | WI | No | Yes | Full Time |
| PracticeMatch, PracticeLink | MD/DO - Cardiac Electrophysiologist, Appleton, WI | ThedaCare Cardiovascular Care | Appleton | WI | No | Yes | Full Time |
| PracticeLink | Electrophysiologist | Mayo Clinic Health System - Eau Claire | Eau Claire | WI | No | Yes | Full Time |



Exhibit 3
Page 50 of 51

Dr. Rupa Bala vs. Oregon Health and Science University, Dr. Charles Henrikson, Dr. Joaquin Cigarroa
Expert Report of Jennifer L. Moody

**Exhibit II - Advertised Electrophysiology Jobs as of October 2023**

| Job Listing Site(s) | Job Posting Title | Organization | City | State | Academic | Electrophysiology Only | Part or Full Time |
|---|---|---|---|---|---|---|---|
| HealthECareers, NEJM | Physician-Cardiac Electrophysiologist-SSM Health Outpatient Center-Madison, WI | SSM Health/Dean Medical Group | Madison | WI | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Cardiac Electrophysiologist to Join Practice in Thriving Wisconsin Community | Marshfield Clinic Health System | Marshfield | WI | Yes | Yes | Full Time |
| PracticeLink | Join a Thriving Practice as a Cardiac Electrophysiologist | Marshfield Medical Center | Marshfield | WI | No | Yes | Full Time |
| PracticeMatch, PracticeLink | Electrophysiologist - Wausau, Wisconsin | Aspirus Health | Wausau | WI | Yes | Yes | Full Time |
| PracticeLink | Employment Opportunity with Charleston Area Medical Center Capitol City of WV | Charleston Area Medical Center, Inc. | Charleston | WV | No | Yes | Full Time |
| Pacific Companies | Rocky Mountain Corridor - Spearhead Your Own EP Program - Brand New 2.6 Million Dollar EP Lab | (not specified) | (not specified) | (not specified) | No | No | Full Time |

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973

Exhibit 3
Page 51 of 51

# Expert Supplemental and Rebuttal Report of Jennifer L. Moody

**DR. RUPA BALA**

v.

**OREGON HEALTH AND SCIENCE UNIVERSITY,**
**DR. CHARLES HENRIKSON,**
**DR. JOAQUIN CIGARROA**

Exhibit 4
Page 1 of 17

## I.    Introduction

1.    I am Jennifer L. Moody, a partner in the Strategy and Business Advisory Division at ECG Management Consultants ("ECG"). I have been retained by Stoel Rives LLP, counsel for Oregon Health and Science University ("OHSU") and Dr. Charles Henrikson and Dr. Joaquin Cigarroa, in the case of *Dr. Rupa Bala v. Oregon Health and Science University et al.*, Case No. 3:18-CV-00850-HZ (United States District Court for the District of Oregon), involving an employment discrimination dispute between Dr. Bala and OHSU, Dr. Charles Henrikson, and Dr. Joaquin Cigarroa (collectively, "Defendants" or "OHSU").

2.    This report supplements my initial expert opinions contained in my November 1, 2023 report submitted in this matter, and together, they comprise my expert opinions in this matter. My initial report contains my qualifications and curriculum vitae.

3.    The purpose of this expert rebuttal report is to assess the analysis and conclusions of plaintiff counsel's retained expert, E. Lisa Broten. In so doing, I incorporate additional analyses that I have conducted since submitting my initial expert report on November 1, 2023. The additional information responds to Ms. Broten's opinions. Like my initial report, I only opine on issues related to the physician job search market including the recruitment market for cardiac electrophysiologists, the viability of Dr. Bala's candidacy in the job market, and Dr. Bala's job search.

4.    To perform my work, I again utilized a team of ECG personnel who worked under my direction and control. All opinions presented in this report are my own.

5.    My hourly rate for the work on this case is $680. In developing my expert rebuttal report, I utilized a project team and billed for their time at a rate of $450 to $560 per hour to assist with data analysis. I oversaw and approved all work performed.

6.    My opinions contained in this report are based on the information I have reviewed to date and are subject to supplementation as additional information becomes available. In addition to the materials I reviewed and relied upon for my initial report, I also reviewed and relied upon additional materials in preparing this report. A detailed accounting of the supplemental documents I reviewed is included as attachment 1.

7.    The ensuing sections primarily focus on my disagreements with Ms. Broten's analysis. It appears to me that Ms. Broten is not qualified to assess and opine on the recruitment process and marketplace specifically related to physicians. Ms. Broten's methodology for assessing the physician employment landscape and recruitment process is incomplete and suggests she has little or no prior exposure to such topics. Her selection and use of benchmarks is flawed and suggests a goal-seeking approach, and her understanding and knowledge of the physician recruitment process appears to be lacking. The marketplace of physicians, much less subspecialty-trained cardiac electrophysiologists, is incredibly unique and cannot be analyzed in the same way as other occupations. The remainder of this report addresses her opinions and details where they are flawed, misleading, and plainly wrong.

Exhibit 4
Page 2 of 17

## II.   Rebuttals

8.   ***Page 5: "Start of her career in Cardiac Electrophysiology. A specialty not held by many women in the cardiology field."***

The fact that few women are cardiac electrophysiologists would make Dr. Bala a desirable candidate for many organizations.[1] In fact, many physician employers, particularly large community health systems, hospitals, and academic medical centers, are highly focused on sex and gender concordant care as well as philosophically committed to diversity, equity, and inclusion.[2,3] This is an example of Ms. Broten not understanding physician employment trends.

9.   ***Page 5: "Her student reviews with OHSU and at the University of Pennsylvania have always been exemplary."; Page 7: It is noted that Dr. Bala had an "excellent career with excellent reviews from patients, students, and staff" while employed at the University of Pennsylvania.***

In my review of documents, this is not accurate. Dr. Bala frequently fell below the median scores of colleagues within her department and division at the University of Pennsylvania.[4] Some students at the University of Pennsylvania noted she was "rude and demeaning,"[5] she was "rude, demeaning/condescending, paranoid, and aggressively defensive and accusational – with multiple episodes of grossly unprofessional behavior,"[6] she "has difficulty making clinical decisions,"[7] her "ability to work in teams is limited,"[8] she is "quick to avoid taking responsibility for a patient's care,"[9] and has a temperament that means "learning procedures with her is not a pleasant experience because of her temperament."[10] In 2011, one student summarized their interactions with Dr. Bala as "it is a bit confusing why this attending is allowed to teach fellows. She is clearly not comfortable with her own skill set during procedures. Her unpredictable behavior and inability to control her temper results in staff and fellow[s] spending more time worried about her behavior and less time focused on the patient. The result is that the staff is more concerned about being chastised by Dr. Bala and less concerned about the patient. This clearly results in a dangerous

---

[1]   AAMC 2022 Physician Specialty Data Report: Active Physicians by Sex and Specialty, 2021.
[2]   Mensah, George A. and Valentin Fuster, "Sex and Gender Differences in Cardiovascular Health." Journal of the American College of Cardiology, vol. 79, no. 14, Apr. 2022, pp. 1385-1387.
[3]   Lau, Emily S., et al. "Does Patient-Physician Gender Concordance Influence Patient Perceptions or Outcomes?" Journal of the American College of Cardiology, vol. 77, no. 8, Mar. 2021, pp. 1135-1138, https://doi.org/10.1016/j.jacc.2020.12.031.
[4]   UPENN000678, UPENN000679, UPENN000703, UPENN000704, UPENN000707, UPHS000109, UPHS000116.
[5]   UPENN000710.
[6]   UPENN000710.
[7]   UPHS000080.
[8]   UPHS000080.
[9]   UPHS000080.
[10]   UPHS000080.

Exhibit 4
Page 3 of 17

situation for the patient."[11] Similarly, learners at OHSU commented that Dr. Bala "often unprofessionally loudly berated the fellow for minor mistakes in front of the team,"[12] that she was "terrifyingly mean,"[13] and that she told a fellow they should 'never say such things out loud ... because they make you sound stupid.'"[14] The presence of numerous comments such as these combined with assessment rating scores below those of her department and division peers suggest that Dr. Bala's reviews from learners have not always been exemplary.

10. ***Page 6: Dr. Bala was "terminated" from Banner University Medical Group.***

The fact that Dr. Bala was terminated would reflect negatively on her desirability as a job candidate and impact her future searches post termination. Ms. Broten may or may not have had access to the same documents that I reviewed regarding Dr. Bala's termination from Banner, which clarify that her termination was primarily associated with behavioral concerns and the fact that Dr. Bala was not very productive.

11. ***Page 7: "Dr. Bala began [her] job search in 2016 prior to resigning from OHSU when she finally realized her contract might not be renewed. She desired to stay in the Pacific Northwest applying for jobs in Oregon and Washington with various hospitals and with colleagues such as with St. Charles Hospital in Bend."***

Prior to her departure from OHSU, Dr. Bala made inquiries to only two hospitals – one in Bend, Oregon and one in Chicago, Illinois – and submitted applications regarding only two positions – one with Dartmouth Hitchcock in Lebanon, New Hampshire, and one with St. Charles Medical Group in Bend, Oregon. St. Charles Medical Group is the employing medical group for the hospital in Bend, Oregon. Dr. Bala thus only communicated with three potential employers, two of which were outside the Pacific Northwest. It appears to me that Ms. Broten does not understand the importance and necessity of recognizing the physician employment marketplace as a national one. For a job search to be comprehensive and diligent, it needs to be a national search with fewer limitations than Dr. Bala imposed.

In addition to the geographic limitations Dr. Bala imposed on her own job search at the time, she also purported to limit her search to include jobs with opportunities to teach and engage in research as employed faculty, and that were located in large metropolitan areas. That, however, was inconsistent with her search activities. St. Charles Health System (parent to both St. Charles Hospital and St. Charles Medical Group) is located in Bend, Oregon, which is not a large metropolitan area and did not offer any medical education programs in 2017 and would have limited research opportunities for Dr. Bala to pursue. Dartmouth Hitchcock is located in Lebanon, New Hampshire, which is not a large metropolitan area. Dr. Bala's stated desire to only accept a position that was in a large metropolitan area (preferably in the Pacific Northwest) and include opportunities to

11    UPHS000118-UPHS000119.
12    OHSU_RB 001443.
13    OHSU_RB 001443.
14    OHSU_RB 000104.

3

Exhibit 4
Page 4 of 17

teach and engage in research as employed faculty is not supported by her early job search activities.

Based on my review of the information in this case, and therefore my understanding of Dr. Bala's career progression, her reputation was strongest while she was employed at OHSU. Had Dr. Bala engaged in a comprehensive and diligent job search at the time, her job search likely would have been successful. Instead, she applied for only two positions and made collegial inquiries about two others while employed at OHSU. (Having noted that Dr. Bala's professional reputation was at its relative peak while she was employed at OHSU, it is important to note that she did receive negative reviews while at the University of Pennsylvania and while employed at OHSU).

12.    ***Page 7: "Dr. Bala was unemployed from 6/20/2017 to 7/1/2018 (12 months and 11 days), prior to accepting new employment at Banner University Medical Group. She submitted over 17 applications prior to and during that time."***

According to the documents I reviewed, Dr. Bala did not apply to 17 positions prior to her employment with Banner University Medical Group. She appears to have only applied to nine positions between the time she departed from OHSU (6/20/2017) and the time she began work at Banner (7/1/2018). She made inquiries about potential openings to professional colleagues and recruiters, but inquiries are not the same thing as applications as positions may not be available or open for candidate consideration at entities without posted positions.

13.    ***Page 7: "She submitted approximately 154 applications from 1/19/2020 forward."***

According to the documents I reviewed, Dr. Bala applied to significantly fewer than 154 positions from 1/19/2020 forward. Inquiries to professional colleagues or conversations with recruiters are not the same thing as an application. I could not discern Ms. Broten's methodology for accounting what constitutes an application, but it appears to be poorly defined and inconsistent, as Dr. Bala's recruitment activities include myriad correspondences in which she is soliciting members of her network and organizations for information about potential openings; however, these communications often fell short of formally applying for a position.

14.    ***Page 8: "OHSU gave specific instructions to OHSU staff to only state dates of employment absent a signed release."***

This is common and for this reason, recruiters are not reliant on reference checks from employers other than to verify employment. Instead, many recruiting organizations will rely upon their own personal and professional networks to provide anecdotal information about candidates that may originate from sources including past colleagues and professional networks. The implication by Ms. Broten of inappropriate interference on OHSU's part illustrates her lack of understanding about the policies and procedures that are standard regarding physician turnover and recruitment.

Exhibit 4
Page 5 of 17

15. ***Dr. Bala's "Honors and Awards" include "6/2020 – Tucson Lifestyle Magazine: Top Doc" (page 8) and "6/2020 – Tucson Lifestyle Magazine: Exceptional Women in Medicine" (page 9).***

Both *Top Doctors* and *Exceptional Women in Medicine* are lists compiled by Castle Connolly Inc., published in regional lifestyle magazines, and utilized to sell additional advertising opportunities to featured physicians. Physicians can be nominated by peers or by physician leaders at their organization. Organizations often submit physicians to Castle Connolly for consideration to market their practice to prospective patients. Castle Connolly screens nominations from medical providers for evaluation criteria including professional qualifications, education, hospital and faculty appointments, research leadership, professional reputation, and disciplinary history. Dr. Bala's inclusion on this list would mean she passed the screening process including verification of her professional reputation. Castle Connolly has a business incentive to include as many physicians as may be qualified as they offer additional paid opportunities for those physicians to be featured in a variety of manners. Importantly, due to the marketing and promotion-related factors mentioned above, physician recruiters do not consider these engineered honors when evaluating candidates. Ms. Broten's reliance on these reported honors as any evidence of a physician's attractiveness as a recruitment candidate is misguided and exemplary of her lack of understanding about the information utilized to screen or source potential physician recruits.

16. ***Page 9: "Dr. Bala's resume provides a record of her accomplishments and research articles and activities as well as defined in the many reference letters from professionals in her field that have indicated that Dr. Bala has had national and international acclaim for her research and innovative approaches to technology in her field. She had been active in research since 1993 participating and writing published research articles until 2014 when she left her job to be a part of the Cardiac Electrophysiology team at OHSU (see resume on file). This is an area for which Dr. Bala states she has substantial loss, as it is not available to her in the private practice community, which appears to be the only type of employment that she has been able to garner since leaving OHSU."***

This is incorrect and again suggests Ms. Broten lacks knowledge regarding the physician employment marketplace. It is possible and common for independent practices to participate in clinical research. In fact, many clinical research organizations will conduct clinical trials with numerous independent practice groups due to lessened administrative burden and a lack of the barriers to entry that are common within academic organizations.

Dr. Bala also conflates the wide range of practice types into two distinct categories – academic practice and independent practice. As I indicated in my initial expert report, the type of organization – a hospital, health system, academic medical center, or independent practice – for whom a physician works does not necessarily dictate the practice environment in which the physician works. For example, a physician role at an academic medical center may or may not involve academic responsibilities. On the other end of the spectrum, a physician in independent practice can

5

Exhibit 4
Page 6 of 17

take an academic appointment at an academic medical center via contractual relationship. Put simply, the type of organization that an employing entity is does not necessarily indicate the type of physician roles available or present at that organization.

Furthermore, Ms. Broten appears to be dismissive of how Dr. Bala's career has actually evolved with respect to research. During her time at the University of Pennsylvania her department leaders expressed concerns that Dr. Bala was not participating in or leading primary research, instead drafting abstracts for publication[15] and rarely speaking outside the Philadelphia area.[16] While at OHSU, Dr. Bala waited 18 months to take the online research test required to begin research activities at the institution[17], which is hardly the behavior expected of someone who is highly focused on research opportunities. It is thus misleading to suggest that Dr. Bala's departure from OHSU damaged her opportunity to engage in research. Ms. Broten concedes that Dr. Bala has not engaged in research since 2014 and that Dr. Bala was not involved in research while employed at OHSU.

17.  *Page 9 "At least 12 years of experience from 2006 until leaving OHSU as an Associate Professor. She was on track to continue as either Associate Professor or graduate to Professor for at least 5 to possibly 8 more years before applying for Chief jobs in the academic arena. The path to professorship can take less or more time depending on the institution. This counselor has averaged that number based on a few research factors including review of her resident classmates from the University of Chicago and how her intern class is now employed."*

It is not an appropriate equivalent to compare Dr. Bala's career path to that of her residency peers. Ms. Broten's ignorance of the relevant differences among Dr. Bala's residency peers again suggests she lacks very important knowledge and experience regarding physician employment and career progression.

- Not all peers are practicing in a like specialty with the same number of years of required training. Some peers are practicing in specialties such as general internal medicine or hospital medicine that require no additional training beyond the internal medicine residency. Those physicians would have a four-year head start advantage to Dr. Bala and thus their trajectories are not comparable. Other physicians with shorter fellowship requirements would similarly have a competitive advantage to have progressed further than Dr. Bala.

- The number of academic programs available for each specialty varies and correspondingly, the number of clinical faculty required for those programs also varies. For example, the American Medical Association shows only 17 cardiac electrophysiologists nationally engaged primarily in medical teaching, meaning that most cardiac

---

[15]  UPENN000642.

[16]  UPHS000123.

[17]  Bala Deposition, page 53

Exhibit 4
Page 7 of 17

electrophysiology faculty balance that with other activities (clinical, research, or admin-istration). By contrast, there are 1,249 general internists engaged primarily in medical teaching.[18]

- Because Dr. Bala's last academic appointment ended in 2020 when she was terminated from Banner University Medical Center, physicians in comparison would have had at least three more years to progress in their academic goals.

- Despite these factors, only 12 of the 35 physicians have reached full professorship de-spite having up to four years' competitive advantage as a head start and another three years during which Dr. Bala was not in academic practice. Thus, it is not reasonable that Dr. Bala would have certainly achieved full professorship in this same time period.

18. ***Page 9-10: "She is currently working in private practice. Although she is happy she was able to find a job, it appears to be the only job she was offered after submitting over 200 applications of the course of a few years."***

Based on the documents I reviewed, this is untrue. Dr. Bala was offered at least three jobs since leaving OHSU. First, she was employed by Banner University Medical Center, a position from which she was terminated. Next, she was employed by UHS, a position from which she resigned. Finally, she is currently employed by Citrus Cardiology.

19. ***Page 10: Dr. Bala put in "time and effort" to her "extensive application[] submissions."***

Dr. Bala's job search details show that most of the positions she applied for were an automated submission through a career website. Those submissions allow a candidate to auto-submit a saved CV through a simple one-click process. It is uncommon for physicians to fill out more extensive job applications until they are in the final stages of the candidacy process as recruiters seek to minimize burden on physicians.

20. ***Page 10: "Recent statistics indicate from MedAxiom 2023 report that three out of four Cardi-ologists are between the ages of 61 and 70."***

This is a misleading statistic. While it is true that a significant number of physicians (64.9%) classified in cardiovascular disease are over age 55, most younger cardiologists are choosing to complete additional training in interventional cardiology or cardiac electrophysiology and thus would be categorized separately in physician demographics such as those reported by the AMA or AAMC. Only 16.1% of interventional cardiologists and 26.1% of cardiac electrophysiologists are over age 55.[19] This is again indicative of Ms. Broten's lack of knowledge of the physician marketplace and particularly the use of physician demographics.

---

[18]   American Medical Association Physician Counts by Specialty, MMS Inc., accessed September 11, 2023.
[19]   AAMC 2022 Physician Specialty Data Report: Active Physicians by Age and Specialty, 2021.

7

Exhibit 4
Page 8 of 17

21. ***Page 10: "Dr. Bala is from India… She is dark skinned."***

Dr. Bala's ethnicity is not an outlier in cardiology: 34.1% of cardiac electrophysiologists and 40.5% of interventional cardiologists identify as Asian. This compares to 20.6% of all physicians. In short, cardiac subspecialists are more likely to be Asian than physicians are overall.[20]

22. ***Page 10: "She has essentially a singular work history with specialized training in cardiac electrophysiology since her residency."***

This is inaccurate. Dr. Bala completed a general cardiology fellowship prior to beginning a cardiac electrophysiology fellowship. She also practiced general internal medicine with Kaiser in Hawaii prior to beginning her general cardiology fellowship. Even if I ignore the exposure and training Dr. Bala accumulated prior to being employed at OHSU, as Ms. Broten apparently did, I cannot ignore the fact that Dr. Bala attested in her deposition to participating in a significant amount of general cardiology on-call services while employed at OHSU. While she is indeed specialized and clearly stated that practicing general cardiology is a dissatisfier for her, she was and is highly qualified to practice within a wider professional scope than just cardiac electrophysiology, as explained in my initial expert report.

23. ***Page 12: "[T]his display [of job search records] is from someone who is well organized and has the ability to keep track of many applications submitted."***

I disagree. I found Dr. Bala's job search records to be haphazard and incomplete, representative of her inconsistent and sporadic job search activity. I shared my opinions related to Dr. Bala's job search extensively in my initial expert report, and my opinions have not changed.

24. ***Page 12: "It is important to make call backs to attempt to determine the reason for not being offered the job. Callbacks are much more difficult given the circumstances that Dr. Bala faced in this professional setting."***

It is not common to field callbacks from physician candidates unless they made it through the final stages of the job search (e.g., an on-site interview visit). There are many reasons a candidate might not be offered a job or even progress to the next stage of screening and it would be unreasonable for a recruiter to speak with every potential applicant. Those reasons may include loss of funding for a position, lack of organizational support or internal disagreement about the position, lack of viable candidates, or a change in search parameters. Organizations may also leave a prepaid posting up on a third-party site for a position that has been filled to generate additional CVs for viable candidates if a future need arises.

---

[20]    AAMC 2022 Physician Specialty Data Report: Active physicians who identified as Asian, 2021.

Exhibit 4
Page 9 of 17

25. ***Page 12: "[I]t is clear that there is a pattern of questionable references offered to employers as Dr. Bala after having initial interests expressed to her by employers in a field that needed experienced cardiologists, was soon gas lighted or denied the next step in the process of hire."***

I disagree that there is a pattern in Dr. Bala's job search that suggests that questionable references are the cause of unsuccessful applications to numerous institutions. Organizations paused or ended Dr. Bala's candidacy for a variety of reasons including another candidate accepting the position or a desire to focus on other candidates. Dr. Bala advanced in the recruitment process, specifically beyond recruiter screening, on multiple occasions, which would not have been the case if "questionable references" were pervasive in her job search.

In my review of Dr. Bala's job search records, I noted that Dr. Bala proactively volunteered to some organizations that she was party to this lawsuit against OHSU. In my experience, the choice to disclose this information could lead to a lack of interest from potential employers. This information, if accompanying one of two or more similar candidates, would almost certainly lead an organization to focus on the candidate without a litigious history.

26. ***Page 14: "The field of cardiology is in desperate need for trained and seasoned cardiologists."***

There is indeed a significant need for trained and seasoned cardiologists. It is important to note that the areas of highest need are general cardiology, an area Dr. Bala was unwilling to consider, and underserved or less desirable non-metropolitan areas, which Dr. Bala was only willing to hesitantly consider at the tail end of her job search. Had Dr. Bala been willing to consider a wider range of positions and geographies, her opportunities for successful placement would have increased.

27. ***Page 14: "Because she is in a small community of experts, whereby everyone knows everyone, reputation is everything. It seems her reputation has been offered by managers and related staff from OHSU as 'hard to deal with,' 'difficult to get along with' and other statements made by personnel seems to have made its way around the community at large."***

Ms. Broten seems to attribute any and all alleged reputational harm that Dr. Bala may have suffered to purported statements made by OHSU staff. However, Ms. Broten cannot say with certainty that any alleged reputational harm would have come from OHSU staff or OHSU staff alone. The documents in this case show that many individuals, well beyond those employed by OHSU, had negative interactions with her. For example, while Dr. Bala was employed at OHSU members of the healthcare community such as community physicians and medical device representatives lodged complaints about her behavior. [21] These individuals are indeed a part of the "small community" to which Ms. Broten refers.

Furthermore, Dr. Bala also received negative feedback from various learners at the University of Pennsylvania and Banner University Medical Center, many of whom have gone on to practice at

---

[21]    Defendants' Motion for Summary Judgment

other organizations and would be in a position to offer casual feedback to recruiters about candidates with whom they had past experiences. When students describe a physician as "rude and demeaning" [22], "rude, demeaning/condescending, paranoid, and aggressively defensive and accusational – with multiple episodes of grossly unprofessional behavior," [23] having "difficulty making clinical decisions," [24] having a limited "ability to work in teams," [25] being "quick to avoid taking responsibility for a patient's care" [26], and having a temperament that means "learning procedures with her is not a pleasant experience," [27] as some of Dr. Bala's students at the University of Pennsylvania did, those perceptions can affect one's professional reputation. This pattern of concerning feedback about Dr. Bala's interactions with learners continued at Banner University Medical Center, where team members shared that phrases such as "I don't have time to explain" and "don't screw this up" were used with colleagues and were perceived as "dismissive" and "disrespectful" by supervisors.[28] Again, these are interactions that would reasonably impact Dr. Bala's professional reputation.

Ms. Broten is correct that within a small subspecialty area of cardiology, and particularly within academic circles, reputation by word of mouth can change quickly even based on information that Dr. Bala herself may have shared with trusted individuals. Because information was publicly reported about Dr. Bala's lawsuit, it is probable that colleagues and professional contacts became aware of and discussed this information. In fact, in my review of relevant documents, Dr. Bala inadvertently harmed her own candidacy at several organizations by offering such negative and confounding information about this pending lawsuit early and openly in the recruitment process.

Dr. Bala also communicated with organizations that either supply recruiter databases nationally (such as PracticeMatch and PracticeLink) or recruit for hospitals in many states (contingent and retained search firms, HCA, Ascension) and strongly expressed her desire to only be employed by academic organizations in large metropolitan areas with many of those recruiters. It is common for recruiters to leave detailed notes in candidate databases that can be readily accessed by other recruiters to whom Dr. Bala may have never spoken. Recruiters, after seeing detailed notes of Dr. Bala's preferences, would likely have eliminated her from consideration for positions that did not meet her stated requirements.

Files I reviewed also detailed Dr. Bala's difficulties achieving minimum productivity requirements at Banner. Minimum productivity standards exist for most employed physician positions and any communications with recruiters about past challenges with productivity would also be a red flag. While I cannot speak directly to the conversations Dr. Bala had with recruiters, it is common to discuss productivity expectations with candidates early in the recruitment screening

---

[22]    UPENN000710.
[23]    UPENN000710.
[24]    UPHS000080.
[25]    UPHS000080.
[26]    UPHS000080.
[27]    UPHS000080.
[28]    BANNER000024.

process and any hesitancy from candidates about stated minimum goals or past productivity challenges could eliminate a candidate from consideration.

28. ***Page 17: "There are a total of 156 accredited U.S. medical schools, 14 accredited Canadian medical schools, and approximately 400 teaching hospitals and health systems"; Page 18-19: "It does not seem feasible that Dr. Bala would not gain the rank to Professor or Chief in the academic arena throughout her career path."***

I do not disagree with these statistics offered by Ms. Broten regarding the landscape of academic medicine as background context for her reliance on AAMC survey data to form opinions. However, it is important to note that there are only 117 accredited fellowship programs specific to cardiac electrophysiology. I state this fact to illustrate how challenging it would have been for Dr. Bala to become a division chief of cardiology. Given the limitations she imposed on her own job search, explicitly avoiding potential opportunities at institutions where participating in general cardiology clinical services would be required, her opportunity to become division chief was similarly self-limited. Furthermore, the likelihood that an organization that does not have an accredited fellowship program specific to cardiac electrophysiology would hire a cardiac electrophysiology specialist into a role that does not require any general cardiology work and then eventually promote that person to division chief is exceptionally low.

It is also important to understand that faculty appointments must be considered within the context of Accreditation Council for Graduate Medical Education ("ACGME") requirements, as all academic programs within the United States must follow these standards to maintain a compliant fellowship program. The ACGME requirements for clinical cardiac electrophysiology state that faculty members must "be role models of professionalism" and "administer and maintain an educational environment conducive to educating fellows."[29] Numerous comments were made by learners at University of Pennsylvania, OHSU, and Banner that suggest that Dr. Bala may not have demonstrated the characteristics required for faculty members that would stymie her efforts to rise within the faculty ranks. Ms. Broten does not appear to be aware of the barriers Dr. Bala would likely face within the growth trajectory toward full professor or division chief.

## III.   Conclusion

29. In summation, my opinions established in my initial expert report remain the same, and I have concluded that Ms. Broten's opinions to the contrary are either based on incomplete information or flawed methodologies or are inaccurate. I question whether Ms. Broten is qualified to opine on topics related to physician employment, having deployed an inappropriate assessment methodology that relied on data sources that are clearly unfamiliar to her and therefore misunderstood, as well as making assumptions that the physician job market and candidacy process mirrors that of other industries, which is also incorrect.

---

[29]   Accreditation Council for Graduate Medical Education Program Requirements for Graduate Medical Education in Clinical Cardiac Electrophysiology.

Exhibit 4
Page 12 of 17

Jennifer L. Moody

December 15, 2023

Date

12

Exhibit 4
Page 13 of 17

*Rupa Bala MD v. OHSU et al*

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | **Additional documents provided by Defendants for rebuttal/supplemental report:** | | |
| 1 | | | Earning Capacity Determination Report of E. Lisa Broten LCSW, 10/27/23 |
| 2 | | | Expert Report of Jennifer Prager CPA, 10/27/23 |
| 3 | | | Vocational Evaluation Report of DT North MS, 11/1/23 |
| 4 | | | Expert Report of Leonard J. Henzke, 11/1/23 |
| 5 | BANNER000022 | BANNER000023 | Notice of termination, 1/17/20 |
| 6 | BANNER000024 | BANNER000025 | Documented Verbal Discussion |
| 7 | BANNER000173 | BANNER000174 | Response to verbal discussion |
| 8 | UPENN000707 | UPENN000710 | 1 Year Evaluation, 2007 |
| 9 | UPENN000678 | UPENN000681 | Teaching Evaluations, 2005-2007 |
| 10 | UPHS000080 | UPHS000080 | Student evaluation of Dr. Bala |
| 11 | UPHS000116 | UPHS000119 | 1 Year Evaluation, 7/1/10 – 6/30/11 |
| 12 | UPHS000141 | UPHS000141 | Email re Rupa Bala teaching, 2/28/12 |
| 13 | UPHS000123 | UPHS000123 | Letter re concerns related to 2nd reappointment of Dr. Bala, 4/27/12 |
| 14 | UPHS000109 | UPHS000110 | 1 Year Evaluation, 7/1/12 – 6/30/13 |
| 15 | UPENN000703 | UPENN000703 | 3 Year Evaluation Summary, 2006 – 2008 |
| 16 | UPENN000704 | UPENN000706 | 1 Year Evaluation, 2008 |
| 17 | UPENN000642 | UPENN000642 | Letter re reappointment of Dr. Bala with concern, 9/11/09 |
| 18 | OHSU_RB 000103 | OHSU_RB 000105 | Emails by fellows re Dr. Bala, 9/17/15 |
| 19 | BALA 1869 | BALA 1870 | Evaluations of Dr. Bala by Fellows for AYs 2014-2015 and 2015-2016 |
| 20 | OHSU_RB 001788 | OHSU_RB 001789 | Analysis of Dr. Bala Performance by student, 8/6/15 |
| 21 | OHSU_RB 000800 | OHSU_RB 000801 | Analysis of Dr. Bala Performance by student, 12/4/15 |
| 22 | OHSU_RB 001783 | OHSU_RB 001785 | Resident Evaluations of Dr. Bala, 7/1/15 - 12/9/15 |
| 23 | OHSU_RB 001441 | OHSU_RB 001443 | Student Evaluations of Dr. Bala, 7/1/15 – 12/15/15 |
| 24 | OHSU_RB 001745 | OHSU_RB 001745 | Fellow Evaluation of Dr. Bala |
| 25 | OHSU_RB 001790 | OHSU_RB 001791 | Overview of Dr. Bala's teaching for previous three years |
| 26 | | | Excerpt of Dr. Bala deposition transcript, 7/28/20, pages 50-54 |
| 27 | BAAA 2285 | BAAA 2287 | Text messages between Dr. Bala and Dr. Rehman |
| | **Plaintiff's experts' documents provided for rebuttal/supplemental report:** | | |
| 28 | | | Second Amended Complaint for Deprivation of Civil Rights, 2/11/19 |
| 29 | | | Defendants' Answer and Affirmative Defenses to Second Amended Complaint for Deprivation of Civil Rights, 4/15/19 |
| 30 | | | Defendants' Motion for Summary Judgment, 8/23/21 |
| 31 | | | Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Cross Motion for Summary Judgment (Corrected), 9/30/21 |
| 32 | | | Reply in Support of Defendants' Motion for Summary Judgment, 11/8/21 |
| 33 | UPENN000001 | UPENN000002 | Offer letter, 3/23/06 |
| 34 | OHSU_RB 001524 | OHSU_RB 001531 | Faculty Evaluations at UPenn |
| 35 | OHSU_RB 000676 | UPENN000684 | Teaching Evaluations |
| 36 | UPENN000563 | UPENN000564 | Overview of Teaching for previous three years |
| 37 | OHSU_RB 001726 | OHSU_RB 001727 | Letter in Support of Promotion by Dr. Kaul, 5/29/14 |
| 38 | OHSU_RB 000050 | OHSU_RB 000073 | Clinician Employment Agreement, 1/5/15 |
| 39 | OHSU_RB 000218 | OHSU_RB 000219 | Position Description |

