**MATTHEW C. ELLIS, OSB No. 075800**
matthew@employmentlawpdx.com
**Matthew C. Ellis, PC**
1500 SW 1st Avenue, Suite 1000
Portland, Oregon 97201
Telephone: 503/345-5407

**STEPHEN L. BRISCHETTO, OSB No. 781564**
slb@brischettolaw.com
1500 SW 1st Avenue, Suite 1000
Portland, Oregon 97201
Telephone:  503 223-5814

Of Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **DR. RUPA BALA**, <br><br> Plaintiff, <br><br> v. <br><br> **OREGON HEALTH AND SCIENCE UNIVERSITY, an Oregon public corporation; DR. CHARLES HENRIKSON, an individual; DR. JOAQUIN CIGARROA, an individual.** <br><br> Defendants. | **CASE NO. 3:18-CV-00850-HZ** <br><br> **PLAINTIFF'S WITNESS STATEMENTS** |

Plaintiff may call the following witnesses at trial in this case. In addition to testifying about the subjects set forth below, they will testify about the exhibits they sent or received, as referenced on Plaintiff's Exhibit list.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

1. **DR. RUPA BALA**                                    Est'd Length of Direct: 6 hours

Plaintiff

Dr. Bala is the plaintiff in the case and will testify about all aspects of her case, consistent with her deposition, interrogatory responses, her most recent complaint, and lodged pretrial order.

Dr. Bala grew up in Savannah, GA. Her father was a Hematology/Oncology Physician and cultivated her interest in Medicine at a very young age. Dr. Bala will testify that she used to round with her father routinely growing up and could never imagine doing anything else but following in his footsteps and caring for patients. She attended Georgetown University for College, graduating in 1994. She was accepted into the early decision program at Georgetown University School of Medicine in her sophomore year of college. She attended Georgetown University School of Medicine and graduated in 1998. She attended the University of Chicago for her Internal Medicine Residency and graduated in 2001. Dr. Bala and her classmates at the University of Chicago developed a strong passion for Academic Medicine that was cultivated in the early years of their training. Many of her classmates from the University of Chicago pursued careers in Academic Medicine and went on to become leaders in their respective fields, achieving chief and director positions, performing high quality research, and educating future generations of students and fellows. From the early stages of her training, it was Dr. Bala's goal to pursue a career in Academic Medicine, similar to her colleagues.

Dr. Bala completed her fellowships in Cardiovascular Diseases and Cardiac Electrophysiology at the University of Pennsylvania. She finished her training in 2006. During her training in Cardiac Electrophysiology, she developed a passion for complex ablation and grew to love the complexities of the field and giving high quality care to her patients.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

After completing her fellowships, Dr. Bala was recruited to stay on as faculty at the University of Pennsylvania as an Assistant Professor of Medicine from 2006 to 2014. Dr. Bala performed high quality clinical research in complex ablation and these papers have continued to be cited to this day. Dr. Bala will testify that her goal was to improve upon patient care, patient safety, and clinical outcomes in the field of complex ablation.

In 1/2015, Dr. Bala was recruited to Oregon Health Sciences University (OHSU) as an Associate Professor of Medicine and the Director of Complex Ablation. Dr. Bala will testify that she had visited Portland on two interview trips and had fallen in love with Portland, OHSU, all the people she had met and interviewed with, and those in the community. Dr. Bala will testify that was excited to start her next chapter in Oregon. Dr. Bala will testify that she reported directly to Dr. Chuck Henrikson. Dr. Bala also reported to Dr. Joaquin Cigarroa (Chief of Clinical Cardiology) and Dr. Sanjiv Kaul (Director of the Knight Cardiovascular Institute). Dr. Bala's initial contract began in 1/2015 and was renewed in 7/2016.

Dr. Bala will testify that when she came to OHSU, she was confronted with a program that needed significant changes to be considered a top program and that there were issues both with staffing, training, clinical skills, safety protocols and overall competence and that she was charged with facilitating many of those changes in order to create a top Electrophysiology Complex Ablation program. Dr. Bala will testify to all the protocols she wrote to improve upon patient care and safety and the plan for additional teaching and training of staff to further goals of patient care.

Dr. Bala will testify about her job duties at OHSU: clinical responsibilities providing care to patients in clinic at both OHSU Waterfront location and Beaverton; performing procedures in the Electrophysiology Lab; clinical inpatient responsibilities on the Clinical Cardiology Service,

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Cardiac Care Unit, Electrophysiology service; teaching responsibilities to medical students, residents, Cardiology Fellows, and Electrophysiology Fellows. Dr. Bala was passionate about teaching students at all levels, including Associated Professionals, and will testify to her experiences.

From March to August 2015, Dr. Bala will testify that she reported the following to Dr. Henrikson, Judi Workman, and Kathy Heitman-Allen: failure to meet standard of care in the lab regarding lab sheath protocol, failure to prep patients adequately for device implantation, patient care, poor staffing that impacted procedures, staff complaining about staying late for patient care, and more.

Dr. Bala will testify about a number of cases in the summer of 2015 that impacted patient care and Dr. Bala disclosed significant medical errors. Dr. Bala will testify that Dr. Henrikson informed her that lab staff did not like her communication or teaching.

Dr. Bala will testify that she made approximately 30 complaints about failure to meet standard of care regarding patient care throughout her employment and that the quality of care at OHSU was far lower than at top Electrophysiology programs. (*See* Plt Response to Defendants Interrogatory 3 for details as to each specific complaint.)

Dr. Bala will testify that the Cardiology program was dysfunctional and in disarray and, soon after, the cardiac heart transplant program at OHSU shut down completely, losing all of their faculty and relocating their patients.

Dr. Bala will testify that, as the only woman in Electrophysiology at the time at OHSU, she started to notice that she was being treated differently than male doctors. She will testify she observed that she was being subjected to a sex and race based double standard and stereotypes in her very male dominated field. She will testify that some of the behaviors she exhibits, on

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

occasion, are inconsistent with race or sex stereotypes for women and women of color, including traits of being self-confident, direct or intense in communication style, asking direct questions during complex procedures and requiring high standards from her co-workers. Consistent with her deposition, she will testify about numerous men in cardiology at OHSU who had similar traits as her with regard to their communication styles and confidence who were treated better than her, who were not undermined by their supervisors and who were not subjected to or investigated for minor or non-existent complaints by staff, and instead complimented for those traits. Likewise, she will testify that there were men who reported substandard medical care who, likewise, were treated better than she was in the face of those reports.

Dr. Bala will testify that she became aware of faculty surveys at OHSU which showed that discrimination at OHSU was reported to be very common, but that people were generally afraid to speak up regarding the concerns for fear of retaliation.

Dr. Bala will testify that other doctors, such as Dr. Firas Zahr, have similar communication styles and can be more aggressive than Plaintiff. Dr. Bala will testify that Dr. Zahr would at times get frustrated, mad or angry in the lab or swear and that staff were bothered by it. Dr. Bala will testify that Dr. Zahr shared his own concerns regarding the training and competency of the lab staff and call center/transfer center protocols with Dr. Bala. Dr. Bala will testify that Dr. Zahr was not subject to complaints for that sort of behavior and was even complimented for his direct communication style. She will also testify that Dr. Zahr, like her, made complaints about patient care and that he was not terminated or non-renewed. She will testify that other doctors who had similarly direct and intense behaviors were treated much better than her, including Drs. Heitner, Henrikson, Dewland, Cigarroa, Mudd, Davis, Cigarroa and others, as referenced in her deposition.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Consistent with the double standard, Dr. Bala will testify that in September 2015, she met with Drs. Cigarroa, Henrikson and Camacho to discuss her communication style and interactions with a Cardiology fellow which she saw were sex stereotypes that constituted a double standard. Dr. Bala will testify that the concerns were generally invalid.

Dr. Bala will testify that she scheduled a meeting with Dr. Kaul in September 2015 about being mistreated in the lab and her having her experience minimized because of her sex, about being referred to as a "nurse" by staff and about her concerns about quality of care, and of the advice he provided, including brining in donuts to the lab staff.

In October of 2015, Dr. Bala was asked to attend a meeting with Dr. Henrikson and the nurse managers, including Kathy Heitman-Allen, Tara Menon and Judi Workman. Dr. Bala will testify that Judi Workman led this meeting. Dr. Bala will testify to this meeting where Dr. Henrikson sat on the side and watched as the nurse managers proceeded to bully, harass, and yell at her for over an hour: she will testify that she was singled out for her work, bullied and harassed by staff for insisting on performing good patient care, criticized for her teaching style and for trying to change systems which were negatively impacting patient care. Dr. Bala will testify that this meeting was the most abusive meeting of her career and reached out to Dr. Kaul later to request that she never be subjected to such a meeting ever again.

Dr. Bala will testify that men, especially white men, were not treated similarly. Dr. Bala will testify that Dr. Henrikson took steps to undermine her authority in an effort to make changes, supporting the nurses over Plaintiff.

Dr. Bala will testify that soon after Plaintiff was provided with a performance expectation plan by Dr. Kaul and Dr. Henrikson in October 2015, and that she prepared a rebuttal to that

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

plan. Dr. Bala will testify that she reported to Dr. Kaul that she was being treated unfairly by staff, including the nurse managers, and that he agreed she was being treated differently.

Dr. Bala will testify that in 11/2015, she was performing a complex VT ablation on her patient who had a LVAD (Left Ventricular Assist Device) in the Electrophysiology Lab. Dr. Bala will testify that during this case she asked the Anesthesia CRNA (certified registered nurse anesthetist) to contact her Attending Anesthesiologist to come to the lab so they could all discuss what Anesthetics to use for the case as she planned to map during Ventricular Tachycardia during the procedure. Dr. Bala will testify that the CRNA told her that she had never done a case like this before and that Dr. Bala said these cases are challenging. Dr. Bala will testify that she told the Anesthesia CRNA that one of her Anesthesia colleagues had mentioned getting the Cardiac Anesthesia team for this case but mentioned it would be too late of notice to do so. Dr. Bala will testify that she relayed this information to the Anesthesia CRNA. Dr. Bala will testify that during the case, she asked the CRNA questions regarding the care of her patient, including the blood gases, hemoglobin, what the dose of the IV pressors were, giving medications, and more. Dr. Bala will testify that her fellow stood next to her for the entire ablation. Dr. Bala will testify that Dr. Christopher Chien from the Heart Failure Service came to the lab repeatedly to check the LVAD device and patient and to offer Dr. Bala advice on how to manage the diuretic therapy during this complex case. Dr. Bala will testify that the case went well and that everyone involved with the case, including the Anesthesia CRNA, had done a great job.

Dr. Bala will testify that later that evening after the case (11/2015) she received an email from Dr. Jeff Kirsch, the Chair of Anesthesiology, who complained that Dr. Bala was allegedly harassing or bullying the Anesthesia CRNA (certified registered nurse anesthetist) Dr. Bala will testify that multiple people were on that email including Dr. Henrikson and Dr. Chuck Kilo

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

(Prior Chief Medical Officer). Dr. Bala will testify that she spoke to Dr. Henrikson regarding the email and that he said the email was not appropriate and Dr. Kirsch did not go through the proper channels. Dr. Bala will testify that Dr. Henrikson had come by the EP lab and had said the case was going well and he was unclear on why the email was sent. Dr. Bala will testify that Dr. Henrikson had spoken to the EP lab staff (technicians and nurses) and the EP fellow, and they had told him that the case went well and there were no issues for the entire case. Dr. Bala will testify that Dr. Henrikson told her of his conversation with the EP team and what they had said to him.

Dr. Bala will testify that she met with Dr. Henrikson and Dr. Cigarroa and they told her that there would be an investigation and that HR would be interviewing everyone in the room. Dr. Bala will testify that she met with Dr. Henrikson a few days later and he said that HR would be limiting their investigation to a few people in the room and not the entire team who was present for the entirety of the case. Dr. Bala will testify that at the time, she was unclear why HR elected not to interview everyone present in the lab. Dr. Bala will testify that the two radiation techs (Clark and Louviere) and the EP fellow (Dr. Kumar) who were present for the entire procedure were not interviewed by HR.

Dr. Bala will testify that Dr. Kirsch refused to provide Dr. Bala with anesthesia for her procedures until the Investigation was completed, grounding her indefinitely from doing procedures.   Dr. Bala will testify that she cancelled EP procedures because Dr. Kirsch refused to provide her with Anesthesia Staff in the EP lab. Dr. Bala will testify that she was told by Dr. Cigarroa that she could not help her colleague Dr. Stecker with a case that he was performing in the EP lab as Anesthesia was involved.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

Dr. Bala will testify that she met with Linda Strahm from HR on 11/30/2015 after Dr. Bala returned from Thanksgiving vacation. Dr. Bala will testify that Linda Strahm was in charge of investigating Dr. Kirsch's concerns. Dr. Bala will testify about her perception of the case which she had thought had gone well and the interactions with the CRNA that resulted in Dr. Kirsch's email and that Strahm's investigation into Kirsch's concerns found no wrongdoing on her part and did not corroborate Kirsch's concerns.

Dr. Bala will testify that even though Dr. Kirsch's complaint was unsubstantiated, she was subject to a professionalism plan (probation) where an email was sent each evening to the Attending Anesthesiologist and CRNA whom she was scheduled to work with the next day requiring that they meet with her in advance to discuss the case and then, during the case, the Attending Anesthesiologist and CRNA were to report any negative interactions they had with Dr. Bala up the chain of command, specifically to Dr. Henrikson and Dr. Schulman. Dr. Bala will testify that this plan and these emails continued for over eight months and during this time frame, there were no complaints from Anesthesia. Dr. Bala will also testify that there are policies and processes that have to be followed at OHSU if someone is not permitted to do procedures at OHSU, and that they were not followed in this case and that men, including white men, are not treated similarly when they are subjected to unfounded complaints.

Dr. Bala will testify that she reached out to both Dr. Henrikson and Linda Strahm regarding the Anesthesia investigation and the email/Anesthesia probation (professionalism email) that was sent out prior to every one of her procedures from that point onward. Dr. Bala will testify that Linda Strahm from HR told her that no wrongdoing was found on her behalf during the investigation and that the only way to get her back in the Electrophysiology lab doing

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

procedures with Anesthesia support was to agree to this probation plan, regardless of the outcome of the investigation.

Dr. Bala will testify about her regular meetings with Linda Strahm and/or Dr. Henrikson from November 2015 forward which generally focused on repairing the increasingly strained relationship between her and Dr. Henrikson. Dr. Bala will testify that in her first meetings with Ms. Strahm in November 2015 and December 2015 about the Kirsch email and anesthesia "probation" and that she reported discrimination against her as a woman, and that she was now being excluded from recruitment dinners by Dr. Henrikson. She will testify that she felt she was subjected to a double standard based on sex and punished for performing high quality patient care and making changes to poor medical practices that she was being subjected to a different set of standards compared to her male colleagues. She will testify that she reported to Henrikson and Strahm in December 2015 that she was not being treated fairly by Kirsch and OHSU in its response to his unsubstantiated concerns and that his probation was unwarranted. She will testify that in December 2015 she specifically informed Linda Strahm that she was being singled out because of her sex and that the anesthesia investigation and Dr. Kirsch's email was not the kind of treatment that similarly situated men would have been subject to, and that men would not be subjected to professionalism protocols that encouraged additional complaints in response to a complaint that was unsubstantiated.

Dr. Bala will testify that starting in January 2016, she engaged in regular meetings with Strahm and Henrikson regarding her work, and specifically her communication style. She will testify that Henrikson routinely brought up concerns he had heard, but had not witnessed first-hand, from her colleagues, including concerns by Karin Paladino and Angela Krebsbach. Dr. Bala will testify that Dr. Henrikson had discussed a complaint from Angela Krebsbach

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

(Electrophysiology Physician Assistant) regarding Dr. Bala's tone in an email and that she felt dismissed according to Dr. Henrikson.

Dr. Bala will testify that she sent Ms. Krebsbach an email and asked her to give Dr. Bala follow-up on her patient and notify her that her patient was being transferred to the Vascular Surgery service and may be going to the Operating Room. Dr. Bala will testify that she acknowledged how busy Ms. Krebsbach was on the service and provided suggestions that may help with communication on the EP service patients. Dr. Bala will testify that she was also empathetic that Ms. Krebsbach was not feeling well. Dr. Bala will testify that she forwarded these emails to Linda Strahm who reviewed them and found no wrongdoing on Dr. Bala's behalf.

Dr. Bala will testify that Dr. Henrikson brought up another complaint from Karen Paladino (EP nurse) in which Dr. Henrikson said Ms. Paladino was hurt by the limited interaction from Dr. Bala and felt dismissed. Dr. Bala will testify that she was in clinic seeing patients and was at the computer writing a note when Ms. Paladino came to her regarding Dr. Bala's patient who was admitted at an outside hospital and was scheduled to undergo a procedure the following week with Dr. Bala. Dr. Bala will testify that she listened to Ms. Paladino and then said that she would call the patient after clinic was finished to review what happened and decide about his procedure the next week. Dr. Bala will testify that she followed up with Ms. Paladino later that day and forwarded the emails to Linda Strahm who stated that the communication was fine. Dr. Bala will testify that she told both Dr. Henrikson and Linda Strahm that she should be allowed to call her patients back and not feel bad or guilty for performing standard patient care and that these complaints were not fair to her.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala will testify that Henrikson raised a complaint that Dr. Bala was sitting in a clinic room used by the Hypertrophic Cardiomyopathy Team and that she had allegedly kicked a physician assistant out of the room. Dr. Bala will testify that she sat in that room during clinic and was writing clinic notes on the computer. She will testify that Dr. Heitner's nurse told her she could not sit in that room moving forward because there were not enough computers. Dr. Bala will testify that she told the nurse that she was there like everyone else seeing patients, being productive, and making money for OHSU. Dr. Bala will testify that she did not kick anyone out of the room. Dr. Bala will testify that Dr. Henrikson told her she could no longer sit in this clinic room and she was the one that was actually kicked out.

Dr. Bala will testify that Dr. Henrikson didn't like that she wore a fleece jacket that had the UPenn logo on it and asked her not to wear her fleece in the hospital moving forward.

Dr. Bala will testify to details regarding numerous concerns and complaints from Dr. Henrikson. She will testify that she would discuss these complaints with Linda Strahm from HR and forward her emails to Linda Strahm to review. Dr. Bala will testify that Linda Strahm looked into the concerns relayed to Henrikson and told plaintiff that the concerns were not valid or, at worse, minor issues. Dr. Bala will testify that Linda Strahm told her that she could not understand why Dr. Henrikson was collecting these complaints and that they were frivolous and non-issues. Plaintiff will testify that men were not subject to similar treatment, and that her main concern raised was that she wanted to be treated the same as others, not worse, and wanted to make improvements to the program without being subjected to constant complaints by Henrikson and staff.

Dr. Bala will testify that in the spring of 2016, that Henrikson raised more concerns about interactions between plaintiff and staff that he had heard about from third parties, including

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

nurses in the EP lab. She will testify that she was subject to a double standard because plaintiff had done nothing wrong in those interactions. She will also testify that she was criticized for doing too much work in the EP program including providing good patient care; calling patients directly to speak with them about their concerns, personally, and that men who did similar work were not criticized nor were they subjected to investigations for providing high quality patient care. Dr. Bala will testify that Dr. Henrikson told her not to call her patients, even if she was worried about them if the call was first sent to an EP nurse. She will testify that she was consistently being undermined by staff, and that Henrikson, by blowing the concerns out of proportion and investigating even minor allegations, did not support her work.

Dr. Bala will testify that during her meetings with Linda Strahm and Dr. Henrikson that she continued to challenge the October 2015 PEP that she felt was unfair and that Dr. Kaul, Dr. Cigarroa and Dr. Henrikson ultimately downgraded the PEP to a coaching document and conceded that some of the information in the PEP was false. Dr. Bala will testify that she was told by Dr. Kaul, Dr. Cigarroa, and Dr. Henrikson that she had made substantial improvement, as well. A few weeks later, she will testify that she was informed in May 2016 that she would be given a final one-year contract ending in June 2017 unless she showed significant improvement. She will testify about her efforts to continue to make improvement from that time forward and that, in June 2016, Plaintiff again informed Strahm and Henrikson that her performance had been scrutinized in a way that males are not scrutinized and reported that she was being treated differently than men.

After her contact was not renewed, Dr. Bala will testify that she met with Dr. Sanjiv Kaul to discuss the non-renewal with him and that it was not fair as she had done nothing wrong. Dr. Bala will testify that Dr. Kaul said Dr. Henrikson had given him an ultimatum that either Dr.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Bala goes, or he would have to go. Thus, he had to pick Dr. Henrikson. Dr. Bala will testify that she told Dr. Kaul that all of this was wrong, including how she was being treated, her contract non-renewal, and that Dr. Henrikson treated her poorly and unfairly compared to her colleagues. Dr. Bala will testify that she told Dr. Kaul that she would escalate her concerns to Dr. Sharon Anderson, Chief of Medicine. Dr. Bala will testify that Dr. Kaul told her that she could talk to Dr. Anderson, but it would not matter as he was the Chief of Cardiology and the Knight Cardiovascular Institute was its own division and he does not report to Dr. Anderson.

Dr. Bala will testify that she arranged a meeting with Dr. Sharon Anderson in July of 2016 to discuss that she was being treated differently because of her sex and because of her concerns about poor patient care. Dr. Bala will testify that she discussed Dr. Kirsch's email and subsequent investigation that found no wrongdoing on her behalf. Dr. Bala will testify that she told Dr. Anderson about the Anesthesia probation she was placed on and the professionalism email that was sent prior to every one of her cases. Dr. Bala will testify that that she was meeting regularly with Linda Strahm and Dr. Henrikson and was subject to numerous, frivolous complaints by Dr. Henrikson. Dr. Bala will testify that Dr. Anderson informed that her that she had heard of the criticisms of Plaintiff and that she agreed they were unwarranted and would speak with Dr. Kaul and Dr. Cigarroa. Dr. Bala will testify that she told Dr. Anderson that her contract was not renewed and that it was unfair as she had done nothing wrong. Dr. Bala will testify that she told Dr. Anderson that she met with Dr. Kaul and that Dr. Henrikson had given him an ultimatum that either he would have to go, or Dr. Bala would have to go, and that Dr. Kaul picked Dr. Henrikson and did not renew her contract. Dr. Bala will testify that Dr. Anderson was concerned about all of these events, the contract non-renewal, and the meeting with Dr. Kaul. Dr. Bala will testify that Dr. Anderson told her that Dr. Henrikson needed

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

leadership training. Dr. Bala will testify that Dr. Anderson said that she would set up a meeting

with Dr. Kaul, Dr. Cigarroa, and Linda Strahm from HR to discuss all of these matters. Dr. Bala

will testify that her next step was to escalate her concerns regarding being treated differently than

her colleagues and contract non-renewal with Dean Mark Richardson, but that Dean Richardson

was injured in a fall in August 2016 and passed away soon after.

Dr. Bala will testify about a case she worked on with Matt Holling, a radiation technician

in August 2016. She will testify that she asked Holling to please be quiet during a complex part

of a procedure so she could focus and hear the rest of the staff in the room. Dr. Bala will testify

that Matt Holling said he was teaching another technician. Dr. Bala will testify that she told Matt

Holling that she would be happy to teach Mr. Holling and the new technician after the case was

done, but needed to hear everyone and focus on the case because she did not want to give her

young patient heart block which was a dangerous complication of the procedure.

Dr. Bala will testify that after the case was completed, Holling reported her for bullying

and harassing for asking him to be quiet. Dr. Bala will testify that Linda Strahm contacted her

and said there was a serious allegation filed against her for bullying and harassing Matt Holling

and that Dr. Cigarroa was concerned because he wanted to keep Matt Holling as a radiation

technician in the Cath Lab and was worried he may not stay due to this concern. Dr. Bala will

testify that she asked Linda Strahm to investigate this complaint of bullying and harassing as she

had done nothing wrong.

Dr. Bala will testify that this complaint of bullying and harassing was investigated by

Linda Strahm and Dr. Henrikson. Dr. Bala will testify that during the investigation, Linda

Strahm had to take a break because the Dean of the School of Medicine had passed away. Dr.

Bala will testify that upon resuming the investigation, Linda Strahm encouraged Dr. Bala to drop

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

the investigation as it was not a big deal. Dr. Bala will testify that she told Linda Strahm that it was a big deal and wrong as she was being accused of bullying and harassing and had done nothing wrong but care for this patient. Dr. Bala will testify that Linda Strahm then continued the investigation.

