REPORT ON STEREOTYPING, BIAS, AND DISCRIMINATION

IN THE MATTER OF


DR. RUPA BALA

V.

OREGON HEALTH SCIENCES UNIVERSITY,

DR. CHARLES HENRIKSON, AND

DR. JOAQUIN CIGARROA


CASE NO. 3:18-CV-00850-YY

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


Report prepared by Dr. Peter Glick, Ph.D.

September 15, 2023

Exhibit 1
Page 1 of 110

**TABLE OF CONTENTS**

I.      Background and Qualifications………………………………………………..3

II.     Type of Testimony………………………………………………………......…6

III.    Documents Reviewed in Preparation of this Report …………………………11

IV.     Scientific Research on Stereotyping and Discrimination……………………….…12

V.      Application to Current Case………………………………………………...... 50

VI.     Compensation & Signature………………………………………………… 94

VII.    Curriculum Vitae………………………………………………........................ 95

Exhibit 1
Page 2 of 110

I, Peter Glick, have been retained by the Law Office of Stephen L. Brischetto, counsel for the plaintiff, in the case of *Dr. Rupa Bala v Oregon Health Sciences University* to issue a report on the science of stereotyping, bias, and discrimination.

## I.    BACKGROUND AND QUALIFICATIONS

I am the Henry Merritt Wriston Dr. in the Social Sciences and a Full Professor of Psychology at Lawrence University in Appleton, WI, having joined the faculty in 1985 shortly after earning my Ph.D. in social psychology at the University of Minnesota. I have co-edited two books on prejudice,[1] co-authored a text on the social psychology of gender and sexism,[2] and authored or co-authored more than 80 professional papers (peer-reviewed journal articles and chapters in edited books) on prejudice, stereotypes, and discrimination, including comprehensive reviews of sex discrimination in the workplace.[3]

My work is highly cited by other scholars, with over 40,000 citations according to *Google Scholar*, indicating my work's wide acceptance and influence in the science of stereotyping and discrimination. My work has also been recognized through scientific awards. Susan T. Fiske of Princeton University and I received the 1995 Gordon Allport Prize for the best paper of the year on inter-group relations for developing ambivalent sexism theory and an

---

[1]Dovidio, J. F., Glick, P., & Rudman, L. A. (Eds.). (2005). *On the Nature of Prejudice: 50 Years After Allport*. Malden, MA: Blackwell Publishing.
  Dovidio, J. F., Hewstone, M., Glick, P. & Esses, V. M. (Eds.). (2010). *The SAGE Handbook of Prejudice, Stereotyping, and Discrimination*. New York: Sage.
[2] Rudman, L. A., & Glick, P. (2008). The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations. New York: Guilford Press.
[3] Glick, P., & Fiske, S. T. (2008). Sex discrimination: The psychological approach. To appear in: F. J. Crosby, M. S. Stockdale, and S. A. Ropp (Eds.). *Sex Discrimination in the Workplace*. Malden, MA: Blackwell.
  Rudman, L. A., Glick, P., & Phelan, J. E. (2008). From the laboratory to the bench: Gender stereotyping research in the courtroom. In E. Borgida & S. T. Fiske (Eds). *Beyond commonsense: Psychological science in the courtroom* (pp. 83-101).Malden, MA: Blackwell Publishing.

Exhibit 1
Page 3 of 110

associated measurement instrument, the Ambivalent Sexism Inventory (ASI).[4] Since its publication in 1996, to my knowledge the ASI has been administered to hundreds of thousands of people in more than 65 nations around the world.[5] Another paper (coauthored with Amy Cuddy, Harvard University, and Susan Fiske, Princeton University) on the Stereotype Content Model received an honorable mention for the 2005-06 Allport Prize.[6] In 2009, the *Harvard Business Review* recognized the Stereotype Content Model as a "breakthrough idea for 2009."[7] The Stereotype Content model is recognized as a powerful theory about how and why stereotypes differ across various social groups, with implications for the different forms of bias (e.g., paternalism versus contempt) that groups receive. In 2011, I received Lawrence University's *Excellence in Scholarship* award for outstanding research contributions.

I am regularly invited to present my work at academic institutions and to wider audiences. Recent invited talks include Harvard Business School, Harvard Kennedy School, and a keynote address for corporate partners of Stanford University's VMWare Women's Leadership Innovation Lab. I have been appointed, at various times, to five scientific journal editorial boards (including the *Journal of Personality and Social Psychology*, an APA publication considered the top journal in social psychology). Peers have recognized my scientific contributions through election as a Fellow, including in the largest and most prestigious organizations in psychology (the *American Psychological Association* and the *Association for Psychological Science*) as well

---

[4] Glick, P. & Fiske, S. T. (1996).  The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70,* 491-512

[5] Glick, P. et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79,* 763-775.
   Glick, P. et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86,* 713–728.

[6] Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2007). The BIAS Map: Behaviors from Intergroup Affect and Stereotypes. *Journal of Personality and Social Psychology, 92,* 631-648.

[7] See https://hbr.org/2009/02/breakthrough-ideas-for-2009

Exhibit 1
Page 4 of 110

as more specialized societies (the *Society for Personality and Social Psychology, Society for the Psychological Study of Social Issues,* and the *Society for the Psychology of Women,* and the *Society of Experimental Social Psychology*). I have served in elected leadership positions in two societies, the executive councils of the *Society of Experimental Social Psychology* and *Society for the Psychological Study of Social Issues* and as President of the former society in 2009. My Curriculum Vitae is attached (Attachment), which list my prior experience as an expert witness (see final pages of Vita).

Exhibit 1
Page 5 of 110

## II.    TYPE OF TESTIMONY

I will provide "social framework" testimony to inform the decision makers in this case about empirically validated principles concerning the operation of stereotypes and bias that can lead to workplace discrimination via double-standards toward women as compared to men. Social psychological and organizational research provides a scientific knowledge base illuminating the forms stereotyping and discrimination take, the circumstances that elicit stereotyping and bias, and their relation to discriminatory behavior. This information can substantially supplement decision-makers' knowledge, going beyond common assumptions about how stereotypes and biases operate.[8]

The courts have allowed social framework testimony in which experts (a) inform juries about general, scientifically validated principles that may aid their decision-making (known as "general causation") as well as (b) illuminate where and how these principles may relate to the case at hand (known as "specific causation"). For general causation, experts review principles established with scientific certainty through empirical research using standard scientific methodologies. For specific causation, as explained below, social frameworks experts often do not apply a scientific certainty standard because it may not be possible or not feasible to conduct a rigorous study to determine whether discrimination occurred in a specific case to an individual plaintiff. In such cases, experts cannot testify with scientific certainty about whether discrimination occurred. The courts (including the U.S. Supreme Court), however, have allowed social framework experts to use their general scientific knowledge to point decision-makers to information that can help them decide whether or not discrimination occurred.

---

[8]Krieger, L. H. (2004). The intuitive psychologist behind the bench: Models of gender bias in social psychology and employment discrimination law. *Journal of Social Issues, 60*, 835-848.

Exhibit 1
Page 6 of 110

In some legal cases, such as large scale class action suits, social framework experts may be able to conduct studies on an organization using standard scientific methods. For example, imagine a case in which female employees have been certified as a class and claim pay discrimination. If the organization has many thousands of employees, the expert might have a sufficiently large sample size and enough information about potential confounding variables (e.g., length of employment at the company, specific job or role, productivity statistics) that could (instead of bias) provide alternative explanations for any overall disparity. With a large sample and a certified class, the expert would potentially be able to use statistical techniques to "pick apart" or "control for" various alternative explanations for pay differences. Such a study could potentially lead to an opinion expressed with "scientific certainty."

By contrast, in cases involving individual plaintiffs who allege discrimination related to their behavior, a systematic study may not be feasible. First, sample size may be small, rendering statistical tests less sensitive and restricting ability to control for potential confounding variables. Further, in cases involving an individual plaintiff, discrimination may be highly contextual and specific. For example, a plaintiff may have suffered sexist discrimination because she was relatively more assertive compared to female peers or because she held a high status position populated almost exclusively by men. Research suggests that women who behaved differently or held less high powered roles would not be expected to receive the same treatment. General statistical comparisons (e.g., all female versus male employees) would not capture such targeted discrimination. Finally, funding and completing an organizational study would likely represent an undue burden on an individual plaintiff given the cost and time it would take to complete one.

When an organizational study is not feasible, alternative explanations to discrimination cannot be scientifically ruled out. When scientists study discrimination using the experimental

Exhibit 1
Page 7 of 110

method, they create highly controlled comparisons. For example, participants might be randomly

assigned to evaluate the same work product with people in different conditions being led to

believe the work product was produced by a man versus a woman. Should average evaluations

show a statistically significant difference across conditions, researchers can conclude that

evaluators tended to discriminate. Even in such experiments, because the comparisons rely on

evaluations *averaged across participants*, the researcher cannot specify whether any single

individual acted in a discriminatory manner.

 Real life cases (though they may offer useful comparators) do not involve precise

experimental control. As a result, it's not possible to pin down with scientific certainty whether a

specific person experienced discrimination. Therefore, in the "specific causation" section of my

report, I do not opine directly about whether the Plaintiff experienced discrimination. Rather, I

consider, whether case facts are consistent with *potential* discrimination, using my knowledge

about general scientific principles to point out their relation to relevant case facts. This represents

a judgment *informed by* general scientific principles but *does not in itself represent a "scientific*

*conclusion."* In the end, the case decision-makers must decide whether alternative (non-

discriminatory) explanations entirely explain the case facts or whether discrimination, at least in

part, was involved.

 Social framework testimony of the sort described above has been widely accepted by the

courts, including the U.S. Supreme Court, such as in *Hopkins v. Price-Waterhouse*, for which my

scientific collaborator Susan T. Fiske was the stereotyping expert).[9] In *Tuli v Brigham &*

*Women's Hospital*, Judge Nancy Gertner, U.S. District Court, denied Defendant's motion to

---

[9] Price-Waterhouse v. Hopkins, 109 S. Ct. 1775 (1989).

Exhibit 1
Page 8 of 110

exclude my social framework testimony on stereotyping, in which I opined about both general and specific causation. With regard to the latter, Judge Gertner noted that:

> "Dr. Glick's testimony…provides the jury with a context for considering the evidence before it… He expressly refuses to come to a conclusion about whether there has been discrimination in this case because such an opinion is for the jury and because he concludes -- appropriately -- that it is not possible to make any decision to a reasonable degree of scientific certainty about a real world case."[10]

Judge Gertner further stated that "While defendants challenge him for not opining about the case at bar, that is in fact a strength of his testimony, not a weakness. He indicates that such an opinion is for the decision-makers in this case, namely the jury."[11] Judge Gertner's decision defines the "guardrails" within which a social framework expert should operate, leaving the final decision up to the appropriate case decision-makers.

The current report includes separate sections corresponding to general causation (established scientific principles) and specific causation (application to the current case). The former section reviews research on stereotyping, bias, and discrimination, summarizing the current scientific consensus about how and when discrimination occurs and the forms it takes. The latter section considers how the principles reviewed in the first section can be applied to the current case while leaving the ultimate decision about whether or not discrimination occurred to the case decision-makers.

---

[10] MEMORANDUM RE: MOTION TO EXCLUDE EXPERT TESTIMONY, January 6, 2009. Judge Nancy Gertner, United States District Court for the District of Massachusetts. Civil Action no. 07cv-12338-NG, p. 4.

[11] *Ibid*, p. 9.

Exhibit 1
Page 9 of 110

In sum, my report informs trial decision-makers about *general principles of stereotyping, bias, and discrimination that have been established with scientific certainty* based on well accepted empirical methodologies in psychology. These principles provide an interpretive framework that may aid case decision-makers to make more informed judgments about whether or not discrimination occurred. Information I provide goes substantially beyond common-sense knowledge in several ways. For example, research reveals how bias depends on situational context (e.g., role expectations for a job), targets specific judgment dimensions (e.g., perceived warmth). Compared to common-sense knowledge, scientific research reveals a much more nuanced picture of how stereotypes and bias work, including in what circumstances and toward whom they tend to occur. Although I point out ways in which general principles can be applied to the current case and opine about where case facts are consistent with discrimination, I expressly note that because alternative explanations cannot be ruled out, my case opinions do not carry the weight of scientific certainty. In the end, the case decision-makers must decide whether discrimination occurred.

Exhibit 1
Page 10 of 110

### III.    DOCUMENTS REVIEWED IN PREPARATION OF THIS REPORT

Below is a list of documents regarding the current case that I have reviewed:

- Second Amended Complaint

- Defendants' Answer and Affirmative Defenses to Second Amended Complaint

- Exhibits in the range of 1 to 232 that were referred to in the depositions listed below

- Deposition of Rupa Bala, MD

- Deposition of Charles Henrikson, MD

- Deposition of Linda Strahm

- Deposition of Charles Kilo, MD

- Deposition of Jeffrey Kirsch, MD

- Deposition of Joaquin Cigarroa, MD

- Deposition of Jill Gelow, MD

- Deposition of Sharon Anderson, MD

- Deposition of Sanjiv Kaul, MD

- Deposition of Peter Schulman, MD

- Deposition of Mary Katharine Heitman-Allen, RN

Exhibit 1
Page 11 of 110

## IV. SCIENTIFIC RESEARCH ON STEREOTYPING AND DISCRIMINATION

Scientific research on stereotyping is well established, having been systematically investigated for many decades, beginning in the 1920s and 1930s,[12] but gaining more social scientific attention, with increasingly sophisticated methods of investigation, in the last 60 years.[13] The study of stereotypes (beliefs about social groups), prejudice (biased feelings toward social groups), and discrimination (differential treatment of social groups) represents a major subfield of social psychology[14] and is an increasingly frequent topic of research among applied psychologists.[15] Stereotyping research has been conducted both in the laboratory and naturalistic field settings.[16] Basic principles first established in the laboratory have been shown to generalize to other populations and settings (e.g., working adults in the business world; large organizations such as the Armed Forces).[17] For example, laboratory research showing that women, compared to men, tend to receive equal praise for performance but are denied tangible rewards (such as

---

[12]Katz, D., & Braly, K. W. (1933). Racial stereotypes of 100 college students. *Journal of Abnormal Social Psychology, 28*, 280-290

[13]Fiske, S.T. (1998). Prejudice, stereotyping and discrimination. In D. T. Gilbert, S. T. Fiske, and G. Lindzey (Eds.). *The Handbook of Social Psychology* (4th ed). New York: McGraw-Hill.

[14]*Ibid.*

[15]Koch, A. J., D'Mello, S. D., & Sackett, P. R. (2015). A meta-analysis of gender stereotypes and bias in experimental simulations of employment decision making. *Journal of Applied Psychology, 100*, 128.

[16]Riach, P. A., & Rich, J. (2002). Field experiments of discrimination in the market place. *The economic journal, 112*(483), F480-F518.

[17] Glick, P., Zion, C., & Nelson, C. (1988). What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology, 55*, 178-186;

Glick, P. (1991). Trait-based and sex-based discrimination in occupational prestige, occupational salary, and hiring. *Sex Roles, 25*, 351-378;

Heilman, M E. (2001). Description and prescription: How gender stereotypes prevent women's ascent up the organizational ladder. *Journal of Social Issues, 57*, 657-674;

Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

Pryor, J. B., et al. (1995). A social psychological model for predicting sexual harassment. *Journal of Social Issues, 51*, 69-84.

Exhibit 1
Page 12 of 110

higher pay or a promotion[18]) corresponds to findings in field studies that even though women receive similar or better performance evaluations in actual jobs, managers rate them as lower on "promotability." Specifically, in six studies involving over 4,000 individuals that included *both* supervisors' performance evaluations and ratings of subordinates' "promotion potential," even though women were generally rated as performing better than men, *supervisors were more likely to rate men as having higher promotion potential than women*.[19] An even more comprehensive meta-analysis (a technique that incorporates data from many, previously conducted studies) involved close to half a million workers in 142 field studies across various work settings, representing 30 years of data. This meta-analysis, which examined how organizational rewards (e.g., bonuses, raises, promotions) were actually allocated, found that even though they achieved similar performance evaluations compared to men, women were denied rewards relative to men. Specifically: *"...sex differences in organizational rewards were almost 14 times larger than sex differences in performance evaluations*" (p. 1532). These disparities were stronger in jobs dominated by men and in high status roles.[20]

Stereotyping and discrimination represent complex processes that depend on situational context, organizational climate and practices, individual attitudes, and other factors. Some factors can lessen the likelihood that unfair biases will impact decisions and behavior. For

---

[18] Vescio, T. K., Gervais, S. J., Snyder, M., & Hoover, A. (2005). Power and the creation of patronizing environments: the stereotype-based behaviors of the powerful and their effects on female performance in masculine domains. *Journal of personality and social psychology*, *88*(4), 658.

[19] Roth, P. L., Purvis, K. L., & Bobko, P. (2012). A meta-analysis of gender group differences for measures of job performance in field studies. *Journal of Management*, *38*(2), 719-739.

[20] Joshi, A., Son, J., & Roh, H. (2015). When can women close the gap? A meta-analytic test of sex differences in performance and rewards. *Academy of Management Journal, 58*, 1516–1545.

Exhibit 1
Page 13 of 110

example, organizations can take steps to limit bias in personnel decisions by relying on objective

information and behavioral benchmarks rather than subjective opinions as well as by holding

decision-makers accountable for making unbiased decisions.[21]

**PEOPLE TEND TO DENY BIASES, USE PRETEXTS TO JUSTIFY DISCRIMINATION**

Although people commonly hold biases, they also like to think they are fair-minded and

unprejudiced rather than discriminatory.[22] Thus, when people engage in discrimination, they

typically do so under the psychological cover of a nondiscriminatory pretext. For example,

studies show that when people evaluate job applicants, White evaluators rate a Black candidate

with stellar qualifications and no weaknesses as equally hirable compared to a similar White

candidate. Unambiguously stellar qualifications provide no excuse or "cover" for discrimination

– to knock the candidate would seem like obvious racism. However, when White evaluators

judge candidates who have significant weaknesses as well as strengths (i.e., a "mixed" or

arguably mediocre candidate), discrimination occurs: evaluators give the mediocre White

candidate the "benefit of the doubt" whereas they view the Black candidate's identical

weaknesses as disqualifying.[23] Evaluators can point to the candidate's weaknesses as the reason

for their negative judgment toward the Black candidate, providing a non-discriminatory excuse

for their behavior.

---

[21]Koch et al. (2015), *Op cit*.

[22] O'Brien, L. T., Crandall, C. S., Horstman-Reser, A., Warner, R., Alsbrooks, A., & Blodorn, A.
(2010). But I'm no bigot: How prejudiced White Americans maintain unprejudiced self-
images. *Journal of Applied Social Psychology*, *40*(4), 917-946.

    Dovidio, J. F., & Gaertner, S. L. (2004). *Aversive racism.* In M. P. Zanna (Ed.), *Advances in
    experimental social psychology, Vol. 36* (p. 1–52). Elsevier Academic Press.

[23] Dovidio, J. F., & Gaertner, S. L. (2000). Aversive racism and selection decisions: 1989 and
1999. *Psychological science*, *11*(4), 315-319.

Exhibit 1
Page 14 of 110

Having an apparently nondiscriminatory pretext for evaluating a woman or minority group member less positively psychologically "allows" biased individuals to act on their biases and discriminate (e.g., in personnel evaluations). The result: people deny and mask their prejudiced behaviors, making discrimination dependent on the situational context (e.g., "is there a plausible nondiscriminatory excuse I can rely on?"). Therefore, bias becomes more subtle compared to overt, unapologetic bigotry. For example, a successful woman might be derided on subjective dimensions that are more difficult to dispute ("She's dislikeable") than on more objective dimensions (e.g., "She's bad at her job") that evidence clearly contradicts.

Further, because having a nondiscriminatory rationale "releases" people's prejudices, discrimination often involves mixed motives. For example, consider the following experiment: White participants interacted with someone they believed to be a fellow participant, but who was actually in league with the experimenter. Depending on randomly assigned condition, the actor was Black or White, with each trained to behave similarly. However, the actor's behavior varied depending on random assignment. In one condition, the actor was friendly and in the other he was rude. Subsequently, the White participants had an opportunity to determine how much shock to deliver to the actor when he made mistakes in a learning experiment. When the actors had initially behaved in a friendly way, Whites treated the Black and White actor equivalently (giving low shock levels) but when the actors had been rude, the Black (but not the White) actor was shocked more severely.[24] White participants could justify delivering greater shock based on the other person's rudeness, but the results firmly establish that they did so only toward a rude

---

[24] Rogers, R. W., & Prentice-Dunn, S. (1981). Deindividuation and anger-mediated interracial aggression: Unmasking regressive racism. *Journal of Personality and Social Psychology*, *41*(1), 63.

Exhibit 1
Page 15 of 110

Black but not a similarly rude White person, indicating racial bias. The confederate's rudeness represented a plausible motive, but this masked (and released) discrimination.

## SEXISM: AN AMBIVALENT PREJUDICE

Sexism is an inherently ambivalent prejudice due to two basic aspects of gender relations: (a) men generally possess more status and power than women, but (b) are intimately interdependent with women (due to heterosexual attraction, reproduction, and reliance on women to rear children and for domestic labor).[25] This ambivalence is captured by the saying "Can't live with them, can't live without them." To illustrate how this differs from other prejudices, consider one of the first racial prejudice measures used by researchers: the social distance scale.[26] This measure assessed how much intimacy Whites would tolerate with Black people. A mildly racist White person might be willing to have a Black co-worker, but not to date or marry a Black person, with the latter considered to reflect a less prejudice. Such a measure does not work for sexism, which is more firmly rooted in *role segregation*[27] than spatial segregation – a highly sexist man might not want to have female co-workers, but (if heterosexual) would certainly be willing to date or marry a woman as opposed to a man. While a racist White person might well want to "live without" Black people, a sexist man is unlikely to suggest completely eliminating interaction with women. In extreme cases, a racist might endorse race-based genocide, but one cannot imagine that heterosexual men would endorse the complete elimination of all women.

---

[25] Glick, P., & Fiske, S. T. (1996). The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512.

   Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[26] Bogardus, E. S. (1927). Race, friendliness, and social distance. *Journal of Applied Sociology, 11*, 272-287.

[27] Eagly, A. H. (1987). *Sex differences in social behavior: A social role interpretation*. Hillsdale, NJ: Erlbaum.

Exhibit 1
Page 16 of 110

In other words, sexist attitudes must accommodate a state of affairs in which male dominance coexists with intimacy, making sexism inherently ambivalent.[28] *Benevolent sexism* (BS), the subjectively positive side of sexist ambivalence, includes affectionate yet patronizing and discriminatory attitudes toward women as wonderful but weak (i.e., not fully competent), requiring men's provision and protection. *Hostile sexism* (HS), the subjectively negative side of sexist ambivalence, represents overtly competitive and demeaning attitudes toward women who are viewed as a threat to men's power.[29] Men, on average, tend to endorse hostile sexism more than women do; for benevolent sexism, gender differences tend to be smaller and, in nations with stark gender inequality, even reverse (i.e., women tend to outscore men).[30]

While it may seem like such ambivalent attitudes would be in conflict, ambivalently sexist attitudes generally are not because the positive and negative poles of sexist ambivalence are directed toward different types of women or toward different types of female behavior.[31] Specifically, women who embrace traditional roles and fulfill men's desires tend to receive benevolent sexism (e.g., paternalistic affection and protection toward a supportive wife or chivalrous solicitude toward a sexually attractive, subordinate female co-worker). By contrast, women who occupy powerful roles or are viewed as violating traditional norms of femininity (which emphasize modesty, deference, and warmth) tend to elicit sexist hostility.

---

[28] Glick, P. & Fiske, S. T. (1996).  The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70,* 491-512.

[29] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[30] Glick, P., Fiske, S. T., Mladinic, A., Saiz, J. L., Abrams, D., Masser, B., ... & López, W. L. (2000). Beyond prejudice as simple antipathy: hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology*, *79*(5), 763.

[31] Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997).  The two faces of Adam: Ambivalent sexism and polarized attitudes toward women.  *Personality and Social Psychology Bulletin, 23*, 1323-1334.

