

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

DR. RUPA BALA,

     Plaintiff,

vs.                  Case No.: 3:18-CV-00850-HZ

OREGON HEALTH AND SCIENCE
UNIVERSITY, an Oregon public
corporation; DR. CHARLES HENRIKSON,
an individual; DR. JOAQUIN CIGARROA,
an individual,

     Defendants.
_____

REMOTE STREAMING DEPOSITION OF

PETER GLICK, PH.D.

TAKEN ON
WEDNESDAY, JANUARY 10, 2024
10:04 A.M.

4941 RIVERMOOR DRIVE
OMRO, WISCONSIN 54963

Exhibit 2
Page 1 of 163

2

1           APPEARANCES BY VIDEOCONFERENCE
2
3   Appearing on behalf of the Plaintiff:
4   STEPHEN BRISCHETTO, ESQUIRE
5   Brischetto Law Offices
6   621 SW Morrison Street, Suite 1025
7   Portland, OR 97205
8   (503) 645-3794
9   (503) 274-8575 (Fax)
10  slb@brischettolaw.com
11  -and-
12  MATTHEW C. ELLIS, ESQUIRE
13  Matthew C. Ellis, PC
14  1500 SW 1st Avenue, Suite 1000
15  Portland, OR  97201
16  (503) 345-5497
17  matthew@employmentlawpdx.com
18
19
20
21
22
23
24
25

3

1           APPEARANCES BY VIDEOCONFERENCE
                (CONTINUED)
2
3   Appearing on behalf of the Defendants:
4   MEGAN S. BRADFORD, ESQUIRE
5   ANDREA H. THOMPSON, ESQUIRE
6   Stoel Rives, LLP
7   760 SW 9th Avenue, Suite 3000
8   Portland, OR 97205
9   (503) 224-3380
10  (503) 220-2480 (Fax)
11  megan.bradford@stoel.com
12
13  Also Present:
14  Emily Shults, Deputy General Counsel, Oregon Health &
15  Science University
16
17
18
19
20
21
22
23
24
25

4

1                EXAMINATION INDEX
2                                    Page
3
4   EXAMINATION BY MS. BRADFORD              9
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1                 EXHIBITS INDEX
2   Exhibit                        Page
3
4    1    EXPERT WITNESS              26
5
6    2    REPORT ON STEREOTYPING BIAS      33
7         AND DISCRIMINATION
8
9    3    REPORT ON STEREOTYPING BIAS      34
10        AND DISCRIMINATION
11
12   4    AMBIVALENT SEXISM INVENTORY      74
13
14   5    JOURNAL OF PERSONALITY AND       80
15        SOCIAL PSYCHOLOGY 2004
16
17   6    JOURNAL OF ORGANIZATION          90
18        BEHAVIOR 2017
19
20   7    JOURNAL OF MANAGEMENT            114
21
22   8    PSYCHOLOGICAL BULLETIN 2016      123
23
24   9    INTERNATIONAL JOURNAL FOR        157
25        EQUITY IN HEALTH ARTICLE



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 2 of 163

6

1          EXHIBITS INDEX CONTINUED
2    Exhibit                        Page
3
4    10      JAMA NETWORK ARTICLE          161
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

8

1          So we're stipulating today to taking Dr.
2    Glick's deposition via remote means, agreed?
3          MR. BRISCHETTO:  Agreed.
4          MS. BRADFORD:  Stipulate that the oath can
5    be administered by a court reporter who is not
6    present with the witness?
7          MR. BRISCHETTO:  Agreed.
8          MS. BRADFORD:  We'll stipulate that the
9    video is being recorded by the videographer, not the
10   video conferencing method, and that the
11   videographer's video will be the official video
12   record for use at trial?
13         MR. BRISCHETTO:  Agreed.
14         MS. BRADFORD:  And we'll stipulate that
15   any time that needs to be spent addressing technical
16   issues will not be counted against the presumptive
17   allotted time of seven hours?
18         MR. BRISCHETTO:  Agreed.
19         MS. BRADFORD:  Thank you.  That's all I
20   have.
21         THE VIDEOGRAPHER:  Our court reporter will
22   swear in the witness.
23         THE REPORTER:  Dr. Glick, would you please
24   raise your right hand for me.
25         Do you affirm under penalty of perjury

7

1          REMOTE STREAMING DEPOSITION OF
2              PETER GLICK, PH.D.
3                 TAKEN ON
4          WEDNESDAY, JANUARY 10, 2024
5                 10:04 A.M.
6
7          THE VIDEOGRAPHER:  We are on the record.
8    The time is 10:04 a.m.  The date is January 10th,
9    2024.
10         This is the beginning of the deposition of
11   Dr. Peter Glick.  Case caption is Bala v. OHSU.
12         Will counsel please introduce themselves
13   and state who they represent.
14         MR. BRISCHETTO:  Steve Brischetto, for the
15   plaintiff.
16         MS. BRADFORD:  And Megan Bradford, on
17   behalf of Oregon Health and Science University and
18   Dr. Joaquin Cigarroa and Dr. Charles Henrikson.
19         THE VIDEOGRAPHER:  Before our court
20   reporter swears -- swears in the witness, Counsel,
21   you can make any -- yes.  We can --
22         MS. BRADFORD:  Thank you.
23         So, Mr. Brischetto, I'm assuming that
24   these stipulations won't be a problem, but just want
25   to put them on the record.

9

1    that you are Dr. Peter Glick and that the testimony
2    you are about to give will be the truth, the whole
3    truth, and nothing but the truth?
4          THE DEPONENT:  I do.
5          THE REPORTER:  Thank you.
6          THE VIDEOGRAPHER:  You may proceed.
7          MS. BRADFORD:  Thank you.
8    PETER GLICK, PH.D., having been first duly sworn,
9    was examined and testified as follows:
10   EXAMINATION
11   BY MS. BRADFORD:
12      Q.  Good morning, Dr. Glick.
13      A.  Good morning.
14      Q.  So as I stated earlier, my name is Megan
15   Bradford, and I represent OHSU and Doctors Henrikson
16   and Cigarroa in this case.  I may refer to them just
17   collectively as "OHSU" or "Defense" throughout this
18   case.  If I have a specific question about Dr.
19   Cigarroa or Dr. Henrikson, I'll make sure to
20   communicate that, okay?
21      A.  Thanks.  Yes.
22      Q.  I think it's fair to say that this is not
23   the first time you've had your deposition taken; is
24   that right?
25      A.  That is correct.



NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 3 of 163

10

1    Q.   Okay.  So I'm going to go through some
2 ground rules that I think, most of which will not be
3 new to you, but just want to get them on the record.
4 You understand that you're under oath to tell the
5 truth in this deposition, right?
6    A.   Yes, I do.
7    Q.   And that oath is no different than if you,
8 for example, were before a judge and before a jury
9 up on a witness stand, right?
10    A.   Yes.  I understand that and take that oath
11 seriously.
12    Q.   And that you understand that that oath
13 carries a penalty of perjury?
14    A.   Yes.
15    Q.   Which means you could be charged with a
16 crime if you don't testify truthfully?
17    A.   Correct.
18    Q.   And, also, your -- the testimony that you
19 give today can be used to, for example, impeach your
20 testimony if you were to testify at trial in this
21 case.
22    A.   Yes.
23    Q.   Do you have anything going on in your life
24 right now that would affect your ability to
25 understand my questions and answer truthfully?

11

1    A.   No, I do not.
2    Q.   Are you taking any medications right now
3 that would affect your ability to testify truthfully
4 and -- and openly?
5    A.   No, I am not.
6    Q.   You've already acknowledged this before we
7 went on the record, but I think you said you -- you
8 understand that the difficulty that -- of the job
9 that the court reporter has and the importance of,
10 for one, not talking over each other, and another,
11 answering audibly, so no shaking of the heads, no
12 uh-huh, huh-uh.  Those things aren't picked up by
13 the record.  Is that fair that you understand those
14 things?
15    A.   Yes.  I do.  Sometimes, it's hard to
16 comply --
17    Q.   Yes.
18    A.   -- you know, during the -- during the heat
19 of the deposition, but I -- I will strive to be
20 clear.
21    Q.   And, Dr. -- Dr. Glick, I'll also strive my
22 best to -- to not speak over you or interrupt you.
23 Obviously, you know, as things come up in the
24 deposition and for time purposes, I need to step in
25 and interrupt you, I'll do my best to just do that

12

1 quickly and with clarity.  But yeah, we'll -- we'll
2 need to agree to try not to interrupt each other as
3 much as possible, okay?
4    A.   Yes.
5    Q.   If you answer my question, I'm going to
6 assume that you understood it and that you gave me a
7 full and complete answer; is that fair?
8    A.   That's fair.
9    Q.   And is it also fair that if you -- if you
10 don't understand it, that you will ask me to clarify
11 rather than just give an answer?
12    A.   Yes, that's fair.
13    Q.   And to that extent, if -- if I ask you a
14 question that, for example, maybe you don't -- you
15 can't think of the answer to right away, or you give
16 one detail, but then later on in the deposition, you
17 remember another detail, can you agree to just let
18 me know -- it's okay if we're in the middle of
19 another topic -- "Hey, I remembered my answer to one
20 of those initial questions, and I want to supplement
21 that"?
22    A.   Sure.  That would be fine.
23    Q.   Because otherwise, I'll assume that you
24 gave the full and complete answer to my question; is
25 that fair?

13

1    A.   Yes.
2    Q.   Okay.
3    A.   Yes.
4    Q.   As for breaks, let me know if you need a
5 break.  I do want to be conscious of time and -- and
6 getting this moving along and -- and not keeping any
7 of us here all day, if -- if possible.  But it's --
8 it's my practice to -- to take sort of a -- a mid-
9 morning break, and we'll take a lunch break and
10 another afternoon break, but we'll take more as
11 needed.  But just let me know if you need something.
12       If we're in the middle of a topic that I
13 just have a few more questions I want to get
14 through, I might say, "Let's -- let's get through
15 those first," but please don't be shy about that,
16 letting us know if you need to take a break, okay?
17    A.   Yes.  I understand that and appreciate it.
18    Q.   And then since this deposition is remote,
19 I want to go over a few kind of additional might
20 seem odd to you and overly technical questions.  But
21 let me ask first, have you ever had a remote
22 deposition taken before?  I think you have.
23    A.   Yes, I have.
24    Q.   Okay.  So this shouldn't be entirely new
25 to you, but one thing I just wanted to let you know



Exhibit 2
Page 4 of 163

14

1  about is -- and Mr. Brischetto, having been through
2  this yesterday with my colleague, is familiar with
3  some of this, but I'll screen share exhibits. I
4  believe that you have your report with you; is that
5  correct?
6      A.  Yes.  I have my report in front of me --
7      Q.  Okay.
8      A.  -- printed out.
9      Q.  We'll flip through that a lot.  So I may
10 not screen share that one quite as much, and we can
11 maybe each flip through it by hand instead, but
12 otherwise, I'll screen share.  If you need me to
13 scroll up so that you can better identify a document
14 or something like that, please just let me know,
15 okay?
16     A.  Okay.
17     Q.  But on that same note, what I'll do for
18 any exhibit that I share, I will pull a PDF of it
19 into the chat for both Mr. Brischetto and for
20 yourself to access and -- and you'll have to -- I
21 think you have to hit "save" and download it, but
22 then you can have your own control over the document
23 if you need to, okay?
24     A.  Yes.
25     Q.  Absent special circumstances, can you

15

1  agree to power down all electronic devices around
2  you?  For example, if you have your cell phone with
3  you, can you turn it off while we're in the middle
4  of the deposition?
5      A.  Sure.  I'll - well, I'll silence it, if
6  that's okay.  Just --
7      Q.  I'm sorry, can you say that again?
8      A.  I silenced it.
9      Q.  Okay.  If you could power it down, that
10 would be preferable.
11     A.  Okay.  Just, you know, in case there's
12 some sort of emergency, but I can -- I can do that.
13     Q.  And of course, during any breaks, anything
14 like that, please feel free, you know, to check your
15 phone.  It's just for purposes of -- since we're not
16 in the room with you, you know.  Not that we don't
17 trust you or anything like that.  It's an odd - odd
18 situation of being in the remote deposition.
19         Do you agree not to communicate in any way
20 with anyone who is not on the record during the
21 deposition?  And I say that with -- of course, you
22 can talk to Mr. Brischetto or Mr. Ellis during a
23 break, communicate with them while we're all on the
24 record, but otherwise, that you will not communicate
25 with anyone while we're on the record?

16

1      A.  Yes, I agree to that.
2      Q.  Okay.  Do you agree not to e-mail, chat
3  online, or text during the deposition?
4      A.  Yes.
5      Q.  And if anyone attempts to communicate with
6  you, do you agree to notify all parties immediately?
7      A.  Sure.
8      Q.  It appears that you're alone in the room.
9  I think you said you're in your house.  Can you just
10 verbally confirm that you're alone?
11     A.  Yes.  I'm not only alone in the room, but
12 nobody's in the house.  And the dog is at daycare,
13 and my wife is at work.
14     Q.  Again, you're going to think I don't trust
15 you by asking this, but it's just for purposes of
16 the record and the deposition, if it's possible -- I
17 don't -- if you have, like, a webcam set up that's
18 going to get knocked off by doing this, but are you
19 able to just sort of pan your camera around the
20 room?
21     A.  Sure.
22     Q.  Thank you.
23     A.  And I can walk it around if you like.
24     Q.  No.  That's okay.  You can save the house
25 tour for later.

17

1      A.  Okay.
2      Q.  And you mentioned that your dog's at
3  daycare and everything.  That's -- that's great
4  because my final question on this note is that to
5  the extent possible, can you agree, since this is
6  being video recorded, to keep the background -- the
7  noise to a minimum, for example, keep pets out of
8  the room, things like that?  Sounds like you're
9  going to be alone in the house for the whole day.
10 But can you agree to that to the extent you have
11 control over that?
12     A.  Absolutely.  To the extent that I have
13 control, there should be no disruption.
14     Q.  Thank you.  Okay.  So, Dr. Glick, how did
15 you prepare for this deposition?
16     A.  I talked to Mr. Brischetto on the phone.
17 I reread my report.  I read some articles that Mr.
18 Brischetto sent to me that were about discrimination
19 in the medical setting.  And let's see, what else?
20 I just reviewed my e-mails.  Mr. Brischetto had
21 asked me whether I'd ever talked to Dr. Bala, and I
22 don't recall ever having had any communication with
23 Dr. Bala.  I usually don't communicate directly with
24 plaintiffs or defendants or -- you know.  I usually
25 don't communicate -- I communicate with the lawyers.



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 5 of 163

18

1 So -- but I -- I -- based on my recollection, I've
2 never had any communication, and I didn't find any
3 in my e-mail.
4     Q.  A couple follow-up questions on that.  I
5 don't want you to go into the details of your phone
6 calls with Mr. Brischetto unless I specifically ask.
7 But those phone calls that you had with him, I'm
8 assuming you had calls when you were initially
9 retained on this case, correct?
10     A.  Oh, yes, correct.
11     Q.  And then also when you were drafting your
12 initial report?
13     A.  Yes.  I think we -- we -- likely -- it's
14 been a long time since I initially drafted the
15 report.  But, yes, I -- I think we spoke.
16     Q.  And then did you speak again when you
17 updated that report for 2023?
18     A.  Yes.
19     Q.  Okay.  And I'll -- I'll ask you about that
20 more in a little bit.  But then the -- when I asked
21 you about preparing for this deposition, was that --
22 you were referring to additional phone calls that
23 you had with Mr. Brischetto?
24     A.  Yes.  Just to talk about the likely
25 deposition style --

19

1     MR. BRISCHETTO:  I'm going to instruct
2 you, Dr. Glick, not to discuss the -- the contents
3 of our communication.  All she really wants to know,
4 at least at this point, is whether there were
5 additional phone calls.
6     THE DEPONENT:  Sorry.  Right.  Yes, we did
7 talk on the phone.
8 BY MS. BRADFORD:
9     Q.  And I'm going to ask you, regarding those
10 phone calls, a very direct question.  In those phone
11 calls, as you prepared for your deposition, did Mr.
12 Brischetto provide you with any new facts to
13 consider?
14     A.  I don't think so, no.
15     Q.  You mentioned that he had sent you some
16 articles; is that correct?
17     A.  Yes.  He sent me some articles last night
18 because, apparently, they came up in your deposition
19 yesterday.  Said, "Just want you to -- to have
20 these."
21     Q.  And was that the first time that you had
22 seen -- that he had sent those articles to you?
23     A.  I'm not really sure, but I think so.  But
24 I -- I can't really recall, and I didn't do a search
25 to see if I seen them before, that they -- they are

20

1 not articles I think that I used in any way.
2     Q.  That was my -- going to be my next
3 question.  Did you rely on the articles that Mr.
4 Brischetto sent you when you drafted your report in this
5 case?
6     A.  I don't think I relied on any of them.
7 Some of them were kind of position statements, and I
8 would definitely not use those, so --
9     Q.  Did you get a chance to read them last
10 night?
11     A.  I got a chance to look at them briefly
12 this morning, so, you know, I got them.  It's a
13 little later here than for you guys.  It was my
14 birthday yesterday, so I left them till this
15 morning, and I just -- I glanced at them.  I didn't
16 really thoroughly review them.
17     Q.  Happy belated birthday.
18     Let me ask you this:  From the limited review
19 that you did of them, have they impacted or changed
20 your opinion in this case in any way?
21     A.  No, they have not.
22     Q.  Did they have any bearing on your opinion
23 in this case?
24     A.  Some of them have no bearing because they
25 were more like organizational position statements or

21

1 aspirations.  One of them, you know, is relevant in
2 that it shows that across many countries female
3 physicians report experiencing discrimination.  It's
4 consistent with other information that's in my
5 report.  So in that sense, it's relevant.  Does it
6 change my opinion?  No.  If anything, it just
7 reinforces the pervasiveness of -- of discrimination
8 in a traditionally male field, so that's --
9     Q.  Dr. Glick, the one that you thought was
10 relevant, which one is that?
11     A.  It was about a global survey -- global
12 survey of physicians and experiences of
13 discrimination.  Self-reported experiences of
14 discrimination.
15     Q.  Have you discussed this case with anyone
16 other than Mr. Brischetto or other counsel for Dr.
17 Bala?
18     A.  No.
19     Q.  I think you already mentioned that you --
20 you have not spoken to the plaintiff Dr. Bala in
21 this case?
22     A.  Correct.
23     Q.  Did you speak with any of your colleagues
24 in the psychology world about this?
25     A.  No.



NAEGELI
DEPOSITION & TRIAL     CELEBRATING 40 YEARS IN BUSINESS     (800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 6 of 163

22

1    Q.  What about your spouse -- you mentioned
2  you're married -- did you speak to her?
3    A.  No.  Other than I'm doing a case and that
4  I have a deposition, those sorts of things.
5    Q.  Do you know who Dr. Molly Carnes is?
6    A.  Yes.
7    Q.  How do you know her?
8    A.  I don't know her personally.  I know her
9  by reputation or just have seen that she's -- you
10  know, what -- what she does, and I know she
11  collaborates with someone I do know very well at the
12  University of Wisconsin Madison, Patricia Devine,
13  who's a social psychologist like I am and does
14  research in discrimination.  And we -- we came out
15  of grad school at similar times, so we've been
16  colleagues for a long time doing some similar kinds
17  of work.
18    Q.  How long have you known of Dr. Carnes?
19    A.  I think only relatively recently, but I
20  can't -- I can't pin it down.
21    Q.  Understanding you can't pin it down
22  exactly, would you say that you knew of her before
23  2021?
24    A.  I'm not sure.  I really don't know.  I'm
25  really not good on timelines about that sort of

23

1  thing.
2    Q.  What about before you drafted any of your
3  reports in this case?
4    A.  I think maybe not.  I -- I don't think she
5  had sort of knowledge I may or may not have had of
6  her -- of her influenced what my report -- the shape
7  of my report in any way, or my conclusions of my
8  report.  And I wasn't aware, I think, when I
9  initially drafted my report, that -- that Dr. Carnes
10  was -- was drafting a report, as well.
11    Q.  It sounds, though, like you do know that
12  she was hired to draft a report in this case, much
13  like you, correct?
14    A.  I was only aware of that much later,
15  certainly after I had drafted my -- my initial
16  report.
17    Q.  Have you had a chance to review her
18  report?
19    A.  I did read it.  I didn't go over it with a
20  fine-tooth comb, but I did read it.
21    Q.  I'm going to ask you to put something on
22  the timeline again.  Did you review her report
23  before you submitted your updated 2023 report?
24    A.  No, I believe it was after.
25    Q.  So you would've reviewed her report after

24

1  September 15th of 2023?
2    A.  Yeah, I believe so.  I could check in my
3  e-mail to find out for sure, to see if I'm recalling
4  this correctly, but that would be the easy way to --
5  to figure it out.  I could look in the e-mail and
6  see when that report was sent to me.
7    Q.  And I might have you look at that during a
8  break, Doctor, but -- but don't worry about it right
9  now.  Did the plaintiff Dr. Bala or Mr. Brischetto
10  or any of Dr. Bala's other counsel, did they have
11  any input on the specific opinions that you
12  expressed in your report?
13    A.  No.  I -- I -- I, you know, make it very
14  clear when I hired that I evaluate things
15  independently.  So in terms of the substance of my
16  opinions, no.
17    Q.  What about the, maybe, phrasing of your
18  opinions?  Did they have any input on that?
19    A.  Well, I usually talk to the -- the lawyers
20  about how they handle some of the issues around
21  social framework testimony, so I've done this for a
22  long time.  And some of the ways in which courts
23  handle social framework testimony seems to different
24  -- differ regionally, differ by specific judges.  So
25  I usually like to -- to discuss, you know, general

25

1  approach to it and make sure that we're on the same
2  page, because I have a preference about how to do it
3  that's pretty strong.  So I want to make sure that
4  that is acceptable before they hire me or before we
5  go too -- too far down the road because I -- I want
6  to adhere to the kind of guardrails that I usually
7  try to use in how I do my testimony.
8    Q.  We'll talk about those guardrails and --
9  and some of that a little bit later.  Is it fair to
10  say, therefore, that Counsel only had opinions -- or
11  that you discussed sort of how you phrased opinions,
12  not the content or substance of those opinions?
13    A.  Yeah, I would say that was fair.
14    Q.  Were you asked to revise, delete, add
15  anything to your substantive opinions?
16    A.  Not that I can recall.  Just say that my
17  usual procedure is I draft my entire report, then I
18  send it off to the lawyers.  And -- and particularly
19  want to know if there's any areas where it's just
20  unclear, where I phrase things in a way that's
21  ambiguous for instance, any typos, any issues that
22  might be relevant to the case that -- that I have
23  omitted, that, you know, something for me to
24  consider, but I'm not looking for, you know,
25  feedback that would change my opinions.  I don't --



Exhibit 2
Page 7 of 163

26

1  I don't -- I don't appreciate that.
2      Q.  Fair enough.
3      MS. BRADFORD:  Okay.  I am going to put
4  Document A, which we'll mark as Exhibit 1, into the
5  chat.  Then I will share my screen in just a moment.
6      Mr. Brischetto and Dr. Glitz, do you see
7  that document in the chat?
8      (WHEREUPON, Exhibit 1 was marked for
9  identification.)
10     MR. BRISCHETTO:  Not yet.
11     THE DEPONENT:  Yeah, I don't see it yet,
12  either.
13     MS. BRADFORD:  Probably, I should hit
14  "send."  That would --
15     THE DEPONENT:  Now I see it.
16     MR. BRISCHETTO:  Yeah, now I see it, too.
17     MS. BRADFORD:  And can everybody see my
18  screen?
19     THE DEPONENT:  Yes.
20     MR. BRISCHETTO:  I can see the screen,
21  too.  If you would give us a minute to save and --
22  and -- and display the whole thing on our screens, I
23  appreciate it.
24     MS. BRADFORD:  Okay.  Just let me know
25  when you're ready.

27

1      MR. BRISCHETTO:  I am ready on my end.
2  BY MS. BRADFORD:
3      Q.  So, Dr. Glick, what I handed you marked as
4  Exhibit 1 is a printout from your expert -- from
5  the, essentially, expert witness tab from your
6  website.  Does that look familiar to you?
7      A.  Yes, it does.
8      Q.  And in this, you talk about your -- some
9  of your experience working as an expert witness; is
10  that correct?
11     A.  Yes.
12     Q.  And as I scroll down in this -- oops.
13  That's highlight.  But starting here, where it says,
14  "As a highly experienced expert," do you see that?
15     A.  Yes, I see that.
16     Q.  So it says, "As a highly experienced
17  expert who knows where the legal lines are drawn, my
18  testimony has consistently withstood motions to
19  exclude."  Did I read that correctly?
20     A.  Yes.
21     Q.  So, Dr. Glick, isn't it fair to say,
22  however, that your testimony has actually been
23  excluded or limited in some cases?
24     A.  It was excluded in one case, and then in
25  another case, in the same jurisdiction, it -- and by

28

1  the same magistrate judge, it was excluded, and then
2  the trial judge modified to allow me to testify.
3  And -- and indeed, I testified at trial in that
4  second case.  I can say more about this, and I would
5  like to just say that in the --
6      Q.  Let me -- let me ask you a couple specific
7  questions about that.
8      A.  Sure.
9      Q.  So the case where it was fully excluded,
10  that was the case of "Mullinex v. the -- the
11  University of Texas," correct?
12     A.  Correct.
13     MS. BRADFORD:  And, Ms. Byrd, that's M-U-
14  L-L-E-N-I-X.
15  BY MR. MS. BRADFORD:
16     Q.  What is your understanding of why your
17  testimony was excluded from that case, in a couple
18  of sentences?
19     A.  In a couple of sentences, my understanding
20  is that because judges have a lot of discretion in
21  how the guardrails are defined in social framework
22  testimony, that a judge in this case -- or the
23  magistrate judge that was appointed by the trial
24  judge, decided that this did not fit those
25  guardrails.

29

1      Q.  And then the other case that you were
2  referring to, that's the case of "Nikolova v. the
3  University of Texas," correct?
4      A.  Correct.
5      Q.  And you essentially already said this, but
6  initially, the -- the magistrate judge had excluded
7  your testimony, and then it eventually only -- it
8  was only partially excluded.  You were still allowed
9  to testify, correct?
10     A.  Correct.
11     Q.  And is it fair to say that the judge
12  limited your testimony in that "Nikolova" case to
13  only speaking about general research at the --
14     A.  Yes.  Correct.
15     Q.  In this case, Dr. Glick, do you intend to
16  offer an opinion on whether Dr. Bala was subjected
17  to gender or race discrimination?
18     A.  Well, consistent with my report, the
19  guardrails that I used in this report, which --
20  which I wrote before the exclusion in the "Mullinex"
21  case, the guardrails that I used were the guardrails
22  that Judge Gertner, in -- in a case in Boston, "Tuli
23  v. Brigham and Women's Hospital," had imposed, which
24  was that when talking about the case itself, that
25  this -- the expert -- the social framework expert

Exhibit 2
Page 8 of 163

30

1  should refrain from making the ultimate conclusion,
2  which is up to the jury.  But it's -- in -- in her
3  definition of the guardrails, which was my North
4  Star for quite a while, she said that it was
5  perfectly fine to talk -- point the -- the case
6  decision-makers to issues to consider and to talk
7  about case facts that are consistent with the
8  possibility of discrimination, you know, while not
9  ultimately opining, yes, discrimination definitely
10  occurred, or more likely than not occurred, or
11  something like that.  So I -- that's how I've
12  structured -- I structured my reports for many many
13  years.
14       Post "Mullinex," I have changed my
15  approach because of shifting standards.  What I see
16  as shifting standards in the courts.  And I
17  understand trial judges have a lot of discretion on
18  how to interpret the rules.  It's a little bit
19  frustrating for the expert because it's kind of like
20  the goalposts can shift from jurisdiction to
21  jurisdiction, judge to judge.
22       But I -- I've -- I've become even more
23  conservative, typically in my later reports.  This
24  report was written before that.  And so I do talk a
25  lot about the specific facts of the case, but I

31

1  don't ultimately draw the conclusion that -- that in
2  my understanding is -- is the courts prefer that to
3  be something that -- the way that a social framework
4  expert should handle things.
5       Q.  A couple of follow-up questions to that,
6  Dr. Glick.  You mentioned that it's frustrating
7  dealing with -- with the -- the -- the changing
8  judges and -- and their opinions.  Why do you find
9  that frustrating?
10       A.  Well, because I want to play within the
11  rules.  I'm an academic.  I'm not a lawyer.  I don't
12  have a law degree.  I've had a lot of experience as
13  an expert witness because I've done this, you know,
14  spottily, initially especially, for 30 years, or so.
15  And -- so, you know, you learn over the years it's
16  two different sets of rules about how -- you know,
17  how we do things in science and academia as one
18  domain, how the courts define things.  And I
19  perfectly recognize the courts need to define the
20  rules.  I'm -- I'm -- I want the rules.  I want the
21  guardrails.  I'm perfectly happy to have those.
22       It's just, you know, imagine if you -- you
23  have a job to do and people tell you, "Okay.  These
24  are the rules," and then you abide by those rules.
25  And then all of a sudden, the rules change, and they

32

1  say, "No.  This is not -- your work is not
2  acceptable because you haven't -- you don't fulfill
3  this new set of rules," those shifting goalposts.  I
4  think it's just natural for anyone to feel
5  frustrated.  I'm not in a rage about it.  I'm just -
6  - you know, I wish -- I wish I had a consistent set
7  of guidelines, and I see other colleagues doing
8  different things when I've occasionally been exposed
9  to other expert reports.
10       You know, I try to be conservative in the
11  sense of really abiding by what I think the courts
12  will accept and define, and I totally recognize
13  their authority to do that.  I just wish that there
14  was more consistency case-to-case, so that I
15  understood those rules more completely.
16  Unfortunately, to me, that's -- you know, that's
17  just something I think is natural for anybody to
18  want who's got a job to do.
19       Q.  Let me ask you this, Dr. Glick: If those
20  guardrails or -- or goalposts didn't exist, would
21  you feel comfortable opining on the ultimate issue
22  in this case of whether Dr. Bala was discriminated
23  against?
24       A.  Yes, I would.  If I was asked to play the
25  role of a juror, I would be perfectly comfortable

33

1  rendering an opinion based on what I've seen, which
2  is a lot of documentation on the case, and also
3  informed by my intimate knowledge of research into
4  stereotyping, bias, and discrimination.
5       Q.  And I might ask you a little bit more
6  later about some of those goalposts and -- and
7  things like that.
8       MS. BRADFORD:  But what I want to do is
9  I'm going to put Document C, which we'll mark as
10  Exhibit 2, into the -- into the chat.  I'll hit
11  "send" this time.  And I -- I'm -- I'm not going to
12  screen share this one.
13       (WHEREUPON, Exhibit 2 was marked for
14  identification.)
15  BY MS. BRADFORD:
16       Q.  But, Dr. Glick, do you see that?
17       A.  Okay.  I can download it.  I -- I -- I'm
18  assuming this is my report?
19       Q.  Yes.  So this is your -- and I'll ask you
20  to confirm this.  But this is your report that you
21  drafted.  It's dated July 30th, 2021.
22       A.  Yeah.  I'm just trying to open --
23       Q.  Once you open it.
24       A.  -- actually open it up.  I -- I mean,
25  could I -- okay.  There we go.  All right.  I'm



Exhibit 2
Page 9 of 163

34

1  trying to get my documents here.  My computer is
2  being a little slow.
3      Q.  Sure.
4      A.  So I think it downloaded to my desktop.
5  There we go.  Yeah, that looks like my report, which
6  I have in front of me as a printout, so --
7      Q.  And -- and just to be clear, Dr. Glick,
8  this report here is dated July 30th, 2021, correct?
9      A.  All right.  So that's my initial report.
10  Correct.
11      Q.  And so you were asked to draft an initial
12  report in this case that went along with some
13  summary judgment briefing; is that fair?
14      A.  I can't recall exactly about summary
15  judgment, but -- but yes, I was asked to -- to draft
16  a -- a report.
17      Q.  Okay.
18      MS. BRADFORD:  So now I'm going to drag in
19  Document D, and we'll mark Document D as Exhibit 3.
20      (WHEREUPON, Exhibit 3 was marked for
21  identification.)
22  BY MS. BRADFORD:
23      Q.  Okay.  So, Dr. Glick, is this document --
24  is this the report that you had in front of you,
25  your report drafted September 15th, 2023?

35

1      A.  Yes.  Judging from the cover page, that is
2  my report that -- my current report, yes.
3      Q.  Dr. Glick, how are these two reports
4  different?
5      A.  Well, in the time that this case was
6  sitting, from -- from my perspective, idle or
7  nothing was happening for me relative to the case, I
8  had some other cases that involved discrimination in
9  medical settings, potential discrimination in
10  medical settings, and I became more aware of some of
11  the research not directly in my field, which tends
12  to -- to, you know, not necessarily be in a specific
13  setting, but rather looks at basic processes related
14  to discrimination.  So I became aware of more
15  research, good research, that was done specifically
16  with discrimination, especially sex discrimination,
17  in -- against doctors and surgeons.
18      And so when -- when this case now became
19  reactivated, as far as I'm concerned, right, I had
20  written a report.  Nothing happened for a couple of
21  years.  And then, "Okay.  Now, there's going to be -
22  - we -- we have to you, you know, finalize your report,"
23  and all of that.  I -- I offered to -- to include
24  some of this new information that I had become aware
25  of in the general section on discriminatory

36

1  processes and looking specifically at them in a
2  medical setting.
3      So I think the -- from what I recall, the
4  -- the difference in the reports would mainly be a
5  new section that -- or an expanded section on
6  discrimination in medical settings.
7      MR. BRISCHETTO:  Megan, I'm sorry to
8  interrupt, but I need a break to get on my
9  conference call with the Court, and Matt is not here
10  yet.  So if we can take a break.  If he gets here in
11  a minute or two minutes, he'll come online and --
12  and pick up representation to -- until I get back.
13  If he doesn't get here in a minute or two minutes,
14  it -- it shouldn't be more than 15 minutes.
15      MS. BRADFORD:  Okay.  Thanks, Mr.
16  Brischetto.
17      MR. BRISCHETTO:  Thank you, Megan.
18      THE VIDEOGRAPHER:  Okay.  We'll go off the
19  record, Counsel.  All right.  The time is 10:41 a.m.
20      (WHEREUPON, a recess was taken.)
21      THE VIDEOGRAPHER:  We are on the record.
22  The time is 10:50 a.m.  You may now proceed.
23  BY MS. BRADFORD:
24      Q.  So, Dr. Glick, when we were -- before the
25  break, we were chatting about the changes that you

37

1  had made to your report between 2021 and 2023.  And
2  I think, just for clarity's sake, those changes were
3  adding in the section that you titled "Sex
4  Discrimination in Medicine" on page 40, and
5  "Backlash From Staff Toward Female Physicians"
6  starting on page 44; is that fair?
7      A.  Yeah, I think that's -- I think that
8  summarizes the changes.  I mean, I -- I might have
9  made some other changes.  I -- I can't recall, but
10  that's -- that's what I recall.
11      Q.  So you had mentioned earlier when we were
12  talking a little bit about the guardrails that are
13  placed on your testimony sometimes that, initially,
14  when you drafted this report, you -- you mentioned
15  Judge Gertner and sort of the limitations that she
16  placed, and that you drafted this report sort of
17  with those limitations in mind; is that fair?
18      A.  Yes, that's fair.
19      Q.  But then after the 2021 report was
20  written, and before your September
21  report, the -- is that when the "Mullinex" and
22  "Nikolova" cases happen, and you -- and that's when
23  you said that you've become even more conservative
24  in your approach?
25      A.  Typically, yes.



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 10 of 163

38

1    Q.  Okay.  Did you make any updates to your
2  opinion to bring them more in line with that more
3  conservative approach?
4    A.  No.  I -- I -- I didn't in this case.  I
5  felt it was kind of grandfathered.  I'd already
6  written the report.  It's a different jurisdiction.
7  And, again, I -- I have no qualms about the courts
8  deciding the rules.  It's just that it's the
9  unpredictability or inconsistency.  And I don't -- I
10  don't mind that they change the rules, but it's, you
11  know, inconsistent across different judges in
12  different jurisdictions.  And since I'd already
13  written this, I -- I didn't feel that it was fair
14  for me to now take it back.  I'd -- you know, I'd
15  spent a lot of time on it, as well.
16    Q.  When you made the updates that you did to
17  your report, adding those two sections that we
18  discussed, did you communicate to Counsel that that
19  was your idea, that you wanted to go ahead and make
20  those updates, or were you asked to update it?
21    MR. BRISCHETTO:  I'm -- I'm going to
22  instruct you not to answer that question.  I -- I
23  think it is privileged.  I think it does go to the
24  substance of communications and is work product.
25    MS. BRADFORD:  And I would disagree, Mr.

39

1  Brischetto.  I think under Rule 26, it's pretty
2  clear that in terms of anything relating to the
3  facts or the data, which these sections are
4  explicitly about data applied or any assumptions
5  given by counsel, it's fair to ask that.  Not asking
6  about the reasons, but simply if it was Counsel's
7  idea to add in this additional data, or if it was
8  Dr. Glick's idea to add --
9    MR. BRISCHETTO:  I -- I -- I think I'm
10  still going to instruct him not to answer that
11  question because it seems to me it goes towards
12  strategy, which is work product.  I mean, it's
13  certainly fair if you want to ask him whether that
14  was -- the additional sections were facts or data
15  supplied by counsel.  I'm real comfortable with --
16  with that, but I -- I don't think I'd let him go
17  beyond that.
18    MS. BRADFORD:  Let me reframe the
19  question.
20    MR. BRISCHETTO:  Sure.
21  BY MS. BRADFORD:
22    Q.  Dr. Glick, who found this additional data?
23    MR. BRISCHETTO:  Fair.
24    THE DEPONENT:  This -- is that -- is that
25  okay?

40

1    MR. BRISCHETTO:  Yes, that's fair.
2    THE DEPONENT:  Okay.
3    As I said, in the time, the two years
4  between -- I think it was two years between the
5  initial report and the later report, I had
6  participated in some cases with claims of medical
7  discrimination, and I became aware of more studies
8  that were specifically in that area.  And so I liked
9  to -- you know, I -- I started including those in
10  other reports.  And so I'm the one who found the --
11  those -- those data.  These were not supplied to me
12  by Mr. Brischetto.
13  BY MS. BRADFORD:
14    Q.  And was it your idea to add them to your
15  report?
16    MR. BRISCHETTO:  Again, I'm going to
17  instruct you not to answer that.  It's -- it's the
18  same question as before.  I believe that's work
19  product and privileged.
20    MS. BRADFORD:  And we might need to come
21  back to this on a break.
22    MR. BRISCHETTO:  Sure.
23    MS. BRADFORD:  But I'll move on for now.
24  BY MS. BRADFORD:
25    Q.  Did you review any case materials?  Any,

41

1  you know, case records, anything provided by Dr.
2  Bala's counsel in updating your report?
3    A.  Not that I could -- sorry.  Sorry.  Not
4  that I can recall, no.
5    Q.  I want to ask you a couple of questions
6  now about your experience as an expert witness.  So
7  as we've already gone through, you have been
8  retained as an expert before.  Are all of the times
9  that you've been retained listed in your CV that's
10  attached to this report?
11    A.  I think that it's complete.  There
12  might've been something like a -- a mediation or
13  something like that that, you know, wouldn't be in
14  there, but anything, I believe it's complete in
15  terms of things in federal or state court.
16    Q.  Okay.  And how many of the cases that
17  you've been retained as an expert in, the civil
18  cases, how many of those were you hired by the
19  plaintiff?
20    A.  I think all but two.
21    Q.  So what would that sort of rough
22  percentage be, like 80 percent?  90 percent?
23    A.  I don't know.  I haven't -- I couldn't
24  tell you exactly.  But you can easily count up and -
25  - and do the division.  I will just say that,



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 11 of 163

42

1 typically, given the research that I do, it's
2 usually plaintiffs' lawyers who are seeking the kind
3 of expert who knows the nuances of sex
4 discrimination.
5    Q.   And the -- the CV that's attached to your
6 September 2023 report, is that up to date?
7    A.   It's pretty up to date, but I think some
8 papers may have gotten accepted since that time.  I
9 do have a printed-out CV.  I -- I think I printed
10 out -- I don't know if this is the CV that's from --
11 that was attached to my report or if this is a --
12 later CV, but, you know, I've had a couple of papers
13 as a coauthor accepted recently, but other than
14 that, it should be very up to date.
15    Q.   But you haven't provided any other
16 depositions or other testimony since September of
17 2023; is that fair?
18    A.   Not that I can -- wait, since -- since
19 September of 2023?  I don't think so.  I could
20 double-check on that, but I don't think so.
21    Q.   How much of your income is generated by
22 your work as an expert witness?
23    A.   Oh, it varies considerably.  So just
24 timeline, you know, when I initially started being
25 asked by lawyers to -- to -- to be an expert

43

1 witness, I would do one case here, and maybe two in
2 a year, maybe none.  So it was very spotty, and --
3 and I didn't ever -- I didn't advertise.  So it was
4 not -- you know, it was something I sought out, but
5 kind of came to me.
6       In the last few years, it's been much more
7 frequent.  I guess, I'm becoming more well known
8 among the lawyers, employment lawyers, because I've
9 been asked much more frequently.  And I'm also going
10 into a phased retirement, so I have more time.  And
11 then it's become, you know, much more of a, you
12 know, proportionately, you know, it's sometimes
13 exceeding my -- my liberal arts college salary.
14    Q.   And you mentioned that you used to not
15 advertise your work as an expert witness.  But given
16 the Exhibit 1 that we've admitted, is it fair to say
17 you do advertise that now on your personal website?
18    A.   I put it on my website.  I mean, it's not
19 like paid advertisement, but I put it on my -- yes,
20 I -- I have it on my home page on my website.
21    Q.   Okay.  What --
22       THE VIDEOGRAPHER:  And I'm sorry to
23 interrupt, Counsel.  I -- I have Emily Schultz in
24 the waiting room.  Am I allowed to admit them in?
25 Okay.

44

1       MR. BRISCHETTO:  Yeah.  And I want to
2 advise Counsel, Mr. Ellis has entered the room over
3 here.
4       MS. BRADFORD:  Thank you.
5 BY MS. BRADFORD:
6    Q.   Have you ever worked with Mr. Brischetto
7 or Mr. Ellis before?
8    A.   I don't think so.  I -- but I -- I -- I
9 sometimes do get, you know, lawyers who I've done a
10 case for calling me again.  Maybe Mr. Brischetto can
11 answer that more accurately, but I don't -- I don't
12 think I have.  But I can't swear to it right now.
13    Q.   So let's move on to talking about your
14 presentation of social science research in your
15 report.  You -- it's correct that you earned your
16 Ph.D. in social psychology, right?
17    A.   Yes.
18    Q.   Dr. Glick, can you explain to me how you
19 differentiate the field of social psychology from
20 the field of personality psychology?
21    A.   Well, they're overlapping.  So for
22 instance, you know, the most prominent journal in
23 the field of social psychology is the journal of
24 "Personality and Social Psychology."  So the --
25 they're considered interconnected.

45

1       Social psychologists, in terms of nuance,
2 social psychologists tend to focus not exclusively
3 on personality variables but tend to be very
4 interested in social context.  So for example, you
5 know, in what kinds of organizations is
6 discrimination more or less likely to occur would be
7 about social context, whereas who is more likely to
8 discriminate, right, might get more into
9 personality.  Typically, however, they're -- they're
10 very interlinked fields.
11       And so social psychologists are often
12 looking both at social context variables and
13 personality or attitudinal variables that differ by
14 individuals.  In fact, my most well-known research
15 would be on individual differences in adherence to
16 sexist beliefs, right?  So depending on what you
17 want to define personality as, that's -- that's more
18 of an individual difference variable, but also a
19 social ideology.
20       So -- so we're often looking at the links
21 between these things and looking at both of them at
22 once because we really want to find out -- you know,
23 for instance, how does social context matter?  But
24 maybe not everybody discriminates.  Well, how do
25 individual differences matter?  How do they interact



Exhibit 2
Page 12 of 163

46

1 with social context, which might make people who are
2 inclined to discriminate more or less likely to
3 discriminate?  And so we -- we definitely look at
4 all of those things.
5     Q.  So I just want to ask a couple of follow-
6 up questions on that.  So would you agree that -- I
7 think you just said maybe not everybody
8 discriminates, and you can't just give a blanket
9 statement saying "Everybody discriminates"; is that
10 fair?
11     A.  Yeah.  And I -- I think from the social
12 psychology -- first off, we can't test that.  And
13 you can't test that proposition because it's an
14 absolute, and -- and you'd have to get all the data
15 of all the time in the world.  So I mean, I think
16 based on what we do know, it's likely that everybody
17 at some time has discriminated, right, against
18 others, and that we all have sort of well-learned
19 stereotypes that can bias our perceptions.  But
20 that, you know, when you get down to a specific
21 situation, a specific individual who might or might
22 not be the target of discrimination, that, you know,
23 I wouldn't -- I wouldn't -- we -- we try to figure
24 out, when is that discrimination more or less
25 likely.  And so in that sense, not everybody's going

47

1 to discriminate every time.
2         So I'll just give you an example.  Just I
3 would never make the blanket statement that women
4 are always discriminated against relative to men, or
5 that certain kinds of people always discriminate
6 against women.  I wouldn't make those kinds of
7 absolute statements because the -- the truth is more
8 nuanced than that, which is why I think you need an
9 expert to inform juries about -- about those nuances
10 that are -- that are demonstrated by research.
11     Q.  Speaking of those absolutes, and given
12 your experience as an expert, would you feel
13 uncomfortable making the sort of absolute statement
14 that all women electrophysiologists face
15 discrimination?
16     A.  Yeah.  I think -- I think we can't
17 sustain, typically, those absolute statements
18 because you're not going to have data.  You know, it
19 would be impossible to sustain that, right?  And so
20 I -- I think, just generally, a social scientist who
21 studies these things would be allergic to agreeing
22 to those kinds of absolutes.  And -- and it's more
23 complicated than that and more nuanced than that.
24     Q.  And we'll get to this more -- more later.
25 But I think you would agree, given the research that

48

1 you have done and the studies that you have
2 published, that it is not correct to say that we all
3 hold the same biases or the same levels of bias; is
4 that fair?
5     A.  The way I respond to that is that we have
6 good evidence that gender bias is -- is pervasive,
7 that we're all exposed to it, that we all are likely
8 to at least have some -- some leanings, that, you
9 know, we -- we understand the stereotypes, we've --
10 we've internalized the stereotypes.  Do they always
11 translate into discriminatory behavior?  No, they --
12 they don't.  And that depends on the situation.  It
13 depends on the individual, all sorts of things that
14 I cover in my report.
15     Q.  And, Dr. Glick, I appreciate that.  My
16 question isn't specific to gender biases.  Let me
17 just ask you in this way.  Do you agree with the
18 statement that we all hold -- as people everywhere,
19 we all hold the exact same biases, period?  Do you
20 agree or disagree with that?
21         MR. BRISCHETTO:  I'm going to object that
22 that's vague.  Go ahead.
23         THE DEPONENT:  Yeah.  And that's -- that's
24 my problem with that statement.  You know, I -- I
25 think it's so broad that -- do you want to -- can

49

1 you just repeat that statement?  I'm -- I'm trying
2 to wrap my head around it because I think it's --
3 it's just too general and broad for me to really
4 feel I can have a confident response to it.
5 BY MS. BRADFORD:
6     Q.  Yeah, sure.  And it is a broad statement,
7 and -- and that's sort of why I'm asking if you
8 agree or disagree with this broad statement that we
9 all hold the same biases.
10     A.  I would say that I would not agree with
11 that broad statement because I'm covering all sorts
12 of different kinds of groups, potentially.  And, you
13 know, I'd be -- I think what's more pertinent in
14 this case is to ask questions about gender bias.
15     Q.  You've touched on this already, but is it
16 fair to say that social psychologists examine the
17 power of situations to influence thought and
18 behavior?
19     A.  Yes.  That's kind of a core intellectual
20 tradition of the field and kind of a defining
21 feature.  That's not -- that's not the only thing we
22 do, but that is kind of a core way we define what we
23 do.
24     Q.  And do you agree that situations can have
25 a power influence -- sorry -- a powerful influence



Exhibit 2
Page 13 of 163

50

1 on our thought and our behavior?
2    A.  Oh, absolutely.  I mean, that's -- that's
3 a key.  You know, if you looked at a social
4 psychology textbook, you know, it would be pretty
5 uncommon for them not to make that statement as kind
6 of a key insight about social psychology.  Now,
7 again, you know, it depends, right, on the
8 specifics, but one of the key points that social
9 psychologists have established is that the power of
10 the situation can often exceed people's awareness of
11 the power of the situation.
12    Q.  Do you agree that features of a situation
13 can increase or decrease the likelihood that someone
14 will engage in, say, gender discrimination?
15    A.  Yes.
16    Q.  And same for race discrimination?
17    A.  Oh, yes.
18    Q.  Dr. Glick, on page 13 of your report, you
19 state, and it's towards the bottom, that:
20 Stereotyping and discrimination represent complex
21 processes that depend on situational context,
22 organizational climate and practices, individual
23 attitudes, and other factors.  So given this and
24 what you've just testified about, would you agree
25 that there are many different factors that can

51

1 affect whether someone engages in stereotype and
2 discrimination?
3    A.  Sure.  It depends on how you define
4 "many," but I think that's what I'm saying there is
5 that, you know, this is complicated.  It's not like,
6 "Oh, men hate all women," or -- or something like
7 that.  That's -- that's just not -- that's just not
8 true, and the data show that.  And so we have
9 thousands of studies to try to really understand
10 those nuances, and we've made a ton of progress in
11 understanding when it becomes more or less likely.
12    Q.  And given -- you noted that it's
13 complicated.  Given that, would you agree that the
14 characteristics of specific situations,
15 characteristics of the specific individuals involved
16 in a case need to be carefully analyzed to determine
17 whether anyone engaged in stereotyping or
18 discrimination?
19    A.  If you're talking about a legal case, I
20 definitely think that the case decision-makers
21 should carefully look at the evidence, you know,
22 including things like evidence about -- that might
23 exist about organizational climate, you know, when -
24 - and -- and then -- and the social framework
25 evidence that I can provide.  And I just want to say

52

1 that although things are complex, what social
2 psychologists are also very good at and what -- just
3 personal shout out, what I'm quite well known for,
4 are constructing theories that make sense of this
5 complexity and that provide a framework that can
6 help people in a specific case pick through whether
7 it was likely that discrimination occurred or
8 relatively unlikely that discrimination occurred.
9    Q.  So given what you've -- you've sort of
10 defined your -- your role as, would you agree that -
11 - I think you said that case decision-makers need to
12 carefully analyze and consider these specific
13 situations, but that you need to, as well?
14    A.  Oh, I think I have, yes.
15    Q.  When you prepared your report, did you
16 seek to provide an objective and unbiased
17 presentation of the social science research that was
18 relevant to this case?
19    A.  Yes.  I try to write a report that if you
20 randomly selected 10 of my colleagues in social
21 psychology, especially those who specialize in
22 prejudice and discrimination, that they would read
23 the report and say, "Yeah, that's a fair and
24 accurate rendering of the consensus in the field
25 based on the studies that have been conducted."

53

1    Q.  Dr. Glick, on page 50 of your report, at
2 the top of the page, you write that "social
3 framework experts serve a specific role: educating a
4 jury about research findings and pointing out ways
5 that research findings may help inform their
6 decision."
7        So given this and what you've already
8 talked about this morning, would you agree that if
9 you were to testify in this case, it would be your
10 job to educate the jury on the research that's
11 relevant to stereotyping and bias of discrimination?
12    A.  Yes.  And to provide them with a
13 scientific consensus.  I just want to say that
14 whenever you conduct thousands and thousands of
15 studies, as have been done, you're going to get, you
16 know, some studies that don't find an effect.  But
17 you need to really have somebody who understands
18 what's the theories and also the variables and look
19 at them quite carefully to -- and -- and also then
20 crunch these together.  So we do things such as meta-
21 analyses, which crunch together the data from
22 various studies because there's a lot of noise, as
23 well.
24        You know, you can't -- can't completely
25 eliminate random error in studies, for example.  And



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

Exhibit 2
Page 14 of 163

54

1  so, you know, you need to kind of go with what the -
2  - the weight of the evidence -- the weight of the
3  scientific evidence shows. So what I would say is
4  my report adheres to that weight of the scientific
5  evidence, highlighting some studies that people
6  could understand that are -- are relevant to the
7  issues at hand, that are representative of the
8  weight of the evidence.
9      Q.  Do you think it's important to inform the
10  jury, whether it's through your report or through
11  your testimony, of all of the relevant research on
12  this topic?
13      A.  Well, I have a -- a book on gender with my
14  coauthor Laurie Rudman that's -- I don't know,
15  whatever, 300 pages -- more than 300 pages long.
16  And I don't know the references. It would be
17  thousands of references. And that doesn't cover all
18  the studies, right? There's just too much to -- to
19  -- it would -- I mean, it would be -- I'd have to
20  write several volumes to cover all studies that --
21  you know, in this area. So, you know, I think that
22  would be impossible.
23      Again, it's really to explain in a way
24  that an average person could understand the weight
25  of the evidence with illustrative studies that are -

55

1  - you know, that are particularly demonstrative of a
2  principle and that fit within the general consensus,
3  that is -- that just fit within the general weight
4  of the evidence. I mean, I'll just give you an
5  example.
6      Q.  Here, let me ask you this, Dr. Glick. You
7  mentioned earlier that you -- because of the -- the
8  amount of studies out there that you sometimes have
9  to highlight certain ones. How do you decide which
10  ones to highlight?
11      A.  I think I just answered that question to
12  some extent. Their relevance. Some of them are --
13  are more understandable, and they're -- they're more
14  pertinent to the issues that are at hand in a case.
15  You know, and -- and so they -- they -- and they
16  illustrate the kinds of methods. They're
17  particularly well done, particularly informative, or
18  on point. These would be criteria that I would use
19  to -- to decide, you know, which ones to highlight.
20      But I also will, you know, cite meta-
21  analytic studies, which crunch across sometimes
22  hundreds of -- of studies on a particular kind of
23  effect, or even more, you know, than that, that
24  might have tens of thousands of participants
25  represented across studies, statistically crunch

56

1  them all together. And, also, include some of what
2  we call the moderator variables to start trying to
3  figure out, well, when does this happen? When does
4  this not happen? What's the average effect? All of
5  those sorts of things. So again, it's trying to
6  represent fairly and accurately the weight of the
7  evidence.
8      And again, I would just contend that if you
9  randomly selected 10 or 50 of my colleagues in this
10  area, they would read my report, and I don't know,
11  maybe they'd have a quibble here or there, but I
12  think they would say, "Yeah, that report is, you
13  know, accurate representation of the consensus."
14      Q.  So you mentioned that it's important to
15  present them fairly and accurately, I think you
16  said. When you wrote this report, did you seek to
17  present the -- the relevant research understanding
18  how you've -- you've talked about which research you
19  selected, but did you seek to present that in an
20  even-handed way without favoring one party over the
21  other?
22      A.  It's not a matter of favoring one party
23  over the other. It's a matter of representing the
24  weight of the evidence. So I'll give you an
25  example. Backlash research. I read a lot of

57

1  research on backlash. There was a study done in
2  Sweden, and I looked at the study, and I said, "Oh,
3  this is great. They got an organizational sample,
4  and they looked at backlash in -- in actual
5  organizations."
6      But the -- the materials that they
7  devised, when I looked at -- and this is why you
8  need an expert because when I looked at the actual
9  materials, this person didn't understand the
10  circumstances that produce backlash. So as I say in
11  my report, it's things like women who are assertive,
12  ambitious, or in a position where they have to
13  criticize others, these are the kinds of things that
14  elicit backlash.
15      Well, in this particular study, which was
16  unfortunate because they had a great sample, they
17  did so many things right, but they did one thing
18  fatally wrong in order to test backlash. And that
19  is the materials. When you look at them, they said,
20  "This person is incredibly hardworking." That was
21  kind of the main theme, and -- and that's not what
22  elicits backlash. A hardworking woman, fine.
23  Everybody's fine with a hardworking woman, right?
24  It's an ambitious, assertive women -- women that,
25  you know, not everybody is fine with.

Exhibit 2
Page 15 of 163

58

1    So I look at the study, and I say, "Okay,
2  this is a study, one in a minority, that seems to --
3  to contradict backlash."  But when you examine the
4  study closely, they didn't really understand the
5  theory and the materials were inappropriate.  So
6  then I'm going to say, "Well, as an expert, that one
7  doesn't count," okay?  Not because it didn't find
8  the effect, but because it didn't really test the
9  effect.
10    And again, when you look across a vast set
11  of studies, you're going to find some that don't
12  find the effect, occasionally.  But if across this
13  vast set, it's -- generally, you find this effect
14  and the effect is strong, well, that's the weight of
15  the evidence.
16    Q.  Doctor, like you said that you have been
17  retained by the defense twice before as an expert,
18  correct?
19    A.  Yes.
20    Q.  Did you draft reports in those cases?
21    A.  Yes.  I did draft reports in each of those
22  cases.
23    Q.  Were the studies that you cited in those
24  two cases, were they the same studies that you cited
25  in, for example, Dr. Bala's report?

59

1    A.  Well, to the extent that they worked on
2  similar issues, that was -- the answer would be yes,
3  right?  Now, I don't know what I can say about these
4  cases, because I think both of them -- I'm not --
5  I'm not sure what their status is.  Are they
6  settled?  Or whether this kind of thing I signed
7  confidentiality agreements.  I'm not sure what I'm
8  allowed to say, but I'll just tell you my general
9  process, and I'll give you an example that I think I
10  can talk about.  The "Nikolova" case went to trial.
11  There was a judgment.  So I think it's --
12    Q.  Okay.  I don't mean to interrupt you, I --
13  but I -- I just want to focus on -- and I
14  understand.  I don't want you to go into any details
15  that you can't go into it, those cases.  But my
16  question is, essentially, when you're hired by the
17  defense, do you highlight -- to the extent it covers
18  the same issues or same topic, do you highlight the
19  same research?
20    A.  I would highlight, again, the research
21  that is consistent with the consensus of the field,
22  yes.
23    Q.  When you drafted, Doctor -- I -- I'm
24  sometimes just going to say, for shorthand, "Dr.
25  Bala's report," meaning the report in this case.

60

1    But when you drafted Dr. Bala's report, did you omit
2  any details about the research that might not be
3  favorable to Dr. Bala and her case?
4    A.  I don't think so.  I try to be very fair.
5  You know, I try to, again, represent the weight of
6  the evidence and talk about the studies accurately.
7  And -- and I don't take on cases -- I will tell you
8  that, generally, when I'm looking -- you know, when
9  a lawyer calls me, I say, "Well, let's just have a
10  phone call, and I -- I want to see the complaint or
11  whatever you have," a summary of the case, to see if
12  my expertise is relevant, or, you know, I just feel
13  it would be uncomfortable if I'm hired.
14    And, you know, I have been hired on
15  occasion, where it's like, "Well, what you have to
16  say is not really going to help us, so we're going
17  to not use you further," right?
18    But I try to weed that out when I can by
19  just, you know, seeing if -- if this is a case where
20  the research would be useful, relevant, and -- but I
21  -- you know, I make it clear that I have to -- if my
22  colleagues would read a report and say, "Oh, you
23  really misrepresented our field or our findings," I
24  don't want to do that.  I -- I -- that's -- that --
25  that would go against my -- my -- my whole career.

61

1    Q.  I asked you if you omitted any details
2  about the research that might not be favorable to
3  Dr. Bala's case.  Did you omit any findings or
4  entire studies that might not be favorable?
5    A.  Well, again, I -- I think I've answered
6  this, but, you know, I represent the -- the weight
7  of the evidence in the field.  So there's always
8  going to be some studies, like this Swedish study
9  that I talked about that's going -- that -- you
10  know, that -- there always will be that case.
11  There's a lot of ways to screw up a study, you know?
12    If you ever were in chem lab, you know,
13  maybe you didn't get the reaction you were supposed
14  to get.  There -- there's a lot of ways -- when you
15  get into the details, there are lot a of ways to
16  screw up a study so you maybe don't see an effect.
17    So there's going to be some of those
18  studies and -- and there's random variation, as
19  well.  So, you know, I go by the weight of the
20  evidence and get studies that are representative of
21  that and also that really are relevant to the issues
22  at hand.
23    Q.  You mentioned a couple of times that when
24  you draft your reports, that you -- you like to
25  think that if you were to show the report to your

**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 16 of 163

62

1 colleagues, or something, that they would -- they
2 would think that -- yes, maybe they would have a few
3 nitpicks here and there, but that, overall, you --
4 they -- they generally agreed or thought that you
5 sufficiently captured the relevant research.
6      Have you ever done that with any of your
7 reports, sent it to your colleagues, you know, even
8 if it's after the case is done, and asked to get
9 their opinion on -- on your opinions?
10     A.  No.  I think there's usually
11 confidentiality agreements on these cases, so I
12 don't -- I don't think that would be kosher.  So I -
13 - I don't -- I don't make that a -- I don't make
14 that a practice.  I'm not looking for that -- you
15 know, not -- I'm not subjecting it to that because I
16 don't think it's allowed.
17     Q.  Have you received any training that would
18 allow you to determine in a scientifically reliable
19 way which witness testimony is true and which is
20 false?
21     A.  So I know, I have a Ph.D. in social
22 psychology.  I'm a well-known researcher.  I have
23 thousands -- tens of thousands of citations.  I have
24 awards.  I -- I am very adept in -- in my scientific
25 field.  But, you know, when you come -- when it

63

1 comes -- and I explained in my report, when it comes
2 to a specific case, there's not a scientific method
3 that I'm aware of where you could directly and
4 scientifically assess the credibility of an
5 individual, right?  That's -- you know, so if you
6 look at the studies, right, you have multiple
7 participants, sometimes hundreds, sometimes, even in
8 bigger studies, thousands of participants, right?
9 And we're looking at, when we vary different
10 conditions, what happens across these different sort
11 of things.
12     So if we put a man's name on a resume,
13 take the identical resume and put a woman's name on
14 it, we randomly assign people to evaluate that
15 person for a male-dominated job versus a female-
16 dominated job, let's say.  We then do an
17 experimental study and we compare averages, right?
18 Then we can detect whether discrimination occurs
19 because the qualifications are identical, right?  We
20 -- we have the luxury of creating the situation
21 where we can control for everything.
22     Real life doesn't offer you that, but our
23 experiments allow us to do that, which is what's so
24 great about them because we can then detect whether
25 there is an effect, but we can't say which

64

1 individual discriminated, right?  We know that
2 there's a general effect, that people evaluate the
3 resumes differently depending on whether it's a male
4 or female name, right?
5      So it's -- to me, it's kind of a
6 nonsensical question.  We don't have some sort of
7 infallible lie detector where we can do that.  And,
8 also, my understanding from my years of experience
9 is -- is that the courts do not want social
10 framework -- social framework experts to render
11 credibility judgments about witnesses.  So it
12 wouldn't even be a legitimate part of my role.
13     Q.  Are you familiar with the concept of self-
14 serving bias?
15     A.  Yes.
16     Q.  Is it fair to say that self-serving bias,
17 among other things, can be the tendency to maybe
18 take personal credit for successes and then blame
19 external factors for failures or setbacks?
20     A.  Yeah.  That can be part of self-serving
21 bias.
22     Q.  And that's -- you're assuming you're
23 familiar with it because it's a phenomenon that's
24 been pretty well documented by social psychologists,
25 right?

65

1     A.  Yes, definitely.  The self- and self-
2 serving bias, egocentric biases, definitely
3 something we've researched.
4     Q.  It's a very -- one of the more robust and
5 common biases that's observed by social
6 psychologists, right?
7     A.  Yes.  Especially in Western cultures.
8 Yeah.
9     Q.  If a person's employment contract is not
10 renewed, do you think that could be damaging to that
11 person's self-image?
12     A.  I would think so.  Yeah.  Generally, sure.
13     Q.  And you would agree that -- you know, that
14 could be a situation that's maybe financially
15 damaging to that person, right?
16     A.  I imagine, yes.
17     Q.  As a social psychologist, therefore, would
18 you, therefore, agree that a nonrenewable --
19 nonrenewal of a contract could lead to someone
20 blaming others for that outcome?
21     A.  It certainly could.
22     Q.  And maybe discounting their own behavior
23 as the cause?
24     A.  Yeah, that could -- that could certainly
25 happen.



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 17 of 163

66

1    Q.  In other words, demonstrating self-serving
2  bias, right?
3    A.  Right, yeah.  And in that circumstance,
4  you'd want to look at other evidence of whether the
5  person is being accurate or inaccurate if you add
6  other potential evidence.
7    Q.  And I'll talk to you a little bit later
8  about the documents that you reviewed in this case.
9  But you did review Dr. Bala's deposition about those
10  documents, right?
11    A.  Yes.  I mean, I haven't reread it since,
12  whatever, 2021.  So I'm not going to be an
13  encyclopedic recall.  You know, I'm not going to
14  have encyclopedic or perfect recall of -- of her
15  deposition, but yes, I've read it.
16    Q.  I'm just asking if you reviewed it.
17    THE REPORTER:  I'm sorry, Ms. Bradford,
18  could you repeat that?
19    MS. BRADFORD:  Yes.
20  BY MS. BRADFORD:
21    Q.  I'm just asking if you reviewed it.  It
22  sounds like you have, correct?
23    A.  Yes.  I did in the past.
24    Q.  Do you think that self-serving bias is a
25  psychological phenomenon that the jury should know

67

1  about when evaluating evidence in this case?
2    A.  Well, I think the evidence in this case --
3  you know, I would put it this way, I think that the
4  jury should not rely on -- simply on Dr. Bala's
5  perceptions.  There's a lot of evidence in this
6  case, and that -- that it goes to the issue of
7  whether or not discrimination was likely.  And, you
8  know, that -- the -- again, the -- the -- they --
9  the -- my understanding is I'm not supposed to make
10  credibility judgments, and that would be kind of
11  treading on credibility judgments about Dr. Bala's
12  testimony.
13    As you'll note in my report, I -- I don't
14  focus on Dr. Bala's testimony.  I focus on things
15  like the HR investigations into specific incidents
16  where at least one or more individual claimed that,
17  say, Dr. Bala was rude or abrasive or high-handed or
18  whatever.  And -- and it -- that's -- that goes much
19  more specifically to what actually happened.  What
20  did people say about what happened, okay?  Did
21  people exaggerate what -- what happened?  Those
22  sorts of issues, those are what, to me, are
23  relevant.
24    I'm not making credibility judgments about
25  Dr. Bala, just like I'm not making credibility

68

1  judgments about others.  I'm just pointing out
2  here's what happened according to witnesses.  Jurors
3  need to decide who -- which witnesses they're --
4  they're trusting.  But here's also a -- a process, a
5  timeline, where, you know, witnesses said X and
6  then, say, Dr. Hendrickson said Y.  Those sorts of
7  things that I think are much more relevant to -- to
8  picking that apart.
9    Q.  So, Dr. Glick, I appreciate what you're
10  saying about that.  It's not your role to make the
11  credibility judgments in this case, and I think
12  you'd agree with me that that's the role of the
13  jurors in this case, right?
14    A.  Right.
15    Q.  And that your role is, instead, to help
16  point them to the research, the, you know,
17  psychological phenomena, things like that, that can
18  aid them in making their decisions, right?
19    A.  Sure.
20    Q.  Would you agree that the concept of self-
21  serving bias is something that could aid a decision
22  maker in making a credibility judgment?  Not asking
23  for your opinion on whether -- on credibility in
24  this case, but just, is that a phenomenon that could
25  aid decision-makers in evaluating testimony and

69

1  making their decisions?
2    A.  I think potentially it could.  It didn't
3  occur to me to -- to talk about self-serving bias.
4  I was, again, focused on the evidence from the
5  perspective of claims of discrimination.  I mean,
6  you know, inherently, you know, I think the -- my
7  approach is, you know, not to rely on what the
8  plaintiff says, you know, in terms of their
9  perceptions of whether discrimination occurred, but
10  to rely on the evidence that -- that -- you know,
11  again, there's ample evidence here that goes to the
12  point more directly about whether discrimination may
13  have occurred.  I don't think you see me implying
14  that Dr. Bala is necessarily more or less credible
15  than anyone else.
16    Q.  Have you received any training that would
17  allow you to read deposition testimony or other case
18  records and then infer in a scientifically valid and
19  reliable way whether a past decision was motivated
20  by gender or racial bias?
21    A.  Well, what I have is a -- very intimate
22  knowledge of all of the research that shows the
23  circumstances under which discrimination is more or
24  less likely, so I'd say that that's relevant
25  training.  I don't think there's any other kind of

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 18 of 163

70

1  training that -- that -- that would exist exactly to
2  -- to enable someone to -- to make those judgments
3  in a better way.  But -- so I would -- I would say
4  my -- my -- my experience and understanding of all
5  of the research is the training that's relevant to
6  that.
7      Q.  Is there any research that either you have
8  done or that you have reviewed that has -- that
9  covers how to read written records and then infer
10 from those records in a scientifically --
11 scientifically valid and reliable way whether a past
12 decision was motivated by gender or racial bias?
13     A.  I don't really think that there's any such
14 training.  I mean, there are methods by which you
15 can look at a transcript and -- and have words coded
16 for, you know, maybe evidence of gender bias, right?
17 Like how many -- how many words -- you know, the
18 word "shrill" used, you know, when -- in personnel
19 evaluations of women, but not personnel that -- that
20 -- more frequently than personnel evaluations of
21 men, for instance, something like that.  But
22 otherwise, I can't think of any sort of formal
23 training that is available that would allow anyone
24 to do --
25     Q.  Do you agree that both male and female

71

1  surgeons or physicians sometimes engage in rude and
2  unprofessional conduct?
3      A.  I'm sure --
4      MR. BRISCHETTO:  I'm going to object --
5  before you go -- answer, I'm going to object --
6      THE DEPONENT:  Yeah.  Sorry.
7      MR. BRISCHETTO:  -- on the grounds of
8  vagueness and ambiguousness.  Go ahead, Dr. Blick.
9      THE DEPONENT:  I think we could make a
10 generalization, regardless of profession or group or
11 role, that in -- in any large group there are going
12 to be individuals.  And probably, any individual
13 over the course of their life, there's going to be
14 some instance of potentially rude or whatever kind
15 of behavior you talked about.
16     MS. BRADFORD:  Just give me one moment.
17     THE DEPONENT:  Can I just add that to me,
18 the -- the issue -- sorry.
19     MS. BRADFORD:  Sorry.  Just give me one
20 moment.
21     THE DEPONENT:  Okay.
22     MS. BRADFORD:  Is it okay if we actually
23 take just a brief comfort break, just five minutes?
24     THE VIDEOGRAPHER:  Okay.  Please stand by.
25 The time is 11:36 a.m., and we are off the record.

72

1      (WHEREUPON, a recess was taken.)
2      THE VIDEOGRAPHER:  We are on the record.
3  The time is 11:42 a.m.  You may now proceed.
4      MS. BRADFORD:  Thank you.
5  BY MS. BRADFORD:
6      Q.  So, Dr. Glick, we -- a little bit earlier
7  on, we were talking about sort of the -- the
8  variances that people can hold in terms of the
9  strength and the nature of their biases.
10     Do you agree that women and men can vary
11 in the nature and strength of the attitudes that
12 they hold towards women?
13     A.  Sure.  I mean -- yes.  They -- I would say
14 that about any groups, right.
15     Q.  And, in fact, on -- if you could go to
16 page 17 of your report, you write towards the end of
17 the first paragraph that "men, on average, tend to
18 endorse hostile sexism more than women do; for
19 benevolent sexism, gender differences tend to be
20 smaller and, in nations with stark gender
21 inequality, even reverse (i.e., women tend to
22 outscore men.)"
23     A.  Yes.
24     Q.  Can you please define hostile sexism?
25     A.  Hostile sexism is an explicit form of

73

1  sexism where people have attitudes that women are
2  competitive, compete with men in -- in -- in often
3  unfair ways, are sort of a threat to -- to -- you
4  know, to -- to reverse power relationships.
5      So that -- so examples of items would be
6  that women get upset, you know, when they -- when
7  they're -- when they lose fairly to men, they --
8  they claim discrimination, would be one of the
9  items, that women are trying to gain control over
10 men, that women use kind of sexual allure to -- to
11 manipulate men.  It's just generally a sort of
12 resentful attitude toward women who are perceived at
13 trying to turn the tables on men.
14     Q.  And then what about benevolent sexism?
15     A.  Benevolent sexism has -- although, these
16 two attitudes are -- are-- are correlated
17 positively, that is, the hostile sexist is likely to
18 -- also, to some extent, be a benevolent sexist; not
19 always, but they're correlated.  Benevolent sexism
20 is -- is the sort of more subtle, paternalistic,
21 softer side of sexism.  It's kind of the pat you on
22 the head, "Oh, aren't you sweet?"  There's an
23 underlying sense of women being less competent than
24 men, being more fragile than men, being in need of
25 men's protection and provision, and -- and kind of



Exhibit 2
Page 19 of 163

74

1 these delicate fragile flowers who maybe couldn't be
2 surgeons, for instance, right?
3 So it -- it -- both of them -- the reason
4 they are positively related is that both of them
5 serve the same goal to maintain -- you know, to
6 support the idea of male dominance. And -- but one
7 is the -- the stick.
8 Hostile sexism is the punishment toward
9 women who are seen as competitors to men, so
10 assertive women, things like that. Benevolent
11 sexism is more the carrot dangled toward women to
12 keep them in a more accommodating, subordinate,
13 nurturing kind of role as supporters to men,
14 enabling men to be the ones who wield power.
15 Q. Dr. Glick, did you develop the ambivalent
16 sexism inventory to measure hostile and benevolent
17 sexism?
18 A. Yes, I did, along with Susan Fiske, who's
19 up at Princeton University.
20 MS. BRADFORD: So I'm going to go ahead
21 and drag Document E, which we will mark as -- I
22 believe it's --
23 THE REPORTER: Exhibit 4.
24 MS. BRADFORD: Exhibit 4. Yes, thank you.
25 And then I will go ahead and share my

75

1 screen as well.
2 (WHEREUPON, Exhibit 4 was marked for
3 identification.)
4 THE DEPONENT: Okay. Share it.
5 BY MS. BRADFORD:
6 Q. Dr. Glick, I'm sharing the ambivalent
7 sexism inventory. Do you recognize that? That's --
8 A. I'm looking -- it -- yes. I mean, it's --
9 it's -- it's not the version I have on my computer,
10 but, yes, it's a -- a version of -- of my scale
11 along with Susan Fiske.
12 Q. So does this document contain information
13 on how to calculate individual scores on these
14 measures?
15 A. Yes, it does. I think if you scroll down
16 a little bit, it should. No. You have to reverse
17 some items There's nowhere -- just scroll up. I
18 don't know. Usually, at the bottom, I have
19 instructions --
20 Q. And there's --
21 A. -- on how to do it.
22 Q. -- on here about, you know, depending on
23 if you indicate the degree to which you agree or
24 disagree with each statement, 0 being disagreed
25 strongly, 5 agree strongly, et cetera, things like

76

1 that, right?
2 A. Right. So people can agree or disagree
3 with each statement, and more or less, agree more or
4 less with it, disagree more or less with it, and
5 then you average the ones with the B designation or
6 benevolent sexism items. You average those
7 together, reversing some of the items, like in this
8 version, "In a disaster, women ought not necessarily
9 to be rescued before men."
10 That's -- that's would be scored in the
11 reverse direction. So you would reverse. So if it
12 was a 2 on that item, you'd -- you change it to a 4
13 in scoring. And then you average the items on each
14 scale, and that is your benevolent sexism and
15 hostile sexism score.
16 Q. Dr. Glick, if a person takes this test and
17 gets an average score of 5 on the hostile sexism
18 scale, what does that score indicate to you?
19 A. Well, then they, relative to other people,
20 because the -- the average score on this scale is
21 not going to be anywhere near 5, typically, they
22 would -- they would be relative toward other people
23 more strongly endorsing sexist attitudes. I would -
24 - I would say they are more fitting the profile of
25 an ambivalent sexist. But we don't have some sort

77

1 of specific cut-off norm. Rather, we use this as a
2 research tool and show what do higher versus lower
3 scores on these scales predict or correlate with.
4 And there's a lot of evidence that
5 validates the scale by showing -- for instance, if
6 we get national samples, and I published a couple of
7 cross-national studies, and -- and in fact, we have
8 new data on this not yet published because we're
9 working on the finished -- finalizing the paper, but
10 across the new data, across 62 nations with tens of
11 thousands of participants.
12 If you look at nations where the average
13 score is higher on hostile sexism or higher on
14 benevolent sexism, that is correlated with actual
15 structural gender inequality. That is, those are
16 the nations where there are fewer women in
17 management roles, where women have less economic
18 independence or power, where women have less
19 political power. So all of those sorts of things,
20 that's one example of something that these scales
21 predict.
22 Q. And on the flip side, if a person takes
23 this test and gets a score of zero on either the
24 hostile or benevolent sexism, I'm assuming that the
25 reverse is true, that that indicates, albeit rarely,

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

Exhibit 2
Page 20 of 163

78

1  probably, that relative to other people are much
2  less likely to endorse sexist traits, fair?
3      A.  Yes, in terms of explicit endorsement of
4  sexist attitudes.  Now, that does not mean that they
5  necessarily treat men and women equally because this
6  scale is a -- is one measure.  But in fact, for
7  instance, even though women score lower, on average,
8  in hostile sexism than men, backlash research shows
9  that women are generally about as likely as men to
10  dislike assertive -- you know, dominative assertive
11  high-status women.  So --
12     Q.  Dr. Glick?
13     A.  -- so this is not --
14     Q.  Dr. Glick?
15     A.  -- the only --
16     Q.  Sorry.  I'm just going to interrupt you.
17  I'm so sorry to interrupt you, but just trying to be
18  cognizant of time.  I think even Mr. Brischetto can
19  appreciate we were in a bit of a long deposition
20  yesterday.  I don't want your deposition to have to
21  go all day today, if it's possible to avoid that.
22     So I just want to keep you focused on just
23  my question.  About what -- not going into the
24  backlash studies or anything like that, but just for
25  purposes of this score, it sounds like you agree

79

1  with me -- I'm sorry -- just for purposes of this
2  test, that getting an average score of 0, however
3  rare that might occur, indicates that relative to
4  other people, that person would be less likely to
5  endorse explicit sexist traits, correct?
6      MR. BRISCHETTO:  I do object to the
7  interruption in that -- in that -- with that answer.
8  I -- I saw his discussion of the backlash research
9  as responding -- responsive to your question.  And I
10  think he's entitled to explain his answers.
11  BY MS. BRADFORD:
12     Q.  Is that correct?
13     A.  Yeah, that -- that is correct.  And then I
14  just want to say, again, that -- that this, although
15  an important measure of sexist attitudes, that you
16  can score low on these scales and yet still
17  discriminate.
18     Q.  And the midpoint of these scales is 2.5,
19  correct?
20     A.  Yeah, that would be -- yeah, on this -- on
21  this scaling.  Yeah.
22     Q.  And so, again, just for purposes of this
23  scale, if you endorse sexist views more often than
24  you don't endorse them, then your score would be
25  above a 2.5 we can assume, correct?

80

1      A.  Correct.  Yeah.
2      MS. BRADFORD:  Just you'll give me one
3  moment.  I'm going to pull up -- this will be
4  Document F, which we'll mark as Exhibit 5.  And I'll
5  drop it into the chat in just a moment.  Share
6  screen.
7      (WHEREUPON, Exhibit 5 was marked for
8  identification.)
9  BY MS. BRADFORD:
10     Q.  So, Dr. Glick, what I've put into the
11  chat, and I have on my screen, is a article -- so
12  this is what's marked as Exhibit 5 that I'm assuming
13  you are familiar with.
14     A.  Yes.
15     Q.  And that -- I think that's your name first
16  in the authors, titled "Bad but Bold: Ambivalent
17  Attitudes Toward Men Predict Gender Inequality in 16
18  Nations."  Is it fair to say that you are familiar
19  with this article?
20     A.  Yes.
21     Q.  So I am going to go to page 720 in this
22  document, and there's some highlighted text in here
23  which reads that: Comparisons within nations between
24  men and women, however, offer greater comparability
25  and are illustrated in Figures 1 to 4.  And then it

81

1  defines what "typical" means for the AMI.  Is that
2  fair -- did I read that fairly?
3      A.  Yeah.  Sure.
4      Q.  And I just point that out because I'm
5  going to, you know, go to those figures.  So this is
6  on page 722 of the document.  So looking at Figure
7  3, Dr. Glick, what is the average score of men in
8  the U.S. on the hostile sexism scale?
9      A.  It's a -- it's between 2.0 and 2.5 in the
10  samples.  They're often student samples, so these
11  are not nationally representative samples.
12     Q.  Yeah.
13     A.  So that -- that's, you know, between 2 and
14  2.5.
15     Q.  So again, just based on this study, what
16  is the average score of women in the U.S. on the
17  hostile sexism scale?
18     A.  About a little more than 1.5.
19     Q.  Then I'm going to scroll down to Figure 4,
20  which is about "Benevolent Sexism Across Cultures,"
21  it's titled.  What is the average score of men in
22  the U.S. on the benevolent sexism scale?
23     A.  So roughly about, you know, in between 2.0
24  and 2.5.  Again, so pretty similar in this case to -
25  - to hostile sexism.

Exhibit 2
Page 21 of 163

82

1    Q.   And what about for the average score for
2 women?
3    A.   Looks like it's right about 2.
4    MS. BRADFORD:   Just for the record, in the
5 U.S., again, I'm assuming not the same for every
6 nation.  Okay.  I'm going to stop sharing.
7 BY MS. BRADFORD:
8    Q.   Dr. Glick, in your report, did you
9 disclose the average scores of women and men on your
10 sexism inventory based on this study anywhere?
11    A.   No, because I didn't think that that is
12 relevant.
13    Q.   Do you not think that it would be helpful
14 for a jury to know that, in fact, many women in the
15 U.S. -- many -- excuse me -- men and women in the
16 U.S. don't hold views that, according to this
17 inventory, you would characterize as hostile or
18 benevolent sexism?
19    A.   Let me tell you why I think that it's not
20 relevant.  Because, first off, with explicit scales
21 such as this, we know that there are often social
22 desirability biases where people are reluctant to
23 agree too strongly with some of the items,
24 especially in student samples, where it's often what
25 we obtained.  And because we don't offer sort of

83

1 norms above a cut-off, where we say, this is sexist,
2 this is not sexist.  I -- I get where you're coming
3 from with, oh, if you're above 2.5, you're more
4 agreeing, if you're below 2.5, you're more
5 disagreeing.
6    But the way we use the scales is that, you
7 know, people might be a little reluctant to reveal,
8 right -- if you think about an explicit racism
9 scale, right?  Okay.  People are not going to say --
10 you know, some people will, right?  But most people
11 who might hold racial bias are not going to say,
12 "Oh, I'm super biased toward black people."  You
13 know, most white people are not going to say that.
14    So what we look at is individual
15 difference, variation in this, right?  And see how
16 that predicts other variables.  But we don't take
17 the exact means so seriously because we know that
18 can be suppressed by people simply not wanting to
19 admit their biases, right, especially depending on
20 the context in which you ask them these questions,
21 right?
22    And so that -- and then the other thing I
23 want to say is that if the mean is around a little
24 bit under 2.5, that means that a good portion of the
25 sample is agreeing with most of the items.  So

84

1 again, I've -- I've never -- I've always cautioned,
2 actually.  Whenever anybody contacts me about the
3 scale, and they ask me, "Do you have a norm above
4 which we can label somebody sexist?"  I say, "That
5 is not -- the scale is not designed to do that," you
6 know, to -- to really have a cut-off where we say,
7 "This is normative," you know?  "You're a sexist,
8 you're not a sexist."  We don't -- we don't use it
9 that way.
10    We show that -- when - you know, the
11 higher scores versus lower scores on the scales are
12 associated with these other sorts of things, like,
13 say, likelihood of discriminating.  And finally,
14 again, I -- I want to say that you can score low on
15 the scales and still discriminate.
16    Q.   So is it fair to say, Dr. Glick, based on
17 the explanation that you just gave, that, for -- for
18 example, a -- a study such as this -- an article
19 such as this, that there could be limitations on it
20 and limitations to how sort of you can use it and
21 interpret these figures?
22    A.   Oh, absolutely.  I mean, every -- every --
23 you know, every article, and including this article,
24 will talk about limitations.  You can't -- you can't
25 publish a study without having limitations.  If you

85

1 -- if you sent one in, the reviewers are all going
2 to say, "Well, wait, what about the limitations?"
3 You -- you know, there's no single perfect study.
4 There's better and worse studies, that's for sure,
5 higher quality and lower quality.  But there's no
6 study without limitations.
7    Q.   Yeah.  So -- so given that, Dr. Glick, for
8 the studies that you do cite to in your report and
9 that you do rely on, in your report, did you make
10 note of the limitations of those studies?
11    A.   And I think I made very clear that we're
12 talking about average differences, which is one of
13 the, you know, things, you know, as general context
14 to keep in mind.  So that's -- that's a limitation.
15 And -- and of -- I think, clear about the
16 circumstances under which discrimination is more or
17 less likely and how this doesn't necessarily mean
18 that discrimination always occurs in, say,
19 circumstance X or Y.
20    You know, if I wrote a report discussing
21 the intricacies of each study, then it's going to,
22 you know, I don't know, what, be two, three, four,
23 five times -- 10 times longer.  It's -- it just --
24 really, I'm trying to translate to a more general
25 audience the consensus of the findings.



NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 22 of 163

86

1    And the other thing I will say is that the
2 weaknesses of one study can be made up for by the
3 strength of others. So for instance, experimental
4 studies are great at picking apart causality, what
5 leads to what, under what circumstances of
6 discrimination, or less likely, making perfect
7 comparisons where the only thing different is gender
8 of the name on the article.
9    Organizational studies, there's going to
10 be a little bit -- they're going to be a little bit
11 messier. But if these studies all show a consistent
12 pattern, then the -- the shortcomings of one type of
13 study are made up for by the strengths of another.
14    So again, I'm giving the general
15 consensus. I think it would be unwieldy really
16 impossible to -- you know, what you do in a -- in a
17 journal article report, you can see that -- I assign
18 these studies to my students. They have a very
19 difficult time, even after training in research
20 methods and psychology, you know, getting through
21 all of the intricacies of these studies.
22    Q. Do you have any idea how any of the
23 persons involved in this case would've scored on
24 your sexism measures?
25    A. No, I don't. And I don't -- don't assign

87

1 any, you know. You know, I don't speculate about
2 that.
3    Q. I'm assuming you didn't administer the
4 ambivalent sexism inventory to anyone involved in
5 this case, correct?
6    A. Well, here's a perfect example of social
7 desirability bias. Your organization and you
8 personally are named in a lawsuit, and I give you a
9 sexism scale. I think you would have to be pretty
10 foolish or clueless to -- to -- to be -- you'd be
11 gaming the -- the -- the items. I mean, I think
12 that would just be sort of natural. So it's just
13 not -- you know. I'm using this because it's an
14 entree into understanding how individual differences
15 in sexist attitudes relate to discrimination.
16    But again, I think I use the example in my
17 report, right, of attitudes toward men. Men are
18 supposed to be brave. If a couple is walking down
19 the street -- a heterosexual couple is walking down
20 the street, and a rabid dog comes charging, and the
21 man jumps behind the woman and uses her as a human
22 shield. I don't care how you score on my scale. I
23 think most people -- and this is not empirically
24 determined, but I think most people would say he's a
25 terrible boyfriend, right? He's a terrible husband.

88

1 He's using the woman as a human shield.
2    If the woman did the same thing, I think
3 no matter how you scored on my benevolent sexism
4 scale, you wouldn't think twice about it, right? So
5 there's some of this is kind of baked in as cultural
6 ideology and not necessarily captured by the scale.
7    Q. Do you believe that persons with high
8 sexism scores are likely to behave differently than
9 persons with low sexism scores?
10    A. In certain circumstances, yes. I mean, we
11 show empirically that these attitudes are correlated
12 with, you know, different kinds of discrimination.
13 There's a -- a recent, what's called a systematic
14 review of -- of all the ambivalent sexism studies
15 that brunches across all these different studies,
16 bears across all these different studies to look at
17 what has been established repeatedly in research and
18 what -- what things, you know, you can take away
19 about -- they are related to discrimination. So
20 they do predict discrimination in different
21 circumstances and different types of discrimination.
22    Q. Dr. Glick, how often do people holding
23 sexist or benevolent -- excuse me -- hostile sexist
24 or benevolent sexist views discriminate against
25 women in the workplace?

89

1    A. I mean, as how often, I mean, I can't --
2 you know, we can't assess like sort of a frequency
3 question like that, right? We can say they're more
4 likely to, and -- and we can talk about what kinds
5 of discrimination they're more likely to engage in.
6 How frequently this occurs is, you know, not an
7 issue. If I do an experiment in this, I can't say
8 how frequently this occurs in -- in organizations.
9    Now, organizational studies can give us
10 some sense of how pervasive this is, but I don't
11 think they either can tell us how frequently, right?
12 I mean, here's -- here's an example: this case. Did
13 discrimination occur or not? We have a whole legal
14 case on this, right? You know, can -- can you say
15 for sure -- you know, we wouldn't have a legal case
16 if we could determine in -- in all instances whether
17 it was discrimination or not, right?
18    But crunching across the data, we can see
19 things about, you know, for instance, where we do
20 experimental studies, we can see whether hostile
21 sexists are less likely to hire a woman for a high-
22 status masculine job and people score low on the
23 scale.
24    Q. Dr. Glick, earlier you brought up the term
25 "meta-analysis," and I know this isn't exactly, I

Exhibit 2
Page 23 of 163

90

1  think, how you defined it, but is it correct that a
2  meta-analysis is a study that collects, essentially,
3  all the research on a topic and then aggregates the
4  findings from those studies and provides a
5  statistical estimate of effect size or like the
6  strength of the relationship between the variables;
7  is that -- is that fair?
8      A.  That's fair, yes.
9          MS. BRADFORD:  So I'm going to pull up
10 Document G, which would be Exhibit 6, I believe?
11         THE REPORTER:  Yes.
12         (WHEREUPON, Exhibit 6 was marked for
13 identification.)
14         MS. BRADFORD:  Okay.  Give me just a
15 moment.
16 BY MS. BRADFORD:
17     Q.  So, Dr. Glick, this is a meta-analysis
18 conducted by Jones and colleagues that was published
19 in 2017.  Are you generally familiar with this
20 meta-analysis?
21     A.  I am generally familiar with it, yes.
22     Q.  Okay.  So the abstract or the summary here
23 essentially states that this study provides the
24 first meta-analysis comparing the relationship of
25 racism, sexism, and ageism -- ageism to workplace

91

1  discrimination, correct?
2      A.  Correct.
3      Q.  Okay.  So I'm going to go to page 5.  And
4  on page 5, this talks about the various research
5  that's covered by the meta-analysis.  Do you agree
6  that it covered studies that measured, for example,
7  hostile -- hostile sexism, benevolent sexism,
8  ambivalent sexism, and implicit sexism, among other
9  things?
10     A.  Yes.
11     Q.  I'm going to go to page 16 now, and I'll
12 go ahead and just read this highlighted text.  So it
13 reads, "The 95 percent confidence intervals around
14 racism and ageism did not include zero, suggesting
15 both racism and ageism were significantly related to
16 workplace discrimination.  In contrast, the 95
17 percent confidence interval around sexism included
18 zero, indicated the -- indicating the relationship
19 between sexism and overall workplace discrimination
20 is not statistically different from zero."  Did I
21 read that text correctly?
22     A.  Yes, you did.
23     Q.  Then going to page 17, again, there's some
24 highlighted text here which includes: sexism was not
25 significantly related to discriminatory selection

92

1  against women, that sexist and ageist attitudes were
2  not associated with biased performance evaluation,
3  and that sexism was not related to opposition to
4  organizational policies designed to benefit women.
5  Did I read that highlighted text correctly?
6      A.  Yes.
7      Q.  And then, moving down that, I'm not going
8  to read -- not going to read all the equations out
9  loud, but that: The IAT measures were associated
10 with opposition to diversity policies but were not
11 related to discriminatory selection or performance
12 evaluation.  Did I read that right, Dr. Glick?
13     A.  Yes.
14     Q.  Now, I'm going to go to page 18, which
15 states that: As can be seen in Table 6, benevolent
16 sexism and hostile sexism were differentially
17 related to workplace discrimination.  However,
18 contrary to our initial reasoning, benevolent sexism
19 was negatively associated with workplace
20 discrimination whereas hostile sexism was not
21 related to workplace discrimination.  And did I read
22 that correctly?
23     A.  Yes.
24     Q.  Okay.  So do you agree that this meta-
25 analysis, this one in particular, found that there

93

1  was no relationship between any form of sexism and
2  workplace discrimination?
3      A.  Well, workplace discrimination on certain
4  variables, right?  So for instance, we know that for
5  hiring discrimination there is, at best, kind of
6  weak effects on hiring discrimination.  But when you
7  look at promotions, there are large effects in
8  discrimination against women, right?  So these are -
9  - it's a complex picture, right?  Which I try to
10 convey in my -- my report, and this -- this case
11 doesn't revolve around hiring, right?  You have the
12 paradox.  Women get hired, but then they don't get
13 promoted for the same level of workplace evaluation,
14 right?  So -- so there's the other thing.
15         The -- there's another meta-analysis that
16 I think I cite in my report, Joshi, Son, and Roh,
17 where they looked across organizational evaluations,
18 actual organizational evaluations, and what they
19 found is there was a minor effect of discrimination
20 that was really trivial in terms of discrimination
21 against women in performance evaluations overall.
22 However, when it came to promotions, the same
23 performance evaluations and -- and also salary -- so
24 they looked at rewards.  They kind of crunched those
25 together.  When it came to promotions, salary,



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 24 of 163

94

1  bonuses, rewards, tangible rewards, men got rewarded
2  at higher rates for the same performance evaluations
3  as women.
4       So really, it's a matter of the forms that
5  discrimination takes and when it occurs or toward
6  whom it occurs.  When you do some of these meta-
7  analysis -- the Joshi, Son, and Roh meta-analysis to
8  me is -- is particularly informative because they
9  have both performance evaluations and rewards.  And
10  what they show is you don't get much of an effect on
11  performance evaluations, but you get a big effect on
12  rewards, right?  And to me, that's the epitome of
13  discrimination.  Same performance, differential
14  reward, right?
15       So that -- you -- again, you need to kind
16  of understand the nuances of where the
17  discrimination occurs and how it occurs.  And the
18  other nuance that you have to understand is that --
19  as I was talking about before, with backlash, right?
20  Women score lower in hostile sexism, but they're
21  just as likely to show backlash, typically and
22  sometimes more so than men, toward assertive women.
23       So you know, again, despite it being my
24  scale, hostile sexism, benevolent sexism, these are
25  not the only things that are relevant to whether

95

1  discrimination occurs.  And when you have formal
2  systems where there's kind of guardrails, you might
3  get less bias in performance evaluations, but -- but
4  you still see that difference in rewards.
5       Q.  So, Dr. Glick, just to be -- just to be
6  clear about it, and I understand the -- the various
7  nuances that you have discussed, things like that,
8  that are important to consider with -- with this
9  study and any -- any studies.  But just to be clear,
10  this meta-analysis found that IAT measures, meaning
11  the implicit association test measures, were not
12  related to discriminatory selection or performance
13  evaluation.  It found that, correct?
14       A.  Yes, correct.  And that's consistent with
15  what I'm talking about.  It's not really so much in
16  hiring and informal performance evaluations per se,
17  but in how then that translates into personnel
18  actions like promotions, rewards, punishments,
19  things like that.
20       Q.  And this study also found that benevolent
21  sexism was negatively associated with workplace
22  discrimination, correct?
23       A.  I'd have to go back and look exactly at
24  it, because when it comes to performance
25  evaluations, as is detailed in my report, women

96

1  receive more praise than men, but that praise does
2  not translate into reward.  You also have to also
3  keep in mind, you know, moderator variables, like
4  the type of occupation, is it a male-dominated
5  occupation, a female-dominated occupation where
6  you'd expect things to work differently.
7       Q.  So just -- just so we have some clarity on
8  this.  I know I had read some of this previously,
9  but Dr. Glick, can you just read for me this -- this
10  part here?  This clause that just starts with
11  "benevolent sexism"?
12       A.  "Benevolent sexism was negatively
13  associated with workplace discrimination."
14       Q.  And can you --
15       A.  But again --
16       Q.  -- how --
17       A.  -- was that in --
18       Q.  Can -- can you now tell me --
19       A.  I want to know what the dependent variable
20  is here, that is, was this in hiring?
21       Q.  And, Dr. Glick, I'm just asking you to
22  read the text, okay?
23       A.  Yeah.  I read it.
24       Q.  The -- the next clause that starts with
25  "whereas."

97

1       A.  "Whereas hostile sexism was not related to
2  workplace discrimination."
3       Q.  Dr. Glick, did you cite to this meta-
4  analysis in your report?
5       A.  No, I did not.
6       Q.  Why not?
7       A.  Because a more recent systematic analysis
8  of ambivalent sexism contradicts this to some
9  extent.  And I think the issue is not really
10  completely settled for that reason.  In addition to
11  that -- so there's not -- you know, the -- the
12  evidence is pointing in different directions.  But
13  in addition to that, as I just explained, it's not
14  so much in -- you know, in discrimination -- we're
15  not dealing with hiring discrimination.  And hiring
16  discrimination effects tend to be very weak.  That
17  is, women often do get hired.  But when it comes to
18  -- later personnel decisions, that's where you see
19  the bias.
20       The Joshi, Son, and Roh meta-analysis
21  shows, again, that it's not so much in performance
22  evaluations, it's really in personnel decisions.
23       On top of that, you know, if we're looking
24  at an individual person, it -- it really, again,
25  depends on the type of job and also the -- who --

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 25 of 163

98

1  who is being discriminated -- who is -- who is being
2  evaluated, right?
3       As I've explained, repeatedly, backlash
4  effects occur.  They seem to be independent of
5  hostile sexism, right?  Even women who score lower
6  on hostile sexism tend to show backlash effects.  So
7  that type of discrimination, which is a specific
8  form of discrimination, it may not be captured in
9  this particular set of studies, that sort of
10  discrimination occurs -- you wouldn't necessarily
11  expect it to be predicted by hostile sexism.
12     Q.  So, Dr. Glick, just so I'm clear, just for
13  purposes of the record, you mentioned that there was
14  the most recent systematic analysis that you felt
15  contradicted this study.  Which -- which one is
16  that?
17     A.  It's not in my report, either.  It's
18  Bareket and Fiske, a systematic review of ambivalent
19  sexism.  That includes, you know, not just
20  discrimination, but all sorts of other aspects of
21  ambivalent sexism, where they looked at all
22  empirical studies across all of ambivalent sexism.
23  It took, I guess, about a year and a half to -- to
24  produce.  So -- so there's that study, as well.
25     Q.  And -- and please correct me if I'm wrong,

99

1  but I think you were talking about how, you know,
2  some of the issues and the limitations --
3     A.  Uh-huh.
4     Q.  -- was focused on hiring as compared to --
5  and you were mentioning another study that focused
6  more like promotion and --
7     A.  Right.
8     Q.  -- and things like that.  I think it's
9  fair to say that you -- you've reviewed a lot of
10  documents related to this case, right?
11     A.  Yes.
12     Q.  And are you aware that in this case, Dr. -
13  - Dr. Bala was not denied a promotion at OHSU?
14     A.  I'm not recalling that specifically at the
15  moment, but, you know, the -- the -- we're talking
16  about personnel actions.  The personnel action
17  that's at -- at issue, I think, in this case, is the
18  nonrenewable contract.
19     Q.  Are you aware that while she was at OHSU,
20  Dr. Bala actually received a promotion?
21     A.  I --
22     MR. BRISCHETTO:  Objection it assumes --
23     THE DEPONENT:  -- don't recall --
24     MR. BRISCHETTO:  -- facts not in evidence.
25  Go ahead, Dr. Fiske.

100

1     THE DEPONENT:  Dr. Glick.
2     MR. BRISCHETTO:  I'm -- sorry, Peter.
3     THE DEPONENT:  Yeah, that's fine.
4     I -- I don't recall about that, but I
5  trust your rendering of it.  But I don't recall.
6  And again, the issue -- okay.  And this is --
7     MS. BRADFORD:  Dr. Glick -- let me ask you
8  is, Dr. Glick --
9     THE DEPONENT:  -- this is -- this is a --
10     MS. BRADFORD:  Let me ask you this --
11     THE DEPONENT:  I just want to say another
12  thing.  I mean, the issue is --
13  BY MS. BRADFORD:
14     Q.  Dr. Glick, I'm going to interrupt you.
15  Let me just ask you this, because maybe this will
16  help clarify it.  You've been able to differentiate
17  this study saying that it has limitations because
18  this wasn't a case so much about hiring.  Why are
19  you not able to differentiate the studies that are
20  about promotion?
21     A.  I'm not sure what you're asking.
22     Q.  So you -- you were able to recall that
23  this case and the issues in this case did not --
24  were not issues about the hiring of Dr. Bala,
25  correct?

101

1     A.  Sure.  Oh, yeah.
2     Q.  But you're not able to recall whether or
3  not she received a promotion?
4     A.  Yeah.  I mean, it's been -- you know, when
5  I reviewed all the documents, that was quite a long
6  time ago.  And -- and obviously, she had to be
7  hired, otherwise she wouldn't be there.  So that's
8  kind of a -- you know, a safe assumption that she
9  had to be hired.  I don't recall the particular
10  course of her career before these issues related to
11  perceiving her as abrasive and so on led to the
12  nonrenewable contract.
13     Q.  Dr. Glick, I want to talk about -- this
14  has already come up a little bit, but the frequency
15  of the phenomena that you cover in your report.  So
16  on pages -- starts on page 14.  But this section is
17  titled, "People Tend to Deny Biases; Use Pretext to
18  Justify Discrimination."  So you use the word "tend"
19  there.  You say that "people tend to --
20     A.  Right.
21     Q.  -- biases."  How often do people tend to
22  deny biases?
23     A.  Well, again, when we do studies on this,
24  we're not looking at -- you can't -- you can't --
25  again, I can't really answer that question, right?



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 26 of 163

102

1  I mean, I don't think there's -- there's a way to
2  quite test that because you'd have to know in the
3  real world whether this was a discriminatory act,
4  which, you know, if there are pretexts, that's
5  difficult to pick apart.  That's why you have a
6  legal case, right?  If you had people saying, "Oh,
7  we -- we totally axed her because she's an assertive
8  woman," you know, that's -- that's -- that's not how
9  things work, right?
10      So how do you -- how would you possibly
11  assess frequency in the real world of this
12  phenomenon?  You can look at things like, are there
13  differential rates of promotion given the same --
14  the same degree of favorable evaluation, right?  You
15  can look at those kinds of things.  But you can't --
16  you can't answer the question, right?  There's just
17  really no way to -- to -- to answer that question.
18  But we -- we can say is that when we study this in
19  experiments, is that people deny that they're
20  discriminating when clearly there was a -- a
21  difference between how, say, a man was evaluated
22  versus a woman was evaluated.
23      Q.  So speaking of those studies, so I -- I
24  think -- it looks like you cite two -- four sources
25  in this section of your report.  So in these

103

1  studies, how many of the participants denied bias?
2      A.  Well, again, you know, it would just be an
3  average that would be reported.  So it's not like --
4  you know, it's not reported as -- usually as, like,
5  a distribution so that -- you know, it's -- it's --
6  it's the -- the contrast between on average bias is
7  occurring with on average people.  The -- the -- the
8  mean for, you know, people acknowledging it as bias
9  is extremely low.
10      Q.  So is it fair to say that the studies then
11  also don't say specifically how many participants
12  used a pretext to justify their discrimination?  It
13  was just about what was sort of reported on average?
14      A.  Yeah.  I think that's fair to say, and I -
15  - I think I've said something to that effect before
16  that, you know, how we do these studies, we can't
17  pick apart who exactly is necessarily
18  discriminating, right?  So let's say that, you know,
19  people have a harsher reaction -- one individual has
20  a really -- is -- who happens to be randomly
21  assigned to the condition of evaluating a -- a
22  female target has an extremely harsh reaction to her
23  as abrasive and so on, and kind of like a backlash
24  study.  Is that person discriminating?  Would they
25  do the same if they had been in the condition where

104

1  the target was a male?
2      Well, typically in these studies, they
3  can't be in both conditions because that would tip
4  off what the study is about, right, and change
5  potentially their responses.  So we don't know,
6  right?  Is that just a person who is very reactive?
7  We don't -- we don't know, but we can look in the
8  aggregate and say there's something going on.
9  There's a double standard.  And that's what I want
10  to say is really what needs to be focused on is --
11  is -- you know, you mentioned people having rude
12  behavior.  Well, for the same behavior, is it more
13  likely for a woman to be punished than a man?
14  That's about the double standard, right?
15      You know, at some level, there might be
16  some behavior so off the charts that everybody will
17  be punished, right?  But for, you know, other
18  behaviors, if there's a double standard, that's the
19  problem.
20      Q.  Dr. Glick, which of the studies that you
21  cite here examined a representative sample of
22  employers?
23      A.  Representative sample of employers.  I
24  don't know if any study has really done a
25  representative sample of employers.  I mean, that

105

1  would be pretty impossible, right?
2      It's very expensive to get a
3  representative sample of individuals, and you can't
4  get, like, a worldwide representative sample.  That
5  would be also impossible, you know, to get companies
6  to agree to, say, you know, have -- have their
7  personnel files examined, and to randomly select
8  them and get them to agree.  You can imagine
9  probably their in-house counsels are not going to be
10  too thrilled with that in a lot of cases.
11      So I'm not aware of any.  That would be a
12  true random sample.  Random assignment is frequent
13  in -- is part of experiments.  Random selection is a
14  different story.  Getting a random sample of all --
15  you know, representative sample of all companies, I
16  mean, that -- I don't think anybody could do that.
17      Q.  So which of these -- I'm assuming based on
18  the answer that you just gave the answer is going to
19  be none.  But which of these four studies involve
20  actual managers and employees interacting?
21      A.  Which four studies are you referring to?
22      Q.  The ones in this section on page 14
23  through 15.
24      A.  14 through 15.  Are you talking about --
25  which -- which footnotes are you talking about?



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 27 of 163

106

1  Q.  It'd be footnotes 21 through 24.  I think
2  it's actually 22 through 24 are the ones that you
3  cite to for this section.
4  A.  And what's your question about it, random
5  samples?
6  Q.  Are any of these studies from footnotes 22
7  through 24 -- did any of them involve actual
8  managers and employees interacting?
9  A.  Actual managers and employees.  I don't
10  think so, but I -- no, I -- I would -- don't think
11  so.
12  Q.  And of those --
13  A.  These are studies more about basic
14  processes and -- right.
15  Q.  And so of those same studies, did any
16  involve more than a brief interaction?  Can you
17  recall that?
18  A.  I don't think so.  Yeah, I would say -- I
19  would say probably not.
20  Q.  Dr. Glick, if a result reported in a study
21  is statistically significant -- you kind of covered
22  some of this.  But does that tell us exactly how
23  many people behaved badly?
24  A.  No.  Again, I think I covered that.  You
25  know, when you're comparing across averages, you --

107

1  you know -- you can know whether the effect tends to
2  be in the aggregate, larger or smaller, but you
3  can't -- you can't say, you know, "Joe Smith in this
4  condition necessarily discriminated."
5  Q.  Dr. Glick, on page 19, you state that
6  "sexist ambivalence leads to extreme responses
7  towards women."
8  A.  Yeah.  There's more of what's called
9  response polarization.
10  Q.  And -- and I'm just asking if that's --
11  just confirming that's what you wrote on your
12  report, right?
13  A.  Right.
14  Q.  Do you know whether any of the persons
15  involved in this case have sexist ambivalence views?
16  A.  Well, again, I'm not -- and I'm not
17  classifying individuals in that way.  No.  I mean,
18  I'm providing a framework to understand kind of how
19  sexism works.  Not -- I'm not characterizing
20  specific individuals.
21  Q.  I understand what you have sort of
22  explained earlier -- earlier about frequency and the
23  difficult was -- the difficulty with sometimes
24  talking about frequency, but I'm going to ask this
25  question anyway.  How frequently does sexist

108

1  ambivalence lead to extreme responses to women?
2  A.  Well, again, yeah, I don't think we can
3  put a number on the frequency in real life.  We can
4  say that in studies we see some, you know, things
5  that are correlated with sexist ambivalence,
6  different reactions.  But you -- I can't give you a
7  frequency estimate.  So I say, again, I can't really
8  answer that.  Can't give you an -- an -- an
9  estimate.
10  Q.  In -- in this section, your -- the
11  applicable footnotes are -- they start at 37 and go
12  through, looks like 41.  So that's -- so when I say
13  "studies," that's what I'm -- I'm talking about
14  those ones here, Dr. Glick.
15  A.  Uh-huh.
16  Q.  In those studies, did any of them involve
17  actual managers reacting to female employees in the
18  workplace?
19  A.  I don't think.  And -- well, in the Hebl,
20  et al study, those were, you know, potentially store
21  managers.  It was a field experiment.
22  Q.  Okay.  Do any of these studies involve
23  people reacting to male or female physicians in a
24  operating or procedure room?
25  A.  Sorry.  Say it again.

109

1  Q.  Again, same studies.  Do any of them
2  involve persons reacting to male or female
3  physicians in a operating or procedure room?
4  A.  No.
5  Q.  On page 24, you state that: Stereotypes
6  are more likely to affect perceptions when people
7  make subjective judgments and when behavior or
8  information about a person allow room for
9  interpretation.  Did I read that correctly?
10  A.  Yeah.  I think so.
11  Q.  I think I know the answer to this, but are
12  you able to say how often stereotypes affect
13  subjective judgments?
14  A.  Yeah, again, frequency, I don't think I
15  can give you some sort of estimate on frequency.
16  Q.  So when you say "more likely" here, what -
17  - what do you mean?
18  A.  I mean that when we look at studies or
19  just think about logically, right?  Let's say we're
20  evaluating you on how many widgets you produce, and
21  you produce X number of widgets, and we count them.
22  You know, we're not kind of leaving room for bias to
23  creep in.  But if we're, you know, making inferences
24  about what your motives are, right, in the
25  interaction.  Are you -- are you looking out for

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 28 of 163

110

1  yourself?  Are you a good team player, right?
2          There's a lot more room for subjective
3  differences in -- in how we conclude this.  And we
4  know that there are confirmation biases from lots of
5  studies on -- tons of studies on confirmation bias,
6  that if you suspect somebody's motives, you're more
7  likely to conclude that, you know, maybe they're not
8  the team player, that they're self-interested, or
9  that they're manipulative.  So it leaves room for
10  bias to creep in.
11      Q.   So, Dr. Glick, focusing on the studies
12  mentioned in footnote 59 through -- actually,
13  through 64, so going on to page 26, how many of
14  those studies involve supervisors making judgments
15  about employees?
16      A.   I'm not sure about the Heilman.  She's an
17  -- an organizational psychologist that might be more
18  likely to do that, but I'm not aware if any of them
19  necessarily have that.
20      Q.   And what about colleagues making judgments
21  about fellow employees?
22      A.   I think, generally, you're looking at
23  experimental studies here, and typically, those are
24  created situations rather than, you know, in actual
25  organizations.  And again, you look for the sort of

111

1  triangulation of do you find parallel effects in the
2  organizational studies.
3      Q.   So just to be clear, none of those
4  studies?  None of these --
5      A.   I don't think so.
6      Q.   Okay.  On page 13 of your report -- I
7  realize we're jumping back and forth.  So I can keep
8  everybody on their toes.  You mention a meta-
9  analysis conducted by Roth, Purvis, and Bobko
10  titled, "A Meta-analysis of Gender Group Differences
11  for Measures of Job Performance in Field Studies."
12      A.   Right.
13      Q.   I'm assuming you're familiar with it --
14      A.   Yeah.
15      Q.   -- with it, right?
16      A.   Yeah.
17      Q.   And this meta-analysis focused on field
18  studies and examined actual performance ratings of
19  female and male employees, didn't it?
20      A.   Yes, I believe so.
21      Q.   Okay.  And I think you mentioned on page
22  13 that this meta-analysis found supervisors to be
23  more likely to rate men as having a higher promotion
24  potential; is that right?
25      A.   Right.

112

1      Q.   Okay.  And we've already -- I've already
2  covered some questions about Dr. Bala and her
3  promotion status at OHSU, but I want to ask a little
4  bit more about this meta-analysis.
5          So it also examines whether performance
6  ratings of female employees were lower than those of
7  men.  And it found that, in fact, women on average,
8  received higher rates, didn't it?
9      A.   I -- right.  And that's where I'm saying
10  that the action isn't necessarily so much in hiring
11  or in overall performance evaluations, but rather in
12  personnel decisions based on those performance
13  ratings.  And that's where the Joshi, Son, and Roh
14  is kind of a superior meta-analysis.
15          It's -- it's -- it's bigger, and it has
16  the actual performance evaluations as well as reward
17  allocations.  So not just sort of ratings of
18  promotion potential, but this is -- you know, does
19  it actually translate into rewards like promotion?
20  And -- and again, that's -- that's the finding I was
21  referring to.  To the -- the action seems to be in,
22  you might hire the woman, you might say, yes, she's
23  performing well, but -- and again, it's always in
24  this comparison, right?  A woman might be promoted,
25  but is she promoted as quickly as a man?  Is she

113

1  promoted as high as a man?  And this is, again, on
2  average, across, right, of crunching all these data
3  -- all the data.
4          But the Joshi, Son, and Roh -- both of
5  these studies are kind of consistent with each
6  other.  But the Joshi, Son, and Roh is, I would say,
7  the -- even better than the Roth, et al study
8  because it has both the actual performance
9  evaluations and the reward decisions.
10      Q.   Dr. Glick, in your report, do you state
11  that it's your opinion that the Joshi, Son, and Roh
12  is the more preferable study, at least in your
13  opinion?
14      A.   I don't know that I state that, but I
15  present them both that they're showing something
16  consistent.  And -- and, you know, these are unusual
17  --- it -- it's unusual to have a study like the
18  Joshi, Son, and Roh, right?  I mean, that's a pretty
19  ambitious and a great sample.  So it's, to me, a
20  particularly high-quality study.  They show similar
21  things.  So I didn't -- I don't think I thought it
22  was relevant to -- to start picking apart which one
23  might prefer.
24      Q.   And in fact, you -- as we've established,
25  you do rely and cite to the Roth meta-analysis,

Exhibit 2
Page 29 of 163

114

1  right?
2      A.   Sure.
3          MS. BRADFORD:  So while we are on that,
4  I'm going to pull up Document H, which will be
5  marked as Exhibit 7.  Bring that into the chat.
6          (WHEREUPON, Exhibit 7 was marked for
7  identification.)
8  BY MS. BRADFORD:
9      Q.   Is this that meta-analysis --
10     A.   Yeah.
11     Q.   -- that --
12     A.   Looks like it.
13     Q.   Now, this meta-analysis used D scores to
14  assess the magnitude of differences in the ratings
15  of men and women, correct?
16     A.   I mean, I don't have, again, encyclopedic
17  or photographic recall, so I haven't looked at the
18  study for a while, but yeah, that would be pretty
19  common.
20     Q.   Can you explain what a D score is?
21     A.   So a D score is a way to sort of
22  standardize the measurement of a difference between
23  means.  So you can kind of get a -- shorthand it's -
24  - it's a -- an assessment of effect size.  Is the
25  effect relatively larger or relatively smaller?

115

1      Q.   Right.  The -- it's a standard --
2      A.   It's a mean difference when you
3  standardize it relatively big or relatively small.
4      Q.   Correct.
5      A.   So we could imagine that, say, there's a
6  drug that you could take that would reduce your risk
7  of some sort of disease, but we could imagine that
8  could have either a -- a really big effect on
9  reducing your risk or it could have a small effect,
10  and then that might weigh into, you know, whether
11  you think it's worth it to take it.
12     Q.   I'm going to turn -- well, I have turned
13  to page 727, and I'll go ahead and -- and read this
14  highlighted text: The overall analysis of job
15  performance measures resulted in a mean corrected D
16  score of -.11.  This suggests that females, on
17  average, were rated as performing somewhat better
18  than males in operational field settings.  I read
19  that, right, correct?
20     A.   Right.  Yeah.  And this is consistent with
21  what I said before.  That the, you know -- and --
22  and we don't know exactly how they're performing,
23  right, because we don't -- we don't have an
24  objective.  We don't know if this is discriminatory,
25  or women are just doing better.  They might be doing

116

1  much better than men, right?  We -- we don't know,
2  right?  So there could still be hidden
3  discrimination here, but the -- the action doesn't
4  seem to be so much in performance evaluations, but
5  in rewards.
6      Q.   Now, I'm going to page 728.  And I'll go
7  ahead and read this highlighted.  Again, I -- I'll
8  skip the -- the parentheticals, but: We also report
9  results of supervisory or subjective ratings versus
10  objective measures.  Results for supervisory ratings
11  indicate that the D score is .14 with a credibility
12  interval of -.29 to .01.  Objective measures are
13  associated with a D score of .02.  Did I read that
14  correctly?
15     A.   Yes.
16     Q.   Is it fair to say that the -- this Roth
17  meta-analysis tested your hypothesis that subjective
18  judgments are more likely to be biased against women
19  and found that that was not true?
20     A.   Well, here you're having a crunching
21  against a -- a -- all sorts of different kinds of
22  jobs, and we don't have -- we don't have, you know,
23  this absolute knowledge of exactly how people are
24  performing, what constitutes objective measures.
25  I'd have to see more detail on exactly what that

117

1  would be.  And -- and are these jobs where we expect
2  negative discrimination against women.  As I talk
3  about in my -- in my report, women can receive
4  greater praise than men, but it doesn't translate
5  into greater rewards, right?  So there's clearly
6  something going on there.  So again, the action
7  isn't so much in this sort of overall evaluation of
8  performance, but in how that translates into
9  personnel decisions, what you're punished or
10  rewarded for.
11     Q.   So based on that answer, and I think other
12  answers that you've given, Dr. Glick, is it fair to
13  say that the details of all of these studies, what
14  they studied, how they studied it, how they reported
15  their findings, that they matter, right?
16     A.   Right.  Yeah, yeah, sure.  Details matter.
17     Q.   And they -- those details matter when you
18  are applying those studies to the facts of any given
19  case, correct?
20     A.   The details -- I mean, again, I'm not sure
21  what you're saying, I guess.
22     Q.   Yeah.  So when you have a case, not even
23  necessarily this one, but a case like this, where
24  you're being asked to take those -- take studies,
25  take research, and then apply it to the facts of the

Exhibit 2
Page 30 of 163

118

1  case, or -- or maybe rather tell a fact finder how
2  to apply it, that the details of that research
3  matters. Do you agree with that?
4      A.  Yeah. I think the details matter, but
5  you're not going to be able to convey all of those
6  details. You've got to convey the general weight of
7  the evidence as you see it as an expert because if
8  you try to go into all of the details of things like
9  explaining D scores or things like that and, you
10  know, the -- the limitations of individual studies,
11  like I said, the report would be incredibly unwieldy
12  and -- and -- and basically incomprehensible.
13      Q.  You -- you -- you talked a lot about the -
14  - I'm sorry.
15          Is -- is -- so --
16      A.  Can we take a break because I -- I can use
17  a comfort break. Is that okay right now?
18      Q.  Yeah. Would you --
19      A.  Or you --
20      Q.  I have just two more questions on this.
21      A.  Okay. Sure, sure, sure.
22      Q.  I'll be really quick.
23      A.  I can wait.
24      Q.  -- for a five-minute break, so let me just
25  get through these real quick. But thank you for

119

1  asking.
2          The -- I'm sorry. Is it pronounced the --
3  the Joshi, Son, and Roh study?
4      A.  Sure. Yeah.
5      Q.  Okay. So you've mentioned that a couple
6  of times and of how -- how much you value that
7  study.
8      A.  Sure.
9      Q.  Does that study have limitations when it
10  comes to applying it to the facts of this case?
11      A.  Well, again, all -- you know, we could
12  talk about limitations in -- in all studies, and,
13  you know, it -- it -- it's -- it's showing a general
14  phenomenon, and then whether that actually occurred
15  in the case is, again, to me, for the case decision-
16  makers to -- to figure out, right? So this shows a
17  -- a general discriminatory effect.
18          And the reason I think it's superior is
19  that it has both performance ratings and rewards in
20  actual organizations. And that's a rare thing to
21  have, and it's a very large sample. And what it
22  shows is that for the same performance evaluations,
23  you get differential rewards. And that's where, you
24  know, the -- overall performance evaluations may
25  not show, really, the discriminatory action that

120

1  occurs in personnel decision-making.
2      Q.  And, Dr. Glick, just a few other -- I
3  guess, maybe just one brief question. That
4  highlighted text in the Roth study that we just
5  covered, you didn't disclose that particular finding
6  in your report, did you?
7      A.  I didn't mention that in my report, no.
8      MS. BRADFORD:  Before we go off the
9  record, let me just take one moment.
10      MR. BRISCHETTO:  Well, Megan, while you're
11  off, give some thought to lunch, because I know it's
12  10 to 1:00 for Peter.
13      THE DEPONENT:  Oh, yeah, it is. Yeah.
14      MS. BRADFORD:  Yeah. So, Mr. Brischetto,
15  and just for purposes of the record, if you wouldn't
16  mind just referring to me as Ms. Bradford while
17  we're on the record, that would be great.
18      MR. BRISCHETTO:  I'm sorry?
19      MS. BRADFORD:  If you wouldn't mind just
20  referring to me as Ms. Bradford for purposes of --
21      MR. BRISCHETTO:  Oh, sure. What did I
22  say? I didn't even track it. I -- I will do that.
23  Sure.
24      MS. BRADFORD:  No problem. I -- I did --
25  that's exactly what I was checking about. So, Dr.

121

1  Glick, I think it's almost 1:00 your time.
2      THE DEPONENT:  Yeah, right.
3      MS. BRADFORD:  I think it makes sense,
4  instead of coming back on, to just go ahead and --
5  and take our lunch break now --
6      THE DEPONENT:  Sure.
7      MS. BRADFORD:  -- for everybody. So I
8  propose 30 minutes, if that is okay --
9      THE DEPONENT:  Yes.
10      MS. BRADFORD:  -- with Mr. Brischetto and
11  Dr. Glick?
12      MR. BRISCHETTO:  That is fine with me.
13      THE DEPONENT:  That's good. Thanks.
14  Appreciate that.
15      THE VIDEOGRAPHER:  Okay. All right. The
16  time is 12:49 p.m., and we are off the record.
17      (WHEREUPON, a recess was taken.)
18      THE VIDEOGRAPHER:  We are on the record.
19  The time is 1:29 p.m. You may now proceed.
20      MS. BRADFORD:  Thank you.
21      Real quick, before I get back into my
22  questions, Dr. Glick, I think you had mentioned that
23  when you were on a break that you would check about
24  when you received Dr. Carnes's report. Did you get
25  a chance to do that on your lunch break?


NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 31 of 163

122

1    THE DEPONENT:  Oh, I -- I forgot to do
2  that.  But I do recall that it was really recently
3  that I got that report.  So I think it was within
4  the last couple of weeks.  Maybe Mr. Brischetto
5  could check and -- and see when he sent it because I
6  -- you know, he sent it to me, but I think it was --
7  it was -- it was pretty recently.  It was definitely
8  after I submitted my final report.
9    MS. BRADFORD:  Okay.  So definitely after
10  the --
11    THE DEPONENT:  Definitely after that, as I
12  recall.
13    MS. BRADFORD:  Okay.  Thank you.
14  BY MS. BRADFORD:
15    Q.  Okay.  So diving back into things, on page
16  29 of your report, you have the section titled,
17  "Assertive Women Face Backlash."
18    A.  Yes.
19    Q.  And one of the studies that you cite here
20  is a meta-analyses -- sorry -- a meta-analysis from
21  Williams and Tiedens.
22    A.  Right.
23    Q.  And I apologize if I'm -- Tiedens, if I'm
24  mispronouncing that name.  But in your report, you
25  note that according to this study, that perceivers -

123

1  - that the study showed that perceivers dislike
2  women who exhibit assertiveness or dominance more
3  than men who behave similarly and consequently
4  impose workplace penalties on dominant women.  Is
5  that fair that that's what you say in your report?
6    A.  Yes.
7    Q.  Okay.  But am I correct in saying that you
8  -- you don't disclose any information here about
9  frequency?  In other words, you don't say how often
10  according to this study assertive women face
11  backlash?
12    A.  Right.  I mean, as we've talked about
13  before, I think frequency estimates are -- it's not
14  really something you can get out of these studies.
15  There's -- they're not designed to assess the
16  frequency with which something occurs on -- in a --
17  you know, in daily light.  That's just not the aim
18  of those studies.
19    MS. BRADFORD:  I'm putting Document I,
20  which is -- will be marked as Exhibit 8, into the
21  chat.  I'm going to share my screen.
22    (WHEREUPON, Exhibit 8 was marked for
23  identification.)
24  BY MS. BRADFORD:
25    Q.  Dr. Glick, is this that Williams and

124

1  Tiedens study that we were just referring to?
2    A.  It looks like it, yeah.
3    Q.  And it's titled, "The -- The Subtle
4  Suspension of Backlash: A Meta-analysis of Penalties
5  for Women's Implicit and Explicit Dominance
6  Behavior," correct?
7    A.  Right.
8    Q.  Okay.  So I'm going to go to -- I'm at
9  page 173, and I'm going to read this highlighted
10  section here aloud.  "This indicates that the
11  negative effect of dominance, relative to
12  nondominance, on likability was greater for women
13  than for men, as predicted.  Thus, Hypothesis 1A was
14  supported.  However, the size of this difference was
15  small."  Did I read that correctly?
16    A.  Yes.
17    Q.  And then looking at the second highlighted
18  section of this page, "This indicates that dominant
19  women were liked slightly less than dominant men,
20  but the difference was very small and did not differ
21  significantly from zero."  Did I read that
22  correctly?
23    A.  Yes.
24    Q.  So this meta-analysis found that the
25  observed differences in treatment of dominant men

125

1  versus dominant women was either small or not
2  significant at all, correct?
3    A.  But then, also, there are moderators of
4  these effects.  So this is the overall effect going
5  across studies which, as they point out, have high
6  heterogeneity effect sizes.  And then, what you
7  typically do is then look at what distinguishes
8  between these different studies and when that effect
9  occurs and does not occur.
10    Q.  I'm going to reask my question, Dr. Glick,
11  because I appreciate the -- your sort of explanation
12  of it.  But -- but just to be clear, this meta-
13  analysis found that the observed differences in
14  treatment of dominant men versus dominant women was
15  either small or not significant at all, correct?
16    A.  When you include across all studies and
17  don't distinguish between the different
18  circumstances, that is correct.
19    Q.  Okay.  I'm going to scroll down to the
20  next page, 174.  And I'll read, "Study location
21  moderated the simple effect of gender among dominant
22  targets -- but not the interaction effect -- such
23  that the tendency for dominant women to be liked
24  less than dominant men was present among studies
25  conducted in the lab, but not those conducted in the



Exhibit 2
Page 32 of 163

126

1  field," correct?
2      A.  Yes, that's what it says.
3      Q.  Okay.  So this meta-analysis also found
4  that in studies in the field, as opposed to the lab,
5  dominant women were not liked less than dominant
6  men, correct?
7      A.  Correct.  And they also note in the same
8  paragraph that the number of field studies was quite
9  small compared to the number of laboratory studies.
10  And there may be other differences between them.
11      Q.  Okay.  Then I'm going to scroll down to
12  177.  So this shows a table, right, Dr. Glick?
13      A.  Yes.
14      Q.  It's Table 3.  So when we look at this
15  table, so -- and there's a couple of parts
16  highlighted here.  When the participant was the
17  target of the dominance, was there any difference in
18  reactions to dominant men versus dominant women
19  according to this table?
20      A.  Well, I'd have to see a statistical test
21  of difference.  So there's a P0.2 in the one column
22  and a nonsignificant effect in the other column.  So
23  just seeing the effect in one column versus the
24  other column.
25      Q.  So when we're looking at the D score,

127

1  that's 0.1, right?
2      A.  Right.  That is a -- that -- that is a
3  very small D score and presumably nonsignificant.
4      Q.  So would you agree that a D score .01 is
5  not a meaningful difference?
6      A.  Yes.
7      Q.  So on pages 32 through 36 of your report,
8  you discuss various behaviors that might elicit
9  backlash.
10      A.  Yes.
11      Q.  Some of these include, for example, a
12  masculine or autocratic style, criticism or
13  discipline, self-promoting behavior, things like
14  that, right?
15      A.  Yes.
16      Q.  And again, as we've covered in other
17  sections, you don't give any sort of frequency
18  information?
19      A.  Yeah.  I don't think we can assess
20  frequency.
21      Q.  On -- starting at the bottom of page 32,
22  you state that "research shows that people are more
23  likely to react negatively to criticism from a
24  woman, viewing the same criticism as more
25  reasonable, unwarranted, and unfair when made by a

128

1  woman compared to a man."
2      A.  Yes.
3      Q.  First of all, again, you use the term
4  "more likely" here.  What is that --
5      A.  Compare -- sorry.  More likely, so when
6  you have an experiment where you have the same
7  criticism delivered, and then you vary and you
8  randomly assign people to different conditions and
9  you vary whether the criticism comes from a woman
10  than from a man, and you see a difference between
11  them, that's what the comparison is about.  I think
12  I'm pretty explicit about the comparison involved.
13      Q.  So for this proposition, it looks like you
14  cite to one paper from 2000.  It's the footnote 84,
15  the Sinclair paper.
16      A.  Uh-huh.
17      Q.  Did all the undergraduate students
18  involved in that research react more negatively to
19  criticism from a woman?
20      A.  Again, it's not going to be all.  We can't
21  -- yeah, we can't -- again, we're looking at average
22  differences, right?
23      Q.  What was the average difference in that
24  case? How many --
25      A.  I can't tell you offhand what the average

129

1  difference was.
2      Q.  Okay.  So when you say "more likely" here
3  and you're relying on this research, how much more
4  likely?
5      A.  Well, again, it -- it -- it depends on
6  what -- you know, what -- what effect was found.  I
7  mean, it's -- it's, you know, a significant effect
8  of a difference.  It's a significant difference
9  between conditions.
10      Q.  And can you tell me what that effect was
11  in this study?
12      A.  I can't, you know, recall the specific
13  means in the study, no.  Or the -- yeah.  I can't
14  recall the specific P value or specific means.
15      Q.  Would you agree that there's a difference
16  between saying that, for example, people are 90
17  percent more likely to react negatively to criticism
18  from a woman versus people are 60 percent more
19  likely to react negatively to criticism --
20      A.  Sure.  That's a different statement.  Yes,
21  that's a different statement.
22      Q.  So given that there can be differences
23  when -- in what "more likely" means, why don't you
24  explain that in your report?
25      A.  I -- I explained that we're talking about



Exhibit 2
Page 33 of 163

130

1  average differences, which means that, you know, not
2  everybody is necessarily going to do it.  And I am
3  very clear that in real-life situations, you have
4  potential alternative explanations for any
5  particular decision that's made or evaluation or
6  whatever.
7      Q.   And when you're using the term "average,"
8  Dr. Glick, are -- are you referring to the mean or
9  the median?  Are we talking about the D score?  Can
10  you just clarify that for me?
11      A.   Usually, talking about means when you're
12  talking about average difference.
13      Q.   Can you give an estimate for, in the real
14  world, how often people react more negatively to
15  negative comments given by a woman versus the same
16  negative comments by a man?
17      A.   No, I cannot.
18      Q.   Can tone and body language contribute to
19  how criticism is received?
20      A.   Sure.  I mean, I think tone and body
21  language, you know, there's a lot of research on
22  nonverbal behavior.  Tone and body language can
23  matter in terms of how people perceive a particular
24  comment and so on.  And I think I say that in my
25  report at some point.

131

1      Q.   So for example, if a coworker said that
2  Dr. Bala's tone and body language were insulting or
3  condescending, that's something that the jury should
4  consider, right?
5      A.   Absolutely.  They should consider it.  And
6  the question is, you know, for tone and body
7  language, we may not -- you know, we don't have
8  necessarily some sort of record that we can -- we
9  can directly evaluate.  That's why I point to some
10  incidents in my later section of the report that
11  look at HR investigations or specific e-mail that
12  was considered to have a negative tone by the
13  recipient because there you do have more
14  information, right?  So, you know, we don't know
15  exactly what happened in some of these specific
16  incidents when it comes to tone or body language,
17  but we do know that that can be perceived more
18  negatively when criticism or some sort of perceived
19  slight comes from a woman.
20      So, for instance, I think I cite in the
21  medical section a study that I think was at Stanford
22  Medical School, complaints like -- low-level
23  complaints about communication or rudeness or things
24  like that against the physicians by staff and nurses
25  and so on were more likely to occur toward women

132

1  than toward men.  So the question is, really, is
2  there a double standard?
3      Q.   So, Dr. Glick, I -- when you say that we
4  don't know what tone or body language was used in a
5  certain situation, meaning that, for example, you
6  reviewing the -- the depositions and the records,
7  you know, you -- you weren't there, you -- so you
8  can't exactly say what the tone is, right?
9      A.   Absolutely.  Yeah.
10      Q.   Yeah, I wasn't there.  I can't say that
11  either, right?
12      A.   Absolutely.  But, for instance, with an e-
13  mail, you can read the e-mail, and there's no body
14  language, you know, unless there's, you know -- is -
15  - isn't -- the e-mail is the incident, right?  So in
16  that case, we don't have that same problem.  But in
17  a case where it was, you know, something that
18  happened in a live incident and people could see the
19  person and hear the person, we don't know.
20  Absolutely.
21      Q.   But the person who was actually -- say it
22  was an interaction between a nurse and Dr. Bala,
23  that nurse who was present for the interaction, they
24  would know, right?
25      A.   They have their perception, right?  So for

133

1  instance, give you an example, my wife and I might
2  be discussing something, and she might say, "You're
3  yelling."
4      And I might say, "No, I'm not yelling,"
5  you know, right?  Where's the -- where's -- where do
6  we come up with those words and those subjective
7  impressions?  And we do have incidents here where
8  people perceive them quite differently in terms of
9  tone and so on.
10      So the point is that tone is something
11  that is not -- I mean, if we had a decibel meter, we
12  could know the degree to which the person is
13  "yelling" or how loud their voice is, but we don't
14  have that, right?  And I'm sure you -- you know
15  everybody's had this experience, right?  Where one
16  person sees it as yelling and another person sees it
17  -- we -- we interpret these behaviors differently
18  depending on what we think about the person or how
19  we're feeling in the moment.  So to the extent that
20  these are feelings, they can be biased.  But, you
21  know, it would be great if we could have the instant
22  replay, right, and we could -- the jury could
23  actually see that.  That would be very informative.
24  But we -- we don't have that in a lot of cases.
25      In other cases, we have an HR

Exhibit 2
Page 34 of 163

134

1  investigation and different witnesses talking about
2  what actually happened in -- you know.  And then we
3  also have a case with, like, an e-mail where the
4  tone was judged by the recipient to be hostile or --
5  or -- or rude or something like that.  And I think
6  those -- those are in a different category as far as
7  the jury is concerned.  They can look at that.
8      Q.  Do you think that the tone in an e-mail is
9  not subject to interpretation?
10     A.  Oh, yes.  I mean, tone is very subject to
11 interpretation in an e-mail.  And -- and what I'm
12 saying is when things are subject to interpretation,
13 that opens the door to potential bias.  Does that
14 mean bias necessarily occurred?  Well, you know,
15 that's what the case decision-makers have to decide.
16     Q.  Dr. Glick, on page 37, you state that: Due
17 to gender stereotypes, people generally accord women
18 lower status and authority than men.  What do you
19 mean --
20     A.  Yes.
21     Q.  -- by "generally"?
22     A.  That people lend women less credibility.
23 For instance, there's research in this -- in the
24 medical setting, right, complaints by women or by
25 black individuals where there's no, you know, real

135

1  objective way you can assess that "Oh, you have a
2  broken bone" or something like that, right?  But
3  something like -- like -- maybe like fibromyalgia or
4  something where they don't have a diagnostic -- you
5  know, a complete diagnostic test.  There's evidence
6  that claims by, you know, women or minorities are --
7  are given less credibility, which can lead to
8  undertreatment.  So that's an example.  Trying to
9  remember now what exactly the question was, if you
10 could repeat it.
11     Q.  Yeah.  Actually, let me -- you -- you
12 answered it in part.  I asked what it generally
13 meant, and you answered it in part by saying that
14 people lend less credibility to women.  How many
15 people?  More people?  Some people?  A few people?
16 What do you mean by that?
17     A.  I can't give you an exact estimate in
18 everyday life of -- of, you know, what percentage of
19 people lend women less credibility.  But we know
20 that in general, in studies, that people are less
21 likely to, for instance, to see women as authority
22 figures --
23     Q.  In those --
24     A.  -- or react more negatively to women as
25 authority figures than men.

136

1      Q.  In those studies, in which of them did
2  more than 50 percent of the participants accord
3  women less status and authority?
4      A.  Well, again, they're not reported that
5  way, right?  When you have a difference in means,
6  even if it's a really strong difference in means, we
7  don't know what percentage of people actually did
8  that.
9          Now, you could make some statistical
10 assumptions and try to guesstimate it that way, but
11 that -- you know.  I mean, you could have a strong
12 effect because 30 percent of the people treated men
13 and women very differently, or you could have, you
14 know, 80 percent doing it, and -- and doing it --
15 but doing it moderately, right?  Not as big a mean
16 difference for each -- or not as big a difference
17 for each, you know, the individuals involved.  So,
18 you know, we can't -- I can't pick that apart.  So
19 these kinds of questions I think I'm going to be
20 giving you -- if you want to save time, I think I'm
21 going to be giving you a similar answer to those
22 kinds of questions.
23     Q.  So I guess going back to the -- the
24 initial question, I had asked about what "generally"
25 means.  So you've explained that it's -- it's very

137

1  difficult to assign a level of frequency, whether
2  it's from the studies or applying it to real life.
3  It's very difficult to assign a level of frequency,
4  right?
5      A.  Right.
6      Q.  So then can you explain to me why you use
7  terminology such as "generally" or "more likely" or
8  "tends" or "often"?
9      A.  Yeah, well, "generally," "more likely,"
10 "tends," I mean, this is all -- I'm always putting
11 this in -- in the context of, say, mean differences
12 that you find in experimental studies or effects
13 that you find, say, like in the organizational study
14 that showed women being promoted less often for
15 similar performance evaluations, that you -- you
16 have these general effects, right?  And that they
17 occur in multiple studies.  And that -- that is
18 where I get that language from.  I think I'm trying
19 to make it clear that this is never an absolute kind
20 of thing.
21     Q.  Dr. Glick, how many of Dr. Bala's
22 supervisors and coworkers hold a bias against
23 assertive women?
24     A.  I'm not making any assertions about that.
25 And I --

Exhibit 2
Page 35 of 163

138

1    Q.  So you don't know?
2    A.  -- can't.  No.  And I can't.  I mean,
3    again, even if -- you know, even if I administered
4    my ambivalent sexism inventory toward them, I
5    wouldn't use that as the basis to -- to make some
6    sort of individual diagnosis of whether that person
7    was biased against Dr. Bala.
8    Q.  So would it -- would it be fair to say
9    that you can't say that all the other male
10   cardiologists in Dr. Bala's cardiology unit held a
11   bias against women in cardiology?
12   A.  No.  I wouldn't make a statement like
13   that.
14   Q.  Why wouldn't you make a statement?
15   A.  Well, first off, you know, we talk about
16   my role as a social framework expert, and I think
17   that that's, you know, beyond my purview to -- to
18   make that kind of inference.  I don't want to imply
19   that this general framework creates a scientific
20   certainty about specific individuals in a real-life
21   situation, which I do agree would, you know, kind of
22   be a prejudicing the jury kind of thing.  So I'm
23   trying to stay within that role.
24       And again, you know, even if you know that
25   somebody has -- you know, has expressed sexist

139

1    attitudes, generally, you can't say with some sort
2    of scientific certainty that this person
3    discriminated against that individual in a
4    situation.
5        Now, in a legal case, you know, the jurors
6    are tasked with the difficult decision of trying to
7    pick apart with, you know, all these different
8    alternative explanations going on, and with the fact
9    that people tend to use pretext and have mixed
10   motives when they're making these decisions and not
11   to acknowledge that they're biased when they are, if
12   that's the case, right?
13       They have to pick that -- that stuff
14   apart.  I think if we are turning to the case facts
15   themselves, then I think they're -- the -- the
16   social framework that I provide shows some examples
17   of things that are very consistent with the
18   possibility of bias, and those are things that I'm
19   directing the case decision-makers to look at, but -
20   - but making clear that while there are
21   consistencies with bias, they need to make the
22   ultimate decision.
23   Q.  So, Dr. Glick, you brought up that not
24   being able to talk about something with scientific
25   certainty.  And I was -- I was going to ask you

140

1    about that a little bit later, but while we're on
2    that topic, I'll just ask you about it now.  So on
3    page 6 of your report.
4    A.  Six?
5    Q.  You state that --
6    A.  Jumping way back, huh?
7    Q.  I know.
8    A.  We are going to be here late.
9    Q.  I'm just making sure everybody's on their
10   toes.  You state that: Social framework experts
11   often do not apply a scientific certainty standard
12   because it may not be possible or feasible to
13   conduct a rigorous study to determine whether
14   discrimination occurred in a specific case to an
15   individual plaintiff.  In such cases, experts cannot
16   testify with scientific certainty about whether
17   discrimination occurred.  I read that right, right?
18   A.  I think so.  I'm sorry.  I wasn't totally
19   following along, but I trust you, and that sounds
20   like what I wrote.  Yes, I would agree with that
21   statement.
22   Q.  So you -- okay.  So you agree with that
23   statement, right?
24   A.  Yes.
25   Q.  Do you think that a social framework

141

1    expert in this case could say that discrimination
2    occurred with 100 percent certainty?
3    A.  Discrimination occurred with 100 percent
4    certainty.  I -- I could -- I think -- I think they
5    could express that that's their opinion, but I -- I
6    think they can't say that -- that I can
7    scientifically prove it.
8    Q.  As an experienced social framework expert,
9    yourself, if you heard another witness, maybe on the
10   other side, make that statement, would you question
11   the validity of that?
12   A.  Well, I would say that, you know, even if
13   you're 100 percent convinced by the evidence, and I
14   can -- can certainly imagine that, that I would
15   avoid it because of my experience with what I think
16   courts will allow, you know?  So -- so I take a more
17   -- I mean, I know there's variance among experts and
18   people I admire in -- in what they're willing to
19   say.  So some are willing to say it's more likely
20   than not.  Some are willing to go further than that.
21       And I -- given my own experience with the
22   courts and the -- you know, the variance in the
23   rules, I -- I've sought to avoid that.  So that's
24   just sort of my personal way of doing things, given
25   my understanding.  But again, I'm not a lawyer.

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 36 of 163

142

1    Q.  Okay.  And, Doctor, taking away the -- the
2  guardrails or the things that you're cognizant of,
3  would you ever say in a case that you were retained
4  as an expert that "I am" -- "in my scientific expert
5  opinion, that I am 100 percent certain that
6  discrimination occurred"?
7    A.  I think I would generally avoid that, even
8  if it's pretty obvious because it's just sort of --
9  I don't know.  It's just such -- such of -- you
10  know, such a strong statement.  But, you know, I --
11  I guess I can imagine circumstances where it would
12  be so clear-cut that that would be a reasonable
13  thing to say, but I -- I would probably personally
14  avoid going that far.
15    Q.  So, Dr. Glick, I -- I have asked you a
16  couple of questions about -- I think you've
17  established that you can't say, for example, how
18  many of Dr. Bala's supervisors hold a bias against
19  assertive women or hold a bias against the women of
20  Indian decent.  You can't -- you can't say those
21  things.
22        Is it also fair that you can't say what
23  percentage of complaints about Dr. Bala were
24  motivated by gender bias or racial bias?
25    A.  Yeah.  And I -- I think I would -- I would

143

1  agree with that.  I do think that when you look at
2  the specifics of things, you can start to get some
3  sense of what's more likely or less likely to be
4  biased.
5    Q.  Dr. Glick, do cultural norms within a
6  particular geography or geographical region, can
7  those impact how people, maybe, perceive or
8  interpret behavior?
9    A.  Sure.  I mean, there can be different
10  cultural norms and different styles that could, you
11  know, lead to different interpretations.  Different
12  hand gestures mean different things in different
13  parts of the world for instance, you know.
14    Q.  So, for example, somebody -- the
15  population on the East Coast versus population on
16  the West Coast, you could have different like levels
17  of interpretation based on those geographical
18  differences, right?
19    A.  I mean, in the abstract, you know, yes, I
20  -- I guess so.  I'm not an expert on -- on those
21  kind of regional differences.  I think, you know, I
22  -- I have a lot of expertise on -- on regional -- in
23  sort of global -- more global differences in -- in
24  the strength of sexist attitudes or the overtness of
25  sexist attitudes, but, you know, I guess I don't

144

1  really have a strong opinion on that.
2    Q.  So, Dr. Glick, on page 11 of your report,
3  you go through the documents regarding this case
4  that you reviewed; is that correct?
5    A.  Yes.
6    Q.  Did you rely on counsel for Dr. Bala to
7  identify which documents you should review?
8    A.  Yes, I did.  But I will just say that
9  also, in my conversations with them, I said I want -
10  - you know, I want to see relevant documents,
11  including ones that would be potentially damaging to
12  your claims, right, so that I'm prepared.
13    Q.  Yes.  So -- you explained this a little
14  bit, but how did you define what relevant documents
15  would be to you?
16    A.  Well -- okay.  So for instance, anything
17  that, you know, where -- where someone -- there's
18  evidence about -- talking about the impressions of
19  the individual, if there's -- you know, for
20  instance, the HR investigation is clearly super
21  relevant, right?  You know, those sorts of things.
22  Things that are more like -- I -- I don't know, that
23  just don't -- you know, that don't provide a lot of
24  detail about how somebody was treated or perceived
25  or are just sort of general boilerplate policies

145

1  rather than, you know, specific incidents might be
2  of less interest to me.
3    Q.  Did you request any additional documents
4  on top of the ones that you ended up receiving?
5    A.  Not that I can recall.  I mean, they
6  provided plenty of reading material, so -- and then
7  there's all these exhibits, you know.  Exhibits in
8  the range of 1 to 232, right?  And -- and some
9  pretty long depositions.  A lot of 300-page
10  depositions or 2- to 300-page depositions, so there
11  was a lot of information available.
12    Q.  How much time did you spend reviewing
13  those documents?
14    A.  Oh, I don't know, but it was a long time.
15  It was a considerable number of hours.  And -- and
16  this case in particular, I would say, was on the
17  heavy end of -- in terms of reviewing the documents,
18  because there was a lot of relevant detail, like I
19  pointed out, like the HR investigations and how that
20  unfolded, and understanding the timeline of things
21  in those.  On that -- that was -- I would say this
22  case had an -- an unusually rich set of things for
23  me to dig into compared to a lot of other cases.
24    Q.  Would you say that you thoroughly reviewed
25  the documents, or did you skim through some of them?



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 37 of 163

146

1     A.   Well, I would say what I do is I read to -
2  - you know -- you know, when -- when you get used to
3  reading depositions, you know, there's some stuff at
4  the beginning instructing the witness, you know,
5  about their background, some things that generally
6  are less likely to be relevant.
7          So I will -- I will, you know, read for
8  comprehension there, but then I will definitely, you
9  know, try to figure -- you know, when I see
10  something that I see is -- is more relevant, just
11  generally, to the -- the questions at issue, then I
12  -- I dig into those more completely.  So again, I
13  will say I -- I think I spent -- of all the cases
14  I've done, I feel like I spent -- I spent the most
15  amount of time digging into documents in this case.
16     Q.   And I understand that you received a lot
17  of documents, but is it --
18     A.   Right.
19     Q.   -- you did not receive the full case file,
20  the -- the full amount of production that was
21  exchanged between --
22     A.   Yeah.  I -- yes.  As you know, there's a
23  lot of paper generated, boxes and boxes worth, and,
24  you know, a lot of redundancy in some those things
25  and a lot of those things are -- are not really

147

1  relevant to the issues that I deal with.  So no, I
2  did not -- I imagine I did not see the full universe
3  of things, and I kind of doubt that anyone in this
4  case has read all of them.
5     Q.   This -- apologies that this is sort of an
6  odd question, but you agree -- you don't know what
7  you don't know, right?
8     A.   Right.
9     Q.   So --
10     A.   Right.
11     Q.   Would it be fair to say that it's very
12  possible that there were relevant documents that you
13  did not receive?
14     A.   I wouldn't say it's very possible.  I
15  think, because of all the depositions, you know,
16  that there's a lot of redundancy and talking about
17  some -- some similar issues.  But I think that --
18  that the likelihood -- my sense would be that that's
19  unlikely, that there's some sort of smoking gun
20  document.  I mean, if -- if you had the smoking gun
21  document in your favor, I imagine you would spring
22  it on me right now.
23          If Mr. Brischetto had a smoking gun
24  document in his favor, I'm sure he'd spring it on me
25  a long time ago.  So I -- I kind of doubt that

148

1  there's anything.  If there's anything you want to
2  show me, I would be happy to review.
3     Q.   I'm just confirming you just don't know,
4  correct?
5     A.   Yeah.  As Donald Rumsfeld -- to paraphrase
6  him, there's the unknown -- unknown unknowns.  I
7  imagine there's some unknown unknowns here.
8     Q.   Did you make any notes as you reviewed
9  your documents?  The --
10     A.   Yeah.  I mean, I think I -- usually what I
11  do, and I have to check -- mean, what I do, and I
12  have to check -- I mean, usually, I will just sort
13  of plop relevant sections of, you know, documents
14  into a file just so I can, you know -- you know,
15  instead of going back to this giant document, have
16  sections of those.  But not -- I'm not sure about
17  notes other than that.
18     Q.   I think you've already said this, but
19  you've never met Dr. Bala, right?
20     A.   No.  I don't think I have, no.  And then
21  that would -- it would be unusual that I would meet
22  somebody in the case other than the lawyers.
23     Q.   And so is it fair to say that you don't
24  have any direct personal knowledge of her
25  interaction style in the workplace?

149

1     A.   Correct.
2     Q.   On both pages 53 and 79 of your report,
3  you reference a faculty satisfaction survey that was
4  conducted by OHSU in -- in 2016.  Do you remember
5  that survey?
6     A.   Yes.  Broadly speaking, yes.
7     Q.   Did that survey contain a definition of
8  what constituted harassment or discrimination?
9     A.   I don't recall.
10     Q.   So you wouldn't recall what definitions,
11  if any, were given?
12     A.   I mean, I have to go back and -- and look
13  up what -- what I had.  You know, it was a couple of
14  years ago, so, no.  So a lot of water under the
15  bridge since then.
16     Q.   This survey was anonymous.  Does -- does
17  that sound correct to you?
18     A.   That would be the typical sort of thing,
19  right?  To try to get people to be willing to say
20  things because people are hesitant to -- to report
21  formally.
22     Q.   And I believe that you noted in your
23  report that, in the survey, 13.9 percent of persons
24  reported having experienced harassment, correct?
25     A.   So there was witnessing harassment or

Exhibit 2
Page 38 of 163

150

1  personally experiencing harassment, and it was 23.5
2  percent witnessing it.  Experiencing harassment,
3  13.5 percent.
4      Q.  And -- and I'm looking at page 79 of your
5  report.  I think it says 13.9 percent.
6      A.  Well, maybe there's a typo in one of those
7  because the other one says 13.5, but I don't know.
8  13 to 14, right?
9      Q.  Between 13 and 14 --
10     A.  Yeah.
11     Q.  -- percent.  How many of these reports of
12 harassment involve Dr. Bala's behavior?
13     A.  I have no idea.  And I don't know the
14 timeline here exactly when those were taken.  When
15 that -- you know, and I think -- as you said, an
16 anonymous report.  I don't know that names were
17 named in these responses.
18     Q.  So -- Dr. Glick, just give me one moment.
19 So if I were to represent to you that the survey was
20 conducted around the time of 2015 to 2016, would
21 that sound somewhat correct to you?
22     A.  I -- I -- I cannot recall.  So it says --
23 yeah.  Well, it says -- in my report, it says it was
24 a 2016 survey.
25     Q.  A 2016 survey?

151

1      A.  That's what it says in my report if that's
2  accurate.  I'm assuming when I wrote it, that was
3  accurate.
4      Q.  So that would overlap with Dr. Bala's time
5  at OHSU, right?
6      A.  Yeah.  And I don't have the timelines of
7  my -- you know, mentally, at my fingertips, but --
8  so -- but yeah, I trust you on that.
9      Q.  So going back to -- we talked about the
10 13.9 percent of respondents reported --
11         MS. BRADFORD:  Actually, can we just take
12 a very brief break?
13         THE DEPONENT:  Sure.
14         THE VIDEOGRAPHER:  Okay.  Please stand by.
15 The time is 2:09 p.m.  And we are off the record.
16         (WHEREUPON, a recess was taken.)
17         THE VIDEOGRAPHER:  We were on the record.
18 The time is 2:13 p.m.  You may now proceed.
19 BY MS. BRADFORD:
20     Q.  So when we went off the record, Dr. Glick,
21 I was asking you just a couple of questions about
22 that -- that OHSU survey.
23         Is it fair to say that it's something you
24 don't remember a lot of the details about that
25 survey, that you -- you can't use that survey to say

152

1  that there was, for example, a organizational
2  climate of discrimination at OHSU, to make that
3  broad statement, you couldn't say that, right?
4      A.  I think it's -- it's one piece of
5  evidence, but it's -- you know, it's very broad.
6  And, you know, the -- the -- I -- I wouldn't make a
7  lot of sweeping statements about it based on that.
8      Q.  Much like any of the other research that
9  you rely on, you would need to know quite a lot of
10 details, you know, maybe about what -- for example,
11 who -- who was surveyed?
12         How was the survey conducted, you know,
13 things like that to determine the validity of the
14 survey and -- and what it applies to, right?
15     A.  Well, when you're talking about one of
16 these climate surveys, right, I mean, you want to
17 know how many people participated in it, but, you
18 know, they're -- they're kind of a -- a little bit
19 of a dashboard about a specific people's, you know,
20 sense of an organization and experiences in the
21 organization.  It's not quite the same thing as like
22 a -- a scientific study with carefully controlled
23 conditions and -- and all those sorts of things.
24 It's more of a kind of a quick take on -- on the
25 climate, and I think it's valuable, but, you know,

153

1  it's a first step.
2      Q.  That has a lot of limitations, right?
3      A.  I mean, it certainly can have limitations,
4  yeah.
5      Q.  And stepping away from this survey, is it
6  fair to say you never personally interviewed anybody
7  who worked at OHSU?
8      A.  No, I did not.
9      Q.  You haven't done any -- conducted any of
10 your own tests or analyses to determine what sort of
11 climate OHSU has when it comes to discrimination or
12 harassment, right?
13     A.  No.  And as -- as I explained previously,
14 that would be questionable validity when it's -- or,
15 you know, when there's --in the context of a
16 lawsuit.
17     Q.  We talked about these a little bit
18 earlier, but I want to move on now to discussion --
19 discussing those two sections in your report about
20 that you added in titled, "Sex Discrimination in
21 Medicine and Backlash from Staff for Female
22 Positions."  They start at page 40.
23     A.  Page 3?
24     Q.  Page 40.
25     A.  I thought you said three.  I'm like what?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

Exhibit 2
Page 39 of 163

154

1  Seems like that would not be -- okay.  Page 40.
2  Must have been a little glitch in the Internet
3  there.  Okay.  Yes, I'm there.
4      Q.   Okay.  So on page 40, you cite to studies
5  that, according -- according to what you wrote,
6  "Found that male physicians were disproportionately
7  likely to refer patients to male surgeons and were
8  less likely to make professional referrals to female
9  surgeons," correct?
10     A.   Yes.
11     Q.   As far as you are aware, has Dr. Bala
12  alleged that she received fewer referrals than her
13  male counterparts at OHSU?
14     A.   I don't recall.
15     Q.   In fact, sorry to make you do this, but if
16  you flip -- if you flip to page 61 of your report,
17  you actually note, you write, "Dr. Kaul testified
18  that Dr. Bala had outstanding technical skills and
19  that 'the patients I referred to Dr. Bala, had very
20  glowing reports on her.'"  Did I read that
21  correctly?
22     A.   I assume so.  I was turning it just now,
23  but yeah.  I'm -- I'll -- I -- sounds familiar.
24     Q.   In fact, you even quoted testimony that
25  indicated that Dr. Bala's male colleagues referred

155

1  patients to her?
2      A.   Right.  And that study doesn't say that
3  male physicians never -- you know, as we talked
4  about never making absolute statements, you know,
5  male physicians never refer to female surgeons,
6  right?  It's a -- it's a matter of whether there's,
7  you know, a comparative difference in -- you know,
8  and that comes out in these larger scale studies.
9      Q.   But again, even -- even noting that the
10  study just simply talks about how it is maybe more
11  likely that male physicians refer patients to other
12  male surgeons.  As far as you're aware, Dr. Bala
13  hasn't alleged that in any way she received fewer
14  referrals than her male counterparts?
15     A.   Yeah.  I don't recall any allegation on
16  that specific issue.
17     Q.   Also, on page 41, you note that: Female
18  surgeons also get blamed for poor -- more -- excuse
19  me.  I'm going to start that over.  Female surgeons
20  also get blamed more for poor outcomes than male
21  surgeons.  Did I read that, right?
22     A.   Yes.
23     Q.   Just as a quick initial letter.  It
24  doesn't look like you cite to any study here.  So
25  what's the basis for that statement?

156

1      A.   No, there's Sarsons 2017, footnote 119.
2      Q.   Okay.  So footnote 119 applies to that
3  whole paragraph --
4      A.   The document, yeah.
5      Q.   Okay.  When was Dr. Bala blamed for a bad
6  outcome?
7      A.   This is in the general section on context,
8  right?  So just talking about medical
9  discrimination.  So I'm not -- you know, it's just
10  sort of establishing that studies have shown that
11  there tends to be some bias in medical settings, and
12  it comes out in these various ways.  I'm not saying
13  that was an allegation in this particular case.  I'm
14  just sort of setting up some context there.
15     Q.   I understand your -- your point, Dr.
16  Glick, but I think you explained earlier, and please
17  correct me if I'm wrong, that you added in these
18  sections to your report because you had later,
19  through other work that you'd done on other cases,
20  later, learned about more of this research relevant
21  to women in medicine and that you thought it was
22  relevant to this case, correct.
23     A.   That's broadly relevant to setting the
24  context of the existence of bias, gender bias, in
25  medical settings and among surgeons.  So in that

157

1  sense, I saw it as relevant.  Is it as -- you know,
2  it's not -- it's not -- even though it's not a
3  particular allegation in this case.
4      Q.   When did Dr. Bala ever not receive credit
5  for an unexpectedly good outcome?
6      A.   Again, I'm not saying it's an allegation
7  in this case.  I'm just saying this is sort of a
8  general bias that has been demonstrated to provide
9  context for the existence of studies showing bias in
10  medicine toward female surgeons and female doctors.
11     Q.   Is it fair to say that, as far as you are
12  aware, Dr. Bala has not alleged that she was blamed
13  more for poor outcomes than male surgeons or not
14  given credit for unexpectedly good outcomes?
15     A.   As far as I'm aware, yes.
16     Q.   Regarding the backlash from staff toward
17  female physicians section of your report, which
18  starts on page 44, you refer to a few studies, and I
19  want to talk about just a couple of those.
20     A.   Sure.
21        MS. BRADFORD:  Going to pull up Document
22  J, which we'll mark as Exhibit 9.  I have put that
23  into the chat.  I'll share my screen.
24        (WHEREUPON, Exhibit 9 was marked for
25  identification.)


Exhibit 2
Page 40 of 163

158

1 BY MS. BRADFORD:
2   Q.  So, Dr. Glick, this is a copy of the --
3 the Zelek and Philips study.  Are you familiar with
4 that?
5   A.  Yeah.  I read it in the past.
6   Q.  You cited to it, so I -- I assumed that
7 you've --
8   A.  Yeah.
9   Q.  -- through it, correct?  So just to
10 confirm, this is a study that involves surveys
11 submitted to female nurses at one Canadian hospital
12 in 2000, correct?
13   A.  I believe so, yeah, from what I recall.
14   Q.  Now, the study examined nurse reactions to
15 four different vignettes; is that right?
16   A.  Yes.
17   Q.  And on page 45, it looks like you talk
18 about the results from one of those vignette, the
19 ones -- the one that referrers to leaving a suture
20 tray out with needles by a patient's bed.  Does that
21 sound familiar?
22   A.  Right.  Yes.
23   Q.  So and that just came from one of the
24 vignettes, right?
25   A.  Correct.

159

1   Q.  Why didn't you talk about the other three
2 vignettes?
3   A.  The other three found null effects.
4   Q.  Let's talk about those a little bit.  I'm
5 not going to read all of this highlighting, as it's
6 most of the page, but if we look at page -- looks
7 like it's page 2 from the document.  For the second
8 vignette, right here, isn't it correct that nurses
9 said that they would be more likely to act on a male
10 physician's assertive request than a female
11 physician's assertive request?
12   A.  For the vignette activity you're saying?
13   Q.  Yeah.  And it's this part right here that
14 I'm implying to.
15   A.  Yeah.
16   Q.  Okay.  But also in this same vignette,
17 nurses were equally unlikely to immediately stop and
18 help either a male or female physician; is that
19 correct?
20   A.  Yes.
21   Q.  And then, also, according to this second
22 vignette -- sorry for the scrolling.  Doesn't the
23 paper also state that nurses had a near-universal
24 resentment of the physician's aggression, whether
25 the physician was male or female?

160

1   A.  Yes.
2   Q.  And then if we look at the third vignette,
3 isn't it true that nurses actually expected female
4 doctors to respond more positively to their
5 suggestions about treatment than male doctors?
6   A.  Yes.
7   Q.  And then, finally, for the fourth vignette
8 here, the study actually found that female nurses
9 were more likely to view the male physician's
10 display of anger as inappropriate than the female
11 physician's display, didn't it?
12   A.  Let's see.  It lacks statistical
13 significance, so I'm not -- you know, said all of
14 them lack statistical significance, so --
15   Q.  But --
16   A.  That's a lack of statistical significance.
17 Those are unreliable.  Those are -- those are random
18 noise as far as statistical significance goes, those
19 P values are nowhere near the level of declaring
20 statistical significance, so it's a -- it's a null
21 effect.
22   Q.  Okay.  So is it your testimony that if a
23 study reports a finding -- that that finding lacks
24 statistical significance, that you probably wouldn't
25 want to use that as a basis for your opinion?

161

1   A.  It -- it depends.  Null effects are
2 notoriously less -- you know, less interpretable
3 because there's a lot of potential reasons for --
4 for null effects in an experimental setting or in a
5 vignette study like this.  But in -- you know, where
6 you're doing sort of a repeated, careful attempt to
7 replicate an effect, null effects can be
8 informative.  If you're trying to replicate prior
9 effects and -- and you're repeatedly finding lack of
10 statistical significance, then that would be
11 important.
12   Q.  So just to be clear, so sometimes you find
13 that it's appropriate to rely on a study where the
14 findings lack statistical significance, but
15 sometimes you don't?
16   A.  Yes.
17   Q.  Okay.
18   MS. BRADFORD:  I want to next switch to --
19 I'm putting this into the chat.  It's Document K;
20 we'll mark as Exhibit 10.  Pull this up on the
21 screen.
22   (WHEREUPON, Exhibit 10 was marked for
23 identification.)
24 BY MR. BRADFORD:
25   Q.  And, Dr. Glick, is this the Burton study

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 41 of 163

162

1 from 2022 that you relied on?
2    A.  Looks like it.
3    Q.  So I'm going to go to page 3.  And I'll
4 read this.  "Female physicians had disproportionate
5 representation among reports referencing
6 communication and conversational issues and the
7 lowest severity level.  Male physicians had
8 disproportionate -- proportionate representation for
9 ignoring or omitting procedures, process issues, and
10 physical intimidation."  Did I read that correctly?
11    A.  Yes.
12    Q.  So is it fair to say that according to
13 this study, male physicians were overrepresented
14 among the reports in dealing with harsh or egregious
15 behavior?
16    A.  Physical intimidation.  So physical
17 aggression, yes.  And we know that if there's one
18 robust actual sex difference in behavior, physical
19 aggression is, you know, much more likely to come
20 from men than from women.  Certainly, more extreme
21 physical violence is -- is predominantly male-
22 generated.  So that may be a difference in base
23 rate.
24    Q.  Now, this study didn't examine the
25 frequency with which male or female physicians

163

1 actually exhibited any of the reported behavior,
2 right?
3    A.  Right.  And this is an organizational
4 study.  So you always -- again, trying to see how
5 things cohere together or whether they do cohere
6 together between laboratory studies that have
7 certain kinds of weaknesses like you were asking me,
8 "Were any of these people managers," right?  That's
9 why we have laboratory studies where we can control
10 things that you're asking about.  That's the
11 strength of the lab study.
12        The weakness of the lab study may be,
13 well, does this translate into an organizational
14 setting?  That's where the organizational study can
15 become very useful.  But the organizational study
16 often has the weakness of we don't know actually
17 whether, you know, for instance, more men were using
18 physical intimidation than women, right?  We don't
19 know the actual base rate of that.  And so, you
20 know, it's, again, looking at how these things
21 interlock.
22    Q.  And, Dr. Glick, when you cite to this
23 study, I think you cite to it within the context of
24 talking about patient safety report data and how
25 that, I think you say, is consistent with backlash -

164

1 - backlash research theory.  Is that --
2    A.  Yes.  And I believe they include that in
3 the study, as well, but yeah.
4    Q.  So let's go to page 13 on Table 2.  So
5 according to this, is it correct that 636 female
6 physicians worked at Stanford Hospital during the
7 period covered by this study?
8    A.  I don't see the top of the table, and I'm
9 getting -- I -- okay.  Number of physicians.  I -- I
10 assume this is number of -- yeah.  I mean, I -- I
11 guess that's the case.  Or there's a number of
12 physicians involved in complaints in the study, but
13 I'm guessing more that's the number of physicians
14 overall.  Yeah, that must be the number of
15 physicians overall.  Sure.
16    Q.  And then there were 844 male physicians?
17    A.  Yeah.  That's what this table suggests,
18 yes.
19    Q.  Then if we look at this side of the table,
20 it mentions that 49 female physicians were the
21 subject of a patient safety report, correct?
22    A.  Right.  Fewer women overall were the
23 subject of a safety report.
24    Q.  So 92 percent of female physicians were
25 never the subject of a complaint, correct?

165

1    A.  I think that would be -- so 49 -- okay.
2 So you did -- you did the math then?  All right.
3 I'll trust your math, but yeah, I would hope that
4 most physicians are not the subject of -- of these
5 kinds of complaints.  Yeah.
6    Q.  Okay.  And of the 844 male physicians, 138
7 were the subject of a complaint, right?
8    A.  That's what it looks like.
9    Q.  And that comes out to about 16 percent
10 were the subject of a complaint?
11    A.  I guess.
12    Q.  So male physicians were twice as likely to
13 be the subject of a complaint under this study,
14 correct?
15    A.  I can't remember your initial figure for
16 women, but yeah, I'll trust your math on this in
17 terms of the base rates of overall complaints.  The
18 point of the study, however, relative to backlash is
19 the type of complaints where women are
20 overrepresented.
21    Q.  And if we look at the highlighted section
22 of this text from page 6, I think it talks about how
23 some of these complaints actually involved that some
24 physicians were subject to multiple complaints,
25 right?



NAEGELI
DEPOSITION & TRIAL

(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 42 of 163

166

1    A.  I wouldn't be surprised if that's the
2  case, yeah.
3    Q.  For example, it talks about how some
4  received only one report, some received two to six,
5  things like that?
6    A.  Yeah, yeah.  I see that.  Yes.
7    Q.  The study doesn't tell us exactly how many
8  female physicians were the subject of multiple
9  complaints, does it?
10    A.  Not that I know of.
11    Q.  So if we go back to -- a different table.
12  On page 14, Table 3, you'll see that there are 88
13  complaints about these 49 female physicians.  We
14  already established as 49 earlier.
15    A.  Okay.
16    Q.  Is that fair to say that then some female
17  physicians were obviously the subject of multiple
18  complaints?
19    A.  That -- that suggest that's the case,
20  yeah.
21    Q.  And the same is true for the men?
22    A.  Yes.
23    Q.  So if 92 percent of all female physicians
24  were not the subject of any complaints -- actually,
25  let me rephrase this.

167

1    Why don't we see more female physicians
2  being complained about under your backlash theory,
3  since they're obviously in a position of power and
4  authority at the Stanford hospital?
5    A.  It's, again, not just being in the
6  position of power and authority, as we talked about
7  before interactions, right?  It's their demeanor, as
8  well.  So if they have an assertive demeanor, that's
9  -- that's a different story than -- I think a lot of
10  women in these positions learn that -- and they're
11  also -- women are socialized to be nicer than men.
12  That's part of the gender stereotyping, right?  So,
13  you know, a lot of women can blunt that possibility
14  by doing things like, you know, being -- you know,
15  being much less assertive than they might otherwise
16  be in that role.
17    Q.  One final thing on this study.  I want to
18  go to page 5.  This notes in the highlighted text
19  that: We did not examine the demographic information
20  or job position of the author of the SAFE report
21  because events are often filed anonymously.  So in
22  other words, this study didn't examine who actually
23  files the patient SAFETY reports, right?
24    A.  Right, right.
25    Q.  Do you know who can file patient SAFETY

168

1  reports?
2    A.  Do I know in this study?
3    Q.  No, just generally.
4    A.  I'm sorry.  I'm not sure I understand what
5  you're asking.  I mean, how would I -- how would I
6  possibly know who filed -- are you asking --
7    Q.  Do you know -- do you know --
8    A.  Are you asking in the Bala case?  Are you
9  asking just generally who files patient's SAFETY
10  reports?  My understanding is that staff, nurses, OR
11  techs, people like that would be like --
12    Q.  Yeah.  Yeah, I'm asking just generally,
13  Dr. Glick.  You mentioned that staff can file,
14  nurses, OR techs.  Can other physicians file patient
15  SAFETY reports?
16    A.  I would imagine they could, but -- yeah, I
17  would assume so.
18    Q.  I want to now talk about section five of
19  your report, which is titled the "Application to
20  Current Case and Opinions."
21    A.  Yes.
22    Q.  So on page 51 of your report, you state
23  that -- give me one moment -- you will point the
24  case decision-makers for issues to consider and note
25  when case facts are consistent with discrimination.

169

1  Is that -- did I read that correctly?
2    A.  Yeah.
3    Q.  Is it your role in this case to point the
4  jury toward issues to consider and note when case
5  facts are not consistent with discrimination?
6    A.  Well, I'm looking at this idea of a
7  pattern, right?  If you're trying to diagnose
8  somebody's symptoms, you look for what diseases
9  those symptoms are consistent with.  So, you know,
10  I'm not -- I'm saying you should definitely look at
11  some of these issues to assess whether or not
12  discrimination occurred and, you know, sort of like
13  looking for a negative.  I -- you know, I think --
14  you know, I don't -- I don't know how I would do
15  that, other than I do try to point out things in my
16  report that would lead to less likelihood of
17  discrimination in general.
18    Q.  You mentioned sort of looking at symptoms
19  and things like that.  So, Dr. Glick, bear with me
20  as I ask you about this hypothetical.  And it's
21  confusing, please ask me to rephrase.  But say I go
22  to the doctor, and I say, "I'm having really bad
23  headache."
24    My doctor says, "Well, let's look for
25  symptoms of brain cancer" and just looks at that.



Exhibit 2
Page 43 of 163

170

1  And doesn't say, for example, "Let's look at
2  symptoms that might be a thyroid issue, or hormonal
3  issue," something like that.
4           Would you be concerned if the doctor just
5  went to one specific thing that could be causing the
6  headaches and just looked for symptoms that
7  confirmed that?
8      A.  Well, what I'm saying is I'm looking for
9  ways in which that you can apply the pattern seen in
10  the general research.  You know, what are these
11  alternative explanations?  The alternative
12  explanation is Dr. Bala is -- has -- has a negative
13  personality.  I mean, that's -- that's the
14  alternative, I think, that you would offer, right?
15  That she did things that were, you know, beyond the
16  pale or -- or something like that.  And the question
17  is, okay, could this possibly be discrimination?
18  Well, let's look at that possibility.  Here's the
19  ways in which that's possible.  But I'm not ruling
20  it -- you know, I'm not ruling out other
21  alternatives the jurors -- you know, the
22  alternatives that you will present.  The jurors have
23  to weigh that against this other alternative.
24      Q.  In your report, did you make note anywhere
25  of -- of -- when a decision was made or an action

171

1  was taken, did you ever make note where it was maybe
2  consistent with something other than discrimination?
3  For -- I think the example that you gave -- that you
4  gave was maybe consistent with behavior, bad
5  behavior on Dr. Bala's part.  Did you ever make note
6  of that?
7      A.  Well, I mean, the -- the -- that's the --
8  that's the alternative that's -- that's very least
9  implicitly, and I think explicitly there in my
10  report, right?  Well, was it?  And I think I'd say
11  this.  I think I say there, you know, was she --
12  there could be behavior that just rises above, you
13  know, the standard at which you have to do
14  something, right?
15           I talk about I have no dispute with OHSU's
16  being concerned about communication in the OR,
17  right?  And -- and so I think I present that other
18  alternative.  Actually, if you read the report
19  carefully, although, I say this overall, you know,
20  thing about pointing out consistencies, I do -- in
21  the section, I think if we read through it, I do
22  contrast these two possibilities, and I don't rule
23  out the other possibility.
24           And I do also, you know, say where I think
25  OHSU did something right.  For instance, you know,

172

1  that they are concerned about patient -- about --
2  about communication in the OR and -- and those sort
3  of things, and they have a right to be concerned
4  about that.  And that is a patient-safety issue
5  that, for the HR investigations, the actual
6  investigations themselves, you know, really focused
7  in on, well, what actually happened?  Let's get past
8  these sort of inferences about who Dr. Bala is or
9  what her motives are or these other things that are
10  clearly what we call in -- in social psychology
11  dispositional inferences that are subject -- subject
12  to potential stereotyping bias.  Let's look at what
13  actually happened and what actually people report
14  what -- what literally was said and so on, right?
15           And I think that was -- that was,
16  actually, very well done, right, that part of the
17  investigation, to the extent that you can get at
18  those issues.  You know, you can't -- you know, you
19  don't have, again, instant replay tape of the -- of
20  the incident.
21           So I think I -- I do talk about that other
22  possibility there, even though I initially say that
23  in the beginning of the section.  I think I do
24  contrast these two possibilities.
25      Q.  So, Dr. Glick, just to be clear, is it

173

1  your testimony that in this report, be it in this
2  section or any other, that you point out instances
3  where decisions were made or actions were taken,
4  where those decisions or actions were not consistent
5  with discrimination or were consistent with some
6  alternative explanation?
7      A.  What I'm saying is that I contrast these
8  two alternatives and -- you know, to understand
9  whether it's consistent or not.  And maybe I
10  should've added "or not" to avoid this whole -- this
11  whole issue at that beginning there.  But I'm
12  contrasting, you know, is it -- is it possibly
13  discrimination?
14           And -- and there's always the alternative
15  there that I think I frame it as, you know, yes, a
16  physician's behavior -- a female physician's
17  behavior could rise to a level that, you know, would
18  be appropriate to not renew her contract, to fire
19  her, to discipline her, or -- or whatever.  It's a
20  question of whether there was a double standard,
21  whether there was sort of this kind of echo chamber,
22  or the -- the game of telephone where the -- the --
23  the accounting for the event became more extreme in
24  a stereotype consistent direction, right?  Those are
25  -- are things that are consistent with



NAEGELI
DEPOSITION & TRIAL

(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 44 of 163

174

1 discrimination.
2       The alternative would be the behavior was
3 so egregious, and I think I -- I do contrast those
4 two potential explanations, and I don't make the
5 ultimate conclusion.
6    Q.   Dr. Glick, do you mention anywhere in your
7 report the evidence that Dr. Bala's conduct had
8 prompted complaints at other hospitals?
9    A.   I did see that in -- I did see that issue
10 being aired in -- in her deposition, and then there
11 were some exhibits, I think, from UPenn teaching
12 ratings, I think, or something like that.  And then
13 there's -- was it Arizona --University of Arizona or
14 some subsequent job in Arizona?
15    Q.   Did you mention those in your report?
16    A.   No.  I was focused in on -- on this case,
17 and I focused on the evidence contained in -- in --
18 in the documents that I had access to for this case.
19 I don't -- yeah.  And -- and as far as -- okay.  Go
20 ahead.  Ask -- ask your question.  I assume I -- I'm
21 anticipating what your next question is going to be,
22 but go ahead.
23    Q.   If complaints were made about her conduct
24 in different work settings by different people,
25 wouldn't that raise questions about whether Dr. Bala

175

1 conducts herself professionally in work settings?
2    A.   Well, there's, again, two alternatives,
3 and I think I do consider them both in my report.
4 And we know that gender bias and gender stereotypes
5 are pervasive in the sense that we all kind of carry
6 around, or people carry around these gender
7 stereotypes and have internalized them to some
8 extent.  And the studies show that when you have
9 this combination of somebody who's assertive and --
10 and ambitious and in a high-status power role who is
11 also female, that that is a circumstance that can
12 elicit these kinds of comments about dislikeability,
13 abrasiveness.
14       So I would expect, from the perspective --
15 it's really not diagnostic, is what I'm saying
16 because, you know, it -- it's consistent with either
17 explanation.  It could be that Dr. Bala is behaving
18 in an egregious way.  It could also be that, as we
19 know, backlash tends to occur in certain specific
20 kinds of situations, certain specific kinds of
21 people, and that those -- that -- that -- that
22 existed in all of these situations.
23       And as I recall, I mean, as far as the
24 teaching ratings or -- or whatever it was, at UPenn,
25 there were plenty of people saying, "Oh, she's

176

1 really pleasant and -- and a really good teacher or
2 good to work with."  So there was, like, this
3 inconsistency in perceptions of her, which would be
4 more consistent, actually, with a stereotyping
5 explanation than with a, yo know, egregious behavior
6 explanation.
7    Q.   And, Dr. Glick, I just want to make sure
8 that I'm getting your -- you answer down correctly.
9 So in terms of complaints made against Dr. Bala and
10 her prior subsequent employment, you would agree
11 that it -- it could indicate that she faced
12 discrimination at those places, as well, or it could
13 indicate that she exhibits unprofessional conduct in
14 the workplace, correct?
15    A.   Yes.  It's consistent with either of these
16 two potential explanations, and therefore, you know,
17 it doesn't solve the issue, right?  I don't think
18 you can make the argument that because there were
19 some complaints that were similar across these
20 different settings, which are all medical settings
21 all -- you know, again, these factors that we've
22 already talked about ad nauseam, I don't think you
23 can make the argument that, therefore, it must be
24 her, right, because we would expect the possibility
25 for bias in -- in -- in each of those situations.

177

1       But this case revolves around what
2 happened at OHSU, and that's where the documents
3 really allowed me to dig into events in a detailed
4 way, and I think that's much more diagnostic of the
5 possibility of discrimination.
6    Q.   But, Dr. Glick, you also make note of the
7 questions in this section that the jury must decide
8 or consider in this case.  And I'll give you an
9 example.  On page 54, you lay out four questions
10 that, according to you, "decision-makers must decide
11 the answers to."
12    A.   I mean, them, not me, I think.
13    Q.   Correct.  You -- you say that the -- the
14 jury --
15    A.   Yeah.  I'm not -- I'm not trying to take
16 the -- the role of -- instructions to the jury away
17 from the judge.  I just want to be clear.  I think
18 the context here is that these are questions for
19 them to consider and not ones that I can ultimately
20 -- or that I feel in my role to ultimately resolve.
21    Q.   Yes.  So again, I -- I agree with you that
22 you note that these are questions that the jury must
23 consider.  How did you select these questions?
24    A.   Well, because these are the questions that
25 really revolve around the possibility that there

Exhibit 2
Page 45 of 163

178

1 could be bias, and they need to decide whether they
2 think it was bias versus not.
3    Q.  What's your basis for selecting these
4 specific questions?
5    A.  They seem to me, after reading all the
6 documents in the case, they seem like the most
7 pressing questions for trying to figure out whether
8 there was bias or not.  You know, in -- in some
9 other case, there might be issues with being treated
10 differently because you got pregnant and have young
11 children and are seen as less committed.  Well,
12 that's not a -- not an issue in this case, right?
13 These seem to be -- from the documents I read, these
14 seem to be kind of the -- the core questions where
15 there was likely potential for bias and that the
16 jury needs to kind of sort through to determine
17 whether they think there was.
18    Q.  So -- I mean, can you walk me through what
19 -- what sources you relied on or what methodology
20 you relied on in determining that, in this case,
21 these are the -- the core -- these are the core
22 questions for the decision-makers to answer?
23    A.  I mean, here I'm relying on my expertise,
24 right?  I make it very clear in the introduction to
25 this section that this is not doing science, right?

179

1 This is my application as an expert.  This is my
2 expert opinion.  And these are the -- the issues
3 that jump out to me based on the -- the case facts,
4 right?  You know, I don't focus on things that --
5 I'm focusing on things that -- that are relevant to
6 the decisions about Dr. Bala.
7       Like you were asking me before, "Well, why
8 did you include something in the general section on
9 discrimination in referrals?"  And I said, "Well,
10 that was general context."  Now, we're into the
11 report on specific things for the jury to consider.
12 I'm not bringing that up because that's not an
13 allegation of the case.
14    Q.  So again, you've mentioned that it's based
15 on your expertise, your application of that.  And so
16 what I'm trying to get at is what are -- what are
17 you applying to decide what questions the jury must
18 decide, what principle, what methodology, what
19 criteria?  Point me to that exactly.
20    A.  Again, I'm using my expertise and
21 combining that with my reading of all these case
22 documents to see what I think the processes that are
23 -- are relevant in those processes that any expert
24 in sex discrimination, I think, would land on the
25 similar sorts of issues where there was potential

180

1 for discrimination.
2    Q.  In your opinion, are these the only
3 questions that the jury must decide in this case?
4    A.  Again, the questions the jury must decide
5 is -- is -- is up to -- I think, to the judge in the
6 case, and -- yeah, I mean, I think you're -- you're
7 reading a lot into "must," right?  I'd be content to
8 say these -- these are the questions I think the
9 jury should focus on when they're trying to pick
10 apart whether discrimination occurred or not.  I --
11 this -- this "must" does not carry the weight of
12 some judge's jury instructions.
13    Q.  And, Dr. Glick, I understand you commented
14 that I'm reading a lot into what you wrote here, but
15 I'm trying to just sort of ascertain why you wrote
16 what you wrote.  Do you think that the jurors should
17 consider any questions beyond the ones that you've
18 listed out here?
19    A.  I mean, they're absolutely able to -- to -
20 - to -- to consider -- I don't have a -- a position
21 here where I can dictate what the jury has to do.
22 And I'm very careful to say, "Look, they have to
23 come to their own decision."
24       But from my expert reading of the case
25 facts, if there was discrimination, these are the

181

1 things where that would be possible or likely.  And
2 so you need to go through these issues if you're
3 really going to sort through whether discrimination
4 occurred or not.  So -- so from the perspective of
5 what are the -- what's the potential for
6 discrimination, these are the things from my expert
7 perspective that really should be focused on.
8    Q.  Do you think that the jury should
9 consider, for example, whether Dr. Bala's testimony
10 might be self-serving?
11    A.  Well, I think absolutely they will
12 consider that.  I'm not making credibility
13 judgments.  And -- and -- and as you will see in the
14 rest of my report, I'm generally not focused on Dr.
15 Bala's testimony or saying, "Oh, you should just
16 listen to what Dr. Bala's feelings are."  I'm saying
17 look -- look at the incidents.  Look at the
18 eyewitnesses to the incident.  Look at what they
19 said.  Look at how that was then conveyed by Dr.
20 Henrikson and -- and -- and perhaps altered by him,
21 given the case facts.  And -- and that's the sort of
22 thing to focus on.
23       I'm pointing them to the evidence.  And I
24 may mention once in a while Dr. Bala's perspective.
25 But by no means am I trying to imply that they

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3345
NAEGELIUSA.COM

Exhibit 2
Page 46 of 163

182

1 should just -- you know, just accept Dr. Bala's
2 testimony as the truth.
3     Q.   And, Dr. Glick, I -- I completely
4 appreciate that.  You're not making a credibility
5 judgment here.  And I think you said that, you know,
6 they will look at Dr. Bala's testimony and accept
7 his credibility.  But my question is, in your
8 opinion, should the jury consider whether Dr. Bala's
9 testimony might be self-serving?
10     A.   I think it's fine for them to consider
11 that.
12     MR. BRISCHETTO:  Objection.  Asked and
13 answered.  Go ahead.
14     THE DEPONENT:  Yeah, I think it's fine for
15 them to consider that.  You know, I didn't -- I -- I
16 guess I kind of presume that the jury is going to be
17 skeptical about, you know, Dr. Bala.  They're not
18 going to rely on just Dr. Bala saying, "I was
19 discriminated against," and we're going to -- "Oh,
20 okay.  He was," you know.
21     And I think everybody does intuitively
22 understand.  I think the nuances of discrimination
23 is something where you need an expert to -- to
24 shepherd you through when and how and the form this
25 takes with self-serving bias.  I think we all

183

1 understand that somebody, you know, who has a bad
2 outcome is likely to be defensive about it.  I -- I
3 think that kind of falls maybe under the -- the --
4 the -- something -- the -- the sort of standard that
5 can get you excluded as an expert that "Well, that's
6 common."
7     Q.   And, Dr. Glick, I -- I am not asking you
8 if you think it's fine for them to -- I am asking
9 you yes or no, should the jury consider whether her
10 testimony might be self-serving?
11     MR. BRISCHETTO:  Objection.  Asked and
12 answered.  And argumentative.  Go ahead.
13     THE DEPONENT:  Sure.  I think they should
14 consider that.
15 BY MS. BRADFORD:
16     Q.   Should the jury consider whether Dr. Bala
17 behaved inappropriately?
18     A.   Yes, of course.  Yes.  Whether she behaved
19 inappropriately versus whether it was
20 discrimination.  I think -- I think I do make that
21 clear in that section, but, yes, those are the
22 alternatives.
23     Q.   Looking at page 54, Dr. Glick, and take a
24 moment to read through it.  Where, on page 54, do
25 you say that the jury should, or in this case, must

184

1 decide whether Dr. Bala behaved inappropriately?
2     A.   Okay.  I don't think I say they must do
3 that.  So again, I think -- as you read this
4 section, I think, again, you're reading a lot into
5 this "must."  And I'm not saying this is the only
6 thing they need to consider.  And -- and I do, later
7 on, I think, contrast those two possibilities.
8     And so I think it's kind of implicitly
9 contained in here.  Is it that she's behaving
10 egregiously?  I mean, I guess I just -- I think
11 that's kind of the obvious alternative, and it is
12 explicitly an alternative that I contract to.  So I
13 think this is, to me, not really an issue.
14     Q.   Dr. Glick, should the jury consider
15 whether Dr. Bala's conduct violated any workplace
16 policies or a code of conduct?
17     A.   Sure.  I think they should consider that,
18 but I also think that -- that the core of the
19 question of discrimination is whether they think
20 there's a double standard being imposed.  That, you
21 know -- right?  You can violate a policy and nobody
22 can care.  You can violate a policy and get a slap
23 on the wrist.  You can violate a policy and get
24 fired.  And those are very different kinds of
25 outcomes.  If there's a double standard in the level

185

1 of discipline or punishment that's based on gender,
2 and if the jury thinks that's the case, well, then -
3 - then that's discriminatory.
4     Q.   So, Dr. Glick, again, we've -- we've
5 established that -- that you wrote that these are
6 questions that the jury must decide.  So I just want
7 to take a step back here.  You don't hold a law
8 degree, correct?
9     A.   I don't, what?  Law degree, oh.  I -- I do
10 not hold a law degree.  And again, I -- I think I
11 made it clear earlier that I do not see this as
12 having the weight of a judge's instructions.  And as
13 I -- as I hear you harping on this word "must," I
14 mean that -- you know, that -- that was -- I -- I
15 could easily substitute "These are questions for the
16 jury to consider."  But I think these are the
17 trenchant questions when it comes to discrimination.
18     Q.   Have you had any legal training?
19     A.   Other than having a lot of experience as
20 an expert witness and learning things through that
21 experience and interaction with lawyers in the
22 courts, I have not had any formal legal training.
23     Q.   How do you define discrimination?
24     A.   Double standards, right, that I've been
25 talking about.  So in a nutshell, it's treating



NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Exhibit 2
Page 47 of 163

186

1  people differently based on some social category
2  membership. And so it would be something like for
3  the same behavior, punishing women more than men, or
4  treating people in other categories differently than
5  -- than -- you know, based on the same kind of level
6  behavior.
7      Q.  Do you know the elements of a claim to
8  assess discrimination, the legal elements?
9      A.  I, again, am not a lawyer. If you're
10  asking me to quote, you know, some -- when I -- when
11  I say discrimination, I am defining it in terms of
12  how psychologists and researchers in my field would
13  define it. And I am not ultimately opining on the
14  legal question. So I would like to -- if -- if
15  that's what you're getting at, I would like to just
16  state that I'm -- I'm using -- I'm not -- I'm using
17  the sort of commonly held definition of
18  discrimination among psychologists and researchers
19  in this area.
20      Q.  And I'm assuming the same is true for race
21  discrimination. Your definition is based on your
22  field of social psychology, not the legal elements
23  of race discrimination, correct?
24      A.  Yes, I would say it is. But I think the
25  definition, again, of double standards, treating

187

1  people differently, you know, and unfairly so, and
2  unimportant, that's, I think, how people understand
3  discrimination, as well.
4      Q.  And you understand, as we've pointed out,
5  you -- you don't have legal training. You've been
6  through this quite enough that in the courtroom,
7  certain words like discrimination have special
8  meanings, right?
9      A.  I know that they can and that psychology
10  and the law can have some different nuances in the
11  meanings of things. And I leave that to a judge's
12  instructions to make it clear to the jury what
13  they're supposed to be deciding upon.
14      Q.  And to that point, you would agree with me
15  that it is the judge's job alone to instruct the
16  jury on what discrimination means in that courtroom?
17      A.  Yes.
18      Q.  So throughout your report, you state that
19  you have considered and are opinion on whether these
20  facts are just consistent with potential
21  discrimination.
22      A.  Right.
23      Q.  So we've established that you -- you don't
24  know the elements or the legal definition of
25  discrimination.

188

1      So just to be clear, how can you tell the
2  jury whether facts are consistent with
3  discrimination in the context of this case and these
4  claims that have been brought?
5      A.  Well, I think the legal definition of
6  discrimination -- are you telling me that it
7  contradicts the definition that I'm using? Is there
8  a crucial difference here? So that's one question I
9  have for you.
10      But again, the jury will be instructed by
11  the judge on the legal definition of discrimination.
12      I'm saying from the perspective of
13  research, discrimination shows up in double
14  standards being applied to people based on their
15  social category membership, and I think that
16  definition likely fits within the rubric of
17  discrimination in legal settings.
18      Q.  So you asked me a question, Dr. Glick,
19  with all due respect, you're the witness right now.
20  You're the one who's being asked questions and has
21  to answer them.
22      Is there a difference between legal
23  discrimination and discrimination in the context
24  that you know it?
25      MR. BRISCHETTO:  Objection. Calls for

189

1  speculation. Go ahead.
2      THE DEPONENT:  Again, I'm not -- I'm -- I
3  never claimed to be a lawyer, and so I would defer
4  to the -- the -- the legal experts in the definition
5  of discrimination for any sort of instruction to the
6  jury.
7      And I'm using the word in the -- you know,
8  I've -- I've been very clear about the meaning that
9  I applied to -- to the word discrimination and how
10  we conceptualize it in research. And so that --
11  that should be clear.
12      And if a judge disagrees that this -- just
13  says, "Well, no, that doesn't really apply to what
14  you're supposed to do as a jury," well, then the
15  judge will make that instruction.
16  BY MS. BRADFORD:
17      Q.  So to that point, on page 50 of your
18  report you -- and you've mentioned this earlier, but
19  you talk about how your testimony will -- will stay
20  within the bounds defined by Federal District Court
21  Judge Nancy Gertner.
22      And she was the judge on that Tuli case
23  that we talked about, correct?
24      A.  Yes. My understanding of her reason for
25  including me in that case, where I did write an



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 48 of 163

190

1  application to the case section, where I think I
2  used pretty similar language.
3       Q.  You're aware that she's not the judge of
4  this case, right?
5       A.  Of course, yeah.  And I -- I -- yeah, of
6  course.  I -- I -- I believe she is now retired as a
7  federal district judge and teaches at Harvard.
8       Q.  She retired over 10 years ago, right?
9       A.  I -- I haven't followed her career that
10  closely.
11       Q.  And she isn't the one who decides what you
12  can or cannot testify about, right?
13       A.  Absolutely, yes.  And that's -- we talked
14  about this earlier, and it would be nice if there
15  were a clear, consistent set of interpretations of
16  the rules for including experts.  But clearly,
17  different judges have different interpretations, and
18  they are allowed some discretion.
19       So the trial judge has a lot of
20  discretion, and I have -- I have little doubt that
21  you will try to convince the trial judge that my
22  testimony should be limited or excluded.  That's the
23  way the game is played in -- in -- in these legal
24  cases.
25       Q.  Dr. Glick, is extended contact with

191

1  another person likely to reduce the risk of
2  discrimination?
3       A.  That really depends.  It can increase the
4  risk of discrimination.  So you talk --
5       Q.  I'm sorry.  Can --
6       A.  Sorry, go ahead.
7       Q.  I'm sorry.  I was coughing a little bit.
8  Do you mind saying your answer again?
9       A.  Extended contact can actually exacerbate
10  discrimination in some cases.  So if we're talking
11  about something like racism, right?  Contact tends
12  to have, overall, a positive effect, but not always,
13  right?  You know, so -- so groups that are highly
14  segregated in -- in daily life as they get to know
15  each other as people, that can quell some
16  discrimination.
17       But if you look at gender discrimination,
18  men and women throughout history have had close
19  daily intimate contact, and yet the history is that
20  this has been very compatible with discrimination.
21  That's -- that's the whole sort of contribution of
22  ambivalent sexism theory.  Part of the contribution
23  of ambivalent sexism theory is to reconcile how can
24  you get this intimate interdependence and yet
25  maintain a power difference.

192

1       And so when you structure things by roles
2  and stereotypes that have women being more
3  accommodating or prescribing women to be more
4  nurturing, accommodating, less powerful, less --
5  less ambitious, all of those other sorts of things,
6  men to be more risk-taking, ambitious, assertive,
7  and powerful, then daily contact just reinforces --
8  you know, in those kind of role contexts, daily
9  contact just -- contact can reinforce those status
10  divisions, right?
11       If you think about a system -- I'll give
12  you an example that's not gender.  If you think
13  about a system like, you know, in the old south,
14  right, during the days of slavery and -- and the --
15  and the Jim Crow era as well, right?  Jimmy Carter
16  talked about this, for instance, just anecdotally in
17  his -- in his autobiography, that, you know, he
18  played with black friends when he was a child.
19       But as they got a little -- they -- they
20  knew to come to the back door, right?  He never told
21  them to come to the back door.  He didn't know why
22  they had to come to the back door.  They knew why
23  they had to come to the back door because there was
24  this status difference and they were at risk if they
25  violated that status difference.  So the daily

193

1  contact can exist and reinforce those status
2  differences.
3       Q.  So, Dr. Glick, I -- I think your answer
4  for this will be, "It depends," but correct me if
5  I'm wrong.
6       A.  Most likely.
7       Q.  Can individuating information be a factor
8  that can reduce the risk of discrimination?
9       A.  Yes, it definitely depends.  It's the same
10  thing.  It can exacerbate discrimination.  So I
11  talk, I think, in my report about descriptive
12  stereotyping and prescriptive stereotyping.  With
13  descriptive stereotyping, it's like, "Oh, we expect
14  women to be warmer," right?  That's part of the
15  stereotype.  And so we're not surprised if a woman
16  is warm and we then, you know, rapidly slaughter
17  into that -- that sort of role and that stereotype,
18  right?
19       But if she defies that stereotype, we'll
20  say, "Oh, no, she's not warm.  She's not like most
21  women."  But if that is also a prescription, a
22  prescriptive stereotype, she should be warm.  She
23  shouldn't be assertive and ambitious.  Then you get
24  prescriptive discrimination, right?  Like backlash
25  is a prescriptive discrimination.  So individuating

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 49 of 163

194

1  information gets rid of the initial stereotyping,
2  right? I might assume, "Oh, she's warm. She's
3  going to be warm because she's female," right? And
4  then I see, "Oh" -- I think, "Oh, no, she's not.
5  And in fact, now I hate her because she's not,"
6  right?
7        I think I use that example of, you know,
8  descriptive stereotype would be: Norwegians love to
9  ski. You meet a Norwegian, and they say, "I've
10  never skied in my life." And you're surprised,
11  right? But now you're like, "Oh, okay, well, not
12  all Norwegians love to ski. This person is an
13  exception to the stereotype." Okay. That's fine,
14  because that's just a descriptive stereotype.
15        And now, the stereotype that men should be
16  brave, I used that example, right? The rabid dog
17  attacking and the man jumping behind the woman,
18  right? That's a prescriptive stereotype. And you
19  say, "This guy's not brave. And, in fact, he's a
20  horrible person," right? "He's a bad boyfriend.
21  She should break up with him. Nobody should trust
22  him," right? That would be an example of the
23  prescriptive kind of stereotyping.
24        So the individuating information, yes, has
25  successfully gotten rid of the stereotype that he's

195

1  going to be courageous because he's male, but it has
2  led to condemnation because he has violated a
3  prescription. So that is a crucial thing for people
4  to understand.
5     Q.  Dr. Glick, I understand your testimony
6  that individuating information can exacerbate, I
7  think you said, discrimination or the risk of
8  discrimination.
9     A.  Right. We can --
10     Q.  Is it --
11     A.  Especially prescriptive.
12     Q.  Let me -- let me finish first.
13     A.  Sorry.
14     Q.  Is it true that it can also mitigate the
15  risk of discrimination?
16     A.  When the stereotype is not prescriptive,
17  then it can mitigate the chance of discrimination.
18        MS. BRADFORD: Is it possible -- can I get
19  a quick time check on where we're at, Ms. Byrd?
20        THE REPORTER: Four hours and 10 minutes.
21        THE VIDEOGRAPHER: And, Ms. Bradford, I
22  just want to let you know you are still currently
23  sharing your screen. I just wanted to let you know.
24        MS. BRADFORD: Just a black screen that
25  you all have to look at. Sorry.

196

1        Thank you, Vincent.
2  BY MS. BRADFORD:
3     Q.  Dr. Glick, do you think that
4  accountability can reduce the risk of
5  discrimination?
6     A.  So holding just -- say, decision-makers
7  accountable for, let's say, having more equity and
8  promotions and things like that, yes. It can help,
9  yes.
10     Q.  Do you know whether anyone at OHSU is
11  accountable to Dr. Bala for the decision to not
12  renewed the contract?
13     A.  Accountable to Dr. Bala. Usually, when
14  we're talking about accountability, it's that
15  there's some oversight by people higher up, right,
16  in an administration for decisions that are made
17  about things like promotion or -- or how somebody's
18  evaluated or things like that.
19        So that -- that there is really discussion
20  and concern about are we not applying double
21  standards, some way of assessing whether we are,
22  checking on circumstances where there might be the
23  likelihood of double standards, that sort of thing.
24  So it's not -- it wouldn't be accountability to Dr.
25  Bala per se. It would be accountability up the

197

1  chain of command is normally we're talking about.
2     Q.  Can objective measures or benchmarks be
3  used to reduce the risk of discrimination?
4     A.  They can, and that's certainly, in HR
5  circles, considered a practice that can -- can help.
6  When you, you know, take away -- it's really -- you
7  know, when you think about this, in terms of not so
8  much in the formal evaluations that are made about
9  someone, which, where we see less likelihood of --
10  of discrimination than in the actual decisions made
11  about them, it's translating to a fair process, a
12  fair, transparent, accountable process so that you
13  are saying, "Okay, well, if they fulfill these
14  criteria and these evaluations that you guys may
15  have," that -- that can help mitigate
16  discrimination.
17     Q.  Do you know whether OHSU had objective
18  measures or benchmarks in place that were used in
19  evaluating Dr. Bala's performance on the job?
20     A.  I think they're -- usually in medical
21  settings, there's, you know, the RWVUs or R --
22  whatever, those value units and those sorts of
23  things are part of assessing someone's performance.
24  There's certainly benchmarks for things like
25  completing notes and things like that. That's very

NAEGELI
DEPOSITION & TRIAL

(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 50 of 163

198

1 typical in medical settings. You know, then there's
2 other sorts of things that are more judgment based,
3 like, "Oh, we think she's abrasive and bad
4 communicator." Those sorts of things where there
5 might not be as clear-cut a benchmark or way of
6 evaluating.
7     Q. Do you know if OHSU had any of these kinds
8 of benchmarks?
9     A. I believe they had things like looking at
10 relative value units and -- and completion of notes
11 and things like that. But I'm not -- I'm not
12 recalling -- it's been a while. Yeah, I'm not
13 recalling their exact process. All the things that
14 go into their -- their evaluation system.
15     Q. There may be a few, but you can't say for
16 sure how many or what they are?
17     A. Yeah, I can't recall at this point.
18     Q. On page 50 of your report, you note that:
19 Should the case -- for example, I'll use language
20 such as, should the case decision-makers find
21 allegation X credible, such behavior would be
22 consistent with research showing Y. And then you
23 sort of follow that framework throughout section
24 five of your report.
25     A. Right. Yes.

199

1     Q. What method did you use to determine
2 whether an allegation, if credible, would be
3 consistent with research showing why?
4     A. Again, here's where I'm relying on my
5 expert knowledge of the field and -- and the
6 circumstances under which discrimination is likely
7 to -- more or less likely to occur, and the forms
8 it's more or less likely to take, all of those sorts
9 of things. Those are what allow me to hone in on
10 where I see the most important issues for the jury
11 to consider.
12     So as I note at the beginning of the
13 section, this is not in itself a scientific process.
14 It's applying my knowledge of the science, which is
15 based in scientific methodology and error rates and
16 all those other things, to the patterns that, you
17 know, are evident in the case documents, and -- and
18 then saying, "Okay. Well, these are the -- the
19 potential areas, right, to look at."
20     Now, what's the decision? That's up to
21 the jury to decide whether that evidence warrants
22 the conclusion from a legal standard, whatever legal
23 standard the judge gives, that -- that this might be
24 discrimination or not.
25     Q. So, Dr. Glick, you know, like -- like

200

1 before, you might think that I'm harping on this
2 point, but it's an important thing I want to hash
3 out.
4     When you say that you're relying on your
5 expert knowledge in this regard, what specific
6 scientific method or principle have you been trained
7 in, or are you relying on that you use to determine
8 whether an allegation, if credible, is consistent
9 with social science research or is consistent with
10 discrimination?
11     MR. BRISCHETTO: Objection. Asked and
12 answered. Go ahead.
13     THE DEPONENT: Yeah. I -- I think it is
14 the same answer. I'm telling you that there isn't a
15 scientific method that I know of by which one can do
16 that.
17     But again, if you got randomly selected 10
18 researchers who do what I do, I think they would
19 hone in on the same things. Just, you know, that
20 these are the things -- when you understand the
21 patterns that -- that occur according to the
22 research, these are the -- the relevant possible
23 areas where there's potential evidence for
24 discrimination.
25     And therefore, these are the ones that are

201

1 going to be most important from that perspective to
2 -- to examine, and the jury should examine them
3 independently and, you know, providing a framework
4 that might be helpful to them in picking apart these
5 things and a -- away of thinking about it.
6     But -- but that's still up to them to
7 decide whether the alternative that Dr. Bala behaved
8 in egregious behavior, that alternative is more
9 likely than the alternative that she was
10 discriminated against or whether they think, "I
11 don't like all of her behavior, but she also was
12 discriminated against" because both can coexist.
13 There can still be double standards.
14 BY MS. BRADFORD:
15     Q. How do we determine whether you are
16 correct that an allegation is consistent with
17 discrimination?
18     A. Well, again, I think you'd have to consult
19 other experts in my field, and, you know, that --
20 that would be one way you could try to do that.
21     I -- you know, again, I think this is how
22 expert opinion works. And again, it depends on the
23 judge, right? In the "Mullinex" case, they said,
24 "Well, no, that -- that-- that part of the report is
25 no good." And -- or, you know, in the "Nikolova"

(800) 528-3335

NAEGELI
DEPOSITION & TRIAL

NAEGELIUSA.COM

Exhibit 2
Page 51 of 163

202

1  case, "That part of the report was excluded." So
2  depending on your judge's opinion on this, they --
3  you -- you could potentially get that aspect of --
4  of what I opine excluded, and -- and that's -- you
5  know, that's a legal decision.
6          And as I said, I'm not a lawyer. I tried
7  to color within the lines, you know, stay within the
8  guardrails of -- you know. Sometimes those -- those
9  -- those rules seem to shift or -- or be imposed
10  differently by different trial judges. And if your
11  trial judge deems that to be going too far, you
12  know, I -- I've done my best, and -- and -- and
13  fine, you know? So I don't know how else to answer
14  that.
15      Q.  Dr. Glick, when you are opining that --
16  you know, maybe research is -- oh, sorry, excuse me
17  -- whether facts are consistent with the research,
18  or whether, you know, for example, such behavior
19  would be consistent with research showing why, when
20  you're giving an opinion like that, do you need to
21  know whether the situation in this case was similar
22  to situations involved in the research?
23      A.  Well, I'm -- it's pretty broad. And I --
24  you're getting something more specific here. I
25  mean, we know that for instance -- so -- so when we

204

1  processes that show up again and again and again.
2  So let's just talk about in-group bias, right?
3  There's a lot of research on in-group bias, and it
4  applies to, you can create artificial groups in the
5  lab and people will show some in-group favoritism.
6  They're not going to go out and be super hostile
7  toward this other made-up group, you know, right,
8  but they show some favoritism toward members of
9  their temporary, unimportant groups, right?
10          You know, you can do this when you pick up
11  teams for a game or something like that. You can
12  see some of this phenomenon happening. That can be
13  exacerbated by other factors, like if it's
14  explicitly a competition and so on. So -- so
15  there's a lot of general factors that we know about
16  and that we know that they occur, whether the group
17  is a temporary group in the lab, whether the group
18  is an actual set of groups that exist in the world,
19  and -- and so -- but those all differ. There's --
20  there's still -- across these things, there's always
21  going to be some differences that don't necessarily
22  matter to the basic process, right?
23          We try to figure out what are the core
24  things that really matter to the extent that we can
25  in our research. And on those core things, we think

203

1  think about this in social science, you know, we
2  think about general variables, right, like assertive
3  behavior, right? The form that behavior takes might
4  be different with different individuals, but there's
5  this sort of general category of certain kinds of
6  assertion or dominance, right? Powerful positions,
7  you know, that combined with powerful traditionally
8  male-dominated position, right?
9          You know, these sorts of things are more
10  general categories of things. And then you have,
11  you know, within that variations in different ways
12  of showing dominance or -- or different kinds of
13  male-dominated jobs. But we think in terms of these
14  more global kinds of variables. And that's where I
15  -- I tend -- I think I'm focusing.
16      Q.  The studies that you mentioned in your
17  report, are they comparable to the facts of this
18  case in all material respects?
19          MR. BRISCHETTO:  Objection, vague. Go
20  ahead.
21          THE DEPONENT:  Yeah, in all material
22  respects, right? I mean, there's always going to be
23  variations in different situations, right? There's
24  always going to be specifics in the situation. But
25  underlying those specifics, there are some general

205

1  about them in terms of these kinds of global
2  variables that -- that I talked about, like status
3  or dominate -- dominative behavior, those sorts of
4  things.
5          And -- and those have some
6  generalizability. Sure, there's -- there's going to
7  be -- you know. The -- the color of the room could
8  be different, but does that matter? Probably not,
9  right? There's always going to be some "material
10  differences" in some specifics, but we know that
11  there's some broad generalizability to these
12  findings.
13  BY MS. BRADFORD:
14      Q.  Dr. Glick, earlier you've mentioned -- you
15  know, I think you've used different terms, but
16  you've mentioned that your testimony, you want --
17  you know, you want to make sure that you're
18  following the right guardrails, that you're coloring
19  between the lines, things like that. Why are you
20  concerned about that?
21      A.  Well, because I don't like being excluded.
22  I mean, I feel like that's -- you know, it -- it
23  doesn't feel good. Exclusion, right? Nobody likes
24  to be excluded. Humans have a basic need to belong
25  and like to be included.



Exhibit 2
Page 52 of 163

206

1     So, you know, I -- I don't want that to
2  happen.  I -- I understand I'm an academic who's not
3  a lawyer.  I'm doing something at the intersection
4  of what I do as a researcher and the law.  And I'm -
5  - you know, in the -- the rules are defined by the
6  Court.  So sure, I -- I'm trying to understand those
7  rules and to -- to adhere to them as best I can.  It
8  -- it just becomes, as I said, a bit more difficult
9  when the -- the goalposts move, right?
10     So I think that's -- it's -- that's just
11  being -- I think that's just being responsible,
12  right?  And understanding that there can be a
13  different set of standards, you know, because this
14  is in a legal context, and I understand the
15  authority structure and I understand that,
16  unfortunately, the -- the rules that I think have
17  been established may shift or -- or be different in
18  different jurisdictions, and -- and I'd rather not
19  be excluded.
20     I just feel like it's, you know, next time
21  I'm in a deposition, "Wasn't it true that you were
22  excluded in case X?"  And like, "Well, yeah.  That
23  happened, and here's why," right?  But it doesn't
24  feel good when that happens.
25     Q.  Dr. Glick, are you open to tailoring your

207

1  opinions or your testimony to ensure that it's not
2  excluded?
3     A.  Well, again -- but -- you know, small but
4  suspicious about this term "tailoring" my
5  conclusions, right?  It's -- it's what I -- you
6  know, am I willing to not do an application to the
7  case section?
8     Generally, I'm arguing to lawyers,
9  especially in federal court, that it is best if I
10  simply talk about the social framework, the general
11  stuff, and let them make the arguments about
12  application to the case.  Because, again, if the
13  rules are shifting, I don't want to have to deal
14  with this exclusion or restriction or to write this
15  whole section of a report that later is going to be,
16  you know, excised from -- from the case.
17     So -- you know, to the extent that the --
18  I mean, "tailor my conclusions" sound like I'm just
19  willing to -- I -- I don't like that language.
20  Maybe you didn't mean it this way, but it almost
21  sounds like you're saying, "Oh, you're just, you
22  know, going to say what somebody wants you to say."
23     I try to accurately portray the science,
24  and then if -- if it's permissible in the legal
25  context that I can do an application to the case,

208

1  then I'm willing to do that.  But I very much point
2  out that that's a -- a different animal, right?
3  That it's not doing science in the same way it's
4  applying the science from the understanding of
5  having expertise in it.  If the courts deem that
6  that's not something that should be done, then I'm -
7  - I'm quite willing to just stick to the general
8  framework.  But my conclusions are based on the
9  science.
10     Q.  Just so there's -- there's a clear answer
11  in this regard.  I -- I understand what you're
12  saying about how you want to make sure you're
13  abiding by what the judge is saying and how it's
14  different for every judge.
15     Yes or no, are you willing to tell your
16  opinion to ensure that they will be -- excuse me --
17  to ensure that they will not be excluded by a judge?
18     MR. BRISCHETTO:  I'm going to object.
19  That question is argumentative.  It has been asked -
20  - asked and answered, and he's perfectly entitled to
21  give a yes or no answer with an explanation, which
22  is what he's done.
23     Go ahead, Mr. Glick -- Dr. Glick.
24     THE DEPONENT:  Well, the clearest answer I
25  can give you is I'm willing to no longer write

209

1  applications of the case sections if the courts deem
2  that that's not what a social -- you know, a social
3  framework expert should do.  So -- so I -- I'm --
4  I'm open to having guardrails, applying the science
5  the same way that I always do, but not making -- you
6  know, not -- not opining -- not doing that section
7  of applications of the case if it's deemed
8  inappropriate.
9  BY MS. BRADFORD:
10     Q.  Dr. Glick, on page 51 of your report, you
11  write that: Biased individuals typically justify
12  their actions by citing apparently legitimate
13  motives in an effort to deny that bias skewed their
14  judgment.
15     So you use the word "typically" here, and
16  much like some of my other questions before, can you
17  explain to me what "typically" means?
18     A.  Right, so I -- I see where you're coming
19  from.  It sounds like a frequency statement.  What
20  I'm saying is when we do research where we can then
21  definitively demonstrate that there was bias
22  occurring across different conditions, right?
23     Do an experimental study that's completely
24  well controlled and shows that there is differential
25  treatment, and then also ask people why they made



Exhibit 2
Page 53 of 163

210

1  that decision.  People, typically, in those studies,
2  right, that there's very -- people -- not -- like
3  nobody will say, "Oh, it was because of the person's
4  gender."  They -- they provide other reasons.  And
5  we find that discrimination is more likely to occur
6  when there are these other potential reasons, right?
7      I mean, that's the difference between old-
8  fashioned sexism and -- and contemporary sexism, or
9  sexism in a highly sexist patriarchal country versus
10  a more egalitarian country, you know, you can just
11  be discriminatory.  And in old-fashioned sexism, you
12  could just say, "Oh, no, it's because she's a woman.
13  We don't allow women to do this job."
14      Well, that -- that's not how it typically
15  occurs in contemporary American society, where you
16  have this overt exclusion of women.  It's -- well --
17  you know, this has to do with her behavior, right?
18  And if there's some behavior to hang it on, then we
19  have that alternative explanation situation.  But in
20  experiments, we can show whether gender made a
21  difference.
22      Q.  So just to be clear, when you use the word
23  "typically" here, do you mean that this happens more
24  often than not?
25      A.  What I'm saying is in the studies where we

211

1  can definitively show that discrimination occurred,
2  people deny that they discriminated.
3      Q.  Do people deny that more often than not?
4      A.  More often than not.  And I would say, I
5  mean, I have to go back and look at the studies, but
6  I think the consensus in -- in social psychology
7  would be it would be very rare for someone to say,
8  "Yeah, that was about gender," okay?  That -- that
9  just pretty much doesn't happen --
10      Q.  Okay.  So --
11      A.  -- more -- more than more often than not.
12  It'd be very rare for somebody to openly admit that
13  they discriminated.
14      Q.  Okay.  So just to be clear, the studies
15  that you relied on, they state that more often than
16  not, people would deny that bias occurred?
17      MR. BRISCHETTO:  Objection.  That's
18  argumentative.  And asked and answer.  Go ahead.
19      THE DEPONENT:  Yes, I think I agree with
20  what you said.
21  BY MS. BRADFORD:
22      Q.  Do you think that the jury should distrust
23  any witness who claims they were not motivated by
24  bias?
25      A.  Well, that sounds like a credibility

212

1  question.  Nice try.  What I'm saying is that the
2  research shows that in contemporary American
3  society, that when people engage in bias, they
4  typically do not admit that -- in those studies,
5  they typically do not admit that they're engaging in
6  bias.
7      So if somebody says, "Hey, I -- it's not
8  because she's a woman, that I dislike her, it's
9  because of her behavior."  Well, you know, that --
10  that could be, right?
11      Or it could be a combination of the two,
12  which is, you know, more likely than just -- as
13  we've talked about, discrimination against women
14  takes different forms and --depending upon the one's
15  behavior.  If you're super nice and subordinate,
16  you're not going to get this kind of backlash
17  discrimination, right?
18      So -- but to go back to your question,
19  right?  If they did discriminate, they're typically
20  not going to -- the study suggests they're not
21  likely to say that they discriminated against the
22  person.  If they cite a reason about the person's
23  behavior, that probably was part of the issue.  But
24  that can combine with discrimination, as well.
25      So I think I'm very clear about this.  You

213

1  can have these mixed motives, and it's -- for
2  backlash discrimination, it's both the woman's
3  behavior and the fact that she's a woman that
4  interact to lead to discrimination when it occurs.
5  When that discrimination occurs, it's likely to be
6  denied.  So, you know, you have to look at the other
7  evidence to pick it apart.
8      Just like you were saying, can you rely on
9  Dr. Bala, and say, "I -- I was discriminated
10  against?"  Okay.  Here's $2 million because you were
11  discriminated against.  You know, that -- that
12  doesn't happen, right?  We understand that -- that
13  you're fired, you're upset, and you don't feel it
14  was your fault.  That that's -- you know, right?
15  It's pretty common.
16      You know, similarly, if somebody
17  potentially discriminated, they're not going to be
18  like, "Hey, I didn't because she's a woman," you
19  know, right?  So you have to look at the other facts
20  as best you can to see, well, what really happened?
21  And then what did people read out of that or
22  interpret from that?  Is that consistent with the
23  research or not consistent with the research?  Those
24  are the sort of things I think people in the jury
25  have to do -- should do.  They don't have to do



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 54 of 163

214

1 anything I say. But that I recommend that they do.
2 How's that?
3      Q.   Dr. Glick, on page 55, you note that:
4 Although people may view some assertive behaviors as
5 dislikable and performed by a man, their reactions
6 tend to be comparatively more muted than reactions
7 to a woman who acts the same way. I think you can
8 probably anticipate my question here. What do you
9 mean by "tend"?
10     A.   It's the same answer. So, you know, based
11 on the research you're talking about, average
12 differences, there is a double standard that
13 emerges, right? And -- and that -- that occurs for
14 female as well as male perceivers, typically, right?
15 And so that's what I mean by that.
16     Q.   Do you mean that it happens more often
17 than not?
18     A.   Well, the -- in the studies, the average
19 difference happens, right? But, you know, I -- we
20 can't, again, isolate who particularly
21 discriminated. So if you mean by more often than
22 not, if you mean, you know, most individuals, right,
23 what do you mean by more often than not? Do you
24 mean that every individual is doing this or the vast
25 majority of individuals are doing this? I can't --

215

1 I can't tell you that, right? I don't think the
2 studies tell you that. But they tell you that --
3 that it's an occurrence that happens in the
4 aggregate, that women are -- are -- are broadly
5 treated differently than men on this.
6      Q.   I think you said that the studies talk
7 about the -- the average difference with which it
8 occurs; is that fair?
9      A.   Right.
10     Q.   So what is the average difference in those
11 studies that apply here?
12     A.   Well, in the studies that specifically are
13 designed to test backlash, the average differences
14 tend to be quite strong in terms of the perceptions
15 of women, and they're also targeted on these things,
16 like she's rude, abrasive, dislikable, those sorts
17 of things. That's the form it takes, not in terms
18 of demeaning her competence, for instance, right?
19 So that's another part of understanding this
20 pattern.
21     Q.   So I don't think that answered my
22 question. So which -- in the studies that you're
23 referring to here, what was the average difference?
24     A.   Well, if you look at Laurie Rudman's
25 review of backlash research, the average difference

216

1 is I think the D score is -- is in the strong
2 category. I can't whip out the numbers here
3 spontaneously. Not, again, an encyclopedia on --
4 like with a photographic memory. But, you know,
5 there is -- there is a difference. And, of course,
6 when you're talking about evaluating somebody on the
7 job, you know, any difference can be of practical
8 consequence.
9      MS. BRADFORD:   Is everybody good if we
10 take like maybe an -- an eight-minute break, come
11 back at -- on the --
12     MR. BRISCHETTO:   Okay.
13     THE DEPONENT:   Yes.
14     THE VIDEOGRAPHER:   Okay. The time is 3:42
15 p.m., And we are off the record.
16     (WHEREUPON, a recess was taken.)
17     THE VIDEOGRAPHER:   We are on the record.
18 The time is 3:56 p.m. You may now proceed.
19     MS. BRADFORD:   Thank you.
20 BY MS. BRADFORD:
21     Q.   So, Dr. Glick, your last bullet point on
22 page 54 refers to incidents being minor. What
23 incidents are you referring to here?
24     MR. BRISCHETTO:   Counsel, is this 54?
25     MS. BRADFORD:   Yes. Of his report.

217

1      THE DEPONENT:   Can you just -- I'm -- I'm
2 not sure if I'm not seeing what you're --
3      MS. BRADFORD:   Yeah.
4      THE DEPONENT:   -- talking about. "Or --
5      MR. BRISCHETTO:   I'm not seeing --
6      THE DEPONENT:   "-- or over-weight." Yeah.
7 That's a question, right? Were -- were minor
8 incidents overweighted? That's -- that's a
9 question, right? Or were the -- you know. So the
10 alternative is that they weren't minor.
11 BY MS. BRADFORD:
12     Q.   So do you have an opinion on whether any
13 incidents in this case involving Dr. Bala were minor
14 or not?
15     A.   No. I'm offering -- I'm just -- what I'm
16 doing there is I'm -- I'm saying, you know, this is
17 a question to ask.
18     Q.   On page 57, you state that: Some research
19 even suggests that female subordinates can be more
20 likely than men to reject a female leader's
21 legitimacy. Which research suggests this?
22     A.   I can't -- you know, off the top of my
23 head -- I mean, I have a study, I think, that I
24 cited earlier in the report, and that's why I don't
25 cite it again. But I'd have to go back and comb



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 55 of 163

218

1 through the earlier sections. If you want me to do
2 that, I can try to figure out which specific study
3 that was, but there's -- at least there was a study
4 that I cited.
5        Most of the studies find similar levels of
6 backlash between men and women. But, you know, when
7 it's in a context where you're comparing yourself to
8 a more successful person, there's a finding of
9 greater backlash toward female leaders by women.
10    Q. So I know you said that you -- you can't
11 remember the exact study off the top of your head,
12 but so when you say that they can be more likely
13 than men to do this, how much more likely?
14    A. Well, the point there -- and again, I
15 can't give you a direct answer to that. The point
16 is simply that, you know, Dr. Kaul said, "Well,
17 women can't discriminate against women. Nurse --
18 the nurses are women; they can't -- they wouldn't be
19 likely to discriminate against women." And that's
20 not true for this kind of discrimination. Most of
21 the findings are more that it's relatively equal
22 between men and women in terms of discriminating
23 toward assertive women and sometimes even a finding
24 of women showing more discrimination.
25    Q. Do you agree that "more likely" means at

219

1 least just over 50 percent?
2    A. More likely than men, that's the
3 comparison. So I think if you read it -- I hope
4 it's clear. But my comparison is always in this
5 kind of experimental set study where I'm talking
6 about, you know, comparing female to male perceivers
7 in this case.
8    Q. So -- and -- and thank you for pointing
9 that out. I -- let me rephrase that. It -- it
10 means that they are at least 50 percent more likely
11 than men to do this?
12    A. It means that there's a mean difference,
13 right? Again, we can't -- I can't tell you who is
14 doing this within that mean difference, right? So I
15 can't pin a number on that, but it's -- it's a mean
16 difference, the mean difference between women and
17 men on having negative reaction to an assertive
18 woman.
19    Q. So walking away from this specific
20 statement, Dr. Glick, to you, does -- does "more
21 likely than not" mean greater than 50 percent?
22    MR. BRISCHETTO: I'm going to object to
23 the form. Assume this fact is not in evidence. Go
24 ahead.
25    THE DEPONENT: So do you mean saying there

220

1 was more -- something like, for instance, in this
2 case, saying there was more likely than not that --
3 it was more likely than not that discrimination
4 occurred, then, yes. Then in that case, it would be
5 50 percent -- more than 50 percent or 50 -- yeah,
6 more than 50 percent.
7        But when I'm talking about experimental
8 studies and I'm making a specific comparison, I'm
9 saying the means were different.
10 BY MS. BRADFORD:
11    Q. So, Dr. Glick, I'm just trying to figure
12 out what exactly you mean when you use words like
13 "more likely" or "tend" or "typically" or
14 "generally."
15        Would you agree that if there is a
16 difference between -- for example, saying that
17 female subordinates can be 51 percent more likely
18 than men to reject a female leader's legitimacy,
19 there's a difference between saying that and female
20 subordinates can be 85 percent more likely than men
21 to reject a female leader's legitimacy?
22    A. Right. And as we've discussed, I can't
23 necessarily pin down those numbers in an experiment
24 that shows there was -- there were -- women, on
25 average, made lower ratings or -- or made more --

221

1 had -- had more discriminatory ratings toward women
2 than men did, right? That's what that "more likely"
3 there means in that context.
4        So if you want me to -- if you want me to
5 rephrase the -- the statement, it would be that
6 women's average rating of an assertive women --
7 woman was more negative than the average for men.
8 Now, that's a lot to say, right? So I guess I'm
9 using the "more likely" in that comparison as that -
10 - a way to more concisely convey that comparison.
11 But I'm sorry if there's any ambiguity in that.
12    Q. Would you agree that when you say that
13 something typically occurs or that it generally
14 occurs, that a layperson such as a juror could hear
15 that and think, "Well, it occurs a lot," right?
16    MR. BRISCHETTO: Objection. Calls for
17 speculation. Go ahead.
18    THE DEPONENT: Well, what I'm saying is
19 within -- within the -- the -- the research, it's a
20 -- it's a finding that typically occurs, right? So
21 it's within the research, this typically occurs.
22 I'm not making the claim that I can put a -- a
23 specific number on how often it occurs in the
24 workplace.
25 BY MS. BRADFORD:



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 56 of 163

222

1    Q.  Does -- the research that you cite to,
2  does it say -- does it commonly use words like
3  "typically" or "generally" or "tend to"?
4    A.  I would imagine, yeah.  I mean, I -- I --
5  I don't know.  I'd have to think about that.  But I
6  think when I'm writing a scientific paper and we
7  understand the -- the context that we say things
8  like "more likely," that's -- that's pretty common.
9    Q.  And then when you say those things like
10  "more likely," do you support it with a specific
11  figure?
12    A.  Oh, sure.  I mean, there's -- there's
13  specific, you know, data that's being reported in
14  the scientific studies, right?  This is a summary,
15  so I'm not throwing a bunch of numbers at people
16  typically.
17    Q.  Why is it important to point out that
18  specific data in the study rather than just say
19  "typically"?
20    A.  Well, because this -- this is a different
21  context.  When you're writing the primary research
22  report, you're writing to an audience of Ph.D.
23  researchers and you're showing them the data.  And -
24  - and these days, usually, the data are also fully
25  available to them to have transparency in a set of

223

1  supplementary materials that are posted online.
2      So, you know, we're -- we're focused on
3  people who can understand and interpret the numbers,
4  understand statistical significance, all those sorts
5  of things.  If you're writing a summary of those
6  results, like, say in the textbook I wrote with
7  Laurie Rudman that conveys, you know, the -- the
8  findings, then you don't do that because it's --
9  it's not something people are really prepared
10  necessarily to -- to understand or read.  Even
11  simple graphs, people are often not able to read
12  them correctly according to the research.
13      So it's -- it's really just a different
14  context in terms of summarizing the research.  Or
15  for instance, in the discussion section, you
16  summarize what you found and -- and you typically do
17  not report the numbers there.  Those are in the
18  results section.
19    Q.  But you -- so you agree that when you're
20  writing studies, for example, that it is important
21  to be transparent about the findings that you're
22  reporting and the terminology relating to those
23  findings?
24    A.  Not sure what you mean about the
25  terminology related to those findings, but yeah, I

224

1  mean, you -- you are reporting the numbers, and
2  these days you're typically also even reporting the
3  raw data.  So if somebody else wants to check on
4  your numbers and crunch your numbers, they can do
5  that in the studies.  So that -- that's often done
6  these days, but not for a lot of higher studies.
7    Q.  Don't you think it's important to be
8  transparent about that information and those
9  statements for a jury?
10    A.  Again, I think I have to convey this in a
11  way that jurors can comprehend and understand
12  without doing violence and to the -- you know, to
13  the -- and to summarize the results of cross
14  studies.  So, you know, when we're talking about the
15  report of a specific study, we're talking about the
16  primary research article.  Then, you know, you're
17  giving all sorts of details that you're not going to
18  give, say, in a -- a review article that you might
19  write.  Even for a professional audience, you're
20  typically not going to put all these numbers in a --
21  a review article.  You're going to summarize the
22  weight of the evidence and the findings.  So it's
23  just different contexts.  You do different things.
24    Q.  Dr. Glick, I know you've been through this
25  a lot.  You've -- you've testified in trials,

225

1  correct, right?
2    A.  Yes.
3    Q.  So you know that in trials you don't just
4  take the stand and talk to the jury.  Your -- you
5  answer questions asked by counsel, correct?
6    A.  Correct.
7    Q.  It's important to have answers as much as
8  you can to those questions, correct?
9    A.  Yeah.  You have to give answers.  Yes.
10    Q.  So -- so let's try this again.  So let's
11  go to page 58.  You write that "research established
12  that women typically receive backlash and hostility
13  for" and then it looks like you give five examples
14  or -- or five types of behavior.  So I'm asking you,
15  what do you mean by "typically"?
16    A.  That these are the circumstances under
17  which backlash affects mean differences in how a
18  woman or a man who behaves in the same fashion
19  occur.
20    Q.  How often do these circumstances occur?
21    A.  Again, I can't give you a frequency in
22  daily life of how often these things occur, because
23  it's just not the way that the research is -- is
24  done.  I mean, I could just remove the word
25  "typically" here, and then we just say, "Research

Exhibit 2
Page 57 of 163

226

1 establishes that women receive backlash." But I
2 don't want to imply that it always occurs. So I'm
3 actually using "typically" there to kind of signal
4 that this is not an absolute.
5     Q.  So what does the research say, how often
6 --
7     A.  The research --
8     Q.  -- according to the research, does it
9 occur?
10    A.  Again, the research doesn't test frequency
11 of occurrence. It tests -- you will have studies,
12 right, and there's many of these studies, and they
13 show that under these circumstances, women are seen,
14 say, as more abrasive than men. And these are the -
15 - the variables that are associated with unleashing
16 backlash. And that's the typical finding.
17         I mean, again, if I didn't put
18 "typically," there would just say, "This is when
19 women get backlash." And I think it would sound
20 kind of absolute, like, you know, it's inevitable.
21 Well, it's not inevitable in every circumstance that
22 that occurs.
23    Q.  Dr. Glick, would you agree with me that
24 words like "typically," "tend," "generally", "more
25 likely," that's terminology related to the frequency

227

1 with which something occurs?
2     A.  Not in the way that you're talking about
3 it necessarily. Not in the context of when I'm
4 talking about experimental studies and differences
5 between means and -- you know, right? You're --
6 you're -- you're -- the -- saying, this is -- I'm
7 making claims about frequency in daily life, and I'm
8 trying to make these claims within the context of
9 the research.
10        And I think that those words, that I put
11 those words in there to convey that this is not an
12 absolute because it would be prejudicing the jury if
13 I just said, "Hey, when a woman does this, they get
14 backlash." Well, that's the typical finding, but
15 it's not everybody. It's not -- it's mean
16 differences. I try to make that clear in the
17 report. So -- so I think by using these words, I'm
18 actually softening what I'm saying here to indicate
19 that this is not an absolute.
20    Q.  So, So, Dr. Glick, it sounds like you've --
21 you've talked -- you've testified a couple of times
22 that you've tried to phrase it in a certain way so
23 that it can't be interpreted as an absolute or that
24 you're -- you're trying, essentially, not to
25 overstate what it means, something like that.

228

1     Rather than just use these -- these terms, why don't
2 you just say what exactly the research shows on this
3 point?
4     A.  I think I am saying what the research
5 shows. Typically, the finding is this.
6     Q.  So does the research show -- let me
7 rephrase that. Which study says that women
8 typically receive backlash and hostility for these
9 five factors?
10    A.  Well, again, there's lots of backlash
11 studies. So I'm -- what I'm summarizing is, across
12 all these backlash studies, the typical finding --
13 maybe we can rephrase it that way, maybe that --
14 that would be more conducive to you. The typical
15 finding across these studies, these are the
16 circumstances under which backlash tends to occur.
17    Q.  Okay. So the typical finding among those
18 studies, how many of those studies is that the
19 finding?
20    A.  I can't give you an exact count. That's
21 the weight of the evidence across studies.
22    Q.  Why don't you -- I understand that you
23 have a section of your report where you -- you lay
24 out the research, and then you have the section
25 where you provide these statements, you, you know,

229

1 apply them to the case facts. Why don't you cite
2 back to that research as you make those statements?
3     A.  Because I've already cited it in the other
4 section. So you have a section that has exactly the
5 same set of variables. We could go back to it, and
6 there's research cited in that section. So I felt
7 that, you know, it would just be redundant to -- to
8 just repeat the same citations, because there's
9 clearly a corresponding section in the scientific
10 section of the report.
11    Q.  So do you think that the case decision-
12 makers in this case should just assume that there is
13 certain research that applies to these statements
14 that you're making? How are they supposed to know
15 which research applies?
16    A.  Again, I have a -- a parallel section
17 early in the report that provides citations. I'm
18 just tagging back to that and giving you a reminder
19 here. But my main focus here is on what does this
20 mean in this particular case, potentially? So I
21 feel like I've already covered in my report. I'm
22 just kind of reminding people, summarizing what I've
23 already said, and I have the citations in there, so
24 I don't see that as a big problem.
25    Q.  On page 60 of your report, you say that:



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 58 of 163

230

1  Research shows that people view women, as compared
2  to men, as more emotional and show less tolerance
3  for perceived expressions of anger in women as
4  compared to men.  Which research shows this?
5      A.  Again, I have a section on the
6  emotionality stereotype earlier in the report with
7  citations.  And we can flip back there, trying to
8  remember if I did a really detailed table of
9  contents here.  I didn't do a super detailed table
10  of contents.  But if we flip back in the report,
11  there's a section on stereotypes and -- and the
12  content of those stereotypes on page 22.  "People
13  stereotype women as more emotional."  Right there,
14  and there's citations to research there.  So again,
15  I felt like I'd already covered it, I'd already
16  documented it, and I'm just reminding, you know,
17  right?  It's -- it would be redundant to reproduce
18  the specific citations there.
19      Q.  And so the studies that you cite to on
20  page 22, do all of those studies discuss that people
21  view women, as compared to men, as more emotional
22  and show less tolerance for perceived expressions of
23  anger in women as compared to men?
24      A.  Some show one thing and some show the
25  other thing?  Yes.  I mean, where -- where -- where

231

1  the citations appear is where it's the relevant
2  point.
3      Q.  What do you mean some show one thing and
4  some show --
5      A.  So "people stereotype women as more
6  emotional."  I've got -- what -- 48, the Shields
7  citation.  That's actually a book that summarizes a
8  lot of different research for the -- the issue about
9  how people perceive anger in women.  I've got the
10  citation to Brescoll and Uhlmann, right?  That
11  emotionality seems inconsistent with status.  That's
12  a different citation, right?  So -- I mean, I -- I
13  put the footnotes next to statements, so those are -
14  - those are the relevant citations for those
15  statements.
16      Q.  Does this research show that all people
17  have these views?
18      A.  Well, again, I think I make it clear
19  generally in the report that we're not talking about
20  absolutes, that we are talking about average
21  effects.  And I -- you know, that that's -- that's
22  the general context that I provide in the report.
23  And I try to use, again, words like "tend to," often
24  kind of reinstating those words.  I don't always do
25  that, but I -- I try to do that frequently to try to

232

1  kind of remind readers that this is not an absolute
2  thing.  And then, of course, at the end of the
3  report, I say, "Look, you know, in any individual
4  case, we can't know what's the scientific certainty,
5  what happened."  But this framework can help people
6  sort through what -- what might have happened.
7      MS. BRADFORD:  Can I just take a brief
8  two-minute break, please?
9      THE DEPONENT:  Sure.
10      THE VIDEOGRAPHER:  Please stand -- stand
11  by.  The time is 4:18 p.m.  And we are off the
12  record.
13      (WHEREUPON, a recess was taken.)
14      THE VIDEOGRAPHER:  We are on the record.
15  The time is 4:23 p.m.  You may now proceed.
16  BY MS. BRADFORD:
17      Q.  So, Dr. Glick, when we took that break, I
18  had been asking you about how on page 60, you noted
19  that: Research shows that people view women, as
20  compared to men, as more emotional and show less
21  tolerance for perceived expressions of anger in
22  women as compared to men.  And you referred to how
23  that relates back to the studies on page 22.
24  According to those studies, how many people view
25  women as compared to men as more emotional?

233

1      A.  Again, I cannot give you an exact number
2  from those studies.  You know, I mean, it's possible
3  that there might be in some of the studies on
4  stereotyping where it's just sort of rating
5  emotionality of men and women that you could get
6  that -- those data, but that's not normally how the
7  data are reported.  So I -- I -- typically, you
8  don't have a full distribution so that you could
9  figure that out exactly.  But rather sort of the
10  average rating of women's emotionality differs from
11  the average rating of men's emotionality.
12      Q.  Can you tell me if the data says that
13  there's a statistically significant difference?
14      A.  Yes, it does.
15      Q.  It says that in all of those reports on
16  page 20 -- sorry -- all those studies on page 20?
17      A.  I mean, that I don't think I would have
18  included them, and my practice would be, I wouldn't
19  have included them in my report if they didn't show
20  a statistically significant difference on this.
21      Q.  Isn't it correct, though, that we've been
22  through some studies earlier today where we pointed
23  out that there were, in some instances, not a
24  statistical difference, and I think you explained
25  that sometimes you will still rely on the study even

Exhibit 2
Page 59 of 163

234

1 when there is no statical -- statistically
2 significant difference, correct?
3      A.  I -- in those cases, I did not talk about
4 the nonsignificant effects.  I think was the point
5 that you were trying to make.  I was talking about
6 some effects that were statistically significant.
7 So I mean, I think that doesn't make much sense to
8 me, but yeah.  All right.  I wasn't citing null
9 effects as if they were differences.
10      Q.  Earlier, I had asked you about how biased
11 individuals typically justify their actions by
12 citing apparently legitimate motives in an effort to
13 deny bias.  And I asked you about the word
14 "typically."
15          In the studies that you referred to there,
16 what was the average number of participants who
17 engaged in discriminatory behavior across those
18 studies?
19      A.  Again, it's not reported in terms of the
20 average number of people who discriminated because,
21 typically, in those studies -- sorry for using that
22 word.  But in those studies, the usual way of doing
23 things is that -- I'm sorry.  What was the -- the
24 study about you were asking about?  Sorry, I lost
25 the thread.

235

1      Q.  That biased individuals typically justify
2 --
3      A.  Oh, right.
4      Q.  -- their actions.
5      A.  All right.  So you're showing bias in a
6 between-participants experiment.  People are
7 randomly assigned to different conditions.  So let's
8 say it's a backlash study and you're seeing an
9 assertive female target and a similarly assertive
10 male target while you're randomly assigned to one
11 condition or the other.  So we can't say which
12 specific individuals discriminated.
13          So we can find that there's an average
14 difference, that gender did make a difference
15 because everything else was well controlled for and
16 people were randomly assigned to these conditions.
17 And we find an average difference in the evaluation
18 of the woman versus the man, right?  That can only
19 be accounted for by the one thing that was
20 different, gender.
21          And then we can ask people, "Did your
22 evaluation have anything to do with gender?"  People
23 typically say no in those studies.  People in those
24 studies will almost invariably say, "No, gender
25 didn't matter at all in my evaluation," but we know

236

1 in the aggregate that it did.  That's the point.
2 But I cannot give you a frequency of what percent of
3 people discriminated in those studies.
4      Q.  Can you tell me if those studies reported
5 a statistically significant difference?
6      A.  Again, I wouldn't have cited them if they
7 didn't show that.
8      Q.  Okay.  So is it --
9      A.  And, again --
10      Q.  -- your testimony -- is it your testimony
11 that every study that you relied on in your report
12 reported a statistically significant difference that
13 supports the opinions that you give?
14          MR. BRISCHETTO:  Objection, vague,
15 ambiguous.  Go ahead.
16          THE DEPONENT:  That's a really global
17 thing, so I can't tell you -- I don't -- I don't
18 know if there would be an exception anywhere, and I
19 have to think about that.  But my typical practice,
20 practice that I would have is I would be including
21 studies where I'm saying this effect occurred.  That
22 would be a statistically significant effect.
23 BY MS. BRADFORD:
24      Q.  A problem that exists when we're talking
25 about the words, for example, "typically," or if

237

1 we're talking about frequency within studies, is
2 that I think, as you pointed out, we oftentimes
3 don't know how many people actually reported
4 exhibiting backlash in a study, right?
5          MR. BRISCHETTO:  Objection, vague.  Go
6 ahead.
7          THE DEPONENT:  I -- I think that's right.
8 I mean, again, we can't -- we can say that on
9 average backlash occurred, but we can't pinpoint who
10 exactly engaged in the backlash.  And I think in --
11 in any specific case, the issue is whether --
12 whether, you know, a specific individual engaged in
13 backlash.  It's -- you know, the -- the frequency
14 estimate here does not tell you whether or not
15 somebody in a specific real-life situation committed
16 backlash.
17 BY MS. BRADFORD:
18      Q.  We don't know -- we don't know -- when
19 we're looking, for example, at a statistical -- at a
20 D score, for example, we don't know how many
21 participants actually swung that score a certain
22 way, right?  It could have been a small sample size
23 and therefore just two people affected it, or it
24 could have been a huge sample size and a lot of
25 people swung the score a certain way, right?

Exhibit 2
Page 60 of 163

238

1    MR. BRISCHETTO: Objection, vague. Go
2 ahead.
3    THE DEPONENT: Yeah. So part of what we
4 do in these studies is that you try to have enough
5 people in these different conditions that one or two
6 outliers is not going to determine that effect
7 because you're averaging over a lot of people. So
8 that's part of the reason why you use bigger sample
9 sizes in the research to get rid of that -- that
10 sort of random outlier.
11    Another common practice is if you see
12 somebody who is an extreme outlier, you'll often see
13 in research reports, I mean, you don't want to be
14 excluding outliers left and right, you know, to
15 where you're really reducing your sample size and --
16 and gaming -- seemingly gaming the system. But, you
17 know, for extreme outliers, people will screen them
18 out of the data and then report that because you
19 don't want those one or two or three outliers to be
20 having an outsized influence on the effects. But
21 again, with larger sample sizes, it's not going to
22 be swung by one or two people.
23 BY MS. BRADFORD:
24    Q.  Why don't you just say that the research
25 shows that there are statistically significant

240

1 know, it is kind of a specialized term, and, you
2 know, I think that -- that, too, can be interpreted
3 differently by different people on a jury who don't
4 understand the statistics.
5    Q.  Do you think that a jury could
6 misunderstand what you mean by the words "tend" or
7 "generally" or "typically"?
8    MR. BRISCHETTO: Objection, calls for
9 speculation, asked and answered multiple times over.
10 Go ahead.
11    THE DEPONENT: I mean, it's certainly --
12 it's certainly possible, and the, you know, you're
13 here to help clarify it. And I'm trying to respond
14 as clearly as I possibly can. Again, I -- I tend --
15 I put those words in there in part to signal that
16 these are not absolutes and -- and not overstate the
17 findings in that way, not imply a whole -- you know,
18 imply an absolute that would then lead people,
19 mislead people into thinking this always occurs.
20 BY MS. BRADFORD:
21    Q.  On page 65 of your report, you note that:
22 There was a consistent pattern of exaggeratedly
23 negative interpretations of Dr. Bala's tone and
24 intent. What do you mean by this?
25    A.  Where on that -- where on that page are

239

1 differences in, you know, for example, people who
2 view assertive behaviors as dislikable, performed by
3 a man versus as performed by a woman.
4    A.  That would be another way to say it.
5    Q.  Wouldn't that be a more accurate way to
6 say it?
7    A.  I think -- you know, again, I'm trying to
8 write this for a general audience, be true to the
9 research, and be in a way that is going to engage
10 people, and that people don't totally understand the
11 term statistical significance. So I try to keep it
12 away from the sort of more jargony kind of language
13 and try to explain it in a way that's true to the
14 research, but at the same time, you know, is
15 engaging and -- and understandable.
16    Q.  You said that a lot of people don't
17 understand what the term "statistically significant
18 difference" is. You would agree that you would be
19 there as an expert to -- to educate the jury on
20 that, right?
21    A.  Yeah. I mean, I could do a little mini-
22 course on statistics, but I spend quite a few hours
23 on this concept in -- in my research methods class,
24 and even so, a lot of students are not completely
25 understanding the nuances of that term. So, you

241

1 you?
2    Q.  It is the --
3    A.  Oh, I see.
4    Q.  -- paragraph. It's a --
5    A.  Right. Okay. So I'm referring especially
6 to these HR investigations, right? And I think that
7 if you look closely at the HR investigations, you
8 have Dr. Henrikson's characterization of what
9 happened based on talking to people who were there.
10 And I think in both of those HR investigations or
11 incidents where he was not in the room, so he's
12 relaying what people said.
13    And then you have Ms. Strahm's
14 investigation into this, where she went directly and
15 interviewed the people who were there. And you see
16 this disparity, right? I mean, I think it's -- it's
17 just simply -- you know, I don't -- I don't have the
18 scientific method here, right? This is simply an
19 obvious disparity in the characterization that --
20 that, you know, Dr. Henrikson conveys the most
21 negative comments.
22    He -- you know -- so -- I'm going to have
23 to go back and -- and -- and look at this to be --
24 make sure it'll be accurate. But if we look at
25 those -- those incidents, and I'd be happy to do



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 61 of 163

242

1 that, look at those incidents in detail, there's
2 kind of a disparity between how Dr. Henrikson
3 characterizes what he heard from the people who were
4 there, and then with the formal investigation, that
5 was documented by notes, what people actually say.
6      Q.   How do you define disparity?
7      A.   Difference.  I mean, if -- I mean, I think
8 we should look -- I -- I would say if you want to
9 see what I'm talking about, we need to go directly
10 to, you know, picking apart those -- those incidents
11 and go to pages, you know, bottom of 65.  I -- you
12 know, I've got, like, two and a half, three pages on
13 -- more.  I have like -- what?  One, two, three,
14 four.  Four pages going in detail on the Sue Bardon
15 incident and the subsequent investigation and the
16 difference between how Dr. Henrikson portrayed it
17 and -- and what actually -- what other -- what
18 people who were in the room said happened, right?
19          And then the Matt Holling incident, I've
20 got one, two, three, about another four pages with a
21 similar sort of thing where there was an HR
22 investigation.  And so that -- that's where I'm
23 talking about this pattern.
24      Q.   So, Dr. Glick, are you getting your
25 opinion on how Dr. Henrikson interpreted or

243

1 presented something as compared to other people?
2      A.   I mean, this is just -- just read -- read
3 what people said and what Dr. Henrikson said they --
4 they said.  And you see, in cases where people
5 where, you know, not -- where saying that Dr. Bala
6 behaved appropriately, that Dr. Henrikson is only
7 conveying the negative comments by one or two people
8 and -- and not conveying the positive comments, and
9 that, also, the negative comments become inferences
10 about intent or other things that are not really
11 focused on what actually happened.
12          In both of those incidents, the HR person
13 found no evidence that Dr. Bala behaved
14 inappropriately after conducting a formal
15 investigation, right?  And -- and yet, there's this
16 characterization by Dr. Henrikson that she did
17 behave inappropriately.  I think this is not -- this
18 is very evident that that happened.  Now, why did
19 that happen?  That's for the jury to decide.
20      Q.   Is it your opinion that Dr. Henrikson had
21 exaggerated the negative interpretations of Dr.
22 Bala's tone and intent?
23      A.   I think that compared to what the
24 eyewitnesses to these incidents said, Dr.
25 Henrikson's characterization was more negative and

244

1 presumed tone and intent.  He was not in the room
2 and does not accurately reflect what the
3 eyewitnesses subsequently told Ms. Strahm, the HR
4 person who investigated.  So there's a difference or
5 disparity there, and the disparity is in the
6 direction of what would be consistent with
7 discrimination.
8          Is it possible there were some other
9 reasons why Dr. Henrikson -- you know, maybe he
10 misunderstood?  Maybe.  I don't know, right?  I
11 mean, that's your job to figure that out, that there
12 might be some other possibilities there.  But
13 there's definitely, I think, if you look at it, any
14 reasonable person looking at it would say, yeah, and
15 -- and look at Ms. Strahm's conclusions, right,
16 versus Dr. Henrikson's characterization.
17          Dr. Henrikson's characterization is
18 overtly, "She behaved rudely, unprofessionally, she
19 made everybody cower," and so on, right.  And Ms.
20 Strahm formally investigates, interviews the people
21 who were in the room, and concludes, "No, that's not
22 the case."  And, in fact, in the second incident,
23 Matt Holling, his behavior is consistent with
24 disrespecting the surgeon in charge of the operation
25 Dr. Bala.

245

1      Q.   So, Dr. Glick, it sounds like -- I think
2 you just gave the example there of compare Ms.
3 Strahm's conclusion, I think, you versus Dr.
4 Henrikson's interpretations, things like that.
5      A.   Right.
6      Q.   So are you essentially weighing what Dr.
7 Henrikson said or reported as compared to what
8 others did?
9      A.   What I'm saying is that if you look at
10 this, you see a difference.  Why that difference
11 occurred?  It's consistent with the possibility of
12 discrimination and would be consistent with the
13 pattern we would expect of, you know, how someone
14 might do that, might -- might characterize an
15 assertive woman in a discriminatory way.  Is that
16 ultimately what it reflects?  That's up for the jury
17 to decide.
18          But I'm saying the -- the difference is
19 evident in the record, and it's -- you know, it's
20 clear.  Why -- why was there the investigation?
21 Because Dr. Henrikson said she behaved
22 unprofessionally.  Linda Strahm conducted a formal
23 investigation.  She systematically interviewed and
24 kept notes.  Now -- now, maybe there's -- who knows
25 what's going on here, but it is definitely very



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 62 of 163

246

1  consistent that there's clearly a disparity, right?
2      I think that's -- that's pretty much
3  indisputable.  Otherwise, there wouldn't have been
4  an investigation in the first place and then a
5  conclusion that there was no inappropriate behavior.
6      Q.  So, Dr. Glick, I think you just said there
7  that there -- there are differences in these
8  accounts that are evident in the record, and I --
9  you also said that there's clearly a disparity.
10     What training have you received to
11 determine -- to determine how to weigh certain
12 witnesses' accounts against other witnesses'
13 accounts?
14     MR. BRISCHETTO:  Objection.  Assumes a
15 fact not in evidence.  Go ahead.
16     THE DEPONENT:  This is not about weighing
17 different accounts.  I'm saying that if you look at
18 this, the characterizations are different, right?
19 And Dr. Henrikson's characterization, the person who
20 wasn't in the room, is consistent with the direction
21 that one would expect from research on
22 discrimination toward an assertive, high-status
23 woman.
24     All right.  I'm not concluding ultimately
25 if that's the reason for it, but I'm saying that,

247

1  you know, you don't need special training to see --
2  I mean, let's -- would it -- would it -- I mean, I
3  think we just need to go to the specifics.  What --
4  what Dr. Henrikson said.  I don't want to get this
5  wrong.  So let's see.  Where do we have this?  I'm
6  trying to look through here.  These several pages,
7  right?  It'll take me a little while.
8  BY MS. BRADFORD:
9      Q.  Let me ask you this, Dr. Glick, and then -
10 - and then if you find it, please interrupt me and
11 feel free to -- to add it in.  You just said that
12 you don't need special training to determine if --
13 if -- you know, essentially, what you're saying, if
14 these disparities are clear, if there are
15 differences in the accounts.
16     So is this an opinion that you're giving
17 based on your scientific expertise, or is it your
18 personal opinion?
19     MR. BRISCHETTO:  Objection.  Assumes a
20 fact not in evidence.  Go ahead.
21     THE DEPONENT:  Okay.  Right.  So I -- I
22 think what -- there's two different things going on
23 here, right?  One is, if you look at Dr. Henderson's
24 account in each of these incidents, he draws
25 conclusions or -- or portrays them in a certain way

248

1  that is not the same.  And I think that -- you know,
2  look, if a juror disagrees with me, they can say I'm
3  full of it and -- and disagree with me.
4      But if you just look at that, I think it's
5  obvious that when -- then you look at some of the
6  witnesses to the event and ones that Dr. Henrikson
7  is saying he's getting these -- these views from,
8  right, it's not the same, all right?
9      You know, witnesses in the Matt Holling
10 incident, for instance, said that Dr. Bala was
11 perfectly appropriate.  She was asking for quiet
12 during a difficult part of the operation, and Matt
13 Holling interrupted her, disputed, or -- or said,
14 "Well, I don't see why we have to be quiet."  Look,
15 I -- I think this is pretty obvious.  And then, you
16 know, Henrikson said she made everybody in the room
17 cower, or whatever.  I mean -- and maybe that was
18 the other incident.
19     But -- but if you just look at the
20 specifics, and I would prefer that we just kind of
21 dig into the specifics because it's done in my
22 report, and I'm -- I'm not -- you know, I don't want
23 to get the two incidents confused or be inaccurate
24 in my portrayal here.  But it's very clear that Dr.
25 Henrikson's account is different from some of the

249

1  things the eyewitnesses said, and that in some
2  cases, he said, "Well, I talked to this person," but
3  his account differs, and it differs in a way -- and
4  here's the part that comes in about my expertise.
5  It differs in a way that is consistent with what the
6  research on stereotyping would expect.
7  BY MS. BRADFORD:
8      Q.  So, Dr. Glick, you -- you said a couple of
9  times that I -- so that -- "I think that this is the
10 case."  So I guess what I'm just asking is, when you
11 say that, are you giving your personal opinion, or
12 are you giving your opinion as an expert in social
13 psychology?
14     MR. BRISCHETTO:  Objection, assumes a fact
15 not in evidence.  Go ahead.
16     THE DEPONENT:  What I'm saying that the
17 difference is consistent with the possibility that
18 Dr. Henrikson applied stereotypes, that is based on
19 my expertise in social psychology.  When I observe
20 that there's a difference, that is, to me, is simply
21 something that anybody can see, and, you know, that
22 that's just evident in the record, okay?  I think
23 it's -- it's pretty obvious and -- and doesn't
24 require special training to see that, you know,
25 person A says one thing, and person B says something

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3345
NAEGELIUSA.COM

Exhibit 2
Page 63 of 163

250

1 different.  That's -- that doesn't require special
2 training.  I'm just pointing those differences out.
3        If the jurors disagree with my
4 characterization of them, that's fine.  That's their
5 prerogative.  But if they agree that there are these
6 differences, then I'm further pointing out that Dr.
7 Hendrickson's -- the views that he conveyed are
8 consistent with stereotyping.  That part is the part
9 that is informed by my expertise.
10 BY MS. BRADFORD:
11    Q.  So just to be clear, when you are talking
12 about, for example, whether there are differences in
13 his account from others, things like that, you're
14 saying something you just said, that that's not
15 something that requires special training; you think
16 it's just clear, correct?
17    A.  Yes.
18    Q.  On pages 65 through 75 of your report, you
19 discuss how three incidents could be consistent with
20 discrimination, offering your interpretations of the
21 evidence that we've -- we've just gone through,
22 correct?  And just to be clear, these incidents, as
23 you phrase them, are the Sue Bardon and
24 anesthesiology incident, right?
25    A.  Yes.

251

1    Q.  The Matt Holling incident?
2    A.  Yes.
3    Q.  And then the e-mail to Angela Krebsbach,
4 correct?
5    A.  Correct.
6    Q.  You give some explanation for this in your
7 report, but I just want to be clear, why did you
8 focus on -- on these three incidents?
9    A.  Because like, as I say in the introduction
10 to those three incidents in the report, that there
11 was more evidence here.  We talked about this
12 before.  You know, right?  We don't know what
13 somebody's tone was exactly, right?  We can get
14 closer to that when we have multiple people in the
15 room, you know, disagreeing on what that tone was,
16 right, then that -- that suggests that this was
17 somewhat of a subjective perception, right?
18        And in the e-mail case, we have the actual
19 incident itself, right?  There's no body language or
20 tone that's relevant.  E-mails can have a tone,
21 right?  But the jurors can look at that e-mail and
22 say, okay, is this e-mail somehow rude, arrogant,
23 whatever, or -- or insulting or not?  They can make
24 an independent incident.  So -- so these incidents -
25 - and -- and then because the first two incidents

252

1 were investigated by HR that conducted a formal
2 investigation, and -- and there's a case where, you
3 know, Ms. Strahm did something well.  I -- I think
4 she -- she did seriously investigate these
5 incidents.  And she talked to each person.  She kept
6 detailed notes.  Okay.  That --- that's -- that's
7 good procedure, right?
8        And based on that, their own HR department
9 concluded that Dr. Bala had not done anything
10 unprofessional.  And it's clear that Dr. Henrikson
11 claims she did.  That's the disparity.  I -- I just
12 don't think this is -- this is just something that
13 you don't -- you don't -- you don't need to be a
14 weatherman to know which way the wind blows, right?
15 I mean --
16    Q.  Dr. Glick, right now I'm just asking why
17 you picked those incidents.  And --
18    A.  Because there's so much -- yes.  Because
19 you can -- because the case decision-makers --
20 because of the investigations.  The first two I
21 picked because there were the HR investigations, and
22 so those were the only two HR investigations I'm
23 aware of, of Dr. Bala's behavior.  And that was then
24 formal interviews instead of hearsay and gossip and
25 secondhand renderings, right?  This was, "Okay.

253

1 We're going to go and investigate and find out."
2 And she did tend to focus on, well, what actually
3 happened.  Not what you think was the intent or
4 anything else like that, what actually happened.
5        I think that was all good procedure, and
6 that gives you a lot of information to go on.
7 That's why I picked those two incidents.  The last
8 one it's because the e-mail is the incident, and so
9 case decision-makers can look at that and decide for
10 themselves.
11    Q.  So, Dr. Glick, you would agree that there
12 were -- not going into the details of all them, but
13 just you would agree that there were many other
14 complaints about the doctor and her behavior beyond
15 just these three, correct?
16        MR. BRISCHETTO:  Objection, calls for
17 speculation.  Go ahead.
18        THE DEPONENT:  Yeah.  I'm -- I -- I agree
19 that there were other complaints, but those other
20 complaints weren't formally investigated, for
21 instance.  And so --
22 BY MS. BRADFORD:
23    Q.  I'm just asking if there were others.
24    A.  Yes, there were other complaints, right.
25 Yes.



Exhibit 2
Page 64 of 163

254

1    Q.   And just to be clear, when you selected
2 these three specific incidents to focus on, you did
3 so without reviewing the entire production in this
4 case, correct?
5    A.   Well, again, as we talked about, I -- I --
6 I reviewed a lot -- a heavy load of documents,
7 including -- you know, there was a lot of detail
8 about this in the Strahm deposition, for instance.
9 But again, I did not have the entire universe of
10 documents available.
11        And I also want to add in response to
12 that earlier query, is that I do talk about the
13 other incidents, but I mentioned that these
14 incidents are worth digging into further because
15 there's more information about them.
16    Q.   With regard to the other incidents, the
17 other complaints that were brought against Dr. Bala.
18 If people --actually, let me just ask this first.
19 Would you agree that those complaints, they were
20 brought by a variety of individuals, ranging from
21 staff to nurses to other physicians to people who
22 didn't even work at OHSU, correct?
23    A.   Yes.  Again, bias, you know, can occur.
24 Gender biases like this are shared and -- and stem
25 from shared social stereotyping and prescriptions.

255

1 So it's not surprising that they would come from
2 different people.
3    Q.   That's a yes to my question?
4    A.   I said yes at the beginning, yes.
5    Q.   If any of those people who brought those
6 complaints were called to testify at trial under
7 oath, and they sat in front of the jury and they
8 gave the jury detailed descriptions about their
9 interactions with Dr. Bala, do you agree that the
10 jury should carefully consider their testimony?
11    A.   Absolutely.  I think the jury needs to
12 carefully consider all the facts and different
13 perspectives, but they -- they also need to
14 understand the possibility that it could be biased.
15    Q.   On page 85, you refer to unsubstantiated
16 complaints against Dr. Bala.  It's in the -- the
17 heading of one of your questions.  How did you
18 determine that a complaint was unsubstantiated?
19    A.   I have to see what I was talking about in
20 this section.
21        MR. BRISCHETTO:  Where are you on page 85?
22        MS. BRADFORD:  It's number four.  It's the
23 title of number four, bold.
24        MR. BRISCHETTO:  Got it.  I see it.  Thank
25 you.

256

1        MS. BRADFORD:  Uh-huh.
2        THE DEPONENT:  I mean, I may be referring
3 to uninvestigated complaints.  I have to think about
4 -- you know, this is -- been a couple of years ago,
5 so I'd have to think about why I use that term, but
6 I think I was maybe -- Let me see.  I'd have to read
7 through this again to see for sure, you know, what
8 I'm referring to there.  This is several pages long,
9 so --
10 BY MS. BRADFORD:
11    Q.   Let me ask you this, Dr. Glick:  Do you
12 plan to tell the jury that any complaints brought
13 against Dr. Bala were unsubstantiated?
14    A.   I would define not using that term on the
15 stand, so I don't think it's a necessary term.
16    Q.   Dr. Bala has obviously complained that she
17 was discriminated against.  Are her complaints
18 substantiated or unsubstantiated?
19    A.   Well, as we talked about before, I -- I
20 think, you know, no case is going to be decided by,
21 "Oh, I was discriminated against."
22        "Sure.  Here's some money."
23        And I think that -- that -- that the case
24 decision-makers have to weigh the totality of the
25 evidence.  That's their job, and to consider these

257

1 different alternatives.
2        And -- and sure, I think it's commonly
3 understood by jurors that somebody -- and, in fact,
4 we know from the research that people are -- are --
5 tend to be skeptical of claims of discrimination in
6 the first place.  Even when -- even under
7 circumstances that -- that were rigged to indicate
8 that discrimination was likely, people are still
9 skeptical about claims of discrimination.
10    Q.   Do you note that anywhere in your report?
11    A.   Yeah, I think I do.  There's a study where
12 people were told that of the people evaluating this
13 person, several were known to have bias, and -- you
14 know, and then the person is evaluated poorly and
15 later complains that they think they were
16 discriminated against, and people are still --
17 respond negatively to that person and see them as
18 whining and complaining.
19        So the general tendency is for people to
20 be somewhat skeptical or -- or at least not
21 positive toward people who claim that they were
22 discriminated against.
23    Q.   Dr. Glick, on page 87, you note that:  OHSU
24 administrators resisted evidence that was more
25 favorable toward Dr. Bala.



Exhibit 2
Page 65 of 163

258

1    MS. BRADFORD:  And, Mr. Brischetto, I just
2 think that that's the end of the first paragraph on
3 page --
4    THE DEPONENT:  Yeah.  And I think what I'm
5 referring to, which I start the next paragraph with,
6 is that you had two HR investigations that -- you
7 know, they were seen as incidents serious enough to
8 investigate, right?
9 BY MS. BRADFORD:
10    Q.  But I didn't actually ask you -- let me
11 actually ask my question about it.  I was just
12 reading what the language said real quick.
13    So did I read that correctly, that that's
14 what you wrote?
15    A.  Oh, did you read it correctly?  Okay.  Can
16 you just repeat it?
17    Q.  Yeah.  That case documents suggest that:
18 Multiple OHSU administrators resisted evidence that
19 was more favorable toward Dr. Bala, as well as
20 resisted crediting the possibility of discrimination
21 toward her.
22    Did I read that correctly?
23    A.  Yes.  Okay.
24    Q.  Do you think that something like that --
25 doing something like that is a problem because you

259

1 would expect OHSU to -- to look at the whole
2 picture, that it is important that they consider all
3 of the evidence, correct?
4    A.  Well, I think, you know, this is -- sort
5 of as a general blanket statement, sure.  You should
6 consider, you know, the evidence that is available.
7    Q.  Not just the evidence that's bad for her,
8 but also that is good for her, right?
9    A.  Sure.
10    Q.  And as an expert, would you agree that
11 when you're offering an opinion, it's important for
12 you to do the same?  And I can clarify that if you
13 need me to.
14    A.  Yeah.  I mean, I -- I do try to take the
15 totality of the evidence in the case documents into
16 account.
17    Q.  Do you think it's important to present not
18 just the evidence or research that's favorable to
19 the person who hired you, but evidence or research
20 that is not favorable, but relevant, as well?
21    A.  Do you have -- I -- I -- I -- I think I
22 have presented the -- the research consensus fairly
23 about when discrimination tends to occur, the forms
24 it tends to take, and the forms it doesn't tend to
25 take.

260

1    For instance, that backlash tends to
2 target likability, not competence.  So that research
3 would be less relevant if it was demeaning Dr.
4 Bala's competence rather than her likability.
5    Q.  And, Dr. Glick, I'm not asking if -- if
6 you think you did that in this case.  I'm just
7 asking if you think, as an expert, it's important to
8 present not just the evidence or research that's
9 favorable to the person who hired you, but also the
10 relevant evidence or research that is not favorable?
11    A.  What I would say is it's important to
12 present the weight of the evidence of the research.
13 So there's always going to be some research that
14 seems contradictory what's the weight of the
15 evidence of the mass of studies.  So to present some
16 studies that show -- that -- that don't show an
17 effect when most of the studies do, I think that's
18 simply muddying the waters.  Rather, I'm trying to -
19 - to present the consensus.
20    Q.  You think it's important to present the
21 weight of the evidence as well, that that -- that
22 those studies relate to?
23    A.  That's what I'm saying, yes.
24    Q.  Okay.  You noted earlier on, I think it
25 was this -- maybe it was this morning, that when you

261

1 were reviewing this case, you had sort of started to
2 pull in what you thought were, like, the relevant
3 documents to work off of, maybe a PDF or something
4 like that; is that right?
5    A.  Yeah, I think I -- I did that, but I
6 haven't looked on my computer to see what I have.
7 This was a long time ago.
8    Q.  Did you save that?
9    A.  I -- it might be on my computer.
10    Q.  Okay.  Did you take any notes during --
11 during this deposition?
12    A.  No, I did not.
13    Q.  And beyond that document, PDF, or whatever
14 form it might be in on your computer, is it accurate
15 -- I think you said that you don't have any other
16 notes from this case that you took?
17    A.  Again, I'd have to check my computer files
18 to see what I have, but, you know, I usually -- when
19 I'm writing my report, I edit the same version.  I
20 don't try to keep multiple versions, which can be
21 confusing.  And, yeah, I'm not sure what else I
22 might have in terms of notes.
23    Q.  And just to be clear, Dr. Glick, I'm
24 talking about things that are different from draft
25 opinions or anything like that.  Just focusing on if

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 66 of 163

262

1 you had notes or anything detailing the specific
2 documents that you were relying on, things like
3 that.
4     A.  I can't -- I can't exactly recall, so --
5     Q.  And we have -- we'll talk with Mr.
6 Brischetto about that.
7         MS. BRADFORD:  But again, Mr. Brischetto,
8 I'm not asking for any of his draft reports, but we
9 are going to ask if he can go through and look and
10 see if he has any of that information so that it can
11 be produced to us.
12         And so with that, we're going to hold the
13 deposition open, but I don't have any other
14 questions at this time.
15         MR. BRISCHETTO:  Yeah, we don't agree to
16 hold the deposition open.  And, you know, it's our
17 position you've been given all documents you're
18 entitled to.
19         And so thank you very much.  I have no
20 questions.
21         THE VIDEOGRAPHER:  Okay.  Before we go off
22 the record, Counsel, our court reporter will take
23 orders for the transcript.
24         THE REPORTER:  Ms. Bradford, would you
25 like to order the original?

263

1         MS. BRADFORD:  Yes, please.
2         THE REPORTER:  And, Mr. Brischetto, would
3 you like to order a copy?
4         MR. BRISCHETTO:  I would.
5         THE VIDEOGRAPHER:  Okay.  And, Mr.
6 Brischetto, Ms. Bradford will be getting today's
7 video deposition included in her fee.  Would you
8 like a copy of today's video deposition?
9         MR. BRISCHETTO:  I would.
10         THE VIDEOGRAPHER:  All right.  Perfect.
11         All right.  The time is 5:05 p.m., and we
12 are off the record.
13         (WHEREUPON, the deposition of PETER GLICK
14 was concluded at 5:05 p.m.)
15
16
17
18
19
20
21
22
23
24
25

264

1         CERTIFICATE OF VIDEOGRAPHER
2
3     I the undersigned, Vincent Guerrera, am a videographer
4 on behalf of NAEGELI Deposition & Trial.  I do hereby
5 certify that I have accurately made the video recording of
6 the deposition of Peter Glick, PHD, in the above captioned
7 matter on the 10th day of January, 2024, taken at the
8 location of 4941 Rivermoor Drive Omro, WI 54963.
9
10     No alterations, additions or deletions were made
11 thereto.
12
13     I further certify that I am not related to any of
14 these parties in the matter and I have no financial
15 interest in the outcome of this matter.
16
17
18 Vincent Guerrera
19 Videographer
20
21
22
23
24
25

265

1         CERTIFICATE
2
3     I, Michelle Byrd, do hereby certify that I reported
4 all proceedings adduced in the foregoing matter and that
5 the foregoing transcript pages constitutes a full, true
6 and accurate record of said proceedings to the best of my
7 ability.
8
9     I further certify that I am neither related
10 to counsel or any party to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13     IN WITNESS HEREOF, I have hereunto set my hand this
14 24th day of January, 2024.
15
16
17
18
19
20 /S/  Michelle Byrd
21
22
23
24
25



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 67 of 163

266

1           CORRECTION SHEET
2   Deposition of: Peter Glick, PHD        Date: 01/10/24
3   Regarding:    Rupa Bala, MD vs. OHSU
4   Reporter:    Byrd/Hernandez
5   _____
6   Please make all corrections, changes or clarifications
7   to your testimony on this sheet, showing page and line
8   number.  If there are no changes, write "none" across
9   the page. Sign this sheet on the line provided.
10  Page   Line   Reason for Change
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24          Signature_____
25             Peter Glick, PHD

267

1           DECLARATION
2   Deposition of: Peter Glick, PHD        Date: 01/10/24
3   Regarding:    Rupa Bala, MD vs. OHSU
4   Reporter:    Byrd/Hernandez
5   _____
6
7   I declare under penalty of perjury the following to
8   be true:
9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Page herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 2024.
16
17
18
19
20
21
22
23
24          Signature_____
25             Peter Glick, PHD



Exhibit 2
Page 68 of 163

Peter Glick PHD    January 10, 2024    NDT Assgn # 70900    Page 69

---

**$**

**$2** 213:10

---

**0**

**0** 75:24 79:2

**0.1** 127:1

**01** 116:12
  127:4

**02** 116:13

---

**1**

**1** 26:4 26:8
  27:4
  43:16 80:25
  145:8

**1.5** 81:18

**1:00** 120:12
  121:1

**1:29** 121:19

**10** 7:4
  52:20
  56:9
  85:23
  120:12
  161:20
  161:22
  190:8
  195:20
  200:17

**10:04** 7:5 7:8

**10:41** 36:19

**10:50** 36:22

**100** 141:2
  141:3
  141:13
  142:5

**10th** 7:8

**11** 115:16

144:2

**11:36** 71:25

**11:42** 72:3

**119** 156:1
  156:2

**12:49** 121:16

**13** 50:18
  111:6
  111:22
  150:8 150:9
  164:4

**13.5** 150:3
  150:7

**13.9** 149:23
  150:5
  151:10

**138** 165:6

**14** 101:16
  105:22
  105:24
  116:11
  150:8 150:9
  166:12

**15** 36:14
  105:23
  105:24

**15th** 24:1
  34:25

**16** 80:17
  91:11 165:9

**17** 72:16
  91:23

**173** 124:9

**174** 125:20

**177** 126:12

**18** 92:14

**19** 107:5

**1A** 124:13

---

**2**

**2** 33:10 33:13
  76:12 81:13
  82:3 145:10
  159:7 164:4

**2.0** 81:9
  81:23

**2.5** 79:18
  79:25
  81:9
  81:14 81:24
  83:3 83:4
  83:24

**2:09** 151:15

**2:13** 151:18

**20** 233:16
  233:16

**2000** 128:14
  158:12

**2015** 150:20

**2016** 149:4
  150:20
  150:24
  150:25

**2017** 90:19
  156:1

**2021** 22:23
  33:21
  34:8 37:1
  37:19 66:12

**2022** 162:1

**2023** 18:17
  23:23
  24:1 34:25

37:1 42:6
  42:17 42:19

**2024** 7:4 7:9

**21** 106:1

**22** 106:2
  106:6
  230:12
  230:20
  232:23

**23.5** 150:1

**232** 145:8

**24** 106:1
  106:2 106:7
  109:5

**26** 39:1
  110:13

**29** 116:12
  122:16

---

**3**

**3** 34:19 34:20
  37:20
  81:7 126:14
  153:23
  162:3
  166:12

**3:42** 216:14

**3:56** 216:18

**30** 31:14
  121:8
  136:12

**300** 54:15
  54:15

**300-page**
  145:9
  145:10

**30th** 33:21



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 69 of 163

34:8

**32** 127:7
127:21

**36** 127:7

**37** 108:11
134:16

---
4
---

**4** 74:23 74:24
75:2
76:12 80:25
81:19

**4:18** 232:11

**4:23** 232:15

**40** 37:4
153:22
153:24
154:1 154:4

**41** 108:12
155:17

**44** 37:6
157:18

**45** 158:17

**48** 231:6

**49** 164:20
165:1
166:13
166:14

---
5
---

**5** 75:25 76:17
76:21
80:4 80:7
80:12
91:3 91:4
167:18

**5:05** 263:11
263:14

**50** 53:1
56:9
136:2
189:17
198:18
219:1
219:10
219:21
220:5 220:5
220:5 220:6

**51** 168:22
209:10
220:17

**53** 149:2

**54** 177:9
183:23
183:24
216:22
216:24

**55** 214:3

**57** 217:18

**58** 225:11

**59** 110:12

---
6
---

**6** 90:10 90:12
92:15 140:3
165:22

**60** 129:18
229:25
232:18

**61** 154:16

**62** 77:10

**636** 164:5

**64** 110:13

**65** 240:21
242:11
250:18

---
7
---

**7** 114:5 114:6

**720** 80:21

**722** 81:6

**727** 115:13

**728** 116:6

**75** 250:18

**79** 149:2
150:4

---
8
---

**8** 123:20
123:22

**80** 41:22
136:14

**84** 128:14

**844** 164:16
165:6

**85** 220:20
255:15
255:21

**87** 257:23

**88** 166:12

---
9
---

**9** 157:22
157:24

**90** 41:22
129:16

**92** 164:24
166:23

**95** 91:13
91:16

---
A
---

**a.m** 7:5 7:8

36:19 36:22
71:25 72:3

**abide** 31:24

**abiding** 32:11
208:13

**ability** 10:24
11:3

**able** 16:19
100:16
100:19
100:22
101:2
109:12
118:5
139:24
180:19
223:11

**abrasive**
67:17
101:11
103:23
198:3
215:16
226:14

**abrasiveness**
175:13

**Absent** 14:25

**absolute**
46:14
47:7
47:13 47:17
116:23
137:19
155:4 226:4
226:20
227:12
227:19
227:23
232:1
240:18



Exhibit 2
Page 70 of 163

**absolutely**
 17:12
 50:2
 84:22 131:5
 132:9
 132:12
 132:20
 180:19
 181:11
 190:13
 255:11
**absolutes**
 47:11 47:22
 231:20
 240:16
**abstract**
 90:22
 143:19
**academia**
 31:17
**academic**
 31:11 206:2
**accept**
 32:12 182:1
 182:6
**acceptable**
 25:4 32:2
**accepted** 42:8
 42:13
**access**
 14:20
 174:18
**accommodating**
 74:12 192:3
 192:4
**accord** 134:17
 136:2
**according**
 68:2

82:16
122:25
123:10
126:19
154:5 154:5
159:21
162:12
164:5
177:10
200:21
223:12
226:8
232:24
**account**
 247:24
 248:25
 249:3
 250:13
 259:16
**accountabilit**
**y** 196:4
 196:14
 196:24
 196:25
**accountable**
 196:7
 196:11
 196:13
 197:12
**accounted**
 235:19
**accounting**
 173:23
**accounts**
 246:8
 246:12
 246:13
 246:17
 247:15
**accurate**

52:24 56:13
66:5
151:2 151:3
239:5
241:24
261:14
**accurately**
 44:11
 56:6
 56:15
 60:6 207:23
 244:2
**acknowledge**
 139:11
**acknowledged**
 11:6
**acknowledging**
 103:8
**across** 21:2
 38:11 55:21
 55:25 58:10
 58:12 63:10
 77:10 77:10
 81:20 88:15
 88:16 89:18
 93:17 98:22
 106:25
 113:2 125:5
 125:16
 176:19
 204:20
 209:22
 228:11
 228:15
 228:21
 234:17
**act** 102:3
 159:9
**action** 99:16

112:10
112:21
116:3 117:6
119:25
170:25
**actions** 95:18
 99:16 173:3
 173:4
 209:12
 234:11
 235:4
**activity**
 159:12
**acts** 214:7
**actual** 57:4
 57:8
 77:14 93:18
 105:20
 106:7 106:9
 108:17
 110:24
 111:18
 112:16
 113:8
 119:20
 162:18
 163:19
 172:5
 197:10
 204:18
 251:18
**actually**
 27:22 33:24
 67:19 71:22
 84:2
 99:20 106:2
 110:12
 112:19
 119:14
 132:21
 133:23



Exhibit 2
Page 71 of 163

134:2
135:11
136:7
151:11
154:17
160:3 160:8
163:1
163:16
165:23
166:24
167:22
171:18
172:7
172:13
172:13
172:16
176:4 191:9
226:3
227:18
231:7 237:3
237:21
242:5
242:17
243:11
253:2 253:4
254:18
258:10
258:11

**ad** 176:22

**add** 25:14
39:7 39:8
40:14
66:5
71:17
247:11
254:11

**added**
153:20
156:17
173:10

**adding** 37:3

38:17

**addition**
97:10 97:13

**additional**
13:19 18:22
19:5 39:7
39:14 39:22
145:3

**addressing**
8:15

**adept** 62:24

**adhere** 25:6
206:7

**adherence**
45:15

**adheres** 54:4

**administer**
87:3

**administered**
8:5 138:3

**administratio
n** 196:16

**administrator
s** 257:24
258:18

**admire** 141:18

**admit** 43:24
83:19
211:12
212:4 212:5

**admitted**
43:16

**advertise**
43:3
43:15 43:17

**advertisement**
43:19

**advise** 44:2

**affect**
10:24
11:3 51:1
109:6
109:12

**affected**
237:23

**affects**
225:17

**affirm** 8:25

**afternoon**
13:10

**against**
8:16
32:23 35:17
46:17
47:4 47:6
60:25 88:24
92:1 93:8
93:21
116:18
116:21
117:2
131:24
137:22
138:7
138:11
139:3
142:18
142:19
170:23
176:9
182:19
201:10
201:12
212:13
212:21
213:10
213:11
218:17

218:19
246:12
254:17
255:16
256:13
256:17
256:21
257:16
257:22

**ageism**
90:25 90:25
91:14 91:15

**ageist** 92:1

**aggregate**
104:8 107:2
215:4 236:1

**aggregates**
90:3

**aggression**
159:24
162:17
162:19

**ago** 101:6
147:25
149:14
190:8 256:4
261:7

**agreed** 8:2
8:3 8:7
8:13 8:18
62:4

**agreeing**
47:21
83:4 83:25

**agreements**
59:7 62:11

**ahead** 38:19
48:22 71:8



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 72 of 163

74:20 74:25
91:12 99:25
115:13
116:7 121:4
174:20
174:22
182:13
183:12
189:1 191:6
200:12
203:20
208:23
211:18
219:24
221:17
236:15
237:6 238:2
240:10
246:15
247:20
249:15
253:17

**aid** 68:18
68:21 68:25

**aim** 123:17

**aired** 174:10

**al** 108:20
113:7

**albeit** 77:25

**allegation**
155:15
156:13
157:3 157:6
179:13
198:21
199:2 200:8
201:16

**alleged**
154:12
155:13

157:12

**allergic**
47:21

**allocations**
112:17

**allotted** 8:17

**allow** 28:2
62:18 63:23
69:17 70:23
109:8
141:16
199:9
210:13

**allowed**
29:8
43:24
59:8
62:16 177:3
190:18

**allure** 73:10

**alone** 16:8
16:10 16:11
17:9 187:15

**aloud** 124:10

**already**
11:6
21:19
29:5 38:5
38:12
41:7
49:15
53:7 101:14
112:1 112:1
148:18
166:14
176:22
229:3
229:21
229:23
230:15

230:15

**altered**
181:20

**alternative**
130:4 139:8
170:11
170:11
170:14
170:23
171:8
171:18
173:6
173:14
174:2
184:11
184:12
201:7 201:8
201:9
210:19
217:10

**alternatives**
170:21
170:22
173:8 175:2
183:22
257:1

**am** 11:5 22:13
26:3 27:1
43:24 62:24
80:21 90:21
123:7 130:2
142:4 142:5
181:25
183:7 183:8
186:9
186:11
186:13
207:6 228:4

**ambiguity**
221:11

**ambiguous**

25:21
236:15

**ambiguousness**
71:8

**ambitious**
57:12 57:24
113:19
175:10
192:5 192:6
193:23

**ambivalence**
107:6
107:15
108:1 108:5

**ambivalent**
74:15
75:6
76:25 80:16
87:4
88:14
91:8 97:8
98:18 98:21
98:22 138:4
191:22
191:23

**American**
210:15
212:2

**AMI** 81:1

**among** 43:8
64:17
91:8 125:21
125:24
141:17
156:25
162:5
162:14
186:18
228:17

**amount** 55:8



Exhibit 2
Page 73 of 163

146:15
146:20

**ample** 69:11

**analyses**
53:21
153:10

**analysis**
92:25
94:7 97:4
97:7
98:14 111:9
115:14
125:13

**analytic**
55:21

**analyze** 52:12

**analyzed**
51:16

**anecdotally**
192:16

**anesthesiolog
y** 250:24

**Angela** 251:3

**anger**
160:10
230:3
230:23
231:9
232:21

**animal** 208:2

**anonymous**
149:16
150:16

**anonymously**
167:21

**answer**
10:25
12:5 12:7

12:11 12:15
12:19 12:24
38:22 39:10
40:17 44:11
59:2 71:5
79:7 101:25
102:16
102:17
105:18
105:18
108:8
109:11
117:11
136:21
176:8
178:22
188:21
191:8 193:3
200:14
202:13
208:10
208:21
208:24
211:18
214:10
218:15
225:5

**answered**
55:11
61:5 135:12
135:13
182:13
183:12
200:12
208:20
215:21
240:9

**answering**
11:11

**answers** 79:10
117:12
177:11

225:7 225:9

**anticipate**
214:8

**anticipating**
174:21

**anybody** 32:17
84:2 105:16
153:6
249:21

**anyone**
15:20 15:25
16:5
21:15
32:4
51:17 69:15
70:23
87:4
147:3
196:10

**anything**
10:23 15:13
15:17
21:6
25:15
39:2 41:1
41:14 78:24
144:16
148:1 148:1
214:1
235:22
252:9 253:4
261:25
262:1

**anyway** 107:25

**anywhere**
76:21 82:10
170:24
174:6
236:18
257:10

**apart** 68:8
86:4
102:5
103:17
113:22
136:18
139:7
139:14
180:10
201:4 213:7
242:10

**apologies**
147:5

**apologize**
122:23

**apparently**
19:18
209:12
234:12

**appear** 231:1

**appears** 16:8

**applicable**
108:11

**application**
168:19
179:1
179:15
190:1 207:6
207:12
207:25

**applications**
209:1 209:7

**applied**
39:4 188:14
189:9
249:18

**applies**
152:14
156:2 204:4



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 74 of 163

229:13
229:15

**apply**
117:25
118:2
140:11
170:9
189:13
215:11
229:1

**applying**
117:18
119:10
137:2
179:17
196:20
199:14
208:4 209:4

**appointed**
28:23

**appreciate**
13:17
26:1
26:23 48:15
68:9
78:19
121:14
125:11
182:4

**approach** 25:1
30:15 37:24
38:3 69:7

**appropriate**
161:13
173:18
248:11

**appropriately**
243:6

**area** 40:8
54:21 56:10

186:19

**areas** 25:19
199:19
200:23

**aren't**
11:12 73:22

**arguing** 207:8

**argument**
176:18
176:23

**argumentative**
183:12
208:19
211:18

**arguments**
207:11

**Arizona**
174:13
174:13
174:14

**arrogant**
251:22

**article** 80:11
80:19 84:18
84:23 84:23
86:8
86:17
224:16
224:18
224:21

**articles**
17:17 19:16
19:17 19:22
20:1 20:3

**artificial**
204:4

**arts** 43:13

**ascertain**

180:15

**aspect** 202:3

**aspects** 98:20

**aspirations**
21:1

**assertion**
203:6

**assertions**
137:24

**assertive**
57:11 57:24
74:10 78:10
78:10 94:22
102:7
122:17
123:10
137:23
142:19
159:10
159:11
167:8
167:15
175:9 192:6
193:23
203:2 214:4
218:23
219:17
221:6 235:9
235:9 239:2
245:15
246:22

**assertiveness**
123:2

**assess** 63:4
89:2 102:11
114:14
123:15
127:19
135:1
169:11

186:8

**assessing**
196:21
197:23

**assessment**
114:24

**assign**
63:14 86:17
86:25 128:8
137:1 137:3

**assigned**
103:21
235:7
235:10
235:16

**assignment**
105:12

**associated**
84:12
92:2 92:9
92:19 95:21
96:13
116:13
226:15

**association**
95:11

**assume** 12:6
12:23 79:25
154:22
164:10
168:17
174:20
194:2
219:23
229:12

**assumed** 158:6

**assumes** 99:22
246:14
247:19



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 75 of 163

249:14

**assuming** 7:23
18:8
33:18 64:22
77:24 80:12
82:5 87:3
105:17
111:13
151:2
186:20

**assumption**
101:8

**assumptions**
39:4 136:10

**attached**
41:10
42:5 42:11

**attacking**
194:17

**attempt** 161:6

**attempts** 16:5

**attitude**
73:12

**attitudes**
50:23 72:11
73:1
73:16 76:23
78:4
79:15 80:17
87:15 87:17
88:11
92:1
139:1
143:24
143:25

**attitudinal**
45:13

**audibly** 11:11

**audience**
85:25
222:22
224:19
239:8

**author** 167:20

**authority**
32:13
134:18
135:21
135:25
136:3 167:4
167:6
206:15

**authors** 80:16

**autobiography**
192:17

**autocratic**
127:12

**available**
70:23
145:11
222:25
254:10
259:6

**average** 54:24
56:4
72:17
76:5 76:6
76:13 76:17
76:20 77:12
78:7 79:2
81:7
81:16 81:21
82:1 82:9
85:12 103:3
103:6 103:7
103:13
112:7 113:2
115:17

128:21
128:23
128:25
130:1 130:7
130:12
214:11
214:18
215:7
215:10
215:13
215:23
215:25
220:25
221:6 221:7
231:20
233:10
233:11
234:16
234:20
235:13
235:17
237:9

**averages**
63:17
106:25

**averaging**
238:7

**avoid** 78:21
141:15
141:23
142:7
142:14
173:10

**awards** 62:24

**aware** 23:8
23:14 35:10
35:14 35:24
40:7 63:3
99:12 99:19
105:11
110:18

154:11
155:12
157:12
157:15
190:3
252:23

**awareness**
50:10

**away** 12:15
88:18 142:1
153:5
177:16
197:6 201:5
219:19
239:12

**axed** 102:7

————————

B
**background**
17:6 146:5

**backlash** 37:5
56:25
57:1 57:4
57:10 57:14
57:18 57:22
58:3 78:8
78:24
79:8
94:19 94:21
98:3 98:6
103:23
122:17
123:11
124:4 127:9
153:21
157:16
163:25
164:1
165:18
167:2
175:19



Exhibit 2
Page 76 of 163

193:24
212:16
213:2
215:13
215:25
218:6 218:9
225:12
225:17
226:1
226:16
226:19
227:14
228:8
228:10
228:12
228:16
235:8 237:4
237:9
237:10
237:13
237:16
260:1

**bad** 80:16
156:5
169:22
171:4 183:1
194:20
198:3 259:7

**badly** 106:23

**baked** 88:5

**Bala** 7:11
17:21 17:23
21:17 21:20
24:9
29:16 32:22
60:3
67:17 67:25
69:14 99:13
99:20
100:24
112:2

132:22
138:7
142:23
144:6
148:19
154:11
154:18
154:19
155:12
156:5 157:4
157:12
168:8
170:12
172:8
174:25
175:17
176:9 179:6
182:17
182:18
183:16
184:1
196:11
196:13
196:25
201:7 213:9
217:13
243:5
243:13
244:25
248:10
252:9
254:17
255:9
255:16
256:13
256:16
257:25
258:19

**Bala's**
24:10
41:2
58:25 59:25

60:1 61:3
66:9 67:4
67:11 67:14
131:2
137:21
138:10
142:18
150:12
151:4
154:25
171:5 174:7
181:9
181:15
181:16
181:24
182:1 182:6
182:8
184:15
197:19
240:23
243:22
252:23
260:4

**Bardon** 242:14
250:23

**Bareket** 98:18

**base** 162:22
163:19
165:17

**based** 18:1
33:1
46:16 52:25
81:15 82:10
84:16
105:17
112:12
117:11
143:17
152:7 179:3
179:14
185:1 186:1

186:5
186:21
188:14
198:2
199:15
208:8
214:10
241:9
247:17
249:18
252:8

**basic** 35:13
106:13
204:22
205:24

**basically**
118:12

**basis** 138:5
155:25
160:25
178:3

**bear** 169:19

**bearing** 20:22
20:24

**bears** 88:16

**became**
35:10 35:14
35:18
40:7 173:23

**become**
30:22 35:24
37:23 43:11
163:15
243:9

**becomes** 51:11
206:8

**becoming** 43:7

**bed** 158:20



Exhibit 2
Page 77 of 163

**beginning**
7:10
146:4
172:23
173:11
199:12
255:4

**behalf** 7:17

**behave** 88:8
123:3
243:17

**behaved**
106:23
183:17
183:18
184:1 201:7
243:6
243:13
244:18
245:21

**behaves**
225:18

**behaving**
175:17
184:9

**behavior**
48:11 49:18
50:1
65:22 71:15
104:12
104:12
104:16
109:7 124:6
127:13
130:22
143:8
150:12
162:15
162:18
163:1 171:4
171:5

171:12
173:16
173:17
174:2 176:5
186:3 186:6
198:21
201:8
201:11
202:18
203:3 203:3
205:3
210:17
210:18
212:9
212:15
212:23
213:3
225:14
234:17
244:23
246:5
252:23
253:14

**behaviors**
104:18
127:8
133:17
214:4 239:2

**behind**
87:21
194:17

**belated** 20:17

**beliefs** 45:16

**believe**
14:4
23:24
24:2
40:18 41:14
74:22
88:7 90:10

111:20
149:22
158:13
164:2 190:6
198:9

**belong** 205:24

**benchmark**
198:5

**benchmarks**
197:2
197:18
197:24
198:8

**benefit** 92:4

**benevolent**
72:19 73:14
73:15 73:18
73:19 74:10
74:16
76:6
76:14 77:14
77:24 81:20
81:22 82:18
88:3
88:23 88:24
91:7
92:15 92:18
94:24 95:20
96:11 96:12

**best** 11:22
11:25
93:5 202:12
206:7 207:9
213:20

**better**
14:13
70:3 85:4
113:7
115:17
115:25

116:1

**between-participants** 235:6

**beyond**
39:17
138:17
170:15
180:17
253:14
261:13

**bias** 33:4
46:19
48:3 48:6
49:14 53:11
64:14 64:16
64:21
65:2 66:2
66:24 68:21
69:3
69:20 70:12
70:16 83:11
87:7 95:3
97:19 103:1
103:6 103:8
109:22
110:5
110:10
134:13
134:14
137:22
138:11
139:18
139:21
142:18
142:19
142:24
142:24
156:11
156:24
156:24
157:8 157:9



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 78 of 163

172:12
175:4
176:25
178:1 178:2
178:8
178:15
182:25
204:2 204:3
209:13
209:21
211:16
211:24
212:3 212:6
234:13
235:5
254:23
257:13
**biased**
83:12
92:2 116:18
133:20
138:7
139:11
143:4
209:11
234:10
235:1
255:14
**biases** 48:3
48:16 48:19
49:9 65:2
65:5 72:9
82:22 83:19
101:17
101:21
101:22
110:4
254:24
**bigger** 63:8
112:15
238:8

**birthday**
20:14 20:17
**bit** 18:20
25:9
30:18
33:5
37:12
66:7 72:6
75:16 78:19
83:24 86:10
86:10
101:14
112:4 140:1
144:14
152:18
153:17
159:4 191:7
206:8
**black** 83:12
134:25
192:18
195:24
**blame** 64:18
**blamed** 155:18
155:20
156:5
157:12
**blaming** 65:20
**blanket**
46:8 47:3
259:5
**Blick** 71:8
**blows** 252:14
**blunt** 167:13
**Bobko** 111:9
**body** 130:18
130:20
130:22
131:2 131:6

131:16
132:4
132:13
251:19
**boilerplate**
144:25
**bold** 80:16
255:23
**bone** 135:2
**bonuses** 94:1
**book** 54:13
231:7
**Boston** 29:22
**bottom**
50:19 75:18
127:21
242:11
**bounds** 189:20
**boxes**
146:23
146:23
**boyfriend**
87:25
194:20
**Bradford** 7:16
7:16 7:22
8:4 8:8
8:14 8:19
9:7 9:11
9:15 19:8
26:3
26:13 26:17
26:24
27:2
28:13 28:15
33:8
33:15 34:18
34:22 36:15
36:23 38:25

39:18 39:21
40:13 40:20
40:23 40:24
44:4 44:5
49:5
66:17 66:19
66:20 71:16
71:19 71:22
72:4 72:5
74:20 74:24
75:5
79:11
80:2 80:9
82:4 82:7
90:9
90:14 90:16
100:7
100:10
100:13
114:3 114:8
120:8
120:14
120:16
120:19
120:20
120:24
121:3 121:7
121:10
121:20
122:9
122:13
122:14
123:19
123:24
151:11
151:19
157:21
158:1
161:18
161:24
183:15
189:16
195:18



Exhibit 2
Page 79 of 163

195:21
195:24
196:2
201:14
205:13
209:9
211:21
216:9
216:19
216:20
216:25
217:3
217:11
220:10
221:25
232:7
232:16
236:23
237:17
238:23
240:20
247:8 249:7
250:10
253:22
255:22
256:1
256:10
258:1 258:9
262:7
262:24
263:1 263:6

**brain** 169:25

**brave** 87:18
194:16
194:19

**break** 13:5
13:9 13:9
13:10 13:16
15:23
24:8 36:8
36:10 36:25
40:21 71:23

118:16
118:17
118:24
121:5
121:23
121:25
151:12
194:21
216:10
232:8
232:17

**breaks** 13:4
15:13

**Brescoll**
231:10

**bridge** 149:15

**brief** 71:23
106:16
120:3
151:12
232:7

**briefing**
34:13

**briefly** 20:11

**Brigham** 29:23

**bring** 38:2
114:5

**bringing**
179:12

**Brischetto**
7:14 7:14
7:23 8:3
8:7 8:13
8:18 14:1
14:19 15:22
17:16 17:18
17:20
18:6 18:23

19:1
19:12
20:4
21:16
24:9 26:6
26:10 26:16
26:20
27:1 36:7
36:16 36:17
38:21
39:1 39:9
39:20 39:23
40:1
40:12 40:16
40:22
44:1 44:6
44:10 48:21
71:4 71:7
78:18
79:6
99:22 99:24
100:2
120:10
120:14
120:18
120:21
121:10
121:12
122:4
147:23
182:12
183:11
188:25
200:11
203:19
208:18
211:17
216:12
216:24
217:5
219:22
221:16
236:14

237:5 238:1
240:8
246:14
247:19
249:14
253:16
255:21
255:24
258:1 262:6
262:7
262:15
263:2 263:4
263:6 263:9

**broad** 48:25
49:3 49:6
49:8
49:11 152:3
152:5
202:23
205:11

**broadly** 149:6
156:23
215:4

**broken** 135:2

**brought** 89:24
139:23
188:4
254:17
254:20
255:5
256:12

**brunches**
88:15

**bullet** 216:21

**bunch** 222:15

**Burton** 161:25

**Byrd** 28:13
195:19



Exhibit 2
Page 80 of 163

Peter Glick PHD    January 10, 2024    NDT Assgn # 70900    Page 81

—————
C
—————

**calculate**
75:13

**camera** 16:19

**Canadian**
158:11

**cancer** 169:25

**caption** 7:11

**captured** 62:5
88:6 98:8

**cardiologists**
138:10

**cardiology**
138:10
138:11

**care** 87:22
184:22

**career**
60:25
101:10
190:9

**careful** 161:6
180:22

**carefully**
51:16 51:21
52:12 53:19
152:22
171:19
255:10
255:12

**Carnes** 22:5
22:18 23:9

**Carnes's**
121:24

**carries** 10:13

**carrot** 74:11

**carry** 175:5
175:6
180:11

**Carter** 192:15

**case** 7:11
9:16 9:18
10:21 15:11
18:9 20:5
20:20 20:23
21:15 21:21
22:3 23:3
23:12 25:22
27:24 27:25
28:4 28:9
28:10 28:17
28:22
29:1 29:2
29:12 29:15
29:21 29:22
29:24
30:5 30:7
30:25 32:22
33:2
34:12
35:5 35:7
35:18
38:4
40:25
41:1 43:1
44:10 49:14
51:16 51:19
51:20
52:6
52:11 52:18
53:9
55:14 59:10
59:25
60:3
60:11 60:19
61:3
61:10
62:8 63:2

66:8 67:1
67:2 67:6
68:11 68:13
68:24 69:17
81:24 86:23
87:5
89:12 89:14
89:15 93:10
99:10 99:12
99:17
100:18
100:23
100:23
102:6
107:15
117:19
117:22
117:23
118:1
119:10
119:15
119:15
128:24
132:16
132:17
134:3
134:15
139:5
139:12
139:14
139:19
140:14
141:1 142:3
144:3
145:16
145:22
146:15
146:19
147:4
148:22
156:13
156:22
157:3 157:7

164:11
166:2
166:19
168:8
168:20
168:24
168:25
169:3 169:4
174:16
174:18
177:1 177:8
178:6 178:9
178:12
178:20
179:3
179:13
179:21
180:3 180:6
180:24
181:21
183:25
185:2 188:3
189:22
189:25
190:1 190:4
198:19
198:20
199:17
201:23
202:1
202:21
203:18
206:22
207:7
207:12
207:16
207:25
209:1 209:7
217:13
219:7 220:2
220:4 229:1
229:11
229:12



Exhibit 2
Page 81 of 163

229:20
232:4
237:11
244:22
249:10
251:18
252:2
252:19
253:9 254:4
256:20
256:23
258:17
259:15
260:6 261:1
261:16
**cases** 27:23
35:8
37:22
40:6
41:16 41:18
58:20 58:22
58:24
59:4
59:15
60:7
62:11
105:11
133:24
133:25
140:15
145:23
146:13
156:19
190:24
191:10
234:3 243:4
249:2
**case-to-**
**case** 32:14
**categories**
186:4

203:10
**category**
134:6 186:1
188:15
203:5 216:2
**causality**
86:4
**cause** 65:23
**causing** 170:5
**cautioned**
84:1
**cell** 15:2
**certain**
47:5 55:9
88:10
93:3
132:5 142:5
163:7
175:19
175:20
187:7 203:5
227:22
229:13
237:21
237:25
246:11
247:25
**certainly**
23:15 39:13
65:21 65:24
141:14
153:3
162:20
197:4
197:24
240:11
240:12
**certainty**
138:20
139:2

139:25
140:11
140:16
141:2 141:4
232:4
**cetera** 75:25
**chain** 197:1
**chamber**
173:21
**chance** 20:9
20:11 23:17
121:25
195:17
**change** 21:6
25:25 31:25
38:10 76:12
104:4
**changed** 20:19
30:14
**changes** 36:25
37:2 37:8
37:9
**changing** 31:7
**characteristi**
**cs** 51:14
51:15
**characterizat**
**ion** 241:8
241:19
243:16
243:25
244:16
244:17
246:19
250:4
**characterizat**
**ions** 246:18
**characterize**

82:17
245:14
**characterizes**
242:3
**characterizin**
**g** 107:19
**charge** 244:24
**charged** 10:15
**charging**
87:20
**Charles** 7:18
**charts** 104:16
**chat** 14:19
16:2 26:5
26:7
33:10
80:5
80:11 114:5
123:21
157:23
161:19
**chatting**
36:25
**check** 15:14
24:2 121:23
122:5
148:11
148:12
195:19
224:3
261:17
**checking**
120:25
196:22
**chem** 61:12
**child** 192:18
**children**



NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 82 of 163

178:11

**Cigarroa** 7:18
9:16 9:19

**circles** 197:5

**circumstance**
66:3
85:19
175:11
226:21

**circumstances**
14:25 57:10
69:23 85:16
86:5
88:10 88:21
125:18
142:11
196:22
199:6
225:16
225:20
226:13
228:16
257:7

**citation**
231:7
231:10
231:12

**citations**
62:23 229:8
229:17
229:23
230:7
230:14
230:18
231:1
231:14

**cite** 55:20
85:8
93:16
97:3 102:24

104:21
106:3
113:25
122:19
128:14
131:20
154:4
155:24
163:22
163:23
212:22
217:25
222:1 229:1
230:19

**cited** 58:23
58:24 158:6
217:24
218:4 229:3
229:6 236:6

**citing** 209:12
234:8
234:12

**civil** 41:17

**claim** 73:8
186:7
221:22
257:21

**claimed** 67:16
189:3

**claims** 40:6
69:5
135:6
144:12
188:4
211:23
227:7 227:8
252:11
257:5 257:9

**clarify** 12:10
100:16

130:10
240:13
259:12

**clarity**
12:1 96:7

**clarity's**
37:2

**class** 239:23

**classifying**
107:17

**clause**
96:10 96:24

**clear** 11:20
24:14
34:7 39:2
60:21 85:11
85:15
95:6 95:9
98:12 111:3
125:12
130:3
137:19
139:20
161:12
172:25
177:17
178:24
183:21
185:11
187:12
188:1 189:8
189:11
190:15
208:10
210:22
211:14
212:25
219:4
227:16
231:18
245:20

247:14
248:24
250:11
250:16
250:22
251:7
252:10
254:1
261:23

**clear-cut**
142:12
198:5

**clearest**
208:24

**clearly**
102:20
117:5
144:20
172:10
190:16
229:9
240:14
246:1 246:9

**climate** 50:22
51:23 152:2
152:16
152:25
153:11

**close** 191:18

**closely**
58:4 190:10
241:7

**closer** 251:14

**clueless**
87:10

**Coast**
143:15
143:16

**coauthor**



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 83 of 163

42:13 54:14

**code** 184:16

**coded** 70:15

**coexist**
201:12

**cognizant**
78:18 142:2

**cohere**
163:5 163:5

**collaborates**
22:11

**colleague**
14:2

**colleagues**
21:23 22:16
32:7
52:20
56:9
60:22
62:1 62:7
90:18
110:20
154:25

**collectively**
9:17

**collects** 90:2

**college** 43:13

**color** 202:7
205:7

**coloring**
205:18

**column** 126:21
126:22
126:23
126:24

**comb** 23:20
217:25

**combination**
175:9
212:11

**combine**
212:24

**combined**
203:7

**combining**
179:21

**comes** 63:1
63:1
87:20 95:24
97:17
119:10
128:9
131:16
131:19
153:11
155:8
156:12
165:9
185:17
249:4

**comfort** 71:23
118:17

**comfortable**
32:21 32:25
39:15

**coming** 83:2
121:4
209:18

**command** 197:1

**comment**
130:24

**commented**
180:13

**comments**
130:15
130:16

175:12
241:21
243:7 243:8
243:9

**committed**
178:11
237:15

**common** 65:5
114:19
183:6
213:15
222:8
238:11

**commonly**
186:17
222:2 257:2

**communicate**
9:20
15:19 15:23
15:24
16:5
17:23 17:25
17:25 38:18

**communication**
17:22
18:2 19:3
131:23
162:6
171:16
172:2

**communication
s** 38:24

**communicator**
198:4

**companies**
105:5
105:15

**comparability**
80:24

**comparable**
203:17

**comparative**
155:7

**comparatively**
214:6

**compare** 63:17
128:5 245:2

**compared** 99:4
126:9 128:1
145:23
230:1 230:4
230:21
230:23
232:20
232:22
232:25
243:1
243:23
245:7

**comparing**
90:24
106:25
218:7 219:6

**comparison**
112:24
128:11
128:12
219:3 219:4
220:8 221:9
221:10

**comparisons**
80:23 86:7

**compatible**
191:20

**compete** 73:2

**competence**
215:18
260:2 260:4



NAEGELI DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 84 of 163

competent
  73:23

competition
  204:14

competitive
  73:2

competitors
  74:9

complained
  167:2
  256:16

complaining
  257:18

complains
  257:15

complaint
  60:10
  164:25
  165:7
  165:10
  165:13
  255:18

complaints
  131:22
  131:23
  134:24
  142:23
  164:12
  165:5
  165:17
  165:19
  165:23
  165:24
  166:9
  166:13
  166:18
  166:24
  174:8
  174:23
  176:9

  176:19
  253:14
  253:19
  253:20
  253:24
  254:17
  254:19
  255:6
  255:16
  256:3
  256:12
  256:17

complete 12:7
  12:24 41:11
  41:14 135:5

completely
  32:15 53:24
  97:10
  146:12
  182:3
  209:23
  239:24

completing
  197:25

completion
  198:10

complex 50:20
  52:1 93:9

complexity
  52:5

complicated
  47:23
  51:5 51:13

comply 11:16

comprehend
  224:11

comprehension
  146:8

computer 34:1

  75:9
  261:6 261:9
  261:14
  261:17

concept 64:13
  68:20
  239:23

conceptualize
  189:10

concern
  196:20

concerned
  35:19 134:7
  170:4
  171:16
  172:1 172:3
  205:20

concisely
  221:10

conclude
  110:3 110:7

concluded
  252:9
  263:14

concludes
  244:21

concluding
  246:24

conclusion
  30:1 31:1
  174:5
  199:22
  245:3 246:5

conclusions
  23:7
  207:5
  207:18
  208:8
  244:15

  247:25

condemnation
  195:2

condescending
  131:3

condition
  103:21
  103:25
  107:4
  235:11

conditions
  63:10 104:3
  128:8 129:9
  152:23
  209:22
  235:7
  235:16
  238:5

conducive
  228:14

conduct 53:14
  71:2 140:13
  174:7
  174:23
  176:13
  184:15
  184:16

conducted
  52:25 90:18
  111:9
  125:25
  125:25
  149:4
  150:20
  152:12
  153:9
  245:22
  252:1

conducting
  243:14


NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 85 of 163

conducts
175:1

conference
36:9

conferencing
8:10

confidence
91:13 91:17

confident
49:4

confidentiali
ty 59:7
62:11

confirm 16:10
33:20
158:10

confirmation
110:4 110:5

confirmed
170:7

confirming
107:11
148:3

confused
248:23

confusing
169:21
261:21

conscious
13:5

consensus
52:24 53:13
55:2
56:13 59:21
85:25 86:15
211:6
259:22
260:19

consequence
216:8

consequently
123:3

conservative
30:23 32:10
37:23 38:3

consider
19:13 25:24
30:6
52:12
95:8
131:4 131:5
168:24
169:4 175:3
177:8
177:19
177:23
179:11
180:17
180:20
181:9
181:12
182:8
182:10
182:15
183:9
183:14
183:16
184:6
184:14
184:17
185:16
199:11
255:10
255:12
256:25
259:2 259:6

considerable
145:15

considerably

42:23

considered
44:25
131:12
187:19
197:5

consistencies
139:21
171:20

consistency
32:14

consistent
21:4
29:18
30:7 32:6
59:21 86:11
95:14 113:5
113:16
115:20
139:17
163:25
168:25
169:5 169:9
171:2 171:4
173:4 173:5
173:9
173:24
173:25
175:16
176:4
176:15
187:20
188:2
190:15
198:22
199:3 200:8
200:9
201:16
202:17
202:19
213:22

213:23
240:22
244:6
244:23
245:11
245:12
246:1
246:20
249:5
249:17
250:8
250:19

consistently
27:18

constituted
149:8

constitutes
116:24

constructing
52:4

consult
201:18

contact
190:25
191:9
191:11
191:19
192:7 192:9
192:9 193:1

contacts 84:2

contain 75:12
149:7

contained
174:17
184:9

contemporary
210:8
210:15
212:2



Exhibit 2
Page 86 of 163

contend 56:8

content 25:12
180:7
230:12

contents 19:2
230:9
230:10

context
45:4 45:7
45:12 45:23
46:1
50:21 83:20
85:13
137:11
153:15
156:7
156:14
156:24
157:9
163:23
177:18
179:10
188:3
188:23
206:14
207:25
218:7 221:3
222:7
222:21
223:14
227:3 227:8
231:22

contexts
192:8
224:23

contract 65:9
65:19 99:18
101:12
173:18
184:12
196:12

contradict
58:3

contradicted
98:15

contradictory
260:14

contradicts
97:8 188:7

contrary
92:18

contrast
91:16 103:6
171:22
172:24
173:7 174:3
184:7

contrasting
173:12

contribute
130:18

contribution
191:21
191:22

control 14:22
17:11 17:13
63:21
73:9 163:9

controlled
152:22
209:24
235:15

conversationa
l 162:6

conversations
144:9

convey
93:10 118:5
118:6

221:10
224:10
227:11

conveyed
181:19
250:7

conveying
243:7 243:8

conveys 223:7
241:20

convince
190:21

convinced
141:13

copy 158:2
263:3 263:8

core 49:19
49:22
178:14
178:21
178:21
184:18
204:23
204:25

correct
9:25
10:17
14:5 18:9
18:10 19:16
21:22 23:13
27:10 28:11
28:12
29:3 29:4
29:9
29:10 29:14
34:8
34:10 44:15
48:2
58:18 66:22
79:5

79:12 79:13
79:19 79:25
80:1 87:5
90:1 91:1
91:2
95:13 95:14
95:22 98:25
100:25
114:15
115:4
115:19
117:19
123:7 124:6
125:2
125:15
125:18
126:1 126:6
126:7 144:4
148:4 149:1
149:17
149:24
150:21
154:9
156:17
156:22
158:9
158:12
158:25
159:8
159:19
164:5
164:21
164:25
165:14
176:14
177:13
185:8
186:23
189:23
193:4
201:16
225:1 225:5
225:6 225:8



Exhibit 2
Page 87 of 163

233:21
234:2
250:16
250:22
251:4 251:5
253:15
254:4
254:22
259:3

**corrected**
115:15

**correctly**
24:4
27:19 91:21
92:5
92:22 109:9
116:14
124:15
124:22
154:21
162:10
169:1 176:8
223:12
258:13
258:15
258:22

**correlate**
77:3

**correlated**
73:16 73:19
77:14 88:11
108:5

**corresponding**
229:9

**coughing**
191:7

**counsel**
7:12 7:20
21:16 24:10
25:10 36:19

38:18
39:5
39:15
41:2
43:23
44:2
144:6
216:24
225:5
262:22

**counsels**
105:9

**Counsel's**
39:6

**count** 41:24
58:7 109:21
228:20

**counted** 8:16

**counterparts**
154:13
155:14

**countries**
21:2

**country** 210:9
210:10

**couple** 18:4
28:6
28:17 28:19
31:5
35:20
41:5
42:12
46:5
61:23
77:6
87:18 87:19
119:5 122:4
126:15
142:16
149:13

151:21
157:19
227:21
249:8 256:4

**courageous**
195:1

**course**
15:13 15:21
71:13
101:10
183:18
190:5 190:6
216:5 232:2
239:22

**court** 7:19
8:5 8:21
11:9 36:9
41:15
189:20
206:6 207:9
262:22

**courtroom**
187:6
187:16

**courts**
24:22 30:16
31:2
31:18 31:19
32:11
38:7 64:9
141:16
141:22
185:22
208:5 209:1

**cover** 35:1
48:14 54:17
54:20
101:15

**covered**
91:5 91:6

106:21
106:24
112:2 120:5
127:16
164:7
229:21
230:15

**covering**
49:11

**covers**
59:17 70:9

**cower**
244:19
248:17

**coworker**
131:1

**coworkers**
137:22

**create** 204:4

**created**
110:24

**creates**
138:19

**creating**
63:20

**credibility**
63:4
64:11 67:10
67:11 67:24
67:25 68:11
68:22 68:23
116:11
134:22
135:7
135:14
135:19
181:12
182:4 182:7
211:25



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 88 of 163

credible
69:14
198:21
199:2 200:8

credit
64:18 157:4
157:14

crediting
258:20

creep
109:23
110:10

crime 10:16

criteria
55:18
179:19
197:14

criticism
127:12
127:23
127:24
128:7 128:9
128:19
129:17
129:19
130:19
131:18

criticize
57:13

cross 224:13

cross-
national
77:7

Crow 192:15

crucial 188:8
195:3

crunch
53:20 53:21

55:21 55:25
224:4

crunched
93:24

crunching
89:18 113:2
116:20

cultural 88:5
143:5
143:10

cultures 65:7
81:20

current
35:2 168:20

currently
195:22

cut-off
77:1 83:1
84:6

CV 41:9
42:5 42:9
42:10 42:12

—————

D

daily
123:17
191:14
191:19
192:7 192:8
192:25
225:22
227:7

damaging
65:10 65:15
144:11

dangled 74:11

dashboard
152:19

data 39:3
39:4 39:7
39:14 39:22
40:11 46:14
47:18
51:8
53:21
77:8
77:10 89:18
113:2 113:3
163:24
222:13
222:18
222:23
222:24
224:3 233:6
233:7
233:12
238:18

date 7:8 42:6
42:7 42:14

dated 33:21
34:8

day 13:7 17:9
78:21

daycare 16:12
17:3

days 192:14
222:24
224:2 224:6

deal 147:1
207:13

dealing
31:7
97:15
162:14

decent 142:20

decibel
133:11

decide 55:9
55:19
68:3 134:15
177:7
177:10
178:1
179:17
179:18
180:3 180:4
184:1 185:6
199:21
201:7
243:19
245:17
253:9

decided 28:24
256:20

decides
190:11

deciding 38:8
187:13

decision 53:6
68:21 69:19
70:12
119:15
130:5 139:6
139:22
170:25
180:23
196:11
199:20
202:5 210:1
229:11

decision-
makers 30:6
51:20 52:11
68:25
134:15
139:19
168:24
177:10



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 89 of 163

178:22
196:6
198:20
252:19
253:9
256:24

**decision-making**
120:1

**decisions**
68:18
69:1
97:18 97:22
112:12
113:9 117:9
139:10
173:3 173:4
179:6
196:16
197:10

**declaring**
160:19

**decrease**
50:13

**deem** 208:5
209:1

**deemed** 209:7

**deems** 202:11

**defendants**
17:24

**defense**
9:17
58:17 59:17

**defensive**
183:2

**defer** 189:3

**defies** 193:19

**define**

31:18 31:19
32:12 45:17
49:22
51:3
72:24
144:14
185:23
186:13
242:6
256:14

**defined** 28:21
52:10
90:1 189:20
206:5

**defines** 81:1

**defining**
49:20
186:11

**definitely**
20:8 30:9
46:3
51:20
65:1 65:2
122:7 122:9
122:11
146:8
169:10
193:9
244:13
245:25

**definition**
30:3
149:7
186:17
186:21
186:25
187:24
188:5 188:7
188:11
188:16
189:4

**definitions**
149:10

**definitively**
209:21
211:1

**degree**
31:12 75:23
102:14
133:12
185:8 185:9
185:10

**delete** 25:14

**delicate** 74:1

**delivered**
128:7

**demeaning**
215:18
260:3

**demeanor**
167:7 167:8

**demographic**
167:19

**demonstrate**
209:21

**demonstrated**
47:10 157:8

**demonstrating**
66:1

**demonstrative**
55:1

**denied**
99:13 103:1
213:6

**deny** 101:17
101:22
102:19
209:13
211:2 211:3

211:16
234:13

**department**
252:8

**depend** 50:21

**dependent**
96:19

**depending**
45:16
64:3
75:22 83:19
133:18
202:2
212:14

**depends** 48:12
48:13
50:7 51:3
97:25 129:5
161:1 191:3
193:4 193:9
201:22

**DEPONENT**
9:4 19:6
26:11 26:15
26:19 39:24
40:2
48:23
71:6 71:9
71:17 71:21
75:4
99:23 100:1
100:3 100:9
100:11
120:13
121:2 121:6
121:9
121:13
122:1
122:11
151:13
182:14



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 90 of 163

183:13
189:2
200:13
203:21
208:24
211:19
216:13
217:1 217:4
217:6
219:25
221:18
232:9
236:16
237:7 238:3
240:11
246:16
247:21
249:16
253:18
256:2 258:4

**deposition**
7:1 7:10
8:2 9:23
10:5
11:19 11:24
12:16 13:18
13:22
15:4
15:18 15:21
16:3
16:16 17:15
18:21 18:25
19:11 19:18
22:4 66:9
66:15 69:17
78:19 78:20
174:10
206:21
254:8
261:11
262:13
262:16

263:7 263:8
263:13

**depositions**
42:16 132:6
145:9
145:10
145:10
146:3
147:15

**descriptions**
255:8

**descriptive**
193:11
193:13
194:8
194:14

**designation**
76:5

**designed** 84:5
92:4 123:15
215:13

**desirability**
82:22 87:7

**desktop** 34:4

**despite** 94:23

**detail**
12:16 12:17
116:25
144:24
145:18
242:1
242:14
254:7

**detailed**
95:25 177:3
230:8 230:9
252:6 255:8

**detailing**
262:1

**details**
18:5
59:14
60:2 61:1
61:15
117:13
117:16
117:17
117:20
118:2 118:4
118:6 118:8
151:24
152:10
224:17
253:12

**detect**
63:18 63:24

**detector** 64:7

**determine**
51:16 62:18
89:16
140:13
152:13
153:10
178:16
199:1 200:7
201:15
238:6
246:11
246:11
247:12
255:18

**determined**
87:24

**determining**
178:20

**develop** 74:15

**devices** 15:1

**Devine** 22:12

**devised** 57:7

**diagnose**
169:7

**diagnosis**
138:6

**diagnostic**
135:4 135:5
175:15
177:4

**dictate**
180:21

**differ**
24:24 24:24
45:13
124:20
204:19

**difference**
36:4
45:18 83:15
95:4 102:21
114:22
115:2
124:14
124:20
126:17
126:21
127:5
128:10
128:23
129:1 129:8
129:8
129:15
130:12
136:5 136:6
136:16
136:16
155:7
162:18
162:22
188:8
188:22



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 91 of 163

191:25
192:24
192:25
210:7
210:21
214:19
215:7
215:10
215:23
215:25
216:5 216:7
219:12
219:14
219:16
219:16
220:16
220:19
233:13
233:20
233:24
234:2
235:14
235:14
235:17
236:5
236:12
239:18
242:7
242:16
244:4
245:10
245:10
245:18
249:17
249:20

**differences**
45:15 45:25
72:19 85:12
87:14 110:3
111:10
114:14
124:25

125:13
126:10
128:22
129:22
130:1
137:11
143:18
143:21
143:23
193:2
204:21
205:10
214:12
215:13
225:17
227:4
227:16
234:9 239:1
246:7
247:15
250:2 250:6
250:12

**different**
10:7
24:23 31:16
32:8 35:4
38:6
38:11 38:12
49:12 50:25
63:9
63:10
86:7
88:12 88:15
88:16 88:20
88:21 91:20
97:12
105:14
108:6
116:21
125:8
125:17
128:8

129:20
129:21
134:1 134:6
139:7 143:9
143:10
143:11
143:11
143:12
143:12
143:16
158:15
166:11
167:9
174:24
174:24
176:20
184:24
187:10
190:17
190:17
202:10
203:4 203:4
203:11
203:12
203:23
205:8
205:15
206:13
206:17
206:18
208:2
208:14
209:22
212:14
220:9
222:20
223:13
224:23
224:23
231:8
231:12
235:7
235:20

238:5 240:3
246:17
246:18
247:22
248:25
250:1 255:2
255:12
257:1
261:24

**differential**
94:13
102:13
119:23
209:24

**differentiall
y** 92:16

**differentiate**
44:19
100:16
100:19

**differently**
64:3 88:8
96:6
133:8
133:17
136:13
178:10
186:1 186:4
187:1
202:10
215:5 240:3

**differs**
233:10
249:3 249:3
249:5

**difficult**
86:19 102:5
107:23
137:1 137:3
139:6 206:8



Exhibit 2
Page 92 of 163

Peter Glick PHD    January 10, 2024    NDT Assgn # 70900    Page 93

248:12

**difficulty**
11:8 107:23

**dig** 145:23
146:12
177:3
248:21

**digging**
146:15
254:14

**direct**
19:10
148:24
218:15

**directing**
139:19

**direction**
76:11
173:24
244:6
246:20

**directions**
97:12

**directly**
17:23 35:11
63:3
69:12 131:9
241:14
242:9

**disagree**
38:25 48:20
49:8
75:24
76:2 76:4
248:3 250:3

**disagreed**
75:24

**disagreeing**
83:5 251:15

**disagrees**
189:12
248:2

**disaster** 76:8

**discipline**
127:13
173:19
185:1

**disclose** 82:9
120:5 123:8

**discounting**
65:22

**discretion**
28:20 30:17
190:18
190:20

**discriminate**
45:8 46:2
46:3 47:1
47:5
79:17 84:15
88:24
212:19
218:17
218:19

**discriminated**
32:22 46:17
47:4 64:1
98:1
107:4 139:3
182:19
201:10
201:12
211:2
211:13
212:21
213:9
213:11
213:17
214:21

234:20
235:12
236:3
256:17
256:21
257:16
257:22

**discriminates**
45:24
46:8 46:9

**discriminatin
g** 84:13
102:20
103:18
103:24
218:22

**discriminatio
n** 17:18
21:3 21:7
21:13 21:14
22:14 29:17
30:8 30:9
33:4 35:8
35:9
35:14 35:16
35:16
36:6 37:4
40:7 42:4
45:6
46:22 46:24
47:15 50:14
50:16 50:20
51:2
51:18
52:7 52:8
52:22 53:11
63:18
67:7 69:5
69:9
69:12 69:23
73:8
85:16 85:18

86:6
87:15 88:12
88:19 88:20
88:21
89:5
89:13 89:17
91:1
91:16 91:19
92:17 92:20
92:21
93:2 93:3
93:5 93:6
93:8
93:19 93:20
94:5
94:13 94:17
95:1
95:22 96:13
97:2
97:14 97:15
97:16
98:7 98:8
98:10 98:20
101:18
103:12
116:3 117:2
140:14
140:17
141:1 141:3
142:6 149:8
152:2
153:11
153:20
156:9
168:25
169:5
169:12
169:17
170:17
171:2 173:5
173:13
174:1
176:12



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

Exhibit 2
Page 93 of 163

177:5 179:9
179:24
180:1
180:10
180:25
181:3 181:6
182:22
183:20
184:19
185:17
185:23
186:8
186:11
186:18
186:21
186:23
187:3 187:7
187:16
187:21
187:25
188:3 188:6
188:11
188:13
188:17
188:23
188:23
189:5 189:9
191:2 191:4
191:10
191:16
191:17
191:20
193:8
193:10
193:24
193:25
195:7 195:8
195:15
195:17
196:5 197:3
197:10
197:16
199:6

199:24
200:10
200:24
201:17
210:5 211:1
212:13
212:17
212:24
213:2 213:4
213:5
218:20
218:24
220:3 244:7
245:12
246:22
250:20
257:5 257:8
257:9
258:20
259:23

**discriminator**
**y** 35:25
48:11 91:25
92:11 95:12
102:3
115:24
119:17
119:25
185:3
210:11
221:1
234:17
245:15

**discuss**
19:2
24:25 127:8
230:20
250:19

**discussed**
21:15 25:11
38:18

95:7 220:22

**discussing**
85:20 133:2
153:19

**discussion**
79:8 153:18
196:19
223:15

**disease** 115:7

**diseases**
169:8

**dislikable**
214:5
215:16
239:2

**dislike** 78:10
123:1 212:8

**dislikeabilit**
**y** 175:12

**disparities**
247:14

**disparity**
241:16
241:19
242:2 242:6
244:5 244:5
246:1 246:9
252:11

**display** 26:22
160:10
160:11

**dispositional**
172:11

**disproportion**
**ate** 162:4
162:8

**disproportion**
**ately** 154:6

**dispute**
171:15

**disputed**
248:13

**disrespecting**
244:24

**disruption**
17:13

**distinguish**
125:17

**distinguishes**
125:7

**distribution**
103:5 233:8

**district**
189:20
190:7

**distrust**
211:22

**diversity**
92:10

**diving** 122:15

**division**
41:25

**divisions**
192:10

**doctor** 24:8
58:16 59:23
142:1
169:22
169:24
170:4
253:14

**doctors**
9:15
35:17
157:10



Exhibit 2
Page 94 of 163

160:4 160:5

**document**
 14:13 14:22
 26:4 26:7
 33:9
 34:19 34:19
 34:23 74:21
 75:12
 80:4
 80:22
 81:6
 90:10 114:4
 123:19
 147:20
 147:21
 147:24
 148:15
 156:4
 157:21
 159:7
 161:19
 261:13

**documentation**
 33:2

**documented**
 64:24
 230:16
 242:5

**documents**
 34:1 66:8
 66:10 99:10
 101:5 144:3
 144:7
 144:10
 144:14
 145:3
 145:13
 145:17
 145:25
 146:15
 146:17

147:12
148:9
148:13
174:18
177:2 178:6
178:13
179:22
199:17
254:6
254:10
258:17
259:15
261:3 262:2
262:17

**dog** 16:12
 87:20
 194:16

**dog's** 17:2

**domain** 31:18

**dominance**
 74:6
 123:2 124:5
 124:11
 126:17
 203:6
 203:12

**dominant**
 123:4
 124:18
 124:19
 124:25
 125:1
 125:14
 125:14
 125:21
 125:23
 125:24
 126:5 126:5
 126:18
 126:18

**dominate**

205:3

**dominated**
 63:16

**dominative**
 78:10 205:3

**Donald** 148:5

**done** 24:21
 31:13 35:15
 44:9 48:1
 53:15 55:17
 57:1 62:6
 62:8 70:8
 104:24
 146:14
 153:9
 156:19
 172:16
 202:12
 208:6
 208:22
 224:5
 225:24
 248:21
 252:9

**door** 134:13
 192:20
 192:21
 192:22
 192:23

**double**
 104:9
 104:14
 104:18
 132:2
 173:20
 184:20
 184:25
 185:24
 186:25
 188:13
 196:20

196:23
201:13
214:12

**double-**
 **check** 42:20

**doubt** 147:3
 147:25
 190:20

**download**
 14:21 33:17

**downloaded**
 34:4

**Dr** 7:11
 7:18 7:18
 8:1 8:23
 9:1 9:12
 9:18 9:19
 11:21 11:21
 17:14 17:21
 17:23
 19:2 21:9
 21:16 21:20
 22:5
 22:18
 23:9 24:9
 24:10
 26:6 27:3
 27:21 29:15
 29:16
 31:6
 32:19 32:22
 33:16
 34:7
 34:23
 35:3
 36:24
 39:8
 39:22
 41:1
 44:18 48:15
 50:18



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 95 of 163

| | | | |
|---|---|---|---|
| 53:1 55:6 | 125:10 | 177:6 179:6 | 240:23 |
| 58:25 59:24 | 126:12 | 180:13 | 241:8 |
| 60:1 60:3 | 130:8 131:2 | 181:9 | 241:20 |
| 61:3 66:9 | 132:3 | 181:14 | 242:2 |
| 67:4 | 132:22 | 181:16 | 242:16 |
| 67:11 67:14 | 134:16 | 181:19 | 242:24 |
| 67:17 67:25 | 137:21 | 181:24 | 242:25 |
| 68:6 68:9 | 137:21 | 182:1 182:3 | 243:3 243:5 |
| 69:14 | 138:7 | 182:6 182:8 | 243:6 |
| 71:8 72:6 | 138:10 | 182:17 | 243:13 |
| 74:15 | 139:23 | 182:18 | 243:16 |
| 75:6 | 142:15 | 183:7 | 243:20 |
| 76:16 78:12 | 142:18 | 183:16 | 243:21 |
| 78:14 80:10 | 142:23 | 183:23 | 243:24 |
| 81:7 82:8 | 143:5 144:2 | 184:1 | 244:9 |
| 84:16 | 144:6 | 184:14 | 244:16 |
| 85:7 | 148:19 | 184:15 | 244:17 |
| 88:22 89:24 | 150:12 | 185:4 | 244:25 |
| 90:17 92:12 | 150:18 | 188:18 | 245:1 245:3 |
| 95:5 96:9 | 151:4 | 190:25 | 245:6 |
| 96:21 | 151:20 | 193:3 195:5 | 245:21 |
| 97:3 | 154:11 | 196:3 | 246:6 |
| 98:12 99:12 | 154:17 | 196:11 | 246:19 |
| 99:13 99:20 | 154:18 | 196:13 | 247:4 247:9 |
| 99:25 100:1 | 154:19 | 196:24 | 247:23 |
| 100:7 100:8 | 154:25 | 197:19 | 248:6 |
| 100:14 | 155:12 | 199:25 | 248:10 |
| 100:24 | 156:5 | 201:7 | 248:24 |
| 101:13 | 156:15 | 202:15 | 249:8 |
| 104:20 | 157:4 | 205:14 | 249:18 |
| 106:20 | 157:12 | 206:25 | 250:6 252:9 |
| 107:5 | 158:2 | 208:23 | 252:10 |
| 108:14 | 161:25 | 209:10 | 252:16 |
| 110:11 | 163:22 | 213:9 214:3 | 252:23 |
| 112:2 | 168:13 | 216:21 | 253:11 |
| 113:10 | 169:19 | 217:13 | 254:17 |
| 117:12 | 170:12 | 218:16 | 255:9 |
| 120:2 | 171:5 172:8 | 219:20 | 255:16 |
| 120:25 | 172:25 | 220:11 | 256:11 |
| 121:11 | 174:6 174:7 | 224:24 | 256:13 |
| 121:22 | 174:25 | 226:23 | 256:16 |
| 121:24 | 175:17 | 227:20 | 257:23 |
| 123:25 | 176:7 176:9 | 232:17 | 257:25 |



Exhibit 2
Page 96 of 163

258:19
260:3 260:5
261:23

**draft** 23:12
25:17 34:11
34:15 58:20
58:21 61:24
261:24
262:8

**drafted** 18:14
20:4 23:2
23:9
23:15 33:21
34:25 37:14
37:16 59:23
60:1

**drafting**
18:11 23:10

**drag** 34:18
74:21

**draw** 31:1

**drawn** 27:17

**draws** 247:24

**drop** 80:5

**drug** 115:6

**due** 134:16
188:19

**duly** 9:8

**during**
11:18 11:18
15:13 15:20
15:22
16:3 24:7
164:6
192:14
248:12
261:10
261:11

---
E

**earlier**
9:14
37:11
55:7 72:6
89:24
107:22
107:22
153:18
156:16
166:14
185:11
189:18
190:14
205:14
217:24
218:1 230:6
233:22
234:10
254:12
260:24

**early** 229:17

**earned** 44:15

**easily**
41:24
185:15

**East** 143:15

**easy** 24:4

**echo** 173:21

**economic**
77:17

**edit** 261:19

**educate** 53:10
239:19

**educating**
53:3

**effect**
53:16 55:23

56:4 58:8
58:9
58:12 58:13
58:14 61:16
63:25
64:2 90:5
93:19 94:10
94:11
103:15
107:1
114:24
114:25
115:8 115:9
119:17
124:11
125:4 125:6
125:8
125:21
125:22
126:22
126:23
129:6 129:7
129:10
136:12
160:21
161:7
191:12
236:21
236:22
238:6
260:17

**effects**
93:6 93:7
97:16
98:4 98:6
111:1 125:4
137:12
137:16
159:3 161:1
161:4 161:7
161:9
231:21

234:4 234:6
234:9
238:20

**effort** 209:13
234:12

**egalitarian**
210:10

**egocentric**
65:2

**egregious**
162:14
174:3
175:18
176:5 201:8

**egregiously**
184:10

**eight-**
minute
216:10

**either**
26:12
70:7
77:23 89:11
98:17 115:8
125:1
125:15
132:11
159:18
175:16
176:15

**electronic**
15:1

**electrophysio**
logists
47:14

**elements**
186:7 186:8
186:22
187:24



Exhibit 2
Page 97 of 163

elicit
  57:14 127:8
  175:12
elicits 57:22
eliminate
  53:25
Ellis 15:22
  44:2 44:7
else 17:19
  69:15
  202:13
  224:3
  235:15
  253:4
  261:21
e-mail 16:2
  18:3 24:3
  24:5 131:11
  132:13
  132:15
  134:3 134:8
  134:11
  251:3
  251:18
  251:21
  251:22
  253:8
e-mails 17:20
  251:20
emergency
  15:12
emerges
  214:13
Emily 43:23
emotional
  230:2
  230:13
  230:21
  231:6

232:20
232:25
emotionality
  230:6
  231:11
  233:5
  233:10
  233:11
empirical
  98:22
empirically
  87:23 88:11
employees
  105:20
  106:8 106:9
  108:17
  110:15
  110:21
  111:19
  112:6
employers
  104:22
  104:23
  104:25
employment
  43:8 65:9
  176:10
enable 70:2
enabling
  74:14
encyclopedia
  216:3
encyclopedic
  66:13 66:14
  114:16
endorse 72:18
  78:2 79:5
  79:23 79:24

endorsement
  78:3
endorsing
  76:23
engage
  50:14
  71:1 89:5
  212:3 239:9
engaged 51:17
  234:17
  237:10
  237:12
engages 51:1
engaging
  212:5
  239:15
ensure
  207:1
  208:16
  208:17
entered 44:2
entire
  25:17
  61:4
  254:3 254:9
entirely
  13:24
entitled
  79:10
  208:20
  262:18
entree 87:14
epitome 94:12
equal 218:21
equally
  78:5 159:17
equations

92:8
equity 196:7
era 192:15
error 53:25
  199:15
especially
  31:14 35:16
  52:21
  65:7
  82:24 83:19
  195:11
  207:9 241:5
essentially
  27:5 29:5
  59:16
  90:2
  90:23
  227:24
  245:6
  247:13
established
  50:9
  88:17
  113:24
  142:17
  166:14
  185:5
  187:23
  206:17
  225:11
establishes
  226:1
establishing
  156:10
estimate 90:5
  108:7 108:9
  109:15
  130:13
  135:17



Exhibit 2
Page 98 of 163

237:14

**estimates**
123:13

**et** 75:25
108:20
113:7

**evaluate**
24:14 63:14
64:2 131:9

**evaluated**
98:2 102:21
102:22
196:18
257:14

**evaluating**
67:1
68:25
103:21
109:20
197:19
198:6 216:6
257:12

**evaluation**
92:2
92:12 93:13
95:13
102:14
117:7 130:5
198:14
235:17
235:22
235:25

**evaluations**
70:19 70:20
93:17 93:18
93:21 93:23
94:2 94:9
94:11
95:3
95:16 95:25

97:22
112:11
112:16
113:9 116:4
119:22
119:24
137:15
197:8
197:14

**even-handed**
56:20

**event**
173:23
248:6

**events** 167:21
177:3

**eventually**
29:7

**everybody**
26:17 45:24
46:7 46:9
46:16 57:25
104:16
111:8 121:7
130:2
182:21
216:9
227:15
244:19
248:16

**everybody's**
46:25 57:23
133:15
140:9

**everyday**
135:18

**everything**
17:3
63:21
235:15

**everywhere**
48:18

**evidence** 48:6
51:21 51:22
51:25
54:2 54:3
54:5 54:8
54:25
55:4 56:7
56:24 58:15
60:6 61:7
61:20
66:4 66:6
67:1 67:2
67:5 69:4
69:10 69:11
70:16
77:4
97:12 99:24
118:7 135:5
141:13
144:18
152:5 174:7
174:17
181:23
199:21
200:23
213:7
219:23
224:22
228:21
243:13
246:15
247:20
249:15
250:21
251:11
256:25
257:24
258:18
259:3 259:6
259:7

259:15
259:18
259:19
260:8
260:10
260:12
260:15
260:21

**evident**
199:17
243:18
245:19
246:8
249:22

**exacerbate**
191:9
193:10
195:6

**exacerbated**
204:13

**exact** 48:19
83:17
135:17
198:13
218:11
228:20
233:1

**exactly** 22:22
34:14 41:24
70:1
89:25 95:23
103:17
106:22
115:22
116:23
116:25
120:25
131:15
132:8 135:9
150:14
166:7



Exhibit 2
Page 99 of 163

179:19
220:12
228:2 229:4
233:9
237:10
251:13
262:4

**exaggerate**
67:21

**exaggerated**
243:21

**exaggeratedly**
240:22

**EXAMINATION**
9:10

**examine** 49:16
58:3 162:24
167:19
167:22
201:2 201:2

**examined**
9:9
104:21
105:7
111:18
158:14

**examines**
112:5

**example**
10:8
10:19 12:14
15:2 17:7
45:4 47:2
53:25
55:5
56:25 58:25
59:9
77:20 84:18
87:6
87:16 89:12

91:6 127:11
129:16
131:1 132:5
133:1 135:8
142:17
143:14
152:1
152:10
166:3 170:1
171:3 177:9
181:9
192:12
194:7
194:16
194:22
198:19
202:18
220:16
223:20
236:25
237:19
237:20
239:1 245:2
250:12

**examples** 73:5
139:16
225:13

**exceed** 50:10

**exceeding**
43:13

**exception**
194:13
236:18

**exchanged**
146:21

**excised**
207:16

**exclude** 27:19

**excluded**
27:23 27:24

28:1 28:9
28:17
29:6 29:8
183:5
190:22
202:1 202:4
205:21
205:24
206:19
206:22
207:2
208:17

**excluding**
238:14

**exclusion**
29:20
205:23
207:14
210:16

**exclusively**
45:2

**excuse**
82:15 88:23
155:18
202:16
208:16

**exhibit** 14:18
26:4 26:8
27:4
33:10 33:13
34:19 34:20
37:20 43:16
74:23 74:24
75:2 80:4
80:7
80:12 90:10
90:12 114:5
114:6 123:2
123:20
123:22
157:22

157:24
161:20
161:22

**exhibited**
163:1

**exhibiting**
237:4

**exhibits** 14:3
145:7 145:7
174:11
176:13

**exist** 32:20
51:23
70:1
193:1
204:18

**existed**
175:22

**existence**
156:24
157:9

**exists** 236:24

**expanded** 36:5

**expect** 96:6
98:11 117:1
175:14
176:24
193:13
245:13
246:21
249:6 259:1

**expected**
160:3

**expensive**
105:2

**experience**
27:9 31:12



Exhibit 2
Page 100 of 163

41:6
47:12
64:8 70:4
133:15
141:15
141:21
185:19
185:21

**experienced**
27:14 27:16
141:8
149:24

**experiences**
21:12 21:13
152:20

**experiencing**
21:3
150:1 150:2

**experiment**
89:7 108:21
128:6
220:23
235:6

**experimental**
63:17
86:3
89:20
110:23
137:12
161:4
209:23
219:5 220:7
227:4

**experiments**
63:23
102:19
105:13
210:20

**expert** 27:4
27:5 27:9

27:14 27:17
29:25 29:25
30:19
31:4
31:13
32:9 41:6
41:8
41:17
42:3
42:22 42:25
43:15
47:9
47:12
57:8 58:6
58:17 118:7
138:16
141:1 141:8
142:4 142:4
143:20
179:1 179:2
179:23
180:24
181:6
182:23
183:5
185:20
199:5 200:5
201:22
209:3
239:19
249:12
259:10
260:7

**expertise**
60:12
143:22
178:23
179:15
179:20
208:5
247:17
249:4

249:19
250:9

**experts**
53:3
64:10
140:10
140:15
141:17
189:4
190:16
201:19

**explain** 44:18
54:23 79:10
114:20
129:24
137:6
209:17
239:13

**explained**
63:1
97:13
98:3 107:22
129:25
136:25
144:13
153:13
156:16
233:24

**explaining**
118:9

**explanation**
84:17
125:11
170:12
173:6
175:17
176:5 176:6
208:21
210:19
251:6

**explanations**

130:4 139:8
170:11
174:4
176:16

**explicit**
72:25
78:3 79:5
82:20
83:8
124:5
128:12

**explicitly**
39:4
171:9
184:12
204:14

**exposed**
32:8 48:7

**express** 141:5

**expressed**
24:12
138:25

**expressions**
230:3
230:22
232:21

**extended**
190:25
191:9

**extent**
12:13
17:5
17:10 17:12
55:12
59:1
59:17 73:18
97:9 133:19
172:17
175:8
204:24



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 101 of 163

207:17

**external**
64:19

**extreme** 107:6
108:1
162:20
173:23
238:12
238:17

**extremely**
103:9
103:22

**eyewitnesses**
181:18
243:24
244:3 249:1

---

F

**face** 47:14
122:17
123:10

**faced** 176:11

**fact** 45:14
72:15
77:7 78:6
82:14 112:7
113:24
118:1 139:8
154:15
154:24
194:5
194:19
213:3
219:23
244:22
246:15
247:20
249:14
257:3

**factor** 193:7

**factors** 50:23
50:25 64:19
176:21
204:13
204:15
228:9

**facts** 19:12
30:7
30:25
39:3
39:14 99:24
117:18
117:25
119:10
139:14
168:25
169:5 179:3
180:25
181:21
187:20
188:2
202:17
203:17
213:19
229:1
255:12

**faculty** 149:3

**failures**
64:19

**fair** 9:22
11:13
12:7 12:8
12:9
12:12 12:25
25:9
25:13
26:2
27:21 29:11
34:13
37:6
37:17 37:18

38:13
39:5
39:13 39:23
40:1
42:17 43:16
46:10
48:4
49:16 52:23
60:4
64:16
78:2
80:18
81:2
84:16
90:7 90:8
99:9 103:10
103:14
116:16
117:12
123:5 138:8
142:22
147:11
148:23
151:23
153:6
157:11
162:12
166:16
197:11
197:12
215:8

**fairly** 56:6
56:15
73:7 81:2
259:22

**falls** 183:3

**false** 62:20

**familiar** 14:2
27:6
64:13 64:23
80:13 80:18

90:19 90:21
111:13
154:23
158:3
158:21

**fashion**
225:18

**fashioned**
210:8

**fatally** 57:18

**fault** 213:14

**favor**
147:21
147:24

**favorable**
60:3 61:2
61:4 102:14
257:25
258:19
259:18
259:20
260:9
260:10

**favoring**
56:20 56:22

**favoritism**
204:5 204:8

**feasible**
140:12

**feature** 49:21

**features**
50:12

**federal** 41:15
189:20
190:7 207:9

**fee** 263:7

**feedback**



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 102 of 163

25:25

**feel** 15:14
  32:4
  32:21 38:13
  47:12
  49:4
  60:12
  146:14
  177:20
  205:22
  205:23
  206:20
  206:24
  213:13
  229:21
  247:11

**feeling**
  133:19

**feelings**
  133:20
  181:16

**fellow** 110:21

**felt** 38:5
  98:14 229:6
  230:15

**female** 21:2
  37:5
  63:15
  64:4
  70:25
  103:22
  108:17
  108:23
  109:2
  111:19
  112:6
  153:21
  154:8 155:5
  155:17
  155:19
  157:10

157:10
157:17
158:11
159:10
159:18
159:25
160:3 160:8
160:10
162:4
162:25
164:5
164:20
164:24
166:8
166:13
166:16
166:23
167:1
173:16
175:11
194:3
214:14
217:19
217:20
218:9 219:6
220:17
220:18
220:19
220:21
235:9

**female-
dominated**
  96:5

**females**
  115:16

**fewer** 77:16
  154:12
  155:13
  164:22

**fibromyalgia**
  135:3

**field** 21:8
  35:11 44:19
  44:20 44:23
  49:20 52:24
  59:21 60:23
  61:7
  62:25
  108:21
  111:11
  111:17
  115:18
  126:1 126:4
  126:8
  186:12
  186:22
  199:5
  201:19

**fields** 45:10

**figure** 24:5
  46:23
  56:3 81:6
  81:19
  119:16
  146:9
  165:15
  178:7
  204:23
  218:2
  220:11
  222:11
  233:9
  244:11

**figures** 80:25
  81:5
  84:21
  135:22
  135:25

**file** 146:19
  148:14
  167:25
  168:13

168:14

**filed**
  167:21
  168:6

**files** 105:7
  167:23
  168:9
  261:17

**final** 17:4
  122:8
  167:17

**finalize**
  35:22

**finalizing**
  77:9

**finally** 84:13
  160:7

**financially**
  65:14

**finder** 118:1

**finding**
  112:20
  120:5
  160:23
  160:23
  161:9 218:8
  218:23
  221:20
  226:16
  227:14
  228:5
  228:12
  228:15
  228:17
  228:19

**findings** 53:4
  53:5
  60:23 61:3



Exhibit 2
Page 103 of 163

85:25
90:4 117:15
161:14
205:12
218:21
223:8
223:21
223:23
223:25
224:22
240:17

**fine** 12:22
30:5
57:22 57:23
57:25 100:3
121:12
182:10
182:14
183:8
194:13
202:13
250:4

**fine-tooth**
23:20

**fingertips**
151:7

**finish** 195:12

**finished** 77:9

**fire** 173:18

**fired**
184:24
213:13

**first** 9:8
9:23
13:15 13:21
19:21 46:12
72:17 80:15
82:20 90:24
128:3
138:15

153:1
195:12
246:4
251:25
252:20
254:18
257:6 258:2

**Fiske** 74:18
75:11 98:18
99:25

**fit** 28:24
55:2 55:3

**fits** 188:16

**fitting** 76:24

**five** 71:23
85:23
168:18
198:24
225:13
225:14
228:9

**five-minute**
118:24

**flip** 14:9
14:11 77:22
154:16
154:16
230:7
230:10

**flowers** 74:1

**focus** 45:2
59:13 67:14
67:14 179:4
180:9
181:22
229:19
251:8 253:2
254:2

**focused**

69:4
78:22
99:4 99:5
104:10
111:17
172:6
174:16
174:17
181:7
181:14
223:2
243:11

**focusing**
110:11
179:5
203:15
261:25

**follow-up**
18:4 31:5

**foolish** 87:10

**footnote**
110:12
128:14
156:1 156:2

**footnotes**
105:25
106:1 106:6
108:11
231:13

**forgot** 122:1

**form** 72:25
93:1 98:8
182:24
203:3
215:17
219:23
261:14

**formal**
70:22
95:1 185:22

197:8 242:4
243:14
245:22
252:1
252:24

**formally**
149:21
244:20
253:20

**forms** 94:4
199:7
212:14
259:23
259:24

**forth** 111:7

**fourth** 160:7

**fragile** 73:24
74:1

**frame** 173:15

**framework**
24:21 24:23
28:21 29:25
31:3
51:24
52:5 53:3
64:10 64:10
107:18
138:16
138:19
139:16
140:10
140:25
141:8
198:23
201:3
207:10
208:8 209:3
232:5

**free** 15:14
247:11



Exhibit 2
Page 104 of 163

**frequency**
89:2 101:14
102:11
107:22
107:24
108:3 108:7
109:14
109:15
123:9
123:13
123:16
127:17
127:20
137:1 137:3
162:25
209:19
225:21
226:10
226:25
227:7 236:2
237:1
237:13
**frequent** 43:7
105:12
**frequently**
43:9
70:20
89:6 89:8
89:11
107:25
231:25
**friends**
192:18
**front** 14:6
34:6
34:24 255:7
**frustrated**
32:5
**frustrating**
30:19

31:6 31:9
**fulfill**
32:2 197:13
**full** 12:7
12:24
146:19
146:20
147:2 233:8
248:3
**fully** 28:9
222:24

_____

G
**gain** 73:9
**game** 173:22
190:23
204:11
**gaming**
87:11
238:16
238:16
**gender**
29:17
48:6
48:16 49:14
50:14 54:13
69:20 70:12
70:16 72:19
72:20 77:15
80:17
86:7 111:10
125:21
134:17
142:24
156:24
167:12
175:4 175:4
175:6 185:1
191:17
192:12

210:4
210:20
211:8
235:14
235:20
235:22
235:24
254:24
**general** 24:25
29:13 35:25
49:3 55:2
55:3 59:8
64:2
85:13 85:24
86:14 118:6
119:13
119:17
135:20
137:16
138:19
144:25
156:7 157:8
169:17
170:10
179:8
179:10
203:2 203:5
203:10
203:25
204:15
207:10
208:7
231:22
239:8
257:19
259:5
**generalizabil
ity** 205:6
205:11
**generalizatio
n** 71:10

**generally**
47:20 58:13
60:8 62:4
65:12 73:11
78:9
90:19 90:21
110:22
134:17
134:21
135:12
136:24
137:7 137:9
139:1 142:7
146:5
146:11
168:3 168:9
168:12
181:14
207:8
220:14
221:13
222:3
226:24
231:19
240:7
**generated**
42:21
146:23
162:22
**geographical**
143:6
143:17
**geography**
143:6
**Gertner** 29:22
37:15
189:21
**gestures**
143:12
**gets** 36:10
76:17 77:23



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 105 of 163

194:1

**getting**
13:6 79:2
86:20
105:14
164:9 176:8
186:15
202:24
242:24
248:7 263:6

**giant** 148:15

**given** 39:5
42:1
43:15 47:11
47:25 50:23
51:12 51:13
52:9 53:7
85:7 102:13
117:12
117:18
129:22
130:15
135:7
141:21
141:24
149:11
157:14
181:21
262:17

**gives**
199:23
253:6

**giving**
86:14
136:20
136:21
202:20
224:17
229:18
247:16
249:11

249:12

**glanced** 20:15

**Glick** 7:2
7:11 8:23
9:1 9:8
9:12
11:21 17:14
19:2 21:9
27:3
27:21 29:15
31:6
32:19 33:16
34:7
34:23
35:3
36:24 39:22
44:18 48:15
50:18
53:1 55:6
68:9 72:6
74:15
75:6
76:16 78:12
78:14 80:10
81:7 82:8
84:16
85:7
88:22 89:24
90:17 92:12
95:5 96:9
96:21
97:3
98:12 100:1
100:7 100:8
100:14
101:13
104:20
106:20
107:5
108:14
110:11
113:10

117:12
120:2 121:1
121:11
121:22
123:25
125:10
126:12
130:8 132:3
134:16
137:21
139:23
142:15
143:5 144:2
150:18
151:20
156:16
158:2
161:25
163:22
168:13
169:19
172:25
174:6 176:7
177:6
180:13
182:3 183:7
183:23
184:14
185:4
188:18
190:25
193:3 195:5
196:3
199:25
202:15
205:14
206:25
208:23
208:23
209:10
214:3
216:21
219:20

220:11
224:24
226:23
227:20
232:17
242:24
245:1 246:6
247:9 249:8
252:16
253:11
256:11
257:23
260:5
261:23
263:13

**Glick's** 8:2
39:8

**glitch** 154:2

**Glitz** 26:6

**global**
21:11 21:11
143:23
143:23
203:14
205:1
236:16

**glowing**
154:20

**goal** 74:5

**goalposts**
30:20
32:3
32:20
33:6 206:9

**gone** 41:7
250:21

**gossip** 252:24

**gotten** 42:8
194:25



Exhibit 2
Page 106 of 163

grad 22:15

grandfathered
  38:5

graphs 223:11

great 17:3
  57:3
  57:16 63:24
  86:4 113:19
  120:17
  133:21

greater 80:24
  117:4 117:5
  124:12
  218:9
  219:21

ground 10:2

grounds 71:7

group 71:10
  71:11
  111:10
  204:7
  204:16
  204:17
  204:17

groups
  49:12 72:14
  191:13
  204:4 204:9
  204:18

guardrails
  25:6 25:8
  28:21 28:25
  29:19 29:21
  29:21
  30:3
  31:21 32:20
  37:12
  95:2
  142:2 202:8

205:18
209:4

guess 43:7
  98:23
  117:21
  120:3
  136:23
  142:11
  143:20
  143:25
  164:11
  165:11
  182:16
  184:10
  221:8
  249:10

guessing
  164:13

guesstimate
  136:10

guidelines
  32:7

gun 147:19
  147:20
  147:23

guys 20:13
  197:14

guy's 194:19

——————————
        H
——————————
half 98:23
  242:12

hand 8:24
  14:11
  54:7
  55:14 61:22
  143:12

handed 27:3

handle

24:20 24:23
31:4

hang 210:18

happen
  37:22
  56:3 56:4
  65:25 206:2
  211:9
  213:12
  243:19

happened
  35:20 67:19
  67:20 67:21
  68:2 131:15
  132:18
  134:2 172:7
  172:13
  177:2
  206:23
  213:20
  232:5 232:6
  241:9
  242:18
  243:11
  243:18
  253:3 253:4

happens 63:10
  103:20
  206:24
  210:23
  214:16
  214:19
  215:3

happy 20:17
  31:21 148:2
  241:25

harassment
  149:8
  149:24
  149:25
  150:1 150:2

150:12
153:12

hard 11:15

hardworking
  57:20 57:22
  57:23

harping
  185:13
  200:1

harsh
  103:22
  162:14

harsher
  103:19

Harvard 190:7

hash 200:2

hate 51:6
  194:5

haven't
  32:2
  41:23 42:15
  66:11
  114:17
  153:9 190:9
  261:6

having 9:8
  14:1
  17:22 84:25
  104:11
  111:23
  116:20
  149:24
  169:22
  185:12
  185:19
  196:7 208:5
  209:4
  219:17
  238:20



Exhibit 2
Page 107 of 163

head 49:2
73:22
217:23
218:11

headache
169:23

headaches
170:6

heading
255:17

heads 11:11

Health 7:17

hear 132:19
185:13
221:14

heard 141:9
242:3

hearsay
252:24

heat 11:18

heavy
145:17
254:6

Hebl 108:19

he'd 147:24

Heilman
110:16

held 138:10
186:17

he'll 36:11

help 52:6
53:5
60:16 68:15
100:16
159:18
196:8 197:5
197:15

232:5
240:13

helpful 82:13
201:4

Henderson's
247:23

Hendrickson
68:6

Hendrickson's
250:7

Henrikson
7:18 9:15
9:19 181:20
241:20
242:2
242:16
242:25
243:3 243:6
243:16
243:20
244:9 245:7
245:21
247:4 248:6
248:16
249:18
252:10

Henrikson's
241:8
243:25
244:16
244:17
245:4
246:19
248:25

here's 68:2
68:4 87:6
89:12 89:12
170:18
199:4
206:23

213:10
249:4
256:22

herself 175:1

he's 79:10
87:24 87:25
88:1 194:19
194:20
194:25
195:1
208:20
208:22
241:11
248:7

hesitant
149:20

heterogeneity
125:6

heterosexual
87:19

Hey 12:19
212:7
213:18
227:13

hidden 116:2

high 88:7
89:21 113:1
125:5

higher 77:2
77:13 77:13
84:11
85:5 94:2
111:23
112:8
196:15
224:6

high-handed
67:17

highlight

27:13
55:9
55:10 55:19
59:17 59:18
59:20

highlighted
80:22 91:12
91:24
92:5 115:14
116:7 120:4
124:9
124:17
126:16
165:21
167:18

highlighting
54:5 159:5

highly
27:14 27:16
191:13
210:9

high-
quality
113:20

high-status
78:11
175:10
246:22

hire 25:4
89:21
112:22

hired 23:12
24:14 41:18
59:16 60:13
60:14 93:12
97:17 101:7
101:9
259:19
260:9

hiring 93:5


NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 108 of 163

93:6
93:11 95:16
96:20 97:15
97:15
99:4 100:18
100:24
112:10

**history**
191:18
191:19

**hit** 14:21
26:13 33:10

**hold** 48:3
48:18 48:19
49:9 72:8
72:12 82:16
83:11
137:22
142:18
142:19
185:7
185:10
262:12
262:16

**holding** 88:22
196:6

**Holling**
242:19
244:23
248:9
248:13
251:1

**home** 43:20

**hone** 199:9
200:19

**hope** 165:3
219:3

**hormonal**
170:2

**horrible**
194:20

**hospital**
29:23
158:11
164:6 167:4

**hospitals**
174:8

**hostile** 72:18
72:24 72:25
73:17
74:8
74:16 76:15
76:17 77:13
77:24
78:8 81:8
81:17 81:25
82:17 88:23
89:20
91:7 91:7
92:16 92:20
94:20 94:24
97:1 98:5
98:6
98:11 134:4
204:6

**hostility**
225:12
228:8

**hours** 8:17
145:15
195:20
239:22

**house** 16:9
16:12 16:24
17:9

**How's** 214:2

**HR** 67:15
131:11
133:25

144:20
145:19
172:5 197:4
241:6 241:7
241:10
242:21
243:12
244:3 252:1
252:8
252:21
252:22
258:6

**huge** 237:24

**huh** 140:6

**huh-uh** 11:12

**human** 87:21
88:1

**Humans** 205:24

**hundreds**
55:22 63:7

**husband** 87:25

**hypothesis**
116:17
124:13

**hypothetical**
169:20

----

**I**

**i.e** 72:21

**IAT** 92:9
95:10

**I'd** 17:21
38:5
38:12 38:14
38:14 39:16
49:13 54:19
69:24 95:23
116:21
126:20

171:10
180:7
206:18
217:25
222:5
230:15
230:15
241:25
256:5 256:6
261:17

**idea** 38:19
39:7 39:8
40:14
74:6
86:22
150:13
169:6

**identical**
63:13 63:19

**identificatio
n** 26:9
33:14 34:21
75:3 80:8
90:13 114:7
123:23
157:25
161:23

**identify**
14:13 144:7

**ideology**
45:19 88:6

**idle** 35:6

**ignoring**
162:9

**I'll** 9:19
11:21 11:25
12:23
14:3
14:12 14:17
15:5 15:5



Exhibit 2
Page 109 of 163

| | | | |
|---|---|---|---|
| 18:19 18:19 | 33:11 33:11 | 90:9 91:3 | 136:20 |
| 33:10 33:19 | 33:17 33:22 | 91:11 | 137:10 |
| 40:23 | 33:25 34:18 | 92:7 | 137:18 |
| 47:2 55:4 | 35:19 | 92:14 95:15 | 137:24 |
| 56:24 | 36:7 | 96:21 98:12 | 138:22 |
| 59:8 59:9 | 38:21 38:21 | 98:25 99:14 | 139:18 |
| 66:7 80:4 | 39:9 | 100:2 | 140:9 |
| 91:11 | 39:15 40:10 | 100:14 | 140:18 |
| 115:13 | 40:16 | 100:21 | 141:25 |
| 116:6 116:7 | 43:7 43:9 | 105:11 | 143:20 |
| 118:22 | 43:22 48:21 | 105:17 | 144:12 |
| 125:20 | 49:1 49:1 | 107:10 | 147:24 |
| 140:2 | 49:7 | 107:16 | 148:3 |
| 154:23 | 49:11 | 107:16 | 148:16 |
| 157:23 | 51:4 52:3 | 107:18 | 150:4 151:2 |
| 162:3 165:3 | 58:6 59:4 | 107:19 | 153:25 |
| 165:16 | 59:5 59:7 | 107:24 | 154:3 |
| 177:8 | 59:7 | 108:13 | 154:23 |
| 192:11 | 59:23 | 108:13 | 155:19 |
| 198:19 | 60:8 | 110:16 | 156:9 |
| **illustrate** | 60:13 62:14 | 110:18 | 156:12 |
| 55:16 | 62:15 62:22 | 111:13 | 156:13 |
| **illustrated** | 63:3 | 112:9 114:4 | 156:17 |
| 80:25 | 66:12 66:13 | 115:12 | 157:6 157:7 |
| **illustrative** | 66:16 66:17 | 116:6 | 157:15 |
| 54:25 | 66:21 | 117:20 | 159:4 |
| | 67:9 | 118:14 | 159:14 |
| **I'm** 7:23 10:1 | 67:24 67:25 | 119:2 | 160:13 |
| 12:5 15:7 | 68:1 71:3 | 120:18 | 161:19 |
| 16:11 | 71:4 71:5 | 122:23 | 162:3 164:8 |
| 18:7 19:1 | 74:20 | 122:23 | 164:13 |
| 19:9 | 75:6 75:8 | 123:19 | 168:4 168:4 |
| 19:23 | 77:24 78:16 | 123:21 | 168:12 |
| 22:3 | 78:17 | 124:8 124:8 | 169:6 |
| 22:24 22:24 | 79:1 80:3 | 124:9 | 169:10 |
| 23:21 | 80:12 | 125:10 | 169:10 |
| 24:3 | 81:4 | 125:19 | 169:22 |
| 25:24 31:11 | 81:19 | 126:11 | 170:8 170:8 |
| 31:11 31:20 | 82:5 82:6 | 128:12 | 170:19 |
| 31:20 31:21 | 83:12 85:24 | 133:4 | 170:20 |
| 32:5 32:5 | 86:14 | 133:14 | 173:7 |
| 33:9 | 87:3 87:13 | 134:11 | 173:11 |
| | | 136:19 | 174:20 |



Exhibit 2
Page 110 of 163

| | | | |
|---|---|---|---|
| 175:15 | 208:25 | 245:18 | **implicitly** |
| 176:8 | 209:3 209:4 | 246:17 | 171:9 184:8 |
| 177:15 | 209:20 | 246:24 | **imply** |
| 177:15 | 210:25 | 246:25 | 138:18 |
| 178:23 | 212:1 | 247:5 248:2 | 181:25 |
| 179:5 | 212:25 | 248:22 | 226:2 |
| 179:12 | 217:1 217:1 | 248:22 | 240:17 |
| 179:16 | 217:2 217:5 | 249:10 | 240:18 |
| 179:20 | 217:15 | 249:16 | **implying** |
| 180:14 | 217:15 | 250:2 250:6 | 69:13 |
| 180:15 | 217:15 | 252:16 | 159:14 |
| 180:22 | 217:16 | 252:22 | **importance** |
| 181:12 | 217:16 | 253:18 | 11:9 |
| 181:14 | 219:5 | 253:23 | **important** |
| 181:16 | 219:22 | 256:8 258:4 | 54:9 |
| 181:23 | 220:7 220:8 | 260:5 260:6 | 56:14 79:15 |
| 184:5 | 220:8 | 260:18 | 95:8 161:11 |
| 186:16 | 220:11 | 260:23 | 199:10 |
| 186:16 | 221:8 | 261:19 | 200:2 201:1 |
| 186:16 | 221:11 | 261:21 | 222:17 |
| 186:16 | 221:18 | 261:23 | 223:20 |
| 186:20 | 221:22 | 262:8 | 224:7 225:7 |
| 188:7 | 222:6 | **imagine** 31:22 | 259:2 |
| 188:12 | 222:15 | 65:16 105:8 | 259:11 |
| 189:2 189:2 | 225:14 | 115:5 115:7 | 259:17 |
| 189:7 191:5 | 226:2 227:3 | 141:14 | 260:7 |
| 191:7 193:5 | 227:6 227:7 | 142:11 | 260:11 |
| 198:11 | 227:17 | 147:2 | 260:20 |
| 198:11 | 227:18 | 147:21 | **impose** 123:4 |
| 198:12 | 228:11 | 148:7 | **imposed** 29:23 |
| 199:4 200:1 | 228:11 | 168:16 | 184:20 |
| 200:14 | 229:17 | 222:4 | 202:9 |
| 202:6 | 229:21 | **immediately** | **impossible** |
| 202:23 | 230:16 | 16:6 159:17 | 47:19 54:22 |
| 203:15 | 234:23 | **impact** 143:7 | 86:16 105:1 |
| 206:2 206:3 | 236:21 | **impacted** | 105:5 |
| 206:4 206:6 | 239:7 | 20:19 | **impressions** |
| 206:21 | 240:13 | **impeach** 10:19 | 133:7 |
| 207:8 | 241:5 | **implicit** 91:8 | 144:18 |
| 207:18 | 241:22 | 95:11 124:5 | |
| 208:1 208:6 | 242:9 | | |
| 208:7 | 242:22 | | |
| 208:18 | 245:9 | | |



Exhibit 2
Page 111 of 163

inaccurate
  66:5 248:23

inappropriate
  58:5 160:10
  209:8 246:5

inappropriate
  ly 183:17
  183:19
  184:1
  243:14
  243:17

incident
  132:15
  132:18
  172:20
  181:18
  242:15
  242:19
  244:22
  248:10
  248:18
  250:24
  251:1
  251:19
  251:24
  253:8

incidents
  67:15
  131:10
  131:16
  133:7 145:1
  181:17
  216:22
  216:23
  217:8
  217:13
  241:11
  241:25
  242:1
  242:10
  243:12

243:24
247:24
248:23
250:19
250:22
251:8
251:10
251:24
251:25
252:5
252:17
253:7 254:2
254:13
254:14
254:16
258:7

inclined 46:2

include 35:23
  56:1
  91:14
  125:16
  127:11
  164:2 179:8

included
  91:17
  205:25
  233:18
  233:19
  263:7

includes
  91:24 98:19

including
  40:9
  51:22 84:23
  144:11
  189:25
  190:16
  236:20
  254:7

income 42:21

incomprehensi
  ble 118:12

inconsistency
  38:9 176:3

inconsistent
  38:11
  231:11

increase
  50:13 191:3

incredibly
  57:20
  118:11

indeed 28:3

independence
  77:18

independent
  98:4 251:24

independently
  24:15 201:3

Indian 142:20

indicate
  75:23 76:18
  116:11
  176:11
  176:13
  227:18
  257:7

indicated
  91:18
  154:25

indicates
  77:25
  79:3 124:10
  124:18

indicating
  91:18

indisputable

246:3

individual
  45:15 45:18
  45:25 46:21
  48:13 50:22
  63:5 64:1
  67:16 71:12
  75:13 83:14
  87:14 97:24
  103:19
  118:10
  138:6 139:3
  140:15
  144:19
  214:24
  232:3
  237:12

individuals
  45:14 51:15
  71:12 105:3
  107:17
  107:20
  134:25
  136:17
  138:20
  203:4
  209:11
  214:22
  214:25
  234:11
  235:1
  235:12
  254:20

individuating
  193:7
  193:25
  194:24
  195:6

inequality
  72:21 77:15
  80:17



Exhibit 2
Page 112 of 163

**inevitable**
226:20
226:21

**infallible**
64:7

**infer** 69:18
70:9

**inference**
138:18

**inferences**
109:23
172:8
172:11
243:9

**influence**
49:17 49:25
49:25
238:20

**influenced**
23:6

**inform** 47:9
53:5 54:9

**informal**
95:16

**information**
21:4
35:24 75:12
109:8 123:8
127:18
131:14
145:11
167:19
193:7 194:1
194:24
195:6 224:8
253:6
254:15
262:10

**informative**

55:17
94:8 133:23
161:8

**informed** 33:3
250:9

**in-group**
204:2 204:3
204:5

**inherently**
69:6

**in-house**
105:9

**initial** 12:20
18:12 23:15
34:9
34:11
40:5
92:18
136:24
155:23
165:15
194:1

**initially**
18:8
18:14
23:9 29:6
31:14 37:13
42:24
172:22

**input** 24:11
24:18

**insight** 50:6

**instance**
25:21 44:22
45:23 70:21
71:14
74:2 77:5
78:7 86:3
89:19
93:4 131:20

132:12
133:1
134:23
135:21
143:13
144:16
144:20
163:17
171:25
192:16
202:25
215:18
220:1
223:15
248:10
253:21
254:8 260:1

**instances**
89:16 173:2
233:23

**instant**
133:21
172:19

**instead** 14:11
68:15 121:4
148:15
252:24

**instruct** 19:1
38:22 39:10
40:17
187:15

**instructed**
188:10

**instructing**
146:4

**instruction**
189:5
189:15

**instructions**
75:19

177:16
180:12
185:12
187:12

**insulting**
131:2
251:23

**intellectual**
49:19

**intend** 29:15

**intent** 240:24
243:10
243:22
244:1 253:3

**interact**
45:25 213:4

**interacting**
105:20
106:8

**interaction**
106:16
109:25
125:22
132:22
132:23
148:25
185:21

**interactions**
167:7 255:9

**interconnecte**
**d** 44:25

**interdependen**
**ce** 191:24

**interest**
145:2

**interested**
45:4

**interlinked**



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 113 of 163

45:10

**interlock**
163:21

**internalized**
48:10 175:7

**Internet**
154:2

**interpret**
30:18 84:21
133:17
143:8
213:22
223:3

**interpretable**
161:2

**interpretatio**
**n** 109:9
134:9
134:11
134:12
143:17

**interpretatio**
**ns** 143:11
190:15
190:17
240:23
243:21
245:4
250:20

**interpreted**
227:23
240:2
242:25

**interrupt**
11:22 11:25
12:2 36:8
43:23 59:12
78:16 78:17
100:14

247:10

**interrupted**
248:13

**interruption**
79:7

**intersection**
206:3

**interval**
91:17
116:12

**intervals**
91:13

**interviewed**
153:6
241:15
245:23

**interviews**
244:20
252:24

**intimate** 33:3
69:21
191:19
191:24

**intimidation**
162:10
162:16
163:18

**intricacies**
85:21 86:21

**introduce**
7:12

**introduction**
178:24
251:9

**intuitively**
182:21

**invariably**

235:24

**inventory**
74:16
75:7
82:10 82:17
87:4 138:4

**investigate**
252:4 253:1
258:8

**investigated**
244:4 252:1
253:20

**investigates**
244:20

**investigation**
134:1
144:20
172:17
241:14
242:4
242:15
242:22
243:15
245:20
245:23
246:4 252:2

**investigation**
**s** 67:15
131:11
145:19
172:5 172:6
241:6 241:7
241:10
252:20
252:21
252:22
258:6

**involve**
105:19
106:7

106:16
108:16
108:22
109:2
110:14
150:12

**involved** 35:8
51:15 86:23
87:4 107:15
128:12
128:18
136:17
164:12
165:23
202:22

**involves**
158:10

**involving**
217:13

**isn't** 27:21
48:16 89:25
112:10
117:7
132:15
159:8 160:3
190:11
200:14
233:21

**isolate**
214:20

**issue** 32:21
67:6
71:18
89:7 97:9
99:17 100:6
100:12
146:11
155:16
170:2 170:3
172:4
173:11



Exhibit 2
Page 114 of 163

174:9
176:17
178:12
184:13
212:23
231:8
237:11

**issues** 8:16
24:20 25:21
30:6 54:7
55:14
59:2
59:18 61:21
67:22
99:2 100:23
100:24
101:10
147:1
147:17
162:6 162:9
168:24
169:4
169:11
172:18
178:9 179:2
179:25
181:2
199:10

**It'd** 106:1
211:12

**item** 76:12

**items** 73:5
73:9
75:17
76:6 76:7
76:13 82:23
83:25 87:11

**it'll**
241:24
247:7

**I've** 18:1

24:21 30:11
30:22 30:22
31:12 31:13
32:8 33:1
42:12
43:8 44:9
61:5
66:15 80:10
84:1 84:1
84:1 98:3
103:15
112:1
141:23
146:14
185:24
189:8 189:8
194:9
202:12
229:3
229:21
229:22
231:6 231:9
242:12
242:19

——————
J
——————

**January** 7:4
7:8

**jargony**
239:12

**Jim** 192:15

**Jimmy** 192:15

**Joaquin** 7:18

**job** 11:8
31:23 32:18
53:10 63:15
63:16 89:22
97:25
111:11
115:14
167:20

174:14
187:15
197:19
210:13
216:7
244:11
256:25

**jobs** 116:22
117:1
203:13

**Joe** 107:3

**Jones** 90:18

**Joshi** 93:16
94:7
97:20
112:13
113:4 113:6
113:11
113:18
119:3

**journal** 44:22
44:23 86:17

**judge** 10:8
28:1 28:2
28:22 28:23
28:24
29:6
29:11 29:22
30:21 30:21
37:15
177:17
180:5
188:11
189:12
189:15
189:21
189:22
190:3 190:7
190:19
190:21
199:23

201:23
202:11
208:13
208:14
208:17

**judged** 134:4

**judges**
24:24 28:20
30:17
31:8
38:11
190:17
202:10

**judge's**
180:12
185:12
187:11
187:15
202:2

**Judging** 35:1

**judgment**
34:13 34:15
59:11 68:22
182:5 198:2
209:14

**judgments**
64:11 67:10
67:11 67:24
68:1
68:11
70:2
109:7
109:13
110:14
110:20
116:18
181:13

**July** 33:21
34:8

**jump** 179:3



Exhibit 2
Page 115 of 163

jumping 111:7
  140:6
  194:17

jumps 87:21

juries 47:9

jurisdiction
  27:25 30:20
  30:21 38:6

jurisdictions
  38:12
  206:18

juror 32:25
  221:14
  248:2

jurors 68:2
  68:13 139:5
  170:21
  170:22
  180:16
  224:11
  250:3
  251:21
  257:3

jury 10:8
  30:2 53:4
  53:10 54:10
  66:25
  67:4
  82:14 131:3
  133:22
  134:7
  138:22
  169:4 177:7
  177:14
  177:16
  177:22
  178:16
  179:11
  179:17
  180:3 180:4

180:9
180:12
180:21
181:8 182:8
182:16
183:9
183:16
183:25
184:14
185:2 185:6
185:16
187:12
187:16
188:2
188:10
189:6
189:14
199:10
199:21
201:2
211:22
213:24
224:9 225:4
227:12
239:19
240:3 240:5
243:19
245:16
255:7 255:8
255:10
255:11
256:12

justify
  101:18
  103:12
  209:11
  234:11
  235:1

———————
        K
———————
Kaul 154:17
  218:16

key 50:3 50:6
  50:8

kinds 22:16
  45:5 47:5
  47:6
  47:22 49:12
  55:16 57:13
  88:12
  89:4 102:15
  116:21
  136:19
  136:22
  163:7 165:5
  175:12
  175:20
  175:20
  184:24
  198:7 203:5
  203:12
  203:14
  205:1

knew 22:22
  192:20
  192:22

knocked 16:18

knowledge
  23:5 33:3
  69:22
  116:23
  148:24
  199:5
  199:14
  200:5

known 22:18
  43:7 52:3
  257:13

kosher 62:12

Krebsbach
  251:3

———————
        L
———————
lab 61:12
  125:25
  126:4
  163:11
  163:12
  204:5
  204:17

label 84:4

laboratory
  126:9 163:6
  163:9

lack 160:14
  160:16
  161:9
  161:14

lacks
  160:12
  160:23

land 179:24

language
  130:18
  130:21
  130:22
  131:2 131:7
  131:16
  132:4
  132:14
  137:18
  190:2
  198:19
  207:19
  239:12
  251:19
  258:12

large 71:11
  93:7 119:21

larger 107:2



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 116 of 163

114:25
155:8
238:21

**last** 19:17
20:9 43:6
122:4
216:21
253:7

**late** 140:8

**later** 12:16
16:25 20:13
23:14
25:9
30:23
33:6 40:5
42:12 47:24
66:7
97:18
131:10
140:1
156:18
156:20
184:6
207:15
257:15

**Laurie**
54:14
215:24
223:7

**law** 31:12
185:7 185:9
185:10
187:10
206:4

**lawsuit**
87:8 153:16

**lawyer**
31:11
60:9 141:25
186:9 189:3

202:6 206:3

**lawyers** 17:25
24:19 25:18
42:2
42:25
43:8 43:8
44:9 148:22
185:21
207:8

**lay** 177:9
228:23

**layperson**
221:14

**lead** 65:19
108:1 135:7
143:11
169:16
213:4
240:18

**leaders** 218:9

**leader's**
217:20
220:18
220:21

**leads** 86:5
107:6

**leanings** 48:8

**learn** 31:15
167:10

**learned**
156:20

**learning**
185:20

**least** 19:4
48:8
67:16
113:12
171:8 218:3

219:1
219:10
257:20

**leave** 187:11

**leaves** 110:9

**leaving**
109:22
158:19

**led** 101:11
195:2

**legal** 27:17
51:19 89:13
89:15 102:6
139:5
185:18
185:22
186:8
186:14
186:22
187:5
187:24
188:5
188:11
188:17
188:22
189:4
190:23
199:22
199:22
202:5
206:14
207:24

**legitimacy**
217:21
220:18
220:21

**legitimate**
64:12
209:12
234:12

**lend** 134:22
135:14
135:19

**less** 45:6
46:2
46:24 51:11
69:14 69:24
73:23
76:3 76:4
76:4
77:17 77:18
78:2 79:4
85:17
86:6
89:21
95:3 124:19
125:24
126:5
134:22
135:7
135:14
135:19
135:20
136:3
137:14
143:3 145:2
146:6 154:8
161:2 161:2
167:15
169:16
178:11
192:4 192:4
192:5 197:9
199:7 199:8
230:2
230:22
232:20
260:3

**let's** 13:14
13:14 17:19
44:13 60:9



Exhibit 2
Page 117 of 163

63:16
103:18
109:19
159:4
160:12
164:4
169:24
170:1
170:18
172:7
172:12
196:7 204:2
225:10
225:10
235:7 247:2
247:5

**letter** 155:23

**letting** 13:16

**level** 93:13
104:15
137:1 137:3
160:19
162:7
173:17
184:25
186:5

**levels** 48:3
143:16
218:5

**liberal** 43:13

**lie** 64:7

**life** 10:23
63:22 71:13
108:3
135:18
137:2
191:14
194:10
225:22
227:7

**light** 123:17

**likability**
124:12
260:2 260:4

**likelihood**
50:13 84:13
147:18
169:16
196:23
197:9

**likely**
18:13 18:24
30:10
45:6 45:7
46:2
46:16 46:25
48:7
51:11
52:7 67:7
69:24 73:17
78:2 78:9
79:4
85:17
86:6 88:8
89:4 89:5
89:21 94:21
104:13
109:6
109:16
110:7
110:18
111:23
116:18
127:23
128:4 128:5
129:2 129:4
129:17
129:19
129:23
131:25
135:21
137:7 137:9

141:19
143:3 143:3
146:6 154:7
154:8
155:11
159:9 160:9
162:19
165:12
178:15
181:1 183:2
188:16
191:1 193:6
199:6 199:7
199:8 201:9
210:5
212:12
212:21
213:5
217:20
218:12
218:13
218:19
218:25
219:2
219:10
219:21
220:2 220:3
220:13
220:17
220:20
221:2 221:9
222:8
222:10
226:25
257:8

**limitation**
85:14

**limitations**
37:15 37:17
84:19 84:20
84:24 84:25
85:2 85:6

85:10
99:2 100:17
118:10
119:9
119:12
153:2 153:3

**limited** 20:18
27:23 29:12
190:22

**Linda** 245:22

**line** 38:2

**lines** 27:17
202:7
205:19

**links** 45:20

**listed** 41:9
180:18

**listen** 181:16

**literally**
172:14

**little**
18:20 20:13
25:9
30:18
33:5 34:2
37:12
66:7 72:6
75:16 81:18
83:7
83:23 86:10
86:10
101:14
112:3 140:1
144:13
152:18
153:17
154:2 159:4
190:20
191:7
192:19



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 118 of 163

239:21
247:7

**live** 132:18

**L-L-E-N-I-X**
28:14

**load** 254:6

**location**
125:20

**logically**
109:19

**long** 18:14
22:16 22:18
24:22 54:15
78:19 101:5
145:9
145:14
147:25
256:8 261:7

**longer**
85:23
208:25

**lose** 73:7

**lost** 234:24

**lot** 14:9
28:20 30:17
30:25 31:12
33:2
38:15 53:22
56:25 61:11
61:14 61:15
67:5 77:4
99:9 105:10
110:2
118:13
130:21
133:24
143:22
144:23
145:9

145:11
145:18
145:23
146:16
146:23
146:24
146:25
147:16
149:14
151:24
152:7 152:9
153:2 161:3
167:9
167:13
180:7
180:14
184:4
185:19
190:19
204:3
204:15
221:8
221:15
224:6
224:25
231:8
237:24
238:7
239:16
239:24
253:6 254:6
254:7

**lots** 110:4
228:10

**loud** 92:9
133:13

**love** 194:8
194:12

**low** 79:16
84:14 88:9

89:22 103:9

**lower** 77:2
78:7
84:11
85:5
94:20
98:5
112:6
134:18
220:25

**lowest** 162:7

**low-level**
131:22

**lunch** 13:9
120:11
121:5
121:25

**luxury** 63:20

———— M ————

**made-up** 204:7

**Madison** 22:12

**magistrate**
28:1
28:23 29:6

**magnitude**
114:14

**mail** 132:13

**main** 57:21
229:19

**mainly** 36:4

**maintain** 74:5
191:25

**majority**
214:25

**maker** 68:22

**makers** 119:16

229:12

**male** 21:8
64:3
70:25
74:6
104:1
108:23
109:2
111:19
138:9 154:6
154:7
154:13
154:25
155:3 155:5
155:11
155:12
155:14
155:20
157:13
159:9
159:18
159:25
160:5 160:9
162:7
162:13
162:21
162:25
164:16
165:6
165:12
195:1
214:14
219:6
235:10

**male-
dominated**
63:15
96:4
203:8
203:13

**males** 115:18



Exhibit 2
Page 119 of 163

man 87:21
  102:21
  104:13
  112:25
  113:1 128:1
  128:10
  130:16
  194:17
  214:5
  225:18
  235:18
  239:3

management
  77:17

managers
  105:20
  106:8 106:9
  108:17
  108:21
  163:8

manipulate
  73:11

manipulative
  110:9

man's 63:12

mark 26:4
  33:9
  34:19 74:21
  80:4 157:22
  161:20

marked 26:8
  27:3
  33:13 34:20
  75:2 80:7
  80:12 90:12
  114:5 114:6
  123:20
  123:22
  157:24
  161:22

married 22:2

masculine
  89:22
  127:12

mass 260:15

material
  145:6
  203:18
  203:21
  205:9

materials
  40:25
  57:6 57:9
  57:19
  58:5 223:1

math 165:2
  165:3
  165:16

Matt 36:9
  242:19
  244:23
  248:9
  248:12
  251:1

matter
  45:23 45:25
  56:22 56:23
  88:3 94:4
  117:15
  117:16
  117:17
  118:4
  130:23
  155:6
  204:22
  204:24
  205:8
  235:25

matters 118:3

may 9:6
  9:16 14:9
  23:5 23:5
  36:22
  42:8 53:5
  69:12
  72:3 98:8
  119:24
  121:19
  126:10
  131:7
  140:12
  151:18
  162:22
  163:12
  181:24
  197:14
  198:15
  206:17
  214:4
  216:18
  232:15
  256:2

maybe 12:14
  14:11
  23:4
  24:17
  43:1 43:2
  44:10 45:24
  46:7
  56:11 61:13
  61:16
  62:2
  64:17 65:14
  65:22 70:16
  74:1 100:15
  110:7 118:1
  120:3 122:4
  135:3 141:9
  143:7 150:6
  152:10
  155:10

  171:1 171:4
  173:9 183:3
  202:16
  207:20
  216:10
  228:13
  228:13
  244:9
  244:10
  245:24
  248:17
  256:6
  260:25
  261:3

mean 33:24
  37:8
  39:12 43:18
  46:15
  50:2
  54:19
  55:4
  59:12 66:11
  69:5
  70:14 72:13
  75:8 78:4
  83:23 84:22
  85:17 87:11
  88:10
  89:1 89:1
  89:12
  100:12
  101:4 102:1
  103:8
  104:25
  105:16
  107:17
  109:17
  109:18
  113:18
  114:16
  115:2
  115:15



Exhibit 2
Page 120 of 163

117:20
123:12
129:7 130:8
130:20
133:11
134:10
134:14
134:19
135:16
136:11
136:15
137:10
137:11
138:2
141:17
143:9
143:12
143:19
145:5
147:20
148:10
148:12
149:12
152:16
153:3
164:10
168:5
170:13
171:7
175:23
177:12
178:18
178:23
180:6
180:19
184:10
185:14
202:25
203:22
205:22
207:18
207:20
210:7

210:23
211:5 214:9
214:15
214:16
214:21
214:22
214:23
214:24
217:23
219:12
219:14
219:15
219:16
219:21
219:25
220:12
222:4
222:12
223:24
224:1
225:15
225:17
225:24
226:17
227:15
229:20
230:25
231:3
231:12
233:2
233:17
234:7 237:8
238:13
239:21
240:6
240:11
240:24
241:16
242:7 242:7
243:2
244:11
247:2 247:2
248:17

252:15
256:2
259:14

**meaning** 59:25
95:10 132:5
189:8

**meaningful**
127:5

**meanings**
187:8
187:11

**means** 8:2
10:15
81:1
83:17 83:24
114:23
129:13
129:14
129:23
130:1
130:11
136:5 136:6
136:25
181:25
187:16
209:17
218:25
219:10
219:12
220:9 221:3
227:5
227:25

**meant** 135:13

**measure** 74:16
78:6 79:15

**measured** 91:6

**measurement**
114:22

**measures**
75:14 86:24

92:9
95:10 95:11
111:11
115:15
116:10
116:12
116:24
197:2
197:18

**median** 130:9

**mediation**
41:12

**medical** 17:19
35:9
35:10
36:2 36:6
40:6 131:21
131:22
134:24
156:8
156:11
156:25
176:20
197:20
198:1

**medications**
11:2

**medicine** 37:4
153:21
156:21
157:10

**meet** 148:21
194:9

**Megan** 7:16
9:14 36:7
36:17
120:10

**members** 204:8

**membership**
186:2



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 121 of 163

188:15

**memory** 216:4

**men** 47:4 51:6
70:21 72:10
72:17 72:22
73:2 73:7
73:10 73:11
73:13 73:24
73:24
74:9
74:13 74:14
76:9 78:5
78:8 78:9
80:17 80:24
81:7
81:21
82:9
82:15 87:17
87:17
94:1
94:22
96:1 111:23
112:7
114:15
116:1 117:4
123:3
124:13
124:19
124:25
125:14
125:24
126:6
126:18
132:1
134:18
135:25
136:12
162:20
163:17
166:21
167:11
186:3

191:18
192:6
194:15
215:5
217:20
218:6
218:13
218:22
219:2
219:11
219:17
220:18
220:20
221:2 221:7
226:14
230:2 230:4
230:21
230:23
232:20
232:22
232:25
233:5

**men's** 73:25
233:11

**mentally**
151:7

**mention** 111:8
120:7 174:6
174:15
181:24

**mentioned**
17:2
19:15 21:19
22:1 31:6
37:11 37:14
43:14
55:7
56:14 61:23
98:13
104:11
110:12

111:21
119:5
121:22
168:13
169:18
179:14
189:18
203:16
205:14
205:16
254:13

**mentioning**
99:5

**mentions**
164:20

**messier** 86:11

**met** 148:19

**meta** 53:20
55:20 92:24
94:6 97:3
111:8
125:12

**meta-analyses**
122:20

**meta-analysis**
89:25
90:2
90:17 90:20
90:24
91:5
93:15
94:7
95:10 97:20
111:10
111:17
111:22
112:4
112:14
113:25
114:9

114:13
116:17
122:20
124:4
124:24
126:3

**meter** 133:11

**method** 8:10
63:2
199:1 200:6
200:15
241:18

**methodology**
178:19
179:18
199:15

**methods** 55:16
70:14 86:20
239:23

**mid** 13:8

**middle**
12:18 13:12
15:3

**midpoint**
79:18

**might've**
41:12

**million**
213:10

**mind** 37:17
38:10 85:14
96:3 120:16
120:19
191:8

**mini** 239:21

**minimum** 17:7

**minor** 93:19
216:22



Exhibit 2
Page 122 of 163

217:7
217:10
217:13
**minorities**
135:6
**minority** 58:2
**minute**
26:21 36:11
36:13
**minutes** 36:11
36:13 36:14
71:23 121:8
195:20
**mislead**
240:19
**mispronouncin**
**g** 122:24
**misrepresente**
**d** 60:23
**misunderstand**
240:6
**misunderstood**
244:10
**mitigate**
195:14
195:17
197:15
**mixed** 139:9
213:1
**moderated**
125:21
**moderately**
136:15
**moderator**
56:2 96:3
**moderators**
125:3

**modified** 28:2
**Molly** 22:5
**moment** 26:5
71:16 71:20
80:3 80:5
90:15 99:15
120:9
133:19
150:18
168:23
183:24
**money** 256:22
**morning**
9:12 9:13
13:9
20:12 20:15
53:8 260:25
**motions** 27:18
**motivated**
69:19 70:12
142:24
211:23
**motives**
109:24
110:6
139:10
172:9
209:13
213:1
234:12
**move** 40:23
44:13
153:18
206:9
**moving** 13:6
92:7
**M-U** 28:13
**muddying**

260:18
**Mullinex**
28:10 29:20
30:14 37:21
201:23
**multiple** 63:6
137:17
165:24
166:8
166:17
240:9
251:14
258:18
261:20
**muted** 214:6

---

N

**Nancy** 189:21
**nation** 82:6
**national** 77:6
**nationally**
81:11
**nations** 72:20
77:10 77:12
77:16 80:18
80:23
**natural**
32:4
32:17 87:12
**nature** 72:9
72:11
**nauseam**
176:22
**near-**
**universal**
159:23
**necessarily**
35:12 69:14

76:8 78:5
85:17
88:6
98:10
103:17
107:4
110:19
112:10
117:23
130:2 131:8
134:14
204:21
220:23
223:10
227:3
**necessary**
256:15
**needles**
158:20
**negative**
117:2
124:11
130:15
130:16
131:12
169:13
170:12
219:17
221:7
240:23
241:21
243:7 243:9
243:21
243:25
**negatively**
92:19 95:21
96:12
127:23
128:18
129:17
129:19



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 123 of 163

130:14
131:18
135:24
257:17

**nice** 190:14
212:1
212:15

**nicer** 167:11

**night** 19:17
20:10

**Nikolova** 29:2
29:12 37:22
59:10
201:25

**nitpicks** 62:3

**nobody** 184:21
194:21
205:23
210:3

**nobody's**
16:12

**noise** 17:7
53:22
160:18

**nondominance**
124:12

**none** 43:2
105:19
111:3 111:4

**nonrenewable**
65:18 99:18
101:12

**nonrenewal**
65:19

**nonsensical**
64:6

**nonsignifican
t** 126:22

127:3 234:4

**nonverbal**
130:22

**norm** 77:1
84:3

**normally**
197:1 233:6

**normative**
84:7

**norms** 83:1
143:5
143:10

**North** 30:3

**Norwegian**
194:9

**Norwegians**
194:8
194:12

**note** 14:17
17:4
67:13 85:10
122:25
126:7
154:17
155:17
168:24
169:4
170:24
171:1 171:5
177:6
177:22
198:18
199:12
214:3
240:21
257:10
257:23

**noted** 51:12
149:22

232:18
260:24

**notes** 148:8
148:17
167:18
197:25
198:10
242:5
245:24
252:6
261:10
261:16
261:22
262:1

**nothing** 9:3
35:7 35:20

**notify** 16:6

**noting** 155:9

**notoriously**
161:2

**nowhere** 75:17
160:19

**nuance** 45:1
94:18

**nuanced**
47:8 47:23

**nuances**
42:3 47:9
51:10 94:16
95:7 182:22
187:10
239:25

**null** 159:3
160:20
161:1 161:4
161:7 234:8

**nurse**
132:22
132:23

158:14
218:17

**nurses** 131:24
158:11
159:8
159:17
159:23
160:3 160:8
168:10
168:14
218:18
254:21

**nurturing**
74:13 192:4

**nutshell**
185:25

——————

O

**oath** 8:4 10:4
10:7
10:10 10:12
255:7

**object**
48:21
71:4 71:5
79:6 208:18
219:22

**Objection**
99:22
182:12
183:11
188:25
200:11
203:19
211:17
221:16
236:14
237:5 238:1
240:8
246:14
247:19



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 124 of 163

249:14
253:16

**objective**
52:16
115:24
116:10
116:12
116:24
135:1 197:2
197:17

**obtained**
82:25

**obvious** 142:8
184:11
241:19
248:5
248:15
249:23

**obviously**
11:23 101:6
166:17
167:3
256:16

**occasion**
60:15

**occasionally**
32:8 58:12

**occupation**
96:4 96:5
96:5

**occur** 45:6
69:3 79:3
89:13
98:4
125:9
131:25
137:17
175:19
199:7
200:21

204:16
210:5
225:19
225:20
225:22
226:9
228:16
254:23
259:23

**occurred**
30:10 30:10
52:7 52:8
69:9
69:13
119:14
134:14
140:14
140:17
141:2 141:3
142:6
169:12
180:10
181:4 211:1
211:16
220:4
236:21
237:9
245:11

**occurrence**
215:3
226:11

**occurring**
103:7
209:22

**occurs**
63:18 85:18
89:6 89:8
94:5 94:6
94:17 94:17
95:1
98:10 120:1

123:16
125:9
210:15
213:4 213:5
214:13
215:8
221:13
221:14
221:15
221:20
221:21
221:23
226:2
226:22
227:1
240:19

**odd** 13:20
15:17 15:17
147:6

**offer** 29:16
63:22 80:24
82:25
170:14

**offered** 35:23

**offering**
217:15
250:20
259:11

**offhand**
128:25

**official** 8:11

**oftentimes**
237:2

**oh** 18:10
42:23
50:2
50:17
51:6
52:14 57:2

60:22 73:22
83:3
83:12 84:22
101:1 102:6
120:13
120:21
122:1
134:10
135:1
145:14
175:25
181:15
182:19
185:9
193:13
193:20
194:2 194:4
194:4
194:11
198:3
202:16
207:21
210:3
210:12
222:12
235:3 241:3
256:21
258:15

**OHSU** 7:11
9:15 9:17
99:13 99:19
112:3 149:4
151:5
151:22
152:2 153:7
153:11
154:13
171:25
177:2
196:10
197:17
198:7



Exhibit 2
Page 125 of 163

254:22
257:23
258:18
259:1

**OHSU's** 171:15

**okay** 9:20
10:1 12:3
12:18
13:2
13:16 13:24
14:7
14:15 14:16
14:23
15:6 15:9
15:11
16:2
16:24
17:1
17:14 18:19
26:3
26:24 31:23
33:17 33:25
34:17 34:23
35:21 36:15
36:18
38:1
39:25
40:2
41:16 43:21
43:25
58:1 58:7
59:12 67:20
71:21 71:22
71:24
75:4 82:6
83:9
90:14 90:22
91:3
92:24 96:22
100:6
108:22
111:6

111:21
112:1
118:17
118:21
119:5 121:8
121:15
122:9
122:13
122:15
123:7 124:8
125:19
126:3
126:11
129:2
140:22
142:1
144:16
151:14
154:1 154:3
154:4 156:2
156:5
159:16
160:22
161:17
164:9 165:1
165:6
166:15
170:17
174:19
182:20
184:2
194:11
194:13
197:13
199:18
211:8
211:10
211:14
213:10
216:12
216:14
228:17
236:8 241:5

247:21
249:22
251:22
252:6
252:25
258:15
258:23
260:24
261:10
262:21
263:5

**old** 192:13
210:7

**old-fashioned**
210:11

**omit** 60:1
61:3

**omitted** 25:23
61:1

**omitting**
162:9

**ones** 55:9
55:10 55:19
74:14
76:5 105:22
106:2
108:14
144:11
145:4
158:19
177:19
180:17
200:25
248:6

**one's** 212:14

**online** 16:3
36:11 223:1

**oops** 27:12

**open** 33:22

33:23 33:24
206:25
209:4
262:13
262:16

**openly** 11:4
211:12

**opens** 134:13

**operating**
108:24
109:3

**operation**
244:24
248:12

**operational**
115:18

**opine** 202:4

**opining**
30:9
32:21
186:13
202:15
209:6

**opinion** 20:20
20:22
21:6
29:16
33:1 38:2
62:9
68:23
113:11
113:13
141:5 142:5
144:1
160:25
179:2 180:2
182:8
187:19
201:22
202:2



Exhibit 2
Page 126 of 163

202:20
208:16
217:12
242:25
243:20
247:16
247:18
249:11
249:12
259:11

**opinions**
24:11 24:16
24:18 25:10
25:11 25:12
25:15 25:25
31:8 62:9
168:20
207:1
236:13
261:25

**opposed** 126:4

**opposition**
92:3 92:10

**order** 57:18
262:25
263:3

**orders** 262:23

**Oregon** 7:17

**organization**
87:7 152:20
152:21

**organizationa
l** 20:25
50:22 51:23
57:3 86:9
89:9 92:4
93:17 93:18
110:17
111:2
137:13

152:1 163:3
163:13
163:14
163:15

**organizations**
45:5 57:5
89:8 110:25
119:20

**original**
262:25

**others**
46:18 57:13
65:20
68:1 86:3
245:8
250:13
253:23

**otherwise**
12:23 14:12
15:24 70:22
101:7
167:15
246:3

**ought** 76:8

**outcome** 65:20
156:6 157:5
183:2

**outcomes**
155:20
157:13
157:14
184:25

**outlier**
238:10
238:12

**outliers**
238:6
238:14
238:17

238:19

**outscore**
72:22

**outsized**
238:20

**outstanding**
154:18

**overall**
62:3
91:19 93:21
112:11
115:14
117:7
119:24
125:4
164:14
164:15
164:22
165:17
171:19
191:12

**overlap** 151:4

**overlapping**
44:21

**overly** 13:20

**overrepresent
ed** 162:13
165:20

**oversight**
196:15

**overstate**
227:25
240:16

**overt** 210:16

**overtly**
244:18

**overtness**
143:24

**over-weight**
217:6

**overweighted**
217:8

---

P

**p.m** 121:16
121:19
151:15
151:18
216:15
216:18
232:11
232:15
263:11
263:14

**P0.2** 126:21

**page** 25:2
35:1 37:4
37:6
43:20 50:18
53:1 53:2
72:16 80:21
81:6 91:3
91:4
91:11 91:23
92:14
101:16
105:22
107:5 109:5
110:13
111:6
111:21
115:13
116:6
122:15
124:9
124:18
125:20
127:21
134:16



Exhibit 2
Page 127 of 163

140:3 144:2
150:4
153:22
153:23
153:24
154:1 154:4
154:16
155:17
157:18
158:17
159:6 159:6
159:7 162:3
164:4
165:22
166:12
167:18
168:22
177:9
183:23
183:24
189:17
198:18
209:10
214:3
216:22
217:18
225:11
229:25
230:12
230:20
232:18
232:23
233:16
233:16
240:21
240:25
255:15
255:21
257:23
258:3
**pages** 54:15
54:15

101:16
127:7 149:2
242:11
242:12
242:14
242:20
247:6
250:18
256:8
**paid** 43:19
**pale** 170:16
**pan** 16:19
**paper** 77:9
128:14
128:15
146:23
159:23
222:6
**papers** 42:8
42:12
**paradox** 93:12
**paragraph**
72:17 126:8
156:3 241:4
258:2 258:5
**parallel**
111:1
229:16
**paraphrase**
148:5
**parenthetical**
**s** 116:8
**partially**
29:8
**participant**
126:16
**participants**
55:24

63:7 63:8
77:11 103:1
103:11
136:2
234:16
237:21
**participated**
40:6 152:17
**particular**
55:22 57:15
92:25
98:9
101:9 120:5
130:5
130:23
143:6
145:16
156:13
157:3
229:20
**particularly**
25:18
55:1
55:17 55:17
94:8 113:20
214:20
**parties** 16:6
**party** 56:20
56:22
**past** 66:23
69:19 70:11
158:5 172:7
**pat** 73:21
**paternalistic**
73:20
**patient**
163:24
164:21
167:23
167:25

168:14
172:1
**patients**
154:7
154:19
155:1
155:11
**patient's**
158:20
168:9
**patient-**
**safety**
172:4
**patriarchal**
210:9
**Patricia**
22:12
**pattern** 86:12
169:7 170:9
215:20
240:22
242:23
245:13
**patterns**
199:16
200:21
**PDF** 14:18
261:3
261:13
**penalties**
123:4 124:4
**penalty**
8:25 10:13
**people**
31:23
46:1 47:5
48:18
52:6 54:5
63:14



64:2
67:20 67:21
72:8 73:1
76:2
76:19 76:22
78:1 79:4
82:22
83:7 83:9
83:10 83:10
83:12 83:13
83:18 87:23
87:24 88:22
89:22
101:17
101:19
101:21
102:6
102:19
103:7 103:8
103:19
104:11
106:23
108:23
109:6
116:23
127:22
128:8
129:16
129:18
130:14
130:23
132:18
133:8
134:17
134:22
135:14
135:15
135:15
135:15
135:15
135:19
135:20
136:7

136:12
139:9
141:18
143:7
149:19
149:20
152:17
163:8
168:11
172:13
174:24
175:6
175:21
175:25
186:1 186:4
187:1 187:2
188:14
191:15
195:3
196:15
204:5
209:25
210:1 210:2
211:2 211:3
211:16
212:3
213:21
213:24
214:4
222:15
223:3 223:9
223:11
229:22
230:1
230:12
230:20
231:5 231:9
231:16
232:5
232:19
232:24
234:20
235:6

235:16
235:21
235:22
235:23
236:3 237:3
237:23
237:25
238:5 238:7
238:17
238:22
239:1
239:10
239:10
239:16
240:3
240:18
240:19
241:9
241:12
241:15
242:3 242:5
242:18
243:1 243:3
243:4 243:7
244:20
251:14
254:18
254:21
255:2 255:5
257:4 257:8
257:12
257:12
257:16
257:19
257:21

**people's**
50:10
152:19

**per** 95:16
196:25

**perceive**
130:23

133:8 143:7
231:9

**perceived**
73:12
131:17
131:18
144:24
230:3
230:22
232:21

**perceivers**
122:25
123:1
214:14
219:6

**perceiving**
101:11

**percent** 41:22
41:22 91:13
91:17
129:17
129:18
136:2
136:12
136:14
141:2 141:3
141:13
142:5
149:23
150:2 150:3
150:5
150:11
151:10
164:24
165:9
166:23
219:1
219:10
219:21
220:5 220:5
220:6



Exhibit 2
Page 129 of 163

220:17
220:20
236:2

**percentage**
41:22
135:18
136:7
142:23

**perception**
132:25
251:17

**perceptions**
46:19
67:5 69:9
109:6 176:3
215:14

**perfect** 66:14
85:3 86:6
87:6 263:10

**perfectly**
30:5
31:19 31:21
32:25
208:20
248:11

**performance**
92:2
92:11 93:21
93:23
94:2 94:9
94:11 94:13
95:3
95:12 95:16
95:24 97:21
111:11
111:18
112:5
112:11
112:12
112:16
113:8

115:15
116:4 117:8
119:19
119:22
119:24
137:15
197:19
197:23

**performed**
214:5 239:2
239:3

**performing**
112:23
115:17
115:22
116:24

**perhaps**
181:20

**period**
48:19 164:7

**perjury**
8:25 10:13

**permissible**
207:24

**person**
54:24
57:9
57:20 63:15
65:15
66:5
76:16 77:22
79:4
97:24
103:24
104:6 109:8
132:19
132:19
132:21
133:12
133:16

133:16
133:18
138:6 139:2
191:1
194:12
194:20
212:22
218:8
243:12
244:4
244:14
246:19
249:2
249:25
249:25
252:5
257:13
257:14
257:17
259:19
260:9

**personal**
43:17
52:3
64:18
141:24
148:24
247:18
249:11

**personality**
44:20 44:24
45:3 45:9
45:13 45:17
170:13

**personally**
22:8 87:8
142:13
150:1 153:6

**personnel**
70:18 70:19
70:20 95:17

97:18 97:22
99:16 99:16
105:7
112:12
117:9 120:1

**persons** 86:23
88:7 88:9
107:14
109:2
149:23

**person's** 65:9
65:11 210:3
212:22

**perspective**
35:6 69:5
175:14
181:4 181:7
181:24
188:12
201:1

**perspectives**
255:13

**pertinent**
49:13 55:14

**pervasive**
48:6
89:10 175:5

**pervasiveness**
21:7

**Peter** 7:2
7:11 9:1
9:8 100:2
120:12
263:13

**pets** 17:7

**Ph.D** 7:2
9:8 44:16
62:21
222:22



Exhibit 2
Page 130 of 163

phased 43:10

phenomena
  68:17
  101:15

phenomenon
  64:23 66:25
  68:24
  102:12
  119:14
  204:12

Philips 158:3

phone 15:2
  15:15 17:16
  18:5 18:7
  18:22
  19:5 19:7
  19:10 19:10
  60:10

photographic
  114:17
  216:4

phrase
  25:20
  227:22
  250:23

phrased 25:11

phrasing
  24:17

physical
  162:10
  162:16
  162:16
  162:18
  162:21
  163:18

physician
  159:18
  159:25

physicians

21:3
21:12
71:1 108:23
109:3
131:24
154:6 155:3
155:5
155:11
157:17
162:4 162:7
162:13
162:25
164:6 164:9
164:12
164:13
164:15
164:16
164:20
164:24
165:4 165:6
165:12
165:24
166:8
166:13
166:17
166:23
167:1
168:14
254:21

physician's
  159:10
  159:11
  159:24
  160:9
  160:11
  173:16
  173:16

Physicians
  37:5

pick 36:12
  52:6 102:5

103:17
136:18
139:7
139:13
180:9
204:10
213:7

picked
  11:12
  252:17
  252:21
  253:7

picking
  68:8 86:4
  113:22
  201:4
  242:10

picture
  93:9 259:2

piece 152:4

pin 22:20
  22:21
  219:15
  220:23

pinpoint
  237:9

placed
  37:13 37:16

places 176:12

plaintiff
  7:15
  21:20
  24:9
  41:19
  69:8 140:15

plaintiffs
  17:24 42:2

plan 256:12

play 31:10
  32:24

played 190:23
  192:18

player
  110:1 110:8

pleasant
  176:1

please 7:12
  8:23
  13:15 14:14
  15:14 71:24
  72:24 98:25
  151:14
  156:16
  169:21
  232:8
  232:10
  247:10
  263:1

plenty
  145:6
  175:25

plop 148:13

point 19:4
  30:5
  55:18 68:16
  69:12
  81:4
  125:5
  130:25
  131:9
  133:10
  156:15
  165:18
  168:23
  169:3
  169:15
  173:2
  179:19



Exhibit 2
Page 131 of 163

```
187:14
189:17
198:17
200:2 208:1
216:21
218:14
218:15
222:17
228:3 231:2
234:4 236:1
pointed
145:19
187:4
233:22
237:2
pointing 53:4
68:1
97:12
171:20
181:23
219:8 250:2
250:6
points 50:8
polarization
107:9
policies 92:4
92:10
144:25
184:16
policy 184:21
184:22
184:23
political
77:19
poor 155:18
155:20
157:13
poorly 257:14
population
```

```
143:15
143:15
portion 83:24
portray
207:23
portrayal
248:24
portrayed
242:16
portrays
247:25
position 20:7
20:25 57:12
167:3 167:6
167:20
180:20
203:8
262:17
positions
153:22
167:10
203:6
positive
191:12
243:8
257:21
positively
73:17
74:4 160:4
possibilities
171:22
172:24
184:7
244:12
possibility
30:8 139:18
167:13
170:18
171:23
```

```
172:22
176:24
177:5
177:25
245:11
249:17
255:14
258:20
possible 12:3
13:7
16:16
17:5
78:21
140:12
147:12
147:14
170:19
181:1
195:18
200:22
233:2
240:12
244:8
possibly
102:10
168:6
170:17
173:12
240:14
Post 30:14
posted 223:1
potential
35:9 66:6
111:24
112:18
130:4
134:13
161:3
172:12
174:4
176:16
```

```
178:15
179:25
181:5
187:20
199:19
200:23
210:6
potentially
49:12
69:2
71:14 104:5
108:20
144:11
202:3
213:17
229:20
power 15:1
15:9
49:17 49:25
50:9
50:11
73:4
74:14 77:18
77:19 167:3
167:6
175:10
191:25
powerful
49:25 192:4
192:7 203:6
203:7
practical
216:7
practice 13:8
62:14 197:5
233:18
236:19
236:20
238:11
practices
```



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 132 of 163

50:22

**praise** 96:1
96:1 117:4

**predict**
77:3
77:21 80:17
88:20

**predicted**
98:11
124:13

**predicts**
83:16

**predominantly**
162:21

**prefer** 31:2
113:23
248:20

**preferable**
15:10
113:12

**preference**
25:2

**pregnant**
178:10

**prejudice**
52:22

**prejudicing**
138:22
227:12

**prepare** 17:15

**prepared**
19:11 52:15
144:12
223:9

**preparing**
18:21

**prerogative**

250:5

**prescribing**
192:3

**prescription**
193:21
195:3

**prescriptions**
254:25

**prescriptive**
193:12
193:22
193:24
193:25
194:18
194:23
195:11
195:16

**present** 8:6
56:15 56:17
56:19
113:15
125:24
132:23
170:22
171:17
259:17
260:8
260:12
260:15
260:19
260:20

**presentation**
44:14 52:17

**presented**
243:1
259:22

**pressing**
178:7

**presumably**

127:3

**presume**
182:16

**presumed**
244:1

**presumptive**
8:16

**pretext**
101:17
103:12
139:9

**pretexts**
102:4

**pretty** 25:3
39:1 42:7
50:4
64:24 81:24
87:9
105:1
113:18
114:18
122:7
128:12
142:8 145:9
190:2
202:23
211:9
213:15
222:8 246:2
248:15
249:23

**previously**
96:8 153:13

**primary**
222:21
224:16

**Princeton**
74:19

**principle**

55:2 179:18
200:6

**printed**
14:8 42:9

**printed-out**
42:9

**printout** 27:4
34:6

**prior** 161:8
176:10

**privileged**
38:23 40:19

**probably**
26:13 71:12
78:1
105:9
106:19
142:13
160:24
205:8
212:23
214:8

**problem**
7:24
48:24
104:19
120:24
132:16
229:24
236:24
258:25

**procedure**
25:17
108:24
109:3 252:7
253:5

**procedures**
162:9

**proceed** 9:6



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 133 of 163

36:22
72:3 121:19
151:18
216:18
232:15

**process**
59:9 68:4
162:9
197:11
197:12
198:13
199:13
204:22

**processes**
35:13
36:1
50:21
106:14
179:22
179:23
204:1

**produce** 57:10
98:24
109:20
109:21

**produced**
262:11

**product** 38:24
39:12 40:19

**production**
146:20
254:3

**profession**
71:10

**professional**
154:8
224:19

**professionall**
**y** 175:1

**profile** 76:24

**progress**
51:10

**prominent**
44:22

**promoted**
93:13
112:24
112:25
113:1
137:14

**promotion**
99:6
99:13 99:20
100:20
101:3
102:13
111:23
112:3
112:18
112:19
196:17

**promotions**
93:7
93:22 93:25
95:18 196:8

**prompted**
174:8

**pronounced**
119:2

**proportionate**
162:8

**proportionate**
**ly** 43:12

**propose** 121:8

**proposition**
46:13
128:13

**protection**
73:25

**prove** 141:7

**provide** 19:12
51:25
52:5
52:16 53:12
139:16
144:23
157:8 210:4
228:25
231:22

**provided** 41:1
42:15 145:6

**provides** 90:4
90:23
229:17

**providing**
107:18
201:3

**provision**
73:25

**psychological**
66:25 68:17

**psychologist**
22:13 65:17
110:17

**psychologists**
45:1 45:2
45:11 49:16
50:9 52:2
64:24
65:6 186:12
186:18

**psychology**
21:24 44:16
44:19 44:20
44:23 44:24
46:12

50:4 50:6
52:21 62:22
86:20
172:10
186:22
187:9 211:6
249:13
249:19

**publish** 84:25

**published**
48:2 77:6
77:8 90:18

**pull** 14:18
80:3 90:9
114:4
157:21
161:20
261:2

**punished**
104:13
104:17
117:9

**punishing**
186:3

**punishment**
74:8 185:1

**punishments**
95:18

**purposes**
11:24 15:15
16:15 78:25
79:1
79:22 98:13
120:15
120:20

**purview**
138:17

**Purvis** 111:9

**putting**



Exhibit 2
Page 134 of 163

123:19
137:10
161:19

---

Q

qualification
s 63:19

quality
85:5 85:5

qualms 38:7

quell 191:15

query 254:12

question 9:18
12:5
12:14 12:24
17:4
19:10
20:3
38:22 39:11
39:19 40:18
48:16 55:11
59:16
64:6
78:23
79:9 89:3
101:25
102:16
102:17
106:4
107:25
120:3
125:10
131:6 132:1
135:9
136:24
141:10
147:6
170:16
173:20
174:20
174:21

182:7
184:19
186:14
188:8
188:18
208:19
212:1
212:18
214:8
215:22
217:7 217:9
217:17
255:3
258:11

questionable
153:14

questions
10:25 12:20
13:13 13:20
18:4 28:7
31:5 41:5
46:6
49:14 83:20
112:2
118:20
121:22
136:19
136:22
142:16
146:11
151:21
174:25
177:7 177:9
177:18
177:22
177:23
177:24
178:4 178:7
178:14
178:22
179:17
180:3 180:4

180:8
180:17
185:6
185:15
185:17
188:20
209:16
225:5 225:8
255:17
262:14
262:20

quibble 56:11

quick
118:22
118:25
121:21
152:24
155:23
195:19
258:12

quickly
12:1 112:25

quiet
248:11
248:14

quite 14:10
30:4 52:3
53:19 101:5
102:2 126:8
133:8 152:9
152:21
187:6 208:7
215:14
239:22

quote 186:10

quoted 154:24

---

R

rabid 87:20
194:16

race 29:17
50:16
186:20
186:23

racial
69:20 70:12
83:11
142:24

racism 83:8
90:25 91:14
91:15
191:11

rage 32:5

raise 8:24
174:25

random
53:25 61:18
105:12
105:12
105:13
105:14
106:4
160:17
238:10

randomly
52:20
56:9
63:14
103:20
105:7 128:8
200:17
235:7
235:10
235:16

range 145:8

ranging
254:20

rapidly
193:16



Exhibit 2
Page 135 of 163

**rare** 79:3
119:20
211:7
211:12

**rarely** 77:25

**rate** 111:23
162:23
163:19

**rated** 115:17

**rates** 94:2
102:13
112:8
165:17
199:15

**rather**
12:11 35:13
77:1 110:24
112:11
118:1 145:1
206:18
222:18
228:1 233:9
260:4
260:18

**rating**
221:6 233:4
233:10
233:11

**ratings**
111:18
112:6
112:13
112:17
114:14
116:9
116:10
119:19
174:12
175:24
220:25

221:1

**raw** 224:3

**react**
127:23
128:18
129:17
129:19
130:14
135:24

**reacting**
108:17
108:23
109:2

**reaction**
61:13
103:19
103:22
219:17

**reactions**
108:6
126:18
158:14
214:5 214:6

**reactivated**
35:19

**reactive**
104:6

**readers** 232:1

**reading** 145:6
146:3 178:5
179:21
180:7
180:14
180:24
184:4
258:12

**reads** 80:23
91:13

**ready** 26:25

27:1

**real** 39:15
63:22 102:3
102:11
108:3
118:25
121:21
130:13
134:25
137:2
258:12

**realize** 111:7

**real-life**
130:3
138:20
237:15

**really** 19:3
19:23 19:24
20:16 22:24
22:25 32:11
45:22
49:3 51:9
53:17 54:23
58:4 58:8
60:16 60:23
61:21 70:13
84:6
85:24 86:15
93:20
94:4
95:15
97:9
97:22 97:24
101:25
102:17
103:20
104:10
104:24
108:7 115:8
118:22
119:25

122:2
123:14
132:1 136:6
144:1
146:25
169:22
172:6
175:15
176:1 176:1
177:3
177:25
181:3 181:7
184:13
189:13
191:3
196:19
197:6
204:24
213:20
223:9
223:13
230:8
236:16
238:15
243:10

**reask** 125:10

**reason** 74:3
97:10
119:18
189:24
212:22
238:8
246:25

**reasonable**
127:25
142:12
244:14

**reasoning**
92:18

**reasons** 39:6



Exhibit 2
Page 136 of 163

161:3 210:4
210:6 244:9

**recall**
17:22 19:24
25:16 34:14
36:3 37:9
37:10
41:4
66:13 66:14
99:23 100:4
100:5
100:22
101:2 101:9
106:17
114:17
122:2
122:12
129:12
129:14
145:5 149:9
149:10
150:22
154:14
155:15
158:13
175:23
198:17
262:4

**recalling**
24:3
99:14
198:12
198:13

**receive**
96:1
117:3
146:19
147:13
157:4
225:12
226:1 228:8

**received**
62:17 69:16
99:20 101:3
112:8
121:24
130:19
146:16
154:12
155:13
166:4 166:4
246:10

**receiving**
145:4

**recent**
88:13
97:7 98:14

**recently**
22:19 42:13
122:2 122:7

**recess**
36:20
72:1 121:17
151:16
216:16
232:13

**recipient**
131:13
134:4

**recognize**
31:19 32:12
75:7

**recollection**
18:1

**recommend**
214:1

**reconcile**
191:23

**record** 7:7
7:25 8:12

10:3 11:7
11:13 15:20
15:24 15:25
16:16 36:19
36:21 71:25
72:2 82:4
98:13 120:9
120:15
120:17
121:16
121:18
131:8
151:15
151:17
151:20
216:15
216:17
232:12
232:14
245:19
246:8
249:22
262:22
263:12

**recorded**
8:9 17:6

**records**
41:1
69:18
70:9
70:10 132:6

**reduce**
115:6 191:1
193:8 196:4
197:3

**reducing**
115:9
238:15

**redundancy**
146:24
147:16

**redundant**
229:7
230:17

**refer** 9:16
154:7 155:5
155:11
157:18
255:15

**reference**
149:3

**references**
54:16 54:17

**referencing**
162:5

**referrals**
154:8
154:12
155:14
179:9

**referred**
154:19
154:25
232:22
234:15

**referrers**
158:19

**referring**
18:22
29:2 105:21
112:21
120:16
120:20
124:1 130:8
215:23
216:23
241:5 256:2
256:8 258:5

**refers** 216:22

**reflect** 244:2



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 137 of 163

reflects
  245:16
refrain 30:1
reframe 39:18
regard
  200:5
  208:11
  254:16
regarding
  19:9
  144:3
  157:16
regardless
  71:10
region 143:6
regional
  143:21
  143:22
regionally
  24:24
reinforce
  192:9 193:1
reinforces
  21:7 192:7
reinstating
  231:24
reject 217:20
  220:18
  220:21
relate
  87:15
  260:22
related 35:13
  74:4
  88:19 91:15
  91:25
  92:3
  92:11 92:17

92:21 95:12
97:1
99:10
101:10
223:25
226:25
relates
  232:23
relating 39:2
  223:22
relationship
  90:6
  90:24 91:18
  93:1
relationships
  73:4
relative 35:7
  47:4
  76:19 76:22
  78:1 79:3
  124:11
  165:18
  198:10
relatively
  22:19
  52:8 114:25
  114:25
  115:3 115:3
  218:21
relaying
  241:12
relevance
  55:12
relevant 21:1
  21:5
  21:10 25:22
  52:18 53:11
  54:6
  54:11 56:17
  60:12 60:20

61:21
62:5
67:23
68:7
69:24
70:5
82:12 82:20
94:25
113:22
144:10
144:14
144:21
145:18
146:6
146:10
147:1
147:12
148:13
156:20
156:22
156:23
157:1 179:5
179:23
200:22
231:1
231:14
251:20
259:20
260:3
260:10
261:2
reliable
  62:18 69:19
  70:11
relied 20:6
  162:1
  178:19
  178:20
  211:15
  236:11
reluctant

82:22 83:7
rely 20:3
  67:4 69:7
  69:10
  85:9 113:25
  144:6 152:9
  161:13
  182:18
  213:8
  233:25
relying 129:3
  178:23
  199:4 200:4
  200:7 262:2
remember
  12:17 135:9
  149:4
  151:24
  165:15
  218:11
  230:8
remembered
  12:19
remind 232:1
reminder
  229:18
reminding
  229:22
  230:16
remote 7:1
  8:2 13:18
  13:21 15:18
remove 225:24
render 64:10
rendering
  33:1
  52:24 100:5
renderings



252:25

**renew** 173:18

**renewed** 65:10
196:12

**repeat** 49:1
66:18
135:10
229:8
258:16

**repeated**
161:6

**repeatedly**
88:17
98:3 161:9

**rephrase**
166:25
169:21
219:9 221:5
228:7
228:13

**replay** 133:22
172:19

**replicate**
161:7 161:8

**report** 14:4
14:6
17:17 18:12
18:15 18:17
20:4 21:3
21:5 23:6
23:7 23:8
23:9
23:10 23:12
23:16 23:18
23:22 23:23
23:25
24:6
24:12 25:17
29:18 29:19
30:24 33:18

33:20
34:5 34:8
34:9
34:12 34:16
34:24 34:25
35:2 35:2
35:20 35:22
37:1
37:14 37:16
37:19 37:21
38:6
38:17
40:5 40:5
40:15
41:2
41:10
42:6
42:11 44:15
48:14 50:18
52:15 52:19
52:23
53:1 54:4
54:10 56:10
56:12 56:16
57:11 58:25
59:25 59:25
60:1
60:22 61:25
63:1
67:13 72:16
82:8 85:8
85:9
85:20 86:17
87:17 93:10
93:16 95:25
97:4
98:17
101:15
102:25
107:12
111:6
113:10
116:8 117:3

118:11
120:6 120:7
121:24
122:3 122:8
122:16
122:24
123:5 127:7
129:24
130:25
131:10
140:3 144:2
149:2
149:20
149:23
150:5
150:16
150:23
151:1
153:19
154:16
156:18
157:17
163:24
164:21
164:23
166:4
167:20
168:19
168:22
169:16
170:24
171:10
171:18
172:13
173:1 174:7
174:15
175:3
179:11
181:14
187:18
189:18
193:11
198:18

198:24
201:24
202:1
203:17
207:15
209:10
216:25
217:24
222:22
223:17
224:15
227:17
228:23
229:10
229:17
229:21
229:25
230:6
230:10
231:19
231:22
232:3
233:19
236:11
238:18
240:21
248:22
250:18
251:7
251:10
257:10
261:19

**reported**
103:3 103:4
103:13
106:20
117:14
136:4
149:24
151:10
163:1
222:13



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 139 of 163

233:7
234:19
236:4
236:12
237:3 245:7

**reporter** 7:20
8:5 8:21
8:23 9:5
11:9
66:17 74:23
90:11
195:20
262:22
262:24
263:2

**reporting**
223:22
224:1 224:2

**reports**
23:3
30:12 30:23
32:9 35:3
36:4
40:10 58:20
58:21 61:24
62:7 150:11
154:20
160:23
162:5
162:14
167:23
168:1
168:10
168:15
233:15
238:13
262:8

**represent**
7:13 9:15
50:20
56:6 60:5

61:6 150:19

**representatio
n** 36:12
56:13 162:5
162:8

**representativ
e** 54:7
61:20 81:11
104:21
104:23
104:25
105:3 105:4
105:15

**represented**
55:25

**representing**
56:23

**reproduce**
230:17

**reputation**
22:9

**request** 145:3
159:10
159:11

**require**
249:24
250:1

**requires**
250:15

**reread**
17:17 66:11

**rescued** 76:9

**research**
22:14 29:13
33:3
35:11 35:15
35:15 42:1

44:14 45:14
47:10 47:25
52:17
53:4 53:5
53:10 54:11
56:17 56:18
56:25
57:1
59:19 59:20
60:2
60:20
61:2 62:5
68:16 69:22
70:5 70:7
77:2 78:8
79:8
86:19 88:17
90:3 91:4
117:25
118:2
127:22
128:18
129:3
130:21
134:23
152:8
156:20
164:1
170:10
188:13
189:10
198:22
199:3 200:9
200:22
202:16
202:17
202:19
202:22
204:3
204:25
209:20
212:2
213:23

213:23
214:11
215:25
217:18
217:21
221:19
221:21
222:1
222:21
223:12
223:14
224:16
225:11
225:23
225:25
226:5 226:7
226:8
226:10
227:9 228:2
228:4 228:6
228:24
229:2 229:6
229:13
229:15
230:1 230:4
230:14
231:8
231:16
232:19
238:9
238:13
238:24
239:9
239:14
239:23
246:21
249:6 257:4
259:18
259:19
259:22
260:2 260:8
260:10
260:12



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 140 of 163

260:13

**researched**
65:3

**researcher**
62:22 206:4

**researchers**
186:12
186:18
200:18
222:23

**resentful**
73:12

**resentment**
159:24

**resisted**
257:24
258:18
258:20

**resolve**
177:20

**respect**
188:19

**respects**
203:18
203:22

**respond**
48:5
160:4
240:13
257:17

**respondents**
151:10

**responding**
79:9

**response** 49:4
107:9
254:11

**responses**

104:5 107:6
108:1
150:17

**responsible**
206:11

**responsive**
79:9

**rest** 181:14

**restriction**
207:14

**result** 106:20

**resulted**
115:15

**results** 116:9
116:10
158:18
223:6
223:18
224:13

**resume**
63:12 63:13

**resumes** 64:3

**retained** 18:9
41:8 41:9
41:17 58:17
142:3

**retired** 190:6
190:8

**retirement**
43:10

**reveal** 83:7

**reverse** 72:21
73:4
75:16 76:11
76:11 77:25

**reversing**
76:7

**review**
20:16 20:18
23:17 23:22
40:25
66:9
88:14 98:18
144:7 148:2
215:25
224:18
224:21

**reviewed**
17:20 23:25
66:8
66:16 66:21
70:8 99:9
101:5 144:4
145:24
148:8 254:6

**reviewers**
85:1

**reviewing**
132:6
145:12
145:17
254:3 261:1

**revise** 25:14

**revolve** 93:11
177:25

**revolves**
177:1

**reward**
94:14
96:2 112:16
113:9

**rewarded** 94:1
117:10

**rewards** 93:24
94:1 94:1
94:9

94:12
95:4
95:18
112:19
116:5 117:5
119:19
119:23

**rich** 145:22

**rid** 194:1
194:25
238:9

**rigged** 257:7

**rigorous**
140:13

**rise** 173:17

**rises** 171:12

**risk** 115:6
115:9 191:1
191:4
192:24
193:8 195:7
195:15
196:4 197:3

**risk-taking**
192:6

**road** 25:5

**robust** 65:4
162:18

**Roh** 93:16
94:7
97:20
112:13
113:4 113:6
113:11
113:18
119:3

**role** 32:25
52:10



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 141 of 163

53:3
64:12 68:10
68:12 68:15
71:11 74:13
138:16
138:23
167:16
169:3
175:10
177:16
177:20
192:8
193:17
**roles** 77:17
192:1
**room** 15:16
16:8
16:11 16:20
17:8
43:24
44:2 108:24
109:3 109:8
109:22
110:2 110:9
205:7
241:11
242:18
244:1
244:21
246:20
248:16
251:15
**Roth** 111:9
113:7
113:25
116:16
120:4
**rough** 41:21
**roughly** 81:23
**rubric** 188:16

**rude** 67:17
71:1
71:14
104:11
134:5
215:16
251:22
**rudely** 244:18
**rudeness**
131:23
**Rudman**
54:14 223:7
**Rudman's**
215:24
**rule** 39:1
171:22
**rules** 10:2
30:18 31:11
31:16 31:20
31:20 31:24
31:24 31:25
32:3
32:15
38:8
38:10
141:23
190:16
202:9 206:5
206:7
206:16
207:13
**ruling** 170:19
170:20
**Rumsfeld**
148:5
**RWVUs** 197:21

─────────
        S
─────────
**safe** 101:8

167:20
**safety** 163:24
164:21
164:23
167:23
167:25
168:9
168:15
**sake** 37:2
**salary**
43:13 93:23
93:25
**sample** 57:3
57:16 83:25
104:21
104:23
104:25
105:3 105:4
105:12
105:14
105:15
113:19
119:21
237:22
237:24
238:8
238:15
238:21
**samples**
77:6
81:10 81:10
81:11 82:24
106:5
**Sarsons** 156:1
**sat** 255:7
**satisfaction**
149:3
**save** 14:21
16:24 26:21
136:20

261:8
**saw** 79:8
157:1
**scale** 75:10
76:14 76:18
76:20
77:5 78:6
79:23
81:8
81:17 81:22
83:9 84:3
84:5 87:9
87:22
88:4 88:6
89:23 94:24
155:8
**scales** 77:3
77:20 79:16
79:18 82:20
83:6
84:11 84:15
**scaling** 79:21
**school**
22:15
131:22
**Schultz** 43:23
**science**
7:17
31:17 44:14
52:17
178:25
199:14
200:9 203:1
207:23
208:3 208:4
208:9 209:4
**scientific**
53:13
54:3 54:4
62:24



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 142 of 163

63:2 138:19
139:2
139:24
140:11
140:16
142:4
152:22
199:13
199:15
200:6
200:15
222:6
222:14
229:9 232:4
241:18
247:17

**scientificall**
**y** 62:18
63:4
69:18 70:10
70:11 141:7

**scientist**
47:20

**score** 76:15
76:17 76:18
76:20 77:13
77:23
78:7
78:25
79:2
79:16 79:24
81:7
81:16 81:21
82:1
84:14 87:22
89:22 94:20
98:5 114:20
114:21
115:16
116:11
116:13
126:25

127:3 127:4
130:9 216:1
237:20
237:21
237:25

**scored**
76:10 86:23
88:3

**scores**
75:13
77:3 82:9
84:11 84:11
88:8 88:9
114:13
118:9

**scoring** 76:13

**screen** 14:3
14:10 14:12
26:5
26:18 26:20
33:12
75:1 80:6
80:11
123:21
157:23
161:21
195:23
195:24
238:17

**screens** 26:22

**screw** 61:11
61:16

**scroll**
14:13 27:12
75:15 75:17
81:19
125:19
126:11

**scrolling**
159:22

**se** 95:16
196:25

**search** 19:24

**second** 28:4
124:17
159:7
159:21
244:22

**secondhand**
252:25

**section** 35:25
36:5 36:5
37:3 101:16
102:25
105:22
106:3
108:10
122:16
124:10
124:18
131:10
131:21
156:7
157:17
165:21
168:18
171:21
172:23
173:2 177:7
178:25
179:8
183:21
184:4 190:1
198:23
199:13
207:7
207:15
209:6
223:15
223:18
228:23

228:24
229:4 229:4
229:6 229:9
229:10
229:16
230:5
230:11
255:20

**sections**
38:17
39:3
39:14
127:17
148:13
148:16
153:19
156:18
209:1 218:1

**seeing**
60:19
126:23
217:2 217:5
235:8

**seek** 52:16
56:16 56:19

**seeking** 42:2

**seem** 13:20
98:4
116:4 178:5
178:6
178:13
178:14
202:9

**seemingly**
238:16

**seems** 24:23
39:11
58:2 112:21
154:1
231:11



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 143 of 163

260:14

**seen** 19:22
19:25
22:9 33:1
74:9
92:15 170:9
178:11
226:13
258:7

**sees** 133:16
133:16

**segregated**
191:14

**select**
105:7
177:23

**selected**
52:20
56:9
56:19
200:17
254:1

**selecting**
178:3

**selection**
91:25 92:11
95:12
105:13

**self** 64:13
65:1 65:1
68:20

**self-image**
65:11

**self-
  interested**
110:8

**self-
  promoting**

127:13

**Self-reported**
21:13

**self-
  serving**
64:16 64:20
66:1
66:24
69:3 181:10
182:9
182:25
183:10

**send** 25:18
26:14 33:11

**sense** 21:5
32:11 46:25
52:4
73:23 89:10
121:3 143:3
147:18
152:20
157:1 175:5
234:7

**sent** 17:18
19:15 19:17
19:22
20:4 24:6
62:7 85:1
122:5 122:6

**sentences**
28:18 28:19

**September**
24:1
34:25 37:20
42:6
42:16 42:19

**serious** 258:7

**seriously**
10:11 83:17

252:4

**serve** 53:3
74:5

**serving** 64:14
65:2 68:21

**setbacks**
64:19

**sets** 31:16

**setting** 17:19
35:13
36:2 134:24
156:14
156:23
161:4
163:14

**settings** 35:9
35:10
36:6 115:18
156:11
156:25
174:24
175:1
176:20
176:20
188:17
197:21
198:1

**settled**
59:6 97:10

**seven** 8:17

**several** 54:20
247:6 256:8
257:13

**severity**
162:7

**sex** 35:16
37:3 42:3
153:20
162:18

179:24

**sexism**
72:18 72:19
72:24 72:25
73:1
73:14 73:15
73:19 73:21
74:8
74:11 74:16
74:17
75:7 76:6
76:14 76:15
76:17 77:13
77:14 77:24
78:8 81:8
81:17 81:20
81:22 81:25
82:10 82:18
86:24
87:4 87:9
88:3 88:8
88:9
88:14 90:25
91:7 91:7
91:8 91:8
91:17 91:19
91:24
92:3
92:16 92:16
92:18 92:20
93:1
94:20 94:24
94:24 95:21
96:11 96:12
97:1 97:8
98:5 98:6
98:11 98:19
98:21 98:22
107:19
138:4
191:22
191:23



Exhibit 2
Page 144 of 163

210:8 210:8
210:9
210:11

**sexist**
45:16 73:17
73:18 76:23
76:25
78:2 78:4
79:5
79:15 79:23
83:1 83:2
84:4 84:7
84:8
87:15 88:23
88:23 88:24
92:1
107:6
107:15
107:25
108:5
138:25
143:24
143:25
210:9

**sexists** 89:21

**sexual** 73:10

**shaking** 11:11

**shape** 23:6

**share** 14:3
14:10 14:12
14:18
26:5
33:12 74:25
75:4 80:5
123:21
157:23

**shared** 254:24
254:25

**sharing**
75:6 82:6

195:23

**shepherd**
182:24

**she's** 22:9
102:7
110:16
112:22
175:25
184:9 190:3
193:20
193:20
194:2 194:2
194:3 194:4
194:5 198:3
210:12
212:8 213:3
213:18
215:16

**shield**
87:22 88:1

**Shields** 231:6

**shift** 30:20
202:9
206:17

**shifting**
30:15 30:16
32:3 207:13

**shortcomings**
86:12

**shorthand**
59:24
114:23

**should've**
173:10

**shout** 52:3

**showed**
123:1
137:14

**showing**
77:5 113:15
119:13
157:9
198:22
199:3
202:19
203:12
218:24
222:23
235:5

**shown** 156:10

**shows** 21:2
54:3
69:22
78:8
97:21
119:16
119:22
126:12
127:22
139:16
188:13
209:24
212:2
220:24
228:2 228:5
230:1 230:4
232:19
238:25

**shrill** 70:18

**shy** 13:15

**signal**
226:3
240:15

**signed** 59:6

**significance**
160:13
160:14
160:16

160:18
160:20
160:24
161:10
161:14
223:4
239:11

**significant**
106:21
125:2
125:15
129:7 129:8
233:13
233:20
234:2 234:6
236:5
236:12
236:22
238:25
239:17

**significantly**
91:15 91:25
124:21

**silence** 15:5

**silenced** 15:8

**similar** 22:15
22:16
59:2
81:24
113:20
136:21
137:15
147:17
176:19
179:25
190:2
202:21
218:5
242:21

**similarly**
123:3



Exhibit 2
Page 145 of 163

213:16
235:9

**simple** 125:21
223:11

**simply** 39:6
67:4
83:18
155:10
207:10
218:16
241:17
241:18
249:20
260:18

**Sinclair**
128:15

**single** 85:3

**sitting** 35:6

**situation**
15:18 46:21
48:12 50:10
50:11 50:12
63:20 65:14
132:5
138:21
139:4
202:21
203:24
210:19
237:15

**situational**
50:21

**situations**
49:17 49:24
51:14 52:13
110:24
130:3
175:20
175:22
176:25

202:22
203:23

**six** 140:4
166:4

**size** 90:5
114:24
124:14
237:22
237:24
238:15

**sizes** 125:6
238:9
238:21

**skeptical**
182:17
257:5 257:9
257:20

**skewed** 209:13

**ski** 194:9
194:12

**skied** 194:10

**skills** 154:18

**skim** 145:25

**skip** 116:8

**slap** 184:22

**slaughter**
193:16

**slavery**
192:14

**slight** 131:19

**slightly**
124:19

**slow** 34:2

**small** 115:3
115:9
124:15
124:20

125:1
125:15
126:9 127:3
207:3
237:22

**smaller** 72:20
107:2
114:25

**Smith** 107:3

**smoking**
147:19
147:20
147:23

**social**
22:13 24:21
24:23 28:21
29:25
31:3
44:14 44:16
44:19 44:23
44:24
45:1 45:2
45:4 45:7
45:11 45:12
45:19 45:23
46:1
46:11 47:20
49:16
50:3 50:6
50:8
51:24
52:1
52:17 52:20
53:2
62:21
64:9
64:10 64:24
65:5
65:17 82:21
87:6 138:16
139:16

140:10
140:25
141:8
172:10
186:1
186:22
188:15
200:9 203:1
207:10
209:2 209:2
211:6
249:12
249:19
254:25

**socialized**
167:11

**society**
210:15
212:3

**softening**
227:18

**softer** 73:21

**solve** 176:17

**somebody**
53:17
84:4 138:25
143:14
144:24
148:22
175:9 183:1
207:22
211:12
212:7
213:16
216:6 224:3
237:15
238:12
257:3

**somebody's**
110:6 169:8



196:17
251:13

**somehow**
251:22

**someone** 22:11
50:13
51:1
65:19
70:2 144:17
197:9 211:7
245:13

**someone's**
197:23

**somewhat**
115:17
150:21
251:17
257:20

**Son** 93:16
94:7
97:20
112:13
113:4 113:6
113:11
113:18
119:3

**sorry** 15:7
19:6 36:7
41:3 41:3
43:22 49:25
66:17
71:6
71:18 71:19
78:16 78:17
79:1
100:2
108:25
118:14
119:2
120:18
122:20

128:5
140:18
154:15
159:22
168:4 191:5
191:6 191:7
195:13
195:25
202:16
221:11
233:16
234:21
234:23
234:24

**sort** 13:8
15:12 16:19
22:25
23:5
25:11 37:15
37:16 41:21
46:18 47:13
49:7 52:9
63:10
64:6
70:22
72:7 73:3
73:11 73:20
76:25 82:25
84:20 87:12
89:2 98:9
103:13
107:21
109:15
110:25
112:17
114:21
115:7 117:7
125:11
127:17
131:8
131:18
138:6 139:1

141:24
142:8
143:23
144:25
147:5
147:19
148:12
149:18
153:10
156:10
156:14
157:7 161:6
169:12
169:18
172:2 172:8
173:21
178:16
180:15
181:3
181:21
183:4
186:17
189:5
191:21
193:17
196:23
198:23
203:5
213:24
232:6 233:4
233:9
238:10
239:12
242:21
259:4 261:1

**sorts** 22:4
48:13 49:11
56:5
67:22
68:6
77:19 84:12
98:20

116:21
144:21
152:23
179:25
192:5
197:22
198:2 198:4
199:8 203:9
205:3
215:16
223:4
224:17

**sought** 43:4
141:23

**sound**
149:17
150:21
158:21
207:18
226:19

**sounds** 17:8
23:11 66:22
78:25
140:19
154:23
207:21
209:19
211:25
227:20
245:1

**sources**
102:24
178:19

**south** 192:13

**speak** 11:22
18:16 21:23
22:2

**speaking**
29:13 47:11
102:23



Exhibit 2
Page 147 of 163

149:6

**special** 14:25
187:7 247:1
247:12
249:24
250:1
250:15

**specialize**
52:21

**specialized**
240:1

**specific** 9:18
24:11 24:24
28:6
30:25 35:12
46:20 46:21
48:16 51:14
51:15
52:6
52:12
53:3 63:2
67:15
77:1 98:7
107:20
129:12
129:14
129:14
131:11
131:15
138:20
140:14
145:1
152:19
155:16
170:5
175:19
175:20
178:4
179:11
200:5
202:24

218:2
219:19
220:8
221:23
222:10
222:13
222:18
224:15
230:18
235:12
237:11
237:12
237:15
254:2 262:1

**specifically**
18:6
35:15
36:1 40:8
67:19 99:14
103:11
215:12

**specifics**
50:8
143:2
203:24
203:25
205:10
247:3
248:20
248:21

**speculate**
87:1

**speculation**
189:1
221:17
240:9
253:17

**spend**
145:12
239:22

**spent** 8:15

38:15
146:13
146:14
146:14

**spoke** 18:15

**spoken** 21:20

**spontaneously**
216:3

**spottily**
31:14

**spotty** 43:2

**spouse** 22:1

**spring** 147:21
147:24

**staff** 37:5
131:24
153:21
157:16
168:10
168:13
254:21

**stand** 10:9
71:24
151:14
225:4
232:10
232:10
256:15

**standard**
104:9
104:14
104:18
115:1 132:2
140:11
171:13
173:20
183:4
184:20
184:25

199:22
199:23
214:12

**standardize**
114:22
115:3

**standards**
30:15 30:16
185:24
186:25
188:14
196:21
196:23
201:13
206:13

**Stanford**
131:21
164:6 167:4

**Star** 30:4

**stark** 72:20

**start** 56:2
108:11
113:22
143:2
153:22
155:19
258:5

**started**
40:9
42:24 261:1

**starting**
27:13
37:6 127:21

**starts**
96:10 96:24
101:16
157:18

**state** 7:13
41:15 50:19



Exhibit 2
Page 148 of 163

107:5 109:5
113:10
113:14
127:22
134:16
140:5
140:10
159:23
168:22
186:16
187:18
211:15
217:18

**stated** 9:14

**statement**
46:9 47:3
47:13 48:18
48:24
49:1 49:6
49:8
49:11
50:5
75:24
76:3 129:20
129:21
138:12
138:14
140:21
140:23
141:10
142:10
152:3
155:25
209:19
219:20
221:5 259:5

**statements**
20:7
20:25
47:7
47:17 152:7
155:4 224:9

228:25
229:2
229:13
231:13
231:15

**states**
90:23 92:15

**statical**
234:1

**statistical**
90:5 126:20
136:9
160:12
160:14
160:16
160:18
160:20
160:24
161:10
161:14
223:4
233:24
237:19
239:11

**statistically**
55:25 91:20
106:21
233:13
233:20
234:1 234:6
236:5
236:12
236:22
238:25
239:17

**statistics**
239:22
240:4

**status** 59:5
89:22 112:3
134:18

136:3 192:9
192:24
192:25
193:1 205:2
231:11

**stay** 138:23
189:19
202:7

**stem** 254:24

**step** 11:24
153:1 185:7

**stepping**
153:5

**stereotype**
51:1 173:24
193:15
193:17
193:19
193:22
194:8
194:13
194:14
194:15
194:18
194:25
195:16
230:6
230:13
231:5

**stereotypes**
46:19
48:9
48:10 109:5
109:12
134:17
175:4 175:7
192:2
230:11
230:12
249:18

**stereotyping**
33:4
50:20 51:17
53:11
167:12
172:12
176:4
193:12
193:12
193:13
194:1
194:23
233:4 249:6
250:8
254:25

**Steve** 7:14

**stick** 74:7
208:7

**stipulate** 8:4
8:8 8:14

**stipulating**
8:1

**stipulations**
7:24

**stop** 82:6
159:17

**store** 108:20

**story**
105:14
167:9

**Strahm**
244:3
244:20
245:22
252:3 254:8

**Strahm's**
241:13
244:15
245:3


NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

Exhibit 2
Page 149 of 163

**strategy**
39:12

**STREAMING** 7:1

**street**
87:19 87:20

**strength** 72:9
72:11
86:3 90:6
143:24
163:11

**strengths**
86:13

**strive**
11:19 11:21

**strong** 25:3
58:14 136:6
136:11
142:10
144:1
215:14
216:1

**strongly**
75:25 75:25
76:23 82:23

**structural**
77:15

**structure**
192:1
206:15

**structured**
30:12 30:12

**student** 81:10
82:24

**students**
86:18
128:17
239:24

**studied**

117:14
117:14

**studies**
40:7
47:21
48:1 51:9
52:25 53:15
53:16 53:22
53:25
54:5
54:18 54:20
54:25
55:8
55:21 55:22
55:25 58:11
58:23 58:24
60:6 61:4
61:8
61:18 61:20
63:6 63:8
77:7
78:24
85:4 85:8
85:10
86:4 86:9
86:11 86:18
86:21 88:14
88:15 88:16
89:9
89:20
90:4 91:6
95:9 98:9
98:22
100:19
101:23
102:23
103:1
103:10
103:16
104:2
104:20
105:19

105:21
106:6
106:13
106:15
108:4
108:13
108:16
108:22
109:1
109:18
110:5 110:5
110:11
110:14
110:23
111:2 111:4
111:11
111:18
113:5
117:13
117:18
117:24
118:10
119:12
122:19
123:14
123:18
125:5 125:8
125:16
125:24
126:4 126:8
126:9
135:20
136:1 137:2
137:12
137:17
154:4 155:8
156:10
157:9
157:18
163:6 163:9
175:8
203:16
210:1

210:25
211:5
211:14
212:4
214:18
215:2 215:6
215:11
215:12
215:22
218:5 220:8
222:14
223:20
224:5 224:6
224:14
226:11
226:12
227:4
228:11
228:12
228:15
228:18
228:18
228:21
230:19
230:20
232:23
232:24
233:2 233:3
233:16
233:22
234:15
234:18
234:21
234:22
235:23
235:24
236:3 236:4
236:21
237:1 238:4
260:15
260:16
260:17



Exhibit 2
Page 150 of 163

260:22

**stuff**
139:13
146:3
207:11

**style** 18:25
127:12
148:25

**styles** 143:10

**subject** 134:9
134:10
134:12
164:21
164:23
164:25
165:4 165:7
165:10
165:13
165:24
166:8
166:17
166:24
172:11
172:11

**subjected**
29:16

**subjecting**
62:15

**subjective**
109:7
109:13
110:2 116:9
116:17
133:6
251:17

**submitted**
23:23 122:8
158:11

**subordinate**
74:12

212:15

**subordinates**
217:19
220:17
220:20

**subsequent**
174:14
176:10
242:15

**subsequently**
244:3

**substance**
24:15 25:12
38:24

**substantiated**
256:18

**substantive**
25:15

**substitute**
185:15

**subtle**
73:20 124:3

**successes**
64:18

**successful**
218:8

**successfully**
194:25

**sudden** 31:25

**Sue** 242:14
250:23

**sufficiently**
62:5

**suggest**
166:19
258:17

**suggesting**

91:14

**suggestions**
160:5

**suggests**
115:16
164:17
212:20
217:19
217:21
251:16

**summarize**
223:16
224:13
224:21

**summarizes**
37:8 231:7

**summarizing**
223:14
228:11
229:22

**summary** 34:13
34:14 60:11
90:22
222:14
223:5

**super** 83:12
144:20
204:6
212:15
230:9

**superior**
112:14
119:18

**supervisors**
110:14
111:22
137:22
142:18

**supervisory**

116:9
116:10

**supplement**
12:20

**supplementary**
223:1

**supplied**
39:15 40:11

**support**
74:6 222:10

**supported**
124:14

**supporters**
74:13

**supports**
236:13

**supposed**
61:13
67:9
87:18
187:13
189:14
229:14

**suppressed**
83:18

**sure** 9:19
12:22
15:5 16:7
16:21 19:23
22:24
24:3 25:1
25:3 28:8
34:3
39:20 40:22
49:6 51:3
59:5 59:7
65:12 68:19
71:3 72:13



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 151 of 163

81:3 85:4
89:15
100:21
101:1
110:16
114:2
117:16
117:20
118:21
118:21
118:21
119:4 119:8
120:21
120:23
121:6
129:20
130:20
133:14
140:9 143:9
147:24
148:16
151:13
157:20
164:15
168:4 176:7
183:13
184:17
198:16
205:6
205:17
206:6
208:12
217:2
222:12
223:24
232:9
241:24
256:7
256:22
257:2 259:5
259:9
261:21

**surgeon**
244:24
**surgeons**
35:17
71:1 74:2
154:7 154:9
155:5
155:12
155:18
155:19
155:21
156:25
157:10
157:13
**surprised**
166:1
193:15
194:10
**surprising**
255:1
**survey**
21:11 21:12
149:3 149:5
149:7
149:16
149:23
150:19
150:24
150:25
151:22
151:25
151:25
152:12
152:14
153:5
**surveyed**
152:11
**surveys**
152:16
158:10

**Susan** 74:18
75:11
**suspect** 110:6
**Suspension**
124:4
**suspicious**
207:4
**sustain** 47:17
47:19
**suture** 158:19
**swear** 8:22
44:12
**swears** 7:20
7:20
**Sweden** 57:2
**Swedish** 61:8
**sweeping**
152:7
**sweet** 73:22
**switch** 161:18
**sworn** 9:8
**swung**
237:21
237:25
238:22
**symptoms**
169:8 169:9
169:18
169:25
170:2 170:6
**system** 192:11
192:13
198:14
238:16
**systematic**
88:13 97:7

98:14 98:18
**systematicall
y** 245:23
**systems** 95:2

_____

T

**tab** 27:5
**table** 92:15
126:12
126:14
126:15
126:19
164:4 164:8
164:17
164:19
166:11
166:12
230:8 230:9
**tables** 73:13
**tagging**
229:18
**tailor** 207:18
**tailoring**
206:25
207:4
**taking** 8:1
11:2 142:1
**talk** 15:22
18:24
19:7
24:19
25:8 27:8
30:5 30:6
30:24 59:10
60:6 66:7
69:3
84:24
89:4 101:13
117:2



(800)528-3335
NAEGELIUSA.COM
NAEGELI DEPOSITION & TRIAL

Exhibit 2
Page 152 of 163

119:12
138:15
139:24
157:19
158:17
159:1 159:4
168:18
171:15
172:21
189:19
191:4
193:11
204:2
207:10
215:6 225:4
234:3
254:12
262:5
**talked**
17:16 17:21
53:8
56:18
61:9
71:15
118:13
123:12
151:9
153:17
155:3 167:6
176:22
189:23
190:13
192:16
205:2
212:13
227:21
249:2
251:11
252:5 254:5
256:19
**talking** 11:10
29:24 37:12

44:13 51:19
72:7
85:12 94:19
95:15
99:1
99:15
105:24
105:25
107:24
108:13
129:25
130:9
130:11
130:12
134:1
144:18
147:16
152:15
156:8
163:24
185:25
191:10
196:14
197:1
214:11
216:6 217:4
219:5 220:7
224:14
224:15
227:2 227:4
231:19
231:20
234:5
236:24
237:1 241:9
242:9
242:23
250:11
255:19
261:24
**talks** 91:4
155:10

165:22
166:3
**tangible** 94:1
**tape** 172:19
**target**
46:22
103:22
104:1
126:17
235:9
235:10
260:2
**targeted**
215:15
**targets**
125:22
**tasked** 139:6
**teacher** 176:1
**teaches** 190:7
**teaching**
174:11
175:24
**team** 110:1
110:8
**teams** 204:11
**technical**
8:15
13:20
154:18
**techs**
168:11
168:14
**telephone**
173:22
**temporary**
204:9
204:17

**tend** 45:2
45:3
72:17 72:19
72:21 97:16
98:6 101:17
101:18
101:19
101:21
139:9
203:15
214:6 214:9
215:14
220:13
222:3
226:24
231:23
240:6
240:14
253:2 257:5
259:24
**tendency**
64:17
125:23
257:19
**tends** 35:11
107:1 137:8
137:10
156:11
175:19
191:11
228:16
259:23
259:24
260:1
**tens** 55:24
62:23 77:10
**term** 89:24
128:3 130:7
207:4
239:11
239:17



Exhibit 2
Page 153 of 163

239:25
240:1 256:5
256:14
256:15

**terminology**
137:7
223:22
223:25
226:25

**terms** 24:15
39:2
41:15
45:1 69:8
72:8 78:3
93:20
130:23
133:8
145:17
165:17
176:9
186:11
197:7
203:13
205:1
205:15
215:14
215:17
218:22
223:14
228:1
234:19
261:22

**terrible**
87:25 87:25

**test** 46:12
46:13 57:18
58:8
76:16 77:23
79:2
95:11 102:2
126:20

135:5
215:13
226:10

**tested** 116:17

**testified** 9:9
28:3
50:24
154:17
224:25
227:21

**testify** 10:16
10:20
11:3 28:2
29:9 53:9
140:16
190:12
255:6

**testimony** 9:1
10:18 10:20
24:21 24:23
25:7
27:18 27:22
28:17 28:22
29:7
29:12 37:13
42:16 54:11
62:19 67:12
67:14 68:25
69:17
154:24
160:22
173:1 181:9
181:15
182:2 182:6
182:9
183:10
189:19
190:22
195:5
205:16
207:1

236:10
236:10
255:10

**tests**
153:10
226:11

**Texas** 28:11
29:3

**text** 16:3
80:22 91:12
91:21 91:24
92:5
96:22
115:14
120:4
165:22
167:18

**textbook** 50:4
223:6

**thank** 7:22
8:19 9:5
9:7 16:22
17:14 36:17
44:4 72:4
74:24
118:25
121:20
122:13
196:1
216:19
219:8
255:24
262:19

**Thanks** 9:21
36:15
121:13

**theme** 57:21

**themselves**
7:12 139:15
172:6

253:10

**theories** 52:4
53:18

**theory** 58:5
164:1 167:2
191:22
191:23

**therefore**
25:10 65:17
65:18
176:16
176:23
200:25
237:23

**there's** 15:11
25:19 35:21
53:22 54:18
61:7
61:11 61:14
61:17 61:18
62:10
63:2 64:2
67:5
69:11 69:25
70:13 71:13
73:22 75:17
75:20
77:4
80:22
85:3 85:4
85:5 86:9
88:5
88:13 91:23
93:14 93:15
95:2
97:11 98:24
102:1 102:1
102:16
104:8 104:9
104:18
107:8 110:2



Exhibit 2
Page 154 of 163

115:5 117:5
123:15
126:15
126:21
129:15
130:21
132:13
132:14
134:23
134:25
135:5
141:17
144:17
144:19
145:7 146:3
146:22
147:16
147:19
148:1 148:1
148:6 148:7
150:6
153:15
155:6 156:1
161:3
162:17
164:11
173:14
174:13
175:2
184:20
184:25
196:15
197:21
197:24
198:1
200:23
203:4
203:22
203:23
204:3
204:15
204:19
204:20

204:20
205:6 205:6
205:9
205:11
208:10
208:10
210:2
210:18
218:3 218:8
219:12
220:19
221:11
222:12
222:12
226:12
228:10
229:6 229:8
230:11
230:14
233:13
235:13
242:1
243:15
244:4
244:13
245:24
246:1 246:9
247:22
249:20
251:19
252:2
252:18
254:15
257:11
260:13

**they'd** 56:11

**they're** 44:21
44:25
45:9 45:9
55:13 55:13
55:16
68:3 68:4

73:7
73:19 81:10
86:10
89:3 89:5
94:20
102:19
110:7 110:8
110:9
113:15
115:22
123:15
136:4
139:10
139:11
139:15
141:18
152:18
152:18
167:3
167:10
180:9
180:19
182:17
187:13
197:20
204:6 212:5
212:19
212:20
213:17
215:15

**third** 160:2

**thoroughly**
20:16
145:24

**thousands**
51:9
53:14 53:14
54:17 55:24
62:23 62:23
63:8 77:11

**thread** 234:25

**threat** 73:3

**thrilled**
105:10

**throughout**
9:17 187:18
191:18
198:23

**throwing**
222:15

**Thus** 124:13

**thyroid** 170:2

**Tiedens**
122:21
122:23
124:1

**till** 20:14

**timeline**
23:22 42:24
68:5 145:20
150:14

**timelines**
22:25 151:6

**tip** 104:3

**title** 255:23

**titled** 37:3
80:16 81:21
101:17
111:10
122:16
124:3
153:20
168:19

**today** 8:1
10:19 78:21
233:22

**today's** 263:6
263:8



Exhibit 2
Page 155 of 163

**toes** 111:8
  140:10

**tolerance**
  230:2
  230:22
  232:21

**ton** 51:10

**tone** 130:18
  130:20
  130:22
  131:2 131:6
  131:12
  131:16
  132:4 132:8
  133:9
  133:10
  134:4 134:8
  134:10
  240:23
  243:22
  244:1
  251:13
  251:15
  251:20
  251:20

**tons** 110:5

**tool** 77:2

**top** 53:2
  97:23 145:4
  164:8
  217:22
  218:11

**topic** 12:19
  13:12 54:12
  59:18
  90:3 140:2

**totality**
  256:24
  259:15

**totally** 32:12
  102:7
  140:18
  239:10

**touched** 49:15

**tour** 16:25

**toward** 37:5
  73:12
  74:8
  74:11 76:22
  80:17 83:12
  87:17
  94:5
  94:22
  131:25
  132:1 138:4
  157:10
  157:16
  169:4 204:7
  204:8 218:9
  218:23
  221:1
  246:22
  257:21
  257:25
  258:19
  258:21

**towards** 39:11
  50:19 72:12
  72:16 107:7

**track** 120:22

**tradition**
  49:20

**traditionally**
  21:8 203:7

**trained** 200:6

**training**
  62:17 69:16
  69:25

70:1 70:5
70:14 70:23
86:19
185:18
185:22
187:5
246:10
247:1
247:12
249:24
250:2
250:15

**traits** 78:2
  79:5

**transcript**
  70:15
  262:23

**translate**
  48:11 85:24
  96:2 112:19
  117:4
  163:13

**translates**
  95:17 117:8

**translating**
  197:11

**transparency**
  222:25

**transparent**
  197:12
  223:21
  224:8

**tray** 158:20

**treading**
  67:11

**treat** 78:5

**treated**
  136:12
  144:24

178:9 215:5

**treating**
  185:25
  186:4
  186:25

**treatment**
  124:25
  125:14
  160:5
  209:25

**trenchant**
  185:17

**trial** 8:12
  10:20
  28:2 28:3
  28:23 30:17
  59:10
  190:19
  190:21
  202:10
  202:11
  255:6

**trials** 224:25
  225:3

**triangulation**
  111:1

**tried** 202:6
  227:22

**trivial** 93:20

**true** 51:8
  62:19 77:25
  105:12
  116:19
  160:3
  166:21
  186:20
  195:14
  206:21
  218:20
  239:8



Exhibit 2
Page 156 of 163

Peter Glick PHD     January 10, 2024     NDT Assgn # 70900     Page 157

239:13

**trust** 15:17
  16:14 100:5
  140:19
  151:8 165:3
  165:16
  194:21

**trusting** 68:4

**truth** 9:2 9:3
  9:3 10:5
  47:7 182:2

**truthfully**
  10:16 10:25
  11:3

**try** 12:2 25:7
  32:10 46:23
  51:9
  52:19
  60:4 60:5
  60:18
  93:9
  118:8
  136:10
  146:9
  149:19
  169:15
  190:21
  201:20
  204:23
  207:23
  212:1 218:2
  225:10
  227:16
  231:23
  231:25
  231:25
  238:4
  239:11
  239:13
  259:14
  261:20

**trying**
  33:22
  34:1 49:1
  56:2 56:5
  73:9
  73:13 78:17
  85:24 135:8
  137:18
  138:23
  139:6 161:8
  163:4 169:7
  177:15
  178:7
  179:16
  180:9
  180:15
  181:25
  206:6
  220:11
  227:8
  227:24
  230:7 234:5
  239:7
  240:13
  247:6
  260:18

**Tuli** 29:22
  189:22

**turn** 15:3
  73:13
  115:12

**turned** 115:12

**turning**
  139:14
  154:22

**twice** 58:17
  88:4 165:12

**two-minute**
  232:8

**type** 86:12

96:4
97:25
98:7 165:19

**types** 88:21
  225:14

**typical**
  81:1 149:18
  198:1
  226:16
  227:14
  228:12
  228:14
  228:17
  236:19

**typically**
  30:23 37:25
  42:1 45:9
  47:17 76:21
  94:21 104:2
  110:23
  125:7
  209:11
  209:15
  209:17
  210:1
  210:14
  210:23
  212:4 212:5
  212:19
  214:14
  220:13
  221:13
  221:20
  221:21
  222:3
  222:16
  222:19
  223:16
  224:2
  224:20
  225:12
  225:15

225:25
226:3
226:18
226:24
228:5 228:8
233:7
234:11
234:14
234:21
235:1
235:23
236:25
240:7

**typo** 150:6

**typos** 25:21

---

U

**U.S** 81:8
  81:16 81:22
  82:5
  82:15 82:16

**uh-huh**
  11:12
  99:3 108:15
  128:16
  256:1

**Uhlmann**
  231:10

**ultimate** 30:1
  32:21
  139:22
  174:5

**ultimately**
  30:9 31:1
  177:19
  177:20
  186:13
  245:16
  246:24

**unbiased**


NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Exhibit 2
Page 157 of 163

52:16

**unclear** 25:20

**uncomfortable**
47:13 60:13

**uncommon** 50:5

**undergraduate**
128:17

**underlying**
73:23
203:25

**understand**
10:4
10:10 10:12
10:25
11:8
11:13 12:10
13:17 30:17
48:9 51:9
54:6
54:24
57:9 58:4
59:14 94:16
94:18
95:6 107:18
107:21
146:16
156:15
168:4 173:8
180:13
182:22
183:1 187:2
187:4 195:4
195:5
200:20
206:2 206:6
206:14
206:15
208:11
213:12
222:7 223:3
223:4

223:10
224:11
228:22
239:10
239:17
240:4
255:14

**understandabl
e** 55:13
239:15

**understanding**
22:21 28:16
28:19
31:2
51:11 56:17
64:8 67:9
70:4
87:14
141:25
145:20
168:10
189:24
206:12
208:4
215:19
239:25

**understands**
53:17

**understood**
12:6
32:15 257:3

**undertreatmen
t** 135:8

**unexpectedly**
157:5
157:14

**unfair** 73:3
127:25

**unfairly**

187:1

**unfolded**
145:20

**unfortunate**
57:16

**unfortunately**
32:16
206:16

**unimportant**
187:2 204:9

**uninvestigate
d** 256:3

**unit** 138:10

**units**
197:22
198:10

**universe**
147:2 254:9

**University**
7:17
22:12 28:11
29:3
74:19
174:13

**unknown** 148:6
148:6 148:7

**unknowns**
148:6 148:7

**unleashing**
226:15

**unless** 18:6
132:14

**unlikely** 52:8
147:19
159:17

**unpredictabil
ity** 38:9

**unprofessiona
l** 71:2
176:13
252:10

**unprofessiona
lly**
244:18
245:22

**unreliable**
160:17

**unsubstantiat
ed** 255:15
255:18
256:13
256:18

**unusual**
113:16
113:17
148:21

**unusually**
145:22

**unwarranted**
127:25

**unwieldy**
86:15
118:11

**update** 38:20

**updated** 18:17
23:23

**updates**
38:1
38:16 38:20

**updating** 41:2

**UPenn**
174:11
175:24

**upon** 187:13
212:14



Exhibit 2
Page 158 of 163

upset 73:6
  213:13
useful
  60:20
  163:15
usual 25:17
  234:22
usually 17:23
  17:24 24:19
  24:25
  25:6 42:2
  62:10 75:18
  103:4
  130:11
  148:10
  148:11
  148:12
  196:13
  197:20
  222:24
  261:18

———————

V
vague 48:22
  203:19
  236:14
  237:5 238:1
vagueness
  71:8
valid 69:18
  70:11
validates
  77:5
validity
  141:11
  152:13
  153:14
valuable
  152:25

value 119:6
  129:14
  197:22
  198:10
values 160:19
variable
  45:18 96:19
variables
  45:3
  45:12 45:13
  53:18
  56:2
  83:16
  90:6 93:4
  96:3
  203:2
  203:14
  205:2
  226:15
  229:5
variance
  141:17
  141:22
variances
  72:8
variation
  61:18 83:15
variations
  203:11
  203:23
varies 42:23
variety
  254:20
various 53:22
  91:4 95:6
  127:8
  156:12
vary 63:9
  72:10 128:7

128:9
vast 58:10
  58:13
  214:24
verbally
  16:10
version
  75:9
  75:10
  76:8 261:19
versions
  261:20
versus
  63:15
  77:2
  84:11
  102:22
  116:9 125:1
  125:14
  126:18
  126:23
  129:18
  130:15
  143:15
  178:2
  183:19
  210:9
  235:18
  239:3
  244:16
  245:3
via 8:2
video 8:9
  8:10 8:11
  8:11 17:6
  263:7 263:8
videographer
  7:7 7:19
  8:9 8:21
  9:6 36:18

36:21 43:22
  71:24
  72:2 121:15
  121:18
  151:14
  151:17
  195:21
  216:14
  216:17
  232:10
  232:14
  262:21
  263:5
  263:10
videographer'
  s 8:11
view 160:9
  214:4 230:1
  230:21
  232:19
  232:24
  239:2
viewing
  127:24
views 79:23
  82:16 88:24
  107:15
  231:17
  248:7 250:7
vignette
  158:18
  159:8
  159:12
  159:16
  159:22
  160:2 160:7
  161:5
vignettes
  158:15
  158:24



NAEGELI DEPOSITION & TRIAL     (800)528-3335     NAEGELIUSA.COM

Exhibit 2
Page 159 of 163

159:2

**Vincent** 196:1

**violate**
184:21
184:22
184:23

**violated**
184:15
192:25
195:2

**violence**
162:21
224:12

**voice** 133:13

**volumes** 54:20

———————

W

**wait** 42:18
85:2 118:23

**waiting** 43:24

**walk** 16:23
178:18

**walking** 87:18
87:19
219:19

**warm** 193:16
193:20
193:22
194:2 194:3

**warmer** 193:14

**warrants**
199:21

**wasn't** 23:8
100:18
132:10
140:18
206:21
234:8

246:20

**water** 149:14

**waters** 260:18

**ways** 24:22
53:4
61:11 61:14
61:15
73:3 156:12
170:9
170:19
203:11

**weak** 93:6
97:16

**weakness**
163:12
163:16

**weaknesses**
86:2 163:7

**weatherman**
252:14

**webcam** 16:17

**website**
27:6
43:17 43:18
43:20

**WEDNESDAY** 7:4

**weed** 60:18

**weeks** 122:4

**weigh**
115:10
170:23
246:11
256:24

**weighing**
245:6
246:16

**weight** 54:2

54:2 54:4
54:8
54:24
55:3 56:6
56:24 58:14
60:5 61:6
61:19 118:6
180:11
185:12
224:22
228:21
260:12
260:14
260:21

**we'll** 8:8
8:14 12:1
12:1 13:9
13:10
14:9 25:8
26:4 33:9
34:19 36:18
47:24
80:4 157:22
161:20
193:19
262:5

**well-known**
45:14 62:22

**well-
learned**
46:18

**we're** 8:1
12:18 13:12
15:3
15:15 15:23
15:25
25:1
45:20
48:7
60:16
63:9 77:8

85:11 97:14
97:23 99:15
101:24
109:19
109:22
109:23
111:7
120:17
126:25
128:21
129:25
133:19
140:1
179:10
182:19
191:10
193:15
195:19
196:14
197:1 223:2
223:2
224:14
224:15
231:19
236:24
237:1
237:19
253:1
262:12

**West** 143:16

**Western** 65:7

**we've** 22:15
41:7
43:16
48:9
48:10 51:10
65:3
112:1
113:24
123:12
127:16
176:21



Exhibit 2
Page 160 of 163

185:4 185:4
187:4
187:23
212:13
220:22
233:21
250:21
250:21

**whatever**
54:15 60:11
66:12 67:18
71:14 130:6
173:19
175:24
197:22
199:22
248:17
251:23
261:13

**whenever**
53:14 84:2

**whereas**
45:7
92:20 96:25
97:1

**where's** 133:5
133:5

**WHEREUPON**
26:8
33:13 34:20
36:20
72:1 75:2
80:7
90:12 114:6
121:17
123:22
151:16
157:24
161:22
216:16
232:13

263:13

**whether** 17:21
19:4
29:16 32:22
39:13
51:1
51:17
52:6
54:10
59:6
63:18 63:24
64:3 66:4
67:7
68:23
69:9
69:12 69:19
70:11 89:16
89:20 94:25
101:2 102:3
107:1
107:14
112:5
115:10
119:14
128:9 137:1
138:6
140:13
140:16
155:6
159:24
163:5
163:17
169:11
173:9
173:20
173:21
174:25
178:1 178:7
178:17
180:10
181:3 181:9
182:8 183:9

183:16
183:18
183:19
184:1
184:15
184:19
187:19
188:2
196:10
196:21
197:17
199:2
199:21
200:8 201:7
201:10
201:15
202:17
202:18
202:21
204:16
204:17
210:20
217:12
237:11
237:12
237:14
250:12

**whining**
257:18

**whip** 216:2

**white** 83:13

**whole** 9:2
17:9
26:22 60:25
89:13 156:3
173:10
173:11
191:21
207:15
240:17
259:1

**whom** 94:6

**who's** 22:13
32:18 74:18
175:9
188:20
206:2

**widgets**
109:20
109:21

**wield** 74:14

**wife** 16:13
133:1

**Williams**
122:21
123:25

**willing**
141:18
141:19
141:20
149:19
207:6
207:19
208:1 208:7
208:15
208:25

**wind** 252:14

**Wisconsin**
22:12

**wish** 32:6
32:6 32:13

**withstood**
27:18

**witness**
7:20 8:6
8:22 10:9
27:5 27:9
31:13
41:6 42:22



Exhibit 2
Page 161 of 163

43:1
43:15 62:19
141:9 146:4
185:20
188:19
211:23

**witnesses**
64:11
68:2 68:3
68:5
134:1
246:12
246:12
248:6 248:9

**witnessing**
149:25
150:2

**woman** 57:22
57:23 87:21
88:1 88:2
89:21 102:8
102:22
104:13
112:22
112:24
127:24
128:1 128:9
128:19
129:18
130:15
131:19
193:15
194:17
210:12
212:8 213:3
213:18
214:7
219:18
221:7
225:18
227:13
235:18

239:3
245:15
246:23

**woman's** 63:13
213:2

**women** 47:3
47:6
47:14
51:6
57:11 57:24
57:24 70:19
72:10 72:12
72:18 72:21
73:1 73:6
73:9
73:10 73:12
73:23
74:9
74:10 74:11
76:8
77:16 77:17
77:18
78:5 78:7
78:9
78:11 80:24
81:16
82:2 82:9
82:14 82:15
88:25
92:1 92:4
93:8
93:12 93:21
94:3
94:20 94:22
95:25 97:17
98:5
107:7 108:1
112:7
114:15
115:25
116:18
117:2 117:3

122:17
123:2 123:4
123:10
124:12
124:19
125:1
125:14
125:23
126:5
126:18
131:25
134:17
134:22
134:24
135:6
135:14
135:19
135:21
135:24
136:3
136:13
137:14
137:23
138:11
142:19
142:19
156:21
162:20
163:18
164:22
165:16
165:19
167:10
167:11
167:13
186:3
191:18
192:2 192:3
193:14
193:21
210:13
210:16
212:13

215:4
215:15
218:6 218:9
218:17
218:17
218:18
218:19
218:22
218:23
218:24
219:16
220:24
221:1 221:6
225:12
226:1
226:13
226:19
228:7 230:1
230:3
230:13
230:21
230:23
231:5 231:9
232:19
232:22
232:25
233:5

**women's** 29:23
124:5 221:6
233:10

**work** 16:13
22:17
32:1
38:24 39:12
40:18 42:22
43:15
96:6
102:9
156:19
174:24
175:1 176:2
254:22



Exhibit 2
Page 162 of 163

261:3

**worked** 44:6
59:1
153:7 164:6

**working**
27:9 77:9

**workplace**
88:25 90:25
91:16 91:19
92:17 92:19
92:21
93:2 93:3
93:13 95:21
96:13
97:2 108:18
123:4
148:25
176:14
184:15
221:24

**works**
107:19
201:22

**world** 21:24
46:15 102:3
102:11
130:14
143:13
204:18

**worldwide**
105:4

**worry** 24:8

**worse** 85:4

**worth**
115:11
146:23
254:14

**would've**
23:25 86:23

**wrap** 49:2

**wrist** 184:23

**write** 52:19
53:2
54:20 72:16
154:17
189:25
207:14
208:25
209:11
224:19
225:11
239:8

**writing** 222:6
222:21
222:22
223:5
223:20
261:19

**written** 30:24
35:20 37:20
38:6
38:13 70:9

**wrong** 57:18
98:25
156:17
193:5 247:5

**wrote** 29:20
56:16 85:20
107:11
140:20
151:2 154:5
180:14
180:15
180:16
185:5 223:6
258:14

─────────

Y

─────────

**yelling** 133:3

133:4
133:13
133:16

**yesterday**
14:2
19:19 20:14
78:20

**yet** 26:10
26:11 36:10
77:8
79:16
191:19
191:24
243:15

**yo** 176:5

**you'll**
14:20 67:13
80:2 166:12
238:12

**young** 178:10

**yourself**
14:20 110:1
141:9 218:7

**you've** 9:23
11:6
37:23
41:9
41:17 49:15
50:24
52:9 52:9
53:7
56:18 56:18
99:9 100:16
117:12
118:6 119:5
136:25
142:16
148:18
148:19
158:7

179:14
180:17
187:5
189:18
205:14
205:15
205:16
224:24
224:25
224:25
227:20
227:21
227:21
227:22
262:17

─────────

Z

**Zelek** 158:3

**zero** 77:23
91:14 91:18
91:20
124:21



Exhibit 2
Page 163 of 163