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 40 | OHSU_RB 001704 | OHSU_RB 001705 | Letter of Recommendation by Dr. Parmacek to Dr. Henrikson, 6/20/14 |
| 41 | OHSU_RB 000423 | OHSU_RB 00423 | Letter of Recommendation by Dr. Parmacek to Dr. Kaul, 6/20/14 |
| 42 | OHSU_RB 000020 | OHSU_RB 0023 | Appointment letter, 7/16/14 |
| 43 | BALA 0874 | BALA 0875 | Analysis of Educator Performance, 8/6/15 |
| 44 | BALA 1869 | BALA 1869 | Annual Faculty Evaluation, 2014-2015 |
| 45 | OHSU_RB 001809 | OHSU_RB 001810 | Letter in support of promotion by Dr. Henriken |
| 46 | BALA 0992 | BALA 0996 | Analysis of Education Performance, Dec. 2015 |
| 47 | OHSU_RB 001441 | OHSU_RB 001443 | Aggregate Evaluation Report – Student Evaluations, 12/17/15 |
| 48 | OHSU_RB 001797 | OHSU_RB 001797 | Letter in support of promotion by Dr. Hutchinson, 9/20/15 |
| 49 | OHSU_RB 001811 | OHSU_RB 001811 | Letter in support of promotion by Dr. Shah, 9/20/15 |
| 50 | OHSU_RB 001799 | OHSU_RB 001799 | Letter of reference for promotion by Dr. LeMond, 9/25/15 |
| 51 | OHSU_RB 001805 | OHSU_RB 001805 | Letter in support of promotion by Dr. Narayan, 9/29/15 |
| 52 | OHSU_RB 001800 | OHSU_RB 001801 | Letter in support of promotion by Dr. Marchlinski, 9/30/15 |
| 53 | OHSU_RB 001795 | OHSU_RB 001795 | Letter in support of promotion by Dr. Gerstenfeld, 10/24/15 |
| 54 | OHSU_RB 001780 | OHSU_RB 001782 | Letter recommending promotion by Dr. Fennerty, 12/5/15 |
| 55 | OHSU_RB 001807 | OHSU_RB 001808 | Letter in support of promotion by Dr. Patton, 12/11/15 |
| 56 | OHSU_RB 001735 | OHSU_RB 001738 | Letter by Dr. Anderson proposing appointment, 12/27/15 |
| 57 | OHSU_RB 001745 | OHSU_RB 001745 | Fellow Evaluations |
| 58 | BALA 1870 | BALA 1870 | Annual Faculty Evaluation, 2015-2016 |
| 59 | BALA 00193 | BALA 00195 | Personal statement in support of promotion |
| 60 | OHSU_RB 000099 | OHSU_RB 000099 | Annual salary increase, 7/1/16 |
| 61 | OHSU_RB 000010 | OHSU_RB 000010 | Appointment to Associate Professor, 7/1/16 |
| 62 | BALA 2028 | BALA 2028 | Cover of 'Tucson Lifestyle' |
| 63 | BALA 2034 | BALA 2036 | 2020 Top Doctors, 'Tucson Lifestyle,' June 2020 |
| 64 | BALA 2440 | BALA 2464 | CV of Rupa Bala |
| 65 | BALA 2469 | BALA 2470 | Exceptional Women in Medicine, 'Tucson Lifestyle,' March 2021 |
| 66 | OHSU_RB 000257 | OHSU_RB 000257 | Controlled Substance Registration Certificate, 7/21/13 |
| 67 | OHSU_RB 000258 | OHSU_RB 000258 | Medical Physician and Surgeon License, 9/24/01 |
| 68 | OHSU_RB 000259 | OHSU_RB 000259 | Certificate re Clinical Cardiac Electrophysiology, 2007-2017 |
| 69 | OHSU_RB 000260 | OHSU_RB 000260 | Certificate re Cardiovascular Disease, 2006-2016 |
| 70 | OHSU_RB 000261 | OHSU_RB 000261 | Medicinae Doctoris certificate |
| 71 | | | Revised – University of Chicago Residency Class, 1998 |
| 72 | BALA 2485 | BALA 2509 | CV of Rupa Bala, 10/2022 |
| 73 | | | Defendants' Response to Plaintiff's First Set of Interrogatories, 6/6/19 |
| 74 | | | Declaration of Dr. Rick Koch in Opposition to Defendant's Motion for Summary Judgment, 9/29/21 |
| 75 | OHSU_RB 004055 | OHSU_RB 004057 | Text messages between Dr. Dewland and Dr. Henrikson, 11/15/17-11/16/17 |
| 76 | OHSU_RB 004068 | OHSU_RB 004068 | Text messages between Ms. MacNeill and Dr. Henrikson, 9/12/17 |
| 77 | | | Excerpt of Dr. Henrikson deposition transcript, 8/7/20, pages 27-43 |
| 78 | VIRGINIAMASON 000030 | VIRGINIAMASON 000036 | Candidate notes, 8/25/17-9/25/17 |
| 79 | | | Excerpt of Dr. Bala deposition transcript, 7/28/20, pages 266-319 |
| 80 | BALA 000001 | BALA 000109 | 2016-2020 job search documents |
| 81 | BALA 1871 | BALA 2027 | August 2020 – November 2020 job search documents |
| 82 | BALA 2037 | BALA 2150 | December 2020 job search documents [*BALA 2028-2036 not included*] |
| 83 | BALA 1600 | BALA 1671 | February 2020 – June 2020 job search documents |
| 84 | BALA 2151 | BALA 2260 | January 2021 – February 2021 job search documents |
| 85 | BALA 2298 | BALA 2439 | September 2021 – October 2022 job search documents |

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 86 | BALA 2471 | BALA 2509 | November 2021 – June 2022 job search documents |
| 87 | BALA 2513 | BALA 2550 | January 2021 – June 2022 job search documents |
| 88 | | | List of job search efforts 2016-2022 with notes by Dr. Bala, updated 11/30/22 |
| 89 | BALA 2465 | BALA 2468 | Email string re position in Atlanta GA (Jackson Physicians), Aug. 2022 |
| 90 | BALA 1564 | BALA 1584 | Banner HR emails, Aug.-Oct. 2019 |
| 91 | BALA 1771 | BALA 1773 | Banner HR emails, 9/27/19 – 10/8/19 |
| 92 | BALA 1767 | BALA 1768 | Banner HR email string, 10/15/19 |
| 93 | BALA 1517 | BALA 1528 | Banner fellow evaluations |
| 94 | BALA 1784 | BALA 1788 | Banner comments/feedback |
| 95 | BALA 1592 | BALA 1596 | Banner emails and notice of termination |
| 96 | | | Banner Verbal discussion, typed notes (undated) |
| 97 | BALA 1481 | BALA 1483 | Banner emails/investigation |
| 98 | BALA 1484 | BALA 1513 | Dr. Bala's response to Banner verbal discussion, 7/24/19 |
| 99 | BALA 1516 | BALA 1516 | Corrective Action Guidelines for Banner Leaders |
| 100 | BANNER000272 | BANNER000275 | Typed notes of ER Consultant, 9/26/19 |
| 101 | BANNER000024 | BANNER000025 | Documented Verbal Discussion |
| 102 | BANNER000144 | BANNER000174 | Emails w/ Dr. Bala's response to verbal discussion, Aug.-Oct. 2019 |
| 103 | BANNER000337 | BANNER000340 | Dr. Bala email to Leadership, 9/2/19 |
| 104 | BANNER000175 | BANNER000196 | ER Investigation Report |
| 105 | BANNER000022 | BANNER000023 | Notice of termination, 1/17/20 |
| 106 | BANNER000001 | BANNER000021 | Physician Employment Agreement, 3/28/18 |
| 107 | BAAA 2674 | BAAA 2690 | Employment Agreement, UHS Medical Group, 2/8/21 |
| 108 | BALA 2261 | BALA 2297 | Employment Agreements, 8/6/21 and unsigned/undated |
| 109 | BALA 1322 | BALA 1322 | Form W-2, 2015 |
| 110 | BALA 1357 | BALA 1357 | Form W-2, 2016 |
| 111 | BALA 2876 | BALA 2877 | Form 1099s, 2017 |
| 112 | BALA 1412 | BALA 1412 | Form W-2, 2017 |
| 113 | BALA 1470 | BALA 1470 | Form W-2, 2018 (clean copy) |
| 114 | BALA 2879 | BALA 2879 | Form W-2, 2018 (photo copy) |
| 115 | BALA 2717 | BALA 2722 | Form W-2s, 2019-2021 |
| 116 | BALA 2881 | BALA 2881 | Form W-2, 2022 |
| 117 | BALA 2723 | BALA 2725 | Citrus Cardiology Employment Application, 11/14/22 |
| 118 | BALA 2726 | BALA 2727 | Citrus Cardiology offer letter, 10/14/22 |
| 119 | BALA 2728 | BALA 2744 | Physician Services Employment Agreement, Citrus Cardiology, 10/26/22 |
| 120 | BALA 2745 | BALA 2777 | Citrus Cardiology Employee Handbook |
| 121 | BALA 2778 | BALA 2825 | Citrus Cardiology 2023 Benefit Enrollment Guide |
| 122 | BALA 2826 | BALA 2854 | AAMC Faculty Salary Reports, FY 2021 |
| 123 | BALA 2855 | BALA 2873 | MGMA Physician Compensation Reports, FY 2021 |
| 124 | BALA 2623 | BALA 2673 | AAMC report: Exploring Salary Equity Among Medical School Leadership, Nov. 2022 |
| 125 | | | 2916 AAMC - 2020 Western - Compensation by Medical School Type (CS)-5 |
| 126 | | | 2917 AAMC - 2022 - Private Compensation by Medical School Type (CS)-8 |
| 127 | | | 2918 AAMC - 2022 - All schools - Compensation by Medical School Type (CS)-6 |
| 128 | | | 2919 AAMC - 2022 Public Schools - Compensation by Medical School |

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | | | Type (CS)-7 |
| 129 | | | 2920 AAMC 2021 - Western - Compensation by Medical School Type (CS)-4 |
| 130 | | | 2921 AAMC 2022 Western - Compensation by Medical School Type (CS)-2 |
| 131 | | | 2922 Rupa Bala CV – 2023 |
| 132 | | | Article 'Workforce in Crisis: Charting the Path Forward', in American College of Cardiology, 6/2/23 |
| 133 | | | Article 'Under the Radar: Visibility and the Effects of Discrimination Lawsuits in Small and Large Firms' in American Sociological Review, 2022 |
| 134 | | | Article 'By the numbers: How cardiologists have been affected by the COVID-19 pandemic' in Cardiovascular Business, 4/14/20 |
| 135 | | | 'Retaliation – Maike it Personal' on US EEOC website |
| 136 | | | Occupation profile for Cardiologists on O*Net OnLine |
| 137 | | | Occupational Outlook Handbook on US Bureau of Labor Statistics website, for Physicians and Surgeons |
| 138 | | | Ms. Broten's Case Notes, 9/30/23 – 10/7/23 |
| 139 | | | Ms. Broten's Case Notes, 10/8/23 – 11/28/23 |

# Expert Report of Leonard J. Henzke

**Dr. Rupa Bala**

V.

**Oregon Health & Science University, et al.**



1111 Third Avenue, Suite 2500
Seattle, WA 98101
**P (206) 689-2200**
F (206) 689-2209

800.729.7635    **ecgmc.com**

Exhibit 5
Page 1 of 24

## I.    Introduction

1.    I am Leonard J. Henzke, a partner in the Strategy and Business Advisory Division at ECG Management Consultants. I have been retained by Stoel Rives LLP, acting on behalf of its client Oregon Health & Science University ("OHSU") and its employees Drs. Charles Henrikson and Joaquin Cigarroa, in a case involving an employment discrimination dispute between a former physician employee ("Plaintiff") and Defendants OHSU, Dr. Charles Henrikson, and Dr. Joaquin Cigarroa (collectively, "Defendants" or "OHSU"). The former employee, Rupa Bala, M.D., practiced as an electrophysiologist, which is a subspecialty of the cardiology specialty.

2.    ECG is one of the largest consulting firms in the country that provides services to healthcare providers. In my 25 years at the firm, I have worked extensively with hospitals, physician groups, and integrated health systems on business matters related to physician compensation, physician group acquisitions, hospital-physician partnerships, and hospital service line planning, among other services. I have designed dozens of physician compensation plans for hospitals, health systems, and medical groups. I have also worked on dozens of physician group acquisitions that have involved analyzing historical levels of physician compensation and developing new physician compensation plans.

3.    I have authored many internal ECG and national publications pertaining to physician compensation and hospital/physician partnerships. Further, I have spoken frequently for national and regional healthcare associations, including state hospital associations and the American Medical Group Association. Finally, I regularly read industry publications and generally stay up to date on industry developments. A copy of my curriculum vitae is attached as Attachment 1.

4.    I have served as an expert witness in several disputes related to physician compensation and related matters.

- In 2018, I authored a report and was deposed on behalf of Franciscan Health System in the *State of Washington v. Franciscan Health System* case in the Western District of Washington, no. 3:17-cv-05690.
- In 2021, I authored a report and was deposed on behalf of Burt E. Schear, M.D. & Associates, Inc. in the *Burt E. Schear, M.D. & Associates, Inc., et al. v. Alliance Physicians, Inc. d/b/a Kettering Physicians Network, et al.* case in the Ohio Civil Division, no. 2020 CV 01820.



Exhibit 5
Page 2 of 24

- In 2022, I authored a report and was deposed on behalf of Michael D. Black, M.D., M.B.A. in the *Michael D. Black, M.D., M.B.A. v. Cables News Network Inc., Elizabeth Cohen, John Bonifield, Dana Ford, Anderson Cooper, and Kelly Robinson* case in the Florida Circuit Court, no. 502016CA001517XXXXMB.

5.  My firm is being paid for my services at my standard hourly rate of $680. I have enlisted the support of ECG staff in the preparation of this report; their billing rates range from $370 to $560 per hour. I authored this report and oversaw and approved all work performed by staff.

6.  I have reviewed documents provided by legal counsel in preparing this expert report, including those listed below. A comprehensive list of reviewed documents is included as Attachment 2.
    - Excerpts from Plaintiff's deposition in the case, dated July 28, 2020.
    - Excerpts from an "Initial Disclosures" document that provides a description of the damages categories that are being claimed.
    - Contracts, compensation data, benefits information, and other relevant information from the positions held by Plaintiff over the past decade.
    - Documents related to Plaintiff's income, including tax returns and W-2s.
    - Copies of Plaintiff's curriculum vitae.
    - Compensation statistic summaries produced by Plaintiff.

7.  Plaintiff alleges employment discrimination and that the nonrenewal of her contract with and departure from OHSU negatively impacted her career trajectory and her future earning potential.

8.  The remainder of this report summarizes my expert findings but does not attempt to make any legal conclusions related to Plaintiff's allegations. I reserve the right to amend, update, or supplement this report as the result of new developments, including the discovery of new evidence or new expert testimony.

## II.    Industry Standards Applicable to Physician Compensation

9.  Physicians are highly paid professionals who undergo many years of training to prepare them to provide patient care. Although they all attend medical school, compensation levels vary widely among physicians for a variety of reasons, including the level of specialty training, production variabilities, third-party reimbursement differences, practice setting, and other reasons. In my 25 years of experience designing physician compensation plans for



Exhibit 5
Page 3 of 24

health systems and medical groups, I have utilized several industry standards to design compensation plans and to ensure compensation is fair, appropriate, and commensurate with the market.

10.    One industry standard I utilize in my practice is to incorporate compensation benchmarks that reflect payments to like physicians in the **same specialty**. It is important to utilize benchmarks from the same specialty. Therefore, one cannot compare compensation for a cardiologist such as Plaintiff, for example, to compensation for a family practice physician. Compensation levels for specialists are generally higher than compensation levels for primary care physicians. This variance exists for a variety of reasons, including that specialists generally undergo longer training periods, are in higher demand, and generate higher levels of revenue.

11.    A second industry standard is to incorporate **multiple compensation surveys** to determine appropriate physician compensation levels. It is common to utilize surveys from organizations such as the Medical Group Management Association (MGMA), American Medical Group Association (AMGA), the Association of American Medical Colleges (AAMC), and my own firm (ECG Management Consultants). All of these organizations annually publish large national compensation surveys that include benchmarks for physician compensation within each reported specialty. The use of multiple surveys in an analysis increases the overall sample size of the physicians being evaluated and increases accuracy.

12.    A third industry standard is to utilize **surveys specific to the physician's employing entity**. The surveys above contain cohorts related to academic physicians (those employed by an academic medical center) and community physicians (those employed by hospitals, health systems and independent medical groups that include private practice clinics). Community physicians generally have only clinical responsibilities that involve providing care to patients, although some community physicians also provide administrative leadership. Academic physicians have a larger range of duties—clinical, teaching, research, and administrative responsibilities. Academic physicians generally produce less revenue relative to their community physician peers, and generally earn lower incomes. Plaintiff has been employed by both independent medical groups, including a private clinic, in a community physician setting, and academic medical centers in an academic physician setting. This distinction is very important for the purposes of this report.

13.    The third standard related to the employing entity outlined above is referenced in Plaintiff's testimony. In Plaintiff's testimony it appears she delineates between the academic positions she had at both OHSU and Banner, and what she defines as "private practice" jobs, which



Exhibit 5
Page 4 of 24

she notes have "high volume."[1] These categorizations she apparently utilizes correspond to the types of benchmarks I utilized in my analysis. The organizations in the academic benchmarks include large academic medical centers such as OHSU, which attract physicians interested in teaching, research, and clinical responsibilities. The organizations in the community benchmarks include independent private practice groups, hospitals, and health systems – all organizations that employ physicians who spend their time primarily in clinical practice.

14.    A fourth industry standard, which is applicable only to academic physicians, is to consider the **physician's academic title/position**. As physicians gain experience in an academic environment, they typically are promoted to progressively higher levels until they reach full professor, and in some cases, Division Chief or Department Chair. These promotions are generally aligned with progressively higher levels of compensation.

15.    A fifth standard, which is generally more applicable to community physicians, is to consider the correlation between **compensation and productivity**. Community physicians, such as those in private practice, are frequently paid using incentives that reward high levels of productivity, and a common phrase utilized in the industry is "market pay for market work." Therefore, physician compensation is generally considered fair if productivity and compensation are highly correlated within the specialty-specific benchmarks. In general, physicians are often paid at the low end of the spectrum in the initial term of new employment arrangements in a community setting. This is because it often takes several years to build a practice and generate high levels of revenue. This standard does not generally apply to academic physicians, as most academic medical centers do not heavily incentivize productivity.

### III.    Plaintiff's Compensation Was Within Market Range During Her Employment at OHSU and in Subsequent Employment Settings

16.    I utilized the standards in the aforementioned section of this report to outline benchmark compensation levels for the electrophysiology specialty. Table 1 below outlines a range of compensation rates for community physicians in the electrophysiology specialty using a blend of three industry surveys: MGMA, AMGA, and ECG. The table includes data from the most recently available versions of the relevant surveys. The composite benchmark represents the weighted average, based on sample size, of the three industry surveys utilized.

---

[1]    Plaintiff's testimony, page 274 line 1.

Exhibit 5
Page 5 of 24

**Table 1: Electrophysiology Median Benchmarks – Community Physicians**

| Specialty[2] | Median |
|---|---|
| MGMA | $726,428 |
| AMGA | $671,043 |
| ECG | $650,000 |
| Weighted Average | $683,841 |

17. Because Plaintiff has also worked for academic medical centers, I also gathered data related to benchmark compensation levels for academic physicians in the cardiology specialty. The most common survey utilized to benchmark academic physicians is from the Association of American Medical Colleges (AAMC), which encompasses data from thousands of physicians practicing in academic settings.

18. The AAMC survey does not report a benchmark for electrophysiology; as such, I utilized the benchmark for invasive-interventional cardiology, which I understand is consistent with OHSU practices. Table 2 below illustrates median levels of compensation for academic cardiologists at the assistant professor, associate professor, and professor levels. For this analysis, the most recent versions of the AAMC survey was utilized.

**Table 2: Cardiology: Invasive Interventional ─ Median Benchmarks ─ Academic Physicians**

| Benchmark Survey[3] | Assistant Professor: Median | Associate Professor: Median | Professor: Median |
|---|---|---|---|
| AAMC | $415,292 | $477,278 | $481,256 |

19. I utilized the benchmark data to compare Plaintiff's actual historical compensation to market. In conducting this analysis, I:

---

[2]   Source: Clinical compensation benchmarks are based on a respondent-weighted blend of MGMA Data-Dive 2023 Provider Compensation, 2022 Data for Cardiology: Electrophysiology; AMGA 2023 Medical Group Compensation and Productivity Survey for Cardiology-EP; and ECG 2023 Physician and APP Compensation Survey for Cardiology - Electrophysiology. See Exhibit I for additional details.

[3]   Source: Clinical compensation benchmarks are based on 2022 Data and AAMC Faculty Salary Report FY22 for Cardiology: Invasive Interventional-Med. See Exhibit II for additional details.



Exhibit 5
Page 6 of 24

- Utilized data from Plaintiff's contracts and other information provided (including tax forms) to determine her historical levels of compensation at each employing organization.

- Compiled benchmark data that corresponds to the contract year of each employing organization. For example, for the contract year 2018, I utilized data from the 2019 surveys (which includes data compiled from 2018).

- Utilized comparative benchmark data that corresponds to Plaintiff's employing entity. For years in which Plaintiff was employed by OHSU and Banner University Medical Group, I utilized academic benchmarks. For years in which Plaintiff was and is employed by United Medical Associates, PC and Citrus Cardiology Consultants, PA, I utilized community benchmarks.

The results from my analysis are illustrated in the table below:

### Table 3: Plaintiff's Historic Employment and Compensation[4]

| Employing Organization | Annual Compensation[5] | Benchmark | Benchmark Median[6,7] | Compensation: Percent of Benchmark Median |
|---|---|---|---|---|
| OHSU[8] | $409,000 | Academic – Associate Professor | $413,000 | 99% |
| Banner[9] | $450,000 | Academic – Associate Professor | $419,000 | 107% |

---

[4]   See Exhibit III for additional details.

[5]   Plaintiff's OHSU annual compensation figures are rounded to the nearest thousand.

[6]   Academic source: clinical compensation benchmarks are based on AAMC Faculty Salary Report FY22 for Cardiology: Invasive Interventional-Med. The year for each source corresponds with the employment year.

[7]   Community source: clinical compensation benchmarks are based on a respondent-weighted blend of MGMA DataDive 2023 Provider Compensation, 2022 Data for Cardiology: Electrophysiology; AMGA 2023 Medical Group Compensation and Productivity Survey for Cardiology-EP; and ECG 2023 Physician and APP Compensation Survey for Cardiology - Electrophysiology. The year for each source corresponds with the employment year.

[8]   OHSU annual compensation extracted from OHSU Emp Labor Dist Summary 2015 to 2017 for Plaintiff. 2017 base compensation data was annualized based on Plaintiff's termination date and one-time payments were treated as such.

[9]   Banner annual compensation extracted from addendum 3.1A Compensation plan exhibit in the Physician Employment Agreement (0485-01-67041).



Exhibit 5
Page 7 of 24

| Employing Organization | Annual Compensation[5] | Benchmark | Benchmark Median[6,7] | Compensation: Percent of Benchmark Median |
|---|---|---|---|---|
| United Medical Associates[10] | $500,000 | Community | $669,821 | 75% |
| Citrus Cardiology[11] | $525,000 | Community | $683,841 | 77% |

20.   As illustrated in the Table 3, Plaintiff's compensation at all four organizations is within a reasonable range of the median benchmark. Her compensation at both UMA and Citrus Cardiology is lower than the median, but this is aligned with industry norms at community physician groups (non-academic), which often pay a guaranteed salary (with no productivity incentives) for the first one to two years of employment. As previously mentioned, this type of provision provides a physician new to a community physician group, such as a private practice group, with time to build a practice and increase productivity. In most situations, the expectation is that a physician will build productivity levels during this period to a point where salaries will increase when physicians become eligible for productivity incentives. This is consistent with the situation at Plaintiff's current employer – she is paid a guarantee in the first 12 months of employment, but then is expected to transition into a productivity model that pays progressively higher levels of compensation at higher levels of productivity.

21.   Therefore, I conclude that Plaintiff was paid in accordance with market at all four organizations.

### IV.   Plaintiff's Earning Capacity Was Not Negatively Impacted by Her Departure from OHSU

22.   In her deposition, Plaintiff claims that "my termination at OHSU changed the actual trajectory of my career." She indicates that, had she stayed in academic medicine at OHSU, she might have one day been promoted to full professor and been considered for a Division Chief role. She also states in her deposition that her future earnings capacity was negatively impacted because of her departure from OHSU.[12] Plaintiff also stated in her deposition that she would not be against working in a high-volume private practice setting.[13]

---

[10]   United Medical Associates annual compensation was extracted from Exhibit B in the employment agreement dated 02/08/2021.

[11]   Citrus Cardiology Consultants annual compensation was extracted from the offer letter to Plaintiff on October 14, 2022.

[12]   Plaintiff's deposition, page 288, line 18, and page 297, line 7.

[13]   Plaintiff's deposition, page 274.



Exhibit 5
Page 8 of 24

23.    While my assessment and conclusions assume Plaintiff's assertion that she would have eventually been promoted to full professor and then Division Chief, I am not providing an opinion regarding the reasonableness or accuracy of her assertion. In reality, very few academic physicians ever attain the title of Division Chief, as many cardiology divisions are quite large and there is only one Chief per division (the current OHSU website lists 19 cardiologists in the division). Further, based on my expertise and familiarity with these arrangements, in most institutions the Division Chief position is held by an interventional cardiologist.

24.    To determine whether her assertions regarding her future earnings capacity are valid, I constructed two compensation scenarios for comparative purposes. Each compensation scenario projects total compensation for Plaintiff beginning with her employment at OHSU in 2015. The scenarios are as follows:

- "Actual" Scenario: The income (including take-home compensation and employer contributions to retirement) Plaintiff earned from OHSU, Banner, UMA, and Citrus Cardiology in 2015-2023, plus income expected to be earned in 2024-2038 (when she is expected to retire at age 65). I assume she remains at Citrus Cardiology for the remainder of her career.

- "But For" Scenario: Actual income (including take-home compensation and employer contributions to retirement) earned at OHSU in 2015-2017, plus projected income earned at OHSU in 2018-2038 had Plaintiff continued to work there (through an expected retirement age of 65).

25.    In the Actual scenario, the basis for the calculation of past and future income includes the following key assumptions, which are based on historical data and several assumptions:

- Contractual income levels are assumed through the end of 2023, which corresponds to the approximate date of this report. The compensation levels in the Citrus Cardiology contract were utilized for the period of 2022-2023.

- Plaintiff's income will increase to median benchmark levels in 2024 and will increase at a market rate of 2.4% per year until Plaintiff's income increases to 75th percentile



Exhibit 5
Page 9 of 24

benchmark levels in 2027.[14] Her compensation will continue to increase at a market rate of 2.4% per year from 2028 to 2038.[15]

- Plaintiff's actual total OHSU cash contributions to retirement from 2015 to 2017.[16]

- Plaintiff received benchmark median employer contributions to her retirement account(s) from Banner and UMA from 2018 to 2021.[17]

- Plaintiff will receive benchmark median employer contributions to her retirement account(s) from Citrus Cardiology from 2022 to 2038.[18]

26.     In the But For scenario, income is calculated based on a different set of assumptions:

- Actual cash compensation levels are assumed through 2017 when Plaintiff left OHSU.

- Plaintiff continues under an employment arrangement with OHSU, and cash compensation levels increase at a market rate of 3.0% through 2023, when I assume that Plaintiff is promoted to full professor. At this time, her cash compensation increases to the median benchmark level of full professor.[19]

- Cash compensation continues to increase at a market rate of 3.0% through 2027, when I assume Plaintiff is promoted to a cardiology Division Chief position. At this time her cash compensation increases to the median benchmark level of a Division Chief and increases at a 3.0% annual rate until she retires in 2038.

- Plaintiff's actual total OHSU cash contributions to retirement from 2015 to 2017.[20]

- OHSU continued to contribute to Plaintiff's retirement account at a rate of 7.9% of cash compensation.[21]

---

[14]    I believe it is appropriate to assume a level of the 75th percentile of compensation in 2027.   By this time, Plaintiff will have had several years to build her practice and her contract contains significant incentives to increase productivity.

[15]    The community market rate is based on the compound annual growth rate of 2.4% between 2017 and 2022 for median compensation in the community benchmarks; these benchmarks are based on MGMA DataDive Compensation for Cardiology: Electrophysiology, AMGA Medical Group Compensation and Productivity Survey for Cardiology-EP, and ECG Physician and APP Compensation Survey for Cardiology - Electrophysiology, utilizing the surveys/reports that provided 2017 and 2022 data.

[16]    Based on OHSU_RB 000609-OHSU_RB 000613, Pension Plan.pdf, provided by counsel. Details were not disclosed regarding OHSU's contribution to Plaintiff's account in 2015. For simplicity, I assumed the balance as of December 31, 2015 was OHSU's contribution for the year.

[17]    Based on median employer contributions to retirement from the 2019-2022 ECG Compensation and Productivity Surveys (based on 2018-2021 data).

[18]    Based on the approximate average median of employer contributions to retirement from the 2016-2022 ECG Compensation and Productivity Surveys (based on 2015-2021 data).

[19]    Based on the compound annual growth rate of 3.0% between 2017 and 2022 for median compensation in the academic benchmarks; these benchmarks are based on AAMC Faculty Salary Report, utilizing the reports that provided 2017 and 2022 data, for Cardiology: Invasive Interventional-Med.

[20]    See footnote 16.

[21]    Assumes OHSU continues to contribute to Plaintiff's retirement account at a rate of 7.9% of cash compensation, which is the three-year average of OHSU's contributions from 2015 to 2017.



Exhibit 5
Page 10 of 24

27.   Table 4 below illustrates projected total cash compensation and employer contributions to retirement from 2015 through 2038 under both scenarios.

- Total cash compensation for the Actual scenario is $2,464,000 higher than in the But For scenario.

- Total employer contributions to retirement for the Actual scenario is $69,000 lower than in the But For scenario.

- Together, Plaintiff receives $2,395,000 more income in the Actual scenario than in the But For scenario.

**Table 4: Projected Total Income and Employer Retirement Contributions[22]**

| Scenario | 2015-2023 | 2024-2038 | 2015-2038 |
|---|---|---|---|
| **Cash Compensation** | | | |
| Actual | $4,145,000 | $15,605,000 | $19,750,000 |
| But For | $3,922,000 | $13,364,000 | $17,286,000 |
| Variance | $223,000 | $2,241,000 | $2,464,000 |
| **Employer Retirement Contributions** | | | |
| Actual | $222,000 | $866,000 | $1,088,000 |
| But For | $233,000 | $924,000 | $1,157,000 |
| Variance | ($11,000) | ($58,000) | ($69,000) |
| **Grand Total** | | | |
| Actual | $4,367,000 | $16,471,000 | $20,838,000 |
| But For | $4,155,000 | $14,288,000 | $18,443,000 |
| Variance | $212,000 | $2,183,000 | $2,395,000 |

28.   Therefore, I conclude that Plaintiff's future earning potential is actually higher under the Actual scenario.

## V.   Conclusions

29.   In the documents provided by legal counsel, Plaintiff alleges that OHSU discriminated against Plaintiff and that Plaintiff's career trajectory and future earnings potential suffered as a result of OHSU's nonrenewal of her contract. After conducting an analysis that encompasses a projection of future earnings potential in contrasting Actual and But For scenarios,

---

[22]   See Exhibit IV for additional details.



Exhibit 5
Page 11 of 24

I have concluded that Plaintiff's future earnings capacity was not negatively impacted by her departure from OHSU. In fact, she was able to secure subsequent employment including her current position with a successful private practice group that projects to pay her more than she would be able to earn in an academic environment.

_____          November 1, 2023_____
Leonard J. Henzke                           Date

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company

Exhibit 5
Page 12 of 24

**Attachment 1**

**Curriculum Vitae: Leonard J. Henzke**

With 25 years of healthcare management consulting experience advising hospitals, health systems, and physician practices, Len possesses the ability to foster cooperation and build trust among the leadership of divergent healthcare organizations, which has been one of the cornerstones of his consulting career.

Len has worked closely with a variety of leading hospitals, health systems, and medical groups nationwide, directing engagements involving system and organizational strategic planning, hospital/medical group affiliations and transactions, and physician organization development and design. As a facilitator, Len has advanced numerous engagements between hospital executives and physicians in designing creative and effective alignment vehicles to further mutual goals, and his clients appreciate his ability to find common ground among stakeholders with competing interests. Len has led diverse transformative engagements, including the completion of a strategic integration plan for a large, independent community hospital and a regional health system that positioned the client for expansion into a new market; the facilitation of a merger of four independent multispecialty groups into a single group with over 700 physicians; and the development of an integrated employed physician network for a major health system that resulted in improved market share and physician alignment.

Len has led dozens of engagements that have involved working directly with individual physicians, including many related to transactions and affiliations as well as physician compensation. As a result, he is often called upon by hospital executives to explore partnerships with independent physicians and medical groups that ultimately improve alignment and relationships between physicians and hospital executives.

Prior to joining ECG, Len worked as a healthcare legislative aide for the US Senate Labor and Human Resources Committee.

With expertise in many areas, Len is a frequent speaker and author and has addressed regional, state, and national associations on issues related to hospital-physician alignment, physician compensation, accountable care organizations, physician call coverage arrangements, and compliance.

## Education
**University of Washington**
Master of Business Administration
Master of Health Administration

**College of William & Mary**
Bachelor of Arts

## Publications

- "Operationalizing Your Comanagement Arrangement: Major Steps and Common Pitfalls" (June 1, 2014), ecgmc.com.

- "The Fate of Physician-Owned Orthopedic ASCs: Independence or Integration?" (December 31, 2013), ecgmc.com.

- "Partnering with Orthopedists: Understanding the Options" (December 15, 2011), ecgmc.com.



Exhibit 5
Page 13 of 24

- "Disclosure of Financial Relationships Report" (*Compliance Today*, June 2008).
- "Organizational and Governance Structure for Employed Physician Networks" (February 29, 2008), ecgmc.com.
- "Solutions to Emergency Department Call Coverage Issues: Guidance for Payment Solutions" (*Compliance Today*, January 2008).
- "Solutions to Emergency Department Call Coverage Issues: The Office of Inspector General Provides Hospitals with Its First Guidance to Payment Solutions" (October 26, 2007), ecgmc.com.
- "Addressing the ED Call Coverage Crisis: What Hospital Leaders Can Do" (January 29, 2007), ecgmc.com.
- "Call of the Riled: addressing the financial impacts of ED call coverage" (*HFM Magazine*, January 2007).
- "They Call More Than They Visit: Improving Operations to Provide Excellent Telephone Service" (*Group Practice Journal*, February 2004).
- "What Boards Should Know About the Emerging Call Coverage Crisis" (*American Governance Leader*, April–May 2003).

## Speaking Engagements

- "Orthopedics—Trends in Hospital-Physician Alignment" (Washington State Orthopaedic Association Annual Meeting, November 17, 2012).
- "A Whole New Ball Game: Value-Based Physician Compensation" (Georgia Hospital Association, March 20, 2012).
- "A Whole New Ballgame: Value-Based Physician Compensation" (AMGA 2012 Annual Conference, March 8, 2012).
- "On-Call Compensation Data-Driven Solutions" (webcast, HCPro, December 6, 2011).
- "Hospital-Physician Alignment Trends" (Davis Wright Tremaine, October 5, 2011).
- "Current Trends in Physician Employment by System with an Emphasis on Compensation" (Association of Washington Public Hospital Districts—Government Agency Collaboration Project, June 10, 2011).
- "Making the Most of Hospital-Physician Alignment: Why Employment Is Not the Only Way" (Hospital & Physician Relations: An Executive Summit, October 26, 2010).
- "Cutting-Edge Physician-Hospital Relationship Models—An Examination of the Critical Legal and Business Issues" (Hospital & Physician Relations: An Executive Summit, October 25, 2010).
- "Multispecialty and Cardiology Group Acquisition Trends" (Northwest Medical Group Alliance Meeting, October 15, 2010).
- "Accountable Care Organizations: Case Studies and Physician Alignment Implications" (California HFMA Fall Conference, September 19, 2010).
- "Physician Compensation: Recent Trends and the Outlook for the Future" (Northwest Medical Group Alliance, December 4, 2009).



Exhibit 5
Page 14 of 24

- "Winning Strategies for Successfully Employing Physicians" (Voluntary Hospitals of America—West Coast, CFO/COO Group, August 6, 2009).

- "Physician Alignment Discussion" (Association of Washington Public Hospital Districts, June 12, 2009).

- "Hospital-Based Clinics & Medical Foundations" (Hooper Lundy & Bookman Health Leaders Conference, September 23, 2008).

- "Physician Employment Workshop" (Florida Hospital Association, April 4, 2008).

- "Hospital-Medical Staff Relations: Northwest Trends and Issues" (Washington State Hospital Association/Oregon Association of Hospitals and Health Systems, June 23, 2004).

- "Avoiding Catastrophe: A Guide to On-Call Coverage Issues" (Oregon Association of Hospitals and Health Systems, October 28, 2003).

## Webinars

- "Physician Compensation in a Value-Based World" (Telnet webinar, Georgia Hospital Association, February 27, 2014).

- "Value-Based Physician Compensation: Considerations in the Transition" (Association of Staff Physician Recruiters, April 24, 2013).

- "Critical Trends in Physician Compensation" (Georgia Hospital Association, February 10, 2011).

- "Specialist Employment Trends" (Georgia Hospital Association, January 18, 2011).

- "The Pay-for-Call Issue: What Hospital Executives Should Know" (Northern New England Association of Healthcare Executives, April 16, 2010).