Dr. Bala will testify that these concerns were investigated by both Henrikson and Strahm. She will testify that Strahm found that Plaintiff did nothing wrong, but Henrikson, in speaking with the same witnesses, found the opposite. Dr. Bala will testify about Linda Strahm's communications with the witnesses after the fact, including Clark, Mehta and Kelly, who reinforced that they had reported to Henrikson that Dr. Bala had done nothing wrong and that it was Matt Holling, the radiation technician, who was unprofessional. Dr. Bala will testify that men often asked for quiet in the lab during portions of procedures and that no one files complaints about them or investigates them for any such behavior. Dr. Bala will testify she informed Strahm, again, that she was subject to a double standard based on sex and that the ongoing emails asking people to file complaints about her should stop.

Dr. Bala will testify that she told Linda Strahm about a patient of hers who was coding n the EP lab and was shocked 16-17 times and no one from Electrophysiology, including her partner who was in the lab control room next door, came to help. Dr. Bala will testify that she reached out to Dr. Henrikson about this case and no response or help from the Electrophysiology team and that it should be discussed in their Morbidity and Morbidity (M and M) meeting. Dr. Bala will testify that Dr. Henrikson never addressed these concerns regarding the coding patient and no help from the Electrophysiology team with her or the rest of the Electrophysiology team at the M and M conference.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala will testify that Linda Strahm reached out to her to tell her that she had concluded her investigation regarding the Matt Holling complaint of bullying and harassing and that she would be setting up a meeting with Dr. Sharon Anderson, Dr. Kaul, and Dr. Cigarroa to address her findings. Dr. Bala will testify that Ms. Linda Strahm informed her that she would escalate the concerns regarding the patient who was coding, the lack of assistance from the EP team, and no apparent response from Dr. Henrikson.

Dr. Bala will testify that in August of 2016 that she received an email from Dr. Henrikson that the "special treatment" that she was subjected to with emails prior to each and every case would stop. Dr. Bala will testify that she forwarded this email to Cardiology Leadership – Dr. Kaul and Linda Strahm and it was wrong to treat her differently than her male colleagues and no one should be subjected to this type of treatment.

Dr. Bala will testify that in August 2016, Plaintiff sent Strahm a link to written materials about sex stereotyping.

Dr. Bala will testify that in late 2016 and in 2017 she made PSI complaints and quality of care complaints. She will testify that she had serious concerns about the training and staffing in the EP lab, and that the poor training and staffing contributed to dangerous patient care. Dr. Bala will also testify as to complaints she made about unsafe medical procedures and a patient potentially receiving 10 times too much heparin, which is potentially life threatening. See also Interrogatory 3 response.

Dr. Bala will testify that she met with Linda Strahm after a meeting that she had with Dr. Anderson, Dr. Cigarroa, and Dr. Kaul to discuss her concerns and the results of the investigation that Linda Strahm had performed for Matt Holling's complaint of bullying and harassing and the patient who had coded. Dr. Bala will testify that Linda Strahm said that there was nothing she

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

could do further. Dr. Bala will testify that Linda Strahm told her that she was asked if Dr. Bala would ever consider staying on as faculty at OHSU and that Linda Strahm had said no considering how poorly Dr. Bala had been treated during her employment at OHSU. Dr. Bala will testify that Linda Strahm told her that there was nothing more that she could do and would respect her wishes to escalate her concerns.

Dr. Bala will testify that she escalated her concerns to Dr. Chuck Kilo (previous Chief Medical Officer at OHSU) that she was being discriminated against because of her sex and for making patient care concerns, PSI complaints in early 2017. Dr. Bala will testify that she both reported to Dr. Kilo by email and meeting with him in person. Dr. Bala will testify that Dr. Kilo responded that she should be softer in her style, and in February 2017, Plaintiff again reported that she was being treated differently because of her sex.

Dr. Bala will testify that she continued to make complaints of sex discrimination and unequal treatment in March 2017 to Strahm, Kilo and Kaul and that then, for the first time Linda Strahm told her that if she had concerns about discrimination, she should file a complaint with the AAEO office and that this was the first time she can recall knowing what AAEO was. She will testify that at no time did anyone look into her allegations of sex discrimination. Dr. Bala will testify that this came up in the context of a complaint that a coworker was not providing her the same level of support as her male colleagues in March 2017. She will testify that in May 2017, the lead EP tech referred to her as the "B word" during a procedure. While he apologized, she will testify that OHSU took no other steps to look into the allegation and did not discipline or counsel him.

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala will testify that, despite repeatedly reporting sex discrimination, that Defendant never took any steps to investigate any of her concerns. Dr. Bala will testify that she resigned in June 2017 in lieu of termination.

Dr. Bala will testify that when her employment at OHSU involuntarily ended, she was devastated. Dr. Bala will testify about the emotional distress thar arose out of the termination, that she felt depressed, anxious, became more withdrawn from friends and that she felt like her career trajectory was seriously impacted. Dr. Bala will testify that she missed her friends at OHSU and especially her patients. She will testify that she felt embarrassed and anxious and lost confidence because of the treatment at OHSU. Dr. Bala will testify about how she wanted to stay at OHSU forever, to start a family while at OHSU, and that the termination of her employment made her feel like she could not do that since she was not in stable place, career-wise.

Dr. Bala will testify that she initially applied for jobs in Oregon because she loved the PNW and did not want to leave. Dr. Bala will testify that she applied for jobs in Seattle and Academic jobs at multiple different centers. She will testify that at least one prospective employer in Bend had received negative references from Dr. Cigarroa, and that another job in Seattle disappeared because of references from OHSU and Dr. Henrikson. Dr. Bala will testify that she applied to a job at MUSC (Medical University of South Carolina) and the interview had gone well and all of a sudden, contact had ended. Dr. Bala will testify that she later found out during depositions that Dr. Henrikson had spoken to a Heart Failure Cardiologist at MUSC, Dr. Dan Judge, whom Dr. Bala had interviewed with and whom Dr. Henrikson had known from training at Johns Hopkins and had given Dr. Bala a negative reference.

Dr. Bala will testify that the only offer she had after leaving OHSU was from Banner University Medical Center/University of Arizona and she was forced to take the position as she

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

had no other options. She will testify that this job had substantial differences in the duties, compensation, responsibilities, benefits, promotional opportunities, status and location than her position at OHSU, and that it was not a traditional academic medicine position because it was a private employer (Banner Health) that had purchased the hospital and was affiliated with the University of Arizona. Furthermore, Dr. Bala's position was a job where she was employed in a hospital setting, not a university setting. Dr. Bala's contract was from Banner Health Group and she had a predominantly clinical position. Dr. Bala will testify that she had no protected research time and no money or funds allocated to research which was different from her position at OHSU. Dr. Bala will testify that she was worried about taking this position in Arizona as the faculty that she had interviewed with and the Chief of Cardiology, Dr. Nancy Sweitzer, had all expressed concerns regarding the merger between the University of Arizona and Banner Health that had occurred in 2015 and it was still unclear how this merger would affect faculty, quality of patient care, research efforts, salaries including other issues. Dr. Bala will testify that there was instability at Banner University Medical Center that was very clear from the onset and became more magnified after she started her position.

Dr. Bala will testify that the Director of the Cath labs was terminated soon after Dr. Bala started her job at Banner and that the Chief of Heart Failure, a woman, was also terminated soon after Dr. Bala started. She will testify that the Chief of Cardiology, Dr. Nancy Sweitzer, had said the Chief of Heart Failure had done nothing wrong to deserve being terminated. Dr. Bala will testify that her job in Arizona was not equivalent to her position in Oregon as she was doing minimal research, had low procedure volumes as she was trying to grow her practice and there was not enough patients and there was competition from private practice groups for the same types of patients. Dr. Bala will testify that the low procedure volumes affected the types of

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

procedures she was doing and the number of procedures she was doing. Dr. Bala will testify that her case load at Banner was less than she had at OHSU and that she had less lab days at Banner than she had at OHSU. Dr. Bala will testify that many colleagues at Banner University Medical Center were unhappy due to the toxic culture/environment and were terminated or voluntarily resigned.

Dr. Bala will testify that she went on FMLA in 10/2019 after her father was diagnosed with a malignant brain tumor. Dr. Bala will testify that her father passed away while she was on FMLA at the end of Dec 2019. Dr. Bala will testify that the Chief of Electrophysiology from Banner University Medical Center reached out to her to confirm that she was due back to her position on 1/20/2020 from FMLA. On 1/19/2020, Dr. Bala flew back to Tucson, Arizona from Atlanta, Georgia and there was a termination letter on her doorstep. Dr. Bala will testify that she was terminated by Banner Health while she was on FMLA.

Dr. Bala will testify about her job search efforts post OHSU which included expressing interest or applying to over 200 jobs over the years and her lost wages and benefits because of the involuntary departure from employment, and about the period of times in which she was employed, her duties, benefits and her rates of pay. Dr. Bala will testify that she tried networking with colleagues, using both in-house and third-party recruiters, directly applying to jobs and more. She will testify that she often got initial interest in response to her inquiries, then that interest often dried up at the time in which one would be expected to check references or run online searches. She will testify that one recruiter told her she couldn't get the job with the pending lawsuit in place. She will also testify that she didn't get jobs after the employers learned of the alleged discrimination by defendants.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala will testify that she took a temporary position at UHS Wilson Medical Center in Johnson City, New York in 3/2021. She will testify that this job had substantial differences in the duties, compensation, responsibilities, benefits, promotional opportunities, status and location than her position at OHSU. Dr. Bala will testify that the Chief of Cardiology stated that UHS Leadership was concerned about her lawsuit and would only give her a short-term position as their Electrophysiologist was set to leave. Dr. Bala will testify that this position was not equivalent to her position in Oregon. Dr. Bala will testify that Johnson City is a rural area in Central NY and that in her temporary position, she performed no research and had limited teaching of fellows. Dr. Bala will testify that she was not supported by UHS leadership due to her lawsuit and that UHS was actively interviewing other candidates for the entirety of her employment. Dr. Bala will testify that UHS Medical Group hired a graduating fellow on a J-1 visa to replace Dr. Bala. Dr. Bala will testify that she was not supported by UHS Leadership, but stayed in this position when her Chief of Cardiology/EP colleague went out on medical leave with an acute stroke. Dr. Bala will testify that she performed her procedures and her colleagues' procedures, saw all the EP consults in the hospital, and helped manage all the EP outpatients in clinic while her colleague was out on medical leave. Dr. Bala will testify that she resigned in 5/2022 to find a permanent job, soon before the start date of the physician who was hired to replace her. Dr. Bala will testify that her Chief had wanted her to stay and she had agreed, but it was overruled by UHS Leadership.

Dr. Bala will testify that she took a job with Citrus Cardiology Consultants in 10/2022 and started that position in 1/2023. Dr. Bala will testify that Citrus Cardiology Consultants is a Private Practice Group in Central Florida and her current job has substantial differences in the duties, compensation, responsibilities, benefits, promotional opportunities, status and location

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

than her position at OHSU. Dr. Bala will testify that she currently lives in a retirement community in "The Villages". Dr. Bala will testify that she has no friends in the community outside of her medical assistant. Dr. Bala will testify that she has no hobbies and has to drive to Tampa or Orlando, which are both over an hour away, to meet people that are in her age range. Dr. Bala will testify that she is not doing any research and is not doing any teaching. Dr. Bala will testify that her current job is not equivalent to her job at OHSU. Dr. Bala will testify that after her 1st year contact and guaranteed salary, her contract was renewed and she was placed on a productivity model. Dr. Bala will testify that she is performing cases in the EP lab approximately 6 days/month which is less than her lab days at OHSU. Dr. Bala will testify that starting 2/1/2024, her salary decreased to $8500 every two week period or $17,000 per month which is her current paystub. Dr. Bala will testify that her yearly salary will be $221,000.

Dr. Bala will testify that her salary as a Cardiac Electrophysiologist at Citrus Cardiology Consultants is restricted for the following reasons: she currently has 6 lab days per month and thus cannot perform more procedures; her General Cardiology Partners perform the large majority of devices including pacemakers, implantable cardioverter defibrillators, biventricular devices, loop recorders and thus, they are being not referred to Electrophysiology and this results in no revenue; she does not interpret or bill for device interrogations (remote interrogations or device clinic interrogations) – these interrogations are billed for by the General Cardiology partners; she does not interpret Echocardiograms or Stress Tests and these tests are being interpreted and billed for by the General Cardiology partners; she rounds on the General Cardiology Consult Service up to 6 weeks per year (she does not take any additional call and does not have additional rounding responsibilities due to the fact that she does not interpret echocardiograms or interpret stress tests). Dr. Bala will testify that she is an employee of Citrus

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Cardiology Consultants and there is no prospect of a partnership track or additional equity being offered.

Dr. Bala will testify that she is not performing the full scope of Electrophysiology procedures at Citrus Cardiology Consultants like she was performing at OHSU due to being in private practice in small, rural hospitals with limited procedure days and no ability to increase any additional General Cardiology Services for billing. She will testify that there are workplace conditions that limit her ability to be successful or produce at a high rate. Dr. Bala will testify that she misses doing complex electrophysiology and makes a small fraction of what she made at any Electrophysiology job, previously. She will testify that, her historical average at Citrus Cardiology Consultants suggests she will make approximately $221,000 per year for this year and that there is not much reason to be optimistic about that growing much higher in the future in any material way since she cannot do general cardiology there and has limited lab days for procedures. She will testify about Exhibit 213, and how her CEO indicated she might at some point be able to make as much as $330,000, like another colleague of hers, but that that colleague had been at Citrus Cardiology Consultants for approximately ten years at the time of the communication.

Dr. Bala will testify that she reasonably expected to be promoted to full professor at OHSU and subsequently Chief, either at OHSU or in another Academic Center, similar to the career trajectory of her colleagues from the University of Chicago residency class and her colleagues at the University of Pennsylvania. She will testify that if she had not been terminated by OHSU, her career trajectory would have been similar to her colleagues with upward advancement in Academic Medicine, which has always been her goal. She will testify that her subsequent work has been in private practice or in private practice partnerships with public

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

institutions. She will testify that her goal was to be a Division Chief of Electrophysiology within five years of additional work at OHSU and ultimately becoming Chair of Cardiology.

Dr. Bala will testify that she has experienced significant trauma and emotional distress from the discrimination that she experienced at OHSU. She will testify that after her employment ended, she read many news reports and articles regarding discrimination and harassment at OHSU and they all had an additive effect of compounding her trauma. Dr. Bala will testify that she followed the Tik Tok dancer case from OHSU and the failure of many mandatory reporters to come forward and report harassment. Dr. Bala will testify that these concerns mirrored her own experiences while working at OHSU. Dr. Bala will testify that she followed the investigation by Covington and Associates, Eric Holder's law firm, and read the detailed report issued at the end of the investigation. Dr. Bala will testify that the Covington Report helped explain how systemic problems at OHSU and conflicts in its own policies enabled OHSU to ignore complaints of discrimination, which further compounded her emotional distress.

Dr. Bala will testify that the current case of the Senior Associate Dean taking pictures of female medical students under the table and the initial response from the Dean of the Medical School and initial investigation with no punishment for the parties involved brought back more trauma as the same patterns emerged, further exacerbating her emotional distress. Dr. Bala will testify that the Dean of the Medical School being asked to step down, but being allowed to stay employed at OHSU, brought on trauma as to how men are being treated differently than women at OHSU and the women are not being protected. Dr. Bala will also testify that from all of these reports there seems to be different policies dealing with Code of Conduct Violations, discrimination, and harassment when dealing with high-ranking male physicians in leadership with patterns emerging and causing further distress.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala will testify that Electrophysiology is a small field and that her reputation is ruined forever. She will testify that she has never spoken publicly about her time at OHSU and has never said anything negative about the defendants or OHSU at any time. Dr. Bala will testify that not speaking about her story or perspective has damaged her significantly and the silence has taken a severe toll. Dr. Bala will testify that she will always have a "Scarlett Letter" and that her career in Electrophysiology is effectively over, never achieving what she set out to do nor what she wanted to do. Dr. Bala will testify that taking care of patients makes her whole as a person and gives her great joy but that it comes at a significant cost with all that she has sustained. Dr. Bala will testify that all she ever wanted to do from an early age was to be a physician, similar to her father, and care for patients. Dr. Bala will testify that this goal made her persistent in her job search in the face of numerous rejections and compounding failures. Dr. Bala will testify that she could not imagine doing anything else or being anything else other than a physician and caring for others.

### 2. DR. JILL M. GELOW                    Est'd Length of Direct: 30 Minutes
Physician

Dr. Gelow is a Cardiologist who is the medical director of the heart transplant program for Providence St. Vincent in Portland, Oregon. From 2011 through July 2016, Dr. Gelow was a cardiologist at OHSU and the medical director of the heart transplant program at OHSU before its collapse.

Dr. Gelow will testify that while at OHSU she observed comments in the workplace that she felt were inappropriate related to gender. She will testify that she recalled Dr. Kaul stating during a faculty meeting that he wished they could go back to the mid 1800s when women couldn't be doctors because it would be easier to arrange things then. She will testify that she was accused

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

of "having too much estrogen" by a male cardiac surgeon around the time that 5 people had died as part of the heart transplant program OHSU.  She also will testify that OHSU was not accommodating to women's schedules and that, for a long time, they did not provide a place for women to pump in the hospital or the VA and seemed to schedule meetings at a time that impacted many women's' childcare schedules.

She will testify that because she had concerns about whether OHSU was a good place for women, she encouraged a mentor of hers, Dr. Michelle Albert, to come to OHSU to present on diversity and inclusion issues, especially issues related to race and sex in cardiology.  She will testify that, after the presentation, that Dr. Albert indicated that she didn't believe OHSU was a good place for female cardiologist. She will testify that she was advised by Ms. Alpert and others that, to be successful in a male dominated field like cardiology, that you had to be careful how you dressed and to make sure your clothes communicated a sense of competence. She will testify that she was advised to dress nice and wear very high heels, and that both would help you if you were a woman in cardiology, and that she has found that to be true.   She will testify that women in a male dominated field like cardiology are often in a Catch-22; if you are too nice, people won't respect you, but if you are too intense,  people, will not support you and will undermine you.

Dr. Gelow will testify that she generally had a good relationship with Dr. Bala. She will testify that there were times where they did not see eye to eye as to the best course of treatment for a patient, but that their communications were always professional, even when they disagreed. She will testify that it not uncommon to have disagreement with colleagues, and that the disagreement with Dr. Bala was not that big of a deal, as both were clearly focused on the best interest of the patient. She will testify that there many men she worked with at OHSU who handled themselves much less professionally when communicated differences of opinion than Dr. Bala.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Gelow will testify that Dr. Henrikson did not do anything to stand up for Dr. Bala or support her, from her perspective. She will testify that she heard from fellows that Bala was hard on them but that they respected her teaching and her expertise, greatly. She will testify that Drs. Cigarroa and Henrikson recruit people, like Dr. Bala, promising that they will make OHSU the Harvard of the West, but that they are not capable of creating that at OHSU because of failures in leadership.

Dr. Gelow is expected to testify that the culture at OHSU is that one cannot speak up without fear of retaliation. She will testify that she raised these concerns to Dean Anderson, and that she met with Kaul and Cigarroa, too. She will testify that the culture in the department is especially bad for women and people of color, and about her experience as a woman and her observations about Dr. Cigarroa's treatment of Dr. Shenje; a talented Black male cardiologist who was pushed out by Cigarroa. She will testify that she raised many of these concerns to OHSU and that they never looked into them, as far as she knows.

She will testify that, after Dr. Bala left OHSU, that she was shocked that she was not able to find an excellent job, immediately, given her training and experience. She will testify that she observed men in cardiology and anesthesia, who were much worse communicators than Dr. Bala, were able to land on their feet and get work comparable very soon after being forced out of OHSU.

3. **DR. MAUREEN MAYS**                              Est'd Length of Direct : 45 minutes

    Physician

Dr. Mays will testify that from 2006 through 2009, she was employed by OHSU  She will testify that, throughout her employment, she observed a culture of discrimination against women within Cardiology at OHSU and retaliation against those who oppose unlawful actions. She will testify that Dr. Kaul made negative statements about women and the value they bring to the

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

workforce. Dr. Mays will testify that "I was told that before I was here there were no women in the department, and now there are four. I hope they are happy, now."  On another occasion, Dr. Mays will testify that she attended a lunch meeting with the other cardiologists and their spouses. During the meeting, Dr. Mays will testify that was the only female doctor sitting at a large table that including Dr. Kaul. For approximately 20 minutes, Dr. Kaul told a story about the color of his penis.  Dr. Mays will testify that Dr. Kaul complimented her because of her sex in ways that made her feel uncomfortable. For example, on another occasion, she was having a cup of coffee while at work with a female colleague.  Dr. Kaul approached the women and made an approving comment to us how we were "so girly."

Dr. Mays will testify that she is aware that there is a stereotype that women are too emotional.  Dr. Mays will testify that she once became emotional while she was waiting for the OHSU tram but that no one was around to witness it. Dr. Mays will testify that, somehow, Dr. Kaul learned that she had, briefly, cried, and called her into his office. Dr. Mays will testify that Kaul told her it was highly inappropriate and unprofessional for her to cry and not to do it again.

Dr. Mays will testify that Dr. Kaul also treated her significantly worse than men who engaged in far more egregious behaviors. Dr. Mays will testify that, on one occasion, she was in the clinic after it had closed and the subject of cartwheels came up in conversation. Dr. Mays will testify that she told her colleagues she could to a perfect cartwheel, and they challenged her to do it, which she did. Dr. Mays will testify that, a few days later, Dr. Kaul called her into his office and was angry with her for doing a cartwheel, even after the clinic was closed. Dr. Mays will testify that he said the behavior was  "immature and childish," consistent with sex stereotypes. Dr. Mays will testify she saw men engage in far more immature and childish behavior who were not counseled. Dr. Mays will testify that she told Kaul about a specific

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

example that same week where a male cardiologist had banged his fist on a table in a violent and angry fashion and repeatedly used profanity all within the full view of patients. Dr. Mays will testify that Dr. Kaul reacted negatively to her bringing up this double standard and that he demanded that Dr. Mays leave his office.

Dr. Mays will testify that she had a number of negative interactions with Dr. Cigarroa which resulted in the termination of her employment. Dr. Mays will testify that she was approached by a colleague, Dr. Carlos A. Dujovne, who was not licensed in Oregon at the time, which restricted his ability to be listed as the investigator on a clinical trial. Dr. Mays will testify that he wanted to tell OHSU and the FDA that he was the investigator for the trial—which would result in increased funds to him—but to lie to the pharmaceutical company and say Dr. Mays will testify that was the investigator, since he was not yet licensed in Oregon. Dr. Mays will testify that she didn't agree to his proposal because she knew it was fraudulent and reported the fraud to Dr. Cigarroa. Dr. Mays will testify that Dr. Cigarroa said he would "take care of it."

Dr. Mays will testify that, soon after reporting the fraud to Cigarroa, Dr. Cigarroa started a campaign to force Dr. Mays out of the clinic, accusing Dr. Mays of financially mismanaging the cardiology lab. Even though this was not corroborated in an investigation by OHSU, Dr. Mays will testify that Dr. Kaul and Dr. Cigarroa terminated her employment, anyway, because of stereotypical perceptions of her communication style. Dr. Mays will testify that Dr. Kaul and Dr. Cigarroa told her that she was being terminated because she was too "childish" and because "You just can't get along with anyone." Dr. Mays will testify that when she asked who it was they thought she didn't get along with, they only mentioned Dr. Dujovne; the same doctor who Dr. Mays reported to Dr. Cigarroa for fraud.

**4. DR. RICK F. KOCH**                    **Est'd Length of Direct: 20 min.**

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Physician

From approximately 2005-2018, Dr. Koch was a Cardiologist at Bend Memorial Clinic. When Dr. Bala was at OHSU, Dr. Koch would often send Ventricular Tachycardia and Atrial Fibrillation ablation cases to her, which are cases where a patient has an abnormally high heart rate, because she was known as an expert on such cases. The patients he referred to her routinely gave very positive feedback to him about Dr. Bala.

Soon after Dr. Bala left OHSU in June 2017, Dr. Koch was doing due diligence toward trying to bring her to the clinic that he was working at in Bend. As a result, during the summer of 2017, he reached out to Dr. Cigarroa to get a reference. He often called providers to get references for potential hires and generally find the doctors he spoke with to be fairly forthcoming when the candidate is a good candidate.

The feedback Dr. Cigarroa gave Dr. Koch regarding Dr. Bala was unusual. He told Dr. Koch that she was highly skilled and had an excellent relationship with her patients. He did not give Dr. Koch a good reference as to her communications with her colleagues. Instead, he advised Dr. Koch to get input on how she interacts as a "team player" and to contact Dr. Henrikson to do so.  Dr. Koch thanked Dr. Cigarroa for the information.  Just prior to ending the conversation Dr. Cigarroa brought it up a second time. Dr. Cigarroa reiterated that it was very critical that Dr. Koch contact Dr. Henrikson to get additional information on her interpersonal skills.