Exhibit 1
Page 17 of 110

Another way to describe this complementarity is that benevolent sexism defines prescriptive ideals of how women *should* be (e.g., modest, deferent) and hostile sexism defines complementary proscriptions about how women *should not* be (e.g., assertive, powerful).[32] More specifically, hostile and benevolent sexism each encompass three domains of male-female relations: *power*, *gender stereotyping and roles*, and *intimate heterosexuality*.[33] Benevolence tends to be directed toward women who reinforce rather than challenge men's power, who fulfill idealized positive stereotypes of femininity and enact traditional female roles, and/or who are viewed as sexually attractive and compliant. By contrast, sexist hostility tends to occur toward women who are viewed as challenging men's power, violating traditional ideals of femininity or "invading" roles and positions of power that "belong" to men, and/or who are sexually unattractive or unavailable.

Research conducted on tens of thousands of participants in more than 25 nations shows that men who endorse hostile sexism are also likely to endorse benevolent sexism[34] – thus, sexist men are usually ambivalent toward women. An ambivalent sexist might protest that he cannot possibly be prejudiced against women because there are women he loves, provides for, and protects. Ample research reveals, however, that benevolently sexist treatment is contingent:

---

[32] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

[33] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[34] Glick, P. et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79,* 763-775.

   Glick, P. et al. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology, 86,* 713–728.

Exhibit 1
Page 18 of 110

women must conform to sexist conceptions about how women "should" behave.[35] Further, even though subjective feelings of affection accompany benevolently sexist (patronizing) treatment, these behaviors reinforce men's dominance. For example, benevolent sexists tend to give compliant or "feminine" female subordinates excessive (patronizing) praise while simultaneously denying them tangible rewards (e.g., a higher salary) and opportunities (e.g., choice assignments).[36]

*Sexist ambivalence leads to extreme responses toward women*

Ambivalence produces "response amplification,"[37] more extremely positive and negative responses toward targets of ambivalence. Sexist ambivalence can be directed toward different women, with benevolent sexism directed toward "types" of women viewed as upholding sexist prescriptions and hostile sexism toward female "types" viewed as violating sexist prescriptions.[38] Thus, an ambivalent sexist who adores his supportive wife, gives his secretary flowers, and loves his kindly mother will react with intense hostility to women perceived as challenging his

---

[35] Abrams, D., Viki, G. T. N., Masser, B., & Bohner, G. (2003). Perceptions of stranger and acquaintance rape: The role of benevolent and hostile sexism in victim blame and rape proclivity. *Journal of Personality and Social Psychology*, *84*, 111-125.

[36] Vescio, T. K., Gervais, S. J., Snyder, M., & Hoover, A. (2005). Power and the creation of patronizing environments: The stereotype-based behaviors of the powerful and their effects on female performance in masculine domains, *Journal of Personality and Social Psychology. 88*, 658-672.

[37] Katz, I. & Hass, R. G. (1988). Racial ambivalence and value conflict: Correlational and priming studies of dual cognitive structures. *Journal of Personality and Social Psychology, 55*, 893-905.

Katz, I., Wackenhut, J., & Hass, R. G. (1986). Racial ambivalence, value duality, and behavior. In J.F. Dovidio and S.L. Gaertner (Eds.). *Prejudice, discrimination, and racism*. San Diego: Academic Press.

[38] Eckes, T. (2002). Paternalistic and envious gender stereotypes: Testing predictions from the Stereotype Content Model. *Sex Roles, 47*, 99-114.

Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997). The two faces of Adam: Ambivalent sexism and polarized attitudes toward women. *Personality and Social Psychology Bulletin, 23*, 1323-1334.

Exhibit 1
Page 19 of 110

authority, competing with him for resources, or failing to comply with sexist ideals of femininity. Thus, the two poles of sexist ambivalence work in concert, rewarding women when they conform and punishing women when they fail to conform to sexist prescriptions.

Sexist ambivalence can also be directed toward the same woman at different times, depending on whether her behavior of the moment fits or challenges sexist prescriptions.[39] Benevolent sexism tends to occur when women reinforce male power (e.g., by being compliant, modest, or flattering men), embrace traditional tasks (e.g., social support), or elicit sexual attraction (e.g., attractive women who tolerate male advances). Hostile sexism tends to occur when women challenge male power (e.g., by stating an independent opinion or criticizing), take on nontraditional or powerful roles (e.g., takes a leadership position or succeeds in a "masculine" domain), or are deemed sexually unattractive or unavailable (e.g., refuse male advances).[40]

Because traditional sexist attitudes are rooted in differences in power and roles, sexism often revolves around complaints about a woman's social behavior, with men being permitted greater latitude to be assertive than women. Thus, an aggressive man may be deemed appropriately "assertive" and an assertive woman "a bitch" because women are held to much higher standards of "niceness" and deference than men.[41]

---

[39] Hebl, M. R., King, E., Glick, P., Singletary, S. L. & Kazama, S. M. (2007). Hostile and benevolent reactions toward pregnant women: Complementary interpersonal punishments and rewards that maintain traditional roles. *Journal of Applied Psychology, 92,* 1499-1511.

[40] Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

[41] Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77,* 1004-1010.

Exhibit 1
Page 20 of 110

## SEX STEREOTYPES

Stereotypes are category-based expectations about others; they represent beliefs about men and women's traits rooted in historical differences in power and roles, such as men as breadwinners and women as child-rearers.[42] Although gender roles have changed, gender stereotypes have remained remarkably stable on two core dimensions: agency (i.e., assertive, ambitious) and communality (i.e., warm, nurturing).[43] Data from representative national polls from the 1940s to 2018[44] reveal that gender stereotypes continue to assign agency more to men than women, and that the stereotype of women as more communal has actually become stronger over time. Stereotypes no longer deny overall competence (e.g., intelligence) to women, presumably due to women's increased participation in the paid workforce over the past 80 years. However, while perceived as equally intelligent to men overall, women remain stereotyped as less competent than men in occupations and on tasks that remain male dominated (e.g., mechanical skills, analytical skills, being a leader).[45]

Gender stereotypes assign women supportive traits associated with nurturing, such as *empathetic*, *kind*, *sensitive*, as well lower status or subordinate traits such as *yielding, agreeable, emotional, impressionable, gullible, insecure,* and *naïve*. By contrast, stereotypes assign men high-power, dominance-oriented traits such as *decisive, aggressive, forceful, controlling,*

---

[42]Rudman, L. A., & Glick, P. (2008). *The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations*. New York: Guilford Press.

[43]Haines, E. L., Deaux, K., & Lofaro, N. (2016). The times they are a-changing… or are they not? A comparison of gender stereotypes, 1983–2014. *Psychology of Women Quarterly*, *40*(3), 353-363.

[44]Eagly, A. H., Nater, C., Miller, D. I., Kaufmann, M., & Sczesny, S. (2019). Gender stereotypes have changed: A cross-temporal meta-analysis of US public opinion polls from 1946 to 2018. *American Psychologist*.

[45]Heilman, M. E., Wallen, A. S., Fuchs, D., & Tamkins, M. M. (2004). Penalties for success: reactions to women who succeed at male gender-typed tasks. *Journal of applied psychology*, *89*(3), 416.

Exhibit 1
Page 21 of 110

*dominating*, and *arrogant* that suit them for positions of power.[46] Men are generally accorded

more status and, therefore, more credibility and influence than women.[47] As reviewed below,

gender stereotypes not only influence initial expectations about others – they skew how

perceivers interpret and remember subsequent information via confirmation biases. Importantly,

even when women manage to convince others that they do not "fit" stereotyped expectations

(e.g., a woman convinces others she is assertive rather than yielding), they can face backlash due

to gendered prescriptions that they "should" behave in line with "feminine" stereotypes.

In addition, people stereotype women as more emotional.[48] For example, research

participants viewed a woman (but not a man) who exhibited anger at work as more "out of

control," leading them to recommend paying her less and according her less power.[49] The female

emotionality stereotype leads people to view women as less suited to high status positions in the

workplace,[50] as well as "overly sensitive" and likely to exaggerate problems they experience in

the workplace.[51] Hostile sexist attitudes, which have been linked to workplace discrimination

---

[46]Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are
   allowed to be, and don't have to be: The contents of prescriptive gender
   stereotypes. *Psychology of women quarterly*, *26*(4), 269-281.

   Rudman, L. A., Moss-Racusin, C. A., Glick, P., & Phelan, J. E. (2012). Reactions to
   vanguards: Advances in backlash theory. In *Advances in experimental social
   psychology* (Vol. 45, pp. 167-227). Academic Press.

[47] Ridgeway, C. L. (2001). Gender, status, and leadership. *Journal of Social issues*, *57*(4), 637-
   655.

[48] Shields, S. A., & Shields, S. A. (2002). *Speaking from the heart: Gender and the social
   meaning of emotion*. Cambridge University Press.

[49] Brescoll, V. L., & Uhlmann, E. L. (2008). Can an angry woman get ahead? Status conferral,
   gender, and expression of emotion in the workplace. *Psychological Science, 19*(3), 268–
   275.

[50] Timmers, M., Fischer, A. H., & Manstead, A. S. R. (2003). Ability versus vulnerability:
   Beliefs about men's and women's emotional behaviour. *Cognition & Emotion*, *17*(1), 41–
   63

[51] Glick, P., & Fiske, S. T. (1996). The ambivalent sexism inventory: Differentiating hostile and
   benevolent sexism. *Journal of personality and social psychology*, *70*(3), 491-501.

Exhibit 1
Page 22 of 110

against women in male-dominated occupations,[52] explicitly include beliefs such as: "Most women interpret innocent remarks or acts as being sexist"; "Women are too easily offended"; "Women exaggerate problems they have at work"; and "When women lose to men in a fair competition, they typically complain about being discriminated against."[53] Emotionality stereotypes combine with hostile sexist beliefs to undermine women's perceived credibility when it comes to workplace complaints (e.g., about being harassed, treated unfairly, or bullied).

**STEREOTYPES BIAS PERCEPTIONS OF OTHERS' BEHAVIOR**

Gender represents a primary category by which we classify other individuals: it's the first social category into which people are classified after (and even before) birth (e.g., the first question people typically ask about a newborn: "Is it a boy or a girl?"). Children learn to use gender to label others at a very young age (by about 2 years old, before awareness of other social categories such as race).[54] Both children[55] and adults[56] automatically use gender categorization to classify others; in turn, gender classification elicits well-learned stereotypes that bias expectations about the "appropriate" or expected behaviors for each gender.[57] Even when evidence contradicts a stereotype, confirmation biases influence how people interpret and

---

[52] Masser, B. M., & Abrams, D. (2004). Reinforcing the glass ceiling: The consequences of hostile sexism for female managerial candidates. *Sex Roles*, *51*(9-10), 609-615.

[53] Glick & Fiske (1996), *op cit.*

[54] Zosuls, K. M., Ruble, D. N., Tamis-LeMonda, C. S., Shrout, P. E., Bornstein, M. H., & Greulich, F. K. (2009). The acquisition of gender labels in infancy: Implications for gender-typed play. *Developmental Psychology*, *45*(3), 688.

[55] Bennett, M., Sani, F., Hopkins, N., Agostini, L., & Malucchi, L. (2000). Children's gender categorization: An investigation of automatic processing. *British Journal of Developmental Psychology*, *18*(1), 97-102.

[56] Taylor, S. E., Fiske, S. T., Etcoff, N. L., & Ruderman, A. J. (1978). Categorical and contextual bases of person memory and stereotyping. *Journal of personality and social psychology*, *36*(7), 778.

[57] Hill, S. E., & Flom, R. (2007). 18-and 24-month-olds' discrimination of gender-consistent and inconsistent activities. *Infant Behavior and Development*, *30*(1), 168-173.

Exhibit 1
Page 23 of 110

remember information about others.[58] That is, biased perceivers view an individual's behavior through a distorted, stereotypical lens.

Stereotypes are more likely to affect perceptions when people make subjective judgments and when behavior or information about a person allow room for interpretation. For example, when evaluators did not have clear, objective evidence about performance, people assumed that a woman holding a high-level job in a masculine field was less competent than an identically described man.[59] By contrast, for subjective inferences about people's intentions, motives, and likeability, stereotypes can operate more freely. To illustrate, consider the difference between merely describing a person's behavior versus making an inference about *why* he or she did it: "She made a complaint about a co-worker" describes a behavior without inferring the motives for the behavior. Inferences about "why" someone did something involve conjectures about an individual's personality, also known as "dispositional attributions." The same behavior can easily lead to more positive or more negative personality inferences. For example, one might infer that "She made a complaint because she's someone who stands up for herself" (a positive construal) versus "She made a complaint because she's arrogant and bitter" (a negative construal). Stereotypes can lead people to leap from observed behavior to negative dispositional inferences. Confirmation bias can then distort inferences about further behavior, falsely increasing people's certainty about initial inferences.[60]

---

[58]Fiske, S. T. (1998). *Op. Cit.*
[59]Heilman, M. E., Wallen, A. S., Fuchs, D., & Tamkins, M. M. (2004). Penalties for success: reactions to women who succeed at male gender-typed tasks. *Journal of applied psychology*, *89*(3), 416.
[60]Costabile, K. A., & Madon, S. (2019). Downstream effects of dispositional inferences on confirmation biases. *Personality and Social Psychology Bulletin*, *45*, 557-570.

Exhibit 1
Page 24 of 110

When people use stereotypes, they tend to make stereotype-consistent dispositional inferences and to fail to consider situational explanations. For example, research shows that people tend to excuse men's emotionality as situational ("He's having a bad day") while attributing the same emotional display by a woman to an underlying disposition ("She's an emotional person").[61] In two experiments, researchers presented male and female faces (one at a time) on a computer screen. The faces exhibited equivalent, moderately intense emotional expressions (e.g., sadness, fear, disgust). Each face was paired with a situational reason for the emotion (e.g., *Was yelled at by the boss*, *Just attended a family funeral*, *Heard footsteps in the dark*). Participants were more likely to attribute men's emotions to the situation (e.g., he was provoked to anger by the situation) and to conclude that women's emotions reflected her disposition (e.g., she's an angry person). These differences held across expressions of various emotions; sadness, fear, and anger.

In general, research shows that stereotype-based dispositional inferences exacerbate stereotype-confirmation processes. Specifically, once a perceiver makes an initial, stereotyped snap judgment about another person's personality (e.g., "She's emotional") they are especially likely to: (a) remember information that "fits" (rather than information that contradicts) their impressions, and (b) interpret ambiguous information about others in ways that support their initial impression.[62] By fostering inferences about personality and motives, stereotypes can produce cascading effects, biasing interpretation of subsequent encounters.[63]

---

[61] Barrett, L. F., & Bliss-Moreau, E. (2009). She's emotional. He's having a bad day: Attributional explanations for emotion stereotypes. *Emotion*, *9*(5), 649.

[62] *Op cit*.

[63] Fiske, S. T. (1998). *Op. Cit.*

Exhibit 1
Page 25 of 110

Importantly, stereotype effects are not absolute nor are they impervious to reality. Rather, they operate like a "thumb on the scale" leading to biased perceptions. That is, stereotypes typically shade or bias perceptions in a manner more like augmented reality than a completely made up fantasy. People respond to "evidence" about another person, but do so in biased ways unless they take steps to guard against stereotyped inference and bias.

**SEX STEREOTYPES ACT AS GENDER PRESCRIPTIONS**

Sex stereotypes not only describe how men and women are *expected* to behave, but also prescribe how women and men "*should*" behave (e.g., women *should* be warm) and *should not* behave (e.g., men *should not* be weak).[64] All stereotypes are inherently *descriptive*, they define expectations about how people in a category typically behave. As noted above, descriptive stereotypes can lead to discrimination, such as when women are presumed to be less competent than men in a masculine domain. But additional forms of discrimination occur when stereotypes are also *prescriptive* (i.e., represent normative social standards specifying how men and women *ideally* ought to behave).

The following example illustrates the difference between merely descriptive versus prescriptive stereotypes: Imagine holding the stereotype that Norwegians love to ski. Meeting a Norwegian who does not ski would occasion surprise because this individual violates "ski-loving Norwegian" expectations. However, one would probably not be offended or irate because the stereotype is descriptive (i.e., an expectation), not prescriptive. By contrast, imagine a man who jumps behind his girlfriend, using her as a human shield, when a rabid dog charges. Most people would probably feel extremely offended, irate, and consider him a poor excuse for a man due to

---

[64] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

Exhibit 1
Page 26 of 110

the *prescriptive* stereotype that men should be brave. Now consider the reverse situation in which the woman jumps behind the man, using him as a shield. Would people feel offended by her behavior or consider her a "poor excuse for a woman?" If not, the example reveals a double standard in judgment due to prescriptive sex stereotypes.

The example above illustrates that men (not just women) are judged harshly for failing to live up to prescriptive stereotypes. However, stereotypes specifically prescribe women to be warm and helpful and forbid women from being "too assertive"; by contrast, men are not prescribed to be warm and agreeable, and are instead permitted or even encouraged to assert themselves. This occurs because prescriptive stereotypes serve to reinforce traditional gender roles (e.g., women as caregivers, men as providers) and to preserve male dominance. Thus, stereotypes prescribe men to show no weakness, be assertive, and seek status.[65] By contrast, as reviewed in detail below, women risk disapproval for these same assertive behaviors. These effects are relative. For example, when a man's behavior becomes too extreme, people might reject him as arrogant and autocratic for running roughshod over others.[66] A discriminatory double standard is revealed, however, when people reject a female leader for much milder self-assertion. In other words, the bar is set differently for men and women.

**WOMEN FACE PRESSURE TO "NURTURE" AND ACCOMMODATE OTHERS**

Gender prescriptions pressure women, but not men, to engage in extra effort at work to be nurturing, agreeable, and perform optional helping/support behaviors. Because people expect helpful, warm, and nurturing behaviors from women, women do not typically receive organizational rewards for doing so (because they are merely complying with strong, gendered

---

[65] Prentice & Carranza (2002), op cit.
[66] Driskell, J. E., & Salas, E. (2005). The effect of content and demeanor on reactions to dominance behavior. *Group Dynamics: Theory, Research, and Practice*, 9(1), 3-14.

Exhibit 1
Page 27 of 110

expectations). By contrast, when women fail to go out of their way to engage in extra help and support at work, they encounter social and organizational penalties for being "insufficiently warm" (i.e., failing to conform to stereotypic prescriptions). Specifically, research has examined what organizational psychologists term "organizational citizenship behaviors,"[67] discretionary acts such as going out of one's way to help a colleague accomplish a task outside one's job description. Altruism represents a central dimension of organizational citizenship behaviors, which include helping, nurturing, and "cheerleading" (e.g., celebrating a co-worker's accomplishments), all behaviors stereotypically prescribed for women.[68]

In two well-controlled experimental studies, one with undergraduate participants and a replication with working adults, people evaluated men and women who went out of their way to help a co-worker after hours. Evaluators read a personnel file about a target person whose name was varied between conditions to be male or female. The worker's file included an incident in which he or she either chose or chose not to voluntarily stay late (which would require missing a celebratory work dinner) to help a co-worker who needed to prepare a report for the following morning. Findings revealed that women were "… judged more negatively than men whatever they did with respect to helping behavior: When they helped, they were not awarded the high regard bestowed upon men, and when they did not help, only they, not men, paid the price in terms of performance evaluations and reward recommendations" (p. 435).[69]

[67]Organ, D. W. (1988). *Organizational citizenship behavior: The good soldier syndrome*. Lexington Books/DC Heath and Com.

[68]Organ, D. W. (1990). The motivational basis of organizational citizenship behavior. *Research in organizational behavior, 12*(1), 43-72.

  Kark, R., & Waismel-Manor, R. (2005). Organizational citizenship behavior: What's gender got to do with it?. Organization, 12(6), 889-917.

[69]Heilman, M. E., & Chen, J. J. (2005). Same behavior, different consequences: reactions to men's and women's altruistic citizenship behavior. *Journal of Applied Psychology, 90*(3), 431-441.

Exhibit 1
Page 28 of 110

In sum, sex stereotypes lead people to expect women to go out of their way to act as nurturers and helpers at work in ways that exceed their formal job role (i.e., are not part of their job description). Unlike men, when women put in the effort to perform these extra behaviors, they receive no reward for doing so (it is simply expected that they will). By contrast, if they fail to go out of their way to be nurturers and cheerleaders for others, women are penalized, whereas men who behave similarly are not.

**ASSERTIVE WOMEN FACE BACKLASH**

As noted above, descriptive stereotypes set up expectations that women will be less competent in masculine domains, requiring them to work harder to prove their competence. Yet once women overcome this hurdle, they face another: The assertive actions women must take to prove their competence can be viewed as violating gender prescriptions, creating *backlash* (social and workplace penalties). Research (reviewed below) shows that a variety of assertive behaviors lead to penalties for women. These behaviors include self-promotion (e.g., talking about one's accomplishments and skills), criticizing others (e.g., pointing out a mistake), showing anger, as assertive style (e.g., issuing commands). Further, merely succeeding in a masculine domain can trigger backlash toward women.

When women exhibit assertive behaviors they risk hostile reactions and punishment, collectively known as *backlash*.[70] A meta-analysis of 63 studies with over 7,000 participants[71] shows that perceivers (a) dislike women who exhibit assertiveness or dominance more than men who behave similarly and, consequently, (b) impose workplace penalties on dominant women

---

[70] Rudman, L. A., Moss-Racusin, C. A., Glick, P., & Phelan, J. E. (2012). Reactions to vanguards: Advances in backlash theory. *Advances in Experimental Social Psychology*, *45*, 167.

[71] Williams, M. J., & Tiedens, L. Z. (2016). The subtle suspension of backlash: A meta-analysis of penalties for women's implicit and explicit dominance behavior. *Psychological Bulletin*, *142*(2), 165.

Exhibit 1
Page 29 of 110

(e.g., rate them as less hirable or promotable). Keep in mind that prescriptions for women and men reflect *relative* standards for each sex. For example, a man who grossly abuses power over others may elicit hostility and incur workplace penalties. However, a double standard occurs when the threshold for acceptable behavior differs for one sex compared to the other. In other words, is the same behavior accepted or only mildly punished if shown by a man, but more strongly rejected and punished when shown by a woman? Research has tested for a discriminatory double standard for dominant behaviors by painstakingly creating controlled comparisons in which researchers randomly assign participants to evaluate either a man or a woman who has been trained to exhibit identical assertive behaviors.

Research documents greater dislike for assertive women, whom people view as insufficiently warm, compared to similarly assertive men, in turn, leading to work-related discrimination.[72] These effects are driven by people's negative emotional reactions, evident not only in likeability ratings, but by facial reactions to assertive women compared to identically assertive men (among participants surreptitiously recorded so that their facial reactions could subsequently be coded by observers who did not know whether participants were reacting to a female or male leader).[73] A recent meta-analysis (a technique in which extant studies are subjected to rigorous statistical review aimed at establishing whether an effect is reliable) confirmed scientifically reliable backlash effects in perceived likeability and personnel ratings

---

[72] Ibid

[73] Butler, D., & Geis, F. L. (1990). Nonverbal affect responses to male and female leaders. Implications for leadership evaluations. *Journal of Personality and Social Psychology, 58,* 48-59.

Exhibit 1
Page 30 of 110

when women (compared to men) enacted verbal self-assertion.[74] Backlash manifests in a specific type of biased impression: viewing a woman as *cold and dislikeable*.[75]

 ***Women and men engage in backlash toward assertive women.*** Studies generally find that backlash toward female leaders occurs among women as well as men, with strong effects among people who support an existing gender hierarchy (i.e., more men than women in powerful roles) as fair and legitimate.[76] Indeed, some studies suggest that female (more so than male) subordinates react more negatively to a female leader than male subordinates do.[77] People are especially likely to compare themselves to others within their own social group (e.g., men with other men).[78] When comparing to a person who has succeeded in a domain they also aspire to succeed in, people feel bad about themselves.[79] Specifically, research shows that when a woman compares herself to a successful female leader (e.g., her boss), she is likely to: (a) experience self-esteem threat ("why am I not as successful or powerful as her?") and, as a result, seek to (b) bring the successful woman down by derogating her as "interpersonally hostile and unlikable."[80] By doing so, women were able to protect their own self-esteem. In short, women with ambitions to be successful are more prone to envy another woman's (more than a man's) success and, as a

---

[74]Williams, M. J., & Tiedens, L. Z. (2016). The subtle suspension of backlash: A meta-analysis of penalties for women's implicit and explicit dominance behavior. *Psychological bulletin*, *142*, 165.

[75]Rudman et al (2012), op cit.