- "The Physician Market—Compensation, Benefits, Recruiting, and Employment Trends" (Georgia Hospital Association, February 23, 2010).

- "Assessing FMV in Hospital-Physician Arrangements: What Healthcare Executives Should Know" (Georgia Hospital Association, January 28, 2010).

- "Winning Strategies for Successfully Employing Physicians" (Arizona Hospital and Healthcare Association, May 27, 2009).

- "Latest Trends in Physician Compensation, Benefits, and Recruiting" (Arizona Hospital and Healthcare Association, March 26, 2009).

- "Assessing FMV in Hospital-Physician Arrangements: What Healthcare Executives Should Know" (Georgia Hospital Association, February 19, 2009).

- "Assessing FMV in Hospital-Physician Arrangements: What Healthcare Executives Should Know" (World Research Group, July 23, 2008).

- "ED Call Coverage—OIG Speaks Out" (Telnet, March 11, 2008).

- "OIG Call Coverage" (Arizona Hospital and Healthcare Association, February 28, 2008).

- "Physician Governance within Integrated Delivery Systems" (Georgia Hospital Association, February 19, 2008).



Exhibit 5
Page 15 of 24

**Attachment 2**

Documents Provided to Physician Compensation Expert

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 1 | UPENN000450 | UPENN000455 | Clinical Practices of the University of Pennsylvania Department of Medicine Member Practice Agreement [Hospital Based Physician] |
| 2 | UPHS000194 | UPHS000195 | MOU for Joint Faculty Appointments at the Philadelphia Veterans Administration Medical Center and the University of Pennsylvania Schools of Medicine and Dentistry |
| 3 | UPHS000038 | UPHS000040 | Academic Plan for Rupa Bala, MD |
| 4 | OHSU_RB 000050 | OHSU_RB 000073 | Oregon Health & Science University Clinician Employment Agreement |
| 5 | BANNER000557 | BANNER000577 | Banner-University Medical Group Physician Employment Agreement |
| 6 | BAAA 2674 | BAAA 2691 | United Medical Associates PC Employment Agreement, 2/8/21 |
| 7 | BAAA 2692 | BAAA 2710 | United Medical Associates PC Employment Agreement, 8/6/21 |
| 8 | BALA 2728 | BALA 2744 | Citrus Cardiology Consultants P.A. Physician Services Employment Agreement |
| 9 | OHSU_RB 000026 | OHSU_RB 000048 | Rupa Bala, MD CV: 2014 |
| 10 | BANNER000579 | BANNER000604 | Rupa Bala, MD CV: 2015-2017 |
| 11 | ADVOCATE000004 | ADVOCATE000029 | Rupa Bala, MD CV: 2017 |
| 12 | BALA 000770 | BALA 000793 | Rupa Bala, MD CV: 2020 |
| 13 | BALA 2440 | BALA 2464 | Rupa Bala, MD CV: 2021 |
| 14 | BALA 2485 | BALA 2509 | Rupa Bala, MD CV: May 2022 |
| 15 | | | Excerpt of July 28, 2020 Deposition of Dr. Rupa Bala (pages 264-316) |
| 16 | | | Excerpt of Plaintiff's Initial Disclosures (pages 12-13) |
| 17 | BALA 000625 | BALA 000628 | OHSU Offer Letter, 7/16/14 |
| 18 | OHSU_RB 000015 | OHSU_RB 000016 | OHSU Position Description, Unclassified Academic Personnel |
| 19 | OHSU_RB 000614 | OHSU_RB 000620 | OHSU Employee History Detail, Rupa Bala |
| 20 | OHSU_RB 000386 | OHSU_RB 000472 | OHSU Group Medical Plan, PPO Plan, effective 1/1/17 |
| 21 | OHSU_RB 000338 | OHSU_RB 000382 | OHSU Oregon Group Dental Plan, Delta Dental Premier Plan B, effective 1/1/17 |
| 22 | BALA 0846 | BALA 0847 | OHSU communication re promotion, 4/13/15-4/14/15 |
| 23 | BALA 0193 | BALA 00195 | Personal Statement by Rupa Bala re promotion (OHSU) |
| 24 | OHSU_RB 001780 | OHSU_RB 001782 | OHSU Recommendation for Appointment to Associate Professor, 12/5/15 |
| 25 | OHSU_RB 000098 | OHSU_RB 000098 | OHSU Appointment to Associate Professor effective 1/1/16 |
| 26 | OHSU_RB 000099 | OHSU_RB 000099 | OHSU Annual Salary effective 7/1/16 |
| 27 | OHSU_RB 000853 | OHSU_RB 000853 | OHSU Monthly Benefit Contribution, 2015-2017 |
| 28 | OHSU_RB 000852 | OHSU_RB 000852 | OHSU Total Compensation, 2015-2017 |
| 29 | OHSU_RB 000609 | OHSU_RB 000613 | Fidelity Investments OHSU Pension Plan, Retirement Savings Statement: 1/1/16-5/3/19 |
| 30 | OHSU_RB 000605 | OHSU_RB 000608 | Fidelity Investments OHSU Tax Deferred Investment Plan, Retirement Savings Statement: 1/1/16-5/3/19 |
| 31 | OHSU_RB 000383 | OHSU_RB 000385 | OHSU Retirement Account Summary: 5/3/17-5/2/19 |
| 32 | BANNER000130 | BANNER000130 | Physician Recruitment - BUMG Physician Request Form |
| 33 | BANNER000079 | BANNER000080 | Banner Health Position Description, signed by Rupa Bala 4/11/18 |
| 34 | BANNER000087 | BANNER000087 | Banner Health New Hire Paperwork |
| 35 | BANNER000532 | BANNER000550 | Banner Health Payroll Report: 5/23/18-12/20/18 |
| 36 | BALA 2727 | BALA 2727 | Citrus Cardiology Consultants P.A. Offer Letter, 10/14/22 |
| 37 | BALA 2723 | BALA 2725 | Citrus Cardiology Consultants P.A. Employment Application, 11/14/22 |



Exhibit 5
Page 16 of 24

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 38 | BALA 2778 | BALA 2825 | Citrus Cardiology Consultants P.A. Benefit Enrollment Guide, 2023 |
| 39 | BALA 1290 | BALA 1470 | Rupa Bala Tax Returns: 2015-2018 |
| 40 | BALA 2551 | BALA 2622 | Rupa Bala Tax Returns: 2019-2021 |
| 41 | OHSU_RB000324 | OHSU_RB000324 | OHSU W-2: 2015 |
| 42 | OHSU_RB000323 | OHSU_RB000323 | OHSU W-2: 2016 |
| 43 | BALA 2876 | BALA 2877 | 1099-MISC: 2017 (Medtronic Logistics & Quality Conferences) |
| 44 | OHSU_RB000325 | OHSU_RB000325 | OHSU W-2: 2017 |
| 45 | BANNER000500 | BANNER000501 | Banner-Univ Med Group W-2: 2018 |
| 46 | BANNER000502 | BANNER000503 | Banner-Univ Med Group W-2: 2019 |
| 47 | BAAA 2719 | BAAA 2720 | Banner-Univ Med Group W-2: 2020 |
| 48 | BAAA 2721 | BAAA 2721 | United Medical Associates, PC W-2: 2021 |
| 49 | BAAA 2283 | BAAA 2284 | United Medical Associates, PC W-2: 2022 |
| 50 | BALA 2826 | BALA 2854 | AAMC Faculty Salary Report, FY 2021: Summary Statistics |
| 51 | BALA 2855 | BALA 2873 | MGMA Physician Compensation Reports, 2021 |
| 52 | | | FRCP 26. Duty to Disclose; General Provisions Governing Discovery (Rule Text & Notes of Decisions) |
| 53 | | | Exhibit A to Amended Stipulated Protective Order, signed 10/13/23 |

**ECG** MANAGEMENT CONSULTANTS
A Siemens Healthineers Company

EST 1973

Exhibit 5
Page 17 of 24

EXHIBIT I

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: Community**

[1] **MGMA**

| Data Year | Specialty | Count | | 25th | | Median | | 75th | MGMA Blend Weight |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | Cardiology: Electrophysiology | 526 | $ | 585,043 | $ | 726,428 | $ | 932,612 | 33% |
| 2021 | Cardiology: Electrophysiology | 596 | $ | 552,106 | $ | 691,737 | $ | 883,540 | 39% |
| 2020 | Cardiology: Electrophysiology | 542 | $ | 545,527 | $ | 670,956 | $ | 842,467 | 41% |
| 2019 | Cardiology: Electrophysiology | 485 | $ | 554,637 | $ | 683,692 | $ | 842,945 | 43% |
| 2018 | Cardiology: Electrophysiology | 411 | $ | 512,478 | $ | 639,828 | $ | 797,745 | 40% |
| 2017 | Cardiology: Electrophysiology | 449 | $ | 501,531 | $ | 617,220 | $ | 754,591 | 45% |

[2] **AMGA**

| Data Year | Specialty | Count | | 25th | | Median | | 75th | AMGA Blend Weight |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | Cardiology - EP | 690 | $ | 528,177 | $ | 671,043 | $ | 847,649 | 43% |
| 2021 | Cardiology - EP | 583 | $ | 513,864 | $ | 651,300 | $ | 789,090 | 38% |
| 2020 | Cardiology - EP | 522 | $ | 499,990 | $ | 621,929 | $ | 782,811 | 39% |
| 2019 | Cardiology - EP | 449 | $ | 516,198 | $ | 636,899 | $ | 816,191 | 39% |
| 2018 | Cardiology - EP | 442 | $ | 477,693 | $ | 594,745 | $ | 750,738 | 43% |
| 2017 | Cardiology - EP | 388 | $ | 498,876 | $ | 580,868 | $ | 716,991 | 39% |

[3] **ECG**

| Data Year | Specialty | Count | | 25th | | Median | | 75th | ECG Blend Weight |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 401 | $ | 508,463 | $ | 650,000 | $ | 822,080 | 25% |
| 2021 | Cardiology - Electrophysiology | 366 | $ | 532,369 | $ | 663,633 | $ | 807,509 | 24% |
| 2020 | Cardiology - Electrophysiology | 270 | $ | 511,515 | $ | 627,358 | $ | 763,074 | 20% |
| 2019 | Cardiology - Electrophysiology | 207 | $ | 530,444 | $ | 646,453 | $ | 833,014 | 18% |
| 2018 | Cardiology - Electrophysiology | 169 | $ | 457,778 | $ | 613,934 | $ | 837,037 | 17% |
| 2017 | Cardiology - Electrophysiology | 164 | $ | 516,584 | $ | 645,483 | $ | 810,922 | 16% |

[4] **Data Source Blend**

| Data Year | Specialty | Count | | 25th | | Median | | 75th | Data Source Blend Weight |
|---|---|---|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 1,617 | $ | 541,786 | $ | 683,841 | $ | 868,946 | 100% |
| 2021 | Cardiology - Electrophysiology | 1,545 | $ | 533,000 | $ | 669,821 | $ | 829,888 | 100% |
| 2020 | Cardiology - Electrophysiology | 1,334 | $ | 520,824 | $ | 642,947 | $ | 803,054 | 100% |
| 2019 | Cardiology - Electrophysiology | 1,141 | $ | 535,122 | $ | 658,522 | $ | 830,615 | 100% |
| 2018 | Cardiology - Electrophysiology | 1,022 | $ | 488,389 | $ | 616,048 | $ | 783,913 | 100% |
| 2017 | Cardiology - Electrophysiology | 1,001 | $ | 502,968 | $ | 607,760 | $ | 749,246 | 100% |

[1] MGMA DataDive 2018-2023 Provider Compensation, 2017-2022 Data, for Cardiology: Electrophysiology.
[2] AMGA *2018-2023 Medical Group Compensation and Productivity Surveys* for Cardiology-EP.
[3] ECG *2018-2023 Physician and APP Compensation Surveys* for Cardiology-Electrophysiology.
[4] Respondent-weighted blend.



EXHIBIT II

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: Academic**

[1] **AAMC**

| Data Year | Specialty | Rank | Count | 25th | Median | 75th |
|---|---|---|---|---|---|---|
| 2022 | Cardiology: Invasive Interventional-Med. | Instructor | 27 | $ 162,556 | $ 343,000 | $ 449,218 |
| 2022 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 434 | $ 347,994 | $ 415,292 | $ 537,550 |
| 2022 | Cardiology: Invasive Interventional-Med. | Associate Professor | 318 | $ 411,102 | $ 477,278 | $ 585,704 |
| 2022 | Cardiology: Invasive Interventional-Med. | Professor | 262 | $ 410,665 | $ 481,256 | $ 611,464 |
| 2022 | Cardiology: Invasive Interventional-Med. | Chief | 22 | $ 554,160 | $ 716,205 | $ 836,677 |
| 2021 | Cardiology: Invasive Interventional-Med. | Instructor | 32 | $ 182,900 | $ 347,000 | $ 442,887 |
| 2021 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 464 | $ 333,208 | $ 400,003 | $ 520,333 |
| 2021 | Cardiology: Invasive Interventional-Med. | Associate Professor | 321 | $ 381,436 | $ 450,903 | $ 563,107 |
| 2021 | Cardiology: Invasive Interventional-Med. | Professor | 280 | $ 388,184 | $ 455,804 | $ 569,404 |
| 2021 | Cardiology: Invasive Interventional-Med. | Chief | 19 | $ 613,349 | $ 738,878 | $ 1,020,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Instructor | 37 | $ 276,000 | $ 371,000 | $ 457,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 429 | $ 322,000 | $ 385,000 | $ 498,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Associate Professor | 296 | $ 372,000 | $ 455,000 | $ 555,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Professor | 258 | $ 360,000 | $ 441,000 | $ 547,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Chief | 23 | $ 599,000 | $ 700,000 | $ 1,024,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Instructor | 27 | $ 230,000 | $ 337,000 | $ 437,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 427 | $ 300,000 | $ 380,000 | $ 500,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Associate Professor | 289 | $ 354,000 | $ 440,000 | $ 540,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Professor | 250 | $ 361,000 | $ 433,000 | $ 524,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Chief | 24 | $ 548,000 | $ 611,000 | $ 723,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Instructor | 17 | $ 240,000 | $ 350,000 | $ 452,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 423 | $ 299,000 | $ 374,000 | $ 492,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Associate Professor | 295 | $ 342,000 | $ 419,000 | $ 512,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Professor | 250 | $ 351,000 | $ 419,000 | $ 514,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Chief | 27 | $ 517,000 | $ 646,000 | $ 695,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Instructor | 29 | $ 236,000 | $ 275,000 | $ 473,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 522 | $ 281,000 | $ 358,000 | $ 475,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Associate Professor | 309 | $ 340,000 | $ 413,000 | $ 511,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Professor | 239 | $ 347,000 | $ 415,000 | $ 520,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Chief | 30 | $ 500,000 | $ 633,000 | $ 731,000 |

[1] Clinical compensation benchmarks are based on AAMC *Faculty Salary Reports, FY 2017-2022* , for Cardiology: Invasive Interventional-Med.



Exhibit 5
Page 19 of 24

EXHIBIT III

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Plaintiff's Historical Compensation to Market Comparison**

| Employer | Employment Year | Benchmark [1,2] | Dr. Bala Annual Compensation | Benchmark Median | Dr. Bala's Compensation: Percentage of Benchmark Median |
|---|---|---|---|---|---|
| [3] OHSU | 2017 | Associate Professor | $ 409,000 | $ 413,000 | 99% |
| [4] Banner Medical Group | 2018 | Associate Professor | $ 450,000 | $ 419,000 | 107% |
| [5] United Medical Associates | 2021 | Community | $ 500,000 | $ 669,821 | 75% |
| [6] Citrus Cardiology | 2022 | Community | $ 525,000 | $ 683,841 | 77% |

Note: Dr. Bala's OHSU annual compensation figures are rounded to the nearest thousand.

[1] OHSU and Banner compensation benchmarking is based on academic clinical compensation benchmarks from *AAMC Faculty Salary Report* for Cardiology: Invasive Interventional-Med., associate professor. The year for each source corresponds with the employment year.

[2] United Medical Associates and Citrus Cardiology compensation is based on community clinical compensation benchmarks using a respondent-weighted blend of MGMA DataDive Provider Compensation for Cardiology: Electrophysiology; AMGA *Medical Group Compensation and Productivity Survey* for Cardiology-EP; and ECG *Physician and APP Compensation Survey* for Cardiology-Electrophysiology. The year for each source corresponds with the employment year.

[3] OHSU annual compensation extracted from "OHSU Emp Labor Dist Summary 2015 to 2017" for Dr. Bala; 2017 base compensation data was annualized based on Dr. Bala's termination date, and onetime payments were treated as such.

[4] Banner Medical Group annual compensation extracted from addendum 3.1A Compensation plan exhibit in the Physician Employment Agreement (0485-01-67041).

[5] United Medical Associates annual compensation was extracted from Exhibit B in the employment agreement dated February 8, 2021.

[6] Citrus Cardiology Consults annual compensation was extracted from the offer letter to Dr. Bala on October 14, 2022.

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973

Exhibit 5
Page 20 of 24

EXHIBIT IV

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Projected Total Compensation and Benefits Scenarios**

| Key Assumptions | | | |
|---|---|---|---|
| Measure | Assumption | | Notes |
| [1] Compensation Growth Rate: Community Benchmarks | 2.4% | | *2017 to 2022 CAGR* |
| [2] Compensation Growth Rate: Academic Benchmarks | 3.0% | | *2017 to 2022 CAGR* |
| [3] Increase to Median Compensation | 2024 | Median | $716,876 | *Actual scenario* |
| [4] Increase to 75th Percentile | 2027 | 75th Percentile | $977,723 | *Actual scenario* |
| [5] Promotion to Full Professor | 2023 | Median | $495,702 | *But For scenario* |
| [6] Promotion to Chief | 2027 | Median | $830,345 | *But For scenario* |
| [7] Employer Contribution to Retirement as a % of Cash Compensation: Actual 2015–2017 | | | |
| [7] Employer Contribution to Retirement as a % of Cash Compensation: Actual 2018–2023 | ECG Median | | *Informed by IRS limitations* |
| [8] Employer Contribution to Retirement as a % of Cash Compensation: Actual 2023–2038 | ECG Average Median 2015–2023 | | *Informed by IRS limitations* |
| [9] Employer Contribution as a % of Cash Compensation: But For 2015–2017 | Reported Actuals | | *401(a) contributions by OHSU* |
| [7] Employer Contribution as a % of Cash Compensation: But For 2018–2038 | Average OHSU Contributions 2015–2017 | | *Informed by IRS limitations* |

| Analysis Takeaways | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2015 to 2023 | | | 2024 to 2038 | | | 2015 to 2038 | | |
| Scenario | Total Cash Compensation | Total Employer Retirement Contributions | Total Cash Compensation + Total Employer Retirement Contributions | Total Cash Compensation | Total Employer Retirement Contributions | Total Cash Compensation + Total Employer Retirement Contributions | Total Cash Compensation | Total Employer Retirement Contributions | Total Cash Compensation + Total Employer Retirement Contributions |
| Actual | $ 4,145,000 | $ 222,000 | $ 4,367,000 | $ 15,605,000 | $ 866,000 | $ 16,471,000 | $ 19,750,000 | $ 1,088,000 | $ 20,838,000 |
| But For | 3,922,000 | 233,000 | 4,155,000 | 13,364,000 | 924,000 | 14,288,000 | 17,286,000 | 1,157,000 | 18,443,000 |
| Variance | $ 223,000 | $ (11,000) | $ 212,000 | $ 2,241,000 | $ (58,000) | $ 2,183,000 | $ 2,464,000 | $ (69,000) | $ 2,395,000 |

| Detailed Analysis | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Actual | | | But For | | Variance | | |
| | | | | Cash Compensation | | | Cash Compensation | | Cash Compensation | |
| Year | Employing Organization: Actual Scenario | Employing Organization: But For Scenario | Cash Compensation | Employer Retirement Contributions | + Employer Retirement Contributions | Cash Compensation | Employer Retirement Contributions | + Employer Retirement Contributions | Cash Compensation | Employer Retirement Contributions | + Employer Retirement Contributions |
| 2015 | OHSU | OHSU | $ 398,000 | $ 31,000 | $ 429,000 | $ 398,000 | $ 31,000 | $ 429,000 | $ - | $ - | $ - |
| 2016 | OHSU | OHSU | 383,000 | 32,000 | 415,000 | 383,000 | 32,000 | 415,000 | - | - | - |
| 2017 | OHSU | OHSU | 409,000 | 31,000 | 440,000 | 409,000 | 31,000 | 440,000 | - | - | - |
| 2018 | Banner Medical Group | OHSU | 450,000 | 18,000 | 468,000 | 421,000 | 22,000 | 443,000 | 29,000 | (4,000) | 25,000 |
| 2019 | Banner Medical Group | OHSU | 464,000 | 20,000 | 484,000 | 434,000 | 22,000 | 456,000 | 30,000 | (2,000) | 28,000 |
| 2020 | Banner Medical Group | OHSU | 478,000 | 23,000 | 501,000 | 447,000 | 22,000 | 469,000 | 31,000 | 1,000 | 32,000 |
| 2021 | United Medical Associates | OHSU | 500,000 | 23,000 | 523,000 | 460,000 | 23,000 | 483,000 | 40,000 | - | 40,000 |
| 2022 | Citrus Cardiology | OHSU | 525,000 | 21,000 | 546,000 | 474,000 | 24,000 | 498,000 | 51,000 | (3,000) | 48,000 |
| 2023 | Citrus Cardiology | OHSU | 538,000 | 23,000 | 561,000 | 496,000 | 26,000 | 522,000 | 42,000 | (3,000) | 39,000 |
| 2024 | Citrus Cardiology | OHSU | 717,000 | 26,000 | 743,000 | 511,000 | 29,000 | 540,000 | 206,000 | (3,000) | 203,000 |
| 2025 | Citrus Cardiology | OHSU | 734,000 | 29,000 | 763,000 | 526,000 | 32,000 | 558,000 | 208,000 | (3,000) | 205,000 |
| 2026 | Citrus Cardiology | OHSU | 752,000 | 32,000 | 784,000 | 542,000 | 36,000 | 578,000 | 210,000 | (4,000) | 206,000 |
| 2027 | Citrus Cardiology | OHSU | 978,000 | 36,000 | 1,014,000 | 830,000 | 40,000 | 870,000 | 148,000 | (4,000) | 144,000 |
| 2028 | Citrus Cardiology | OHSU | 1,001,000 | 40,000 | 1,041,000 | 855,000 | 45,000 | 900,000 | 146,000 | (5,000) | 141,000 |
| 2029 | Citrus Cardiology | OHSU | 1,025,000 | 45,000 | 1,070,000 | 881,000 | 50,000 | 931,000 | 144,000 | (5,000) | 139,000 |
| 2030 | Citrus Cardiology | OHSU | 1,049,000 | 50,000 | 1,099,000 | 907,000 | 56,000 | 963,000 | 142,000 | (6,000) | 136,000 |
| 2031 | Citrus Cardiology | OHSU | 1,074,000 | 56,000 | 1,130,000 | 934,000 | 62,000 | 996,000 | 140,000 | (6,000) | 134,000 |
| 2032 | Citrus Cardiology | OHSU | 1,100,000 | 62,000 | 1,162,000 | 962,000 | 70,000 | 1,032,000 | 138,000 | (8,000) | 130,000 |
| 2033 | Citrus Cardiology | OHSU | 1,126,000 | 69,000 | 1,195,000 | 991,000 | 78,000 | 1,069,000 | 135,000 | (9,000) | 126,000 |
| 2034 | Citrus Cardiology | OHSU | 1,153,000 | 77,000 | 1,230,000 | 1,021,000 | 80,000 | 1,101,000 | 132,000 | (3,000) | 129,000 |
| 2035 | Citrus Cardiology | OHSU | 1,181,000 | 83,000 | 1,264,000 | 1,052,000 | 83,000 | 1,135,000 | 129,000 | - | 129,000 |
| 2036 | Citrus Cardiology | OHSU | 1,209,000 | 85,000 | 1,294,000 | 1,084,000 | 85,000 | 1,169,000 | 125,000 | - | 125,000 |
| 2037 | Citrus Cardiology | OHSU | 1,238,000 | 87,000 | 1,325,000 | 1,117,000 | 88,000 | 1,205,000 | 121,000 | (1,000) | 120,000 |
| 2038 | Citrus Cardiology | OHSU | 1,268,000 | 89,000 | 1,357,000 | 1,151,000 | 90,000 | 1,241,000 | 117,000 | (1,000) | 116,000 |
| Variance | | | $ 19,750,000 | $ 1,088,000 | $ 20,838,000 | $ 17,286,000 | $ 1,157,000 | $ 18,443,000 | $ 2,464,000 | $ (69,000) | $ 2,395,000 |

Note: Figures are rounded to the nearest thousand.

[1] The community market rate is based on the compound annual growth rate of 2.4% between 2017 to 2022 for median compensation in the community benchmarks; these benchmarks are based on MGMA DataDive Compensation for Cardiology: Electrophysiology, AMGA *Medical Group Compensation and Productivity Survey* for Cardiology-EP, and ECG *Physician and APP Compensation Survey* for Cardiology-Electrophysiology, utilizing the surveys/reports that provided 2017 and 2022 data.

[2] The academic market rate is based on the compound annual growth rate of 3.0% between 2017 to 2022 for median compensation in the academic benchmarks; these benchmarks are based on AAMC *Faculty Salary Report* for Cardiology: Invasive Interventional-Med., utilizing the reports that provided 2017 and 2022 data.

[3] Clinical compensation benchmarks are based on a respondent-weighted blend of MGMA DataDive 2023 Provider Compensation, 2022 Data for Cardiology: Electrophysiology; AMGA 2023 *Medical Group Compensation and Productivity Survey* for Cardiology-EP; and ECG *2023 Physician and APP Compensation Survey* for Cardiology-Electrophysiology. Due to the latest benchmarks being based on 2022 data, the compensation annual growth rate of 2.4% per year was applied to estimate median compensation in 2024.

[4] Clinical compensation benchmarks are based on a respondent-weighted blend of MGMA DataDive 2023 Provider Compensation, 2022 Data for Cardiology: Electrophysiology; AMGA 2023 *Medical Group Compensation and Productivity Survey* for Cardiology-EP; and ECG *2023 Physician and APP Compensation Survey* for Cardiology-Electrophysiology. Due to the latest benchmarks being based on 2022 data, the compensation annual growth rate of 2.4% per year was applied to estimate median compensation in 2024.

[5] Clinical compensation benchmarks are based on based on AAMC *Faculty Salary Report, FY 2022,* for Cardiology: Invasive Interventional-Med., professor; the compensation annual growth rate of 3.0% per year was applied to estimate median compensation in 2023.

[6] Clinical compensation benchmarks are based on based on AAMC *Faculty Salary Report, FY 2022,* for Cardiology: Invasive Interventional-Med., chief; the compensation annual growth rate of 3.0% per year was applied to estimate median compensation in 2023.

[7] Based on OHSU, RB 000609-OHSU, RB 000613 "Pension Plan.pdf" provided by counsel. Details were not disclosed regarding OHSU's contribution to Dr. Bala's account in 2015. For simplicity, I assumed the balance as of December 31, 2015, is OHSU's contribution for the year. For 2018 to 2038, I assumed OHSU would continue contributing to Dr. Bala's retirement account(s) at a rate of 7.9% of total cash compensation, which is the three-year average of OHSU's contributions from 2015 to 2017.

[8] 2018 to 2021 is based on median employer contributions to retirement from the 2019-2023 ECG *Physician and APP Compensation Surveys* (based on 2018-2021 data). 2023 to 2038 is based on the approximate average of median employer contributions to retirement from 2016 to 2022 ECG Compensation and Productivity Surveys (based on 2015 to 2021 data).

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973 50

Exhibit 5
Page 21 of 24

EXHIBIT V

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Employment Setting**

[1] MGMA

**Physician Owned**

| Data Year | Specialty | Count | 25th | Median | 75th | MGMA Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology: Electrophysiology | 42 | $ 583,426 | $ 863,076 | $ 1,050,370 | 39% |
| 2021 | Cardiology: Electrophysiology | 48 | $ 541,009 | $ 717,337 | $ 1,017,425 | 44% |
| 2020 | Cardiology: Electrophysiology | 52 | $ 537,536 | $ 655,997 | $ 874,713 | 47% |
| 2019 | Cardiology: Electrophysiology | 52 | $ 486,714 | $ 600,000 | $ 789,345 | 44% |
| 2018 | Cardiology: Electrophysiology | 51 | $ 507,487 | $ 603,114 | $ 752,037 | 45% |

**Hospital Employed**

| Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology: Electrophysiology | 465 | $ 589,657 | $ 722,292 | $ 930,132 | 33% |
| 2021 | Cardiology: Electrophysiology | 521 | $ 565,439 | $ 692,052 | $ 870,085 | 40% |
| 2020 | Cardiology: Electrophysiology | 467 | $ 547,317 | $ 671,543 | $ 831,368 | 41% |
| 2019 | Cardiology: Electrophysiology | 408 | $ 563,734 | $ 693,095 | $ 865,941 | 43% |
| 2018 | Cardiology: Electrophysiology | 344 | $ 521,635 | $ 645,007 | $ 824,197 | 41% |

[2] AMGA

**Private Practice**

| Data Year | Specialty | Count | 25th | Median | 75th | AMGA Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - EP | 65 | $ 490,740 | $ 619,426 | $ 795,198 | 61% |
| 2021 | Cardiology - EP | 61 | $ 496,254 | $ 646,581 | $ 825,027 | 56% |
| 2020 | Cardiology - EP | 58 | $ 455,052 | $ 560,191 | $ 693,750 | 53% |
| 2019 | Cardiology - EP | 67 | $ 558,013 | $ 636,899 | $ 814,446 | 56% |
| 2018 | Cardiology - EP | 62 | $ 491,909 | $ 631,231 | $ 749,767 | 55% |

**Hospital Employed**

| Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - EP | 625 | $ 531,028 | $ 676,977 | $ 857,747 | 45% |
| 2021 | Cardiology - EP | 522 | $ 515,202 | $ 654,824 | $ 787,091 | 40% |
| 2020 | Cardiology - EP | 464 | $ 502,701 | $ 635,229 | $ 797,783 | 41% |
| 2019 | Cardiology - EP | 382 | $ 512,189 | $ 635,732 | $ 815,655 | 40% |
| 2018 | Cardiology - EP | 380 | $ 474,169 | $ 586,286 | $ 750,674 | 45% |

[3] ECG

**Private Practice**

| Data Year | Specialty | Count | 25th | Median | 75th | ECG Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 1 | $ - | $ - | $ - | 0% |
| 2021 | Cardiology - Electrophysiology | 3 | $ - | $ - | $ - | 0% |
| 2020 | Cardiology - Electrophysiology | 3 | $ - | $ - | $ - | 0% |
| 2019 | Cardiology - Electrophysiology | 3 | $ - | $ - | $ - | 0% |
| 2018 | Cardiology - Electrophysiology | 2 | $ - | $ - | $ - | 0% |

**Hospital Employed**

| Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 303 | $ 546,885 | $ 667,863 | $ 838,778 | 22% |
| 2021 | Cardiology - Electrophysiology | 271 | $ 565,439 | $ 689,853 | $ 994,623 | 20% |
| 2020 | Cardiology - Electrophysiology | 210 | $ 542,076 | $ 653,817 | $ 787,089 | 18% |
| 2019 | Cardiology - Electrophysiology | 161 | $ 540,421 | $ 646,453 | $ 833,014 | 17% |
| 2018 | Cardiology - Electrophysiology | 115 | $ 537,630 | $ 641,973 | $ 883,759 | 14% |

[4] Data Source Blend

**Private Practice**

| Data Year | Specialty | Count | 25th | Median | 75th | Data Source Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 107 | $ 527,121 | $ 715,064 | $ 895,359 | 100% |
| 2021 | Cardiology - Electrophysiology | 109 | $ 515,963 | $ 677,740 | $ 909,753 | 100% |
| 2020 | Cardiology - Electrophysiology | 110 | $ 494,044 | $ 605,481 | $ 779,296 | 100% |
| 2019 | Cardiology - Electrophysiology | 119 | $ 526,857 | $ 620,775 | $ 803,477 | 100% |
| 2018 | Cardiology - Electrophysiology | 113 | $ 498,940 | $ 618,541 | $ 750,792 | 100% |

**Hospital Employed**

| Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 1,393 | $ 554,048 | $ 690,121 | $ 877,784 | 100% |
| 2021 | Cardiology - Electrophysiology | 1,314 | $ 545,482 | $ 676,809 | $ 862,800 | 100% |
| 2020 | Cardiology - Electrophysiology | 1,141 | $ 528,209 | $ 653,513 | $ 809,561 | 100% |
| 2019 | Cardiology - Electrophysiology | 951 | $ 539,082 | $ 662,157 | $ 840,168 | 100% |
| 2018 | Cardiology - Electrophysiology | 839 | $ 502,329 | $ 617,995 | $ 799,061 | 100% |

[1] Clinical compensation benchmarks are based on MGMA DataDive 2019-2023 Provider Compensation, 2018-2022 Data for Cardiology: Electrophysiology.
[2] Clinical compensation benchmarks are based on AMGA *2019-2023 Medical Group Compensation and Productivity Surveys* for Cardiology-EP.
[3] Clinical compensation benchmarks are based on ECG *2019-2023 Physician and APP Compensation Surveys* for Cardiology-Electrophysiology.
[4] Respondent-weighted blend.