Ultimately, Dr. Koch understood Dr. Cigarroa to be suggesting that while she was a very skilled doctor, there were interpersonal skills issues and perhaps Dr. Bala was not a team player. Dr. Koch came away from his conversation in the summer of 2017 with 2 distinct impressions:

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

Dr. Cigarroa was insinuating there were red flags regarding Dr. Bala as a team player that only Hendrickson could expound upon in detail. Bringing up that point again just prior to the end of our discussion felt highly unusual and orchestrated to reinforce his point that Dr. Koch should get the real story from Hendrickson.

What Dr. Cigarroa suggested went against everything Dr. Koch knew about Dr. Bala personally and professionally. Dr. Koch's patients whom he referred for VT and A Fib ablations (there were no EPs in Bend performing A Fib ablations at that time) raved about the care Dr. Bala provided and her thorough and personal touch. There was never a negative comment from any of his patients, only praise and thanks for her care. Dr. Koch called Dr. Henrikson, left at least one or two messages for him and explained why he was calling. Dr. Henrikson never returned his calls.

5. **DR. PETER GLICK, PH.D.(possible remote witness) Est'd Length of Direct – 1.5 hour**

Social Psychologist

Dr. Glick has submitted an expert narrative report setting forth his qualifications, the substance of opinions he will give, and the facts and data upon which the opinions are based. Trial Exhibit 185 is his expert narrative report.

6. **DR. MOLLY CARNES ,M.D. (possible remote witness) Est'd Length of Direct – 1.5 hour**

Dr. Carnes is retired Physician-scientist and tenured Professor who has held a variety of leadership positions in academic-medicine. Dr. Carnes has submitted an expert narrative report setting her qualifications, the substance of opinions she will give, and the facts and data upon which the opinions are based. Trial Exhibit 186 is her expert narrative report.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

7. **LISA BROTEN**                                    Est'd Length of Direct – 1.5 hour

Vocational Counselor

Ms. Broten is a vocational counselor.  She has submitted an expert narrative report, a rebuttal report and a supplemental report setting forth her qualifications, the substance of opinions she will give, and the facts and data upon which the opinions are based.  Trial Exhibits 187 – 192 are her expert narrative reports and demonstrative charts from those reports.

8. **NORA OSTROFE  (possible remote witness)**        Est'd Length of Direct – 1.0 hour

Economist

Ms. Ostrofe is a Vice President and Senior Economist at J.S. Held.  She has submitted an expert narrative report and two supplemental reports setting forth her qualifications, the substance of opinions she will give, and the facts and data upon which the opinions are based.  Trial Exhibits193 – 198 are her expert narrative reports and demonstrative charts from those reports.

9. **DAVID GLUSMAN (perpetuation testimony/remote)** Est'd Length of Direct – 1.0 hour

Mr. Glusman is a certified public account.  He has submitted an expert narrative rebuttal report and a supplemental and rebuttal report setting forth his qualifications, the substance of opinions he will give, the facts and data upon which the opinions are based.  Trial Exhibits 199 – 205 are Mr. Glusman's narrative reports and demonstrative charts from those reports.

10. **DR. CHARLES HENRIKSON**                         Est'd Length of Direct - 2.0 hours

Physician

Dr. Henrikson may called as an adverse witness in addition, to or in lieu of, Plaintiff's designation of excerpts of his deposition testimony.  As an adverse witness, Plaintiff does not know the substance of what he will say at trial.  If Plaintiff's designation of his deposition testimony is not utilized at trial, Plaintiff expects Dr. Henrikson to testify regarding the topics and substance in

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

Plaintiff's designation of deposition testimony in the same way that he did in the designation. In addition, Plaintiff expects that Dr. Henrikson would testify as set forth below based upon his deposition testimony.

Dr. Henrikson is a physician, a professor of medicine at OHSU and the Director of the EP lab. The EP lab consists of himself and 2 other physicians as well as other doctors at OHSU on a part-time basis. He is involved in running the EP lab and clinic, performing inpatient consults, training fellows and residents, doing research and maintaining the research enterprise. At the time Dr. Bala was at OHSU, the EP service was staffed with himself, Dr. Bala, 3 or 4 other core physicians and other physicians who perform part-time work.

His duties include responsibility of evaluating the performance of the physicians who are direct reports. The Clinical Chief, Dr. Cigarroa, and the Cardiology Chief and Head of KCVI, Dr. Kaul also evaluate the performance of the physicians.

Dr. Henrikson does not have a role in contract formation. He did provide input to Dr. Kaul on the offer letter sent to Dr. Bala. He gave advice regarding Dr. Bala's academic level, her promotion to associate professor as a part of her recruitment and the breakdown between clinical and research. He does have a role in contract renewal. He was in frequent contact with the Clinical Chief, Dr. Cigarroa, and the Cardiology Chief, Dr. Kaul, about how Dr. Bala was performing and any concerns regarding performance. In the normal course, he participates with Dr. Kaul and Dr. Cigarroa in making the contract renewal decision. He participated in the decision to renew Dr. Bala's contract reflected in Deposition Exhibit 72.

Dr. Henrikson learned of concerns regarding Dr. Bala's performance within her first few months. He was concerned her first day in the clinic. She had a list of change she wanted to make. She wanted more help in the clinic, additional physicians' assistants, different pathways to

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

schedule repeat procedures and more procedures and more rooms. She wanted these changes because she felt she would be more productive and because that was the way it was done at UPenn. She talked about improving procedures.

Dr. Henrikson was concerned about the length of the list, the presentation of the list and the time frame. She wanted all of these things fixed by her next clinic. Dr. Henrikson does not recall his specific responses. He knows how he likely would respond. He likely would respond that what she wanted was unrealistic.

Dr. Henrikson will testify that the lab staff reported through the nurse hierarchy. The lab staff included EP techs, radiology techs and nurses who reported through nurse managers. The nurse manager was Kathy Heitman-Allen who reported to Judi Workman.

Deposition Exhibit 177 is an email from Judi Workman to Dr. Henrikson dated May 8. The email contains 4 changes Dr. Bala brought up. Some of the changes were difficult, some made sense and one was very challenging. Dr. Henrikson will testify that some of the changes were reasonable changes needed for patient care. He felt the fourth change was unreasonable. He found it hard to believe Dr. Bala wanted this change.

Deposition Exhibit 178 is an email from Henrikson to a group of individuals. The email sets forth Dr. Bala's suggestions for changes in EP lab protocols for management of lines. Dr. Henrikson agrees that standardizing protocols is a patient care and safety issue that he agrees with. The changes in this email are changes they continue to follow to this day. He had no concerns about these changes. He didn't see the nurse managers emails at the time. He knew there were nursing concerns about the changes at time. He understood the nurses wanted to be involved in the decision to make these changes. He doesn't think this needed nursing approval.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Deposition Exhibit 163 is an August 10, 2015 email regarding sheath pull orders. The EP Team put together these protocols. Dr. Henrikson agreed to the protocols. These protocols affect patient care. Dr. Henrikson found nothing inappropriate in this communication and believes it shows leadership. Exhibit 178 expresses the nurses concerns about the new protocol. Dr. Henrikson does not recall if the nurses came around.

Deposition Exhibit 34 is an email from Dr. Robinson dated August 19, 2015. The email discusses two topics: scheduling EP procedures separately from cardiology and concerns regarding Dr. Bala. Anesthesia was a challenged since Dr. Henrikson arrived at OHSU. The ability to scheduled anesthesia for EP procedures was a source of frustration. The portion of the email regarding Dr. Bala was worrisome. He doesn't recall what he did in response to this email about Dr. Bala. He doesn't recall if he met with Dr. Robinson at any point in time regarding Dr. Bala.

Deposition Exhibit 36 is an email from the nurse manager to Dr. Bala on August 19, 2015. He saw this in preparation for his deposition but had not seen it before. This email is 8 hours after Dr. Robinson's email. The email raises significant concerns regarding patients. These concerns include medication mistakes by a CNRA administering Heparin, nurses not understanding what the procedure entailed, needing an EP nurse in the room rather than the control room, staff not using sterile techniques, not taking initiative and being unprofessional about extending a case to provide patient care. Dr. Henrikson feels that portions of the email are aggressive and unnecessary. He also considers the statement regarding the Hopkins program as a personal criticism of him and his training. He thought the email showed disrespect for him.

Dr. Henrikson felt the descriptions of the staff as not taking initiative was aggressive and unnecessary. He believed the staff was fearful of Dr. Bala set a tone where the staff would be

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

fearful and afraid of speaking.  He felt that the techs, the anesthesiologists, the EP techs and the nurses.  He believes that Dr. Robinson told him the anesthesiologists were fearful.

Dr. Henrikson does not have documentation of conversations with Dr. Robinson as of August 19, doesn't recall any conversations with Dr. Robinson about Dr. Bala, and doesn't recall if he had meetings, telephone conversations or other contract with Robinson regarding Dr. Bala. Dr. Henrikson views portions of Heitman-Allen's email as insulting to Dr. Bala.

Dr. Henrikson doesn't recall initiating disciplinary action against any individual for their treatment or communications regarding Dr. Bala.

Dr. Henrikson will testify regarding his authority to discipline.  He had authority to discipline physicians, fellows and students.  He didn't have authority to discipline nurses or techs. He never recommended disciplinary action against a nurse, tech or nurse manager regarding Dr. Bala.

Deposition Exhibit 37 is the same incident as Deposition Exhibit 36.  Dr. Bala recommends discussion of the August 18 incident in the EP M&M process.  That is the quality-of-care review process.  Dr. Bala is showing leadership by contacting the appropriate people, laying out concerns accurately through the appropriate process.

Deposition Exhibit 179 are Dr. Henrikson's notes of a log he began making regarding Dr. Bala. The anesthesia incident on August 18 is one of the incidents that triggered this meeting. These notes document two meetings on August 31.   Dr. Henrikson will testify concerning the August 31, 2015 meeting.  He doesn't recall the specific interactions. Dr. Henrikson does not recall when he first spoke with Dr. Cigarroa about performance concerns regarding Dr. Bala.  He believes that he spoke with him about Dr. Bala by the time of these notes.  He doesn't know if he spoke with Human Resources by this time.

**Page 37 – PLAINTIFF'S WITNESS STATEMENTS**

Dr. Henrikson knew that it was unlawful to retaliate against someone for raising concerns about quality of care. He felt it is common sense that you can't retaliate if someone raises objections to some part of patient care.

Dr. Henrikson will testify concerning Deposition Exhibit 180. Dr. Henrikson knew that Heitman-Allen felt the Dr. Bala was using bullying as a means of obtaining excellence. the meeting that occurred in October 2015. Dr. Henrikson was aware that Heitman-Allen was trying to manage complaints from staff; and that the complaints arose in circumstances where Dr. Bala had concerns about staff's job performance as it related to patient care. Dr. Henrikson knew that many of Dr. Bala's complaints about staff performance were valid.

Dr. Henrikson will testify concerning Deposition Exhibit 173. He knew that Karen Paladino was referring to Dr. Bala as 'rupster.' He didn't consider it disrespectful for her to do so and took no action to give her feedback. Paladino is one of several persons Dr. Henrikson spoke with about the lawsuit after it was filed. He didn't get specific instructions not to discuss the lawsuit. He texted Paladino about Dr. Bala after he had a performance feedback discussion with her.

Dr. Henrikson will testify concerning his text messages with Eric Stecker. Stecker suggested to Dr. Henrikson that they exclude Dr. Bala from recruiting interviews with physicians out of a concern that Dr. Bala will say something negative about the program. Dr. Henrikson texted Stecker that he was on his own when Dr. Bala was excluded from procedures involving anesthesia. He doesn't recall if he shared performance information regarding Dr. Bala with Dr. Stecker. He texted Dr. Stecker that the process followed in excluding Dr. Bala from anesthesia services was not ideal, that it was a due process violation, and that it creates a "constitutional legal case against OHSU" and is a "gift to her lawyers."

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Henrikson will testify that he voluntarily attended leadership training. The training focused on mid-level managers and provided various techniques to successfully manage people. Both Dr. Cigarroa and Dr. Kaul encouraged him to do this training. He believes that all section chiefs were encouraged to attend this training. Concerns regarding his management of Dr. Bala were a part of the rationale for him taking this training and gave him greater impetuous for this training. Dr. Henrikson knew of a meeting between Dr. Anderson, Dr. Cigarroa and Dr. Kaul.

Dr. Kaul told Dr. Henrikson he hadn't done well in his management of Dr. Bala. He doesn't recall the specifics of this discussion. He was having one on ones with Dr. Kaul every 3 months for supervision. He doesn't recall if he told Dr. Kaul with respect to Dr. Bala that it is her or me. He does believe that it was clear that he and Dr. Bala were not compatible. He was never disciplined with respect to his treatment of Dr. Bala.

Dr. Henrikson knew that Dr. Anderson met with Linda Strahm to discuss Dr. Bala. He never heard that people were unhappy with him. He never heard that Dr. Kilo told Dr. Cigarroa that people were unhappy with him. Ms. Strahm did not tell him that he couldn't be objective when it came to Dr. Bala. He felt that his relationship with Dr. Bala had broken down beyond repair by the time that Dr. Anderson met with Ms. Strahm.

Deposition Exhibit 165 are notes of a meeting between Dr. Bala, Dr. Henrikson, Dr. Cigarroa and Dr. Camacho on September 17, 2015. This meeting concerned Lidija McGrath. Dr. Cigarroa called this meeting. The meeting was triggered by an interaction between Dr. Bala and Dr. McGrath. McGrath did not come to him with her concerns. She raised her concerns with someone else. In the meeting, they discussed the incident with McGrath in the context of other interactions between Dr. Bala with fellows and lab staff. At the meeting, he talked about general fellows and Dr. Camacho talked about EP fellows. He wrote down one sentence relating to

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

concerns Dr. Bala expressed during the meeting. The one sentence says Dr. Bala was frustrated with the individual knowledge base of fellows and staff. He doesn't recall the specifics of what Dr. Bala said. McGrath did not have all details of the patient straight which led to confusion in the consult. Dr. Bala expressed concerns regarding Dr. McGrath's knowledge base.

Dr. Cigarroa's email to Tuan Mai came after the September 17 meeting. Dr. Henrikson does not know why Dr. Cigarroa solicited the email from Dr. Mai. Dr. Henrikson did not attempt to circulate Dr. Mai's email to Dr. Bala.

Deposition Exhibit 167 is an email from Dr. McGrath. This came after the meeting on September 17. Dr. Henrikson did not inform Dr. Bala of Dr. McGrath's email. Dr. Henrikson knew on September 17 of McGrath's report of a change in Dr. Bala.

Deposition Exhibit 166 is an email between Dr. Bala and Dr. McGrath. Dr. Henrikson was not aware of this email at the time of the meeting. He admits that Dr. Bala's email keeps open communication which is important and that the email is warm and supportive. He thinks Dr. Bala is doing "damage control" in the email. He doesn't recall if Dr. McGrath continued to work with Dr. Bala. Dr. McGrath did continue to have interactions with Dr. Bala. He never received another complaint.

Dr. Henrikson will testify concerning the performance improvement plan. Deposition Exhibit 168 discusses a meeting on September 17 that focused on education and interaction with fellows. The discussion focused on the lab, the PCU and the recovery area. He doesn't know if the EP discussion the emails discuss ever occurred. Deposition Exhibit 78 is a series of emails between Dr. Kaul, Ms. Strahm, Dr. Henrikson and Dr. Cigarroa that occurred from October 1 through October 6, 2015. They had discussions about non-renewal of Dr. Bala's contract. He

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

doesn't remember what happened before the email. He doesn't recall considering non-renewal before the PIP. Ms. Strahm recommended the PIP. He doesn't recall opposing the PIP.

Deposition Exhibit 169 is an email from Dr. Cigarroa which mentions putting Dr. Bala on probation. Dr. Henrikson doesn't recall a discussion of putting Dr. Bala on probation. Exhibit 181 are notes of an October meeting regarding the PIP. Dr. Henrikson had input into the PIP. He met with Ms. Strahm multiple times. He doesn't recall if he met regarding the PIP.

He recalls telling Ms. Strahm that Dr. Bala could be abrasive. He spent time talking with Ms. Strahm about Dr. Bala's reference to U Penn, about lower standards at OHSU compared to U Penn and about how things were at OHSU. He told Ms. Strahm he had a trouble with these references. He saw himself as Dr. Bala's advocate. Ms. Strahm has a note that Dr. Henrikson criticized Dr. Bala for being very linear, for not conferring during procedures, for saying she wouldn't take call or teach. Dr. Henrikson recalls telling Ms. Strahm that Dr. Bala was incompatible with the system at OHSU. He believes these are Ms. Strahm's interpretations of that statement.

Deposition Exhibit 82 is the performance expectations plan (the "PIP"). He agreed and supported the plan. He will testify concerning the incidents that led to the PIP, the basis for the PIP and process used in developing the PIP. He doesn't recall any discussions regarding making the PIP objective and measurable. Dr. Bala was not involved in developing the PIP. Human Resources was in charge and developed the structure. She wasn't given access to the documentation on which the PIP was based. He discussed with Ms. Strahm all the topics in the PIP including professional interactions, teaching expectations and team participation. He doesn't recall telling anyone she was on a PIP but may have. He wasn't told the document was confidential. He doesn't know if OHSU policy makes the document confidential. He knew that

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala was upset about the PIP. He wasn't involved in giving her the PIP. He wasn't involved because the Chair of the Department is the one to give her the PIP.

Deposition Exhibit 83 is Dr. Bala's response to the PIP. He read Exhibit 83 at the time he received the document. He doesn't remember discussing it with Linda Strahm, Dr. Kul or Dr. Cigarroa but he's sure they discussed it. He's sure they discussed the fact that Dr. Bala was unhappy, that she lacked understanding of her effect on people, that she lacked insight and that some things needed to be addressed with her. He will testify concerning the specific facts that Dr. Bala provided in response to the PIP and what he did to determine if her facts were accurate.

He will testify as to whether Dr. Bala was not able to attend conferences that others attended, whether Dr. Bala refused call, whether he undertook to talk with witnesses she identified, and his conversation with Dr. Jill Gelow and his attempts to document those conversations. He will testify concerning his conversations with Dr. Kumar and Dr. Mehta. He perceived that Dr. Kumar endorsed difficulties working with Dr. Bala and that Dr. Mehta asked if he could take a break from working with her. He will testify that both continued to work with her. He didn't document his conversations with Dr. Kumar and Dr. Mehta.

Deposition Exhibit 84 is an email from Linda Strahm. Dr. Henrikson will testify that Ms. Strahm's email questioning whether they were "off base" is inconsistent with his conversations with Ms. Strahm.

Dr. Henrikson will testify concerning his interactions with Anesthesia, Dr. Kirsch's complaint and the investigation of Dr. Kirsch's complaint. Dr. Henrikson received Dr. Kirsch's November email which is Deposition Exhibit 42 which he forwarded to Dr. Kaul and Cigarroa. Prior to Dr. Kirsch's email, Dr. Henrikson had discussions with Dr. Schulman and individual anesthesia providers. These discussions were about bullying and harassment of anesthesia. Dr.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Henrikson did not document these conversations. He remembers talking to Jim Hilliard, the lead CRNA. He didn't consider these interviews. He considered these as conversations with colleagues. He didn't report these conversations to Dr. Kaul or Dr. Cigarroa. He doesn't recall telling Dr. Bala about these conversations. He does recall speaking with Dr. Bala on multiple times about interactions with anesthesia. He also doesn't recall talking with Dr. Kirsch. He will testify that he was receiving concerns from all over the hospital, some were escalated and some were not. Some he tried to manage.

He will testify that if anesthesia refused to work with Dr. Bala, it was a major impediment to her job. Once Dr. Kirsch took the position that anesthesia would not work with her, Dr. Henrikson did not see a point in discussing with Dr. Kaul or Cigarroa how things go to this point.

Dr. Henrikson was not aware of Dr. Kirsch's email to Dr. Kilo which is Deposition Exhibit 47. He does not agree with Dr. Kirsch's statement regarding Dr. Kaul's and Cigarroa's attempts to deal with Dr. Bala. He denies telling anyone outside of cardiology that Dr. Kaul and Cigarroa tried to deal with Dr. Bala. He has a lay understanding of Dr. Kilo's reference to 'due process.' His lay understanding is that there is a process which had not been followed.

Dr. Henrikson received a copy of Dr. Bala's email which is Deposition Exhibit 48. He will testify that he does not agree with Dr. Bala's statement that she had not heard anything about this from her supervisors. He did not tell his supervisors of his conversations with Dr. Bala because emails were coming fast and furious. Dr. Henrikson is sure that he told Dr. Kaul and Cigarroa about his conversations with Schulman the next day.

After this exchange of emails, he understood that Kirsch's complaint was forwarded to Human Resources and Ms. Strahm took the lead. Deposition Exhibit 87 are notes of a meeting dated November 13, 2015. Dr. Henrikson does not remember this meeting. He does not know the

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

scope of Strahm's investigation. He provided information to Ms. Strahm on his communications with Dr. Schulman and any complaints from anesthesia. He does not know how Ms. Strahm decided on which incidents to investigate.

Deposition Exhibit 88 are notes of a meeting on November 16, 2015. Dr. Henrikson does not recall this meeting. He will acknowledge the notes discuss an interaction between Dr. Bala and Sue Bardon a member of the anesthesia staff. He will testimony concerning his knowledge of the incident involved in the interaction. Deposition Exhibit 55 is an email from Sue Bardon to Dr. Henrikson. He acknowledges receiving this email. He doesn't recall if he asked Bardon to provide this email. He doesn't recall if he met with Bardon. He believes that Exhibit 55 is him investigating the incident that led to Dr. Kirsch's email. Dr. Henrikson read and was aware of Ms. Bardon comparison of Dr. Bala to a male physician.

Dr. Henrikson will testify that keeping Dr. Bala out of the EP lab was inappropriate and that proper procedures were not followed. He does not recall if he put this statement in writing. Linda Strahm found that Dr. Bala had engaged in no wrongdoing in the incident that led to Dr. Kirsch's email. He knew that Ms. Strahm found no wrongdoing. He hasn't seen Ms. Strahm's findings and conclusion in writing. He doesn't know why her findings and conclusions were not put in writing.

Deposition Exhibit 94 are notes of a meeting between Dr. Henrikson, Dr. Cigarroa and Ms. Strahm. He doesn't remember this meeting. He recalls that he participated in developing a plan for Dr. Bala to return to the EP with anesthesia support. Dr. Henrikson does not know if Dr. Bala was interviewed regarding the incident that led to Dr. Kirsch's email before the plan was developed and put in place.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

He saw the process that was occurring as negotiation between KCVI, Human Resources and Anesthesia. Dr. Henrikson viewed Dr. Kirsch as very powerful. He perceived that if Dr. Kirsch set a bar on Dr. Bala's work with Anesthesia, KCVI had to clear the bar. Dr. Henrikson saw Dr. Kirsch as very powerful because the Sedation Chair is the Anesthesia Chair. In his role as Sedation Chair, Dr. Kirsch set the requirements for when other departments were required to use the anesthesia service. Under Dr. Kirsch's time as Sedation Chair, the Cardiology Department went from having a requirement to use Anesthesia for 5% of their procedures to 95% of their procedures. Dr. Henrikson will testify that if someone wanted to sue Anesthesia, he would happily testify for the plaintiff.

Dr. Henrikson will testify concerning Deposition Exhibits 182 and 183. Dr. Henrikson asked Ms. Workman to make notes summarizing a meeting held in October. He requested notes because the issues with Dr. Bala and Anesthesia were making it more complicated to non-renew Dr. Bala's contract. Dr. Henrikson was gathering as much information as possible. He was gathering evidence because Dr. Cigarroa requested that he do so. He doesn't recall the substance of the communication where Dr. Cigarroa made this request.

Dr. Henrikson will testify that there was a concern that Dr. Bala would get a lawyer. There were conversations about the possibility of being sued. Exhibit 183 are the notes that Workman created in response to Dr. Henrikson's request. He doesn't know why the notes are dated October 7 when the notes were created in December.

Dr. Henrikson will testify about the plan to return Dr. Bala to the EP lab. He will testify that while he was the Chief of the EP section, no other physician was put under a plan with procedures like Dr. Bala. He will testify that as a part of the pre-huddle procedure, an email was sent to staff requiring them to contact Dr. Henrikson or Dr. Schulman if there were any concerns

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

regarding Dr. Bala's communications. Dr. Henrikson did not keep a log of contacts he received from the staff. He acknowledges that he received no negative feedback on Dr. Bala as a result of the procedure.

Dr. Henrikson began keeping documentation on Dr. Bala in in 2016. Human Resources advised him to do so. Deposition Exhibit 184 is the documentation that he kept. Dr. Henrikson does not recall if Exhibit 184 contains all of the concerns staff raised with him about Dr. Bala during the time of the log. He will testify that he was receiving complaints on a regular basis, he has no documentation of complaints other than these and he can't identify any additional specific incidents beyond these.