[76]*Ibid.*

[77]Parks-Stamm, E. J., Heilman, M. E., & Hearns, K. A. (2008). Motivated to penalize: Women's strategic rejection of successful women. *Personality and Social Psychology Bulletin*, *34*(2), 237-247.
 Warning, R., & Buchanan, F. R. (2009). An exploration of unspoken bias: Women who work for women. *Gender in Management: An International Journal*, 24 (2), pp. 131-145.

[78]Guimond, S. (Ed.). (2006). *Social comparison and social psychology: Understanding cognition, intergroup relations, and culture.* Cambridge University Press.

[79]Tesser, A., & Campbell, J. (1982). Self-evaluation maintenance and the perception of friends and strangers. *Journal of Personality*, *50*(3), 261-279.

[80]Parks-Stamm et al. (2008), *op cit.*, p. 245.

Exhibit 1
Page 31 of 110

result, to try to "cut her down to size" to preserve their own self-esteem. Nevertheless, while research suggests some gender differences in the psychological reasons for backlash against female leaders, the general finding is that both male and female perceivers tend to derogate female leaders as dislikeable, cold, hostile, and angry.

**BEHAVIORS THAT ELICIT BACKLASH**

The types of behaviors for which women (relative to identically described men) receive backlash include: (a) behaving in a "masculine" (i.e., assertive or autocratic) manner, (b) criticizing or correcting others, (c) engaging in self-promotion by talking about their skills and accomplishments, (d) expressing anger, (e) expressing ambition to achieve powerful roles, and (e) merely being successful in a masculine domain. I review evidence for each below.

***"Masculine" or autocratic style.*** Assertive behaviors prescribed for high status roles clash with those prescribed for women.[81] To be perceived as competent in high status roles, women must show assertiveness, but a meta-analysis of over 60 studies examining reactions to male and female leaders revealed greater dislike for and lower evaluations of women (compared to men) who behave in stereotypically masculine, assertive ways.[82] It is important to note the specificity of this effect. Women (relative to similar men) are not *always* devalued or penalized. Rather, people penalize women, especially on social dimensions (dislike, perceiving them as insufficiently warm),[83] when they enact a high status role in an assertive (masculine) way.

***Criticism and/or discipline.*** People generally like to hear positive feedback about themselves, whereas negative evaluations elicit defensiveness. Research shows that people are more likely to react negatively to criticism from a woman, viewing the same criticism as more

---

[81] Eagly, A. H., & Karau, S. J. (2002). *Op. Cit.*
[82] Eagly, A. H., et al. (1992). *Op. Cit.*
[83] Heilman et al. (2004). *Op. Cit.*

Exhibit 1
Page 32 of 110

unreasonable, unwarranted, and unfair when made by a woman compared to a man. These effects disappear for favorable feedback: men and women who offer similar praise are evaluated equally positively. However, when offering criticism, people view women significantly more negatively than men and rate the criticism as less justified.[84] In sum, people accept women (as well as men) who praise them, but denigrate women (more so than men) who criticize them.

*"Self-promoting" behavior.* Self-promoting behavior represents a form of self-assertion that can be perceived as interpersonally insensitive, immodest, and condescending (e.g., "you think you are better than me"). Although men are expected to trumpet their successes and talents, self-promotion violates prescriptive stereotypes for women. Research demonstrates that women (in comparison to identically behaving men) who highlight their skills and accomplishments (even in the context of a job interview, where such behavior is more expected) are perceived significantly more negatively – specifically, they are viewed as colder, dislikable, and as less desirable job candidates.[85]

*Expressing anger.* Anger is an assertive emotion. Stereotypes prohibit women, more so than men, from expressing anger and women who do so are more likely to be viewed as "out of control" or unreasonable. In a series of studies, working adults evaluated videotaped actors portraying male and female professionals of similar age, attractiveness, and ethnicity in a job interview.[86] Using identical scripts, they described a difficult work experience (as part of a team that lost an important account), expressing anger about a colleague. Participants rated the female

---

[84] Sinclair, L., & Kunda, Z. (2000). Motivated stereotyping of women: She's fine if she praised me but incompetent if she criticized me. *Personality and Social Psychology Bulletin, 26*, 1329-1342.

[85] Rudman et al. (2012a). *Op. Cit.*

[86] Brescoll, V., & Uhlmann, E. (2007). Can an angry woman get ahead? Status conferral, gender, and workplace emotion expression. Manuscript submitted for publication. Psychological Science.

Exhibit 1
Page 33 of 110

(as compared to the male) professional who expressed anger as deserving less independence, power, status, and salary. Further, participants viewed the female (as compared to male) professional's anger as reflecting her personality, rather than being a justified reaction to the situation. A woman who admitted anger was also more likely than a man to be seen as "out of control." These effects did not occur when male and female professionals expressed sadness (a nonassertive emotion) or when the materials did not mention their emotional response.[87]

**Seeking power.** Women who are explicitly ambitious and want to attain power elicit backlash. For example, participants were less likely to vote for a female as compared to an identical male political candidate when they were described as power-seeking (e.g., a newspaper article characterizing the candidate as "a politician that has always had a strong will to power").[88] Consistent with other backlash research, power-seeking female candidates were viewed as less warm than identical male candidates; they also evoked more "moral outrage" (e.g., contempt, anger, disgust). Both the perceived warmth deficit and moral outrage led to discrimination (lower voting preference) against the female (as compared to male) power-seeking candidate. In sum, ambitious women who seek powerful positions elicit backlash.

**Success in a masculine domain.** Merely being successful in a high status, masculine domain can trigger backlash toward women. For example, in one study participants evaluated an Assistant Vice President for sales in an aircraft manufacturing company (a male-dominated industry and role). The person rated was either male or female. Researchers also varied whether there was clear evidence that the individual was a stellar performer (e.g., generated sales revenue

[87] Prentice, D. A., & Carranza, E. (2002). What women and men should be, shouldn't be, are allowed to be, and don't have to be: The contents of prescriptive gender stereotypes. *Psychology of Women Quarterly, 26,* 269-281.

[88] Okimoto, T. G., & Brescoll, V. L. (2010). The price of power: Power seeking and backlash against female politicians. *Personality and Social Psychology Bulletin*, *36*(7), 923-936.

Exhibit 1
Page 34 of 110

putting the person in the top 5% in the company). Consistent with prior research on double standards for demonstrating competence, when information about performance was ambiguous, participants assumed a woman was less competent than a man. This competence deficit disappeared when the person was described as clearly being a top performer; but although the woman thereby escaped descriptive stereotypes about presumed incompetence, she elicited backlash for her counter-stereotypical success in a masculine domain. Specifically, she was rated significantly lower in warmth (e.g., more likely to be seen as "interpersonally hostile") and elicited more dislike.[89] A second study demonstrated that women were not penalized for success in a *female* domain (Assistant Vice President in Human Resources in charge of "employee assistance") but only when the job was conventionally masculine (Assistant Vice President in charge of "financial planning").[90] Finally, a third study showed that being perceived as dislikeable results in recommending lower salaries and fewer promotion opportunities.[91] Subsequent research has confirmed that perceived deficits in warmth and communality led to the discriminatory effects toward women who succeed in male domains.[92]

**Assertiveness as a 'status violation.'** Research suggests that backlash occurs because assertive women are viewed as committing a "status violation" (i.e., "getting too big for their britches").[93] Assertive women are perceived as "status incongruent" (i.e., as "acting above" their station) and therefore a threat to the male hierarchy. Thus, even when a woman's qualifications

---

[89]Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

[90]*Ibid.*

[91]*Ibid.*

[92] Heilman, M. E., & Okimoto, T. G. (2007). Why are women penalized for success at male tasks?: the implied communality deficit. *Journal of applied psychology*, *92*(1), 81.

[93] Rudman, L. A., Moss-Racusin, C. A., Phelan, J. E., & Nauts, S. (2012b). Status incongruity and backlash effects: Defending the gender hierarchy motivates prejudice against female leaders. *Journal of Experimental Social Psychology*, *48*(1), 165-179.

Exhibit 1
Page 35 of 110

were described as unambiguously stellar (e.g., she received a MacArthur genius grant), if she

exhibited assertiveness (e.g., by criticizing others in her field), she was less liked and viewed as

less hirable than an identically described man.[94] Further, backlash was particularly likely to

occur from individuals who sought to justify or uphold the current *status quo* (i.e., who viewed

the current social hierarchy in which men disproportionately hold the most powerful positions as

fair and justified).[95] In sum, people who are invested in defending the current hierarchy show

stronger backlash effects against assertive women.

    ***Backlash and workplace discrimination.*** Does being disliked translate into workplace

discrimination?  In a field study,[96] supervisors' initial liking for subordinates (at 1 month on the

job) correlated more strongly than measures of subordinates' ability (aptitude tests) with

supervisors' performance evaluations four months later. Employees' aptitude accounted for less

than 10% of the variation in supervisor performance evaluations, whereas initial liking accounted

for close to 50% of the variation in performance evaluations. Liking, whether at 1 month or 5

months, was the single best predictor of performance evaluations.

    Given that (a) backlash leads to viewing an individual as dislikeable and difficult and (b)

liking predicts workplace evaluations, it's not surprising that backlash toward assertive and

successful women creates workplace penalties. Specifically, assertive women (compared to men)

---

[94] Ibid, Study 2
[95] Ibid, Study 3
[96] Lefkowitz, J., & Battista, M. (1995). Potential sources of criterion bias in supervisor ratings
    used for test validation. *Journal of Business and Psychology*, *9*(4), 389-414.

Exhibit 1
Page 36 of 110

tend to receive lower hiring ratings,[97] lower offers in salary negotiations,[98] lower promotion

ratings,[99] poorer leadership evaluations,[100] increased risk of sexual harassment,[101] and a greater

likelihood of sabotage from coworkers.[102] In other words, people who dislike assertive women

act on this dislike by discriminating against them in tangible ways that adversely affect

workplace outcomes. When people are given the opportunity (e.g., are put in charge of a

personnel evaluation), dislike turns into discriminatory penalties and even sabotage.[103]

**DENYING FEMALE LEADERS RESPECT CREATES A VICIOUS CYCLE**

High status roles are associated both with stereotypically masculine traits (e.g., ambition,

assertiveness, decisiveness)[104] and with men as "role incumbents" (i.e., when asked to "think of a

leader," it's likely the person who pops to mind is a man not a woman).[105] Due to gender

stereotypes, people generally accord women lower status and authority than men.[106] Women in

---

[97] Rudman, L. A. (1998). Self-promotion as a risk factor for women: the costs and benefits of counter-stereotypical impression management. *Journal of personality and social psychology*, *74*(3), 629.

[98] Bowles, H. R., Babcock, L., & Lai, L. (2007). Social incentives for gender differences in the propensity to initiate negotiations: Sometimes it does hurt to ask. *Organizational Behavior and Human Decision Processes*, *103*(1), 84-103.

[99] Heilman, M. E., Wallen, A. S., Fuchs, D., & Tamkins, M. M. (2004). Penalties for success: reactions to women who succeed at male gender-typed tasks. *Journal of Applied Psychology*, *89*(3), 416.

[100] Eagly et al. (1992).*Op cit*.

[101] Berdahl, J. L. (2007). The sexual harassment of uppity women. *Journal of Applied Psychology*, *92*(2), 425.

[102] Heim, P. (1990). Keeping the power dead even. *Journal of American Medical Women's Association, 45,* 232-243.

[103] Rudman, L. A., & Phelan, J. E. (2008). Backlash effects for disconfirming gender stereotypes in organizations. *Research in organizational behavior*, *28*, 61-79.

[104] Koenig, A. M., Eagly, A. H., Mitchell, A. A., & Ristikari, T. (2011). Are leader stereotypes masculine? A meta-analysis of three research paradigms. *Psychological bulletin*, *137*(4), 616.

[105] Glick, P., Zion, C., & Nelson, C. (1988). What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology*, *55*(2), 178.

[106] Ridgeway, C. L. (2001). Gender, status, and leadership. *Journal of Social issues*, *57*(4), 637-655.

Exhibit 1
Page 37 of 110

masculine fields have to disprove lower expectations due to stereotypes.[107] In work roles dominated by men, research shows that women have to work harder and perform better to prove their competence compared to men.[108]

The tendency to accord women less status and authority can combine with backlash to create a vicious cycle. Because subordinates are less likely to respect and cooperate with them, female leaders may need to assert their authority more forcefully, exacerbating backlash and rejection.[109] Complying with authorities typically represents a voluntary social contract. As long as subordinates view a leader as legitimate (i.e., view the leader's status and power as deserved or justified), people readily comply with the leader, allowing the leader to assert their authority lightly rather than with a heavy hand. Most famously, Milgram's classic studies on obedience to authority showed that people will comply with an authority they view as legitimate, quelling any doubts about an authority's dubious requests.[110] In Milgram's experiments, people experienced consternation about obeying an authority (a scientist) who asked them to deliver what appeared to be increasingly dangerous and painful shocks to another person. Yet most went along, even though the authority figure had no real power (e.g.,  the man dressed in a lab coat in the Milgram study did not control participants' employment outcomes; people could simply leave and not face any harmful life consequences). So long as participants saw the authority as legitimate, they

---

[107]Foschi, M. (2000). Double standards for competence: Theory and research. *Annual review of Sociology*, *26*(1), 21-42.

[108] Gorman, E. H., & Kmec, J. A. (2009). Hierarchical rank and women's organizational mobility: Glass ceilings in corporate law firms. *American Journal of Sociology*, *114*(5), 1428-1474.

[109] Vial, A. C., Napier, J. L., & Brescoll, V. L. (2016). A bed of thorns: Female leaders and the self-reinforcing cycle of illegitimacy. *The Leadership Quarterly*, *27*(3), 400-414.

[110] Milgram, S. (1974), *Obedience to Authority: An Experimental View*, London: Tavistock Publications.

Exhibit 1
Page 38 of 110

tended to comply. By contrast, when the researcher deliberately reduced the authority's

legitimacy, compliance decreased.

In daily life, compliance with authorities tends to be voluntary, even eager.[111] For

example, a manager may lightly express a preference and an eager subordinate may jump to

fulfill it. When invested with legitimacy, authorities need not resort to threats or coercion. This

system breaks down, however, when subordinates do not grant a leader legitimacy. Consider a

familiar example, the substitute middle school teacher. Unlike with the students' regular teacher,

who can gain compliance without resorting to threats, the substitute teacher may find his or her

authority questioned or rejected. If the students fail to grant the substitute legitimacy, the

classroom can quickly descend into chaos. What happens next? The substitute teacher must

resort to a more autocratic style, issuing stern commands, making threats, and handing out

punishment to gain control, restore order, and create a functioning classroom. Threats and

punishment (e.g., sending students to the principal's office) may allow the classroom to begin to

function, but increase dislike toward and resentment toward the teacher, who may be mocked,

sabotaged, and disrespected when the students feel they can get away with it. Research suggests

a similar dynamic when subordinates fail to grant legitimacy to female leaders.[112]

If subordinates do not automatically accord female leaders status and legitimacy, female

leaders may have to resort to more assertive tactics to get the group to function (i.e., perform

---

[111] Magee, J. C., & Frasier, C. W. (2014). Status and power: The principal inputs to influence for public managers. *Public Administration Review*, *74*(3), 307-317.

[112] Fragale, A. R., Overbeck, J. R., & Neale, M. A. (2011). Resources versus respect: Social judgments based on targets' power and status positions. *Journal of Experimental Social Psychology*, *47*(4), 767-775.

Exhibit 1
Page 39 of 110

their roles).[113] When this happens, subordinates "…perceive power differentials to be relatively high" (i.e., view themselves as the victims of an illegitimate power differential).[114] Further, when subordinates reject a leader's legitimacy, they tend to feel more empowered to resist or defy the leader,[115] which can manifest in uncooperative, resistant, or undermining behavior.[116] Such a vicious cycle can further erode the relationship between leaders and subordinates.

## SEX DISCRIMINATION IN MEDICINE

Researchers examined case records spanning 20 years (1997-2018) at a university medical center for over 550,000 cases performed by more than 130 surgeons. Female (compared to male) surgeons received fewer referrals from male colleagues. As a result, female surgeons had lower case volumes, leading to lower pay compared to male surgeons. Specifically, female surgeons received "5.4 fewer new patient referrals per month," almost 40% fewer than the overall monthly referral average across all surgeons at the medical center.[117] Another study examined close to 40,000,000 outpatient referrals to surgeons made by over 40,000 physicians to surgeons from 1997 to 2018. They found that male physicians were disproportionately likely to refer patients to male surgeons (even after controlling for the higher proportion of male

---

[113]Ellemers, N., Rink, F., Derks, B., & Ryan, M. K. (2012). Women in high places: When and why promoting women into top positions can harm them individually or as a group (and how to prevent this). *Research in Organizational Behavior*, *32*, 163-187.

von Hippel, C., Wiryakusuma, C., Bowden, J., & Shochet, M. (2011). Stereotype threat and female communication styles. *Personality and Social Psychology Bulletin*, *37*(10), 1312-1324.

[114]Vial et al (2016), *op cit*.

[115]Lammers, J., Galinsky, A. D., Gordijn, E. H., & Otten, S. (2008). Illegitimacy moderates the effects of power on approach. *Psychological Science*, *19*(6), 558-564.

[116]De Cremer, D., & Tyler, T. R. (2007). The effects of trust in authority and procedural fairness on cooperation. *Journal of applied psychology*, *92*(3), 639.

[117]Chen, Y. W., Westfal, M. L., Chang, D. C., & Kelleher, C. M. (2021). Contribution of unequal new patient referrals to female surgeon under-employment. *The American Journal of Surgery*, *222*(4), 746-750.

Exhibit 1
Page 40 of 110

compared to female surgeons) and were less likely to make procedural referrals to female

surgeons. These differences were stronger for referrals from other surgeons and did not diminish

over time (i.e., persisted across two decades).[118]

Further, consistent with stereotypes demeaning women's competence in masculine fields

and with "prove it again bias" (the demand for women, more than men, to constantly prove their

competence) female surgeons also get blamed more for poor outcomes than male surgeons.

Specifically, other physicians became less likely to send referrals to a female as compared to a

male surgeon after a patient's death (within 7 days after a procedure). Additionally, consistent

with research on how people generalize biases toward a group as a whole, the drop in referrals

extended to *other* female surgeons, clearly revealing a gender bias. This research also looked at

the effects of unexpectedly positive outcomes for risky procedures known to have high mortality

rates. An unexpectedly positive outcome was defined as no death or hospital readmission a

month after a risky procedure. Male surgeons experienced an increase in referrals after

unexpectedly good outcomes, whereas female surgeons did not.[119]

In sum, female surgeons were more likely to be blamed for bad outcomes (while male

surgeons received the benefit of the doubt) and less likely to be accorded credit (did not reap

more referrals) after unexpectedly good outcomes. Further, when a female surgeon's patient

died, physicians subsequently referred fewer patients to *other* female surgeons; this

generalization effect did not occur when male surgeons lost a patient. The generalization to other

female surgeons clearly reveals stereotyping: a poor outcome involving a female surgeon

---

[118]Dossa, F., Zeltzer, D., Sutradhar, R., Simpson, A. N., & Baxter, N. N. (2022). Sex differences
in the pattern of patient referrals to male and female surgeons. *JAMA Surgery*, *157*(2),
95-103.

[119]Sarsons, H. (2017). Interpreting signals in the labor market: Evidence from medical
referrals. *Job Market Paper*, 141-45.

Exhibit 1
Page 41 of 110

reinforced stereotypes assigning less competence to female surgeons as a group. Importantly, consistent with confirmation biases, generalization to other female surgeons only occurred after bad (patient's death) but not good (unexpectedly positive) patient outcomes. These referral patterns show that peers punish female (compared to male) surgeons more for bad outcomes and reward them less for good outcomes.

The referral biases described above might be reasonable if female surgeons were demonstrably less competent than male surgeons. However, studies reveal that, if anything, female surgeons tend to have better patient outcomes than male surgeons, even after controlling for procedure complexity or difficulty. Based on Medicare records, researchers examined mortality rates for close to 900,000 patients treated by over 45,000 surgeons. Analyses (controlling for patient age, comorbidities, procedure type, and surgeon specialty) revealed no differences in mortality rates (within a month of the surgery) for male and female surgeons.[120] Another study examined outcomes for over 1.3 million surgery patients treated by almost 3,000 surgeons over a 12-year period (2007 to 2019), measuring deaths, readmissions, and complications after surgery. The study's main aim was to examine whether mismatches between patient and surgeon gender predicted negative outcomes. Female surgeons generally had fewer negative outcomes than male surgeons, though this was due to male surgeons having worse outcomes with female patients. Specifically, male and female surgeons had similar negative

---

[120]Tsugawa, Y., Jena, A. B., Orav, E. J., Blumenthal, D. M., Tsai, T. C., Mehtsun, W. T., & Jha, A. K. (2018). Age and sex of surgeons and mortality of older surgical patients: observational study. *British Medical Journal*, *361*. Retrieved from https://www.bmj.com/content/361/bmj.k1343.

Exhibit 1
Page 42 of 110

outcome rates when they treated male patients. However, male surgeons showed higher negative outcome rates than female surgeons when treating female patients.[121]

Finally, another study used medical records to carefully construct a "matched cohort" comparison. Specifically, over 100,000 patients treated by over 3000 surgeons were selected so that "surgical procedures performed by a female surgeon were matched by patient age, patient sex, comorbidity, surgeon volume, surgeon age, and hospital to patients undergoing the same operation by a male surgeon" (p. 1). This method comes as close as possible to an experimental design (i.e., randomly assigning patients to female versus male surgeons for procedures), aiming to eliminate alternative explanations for any observed differences in outcomes. The results showed similar rates for complications and readmission, but a significantly lower 30-day mortality rate for patients operated on by female as compared to male surgeons, a relative difference of 4%.

In sum, research documents multi-faceted sex discrimination against women in medicine. Female surgeons receive fewer referrals overall as well as fewer procedural referrals, especially from male colleagues. Research documents that these discriminatory effects persisted across three decades (from the 1990s to the late 2010s). Consistent with stereotype-driven skepticism about women's competence in male-dominated occupations, referral patterns suggest that colleagues tend to blame female surgeons but excuse male surgeons when patients die following surgery, with the same pattern generalizing to other female surgeons. Yet considerable research on patient outcomes across decades shows that compared to male surgeons, female surgeons achieve similar (in some studies) or better patient outcomes (e.g., lower mortality) compared to

---

[121]Wallis, C. J., Jerath, A., Coburn, N., Klaassen, Z., Luckenbaugh, A. N., Magee, D. E., ... & Satkunasivam, R. (2022). Association of surgeon-patient sex concordance with postoperative outcomes. *JAMA surgery*, *157*(2), 146-156.

Exhibit 1
Page 43 of 110

male surgeons. The most rigorously matched study of patient outcomes showed an overall lower mortality rate after surgeries by female as compared to male surgeons. Taken together, these findings present a pattern of interlocking biases that unfairly disadvantage female (relative to male) surgeons, impairing their productivity and leading to lower compensation.

**BACKLASH FROM STAFF TOWARD FEMALE PHYSICIANS**

Backlash, as noted above, represents punishment toward women who are seen as too assertive and, therefore, insufficiently warm in interpersonal interactions due to stereotypical double standards for women's versus men's behavior. Backlash therefore emerges in complaints about women's communication style (e.g., as "abrasive" or rude) for authoritative behavior that people typically tolerate from men. Because physicians, especially surgeons (who must command in the OR), are in positions of authority over staff (e.g., nurses), female physicians and surgeons face the risk of backlash for performing their occupational role.

Because most nurses are female, people may commonly assume that nurses would favor, rather than discriminate against, female physicians as members of their own gender group. In qualitative studies, however, female doctors and surgeons consistently report that (compared to nurses' interactions with male doctors) they receive less help and more resistance to their authority from nurses, as well as have to work harder (e.g., bring treats to meetings) to be perceived by nurses as likeable.[122] In one qualitative study in which quantitative analyses were performed, data from a national survey of Norwegian doctors revealed a statistically significant

---

[122] Heim, P. (1990). Keeping the power dead even. *Journal of American Medical Women's Association, 45*, 232–243.

Hutchison, K. (2020). Four types of gender bias affecting women surgeons and their cumulative impact. *Journal of Medical Ethics*, *46*(4), 236-241.