Exhibit 5
Page 22 of 24

EXHIBIT VI

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Region**

## MGMA [1]

| Data Year | Region | Specialty | Count | 25th | Median | 75th | MGMA Blend Weight |
|---|---|---|---|---|---|---|---|
| 2022 | Eastern | Cardiology: Electrophysiology | 129 | $ 480,466 | $ 596,476 | $ 710,615 | 36% |
| 2022 | Midwest | Cardiology: Electrophysiology | 104 | $ 609,483 | $ 709,465 | $ 904,375 | 25% |
| 2022 | Southern | Cardiology: Electrophysiology | 184 | $ 685,766 | $ 862,886 | $ 1,050,988 | 38% |
| 2022 | Western | Cardiology: Electrophysiology | 109 | $ 629,051 | $ 741,912 | $ 962,799 | 31% |
| 2021 | Eastern | Cardiology: Electrophysiology | 140 | $ 468,929 | $ 586,375 | $ 693,924 | 40% |
| 2021 | Midwest | Cardiology: Electrophysiology | 149 | $ 568,481 | $ 690,757 | $ 849,719 | 33% |
| 2021 | Southern | Cardiology: Electrophysiology | 198 | $ 606,527 | $ 799,083 | $ 1,056,504 | 50% |
| 2021 | Western | Cardiology: Electrophysiology | 109 | $ 573,915 | $ 722,777 | $ 913,690 | 32% |
| 2020 | Eastern | Cardiology: Electrophysiology | 117 | $ 470,715 | $ 582,812 | $ 756,694 | 41% |
| 2020 | Midwest | Cardiology: Electrophysiology | 164 | $ 557,427 | $ 644,384 | $ 835,658 | 38% |
| 2020 | Southern | Cardiology: Electrophysiology | 174 | $ 569,173 | $ 737,315 | $ 952,263 | 55% |
| 2020 | Western | Cardiology: Electrophysiology | 87 | $ 564,208 | $ 707,424 | $ 828,277 | 29% |
| 2019 | Eastern | Cardiology: Electrophysiology | 96 | $ 501,725 | $ 575,771 | $ 703,491 | 45% |
| 2019 | Midwest | Cardiology: Electrophysiology | 152 | $ 559,460 | $ 677,028 | $ 817,913 | 36% |
| 2019 | Southern | Cardiology: Electrophysiology | 142 | $ 611,961 | $ 760,553 | $ 1,018,885 | 57% |
| 2019 | Western | Cardiology: Electrophysiology | 95 | $ 561,150 | $ 701,180 | $ 846,047 | 37% |
| 2018 | Eastern | Cardiology: Electrophysiology | 69 | $ 492,418 | $ 559,056 | $ 701,562 | 42% |
| 2018 | Midwest | Cardiology: Electrophysiology | 129 | $ 493,971 | $ 629,050 | $ 778,163 | 35% |
| 2018 | Southern | Cardiology: Electrophysiology | 122 | $ 547,054 | $ 744,240 | $ 948,665 | 52% |
| 2018 | Western | Cardiology: Electrophysiology | 91 | $ 521,337 | $ 638,538 | $ 770,747 | 36% |

## AMGA [2]

| Data Year | Region | Specialty | Count | 25th | Median | 75th | AMGA Blend Weight |
|---|---|---|---|---|---|---|---|
| **2022** | **Eastern** | **Cardiology - EP** | **138** | **$ 502,255** | **$ 614,897** | **$ 792,161** | **38%** |
| 2022 | North | Cardiology - EP | 180 | $ 495,632 | $ 661,612 | $ 783,176 | 43% |
| 2022 | Southern | Cardiology - EP | 221 | $ 614,687 | $ 774,766 | $ 1,005,852 | 46% |
| 2022 | Western | Cardiology - EP | 151 | $ 519,758 | $ 607,654 | $ 749,855 | 43% |
| 2021 | Eastern | Cardiology - EP | 119 | $ 497,760 | $ 590,498 | $ 751,518 | 34% |
| 2021 | North | Cardiology - EP | 198 | $ 540,130 | $ 682,288 | $ 770,482 | 44% |
| 2021 | Southern | Cardiology - EP | 118 | $ 541,940 | $ 695,880 | $ 820,213 | 30% |
| 2021 | Western | Cardiology - EP | 148 | $ 508,672 | $ 598,029 | $ 784,312 | 43% |
| 2020 | Eastern | Cardiology - EP | 116 | $ 473,695 | $ 548,175 | $ 707,963 | 40% |
| 2020 | North | Cardiology - EP | 161 | $ 556,838 | $ 715,373 | $ 900,686 | 37% |
| 2020 | Southern | Cardiology - EP | 97 | $ 526,000 | $ 635,208 | $ 755,798 | 31% |
| 2020 | Western | Cardiology - EP | 148 | $ 499,791 | $ 552,827 | $ 755,275 | 50% |
| 2019 | Eastern | Cardiology - EP | 90 | $ 511,730 | $ 585,806 | $ 712,459 | 42% |
| 2019 | North | Cardiology - EP | 172 | $ 572,417 | $ 689,938 | $ 827,287 | 41% |
| 2019 | Southern | Cardiology - EP | 68 | $ 525,000 | $ 694,537 | $ 815,228 | 27% |
| 2019 | Western | Cardiology - EP | 119 | $ 483,459 | $ 566,019 | $ 821,975 | 46% |
| 2018 | Eastern | Cardiology - EP | 74 | $ 497,809 | $ 568,108 | $ 686,103 | 45% |
| 2018 | North | Cardiology - EP | 174 | $ 540,038 | $ 600,670 | $ 752,041 | 47% |
| 2018 | Southern | Cardiology - EP | 70 | $ 548,170 | $ 663,277 | $ 812,540 | 30% |
| 2018 | Western | Cardiology - EP | 124 | $ 446,409 | $ 506,025 | $ 765,831 | 48% |

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company

EST 1973

Exhibit 5
Page 23 of 24

EXHIBIT VI

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Region**

**ECG [3]**

| Data Year | Region | Specialty | Count | 25th | Median | 75th | ECG Blend Weight |
|---|---|---|---|---|---|---|---|
| 2022 | Eastern | Cardiology - Electrophysiology | 93 | $ 437,550 | $ 550,000 | $ 631,031 | 26% |
| 2022 | Midwest | Cardiology - Electrophysiology | 137 | $ 500,000 | $ 645,042 | $ 728,587 | 33% |
| 2022 | Southern | Cardiology - Electrophysiology | 78 | $ 589,440 | $ 789,465 | $ 917,387 | 16% |
| 2022 | Western | Cardiology - Electrophysiology | 93 | $ 598,826 | $ 710,470 | $ 980,891 | 26% |
| 2021 | Eastern | Cardiology - Electrophysiology | 91 | $ 450,328 | $ 547,709 | $ 686,065 | 26% |
| 2021 | Midwest | Cardiology - Electrophysiology | 108 | $ 587,393 | $ 686,221 | $ 781,893 | 24% |
| 2021 | Southern | Cardiology - Electrophysiology | 78 | $ 476,221 | $ 722,000 | $ 895,988 | 20% |
| 2021 | Western | Cardiology - Electrophysiology | 89 | $ 574,227 | $ 680,293 | $ 953,038 | 26% |
| 2020 | Eastern | Cardiology - Electrophysiology | 55 | $ 449,467 | $ 518,750 | $ 595,986 | 19% |
| 2020 | Midwest | Cardiology - Electrophysiology | 108 | $ 531,332 | $ 634,998 | $ 783,064 | 25% |
| 2020 | Southern | Cardiology - Electrophysiology | 46 | $ 546,588 | $ 704,753 | $ 761,756 | 15% |
| 2020 | Western | Cardiology - Electrophysiology | 61 | $ 569,938 | $ 675,134 | $ 785,207 | 21% |
| 2019 | Eastern | Cardiology - Electrophysiology | 28 | $ 487,873 | $ 527,917 | $ 620,906 | 13% |
| 2019 | Midwest | Cardiology - Electrophysiology | 98 | $ 526,472 | $ 647,593 | $ 822,414 | 23% |
| 2019 | Southern | Cardiology - Electrophysiology | 39 | $ 591,778 | $ 777,233 | $ 948,182 | 16% |
| 2019 | Western | Cardiology - Electrophysiology | 42 | $ 567,080 | $ 648,805 | $ 862,351 | 16% |
| 2018 | Eastern | Cardiology - Electrophysiology | 22 | $ 355,488 | $ 408,410 | $ 528,660 | 13% |
| 2018 | Midwest | Cardiology - Electrophysiology | 66 | $ 484,854 | $ 629,641 | $ 832,015 | 18% |
| 2018 | Southern | Cardiology - Electrophysiology | 41 | $ 522,472 | $ 638,066 | $ 864,522 | 18% |
| 2018 | Western | Cardiology - Electrophysiology | 41 | $ 446,021 | $ 638,838 | $ 953,356 | 16% |

**Data Source Blend [4]**

| Data Year | Region | Specialty | Count | 25th | Median | 75th | Data Source Blend Weight |
|---|---|---|---|---|---|---|---|
| 2022 | Eastern | Cardiology - Electrophysiology | 360 | $ 477,732 | $ 591,531 | $ 721,315 | 100% |
| 2022 | Midwest | Cardiology - Electrophysiology | 421 | $ 525,178 | $ 668,041 | $ 795,352 | 100% |
| 2022 | Southern | Cardiology - Electrophysiology | 483 | $ 637,687 | $ 810,709 | $ 1,008,761 | 100% |
| 2022 | Western | Cardiology - Electrophysiology | 353 | $ 574,337 | $ 676,198 | $ 876,476 | 100% |
| 2021 | Eastern | Cardiology - Electrophysiology | 350 | $ 473,895 | $ 577,724 | $ 711,463 | 100% |
| 2021 | Midwest | Cardiology - Electrophysiology | 455 | $ 560,633 | $ 685,995 | $ 799,139 | 100% |
| 2021 | Southern | Cardiology - Electrophysiology | 394 | $ 561,387 | $ 752,914 | $ 953,959 | 100% |
| 2021 | Western | Cardiology - Electrophysiology | 346 | $ 546,088 | $ 658,488 | $ 868,470 | 100% |
| 2020 | Eastern | Cardiology - Electrophysiology | 288 | $ 467,858 | $ 556,627 | $ 706,375 | 100% |
| 2020 | Midwest | Cardiology - Electrophysiology | 433 | $ 550,699 | $ 668,438 | $ 846,719 | 100% |
| 2020 | Southern | Cardiology - Electrophysiology | 317 | $ 552,685 | $ 701,346 | $ 864,501 | 100% |
| 2020 | Western | Cardiology - Electrophysiology | 296 | $ 533,180 | $ 623,471 | $ 782,900 | 100% |
| 2019 | Eastern | Cardiology - Electrophysiology | 214 | $ 504,120 | $ 573,730 | $ 696,457 | 100% |
| 2019 | Midwest | Cardiology - Electrophysiology | 422 | $ 557,080 | $ 675,454 | $ 822,557 | 100% |
| 2019 | Southern | Cardiology - Electrophysiology | 249 | $ 585,051 | $ 745,137 | $ 952,194 | 100% |
| 2019 | Western | Cardiology - Electrophysiology | 256 | $ 526,009 | $ 629,758 | $ 837,532 | 100% |
| 2018 | Eastern | Cardiology - Electrophysiology | 165 | $ 476,578 | $ 543,030 | $ 671,575 | 100% |
| 2018 | Midwest | Cardiology - Electrophysiology | 369 | $ 514,063 | $ 615,773 | $ 775,477 | 100% |
| 2018 | Southern | Cardiology - Electrophysiology | 233 | $ 543,064 | $ 701,233 | $ 892,963 | 100% |
| 2018 | Western | Cardiology - Electrophysiology | 256 | $ 472,981 | $ 574,400 | $ 797,612 | 100% |

[1] Clinical compensation benchmarks are based on MGMA DataDive 2019-2023 Provider Compensation, 2018-2022 Data for Cardiology: Electrophysiology.
[2] Clinical compensation benchmarks are based on AMGA *2019-2023 Medical Group Compensation and Productivity Surveys* for Cardiology-EP.
[3] Clinical compensation benchmarks are based on ECG *2019-2023 Physician and APP Compensation Surveys* for Cardiology-Electrophysiology.
[4] Respondent-weighted blend.



Exhibit 5
Page 24 of 24

# Expert Rebuttal and Supplemental Report of Leonard J. Henzke

**Dr. Rupa Bala**

v.

**Oregon Health & Science University, et al.**



Exhibit 6
Page 1 of 29

## I.    Introduction

1.    I am Leonard Henzke, a Principal in the Strategy and Business Advisory division at ECG Management Consultants, Inc. ("ECG"). I have been retained by Stoel Rives LLP, acting on behalf of its client Oregon Health & Science University ("OHSU") and its employees Drs. Charles Henrikson and Joaquin Cigarroa, in a case involving an employment discrimination dispute between a former physician employee ("Plaintiff") and Defendants OHSU, Dr. Henrikson, and Dr. Cigarroa (collectively, "Defendants" or "OHSU"). The former employee, Rupa Bala, M.D., practiced as an electrophysiologist, which is a subspecialty of the cardiology specialty.

2.    This report supplements my initial expert opinions contained in my November 1, 2023 Expert Report submitted in this matter, and together, they contain all of my expert opinions in this matter. My initial report contains my qualifications and curriculum vitae.

3.    The purpose of this rebuttal expert report is to assess the analyses and conclusions in the Plaintiff's expert reports from Lisa Broten and Nora Ostrofe. In so doing, I incorporate additional analyses that I have conducted since submitting my initial expert report that respond to the Plaintiff's experts' opinions regarding an earnings capacity determination. Like my initial expert report, I only assess claims related to damages incurred by Plaintiff. To perform my work, I again utilized a team of ECG personnel who worked under my direction and control. All opinions presented in this report are my own. ECG is paid $680 per hour for my work in this matter and my compensation does not depend on offering a particular opinion or the outcome of this case.

4.    Alongside my knowledge and use of industry data and best practices based on my extensive experience, my assessment and opinions are supported by data that I specifically requested and that was provided by counsel through discovery. In addition to the documents I reviewed to inform my initial expert report, attachment 1 details the documents that the Plaintiff's experts relied on and additional documents provided to me, all of which I relied on to form my opinions in this rebuttal and supplemental report.

## II.    Summary of Opinions

5.    My conclusions regarding Plaintiff's actual earnings potential, compared to but for scenarios that involve remaining employed at OHSU, have not changed. After mirroring many of the core assumptions and promotion timelines asserted in Plaintiff's experts' assessment of earnings, my opinion remains that Plaintiff's earnings capacity was not negatively impacted by her departure from OHSU and that her current position in private practice is likely to result in compensation that is significantly greater than what she would have been able to earn had she remained employed at OHSU.



Exhibit 6
Page 2 of 29

6.   Furthermore, I have identified several elements of Plaintiff's experts' assessments of earnings potential to be flawed and misleading, including:

- Ms. Broten does not properly utilize physician compensation benchmarks.

- Ms. Broten and Ms. Ostrofe incorrectly assume Plaintiff's compensation will not grow following 2023.

- Ms. Broten and Ms. Ostrofe's assertion that years of experience automatically leads to 75th percentile compensation is flawed and results in dramatically overstated "But For" earnings potential projections.

- Neither Ms. Broten nor Ms. Ostrofe analyzed the actual compensation incentive terms of Plaintiff's contract with Citrus Cardiology, which have the potential to significantly increase impact on her earnings potential.

- Ms. Ostrofe's assumptions relating to OHSU's administration of Plaintiff's retirement plan are not in accordance with the law and artificially inflate compensation in her but for scenarios.

## III.   General Observations

7.   In reviewing the Plaintiff's expert reports, I concurred with several components of their respective analyses, including those outlined in paragraphs 8-13 of my rebuttal below.

8.   In their reports, Ms. Broten and Ms. Ostrofe utilize detailed financial projections to determine the likely future earnings potential of the Plaintiff under three separate financial scenarios. The value of compensation under these scenarios is then discounted to the present day (a "net present value" analysis) to enable a simple comparison of the projections. Further, the values in these scenarios are compared to a baseline value that is attributed to Plaintiff's likely future earnings at her current employer, Citrus Cardiology. In completing these analyses, Ms. Broten provided compensation projections to Ms. Ostrofe, who conducted the net present value analysis. In general, I agree with this approach, and it is commonly utilized in finance to determine the net present value of future cash flows. Cash flows, in this case, represent the Plaintiff's projected future compensation.

9.   In her report, Ms. Broten also relies on commonly accepted physician compensation benchmark sources to help determine future compensation for the Plaintiff. These benchmarks include the Medical Group Management Association ("MGMA") and the Association of American Medical Colleges. While I agree that these are commonly accepted benchmarks that are utilized in the industry to set physician compensation rates, I do not agree with how these benchmarks were applied in the Plaintiff's experts' analyses, and I also believe that Ms. Broten failed to consider utilizing several other reliable benchmark sources. As outlined later in this report, the application of these benchmarks was flawed – when applied poorly, the misapplication of these benchmarks can yield very misleading results and incorrect conclusions.



Exhibit 6
Page 3 of 29

10.    I agree that it is necessary to make a distinction between the likely career trajectories of working in an academic environment versus a community physician environment. As outlined in my initial report and in the Plaintiff's reports, the compensation potential differs substantially in these two environments. The first two scenarios presented by the Plaintiff's experts in the reports outline an academic future, while the third considers a career in private practice.

11.    In their scenario analyses, both Ms. Broten and Ms. Ostrofe assume that the Plaintiff will continue to work until age 70. While this is beyond the normal range of retirement for a physician, I realize that the Plaintiff indicated a desire to work to age 70. As such, I think it is appropriate to utilize age 70 as a target retirement age in the damages analysis, as long as that assumption is applied consistently to any scenarios considered. For the purposes of my updated analysis, I utilized 70 as a retirement age as well.

12.    Both Ms. Broten and Ms. Ostrofe outline a scenario that assumes the Plaintiff is promoted to professor only and then another scenario that assumes the Plaintiff is also eventually promoted to division chief. The trajectory outlined in their analyses is similar to the trajectory I assumed in my initial report. I agree that it is a possibility that the Plaintiff will someday be promoted to division chief. However, I also believe that it is a somewhat aspirational and likely low-probability scenario, as there are currently 19 cardiologists in the division at OHSU and the fact that current division chief has been in his position for over a decade. Further, OHSU's eventual search for a replacement may consider external candidates.

13.    In general, I believe the core assumptions outlined in the Plaintiff's expert "Private Practice as of 6/19/17" scenario most closely align with the likely career trajectory and earnings potential of the Plaintiff. In this scenario, I agree that an assumption that the Plaintiff earns compensation equivalent to the market 75th percentile of the community of cardiac electrophysiologists is appropriate. I agree with the Plaintiff's experts that this level of compensation as an electrophysiologist in private practice is a likely scenario and one in which the Plaintiff would thrive clinically and financially; I also believe this is the scenario, among those presented, that most closely resembles the Plaintiff's career now and into the future.

14.    However, Ms. Ostrofe positions the "Private Practice as of 6/19/17" scenario as a "But For" assessment rather than as an estimation of the Plaintiff's future career earnings. The Plaintiff did not enter private practice until January 30, 2023. It is not appropriate to assume she would have entered private practice on the first day after her OHSU contract ended in 2017, because that did not actually occur and was unlikely to occur. I now understand from Jennifer Moody's initial expert report that "after receiving notice of nonrenewal of her contract at OHSU, Dr. Bala did not engage in a comprehensive and diligent job search while still employed at OHSU" and that "following her notice of her contract nonrenewal in May 2016 and through the end of her employment at OHSU … Dr. Bala did not apply to any [positions in private practice]."[1]

---

[1]    Moody initial expert report (November 1, 2023), section V.a.



Exhibit 6
Page 4 of 29

15.     I did not develop a model to be compared to Ms. Ostrofe's "Private Practice as of 6/19/17" for the reasons discussed above. However, had the Plaintiff entered into private practice at that time, I would have assumed a very different annual compensation level during the initial period relative to what the Plaintiff's experts assumed. The Plaintiff's experts assumed compensation for the initial term of employment at a level of $561,589 annually, which is the average of the 50th percentile compensation benchmarks the experts relied on. This assumption is flawed for two reasons and results in artificially inflated damages:

- First, as I explained in my initial expert report, it is an industry standard for private practice organizations to pay physicians at rates that are below median benchmark levels for the initial term of employment (usually one to two years).

- Second, and perhaps more importantly, the experts seem to have overlooked the fact that they relied on 2022 benchmark data to represent a 2017 compensation projection. Based on the fact that compensation tends to increase over time, as I have indicated in my assessment of damages, this means that the Plaintiff's experts have assumed that compensation for the initial term of employment is actually above the benchmark median for 2017.

## IV.     Updated Data Was Utilized to Make Changes to My Analysis

16.     The original analysis outlined in my initial expert report includes two scenarios (an "Actual" scenario and a "But For" scenario). Both scenarios include detailed assumptions related to Plaintiff's historical compensation and future projected compensation.

17.     Since my initial expert report was completed, I have had the opportunity to review the compensation data relied on by Ms. Broten and Ms. Ostrofe. In my initial expert report, I relied on compensation information contained in payroll data for the period of time in which the Plaintiff was employed by OHSU. For the periods in which the Plaintiff was employed at Banner University Medical Group, UMA, and for the initial term of employment with Citrus Cardiology, I initially relied on compensation details outlined in the Plaintiff's employment contracts. In my revised projections, I have utilized data from tax documents to determine Plaintiff's compensation from June 19, 2017 to January 30, 2023. By aligning my perspective of the Plaintiff's historic compensation with Ms. Broten and Ms. Ostrofe's analyses, a true apples-to-apples comparison of the future earnings scenarios is possible. These financial assumptions have been updated across the scenarios I modeled, and the results do not materially change my original conclusions or my assessment of the Plaintiff's potential earnings.

18.     In addition to updating my scenario capturing the Plaintiff's actual compensation through January 30, 2023, which is based on the same earnings data relied on by Ms. Ostrofe for the period in her "Post-termination Earnings and Fringe Benefits" assessment, I have also updated my analysis to



Exhibit 6
Page 5 of 29

now include two separate "But For" scenarios that now enable a simple comparison to the Plaintiff's experts' analysis. The scenarios are:

- Plaintiff remains employed at OHSU and is promoted to professor in 2023.
- Plaintiff remains employed at OHSU and is promoted to professor in 2023 and then to division chief in 2027.

Further, in both scenarios I have included projections for employer healthcare and social security contributions. I did not include these projections in my initial report because they do not have a material impact on overall projected compensation (they are aligned under all scenarios).

**V.    Ms. Broten Does Not Properly Utilize Physician Compensation Benchmarks**

19.    Much of Ms. Broten's report is devoted to a benchmarking analysis of Plaintiff's compensation. In general, she makes a series of statements starting on page 16 of her report that indicates she is inexperienced in utilizing this data.

20.    Ms. Broten does not appear to thoroughly understand the source of the survey data she quotes in her report. In several instances she makes references to a Pinnacle Physician Compensation Report. For example, she appears to quote data from the MGMA under a term she calls "2021 Pinnacle Physician Compensation Report." Pinnacle is a firm that provides physician compensation and valuation services and does not publish a compensation survey. It appears to me that Ms. Broten lacks sufficient understanding of relevant physician compensation data sources to opine on earnings potential in the physician marketplace.

21.    Ms. Broten does not appear to understand common statistical terms such as the "median" and the "mean." In citing benchmarking studies on pages 18 to 20 of her report she appears to utilize "mean" and "median/50th percentile" interchangeably. In reality, these are very different terms – mean represents the average of a data set and median the middle value of a data set. In general, experts in data analysis ordinarily will utilize median benchmarks when analyzing compensation data because the mean is frequently distorted by outliers. In fact, all physician compensation survey data sources that I am aware of report only the 10th through 90th percentiles. It's possible that she also did not have complete access to the survey data she cites in her report.

22.    While Ms. Broten utilizes community surveys to analyze compensation paid under an academic position, she sometimes utilizes the wrong data source. As outlined in paragraph 12 of my initial report, it is important to utilize surveys specific to a physician's employing entity. In the case of Plaintiff's employment with Banner, it is only appropriate to utilize an academic survey, as this employing entity is an academic medical group (Plaintiff held an Associate Professor position with the organization). On page 19 of her report Ms. Broten compares Plaintiff's compensation at Banner, an academic group, to community data from the 2021 Pinnacle Physician Compensation Report (MGMA). This indicates that Ms. Broten does not understand the importance of utilizing academically oriented benchmarks for academic positions, and community data for non-academic



Exhibit 6
Page 6 of 29

positions. She appears to misunderstand the difference between community and academic benchmarks.

23.  It appears to me that Ms. Broten's use of the 75th percentile compensation benchmarks in her assessment of damages was misguided. On page 19 of the report, she makes the claim that "it is entirely possible that Dr. Bala would be considered at the 75th percentile having worked in the field for 15 years in her specialty." Ms. Broten appears to believe that the ability to earn higher levels of compensation within a specific cohort is entirely related to experience. In reality, industry data illustrates otherwise. In both the academic and community settings there is no evidence to suggest that years of experience somehow results in higher levels of compensation in a particular specialty. In fact, a review of the MGMA data for age-specific cohorts indicates that compensation levels within a specialty actually decline at the highest levels of longevity. In my experience, this is a common benchmark finding among most physician specialties. As illustrated in table 1 below, compensation levels for physicians actually *decline* as physicians become more experienced – median compensation peaks at 13 to 17 years of experience for community physicians and eight to 12 years for academic physicians. There is no reason to believe that Plaintiff's compensation would increase solely on the basis of her years of experience as a physician.

**Table 1: MGMA Median Compensation by Years of Experience: Surgical Specialists[2]**

| Years of Experience | Community | Academic |
|---|---|---|
| 1-2 Years | $ 453,824 | $ 387,279 |
| 3-7 Years | $ 499,990 | $ 457,692 |
| 8-12 Years | $ 528,419 | **$ 508,705** |
| 13-17 Years | **$ 551,995** | **$ 487,109** |
| 18-22 Years | **$ 544,700** | $ 461,624 |
| 23+ Years | $ 514,902 | $ 490,650 |

24.  The paragraphs above illustrate the Plaintiff's experts' fundamental lack of understanding of benchmarks and other key elements of physician compensation. In the paragraphs below, I illustrate how their lack of understanding of this subject led to the development of flawed assumptions and damages scenarios that are filled with errors.

## VI.  Ms. Broten and Ms. Ostrofe Use Incorrect Assumptions in Their Financial Projections

25.  First, the Plaintiff's experts fail to utilize any compensation growth assumptions for periods following 2023 in all four of the scenarios developed. Starting with the "Advances to Professor" scenario, and also in the "Advances to Chief," "Private Practice," and "Post-termination Earnings

---

[2]    Based on 2023 MGMA DataDive Provider Compensation, 2022 data, for surgical specialties. The sample size for years of experience benchmarks specific to cardiac electrophysiology is insufficient and therefore unreliable.



Exhibit 6
Page 7 of 29

and Fringe Benefits" scenarios, the Plaintiff's experts fail to utilize any compensation growth assumptions starting on December 31, 2024. For example, in the "Advances to Professor" scenario, compensation is maintained at $652,906 from 2024 through 2043. This is not realistic and contrasts with actual experiences in the market, as physicians are in high demand and have received progressively higher levels of compensation annually for decades. The Plaintiff's experts would presumably recognize that these market trends exist if they had an adequate understanding of physician compensation benchmark data and how to apply it to analyses such as theirs. As outlined in my initial report, compensation levels for cardiologists have risen at a historical rate of 2.4 percent for community physicians and 3.0 percent for academic physicians from 2017 to 2022. I applied these growth rates in my initial report. Plaintiff's experts' failure to utilize growth rates in these scenarios results in errors in damages – in the millions of dollars – due to the compounding effect of the growth rates.

26.    Second, the Plaintiff's experts have a flawed understanding of the percentiles to utilize in their projections. In the scenario analyses outlined in their reports, it appears to me that the experts have cherry-picked the 75th percentile in three of the four scenarios. In fact, in the two academic scenarios utilized by Ms. Ostrofe she utilizes the 75th percentile for academic benchmarks. This is not supported by the facts in this case, such as documents from OHSU indicating that the Plaintiff's salary is aligned with the 50th percentile. In addition, as outlined in paragraph 19 above, this is a flawed assumption as there is no correlation between seniority and compensation levels for academic physicians. Compensation does generally increase as physicians are promoted to higher academic positions, but once promoted there is no evidence to suggest that experience will automatically lead to compensation levels that approach the 75th percentile. Productivity is the primary driver of higher levels of compensation, and as outlined in the paragraph below the Plaintiff is well-positioned in her current position at Citrus Cardiology to attain high levels of productivity and compensation.

27.    Third, and perhaps most importantly, the Plaintiff's experts fail to analyze the terms in Plaintiff's Citrus Cardiology contract that will very likely lead to substantially higher levels of compensation over the trajectory of Plaintiff's career following the initial term, which guaranteed $525,000 for the first year. In her testimony and in her expert reports, Plaintiff makes the case repeatedly that the situation at OHSU irrevocably harmed her ability to produce high levels of compensation over her career. In reality, this charge is flawed, as she currently possesses the ability to earn levels of compensation, under her current contract, that vastly exceed what she earned as an OHSU employee.

28.    In the Plaintiff's expert reports, the high levels of damages are anchored by the low values calculated in the "Post-termination Earnings and Fringe Benefits" scenario. In this scenario the experts assume that Plaintiff's initial contract compensation of $525,000 continues from 2023 through 2043. Based on my understanding of physician compensation benchmarks, it is my opinion that Ms. Ostrofe's assumption, informed by Ms. Broten's expert report, that Plaintiff will never receive



Exhibit 6
Page 8 of 29

a raise for the remainder of her career is extremely flawed and misleading, especially in comparison to the modeled compensation levels presented in Ms. Ostrofe's "Private Practice as of 6/19/17" scenario that assumes an approximate 75th percentile compensation.

29.    The assumption that compensation will not increase above $525,000 from 2023 to 2043 illustrates that the Plaintiff's experts understand neither how physician contracts are typically written in a private practice environment such as Citrus Cardiology nor what specialty-specific benchmark trends would suggest. Based on my experience, new physicians typically take one to two years to become fully productive members of a new practice; it takes time to build a patient panel even when practicing in a busy physician group. Therefore, Plaintiff would be expected to produce revenue that is far less than the more established physicians in Citrus Cardiology, at least for the first one to two years. Paying a new physician such as the Plaintiff a salary that is low relative to the benchmarks is standard practice. Further, it would be inappropriate to assume that any facts or circumstances related to this litigation would create any "barriers to employment" such as pay that is below market norms, as alluded to in Ms. Broten's report on page 20. Rather, the $525,000 is a minimum salary that is only intended to be temporary until Plaintiff is able to build a self-sustaining and busy clinical practice. This often takes one to two years.

30.    Building upon the argument outlined in the paragraphs immediately above, it also appears that the Plaintiff's experts failed to read the details of the Plaintiff's Citrus Cardiology contract. In EXHIBIT A of the contract a detailed revenue-sharing arrangement is outlined that will enable Plaintiff to significantly increase her compensation levels over time. Under the terms of the contract, she is paid a "minimum salary" of $525,000, with opportunities to earn from 55 percent to 75 percent of revenue once she builds a practice and exceeds a revenue level of $600,000 annually. It is important to note that the $600,000 revenue figure is a highly attainable goal for an electrophysiologist such as the Plaintiff. In fact, the $600,000 goal represents only the 28th percentile of the latest MGMA survey related to electrophysiologists – meaning that 72 percent of electrophysiologists nationwide exceed this goal.

31.    The structure of Citrus Cardiology further illustrates why Plaintiff could easily expect to earn very high levels of compensation. In the electrophysiology specialty physicians commonly receive referrals from other cardiologists, as electrophysiologists are able to diagnose problems that require specialized expertise in diagnosing and treating issues related to the heart's electrical system. The cardiologists within a group such as Citrus Cardiology are highly incentivized to refer patients within their own group because it benefits the patient clinically (because the physicians are in the same group and can communicate/collaborate easily) and the group financially (because the physicians all share in the revenue generated by the group). In her practice at Citrus Cardiology, it is highly unlikely that she is experiencing the residual effects of "barriers to employment" such as outlined in page 20 of Ms. Broten's report. In contrast, Plaintiff is set up well for a high level of financial success through a supportive, successful group and a contract with favorable terms that will pay her high levels of compensation. In fact, the Plaintiff is one of only two board-certified



Exhibit 6
Page 9 of 29

cardiac electrophysiologists among the 22 physicians and five nurse practitioners listed on Citrus Cardiology's website – meaning she is a preferred referral destination for all of these providers.[3]

32.    Fourth, the Plaintiff's experts utilize flawed assumptions related to the level of retirement compensation to be earned in the various scenarios. In the two academic scenarios titled "Advances to Professor" and "Advances to Chief" the Plaintiff's experts utilize wildly optimistic numbers related to the expectant level of retirement contributions. In these scenarios retirement contributions are set at $122,744 and $141,259, respectively, for the two scenarios in perpetuity. This represents millions of dollars of compensation that is a significant driver of the high levels of supposed damages outlined in Plaintiff's report. In reality, OHSU's contributions to retirement are limited by their own policies and by the IRS. In 2017, the maximum contribution possible according to these limitations was $33,000. As evidenced by Plaintiff's records, OHSU contributes approximately 12 percent of gross compensation up to the IRS compensation limit defined by the IRS in code section *401(a)(17)/404(l) Annual Compensation* and that OHSU's total contribution cannot exceed the IRS's total contribution limit as defined in code section *415(c)(1)(A) DB Limits*. Dismissing the impact of OHSUs policy and IRS limitations on this element of materially distorts and overstates the asserted damages.

33.    A close read of the Plaintiff's report reveals that the six-figure numbers are simply the function of inappropriate assumptions. First, from 2017 to 2022, Ms. Ostrofe assumes OHSU's policy is to contribute 12 percent of gross cash compensation to retirement via the OHSU University Pension Plan, without any limitations. Then, from 2023 forward Ms. Ostrofe assumes that OHSU's policy changes to align with Bureau of Labor Statistics data such that OHSU contributes 18.8 percent of gross cash compensation, again without any limitations. In both cases, Ms. Ostrofe ignores OHSU's actual Pension Plan contribution policies and procedures and IRS limitations on employer contributions to retirement. Ms. Ostrofe's dismissal of reality and application of incorrect and flawed assumptions in its place illustrate an apparent lack of understanding of both OHSU's actual contribution procedures and the U.S. tax laws. Under these laws, retirement contributions are subject to a contribution cap, which is $66,000 in 2023. Based on the compound annual growth rate of this cap from 2017 to 2024 of 3 percent, this cap is expected to grow to $120,500 by 2043. Ms. Ostrofe's assumption of $122,744 as early as 2023 is inappropriate and assumes OHSU has changed its actual retirement contribution procedures and is intentionally administering their benefits plan in a manner that is not in accordance with the law.

34.    In conclusion, the assumptions in the Plaintiff's expert reports are flawed and have resulted in damages scenarios that are inaccurate by millions of dollars. The assumptions in the academic "Advances to Professor" and "Advances to Chief" scenarios utilize compensation and benefits figures that are grossly inflated and cherry-picked for take-home income and retirement income; these errors result in damages assumptions that are flawed. Conversely, the experts have created

---

[3]        According to Citrus Cardiology's website, accessed on 11/29/23 (https://citruscardiology.org/our-providers/).



Exhibit 6
Page 10 of 29

a final scenario entitled "Post-termination Earnings and Fringe Benefits" that is meant to outline the Plaintiff's future earnings potential under her Citrus Cardiology contract but in reality is deeply flawed. The experts failed to read the detailed terms of the contract in developing this scenario, which in turn resulted in artificially low levels of projected compensation for her career.

**VII.   Revised Analysis**

35.    I have revised the scenario analyses outlined in my initial report to reflect updates to the data and to develop scenarios that enable a direct comparison to Ms. Ostrofe's scenarios. The results of these scenarios are summarized in tables 2 and 3 below. Additional details related to these scenarios are shown in Exhibits I-VIII.

**Table 2: Comparison to But For "Advances to Professor"**

| Scenario | 2017-2023 | 2024-2043 | 2015-2043 |
|---|---|---|---|
| **Cash Compensation** | | | |
| Actual | $2,073,000 | $22,412,000 | $24,485,000 |
| But For | $3,320,000 | $14,381,000 | $17,701,000 |
| **Variance** | **$(1,247,000)** | **$8,031,000** | **$6,784,000** |
| **Benefits (Employer Contributions to Retirement, Insurance, and Social Security)** | | | |
| Actual | $134,000 | $1,182,000 | $1,316,000 |
| But For | $360,000 | $1,699,000 | $2,059,000 |
| **Variance** | **$(226,000)** | **$(517,000)** | **$(743,000)** |
| **Grand Total** | | | |
| Actual | $2,207,000 | $23,594,000 | $25,802,000 |
| But For | $3,680,000 | $16,080,000 | $19,760,000 |
| **Variance** | **$(1,473,000)** | **$7,514,000** | **$6,042,000** |

Exhibit 6
Page 11 of 29

**Table 3: Comparison to But For "Advances to Chief"**

| Scenario | 2017-2023 | 2024-2043 | 2015-2043 |
|---|---|---|---|
| **Cash Compensation** | | | |
| Actual | $2,073,000 | $22,412,000 | $24,485,000 |
| But For | $3,320,000 | $19,739,000 | $23,059,000 |
| **Variance** | **$(1,247,000)** | **$2,673,000** | **$1,426,000** |
| **Benefits (Employer Contributions to Retirement, Insurance, and Social Security)** | | | |
| Actual | $134,000 | $1,182,000 | $1,316,000 |
| But For | $360,000 | $1,699,000 | $2,059,000 |
| **Variance** | **$(226,000)** | **$(517,000)** | **$(743,000)** |
| **Grand Total** | | | |
| Actual | $2,207,000 | $23,594,000 | $25,802,000 |
| But For | $3,680,000 | $21,438,000 | $25,118,000 |
| **Variance** | **$(1,473,000)** | **$2,156,000** | **$684,000** |

36.     Therefore, I conclude that Plaintiff's future earning potential is actually higher under the "Actual" scenario when compared to both "But For" scenarios.