Dr. Henrikson will testify concerning incidents involving Angela, Karen Paladino and Julie discussed in Deposition Exhibits 184, 185 and 186. He will testify that he considered Dr. Bala's email to Angela somewhat insulting. He acknowledges that Angela made a mistake, was upset about her mistake and that Dr. Bala's email was supportive. Dr. Henrikson heard about the incident involving Paladino directly from Paladino. Paladino complained about an email from Dr. Bala. Dr. Henrikson reviewed the email and found there was nothing inappropriate about her email. Dr. Henrikson learned of an incident where Dr. Bala asked Tom to take over for Julie in a procedure and Julie accused Dr. Bala of bullying her in front of a room full of people. Dr. Henrikson interviewed some of those present at the time. Dr. Henrikson acknowledged that Julie made a mistake during the procedure, was upset about the mistake and later apologized to Dr. Bala. Dr. Bala accepted the apology.

Dr. Henrikson does not recall Dr. Bala's version of the incident and does not recall if he got Dr. Bala's version of the incident. He will testify that asking for a change of staff is something

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

that is not done lightly because it is insulting. At the same time, Dr. Henrikson will also testify that it is always reasonable to ask for someone to help.

He will testify regarding a fourth incident involving someone who didn't want Dr. Bala to sit in a room and use a laptop. There was a larger team working there. Dr. Bala made a comment to the effect that she makes more money for the hospital so she should be able to work where she wants. Dr. Henrikson will testify that it is not unreasonable for a team to ask a physician to move.

He will testify that he believes there were other incidents of complaints but he doesn't recall them and has no documentation.

Dr. Henrikson will testify that during January and February 2016, he did not invite Dr. Bala to participate in recruitment dinners. During the course of the PIP, he will say she made statements expressing that she may leave. He was concerned that she would say something negative about the staff. He changed his mind and began inviting her after Linda Strahm and Dr. Bala spoke to him.

Dr. Henrikson will testify concerning the meetings that were held to discuss the PIP. He will testify that he participated in a meeting with Ms. Strahm where she asked him to make a list of changes he wanted that were important to her success. Deposition Exhibit 105 is Dr. Henrikson's list of changes he wanted from Dr. Bala. He provided his list more than once, sometimes verbally and sometimes in writing. All the items on the list were important to him. Dr. Henrikson was critical of the way Dr. Bala talked about U Penn. He wanted her to talk less about U Penn because he found it insulting. Her most common attire was U Penn fleece. He wanted her to wear it less. He wanted her to be more flexible with scheduling and to say "yes" more often. He didn't believe Dr. Bala was flexible enough. He also wanted fewer complaints of interpersonal stuff. He acknowledges that he told Dr. Bala that he has gotten fewer complaints lately.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Henrikson will testify concerning the change of the PIP into a coaching document.

He will testify concerning statements in Deposition Exhibit 107 where Dr. Bala said Dr. Kaul told her that he did not write the PIP. Dr. Henrikson will testify that the PIP was written by Dr. Kaul, Dr. Cigarroa, Dr. Henrikson and Ms. Strahm. He acknowledges that as Dr. Bala's direct supervisor Dr. Kaul relied upon his judgment.

Dr. Henrikson will testify regarding Deposition Exhibits 118 and 187. Dr. Henrikson will testify that the email states that he opposes removing the PIP from Dr. Bala's file. He will testify that he was open to doing so. It was Dr. Kaul's decision to make, and he understood that Dr. Kaul decided to change the PIP to a coaching document.

Dr. Henrikson will testify he participated in conversations to discuss renewal or non-renewal of Dr. Bala's contract. He remembers meetings to discuss this with Dr. Kaul, Ms. Strahm and Dr. Cigarroa. He doesn't remember the number of meetings or what transpired in each meeting. Deposition Exhibit 187 are Ms. Strahm's notes of an April 16, 2016 meeting. He doesn't recall if he met with Ms. Strahm on April 16.

He doesn't recognize Deposition Exhibit 188 which is a note of Linda Strahm. He recalls discussing with Ms. Strahm a 6-month contract renewal versus a one-year contract renewal. He discussed with Ms. Strahm Dr. Bala's threats to find another job. Dr. Henrikson had long thought that one of the best outcomes for Dr. Bala would be to find a new job somewhere else. He thought would be more successful at another job.

Dr. Henrikson will testify concerning his emails with Karen Porreco set forth in Deposition Exhibit 123. Dr. Henrikson was thinking of a short contract, 3 to 6 months in length that would not be renewable. He proposed this in his email to Ms. Porreco.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Deposition Exhibit 124 are notes of a meeting between Dr. Bala, Ms. Strahm and Dr. Henrikson on May 2, 2016 and Exhibit 125 is an email from Ms. Strahm to Ms. Porreco on the day after the meeting. The email contains a comment that Dr. Henrikson "still hadn't told her." Dr. Henrikson will testify that he doesn't recall if he delayed telling Dr. Bala of his decision. He denies that Ms. Strahm had to push him to tell Dr. Bala. He will testify that the decision to give her a terminal contract was a group decision of Dr. Cigarroa, Dr. Kaul, Ms. Strahm and himself.

Deposition Exhibit 126 is an email from Dr. Henrikson to Dr. Kaul dated May 8, 2016. Dr. Henrikson sent this to Dr. Kaul to communicate his conclusion that Dr. Bala was a poor fit who is not a viable long-term faculty member. He recommended a terminal contract. A terminal contract is one that most likely will not be renewed.

Dr. Henrikson will testify that he does not know where the term "terminal" contract came from. He doesn't know if he came up with the term or if Human Resources came up with the term. The decision was to give Dr. Bala one year to find another job. His thinking was that Dr. Bala would be able to tell prospective employers not to contact her current employer because they didn't know she was looking for another job.

Dr. Henrikson will testify that he believes Dr. Kaul told Dr. Bala of the decision to place her on a terminal contract. He will testify that he doesn't recall presenting her with the decision.

Dr. Henrikson will testify concerning the meeting where Dr. Bala was informed she would be given a terminal contract. He acknowledges the Deposition Exhibit 128 are notes of the meeting. He doesn't remember this meeting or what he said at the meeting. He will testify that he remembers telling Dr. Bala that her contract would be for an additional year, that there was a chance of renewal but it was not likely. He does not believe that there was ever a discussion of

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

whether to review the decision to not renew after this date. Dr. Henrikson will testify there were continued reports of problems with Dr. Bala after she was informed of the terminal contract.

Dr. Henrikson will testify concerning the three PSIs that Dr. Bala filed. He will testify that Deposition Exhibit 189 raised a concern regarding the lab, was reviewed and led to changes in training for staff. He will testify that newer staff had made a mistake that reflected the need for additional training. He does not agree that the initial training of the staff was not proper.

Plaintiff may also inquire of Dr. Henrikson regarding documents and/or topics not covered in his deposition as a result of time limitations, unavailability of documents or information. Topics which Plaintiff may inquire include the OHSU policies for renewal and termination of contracts and the Medical Staff By-laws procedures for restricting privileges.

11. **LINDA STRAHM**                                    Est'd Length of Direct. 2 hours

   HR Director

Ms. Strahm may be called as an adverse witness. As a result, Plaintiff does not know the precise substance of what she will say at trial but Plaintiff expects she will testify as set forth below based upon her deposition testimony.

Ms. Strahm will testify that she worked at OHSU for almost 20 years and for the last decade years, she was the Director of Human Resources for the school of medicine. In that role, she supported approximately 6,000 employees and reported directly to the Dean of the School of Medicine. In addition, Strahm will testify she was an embedded HR manager for KCVI, where Plaintiff worked, and provided direct support to that group as a primary HR resource. She will testify she is familiar with the polices and practice governing discrimination reporting at OHSU, including those governing complaints of employees of discrimination and knows how those complaints are handled, internally, as well as policies governing non-renewal of contracts,

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

termination and due process. Ms. Strahm will testify about her training on discrimination, gender stereotyping and implicit bias. She will testify about OHSU training on unconscious bias and stereotyping in both the race and gender context, which references the same kind of social science studies relied on by Dr. Carnes and Dr. Glick. She will testify she has taken tests to help her identify biases and is aware of the concept of sex stereotypes and of some limited common stereotypes for women.

Ms. Strahm will testify that she first learned of Dr. Bala in October 2015, about 9 months after she was recruited from Penn to be the Director of Complex Ablation at OHSU when Dr. Kaul, Cigarroa and Henrikson wanted to terminate her contract. She will testify that she met with Kaul, Henrikson and Cigarroa, who discussed concerns about Bala's communication style as being too abrasive, abrupt, impatient and unprofessional and that that she referred too much to her time at Penn which OHSU staff found offensive. Ms. Strahm will testify she did not investigate whether the concerns were valid or not but recommended that, instead of ending her contract, that they place her on an improvement plan so Bala had a fair chance to turn things around, and that she helped create the performance plan. She will testify that she received a lengthy rebuttal from Dr. Bala with facts and witnesses to contact in her defense which caused her to question if they were off base in their critiques of her, and that no one looked into Bala's version of the facts to see if she was correct.

Ms. Strahm will testify in November 2015, she was forwarded a complaint by Dr. Kirsch, the chair of the department of anesthesiology about Dr. Bala communication style during a specific procedure. She will testify that she was charged with investigating the factual basis for Dr. Kirsch's complaints about Dr. Bala and that she first met Dr. Bala as part of that investigation process. She will testify that Bala raised concerns about sex stereotypes and that both the Kirsch email, OHSU's

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

response to the email, and the PEP were unfounded and part of a double standard for men and women. She will testify that Dr. Bala provided her with specific information from students at OHSU who were very positive of Dr. Bala's teaching and that Bala was upset that there was never an attempt to look into her previous complaints that she had raised about safety in the lab. She will testify she didn't do anything to look into Bala's complaints of discrimination or Bala concerns about quality of care in the lab, at that time or at any other time.

She will testify about her investigation into Kirsch's email which including speaking to those who witnessed Dr. Bala's behavior on the day in question, and that witnesses did not corroborate Dr. Kirsch's concerns. She will testify that, while her investigation was ongoing, Dr. Bala was not permitted to perform procedures because Kirsch refused to provide anesthesia, essentially grounding her clinical practice. Ms. Strahm will testify that she told leadership in late November, including Henrikson, Kirsch and Cigarroa, that Kirsch's concerns were not corroborated. She will testify Henrikson, Kirsch and Cigarroa thought Kirsch's email was overly alarmist and that his handling of the situation was unprofessional. She will testify that Kirsch was known to be intense, strong willed and that people had reported him for bullying for years. Nonetheless, Strahm will testify that they created a procedure whereby all anesthesia staff had to monitor Bala's performance in the lab and required them to report any negative interactions immediately; a procedure that was in place for almost a year. She will testify that Dr. Kirsch was ultimately asked to step down as chair by Dean Anderson because he had a longstanding history of not working well with senior management.

Ms. Strahm will testify that from November 2015 forward she had a series of meetings with both Bala and Henrikson in an effort to improve their working relationship and communication and that Dr. Henrikson thought that Bala's communication had gotten better over

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

time and that she was receiving excellent evaluations. She will testify that in January 2016 she met with Dr. Henrikson and Dr. Bala about their respective requests of each other and what those requests were and started to look at getting a coach for Dr. Bala. She will testify that Dr. Bala continued to think the performance improvement plan was unwarranted and provide evidence for why, including evidence of positive feedback from fellows, and evidence many of the critiques were simply false.

Ms. Strahm will testify that in spring 2016 she was alerted by Mr. Henrikson of other complaints regarding Dr. Bala including her interactions with Karen Palladino and Angela Kresbach. She will testify she looked into the allegations and they were both unfounded. Strahm will testify that Dr. Bala felt that OHSU had a culture that encouraged people to report her at the drop of a hat for her, but not for male practitioners.

Ms. Strahm will testify that in the spring of 2016 she met with Drs. Kaul, Henrikson and Cigarroa at Bala's request and they agreed to downgrade her performance improvement plan to a coaching document and to make changes to it since some were overstated or based on misunderstandings. She will testify that all agreed that Dr. Bala had shown considerable improvement. Strahm will testify that, soon after, in April 2016, Henrikson indicated he wanted to do a six-month renewal contract for Dr. Bala. She will testify that Henrikson claimed to have concerns about Bala's unpleasantness because of an issue he learned of about a perceived conflict in the computer lab with Julie Kelly, a tech, and Bala ignoring two nurses and another concern from Angela that had occurred months earlier. Strahm will testify that she and Henrikson confronted Dr. Bala about the concerns, and Bala's explanation for what had occurred.

She will testify that Henrikson made the initial decision to place Dr. Bala on a terminal contact, without talking to Kaul, and that both Cigarroa and Kaul went along with Henrikson's

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

recommendation but extended the time to 12 months. She will testify that the understanding was this would be a final contract unless things changed significantly and that she counseled Henrikson and Cigarroa not to give negative references regarding Bala or provide negative information that would be a red flag for Dr. Bala.

Strahm will testify about her meetings with Dr. Bala in June 2016 about getting a coach so she could make the improvement needed to stay on board. She will testify that Strahm met with Henrikson who told her there were continued conflicts with staff, but that Strahm thought the conflicts were minor and that Dr. Bala was not getting the benefit of doubt. She will testify that she concluded that Dr. Bala was initially considered abrasive but that staff and Henrikson had trouble recognizing her significant improvement.

Strahm will testify that in August 2016, Dr. Bala told Strahm about her conversations with Dr. Anderson about discrimination and forwarded Strahm with a link to an article about stereotyping. Strahm will testify that this wasn't the first time that Dr. Bala had complained of being treated differently as a woman but that and that she can't remember when the first time was. Strahm will testify that in August 2016 Dr. Hendrickson brought her another complaint regarding Dr. Bala in his interactions with Matt Holling. Dr. Bala told her in person and in writing that the complaint was meritless and that she was being treated differently than men. Ms. Strahm will testify she interviewed half of the witnesses to the interaction and Dr. Henrikson interviewed the other half. She will testify that the people she spoke to did not corroborate any unprofessionalism by Dr. Bala and did corroborate unprofessionalism by Matt Holling toward Bala and that some of them pointed out that Dr. Bala was being subject to a double standard based on sex. She will testify that Dr Henrikson investigation of the other half of the witnesses found that the opposite was true and that Dr. Bala was unprofessional. Strahm will testify that she spoke to some of the same

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

witnesses as Henrikson and that they told her different things than what Henrikson reported. She will testify that she never looked into whether Dr. Bala was being treated differently than men. She will testify that she found that most people didn't think Bala crossed any lines in her interactions with Holling and told Henrikson about the conclusion, as well as Anderson, Cigarroa and Kaul. She will testify that Dr. Henrikson was ultimately sent to leadership training in part because of his difficulties working with Dr. Bala and because he had difficulty distinguishing between serious complaints about Dr. Bala and less serious complaints and how to address them appropriately. She thought he needed training about how to do that.

Strahm will testify that Bala continued to report concerns about quality of care, including that a patient of hers coded and had to be shocked 16 or 17 times while another doctor watched and did nothing. Strahm will testify that she reported these concerns to Dean Anderson in October 2016 and provided her with an update on Dr. Bala and Dr. Henrikson's relationship. She will testify that she told Dr. Anderson that Dr. Bala felt that she was being treated unfairly because of her gender.

Strahm will testify that throughout 2016 and especially in late 2016 Dr. Bala reported a series of concerns about patient care and lack of training in the cath lab. She will testify that this resulted in a number of near misses that significantly impacted patient care and that some of these complaints were processed through the PSI process. She will testify about communications she had with Dr. Kilo about Dr. Bala's concerns about patient care and discrimination. She will testify about communication between Dr. Bala, Dr. Kilo and herself about Dr. Bala's quality of care complaints and concerns of discrimination, including that men who are intense in cardiology are complimented while women who are intense are demonized. She will testify that there wasn't an investigation into Dr. Bala's concerns of discrimination at this time or at any other time.

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

MS. Strahm will testify that in early 2017 Dr. Bala made other complaints about sex discrimination and being provided less support than others, and which were not investigated. She will testify that she referred her to a AAEO to file a complaint but that Dr. Bala chose not to since none of her prior complaints were investigated. She will testify she never investigated Dr. Bala's concerns of discrimination because that is not her job, but a job that belongs to AAEO. She will testify that she has done investigations of discrimination before in conjunction with AAEO and testify about her part and investigating allegations of sexual harassment for a colleague whose name is identified in Ex 161. She will testify that even though the respondent admitted some of the conduct was substantiated, that he was not disciplined. Strahm will also testify that she learned of many years of bullying complaints against another male senior manager (referred to in Strahm Dep 300:24) who, after many years of complaints of bullying behaviors, made sexual and racial jokes in an email, which was referred to AAEO. She will testify that he was not terminated for this conduct, nor for his years of complaints regarding bullying.

12. **KATHY HEITMAN-ALLEN**                    Est'd Length of Direct: 20 min

Self-employed

Ms. Heitman-Allen is the principal in a real estate sale and project management company. She was employed as a Nurse and Nurse manager at OHSU until her separation from employment in October 2017. Ms. Heitman-Allen separated from her employment at OHSU because Dr. Cigarroa was campaigning against her with the physicians and leadership at OHSU in her position as a Nurse Manager even though he was not her supervisor. Ms. Heitman-Allen resigned her position as Nurse Manager because of Dr. Cigarroa's campaign against her and attempted to continue her employment as a nurse at OHSU. OHSU decided not to permit her to continue her employment leading to her separation.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

As she discussed in her deposition, Ms. Heitman-Allen will testify of her discussions with her supervisor, Judi Workman regarding Dr. Cigarroa's lack of support for her and Workman's opinion that she was doing a good job in her role. She will testify that Ms. Workman disclosed other instances where Dr. Cigarroa campaigned against strong females working at OHSU. Ms. Heitman-Allen will testify that Dr. Cigarroa engaged in a pattern of actions against strong, opinionated women. Ms. Heitman-Allen will testify, as she did in her deposition, that she took positions at OHSU that suggested that Dr. Cigarroa was not acting ethically. She will testify concerning her actions on the fluoroscopy selection committee where she voted on a contract for a fluoroscopy provider that she thought was the best provider. She was instructed that it would be an ethical violation to consider the provider's financial contributions to research at OHSU in the selection. She observed Dr. Cigarroa's conduct after she voted indicating disapproval of her vote.

Ms. Heitman-Allen will testify that she observed that her employment would not have ended at OHSU if she were male or if she wasn't a strong, opinionated women.

13. **DR. SHARON ANDERSON**                           Est'd Length of Direct – 1.0 hour

Physician

Dr. Anderson will be called as an adverse witness. As a result, Plaintiff does not know the substance of what she will say at trial. Plaintiff believes that she is likely to testify as set forth below based upon statements made in her deposition.

Dr. Anderson is an Executive Vice President and Dean of the School of Medicine at OHSU. She has been with OHSU for 29 years. She will give a summary of employment in the field of medicine including her residency at OHSU, her fellowship at Beth Israel, her research fellowship at Brigham and Women's and her position on the faculty at Harvard for a few years. At OHSU,

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

she has held a variety of position including interim division head, associate dean of faculty development and affairs, Chief of Medicine at the VA, Interim Chair and Chair of the Department of Medicine and Dean of the School of Medicine.

Dr. Anderson will testify concerning her duties as Chair of Medicine. She will describe how the Cardiology Department moved out of the School of Medicine and was under the KCVI which became an independent entity at OHSU. As Chair, she had a continued role in appointments and promotions within Cardiology but was not responsible for supervising KCVI. She became Dr. Kaul's boss when she became Dean.

Dr. Anderson will testify concerning Elizabeth Blackwell. Blackwell is famous because she is the first female doctor. Dr. Anderson was unaware of any jokes or derogatory comments by Dr. Kaul regarding Blackwell. She would be offended by the statements attributed to Kaul.

Dr. Anderson will testify concerning her knowledge of the circumstances regarding Dr. Kirsch stepping down as the head of Anesthesia. Anderson participated in discussions regarding Dr. Kirsch's leadership skills. Human Resources participated in those discussions. The proximate concerns for Dr. Kirsch stepping down were concerns related to leadership differences and lack of alignment with the goals of the institution. These concerns had been ongoing for several months.

There were additional concerns regarding Dr. Kirsch's inability to communicate respectfully and professionally. Those concerns had been ongoing over a much longer period of time. Dr. Anderson has a file with documents concerning Dr. Kirsch regarding these communication issues. Plaintiff does not know how Dr. Anderson will testify regarding the length, duration and substance of issues regarding Dr. Kirsch's disrespectful and unprofessional communications because she was instructed not to answer questions concerning this topic. When

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Kirsch stepped down from his position, he was given emeritus status which is an honorific for his service to OHSU.

Dr. Anderson was aware of Dr. Kirsch's attempt to put restrictions on Dr. Bala's use of the Anesthesia service.

Dr. Anderson will testify concerning her knowledge of Deposition Exhibit 205 and issues regarding Dr. John Ma's unprofessional and disrespectful communications. Dr. Anderson didn't ask Dr. Ma to step down but did suggest that it would be a good move on his part. Dr. Ma was head of Emergency Medicine and was the subject of an internal investigation.

Dr. Anderson will testify regarding Deposition Exhibit 209. Exhibit 209 reports that there were complaints regarding Dr. Ma's alleged unprofessional behaviors over more than 12 years including allegations of bullying and threats from over 40 individuals. Plaintiff does not know the substance of Dr. Anderson's testimony regarding this topic because she was instructed not to answers questions regarding the topic.

Dr. Anderson will testify regarding statements attributed to Dr. David Robinson in a newspaper article. Dr. Anderson will testify that she agrees the OHSU is not where it needs to be with respect to discrimination and harassment; and that it has a long way to go.

She will testify concerning Deposition Exhibit 203 which is an email she received from Dr. Steve Heitner dated May 18, 2018. Dr. Heitner is a faculty member at KCVI. Dr. Heitner was alarmed about Dr. Bala's lawsuit and emailed suggesting there was a need to act. At the time, OHSU was losing staff because of the closure of the heart transplant program. Dr. Anderson was dismayed that a number of individuals who had no need to know were aware of Dr. Bala's lawsuit and were talking about it. She heard comments regarding the lawsuit and it was common knowledge at OHSU. She felt it was inappropriate for these discussions to be occurring.

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Anderson will testify concerning her handwritten notes which are Deposition Exhibit 171. Dr. Anderson will testify concerning her meeting with Dr. Bala on July 27, 2016. She will testify that Dr. Bala had concerns about a number of things that transpired at OHSU. Dr. Anderson's gut reaction was that Dr. Bala's reports were concerning and that she was unfairly treated. Dr. Anderson's plan was to seek more information from Dr. Cigarroa.

Dr. Anderson likely thanked Dr. Bala for coming to her and likely told her she would look into things. She doesn't recall if she told Dr. Bala that she (Dr. Anderson) had prior experiences with these faculty similar to Dr. Bala's experience. Dr. Anderson may have had prior experiences with Dr. Kirsch similar to Dr. Bala's.

Dr. Bala told her that when she brings concerns about the clinic to Dr. Henrikson he gets upset and takes it personally. She recommended that they hire an outpatient PA for the EP clinic. She told him this would be more efficient because an M.D. could see more patients. She told him the clinics could be much better. Dr. Bala told her that Dr. Cigarroa said they were not going to hire anyone now.

Dr. Bala told Dr. Anderson that Dr. Henrikson micromanages the EP service. As a result, Dr. Bala cannot direct complex ablation which is what she was hired to do. Dr. Anderson agrees that Dr. Bala should be allowed to do the job she was hired to do. Dr. Bala told her that the in-patient EP service has a different attending every day. Dr. Anderson agrees that having a different attending every day is not optimal. A new doctor every day to every patient has an effect on continuity of care. Further, Dr. Bala reported that the attending is in the lab all day and not available to see patients. Dr. Anderson felt that if this was accurate, it is a suboptimal way for the service to run.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala reported that in the lab she expects a lot. Dr. Bala told her about an incident in July 2015 where she told a fellow don't let a nurse do a sheet and the fellow went to Dr. Henrikson to complain that she was mean. Dr. Bala told Dr. Anderson that when something happens Dr. Henrikson doesn't look into it, he just assumes she is to blame. Dr. Anderson thought this was important because. If true, it would be concerning about Dr. Henrikson's leadership skills. Dr. Bala discussed a tough interaction with Dr. McGrath here she asked for her advice and she gave advice. Dr. Bala discussed a meeting with Dr. Henrikson, Cigarroa and Camacho where she was forced to do something. Dr. Anderson doesn't remember what. Dr. Anderson recalls Dr. Bala recounting an incident where she was brought into a room with nursing supervisors and the nurses were allowed to yell at her. She told her about an incident where Judi Workman was present, made notes of a turf battle and that Dr. Cigarroa banged his fist on a table in anger. She requested that this not happen again. Dr. Anderson acknowledges that she may have used the word "ridiculous" to describe these interactions.