Exhibit 1
Page 44 of 110

difference in the frequency with which female (compared to male) doctors perceived receiving less staff assistance than male doctors.[123]

While suggestive, the qualitative studies described above report female physicians' *perceptions* rather than nurses' behavior. In an experimental study conducted in Canada female nurses were randomly assigned to read a vignette in which either a female or a male physician, contrary to hospital policy, left a suture tray with needles by a patient's bed. Although more than 85% thought the physician should have removed the needles, nurses reported being more likely to step in and remove the needles for a male than a female physician. Further, on average, nurses who said they would remove the needle themselves reported feeling indifferent about doing so when a male physician failed to remove the needles but had negative feelings when they stepped in for a female physician.[124] In sum, nurses' responses to a vignette in which a physician failed to clean up after a procedure supported female physicians' perceptions that nurses (who are mostly women) are more reluctant to help them and more likely to resent doing so. These findings are consistent with backlash research in other domains.

Another study retrospectively examined gender (and minority status) bias in patient safety reports made by staff at an academic medical center (Stanford University) from 2011 through 2020. The researchers stripped identifying information (e.g., physician gender) from the reports before independent coders classified the reports into various categories (e.g., failure to follow procedure, inappropriate communication) and rated each incident's severity on a 1 (mild) to 3 (egregious) scale. Backlash leads people to perceive women (versus men) as more abrasive

---

[123] Gjerberg, E., & Kjølsrød, L. (2001). The doctor–nurse relationship: how easy is it to be a female doctor co-operating with a female nurse?. *Social Science & Medicine*, *52*(2), 189-202.

[124] Zelek, B., & Phillips, S. P. (2003). Gender and power: Nurses and doctors in Canada. *International Journal for Equity in Health*, *2*(1), 1-5.

Exhibit 1
Page 45 of 110

when they engage in relatively mild forms of self-assertion. Therefore, backlash theory suggests that staff members would be more likely to report female (versus male) physicians for mildly assertive behaviors. In other words, backlash theory suggests, for example, that a male physician's curt response or sharp command might fly "under the radar," whereas staff would see the same behavior by a female physician as "out of line" and report it.

The patient safety report data revealed a pattern consistent with backlash research and theory. Staff were disproportionately likely to report female (versus male) physicians for communication-related complaints that coders rated as low in severity (category 1: mild). Differences emerged on the following qualitative categories: (a) inappropriate communication (e.g., "rude" or "snide" tone of voice and body language), (b) lack of communication, and (c) conversational conduct deemed inappropriate at work (e.g., taking a personal phone call). Similar results occurred for minority (Asian, Black) compared to White physicians.[125]

In sum, patient safety reports, showed a pattern consistent with general backlash theory: female physicians risk being seen as rude, dislikeable, and abrasive for behaviors that staff tolerate from male physicians. Given the medical hierarchy, all physicians must assert themselves at work, but staff were more likely to complain about mild (e.g., curt tone) communication-related behaviors for female than for male physicians. This represents an especially important finding given that almost half (47%) of about a decade's worth of reported incidents in the study reported above fit into the "communication" categories that disproportionately targeted female physicians. Further, because this study examined actual

---

[125]Burton, É., Flores, B., Jerome, B., Baiocchi, M., Min, Y., Maldonado, Y. A., & Fassiotto, M. (2022). Assessment of bias in patient safety reporting systems categorized by physician gender, race and ethnicity, and faculty rank: A qualitative study. *JAMA Network Open*, *5*(5), e2213234-e2213234.

Exhibit 1
Page 46 of 110

complaints in the workplace (rather than female physicians' perceptions or nurses' reactions to a

vignette) it represents especially strong evidence for backlash against female physicians.

**WOMEN WHO CONFRONT DISCRIMINATION FACE BACKLASH, RETALIATION**

People who claim they have experienced harassment or bias can also experience

backlash, even when circumstances seem to support their claim. Specifically, even when

evidence strongly suggests that an individual has been discriminated against, observers tend to

view people who claim they have experienced discrimination as overly sensitive "whiners" and

may suspect that the individual (not discrimination) is to blame for negative outcomes.[126]

Women who complain about harassment at work often face both *organizational minimization*

(e.g., mangers discount their complaints as unsubstantiated or minimize the severity of the

harassment) and interpersonal *punishment* (e.g., hostility and occupational penalties),[127]

especially in male-dominated occupations.[128] In a survey of over a thousand public-sector

employees, 67% of those who had vocally resisted interpersonal mistreatment from coworkers or

supervisors experienced social retaliation at work (e.g., hostility, exclusion) and 36% also

experienced formal workplace penalties (e.g., discipline, demotion).[129] Thus retaliation, both

informal and formal for complaining about discrimination is relatively common.

Individuals directly confronted with claims that they have exhibited bias tend to react

defensively, especially if they actually harbor biased attitudes (e.g., sexist beliefs). In one study,

---

[126] Kaiser, C. R., & Miller, C. T. (2001. "Stop complaining! The social costs of making attributions to discrimination." *Personality and Social Psychology Bulletin* 27, 254-263.

[127] Bergman, M. E., Langhout, R. D., Palmieri, P. A., Cortina, L. M., & Fitzgerald, L. F. (2002). The (un) reasonableness of reporting: Antecedents and consequences of reporting sexual harassment. *Journal of Applied Psychology*, *87*(2), 230.

[128] *Ibid*.

[129] Cortina, L. M & Magley, V. J. (2003). Raising voice, risking retaliation: Events following mistreatment in the workplace. *Journal of Occupational Health Psychology, 8,* 247-265.

Exhibit 1
Page 47 of 110

participants imagined being confronted with accusations that they exhibited (depending on randomly assigned condition) either racial or gender bias. Individuals who had scored high on prior tests of prejudice showed greater antagonism and irritation toward the accuser. Further, male participants generally tended to dismiss and trivialize gender bias accusations.[130]

**SUBJECTIVE EVALUATIONS PERMIT DISCRIMINATION**

Stereotype-based bias is more likely to intrude on personnel evaluations when evaluators rely on subjective opinions (i.e., judgments that are in "the eye of the beholder") rather than objective criteria.[131] Subjective judgments involve criteria that are not clearly defined or allow substantial latitude for interpretation so that different evaluators to potentially come to different conclusions. For example, people may disagree in their judgments about another person's perceived attractiveness (i.e., to the extent that "beauty is in the eye of the beholder" it represents a subjective judgment). Subjective judgments open the door to bias. For example, when evaluators judge a person's "fit" with the organization (a subjective judgment), they tend to prefer people who are in the same social categories as typical job incumbents. For example, in an audit study, experimenters sent similar résumés to law firms, but altered information hinting at the applicant's social class (e.g., extracurricular activities such as sailing and polo versus track and soccer). Law firms preferred male candidates who seemed to have high social class backgrounds over equally qualified men perceived as from a lower social class background.[132]

---

[130] Czopp, A. M., & Monteith, M. J. (2003). Confronting prejudice (literally): Reactions to confrontations of racial and gender bias. *Personality and Social Psychology Bulletin, 29*(4), 532-544.

[131] Heilman, M. E., et al. (2004). Penalties for success: Reactions to women who succeed at male-typed gender tasks. *Journal of Applied Psychology, 89*, 416-427.

[132] Rivera, L. A., & Tilcsik, A. (2016). Class advantage, commitment penalty: The gendered effect of social class signals in an elite labor market. *American Sociological Review, 81*(6), 1097-1131.

Exhibit 1
Page 48 of 110

As noted above, women who fail to comply with stereotyped expectations about warmth and agreeableness risk backlash that manifests in seeing them as cold, abrasive, interpersonally difficult, and selfish.[133] Warm-cold represents a core dimension on which people and groups are perceived, in turn influencing their perceived likeability and motives toward others – is this individual self-centered or positively oriented toward others (i.e., warm, kind, trustworthy, cooperative)?[134] Research shows that when people (whether correctly or falsely) view another person as cold and hostile, it becomes extremely difficult for that individual to combat this perception and earn others' trust.[135] In other words, perceived warmth is easy to lose and difficult to earn back due to the subjectivity of such judgments. For example, warm behaviors (e.g., offering help) can be interpreted as having ulterior motives, such as an attempt to earn advantage. Whereas one can prove competence, warmth remains a highly subjective judgment. Thus, once backlash leads to a negative impression on warmth, perceivers are likely to interpret neutral behaviors as "cold" and dismiss apparently warm behaviors as insincere (e.g., as part of a hidden agenda).

---

[133] Rudman et al. (2012). *Op cit.*

[134] Fiske, S. T., Cuddy, A. J., & Glick, P. (2007). Universal dimensions of social cognition: Warmth and competence. *Trends in cognitive sciences*, *11*(2), 77-83.

[135] Tausch, N., Kenworthy, J. B., & Hewstone, M. (2007). The confirmability and disconfirmability of trait concepts revisited: Does content matter? *Journal of Personality and Social Psychology, 92*, 542-556.

Exhibit 1
Page 49 of 110

## V. APPLICATION TO CURRENT CASE AND OPINIONS

Social framework experts serve a specific role: educating a jury about research findings and pointing out ways that research findings may help inform their decision. Based on standard practice, the social framework expert's role has limits. Specifically, the law discourages experts from making "credibility judgments" about disputed evidence. For example, in a case hinging on conflicting testimony about whether or how a specific incident occurred, case decision-makers, not the social framework expert, must decide which witnesses they deem credible. Thus, when facts are disputed (e.g., he says one thing, she says another), consistent with the law and common practice, I will not issue judgments about who is more credible. In these instances, my opinions will be contingent on the case decision-makers' credibility judgments. For example, I will use language such as "Should the case decision-makers find allegation X credible, such behavior would be consistent with research showing Y." In other instances, facts are not disputed. For example, in the current case, documentation provides clear evidence that the Defendants viewed Dr. Bala's communication style as "abrupt," "bullying," and "abrasive." That Defendants' perceived Dr. Bala in this manner is not in dispute and does not require credibility judgments.

My testimony will stay within the bounds defined by Federal District Court Judge Nancy Gertner, who ruled my testimony as admissible for the following reason: it *"...expressly refuses to come to a conclusion about whether there has been discrimination in this case because such an opinion is for the jury and ... it is not possible to make any decision to a reasonable degree of scientific certainty about a real world case."*[136]

---

[136] MEMORANDUM RE: MOTION TO EXCLUDE EXPERT TESTIMONY, January 6, 2009. Judge Nancy Gertner, United States District Court for the District of Massachusetts. Civil Action no. 07cv-12338-NG, p. 4.

Exhibit 1
Page 50 of 110

Therefore, I will not opine with certainty about whether discrimination occurred in this case, but will point the case decision-makers toward issues to consider and note when case facts are consistent with  discrimination (e.g., show a pattern consistent with how stereotyping and bias operate). Because alternative explanations offered by Defendant to explain their actions cannot be ruled out scientifically, case decision-makers must ultimately decide whether they believe discrimination likely did or did not occur.

Below I suggest principles for case decision-makers to keep in mind as they try to disentangle whether discrimination did or did not occur in the current case.

First, biased individuals typically justify their actions by citing apparently legitimate motives in an effort to deny that bias skewed their judgment. Therefore, case decision-makers should not expect biased individuals to own up to or declare biased motives, but instead to claim alternative, nondiscriminatory motivations. Further, individuals commonly have mixed motives such that bias and other motives can both be present. People are actually most likely to discriminate when they can cite apparently nondiscriminatory justifications that provide "cover" for biased decision. Therefore, case decision-makers should consider that the alternative, nonbiased justifications may be entangled with underlying biases. That is, it's not necessarily an "either/or" situation when it comes to whether bias or other factors influenced a decision: often bias creeps in alongside other (apparently non-discriminatory) reasons for a decision.

Second, gender discrimination tends to be targeted and context dependent, rather than an overt, blanket discrimination against all women in all situations. As the scientific section of this report noted, women who comply with gender expectations about "how women should be" tend to elicit affection, protection, and aid (though they are simultaneously likely to be denied the same level of tangible resources, such as pay or powerful positions compared to men). By

Exhibit 1
Page 51 of 110

contrast, women who defy gender prescriptions (e.g., by being assertive) can elicit hostility, workplace penalties, and even retaliatory sabotage (whereas a man who behaved in the same way might be admired, tolerated, or at least receive less hostility and fewer penalties). Thus, while gender discrimination may manifest itself in some general patterns, such as women being paid less overall than men, more intense discrimination often targets *specific women* (not all women), such as those who exhibit behaviors that violate prescriptive gender stereotypes.

Third, discrimination reflects *relative differences* in how people react to women and men who behave in similar ways. For example, imagine a surgeon criticizing a technician or nurse for being inattentive in the OR. The criticized individual might bristle at the reprimand. But would they bristle more and be more likely to report a female as compared to a male surgeon who made the exact same criticism in the exact same manner? Discrimination involves relative comparisons: Did people react *relatively more* negatively toward Dr. Bala than they did toward men who acted similarly? Did Dr. Bala receive more scrutiny and workplace penalties for behavior that received less scrutiny or fewer penalties for men who behaved in similar ways?

Fourth, case decision-makers should remember that they cannot and need not reach their conclusion with "scientific certainty" but instead with appropriate legal certainty (e.g., "more likely than not" or whatever standard the court imposes). In a real life case, comparisons between a female plaintiff and male colleagues will not completely rule out all other factors in the way that scientifically controlled comparisons do (by keeping everything identical except for gender). Nevertheless, understanding scientific findings about sex discrimination can help inform case decision-makers' deliberations about whether, in their judgment, discrimination occurred.

***Background factors***

Exhibit 1
Page 52 of 110

Some background factors make discrimination against women more or less likely. Specifically, women tend to face discrimination more frequently when they work in a male-dominated role. Historically, doctors and surgeons have typically been male. More specifically, Dr. Henrikson (Dr. Bala's immediate superior) testified that, other than Dr. Bala, all of the other Electrophysiology doctors at OHSU were men (Henrikson Deposition, pp. 11-12). In addition, a 2016 faculty satisfaction survey at OHSU more directly suggests an organizational climate in which a substantial minority of faculty reported witnessing harassment (23.5%) or experiencing harassment (13.5%) in the past three years. Substantially fewer, however, reported the incidents they observed (5%). In 2019, an article reporting on discrimination lawsuits filed against OHSU, Vice Provost David Robinson was quoted as saying "We do have harassment and discrimination going on and it's something that we need to deal with" (Exhibit 158 at 1; Exhibit 207 at 2).

Others describe experiences with or concerns about gender discrimination at OHSU. Dr. Jill Gelow recalled Dr. Kaul saying that he wished "to go back to a different year when women didn't work because it was harder to arrange schedules or deal with things" and another meeting in which someone told her to calm down and commented on her having too much estrogen (Gelow Deposition, pp. 12-14). Mary Heitman- Allen testified that, in retrospect, she saw a pattern of discrimination against "strong, opinionated women" at OHSU (Heitman-Allen Deposition, pp. 29-30).

If case decision-makers deem the faculty survey and examples above credible, they suggest an organizational climate in which assertive women may be discriminated against, though do not necessarily indicate whether Dr. Bala herself experienced discrimination. To make a determination about discrimination directed at Dr. Bala will require decision-makers to look more closely at incidents concerning her more specifically.

Exhibit 1
Page 53 of 110

Research on stereotypes and discrimination suggest that the jury should consider the following critical questions. Please note that case decision-makers must decide the answers to these questions, whether affirmatively or negatively. By posing these questions I do not intend to restrict case decision-makers' answers:

1. Did backlash toward and stereotypes about assertive women (compared to similar men) cause exaggerated, negative interpretations of Dr. Bala's behavior and motives? Such discrimination would lead more extreme reactions, both to incidents where Dr. Bala's behavior was within accepted norms for male surgeons and to behaviors that might elicit legitimate concerns, but not lead to as severe reactions if committed by male physicians.

2. Did backlash cause some staff to disrespect Dr. Bala or comply less readily to her directives, compelling her to assert herself more forcefully to do her job? In the operating room, surgeons must lead. If subordinates' biased dislike for a female leader cause them to resist her directives, the female leader must assert herself more forcefully to accomplish her role, which in turn can reinforce negative, stereotype-driven perceptions about her (e.g., "she's abrasive").

3. Did OHSU administrators inappropriately minimize or dismiss Dr. Bala's claims about gender discrimination, failing to investigate despite policies suggesting they should have?

4. When making the decision to terminate Dr. Bala's employment, did backlash and stereotyping lead OHSU administrators to (a) insufficiently weigh improvement in Dr. Bala's behavior and work relationships, and/or (b) over-weight recent incidents that were minor or due to another person's inappropriate behavior?

Exhibit 1
Page 54 of 110

## 1.  DID DR. BALA EXPERIENCE BACKLASH OR NOT?

Discrimination occurs when people impose *double standards*. This includes less positive reactions toward women and men for the same admirable achievements, as well as more hostility and punishment toward women than toward men for less desirable behaviors. For both generally admired and generally disliked behaviors, research shows a trend for both men and women to perceive women (versus men) who perform them as less likeable. Therefore, *the question is not whether Dr. Bala's actions were always pleasant or desirable, but whether a man who behaved similarly would have elicited equally strong negative reactions*. For example, although people may view some assertive behaviors (e.g., criticizing a colleague) as dislikable when performed by a man, their reactions tend to be comparatively more muted than reactions to a woman who acts the same way. Therefore, case decision-makers should consider whether Dr. Bala was denied the same accolades and rewards for her successes and/or was punished more severely for less assertive behaviors than male colleagues were or would be. Either would constitute discrimination.

***A dilemma for women: Punished for behaviors their job may require***

Traditionally male, high status roles may require behaviors that tend to elicit backlash when women exhibit them. For example, a surgeon has to command the operating room and issue directives. In an emergency, directives may need to be terse and require swift compliance from subordinates. Therefore, job requirements can sometimes put women in a difficult bind: to fulfill their role, the job may require actions that (for a woman but not a man) elicit negative reactions from co-workers, both peers and subordinates and both men and women.

While a surgeon must be able to command, I do not question OHSU administrators' concerns about the need to also maintain a collaborative environment in the procedure room. A

Exhibit 1
Page 55 of 110

surgeon who completely dismisses staff represents a danger to safety. Teamwork during a procedure represents potentially a life or death matter. For example, Ms. Heitman-Allen testified how one surgeon, James Suero, dismissively ignored warnings from an assistant that a patient was bleeding from a sheath site; tragically, the patient bled out and died (Heitman-Allen Deposition, p, 105). Therefore, the surgeon walks a delicate line between commanding with authority and creating a collaborative climate where staff can speak up when necessary.

Unfortunately, backlash can create a discriminatory dilemma for female leaders when they exert authority because staff may perceive appropriate authoritative behaviors as abrasive, intimidating, and dictatorial. In such cases, discriminatory perceptions, not the surgeon's behavior, undermine collaboration and the answer lies in educating and training the staff about bias rather than castigating the surgeon. In any specific real-world case, it may be difficult to tease apart whether a female surgeon's allegedly "intimidating" behavior (a) directly represents a risk to teamwork and patient safety or (b) represents a stereotype-driven exaggeration that mischaracterizes behaviors commonly accepted when male surgeons enact them. Importantly, the two possibilities above are not mutually exclusive: a behavior may both be legitimately problematic but may also be perceived in an exaggerated, stereotypical, and discriminatory way.

I endorse OHSU's concerns about workplace climate in the operating room. Should a surgeon's behavior create a climate that completely silences staff, patient safety becomes compromised. At the same time, the organization has an obligation to ensure that stereotype-driven perceptions do not lead to discrimination against female (compared to male) surgeons merely for doing what it takes to perform their role or for acting within the bounds of commonly accepted behavior for male surgeons.

Exhibit 1
Page 56 of 110

*Women as well as men engage in backlash toward assertive women*

In his deposition, Dr. Kaul (an OHSU administrator) expressed incredulity at the idea that nursing staff would discriminate against female physicians, stating that the possibility sounds "… bizarre because they are all women… I just can't imagine that women staff would treat women worse than men" (Kaul Deposition, p. 187). Although men are more likely than women to engage in some forms of gender discrimination (e.g., sexual harassment), research shows that women as well as men tend to exhibit backlash toward assertive women. Some research even suggests that female subordinates can be more likely than men to reject a female leader's legitimacy. Therefore, case decision-makers should keep in mind that, contrary to Dr. Kaul's assumption, research establishes that women as well as men tend to react negatively to assertive behaviors by female leaders.

*Subjective inferences about motives, tone, and intent are especially vulnerable to bias*

Whether a perceiver interprets a specific behavior positively or negatively depends on subjective inferences about the other's intentions, allowing bias to enter in. For example, imagine an individual responding to another person's idea by saying "That's an interesting point of view." The comment could be interpreted as either a sincere compliment or a sarcastic dismissal. While perceivers may generally agree on how to interpret *extreme* behaviors, most behaviors are more ambiguous and open to interpretation. For example, everyone would likely agree that the comment "Shut up, you idiots!" is unambiguously abrasive, belittling and unprofessional, whereas the less extreme comment "Can we please have quiet in here" might be interpreted as a polite, legitimate request or as a brusque and abrasive command depending on subjective perceptions about tone or demeanor. Such subjective perceptions can be influenced by perceivers' biases.

Exhibit 1
Page 57 of 110

Thus, a key question for case decision-makers is whether Dr. Bala's behaviors fully warranted the extreme characterizations they received or whether others' views were skewed or exaggerated due to gender stereotypes and backlash. In other words, were behaviors that might be labeled "assertive" by a male surgeon labeled "abrasive" (and the like) for Dr. Bala? Recall that even if case decision-makers conclude that some behaviors by Dr. Bala were undesirable or unprofessional, the question remains whether others' reactions were more extreme toward her than they would be or were to similar behavior by male surgeons.

**_Behaviors by Dr. Bala similar to those known to elicit backlash_**

As noted earlier in this report, research established that women typically receive backlash and hostility for: (a) assertive behavior, (b) criticizing others, (c) engaging in self-promotion, (d) expressing anger, (e) showing ambition or mere success in high status, stereotypically masculine roles, and (e) claiming to have been discriminated against. Dr. Bala seems to have ticked most or all of the boxes above.

**_Assertiveness._** The Plaintiff as well as Defendants and witnesses agree that Dr. Bals has a direct and assertive demeanor. The Plaintiff describes herself as strong, confident and outspoken (Second Amended Complaint). Tom Clark described Dr. Bala as having a "strong personality" and as "intense" (Exhibit 139), Mary Heitman-Allen characterized Dr. Bala as "strong and direct" (Heitman-Allen Deposition, p. 46). Dr. Henrikson testified that Dr. Bala asserted her opinions strongly from her "first day of clinic" (Henrikson deposition, p. 47). Backlash research shows that the same assertive behaviors that are accepted or even admired for men can be perceived negatively as "crossing a line" when women exhibit them. In other words, bias transforms a behavior that might be perceived as "being direct" for a man into perceived "abrasiveness" for a woman. In the current case, behaviors that may have been perceived in a

Exhibit 1
Page 58 of 110

more extreme manner due to backlash include: directives for silence during difficult ablations (e.g., the Matt Holling incident, see Exhibit 138); asking a company representative to consult a more senior representative during a procedure (Bala Deposition. p. 28); substituting a staff member Dr. Bala perceived as struggling during a procedure with another staff member (Henrikson Deposition, p. 201; Bala Deposition, p. 71); and attempting to institute new protocols (which Dr. Henrikson endorsed as warranted to improve treatment and safety for patients; Henrikson Deposition, p. 68). Others interpreted these incidents as indicating high-handedness, rudeness, abrasiveness, and unprofessional behavior (e.g., see Exhibit 181).

*Criticizing others.* People generally find criticism painful, whether directed at themselves personally or toward groups or organizations with which they identify. But research shows that criticism from women tends to sting more than criticism from men, leading people to resist and delegitimize women, more so than men, who deliver criticism. Both the Plaintiff and her colleagues, including Defendants named in the current lawsuit, agree that Dr. Bala was direct and open with criticism about practices, training, and standards at OHSU that she viewed as diminishing patient safety. For example, Exhibit 181 (notes dated October, 2015 of a meeting between Dr. Henrikson and Ms. Strahm in HR) documents concerns about Dr. Bala criticizing OHSU's training and practices, as well as individual staff members' preparedness. Specifically, Dr. Henrikson alleged to Ms. Strahm that Dr. Bala had told others that "You all simply have lower standards" compared to University of Pennsylvania (where she was trained) and that she allegedly "chewed out [a] mid-level." Some people perceived Dr. Bala's tendency to ask staff procedure-related question as dismissive criticism about their competence; e.g., the incident with CRNA Sue Bardon (covered in more detail below) that led to Dr. Kirsch withdrawing support from the Anesthesiology Department for Dr. Bala's procedures (Exhibit 43).