**VIII.  Conclusions**

37.     While several income-related inputs and assumptions were aligned with Ms. Ostrofe's presented scenarios, my conclusion is that Plaintiff's future earnings capacity was not negatively impacted by her departure from OHSU and that her current position in private practice is very likely to result in compensation that is significantly more than what she would be able to earn in an academic environment.

_Leonard J. Henzke_

Leonard J. Henzke

December 8, 2023

Date



Exhibit 6
Page 12 of 29

ATTACHMENT 1

*Rupa Bala MD v. OHSU et al*

Documents Provided to Physician Compensation Expert – for Rebuttal Report

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | **Additional documents provided by Defendants for rebuttal/supplemental report:** | | |
| 1 | | | Earning Capacity Determination Report of E. Lisa Broten LCSW, 10/27/23 |
| 2 | | | Expert Witness Report of Nora C. Ostrofe MBA, 11/1/23 |
| 3 | | | Vocational Evaluation Report of DT North MS, 11/1/23 |
| 4 | | | Expert Report of Jennifer L. Moody, 11/1/23 |
| 5 | | | Expert Report of Jennifer Prager CPA, 10/27/23 |
| 6 | | | Other YTD Amounts Listed on Pay Period 13 2017 Paystub |
| | **Plaintiff's experts' documents provided for rebuttal/supplemental report:** | | |
| 7 | BALA 2883 A | BALA 2891 | Banner Earnings Statements, 1/16/20-5/21/20 |
| 8 | BALA 4910 | BALA 4915 | Banner Retirement Statements, 9/29/23 |
| 9 | BALA 2909 | BALA 2909 | Citrus Earnings Statement, 9/29/23 |
| 10 | BALA 2916 | BALA 2921 | OHSU Earnings Statements, 12/31/15, 12/30/16 and 6/19/17 |
| 11 | BALA 2892 | BALA 2892 | UMA Earnings Statement, 12/23/21 |
| 12 | BALA 2901 | BALA 2901 | UMA Earnings Statement, 5/26/22 |
| 13 | BALA 2893 | BALA 2900 | UHS Retirement Statements, 12/31/21 and 3/31/22 |
| 14 | BALA 2902 | BALA 2908 | UHS Retirement Statements, 6/30/22 and 6/30/23 |
| 15 | | | Second Amended Complaint for Deprivation of Civil Rights, 2/11/19 |
| 16 | | | Defendants' Answer and Affirmative Defenses to Second Amended Complaint for Deprivation of Civil Rights, 4/15/19 |
| 17 | | | Defendants' Motion for Summary Judgment, 8/23/21 |
| 18 | | | Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Cross Motion for Summary Judgment (Corrected), 9/30/21 |
| 19 | | | Reply in Support of Defendants' Motion for Summary Judgment, 11/8/21 |
| 20 | UPENN000001 | UPENN000002 | Offer letter, 3/23/06 |
| 21 | OHSU_RB 001524 | OHSU_RB 001531 | Faculty Evaluations at UPenn |
| 22 | UPENN000676 | UPENN000684 | Teaching Evaluations |
| 23 | UPENN000563 | UPENN000564 | Overview of Teaching for previous three years |
| 24 | OHSU_RB 001726 | OHSU_RB 001727 | Letter in Support of Promotion by Dr. Kaul, 5/29/14 |
| 25 | OHSU_RB 000050 | OHSU_RB 000073 | Clinician Employment Agreement, 1/5/15 |
| 26 | OHSU_RB 000218 | OHSU_RB 000219 | Position Description |
| 27 | OHSU_RB 001704 | OHSU_RB 001705 | Letter of Recommendation by Dr. Parmacek to Dr. Henrikson, 6/20/14 |
| 28 | OHSU_RB 000423 | OHSU_RB 00423 | Letter of Recommendation by Dr. Parmacek to Dr. Kaul, 6/20/14 |
| 29 | OHSU_RB 000020 | OHSU_RB 0023 | Appointment letter, 7/16/14 |
| 30 | BALA 0874 | BALA 0875 | Analysis of Educator Performance, 8/6/15 |
| 31 | BALA 1869 | BALA 1869 | Annual Faculty Evaluation, 2014-2015 |
| 32 | OHSU_RB 001809 | OHSU_RB 001810 | Letter in support of promotion by Dr. Henrikson |
| 33 | BALA 0992 | BALA 0996 | Analysis of Education Performance, Dec. 2015 |
| 34 | OHSU_RB 001441 | OHSU_RB 001443 | Aggregate Evaluation Report – Student Evaluations, 12/17/15 |
| 35 | OHSU_RB 001797 | OHSU_RB 001797 | Letter in support of promotion by Dr. Hutchinson, 9/20/15 |

**ECG** MANAGEMENT CONSULTANTS
A Siemens Healthineers Company

EST 1973

Exhibit 6
Page 13 of 29

ATTACHMENT 1

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 36 | OHSU_RB 001811 | OHSU_RB 001811 | Letter in support of promotion by Dr. Shah, 9/20/15 |
| 37 | OHSU_RB 001799 | OHSU_RB 001799 | Letter of reference for promotion by Dr. LeMond, 9/25/15 |
| 38 | OHSU_RB 001804 | OHSU_RB 001805 | Letter in support of promotion by Dr. Narayan, 9/29/15 |
| 39 | OHSU_RB 001800 | OHSU_RB 001801 | Letter in support of promotion by Dr. Marchlinski, 9/30/15 |
| 40 | OHSU_RB 001795 | OHSU_RB 001795 | Letter in support of promotion by Dr. Gerstenfeld, 10/24/15 |
| 41 | OHSU_RB 001780 | OHSU_RB 001782 | Letter recommending promotion by Dr. Fennerty, 12/5/15 |
| 42 | OHSU_RB 001807 | OHSU_RB 001808 | Letter in support of promotion by Dr. Patton, 12/11/15 |
| 43 | OHSU_RB 001735 | OHSU_RB 001738 | Letter by Dr. Anderson proposing appointment, 12/27/15 |
| 44 | OHSU_RB 001745 | OHSU_RB 001745 | Fellow Evaluations |
| 45 | BALA 1870 | BALA 1870 | Annual Faculty Evaluation, 2015-2016 |
| 46 | BALA 00193 | BALA 00195 | Personal statement in support of promotion |
| 47 | OHSU_RB 000099 | OHSU_RB 000099 | Annual salary increase, 7/1/16 |
| 48 | OHSU_RB 000010 | OHSU_RB 000010 | Appointment to Associate Professor, 7/1/16 |
| 49 | BALA 2028 | BALA 2028 | Cover of 'Tucson Lifestyle' |
| 50 | BALA 2034 | BALA 2036 | 2020 Top Doctors, 'Tucson Lifestyle,' June 2020 |
| 51 | BALA 2440 | BALA 2464 | CV of Rupa Bala |
| 52 | BALA 2469 | BALA 2470 | Exceptional Women in Medicine, 'Tucson Lifestyle,' March 2021 |
| 53 | OHSU_RB 000257 | OHSU_RB 000257 | Controlled Substance Registration Certificate, 7/21/13 |
| 54 | OHSU_RB 000258 | OHSU_RB 000258 | Medical Physician and Surgeon License, 9/24/01 |
| 55 | OHSU_RB 000259 | OHSU_RB 000259 | Certificate re Clinical Cardiac Electrophysiology, 2007-2017 |
| 56 | OHSU_RB 000260 | OHSU_RB 000260 | Certificate re Cardiovascular Disease, 2006-2016 |
| 57 | OHSU_RB 000261 | OHSU_RB 000261 | Medicinae Doctoris certificate |
| 58 | | | Revised – University of Chicago Residency Class, 1998 |
| 59 | BALA 2485 | BALA 2509 | CV of Rupa Bala, 10/2022 |
| 60 | | | Defendants' Response to Plaintiff's First Set of Interrogatories, 6/6/19 |
| 61 | | | Declaration of Dr. Rick Koch in Opposition to Defendant's Motion for Summary Judgment, 9/29/21 |
| 62 | OHSU_RB 004055 | OHSU_RB 004057 | Text messages between Dr. Dewland and Dr. Henrikson, 11/15/17-11/16/17 |
| 63 | OHSU_RB 004068 | OHSU_RB 004068 | Text messages between Ms. MacNeill and Dr. Henrikson, 9/12/17 |
| 64 | | | Excerpt of Dr. Henrikson deposition transcript, 8/7/20, pages 27-43 |
| 65 | VIRGINIAMASON 000030 | VIRGINIAMASON 000036 | Candidate notes, 8/25/17-9/25/17 |
| 66 | | | Excerpt of Dr. Bala deposition transcript, 7/28/20, pages 266-319 |
| 67 | BALA 000001 | BALA 000109 | 2016-2020 job search documents |
| 68 | BALA 1871 | BALA 2027 | August 2020 – November 2020 job search documents |
| 69 | BALA 2037 | BALA 2150 | December 2020 job search documents [BALA 2028-2036 not included] |
| 70 | BALA 1600 | BALA 1671 | February 2020 – June 2020 job search documents |
| 71 | BALA 2151 | BALA 2260 | January 2021 – February 2021 job search documents |
| 72 | BALA 2298 | BALA 2439 | September 2021 – October 2022 job search documents |
| 73 | BALA 2471 | BALA 2509 | November 2021 – June 2022 job search documents |
| 74 | BALA 2513 | BALA 2550 | January 2021 – June 2022 job search documents |
| 75 | | | List of job search efforts 2016-2022 with notes by Rupa Bala, updated 11/30/22 |
| 76 | BALA 2465 | BALA 2468 | Email string re position in Atlanta GA (Jackson Physicians), Aug. 2022 |
| 77 | BALA 1564 | BALA 1584 | Banner HR emails, Aug.-Oct. 2019 |



Exhibit 6
Page 14 of 29

ATTACHMENT 1

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 78 | BALA 1771 | BALA 1773 | Banner HR emails, 9/27/19 – 10/8/19 |
| 79 | BALA 1767 | BALA 1768 | Banner HR email string, 10/15/19 |
| 80 | BALA 1517 | BALA 1528 | Banner fellow evaluations |
| 81 | BALA 1784 | BALA 1788 | Banner comments/feedback |
| 82 | BALA 1592 | BALA 1596 | Banner emails and notice of termination |
| 83 | | | Banner Verbal discussion, typed notes (undated) |
| 84 | BALA 1481 | BALA 1483 | Banner emails/investigation |
| 85 | BALA 1484 | BALA 1513 | Dr. Bala's response to Banner verbal discussion, 7/24/19 |
| 86 | BALA 1516 | BALA 1516 | Corrective Action Guidelines for Banner Leaders |
| 87 | BANNER000272 | BANNER000275 | Typed notes of ER Consultant, 9/26/19 |
| 88 | BANNER000024 | BANNER000025 | Documented Verbal Discussion |
| 89 | BANNER000144 | BANNER000174 | Emails w/ Dr. Bala's response to verbal discussion, Aug.-Oct. 2019 |
| 90 | BANNER000337 | BANNER000340 | Dr. Bala email to Leadership, 9/2/19 |
| 91 | BANNER000175 | BANNER000194 | ER Investigation Report |
| 92 | BANNER000022 | BANNER000023 | Notice of termination, 1/17/20 |
| 93 | BANNER000001 | BANNER000021 | Physician Employment Agreement, 3/28/18 |
| 94 | BAAA 2674 | BAAA 2710 | Employment Agreements, UHS Medical Group, 2/8/21 and 8/6/21 |
| 95 | BALA 2261 | BALA 2297 | Employment Agreements, 8/6/21 and unsigned/undated |
| 96 | BALA 1322 | BALA 1322 | Form W-2, 2015 |
| 97 | BALA 1357 | BALA 1357 | Form W-2, 2016 |
| 98 | BALA 2876 | BALA 2877 | Form 1099s, 2017 |
| 99 | BALA 1412 | BALA 1412 | Form W-2, 2017 |
| 100 | BALA 1470 | BALA 1470 | Form W-2, 2018 (clean copy) |
| 101 | BALA 2879 | BALA 2879 | Form W-2, 2018 (photo) |
| 102 | BALA 2717 | BALA 2722 | Form W-2s, 2019-2021 |
| 103 | BALA 2881 | BALA 2881 | Form W-2, 2022 |
| 104 | BALA 2723 | BALA 2725 | Citrus Cardiology Employment Application, 11/14/22 |
| 105 | BALA 2726 | BALA 2727 | Citrus Cardiology offer letter, 10/14/22 |
| 106 | BALA 2728 | BALA 2744 | Physician Services Employment Agreement, Citrus Cardiology, 10/26/22 |
| 107 | BALA 2745 | BALA 2777 | Citrus Cardiology Employee Handbook |
| 108 | BALA 2778 | BALA 2825 | Citrus Cardiology 2023 Benefit Enrollment Guide |
| 109 | BALA 2826 | BALA 2854 | AAMC Faculty Salary Reports, FY 2021 |
| 110 | BALA 2855 | BALA 2873 | MGMA Physician Compensation Reports, FY 2021 |
| 111 | BALA 2623 | BALA 2673 | AAMC report: Exploring Salary Equity Among Medical School Leadership, Nov. 2022 |
| 112 | | | 2916 AAMC - 2020 Western - Compensation by Medical School Type (CS)-5 |
| 113 | | | 2917 AAMC - 2022  - Private Compensation by Medical School Type (CS)-8 |
| 114 | | | 2918 AAMC - 2022 - All schools - Compensation by Medical School Type (CS)-6 |
| 115 | | | 2919 AAMC - 2022 Public Schools - Compensation by Medical School Type (CS)-7 |
| 116 | | | 2920 AAMC 2021 - Western - Compensation by Medical School Type (CS)-4 |



Exhibit 6
Page 15 of 29

ATTACHMENT 1

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 117 | | | 2921 AAMC 2022 Western - Compensation by Medical School Type (CS)-2 |
| 118 | | | 2922 Rupa Bala CV – 2023 |
| 119 | | | Article 'Workforce in Crisis: Charting the Path Forward', in American College of Cardiology, 6/2/23 |
| 120 | | | Article 'Under the Radar: Visibility and the Effects of Discrimination Lawsuits in Small and Large Firms' in American Sociological Review, 2022 |
| 121 | | | Article 'By the numbers: How cardiologists have been affected by the COVID-19 pandemic' in Cardiovascular Business, 4/14/20 |
| 122 | | | 'Retaliation – Maike it Personal' on US EEOC website |
| 123 | | | Occupation profile for Cardiologists on O*Net OnLine |
| 124 | | | Occupational Outlook Handbook on US Bureau of Labor Statistics website, for Physicians and Surgeons |
| 125 | | | MedAxiom 2023 Cardiovascular Provider Compensation & Production Survey report |
| 126 | | | Sullivan Cotter 2020 compensation and productivity survey reports |
| 127 | OHSU_RB000001 | OHSU_RB000002 | Notice of a Claim, 12/15/17 |
| 128 | OHSU_RB000003 | OHSU_RB000005 | Policy: A Culture of Ethics and Integrity |
| 129 | OHSU_RB000006 | OHSU_RB000006 | 4.20.17 Faculty Record Memo |
| 130 | OHSU_RB000007 | OHSU_RB000008 | E-Business Suite Termination Details |
| 131 | OHSU_RB000009 | OHSU_RB000009 | 3.9.17 E-mail Re Last Day at Work |
| 132 | OHSU_RB000011 | OHSU_RB000014 | Hiring information workflow sheet |
| 133 | OHSU_RB000015 | OHSU_RB000016 | 11.1.14 Position Description |
| 134 | OHSU_RB000017 | OHSU_RB000018 | Position Approval Request |
| 135 | OHSU_RB000019 | OHSU_RB000019 | 10.6.14 Public Safety Background Check |
| 136 | OHSU_RB000024 | OHSU_RB000024 | Confidentiality and Intellectual Property Assignment Agreement |
| 137 | OHSU_RB000026 | OHSU_RB000048 | CV of Rupa Bala |
| 138 | OHSU_RB000049 | OHSU_RB000049 | Federal and State Program Compliance Registration |
| 139 | OHSU_RB000074 | OHSU_RB000099 | Various emails and HR documents |
| 140 | OHSU_RB000100 | OHSU_RB000101 | PEP Memorandum, 10/9/15 |
| 141 | OHSU_RB000102 | OHSU_RB000105 | Email re complaints about Dr. Bala |
| 142 | OHSU_RB000106 | OHSU_RB000107 | Meeting Notes, 9/17/15 |
| 143 | OHSU_RB000108 | OHSU_RB000261 | Miscellaneous HR documents |
| 144 | OHSU_RB000262 | OHSU_RB000263 | Email string between Ms. Porreco and Ms. Strahm, 5/11/16 |
| 145 | OHSU_RB000264 | OHSU_RB000300 | Code of Conduct |
| 146 | OHSU_RB000301 | OHSU_RB000302 | Forms re: open and close of investigation |
| 147 | OHSU_RB000303 | OHSU_RB000306 | Email by Ms. Shults to Mr. Ellis 9/28/18 re public records response and TCN |
| 148 | OHSU_RB000307 | OHSU_RB000322 | Emails re NAVX issue, 6/20/17-6/26/17 |
| 149 | OHSU_RB000323 | OHSU_RB000325 | W-2 forms: 2015-2017 |
| 150 | OHSU_RB000326 | OHSU_RB000337 | Policies: EEO, harassment, EEO complaints |
| 151 | OHSU_RB000338 | OHSU_RB000623 | SPDs, benefits info re Rupa Bala |
| 152 | BALA 1290 | BALA 1470 | Tax returns, 2015-2018 |
| 153 | BALA 2551 | BALA 2622 | Tax returns, 2019-2021 |
| 154 | | | Emails between Dr. Bala and Ms. Ostrofe, 10/24/23-10/26/23 |



Exhibit 6
Page 16 of 29

EXHIBIT I

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Projected Total Compensation and Benefits: Actual Scenario**

### Key Assumptions

| Measure | Assumption | Notes |
|---|---|---|
| [1] Compensation Growth Rate: Community Benchmarks | 2.4% | 2017 to 2022 CAGR (see exhibit VII) |
| [2] Employer Contribution to Retirement as a % of Cash Compensation: Actual 2017–2022 | See footnote | |
| [3] Social Security Maximum Taxable Earnings 2015 to 2024 | IRS tax code | See exhibit V |
| [3] Social Security Maximum Taxable Earnings Growth Rate 2025 to 2043 | 4.0% | 2015 to 2024 CAGR (see exhibit V) |
| [3] Social Security Tax Rate | 6.2% | |
| [4] Insurance Coverage Cost Escalator | 3.9% | 2015 to 2023 CAGR |
| [5] Citrus Cardiology Contributions to Medical, Dental, Vision Insurance Coverage | $6,420 | |
| [5] Citrus Cardiology Retirement Contributions % of Cash Compensation | 3.0% | Per Nora Ostrofe's Expert Report |

### Detailed Analysis

| Employment Start Date | Employment End Date | Years | Employing Organization | Cash Compensation[6] | Employer Contributions to Medical \| Dental \| Vision Insurance Coverage | Employer Retirement Contributions | Employer Contributions to Social Security | Total Compensation + Benefits |
|---|---|---|---|---|---|---|---|---|
| 1/1/2017 | 6/18/2017 | 0.46 | OHSU | 258,951 | 7,164 | 31,031 | 7,886 | 305,032 |
| 5/23/2018 | 12/31/2018 | 0.61 | Banner Medical Group | 242,277 | 2,607 | - | 7,961 | 252,844 |
| 1/1/2019 | 12/31/2019 | 1.00 | Banner Medical Group | 383,323 | 4,687 | 2,905 | 8,240 | 399,155 |
| 1/1/2020 | 5/16/2020 | 0.37 | Banner Medical Group | 129,000 | 1,598 | 2,295 | 1,998 | 134,891 |
| 1/1/2021 | 12/31/2021 | 1.00 | United Medical Associates | 337,379 | 6,207 | - | 8,854 | 352,440 |
| 1/1/2022 | 5/21/2022 | 0.38 | United Medical Associates | 197,071 | 3,820 | 11,600 | 9,114 | 221,605 |
| 1/30/2023 | 12/31/2023 | 0.92 | Citrus Cardiology | 525,000 | 6,420 | - | 9,932 | 541,352 |
| 1/1/2024 | 12/31/2024 | 1.00 | Citrus Cardiology | 717,000 | 6,700 | 21,500 | 10,500 | 755,700 |
| 1/1/2025 | 12/31/2025 | 1.00 | Citrus Cardiology | 734,000 | 7,000 | 22,000 | 10,900 | 773,900 |
| 1/1/2026 | 12/31/2026 | 1.00 | Citrus Cardiology | 752,000 | 7,300 | 22,600 | 11,300 | 793,200 |
| 1/1/2027 | 12/31/2027 | 1.00 | Citrus Cardiology | 978,000 | 7,600 | 29,300 | 11,800 | 1,026,700 |
| 1/1/2028 | 12/31/2028 | 1.00 | Citrus Cardiology | 1,001,000 | 7,900 | 30,000 | 12,200 | 1,051,100 |
| 1/1/2029 | 12/31/2029 | 1.00 | Citrus Cardiology | 1,025,000 | 8,200 | 30,800 | 12,700 | 1,076,700 |
| 1/1/2030 | 12/31/2030 | 1.00 | Citrus Cardiology | 1,049,000 | 8,500 | 31,500 | 13,200 | 1,102,200 |
| 1/1/2031 | 12/31/2031 | 1.00 | Citrus Cardiology | 1,074,000 | 8,800 | 32,200 | 13,800 | 1,128,800 |
| 1/1/2032 | 12/31/2032 | 1.00 | Citrus Cardiology | 1,100,000 | 9,100 | 33,000 | 14,300 | 1,156,400 |
| 1/1/2033 | 12/31/2033 | 1.00 | Citrus Cardiology | 1,126,000 | 9,500 | 33,800 | 14,900 | 1,184,200 |
| 1/1/2034 | 12/31/2034 | 1.00 | Citrus Cardiology | 1,153,000 | 9,900 | 34,600 | 15,500 | 1,213,000 |
| 1/1/2035 | 12/31/2035 | 1.00 | Citrus Cardiology | 1,181,000 | 10,300 | 35,400 | 16,100 | 1,242,800 |
| 1/1/2036 | 12/31/2036 | 1.00 | Citrus Cardiology | 1,209,000 | 10,700 | 36,300 | 16,700 | 1,272,700 |
| 1/1/2037 | 12/31/2037 | 1.00 | Citrus Cardiology | 1,238,000 | 11,100 | 37,100 | 17,400 | 1,303,600 |
| 1/1/2038 | 12/31/2038 | 1.00 | Citrus Cardiology | 1,268,000 | 11,500 | 38,000 | 18,100 | 1,335,600 |
| 1/1/2039 | 12/31/2039 | 1.00 | Citrus Cardiology | 1,298,000 | 11,900 | 38,900 | 18,800 | 1,367,600 |
| 1/1/2040 | 12/31/2040 | 1.00 | Citrus Cardiology | 1,329,000 | 12,400 | 39,900 | 19,600 | 1,400,900 |
| 1/1/2041 | 12/31/2041 | 1.00 | Citrus Cardiology | 1,361,000 | 12,900 | 40,800 | 20,400 | 1,435,100 |
| 1/1/2042 | 12/31/2042 | 1.00 | Citrus Cardiology | 1,393,000 | 13,400 | 41,800 | 21,200 | 1,469,400 |
| 1/1/2043 | 12/31/2043 | 1.00 | Citrus Cardiology | 1,426,000 | 13,900 | 42,800 | 22,000 | 1,504,700 |
| | | | | $ 24,485,000 | $ 231,000 | $ 720,000 | $ 365,000 | $ 25,802,000 |

Note: Figures may not be exact due to rounding.

[1] The community market rate is based on the compound annual growth rate of 2.4% between 2017 to 2022 for median compensation in the community benchmarks; these benchmarks are based on MGMA DataDive Compensation for Cardiology: Electrophysiology, AMGA *Medical Group Compensation and Productivity Survey* for Cardiology-EP, and ECG *Physician and APP Compensation Survey* for Cardiology-Electrophysiology, utilizing the surveys/reports that provided 2017 and 2022 data. Compensation benchmarks are lag-adjusted by the same growth rate for years beyond 2022.

[2] OHSU employer contributions to medical, dental, and vision insurance coverage is based on Dr. Bala's 2016 W2 Wage and Tax Statement. Insurance contributions for Banner Medical Group, United Medical Associates, and Citrus Cardiology are based on Nora Ostrofe's expert witness report, Schedule 3.0.

[3] Maximum taxable earnings are based on Social Security Administration maximum earnings table for 2015 – 2024; a 4.0% CAGR (2015 - 2014) was used to estimate maximum taxable earnings for 2025 – 2043. The latest social security tax rate of 6.2% was applied across all years. See Exhibit V.

[4] A cost escalator was applied to insurance coverage in 2024 - 2043 based on KFF Employer Health Benefits Survey 2015 to 2023 CAGR. https://www.kff.org/report-section/ehbs-2023-section-6-worker-and-employer-contributions-for-premiums/ (accessed 12/1/2023).

[5] The employer retirement contribution rate and insurance coverage cost are based on data found in Nora Ostrofe's report; Dr. Bala provided Nora Ostrofe with an email outlining Citrus Cardiology's retirement and insurance benefits. Note: According to ECG Management Consultant's proprietary data, the average median employer contribution to retirement from 2015 to 2022 was 7.0%.

[6] Clinical compensation benchmarks are based on a respondent-weighted blend of MGMA DataDive 2023 Provider Compensation, 2022 Data for Cardiology: Electrophysiology; AMGA *2023 Medical Group Compensation and Productivity Survey* for Cardiology-EP; and ECG *2023 Physician and APP Compensation Survey* for Cardiology-Electrophysiology. For periods 2017 - 2023 compensation is based on Dr. Bala's actual historical compensation. See Exhibit IV. 2024 annual compensation is based on the median benchmark. For periods 2025 - 2026 compensation grows at an annual rate of 2.4% until compensation increases to the 75th percentile benchmark in 2027. For periods 2028 - 2043 compensation continues to grow at the 2.4% rate per year.



Exhibit 6
Page 17 of 29

EXHIBIT II

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Projected Total Compensation and Benefits: But For - Promotion to Professor Scenario**

### Key Assumptions

| Measure | Assumption | Notes |
|---|---|---|
| 1 Compensation Growth Rate: Academic Benchmarks | 3.0% | 2017 to 2022 CAGR (see exhibit VIII) |
| 2 Compensation Incremental to Median | 4.8% | Based on Dr. Bala's 2017 OHSU annualized compensation |
| 3 Employer Contribution as a % of Cash Compensation: But For 2017 | Reported Actual | See exhibit IV |
| 4 Employer Contribution as a % of Cash Compensation: But For 2018–2043 | 12.0% | OHSU Policy and IRS limitaitons applied |
| 4 401(a) maximum eligible compensation: 2018-2024 | IRS actual 401(a) maximum eligible compensation | See exhibit VI |
| 4 401(a) maximum eligible compensation growth rate: 2024 to 2043 | 3.0% | 2015 to 2024 CAGR (see exhibit VI) |
| 5 Social Security Maximum Taxable Earnings | IRS tax code | See exhibit V |
| 5 Social Security Maximum Taxable Earnings Growth Rate | 4.0% | 2015 to 2024 CAGR (see exhibit V) |
| 6 Social Security Tax Rate | 6.2% | |
| 7 Insurance Coverage Cost Escalator | 3.9% | 2015 to 2023 CAGR |

### Detailed Analysis

| Employment Start Date | Employment End Date | Years | Employing Organization | Faculty Position | But For - Promotion to Professor | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Cash Compensation[2] | Employer Contributions to Medical \| Dental \| Vision Insurance Coverage | Employer Retirement Contributions | Employer Contributions to Social Security | Total Compensation + Benefits |
| 1/1/2017 | 12/31/2017 | 1.00 | OHSU | Associate Professor | 433,000 | 7,200 | 31,000 | 7,900 | 479,100 |
| 1/1/2018 | 12/31/2018 | 1.00 | OHSU | Associate Professor | 439,000 | 7,500 | 33,000 | 8,000 | 487,500 |
| 1/1/2019 | 12/31/2019 | 1.00 | OHSU | Associate Professor | 461,000 | 7,800 | 33,600 | 8,200 | 510,600 |
| 1/1/2020 | 12/31/2020 | 1.00 | OHSU | Associate Professor | 477,000 | 8,100 | 34,200 | 8,500 | 527,800 |
| 1/1/2021 | 12/31/2021 | 1.00 | OHSU | Associate Professor | 491,000 | 8,400 | 34,800 | 8,900 | 543,100 |
| 1/1/2022 | 12/31/2022 | 1.00 | OHSU | Associate Professor | 500,000 | 8,700 | 36,000 | 9,100 | 554,400 |
| 1/1/2023 | 12/31/2023 | 1.00 | OHSU | Professor | 519,000 | 9,000 | 39,600 | 9,900 | 577,500 |
| 1/1/2024 | 12/31/2024 | 1.00 | OHSU | Professor | 535,000 | 9,400 | 41,400 | 10,500 | 596,300 |
| 1/1/2025 | 12/31/2025 | 1.00 | OHSU | Professor | 551,000 | 9,800 | 42,600 | 10,900 | 614,300 |
| 1/1/2026 | 12/31/2026 | 1.00 | OHSU | Professor | 568,000 | 10,200 | 43,900 | 11,300 | 633,400 |
| 1/1/2027 | 12/31/2027 | 1.00 | OHSU | Professor | 585,000 | 10,600 | 45,200 | 11,800 | 652,600 |
| 1/1/2028 | 12/31/2028 | 1.00 | OHSU | Professor | 602,000 | 11,000 | 46,600 | 12,200 | 671,800 |
| 1/1/2029 | 12/31/2029 | 1.00 | OHSU | Professor | 620,000 | 11,400 | 47,900 | 12,700 | 692,000 |
| 1/1/2030 | 12/31/2030 | 1.00 | OHSU | Professor | 639,000 | 11,800 | 49,400 | 13,200 | 713,400 |
| 1/1/2031 | 12/31/2031 | 1.00 | OHSU | Professor | 658,000 | 12,300 | 50,800 | 13,800 | 734,900 |
| 1/1/2032 | 12/31/2032 | 1.00 | OHSU | Professor | 678,000 | 12,800 | 52,300 | 14,300 | 757,400 |
| 1/1/2033 | 12/31/2033 | 1.00 | OHSU | Professor | 698,000 | 13,300 | 53,900 | 14,900 | 780,100 |
| 1/1/2034 | 12/31/2034 | 1.00 | OHSU | Professor | 719,000 | 13,800 | 55,500 | 15,500 | 803,800 |
| 1/1/2035 | 12/31/2035 | 1.00 | OHSU | Professor | 741,000 | 14,300 | 57,200 | 16,100 | 828,600 |
| 1/1/2036 | 12/31/2036 | 1.00 | OHSU | Professor | 763,000 | 14,900 | 58,900 | 16,700 | 853,500 |
| 1/1/2037 | 12/31/2037 | 1.00 | OHSU | Professor | 786,000 | 15,500 | 60,600 | 17,400 | 879,500 |
| 1/1/2038 | 12/31/2038 | 1.00 | OHSU | Professor | 810,000 | 16,100 | 62,400 | 18,100 | 906,600 |
| 1/1/2039 | 12/31/2039 | 1.00 | OHSU | Professor | 834,000 | 16,700 | 64,300 | 18,800 | 933,800 |
| 1/1/2040 | 12/31/2040 | 1.00 | OHSU | Professor | 859,000 | 17,400 | 66,200 | 19,600 | 962,200 |
| 1/1/2041 | 12/31/2041 | 1.00 | OHSU | Professor | 885,000 | 18,100 | 68,200 | 20,400 | 991,700 |
| 1/1/2042 | 12/31/2042 | 1.00 | OHSU | Professor | 911,000 | 18,800 | 70,200 | 21,200 | 1,021,200 |
| 1/1/2043 | 12/31/2043 | 1.00 | OHSU | Professor | 939,000 | 19,500 | 72,300 | 22,000 | 1,052,800 |
| | | | | | $ 17,701,000 | $ 334,000 | $ 1,353,000 | $ 372,000 | $ 19,760,000 |

Note: Figures may not be exact due to rounding.

[1] The academic market rate is based on the compound annual growth rate of 3.0% between 2017 and 2022 for median compensation for all faculty positions in the academic benchmarks; these benchmarks are based on AAMC *Faculty Salary Report* for Cardiology: Invasive Interventional-Med., utilizing the reports that provided 2017 and 2022 data. Median compensation is lag-adjusted by the same growth rate for years beyond 2022.

[2] Dr. Bala's annualized compensation in 2017 at OHSU exceeds median benchmarks by 4.8%; annual compensation from 2018 - 2043 has an additional 4.8% applied to the median benchmark.

[3] Based on Dr. Bala's 6/19/2017 earnings statement from OHSU.

[4] Employer contributions to retirement are based on OHSU's current policy of contributing approximately 12% of gross compensation up to a wage limit defined by code section 401(a)(17)/404(l).

[5] Maximum taxable earnings are based on Social Security Administration maximum earnings table for 2015 - 2024; a 4.0% CAGR (2015 - 2014) was used to estimate maximum taxable earnings for 2025 - 2043. The latest social security tax rate of 6.2% was applied across all years. See Exhibit V.

[6] A cost escalator was applied to insurance coverage in 2024 - 2043 based on KFF Employer Health Benefits Survey 2015 to 2023 CAGR. https://www.kff.org/report-section/ehbs-2023-section-6-worker-and-employer-contributions-for-premiums/ (accessed 12/1/2023).

[7] Clinical compensation benchmarks are based on based on AAMC *Faculty Salary Report, FY 2022*, for Cardiology: Invasive Interventional-Med. for the faculty position indicated during each period. For periods 2018 - 2043 compensation is based on median benchmarks plus 4.8% for the position indicated. In years where median compensation decreased in the benchmarks, an annual growth rate of 3.0% was applied to the prior year of compensation. All median benchmarks for periods 2023 - 2043 are lag-adjusted by the 3.0% growth rate.