Dr. Bala told her about a meeting to discuss a performance improvement plan on October 21, 20105. Dr. Anderson has a note stating "very poorly done" but she doesn't know if this was her assessment or something Dr. Bala said. Dr. Bala read the PIP and started to cry. She told Dr. Anderson that she did rebut the whole thing.

She recounted an incident with a patient with an LVAD device. Dr. Bala told the CRNA that this was a hard case, there was a need to check the arterial blood gases. She asked the CRNA to call the attending. The CRNA was upset with the direction. Next came an email from Dr. Kirsch alleging that she was bullying the CRNA. Kirsch said his service would no longer provide anesthesia. She told Dr. Anderson Linda Strahm did an investigation and found Bala had done

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

nothing wrong. Dr. Kirsch apologized to Dr. Kaul and Cigarroa but not to Dr. Bala. Dr. Anderson thought he should have apologized to Dr. Bala.

There was a discussion about a huddle. Dr. Bala was already doing a huddle prior to procedures. Dr. Anderson thought this was important. Bala told Anderson that Anesthesia was harassing her. She believes Dr. Bala told her about an email that would be sent out before her procedures. Dr. Bala told Dr. Anderson she met with Dr. Henrikson and Linda Strahm and that Henrikson hates her. She said that Henrikson is very insecure and forbade her from wearing her UPenn sweatshirt, to bring her computer to conferences and didn't invite her to faculty interview dinners.

Dr. Bala told her about a meeting with Dr. Kaul, Dr. Cigarroa, Strahm and someone else. Dr. Anderson has a note that says Strahm recommended coaching. Dr. Bala reported that she was not treated the same in the lab, raised concerns of retaliation and was not treated with respect. Dr. Anderson has an arrow next to that indicating it is important.

Dr. Bala told Dr. Anderson that Dr. Henrikson was insecure, forbade her from wearing her UPenn sweatshirt, kept her from bringing a computer to a conference and didn't invite her to faculty interview dinners.

She will testify about her responsibilities upon receiving a report from Dr. Bala of harassing behavior, different treatment and retaliation. She will testify that she doesn't know if she technically had a responsibility to take some action under OHSU policy given Dr. Bala report.

Dr. Anderson will testify concerning Dr. Bala's reports of discussions between Dr. Henrikson and Ms. Strahm about giving her a 6 month or 1 year contract, an incident where a nurse alleged that Dr. Bala didn't say "hi" when she was wearing headphones and an incident where a nurse lied about seating. Dr. Bala told Dr. Anderson that Dr. Kaul told her that Dr. Henrikson was

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

taking the position that Dr. Kaul either let her go or Henrikson would step down. Dr. Bala told Dr. Anderson that she met with Dr. Kaul and Kaul told her that Dr. Henrikson gave Dr. Kaul an ultimatum – either he lets Dr. Bala go or Dr. Henrikson steps down.

Dr. Bala told Dr. Anderson that KCVI does not value women, that Dr. Cigarroa is insecure and that when she tries to give feedback, you are labeled as a troublemaker. Dr. Bala told Dr. Anderson that Dr. Kaul should have called her in earlier and now she is broken. Dr. Bala told Anderson she feels she is not treated like other doctors and they can't or shouldn't ostracize her. Dr. Anderson felt these were significant statements. Dr. Anderson understood Dr. Bala to be saying she was being treated differently because of her gender.

Dr. Bala told Dr. Anderson that they had "hired behind her" meaning that someone new was starting July 2017. Dr. Bala told Anderson she wanted the anesthesia email removed; she wanted them precluded from bringing an M.D. in front of nurse managers and letting them yell at her and she wanted her job extended beyond July 2017 and wanted good references. She wanted references to go to Dr. Kaul, not Dr. Henrikson. She told Dr. Anderson Linda Strahm and Dr. Kaul would be meeting on August 9 and Linda Strahm was trying to get Dr. Bala to move on.

Dr. Anderson understood that Dr. Bala was in a difficult position and that Linda Strahm was advising her it would be best not to sustain employment in this difficult position. Dr Anderson wrote a note saying that it "would have been better for Chuck to say we just don't get A..." and "needs coaching and leadership." She believes these are Dr. Bala's statements. She doesn't recall if she did or did not share these opinions.\

She will testify concerning Deposition Exhibits 84 and 85 which are the PIP for Dr. Bala and her response to the PIP. Dr. Anderson received a copy of the Performance Improvement Plan for Dr. Bala. She doesn't recall when or how she got it. She would not characterize the PIP as

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

poorly done.  She has seen some that are more specific.  She tries to be specific when she does a PIP.  The best PIPs have specific expectations with dates and milestones.  This one could have included more specifics.  Dr. Anderson could have told Dr. Bala that this was a poor PIP.

Dr. Anderson met with Linda Strahm on October 13, 2016.  She has a note of the conversation.  Strahm told her about an incident where a patient coded, T. Atkinson was nearby, nobody came to help, the family was there and nobody moved the family to another area.  Dr. Bala called for help and wrote up the incident for an M and M conference.  Dr. Henrikson didn't address this at the M and M conference.

Dr. Anderson met with Ms. Strahm regularly to discuss personnel issues.  She doesn't recall if she took any action on Dr. Bala's information from the July 2016 meeting prior to October 13, 2016.  She doesn't recall if she told Dr. Bala she would do something but she likely said she would follow up and seek more information.

Dr. Anderson had follow up conversations with Dr. Cigarroa and probably Linda Strahm.

Strahm looked into the issue of the patient in serious condition and received a slightly different story from the others involved.  Dr. Anderson does not recall the specific ways in which the stories were slightly different.

Dr. Anderson met with Linda Strahm on October 24, 2016.  At this time, there were active conversations concerning Dr. Bala.  Dr. Anderson will testify that Ms. Strahm was not doing a formal discrimination investigation.  In the meeting, Dr. Anderson has a note that Strahm reported that Dr. Bala wanted Dr. Henrikson removed, that Dr. Cigarroa was hearing that people were unhappy with Dr. Henrikson and this was possible coming from Dr. Kilo.  Dr. Anderson does not recall what was said that caused her to write this note.

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

Dr. Anderson has a note about an incident involving a visiting tech who complained Dr. Bala silenced him. This note is a report of Linda Strahm's investigation of the visiting tech incident. Dr. Henrikson discussed the incident with others. Linda Strahm met with them also. Tom Clark reported the Dr. Bala did nothing wrong, just like any other doctor. Dr. Bala said she needs silence. Clark told Henrikson the exact same thing. Julie, a tech, told Henrikson the visiting tech was passive aggressive. Dr. Anderson has a note that Strahm reported "Chuck another example of difficult." Dr. Anderson doesn't know what that statement means. She does recall that the story of what happened did not unfold exactly as had been alleged by the visiting tech.

Dr. Anderson's notes record statements that "Chuck can't be objective"; Chuck's judgment around Dr. Bala is not objective"; and need to separate them. Dr. Anderson thinks these are statements Strahm made in the meeting. Anderson's notes state that Henrikson wanted to meet with Strahm and Bala; that there was a need to separate the two of them and that Strahm should have said to let this incident go. With respect to the patient coding issue, Anderson's notes indicate that Dr. Bala should escalate the issue. Either Dr. Anderson or Ms. Strahm felt Dr. Bala should escalate the issue, meaning to bring the issue to someone's attention at a higher level.

Dr. Anderson thought it was possible that Henrikson's judgment was not objective but she didn't feel she had a strong evidentiary basis. Her evidentiary basis at this time was the meetings she had with Dr. Bala and Ms. Strahm. Dr. Anderson did not have authority to tell Ms. Strahm or Dr. Kaul what to do. She saw her meetings with Ms. Strahm as Ms. Strahm making her aware given her role in making appointments; and seeking advice as a business partner.

Dr. Anderson will testify that she did not receive a copy of Ex 209 but Ms. Strahm's plan in Ex 209 is consistent with Dr. Anderson's notes of her meeting with Ms. Strahm.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Anderson will testify that she has notes of a meeting with Dr. Kaul, Dr. Cigarroa and Ms. Strahm on November 26, 2016. She does not recall this meeting. Her notes reflect that someone said Dr. Bala did not want to stay. She doesn't know who made this statement but does not believe it was her. She does not recall asking Dr. Bala if she wanted to stay. Dr. And3ron has notes that "Linda got different story from others"; and that Dr. Cigarroa counseled Chuck and felt Chuck needed training." Dr. Anderson does not recall what was said about these issues. Dr. Anderson will testify that she may have wondered about Dr. Henrikson's leadership skills, but it may be too strong to say she had concerns about those skills. She has a note that says Chuck is a good person, needs to take ownership of junior faculty, likes procedures only not patient care and ignores other stuff. This is a statement Dr. Kaul made in the meeting. She has a note about a question as to whether Dr. Henrikson wanted to continue in a leadership role. She has a box around this because she felt it was an important question. She has a note that Dr. Kaul told Dr. Henrikson he didn't do well with Dr. Bala. She has a box around this note because she felt it was also important.

Dr. Anderson will testify about the context for the meeting. She didn't need to sign off on a significant personnel action in cardiology. It would be customary for such an action to be taken with her knowledge and concurrence.

Dr. Anderson will testify regarding the OHSU policy regarding reporting discrimination. She will testify that she was a person subject to the reporting requirement in the OHSU policy. She will testify that she did not trigger an investigation by the Affirmative Action Office as to whether Dr. Bala was discriminated against. She will testify that Dr. Bala reported to her that she was being treated unfairly but didn't know if she was reporting that the unfair treatment was because of gender. She will testify that Human Resources was aware that Dr. Bala felt any unfair

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

treatment was because of gender.  She will also testify that she didn't know if Human Resources was aware that Dr. Bala reported unfair treatment because of gender.

Dr. Anderson will testify that she could have gone over Dr. Kaul's head to Dr. Hunter to express concerns about the way that Dr. Bala was being treated.  She didn't go to anyone to raise these concerns.

Dr. Anderson will testify that Dr. Kaul stepped down as head of KCVI and no replacement was located as of the date of her deposition.  Dr. Anderson was replaced by Dr. David Jacoby as interim director of KCVI.

Dr. Anderson received a copy of deposition exhibit 76.  She acknowledges that Ex 76 raises a safety concern regarding patient care.  She doesn't know why she was cc'd on his email.

Dr. Anderson will testify concerning Ex 210, an email from Dr. Cigarroa.  Dr. Anderson's response to the Cigarroa email expresses her concern that OHSU did not a have system in place to make privileged emails like this and she was concerned that this email exposes them to the risk of malpractice.

In addition, Plaintiff may ask Dr. Anderson to testify concerning the OHSU policies regarding termination and nonrenewal of contracts and OHSU's Medical Staff By-laws and how they apply to Dr. Bala's case.

### 14. DR. JOAQUIN CIGARROA                    Est'd Length of Direct – 1.5 hours

Physician

Dr. Cigarroa will be called as an adverse witness.  As a result, Plaintiff does not know the substance of what he will say at trial.  Plaintiff believes that he is likely to testify as set forth below based upon statements made in his deposition.

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

Dr. Cigarroa has been at OHSU since 2006. He is a physician, a professor, Clinical Chief at KCVI, Division Head of Cardiology, and Program Director of Interventional Cardiology Fellowship program. He reports to Dr. David Jacoby. He has previously held positions as an adjunct associate professor, an associate professor and associate chief of clinical affairs for Cardiology. He reported to Dr. Sanjiv Kaul at the time Dr. Bala was there.

At the time, he did not have direct reports. The faculty reported to Section Heads who reported to Dr. Kaul. Dr. Henrikson was a Section Head. Dr. Kaul stepped down in September 2017 or 2018. Dr. Cigarroa became Chief after Dr. Kaul left. As Section Head, Dr. Henrikson was responsible for the strategic direction and operations of the missions of education, research and clinical development of his Section. Dr. Cigarroa oversaw the collective clinical program development of the divisions and the KCVI institute.

Dr. Cigarroa learned that Dr. Kaul stepped down from his position from Dr. Anderson or Dr. Kaul. He was told Dr. Kaul stepped down because he had developed a sustainable financial model for the KCVI.

Dr. Cigarroa will testify that there was no long history of conflicts between KCVI or Cardiology and the Anesthesia Department. He will testify that they worked collaboratively to allocate resources. He will testify there was only one occasion when he made a complaint regarding Dr. Kirsch and that concerned Dr. Bala.

Dr. Cigarroa will testify that Dr. Bala was an associate professor in provisional status when she came to OHSU. The next step in the process is a review by the promotion and tenure committee to remove the provisional status.

Dr. Cigarroa does not recall when he first learned of concerns regarding Dr. Bala. He believes it was soon after she arrived at OHSU. He learned of concerns of one of the general

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

cardiology fellows through someone else. The cardiology fellow was working with Dr. Bala on consult service. The cardiology fellow was Lidija McGrath. He doesn't recall if he learned of concerns from the Anesthesia Department before he learned of the cardiology fellow.

Dr. Cigarroa reviewed Deposition Exhibit 36 in deposition and agrees that Dr. Bala was developing protocols which enhance communication and mitigate risk to the patient. She identified areas to mitigate risk to patients in the future, to identify areas for improvement, and to show why there was confusion in patient care. KCVI and OHSU have committees and process in place to address these kinds of issues. The process for concerns regarding the EP Section was to go to the EP section, then to the Quality Committee and if not resolved at the Quality Committee, Dr. Cigarroa would be alerted.

Dr. Cigarroa knew Dr. Bala had opinions to improve protocols and standards in the EP Section and knew she went through the EP Section and the Quality Committees. He can't recall the date or specific incident where he learned she was invoking the process.

Dr. Cigarroa does not know if OHSU has policies prohibiting retaliation against someone who raises concerns regarding the quality of care. He imagines OHSU does have such policies but her not an expert. He believes the process of quality-of-care improvement is paramount to who OHSU is and to the provision of safe patient care. With respect to Deposition Exhibit 36, he acknowledges that the email regarding the standardization of medication administration and protocols and that such standardization should be made.

Dr. Cigarroa did not see Deposition Exhibit 163 during Dr. Bala's employment. He sees this email as Dr. Bala leading a collective process to endorse new protocols involving patient care. He was aware that Dr. Bala was leading a collective process to endorse new protocols. He received feedback that when things she proposed were not endorsed it created tension and challenged

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

teamwork of the group. He doesn't recall when he first learned of such feedback but does recall that he received such feedback from Kathy Heitman-Allen and Karen Paladino. He doesn't recall the specifics of his conversations with Heitman-Allen or Paladino but recalls the conversations occurred. He didn't document the feedback.

Dr. Cigarroa will testify that he made sure that Heitman-Allen and Paladino understood that no single individual can make changes in protocols without going through the local processes and involving cath lab managers and the EP Section. He also spoke with Dr. Bala about how to go about proposing change.

He observed there was tension in the cath lab. He cannot say what caused it. He will testify that multiple team members raised concerns about professionalism and collegiality.

Dr. Cigarroa will testify regarding Deposition Ex 164, an email he sent to Dr. Tuan Mai, a cardiology fellow in September 2015. Dr. Cigarroa asked Dr. Mai to send this email so Cigarroa did not misunderstand what occurred. He doesn't recall if Dr. Mai raised concerns at the time Dr. Cigarroa learned of the McGrath incident. Subsequent to receiving this email, Dr. Cigarroa met with Dr. Camacho and then with Dr. Camacho and Dr. Bala. He didn't have a meeting with the fellows as a group.

Dr. Mai's email discusses and incident(s) where Dr. Bala was the attending, Dr. Mai approached her to answer questions, Dr. Bala said she was too busy to answer questions and Dr. Mai felt this response was different from other providers. Dr. Cigarroa will testify that it is not a clear yes or no as to whether an EP attending also serving as consult attending can be too busy to answer a fellow's questions. Dr. Cigarroa thinks it is unusual for a provider preparing for a procedure to not be able to call and arrange for another provider to answer the fellow's questions but he can't say it is unprofessional to do so.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Cigarroa doesn't have any recollection of Dr. Mai reporting that Dr. Bala used any discriminatory comments or derogatory negative comments in telling Dr. Mai she was too busy. He doesn't recall if Dr. Bala told him that another provider was readily available or if she told him that she had spoken to the other provider. All he knows of the incident(s) is what is in the email. He also has no recollection of criticizing any other provider for telling a fellow that he or she was too busy to do a consult.

Dr. Cigarroa met with Dr. Camacho, Dr. Henrikson and Dr. Bala on September 17, 2015 and followed up with an email on September 18, 2015. Deposition Exhibit 165 is an email he sent to Karen Porreco and Sanjiv Kaul following the meeting. He sent the email to Porreco because it involved HR and Kaul as Division Head.

The meeting was during the day, not at night. The meeting was triggered by the information received regarding Dr. McGrath. He doesn't recall if he spoke with Dr. Mai or asked Dr. Mai to send Deposition Exhibit 164 prior to the meeting on September 17, 2015. The meeting was triggered by concerns made to Camacho or to Dr. Cigarroa. He doesn't recall which. Cigarroa requested the meeting and the attendees. Dr. Cigarroa's email discusses multiple individuals who raised serious concerns about Dr. Bala's interactions in various environments. Dr. Cigarroa does not recall if he received information from Camacho or Henrikson about other problems before the meeting. He believes that Deposition Exhibit 165 is complete and accurate as to what occurred in the meeting. Dr. Cigarroa remembers the participants in the meeting, the meeting was in his office and that the discussion focused on Dr. McGrath primarily. He doesn't recall the specific discussions at the meeting. He believes other fellows were discussed but he doesn't recall who.

During the meeting Dr. Bala expressed frustration with the knowledge base of fellows and staff. The focus of Dr. Cigarroa and others in the meeting was on providing individuals with a

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

supportive learning environment that treats them with respect and educates them. Dr. Cigarroa didn't take Dr. Bala's statement as an attack on Dr. Camacho's program. He felt there was a need to address Dr. Bala's concerns in a supportive way. Dr. Cigarroa denies banging his fist on the table. He doesn't recall if he told Dr. Bala that she was attacking the program he developed. He also will testify that he didn't use the words "I developed" because it was not his program. Dr. Cigarroa doesn't recall specifically what Dr. Bala said regarding the knowledge base beyond the one sentence in his note of the meeting.

Dr. Cigarroa will testify that he didn't have authority to place Dr. Bala on a performance improvement plan. He doesn't recall if he stated during the meeting that was placing her on a PIP. He doesn't recall if the subject came up. Dr. Kaul in conjunction with HR can implement a PIP. He does have input into the decision.

Deposition Exhibit 166 is an email from Dr. Bala to McGrath dated September 15, 2015. He does not recall if the case discussed in the email is the case that triggered the meeting on September 17. Dr. Cigarroa feels that this is an appropriate email. In the email, McGrath admits to being confused and making a mistake. Dr. Cigarroa does not see anything in the text suggesting McGrath was reluctant to go to Dr. Bala. Dr. Cigarroa thinks that the email reflects appropriate advice to a learner. He was not aware of this email at the time of the meeting.

Subsequent to the September 17 meeting, Dr. Cigarroa received Deposition Exhibit 167 from Dr. McGrath. Dr. Cigarroa doesn't know who informed McGrath of the meeting on September 17. He doesn't recall if Dr. McGrath's or Dr. Mai's emails were given to Dr. Bala. In the email, McGrath says she knows she is a sensitive person. Dr. Cigarroa sees her as hard working and collaborative. He doesn't agree that an overly sensitive physician needs to be told they are overly sensitive and that they need to speak up on their own.

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Cigarroa received Deposition Exhibit 78. He does not recall have discussions of non-renewing Dr. Bala's contract with Dr. Henrikson or Dr. Kaul. He does recall participating in a meeting on October 6, 2015 with Strahm and Porreco and giving input on his experiences with Dr. Bala, He does not recall the discussion at the meeting. He did have input into the discussion of putting her on a PIP. He will testify that neither he, Kaul or Henrikson opposing doing a performance improvement plan.

Deposition Exhibit 169 is an email Dr. Cigarroa sent to Dr. Kaul and Dr. Anderson. He wanted to make sure that the Chair of Medicine was aware of the decision to put Dr. Bala on probation. Dr. Cigarroa sometimes helped Dr. Kaul with administration of the division and with Human Resources. That's why he wrote this particular email. Following this email, someone updated Dr. Anderson but he does not know who.

Deposition Exhibit 81 is an email from Linda Strahm dated October 7, 2015 regarding a draft PIP for Dr. Bala. Dr. Cigarroa received a copy of this email. Dr. Cigarroa believes that Dr. Kaul took the lead in connecting with Linda Strahm. Dr. Cigarroa did not suggest putting Dr. Bala on a last chance agreement but did have input into the decision. Strahm provided a template for a PIP, Dr. Cigarroa had input into the PIP, Dr. Kaul and Dr. Henrikson authored and finalized the PIP. He had the opportunity to edit and suggest changes.

Deposition Exhibit 83 is Dr. Bala's email to Dr. Kaul. Dr. Cigarroa received a copy of this email. He read the email and the attachment. Dr. Cigarroa read the email and attachment carefully. Dr. Bala provided a list of 20 individuals to speak to about her professionalism. Dr. Cigarroa will testify that he did not go out and speak to any of these individuals to follow up on the response. Exhibit 83 raises an issue regarding Dr. Jill Gelow. Dr. Cigarroa will testify that they did not raise an issue regarding Dr. Gelow with Dr. Bala. He will testify that his office is

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

next to Dr. Gelow's office and Dr. Gelow raised issues with him the day after an incident with Dr. Bala. He will testify that Dr. Gelow was concerned with the manner of the interaction and was claiming there was a breach of professionalism. He does not recall if Dr. Gelow contacted Dr. Henrikson or if he contacted Dr. Henrikson regarding the incident. He did not ask Dr. Gelow to put her concerns in writing. He would be surprised to learn that Dr. Gelow was not concerned with the manner of the interaction.

Deposition Exhibit 44 is an email from Dr. Kirsch raising issues regarding Dr. Bala's interactions with Anesthesia. Dr. Kilo asks Dr. Kirsch if he has contacted Dr. Cigarroa. Dr. Cigarroa should be notified of professionalism issues regarding faculty. Dr. Cigarroa ultimately received a copy of the email. Dr. Cigarroa disagreed with the process that Dr. Kirsch used in this email. Dr. Cigarroa was unaware of any incidents involving Dr. Bala and Anesthesia another one from some time ago. He doesn't recall specifically what the incident was. He received an email from Dr. Kaul saying that this was bad. He sent an email to Dr. Kirsch asking if Anesthesia would not provide service on Dr. Bala's cases. He got no response from Dr. Kirsch. He convened a meeting involving Ms. Strahm, the Chief Medical Officer Dr. Kilo, Dr. Schulman from Anesthesia and Dr. Henrikson. At this meeting, there was a collective decision that pending investigation and review and for patient safety they would put a pause on Dr. Bala's cases requiring Anesthesia.

In Deposition Exhibit 46, Dr. Cigarroa advises Kirsch to alert him if and when his faculty are experiencing issues of professionalism or other issues. Dr. Cigarroa will testify that he wanted Kirsch to notify either him or Dr. Kaul. Deposition Exhibit 47 refers to a conversation between Dr. Cigarroa and Dr. Kilo. Dr. Cigarroa recalls having a conversation regarding this issue but doesn't recall the specifics of the conversation. He doesn't recall if he discussed with Dr. Kilo, Kilo's concerning regarding due process. Dr. Cigarroa is familiar with the term "due process,"

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

knows the hospital has by-laws regarding the faculty but would seek guidance from Dr. Kilo and the Professional Board on whether Dr. Kirsch action with respect to Dr. Bala violated hospital policies regarding due process.

With respect to the decision to place Dr. Bala on probation, Dr. Cigarroa does not know if there was discussion of the hospital's policies regarding discipline. He will testify that Linda Strahm, Dr. Kaul, Dr. Cigarroa and Dr. Henrikson engaged Human Resources and followed the processes outline by the School of Medicine and Human Resources relative to the implementation of the PIP. Dr. Cigarroa is unaware of those policies and relied upon Linda Strahm as the expert.

Dr. Bala's employment contract says clinician may be disciplined in accordance with OHSU policy number 03-70-001. Dr. Cigarroa had not read Dr. Bala's contract but was aware of the standard form of faculty contract. He did not pull out the discipline policy and review it at the time of Dr. Bala's PIP.

Dr. Cigarroa saw Dr. Bala's email in Exhibit 49. He was aware of the sentence indicating Dr. Bala would be happy to discuss the incident in the presence of her lawyer. Dr. Cigarroa read Dr. Bala's perception of the VR Ablation that occurred and led to Dr. Kirsch's email.

On November 13, 2015, Dr. Cigarroa spoke with Ms. Strahm regarding the concerns Dr. Kirsch raised and Dr. Bala's response. He doesn't recall the specifics of the discussion.