Exhibit 1
Page 59 of 110

**Self-promotion.** Whereas gender prescriptions encourage men to trumpet their strengths, they encourage women to exhibit more modesty. Others perceived statements by Dr. Bala about her training at the University of Pennsylvania (UPenn) as arrogant and condescending, attempts to place herself "above" others (Henrikson Deposition, pp. 209-210). Further, Dr. Henrikson considered Dr. Bala's comparisons between UPenn and OHSU as "insulting to everybody at OHSU to hear" and viewed her penchant for wearing a fleece with the UPenn logo as implying "how great Penn is and, by implication, how OHSU isn't very good" (Henrikson Deposition, p. 209).

**Anger.** Research shows that people view women, as compared to men, as more emotional and show less tolerance for perceived expressions of anger (an interpersonally assertive emotion) in women as compared to men. For example, Dr. Jill Gelow testified that she was told to "calm down" and had too much estrogen because she was perceived as "upset" (Gelow Deposition, p. 23). Others perceived Dr. Bala as inappropriately expressing anger, accusing her of "bullying" Fellows and staff and has having "really lost her temper at Manish [Dr. Mehta, a Fellow]" (Kaul Deposition, p. 68). Similarly, Dr. Kaul perceived Dr. Bala as acting inappropriately when she and Dr. Gelow disagreed about how to treat a patient (Kaul Deposition, pp. 92-93). By contrast, Dr. Gelow testified that while neither she nor Dr. Bala were probably "at our best" in the moment, the interaction was in line with disagreements between male colleagues about the best course of treatment. Dr. Gelow also testified that Dr. Bala was not being aggressive and was acting on her perceptions of the patient's best interests (Gelow Deposition, pp. 22-23).

**Claiming discrimination.** Both the Plaintiff as well as colleagues, including the Defendants, agree that Dr. Bala complained about double-standards and potential gender discrimination. Research shows that people tend to resist such claims, especially when they are

Exhibit 1
Page 60 of 110

personally accused of bias. Dr. Bala stated that she first raised complaints about discrimination in a September 2015 meeting with Dr. Kaul. They had discussed an incident in which a staff member, who was aware she was a doctor, introduced Dr. Bala as a "nurse" (Second Amended Complaint). She subsequently raised concerns about discrimination to Dr. Sharon Anderson (then the Chair of the Department of Medicine) in July 2016 (Second Amended Complaint), and to Linda Strahm in December 2015 and March of 2017 (see Exhibits 19, 153 & 154).

**Competence in a masculine domain.** Colleagues, including the Defendants, agree that Dr. Bala is highly competent as a surgeon. Dr. Kaul testified that Dr. Bala had outstanding technical skills and that "the patients that I referred to Dr. Bala,.. had very glowing reports on her. They were very happy with her" (Kaul Deposition, pp. 42-43). Dr. Bala's skills were not in question. Rather, consistent with backlash research toward women who succeed in masculine fields, complaints about her concerned her perceived demeanor as being abrasive and her personality as dislikable.

**Status violation as the common denominator.** Themes that emerge in how people reacted to Dr. Bala are consistent with the unifying theme in backlash research: punishing women for "status violations." These themes are evident in others' descriptions of Dr. Bala as "abrupt and disrespectful," "condescending," and "intimidating" (Exhibit 20). Additionally, the same theme can be detected in Mary Heitman-Allen's characterization that Dr. Bala needed to "humble herself" in response to the staff complaints about her (Exhibit 180).

**Were the reactions to Dr. Bala warranted or over-reactions?**

Case decision-makers must ultimately determine whether bias infected interpretations of Dr. Bala's assertive behaviors. For incidents in which the record involves behaviors described by witnesses there is no videotape to rewind to see what actually occurred. How can case decision-

Exhibit 1
Page 61 of 110

makers determine whether a witness's account was biased and exaggerated or accurate? Having multiple witnesses can help, but because people tend to hold similar gender stereotypes, consensus among multiple witnesses does not necessarily resolve the issue: they may agree due to shared biases.

Testimony and documents in the current case present one way for case decision-makers to help determine whether Dr. Bala elicited the kinds of over-reactions to assertive behavior that indicated discriminatory backlash. Several documents suggest over-reactions to Dr. Bala. In an email from Mary Heitman-Allen to Judi Workman, she suggests that Dr. Bala's behavior rises to a level warranting getting the Threat Assessment Team (which deals with the potential for serious workplace violence such as the mass killing at Virginia Tech) involved. Workman, who was herself highly critical of Dr. Bala (see her meeting notes in Exhibit 20), responded "Good Lord!!!!... where on Earth did you come up with this for a MD communication issue?" In her deposition, Heitman-Allen retrospectively realized that "I kind of got off course" with this suggestion … That was an error on my part to characterize it that way…. That was an overreaction on my part and… I never thought that there was physical violence on her part" (Heitman-Allen Deposition, pp. 95-96). Similarly, in another email to Judi Workman about an incident in which Dr. Bala asked a product rep to consult a more senior representative, Heitman-Allen characterized Dr. Bala as having committed "vertical violence" (Exhibit 212). As another example, although Dr. Bala was perceived as too critical toward staff and about procedures at OHSU, when asked about the validity of her concerns during his deposition, Dr. Henrikson acknowledged that "Yes… there were certainly many times where the concerns that Dr. Bala brought up were valid" (Henrikson Deposition, p. 92).

Exhibit 1
Page 62 of 110

Other incidents also suggest the possibility of stereotype-driven over-reactions. In these incidents, Dr. Bala sent emails that recipients viewed as abrasive or unprofessional. Surprised by these reactions, Dr. Bala asked Ms. Strahm (in Human Resources) to review the emails and tell her what she may have done to elicit a negative response. When Ms. Strahm did so, she found nothing wrong with Dr. Bala's emails. Specifically, Dr. Bala forwarded an email (in January 2016) that Angela Krebsbach had found upsetting and had complained about. Ms. Strahm reviewed it and responded "…this communication seems very reasonable and normal. Angela must have been feeling insecure" (Strahm Deposition, p. 176).

Similarly, when Dr. Bala forwarded an email (Exhibit 112) that Karen Paladino viewed as problematic, Ms. Strahm responded to Dr. Bala that this was "Another situation where Karen must has something else going on with you. This communication is fine" (Strahm Deposition, p. 179; Exhibit 112). The email was connected to an incident in which Ms. Paladino had prepped information about a patient and wanted to present it to Dr. Bala who was busy completing notes. Although, in an email to Dr. Henrikson, Ms. Paladino acknowledged that she knew Dr. Bala did not like to be interrupted while in the back room charting, she nevertheless did so and felt "dismissed, disregarded, and disrespected" when Dr. Bala "barely looked up and merely said 'Tell him I will call him.'" In the same email, Ms. Paladino noted that this behavior might warrant reporting Dr. Bala to her union rep as a "belligerent physician" (Exhibit 186).

Another incident that suggests over-reaction occurred when Dr. Bala failed to respond to two nurses who had greeted her because, in Dr. Bala's account, she was listening to music through ear buds and had not noticed they had greeted her. This incident became characterized as Dr. Bala "doesn't talk to them" (Strahm Deposition, p. 206) consistent with a potential stereotypical overgeneralization.

Exhibit 1
Page 63 of 110

For most incidents, Dr. Bala was faulted more for her tone, manner, or inferred motives than her actions *per se*. For example, it's perfectly fine for physicians to ask people to be quiet during a difficult part of a procedure or to offer criticism so long as the *manner* in which this is done does not cross a line into bullying or hostility. Because perceptions about tone and inferences about motives represent subjective judgments, they can readily be skewed due to bias. Case decision-makers should carefully review available documents to determine whether they believe others' perceptions of Dr. Bala's tone and motives were accurate or biased. Below I suggest three incidents to focus on because available information about them is more detailed, more fully documented, and therefore potentially more revealing.

***Incidents that bear closer examination to determine whether biased overreactions occurred***

Scientifically established principles concerning discrimination suggest ways that case decision-makers can attempt to cut through the noise to make a more informed decision about whether people over-reacted to Dr. Bala's behavior. First, focus more on what actually happened than on people's interpretations of *why* it happened. Although bias can affect witnesses descriptions of behaviors (e.g., was someone speaking "loudly" or were they "shouting"?) but bias is even more likely to skew inferences about intentions, motives, or "tone." For example, "She told everyone to be quiet" represents a factual description of a behavior, whereas "She intimidated everyone into silence" represents a subjective inference about tone and intent. Although witnesses may provide inaccurate descriptions of behavior (e.g., due to a faulty or biased memory), biases are even more likely to infect perceptions of a person's tone, intent, and motives.

A second, even more informative, strategy can be used for incidents where the behaviors in question were thoroughly investigated or incident itself is fully captured in a record case

Exhibit 1
Page 64 of 110

decision-makers can independently evaluate. Linda Strahm (HR) investigated two incidents of alleged problematic behavior by Dr. Bala. She solicited multiple accounts of what actually happened (i.e., descriptions of behavior) in separate incidents in which: (1) Certified Registered Nurse Anesthetist (CRNA) Sue Bardon felt that Dr. Bala demeaned her competence and (2) Dr. Bala repeatedly told Matt Holling, a traveling X-Ray Technician, to be quiet during a procedure. These investigations can help case decision-makers to sort out what actually happened (what actual behaviors do witnesses agree occurred?) from potentially biased interpretations about Dr. Bala's motives and intent. A third incident involves an email from Dr. Bala to a Physician Assistant that the recipient (Angela) viewed as hurtful and as "unfair & dismissive" (Exhibit 184). In this case, because the email represents the entire behavior in question, case decision-makers can directly review it, allowing them to determine independently whether they believe the tone was unprofessional, hurtful, dismissive, or unfair. In this latter incident, case decision-makers can directly view the "incident" or behavior simply by reading the email.

After examining the three incidents for which there is more direct information about what happened, should case decision-makers conclude that there was a consistent pattern of exaggeratedly negative interpretations of Dr. Bala's tone and intent, this suggests bias occurred. Below I consider each incident in more detail.

### Sue Bardon, Anesthesiology incident

In November of 2015, Dr. Bala had asked a CRNA earlier in the week to look into whether a cardiac anesthesiologist could staff a case; however, Sue Bardon (apparently not a cardiac specialist) was assigned. In an email on 11/17/2015 to Dr. Henrikson (Exhibit 55), Ms. Bardon stated that she "did not file a complaint" against Dr. Bala, but had felt that Dr. Bala's behavior was "demeaning and belittling" to her. This incident seems to have been the proximal

Exhibit 1
Page 65 of 110

cause of Dr. Kirsch (Chair of Anesthesiology) seeking to deny future staffing support for Dr. Bala, limiting her ability to conduct procedures (Strahm Deposition, p. 93). Due to the problems this created for accomplishing procedures, HR investigated the incident (while suspending Dr. Bala's access to anesthesiologists until the investigation was complete). In her email describing the incident, Bardon stated:

> "In my twenty two years of delivering anesthesia I have encountered at least two surgeons that were clearly more difficult to work with than her. Do you know Dr. _____? When I did my cardiac training at The Cleveland Clinic, I worked with him many times. He is an extremely skilled surgeon, but he has zero tolerance for incompetence. I felt if he was angered, it was not out of malice, he merely expected us all to perform at our highest level. I felt that was fair so I enjoyed working with him. The reason why I felt so uncomfortable with Dr. Bala, is that I felt her behavior to be demeaning and belittling as I don't feel at any point that I was acting in an incompetent manner" (Exhibit 55)

Nurse Bardon's email does not describe actual behaviors. Instead, she focuses on subjective interpretations about tone (demeaning, belittling) and intent (suggesting that Dr. Bala acted out of "malice"). These subjective inferences are consistent with backlash: she attributes noble motives to a demanding male surgeon, malice to a demanding female surgeon, especially given Nurse Bardon's description of the male surgeon she admired at The Cleveland Clinic as "clearly more difficult to work with" than Dr. Bala.

Notes from the subsequent investigation can further aid case decision-makers in deciding whether Nurse Bardon's inferences and others' reactions to the incident were warranted or biased and exaggerated. Linda Strahm testified that Dr. Henrikson conveyed that Dr. Bala had directly told Nurse Bardon "You're not competent" (Strahm Deposition, p. 93, see also Exhibit

Exhibit 1
Page 66 of 110

87). However, Dr. Henrikson was not present in the procedure room and, like a game of telephone, this second-hand report may have been inaccurate due to biased interpretation. When Ms. Strahm spoke directly to Sue Bardon, the notes tell a different story: that Nurse Bardon was "made to feel incompetent" because "Dr. Bala questioned Sue on everything. Drugs, blood pressure, light, lots of questioning. And it wasn't usual for Sue. And … Sue felt Dr. Bala was not pleased with her work" (Strahm Deposition, p. 97). When asked whether Sue Bardon claimed that Dr. Bala actually told her she was not competent, Ms. Strahm referred to her notes and testified "**…** it doesn't appear"; rather, Ms. Strahm testified that it was Dr. Bala's questions that led Nurse Bardon to conclude that Dr. Bala was demeaning her competence (Strahm Deposition, pp. 98-99). When asked, Ms. Strahm admitted that there is a difference between a doctor asking detailed questions versus telling someone they are incompetent. Ms. Strahm stated that Nurse Bardon *perceived* the questions as so intrusive and hostile that she "wanted to stay out of Dr. Bala's way" and subsequently went to "cower in a corner" (Strahm Deposition, p. 99); the latter claim was not supported by others present (Strahm Deposition, p. 106).

Finally, Nurse Bardon noted that an alarm went off during the procedure and Dr. Bala asked "What is the alarm anyway?" Nurse Bardon claimed she replied "I can't turn off right now. My hands are busy" to which Dr. Bala responded "Well, I need to know." Nurse Bardon perceived this comment as being said "very abrasively" (Strahm Deposition, p. 100). Although Nurse Bardon was upset, she did not file a formal complaint, but "…she complained to her -- one of her attendings. And that's how it came to Dr. Kirsch's attention" (Strahm Deposition, pp. 100-101). Dr. Kirsch subsequently sent an email accusing Dr. Bala of "bullying and harassing" anesthesiology staff and sought to deny future anesthesiology support for Dr. Bala.

Exhibit 1
Page 67 of 110

Ms. Strahm interviewed two other witnesses, Dr. Shangraw (the anesthesia attending, who was only in the room for part of the time) and Nurse Olga Aareskgold. Ms. Strahm's notes indicate that neither Dr. Shangraw nor Nurse Aareskgold saw Dr. Bala do anything unprofessional (Strahm deposition, p. 110). Specifically, Ms. Strahm's notes indicate that Nurse Aareskgold "doesn't remember anything unusual or inappropriate" during the procedure (Exhibit 90).

Case decision-makers will need to sort out their own views about exactly what happened, but the details revealed by the investigation provide potentially important clues suggesting biased perceptions. Focusing on claims about actual behavior rather than inferences about tone and intent, Nurse Bardon claimed that Dr. Bala had asked her more questions than she was used to receiving and that Dr. Bala insisted she needed to know why an alarm was going off during the procedure. In her interview with Ms. Strahm, Nurse Bardon did *not* claim that Dr. Bala directly said she was incompetent.

Beyond these claims about actual behavior, Nurse Bardon's account involves her *interpretations* of Dr. Bala's tone and intent, which represent subjective inferences that could be influenced by biases. Nurse Bardon *interpreted* Dr. Bala's questioning as suggesting she was incompetent. She *interpreted* Dr. Bala's insistence that she investigate the alarm as abrasive. And in her email to Dr. Henrikson, Nurse Bardon *interpreted* Dr. Bala's intentions as due to "malice" rather than concern for providing the best possible care. Case decision-makers will ultimately need to decide whether these interpretations were biased or accurate. However, Nurse Aareskgold, who was present throughout did not see anything "unusual or inappropriate" in Dr. Bala's behavior, nor did Dr. Shangraw (though he was not constantly present).

Exhibit 1
Page 68 of 110

The notes and testimony on this incident reveal something else as well. When Dr. Henrikson gave Linda Strahm his account of the incident (based on communication with Nurse Bardon), Ms. Strahm's notes state that he described Dr. Bala as flat out telling Sue Bardon she was incompetent (Strahm Deposition, p. 93, Exhibit 87). This suggests that Dr. Henrikson's perception and recollection of what Nurse Bardon told him may have been distorted by negative views about Dr. Bala. Nurse Bardon claimed she was made to *feel* incompetent by Dr. Bala's questions, whereas (if case decision-makers find Ms. Strahm's notes credible) Dr. Henrikson claimed that Dr. Bala directly called her incompetent. Such distortions are to be expected when information is relayed from one person to the next (as anyone who has played the game "telephone" knows). This distortion, however, occurred in a manner consistent with stereotypes about assertive women as abrasive.

Such potential distortions have particular importance in the current case because Dr. Henrikson was Dr. Bala's direct supervisor and a conduit for complaints about Dr. Bala. For example, Mary Heitman-Allen (lab manager) testified that she "… was taken out of the conversation [about concerns with and improvement in Dr. Bala's behavior] at a certain point … I was told to just report things directly to Dr. Henrikson" (Heitman-Allen Deposition, p. 83). Dr. Henrikson was directly involved in conveying that there were continuing concerns about Dr. Bala and in the decision to offer a non-renewable contract. Therefore, any tendency he may have had to distort information in a stereotype-consistent manner could have affected personnel decisions about Dr. Bala.

### Matt Holling Incident

Linda Strahm also investigated another incident, which took place in August 2016. In this incident, Dr. Bala repeatedly told Matt Holling, an X-Ray Technician, to keep quiet during a

Exhibit 1
Page 69 of 110

procedure, which Mr. Holling viewed as abrasive and unprofessional. In an email on 8/24/2016, Dr. Henrikson conveyed his summary of others' accounts of the incident to Linda Strahm. Dr. Henrikson noted that Mr. Holling had stated "I have never been spoken to in that way in the procedure room" and that Dr. Tuan Mai (a Fellow who was present) had told him "That's just the way she is." Dr. Henrikson indicated that he had also spoken to Tom Clark, but did not indicate specifically what Mr. Clark said. Summing up the incident, Dr. Henrikson asserted that Dr. Bala had been "…very short with the room" with "…the effect of scaring everyone into silence." Dr. Henrikson concluded by saying that he was "… strongly opposed to an extension [for Dr. Bala's contract] past June, given recent behavior breakdown of communication" (Exhibit 138).

Ms. Strahm emailed back asking specifically whether others in the room (Tom Clark, Tuan Mai) had actually been "scared into silence" (which would represent a safety problem) or whether "... they just [understood]that during the difficult ablation procedure it's best to have silence and Rupa's directive for silence was appropriate?" Ms. Strahm also noted that she had heard that Dr. Mehta and Julie Kelly were also present and suggested they should be interviewed as well. She ended her email asking "Was Rupa overly abrasive in asking Matt to be quiet?" or "Was it appropriate to have silence for that part of the case?" (Exhibit 138). This question neatly sums up the key question for determining whether discrimination affected perceptions of Dr. Bala's behavior. Ms. Strahm subsequently interviewed everyone listed above who had been present in the room, including Dr. Bala but not Mr. Holling (as he was a "traveler"), providing information that can help case decision-makers to answer this question.

According to Ms. Strahm's investigation notes, Dr. Bala stated that she had said "When I start mapping with cryo, I'm going to ask you to stop talking" and that Mr. Holling responded by saying "But I'm learning" to which she responded "I'm happy to teach you everything about the

Exhibit 1
Page 70 of 110

case but at this point I have to focus on the case and patient care is more important. I don't want to give her heart block" (Exhibit 139). An interview with Tuan Mai gave a broadly similar account with some different wording. According to Ms. Strahm's notes, he stated "Matt was talking to another tech teaching her about the position. Dr. Bala told him to quiet down" and Mr. Holling responded "This is a teaching institution & how do we learn?" Dr. Mai stated that Dr. Bala then said "There's a lot on the line and I need someone to be quiet" (Exhibit 141).

The notes indicate that Dr. Mai went on to explain that Dr. Bala typically "wants it quieter" during "long procedures" and that "her personality is what it is… [He] is used to it. A new person might see it as abrasive." Dr. Mai's views about Dr. Bala were mixed. He stated that Dr. Bala "is a very good doc. She cares a lot" but she is also "a bit overbearing, intense, things need to be perfect. That's how she takes care of patients" but, as a result, "cases are more tense" with her. When directly asked whether people might be inhibited about speaking up, Dr. Mai stated that Dr. Bala's intensity "may" cross the line into inhibiting people from speaking up when needed, but he concluded that "if it is useful for her, then ok to speak up" (Exhibit 141). Note that Dr. Mai did not directly state that Dr. Bala had behaved unprofessionally during this incident.

Others were less mixed in their reactions, suggesting that Dr. Bala had behaved professionally and appropriately and that Mr. Holling had not. In his interview with Linda Strahm, Dr. Mehta (a Fellow) stated that there was "Nothing out of the ordinary. Appropriate to ask for silence during a difficult case. Nothing out of the ordinary. Tone, request was professionalism (sic) & fine" (Exhibit 140). Julie Kelly, who assisted on the case, stated in her interview that Dr. Bala "… asked them to stop talking two times. They had kept talking" and that "Dr. Bala tried to explain" but the "tech interrupted her and didn't let her finish her sentence."

Exhibit 1
Page 71 of 110

She stated that Dr. Bala's tone was "not loud, not rude, but straightforward" and the notes conclude "Not out of line, not attacking, not accusing. The tech kept interrupting her and didn't let her explain." The notes also indicate that Ms. Kelly had informed Dr. Henrikson that Dr. Bala had behaved appropriately: "Julie told Chuck she wasn't out of line" (Exhibit 142).

Finally, Ms. Strahm interviewed Tom Clark, another EP staff member. Mr. Clark stated that it was "not unusual for attending to ask for silence. Necessary for concentrating as people are chatting. It's usual for doc to ask people to stop talking." Like Julie Kelly, he also suggested that Mr. Holling, not Dr. Bala, had behaved inappropriately, stating "Matt X-ray tech left the room & sat outside. Very inappropriate, very wrong. Very appropriate for Rupa to tell people to be quiet" (Exhibit 140).

In sum, three of four witnesses (Dr. Mai, Dr. Mehta, Ms. Kelly, Mr. Clark) to the interaction between Dr. Bala and Mr. Holling unambiguously stated that Dr. Bala had behaved professionally. Further, two (Julie Kelly and Tom Clark) suggested that Mr. Holling, not Dr. Bala, had behaved inappropriately and unprofessionally, by ignoring Dr. Bala's request for quiet during a difficult part of the procedure, interrupting her, and then leaving the room. Ms. Strahm concluded that there was no evidence Dr. Bala had been unprofessional.

Similar to the prior incident with Sue Bardon, Matt Holling accused Dr. Bala of being rude and abrasive, but interviews with witnesses led Linda Strahm to conclude that these charges were unsubstantiated. Similar to the Sue Bardon incident, communications from Dr. Henrikson to Linda Strahm seemed to paint a more damning picture than the witness interviews. In his email, Dr. Henrikson noted he had talked to Tom Clark, who told Ms. Strahm that Mr. Holling, *not* Dr. Bala had behaved unprofessionally. Yet in Dr. Henrikson's email about the incident to Ms. Strahm (Exhibit 138), he neglected to report what Mr. Clark said, instead quoting Dr. Mai's

Exhibit 1
Page 72 of 110

more ambiguous statement about Dr. Bala's personality. Linda Strahm's interview notes confirm that "Chuck talked w/Tom. Tom said the same thing" (Exhibit 140). Further, Strahm's interview notes for Julie Kelly indicated that she also viewed Dr. Bala's behavior as professional and Mr. Holling as out of line and, according to Ms. Strahm's deposition, Ms. Kelly had said the same to Dr. Henrikson.

Yet Dr. Henrikson summarized the incident by saying that "the story that these people tell was is very consistent with what I related to you: that Rupa was very short with the room (and with Matt in particular), and had the effect of scaring everyone in the room into silence" (Exhibit 138). Thus Dr. Henrikson claimed a consensus that later interviews contradicted; (b) only quoted comments that sounded negative and (despite listing Tom Clark as a person he had spoken to) failed to quote Mr. Clark, who unequivocally supported Dr. Bala and criticized Matt Holling. Dr. Henrikson ends by saying "I am strongly opposed to an extension [for Dr. Bala's contract] past June given recent behavior…" (Exhibit 138). In sum, Dr. Henrikson provided a much more negative spin on Dr. Bala's behavior, failed to report one or more accounts that supported Dr. Bala, and used this incident as an opportunity to seek to limit Dr. Bala's contract renewal  (Exhibit 138).