Exhibit 6
Page 18 of 29

EXHIBIT III

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Projected Total Compensation and Benefits: But For - Promotion to Chief Scenario**

### Key Assumptions

| Measure | Assumption | Notes |
|---|---|---|
| [1] Compensation Growth Rate: Academic Benchmarks | 3.0% | *2017 to 2022 CAGR (see exhibit VIII)* |
| [2] Compensation Incremental to Median | 4.8% | *Based on Dr. Bala's 2017 OHSU annualized compensation* |
| [3] Employer Contribution as a % of Cash Compensation: But For 2017 | Reported Actual | *See exhibit IV* |
| [3] Employer Contribution as a % of Cash Compensation: But For 2018–2043 | 12.0% | *OHSU Policy and IRS limitoitons applied* |
| [4] 401(a) maximum eligible compensation: 2018-2024 | IRS actual 401(a) maximum eligible compensation | *See exhibit VI* |
| [4] 401(a) maximum eligible compensation growth rate: 2024 to 2043 | 3.0% | *2015 to 2024 CAGR (see exhibit VI)* |
| [5] Social Security Maximum Taxable Earnings | IRS tax code | *See exhibit V* |
| [5] Social Security Maximum Taxable Earnings Growth Rate | 4.0% | *2015 to 2024 CAGR (see exhibit V)* |
| [5] Social Security Tax Rate | 6.2% | |
| [6] Insurance Coverage Cost Escalator | 3.9% | *2015 to 2023 CAGR* |

### Detailed Analysis

| Employment Start Date | Employment End Date | Years | Employing Organization | Faculty Position | But For - Promotion to Chief ||||
|---|---|---|---|---|---|---|---|---|
| | | | | | Cash Compensation[7] | Employer Contributions to Medical \| Dental \| Vision Insurance Coverage | Employer Retirement Contributions | Employer Contributions to Social Security | Total Compensation + Benefits |
| 1/1/2017 | 12/31/2017 | 1.00 | OHSU | Associate Professor | 433,000 | 7,200 | 31,000 | 7,900 | 479,100 |
| 1/1/2018 | 12/31/2018 | 1.00 | OHSU | Associate Professor | 439,000 | 7,500 | 33,000 | 8,000 | 487,500 |
| 1/1/2019 | 12/31/2019 | 1.00 | OHSU | Associate Professor | 461,000 | 7,800 | 33,600 | 8,200 | 510,600 |
| 1/1/2020 | 12/31/2020 | 1.00 | OHSU | Associate Professor | 477,000 | 8,100 | 34,200 | 8,500 | 527,800 |
| 1/1/2021 | 12/31/2021 | 1.00 | OHSU | Associate Professor | 491,000 | 8,400 | 34,800 | 8,900 | 543,100 |
| 1/1/2022 | 12/31/2022 | 1.00 | OHSU | Associate Professor | 500,000 | 8,700 | 36,600 | 9,100 | 554,400 |
| 1/1/2023 | 12/31/2023 | 1.00 | OHSU | Professor | 519,000 | 9,000 | 39,600 | 9,900 | 577,500 |
| 1/1/2024 | 12/31/2024 | 1.00 | OHSU | Professor | 535,000 | 9,400 | 41,400 | 10,500 | 596,300 |
| 1/1/2025 | 12/31/2025 | 1.00 | OHSU | Professor | 551,000 | 9,800 | 42,600 | 10,900 | 614,300 |
| 1/1/2026 | 12/31/2026 | 1.00 | OHSU | Professor | 568,000 | 10,200 | 43,900 | 11,300 | 633,400 |
| 1/1/2027 | 12/31/2027 | 1.00 | OHSU | Chief | 830,000 | 10,600 | 45,200 | 11,800 | 897,600 |
| 1/1/2028 | 12/31/2028 | 1.00 | OHSU | Chief | 855,000 | 11,000 | 46,600 | 12,200 | 924,800 |
| 1/1/2029 | 12/31/2029 | 1.00 | OHSU | Chief | 881,000 | 11,400 | 47,900 | 12,700 | 953,000 |
| 1/1/2030 | 12/31/2030 | 1.00 | OHSU | Chief | 907,000 | 11,800 | 49,400 | 13,200 | 981,400 |
| 1/1/2031 | 12/31/2031 | 1.00 | OHSU | Chief | 934,000 | 12,300 | 50,800 | 13,800 | 1,010,900 |
| 1/1/2032 | 12/31/2032 | 1.00 | OHSU | Chief | 962,000 | 12,800 | 52,300 | 14,300 | 1,041,400 |
| 1/1/2033 | 12/31/2033 | 1.00 | OHSU | Chief | 991,000 | 13,300 | 53,900 | 14,900 | 1,073,100 |
| 1/1/2034 | 12/31/2034 | 1.00 | OHSU | Chief | 1,021,000 | 13,800 | 55,500 | 15,500 | 1,105,800 |
| 1/1/2035 | 12/31/2035 | 1.00 | OHSU | Chief | 1,052,000 | 14,300 | 57,200 | 16,100 | 1,139,600 |
| 1/1/2036 | 12/31/2036 | 1.00 | OHSU | Chief | 1,084,000 | 14,900 | 58,900 | 16,700 | 1,174,500 |
| 1/1/2037 | 12/31/2037 | 1.00 | OHSU | Chief | 1,117,000 | 15,500 | 60,600 | 17,400 | 1,210,500 |
| 1/1/2038 | 12/31/2038 | 1.00 | OHSU | Chief | 1,151,000 | 16,100 | 62,400 | 18,100 | 1,247,600 |
| 1/1/2039 | 12/31/2039 | 1.00 | OHSU | Chief | 1,186,000 | 16,700 | 64,300 | 18,800 | 1,285,800 |
| 1/1/2040 | 12/31/2040 | 1.00 | OHSU | Chief | 1,222,000 | 17,400 | 66,200 | 19,600 | 1,325,200 |
| 1/1/2041 | 12/31/2041 | 1.00 | OHSU | Chief | 1,259,000 | 18,100 | 68,200 | 20,400 | 1,365,700 |
| 1/1/2042 | 12/31/2042 | 1.00 | OHSU | Chief | 1,297,000 | 18,800 | 70,200 | 21,200 | 1,407,200 |
| 1/1/2043 | 12/31/2043 | 1.00 | OHSU | Chief | 1,336,000 | 19,500 | 72,300 | 22,000 | 1,449,800 |
| | | | | | $ 23,059,000 | $ 334,000 | $ 1,353,000 | $ 372,000 | $ 25,118,000 |

Note: Figures may not be exact due to rounding.

[1] The academic market rate is based on the compound annual growth rate of 3.0% between 2017 to 2022 for median compensation for all faculty positions in the academic benchmarks; these benchmarks are based on AAMC Faculty Salary Report for Cardiology: Invasive Interventional-Med., utilizing the reports that provided 2017 and 2022 data. Median compensation is lag-adjusted by the same growth rate for years beyond 2022.

[2] Dr. Bala's annualized compensation in 2017 at OHSU exceeds median benchmarks by 4.8%; annual compensation from 2018 - 2026 has an additional 4.8% applied to the median benchmarks. Upon promotion to Chief in 2027, annual compensation from 2027 - 2043 is based strictly on lag-adjusted median. In my experience, compensation at the chief position is often tied more directly to benchmarks (i.e., the 50th percentile) and less connected to the physician's ability to be clinically productive because clinical responsibilities tend to decrease upon promotion to chief.

[3] Based on Dr. Bala's 6/19/2017 earnings statement from OHSU.

[4] Employer contributions to retirement are based on OHSU's current policy of contributing approximately 12% of gross compensation up to a wage limit defined by code section 401(a)(17)/404(l).

[5] Maximum taxable earnings are based on Social Security Administration maximum earnings table for 2015 - 2024; a 4.0% CAGR (2015 - 2014) was used to estimate maximum taxable earnings for 2025 - 2043. The latest social security tax rate of 6.2% was applied across all years. See Exhibit V.

[6] A cost escalator was applied to insurance coverage in 2024 - 2043 based on KFF Employer Health Benefits Survey 2015 to 2023 CAGR. https://www.kff.org/report-section/ehbs-2023-section-6-worker-and-employer-contributions-for-premiums/ (accessed 12/1/2023). The Plaintiff filed her taxes single; therefore, I relied on data from chart 6.4 to establish the growth rate of employer contributions to health insurance premiums.

[7] Clinical compensation benchmarks are based on based on AAMC *Faculty Salary Report, FY 2022,* for Cardiology: Invasive Interventional-Med. for the faculty position indicated during each period. For periods 2018 - 2026 compensation is based on median benchmarks plus 4.8% for the position indicated. For periods 2027 - 2043 compensation is based on median for the position indicated. In years where median compensation decreased in the benchmarks, an annual growth rate of 3.0% was applied to the prior year of compensation. All median benchmarks for periods 2023 - 2043 are lag-adjusted by the 3.0% growth rate.



EXHIBIT IV

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Plaintiff's Historical Compensation to Market Comparison**

| Employer | Start | End | Years | Benchmark [1,2,3] | Dr. Bala Annual Compensation | Benchmark Median | Dr. Bala's Compensation: Percentage of Benchmark Median |
|---|---|---|---|---|---|---|---|
| [6] OHSU | 1/1/2017 | 6/18/2017 | 0.46 | Associate Professor | $ 258,951 | $ 413,000 | 105% |
| [7] Banner Medical Group | 5/23/2018 | 12/31/2018 | 0.61 | Associate Professor | $ 242,277 | $ 419,000 | 95% |
| [7] Banner Medical Group | 1/1/2019 | 12/31/2019 | 1.00 | Associate Professor | $ 383,323 | $ 440,000 | 87% |
| [7] Banner Medical Group | 1/1/2020 | 5/16/2020 | 0.37 | Associate Professor | $ 129,000 | $ 455,000 | 76% |
| [8] United Medical Associates | 1/1/2021 | 12/31/2021 | 1.00 | Community | $ 337,379 | $ 669,821 | 50% |
| [8] United Medical Associates | 1/1/2022 | 5/21/2022 | 0.38 | Community | $ 197,071 | $ 683,841 | 75% |
| [9] Citrus Cardiology | 1/30/2023 | 12/31/2023 | 0.92 | Community | $ 525,000 | $ 700,164 | 75% |

Employment Date Range

[1] OHSU and Banner compensation benchmarking is based on academic clinical compensation benchmarks from *AAMC Faculty Salary Report* for Cardiology: Invasive Interventional-Med., associate professor. The year for each source corresponds with the employment year.

[2] United Medical Associates and Citrus Cardiology compensation is based on community clinical compensation benchmarks using a respondent-weighted blend of MGMA DataDive Provider Compensation for Cardiology: Electrophysiology; AMGA *Medical Group Compensation and Productivity Survey* for Cardiology-EP; and ECG *Physician and APP Compensation Survey* for Cardiology-Electrophysiology. The year for each source corresponds with the employment year. 2023 benchmarks are lag-adjusted based on the compound annual growth rate of 2.4% between 2017 to 2022 for median compensation in the community benchmarks.

[3] Annual compensation is normalized to a full year of compensation for benchmarking purposes: 2017 OHSU one-time payments were treated as such.

[4] OHSU employer contributions to medical, dental, and vision insurance coverage is based on Dr. Bala's 2016 W2 Wage and Tax Statement. Insurance contributions for Banner Medical Group, United Medical Associates, and Citrus Cardiology are based on Nora Ostrofe's expert witness report, Schedule 3.0.

[5] OHSU, Banner Medical Group, and United Medical Associates employer contributions to social security based on Dr. Bala's 2017 - 2022 W2 Wage and Tax Statements. 2023 Citrus Cardiology social security contributions based on the 2023 maxium taxable earnings multiplied by the 2023 tax rate. See Exhibit V.

[6] OHSU annual compensation and employer retirement contributions extracted from Dr. Bala's 6/19/2017 earnings statement from OHSU.

[7] Banner Medical Group annual compensation based on Dr. Bala's 2018 - 2020 W2 Wage and Tax Statement; Employer retirement contributions based on amounts reported in Nora Ostrofe's expert report, Exhibit 5.3.

[8] United Medical Associates annual compensation based on Dr. Bala's 2021 - 2022 W2 Wage and Tax Statement; Employer retirement contributions based on Dr. Bala's 1/1/2022 - 3/31/2022 UHS retirement statement.

[9] Citrus Cardiology Consults annual compensation was extracted from the offer letter to Dr. Bala on October 14, 2022.

ECG MANAGEMENT CONSULTANTS
EST 1973
A Siemens Healthineers Company

Exhibit 6

EXHIBIT V

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Social Security Maxium Taxable Earnings and Tax Rates as a Percent of Taxable Earnings[1]**

| Year | Amount | Tax Rate |
|------|--------|----------|
| 2015 | $ 118,500 | 6.2% |
| 2016 | $ 118,500 | 6.2% |
| 2017 | $ 127,200 | 6.2% |
| 2018 | $ 128,400 | 6.2% |
| 2019 | $ 132,900 | 6.2% |
| 2020 | $ 137,700 | 6.2% |
| 2021 | $ 142,800 | 6.2% |
| 2022 | $ 147,000 | 6.2% |
| 2023 | $ 160,200 | 6.2% |
| 2024 | $ 168,600 | 6.2% |
| **2015 - 2024 CAGR** | **4.0%** | |
| 2025 | $ 175,300 | 6.2% |
| 2026 | $ 182,300 | 6.2% |
| 2027 | $ 189,600 | 6.2% |
| 2028 | $ 197,200 | 6.2% |
| 2029 | $ 205,100 | 6.2% |
| 2030 | $ 213,300 | 6.2% |
| 2031 | $ 221,800 | 6.2% |
| 2032 | $ 230,700 | 6.2% |
| 2033 | $ 239,900 | 6.2% |
| 2034 | $ 249,500 | 6.2% |
| 2035 | $ 259,500 | 6.2% |
| 2036 | $ 269,900 | 6.2% |
| 2037 | $ 280,700 | 6.2% |
| 2038 | $ 291,900 | 6.2% |
| 2039 | $ 303,600 | 6.2% |
| 2040 | $ 315,700 | 6.2% |
| 2041 | $ 328,300 | 6.2% |
| 2042 | $ 341,400 | 6.2% |
| 2043 | $ 355,000 | 6.2% |

[1] 2015 to 2024 Source: Social Security Administration.



Exhibit 6
Page 21 of 29

EXHIBIT VI

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**401(a) IRS Thresholds**

| Year | Compensation Threshold | Contribution Threshold |
|------|------------------------:|------------------------:|
| 2015 | $ 265,000 | $ 53,000 |
| 2016 | $ 265,000 | $ 53,000 |
| 2017 | $ 270,000 | $ 54,000 |
| 2018 | $ 275,000 | $ 55,000 |
| 2019 | $ 280,000 | $ 56,000 |
| 2020 | $ 285,000 | $ 57,000 |
| 2021 | $ 290,000 | $ 58,000 |
| 2022 | $ 305,000 | $ 61,000 |
| 2023 | $ 330,000 | $ 66,000 |
| 2024 | $ 345,000 | $ 69,000 |
| **2015 - 2024 CAGR** | **3.0%** | **3.0%** |
| 2025 | $ 355,300 | $ 71,100 |
| 2026 | $ 365,900 | $ 73,200 |
| 2027 | $ 376,800 | $ 75,400 |
| 2028 | $ 388,000 | $ 77,600 |
| 2029 | $ 399,500 | $ 79,900 |
| 2030 | $ 411,400 | $ 82,300 |
| 2031 | $ 423,600 | $ 84,700 |
| 2032 | $ 436,200 | $ 87,200 |
| 2033 | $ 449,200 | $ 89,800 |
| 2034 | $ 462,600 | $ 92,500 |
| 2035 | $ 476,400 | $ 95,300 |
| 2036 | $ 490,600 | $ 98,100 |
| 2037 | $ 505,200 | $ 101,000 |
| 2038 | $ 520,200 | $ 104,000 |
| 2039 | $ 535,700 | $ 107,100 |
| 2040 | $ 551,600 | $ 110,300 |
| 2041 | $ 568,000 | $ 113,600 |
| 2042 | $ 584,900 | $ 117,000 |
| 2043 | $ 602,300 | $ 120,500 |

[1] 2015 to 2024 Source: IRS.gov.



Exhibit 6
Page 22 of 29

EXHIBIT VII

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: Community**

### [1] MGMA

| Data Year | Specialty | Count | 25th | Median | 75th | MGMA Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology: Electrophysiology | 526 | $ 585,043 | $ 726,428 | $ 932,612 | 33% |
| 2021 | Cardiology: Electrophysiology | 596 | $ 552,106 | $ 691,737 | $ 883,540 | 39% |
| 2020 | Cardiology: Electrophysiology | 542 | $ 545,527 | $ 670,956 | $ 842,467 | 41% |
| 2019 | Cardiology: Electrophysiology | 485 | $ 554,637 | $ 683,692 | $ 842,945 | 43% |
| 2018 | Cardiology: Electrophysiology | 411 | $ 512,478 | $ 639,828 | $ 797,745 | 40% |
| 2017 | Cardiology: Electrophysiology | 449 | $ 501,531 | $ 617,220 | $ 754,591 | 45% |

### [2] AMGA

| Data Year | Specialty | Count | 25th | Median | 75th | AMGA Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - EP | 690 | $ 528,177 | $ 671,043 | $ 847,649 | 43% |
| 2021 | Cardiology - EP | 583 | $ 513,864 | $ 651,300 | $ 789,090 | 38% |
| 2020 | Cardiology - EP | 522 | $ 499,990 | $ 621,929 | $ 782,811 | 39% |
| 2019 | Cardiology - EP | 449 | $ 516,198 | $ 636,899 | $ 816,191 | 39% |
| 2018 | Cardiology - EP | 442 | $ 477,693 | $ 594,745 | $ 750,738 | 43% |
| 2017 | Cardiology - EP | 388 | $ 498,876 | $ 580,868 | $ 716,991 | 39% |

### [3] ECG

| Data Year | Specialty | Count | 25th | Median | 75th | ECG Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 401 | $ 508,463 | $ 650,000 | $ 822,080 | 25% |
| 2021 | Cardiology - Electrophysiology | 366 | $ 532,369 | $ 663,633 | $ 807,509 | 24% |
| 2020 | Cardiology - Electrophysiology | 270 | $ 511,515 | $ 627,358 | $ 763,074 | 20% |
| 2019 | Cardiology - Electrophysiology | 207 | $ 530,444 | $ 646,453 | $ 833,014 | 18% |
| 2018 | Cardiology - Electrophysiology | 169 | $ 457,778 | $ 613,934 | $ 837,037 | 17% |
| 2017 | Cardiology - Electrophysiology | 164 | $ 516,584 | $ 645,483 | $ 810,922 | 16% |

### [4] Data Source Blend

| Data Year | Specialty | Count | 25th | Median | 75th | Data Source Blend Weight |
|---|---|---|---|---|---|---|
| 2022 | Cardiology - Electrophysiology | 1,617 | $ 541,786 | $ 683,841 | $ 868,946 | 100% |
| 2021 | Cardiology - Electrophysiology | 1,545 | $ 533,000 | $ 669,821 | $ 829,888 | 100% |
| 2020 | Cardiology - Electrophysiology | 1,334 | $ 520,824 | $ 642,947 | $ 803,054 | 100% |
| 2019 | Cardiology - Electrophysiology | 1,141 | $ 535,122 | $ 658,522 | $ 830,615 | 100% |
| 2018 | Cardiology - Electrophysiology | 1,022 | $ 488,389 | $ 616,048 | $ 783,913 | 100% |
| 2017 | Cardiology - Electrophysiology | 1,001 | $ 502,968 | $ 607,760 | $ 749,246 | 100% |

[1] MGMA DataDive 2018-2023 Provider Compensation, 2017-2022 Data, for Cardiology: Electrophysiology.
[2] AMGA *2018-2023 Medical Group Compensation and Productivity Surveys* for Cardiology-EP.
[3] ECG *2018-2023 Physician and APP Compensation Surveys* for Cardiology-Electrophysiology.
[4] Respondent-weighted blend.



Exhibit 6
Page 23 of 29

EXHIBIT VIII

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: Academic**

[1] **AAMC**

| Data Year | Specialty | Position | Count | 25th | Median | 75th |
|---|---|---|---|---|---|---|
| 2022 | Cardiology: Invasive Interventional-Med. | Instructor | 27 | $ 162,556 | $ 343,000 | $ 449,218 |
| 2022 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 434 | $ 347,994 | $ 415,292 | $ 537,550 |
| 2022 | Cardiology: Invasive Interventional-Med. | Associate Professor | 318 | $ 411,102 | $ 477,278 | $ 585,704 |
| 2022 | Cardiology: Invasive Interventional-Med. | Professor | 262 | $ 410,665 | $ 481,256 | $ 611,464 |
| 2022 | Cardiology: Invasive Interventional-Med. | Chief | 22 | $ 554,160 | $ 716,205 | $ 836,677 |
| 2021 | Cardiology: Invasive Interventional-Med. | Instructor | 32 | $ 182,900 | $ 347,000 | $ 442,887 |
| 2021 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 464 | $ 333,208 | $ 400,003 | $ 520,333 |
| 2021 | Cardiology: Invasive Interventional-Med. | Associate Professor | 321 | $ 381,436 | $ 450,903 | $ 563,107 |
| 2021 | Cardiology: Invasive Interventional-Med. | Professor | 280 | $ 388,184 | $ 455,804 | $ 569,404 |
| 2021 | Cardiology: Invasive Interventional-Med. | Chief | 19 | $ 613,349 | $ 738,878 | $ 1,020,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Instructor | 37 | $ 276,000 | $ 371,000 | $ 457,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 429 | $ 322,000 | $ 385,000 | $ 498,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Associate Professor | 296 | $ 372,000 | $ 455,000 | $ 555,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Professor | 258 | $ 360,000 | $ 441,000 | $ 547,000 |
| 2020 | Cardiology: Invasive Interventional-Med. | Chief | 23 | $ 599,000 | $ 700,000 | $ 1,024,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Instructor | 27 | $ 230,000 | $ 337,000 | $ 437,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 427 | $ 300,000 | $ 380,000 | $ 500,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Associate Professor | 289 | $ 354,000 | $ 440,000 | $ 540,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Professor | 250 | $ 361,000 | $ 433,000 | $ 524,000 |
| 2019 | Cardiology: Invasive Interventional-Med. | Chief | 24 | $ 548,000 | $ 611,000 | $ 723,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Instructor | 17 | $ 240,000 | $ 350,000 | $ 452,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 423 | $ 299,000 | $ 374,000 | $ 492,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Associate Professor | 295 | $ 342,000 | $ 419,000 | $ 512,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Professor | 250 | $ 351,000 | $ 419,000 | $ 514,000 |
| 2018 | Cardiology: Invasive Interventional-Med. | Chief | 27 | $ 517,000 | $ 646,000 | $ 695,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Instructor | 29 | $ 236,000 | $ 275,000 | $ 473,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Assistant Professor | 522 | $ 281,000 | $ 358,000 | $ 475,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Associate Professor | 309 | $ 340,000 | $ 413,000 | $ 511,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Professor | 239 | $ 347,000 | $ 415,000 | $ 520,000 |
| 2017 | Cardiology: Invasive Interventional-Med. | Chief | 30 | $ 500,000 | $ 633,000 | $ 731,000 |

[1] Clinical compensation benchmarks are based on AAMC *Faculty Salary Reports, FY 2017-2022* , for Cardiology: Invasive Interventional-Med.



Exhibit 6
Page 24 of 29

EXHIBIT IX

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Employment Setting**

**[1] MGMA**

| Physician Owned | | | | | | | Hospital Employed | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Data Year | Specialty | Count | 25th | Median | 75th | MGMA Blend Weight | Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
| 2022 | Cardiology: Electrophysiology | 42 | $ 583,426 | $ 863,076 | $ 1,050,370 | 39% | 2022 | Cardiology: Electrophysiology | 465 | $ 589,657 | $ 722,292 | $ 930,132 | 33% |
| 2021 | Cardiology: Electrophysiology | 48 | $ 541,009 | $ 717,337 | $ 1,017,425 | 44% | 2021 | Cardiology: Electrophysiology | 521 | $ 565,439 | $ 692,052 | $ 870,085 | 40% |
| 2020 | Cardiology: Electrophysiology | 52 | $ 537,536 | $ 655,997 | $ 874,713 | 47% | 2020 | Cardiology: Electrophysiology | 467 | $ 547,317 | $ 671,543 | $ 831,368 | 41% |
| 2019 | Cardiology: Electrophysiology | 52 | $ 486,714 | $ 600,000 | $ 789,345 | 44% | 2019 | Cardiology: Electrophysiology | 408 | $ 563,734 | $ 693,095 | $ 865,941 | 43% |
| 2018 | Cardiology: Electrophysiology | 51 | $ 507,487 | $ 603,114 | $ 752,037 | 45% | 2018 | Cardiology: Electrophysiology | 344 | $ 521,635 | $ 645,007 | $ 824,197 | 41% |

**[2] AMGA**

| Private Practice | | | | | | | Hospital Employed | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Data Year | Specialty | Count | 25th | Median | 75th | AMGA Blend Weight | Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
| 2022 | Cardiology - EP | 65 | $ 490,740 | $ 619,426 | $ 795,198 | 61% | 2022 | Cardiology - EP | 625 | $ 531,028 | $ 676,977 | $ 857,747 | 45% |
| 2021 | Cardiology - EP | 61 | $ 496,254 | $ 646,581 | $ 825,027 | 56% | 2021 | Cardiology - EP | 522 | $ 515,202 | $ 654,824 | $ 787,091 | 40% |
| 2020 | Cardiology - EP | 58 | $ 455,052 | $ 560,191 | $ 693,750 | 53% | 2020 | Cardiology - EP | 464 | $ 502,701 | $ 635,229 | $ 797,783 | 41% |
| 2019 | Cardiology - EP | 67 | $ 558,013 | $ 636,899 | $ 814,446 | 56% | 2019 | Cardiology - EP | 382 | $ 512,189 | $ 635,732 | $ 815,655 | 40% |
| 2018 | Cardiology - EP | 62 | $ 491,909 | $ 631,231 | $ 749,767 | 55% | 2018 | Cardiology - EP | 380 | $ 474,169 | $ 586,286 | $ 750,674 | 45% |

**[3] ECG**

| Private Practice | | | | | | | Hospital Employed | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Data Year | Specialty | Count | 25th | Median | 75th | ECG Blend Weight | Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
| 2022 | Cardiology - Electrophysiology | 1 | $ - | $ - | $ - | 0% | 2022 | Cardiology - Electrophysiology | 303 | $ 546,885 | $ 667,863 | $ 838,778 | 22% |
| 2021 | Cardiology - Electrophysiology | 3 | $ - | $ - | $ - | 0% | 2021 | Cardiology - Electrophysiology | 271 | $ 565,439 | $ 689,853 | $ 994,623 | 21% |
| 2020 | Cardiology - Electrophysiology | 3 | $ - | $ - | $ - | 0% | 2020 | Cardiology - Electrophysiology | 210 | $ 542,076 | $ 653,817 | $ 787,089 | 18% |
| 2019 | Cardiology - Electrophysiology | 3 | $ - | $ - | $ - | 0% | 2019 | Cardiology - Electrophysiology | 161 | $ 540,421 | $ 646,453 | $ 833,014 | 17% |
| 2018 | Cardiology - Electrophysiology | 2 | $ - | $ - | $ - | 0% | 2018 | Cardiology - Electrophysiology | 115 | $ 537,630 | $ 641,973 | $ 883,759 | 14% |

**[4] Data Source Blend**

| Private Practice | | | | | | | Hospital Employed | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Data Year | Specialty | Count | 25th | Median | 75th | Data Source Blend Weight | Benchmark Source | Specialty | Count | 25th | Median | 75th | Survey Blend Weight |
| 2022 | Cardiology - Electrophysiology | 107 | $ 527,121 | $ 715,064 | $ 895,359 | 100% | 2022 | Cardiology - Electrophysiology | 1,393 | $ 554,048 | $ 690,121 | $ 877,784 | 100% |
| 2021 | Cardiology - Electrophysiology | 109 | $ 515,963 | $ 677,740 | $ 909,753 | 100% | 2021 | Cardiology - Electrophysiology | 1,314 | $ 545,482 | $ 676,809 | $ 862,800 | 100% |
| 2020 | Cardiology - Electrophysiology | 110 | $ 494,044 | $ 605,481 | $ 779,296 | 100% | 2020 | Cardiology - Electrophysiology | 1,141 | $ 528,209 | $ 653,513 | $ 809,561 | 100% |
| 2019 | Cardiology - Electrophysiology | 119 | $ 526,857 | $ 620,775 | $ 803,477 | 100% | 2019 | Cardiology - Electrophysiology | 951 | $ 539,082 | $ 662,157 | $ 840,168 | 100% |
| 2018 | Cardiology - Electrophysiology | 113 | $ 498,940 | $ 618,541 | $ 750,792 | 100% | 2018 | Cardiology - Electrophysiology | 839 | $ 502,329 | $ 617,995 | $ 799,061 | 100% |

[1] Clinical compensation benchmarks are based on MGMA DataDive 2019-2023 Provider Compensation, 2018-2022 Data for Cardiology: Electrophysiology.
[2] Clinical compensation benchmarks are based on AMGA *2019-2023 Medical Group Compensation and Productivity Surveys* for Cardiology-EP.
[3] Clinical compensation benchmarks are based on ECG *2019-2023 Physician and APP Compensation Surveys* for Cardiology-Electrophysiology.
[4] Respondent-weighted blend.



Exhibit 6
Page 25 of 29

EXHIBIT X

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Region**

| MGMA [1] | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Year** | **Region** | **Specialty** | **Count** | **25th** | **Median** | **75th** | **MGMA Blend Weight** |
| 2022 | Eastern | Cardiology: Electrophysiology | 129 | $ 480,466 | $ 596,476 | $ 710,615 | 36% |
| 2022 | Midwest | Cardiology: Electrophysiology | 104 | $ 609,483 | $ 709,465 | $ 904,375 | 25% |
| 2022 | Southern | Cardiology: Electrophysiology | 184 | $ 685,766 | $ 862,886 | $ 1,050,988 | 38% |
| 2022 | Western | Cardiology: Electrophysiology | 109 | $ 629,051 | $ 741,912 | $ 962,799 | 31% |
| 2021 | Eastern | Cardiology: Electrophysiology | 140 | $ 468,929 | $ 586,375 | $ 693,924 | 40% |
| 2021 | Midwest | Cardiology: Electrophysiology | 149 | $ 568,481 | $ 690,757 | $ 849,719 | 33% |
| 2021 | Southern | Cardiology: Electrophysiology | 198 | $ 606,527 | $ 799,083 | $ 1,056,504 | 50% |
| 2021 | Western | Cardiology: Electrophysiology | 109 | $ 573,915 | $ 722,777 | $ 913,690 | 32% |
| 2020 | Eastern | Cardiology: Electrophysiology | 117 | $ 470,715 | $ 582,812 | $ 756,694 | 41% |
| 2020 | Midwest | Cardiology: Electrophysiology | 164 | $ 557,427 | $ 644,384 | $ 835,658 | 38% |
| 2020 | Southern | Cardiology: Electrophysiology | 174 | $ 569,173 | $ 737,315 | $ 952,263 | 55% |
| 2020 | Western | Cardiology: Electrophysiology | 87 | $ 564,208 | $ 707,424 | $ 828,277 | 29% |
| 2019 | Eastern | Cardiology: Electrophysiology | 96 | $ 501,725 | $ 575,771 | $ 703,491 | 45% |
| 2019 | Midwest | Cardiology: Electrophysiology | 152 | $ 559,460 | $ 677,028 | $ 817,297 | 36% |
| 2019 | Southern | Cardiology: Electrophysiology | 142 | $ 611,961 | $ 760,553 | $ 1,018,885 | 57% |
| 2019 | Western | Cardiology: Electrophysiology | 95 | $ 561,150 | $ 701,180 | $ 846,047 | 37% |
| 2018 | Eastern | Cardiology: Electrophysiology | 69 | $ 492,418 | $ 559,056 | $ 701,562 | 42% |
| 2018 | Midwest | Cardiology: Electrophysiology | 129 | $ 493,971 | $ 629,050 | $ 778,163 | 35% |
| 2018 | Southern | Cardiology: Electrophysiology | 122 | $ 547,054 | $ 744,240 | $ 948,665 | 52% |
| 2018 | Western | Cardiology: Electrophysiology | 91 | $ 521,337 | $ 638,538 | $ 770,747 | 36% |

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973

Exhibit 6
Page 26 of 29

EXHIBIT X

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Region**

| AMGA [2] | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Data Year** | **Region** | **Specialty** | **Count** | **25th** | **Median** | **75th** | **AMGA Blend Weight** |
| **2022** | **Eastern** | **Cardiology - EP** | **138** | **$ 502,255** | **$ 614,897** | **$ 792,161** | **38%** |
| 2022 | North | Cardiology - EP | 180 | $ 495,632 | $ 661,612 | $ 783,176 | 43% |
| 2022 | Southern | Cardiology - EP | 221 | $ 614,687 | $ 774,766 | $ 1,005,852 | 46% |
| 2022 | Western | Cardiology - EP | 151 | $ 519,758 | $ 607,654 | $ 749,855 | 43% |
| 2021 | Eastern | Cardiology - EP | 119 | $ 497,760 | $ 590,498 | $ 751,518 | 34% |
| 2021 | North | Cardiology - EP | 198 | $ 540,130 | $ 682,288 | $ 770,482 | 44% |
| 2021 | Southern | Cardiology - EP | 118 | $ 541,940 | $ 695,880 | $ 820,213 | 30% |
| 2021 | Western | Cardiology - EP | 148 | $ 508,672 | $ 598,029 | $ 784,312 | 43% |
| 2020 | Eastern | Cardiology - EP | 116 | $ 473,695 | $ 548,175 | $ 707,963 | 40% |
| 2020 | North | Cardiology - EP | 161 | $ 556,838 | $ 715,373 | $ 900,686 | 37% |
| 2020 | Southern | Cardiology - EP | 97 | $ 526,000 | $ 635,208 | $ 755,798 | 31% |
| 2020 | Western | Cardiology - EP | 148 | $ 499,791 | $ 552,827 | $ 755,275 | 50% |
| 2019 | Eastern | Cardiology - EP | 90 | $ 511,730 | $ 585,806 | $ 712,459 | 42% |
| 2019 | North | Cardiology - EP | 172 | $ 572,417 | $ 689,938 | $ 827,287 | 41% |
| 2019 | Southern | Cardiology - EP | 68 | $ 525,000 | $ 694,537 | $ 815,228 | 27% |
| 2019 | Western | Cardiology - EP | 119 | $ 483,459 | $ 566,019 | $ 821,975 | 46% |
| 2018 | Eastern | Cardiology - EP | 74 | $ 497,809 | $ 568,108 | $ 686,103 | 45% |
| 2018 | North | Cardiology - EP | 174 | $ 540,038 | $ 600,670 | $ 752,041 | 47% |
| 2018 | Southern | Cardiology - EP | 70 | $ 548,170 | $ 663,277 | $ 812,540 | 30% |
| 2018 | Western | Cardiology - EP | 124 | $ 446,409 | $ 506,025 | $ 765,831 | 48% |



Exhibit 6

EXHIBIT X

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Region**

| ECG [3] | | | | | | | |
|---------|--------|---------|-------|------|--------|------|-----------------|
| Data Year | Region | Specialty | Count | 25th | Median | 75th | ECG Blend Weight |
| 2022 | Eastern | Cardiology - Electrophysiology | 93 | $ 437,550 | $ 550,000 | $ 631,031 | 26% |
| 2022 | Midwest | Cardiology - Electrophysiology | 137 | $ 500,000 | $ 645,042 | $ 728,587 | 33% |
| 2022 | Southern | Cardiology - Electrophysiology | 78 | $ 589,440 | $ 789,465 | $ 917,387 | 16% |
| 2022 | Western | Cardiology - Electrophysiology | 93 | $ 598,826 | $ 710,470 | $ 980,891 | 26% |
| 2021 | Eastern | Cardiology - Electrophysiology | 91 | $ 450,328 | $ 547,709 | $ 686,065 | 26% |
| 2021 | Midwest | Cardiology - Electrophysiology | 108 | $ 587,393 | $ 686,221 | $ 781,893 | 24% |
| 2021 | Southern | Cardiology - Electrophysiology | 78 | $ 476,221 | $ 722,000 | $ 895,988 | 20% |
| 2021 | Western | Cardiology - Electrophysiology | 89 | $ 574,227 | $ 680,293 | $ 953,038 | 26% |
| 2020 | Eastern | Cardiology - Electrophysiology | 55 | $ 449,467 | $ 518,750 | $ 595,986 | 19% |
| 2020 | Midwest | Cardiology - Electrophysiology | 108 | $ 531,332 | $ 634,998 | $ 783,064 | 25% |
| 2020 | Southern | Cardiology - Electrophysiology | 46 | $ 546,588 | $ 704,753 | $ 761,756 | 15% |
| 2020 | Western | Cardiology - Electrophysiology | 61 | $ 569,938 | $ 675,134 | $ 785,207 | 21% |
| 2019 | Eastern | Cardiology - Electrophysiology | 28 | $ 487,873 | $ 527,917 | $ 620,906 | 13% |
| 2019 | Midwest | Cardiology - Electrophysiology | 98 | $ 526,472 | $ 647,593 | $ 822,414 | 23% |
| 2019 | Southern | Cardiology - Electrophysiology | 39 | $ 591,778 | $ 777,233 | $ 948,182 | 16% |
| 2019 | Western | Cardiology - Electrophysiology | 42 | $ 567,080 | $ 648,805 | $ 862,351 | 16% |
| 2018 | Eastern | Cardiology - Electrophysiology | 22 | $ 355,488 | $ 408,410 | $ 528,660 | 13% |
| 2018 | Midwest | Cardiology - Electrophysiology | 66 | $ 484,854 | $ 629,641 | $ 832,015 | 18% |
| 2018 | Southern | Cardiology - Electrophysiology | 41 | $ 522,472 | $ 638,066 | $ 864,522 | 18% |
| 2018 | Western | Cardiology - Electrophysiology | 41 | $ 446,021 | $ 638,838 | $ 953,356 | 16% |

**ECG** MANAGEMENT CONSULTANTS
A Siemens Healthineers Company
EST 1973

Exhibit 6
Page 28 of 29

EXHIBIT X

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke

**Total Compensation Benchmarks: By Region**

| Data Source Blend [4] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Data Year | Region | Specialty | Count | 25th | Median | 75th | | Data Source Blend Weight |
| 2022 | Eastern | Cardiology - Electrophysiology | 360 | $ 477,732 | $ 591,531 | $ | 721,315 | 100% |
| 2022 | Midwest | Cardiology - Electrophysiology | 421 | $ 525,178 | $ 668,041 | $ | 795,352 | 100% |
| 2022 | Southern | Cardiology - Electrophysiology | 483 | $ 637,687 | $ 810,709 | $ | 1,008,761 | 100% |
| 2022 | Western | Cardiology - Electrophysiology | 353 | $ 574,337 | $ 676,198 | $ | 876,476 | 100% |
| 2021 | Eastern | Cardiology - Electrophysiology | 350 | $ 473,895 | $ 577,724 | $ | 711,463 | 100% |
| 2021 | Midwest | Cardiology - Electrophysiology | 455 | $ 560,633 | $ 685,995 | $ | 799,139 | 100% |
| 2021 | Southern | Cardiology - Electrophysiology | 394 | $ 561,387 | $ 752,914 | $ | 953,959 | 100% |
| 2021 | Western | Cardiology - Electrophysiology | 346 | $ 546,088 | $ 658,488 | $ | 868,470 | 100% |
| 2020 | Eastern | Cardiology - Electrophysiology | 288 | $ 467,858 | $ 556,627 | $ | 706,375 | 100% |
| 2020 | Midwest | Cardiology - Electrophysiology | 433 | $ 550,699 | $ 668,438 | $ | 846,719 | 100% |
| 2020 | Southern | Cardiology - Electrophysiology | 317 | $ 552,685 | $ 701,346 | $ | 864,501 | 100% |
| 2020 | Western | Cardiology - Electrophysiology | 296 | $ 533,180 | $ 623,471 | $ | 782,900 | 100% |
| 2019 | Eastern | Cardiology - Electrophysiology | 214 | $ 504,120 | $ 573,730 | $ | 696,457 | 100% |
| 2019 | Midwest | Cardiology - Electrophysiology | 422 | $ 557,080 | $ 675,454 | $ | 822,557 | 100% |
| 2019 | Southern | Cardiology - Electrophysiology | 249 | $ 585,051 | $ 745,137 | $ | 952,194 | 100% |
| 2019 | Western | Cardiology - Electrophysiology | 256 | $ 526,009 | $ 629,758 | $ | 837,532 | 100% |
| 2018 | Eastern | Cardiology - Electrophysiology | 165 | $ 476,578 | $ 543,030 | $ | 671,575 | 100% |
| 2018 | Midwest | Cardiology - Electrophysiology | 369 | $ 514,063 | $ 615,773 | $ | 775,477 | 100% |
| 2018 | Southern | Cardiology - Electrophysiology | 233 | $ 543,064 | $ 701,233 | $ | 892,963 | 100% |
| 2018 | Western | Cardiology - Electrophysiology | 256 | $ 472,981 | $ 574,400 | $ | 797,612 | 100% |

[1] Clinical compensation benchmarks are based on MGMA DataDive 2019-2023 Provider Compensation, 2018-2022 Data for Cardiology: Electrophysiology.
[2] Clinical compensation benchmarks are based on AMGA *2019-2023 Medical Group Compensation and Productivity Surveys* for Cardiology-EP.
[3] Clinical compensation benchmarks are based on ECG *2019-2023 Physician and APP Compensation Surveys* for Cardiology-Electrophysiology.
[4] Respondent-weighted blend.