Dr. Cigarroa will testify concerning his email with Dr. Kaul in Deposition Exhibit 56. Dr. Cigarroa believed that Dr. Kirsch may not have been providing Dr. Bala appropriate due process rights. He believed that Kirsch's actions were putting Dr. Bala in a difficult position. He disagreed with the manner in which Kirsch proceed but took no action to recommend discipline against him. He participated in a process with Human Resources to support Dr. Bala. He also believed that this was a dangerous precedent and told Ms. Strahm and Dr. Kilo. Dr. Cigarroa did not report to the

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dean that Kirsch may not have provided Dr. Bala with due process. He related this to Dr. Kaul and believed Dr. Kaul was division head. He knew that patient procedures were postponed as a result of Kirsch's actions.

Dr. Cigarroa knew that Linda Strahm was investigating Dr. Kirsch's allegations regarding Dr. Bala and agreed there should be an investigation. He felt Dr. Bala should be provided the opportunity to provide her perspective.

Linda Strahm updated Dr. Cigarroa regarding the investigation, they people she interviewed and the results of the interviews as they were going on. Dr. Cigarroa will testify concerning Deposition Exhibit 57. Dr. Kirsch wrote Strahm that Dr. Bala was scheduled to work with anesthesia on November 20. Strahm wrote Dr. Cigarroa and asked what is up. Dr. Cigarroa advised Dr. Henrikson that Dr. Bala was not allowed in the lab in any capacity under the investigation is completed. Dr. Cigarroa denies he made the decision that Dr. Bala was not allowed in the lab. Dr. Cigarroa will testify that this was a collective decision made by Strahm, Dr. Henrikson, Dr. Cigarroa and Dr. Schulman. He does not recall whether the decision was made in a meeting, via email or through phone calls.

Dr. Cigarroa sent Deposition Exhibit 93 to Dr. Bala advising her that she could not participate in EP procedures involving anesthesia until the investigation was completed. He doesn't recall if this was her first notice she could not participate. The agreed upon plan was for Ms. Strahm to complete her investigation and then provide her findings and recommendations based upon the investigation. Dr. Cigarroa will testify that Ms. Strahm did not provide a written report with findings and recommendations.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Cigarroa will testify regarding his knowledge of OHSU's policies regarding termination and nonrenewal and OHSU's Medical Staff By-Laws regarding the rights of staff with privileges. He will testify concerning how those policies apply or applied to Dr. Bala's case.

With respect to OHSU's policy regarding nonrenewal and termination, he was aware of the policy at the time of Dr. Bala's employment. It was a part of his job to make recommendations regarding discipline of employees. He knew that OHSU's policy applied to Dr. Bala as she was an employee. Dr. Cigarroa used the term "probation" in describing actions he was participating in taking against Dr. Bala. He doesn't recall if he thought probation was discipline. He doesn't recall if he knew cause was necessary to put Dr. Bala on probation. Today, he has no opinion as to whether probation is a form of discipline under OHSU policy. Dr. Cigarroa will testify that he involved experts at Human Resources and the Head of Cardiology and followed the processes that they laid out.

He doesn't recall if he was advised that OHSU policy required a finding of cause to impose any sanction on a faculty member. He can't say he knew the specific language of OHSU policy that required cause to impose probation on a faculty member. He can't recall the granularity of the discussions with Human Resources but he involved them and followed the processes they set forth.

He has seen the OHSU policy regarding credentialing and privileging of the Medical Staff. He has worked with the Professional Board regarding the development of clinical competencies and national standards. He has skimmed aspects of the Medical Staff By-laws but has not read them cover to cover. He understands the difference between Medical Staff membership and clinical privileges, and he knows that Dr. Bala held privileges to perform electrophysiology at OHSU. He will testify that he did not make a request that the Professional Board limit or restrict

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala's privileges and doesn't know of anyone who did make such a request of the Professional Board.  He was aware that 'cause' was required to alter someone's privileges.  He did not make a request that the Professional Board approve the "pause" that he and others imposed on Dr. Bala's ability to perform procedures.   He involved the experts at Human Resources, the Chief Medical Officer and the Division to determine the path forward and followed the process they laid out.  He knew that the Professional Board could require other forms of interventions than limitations or restrictions on privileges.  He did not know the By-laws required that the Professional Board approve and precautionary suspension or restriction of privileges.

In addition, Plaintiff may ask Dr. Cigarroa to testify concerning topics that were not discussed in his deposition such as his communications with others about Dr. Bala after her nonrenewal and the complaint of an African American physician against him.

15.  **DR. SANJIV KAUL**                                    Est'd Length of Direct (1 hour)

Physician

Dr. Kaul was the previous head of cardiovascular medicine at OHSU until September 2017 and director of KCVI from 2013 until 2018. He will testify that he is a general cardiologist who does CV imaging but is not an electrophysiologist. He will testify about the circumstances of him stepping down from KCVI in 2018 surrounding a significant budget deficit caused by Phil Knight's unwillingness to provide more money in the wake of the collapse of the Cardiac program, and other internal problem at OHSU.  He will testify that at the time he left as head of cardiac medicine he was disengaged with his role and had felt that way for many months.   Dr. Cigarroa reported directly to Dr. Kaul at all material times in his role as director of KCVI.

Dr. Kaul will testify that the first he heard of Dr. Bala in the spring of 2014 when Dr. Henrikson proposed recruiting her from Penn to lead up a new complex ablation program at

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

OHSU. He will testify that Penn was a world class program and that, along with Dr. Bala's national reputation as a star EP provider was part of why Dr. Bala was recruited. He will testify that he made the ultimate hiring decision to hire Bala as the director of complex ablations at OHSU; a new position that was created for her. He will testify that this was an area of great potential growth for OHSU that they had not fully capitalized on prior to hiring Dr. Bala. Dr. Kaul will testify that he made the decision to hire her as an associate professor of medicine based on her scholarship, teaching and service on a provisional basis until the promotion and tenure committee brought her on as an associate professor on non-provisional basis. He will testify that going from a provisional status to non-provisional status is a formality that has no real meaning.

Dr. Kaul will testify that he has the ability to make hiring, termination and non-renewal decisions for Dr. Bala but that he always did so in conversations with others, including Doctor Cigarroa and Henrikson. Dr. Kaul will testify that soon after Dr. Bala started, he began receiving very positive feedback about her technical skills. He will testify that he referred his own patients to her and that they were very happy with her work and her demeanor. He will also testify that he got negative feedback from Henrikson and Cigarroa about Bala's communication style, based on nurses and lab staff. He will testify that Henrikson, Cigarroa and Judi Workman told him that Dr. Bala was hard to work with because she had very high standards, and that that impacted the morale of the staff. Dr. Kaul will also testify that he was aware that Bala was trying to change protocols in order to improve patient safety, and that staff didn't like the changes. Dr. Kaul will testify that based solely on the communications with Workman, Henrikson and Cigarroa that they initially decided that Dr. Bala's contact should be not renewed as of 2016. Dr. Kaul will testify that Linda Strahm had concerns about the non-renewal since no one had formally informed Dr. Bala about staff's concerns and recommended putting Bala on a performance plan

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

which everyone agreed was a good idea. Dr. Kaul will testify that he, Henrikson and Cigarroa all provided information to Strahm about the performance plan including that Bala was abrasive to her colleagues, abrupt, impatient, refused to engage her fellows in learning, was inflexible, refused to take call and refused to participate in conferences. He will testify that he doesn't know whether anyone investigated the allegations in the performance plan to determine if they were true or false, and that he assumed that what Henrikson was telling him was true. He will also testify that he had also heard that Dr. Bala was too tough on Lidija McGrath but that McGrath didn't make an actual complaint to anyone about Dr. Bala. He will testify he thought McGrath was "too meek" to make a complaint. Dr. Kaul will testify he met with Dr. Bala in October 2015 to give her a copy of the performance plan and that he thought that Dr Bala needed to have more patience, be less abrupt and that she was too "east coast" in her communication style.

Dr. Kaul will testify about Dr. Bala's response to the performance expectation plan which rebutted the criticism and provided witnesses to speak to, but that no one spoke to the witnesses. He will testify that Dr. Bala suggested that they attend monthly meetings with herself, Kaul. Henrikson, Cigarroa and Lampros to work through their issues but that those meetings likely didn't occur.

Dr. Kaul will testify that he met with Dr. Bala on a number of occasions including in 2015 about concerns raised by Henrikson and Cigarroa but that he doesn't really remember about what they talked about. He will testify that Dr. Bala felt she was being singled out for being direct and voicing patient error care issues and that the lack of dedicated EP staff negatively impacted patient care. Dr. Kaul doesn't recall one way or the other whether they had discussions involving gender or gender discrimination but does recall that advising her that if he brought, she brought donuts in that might help her relationship with lab staff. He will testify that he and Ms.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Strahm agreed that Dr. Henrikson needed coaching regarding his leadership skills and that, after Dr. Bala left employment, he received leadership or management training.

Dr. Kaul will testify that he made a comment during a medical team meeting that it would be easier if we went back to 1837 or 1839 because that's when women weren't allowed to be doctors. He will testify that he meant is as a joke, and he didn't really want to go back to the 1830s when women could not be doctors.

Dr. Kaul will testify about the e-mail complaint he received from Dr. Kirsch about Dr. Bala and anesthesia staff. Doctor Kaul thought that the Kirsch e-mail was highly inappropriate and the wrong way to address what the situation. Dr. Kaul knew that Kirsch could be brisk in his interactions, was not touchy feely and had a reputation for being tough. He will testify that Kirsch could be abrupt, rude, short, curt and abrasive; the same kind of traits he had heard, but not observed, regarding Dr. Bala. He will testify that he thought somebody from the professional board should be involved to address Kirsch's behavior in sending the e-mail and that he, Cigarroa and Henrikson were irate with Kirsch. He will testify that Henriksen thought Dr. Bala was in the right and that Kirsch was in the wrong He will testify that he doesn't know any policies governing due process.

He will testify that Strahm did an investigation into Bala and the source of Kirsch's complaint and concluded that Rupa was not at fault. Regardless, Dr. Kaul will testify that they created a protocol whereby, for every procedure, they would ask staff to raise concerns about Dr. Bala if negative traits were observed. Dr. Kaul will testify that Dr. Bala objected to there being such a procedure and that he was sympathetic to Bala and agreed that it was inappropriate. However, he will also testify that that practice stayed in place for many months after that meeting to make Dr. Kirsch happy. Doctor Kaul will testify that he met with one of Dr. Bala's

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

students who told him that things were getting better and that, in early 2016., he heard from

Strahm, Henrikson and others that that Dr. Bala's communication had improved. Dr. Kaul will

testify that the written feedback he received about Dr. Bala was also positive and that he met

fellows who corroborated that Dr. Bala had improved and that, in March 2016, he agreed that the

performance plan be downgraded to a coaching document based on the positive feedback they

had received. Dr. Kaul will testify about the meetings about down grading it in March 2016 and

that some of the allegations were removed from the coaching document. He will testify that the

allegations about Dr. Bala her not taking call or attending meetings was invalid and based on a

miscommunication or misunderstanding. Despite the improvement, Dr. Kaul will testify that in

May 2016, Henrikson still wanted to terminate Dr. Bala's contract and Dr. Kaul authorized Dr.

Henrikson's plan.

      Doctor Kaul will testify that following Dr. Bala being informed her contract would likely

be terminated as of June 2017, that Dr. Bala informed him that she intended to escalate her

concerns about her treatment to Dr. Anderson and that he suggested she do that. He will

corroborate that he received emails from Bala complaining of different treatment based on

gender and that he doesn't know if anything was done about it. He will testify that he was

perplexed by some of Dr Bala's complaints of discrimination because some of it was focused on

female nurses and lab staff, and he thought it was bizarre that a woman might discriminate

against another woman.

      Dr. Kaul will testify that knew that Dr. Bala raised concerns about the way procedures

were done in the procedure room from a patient care perspective and that she was concerned that

staff in the cath lab were too inexperienced to do complex procedures. He will testify that Dr.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Bala caught errors caused by a lack of training and experience before harm was done to the patient, and that she was upset by the quality of care.

After Dr. Bala left employment with OHSU, Dr. Kaul will testify that he told Henrikson that he could have handled the situation better with Dr/ Bala. He will testify that it was the first time Dr. Henrikson had ever recruited anyone before and he could have handled matters much better. He will testify that he didn't think that Dr. Henrikson had the emotional intelligence to deal with the situation, nor to differentiate significant concerns from less significant concerns.

### 16. DR. CHUCK KILO                          Est'd Length of Direct 45 minutes

Physician

Dr. Chuck Kilo was the chief medical officer for OHSU until March 2017, reporting directly to the chief operating officer. Dr. Kilo will testify that as part of his role he oversaw quality management, regulatory affairs and medical affairs. Dr. Kilo will testify that he had responsibility to oversee and make improvements to the system for reporting medical errors and oversaw the use of an optional database that was used by doctors and staff to report medical error or raise concerns about quality of care. Dr. Kilo would also receive the results of faculty satisfaction surveys along with other department heads.

Dr. Kilo will testify that the first he learned of Dr. Bala was when he received an e-mail from Dr. Kirsch in November 2015 about Dr. Bala's alleged treatment of anesthesia staff. Dr. Kilo will testify that he had concerns that anesthesia was refusing to provide services to Bala without due process based on that email and the discussions that resulted with Kaul, Henrikson and Cigarroa. Dr. Kilo will testify that the OHSU bylaws set forth a process to follow if there was going to be a formal or informal suspension of clinical privileges which was not followed by Kirsch regarding Dr. Bala. He will testify that the process affords the doctor notice and an opportunity to

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

be heard at a hearing, as well as an appeal, which she was not permitted. He will testify that this was a process he had used before and that there is an ombudsman's office at OHSU but that he doesn't know what it is or what they specifically do.

Dr. Kilo will testify that Dr. Kirsch had an abrasive communication style and would use strongly worded language that put many people off over his long career. He will testify that he witnessed this personally and spoke to Kirsch about it over many years, well before November 15. He will testify that other people had come to him with concerns about Kirsch's communication style before, too.

Dr. Kilo will testify that this was part of his job oversees the quality committee of the professional board which looks into medical errors. He will testify that he learned of allegations by Dr. Bala about quality of care in 2016 and 2017. Dr. Kilo will identify about some of those concerns were addressed, including those giving rise to the three PSI reports filed by Dr. Bala, and how OHSU maintains and uses the PSI system to address quality of care concerns. Dr. Kilo will testify that he spoke with Linda Strahm about the PSI complaints raised by Bala and assessing the management of the situation with Dr. Bala and the concerns that she had raised about the EP lab. Dr. Kilo will testify that he shared the information about Dr. Bala's complaints with quality improvement and assumed there would be an investigation but doesn't know what occurred.

Dr. Kilo will testify that he had regular meetings with Linda Strahm regarding HR issues, including the Kirsch Compliant regarding Bala and concerns raised by Bala about quality care issues. He will also testify that he spoke with Strahm regarding Dr. Bala being perceived as strong willed and difficult. Dr. Kilo will testify that he spoke with Dt. Bala on one occasion in early 2017 and found her engaging and appropriate. Dr. Kilo will testify that Dr. Bala expressed concerns to

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

him in this meeting and in writing about the EP lab and their skills and training and that she did not believe her concerns about quality problems at OHSU were being listened to or addressed.

Dr. Kilo will also testify that he spoke with Dr. Bala and Ms. Strahm about the similarities and differences in communication style between Henrikson, on one hand, and Bala and Kirsch on the other. Dr. Kilo will testify that Henrikson was more mild-mannered, and Kirsch and Bala were more strident in their opinions. He will testify that after the meeting with Dr. Bala that she sent him a long e-mail which he forwarded to Linda Strahm and Dr. Cigarroa and that he found many of Bala's concerns to be valid. Dr. Kilo will testify that he was concerned that Dr. Bala was demoralized by the lack of response to her quality-of-care concerns and that she had stopped raising concerns about quality of care because her previous concerns were not being addressed. Dr. Kilo will also testify that he received an email from Bala referring to different treatment by men and women attendings, that he forwarded to Strahm and Cigarroa and assumed they would handle those concerns appropriately. Dr. Kilo will testify he left employment in March 2017 after the March 2017 faculty survey was released.

### 17. DR. JEFFREY KIRSCH (possible remote witness) Est'd Length of Direct 1.5 hours

Physician

Dr. Kirsch may be called as an adverse witness in addition to or in lieu of Plaintiff's designation of his deposition testimony. As a result, Plaintiff does not know the substance of what he will say at trial. If Plaintiff's designation of his deposition testimony is not utilized at trial, Plaintiff expects Dr. Kirsch to testify regarding the topics in Plaintiff's designation of deposition testimony in the same way that he did in the designation. In addition to the substance set forth in the deposition designation, Plaintiff expects that Dr. Kirsch would testify as set forth below.

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Kirsch is currently employed with the Medical College in Wisconsin. He is a professor with tenure. He is Vice Chair of the Anesthesiology Department. He is an Associate Dean in the School of Medicine and a Senior Medical Director. He has been with the Medical College since 2019.

In 2019 he was a Chair emeritus professor with tenure at OHSU. He worked for OHSU from 2002 until he left in 2019. He has been a medical doctor since 1983.

Dr. Kirsch will testify that he was asked to step down from his role as Chair of Anesthesia in a meeting with Sharon Anderson and John Hunter. Prior to being asked to step down, he had not received any criticism of his performance. He continued to work for OHSU for about a year after he was asked to step down. He left OHSU voluntarily and was not asked to leave.

During the time Dr. Bala worked for OHSU, Dr. Kirsch was Chair of Anesthesiology. Dr. Robinson was his Clinical Vice Chair and there were 4 Division Directors beneath Dr. Robinson. There were 30 anesthesiologists and 80 certified RNAs in the Department. They provided Anesthesia services for all the hospital. No programs had their own anesthesiologists.

He will testify that he did not have problems working with Cardiology in 2015. He believed there was a mismatch between what proceduralists wanted and what the institution could afford to provide for staffing. He was aware that cardiologists wanted more flexibility. He will testify that Deposition Exhibit 34 is an example of an attempt to strategize about how best to cover clinical needs with anesthesia. This was an attempt to align growing EP needs with availability.

He doesn't know of any concerns of Dr. Bala concerning disorganization of the cath lab. He was aware that Dr. Robinson was approaching Dr. Henrikson with concerns about Dr. Bala. He doesn't remember his conversations with Dr. Robinson about these concerns.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

He doesn't recall seeing Deposition Exhibit 37 before. He doesn't recall this incident. He agrees that a CRNA giving the dose set forth in the Exhibit is a mistake with a potential harm of hemorrhage which can be fatal. He agrees this would be a significant error.

CRNA's are supposed to know how to make medication calculations accurately. He believes it is appropriate for a proceduralist like Dr. Bala to request that an attending be called. He agrees that Dr. Bala's email expresses quality of care concerns. He doesn't know who the anesthesia attending was or whether Dr. Bala's concern was sent through the peer review process that was in existence.

Dr. Kirsch has seen Deposition Exhibit 39 before. Dr. Harukuni is a cardiac anesthesiologist Dr. Kirsch recruited. He doesn't remember the email or conversations with Dr. Harukuni. Her email raises a concern of unprofessional and abusive behavior by Dr. Bala. He doesn't recall what Harukuni felt was unprofessional or abusive. Her email also raises an issue of a professional disagreement. He doesn't recall the nature of the professional disagreement. He doesn't know if Dr. Harukuni expressed her disagreement or tried to resolve it.

It is part of Dr. Harukuni duty to speak up and express her disagreement. He doesn't know if she did this. What should have happened is that he should have spoken to Harukuni to understand her concern, there should have been a peer review in anesthesia and anesthesia should have interacted with cardiology peer review to determine what is reasonable.

He doesn't recall what he did with the allegation of unprofessional and abusive behavior. His staff should have contacted cardiology about the incident. If Harukani felt there was a policy violation she could have gone to her supervisor or to Human Resources.

Dr. Kirsch will testify that he can't tell if his staff should have done nothing with Harukani's report. He believes it depends upon context. Dr. Kirsch's email requests a meeting

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

with Dr. Bala. He doesn't recall if he met with Dr. Bala. He wanted to meet with Dr. Bala to understand her point of view as to what occurred.

He doesn't recall if he asked Dr. Harukani to talk with Dr. Bala. Dr. Kirsch doesn't have an opinion as to whether Dr. Harukani is sensitive or vulnerable.

Dr. Kirsch will testify that he doesn't recall the incident reflected in Deposition Exhibit 40. He understands what a trauma divert is, he doesn't recall being involved in this incident and he doesn't recall doing any of Dr. Bala's cases. He doesn't remember having a one-on-one with Dr. Bala. Dr. Kirsch is not a cardiac anesthesiologist. He sees Dr. Henrikson's comments as critical of anesthesiology.

Dr. Kirsch does not recall seeing Deposition Exhibit 41. He doesn't recall this series of emails regarding scheduling. He sees this as negotiating a time that works for everyone. He doesn't see any problems with Dr. Bala's interactions in the email.

Dr. Kirsch will testify regarding Deposition Exhibit 43. He doesn't recall if he spoke to anyone before writing this email. He believes the email was triggered by a staff complaint but doesn't remember the staff complaint. He was having difficulty finding anyone to work with Dr. Bala. One CNRA took on trying to find a collaborative way to work with her. This CNRA was Hillier. Hillier came to him and said that he can't make this work anymore. He was concerned that challenging interactions would affect patient care. He doesn't remember whether he documented this interaction. He doesn't remember how he responded. He remembers that he escalated this concern because it raised an issue of the quality of patient care.

He knows there was an investigation of his complaint. He doesn't recall if his concerns were investigated. He doesn't recall if he gave Hillier's name as someone to interview. Dr. Kirsch will testify that he received a laundry list of complaints regarding Dr. Bala for months. He doesn't

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

have a memory of the details of the complaints and doesn't remember the events that led up to his email other than his discussion with Hillier.

He sent his email to Dr. Kilo because Kilo was the Chief Medical Officer in charge of physician interactions in clinical care. Dr. Kirsch knew that Dr. Henrikson reported to Dr. Kaul but did not know the reporting structure in Cardiology beyond this. Dr. Kirsch will identify his email that is Deposition Exhibit 44. He doesn't believe his email infers that he had contact with Dr. Cigarroa, Dr. Kaul or Dr. Bala. His email also doesn't say he wouldn't provide anesthesia service for Dr. Bala's procedures.

Sitting here today, if she had a case that required anesthesia, he would not have prevented her from providing care to the patient. Dr. Kirsch wanted an investigation. It was for Dr. Henrikson, Dr. Cigarroa, Dr. Kaul, the Dean and Dr. Kilo to decide if she cannot provide care to patients during the investigation. He admits it wasn't his decision to make.

Dr. Kirsch will testify concerning Deposition Exhibits 45, 46 and 47. He uses the term "meltdown" to describe what happened with Dr. Bala. He doesn't know what caused him to use the term. He does not think the term reflects that Dr. Bala was overly emotional. He can't describe males whom he has described in those terms.

Dr. Kirsch read Dr. Kilo's statement regarding due process. He believed Dr. Kilo was doing his job which was to oversee the interactions between physicians and that he was calling for due process. Dr. Kirsch felt that he didn't have the ability to force people to provide care in an unsafe environment. He doesn't recall who were the people complaining that the environment was unsafe.

Dr. Kirsch denies he was threatening Dr. Kilo in his email. He doesn't recall if he ever heard the term due process at OHSU. He's sure that OHSU has policies requiring due process.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Kirsch reviewed Deposition Exhibit 48 in deposition. He does not if he knew of Dr. Bala's version of events reflected in Exhibit 48. Dr. Kirsch received Dr. Bala's email that is Deposition Exhibit 49. He was surprised of Dr. Bala's statement that she had not heard of any concerns of Dr. Kirsch and Dr. Robinson. He would not have written his email if he knew that Dr. Bala had not received direct or indirect feedback. His normal approach is to give feedback. He doesn't recall if he did anything to determine the accuracy of Dr. Bala's description of what transpired. Dr. Kirsch doesn't remember if he talked to the individuals in the room as Dr. Bala suggests.

Dr. Kirsch complaint was referred to Linda Strahm. He was not surprised that the complaint was referred to Linda Strahm. Dr. Kirsch reviewed Deposition Exhibit 50. He doesn't recall what he did with respect to this incident. He would only use the term bullying and harassment if the individual complaining used those terms. He used those terms in his emails because others described her behavior in those terms to him.

Dr. Kirsch will testify concerning Deposition Exhibit 54, an email from Andrew Young to Dr. Kirsch. Dr. Kirsch doesn't recall when the Young incident occurred and doesn't recall if he made Dr. Bala aware of the incident. He doesn't recall if he reached to Young and solicited the email. Dr. Young's email describes his interactions with Dr. Bala and Dr. Bala's interactions with a device rep and scrub tech. Dr. Kirsch described these behaviors as bullying and harassing. He will testify that we would only use those words if someone had described the behaviors in those words. Dr. Kirsch will testify whether he considers Young's email to be a complaint. He doesn't recall if he questioned Young about bullying or harassment and doesn't recall if he directed Young to speak to Dr. Bala.