### Email to Angela Krebsbach

A final incident allows case decision-makers a chance to directly view or recapture the "behavior" in question because the incident only involves an email exchange (and not in-person interaction). Therefore, case decision-makers can directly view the entirety of what Dr. Bala actually said and independently evaluate the email's tone. In January of 2016, Angela Krebsbach, a Physician Assistant (PA) failed to inform Dr. Bala that one of her patients had been admitted for vascular surgery. When Dr. Bala became aware that her patient had gone into

Exhibit 1
Page 73 of 110

surgery, she emailed Ms. Krebsbach a reminder to be sure to inform her when something like this occurs. The email is preserved in Exhibit 185. It reads:

> Hi Angela, I am following up on _____ and I see now that he is being admitted to
> Vascular Surgery. It is really important to give me f.u. [full updates] on these things since
> he is on my service and my patient. Perhaps, the weekend sign out: should include all 4
> attendings so that these important facts are passed on. This is why I emailed you about
> him last night after a long case. Thanks, Rupa

Dr. Henrikson testified that Ms. Krebsbach's failure to page Dr. Bala when her patient experienced complications and had to be scheduled for surgery "was a mistake on her part" (Henrikson Deposition, p. 194) and Exhibit 185 shows that Ms. Krebsbach admitted she had made a mistake.

Nevertheless, Dr. Henrikson testified that Dr. Bala's initial email "was upsetting" to Ms. Krebsbach, who "felt very hurt by the tone of the e-mail" (Henrikson Deposition, p. 194). When asked what was upsetting about the email he testified that "the things that may have upset her is saying 'It's really important to give me follow-up on these things since he is on my service and my patient.' That is obvious to Angela and I would imagine she took that as somewhat insulting" (Henrikson Deposition, p. 194). However, when Dr. Bala asked Ms. Strahm to review this email, she responded "…this communication seems very reasonable and normal. Angela must have been feeling insecure" (Strahm Deposition, p. 176).

Ms. Krebsbach responded to Dr. Bala over email with an explanation and apology: "Preston had a event at school that I promised I would not be late for… I was up early this morning as I had to go get a CT of my head. I know these are not excuses. I should have sent an e-mail or text. I apologize and won't let this happen again" (Exhibit 185). Dr. Bala emailed back

Exhibit 1
Page 74 of 110

"Hi Angela, I understand you're being pulled in too many directions and it's too much for one person to do. Hope you are okay and CT is okay...." When asked whether this second email was supportive, Dr. Henrikson testified "Yeah, I think that Angela was upset by her mistake and it upset her, and so -- but I will say that it's not quite clear to me exactly what she was upset about" (Henrikson Deposition, p. 196).

Case decision-makers can judge the appropriateness and tone of Dr. Bala's emails for themselves and judge whether Ms. Krebsbach's upset reaction and complaint were warranted. If they view Dr. Bala's emails as entirely appropriate, then Ms. Krebsbach's upset over being asked to provide updates in the future suggests an exaggerated reaction to a comment that could be construed as criticism or correction, consistent with research showing backlash toward women individuals view as criticizing them.

I focused on the three incidents reviewed above because two of the incidents led to investigations that provided first-hand witness accounts and the third incident was entirely encapsulated by an email exchange. Therefore, these incidents (in comparison to others which were not investigated) provide an opportunity for case decision-makers to analyze what *actually* took place and to independently judge whether Dr. Bala's behavior was professional or problematic, whether others' negative reactions were biased or justified.

**OPINION: Case decision-makers should consider whether coworkers tended to perceive assertive behaviors by Dr. Bala (compared to male colleagues) as more abrasive or offensive. Such tendencies would be consistent with research on backlash against assertive women.**

Exhibit 1
Page 75 of 110

## 2.  DID DISRESPECT TOWARD DR. BALA CAUSE CONFLICT?

Research suggests that female leaders receive less respect than male leaders, creating resistance to female leaders. As noted earlier in this report, hierarchies rely on cooperation. When people perceive authorities as legitimate, they comply readily with directives and suggestions. By contrast, when subordinates disrespect or delegitimize an authority, they resist directives and suggestions. To gain compliance, the authority (like a substitute teacher with whose authority students have rejected) must resort to more blunt and insistent commands to gain compliance. Swift compliance is particularly necessary in an operating room when a surgeon is attempting to complete a difficult procedure. Biased disrespect in such cases represents a significant safety issue.

Multiple witness accounts of the Matt Holling incident suggest such a dynamic. As described above, Dr. Bala and two other witnesses (Ms. Kelly, Mr. Clark) stated that Mr. Holling did not readily comply with Dr. Bala's directive to be quiet while she began a tricky part of a procedure. Ms. Kelly suggested that Mr. Holling would not even let Dr. Bala finish her sentence. Case decision-makers should consider whether they believe it is likely that an X-Ray Technician would question a male surgeon's directive and interrupt him while doing so. Such disrespect for the person in charge is consistent with research on rejection of and backlash toward female authorities. Consider what happened next: Dr. Bala was forced to repeat her command and insist at least two or three times to gain Mr. Holling's compliance, which Mr. Holling viewed as offensive. Imagine instead that Mr. Holling had let Dr. Bala finish her explanation about the need for silence during part of the procedure and had respected this request. She would not have had to insist.

Exhibit 1
Page 76 of 110

Case decision-makers should imagine being a surgeon in this situation. That is, imagine being in charge of a long, technically difficult surgical heart procedure while commanding a team. As you begin a particularly difficult operation that requires complete concentration, you ask for silence in the room. A subordinate not only questions your directive but won't let you finish your explanation about why you need to have quiet. Your concentration is now disrupted and you have to devote attention to controlling an insubordinate staff member. Would you be able to maintain your composure? Would you perhaps become curt, blunt, pull rank, raise your voice, or tell the insubordinate staff member to leave the room? According to witnesses, Dr. Bala did not lose her composure, yet she was nevertheless investigated and Dr. Henrikson used this incident to reinforce his call for a non-renewable contract. By contrast, OHSU administrators never considered investigating or criticizing Mr. Holling's conduct as potentially insubordinate. This incident  is consistent with a discriminatory double-standard: the female surgeon was investigated as potentially being unprofessional for asking for quiet, whereas the male technician who interrupted and resisted her directive was not.

Other examples suggest incidents in which Dr. Bala's authority and status were, consistent with sex discrimination, disrespected. These include an incident in which, at the start of a case, a male nurse (Clay Allen) "brought over the anesthesia attending and said, this -- this is Dr. Bala… but she likes to go by nurse," diminishing her status (Bala Deposition, p. 61). When she described this incident to Dr. Kaul as an example of discriminatory and disrespectful treatment by a staff member, he allegedly advised that Dr. Bala "… should buy them [staff members] donuts and maybe you can improve upon your relationship" (Bala Deposition, p. 61) – in other words, do something stereotypically feminine and nurturing (provide food). Should case decision-makers find the "she likes to go by nurse" allegation credible, it is consistent with sex

Exhibit 1
Page 77 of 110

discrimination by a staff member (undermining a woman's authority). Case decision-makers should consider whether a nurse (male or female) would be likely to make such a comment when introducing a male surgeon to another physician.

Another incident, in which other people with less official status than Dr. Bala allegedly told her she needed to get up and leave a room is also consistent with lower respect toward female (than male) authorities. Dr. Bala testified that she had regularly sat at specific station in a computer room for months. While she was sitting at her accustomed computer, "Erin Ehly, who was the nurse who worked for Dr. Heitner, told me that I wasn't supposed to be in that room and I shouldn't be there and I should be in the other room." When Dr. Bala questioned why she could not be there, the nurse allegedly said "… you're not allowed in here" (Bala Deposition, p. 131). If case decision-makers find this account credible, they should consider whether they believe a nurse would be likely to tell a male surgeon he is "not allowed" to sit in a shared computer room.

As in the Matt Holling incident, the computer room incident became a complaint against Dr. Bala because she questioned why she was "not allowed" to be in the room and asserted her status and authority. In Dr. Bala's account she responded to the attempt to get her to leave the room by questioning "why" and saying "… well, I feel like I'm here. I'm seeing patients in clinic. I'm being efficient. I'm making money for OHSU. I should be allowed to sit here to do my work" (Bala Deposition, p. 131). Like the Matt Holling incident, one possible interpretation is that a staff member's disrespect led Dr. Bala to assert her status, leading to backlash and a complaint about her as being abrasive or rude. In turn, this incident was also used by Dr. Henrikson to push for a limited renewal for Dr. Bala (see Exhibit 121, Strahm Deposition, p. 195).

Exhibit 1
Page 78 of 110

*OPINION: Case decision-makers should consider whether staff members: (a) showed less respect for and compliance to Dr. Bala than typically accorded to male physicians, and, if so, whether this led to (b) a greater need for Dr. Bala to assert her status and authority to accomplish her role and, in turn, (c) intensified backlash against her. Such findings would be consistent with research on stereotype-motivated biases and discrimination.*

### 3.   DID OHSU ADMINISTRATORS MINIMIZE DISCRIMINATION CLAIMS?

Research shows that people experience discriminatory incidents at a much higher rate than they report those incidents to supervisors or make formal complaints within organizations. For example, recall that OHSU's own climate survey showed that whereas 23.5 % of employees reported they had observed and 13.9% reported they had experienced harassment at OHSU, only 5% had reported incidents. Reasons for employees' reluctance to report discrimination include concern that (a) others will view them negatively (as "whiners" and/or blame them for what happened), (b) fear of retaliation, and (c) belief that the organization will not take complaints seriously and/or fail to take effective action. According to research, all of these concerns are realistic: People tend to view those who claim discrimination as "whiners" even when circumstantial evidence makes discrimination likely, complainants often suffer both informal and formal retaliation, and organizations tend to minimize discrimination rather than take effective action. As a result, people can quickly become discouraged and cynical about the value of reporting discrimination internally. Unsupportive organizational responses can quickly shut down an individual's willingness and motivation to pursue a complaint further. For these reasons, organizations need to be proactive in taking complaints seriously and assuming the burden to investigate promptly and take effective action based on an investigation's findings.

Exhibit 1
Page 79 of 110

OHSU's official policy recognizes the need to take discrimination complaints seriously and to initiate an investigation, stating that "Any person who receives a report of discrimination shall promptly notify the AAEO Department or Human Resources of the complaint" (Exhibit 76). The policy specifies that this responsibility includes all academic and administrative officials (e.g., supervisors, department heads, deans, administrators). Finally, the policy notes that the AAEO and Human Resources departments bear "primary responsibility for investigating and resolving complaints lodged by employees" (Exhibit 76, Part 7).

Dr. Bala alleges that she repeatedly raised concerns about discrimination to a number of individuals, including Dr. Kaul, Ms. Strahm, Dr. Anderson, and Dr. Kilo (Bala Complaint). Yet Human Resources did not initiate an investigation into possible discrimination and administrators did not forward Dr. Bala's concerns to OHSU's AAEO Department. Therefore, case decision-makers should consider whether OHSU administrators failed to live up to the organization's policy about investigating discrimination claims and whether a pattern of "organizational minimization" toward discrimination complaints reasonably led Dr. Bala to feel that further pursuing a formal internal complaint would not be worth the time, effort, and stress.

Recall that when Dr. Bala first approached Dr. Kaul (Chief of Cardiology) with concerns about disrespectful treatment from a male nurse (who introduced her as liking to be called "nurse"), Dr. Kaul allegedly suggested she bring donuts in for staffers rather than initiating an investigation or pursuing corrective actions toward the staff member (Bala Deposition, p. 61). If deemed credible, this allegation is consistent with Dr. Kaul's incredulity that nursing staff would discriminate against a female physician (Kaul Deposition, p. 187), and with his admission to making a sexist comment about preferring the days when women were not also physicians (Kaul Deposition, pp. 92-93). Imagine you had experienced disrespectful discrimination at work, and,

Exhibit 1
Page 80 of 110

despite misgivings that reporting would be a positive experience, you decided you should do so, only to be told that the answer was to bring donuts to the person who disrespected you. Consider how this might affect your motivation to report future incidents.

Dr. Bala subsequently reported her concerns about discrimination to other administrators at OHSU. Despite repeated discussions with Ms. Strahm in Human Resources in which Dr. Bala expressed discrimination concerns, as well as two investigations into complaints about Dr. Bala in which Ms. Strahm found no unprofessional behavior by Dr. Bala, Ms. Strahm never initiated an investigation into potential sex discrimination toward Dr. Bala. Importantly, the second investigation that Ms. Strahm conducted – the Matt Holling incident reviewed in detail above – provided evidence, confirmed by several witnesses, of disrespectful, potentially sexist behavior from a staff member toward Dr. Bala. Recall too that Dr. Bala had asked Ms. Strahm to review emails to which others had reacted negatively, which Ms. Strahm had indicated were fine in tone. Yet despite this evidence that Dr. Bala might be being treated unfairly and despite the organization's policy that employee discrimination complaints should be investigated, Ms. Strahm never initiated a Human Resources investigation into potential discrimination nor did she ask the AAEO Department to do so.

Rather, although Ms. Strahm repeatedly found no direct evidence that Dr. Bala had behaved unprofessionally, she responded to Dr. Bala's complaints by shifting the burden to Dr. Bala to push for an investigation. Although organizational policy places the burden on administrators, especially in Human Resources (which the policy specified as an office that could investigate) to pursue discrimination claims, Ms. Strahm testified that she merely referred Dr. Bala to the AAEO Department "if she truly thought it was a gender issue" (Strahm Deposition, p. 249), shifting the burden to Dr. Bala. Further, when Kristina Porreco emailed Ms. Strahm

Exhibit 1
Page 81 of 110

suggesting that the HR Department had an "obligation to 'investigate'" Dr. Bala's discrimination

claims, Ms. Strahm simply replied "Call me please" (Exhibit 153).

Ms. Strahm did not only shift the burden to Dr. Bala to request an investigation. Her

testimony states that Ms. Strahm expressed her opinion that Dr. Bala was not suffering

discrimination. Specifically, referring to notes of one of their meetings in which Dr. Bala stated

that she felt she was being discriminated against due to her gender, Ms. Strahm testified:

> "I'm talking to Rupa and … she's bringing that [gender discrimination] up. She brought it
>
> up more than once. And I told her more than once, if you truly believe this is about a
>
> gender issue, this is what you do [go to the AAEO Department]. *I'm not seeing it that*
>
> *way* and I didn't see it that way….*I believe that she was being treated the way she was*
>
> *being treated based on the complaints that came in about her*" (Strahm Deposition, p.
>
> 249; emphases added).

In other words, rather than remaining open to the possibility that Dr. Bala was being

discriminated against, Ms. Strahm testified she specifically told Dr. Bala that she did not believe

gender was involved. Case decision-makers should consider the likely effect of the main Human

Resources officer stating to someone that, in her view, the problems you are experiencing are not

due to discrimination… but if you really believe that then you need to go to another office to

make a complaint. OHSU's policy (quoted above) indicates that *either* the HR or the AAEO

Department can initiate discrimination investigations and should do so in response to employee

complaints. Case decision-makers should consider whether Ms. Strahm's response violated both

the spirit and letter of OHSU's own policies. The policy does not provide discretion for a

mandated reporter to conclude, prior to an investigation, that the employee's discrimination

claim is false and that any ill treatment is her own fault.

Exhibit 1
Page 82 of 110

Ms. Strahm's response fits with research on "organizational minimization" of discrimination complaints in which administrators tend to downplay the possibility of discrimination. Further Ms. Strahm's testimony suggests potential victim-blaming: assuming that Dr. Bala must have done something wrong to warrant others' negative reactions even though Ms.Strahm's investigations found no evidence of unprofessionalism. For example, in the two cases in which Dr. Bala asked Ms. Strahm to review the tone of emails that recipients had perceived as offensive or abrasive, despite her conclusion that the emails were "fine," Ms. Strahm nevertheless implied that she believed Dr. Bala must have done something that warranted a negative reaction. Regarding the email to Angela Krebsbach, Ms. Strahm testified "I don't have the back story. I don't know how she said it. I don't know any of those details. Dr. Bala is asking me for input. And I said this is -- or she's showing it to me, and I'm saying, yeah, it looks like it's fine" (Strahm Deposition, p. 176). When queried further, about the message she was sending to Dr. Bala, Ms. Strahm stated that she meant "There must be a back story. There is something else to the context of this that is causing the [Angela's] concern … Maybe she's still smarting *because of some other terrible interaction* that you've had together" ( Strahm Deposition, p. 178, emphasis added).

Similarly Dr. Bala asked Ms. Strahm to review the email exchange that Karen Paladino complained about. Ms. Strahm again concluded that the email was "fine" but that Dr. Bala must have done something wrong to elicit the negative reaction. Specifically, Ms. Strahm told Dr. Bala "Another situation where Karen must has something else going on with you. This communication is fine" (Exhibit 112). When asked what she meant by that, Ms. Strahm testified "Same reason as I just mentioned [regarding the Angela Krebsbach email]. That on the surface, this communication looks fine. There is something else going on that I don't know about. *And*

Exhibit 1
Page 83 of 110

*obviously it has to do with you. You may have offended her in the past*" (Strahm Deposition, p. 179, emphasis added). Thus, even when Ms. Strahm found no evidence for any unprofessional tone by Dr. Bala, she assumed that Dr. Bala must have done something wrong. Ms. Strahm also blamed Dr. Bala for not reporting her complaint to the AAEO Department and took this not as a sign of discouragement due to unsupportive responses from administrators she had already complained to (see Exhibit 154). Rather, Ms. Strahm inferred that Dr. Bala did not really believe that she was being discriminated against, testifying "...why she didn't go to AAEO? All I could surmise is she didn't truly believe it was gender based. She thought it was unfair. She thought it was not right, but I don't think she thought it was gender based" (Strahm Deposition, p. 251).

In repeated interactions with various administrators, Dr. Bala generally experienced either criticisms about her demeanor or, at best, tepid support that never led to an investigation of possible discrimination. Even Ms. Strahm, who would seem to have been obligated to investigate an employee's discrimination complaint (or at least to herself inform the AAEO Department about it) failed to do so. Rather, despite repeatedly finding no evidence that Dr. Bala had done anything unprofessional, and uncovering evidence from interviews that Matt Holling, a male subordinate, had disrespected and interrupted Dr. Bala during a critical procedure, Ms. Strahm (according to her own testimony) simply did not believe discrimination was occurring and directly communicated this belief to Dr. Bala. Ms. Strahm instead suggested that even when Dr. Bala's emails seemed "fine," she must have done something wrong to elicit negative reactions. Given her experiences with OHSU administrators, case decision-makers should consider whether it's understandable why Dr. Bala felt discouraged from going to yet another office (AAEO) to pursue her complaints internally. Imagine you had been harassed on the street and went to a police station to report the harassment and ask for an investigation only to have the desk officer

Exhibit 1
Page 84 of 110

suggest "you must have done something to those people who harassed you… and I don't think it's really harassment… but if you insist on an investigation, you need to report this to another precinct." Even if Ms. Strahm personally doubted discrimination had occurred, OHSU policy suggests she bore the obligation to initiate an investigation and not dismiss the possibility.

**OPINION: Case decision-makers should consider whether OHSU administrators: (a) minimized or discounted the possibility that Dr. Bala was experiencing discrimination leading to failure to investigate her complaints and/or (b) blamed Dr. Bala for conflicts created by others who rejected her leadership. Such findings would be consistent with research on stereotype-motivated biases and discrimination.**

## 4.    DID OHSU ADMINISTRATORS INSUFFICIENTLY WEIGH IMPROVEMENT AND COUNT UNSUBSTANTIATED COMPLAINTS AGAINST DR. BALA?

As noted in the scientific section of this report, stereotypes can lead to biased interpretations of behavior. For example, when people have already stereotyped an individual as aggressive and antagonistic, they are prone to interpret ambiguous behavior in a negative light (e.g., as intentionally hostile). In other words, stereotypes set up a suspicious mindset and, rather than being given the benefit of any doubts, people tend to "read" a stereotyped individual's behaviors in a more negative way. The result: stereotypes can "stick" because confirmation biases make it hard for targets to break free from the box others have placed them in.

Ms. Strahm's interview with Tom Clark (about the Matt Holling incident) documents his belief that Dr. Bala had experienced this kind of a biased dynamic. Specifically, Mr. Clark suggested that Dr. Bala had experienced "Some on-boarding difficulties" and, as a result, "Small

Exhibit 1
Page 85 of 110

community. Word gets out. People come in with that filter/bias. Difficult to drop this image."

The interview notes indicate that Mr. Clark went on to say "Within the EP team, over the last

year or 2 everyone likes her a lot. Strong personality and intense, people have come to like her a

lot" (Exhibit 140). In other words, those Dr. Bala worked closely with had come to appreciate

her, but, as Dr. Tuan Mai put it in his interview about the Holling incident "A new person might

see it [her personality] as abrasive" (Exhibit 141). Ms. Strahm's notes also indicate that Mr.

Clark believed Dr. Bala was being unfairly singled out: "Tom feels that there are things other

attendings do that are not addressed. There is some cherry picking. Other attendings have been

known to shout or swear & nothing seems to occur. Standards and expectations are not uniform"

(Exhibit 140). These observations are consistent with discrimination toward Dr. Bala.

      Ms. Strahm also echoed the idea that people's initial negative impressions of Dr Bala had

biased their later perceptions. In her email to a potential coach for Dr. Bala, Ms. Strahm wrote:

"… initially she [Dr. Bala] was considered abrasive … She started out so strong, and her work

colleagues painted her as abrasive… and when she tried to change, they are having a hard time

seeing her differently" (Strahm Deposition, p. 222).  In her deposition, Ms. Strahm elaborated:

"… she started out on the wrong foot. And even if she is trying, people still see her as being

abrasive… " (Strahm Deposition, p. 222). Nevertheless, as noted above, Ms. Strahm did not

credit the idea that Dr. Bala was potentially being discriminated against and later in her

deposition seemed to place blame Dr. Bala for continued negative perceptions, not the people

unwilling to credit improvement. When the questioner summarized by suggesting that Ms.

Strahm had told a potential coach that Dr. Bala "…had a rocky start and people had trouble

adjusting with her attempts to try to improve," Ms. Strahm disagreed, stating: " I didn't say that.

She burned some bridges in the beginning" (Strahm Deposition, p. 247).

Exhibit 1
Page 86 of 110

Case decision-makers should consider whether OHSU administrators who decided to offer a non-renewable contract to Dr. Bala (Ms. Strahm, Dr. Henrikson, Dr. Kaul, and Dr. Cigarroa) fell into the dynamic described by Mr. Clark. Specifically, did prior, stereotypical inferences about Dr. Bala lead OHSU administrators to blame Dr. Bala for complaints that did not hold up to scrutiny, exaggerate Dr. Bala's behavior, and/or insufficiently weigh improvement in her relations with staff and Fellows (e.g., Kaul Deposition, p. 68, p. 147), influencing their decision to specify a non-renewable contract? Case documents suggest that multiple OHSU administrators resisted evidence that was more favorable toward Dr. Bala as well as resisted crediting the possibility of discrimination toward her.

For example, case decision-makers should consider how OHSU administrators treated Dr. Bala *after* Linda Strahm completed her investigation into the Sue Bardon incident. OHSU administrators had suspended anesthesiology support for Dr. Bala, severely restricting her ability to perform procedures, pending an investigation into whether Dr. Bala had behaved unprofessionally toward CRNA Sue Bardon. Suspending support until an investigation was completed may be prudent, but why uniquely impose stigmatizing special restrictions and procedures on Dr. Bala once she was cleared by the investigation? Specifically, OHSU administrators required that only for Dr. Bala (and not other physicians), staff be altered via emails before procedures that "to improve communication and optimize interpersonal interactions" they: (a) must attend a "pre-procedure huddle," (b) should "…page Dr. Chuck Henrikson (EP division chief) to provide him with feedback about how the case went from an interpersonal interaction/communication," and (c) should "… during the case, page Dr. Henrikson (or have him paged) and/or Dr. Peter Schulman if you have a concern" (Exhibit 63).