Exhibit 6
Page 29 of 29

# Second Expert Rebuttal and Supplemental Report of Leonard J. Henzke

**Dr. Rupa Bala**

v.

**Oregon Health & Science University, et al.**



1111 Third Avenue, Suite 2500
Seattle, WA 98101
**P (206) 689-2200**
F (206) 689-2209

122077510.1 0027345-00065

800.729.7635   **ecgmc.com**

Exhibit 7
Page 1 of 12

## I.    Introduction

1.    I am Leonard Henzke, a Principal in the Strategy and Business Advisory division at ECG Management Consultants, Inc. ("ECG"). I have been retained by Stoel Rives LLP, acting on behalf of its client Oregon Health & Science University ("OHSU") and its employees Drs. Charles Henrikson and Joaquin Cigarroa, in a case involving an employment discrimination dispute between a former physician employee ("Plaintiff") and Defendants OHSU, Dr. Charles Henrikson, and Dr. Joaquin Cigarroa (collectively, "Defendants" or "OHSU"). The former employee, Rupa Bala, M.D., practiced as an electrophysiologist, which is a subspecialty of the cardiology specialty.

2.    This report supplements my initial expert opinions contained in my November 1, 2023 Expert Report and in my December 8, 2023 Expert Rebuttal and Supplemental Report. Submitted in this matter and together, they contain all my expert opinions in this matter. My initial report contains my qualifications and curriculum vitae.

3.    The purpose of this rebuttal expert report is to assess the analyses and conclusions in Plaintiff's expert rebuttal report from David H. Glusman. This report was not made available to me prior to the development of my Expert Rebuttal Supplemental Report dated December 8, 2023. In so doing, I incorporate additional analyses that I have conducted since submitting my initial expert report that respond to Mr. Glusman's opinions regarding an earnings capacity determination. In addition, I highlight assertions made in my Initial Expert Report dated November 1, 2023 and my Expert Rebuttal and Supplemental Report dated December 8, 2023 that contradict Mr. Glusman's opinions. As in my previous reports, I only assess claims related to alleged damages incurred by Plaintiff, leaving analyses of other claims (discrimination, job placement difficulties, etc.) to the defendants' other experts. To perform my work, I again utilized a team of ECG personnel who worked under my direction and control. All opinions presented in this report are my own. ECG is paid $680 per hour for my work in this matter and my compensation does not depend on offering a particular opinion or the outcome of this case.

4.    In addition to the documents I reviewed to inform my expert reports dated November 1, 2023 and December 8, 2023, Attachment 1 details additional documents that Mr. Glusman relied on, all of which I relied on to form my opinions in this second rebuttal and supplemental report. These documents include supplemental information related to Plaintiff's 2024 compensation.

## II.    Several of Glusman's Assertions Were Already Addressed in My Expert Report Dated November 1, 2023 and my Expert Rebuttal Supplemental Report Dated December 8, 2023

5.    Mr. Glusman makes several assertions regarding the data I utilized in my Initial Expert Report dated November 1, 2023 related to actual compensation earned by Plaintiff with her former employers. For example, he asserts that I created "fabricated income" for Plaintiff for "approximately six months of 2017" and that I utilized contracts to estimate her actual compensation. He goes on to assert that this does not account for partial years that she worked during that period.



Exhibit 7
Page 2 of 12

6.   In reality, however, in my Initial Expert Report dated November 1, 2023 I was utilizing the best available data to me at the time.   These numbers were refined utilizing confirmed W-2 data in my Expert Rebuttal and Supplemental Report dated December 8, 2023.

7.   The numbers in my Expert Rebuttal and Supplemental Report dated December 8, 2023 are reflective of actual compensation earned by Plaintiff at her former employers. In fact, these numbers closely mirror the numbers in Mr. Glusman's report. Therefore, Mr. Glusman's assertions are incorrect and I stand by the projections in my Expert Rebuttal and Supplemental Report dated December 8, 2023.

### III.   Mr. Glusman Erroneously Represents The Promotion Potential of Plaintiff Under the But-For Scenario

8.   In my Initial Expert Report dated November 1, 2023, I constructed a But-For Scenario that assumes Plaintiff would be promoted to Professor in 2023 and to Cardiology Division Chief in 2027. As noted in the report, this is an aggressive assumption because there is no guarantee that the Plaintiff would ever attain such prestigious appointments had she remained at OHSU. I made these assumptions to be reflective of Plaintiff's career goals, and to also illustrate that she is better off financially under the Actual Scenario even when compared to a But-For Scenario that incorporates a prestigious promotion and associated higher levels of projected compensation.

9.   In his report, Mr. Glusman expands upon these aggressive assumptions and outlines a scenario where the Plaintiff is promoted to Division Chief in 2023. Mr. Glusman asserts that the promotion track outlined in my Initial Expert Report dated November 1, 2023 and my Expert Rebuttal and Supplemental Report dated December 8, 2023 is "inconsistent with public statistics." To justify this claim, Mr. Glusman provides a list of "various academic cardiology chairs" (Mr. Glusman does not utilize the correct term for cardiology leadership positions). The list contains 27 physicians from across the country, which is clearly not exhaustive and represents a fraction of the thousands of cardiologists practicing in academic medicine nationwide. The list does not include any physicians who graduated from a cardiology fellowship program and did not advance to chief, which is the far more likely scenario In essence, Mr. Glusman provides a cherry-picked list of physicians to justify an aggressive promotion track for Plaintiff. It appears to me that this approach may have been taken in order to inflate compensation projections in the asserted But-For scenario. I stand by the promotion track – and the associated compensation levels – outlined in both my Initial Expert Report dated November 1, 2023 and my Expert Rebuttal and Supplemental Report dated December 8, 2023.



Exhibit 7
Page 3 of 12

## IV.    Mr. Glusman Significantly Understates Plaintiff's Projected Compensation in the Actual Scenario

10.    Mr. Glusman develops a compensation projection for Plaintiff in the Actual Scenario that I believe contains flawed assumptions and, in turn, artificially inflates potential damages.

11.    As I outlined in paragraph 29 of my Expert Rebuttal and Supplemental Report dated December 8, 2023, Plaintiff's contract at Citrus Cardiology is typical of those seen in a private practice environment where physicians "typically take one to two years to become fully productive members of a new practice." The base salary paid to Plaintiff is, as I said previously, "only intended to be temporary until Plaintiff is able to build a self-sustaining and busy clinical practice". The base salary was guaranteed for the first year of employment, after which Plaintiff transitions to a collections-based methodology that enables her to earn high levels of compensation that are tied to productivity.

12.    Mr. Glusman does not explain in his report how he developed such low compensation projections, but it appears he assumes that Plaintiff's low productivity in her first year, when she is supposed to be building a practice, will continue for the 20-year length of the compensation projection.

13.    As such, he appears to apply the collections-based methodology in her Citrus Cardiology contract to collections levels produced by Plaintiff in the ramp-up period. As outlined in Exhibit I, Mr. Glusman's projected compensation level for Plaintiff of $264,000 in 2024 is below the 10th percentile of electrophysiology physicians nationally. Mr. Glusman assumes that her compensation will grow to only $414,100 over the 20-year projection period, which is also projected to be well below the 10th percentile.  Additionally, it is unclear to me how or why Mr. Glusman selected $264,000 as Plaintiff's income level in 2024, as it does not appear to be based on any of the documentation that I have reviewed.

14.    Supplemental email correspondence I have received and reviewed between Plaintiff and the Citrus Cardiology practice administrator indicates that her collections levels are low, which is to be expected in the first year of practice. It is also indicated in the correspondence that Plaintiff is expected to increase her hospital electrophysiology lab days by 50%, from 4 to 6 days per month. This is a significant development, as electrophysiologists typically produce the majority of their collections in the lab setting. In my experience working with cardiology practices and divisions of cardiology within larger organizations, electrophysiologists typically work 8 to 10 days per month in hospital labs, with an equal number of days in the clinic. There is significant capacity for Plaintiff to grow her practice.

15.    It should also be noted that Plaintiff could easily seek to transition to a different private practice (or hospital-employed) medical group in the unlikely case that she is not able to grow her collections and associated compensation at Citrus Cardiology. Electrophysiologists are in high demand



Exhibit 7
Page 4 of 12

nationally, and she could seek employment opportunities elsewhere.[1,2] It would be highly unusual for a physician in the prime of her career, such as the Plaintiff, to remain in a situation where he or she was earning a compensation level of less than the 10th percentile of the relevant national benchmark.

16.   Though Plaintiff's compensation model at Citrus Cardiology does not include a minimum base salary beyond the initial 12-month term, this is typical of contracts in the industry and there is no basis to change my projections outlined in the Actual Scenarios of my prior reports. As I have explained, there is no reason to believe that Plaintiff cannot build a self-sustaining and busy clinical practice, receiving an income consistent with median benchmarks levels that eventually grows to 75th percentile compensation benchmark levels when she has further developed her career in private practice (be it at Citrus Cardiology or elsewhere).

## V.   Mr. Glusman Significantly Overstates Benefits Projections in the But-For Scenario

17.   Mr. Glusman makes the assertion that "the Henzke Report only includes retirement account contributions as benefits calculated at 7.9 percent of compensation." I included only retirement contributions in my Initial Report because healthcare and other benefits compensation are likely to be similar under either of the scenarios. However, to align with Plaintiff's experts I included detailed calculations for these benefits in my Expert Rebuttal and Supplemental Report dated December 8, 2023. The assumptions that underlie these projections are outlined in detail in that report and are aligned with OHSU policies and national benchmarks. Perhaps most importantly, because Plaintiff could have also obtained employment at a different academic medical center, my calculations also consider IRS regulations that pertain to limits on retirement compensation.

18.   In his report, Mr. Glusman develops a series of projections that illustrate growing levels of physician benefits for Plaintiff under the But-For scenario. He creates several scenarios that project total benefits compensation at 7.9 percent of compensation and 15.9 percent of compensation. He derives the 15.9 percent figure by averaging the benefits paid to Plaintiff as a percentage of her compensation during her final 3 calendar years in which she was employment at OHSU, 2015 to 2017. During this period, she was paid a range of $390,180 to $413,000. He assumes her compensation at OHSU will grow to $1,334,300 by 2043 in the But-For scenario, and he applies the same benefits percentage each year over the entire projection period. This results in projected benefits compensation of $212,312 in 2043 under the But-For scenario.

19.   This projection is grossly flawed and illustrates a lack of understanding of OHSU's actual policies and IRS limitations regarding employer contributions to retirement.

---

[1]   Jennifer Moody Expert Report (November 1, 2023), ¶ 23 "… in 2021 there were approximately 2,632 actively practicing clinical cardiac electrophysiologists in the United States."

[2]   Jennifer Moody Expert Report (November 1, 2023), ¶ 26 "Cardiology was ranked as the fifth most common physician search for in-house physician recruiters in 2023," "48.8% of [organizations] reported they were seeking cardiologists of some type" in 2018, and "60% of organizations recruiting physicians reported they were searching for cardiologists of some type" in 2023.

ECG MANAGEMENT CONSULTANTS
A Siemens Healthineers Company

Exhibit 7
Page 5 of 12

20.   First, it is inappropriate to apply such a percentage to fringe benefits categories such as healthcare and disability insurance. The cost of insurance does not increase for higher earners. A highly paid cardiologist at an institution such as OHSU receives the same healthcare benefits as a lower-paid primary care physician.

21.   Additionally, the same principle applies to social security taxes. Such taxes are capped at $168,600 in 2024[3], meaning that employers pay the same taxes for someone making $170,000 as they would for an employee making $1,000,000. Mr. Glusman's methodology of applying the same percentage across all levels of compensation is deeply flawed and results in grossly inflated projections for employer-paid benefits.

22.   Further, Mr. Glusman ignores OHSU's policies regarding employer contributions to retirement, which are compliant with IRS regulations related to limits on employer contributions to retirement. As outlined in my Expert Rebuttal and Supplemental Report dated December 8, 2023, OHSU's policy is to contribute up to "approximately 12% of gross compensation up to the IRS compensation limit defined by the IRS in code section *401(a)(17)/404(l) Annual Compensation.*"[4] In 2017 the compensation limit was $270,000, and, based on the compound annual growth rate of this limitation from 2015 to 2024, this limitation projects to be approximately $602,300 in 2043.[5] Further, "OHSU's total contribution cannot exceed the IRS' total contribution limit as defined in code section *415(c)(l)(A) DB Limits*."[6] This limitation was $54,000 in 2017, and, based on the compound annual growth rate of the limitation from 2015 to 2024 of 3.0%, projects to be approximately $120,500 in 2043.[7]

23.   Lastly, in Mr. Glusman's discussion regarding how benefits should be calculated on page 6 and 7 of his report, he indicates that exhibit 5 of his report includes corrected calculations of employer-funded benefits in the Actual scenario. Here, he correctly clarifies that the accurate approach to calculating Social Security tax is to take 6.20% of gross compensation up to the IRS compensation limit, and for Medicare tax to take 1.45% of gross compensation without limitation and an additional 0.9% for gross compensation in excess of $200,000, also without limitation. While Mr. Glusman appears to maintain this approach in Exhibit 6 in the Actual scenario, he does not apply the same approach to the But-For scenario. As discussed in paragraph 17 above, Mr. Glusman applied a fixed 15.9% benefits calculation in the But-For scenario detailed in Exhibit 6. Had Mr. Glusman correctly calculated benefits, his calculation for the But-For scenario in Exhibit 6 would have been materially lower.

---

[3]   Henzke Rebuttal and Supplemental Expert Report (December 8, 2023) Exhibit V
[4]   Henzke Rebuttal and Supplemental Expert Report (December 8, 2023) ¶ 32
[5]   Henzke Rebuttal and Supplemental Expert Report (December 8, 2023) Exhibit VI
[6]   Henzke Rebuttal and Supplemental Expert Report (December 8, 2023) ¶ 32
[7]   Henzke Rebuttal and Supplemental Expert Report (December 8, 2023) Exhibit VI



Exhibit 7
Page 6 of 12

## VI.    Conclusions

24.    Mr. Glusman utilizes a number of assumptions in his rebuttal that are flawed and have resulted in damages scenarios that amount to an inaccurate projection of compensation potential for Plaintiff in the magnitude of millions of dollars. My conclusion, as outlined in both of my previous reports, remains that Plaintiff's future earnings capacity was not negatively impacted by her departure from OHSU and that her current position in private practice is very likely to result in compensation (as outlined in the Actual Scenario[8]) that is significantly more than what she would be able to earn in an academic environment (as outlined in the But-For Scenarios[9]).


Leonard J. Henzke                                          January 16, 2024

                                                            Date

---

[8]    Henzke Rebuttal and Supplemental Expert Report (December 8, 2023) Exhibit I
[9]    Henzke Rebuttal and Supplemental Expert Report (December 8, 2023) Exhibits II and III



Exhibit 7
Page 7 of 12

*Rupa Bala MD v. OHSU et al*

Documents Provided to Glusman - Rebuttal to Henzke

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| | **Documents provided by Defendants:** | | |
| 1 | BALA 3160 | BALA 3160 | Citrus paystub, 2/17/23 |
| 2 | BALA 3161 | BALA 3161 | Form W-2, 2023 |
| 3 | BALA 3078 | BALA 3081 | Citrus emails with Dr. Bala regarding 2024 contract and productivity model, 12/13/23-12/17/23 |
| 4 | BALA 2924 | BALA 2924 | Citrus paystub, 12/8/23 |
| 5 | BALA 2922 | BALA 2923 | Citrus letter to Dr. Bala regarding contract renewal, 12/13/23. With attached Exhibit A, Productivity Compensation |
| 6 | | | Emails between Nora Ostrofe and Dr. Bala, 10/24/23-10/26/23 |
| | **Broten documents:** | | |
| 7 | | | Second Amended Complaint for Deprivation of Civil Rights, 2/11/19 |
| 8 | | | Defendants' Answer and Affirmative Defenses to Second Amended Complaint for Deprivation of Civil Rights, 4/15/19 |
| 9 | | | Defendants' Motion for Summary Judgment, 8/23/21 |
| 10 | | | Plaintiff's Opposition to Defendants' Motion for Summary Judgment; Cross Motion for Summary Judgment (Corrected), 9/30/21 |
| 11 | | | Reply in Support of Defendants' Motion for Summary Judgment, 11/8/21 |
| 12 | UPENN000001 | UPENN000002 | Offer letter, 3/23/06 |
| 13 | OHSU_RB 001524 | OHSU_RB 001531 | Faculty Evaluations at UPenn |
| 14 | UPENN000676 | UPENN000684 | Teaching Evaluations |
| 15 | UPENN000563 | UPENN000564 | Overview of Teaching for previous three years |
| 16 | OHSU_RB 001726 | OHSU_RB 001727 | Letter in Support of Promotion by Dr. Kaul, 5/29/14 |
| 17 | OHSU_RB 000050 | OHSU_RB 000073 | Clinician Employment Agreement, 1/5/15 |
| 18 | OHSU_RB 000218 | OHSU_RB 000219 | Position Description |
| 19 | OHSU_RB 001704 | OHSU_RB 001705 | Letter of Recommendation by Dr. Parmacek to Dr. Henrikson, 6/20/14 |
| 20 | OHSU_RB 000423 | OHSU_RB 00423 | Letter of Recommendation by Dr. Parmacek to Dr. Kaul, 6/20/14 |
| 21 | OHSU_RB 000020 | OHSU_RB 0023 | Appointment letter, 7/16/14 |
| 22 | BALA 0874 | BALA 0875 | Analysis of Educator Performance, 8/6/15 |
| 23 | BALA 1869 | BALA 1869 | Annual Faculty Evaluation, 2014-2015 |
| 24 | OHSU_RB 001809 | OHSU_RB 001810 | Letter in support of promotion by Dr. Henrikson |
| 25 | BALA 0992 | BALA 0996 | Analysis of Education Performance, Dec. 2015 |
| 26 | OHSU_RB 001441 | OHSU_RB 001443 | Aggregate Evaluation Report – Student Evaluations, 12/17/15 |
| 27 | OHSU_RB 001797 | OHSU_RB 001797 | Letter in support of promotion by Dr. Hutchinson, 9/20/15 |
| 28 | OHSU_RB 001811 | OHSU_RB 001811 | Letter in support of promotion by Dr. Shah, 9/20/15 |
| 29 | OHSU_RB 001799 | OHSU_RB 001799 | Letter of reference for promotion by Dr. LeMond, 9/25/15 |
| 30 | OHSU_RB 001804 | OHSU_RB 001805 | Letter in support of promotion by Dr. Narayan, 9/29/15 |
| 31 | OHSU_RB 001800 | OHSU_RB 001801 | Letter in support of promotion by Dr. Marchlinski, 9/30/15 |
| 32 | OHSU_RB 001795 | OHSU_RB 001795 | Letter in support of promotion by Dr. Gerstenfeld, 10/24/15 |
| 33 | OHSU_RB 001780 | OHSU_RB 001782 | Letter recommending promotion by Dr. Fennerty, 12/5/15 |
| 34 | OHSU_RB 001807 | OHSU_RB 001808 | Letter in support of promotion by Dr. Patton, 12/11/15 |
| 35 | OHSU_RB 001735 | OHSU_RB 001738 | Letter by Dr. Anderson proposing appointment, 12/27/15 |
| 36 | OHSU_RB 001745 | OHSU_RB 001745 | Fellow Evaluations |
| 37 | BALA 1870 | BALA 1870 | Annual Faculty Evaluation, 2015-2016 |

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 38 | BALA 00193 | BALA 00195 | Personal statement in support of promotion |
| 39 | OHSU_RB 000099 | OHSU_RB 000099 | Annual salary increase, 7/1/16 |
| 40 | OHSU_RB 000010 | OHSU_RB 000010 | Appointment to Associate Professor, 7/1/16 |
| 41 | BALA 2028 | BALA 2028 | Cover of 'Tucson Lifestyle' |
| 42 | BALA 2034 | BALA 2036 | 2020 Top Doctors, 'Tucson Lifestyle,' June 2020 |
| 43 | BALA 2440 | BALA 2464 | CV of Rupa Bala |
| 44 | BALA 2469 | BALA 2470 | Exceptional Women in Medicine, 'Tucson Lifestyle,' March 2021 |
| 45 | OHSU_RB 000257 | OHSU_RB 000257 | Controlled Substance Registration Certificate, 7/21/13 |
| 46 | OHSU_RB 000258 | OHSU_RB 000258 | Medical Physician and Surgeon License, 9/24/01 |
| 47 | OHSU_RB 000259 | OHSU_RB 000259 | Certificate re Clinical Cardiac Electrophysiology, 2007-2017 |
| 48 | OHSU_RB 000260 | OHSU_RB 000260 | Certificate re Cardiovascular Disease, 2006-2016 |
| 49 | OHSU_RB 000261 | OHSU_RB 000261 | Medicinae Doctoris certificate |
| 50 | | | Revised – University of Chicago Residency Class, 1998 |
| 51 | BALA 2485 | BALA 2509 | CV of Rupa Bala, 10/2022 |
| 52 | | | Defendants' Response to Plaintiff's First Set of Interrogatories, 6/6/19 |
| 53 | | | Declaration of Dr. Rick Koch in Opposition to Defendant's Motion for Summary Judgment, 9/29/21 |
| 54 | OHSU_RB 004055 | OHSU_RB 004057 | Text messages between Dr. Dewland and Dr. Henrikson, 11/15/17-11/16/17 |
| 55 | OHSU_RB 004068 | OHSU_RB 004068 | Text messages between Ms. MacNeill and Dr. Henrikson, 9/12/17 |
| 56 | | | Excerpt of Dr. Henrikson deposition transcript, 8/7/20, pages 27-43 |
| 57 | VIRGINIAMASON 000030 | VIRGINIAMASON 000036 | Candidate notes, 8/25/17-9/25/17 |
| 58 | | | Excerpt of Dr. Bala deposition transcript, 7/28/20, pages 266-319 |
| 59 | BALA 000001 | BALA 000109 | 2016-2020 job search documents |
| 60 | BALA 1871 | BALA 2027 | August 2020 – November 2020 job search documents |
| 61 | BALA 2037 | BALA 2150 | December 2020 job search documents [*BALA 2028-2036 not included*] |
| 62 | BALA 1600 | BALA 1671 | February 2020 – June 2020 job search documents |
| 63 | BALA 2151 | BALA 2260 | January 2021 – February 2021 job search documents |
| 64 | BALA 2298 | BALA 2439 | September 2021 – October 2022 job search documents |
| 65 | BALA 2471 | BALA 2509 | November 2021 – June 2022 job search documents |
| 66 | BALA 2513 | BALA 2550 | January 2021 – June 2022 job search documents |
| 67 | | | List of job search efforts 2016-2022 with notes by Rupa Bala, updated 11/30/22 |
| 68 | BALA 2465 | BALA 2468 | Email string re position in Atlanta GA (Jackson Physicians), Aug. 2022 |
| 69 | BALA 1564 | BALA 1584 | Banner HR emails, Aug.-Oct. 2019 |
| 70 | BALA 1771 | BALA 1773 | Banner HR emails, 9/27/19 – 10/8/19 |
| 71 | BALA 1767 | BALA 1768 | Banner HR email string, 10/15/19 |
| 72 | BALA 1517 | BALA 1528 | Banner fellow evaluations |
| 73 | BALA 1784 | BALA 1788 | Banner comments/feedback |
| 74 | BALA 1592 | BALA 1596 | Banner emails and notice of termination |
| 75 | | | Banner Verbal discussion, typed notes (undated) |
| 76 | BALA 1481 | BALA 1483 | Banner emails/investigation |
| 77 | BALA 1484 | BALA 1513 | Dr. Bala's response to Banner verbal discussion, 7/24/19 |
| 78 | BALA 1516 | BALA 1516 | Corrective Action Guidelines for Banner Leaders |
| 79 | BANNER000272 | BANNER000275 | Typed notes of ER Consultant, 9/26/19 |
| 80 | BANNER000024 | BANNER000025 | Documented Verbal Discussion |
| 81 | BANNER000144 | BANNER000174 | Emails w/ Dr. Bala's response to verbal discussion, Aug.-Oct. 2019 |
| 82 | BANNER000337 | BANNER000340 | Dr. Bala email to Leadership, 9/2/19 |

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 83 | BANNER000175 | BANNER000194 | ER Investigation Report |
| 84 | BANNER000022 | BANNER000023 | Notice of termination, 1/17/20 |
| 85 | BANNER000001 | BANNER000021 | Physician Employment Agreement, 3/28/18 |
| 86 | BAAA 2674 | BAAA 2710 | Employment Agreements, UHS Medical Group, 2/8/21 and 8/6/21 |
| 87 | BALA 2261 | BALA 2297 | Employment Agreements, 8/6/21 and unsigned/undated |
| 88 | BALA 1322 | BALA 1322 | Form W-2, 2015 |
| 89 | BALA 1357 | BALA 1357 | Form W-2, 2016 |
| 90 | BALA 2876 | BALA 2877 | Form 1099s, 2017 |
| 91 | BALA 1412 | BALA 1412 | Form W-2, 2017 |
| 92 | BALA 1470 | BALA 1470 | Form W-2, 2018 (clean copy) |
| 93 | BALA 2879 | BALA 2879 | Form W-2, 2018 (photo) |
| 94 | BALA 2717 | BALA 2722 | Form W-2s, 2019-2021 |
| 95 | BALA 2881 | BALA 2881 | Form W-2, 2022 |
| 96 | BALA 2723 | BALA 2725 | Citrus Cardiology Employment Application, 11/14/22 |
| 97 | BALA 2726 | BALA 2727 | Citrus Cardiology offer letter, 10/14/22 |
| 98 | BALA 2728 | BALA 2744 | Physician Services Employment Agreement, Citrus Cardiology, 10/26/22 |
| 99 | BALA 2745 | BALA 2777 | Citrus Cardiology Employee Handbook |
| 100 | BALA 2778 | BALA 2825 | Citrus Cardiology 2023 Benefit Enrollment Guide |
| 101 | BALA 2826 | BALA 2854 | AAMC Faculty Salary Reports, FY 2021 |
| 102 | BALA 2855 | BALA 2873 | MGMA Physician Compensation Reports, FY 2021 |
| 103 | BALA 2623 | BALA 2673 | AAMC report: Exploring Salary Equity Among Medical School Leadership, Nov. 2022 |
| 104 | | | 2916 AAMC - 2020 Western - Compensation by Medical School Type (CS)-5 |
| 105 | | | 2917 AAMC - 2022  - Private Compensation by Medical School Type (CS)-8 |
| 106 | | | 2918 AAMC - 2022 - All schools - Compensation by Medical School Type (CS)-6 |
| 107 | | | 2919 AAMC - 2022 Public Schools - Compensation by Medical School Type (CS)-7 |
| 108 | | | 2920 AAMC 2021 - Western - Compensation by Medical School Type (CS)-4 |
| 109 | | | 2921 AAMC 2022 Western - Compensation by Medical School Type (CS)-2 |
| 110 | | | 2922 Rupa Bala CV – 2023 |
| 111 | | | Article 'Workforce in Crisis: Charting the Path Forward', in American College of Cardiology, 6/2/23 |
| 112 | | | Article 'Under the Radar: Visibility and the Effects of Discrimination Lawsuits in Small and Large Firms' in American Sociological Review, 2022 |
| 113 | | | Article 'By the numbers: How cardiologists have been affected by the COVID-19 pandemic' in Cardiovascular Business, 4/14/20 |
| 114 | | | 'Retaliation – Maike it Personal' on US EEOC website |
| 115 | | | Occupation profile for Cardiologists on O*Net OnLine |
| 116 | | | Occupational Outlook Handbook on US Bureau of Labor Statistics website, for Physicians and Surgeons |
| **Chiefs documents:** | | | |
| 117 | BALA 3030 | BALA 3038 | Website printout of blank pages from Medscape titled 'Clyde Yancy Goes to Northwestern' |

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 118 | BALA 3039 | BALA 3048 | Website printout from Doximity titled 'Dr. Clyde Yancy Jr., MD – Chicago, IL, Cardiology' |
| 119 | BALA 3049 | BALA 3059 | Website printout from Doximity titled 'Dr. Ioannis Chatzizisis, MD – Miami, FL, Cardiology' |
| 120 | BALA 3060 | BALA 3067 | Website printout from Doximity titled 'Dr. John Kearney Jr., MD – Boston, MA, Cardiology' |
| 121 | BALA 3068 | BALA 3073 | Website printout from Doximity titled 'Dr. Thomas Cappola MD – Philadelphia, PA, Cardiology' |
| 122 | BALA 3074 | BALA 3076 | Website printout from Newswise titled 'Thomas P. Cappola, MD, ScM, Named Chief of the Division of Cardiovascular Medicine at the Perelman School of Medicine at the University of Pennsylvania' |
| 123 | BALA 3077 | BALA 3077 | Spreadsheet created by Dr. Bala titled 'Chiefs,' including information related to Institution, Date competed Fellowship, and Date Became Chief of Cardiology |

CONFIDENTIAL

Exhibit I

Dr. Rupa Bala v. Oregon Health & Science University, et al.
Expert Report of Leonard J. Henzke
**Market Benchmarking and Net Collections Estimate of Glusman Compensation Exhibit**

| Key Assumptions | |
|---|---|
| [1] Compensation Growth Rate: Community Benchmarks | 2.4% |
| [2] Collections Growth Rate: Community Benchmarks | 2.3% |
| [3] Citrus Cardiology Compensation Formula | |
| Compensation % of Net Collections: ≤$600K | 55% |
| Compensation % of Net Collections >$600K and ≤$750K | 60% |
| Compensation % of Net Collections >$750K and ≤$1M | 65% |
| Compensation % of Net Collections: >$1M | 70% |

| Table 1: Citrus Cardiology Compensation and Net Collections Estimates | | | | |
|---|---|---|---|---|
| Period | Cash Compensation | Benchmark Percentile | Net Collections | Benchmark Percentile |
| [4] 2023 Annualized Estimate | $ 231,000 | <10 | $ 420,000 | <10 |
| [4] 2024 Estimate: Based on Aug. 2023 Average | $ 271,000 | <10 | $ 492,000 | <10 |
| [4] 2024 Estimate: Based on Peer (Dr. Uche) Average | $ 330,000 | <10 | $ 600,000 | 16 |

| Table 2: Glusman Analysis - Exhibit 2 | | | | |
|---|---|---|---|---|
| Period | Cash Compensation [5] | Benchmark Percentile | Net Collections | Benchmark Percentile |
| 2023 | $ 476,423 | 13 | n/a | n/a |
| 2024 | $ 264,000 | <10 | $ 480,000 | <10 |
| 2025 | $ 270,300 | <10 | $ 491,455 | <10 |
| 2026 | $ 276,800 | <10 | $ 503,273 | <10 |
| 2027 | $ 283,400 | <10 | $ 515,273 | <10 |
| 2028 | $ 290,200 | <10 | $ 527,636 | <10 |
| 2029 | $ 297,200 | <10 | $ 540,364 | <10 |
| 2030 | $ 304,300 | <10 | $ 553,273 | <10 |
| 2031 | $ 311,600 | <10 | $ 566,545 | <10 |
| 2032 | $ 319,100 | <10 | $ 580,182 | <10 |
| 2033 | $ 326,800 | <10 | $ 594,182 | <10 |
| 2034 | $ 334,600 | <10 | $ 607,667 | <10 |
| 2035 | $ 342,600 | <10 | $ 621,000 | <10 |
| 2036 | $ 350,800 | <10 | $ 634,667 | <10 |
| 2037 | $ 359,200 | <10 | $ 648,667 | <10 |
| 2038 | $ 367,800 | <10 | $ 663,000 | <10 |
| 2039 | $ 376,600 | <10 | $ 677,667 | <10 |
| 2040 | $ 385,600 | <10 | $ 692,667 | <10 |
| 2041 | $ 394,900 | <10 | $ 708,167 | <10 |
| 2042 | $ 404,400 | <10 | $ 724,000 | <10 |
| 2043 | $ 414,100 | <10 | $ 740,167 | <10 |

[1] Growth rate used to lag-adjust benchmarks 2023 to 2043; referenced in previous Henzke report.