**Page 90 – PLAINTIFF'S WITNESS STATEMENTS**

Dr. Kirsch will testify concerning Susan Bardon a nurse anesthetist. He doesn't know if Ms. Bardon was the individual in the room with Dr. Bala on November 12 that led to Dr. Kirsch's complaint of bullying. Dr. Kirsch will testify whether he was aware that Bardon did not file a complaint against Dr. Bala. Reviewing Ms. Bardon's email in deposition, Dr. Kirsch considers Ms. Bardon to be accusing Dr. Bala of harassing her.

Dr. Kirsch will testify concerning the communications in Deposition Exhibit 54. He does not recall if he knew that Dr. Cigarroa was concerned about the actions of anesthesia with respect to Dr. Bala. He did not know that Dr. Cigarroa was unaware of any issues between Dr. Bala and anesthesia other than one case months prior to November 12. Dr. Kirsch was familiar with the PSN system and did not know if anesthesia made escalated concerns through the PSN system regarding Dr. Bala. Dr. Kirsch does not agree that his actions sidestepped Cigarroa's, Kaul's and Henrikson's responsibilities in the situation. Dr. Kirsch does not believe he was obligated to provide due process to Dr. Bala. He believes it was OHSU that was obliged to provide her due process. Dr. Kirsch will deny that Dr. Bala was denied due process. He will testify that due process was outside his area of authority and that he would have no way of knowing what OHSU was doing after he brought his concerns forward.

Dr. Kirsch agrees that ganging up on a physician is a violation of the OHSU Code of Conduct. Dr. Kirsch does not know if Dr. Cigarroa or Dr. Kaul alerted the Dean that due process was violated. He has no memory of receiving a contact from the Dean regarding his actions toward Dr. Bala.

Dr. Kirsch will testify concerning the information in Deposition Exhibit 57. The emails contain exchanges of information regarding Dr. Bala. With respect to the statement in Exhibit 57, he assumed that Dr. Bala was going to be arrested from clinical practice until the investigation of

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

his complaint was completed. He wrote to Ms. Strahm questioning a schedule which seemed to indicate that Dr. Bala was going to work with anesthesia. He understood that there was a process going on chosen by OHSU to investigate Dr. Bala's practice. Dr. Kirsch wrote apologizing to Dr. Cigarroa and Dr. Henrikson because he believed he hurt their feelings. While he acknowledges hurting both doctors' feelings, he denies he was unprofessional. Dr. Kirsch will testify that you can hurt someone feelings with being unprofessional. He will testify that in any institution there are a number of ways of escalating concerns. He chose a way to escalate concerns that was different than what they preferred. He will testify that the path he chose was not unprofessional. Dr. Kirsch will testify that the path he chose was accordance with the rules and regulations of OHSU.

Dr. Kirsch will testify that he chose the path to escalate concerns because of complaints he received from his staff. He had not met Dr. Bala at the time he escalated his concerns. Dr. Kirsch will testify that he did not believe that any bullying or harassment by Dr. Bala was based upon race, age, gender or sexual orientation.

Dr. Kirsch does not recall if he participated in meetings to discuss what steps would be taken regarding Dr. Bala. Dr. Kirsch does not recall if he proposed any of the steps listed in Deposition Exhibit 59. Dr. Kirsch supported the idea of requiring a coach for Dr. Bala and supported the idea of requiring communication between the proceduralist and the anesthesiologist prior to each procedure. Dr. Kirsch will deny that he insisted on any of these requirements. He will testify that it would be up to Dr. Bala's and OHSU what requirements would be imposed on Dr. Bala.

Dr. Kirsch will testify regarding the emails exchanged in Deposition Exhibit 61. He will identify the portions of the emails that are his comments. He will testify he wanted coaching to

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

occur for 6 months and that he thought the coaching would cost 10 thousand dollars. Dr. Kirsch understood that Dr. Bala had a lack of confidence in anesthesia services. He believed she would not accept feedback from anesthesia. He thought she lacked confidence in the anesthesia service because of statements that Sue Bardon and Andrew Young made. Dr. Kirsch understood that Dr. Bala had a concern that his staff wasn't performing their jobs properly. He realized that her concern raised a patient safety issue.

Dr. Kirsch will testify that no one reported to him that Dr. Bala felt the plan he and the others created was humiliating and demeaning. He did not get pushback or resistance to the plan from Dr. Henrikson or Dr. Cigarroa. He will testify concerning the comment in Exhibit 61 that HR refuses to be in the role of observing interactions during procedures. He doesn't recall of knowing of HR refusing to do so. Dr. Kirsch wrote a comment indicating that he wanted daily feedback to Dr. Bala regarding her interactions with staff.

Dr. Kirsch will testify regarding Deposition Exhibit 65. Dr. Kirsch was not aware that Ms. Strahm advised Dr. Bala that she engaged in no wrongdoing. He does not have any information to dispute that Dr. Bala was told this. He did not receive findings from Ms. Strahm regarding her investigation. He does not recall if she told him that Dr. Bala engaged in no wrongdoing. He was not aware that Dr. Bala reported to Ms. Strahm she was being discriminated against. He will testify that Dr. Bala was not involved in developing the plan to his knowledge.

Dr. Kirsch will testify concerning Deposition Exhibit 67, email he received from Dr. Harukuni. Dr. Harukuni asked to be relieved of working on Dr. Bala'' cases. Dr. Kirsch instructed Dr. Robinson to tell Harukuni to go to the cath lab and provide care. He never received any additional information from Harukuni. Dr. Kirsch will testify that he told Dr. Robinson to require

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Harukuni to provide care because he believed that Dr. Bala was working hard to improve the culture in the lab.

Dr. Kirsch received a copy of Deposition Exhibit 68 from Dr. Robinson recommending ending the special email and asking Dr. Kirsch for his input. He will testify that he did not oppose Dr. Robinson's recommendation. During the 7 months that the special procedure was in place Dr. Kirsch has no recollection of any concerns raised regarding Dr. Bala.

Dr. Kirsch was not aware of Dr. Bala's email that is Exhibit 70. He was not informed that she considered the special plan to be harassment. Dr. Kirsch was not asked to apologize to Dr. Bala for his behavior.

Dr. Kirsch will testify that he understands implicit bias and stereotyping, has been trained in implicit bias and stereotyping, and doesn't believe he engages in either. He has given lectures on stereotyping and believes it depends upon the context. Dr. Kirsch will testify concerning his knowledge of the stereotypes that are common with respect to women and women of color. .

18. **DR. DANNY JACOBS**                      Expected Length of Direct: 30 min.

OHSU President

Dr. Jacobs is currently the President of OHSU. Dr. Jacobs will be called as an adverse witness. Dr. Jacobs has not been deposed. As a result, Plaintiff is unable to determine what he will say in his testimony.

Plaintiff expects Dr. Jacobs to testify regarding his knowledge of the survey conducted in 2017, the conditions at OHSU regarding discrimination and harassment at the time he commenced his employment with OHSU, the incidents that triggered OHSU's retention of the firm that produce the Holder Report, the findings of the Holder report, OHSU's approval of the Holder report, public statements Dr. Jacobs has made regarding discrimination and harassment at OHSU since he

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

became President of OHSU and resistance at OHSU to his initiatives. Public statements Dr. Jacobs made include his March 2021 statement that it was a distressing moment for OHSU due to the intersection between issues of race, gender and power found in health care and academia; that there was an urgent need for real, clear, decisive and tangible action to correct the root cause that allow actual harassment, discrimination and racism to exist at OHSU.

19. **DIANE LUND-MUZIKANT**                          Expected Length of Direct: 20 min.

Journalist

Ms. Lund-Muzikant is the Founder and Board Member of the Lund Report.

She wrote an article concerning OHSU published in the Lund Report on March 14, 2017 and has written other articles regarding OHSU. Her articles contain statements made by David Robinson and Gregory Moawad concerning the existence of discrimination and harassment at the Oregon Health and Sciences University. Ms. Lund-Muzikant will testify that she heard Dr. Robinson and Mr. Moawad make the statements attributed to them in the article; that Dr. Robinson was employed as Executive Vice Provost and Mr. Moawad was employed as vice president for campus safety with OHSU at the time the statements were made. Robinson made statements that OHSU has discrimination and harassment going on, that it is something OHSU needs to deal with, and that OHSU has no tolerance for discrimination going forward. Robinson made statements that OHSU did not know who was harassing whom and who feels they were discriminated against. Mr. Moawad made statements that OHSU realized in 2015 that there was an undercurrent of discrimination going on at OHSU, that OHSU didn't have a Title person on board and brought someone on board in 2016, that OHSU came up with a plan to develop and integrate resources and that aggressive action is being taken to deal with harassment and discrimination based upon ethnic, racial and gender incidents. at the time of the article are as set forth below.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

20. **DR. DAVID ROBINSON**                     Expected Length of Direct: 30 min.

Executive Vice Provost, OHSU

Dr. Robinson is the Executive Vice Provost at OHSU and was employed in that position at the time of the events in Dr. Bala's employment. He was not deposed. He will be called as an adverse witness. As a result, Plaintiff is unable to state what he will say in his testimony. He will be called to testify concerning statements attributed to him in published newspaper articles in March 2017 to the effect that OHSU has discrimination and harassment going on, that it's something OHSU needs to deal with, that OHSU has no tolerance for discrimination going forward. Robinson made statements that OHSU did not know who was harassing whom and who feels they were discriminated against. Dr. Robinson's statements were made in connection with a survey conducted of the faculty and staff of OHSU regarding the conditions in the workplace.

21. **MAYA SETHURAMAN (possible remote)**       Expected Length of Direct: 20 min.

Chemist

Ms. Sethuraman and Dr. Bala met in 2007 or 2008. They met through mutual friends who were part of the community of people from India. She works in corporate America and her background is as a chemist. After they met, they became friends. Ms. Sethuraman and Dr. Bala saw each other a couple of times a week, talked frequently on the phone, and travelled together extensively until she got married. They haven't travelled together since Ms. Sethuraman got married and they don't see each frequently since Dr. Bala now lives in another location. They still talk frequently.

Dr. Bala has talked with Ms. Sethuraman about her work at OHSU, her search for employment after leaving OHSU and the effects on her of what transpired at OHSU. Around the time that Dr. Bala was employed at OHSU Ms. Sethuraman got engaged. It was a very happy

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

time in her life.  Initially, Dr. Bala did not talk about what she was experiencing at OHSU.  Ms. Sethuraman believes this was because Dr. Bala did not want what she was experiencing to spoil this time in Ms. Sethuraman's life.  However, after a period of time she began to tell Ms. Sethuraman about what transpired at OHSU and its effects on her.

Ms. Sethuraman observed that what happened at OHSU affected Dr. Bala on a number of different levels.  Dr. Bala experienced extreme difficulty in finding jobs and because of the difficulty in finding jobs took jobs that were not the kind she would have chosen.  She talked about many of the rejections and each rejection she discussed seemed to cause her to be upset.  She felt there was a stigma attached to her as a result of suing her employer and she felt this stigma affected her ability to get a job.

Dr. Bala frequently expressed concern about her career and her career trajectory.  After her education and training at the University of Chicago and the University of Pennsylvania, she had expectations of a career in academic medicine that could lead to a full Professor position, research and an administrative position running a department.  She talked a lot about feeling like her career was lost and her opportunity for advancement in academic medicine gone.

Ms. Sethuraman noticed changes in Dr. Bala which she connects to her employment at and departure from OHSU.  Dr. Bala was a very social, happy person who enjoyed spending time with a lot of people.  She liked to have a lot of fun and was very active.  Ms. Sethuraman has observed she has become guarded, somewhat reclusive, has developed a distrust of people and has isolated herself from her larger group of friends.   She has narrowed her social contacts to a small group of very close friends.

Some of her friends have contacted Ms. Sethuraman and com1mented that Dr. Bala doesn't talk with them anymore.  They have questioned why she has isolated herself.  Ms.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

Sethuraman has also spoke with Dr. Mohile, a friend of Dr. Bala who is also a friend of Ms. Sethuraman's. Both have expressed concern for Dr. Bala and the impact on her of what happened at OHSU and Dr. Bala's career.

Ms. Sethuraman is familiar with the electro-physiology community. She has met some of Dr. Bala's former colleagues. Her observation is that the EP community is a very small community of individuals with alliances and networks.

22. **DR. SUPRIYA MOHILE (possible remote)**        Est'd Length of Direct: 45 min.

Physician, Professor of Medicine and Surgery

Dr. Rupa Bala and Dr. Supriya Mohile are best friends. They talk about everything in their lives and support each other. They rely on each other at the worst of times and communicate regularly through speaking several times a week and texting even more frequently. They met during their internship at the University of Chicago in 1998 and have been friends since that time. Dr. Mohile worked with Dr. Bala as residents together where she had the opportunity to observe Dr. Bala as a clinical colleague. Since residency, Dr. Bala has joined Dr. Mohile's family on many vacations and Dr. Mohile appreciates Dr. Bala's close relationships with her two teens; Dr. Bala sends food they love for their birthdays each year. Because of their close relationship, Dr. Mohile is familiar with Dr. Bala's emotional health over the last 9 years. The "worst of times" for Dr. Bala began when she joined Oregon Health and Science University (OHSU) in 2015.

Dr. Mohile is a Professor of Medicine and Surgery and a geriatric oncologist at the University of Rochester with experience mentoring women faculty and faculty from under-represented groups through leadership roles and National Institute of Health grants. She also is the Vice Chair for Academic Affairs for the University of Rochester Department of Medicine

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

where she counsels hundreds of faculty in processes related to promotion and tenure. Dr. Mohile has often compared and contrasted in discussions with Dr. Bala and in her own mind how supervisors interacted with Dr. Bala and how OHSU responded to Dr. Bala's advocacy for herself as she was reporting discrimination with what Dr. Mohile knows about structures from other University settings (including her own institution) that are designed to combat and address discrimination.

Dr. Mohile has reviewed Eric Holder's 2021 report concerning OHSU which included conclusions that "OHSU's policies and procedures addressing misconduct and reporting are inconsistent and lack clarity and precision" (Finding #3, page 29) and "OHSU lacks a consistent process for addressing and documenting concerns about misconduct, resulting in employee dissatisfaction and disciplinary outcomes that are not always fully informed or effectively implemented"(Finding #4, page 35). From her conversations with Dr. Bala, Dr. Mohile observed emotional distress resulting directly from these two descriptions of OHSU's institutional culture challenges. From what Dr. Bala has reported to Dr. Mohile, the individual defendants' actions towards Dr. Bala include her termination, which happened after she reported the discrimination she was facing numerous times to leadership, human resources, and others. This termination created numerous other downstream consequences after her employment at OHSU further increasing emotional distress that lasts to this very day. Dr. Bala has experienced close to 10 years of significant trauma, which is further outlined below.

Dr. Mohile observed Dr. Bala during their internship and residency at University of Chicago. She learned that Dr. Bala grew up around medicine—her father was a well-loved oncologist who cared for patients in her community. Dr. Bala often talked about times where patients would stop her father on the street or in the grocery store and thank him for his close

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

attention to their care.  These memories of her father inspired Dr. Bala to become a physician.

For her father, being a physician was a "calling" and for Dr. Bala it is the same. A sense of

calling has been defined as "committing one's life to personally meaningful work that serves a

prosocial purpose"  and "a feeling a deep sense of purpose about one's profession, being

personally invested in one's work and an alignment of values" ([When Medicine is a 'Calling' -

To Medicine with Love](#)).   Dr. Bala identifies as a physician—Dr. Mohile says this is who she

is—and Dr. Bala has always had a deep desire to improve patient well-being through clinical

care, research, and teaching.

      The road to becoming a physician is a long one, but Dr. Bala excelled at this—she went

to medical school at Georgetown University and was competitively selected for the internal

medicine residency at the University of Chicago, which is one of the best residencies in the

country.  Drs. Bala and Mohile both chose the University of Chicago due to the institution's

reputation for training physicians to be academic leaders who excel and become leaders in

patient care, research, and education.  During their training at the University of Chicago, they

were both inspired by incredible mentors and leaders—those who are truly passionate experts in

their respective fields.  Dr. Bala was drawn to the field of cardiology, as she was particularly

well suited to what needs to get done in "life or death" situations. As a future geriatrician and

oncologist whose skills were more in line with talking in the outpatient setting versus action in

the inpatient setting, Dr. Mohile remembers relying on Dr. Bala to "run codes" and "put in

lines."  This was not Dr. Mohile's skillset, but it was and continues to be Dr. Bala's.  Dr. Mohile

observed that Dr. Bala is detail oriented and knows the evidence and data inside out.  She utilizes

high quality data to make decisions about clinical care processes as we were trained to do at the

University of Chicago.  Dr. Mohile has observed that many of their colleagues who trained at the

University of Chicago have assumed leadership positions at academic institutions, as authors in journals where they publish their high impact research that changes the way physicians think and practice medicine, and as mentors of those in early career. Their training inspired them to be leaders. Dr. Bala has communicated to Dr. Mohile that she has always aspired to be one of these leaders, and her dreams have been shattered. It was never about just having a job in medicine for Dr. Bala—it was about leading and learning and improving medicine so she could practice at her very best. This is what it meant for Dr. Bala to have medicine as her "calling."

Following University of Chicago, Dr. Bala was selected to two other highly prestigious programs—cardiology and electrophysiology at the University of Pennsylvania. She was selected into electrophysiology at University of Pennsylvania after her cardiology fellowship at the same institution. At this point, she completed 4 additional years of clinical cardiology and electrophysiology training after already completing 4 years of medical school and 3 years of internal medicine training. Dr. Bala tells her patients that she is an "electrician of the heart"— electrophysiologists are experts at identifying and fixing abnormal heart rhythms. They work in a laboratory as a leader of a team of nurses, radiology technicians, mappers, and others to deliver energy to delicate and precise areas of the heart's electrical system. This requires intense concentration and attention to detail—both of which Dr. Bala excels at. At the University of Pennsylvania, Dr. Bala was trained to be a leader in complex ablation and started a pathway towards a promising research career. With complex ablation, the electrophysiologist inserts a catheter into blood vessels, threads this into the heart working with mapping technology to identify the abnormal heart rhythm and uses the catheter to deliver electrical energy to create a scar to stop the abnormal electrical rhythm. These are serious procedures and require precision, skill, and concentration. She published over 40 manuscripts while at the University of

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Pennsylvania with several as first author; her expertise was ablation of complex arrhythmias including premature ventricular contractions and ventricular tachycardia —these are complex conditions that require multidisciplinary care within an academic setting. During her time in training and as an attending at the University of Pennsylvania, she learned how to evaluate and employ the evidence, develop high quality technical skills, understand laboratory culture and protocols, and conduct research. Dr. Bala always has communicated to Dr. Mohile how this training helped her to become the high-quality electrophysiologist she is. In 2013 or so, she began to think about her future. She had many years of being an attending at the University of Pennsylvania and was now in the prime of her career. She was ready to transition from a large program where leadership opportunities were limited to another program where she could use her skills to advance a program. Dr. Bala had many conversations with Dr. Mohile about how excited she was to work with the electrophysiology group at OHSU. She loved Portland; she loves good food and hiking, this was the perfect city for her, and one of the reasons she chose OHSU was because she loved Portland so much. She was hired as an Associate Professor and Director of Complex Ablation and was looking forward to using her expertise to lead efforts to improve patient care and conduct research in complex ablation.

Within a short period of time after working at OHSU, Dr. Bala began calling Dr. Mohile worried about how she was being treated. Dr. Mohile recalls a number of incidents that Dr. Bala discussed with her where she observed that Dr. Bala was worried. Dr. Bala was told not to wear her Penn sweatshirt. She was proud of her training there and Dr. Mohile remembers Dr. Bala wondering why she would have been told not to wear this sweatshirt; Dr. Mohile also did not understand why her leadership was critiquing her clothing like this. Dr. Bala was not invited to dinners with her partners to meet referring providers or new recruits. For example, one of her

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

future colleagues came to interview and they had a faculty dinner to welcome him, and Dr. Bala was not invited. Dr. Bala was excluded from activities that the other faculty participated in. Further, Dr. Mohile believes that Dr. Bala was never empowered to be a leader. In retrospect, Dr. Bala often expressed concern that her supervisors were retaliating against by not including her in activities because Dr. Bala brought up ideas to improve patient safety and care through new laboratory standards and based on what she had learned at the University of Pennsylvania. Dr. Bala felt distressed that they would not let her use her expertise to improve patient care, despite her having a leadership role to do so. She questioned when or how she should communicate the need for improvements. She never second-guessed her own expertise and knowledge, but she did feel like her input was not welcomed and therefore she worried about how she should communicate her thoughts. Despite this, she did her best to care for patients, which was always her focus, and started to develop her life in Portland. Dr. Bala told Dr. Mohile that she had made friends, often went hiking, and was trying to develop roots for her new life.

During her time at OHSU, Dr. Bala told Dr. Mohile about actions her supervisors took that made her job even more difficult. She discussed with Dr. Mohile about difficult situations in the laboratory when she was doing complex procedures. She told Dr. Mohile about asking for lab personnel to refrain from loud talking so she could concentrate during parts of the procedure which were the most delicate and required concentration. She talked about providing direction to the personnel and nurse anesthesiologists on how to provide the care needed for the patient getting the procedure. Dr. Bala talked about how staff would disregard her direction, which created a difficult and dangerous environment. As a physician, Dr. Mohile knows that if the physician needs the room to be quiet so they can concentrate, the room should be quiet. If she was a patient herself, Dr. Mohile would want her physician to work in an environment where the

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

staff is listening to the physician to ensure that her clinical outcomes were the best they could be. Dr. Bala has communicated to Dr. Mohile that she is serious in laboratory settings because she is thinking and concentrating on how to achieve the best outcomes for her patients. Dr. Mohile knows that Dr. Bala's patients are often very sick and require extra care and attention. Dr. Bala talked about how her directions were met with resistance when she asked for things to be a bit differently based on what she had learned at University of Pennsylvania. Dr. Bala expressed concern that staff members called her names openly, and this caused her significant distress.

Dr. Bala struggled with knowing what to do with these incidents, and this caused significant emotional distress. She was unsure of why the lab staff was treating her differently than the other attendings (all male), and she talked about reviewing each procedure over and over in her head to anticipate how she could ensure that what needed to happen for optimal patient care was happening. Dr. Mohile recalls Dr. Bala asking her opinion about what she thought was happening and what she should do. Dr. Bala reported talking to other physician friends to obtain their feedback.

Dr. Bala was distressed about the different ways in which she was treated compared to her colleagues. She talked about visiting her male colleagues during procedures, observing the staff treating them with respect, responding to direction from them, and importantly doing what they asked them to do to ensure proper patient care. She talked about bringing concerns about her treatment to the individual defendants who then undermined her with the staff, which she felt escalated their disregard for her direction during procedures. One key interaction she discussed was when the Chair of Anesthesia accused Dr. Bala of bullying a certified registered nurse anesthetist (CRNA) after an experience during which she was just doing her job by providing clinical direction. Instead of getting proper information on what had actually happened,

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

leadership (i.e., the individual defendants) created a structure where Dr. Bala was penalized; she was pulled out of procedures and was required to have different interactions with the staff and anesthesiologists than others. Dr. Bala was distraught over this incident. She communicated to Dr. Mohile that she was unable to do her job properly in this environment and that in fact she worried that the culture and these actions taken by the individual defendants could lead to a bad patient outcome because the staff felt further emboldened to not take her direction. She expressed concern that she was unable to move forward with research and laboratory improvements as a leader because she had to focus each day self-questioning how she should speak and communicate to try to keep patients safe in the laboratory.

Dr. Bala talked with Dr. Mohile about her attempts to advocate for herself, OHSU's response to these attempts, and her concerns for her future. Dr. Bala talked about her attempts to talk to leadership at OHSU about being treated differently. She discussed a meeting with Dr. Kaul where she raised concerns about different treatment and a toxic culture that could lead to patient harm. She expressed concern that Dr. Kaul advised her to "bring donuts" for the staff and didn't attempt to work through the culture issues. She talked about approaching the Chair of Medicine, Dr. Sharon Anderson, and reporting that she was being discriminated against based upon gender. She felt that Dr. Anderson listened to her and expressed support but did not step in to take direct action to address the discrimination she raised with her. She reported that the Dean had just become injured so she could not talk to him. She discussed her conversations with human resources, who ultimately conducted investigations and found no wrongdoing on her behalf. Dr. Bala and Dr. Mohile had many conversations about Linda in human resources. She felt that Linda supported her in some ways, but that Linda never took action to investigate Dr. Bala's reports that she was being treated differently.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Dr. Bala told Dr. Mohile about a conversation with Dr. Kaul where Dr. Kaul told her that Dr. Henrikson gave him an ultimatum—it was either "him or her", so Dr. Kaul told her he decided to give her a terminal contract. Dr. Bala reported that this termination happened without any new or inciting events—it was all because Dr. Henrikson did not support her. This was devastating to Dr. Bala. She was not believed and was fighting to be believed. She has discussed multiple times with Dr. Mohile that there was no reason for her termination. Dr. Bala told Dr. Mohile that she was aware that Linda knew that she was being treated differently. After her contract was not renewed, Linda from human resources approached Dr. Bala and told her that leadership approached her and asked her if Dr. Bala would consider staying at OHSU, and Linda told them, "of course not, given how poorly she was treated."