Exhibit 1
Page 87 of 110

Imagine receiving such an email when scheduled to work with a specific individual but not with other individuals who serve a similar role. What would you assume? As Dr. Bala noted in her December 13, 2015 email to Linda Strahm, singling her out with an emailed warning to staff about potential problems with "interpersonal interaction" and "communication" after an investigation revealed no unprofessional behavior on Dr. Bala'a part, was "unfair" and "… creates an environment of heightened alert" (Exhibit 65). The final suggestion about paging Dr. Henrikson or Dr. Shulman during a procedure should any staff member "have a concern" seems to communicate especially strongly to staff that OHSU administrators were expecting severe enough problems immediate intervention (even as a procedure was underway) might be required. From a psychological perspective, this email was likely to foster or exacerbate negative expectations about demeanor that women in high status, traditionally masculine roles already face due to common stereotypes. If OHSU administrators were concerned more generally with improving communication and optimizing relationships in procedure rooms, they could have instituted a general requirement for a pre-huddle, as well as a broadly applied reporting system for communication concerns for all procedures, not just those led by Dr. Bala.

Imagine that every time you (and only you) were scheduled to lead a team on an important task at work, management sent out an email to everyone involved that required a pre-meeting and urged them to report any "concerns" about "communication," encouraging them to page upper management immediately (even during the task) if any concerns arose. Imagine further that this procedure was instituted after an investigation into an incident in which you were accused of being unprofessional, but had cleared of wrong-doing? How would this feel and how would it affect your ability to lead a team? Would it make it more or less difficult for you to

Exhibit 1
Page 88 of 110

establish good working relationships? Would you feel similarly to what Dr. Bala stated in her email to Linda Strahm:

> "I should be allowed to practice in the EP lab just like my partners and colleagues, with no discrimination. This is what l asked for from the start... I should be allowed to focus on the patient and case without worrying about whom is going to page whom and every single word that 1 am saying in the lab. This is not an environment that is conducive for success or creates a fair working environment" (Exhibit 65; see also Exhibit 64).

Psychologically, the pre-huddle and email warning requirements uniquely imposed by OHSU administrators on Dr. Bala would be more likely to fan the flames of negative expectations and create barriers to her success by implying to staff that organization authorities believed that Dr. Bala must have done something wrong to warrant being singled out in this manner.

Indeed, a prior section of this report reviewed Linda Strahm's testimony that Ms. Strahm had personally assumed that Dr. Bala must have done something wrong to warrant negative reactions from others and that she did not credit the possibility that Dr. Bala had experienced discrimination. Ms. Strahm's views that Dr. Bala was doing something wrong persisted even though her two investigations (Sue Bardon incident, Matt Holling incident) of complaints against Dr. Bala and her review of emails indicated that Dr. Bala had done nothing wrong. Further, Ms. Strahm became aware in the second investigation (Matt Holling incident) that at least two staff members (Tom Clark, Julie Kelly) felt that the X-ray technician who complained and not Dr. Bala had behaved in a rude, unprofessional, and disrespectful way.

Documents also suggest that Dr. Henrikson, who was Dr. Bala's immediate supervisor, exaggerated incidents in ways that disfavored Dr. Bala. If so, this would be particularly important because Dr. Henrikson was the person who relayed complaints to other administrators

Exhibit 1
Page 89 of 110

and who pushed for giving Dr. Bala a non-renewable contract (Exhibit 126). The two incidents

that Ms. Strahm investigated provide a check on Dr. Henrikson's accounts of Dr. Bala's behavior

given that Ms. Strahm interviewed eyewitnesses. Both investigations suggest that Dr. Henrikson

provided a more extreme and negative account when relaying complaints about Dr. Bala.

Specifically, for the Sue Bardon incident, Ms. Strahm's investigation notes suggest that Dr.

Henrikson claimed that Dr. Bala directly told Ms. Bardon she was incompetent when Ms.

Bardon had claimed something much less extreme: that because Dr. Bala had asked Ms. Bardon

many procedural questions, Ms. Bardon *inferred* that Dr. Bala saw her as incompetent.

In the Matt Holling incident, Dr. Henrikson noted in his email to Ms. Strahm that he had

spoken to Tom Clark as well as to Dr. Mai about what happened. Yet Dr. Henrikson only

reported an ambiguous comment by Dr. Mai ("that's just how she is") that could be construed

negatively, while neglecting to report Tom Clark's observations, which unequivocally supported

Dr. Bala. Ms. Strahm's later investigation notes revealed that Mr. Clark viewed Dr. Bala as

behaving professionally in the face disrespectful behavior by Mr. Holling. The notes also state

that Mr. Clark told Ms. Strahm that he had said the same thing to Dr. Henrikson. Further, Ms.

Strahm's notes indicated that Julie Kelly also had talked to Dr. Henrikson and that she had

echoed similar sentiments as Mr. Clark. Yet Dr. Henrikson ignored these positive views about

Dr. Bala. He stated that "everyone" in the room had been "scared into silence" by Dr. Bala. In

sum, for the two complaints for which a thorough investigation provided a way to check on Dr.

Henrikson's accounts, documents show that he provided a more negative report than

eyewitnesses.

Further, Dr. Sharon Anderson's notes (Exhibit 171) of a meeting she had with Dr. Kaul,

Dr. Cigarroa, and Ms. Strahm suggest that Ms. Strahm had come to view Dr. Henrikson as

Exhibit 1
Page 90 of 110

lacking objectivity about Dr. Bala. The notes stated that "Linda is going to meet with Chuck on Friday, October 28th… She feels that Chuck's judgment around Rupa is not objective. Need to separate them." Case decision-makers will ultimately need to decide whether Dr. Henrikson opinions, incident reports, and recommendations were biased versus objective and accurate. If they conclude the former, then Dr. Henriksons's involvement in relaying complaints to other administrators is consistent with bias and discrimination.

Testimony by other administrators involved in the decision to offer a non-renewable contract also suggest resistance to entertaining the possibility that Dr. Bala had experienced discrimination and resistance to evidence that she had behaved professionally. Specifically, in his deposition, Dr. Cigarroa was asked "… it's true, isn't it, that Linda Strahm found that the allegation regarding Dr. Bala and her treatment of Matt Holling was unsubstantiated?" Dr. Cigarroa replied: "I disagree with that… The particular individual, Matt Holling, had left, which made it challenging -- he was a traveler -- to get his perspective on the issue" (pp. 197-198). But Mr. Holling's perspective was known: he felt insulted and mistreated by Dr. Bala. Dr. Cigarroa failed to mention or take into account that eyewitnesses to the incident agreed Dr. Bala had done nothing wrong. In other words, even after Ms. Strahm's thorough investigation exonerating Dr. Bala, Dr. Cigarroa remained reluctant to conclude that she had done nothing wrong. Finally, as previously noted, Dr. Kaul summarily dismissed the notion that Dr. Bala could have suffered discrimination from nursing staff. Thus, case decision-makers should consider whether these administrators resisted information supporting Dr. Bala and ignored potential indicators that her discrimination complaints had merit.

Case decision-makers should also consider whether administrators too readily dismissed favorable evidence that Dr. Bala had improved her relationships with staff and Fellows and

Exhibit 1
Page 91 of 110

exaggerated the severity of new incidents due to prior negative views about Dr. Bala. In March of 2016, administrators received reports that Dr. Bala's relationships with staff and Fellows had improved. For example, in April of 2016, notes taken by Ms. Strahm indicated that Dr. Bala's relationships with Fellows were "great" (Exhibit 122; Strahm Deposition, p. 198-199). As a result, OHSU administrators (at Dr. Bala's request) downgraded the Performance Improvement Plan to a "coaching document" (Kaul Deposition, p. 148). Yet in May of 2016, Dr. Bala received a nonrenewable contract due to OHSU administrators' perception that Dr. Bala's behavior remained problematic.

The new incidents that occurred between March and May of 2016 seem to include the following: (a) Dr. Bala was listening to music through ear buds, claims she did not notice that two nurses had greeted her, and failed to offer a greeting; (b) Dr. Bala visited a patient the morning after a procedure, interrogated a device to get some data, and passed the information on to a PA (Angela Krebsbach) who complained that Dr. Bala had interfered with her job; (c) when a nurse told Dr. Bala she was not allowed to be in the computer room and should get up and leave, Dr. Bala asserted her status and resisted the directive; and (d) Dr. Bala replaced Julie Kelly with Tom Clark during a procedure, leading Ms. Kelly (in the moment) to feel bullied and temporarily leave the room.

Case decision-makers will need to sort out whether they believe these incidents were sufficiently serious enough to countervail the improvement to Dr. Bala's relations to staff and Fellows; or whether administrators had exaggerated reactions to these incidents due to already having stereotyped Dr. Bala in a negative light. For example, if case decision-makers find Dr. Bala's account that she never noticed the nurses greeting her because she was listening to music on her ear buds credible, should this incident have led to Dr. Henrikson's interpretation that Dr.

Exhibit 1
Page 92 of 110

Bala "does not speak face to face" with the nurses (Exhibit 121) or have weighed into a decision to give Dr. Bala a non-renewable contract? For the PA incident, was interrogating the device and providing the data to the PA a significant breach of medical roles or might it better be interpreted as a helpful act by Dr. Bala (retrieving data while visiting the patient, saving an overworked PA the effort)? For the computer room incident, would a nurse have ever ordered a male doctor out of this shared space and if she did, would he have been seen in as negative a light for asserting his status and resisting? In the Julie Kelly incident, was it Dr. Bala's prerogative to switch staff members? Note that Ms. Kelly subsequently apologized for her behavior (Henrikson Deposition, p. 201) and, in the later Matt Holling incident, defended Dr. Bala as having behaved professionally and appropriately; indeed, according to Ms. Heitman-Allen, Ms. Kelly became a strong advocate for Dr. Bala (Heitman-Allen Deposition, p. 134).


**OPINION: Case decision-makers should consider whether, in their decision-making to award a non-renewable contract, OHSU administrators: (a) downplayed improvement in Dr. Bala's relationships with staff and Fellows, (b) weighed incidents in which Dr. Bala was found to have behaved professionally (e.g., Matt Holling) against her, and/or (c) characterized her behavior in a more negative way than warranted by eyewitness accounts. Such findings would be consistent with stereotype-motivated biases and discrimination.**

Exhibit 1
Page 93 of 110

BALA V OHSU - 94

## VI. COMPENSATION & SIGNATURE

My rate of compensation is as follows:

- $400 per hour for review of documents and report writing

- $5000 per day for deposition and trial testimony

- Payment made in advance for deposition and trial testimony

_____        September 15, 2023

Peter Glick, Ph.D.                                  _____

                                                    Date

Exhibit 1
Page 94 of 110

## CURRICULUM VITAE:
## Peter Glick, PhD.

### SUMMARY

Peter Glick, PhD is the Henry Merritt Wriston Professor at Lawrence University. Co-author of groundbreaking theories of prejudice and sexism, Dr. Glick's highly influential research has received more than 55,000 scholarly citations. As a visiting Professor of Management and Organizations at Northwestern University, he co-designed the Kellogg School of Management's first course on diversity management. He has also taught executive education at Harvard University and developed anti-bias initiatives for Fortune 500 companies (including Airbnb). The *Harvard Business Review* recognized his *stereotype content model* (co-developed with Susan Fiske, Princeton, and Amy Cuddy, Harvard) as a "breakthrough idea for 2009" and received the Society of Experimental Social Psychology's *2022 Scientific Impact Award*. His highly cited work on *benevolent sexism* (with Susan Fiske) has revolutionized understanding of discrimination against women, receiving the Allport Prize for best paper on intergroup relations. In addition to more than 80 articles, he has co-edited or co-authored three books, including the *Sage Handbook of Prejudice*. He has testified in federal court as an expert witness on sex discrimination. Media outlets that have covered his work include the *New York Times*, *Harvard Business Review*, and *PBS NewsHour*. Website: https://faculty.lawrence.edu/glickp/

### ADDRESS

Department of Psychology
Lawrence University                              phone: (920) 716-4195
711 E Boldt Way                                   email: glickp@lawrence.edu
Appleton, WI  54911                              web: https://faculty.lawrence.edu/glickp/

### EDUCATION

Graduate:                 University of Minnesota
                          Ph.D., 1984
                          Specialization in Social Psychology
                          Supporting Program in Statistics

Undergraduate:            Oberlin College
                          A.B., 1979
                          Major in Psychology

### ACADEMIC APPOINTMENTS

*Henry Merritt Wriston Professor in the Social Sciences,* Lawrence University, 2007-present

*Visiting Professor of Management and Organizations,* Fall 2009, Kellogg School of
      Management, Northwestern University

Exhibit 1
Page 95 of 110

*Full Professor of Psychology*, 1997-present, Lawrence University

*Director of Lawrence Fellows Program*, 2004-2007 (designed and implemented a post-doctoral Fellows program across all academic disciplines)

*Faculty Associate to the President*, 2005-07, Lawrence University

*Director, Lawrence University London Centre*, 1998-99

*Chair of Psychology Department*, 1992-93; 1994-96, 1997; 2000-2002, Lawrence University

*Associate Professor of Psychology*, 1990 to 1997, Lawrence University

*Assistant Professor of Psychology*, 1985 to 1990, Lawrence University


## HONORS AND AWARDS

***Scientific Impact Award,*** Society for Experimental Social Psychology, 2022. Awarded for continuing influence of the first paper on the stereotype content model: Fiske, S. T., Cuddy, A. J. C., Glick, P., & Xu, J. (2002). A model of (often mixed) stereotype content: Competence and warmth respectively follow from perceived status and competition. *Journal of Personality and Social Psychology, 82*, 878-902.

***Excellence in Scholarship Award***, Lawrence University, 2011. Awarded to a faculty member who has demonstrated outstanding scholarly contributions.

***Harvard Business Review*** recognized joint research with Susan T. Fiske and Amy J. C. Cuddy on warmth and competence as fundamental dimensions of social perception in "The *HBR* List: Breakthrough Ideas for 2009"

***Gordon W. Allport Intergroup Relations Prize*** for best paper on intergroup relations (awarded by the Society for the Psychological Study of Social Issues and Harvard University):

2005-06: Honorable Mention for Cuddy, A. J. C., Fiske, S. T., & Glick, P. "The BIAS Map: Behaviors from Intergroup Affect and Stereotypes"

1995: Award for Glick, P. & Fiske, S. T. "The Ambivalent Sexism Inventory: Differentiating Hostile and Benevolent Sexism" (*Journal of Personality and Social Psychology*)

**Elected as President** of the *Society of Experimental Social Psychology* for 2009

Exhibit 1
Page 96 of 110

**Elected as a Fellow** in the following professional psychology organizations:

> *Society for the Psychological Study of Social Issues*, Division 9 of APA (2007)
> *Society for the Psychology of Women*, Division 35 of APA (2007)
> *American Psychological Society* (2004)
> *American Psychological Association* (2004)
> *Society for Personality and Social Psychology*, Division 8 of APA (2004)

## EDITORIAL BOARD APPOINTMENTS

> *Journal of Personality and Social Psychology: IRGP* (2003-2018)
> *Personality and Social Psychology Bulletin* (2002-present)
> *Group Processes and Intergroup Relations* (2010-2013)
> *Psychological Inquiry* (2002)
> *Psychology of Women Quarterly* (2003-present)
> *Social Issues and Interventions* book series (sponsored by SPSSI; 2008)

## COUNCIL POSITIONS IN PROFESSIONAL ORGANIZATIONS

> *Society of Experimental Social Psychology* Executive Council, 2007-2010
> *Society for the Psychological Study of Social Issues* Council, 2007-2010

## VISITING AND SUMMER INSTITUTE POSITIONS

Universidad de Granada, Spain, *Consultation*, Supported by a Spanish Government grant for a 1-2 week visits to lecture, consult, and continue research collaborations, December 2007, June 2008, November 2008.

University of Marburg and University of Bielefeld, Germany, *Summer Institute*, 2007

Society for Social and Personality Psychology's *Summer Institute in Social Psychology*, University of Texas at Austin, July 2007. Co-instructor with Alice Eagly (Northwestern University) for 2-week session on Gender, Power, and Roles

Pontificia Universidad Católica de Chile, June 2003. Two weeks as a visiting "outstanding psychologist" (sponsored by a Chilean government grant)

University of Jena, Germany, April 2002. Research consultant for the International Graduate College (a consortium involving the University of Jena, University of Kent at Canterbury, and University of Louvain-la-neuve in Belgium)

Visiting Associate Professor, University of Massachusetts at Amherst, 1993-94

Exhibit 1
Page 97 of 110

## BOOKS

Rudman, L. A., & Glick, P. (2021). *The Social Psychology of Gender: How Power and Intimacy Shape Gender Relations* (2nd Ed.). New York: Guilford Press.

Dovidio, J. F., Hewstone, M., Glick, P. & Esses, V. M. (Eds.). (2010). *The Sage Handbook of Prejudice, Stereotyping, and Discrimination*. London: Sage Publications.

Dovidio, J. F., Glick, P., & Rudman, L. A. (Eds.). (2005). *On the Nature of Prejudice: 50 Years After Allport*. Malden, MA: Blackwell Publishing.

## EDITORSHIP OF SPECIAL JOURNAL ISSUES

Berdahl, J. L., Cooper, M. & Glick, P. (2018). Work as a masculinity contest. *Journal of Social Issues*, *74*(3).

Lee, T., Fiske, S. T., & Glick, P. (2010). Special Issue on Ambivalent Sexism. *Sex Roles, 62*.

## PUBLICATIONS

Haines, E. L., Schachtman, R., Glick, P., & Earvolino, J. (2022). Trash talk about the other gender: Content of, reactions to, and willingness to confront stereotypical comments about men and women. *Group Processes & Intergroup Relations*, 1-21.

Ashburn-Nardo. L., Moss-Racusin, C., Smith, J. L., Sanzari  C. M., Vescio, T. K., & Glick, P. (2022). The reproducibility movement in Psychology: Does researcher gender affect how people perceive scientists with a failed replication? *Frontiers in Psychology, 13,* 3408.

Glick, P. (2020). Take that detour: Unexpected influences on a research career. In King, E., Roberts, Q., & Hebl, M. (Eds.) *Perspectives on Work and Gender* (pp. 101-116). Information Age Publishing.

Glick, P. (2020). Masks and emasculation: Why some male leaders won't take COVID-19 safety precautions. *Scientific American*, *322*(2), 10.

Ramati-Ziber, L., Shnabel, N., & Glick, P. (2020). The beauty myth: Prescriptive beauty norms for women reflect hierarchy-enhancing motivations leading to discriminatory employment practices. *Journal of Personality and Social Psychology*, *119*, 317-343.

Glick, P. (2019). Gender, sexism, and the election: did sexism help Trump more than it hurt Clinton?. *Politics, Groups, and Identities*, *7*(3), 713-723.

Berdahl, J. L., Cooper, M., & Glick, P. (Nov 2, 2018). How masculinity contests undermine organizations and what to do about it. *Harvard Business Review*.

Exhibit 1
Page 98 of 110

Glick, P., Berdahl, J. L., & Alonso, N. M. (2018). Development and validation of the masculinity contest culture scale. *Journal of Social Issues*, *74*(3), 449-476.

Berdahl, J. L., Cooper, M., Glick, P., Livingston, R. W., & Williams, J.C. (2018). Work as a masculinity contest. *Journal of Social Issues 74*(3), 422-448.

Diekman, A. B., & Glick, P. (2018). The role of attitudes in gender. In *Handbook of Attitudes, Volume 2: Applications* (pp. 408-428). Routledge.

Bareket, O., Kahalon, R., Shnabel, N., & Glick, P. (2018). The Madonna-Whore dichotomy: Men who perceive women's nurturance and sexuality as mutually exclusive endorse patriarchy and show lower relationship satisfaction. *Sex Roles*, 1-14.

Rudman, L. A., Glick, P., Marquardt, T., & Fetterolf, J. C. (2017). When women are urged to have casual sex more than men are: perceived risk moderates the sexual advice double standard. *Sex roles*, *77*(5-6), 409-418.

Bear, J. B., & Glick, P. (2017). Breadwinner bonus and caregiver penalty in workplace rewards for men and women. *Social Psychological and Personality Science*, *8*(7), 780-788.

Glick, P., & Raberg, L. (2017). Benevolent sexism and the status of women. In C. B. Travis & J. W. White (Eds.). *Handbook of the Psychology of Women* (pp. 363-380). Washington, DC: American Psychological Association.

Baily Wolf, E., & Glick P. (2016). Competent but cold: The Stereotype Content Model and envy in organizations. In R. H. Smith, U. Merlone, & M. Duffy (Eds). *Envy at work and in organizations*. Oxford: Oxford University Press.

Glick, P., Sakallı-Uğurlu, N., Akbaş, G., Metin Orta, I., & Ceylan, S. (2016). Why do women endorse honor beliefs? The relationship of ambivalent Sexism and Islamic religiosity to Turkish men and women's honor beliefs. *Sex Roles, 75,* 543-554.

Cuddy, A. J. C., Baily Wolf, B., Glick, P., Crotty, S., Chong, J, & Norton, M. I. (2015). Men as cultural ideals: Cultural values moderate gender stereotype content. *Journal of Personality and Social Psychology, 109,* 622-635.

Glick, P., Wilkerson, M., & Cuffe, M. (2015). Masculine identity, ambivalent sexism, and attitudes toward gender subtypes. *Social Psychology, 46,* 210-217.

Connor, R. A., Glick, P, & Fiske, S.T. (2015) Ambivalent sexism in the 21st century. For C. Sibley & F. Barlow (Eds.). *Cambridge Handbook of the Psychology of Prejudice.* Cambridge University Press.

Glick, P. (2015). Victims of success. How envious prejudice foments genocidal intent and undermines moral outrage. In C. A. Small (Ed.). *The Yale Papers: Antisemitism in comparative perspective* (pp. 287-298). N.Y.: ISGAP.

Exhibit 1
Page 99 of 110

Glick, P. (2014). Encouraging confrontation. *Journal of Social Issues, 70*, 779-791.

Rollero, C., Glick, P., & Tartaglia, S. (2014). Psychometric Properties of Short Versions of the Ambivalent Sexism Inventory and Ambivalence Toward Men Inventory. *TPM - Testing, Psychometrics, Methodology in Applied Psychology, 21,* 149-159.

Aranda, B., & Glick P. (2014). Expressing work devotion eliminates the motherhood penalty. *Group Processes and Intergroup Relations, 17,* 91-99.

Hart, J., Glick, P. & Dinero, R. E. (2013). She loves him, she loves him not: Attachment style as a predictor of women's ambivalent sexism toward men. *Psychology of Women Quarterly, 37*, 507-518.

Glick, P. (2013). BS at work: How benevolent sexism undermines women and justifies backlash. In *Gender and Work: Challenging Conventional Wisdom* (pp. 44-50). Boston, MA: Harvard Business School.

Glick, P., & Paluck, E. L. (2013). The aftermath of genocide: History as proximate cause. *Journal of Social Issues, 69*, 200-208.

Hart, J., Hung, J. A., Glick, P. & Dinero, R. E. (2012). He loves her, he loves her not: Attachment style as a personality antecedent to men's ambivalent sexism. *Personality and Social Psychology Bulletin, 38*,1495-1505.

Rudman, L. A., Moss-Racusin, C. A., Glick, P., & Phelan, J. E., & (2012). Reactions to vanguards: Advances in backlash theory. In P. Devine & A. Plant (Ed.). *Advances in Experimental Social Psychology* (Vol. 45, pp. 167-228) San Diego, CA: Academic Press.

Cuddy, A. J. C., Glick, P., & Beninger, A. (2011). The dynamics of warmth and competence judgments, and their outcomes in organizations. In B. M. Staw & A. Brief (Eds.). *Research in Organizational Behavior, 31,* 73-98.

Glick, P. & Fiske, S. T. (2011). Ambivalent sexism revisited. *Psychology of Women Quarterly*. 35, 530-535.

Becker, J. C., Glick, P., Ilic, M., & Bohner, G. (2011). Damned if she does, damned if she doesn't: Consequences of accepting versus confronting patronizing help for the female target and male actor. *European Journal of Social Psychology, 41*, 761-773.

DeLemus, S., Moya, M., & Glick, P. (2010). When contact correlates with prejudice: Adolescents' romantic relationship experience predicts greater benevolent sexism in boys and hostile sexism in girls. *Sex Roles, 63*, 214-225.

Glick, P. & Whitehead, J. (2010). Hostility toward men and the perceived stability of male dominance. *Social Psychology, 41,* 177-185.