[2] The collections growth rate to lag-adjust benchmarks is based on the compound annual growth rate of 2.4% between 2017 to 2022 for median professional collections in the community benchmarks; these benchmarks are based on MGMA DataDive Compensation for Cardiology: Electrophysiology, AMGA *Medical Group Compensation and Productivity Survey* for Cardiology-EP, and ECG *Physician and APP Compensation Survey* for Cardiology-Electrophysiology, utilizing the surveys or reports that provided 2017 and 2022 data.

[3] Based on Dr. Bala's current Citrus Cardiology Physician Services Employment Agreement.

[4] Cash compensation and net collection levels based on email between Dr. Bala and Jerry DeLoach, Chief Executive Officer, Citrus Cardiology.

[5] Cash compensation based on reported compensation in Glusman's exhibit 2.



Exhibit 7
Page 12 of 12



1222 State Ave. NE, Ste.101
Olympia, WA 98506
Toll Free   866-943-1171
Fax   206-267-4666

November 1, 2023


Andrea H. Thompson
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205


Re:    Dr. Rupa Bala
         Date of Separation: June 19, 2017

## VOCATIONAL EVALUATION REPORT

This report contains confidential information.


Dear Ms. Thompson:

The case of Dr. Rupa Bala was referred to me by counsel for Stoel Rives LLP, acting on behalf of Oregon Health and Science University ("OHSU"), Dr. Charles Henrikson, and Dr. Joaquin Cigarroa (collectively, "Defendants" or "OHSU"), for a vocational evaluation to determine vocational potential secondary to separation of employment with OHSU.

I am a board-certified rehabilitation counselor with the Commission on Rehabilitation Counselor Certification, a certified disability management specialist by the Commission for Case Manager Certification, and a certified diplomate of the American Board of Vocational Experts. I am an approved provider with the Washington State Department of Labor and Industries, and a vocational expert for the Social Security Administration. In my role as a vocational expert with the Social Security Administration, I have participated in over 4,000 hearings since 2010. I have also been qualified as a vocational expert at the Washington State Board of Industrial Appeals, Pierce County Washington Superior Court, and the United States District Court for the District of Oregon Portland Division.

In performing my work in this evaluation, I relied on the foundational facts and data provided to me in the form of the records you provided. Additionally, I relied on methods and standards of practice that are generally accepted within the field of vocational rehabilitation counseling. Further, I relied on labor market information and statistics available through the public domain. Lastly, I relied on my clinical judgement consistent

Lakewood
8524 Steilacoom Blvd.
Bldg B, Suite 102B

Port Orchard
1730 Pottery Ave.
Suite 110A

Seattle
14900 Interurban Ave. S.
Suite 271

Exhibit 8
Page 1 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

Page 2 of 8

with my education, training, and experience from my clinical practice as a vocational rehabilitation counselor. My opinions and recommendations are offered on a vocationally more-probable-than-not basis.


## REFERRAL QUESTIONS

1.  What was the availability of electrophysiology jobs in the national economy from 2016 to 2022?

2.  How long would it take someone with Dr. Bala's similar vocational profile to become reemployed following her separation from Oregon Health & Science University on June 19, 2017?


## BACKGROUND INFORMATION

Dr. Rupa Bala is a 50-year-old woman born February 27, 1973. She was working under contract as a cardiologist for Oregon Health & Science University in Portland, Oregon. The date of separation is June 19, 2017. Dr. Bala is currently working under contract as a cardiologist for Citrus Cardiology Consultants in Iverness, Florida.


## EDUCATION AND TRAINING

Dr. Bala graduated from Herschel V. Jenkins High School in Savanah, Georgia in 1990. She completed her Bachelor of Science degree in biology from Georgetown University in Washington, DC in 1994. She earned her medical doctorate from Georgetown University School of Medicine in 1998.

From June 1998 to June 2001, Dr. Bala participated in an internship and residency in the Department of Internal Medicine at the University of Chicago.

From July 2002 to June 2005, she participated in a cardiology fellowship at the Hospital of the University of Pennsylvania in the Department of Cardiovascular Medicine.

From July 2005 to June 2006, Dr. Bala participated in an electrophysiology fellowship in the division of electrophysiology at the Hospital of the University of Pennsylvania.


## LICENSES AND CERTIFICATIONS

According to her CV, Dr. Bala currently holds medical licensure in New York State. She previously held state medical licensure in Illinois, Pennsylvania, Hawaii, Oregon, and Arizona.

Exhibit 8
Page 2 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

Page 3 of 8

## WORK EXPERIENCE

Dr. Bala has approximately 16 years of experience in the internal medicine and the cardiology medical field. Her subspeciality is in electrophysiology.

From July 2006 to September 2014, Dr. Bala worked as an assistant professor of medicine in cardiac electrophysiology at the Hospital of the University of Pennsylvania in Philadelphia, Pennsylvania.

There is a gap in employment from September 6, 2014 to January 4, 2015.

Dr. Bala worked as an associate professor of medicine and director of complex ablations in cardiac electrophysiology at Oregon State Health and Sciences University in Portland, Oregon from January 2015 to June 2017.

There is a gap in employment from June 20, 2017 to June 30, 2018.

From July 2018 to April 2019, she worked as an associate professor and director of electrophysiology laboratory in cardiac electrophysiology at Banner University Medical Center in Tucson, Arizona.

There is a gap in employment from April 20, 2020 to March 28, 2021.

From March 29, 2021 to May 2022, Dr. Bala worked as a cardiac electrophysiology physician for United Health Services/UHS Medical Group in Johnson City, New York.

There is a gap in employment between May 2022 and October 2022.

She was offered employment with Citrus Cardiology on October 14, 2022. She is listed online as one of the cardiologists providing electrophysiology services at Citrus Cardiology at the clinic in Inverness, Florida.

## Occupational Profile/Wage Data

Description
Cardiologists (*Standard Occupational Classification* #29-1212) diagnose, treat, manage, and prevent diseases or conditions of the cardiovascular system. Cardiologists may further subspecialize in interventional procedures (e.g., balloon angioplasty and stent placement), echocardiography, or electrophysiology. Tasks performed by cardiologists include:
- Administer emergency cardiac care for life-threatening heart problems, such as cardiac arrest and heart attack.

Exhibit 8
Page 3 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

Page 4 of 8

- Advise patients and community members concerning diet, activity, hygiene, or disease prevention.
- Answer questions that patients have about their health and well-being.
- Calculate valve areas from blood flow velocity measurements.
- Compare measurements of heart wall thickness and chamber sizes to standards to identify abnormalities, using the results of an echocardiogram.
- Conduct electrocardiogram (EKG), phonocardiogram, echocardiogram, or other cardiovascular tests to record patients' cardiac activity, using specialized electronic test equipment, recording devices, or laboratory instruments.
- Conduct exercise electrocardiogram tests to monitor cardiovascular activity under stress.
- Conduct research to develop or test medications, treatments, or procedures that prevent or control disease or injury.
- Conduct tests of the pulmonary system, using a spirometer or other respiratory testing equipment.
- Design and explain treatment plans, based on patient information such as medical history, reports, and examination results.
- Diagnose cardiovascular conditions, using cardiac catheterization.
- Diagnose medical conditions of patients, using records, reports, test results, or examination information.
- Explain procedures and discuss test results or prescribed treatments with patients.
- Inject contrast media into patients' blood vessels.
- Monitor patient progress following cardiac surgery.
- Monitor patients' conditions and progress, and reevaluate treatments, as necessary.
- Observe ultrasound display screen, and listen to signals to record vascular information, such as blood pressure, limb volume changes, oxygen saturation, and cerebral circulation.
- Obtain and record patient information, including patient identification, medical history, and examination results.
- Operate diagnostic imaging equipment to produce contrast-enhanced radiographs of heart and cardiovascular system.
- Order medical tests, such as echocardiograms, electrocardiograms, and angiograms.
- Perform minimally invasive surgical procedures, such as implanting pacemakers and defibrillators.
- Perform vascular procedures, such as balloon angioplasty and stents.
- Prescribe heart medication to treat or prevent heart problems.
- Recommend surgeons or surgical procedures.
- Supervise or train cardiology technologists or students.
- Talk to other physicians about patients to create a treatment plan.

Industry:
Cardiologists work in two main settings: private practice and integrated programs. Private practice consists of physicians' clinics where integrated programs include

Exhibit 8
Page 4 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

Page 5 of 8

surgical hospitals, outpatient care centers, universities, professional schools, and specialty hospitals.

Geographic Locations:
Cardiologists work throughout the United States and there is more employment in the metropolitan areas. States with the highest employment include New York, California, New Jersey, Florida, and Texas. Given the nature of the occupation, and the compensation rate, job search is often nationwide.

Subspecialities:
Cardiologists work in several medical sub-specialty areas. Broadly, these are categorized as invasive interventional medicine; invasive non-interventional medicine; and non-invasive medicine. Invasive cardiology involves minor surgeries or minimally invasive procedures including catheter procedures, electrophysiology, electrical cardioversion, or implantable devices. Non-invasive procedures involve listening to heart rhythms, taking blood pressure, monitoring pulse during physical activity and do not involve the insertion of fluids or medical devices.

Qualifications:
Cardiologists must hold a medical doctorate in their specialty area. They complete residency in internal medicine and a cardiology fellowship. They hold state medical licensure to practice.

Employment Outlook and Demand:
Demand for workers with higher education attainment is better than those with less education. For example, the United States Bureau of Labor Statistics (BLS) found a 1.0% unemployment rate for those with doctoral degrees versus 2.2% unemployment for those with bachelor's degrees; 4.0% for those with a high school diploma; and 5.5% for those with less than a high school diploma.

The healthcare sector has seen considerable employment growth since 2010 and follows the trend in overall healthcare spending in the United States. BLS reported an increase every quarter between the first quarter of 2010 and the fourth quarter of 2019. In the third quarter of 2016, there were 15,467,000 healthcare sector jobs. By the third quarter of 2017, healthcare sector employment increased to 15,611,000, an increase of 144,000 jobs. This trend continued through the fourth quarter of 2019 wherein there were a total of 16,412,000 healthcare jobs. According to BLS, the gains in health care employment in 2019 accounted for 16.5% of total employment growth (excluding farm-related employment).

Demand for healthcare workers including physicians is strong. Both demographic and Covid related strains have increased the demand of healthcare services and reduced the number of practitioners actively engaged in employment. A recent study (2021) by Doximity found a consistent trendline of retirement for the physician network prior to the pandemic with an additional 2% increase of physician's leaving the workforce during the pandemic. The Association of American Medical Colleges (2021) projects broad

Exhibit 8
Page 5 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

Page 6 of 8

physician shortages between 2019 and 2034. Projected shortages in medical specialties including cardiology, oncology, infectious disease, and pulmonology range between 3,800 and 13,400 nationally by 2034.

Physician labor supply shortages are likely to continue as physicians near retirement age retire earlier, while early career and mid-career physicians are less likely to take early retirement.

BLS anticipates long-term growth for cardiologists of 2% to 4% from 2022 and 2032. BLS projects 600 annual cardiologist job openings. The American College of Cardiology (2021) found similar numbers in its survey with a projected 3% increase in demand for cardiologists through 2031.

*Job Numbers*: Prior to 2019, BLS grouped cardiologist employment data with data with other physician specialties. The combined group was titled Physician and Surgeons, All Other (*SOC* #29-1069) and included dermatologists, emergency medical physicians, neurologists, pathologists, radiologists, ophthalmologists, and acupuncturists. Data are not available by subspecialty area. In its 2016 Occupational Employment Survey (OES), BLS found 338,620 Physician and Surgeon, All Other jobs in the national economy. In 2017, there were 355,460 Physician and Surgeon, All Other jobs. In 2018, the number of jobs rose to 389,180. In 2019, employment in this group grew to 390,680.

In 2020, BLS implemented the Occupational Employment and Wage Survey (OEWS) and with it grouped cardiologists (29-1212); dermatologists (29-1213); emergency medical physicians (29-1217); neurologists (29-1217); pathologists (29-1222); radiologists (29-1224); physicians, all other (29-1229) and ophthalmologists, except pediatric (29-1241); and the 2010 *SOC* group, Physician, All Other (29-1069). There were 375,390 jobs in this broad occupational group in 2020. For the 2021 OEWS, BLS surveyed the distinct occupation of cardiologist (29-1212). BLS reported 18,610 distinct cardiology jobs in the national economy in 2021. In 2022, they reported 16,870 cardiologists.

Cardiologist occupations comprised 4.3% of the physician occupations grouped in the 2016 through 2020 data. If cardiologist job numbers have remained consistent relative to the other physician occupations, that would suggest estimated national employment of cardiologist for 2016 through 2022 was:

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|------|------|------|------|------|------|------|
| 14,561± | 15,285± | 16,735± | 16,799± | 16,142± | 18,610 | 16,870 |

I was not able to find complete studies for the total employment numbers by subspecialty. In its 2023 Cardiology Provider Compensation and Production Survey, MedAxiom reported that electrophysiologist comprised 13.4% of survey respondents in 2020, 13.7% in 2021, and 13.0% in 2022.

Exhibit 8
Page 6 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

Page 7 of 8

## Duration of Unemployment

BLS reports the median number of weeks of unemployment duration for job seekers based on gender and age. Women in the age range 35 to 44 (2016 and 2017) and the age range 45 to 49 (2018 to 2022) have the following annual average median number of weeks of unemployment duration for the years listed.

| Year | Median Weeks Unemployment Duration |
|------|-----------------------------------|
| 2016 | 11.2 weeks |
| 2017 | 10.6 weeks |
| 2018 | 9.6 weeks |
| 2019 | 9.0 weeks |
| 2020 | 9.9 weeks |
| 2021 | 19.0 weeks |
| 2022 | 10.0 weeks |

## VOCATIONAL ASSESSMENT AND OPINION

My opinions below are based on the information in this report including the indicated facts and data I relied upon. Should additional information become available prior to or during trial, I reserve the right to update or supplement my opinions accordingly.

### Referral Questions

1. **What was the availability of electrophysiology jobs in the national economy from 2016 to 2022?**

   There was a reasonable estimation of 2,010 to 2,412 electrophysiology jobs in the United States during this period with an estimated 67 to 80 annual openings.

2. **How long would it take someone with Dr. Bala's similar vocational profile to become reemployed following her separation from Oregon Health & Science University June 19, 2017?**

   In my opinion, with diligent job search effort, Dr. Bala could be reemployed within 9 to 19 weeks. That was true at the time of and prior to her separation from OHSU on June 19, 2017.

Submitted by:

DT North, MS, CRC, CDMS, ABVE/D
Vocational Rehabilitation Counselor
Certified Disability Management Specialist
American Board of Vocational Experts Diplomate

Exhibit 8
Page 7 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

Page 8 of 8

ENCL:       Resources and References
            Records List
            Resume of DT North
            Testimony History 2019 to 2023
            Fee Schedule

Exhibit 8
Page 8 of 17

Vocational Evaluation Report – DT North
Report Date: November 1, 2023
Evaluee: Rupa Bala
Date of Separation: June 19, 2017

**RESOURCES AND REFERENCES**

AAMC Report Reinforces Mounting Physician Shortage. (2022). American Association
of Medical Colleges. Retrieved from https://www.aamc.org

*CPS Home: U.S. Bureau of Labor Statistics*. (2022). Retrieved from
https://www.bls.gov/cps/

*Dictionary of Occupational Titles*: Revised Fourth Edition. (1991). U.S. Department of
Labor.

Doximity (2022). *2021 Physician Compensation Report.* Doximity.
https://c8y.doxcdn.com/image/upload/v1/Press%20Blog/Research%20Reports/D
oximity-Compensation-Report-2021.pdf

Havranek, J. E., &; Blackwell, T. L. (1997). *Forensic Rehabilitation: A Resource for
Vocational Experts*. Elliott &amp; Fitzpatrick.

Mba, J. S. (2022. *A Decade in Review: Cardiology and Interventional Cardiology
Trends*. Cardiac Interventions Today. https://citoday.com/articles/2022-sept-
oct/a-decade-in-review-cardiology-and-interventional-cardiology-trends

MedAxiom (2023) Cardiovascular Provider Compensation and Production. Retrieved
October 25, 2023, from https://info.medaxiom.com/hubfs/2023%20Comp%
20Survey %20Report/2023%20MedAxiom%20Comp%20Survey%20Report.pdf

O*Net online. *O*NET OnLine*. (n.d.). https://www.onetonline.org/

Robinson, R. H. (2014). *Foundations of Forensic Vocational Rehabilitation*. Springer
Publishing Company.

U.S. Bureau of Labor Statistics. (2023). *Occupational Employment and Wage Survey*.
U.S. Bureau of Labor Statistics. https://www.bls.gov/oes/

Exhibit 8
Page 9 of 17

*Rupa Bala MD v. OHSU et al*

Documents Provided to Vocational Rehabilitation Expert

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 1 | UPENN000450 | UPENN000455 | Clinical Practices of the University of Pennsylvania Department of Medicine Member Practice Agreement [Hospital Based Physician] |
| 2 | UPHS000194 | UPHS000195 | MOU for Joint Faculty Appointments at the Philadelphia Veterans Administration Medical Center and the University of Pennsylvania Schools of Medicine and Dentistry |
| 3 | UPHS000038 | UPHS000040 | Academic Plan for Rupa Bala, MD |
| 4 | OHSU_RB 000050 | OHSU_RB 000073 | Oregon Health & Science University Clinician Employment Agreement |
| 5 | BANNER000557 | BANNER000577 | Banner-University Medical Group Physician Employment Agreement |
| 6 | BAAA 2674 | BAAA 2691 | United Medical Associates PC Employment Agreement, 2/8/21 |
| 7 | BAAA 2692 | BAAA 2710 | United Medical Associates PC Employment Agreement, 8/6/21 |
| 8 | BALA 2728 | BALA 2744 | Citrus Cardiology Consultants P.A. Physician Services Employment Agreement |
| 9 | OHSU_RB 000026 | OHSU_RB 000048 | Rupa Bala, MD CV: 2014 |
| 10 | BANNER000579 | BANNER000604 | Rupa Bala, MD CV: 2015-2017 |
| 11 | ADVOCATE000004 | ADVOCATE000029 | Rupa Bala, MD CV: 2017 |
| 12 | BALA 000770 | BALA 000793 | Rupa Bala, MD CV: 2020 |
| 13 | BALA 2440 | BALA 2464 | Rupa Bala, MD CV: 2021 |
| 14 | BALA 2485 | BALA 2509 | Rupa Bala, MD CV: May 2022 |
| 15 | | | Excerpt of July 28, 2020 Deposition of Dr. Rupa Bala (pages 264-316) |
| 16 | | | Excerpt of Plaintiff's Initial Disclosures (pages 12-13) |
| 17 | BALA 000625 | BALA 000628 | OHSU Offer Letter, 7/16/14 |
| 18 | OHSU_RB 000015 | OHSU_RB 000016 | OHSU Position Description, Unclassified Academic Personnel |
| 19 | OHSU_RB 000614 | OHSU_RB 000620 | OHSU Employee History Detail, Rupa Bala |
| 20 | OHSU_RB 000386 | OHSU_RB 000472 | OHSU Group Medical Plan, PPO Plan, effective 1/1/17 |
| 21 | OHSU_RB 000338 | OHSU_RB 000382 | OHSU Oregon Group Dental Plan, Delta Dental Premier Plan B, effective 1/1/17 |
| 22 | OHSU_RB 000099 | OHSU_RB 000099 | OHSU Annual Salary effective 7/1/16 |
| 23 | OHSU_RB 000853 | OHSU_RB 000853 | OHSU Monthly Benefit Contribution, 2015-2017 |
| 24 | OHSU_RB 000852 | OHSU_RB 000852 | OHSU Total Compensation, 2015-2017 |
| 25 | OHSU_RB 000609 | OHSU_RB 000613 | Fidelity Investments OHSU Pension Plan, Retirement Savings Statement: 1/1/16-5/3/19 |
| 26 | OHSU_RB 000605 | OHSU_RB 000608 | Fidelity Investments OHSU Tax Deferred Investment Plan, Retirement Savings Statement: 1/1/16-5/3/19 |
| 27 | OHSU_RB 000383 | OHSU_RB 000385 | OHSU Retirement Account Summary: 5/3/17-5/2/19 |
| 28 | BANNER000130 | BANNER000130 | Physician Recruitment - BUMG Physician Request Form |
| 29 | BANNER000079 | BANNER000080 | Banner Health Position Description, signed by Rupa Bala 4/11/18 |
| 30 | BANNER000087 | BANNER000087 | Banner Health New Hire Paperwork |
| 31 | BANNER000532 | BANNER000550 | Banner Health Payroll Report: 5/23/18-12/20/18 |
| 32 | BALA 2727 | BALA 2727 | Citrus Cardiology Consultants P.A. Offer Letter, 10/14/22 |
| 33 | BALA 2723 | BALA 2725 | Citrus Cardiology Consultants P.A. Employment Application, 11/14/22 |
| 34 | BALA 2778 | BALA 2825 | Citrus Cardiology Consultants P.A. Benefit Enrollment Guide, 2023 |
| 35 | BALA 1290 | BALA 1470 | Rupa Bala Tax Returns: 2015-2018 |
| 36 | BALA 2551 | BALA 2550 | Rupa Bala Tax Returns: 2019-2021 |
| 37 | OHSU_RB000324 | OHSU_RB000324 | OHSU W-2: 2015 |
| 38 | OHSU_RB000323 | OHSU_RB000323 | OHSU W-2: 2016 |
| 39 | BALA 2876 | BALA 2877 | 1099-MISC: 2017 (Medtronic Logistics & Quality Conferences) |
| 40 | OHSU_RB000325 | OHSU_RB000325 | OHSU W-2: 2017 |

| # | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 41 | BANNER000500 | BANNER000501 | Banner-Univ Med Group W-2: 2018 |
| 42 | BANNER000502 | BANNER000503 | Banner-Univ Med Group W-2: 2019 |
| 43 | BAAA 2719 | BAAA 2720 | Banner-Univ Med Group W-2: 2020 |
| 44 | BAAA 2721 | BAAA 2721 | United Medical Associates, PC W-2: 2021 |
| 45 | BAAA 2283 | BAAA 2284 | United Medical Associates, PC W-2: 2022 |
| 46 | BALA 2826 | BALA 2854 | AAMC Faculty Salary Report, FY 2021: Summary Statistics |
| 47 | BALA 2855 | BALA 2873 | MGMA Physician Compensation Reports, 2021 |
| 48 | | | FRCP 26. Duty to Disclose; General Provisions Governing Discovery (Rule Text & Notes of Decisions) |
| 49 | | | Exhibit A to Amended Stipulated Protective Order, signed 11/12/23 |

**DT NORTH, MS, CRC, CDMS, ABVE/D**
1222 State Ave. NE, Suite 101
Olympia, WA 98506
(360) 819-4520
Fax (206) 267-4666
dt@achieveconsultingteam.com

### EDUCATION

**Master of Science, Organizational Development**                                             2003
  Central Washington University, Ellensburg, Washington

**Bachelor of Arts, Psychology**                                                              2000
  The Evergreen State College, Olympia, Washington

**Graduate Coursework, Rehabilitation Counseling**
  *Foundations of Forensic Rehabilitation Counseling*, George Washington University    2012
  *Case Management in Rehabilitation*, Western Washington University                    2020
  *Introduction to Rehabilitation Counseling*, Western Washington University            2020
  *Appraisal Procedures in Counseling*, Central Connecticut State University            2020
  *Medical, Psychological and Vocational Aspects of Disability*, Western Washington University   2021
  *Career Development & Job Placement*, Western Washington University                   2021

### PROFESSIONAL CERTIFICATION

***Certified Rehabilitation Counselor #533199***
Commission on Rehabilitation Counselor Certification

***Certified Disability Management Specialist, #4229008***
The Certification of Disability Management Specialist Commission

***Board Certified Vocational Expert Diplomate Level, #20028***
American Board of Vocational Experts

### PROFESSIONAL EXPERIENCE

**Vocational Rehabilitation Counselor/Vocational Expert**                        2000 to Present
Clinical vocational rehabilitation counseling and case management services including return-to-work services, employability assessment, job placement, and rehabilitation plans. Conduct forensic vocational evaluations and testify in administrative law and civil law venues.

**Vocational Rehabilitation Counselor Firm Manager**                            2005 to Present
Select, train, supervise, and mentor professional staff. Develop work product standards, oversee caseload management, and conduct oversee audits. Monitor and enforce compliance with statutes, administrative rules, professional conduct, and contract requirements.

**President, Achieve Consulting Team, Inc.**                                     2005 to Present
Business development and operations management: Marketing, financial and strategic planning; procurement; contracting; budgeting; and development of operating policy and procedures.

**Management and Consulting**                                                    1992 to Present
Management and leadership: Operations; financial analysis; employee recruitment, selection, and development; continuous quality improvement strategies. Consulting: Conflict resolution, executive coaching, group facilitation, organizational analysis, job analysis, change interventions; benchmarking; and organizational model development.

Updated 10/24/2023

Exhibit 8
Page 12 of 17

**DT NORTH, MS, CRC, CDMS, ABVE/D**

## TEACHING EXPERIENCE

**The Evergreen State College**

Social Psychology of Disability                                                                           2018 & 2019
Work and Disability: Minimizing the Human and Financial Impact of Disability      2016 & 2017

**Sterling Education Services**

Advanced Workers' Compensation: Second Injury Fund                                        10/2016

**Central Washington University, Ellensburg, Washington, Psychology Department**

Industrial/Organizational Psychology                                                                            2009
Organizational Strategy & Management                                                                        2006

## PRESENTATIONS

- *American Board of Vocational Experts' National Certification Examination Development 2016 to 2023.* Presentation. American Board of Vocational Experts. 2023 Annual Conference. 3/2023.
- *Fostering Client Autonomy and Agency*. Joint Presentation with Kimberley North, MA, CDMS, ABVE/D. International Association of Rehabilitation Professionals. 2019 Annual Conference. 5/2019
- *Overlapping Objectives: How Return to Work Goals Overlap Recovery from Post-Traumatic Stress Disorder.* Joint Presentation with Geoff Soleck, Ph.D., Clinical Psychologist. Washington Self-Insurers Association. Return to Work Summit. 7/2018
- *Understanding Emotional Intelligence in Conflict Resolution.* Washington State Executive Assistant Association. Annual Conference. 10/2017
- *Utilizing Enhanced Vocational Services.* Joint Presentation with Kimberley North, MA, CDMS, ABVE/D. Washington Self-Insurers Association. Return to Work Summit. 7/2017
- *Pitfalls in Employability Assessments and Retraining Plans.* Joint Presentation with Doug Palmer, Attorney at Law. International Association of Rehabilitation Professionals, Washington Chapter. 2017 Annual Conference. 5/2017
- *Job Accommodation*. Washington State Self-Insurers Winter Conference. 1/2017
- *The Value of Internships & Volunteer Experience.* TRiO, Evergreen State College. 5/2014
- *The Certification of Disability Management Specialist Commission Role and Function Study* Washington State Dept. of Labor & Industries' Director and Executive Team. 5/2010
- *Washington State Labor and Industries Vocational Benefits.* Professionals of Workers' Compensation. 3/2009
- *Washington State Labor and Industries Vocational Benefits.* People's Injury Network Northwest quarterly meeting. 5/2008
- *Performance Reporting in State Government: What Do Stakeholders Want?* Governor Gary Locke's staff. 6/2003

## PUBLICATIONS

**North, DT (2017)** "ABVE Test Development." The Vocational Expert, Summer 2017 Volume 32, No. 2, 11

**North, DT (2012)** "Applying Interest-Based Processes in a Rights-Based System." CDMSource. Fall 2012

**North, DT & Quick, E (2011)** "The Evolving Domain of Disability Management." Case in Point

**North, DT (2010)** "Will Healthcare Reform Favorably Impact Long-Term Disability?" Contemporary Rehab, Volume 66, No. 3, 1&6

**North, DT (2011) "**Motivating Clients to Return to Work" Rehabilitation Professional, Volume 19, No. 1

**DT NORTH, MS, CRC, CDMS, ABVE/D**

**North, DT & Gonzales, D (2009)** "Measuring the Value of Return-to-Work Programs in an Economic Recession." <u>The Self-Insurer</u>, August 2009, 9-11

**Parker, J, Cromwell, D & North, DT (2009)** "Aging Workforce Requires Proactive Approach Backed by Corporate Culture." <u>The Self-Insurer</u>, May 2009, 4-6

**North, DT (2009)** "Succession Planning in Disability Management Will Avoid an Experience Gap in the Future." <u>Contemporary Rehab</u>, Volume 65 No. 4, 20-21

## RESEARCH

**Standard Setting Study**                                           2023
   Design and lead standard setting workshops to establish cut score for the American Board of Vocational Experts' national certification examination using The Angoff Method.

**Benchmark Study of Professional Codes of Ethics**                  2020
   Codes of ethics of professional certification bodies related to vocational rehabilitation, disability management, case management, and related fields to identify common traits and presented updated Code of Ethics to the American Board of Vocational Experts.

**Job Analysis and Test Specification Study for Vocational Experts**   2016 to 2019
   National role delineation study of vocational experts. Define scope of practice for development of a content-valid certification examination. Create test specifications. Direct development of exam item writing, constructed examination, and beta tested exam items.

**Role and Function Study for Disability Management Specialist**      2009
   National role delineation study of disability management specialists. Define scope of practice for Certification for Disability Management Specialists' criterion-referenced national certification exam.

## PROFESSIONAL AFFILATIONS

**Board Member-at-Large:** *American Board of Vocational Experts*       2015 to Present
   Chair, Test Development Committee
   Member, Ethics Committee

**Commissioner:** *The Certification of Disability Management Specialist Commission*   2008 to 2013
   Chair, Examination and Research Committee
   Chair, Professional Conduct Committee

**Vocational Expert:** *U.S. Social Security Administration Office of Hearing Operations*   2011 to Present
   Regions Served: II, III, IV, V, VI, VII, VIII, IX, & X

**Member:** *International Association of Rehabilitation Professionals*   2010 to Present

**Senior Mediator**: *Dispute Resolution Center of Thurston County*    2008 to Present

**Vocational Rehabilitation Provider:** Washington State *Dept. of Labor & Industries*   2000 to Present
   Vocational Rehabilitation Counselor Supervisor & Forensic Evaluator; #9682

## AWARDS

**David S. Frank Lifetime Achievement Award** – *American Board of Vocational Experts*   2020
**Scott E. Streater Learning and Education Award** – *American Board of Vocational Experts*   2019
**Presidential Citation** – *American Board of Vocational Experts*   2018

**DT North, MS, CRC, CDMS, ABVE/D**
**Testimony History Preceding Four Years**

**07/2011 to 2023**
United States Social Security Administration, Regions II, III, IV, V, VI, VII, VIII, IX, & X
Office of Hearing Operations
Testified in over 4,000 disability hearings

**08/28/2023**
Gonzalez/Washington State Department of Labor and Industries v. Conco Inc.
State of Washington Board of Industrial Insurance Appeals
Case No. 21 25254
On behalf of the defendant represented by Attorney General of Washington/Jordan Couch
Deposition Testimony

**03/25/2022**
Luna Ramirez v. Washington State Department of Labor and Industries
State of Washington Board of Industrial Insurance Appeals
Case No. 21 15304
On behalf of the plaintiff represented by Corey Endres
Deposition Testimony

**01/25/2022**
Willard v. Washington State Department of Labor and Industries
State of Washington Board of Industrial Insurance Appeals
Case No. 21 12811
On behalf of the plaintiff represented by Corey Endres
Deposition Testimony

**09/15/2021**
Ali v. Washington State Department of Labor and Industries
State of Washington Board of Industrial Insurance Appeals
Case Nos. 20 13836 20 19335; 20 19336; 21 14730; 21 14932
On behalf of the plaintiff represented by Corey Endres
Deposition Testimony

**07/19/2021**
Gutierres Martinez v. Washington State Department of Labor and Industries
State of Washington Board of Industrial Insurance Appeals
Case No. 20 22705
On behalf of the plaintiff representative by Corey Endres
Deposition Testimony

**09/17/2020**
Eller v. Washington State Department of Labor and Industries
State of Washington Board of Industrial Insurance Appeals
Docket No. 19 24554
On behalf of the plaintiff represented by David Carson
Deposition Testimony

**07/16/2020**
Stuckey v. Washington State Department of Labor and Industries
State of Washington Board of Industrial Insurance Appeals
Case No. SB30650
On behalf of the plaintiff represented by Kathryn Comfort
Deposition Testimony

**11/25/2019**
Schimke v. Washington State Department of Labor and Industries
State of Washington Board of Industrial Insurance Appeals
Docket No. 19 12580
On behalf of the plaintiff represented by Rachel Scott
Deposition Testimony



1222 State Ave. NE, Ste.101
Olympia, WA 98506
Tel   360.943.1171
Fax   360.943.1181

## Fee Schedule 2023 – Civil

| Rate* | Service |
|---|---|
| Professional Services | $330.00 per hour |
| Deposition and Trial Testimony | $440.00 per hour |
| Travel/Wait Time | $330.00 per hour |
| Automobile Mileage | $.66 per mile |
| Naming/Case Setup Fee | $330.00 |
| Administrative and Document Preparation Services | $55.00 per hour |
| Document Printing | $.10 per page |
| Case-Related Expenses | Actual Cost |
| Electronic Records (CD) | $55.00 |

*Rates are valid through December 31, 2023

**Retainer Amount**
A retainer fee of $2,750 is required at the time of referral for services. No work will be initiated prior to its receipt.

**Deposition Appearances – Advance Payment – 2 Hour Minimum**
Trial testimony and deposition appearances cannot be confirmed until after receipt of the advance payment. The advance payment is due at least five business days prior to the scheduled date of the deposition.  If deposition appearances or trial testimony are cancelled with less than two business days advance notice, the advance payment shall not be refunded.

**Payment Responsibilities**
The retaining party is solely and completely responsible for payment of fees.

**Invoices**
Fees and expenses shall be invoiced monthly and are due upon receipt. Past due balances are subject to interest charged at the rate of 18% per annum. All outstanding balances must be paid prior to any testimony.

| Lakewood | Port Orchard | Seattle |
|---|---|---|
| 8524 Steilacoom Blvd.
Bldg B, Suite 102B | 1730 Pottery Ave.
Suite 110A | 14900 Interurban Ave. S.
Suite 271 |

Exhibit 8
Page 17 of 17