Dr. Bala talked on a number of occasions about how she reported discrimination to multiple leaders within the institution, that no one investigated her reports of discrimination, and that her contract was terminated without anyone investigating her reports of being treated differently. Because of her more senior roles at the University of Rochester, Dr. Mohile has been trained on how reports of discrimination should be properly handled. When she was at OHSU, Dr. Bala did not know herself about how reports of discrimination should be handled. She trusted human resources and leadership to follow the procedures, as they told her they were following them. However, they did not investigate the discrimination she reported multiple times but instead they made her feel like she was in the wrong, prevented her from doing her job, and terminated her "without cause" after she reported discrimination. Dr. Mohile believes this is where the Holder report findings are aligned with what happened to Dr. Bala. Dr. Bala went to every leader she could think of for help. She talked Dr. Mohile on a regular basis about this. Dr. Mohile believes that Dr. Bala always did what was recommended for her to do and was working

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

with human resources for assistance. Despite absolutely no evidence of wrongdoing, she was still terminated. Dr. Bala often still communicates to Dr. Mohile about not understanding the reason behind her termination and reflects that no one evaluated the discrimination she was experiencing despite ongoing and multiple communication efforts by Dr. Bala to human resources and leadership.

Over the above time, these incidents cause Dr. Bala severe emotional distress. She was focused on trying to preserve her reputation and her job. She lost contact with friends and stopped doing things she loved to do. There were several times that she lost contact with Dr. Mohile, and Dr. Mohile was worried for Dr. Bala's safety and would call others to make sure she was safe. Dr. Mohile observed that her once proud and confident friend became despondent and sad. After she lost her job, she went into a deep depression. She was forced to consider next steps in a way that she had not had time or energy to consider. She had to uproot herself from a city she loved to live in and move elsewhere, which was not what she wanted to do or was prepared emotionally to do. She decided to move forward with a lawsuit ONLY when she perceived that the individual defendants were communicating negatively about her to others, which was affecting her ability to get a job. In retrospect, Dr. Mohile believes even the termination itself would have prevented Dr. Bala from getting another academic job. Dr. Bala expressed significant worry about this every time she talked to a recruiter or had to fill out paperwork for a job as many recruiters asked applicants to communicate what happened at their prior job and why they were terminated. This caused severe emotional distress during these episodes of trying to figure out what to say and subsequently as she was turned down from hundreds of jobs she applied too. Dr. Mohile believes that because electrophysiology is a small,

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

"male-dominated" field, being terminated influenced her job prospects and continues to limit options.

Dr. Mohile believes that what happened to Dr. Bala has prevented her from advancing her career in an academic environment. She has applied to hundreds of jobs and has had limited choices. She has discussed with Dr. Mohile the barriers she has faced in obtaining employment. She has lost the ability to follow her calling—through research, clinical care, and teaching. Often job options ended prematurely because recruiters would look up the case on the internet and because of what people said about her. She would think about how to communicate what happened to her to prospective employers—sometimes she focused on her abilities as a physician and at other times she told her story—it never worked. Each job that did not move forward caused Dr. Bala extreme distress—she cried often and suffered from insomnia and anxiety. Dr. Mohile knows that there is gossip about Dr. Bala as she has heard it herself. Dr. Bala has told Dr. Mohile that she has heard that the company device and mapping representatives have gossiped negatively about Dr. Bala because of her case and they often ask her for details about her plans. Dr. Bala has declined to tell her story and has never said negative things about the individual defendants at OHSU or the leadership at OHSU publicly, so no one really knows the facts about what happened to her except a very small group of people. Dr. Mohile knows what happened because she was hearing about this firsthand from Dr. Bala as she was going through this and she believes Dr. Bala. Dr. Mohile has worked clinically with Dr. Bala at the University of Chicago. She knows her to be persistent and truthful. Dr. Mohile sees her as a heroine, even though Dr. Bala herself struggles to get through each day due to what happened to her at OHSU and the case. She has lost her confidence. Because of her significant emotional distress, Dr. Bala has limited her personal interactions to just a handful of people. She has difficulties trusting

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

others given what she has gone through and is scared to have close relationships or interactions. This is a consequence of her trauma. The one and only thing that has allowed her to stay in medicine is the love she has for patient care; this is really her calling and all she ever wanted to do.

Holder report finding #1 concluded that the actions of OHSU are not consistent with their communication about equity and fairness. Since Dr. Bala's case started, there have been numerous other cases regarding OHSU's actions and how they are not consistent with OHSU's communications about equity and fairness. Dr. Bala reads these cases and each of them is a trigger for significant distress. The so-called "Tik-Tock case" and the more recent case where a senior professor was taking inappropriate pictures of students under the table but was allowed to continue to work with them all were triggers for emotional distress. They are triggers for emotional distress because they seem to have similar patterns to what Bala experienced, where victims were not believed and leaders in charge did not address the discrimination with appropriate processes and procedures and that this continues to occur years after the Holder report. Dr. Mohile believes that the Holder investigation demonstrates a culture and process issue demonstrating that OHSU does not follow appropriate procedures and demonstrates that the problem here is not with Dr. Bala but with the institution. She has discussed with Dr. Bala how she was terminated just a few years before the Holder investigation and that it was the first case of many that occurred at OHSU. The Holder investigation caused Dr. Bala extreme distress because she related to the experiences described in the report.

Despite all of the hardships, Dr. Bala has continued to advocate and provide care for patients. Even in her current private practice-based job, she tells Dr. Mohile that patients want to see her because she communicates well with them and has a high prevalence of optimal

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

outcomes after her procedures. This has never been about Dr. Bala's skills as a physician and proceduralist. Dr. Bala has always been well-liked by patients. Despite how she was treated, even towards the end of her time at OHSU, she continued to advocate for high quality patient care and provided this high-quality care herself.

Dr. Mohile will testify that what Dr. Bala experienced at OSHU has not changed Dr. Bala's self-identity as a physician, but the discrimination and the consequences of her termination have led to a career trajectory where Dr. Bala can't and never will be able to fulfill her calling. In this way, not just as her best friend, but as a physician Dr. Mohile can understand and relate to Dr. Bala. Those that know Dr. Mohile, including her personal family and friends, would describe geriatric oncology as a calling for her. In contrast to Dr. Bala's career, Dr. Mohile has been supported and provided the ability to pursue opportunities, where she is able to influence the broader field through her research and teaching. Dr. Mohile has observed Dr. Bala in medical settings and knows her background and education. Dr. Bala could have done the same but was thwarted by what happened at OHSU. In fact, after witnessing the extreme distress and difficulty she has had trying to just do her job at OHSU and trying to advocate for herself there and explain what happened to her with employers, Dr. Mohile does not believe that Dr. Bala will be able to find another academic position commiserate with her years of experience. She has lost years of her academic career and thus has lost the ability to advance in her career such as Dr. Mohile and others at the University of Chicago have advanced. The jobs she is able to get are jobs where the employers are desperate to have anyone there due to location or structure of the practice; these are not jobs that allow Dr. Bala to do the academic work she loves. While Dr. Bala is grateful for the jobs that she has been able to get, they are not jobs she would have chosen. She is not able to do research or teach or care for patients with some of the

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

complex electrophysiology conditions she conducted research in earlier in her career. This causes her deep pain—even just a month ago, she mentioned a reference to one of her papers that was mentioned on social media with significant nostalgia and discussion of where her career could have been now.

Dr. Mohile has counselled Dr. Bala to leave medicine having witnessed the emotional distress and trauma she has experienced during her time at OHSU. Dr. Bala's life is forever changed. What she loves to do, she can't do and in Dr. Mohile's opinion, having been by her side through job application after application and interview after interview, she does not think she will ever be able to do what she loves to do. There are many examples of her going through the job application process and having the job opportunity abruptly end for unclear reasons—there was one opportunity in West Virginia and she was driving to NYC to catch a flight there but was told the interview was cancelled the night before. One practice asked her to sign a contract saying she would not sue them before she would be offered a job. Academic institutions would interview her but would not select her. One academic institution did a zoom interview with her but she was later told this was a "sham" interview by one of the faculty members there. Many of these jobs remained open for a long time after she applied or was interviewed. Dr. Mohile believes they wouldn't hire her because they didn't know what happened—and Dr. Bala was the one who suffered from this. Dr. Mohile believes that because of her termination and the subsequent case, Dr. Bala is perceived as a liability. The electrophysiology community and the world of academic medicine is a small one, and Dr. Bala was the one who was made to be in the wrong and she was respectful enough of this process to not speak publicly about the defendants. This is where the emotional distress is the most difficult—Dr. Bala feels and expresses an

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

extreme loss of the opportunity to live her life to the potential she could have had, including making the deep connections with other colleagues and clinicians that she works with.

Dr. Mohile believes this case provides Dr. Bala finally with the ability to tell her story. Dr. Mohile feels strongly that Dr. Bala's emotional distress is significant and will be for the rest of her life. The experience of discrimination has forever changed her. Dr. Bala has told Dr. Mohile that all she has ever wanted was to do her job. As her best friend, Dr. Mohile knows she wants to help others who have experienced discrimination like her.

23. **DR. SASHA DEMOS, M.D., Ph.D. (possible remote witness)**     Expected Length of Direct: 20 min.

Anesthesiologist

Dr. Demos and Dr. Bala met in 1999. Dr. Demos was a fourth-year medical student at the University of Chicago and Dr. Bala was beginning her medicine residency there. They went on a mission trip together to Nepal for a month in April 2000. Dr. Demos remained at U Chicago for her anesthesia residency and Dr. Bala left to go to the University of Pennsylvania for her cardiology training. Dr. Demos is currently and has been a practicing anesthesiologist at a hospital in the Chicago area for the past 20 years. She and Dr. Bala have stayed in regular contact for almost 25 years since they were both at the University of Chicago. They talked every couple of months if not more frequently.

Dr. Demos has observed that Dr. Bala is very intelligent, highly skilled and highly trained. Her goal has always been on providing high quality patient care. She has excellent outcomes and patients adore her.

Dr. Demos has spoken with Dr. Bala about her experience at OHSU and her difficulty in obtaining comparable employment after leaving OHSU. Dr. Demos will testify that she

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

observed significant emotional distress that started before she left OHSU and has continued after she left OHSU.

While she was at OHSU Dr. Bala faced a number of challenges. She talked with Dr. Demos about these challenges and was highly frustrated about what was happening to her. One specific incident she shared with Dr. Demos involved a complex case Dr. Bala was performing in which a CRNA was present providing anesthesia care. Dr. Bala requested that the CRNA ask the attending anesthesiologist to come to the room so that they could all discuss the management of the patient. Dr. Bala relayed to Dr. Demos that the CRNA was offended by this request and spoke to anesthesia leadership claiming that Dr. Bala was asking a lot of questions and bullying her. Dr. Bala shared that after this episode she was pulled from the lab for the next month and not allowed to perform any other cases while an investigation occurred. The investigation reportedly showed no wrongdoing yet moving forward an email was sent before each case Dr. Bala was performing with anesthesia stating that if there were any issues with Dr. Bala please contact specific anesthesiologists. Dr. Bala shared that she felt disrespected and humiliated by this action and that it was undeserving. Restricting the practice of a physician with no clinical concerns or issues for a month was she felt unfair and inappropriate. She discussed this with Dr. Demos both as a friend but also to gain her advice as an anesthesiologist. Dr. Demos explained that CRNAs work as a care team with a physician anesthesiologist and not only is it completely appropriate and routine to ask the attending anesthesiologist to be present to discuss the plan, it is in the best interest of the patient and the best way to provide the safest and most optimal patient care. These are highly complex cases and clear communication regarding expectations of care is essential for patient safety. Dr. Demos had also never heard of the type of email being sent prior to cases and shared that the physician anesthesiologist can always speak directly with the

**MATTHEW C. ELLIS, PD**
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

surgeon or proceduralist if there are any concerns. There is no reason to send this type of information to anesthesia providers prior to a case with any surgeon or proceduralist. Dr. Demos also serves as a medical staff officer and has attended numerous conferences on medical staff process. She agrees that the restriction of practice in this circumstance was inappropriate. Dr. Demos observed a course of continuing frustration and feelings of discrimination over an extended period of time while she was at OHSU. Another example Dr. Bala shared with Dr. Demos involved a time that Dr. Bala requested quiet in the room during a critical moment of a procedure. Dr. Bala was disappointed and frustrated that this was met with push back instead of support leading to a suboptimal patient care environment. As a proceduralist herself, Dr. Demos shared with Dr. Bala agreement that at times during a difficult procedure in is important that silence is requested from the team, as it is not always clear to the team what moments are critical and require more concentration and minimal distractions. For optimal patient safety, the staff should respect and honor the request regarding noise levels. Dr. Bala shared that she discussed her feelings of discrimination with multiple levels of leadership within OHSU including the Chief of Cardiology and the CMO but that her concerns were dismissed.

Since she has left OHSU, she has reported persistent and upsetting derailment of her career. Dr. Bala had the training and qualifications to have an extremely successful career. Since leaving OHSU, she found that she was not being offered jobs. She began to feel that contacts at OHSU may be saying disparaging remarks. She applied to hundreds of jobs over the years and given her training, successful clinical career with no clinical concerns she should have been able to obtain a top-level academic job. Instead, she has had to take jobs and live in obscure paces at hospitals that have difficulty recruiting. She has reported a feeling of losing control of her life and her career. She has spent a tremendous amount of time applying for jobs and has

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

experienced disappointment after disappointment resulting in feelings of depression. She does not experience satisfaction, growth or enjoyment in the positions she has held and reports feeling as though she has been derailed personally. She is currently living in a retirement community in Florida which is not somewhere a person of her age or skill would choose to practice.

24. **PALMINA FAVA, (possible remote witness)**      Expected Length of Direct: 30 min.

    Attorney

Ms. Fava is a longtime friend of Dr. Bala and one of Dr. Bala's roommates from college. She has stayed in close contact with Dr. Bala since college and considers her one of her closest friends.

Ms. Fava will testify that they talked about her goal of being a doctor regularly as far back as in college. She will testify that Dr. Bala has a clear affinity toward it, even when she was in college, and worked harder than almost anyone she knows to achieve that goal.

Ms. Fava will testify that when she left Penn to go to OHSU that Dr. Bala was optimistic and excited about the opportunity. She will testify that she was excited to make improvements to the program and that she understood that OHSU welcomed her in order to improve the quality of care for complex EP cases. She will testify that Dr. Bala was thrilled to be in a leadership role at OHSU and hoped that the Northwest would enable her to have a lifestyle that had a better work-life balance that her work environment at Penn.

Ms. Fava will testify that soon after starting, Dr. Bala was dismayed by the level of care at OHSU and the unprofessional treatment of her by staff and supervisors. She will testify that Dr. Bala was shocked that she would be investigated by complaints filed by staff about her for merely working to provide safe and high-quality patient care. She will testify that Dr. Bala also told her that men were not undermined by staff in ways both small and large and received much

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

more deference and respect than she did. Ms. Fava will testify that Dr. Bala was upset by how petty and undermining the environment was at OHSU, and that she had never seen anything like it during her career. Ms. Fava will testify that she was aware that the cardiology department at OHSU had a bad reputation, and that what she heard from Dr. Bala was consistent with that reputation.

Ms. Fava will testify that the treatment by OHSU was very hard on Dr. Bala, emotionally. She will testify that she was very anxious about her time at OHSU because, even though the work hours and workload was less stressful than her previous jobs, the OHSU job was more stressful because it felt like her clinical skills didn't matter or were undermined. She will testify that the perception was that the power struggle over the cath lab or EP lab seemed more important to PHSU than providing good quality care, which Dr. Bala found distressing. She will testify that Bala didn't feel like she had a network of people who she could trust.

Ms. Fava will testify that she felt embarrassed and humiliated after her employment at OHSU ended. She will testify she became more withdrawn because she didn't want people to ask her what happened or how she was doing, because she felt ashamed by OHSU's treatment of her. Ms. Fava will testify that Dr. Bala would "ghost" people that she used to stay in close contact with, which she found concerning. She will testify that Dr. Bala had planned to have a family and settle down in Oregon, but that she didn't feel she could because she didn't feel stable enough at OHSU to be a mom and has felt even less stable since her employment at OHSU ended. Ms. Fava will testify that Bala's time at OHSU negative impacted the trajectory of Dr. Bala's life in almost every way imaginable.

Ms. Fava will testify that Dr. Bala would share with her negative reports in press about OHSU since her employment ended. She will testify that Dr. Bala was upset about the Covington

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

report because it showed that OHSU didn't take responsibility for their conduct, and because it showed so many other people had been wronged, in addition to her.

Ms. Fava will testify that up until OHSU, that it was obvious that Dr. Bala had a very promising career trajectory and that, with OHSU, everything changed rapidly for the worse, and that her career and her mental health never fully recovered. She will testify that OHSU caused her to doubt herself and her capabilities and that she is more guarded, less trustful and open with people. Ms. Fava will testify that Dr. Bala used to be more outgoing, happy and gregarious, but has struggled to be positive since her employment with OHSU ended.

Ms. Fava will testify that she is hopeful that Dr. Bala has started to accept that what happened at OHSU is part of her story, but that it does not need to define her as a person. She will testify that she has only recently started seeing glimmers of optimism and hope from Dr. Bal, and that she hopes the old Dr. Bala will re-emerge once she has had a chance to tell her story through this process.

25. **NANCY MAGLIO  (possible remote witness)**        Expected Length of Direct: 20 min.
   Teacher's Assistant

Ms. Maglio is a longtime friend of Dr. Bala and one of Dr. Bala's roommates from college. She is a teaching assistant in West Hartford, Connecticut.  Ms. Maglio has stayed in close contact with Dr. Bala throughout her medical career and until the present day and considers Dr. Bala to be one of her close friends. . She will testify that Dr.  Bala has wanted to be a doctor since when they first met as teenagers and that she was inspired to do that by her father.

Ms. Maglio will testify that Dr. Bala was very excited to start work at OHSU after working in the high-pressure environment at Penn. She will testify that Dr. Bala was excited to be at OHSU long term and to be part of creating a new complex ablation program from the ground up

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone:  (503) 345-5497

She will testify that Dr. Bala loved the Pacific Northwest, the nature, the restaurants in Portland and that she planned to stay there indefinitely. Ms. Maglio will testify that Dr. Bala even took steps to try to start a family in Portland because she was hopeful that it would provide a stable environment for her career and for the next chapter of her life.

Ms. Maglio will testify that within months of Dr. Bala starting at OHSU that Dr. Bala became distressed with the quality of care provided at OHSU. She will testify that she was very concerned that the protocols and practices in place did not promote safe care for patients and that OHSU did not appear open to making improvements. Ms. Maglio will testify that she told Dr. Bala that she may have to leave if OHSU was not willing to change its processes or protocols to focus on patient safety, but that Dr. Bala wanted to try to make it work even though she didn't feel like she fit in at OHSU. She will also testify that Dr. Bala had concerns that she was being treated differently than male practitioners by staff, who gave male doctors much more respect and deference.

Ms. Maglio will testify that after Dr. Bala's employment ended, she was emotionally distraught and didn't know what her career would look like post-OHSU.

Ms. Maglio will testify that after Dr. Bala was let go from OHSU she didn't think she could get another job. She will testify that she missed the northwest and missed her patients and doing good quality work.  She will testify that Dr. Bala would tell her about other times, post termination, that OHSU was in the news for lawsuits related to discrimination or for engaging in discrimination. She will testify that she was especially dismayed when the Covington report came out because it re-affirmed that OHSU had not made any changes to their systems since her termination, and that some of the deficiencies found by the investigators were consistent with her experience.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

She will testify that since OHSU Dr. Bala believes her career as a top EP in academic medicine is over. She will testify that Dr. Bala was dismayed when the only job opportunities she received was at Banner, which is not well regarded in the community, a locums job in New York, and her current job. She will testify that Dr. Bala tried to remain positive about her job opportunities but that she could tell that Dr. Bala was disappointed by her career post-OHSU and believed that her treatment by and termination from OHSU was a barrier to locating good jobs in EP. She will testify that Dr. Bala was conflicted about whether to disclose her lawsuit to prospective employers or not but knew that they would learn of it if they ran a simple Google search.

Ms. Maglio will testify that Dr. Bala is the kind of person who is optimistic, outgoing, fun loving and trusting. She will testify that since leaving OHSU, she has become increasingly withdrawn and inward, and has gone into a protected cocoon. She will testify that, based on her observations, that Dr. Bala is not the same fun-loving person that she was before OHSU and that OHSU was the major negative turning point in her life and career.

26. **AMITAHB GODHA (possible remote witness)**     Expected Length of Direct: 20 min.

Private Equity Finance

Mr. Godha is a longtime friend of Dr. Bala and has known Dr. Bala and her family since college. He is in finance doing private equity commercial real estate in Scottsdale, Arizona. in West Hartford, Connecticut. Mr. Godha has stayed in close contact with Dr. Bala throughout her medical career and until the present day. H will testify that Dr. Bala has wanted to be a doctor since when they first met in college at Georgetown and that she was inspired to be a doctor by her father.

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

Mr. Godha will testify that Dr Bala was thrilled to start work at OHSU because she loves the outdoors, the food in Portland and the city as a whole. He will testify that she would send him cards with picture of her hiking in the Northwest. He will also testify that she saw the move as positive for her career, and it would let her advance her career as director of complex ablation.

Ms. Godha will testify that with Dr. Bala that what you see is what you get. She is passionate, wears her heart on her sleeve and is brilliant. He will testify that when Dr. Bala told him about her treatment at OHSU that she was shocked, saddened, angry and disappointed. He will testify that she didn't believe that the treatment she had received from OHSU, and especially the treatment of her as a woman and their resistance to improving the program, could happen to her.

He will testify that the termination from OHSU was especially difficult because he and the rest of Dr. Bala's peers were all entering the prime of their careers. He will testify that she was on an excellent career trajectory—going from Georgetown, to University of Chicago, to Penn— and that he and all their peers widely assumed she would continue on that trajectory. Mr. Godha will testify that Dr. Bala reported to him that she was being treated differently as a woman and the hardest thing for her is that she really missed her work at OHSU and her patients. Mr. Godha will testify that Dr. Bala possessing an amazing ability to recall each procedure she has done with specificity, who the patient was and that it was her dream to serve patients in a way that improved their lives, but that she feels like that dream has been sacrificed by OHSU.

Mr. Godha will testify that Dr. Bala is usually very social, fun-loving, gregarious and could be the life of the party. He will testify that she is the kind of person who, socially, can make friends in any environment and is easy-going person. He will testify that since OHSU she has retreated into a shell. He will testify that she resisted attempts by friends to be social and that,

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497

when she did appear in social settings, she was not the same as before. He will testify that she is upset with her career and feels embarrassed by her treatment by OHSU. He will also testify that it is important to her to take a stand, as a woman, since most of the worse actors at OHSU are still there, while she is not.

He will testify that when Dr. Bala told him about being treated poorly in a male dominated field that that rang true to him. He will testify that his first job in finance was working for a very talented woman on Wall Street; another male dominated world. He will testify that observed that she worked twice as hard as other men and often far more talented, but that men still disparaged her because of her sex and called her names. He will testify that Dr. Bala is very focused on her time on OHSU because she feels it is important for her to stand up for other woman in the field, so that they are not treated the same way she was.

27. **IAN JOHNSON (possible remote witness)**          Length of Direct: 10 min

Director of Talent Management

Mr. Johnson is the Custodian of Records for Virginia Mason Hospital. If necessary, he will be called to establish the foundation for admission of trial Exhibit 156.

Plaintiff further reserves the right to call any witness listed on Defendant's Lay or Expert Witness Lists.


DATED this 11th Day of March, 2024

s/Matthew C. Ellis
Matthew C. Ellis, OSB #075800
1500 SW First Avenue, Ste 1000
Portland, Oregon 97201
Ph: 503-345-5497
matthew@employmentlawpdx.com

Attorney for Plaintiff

MATTHEW C. ELLIS, PD
621 SW Morrison St, Suite 1025
Portland, Oregon 97205
Telephone: (503) 345-5497