Exhibit 1
Page 100 of 110

Lee, T. L., Fiske, S. T., & Glick, P. (2010). Next gen ambivalent sexism: Converging correlates, causality in context, and converse causality. *Sex Roles, 62,* 395-404.

Lee, T. L., Fiske, S. T., Glick, P., & Chen, Z. (2010). Ambivalent sexism in close relationships: (Hostile) power and (benevolent) romance shape relationship ideals. *Sex Roles, 62,* 583-601.

Expósito, F., Herrera, M. C., Moya, M., & Glick, P. (2010). Don't rock the boat: Women's benevolent sexism predicts fears of marital violence. *Psychology of Women Quarterly, 34*, 20-26.

Glick, P. & Rudman, L. A. (2010). Sexism. In J. F. Dovidio, M. Hewstone, P. Glick, & V. M. Esses (Eds.) *Handbook of prejudice, stereotyping, and discrimination* (pp. 328-344). Newbury Park, CA: Sage.

Cikara, M., Lee, T. L., Fiske, S. T., & Glick, P. (2009) Ambivalent sexism at home and at work: How attitudes toward women in relationships foster exclusion in the public sphere. To appear in Jost, J. T., Kay, A. C., & Thorisdottir, H. (Eds) *Social and psychological bases of ideology and system justification* (pp. 444-462). New York: Oxford University Press.

Cuddy, A. J. C., Fiske, S. T., Kwan, V. S. Y., Glick, P., Demoulin, S., Leyens, J-Ph. et al. (2009). Is the Stereotype Content Model culture-bound? A cross-cultural comparison reveals systematic similarities and differences. *British Journal of Social Psychology, 48*, 1-33.

Glick, P. (2008). When neighbors blame neighbors: Scapegoating and the breakdown of ethnic relations. In V. M. Esses & R. A. Vernon (Eds). *Explaining the breakdown of ethnic relations: Why neighbors kill* (pp. 123-146). Malden, MA: Blackwell.

Rudman, L. A., Glick, P., & Phelan, J. E. (2008). From the laboratory to the bench: Gender stereotyping research in the courtroom. In E. Borgida & S. T. Fiske (Eds). *Beyond common sense: Psychological science in the courtroom* (pp. 83-101). Malden, MA: Blackwell.

Glick, P. (2008). Restating the case: The benefits of diverse samples for theory development. *Psychological Inquiry, 19*, 78-83.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2008). Warmth and competence as universal dimensions of social perception: The Stereotype Content Model and the BIAS Map. In M. P. Zanna (Ed.). *Advances in Experimental Social Psychology* (Vol. 40, pp. 61-150). Thousand Oaks, CA: Academic Press.

Glick, P., Chrislock, K., Petersik, K., Vijay, M., & Turek, A. (2008). Does cleavage work at work? Men, but not women, falsely believe in the power of cleavage to sell a weak product. *Psychology of Women Quarterly, 32*, 326-335.

Exhibit 1
Page 101 of 110

Sakallı-Uğurlu, N., Yalçın, Z. S., & Glick, P. (2007). Ambivalent sexism, belief in a just world, and empathy as predictors of Turkish students' attitudes toward rape victims. *Sex Roles, 57,* 889-895.

Glick, P., Gangl, C., Gibb, S., Klumpner, S., Weinberg, E. (2007). Defensive reactions to masculinity threat: More negative affect toward effeminate (but not masculine) gay men. *Sex Roles, 57*, 55-59.

Moya, M., Glick, P., Expósito, F., De Lemus, S. & Hart, J. (2007). It's for your own good: Benevolent sexism and women's reactions to protectively justified restrictions. *Personality and Social Psychology Bulletin, 33*, 1421-1434.

Hebl, M. R., King, E., Glick, P., Singletary, S. L. & Kazama, S. M. (2007). Hostile and benevolent reactions toward pregnant women: Complementary interpersonal punishments and rewards that maintain traditional roles. *Journal of Applied Psychology, 92*, 1499-1511.

Fiske, S. T., Cuddy, A. J. C., & Glick, P. (2007). Universal dimensions of social cognition: Warmth and competence. *Trends in Cognitive Science, 11*, 77-83.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2007). The BIAS Map: Behaviors from intergroup affects and stereotypes. *Journal of Personality and Social Psychology, 92*, 631-648.

Glick, P., & Fiske, S. T. (2007). Sex discrimination: The psychological approach. In F. J. Crosby, M. S. Stockdale, and S. A. Ropp (Eds.). *Sex discrimination in the workplace* (pp. 155-187). Malden, MA: Blackwell.

Glick, P., Fiske, S. T., Abrams, D., Dardenne, B., Ferreira, M. C., Gonzalez, R., Hachfeld, C., Huang, L-L., Hutchison, P., Kim, H-J., Manganelli, A. M., Masser, B., et al. (2006). Anti-American Sentiment and America's Perceived Intent to Dominate: An 11-Nation Study. *Basic and Applied Social Psychology, 38*, 363-373.

Eastwick, P. W., Eagly, A. H., Glick, P., Johannesen-Schmidt, M., Fiske, S. T., et al. (2006). Is traditional gender ideology associated with sex-typed mate preferences? A test in nine nations. *Sex Roles, 54*, 603-614.

Glick, P., Larsen, S., Johnson, C., Branstiter, H. (2005). Evaluations of sexy women in low and high status jobs. *Psychology of Women Quarterly*, *29*, 389-395.

Moya, M., Poeschl, G., Glick, P., Páez, D. Sedano, I. F. (2005) Sexisme, Masculinité-Féminité et Facteurs Culturels [Sexism, Masculinity-Femininity, and Cultural Factors], *Revue Internationale de Psychologie Sociale*, *18*, 141-167.

Glick, P. (2006). Ambivalent sexism, power distance, and gender inequality across cultures. In S. Guimond (Ed.). *Social comparison processes and levels of analysis* (pp. 283-302). Cambridge: Cambridge University Press.

Exhibit 1
Page 102 of 110

Glick, P. (2005). Choice of scapegoats. In J. F. Dovidio, P. Glick, & L. A. Rudman (Eds.). *On the nature of prejudice: 50 years after Allport* (pp. 244-261). Malden, MA: Blackwell.

Dovidio, J. F., Glick, P., & Rudman, L. A. (2005). Reflecting on *The Nature of Prejudice*: Fifty years after Allport. In J. F. Dovidio, P. Glick, & L. A. Rudman (Eds.). *On the nature of prejudice: 50 years after Allport* (pp. 1-15). Malden, MA: Blackwell.

Cuddy, A. J. C., Fiske, S. T., & Glick, P. (2004). When professionals become mothers, warmth doesn't cut the ice. *Journal of Social Issues, 4*, 701-718.

Glick, P., Lameiras, M., Fiske, S. T., Eckes, T., Masser, B., Volpato, C., Manganelli, A. M., Pek, J., Huang, L., Sakalli-Ugurlu, N., Castro, Y. R., D'Avila Pereira, M. L., Willemsen, T. M., Brunner, A., Six-Materna, I, & Wells, R. (2004). Bad but bold: Ambivalent attitudes toward men predict gender inequality in 16 nations. *Journal of Personality and Social Psychology*, *86*, 713–728.

Sakalli-Ugurlu, N., & Glick P. (2003). Ambivalent sexism and attitudes toward women who engage in premarital sex in Turkey. *Journal of Sex Research, 40*, 296-302.

Moya, M., Páez, D., Glick, P., Fernández, I., & Poeschl, G. (2003). Sexismo, masculinidad-feminidad y factores culturales [Sexism, masculinity-femininity and cultural factors]. *Revista Española de Motivación y Emoción, 4,* 8-9.

Glick, P., Lameiras, M., & Castro, Y. R. (2002). Education and Catholic religiosity as predictors of hostile and benevolent sexism toward women and men. *Sex Roles, 47*, 433-441.

Glick, P., Sakalli-Ugurlu, N., Ferreira, M. C., & Aguiar de Souza, M.  (2002). Ambivalent sexism and attitudes toward wife abuse in Turkey and Brazil. *Psychology of Women Quarterly, 26*, 291-296.

Fiske, S. T., Cuddy, A. J. C., Glick, P., & Xu, J. (2002). A model of (often mixed) stereotype content: Competence and warmth respectively follow from perceived status and competition. *Journal of Personality and Social Psychology, 82*, 878-902.

Fiske, S. T., Cuddy, A. J. C., & Glick, P. (2002). Emotions up and down: Intergroup emotions result from perceived status and competition. In D. M. Mackie & E. R. Smith (Eds.), *From Prejudice to Intergroup Emotions: Differentiated reactions to social groups* (pp. 247-264). New York: Psychology Press.

Glick, P. (2002). Sacrificial lambs dressed in wolves' clothing: Envious prejudice, ideology, and the scapegoating of Jews. In L. S. Newman & R. Erber (Eds.), *Understanding genocide: The social psychology of the Holocaust* (pp. 113-142). Oxford: Oxford University Press.

Glick, P., & Fiske, S. T. (2002). Ambivalent responses. *American Psychologist, 57*, 444-446.

Exhibit 1
Page 103 of 110

Glick, P., & Fiske, S. T. (2002, Winter). Perceived legitimacy and the struggle for civil rights. *Civil Rights Journal, 6(1)*, 72-74.

Glick, P. (2002, November) Isolation, interdisciplinarity, and inspiration: Doing research at a liberal arts college. *APS Observer, 15(9)*, 5, 50.

Glick, P., & Fiske, S. T. (2001) Ambivalent stereotypes as legitimizing ideologies: Differentiating paternalistic and envious prejudice. In J. T. Jost & B. Major (Eds.), The *Psychology of legitimacy: Emerging perspectives on ideology, justice, and intergroup relations*, (pp. 278-306). New York: Cambridge University Press.

Rudman, L. A., & Glick, P. (2001). Prescriptive gender stereotypes and backlash toward agentic women. In Carli, L. L. & Eagly, A. H. (Eds.), *Journal of Social Issues, 57*, 743-762.

Glick, P., & Fiske, S. T. (2001). Ambivalent sexism. In M. P. Zanna (Ed.), *Advances in Experimental Social Psychology* (Vol. 33, pp. 115-188). Thousand Oaks, CA: Academic Press.

Glick, P., & Fiske, S. T. (2001). An ambivalent alliance: Hostile and benevolent sexism as complementary justifications of gender inequality. *American Psychologist, 56*, 109-118.

Glick, P., Fiske, S. T., Mladinic, A., Saiz, J, Abrams, D., Masser, B., Adetoun, B., Osagie, J., Akande, A., Alao, A., Brunner, A., Willemsen, et al. (2000). Beyond prejudice as simple antipathy: Hostile and benevolent sexism across cultures. *Journal of Personality and Social Psychology, 79*, 763-775.

Glick, P., & Hilt, L. (2000). From combative children to ambivalent adults: The development of gender prejudice. In T. Eckes & M. Trautner (Eds.), *Developmental social psychology of gender*. Mahwah, NJ: Erlbaum.

Glick, P. & Fiske, S. T. (1999). Gender, power dynamics, and social interaction. In J. Lorber, M. M. Ferree, & B. Hess (Eds.), *Revisioning gender* (pp. 365-398). Newbury Park, CA: Sage.

Glick, P., & Fiske, S. T. (1999). Sexism and other "isms": Interdependence, status, and the ambivalent content of stereotypes. In W. B. Swann, Jr., L. A. Gilbert, & J. Langlois (Eds.), *Sexism and stereotypes in modern society: The gender science of Janet Taylor Spence* (pp. 193-222). Washington, D.C.: American Psychological Association.

Fiske, S. T., Xu, J., Cuddy, A. J. C., & Glick, P. (1999). Respect versus liking: Status and interdependence underlie ambivalent stereotypes. *Journal of Social Issues, 55*, 473-489.

Rudman, L. A., & Glick, P. (1999). Feminized management and backlash toward agentic women: The hidden costs to women of a kinder, gentler image of middle-managers. *Journal of Personality and Social Psychology, 77*, 1004-1010.

Exhibit 1
Page 104 of 110

Glick, P., & Fiske, S. T. (1999).  The Ambivalence toward Men Inventory: Differentiating hostile and benevolent beliefs about men. *Psychology of Women Quarterly, 23(3)*, 519-536.

Expósito, F., Moya, M., & Glick P. (1998). Sexismo ambivalente: Medición y correlatos. *Revista de Psicología Social, 13*, 159-169.

Glick, P., Diebold, J., Bailey-Werner, B., & Zhu, L. (1997).  The two faces of Adam: Ambivalent sexism and polarized attitudes toward women.  *Personality and Social Psychology Bulletin, 23*, 1323-1334.

Glick, P., & Fiske, S. T. (1997). Hostile and benevolent sexism:  Measuring ambivalent sexist attitudes toward women.  *Psychology of Women Quarterly*, Special Issue: Measuring attitudes toward appropriate roles for men and women, *21*, 119-135.

Glick, P. & Fiske, S. T. (1996). The Ambivalent Sexism Inventory: Differentiating hostile and benevolent sexism. *Journal of Personality and Social Psychology, 70*, 491-512.

Glick, P., Wilk, K., & Perreault, M.  (1995). Images of occupations: Components of gender and status in occupational stereotypes. *Sex Roles, 32*, 565-582.

Fiske, S. T., & Glick, P. (1995). Ambivalence and stereotypes cause sexual harassment: A theory with implications for organizational change.  *Journal of Social Issues, 51*, 97-115.

Glick, P. (1991). Trait-based and sex-based discrimination in occupational prestige, occupational salary, and hiring. *Sex Roles, 25*, 351-378.

Glick, P., Gottesman, D., & Jolton, J. (1989). The fault is not in the stars:  Susceptibility of skeptics and believers in astrology to the Barnum effect. *Personality and Social Psychology Bulletin, 15*, 178-186.

Glick, P., Zion, C., & Nelson, C. (1988).  What mediates sex discrimination in hiring decisions? *Journal of Personality and Social Psychology, 55*, 178-186.

Glick, P., DeMorest, J. A., & Hotze, C. A.  (1988). Self-monitoring and beliefs about partner compatibility in romantic relationships. *Personality and Social Psychology Bulletin, 14*, 485-494.

Glick, P., DeMorest, J. A., & Hotze, C. A.  (1988). Keeping your distance: Group membership, personal space, and requests for small favors. *Journal of Applied Social Psychology, 18*, 315-330.

Glick, P. (1985). Orientations toward relationships: Choosing a situation in which to begin a relationship. *Journal of Experimental Social Psychology, 21*, 544-562.

Exhibit 1
Page 105 of 110

Snyder, M., Berscheid, E., & Glick, P. (1985). Focusing on the exterior and the interior: Two investigations of the initiation of personal relationships. *Journal of Personality and Social Psychology, 48*, 1427-1439.

Glick, P. (1987, August). Stars in our eyes. *Psychology Today*, 6-7.

Glick, P., & Cohen, P. (1987, April 15). Prejudice, human nature, and contemporary history. *Black Issues in Higher Education*, 4-6.

Glick, P. (1987, February). Help, at a distance. *Psychology Today*, 66-67.

Glick, P., & Snyder, M. (1986, May/June). Self-fulfilling prophecy: The psychology of belief in astrology. *The Humanist*, 20-25.

**SELECTED RECENT MEDIA COVERAGE**

*CNN Business, Dec 2018,* on masculinity contest research

*Harvard Business Review, Nov 2018,* coauthored article on masculinity contest research

*New York Times, Nov 2018,* on psychology of anti-Semitism

*Harvard Business Review,* July 2017, on patronizing behavior toward women at work

*Boston Globe, Oct 2017,* coauthored op-ed with Amy Cuddy on gender stereotypes

*PBS NewsHour, June, 2016,* on sexism in the presidential election with interactive

**INVITED TALKS**

American Psychological Association Convention Master Lecturer Keynote Address, Minneapolis 2022
Stanford University (keynote, VMware Women's Innovation Lab corporate sponsors), 2018
Harvard Business School, Gender and Work Symposium, 2017
University of Leuven (KU), 2015 (keynote address and workshops)
Georgetown University McDonough School of Business, 2015
Harvard Business School, 2013
Union College, 2011
INSEAD, 2009
Kellogg School of Management, Northwestern University, 2009
Rotman School of Business, University of Toronto, 2009
Yale University, 2009
School of Management, Yale University, 2009
The Johnson School of Business, Cornell University, 2009
Hamilton College, 2009

Exhibit 1
Page 106 of 110

Jones School of Management, Rice University, 2008
Kellogg School of Management, Northwestern University, 2008
New York University, 2007
Universidad de Granada,  2007
European Association of Experimental Social Psychology, 2007
University of Minnesota, 2006
Stanford University, 2006
Yale University, Hovland Memorial Lecture, 2005
University of Wisconsin-Madison, 2005
Miami University of Ohio, 2005
Purdue University, 2005
University of Western Ontario, 2004
Princeton University, 2004
Midwestern Psychological Association, Chicago, May 1990

**ANTI-BIAS TRAINING**

- ***Airbnb:*** Co-developed online anti-bias training for hosts, 2016
- ***Cognizant:*** Helped to develop anti-bias training, 2016-17

**EXECUTIVE EDUCATION**

- ***Stanford VMWare Women's Innovation Lab keynote for corporate sponsors,*** 2018
- ***Harvard Kennedy School,*** 2017 & 2018
- ***Bayer Healthcare***, 2016
- ***Harvard Business School,*** 2014

**EXPERT WITNESS LITIGATION LIST (most recent listed first)**

Sonya Calloway Durham v North Carolina Department of Justice
United States District Court for the Eastern District of North Carolina, Western Division
Case No. 5:21-CV-371-BO (Provided Report)

Amy Tishelman v Boston Children's Hospital (2023)
Trial Court of Massachusetts, Superior Court Department
Civil Action No.: 2084CV02310 (Provided report)

Shannon Kahn v Transforce, Inc (2023)
United States District Court for the Western District of Washington at Seattle
Case No. 2:22-cv-01086 (Provided report)

Amy Anstead v Virginia Mason Franciscan Health (2022)
United States District Court for the Western District of Washington at Seattle
Case No.: 2:21-CV-00447 (provided report, deposed)

Exhibit 1
Page 107 of 110

Becky Hansen v Ascentra Credit Union, Larry Ridenour, & Linda Andry (2022)
Iowa District Court for Scott County
Case No.: LACE134372 (provided report, deposed)

Emily Kramer v Carta (2022)
Superior Court County of San Francisco
Case No.: CGC-20-585478 (provided report)

Mona Moazzaz v. MetLife, Inc (2022)
United States District Court Southern District of New York
Case No.: 19-cv-10531 (JPO) (provided report, deposed)

Amanda Toole v. Lakeshore Ear Nose & Throat Center, PC (2022)
United States District Court Eastern District of Michigan Southern Division
Case No.: 2:21-cv-11850 (provided report)

Robin Nelson-Bailey v. Brandeis University (2022)
Commonwealth of Massachusetts Superior Court
Case No.: 1981-CV-01430 (provided report, court testimony, Plaintiff received $2.4 million
judgment)

Audrey K. Miller v. Sam Houston State University and Texas State University System (2022)
United States District Court for the Southern District of Texas, Houston Division
Case No.: 4:15-CV-02824 (provided report, deposed)

Jamie Litvack v. University of Washington (2021)
Superior Court of the State of Washington in and for the County of King
Case No. 20-2-16750-9 SEA (provided report, deposed, testified in court)

Mary Elizabeth Knox, et al. v. Contra Costa County District Attorney's Office (2021)
United States District Court Northern District of California Oakland Division
Case No. 3:20-cv-01449 (provided report, deposed)

Tammy Traverso v. Pacific Maritime Association (2021)
Superior Court for the State of California, County of San Francisco
Case No. CGC-18-570611 (deposed)

Dr. Rupa Bala v. Oregon Health and Science University (2021)
U.S. District Court, District of Oregon, Portland Division
Case No. 3:18-CV-00850-YY (provided report)

Linda Susan Mullenix v. University of Texas at Austin (2021)
U.S. District Court for the Western District of Texas, Austin Division
Case No. 1:19-cv-1203-LY (provided report, deposed)

Exhibit 1
Page 108 of 110

Evdokia Nikolova v University of Texas at Austin (2020)
U.S. District Court for the Western District of Texas, Austin Division
Case No. 1:19-cv-00877-RP (provided report, deposition and court testimony, Plaintiff received $3 million judgment)

Jay Gould v. Interface, Inc. (2020)
U.S. District Court for Northern District of Georgia, Atlanta Division
Case No. 1:20-cv-00695-SDG-CCB (provided report, deposed)

Paulette Fauceglia v. University of Southern California (2020)
U.S. District Court for Central District of California
Case No. 2:19-vcv-04738-FMO-GEM (provided report, deposed)

Ana Cruz v. Kiewit Corporation (2020)
District Court of Douglas County Nebraska
Case No. CI 18-09863 (provided report)

Tonisha M. Pinckney v. Anna Maria College (2020)
U.S. District Court of Massachusetts
Case No.: 4:19-CV-00695-40055 (provided report)

Pamela Ries, EdD. v. University of Iowa (2020)
District Court of Iowa for Polk County (provided report)

Sejal Quayle, M.D. v. Catholic Health Initiatives Colorado, Centura Health-Mercy Regional Medical Center, Centura Health Physician Group, & Will McConnell (2020)
United States District Court for the District of Colorado
Case No. 19-cv-02175-KLM (provided report)

Alexandra Criscione v. UnitedHealth Group Inc., United HealthCare Services, Inc., UnitedHealth Networks, Inc., Specialized Care Services, Inc. and Optum Group, LLC (2019)
U.S. District Court for the Middle District of North Carolina, Greensboro Division
Case No. 1:18-CV-856 (provided report, deposed)

Deepa Soni, M.D. v. Robert Wespiser, M.D., Timothy Counihan, M.D., Berkshire Medical Center, Berkshire Faculty Services, Inc., and Berkshire Health Systems, Inc. (2019)
U.S. District Court for the District of Massachusetts
Case No. 1:16-cv-10630 (provided report, deposed)

Angela Gardner v. Serve 20:28, Inc.; Lincoln McIlravy; Old Capitol Hospitality, LLC; Cantilever hotels, LLC. (2018)
Iowa District Court for Johnson County
Case No. LACV078706 (provided report)

Exhibit 1
Page 109 of 110

Stephenie R. Ruffin v Schindler Elevator Corp. (2017)
U.S. District Court for the Eastern District of Wisconsin, Milwaukee Division
Case No. 16-cv-01537 (provided report)

Debby DeLuca v. Sirius XM Radio, Inc. (2016)
U.S. District Court: Southern District of New York
Case No. 12-CV-08329 (provided report)

Kimberly A. Tornabene v. Northwest Permanente, P.C. (2016)
U.S. District Court: District of Oregon, Portland Division
Case No. 3:14-cv-01564-SI (provided report)

Lesley Cooney v. Missoula Spartan, LLC, Subaru of Missoula (2015)
Montana Department of Labor and Industry. Office of Administrative Hearings
Human Rights Bureau Case No. 0141016978; Hearings Case No. 1254-2015 (provided report)

Lynette Sherman v. Greenbrier Hotel Corporation (2010).
U.S. District Court: Southern District of West Virginia at Beckley.
Civil Action No. 09-C-1211 (provided report)

Sagun Tuli, M.D. v. Brigham & Women's Hospital, Inc. and Arthur Day, M.D. (2009)
U.S. District Court, District of Massachusetts
Case Number 07CV12338-NG (provided report, deposed, testified in Federal Court, Plaintiff
received $1.6 million judgment)

Theresa M. Metty v. Motorola, Inc. (2006)
U.S. District Court, Northern District of Illinois – Eastern Division
Case Number 05C 4113 (provided report, deposed, testified in Federal Court)

Shaffer v. Converge Medical, Inc (2004)
Superior Court of the State of California, Alameda County
Case Number RGO 3118693 (provided report)

Carlson et al. v. C. H. Robinson Worldwide (2003)
Hennepin County District Court; Case Number CV-02-3780 (JNE/JGL) (provided report)

Stephanie Adams v. Burroughs-Wellcome Company and Paul Hossenlopp (1995)
Superior Court of New Jersey; Docket Number L-411-95 (provided report, deposed)

Kelley v. Drexel University (1994)
U.S. District Court, Eastern District of Pennsylvania
Case Number 94-CV-5336 (provided report)

Alma P. Navato v. St. Luke's Hospital of Kansas City, et al. (1991)
U.S. District Court, Western District of Missouri
Case Number 90-0068-CV-W-6 (provided report)

Exhibit 1
Page 110 of 110