

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

DR. RUPA BALA,

Plaintiff,

v. Case No.: 3:18-CV-00850-HZ

OREGON HEALTH AND SCIENCE UNIVERSITY, an Oregon public corporation; DR. CHARLES HENRIKSON, an individual; DR. JOAQUIN CIGARROA, an individual,

Defendants.

---

**REMOTE VIDEOTAPED DEPOSITION OF**

**MOLLY CARNES, M.D.**

**TAKEN ON**
**TUESDAY, JANUARY 9, 2024**
**10:06 A.M.**

**2014 CHAMBERLAIN AVENUE**
**MADISON, WISCONSIN 53726**

REMOTE APPEARANCES

Appearing on behalf of the Plaintiff:
STEPHEN L. BRISCHETTO, ESQUIRE
MATTHEW ELLIS, ESQUIRE
Brischetto Law Offices
621 SW Morrison Street, Suite 1025
Portland, OR 97205
(503) 223-5814
(503) 274-8575 (Fax)
slb@brischettolaw.com

Appearing on behalf of the Defendants:
ANDREA H. THOMPSON, ESQUIRE
Stoel Rives, LLP
760 SW 9th Avenue, Suite 3000
Portland, OR 97205
(503) 224-3380
(503) 220-2480 (Fax)
andrea.thompson@stoel.com

ALSO PRESENT:
Megan Bradford, Representative, OHSU
Emily Shults, Esquire, Counsel for OHSU
Vincent Guerrera, Remote Technician

INDEX

| | Page |
|---|---|
| EXAMINATION BY MS. THOMPSON | 8 |
| EXAMINATION BY MR. BRISCHETTO | 300 |
| FURTHER EXAMINATION BY MS. THOMPSON | 301 |

EXHIBITS

| Exhibit | | Page |
|---|---|---|
| 1 | EXPERT STATEMENT | 21 |
| 2 | A PIECE OF MY MIND | 63 |
| 3 | JOURNAL OF GENERAL INTERNAL MEDICINE | 109 |
| 4 | FRONTIERS IN PUBLIC HEALTH | 110 |
| 5 | SECOND AMENDED COMPLAINT | 135 |
| 6 | APPENDIX H | 139 |
| 7 | A QUALITATIVE STUDY | 144 |
| 8 | ANSWER TO SECOND AMENDED COMPLAINT | 168 |
| 9 | OUTLINE OF NEW INTERVENTION | 282 |

REMOTE VIDEOTAPED DEPOSITION OF
MOLLY CARNES, M.D.
TAKEN ON
TUESDAY, JANUARY 9, 2024
10:06 A.M.

THE VIDEOGRAPHER: We are on the record. The time is 10:06 a.m. The date is January 9, 2024.

This is the beginning of the deposition of Dr. Molly Carnes. The case caption is Bala v. OHSU.

Will counsel please introduce themselves and state who they represent.

MR. BRISCHETTO: Steve Brischetto, for the plaintiff.

MS. THOMPSON: Andrea Thompson, for Oregon Health and Sciences University, and Drs. Charles Henrikson and Joaquin Cigarroa.

THE VIDEOGRAPHER: Okay. Ms. Thompson, if you would like to make your stipulations and everything before our court reporter swears in the witness, you may do so.

MS. THOMPSON: Thank you.

Good morning, Mr. Brischetto. I just wanted to get a few things, some stipulations on the record before we administer the oath to Dr. Carnes.

Just want to make sure we're agreeing, we're stipulating that Dr. Carnes's deposition is taking place via remote means.

MR. BRISCHETTO: Agreed.

MS. THOMPSON: All right. And we are stipulating that the oath can be administered by Ms. Byrd, our court reporter, who is not present with the witness.

MR. BRISCHETTO: Agreed.

MS. THOMPSON: All right. We're stipulating that the video is being recorded by a videographer, not the videoconferencing method, and that the videographer's video will be the official video record for use at trial.

MR. BRISCHETTO: Agreed.

MS. THOMPSON: And can we stipulate that the time spent -- sorry. The time spent addressing any technical issues today will not be counted against the presumptive allotted deposition time of seven hours?

MR. BRISCHETTO: Of course.

MS. THOMPSON: All right. That's what I have, Ms. Byrd.

THE REPORTER: All right.

THE VIDEOGRAPHER: Okay. Our -- our court

reporter will swear in the witness.

THE REPORTER: Good morning. Just real quick. I am your court reporter for today and I just have a quick statement to make for the record.

I would like everyone to please speak loudly, clearly, and slowly so I can make an accurate transcript today. Please try not to talk over one another as I can only report one person speaking at a time. I will be administering an affirmation for any testimony given, and I would like to stipulate for the record that the remote affirmation and the remote testimony will be administered and reported by myself, a professional digital reporter. The testimony will be transcribed and certified.

Dr. Carnes, would you please raise your right hand for me.

Do you affirm, under penalty of perjury, that you are Dr. Molly Carnes, and that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: Yes, I do.

THE REPORTER: Thank you.

Please proceed.

MOLLY CARNES, M.D., having affirmed to tell the

truth, was examined, and testified as follows:

EXAMINATION

BY MS. THOMPSON:

Q. Good morning, Dr. Carnes.

A. Good morning.

Q. My name is Andrea Thompson. I introduced myself earlier. I am an attorney for OHSU and Drs. Henrikson and Cigarroa.

Could you please state and spell your full name for the record, please?

A. My last name is Carnes, C-A-R-N-E-S. And professionally I go by Molly, M-O-L-L-Y, although my birth certificate is Mary, M-A-R-Y. So you often will see either one.

Q. Great. Thank you.

And I mentioned who I represent. As we go through the deposition today I may refer to OHSU to encompass not only OHSU but also the individual doctors.

Do you understand?

A. Yes.

Q. Is that fair?

A. Yes.

Q. If I'm going to ask you a specific question about Dr. Henrikson or Dr. Cigarroa, I will

specifically state that.

A. Okay.

Q. Do you understand?

A. Yes.

Q. Okay. Have you ever had your deposition taken before?

A. No.

Q. So with that, and I'm not sure if you're aware but I want to go over some ground rules with you for the deposition. And let me just start by saying doing depositions remotely this way can be a little clunky. Normally, we're in person as we planned to be with you but with the flight cancellations and the weather we're doing this remotely. So please bear with us. Some of the technology could get clunky and the like but the ground rules pretty much are the same.

A. I lived through the pandemic, so.

Q. Okay. All right.

So you understand that you just took an oath to the tell the truth; correct?

A. Yes. Yes.

Q. And you understand that oath is the same as if you were testifying in a courtroom before a judge and before a jury?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

10

A. Yes.
Q. And you understand that that oath carries a penalty of perjury which is a crime?
A. Yes.
Q. Do you understand that if you provide testimony that is not truthful today that we, counsel for OHSU, we will point that out to a judge and/or a jury?
A. Yes.
Q. Dr. Carnes, I'm entitled to your full and best testimony today because this may be the only time that I have an opportunity to speak with you before trial. So if I ask you a question and later on in the deposition you remember something else, right, I ask you a question, you give me an answer but later on you think of something else, will you please let me know and provide that additional information?
A. Yes.
Q. All right. Thank you.
Is there anything going on right now in your life that would prevent you or impede your ability to give full and truthful testimony today?
A. No.
Q. Are you taking any medications right now

11

that might affect your ability to understand my questions or testify truthfully?
A. No.
Q. So we are on video and I can see your head shaking and I will be nodding and the like. Because Ms. Byrd, our court reporter, is taking everything down, it is very important that you answer audibly. So although I can see you shaking your head --
A. Yes.
Q. -- it doesn't reflect in the record.
A. Okay. Thank you.
Q. It's also very important for Ms. Byrd that we do not interrupt one another so we don't have crosstalk because it makes it impossible for her to take down the questions and answers.
Do you understand?
A. Yes.
Q. Okay. Dr. Carnes, if you answer any of my questions today, I'm going to assume that you understood the question and that you provided me with your full and complete answer. Is that fair?
A. Yes.
Q. All right. And if you don't understand any of my questions I really need you to ask me to clarify the question. Is that fair?

12

A. Yes.
Q. Okay. And I anticipate because you're a medical professional and have 30 years of experience conducting research that there may be things I just don't understand, and I'll be asking you to help me understand. And so if my questions aren't good, please let me know. Okay?
A. Sure.
Q. At any point during your deposition you can request a break. If you request a break, I believe, and we can confirm, but I believe that you and Mr. Brischetto and/or Mr. Ellis can go into a separate breakout room if you want to have consultation or we just need comfort breaks. It's 8:13 my time. I'm in Portland, Oregon right now and I've consumed a lot of coffee, so I may be asking for some comfort breaks early myself. Okay?
So because the deposition is remote and this is -- these are rules we typically don't ask if we're in person. These are a little clunky. But absent certain circumstances, I need you to agree to power down all electric -- sorry, all electronic devices that are around you that aren't being used for the deposition.
A. I don't think I have any.

13

Q. I'm not talking about computer printers. I'm talking about cell phones, anything like that. Do you have any of those, any electronic devices near you?
A. I do have my cell phone here. Do you want me to take it away?
Q. If you could power it off, please.
A. Oh, I can do that. I can do that.
Okay. It is off.
Q. Excellent. Thank you.
And can I have your agreement that you will not communicate in any way with anyone not on the record during our deposition today?
A. Yes.
MR. BRISCHETTO: You're not asking her if -- you're not telling -- asking if she is committing not to confer with counsel during breaks; correct?
MS. THOMPSON: Correct.
MR. BRISCHETTO: Okay.
BY MS. THOMPSON:
Q. Obviously, Dr. Carnes, you can speak freely with Dr. -- excuse me, Mr. Brischetto during breaks. I can't imagine you would do this but we've had other situations where unbeknownst to us there were other people in the room with the witness who

are, you know, passing notes and the like. So I just want to confirm there's no one else in the room with you today?
A. No. Right now there's not even anybody else in the house but my husband may come home later.
Q. Okay.
A. But not in this room.
Q. All right. And if anyone does enter the room would you let me know immediately?
A. Yes.
Q. All right. And if anyone attempts to communicate with you other than Mr. Brischetto or Mr. Ellis will you notify us immediately?
A. Yes.
Q. And do you agree not to email during our deposition?
A. Yes.
Q. Do you agree not to engage in any online chat during our deposition?
A. Other than with Mr. Brischetto, is that right? Am I not allowed --
Q. During a break -- during a break you may --
A. Oh, during a break, no. Or, yes. During

a break I can communicate with him but not -- I won't chat with him during the Zoom. Is that right then?
Q. Correct.
A. Is that what you're saying? Okay, sure. Yep. Yep.
Q. Okay. And similarly, you agree that you will not be texting with anyone during our deposition?
A. I just turned my phone off.
Q. All right. Again, I hate to ask but I have to. Is it possible for you to just briefly -- I don't know what kind of setup you have. I don't want to knock your video out but is it possible for you to take your camera and pan the room --
A. Oh, sure.
Q. -- to confirm there's no one else present?
A. I think so. It's just a small little office. Okay, here we go. I've got the camera here. There's a window. There's a messy little desk. There's a door.
Q. You have beautiful furniture.
A. It's an old house but that's pretty much it. It's just a little office.
Q. All right. Thank you so much. Thank you.

A. Built in bookshelves. I tried to straighten the books in the background so I didn't look as messy as I usually do but you caught me. You made me show the other piles of stuff.
Q. Dr. Carnes, I have my screen blurred.
A. So you get it.
Q. Yes. In part because I have other client, you know, matters behind me but yeah, I gotcha.
And then because we're videorecording this and the like, can you agree to do your best to try to keep the video free from distractions such as background noise, pets, kids, and the like? We just want a clean record.
A. Yes. I will do everything I possibly can.
Q. Right. All right.
Dr. Carnes, how did you prepare for this deposition?
A. I re-read my testimony that I had written and submitted. And, excuse me, I pulled up and reviewed some of the materials I referred to in that testimony. I refreshed my recall of some of the papers I referred to. I would say that's pretty much it.
Q. Okay. Have you discussed this case with anyone other than counsel for Dr. Bala?

A. No.
Q. Do you have any documents in front of you right now related to this case?
A. Yes. I tried to pull out things I thought might be useful so I have -- not everything obviously but I have some things at my fingertips. I have my statement here, for example.
Q. So Dr. Carnes, I'm going to request, if we were in a deposition room in person together you would be sitting at a conference room table with nothing in front of you. So I'm going to ask you to please take that stack of papers that you have and put it under your desk, someplace that you can't review them.
A. Got it. Done.
Q. All right. Were any of the documents that you reviewed or that you pulled that you just had in front of you, were any of those documents, documents that were not provided to you by Dr. Bala's counsel?
A. Well, I reviewed some of the studies which I had pulled but any of the materials related to the exhibits it had all been provided to me a long time ago.
Q. Okay. And when you're referring to studies, are all of the studies that you pulled,



that you now have under your desk, are all of those studies that were outlined in your reference page of your report?
A. Yes. Yes.
Q. Any other studies beyond those outlined in your report, or I believe you sent Mr. Brischetto a supplemental email with some additional studies?
A. Yeah. I didn't re-review those in preparation for today. I did read them over -- when he sent them to me and I concluded that there was really nothing new. I mean, it was just simply more evidence of the existence of widespread gender bias throughout academic medicine and also I concluded that even if there had been something it was many years beyond what Dr. Bala had experienced. So basically, I did look at them but not in preparation for today. Today I only looked at things that I had cited.
Q. I'm not sure I understand your answer.
A. Well, I -- you're not -- okay. I think it was a few months ago Mr. Brischetto sent me some new papers in academic medicine that had looked at gender bias and I did look at those papers. In preparation for today though I didn't look at any additional papers from those that I cited in my

written report.
Q. Okay. So your testimony is that -- sorry, I'm so used to being respectful and calling folks doctor, doctor, doctor that I'm referring to Mr. Brischetto as a doctor.
A. (Audio disruption.)
Q. I think what you are testifying to is that Mr. Brischetto provided you some studies --
A. Yes.
Q. -- to review. And did Mr. Brischetto provide those studies to you to review prior to you drafting your June 29, 2021, report?
A. No. They hadn't come out yet. They were new because the case was so long ago and gender bias continues to be studied in academic medicine. And there really is nothing new. It's just more of the same.
Q. Okay.
MS. THOMPSON: Mr. Brischetto, did you provide us a list of those studies?
MR. BRISCHETTO: Yeah. You referred to the list. In the expert disclosure there's an email with those studies.
Does that answer your question?
MS. THOMPSON: One moment. I have an

email that is from Dr. Carnes to you, Mr. Brischetto, sent on September 19, 2023, where Dr. Carnes writes, "I am forwarding these recent publications on which I'm either first author, senior author, or contributing editor." And then there is a list of 11 articles.
MR. BRISCHETTO: Thank you for refreshing my recollection. You're right. That email did not contain those additional studies that we sent to Dr. Carnes. I honestly don't know if we sent you those additional ones because she didn't rely on them but I'm certainly happy to send them to you like during the break or something like that if you want to take a look at them.
MS. THOMPSON: Please.
MR. BRISCHETTO: Sure.
BY MS. THOMPSON:
Q. Dr. Carnes, the materials that Mr. Brischetto provided to you which we have not seen yet, did any of those materials change your opinion or opinions as stated in your June 29, 2021, report?
A. No.
MS. THOMPSON: Dr. Carnes and Mr. Brischetto, do you see there's a chat function at the bottom of the Zoom screen?

THE DEPONENT: Yes.
MS. THOMPSON: So if you click on that, depending on how your Zoom is set up, you should see a ribbon on the right hand side.
THE DEPONENT: Okay.
MS. THOMPSON: And you should see a PDF in the chat.
MR. BRISCHETTO: I don't see a PDF in the chat.
THE DEPONENT: I don't either.
MS. THOMPSON: Okay. Let me -- I did a test earlier.
Let me know if you see --
THE DEPONENT: There it is. Now I see it. Yes.
MS. THOMPSON: All right.
MR. BRISCHETTO: I've got it, too.
BY MS. THOMPSON:
Q. Okay. So again, Dr. Carnes, we're not in person so doing a remote deposition can be a little clunky.
What I have posted into the chat is Document A, which I would like to introduce as Exhibit 1 to your deposition.
(WHEREUPON, Exhibit 1 was marked for

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

identification.)
THE DEPONENT: Do you want me to open it then?
MS. THOMPSON: Please.
Actually, I'm going to screenshare but I want you to have access to the full document.
THE DEPONENT: So I clicked on it. It didn't open.
MS. THOMPSON: You should be able to see a copy of your report at this point.
MR. BRISCHETTO: When I click, it sends me to save.
THE DEPONENT: Oh, now it opened. Okay. Yes. I have it. Yes. Oh, because you screenshared it. That's why. I am viewing Andrea Thompson's screen. Okay. So then I can't move it; right? Do you want me to be able to move it?
BY MS. THOMPSON:
Q. Well, that's why I provided the --
A. Okay. Let me -- let's see. If you can go back to the chat. If I save it then it will let me open it. So if I can go back to that. Go back to the chat window. I think if I save it, it'll let me open it.
ZOOM TECHNICIAN: So Dr. Carnes and

counsel, when a document is in the chat you'll have to download it and then it'll go into your downloads folder and you can open it that way. And if you -- since our -- Ms. Thompson is sharing her screen, you're probably in full screen mode. Just hit your escape button. It'll minimize that so you can see the chat bar.
THE DEPONENT: Got it. Okay. All right. So if I open it here I can save it.
ZOOM TECHNICIAN: If you click the blue downward arrow --
THE DEPONENT: Yep.
ZOOM TECHNICIAN: Yeah.
THE DEPONENT: I'm getting there. Let's see.
MR. BRISCHETTO: I'm there. No pressure, Molly.
MS. THOMPSON: I was going to say, Steve, I'm impressed.
MR. BRISCHETTO: Don't be, really.
THE DEPONENT: Okay. Okay. I have it now. Now, I don't know where everybody else went though. All right.
BY MS. THOMPSON:
Q. All right. So you have a copy of your

June 29, 2021, report; correct?
A. I do.
Q. Okay.
A. I have it right up in front of me. I can't see anybody else now but that's fine.
Q. Okay. And we're marking that as Exhibit 1.
Dr. Carnes, did you seek the input of anyone regarding the content of Exhibit 1?
A. No.
Q. You had no discussion with any of your colleagues about the content of your 2021 report?
A. No.
Q. Okay. Do you know who Dr. Peter Glick is?
A. Yes. In fact, I cited some of his work.
Q. Yeah. I noticed that.
A. I've never met him but I have been an admirer of his work for many years but I don't know him.
Q. Okay. So you haven't discussed this case with Dr. Glick?
A. No. I've never met him.
Q. Okay. So just to be clear, and Dr. Carnes, I apologize. Sometimes I'm going to forget answers that you've given so I may ask you questions

again. And if it becomes -- and Mr. Brischetto, you may have opinions about that but I just want to be very clear that you received no input from anyone related to your June 2021 report?
A. No.
Q. Did Dr. Bala have any input on the specific opinions you expressed?
A. I've never met Dr. Bala.
Q. Did Dr. Bala's counsel have any input on the specific opinions you expressed in your report?
A. No.
Q. Any input on how you phrased any of your opinions in your expert report?
A. Not that I recall.
Q. Is there anything that I could do to refresh your memory today as to whether or not Dr. Bala's counsel provided --
A. You can ask -- you can ask Mr. Brischetto but I'm pretty sure I did this all on my own.
Q. Okay. Are you aware that Dr. Glick issued an expert report in this case?
A. Yes.
Q. And have you seen that report?
A. Yes. I asked to read it because I am such an admirer of his work and Mr. Brischetto said as



long as I didn't share it with anybody, I guess he checked to see if it was okay. And I -- I was pleased to see that -- well, I thought it was a very eloquent report but I was pleased to see that we had actually cited some of the same research, but I was also pleased to see that he really didn't have the academic medicine piece which I think I was brought in for and that I was pleased to see I was able to add to his. Because at first I thought, well, what am I going to add to Peter Glick, but I was pleased to see that I actually was able to add quite a bit because his work has not been in academic medicine.
MR. BRISCHETTO: I would caution, Dr. Carnes, not to disclose your conversations with counsel because that's privileged.
THE DEPONENT: Oh, I'm sorry. Okay.
MR. BRISCHETTO: It's all right. Thank you.
BY MS. THOMPSON:
Q. Dr. Carnes, did you provide any commentary or suggestions regarding Dr. Glick's opinion in this case?
A. No.
Q. Okay. How did you obtain the studies that you reference in your June 2021 report?

A. Well, as a faculty member at the University of Wisconsin I have access to a vast library of materials. And I just accessed them. Reviews. The way I usually do as a tenured faculty member. I research the literature.
Q. Okay. And that's what I was getting to. Not the actual mechanics of how you retrieve the studies but you, yourself, selected the studies that you cited in your report; correct?
A. Yes.
Q. Okay.
A. Can I say, I completely lost the ability to see anybody. Can the -- can the technical person tell me how I can just see people again? All I'm looking at is my home screen. I must have reduced everybody.
ZOOM TECHNICIAN: Absolutely. So Dr. Carnes, if you just go on your computer desktop taskbar where you see the Zoom icon.
THE DEPONENT: Oh, yes. Okay. If I click that will you come back?
ZOOM TECHNICIAN: Yes, we will come back.
THE DEPONENT: No, you didn't. Okay. I'm clicking it.
ZOOM TECHNICIAN: If you hover over it, it

should open up like preview Windows and you should be able to see. Because Ms. Thompson is still sharing her screen so you'll probably see that document. And if not I think --
THE DEPONENT: Okay, now, there was a little green arrow and I clicked that and I'm back. Thank you for helping me. It just -- it was a little disconcerting not to see anybody. Thank you.
BY MS. THOMPSON:
Q. All right. So other than the materials that Mr. Brischetto provided you more recently, all of the studies and citations and references that you relied upon in forming your opinions in your June 2021 report you selected and identified based on your review of literature?
A. Yes.
Q. All right. Thank you.
Dr. Carnes, what is your current occupation?
A. I'm not employed.
Q. What was your last position?
A. I was a professor of medicine, psychiatry, and engineering at the University of Wisconsin.
Q. Okay. I reviewed your CV, which is very impressive. You graduated with a bachelor of arts

degree in 1973; is that correct?
A. Yes. The years, I have to remember the years but I'll stipulate that's correct.
Q. Okay.
A. That sounds right.
Q. What was your major? What did you receive a degree in?
A. Honestly, I don't remember. I think it was called a premed major.
Q. Okay. And you received your medical degree in 1978?
A. Yes.
Q. And you received a Master of Science degree in 2001; right?
A. In epidemiology. Yes.
Q. What is epidemiology?
A. It's the study of risk factors for populations. I was particularly interested in applying the principles of epidemiology to help understand, for example, why women medical studies, a very healthy population of people, were dying off and not surviving to be healthy faculty members since no disease in the western world has the death rate that at that time was seen for women medical students dying off before they became faculty. So

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

generally, the principles of epidemiology are applied to health. But I wanted to learn more about epidemiology so that I could apply those principles to academic medicine.

I hope that answers your question.

Q. Well, you answered my question. I want to unpack that a little bit.

When you refer to the death and dying of female medical students, are you referring to them actually becoming deceased?

A. No. I'm using it metaphorically. Dropping out of the pipeline. So at every -- so for example, there have been almost 50 percent of medical students who identify as women in medical school for 30 years or more now. And at least when I began studying this the percentage of women faculty and the percentage of women full professors was far lower than this. For example, in my own institution there was one M.D. full professor woman when I started studying this in the largest department in the University of Wisconsin.

Q. And so if I understand you -- I'm sorry, what is epidemiology again?

A. Well, it's applying risk factors to populations of people to understand why some groups

of people experience some phenomenon related to health or something else and other groups of people do not experience that. So, for example, you might look at a population of people who have lung cancer and say, you know, which of the people in this population smoked and who didn't? What are the risk factors for lung cancer? And I was interested in the risk factors for men succeeding in academic medicine and women, and then applying it to other vulnerable groups. But we'll use women as the minoritized group here. Women not succeeding to become full professors.

Q. All right. Thank you.

MR. BRISCHETTO: Counsel, for the record, Mr. Ellis has come into the office here with me and is listening in.

(WHEREUPON, Mr. Ellis joined the deposition.)

BY MS. THOMPSON:

Q. Dr. Carnes, it appears from the CV that you attached to your report that your last hospital appointment was in 2011; is that correct?

A. My last hospital appointment was 2020. Or 2019, I believe. And that's when I retired from the VA and moved my full position over to the university

because I had a rather large grant. My clinical work has pretty much always been at the VA.

Q. Okay. When was the last time that you admitted a patient to a hospital?

A. Oh, I haven't seen patients for a long time. I was successful in research, so although I was an administrator of clinical programs, I did not see patients for quite a while. I developed the Women Veterans Health Program. I wrote some of the initial grants to establish and was a leader in establishing geriatrics. We have a large geriatric program at the VA and the university. So I was involved more in an administrative and programmatic level. And education level. I directed the fellowship program. But actually seeing patients, I would say again when I retired from the VA. So that would have been, what did I say, '20? It's either 2019 or 2020.

Q. So you were actively seeing patients up until 2019 or 2020?

A. Yeah. I was mostly in a supervisory capacity. So I was the attending physician supervising residents and fellows. But I didn't actually -- I didn't have my own practice for a long, long time.

Q. When did -- when did you stop having your own practice?

A. I don't think -- I don't think it's relevant because I actually had to tell the university that nothing I was doing with you had anything to do with my clinical expertise. Otherwise, it's a complicated system, but faculty who are physicians -- I'm a physician-scientist so I had to tell the university that what I was doing here related to my science.

Q. Dr. Carnes, I'm sorry, I don't mean to interrupt you.

A. Yeah, it's okay. I know I'm supposed to keep this short but it's complicated.

Q. And so I hope my question is very simple.

When did you stop having your own patient load? What year?

A. I'm not sure I ever had my own patient load. I don't think I ever had a practice.

Q. When you say that you've never had a practice, what do you mean by that?

A. Well, because I am part of an academic medical center, I supervised residents. I supervised fellows. But I really never had a practice such that you would envision a physician

having a practice. There would be no time you could ask a patient who's your doctor and they would say me.
Q. Okay. Thank you.
A. But again, please don't make that relevant or I'm going to get in trouble with the university. My clinical expertise has nothing to do with my deposition or my involvement in this case.
Q. Dr. Carnes, your CV indicates that you're board certified in internal medicine and geriatrics; is that correct?
A. Yes.
Q. Have you ever been board certified as a surgeon?
A. No.
Q. Have you ever been board certified as a proceduralist?
A. No.
Q. And you are not board certified in cardiology; correct?
A. No. No, definitely not.
Q. When was the last time that you performed a surgery?
A. I don't do -- never did surgery.
Q. When was the last time that you performed

an invasive procedure?
A. No. Never.
Q. When was the last time you were in an operating room?
A. Oh, when I was a medical student.
Q. So that would have been back in the '70s?
A. Yep.
Q. Okay. When was the last time you were in a procedure room? And when I say procedure room, just so that we're clear, I understand, and you would know better than I do, but I understand there are surgeries and then there are procedures.
A. Mm-hmm.
Q. Do you understand that distinction?
A. Yeah, absolutely.
Q. Okay.
A. I was not in a procedural specialty which would be, you know, cardiology, pulmonology. You can -- you can -- I could just stipulate, no, I've never done procedures. I've never done surgery. I was an internist, and geriatrics is definitely not a procedural specialty.
Q. Okay. Have you ever been in an electrophysiology lab?
A. Not -- no. Unh-unh.

Q. Have you ever been in a catheter lab related to electrophysiology?
A. No. I'm assuming as a patient doesn't count; right? Right. Okay.
Q. I hope you weren't observing your --
A. Right.
Q. Right. Yes. Okay.
And forgive me, I think you've answered these questions but I want to have a very clean record.
So if I understand you correctly, you've never observed an EP procedure? And when I use the term EP, that's shorthand for electrophysiology.
A. Right. Right. No, I don't think I've ever personally observed one. No.
Q. Okay. Have you ever conducted any studies comparing the behavior of male and female electrophysiologists?
A. No.
Q. Have you ever conducted any studies comparing the reactions of others to male and female electrophysiologists?
A. No. I don't think anybody has.
Q. I'm sorry?
A. I don't think anybody has.

Q. Okay. And you have a very broad and extensive knowledge of the social science research related to medicine and subspecialties; correct?
A. I would like to think so.
Q. Okay. What is cardiac ablation?
A. So the EP cardiologist will map out the electrical charge given by different, like muscle bundles in the heart. And sometimes one of these muscle bundles will go awry and they carefully map it out and then they'll actually ablate with like cautery. They'll kill those cells off so that they can't override the normal sinoatrial node as it directs the heart to beat regularly.
Q. And your understanding of cardiac ablation, how did you come to that knowledge?
A. Well, I'm a physician. We get generally no, you know, even though I might not have been seeing patients, I would have been involved in helping refer patients for ablation or consult with EP cardiologist. So I don't have an in-depth knowledge. I haven't been in the catheter lab but I, as an internist, I interacted with EP cardiologists and I have a general understanding of it.
Q. Okay. Is cardiac ablation a high-risk

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

procedure?
A. I would say, I mean, on the scale of risk where, you know, a surgeon is repairing a ruptured abdominal aorta or a gunshot wound versus, you know, a vaccine, if you would say that's the whole spectrum of invasiveness, I would say EP cardiology is probably like maybe 15, 30 percent on that scale. So it's -- they don't open the heart. It's not a thoracotomy. But yeah, they're in the heart with, you know, electricity. It's pretty high risk.
Q. And when you're saying 15 to 30 percent, could you -- 15 to 30 percent of --
A. Of risk. I'm saying if the highest risk was like repairing a gunshot wound in surgery and the lowest risk was a vaccine, I'd put EP ablation maybe 15 percent in my mind. But that's the way I view it in terms of risk. But it's certainly, you know, it's not something you would undergo lightly. And oftentimes, in fact, because of that, even though it's relatively low risk, sometimes, I mean, quite often people, patients who have abnormalities that would potentially be abatable are treated medically. Are treated with medications to try to suppress that abnormal beat to avoid having to go to EP.

Q. So getting back to your 15 to 30 percent, are you saying that on your scale repairing a gunshot wound would be 100 percent?
A. Yes. Yes.
Q. And something like a vaccine would be zero percent?
A. Yes. Yeah. That was my scale.
Q. Okay.
A. The Carnes scale of risk. There's no data there but, I mean, that's the way I view it. So again, it's not no risk. But if you have a patient that you think would benefit from being ablated, you would certainly, you know, send them for consultation with an EP cardiologist.
Q. So given that you have put a cardiac ablation on -- you have assessed on the Carnes scale that the risk associated with a cardiac ablation is 15 to 30 percent, why in your report did you refer to it as a high-risk procedure?
A. Well, I would view that as high risk. Also, I would say I was making that assessment in an otherwise healthy person. But many people who have to get EP ablation are not otherwise healthy. So I was -- my Carnes scale was in an otherwise healthy person who needs ablation. But many of these

people, for example, those who have ventricular arrhythmias, those who have atrial fibrillation, they have a lot of other comorbidities. They have hypertension. They're obese. They have diabetes. So then the Carnes risk scale would go way up. Then we're maybe talking about 50-60 percent because of these other comorbidities. I was just giving that pure risk in an otherwise healthy person without diabetes, without hypertension, without heart failure.
But Dr. Bala was recruited specifically, as I recall, to lead the real complex ones. The ones that would have to -- that would have these comorbidities and would have complex rhythms that were under her area of expertise. That's why she was recruited it sounds like.
Q. Dr. Carnes, does the level of risk associated with a surgery or procedure affect how physicians behave when they're performing those procedures?
A. Well, I can't specifically speak to all physicians. That would be a little presumptuous. But I think that anybody who is doing something on another human being in a way that requires a lot of training, requires concentration, I think -- now I'm

lost. What was your specific question? I'm sorry. Say it again.
Q. No problem.
Does the level of risk associated with surgery or a procedure affect how physicians maybe behave when performing those procedures?
A. Okay. So then I guess yes is the answer. I mean, I can't -- I think you specifically asked about EP cardiologists. I can't -- I'm not all physicians but I think yes, of course it does. I mean, whether it's physicians or whether it's anybody doing a complex procedure on a human being, it affects the way you behave. You need to concentrate. You need to have quiet in the room. You need to trust your team.
Q. If a physician -- Dr. Carnes, if a physician exhibits professional behavior in email correspondence, does that mean that the physician will exhibit professional behavior when conducting high-risk surgeries or procedures?
MR. BRISCHETTO: Objection. Foundation.
Go ahead.
THE DEPONENT: Yeah, I don't -- I don't -- I mean, I don't think that's in my area of expertise as a physician-scientist but, I mean, as a human

being and somebody who is interested in behavior, I think people who are willing to put very unprofessional statements in an email have a lower threshold for engaging in unprofessional behavior in an interpersonal context. I mean, I don't think my research --
BY MS. THOMPSON:
Q. Dr. Carnes, did you --
A. I don't think my role as an expert physician- scientist is relevant to that question.
Q. Dr. Carnes, did you review -- as part of the -- in your report which we marked as Exhibit 1, and in fact, I'm screensharing so I'm just going to show you, you write, "My opinion is based on review of all the documents sent to me by the law firm representing Dr. Bala and included PDFs of multiple emails, depositions, text messages, and handwritten notes."
Do you recall reviewing a number of emails that were produced in this case?
A. Yes.
Q. Okay. So going back to my question, do you believe that a doctor who exhibits professional communication in writing via email, via letter, via text message means that they would never display any

unprofessional behavior during a surgery or a procedure?
MR. BRISCHETTO: Same objection.
THE DEPONENT: I guess I can't -- I'm not understanding.
BY MS. THOMPSON:
Q. What part of my question do you not understand and I'll try and rephrase it.
A. Well, isn't writing an email behavior?
Q. It is.
A. So then yes. They would engage in unprofessional behavior.
Q. If a doctor communicates professionally in writing, does that mean that they will always communicate professionally during a surgery or procedure?
A. Well, no. I mean, always -- but the converse I do believe is true. If you're willing to write unprofessional emails, I think the threshold that you would behave unprofessionally in an interpersonal interaction is much lower.
Q. Okay.
A. You don't filter your behavior in the same way that people who behave professionally do.
Q. But the converse is true. You've already

testified that simply because somebody communicates professionally in writing does not mean that they will engage in professional conduct during a procedure or surgery; correct?
A. Right.
Q. Okay. If a physician exhibits professional behavior and interactions with students -- and when I use students I'm thinking fellows. I don't know if you would consider a resident a student. It kind of depends on --
A. A learner. We call them learners.
Q. Learners. Okay. So if a physician exhibits professional behavior in interactions with learners, does that mean that a doctor will exhibit professional behavior during high-risk surgeries or procedures?
MR. BRISCHETTO: Continuing objection on foundation.
Go ahead.
THE DEPONENT: Well, I think -- I think it's correlated. I think if people are rude or -- I don't know what the word -- I guess unprofessional toward learners, the likelihood that they would exhibit those same behaviors toward staff or other individuals would be more likely. And I think people

who interact respectfully with students are also more likely to interact professionally with other members of a team. Because in academic medicine, it is kind of a spectrum. And the attending who's at the top really treats all members of the team as learners. It's just a mindset in academic medicine. You're trying to -- that's why I think Bala kept wanting the staff to learn more. She tried to do that journal club. You know, she was trying to treat everybody as learners. So yes, I do think in academic medicine, perhaps uniquely, I think people who treat official learners with respect would also treat other members of the team with respect. I do think that's true.
BY MS. THOMPSON:
Q. And based on what, Dr. Carnes? Is there a particular study that you can refer to? What methodology are you using to derive that conclusion?
A. Well, I will admit some of that is probably from my own observation. But if you look at some of the studies that have looked, for example, at behavior in operating rooms, when the surgeons are viewed as rude or condescending it is true for multiple staff members within that OR setting that have been interviewed. And I would

have to go back and specifically pull those studies. But there was one qualitative study interviewing members in an operating room. And I would say there was quite a lot of alignment on the behavior toward all members of the team of the top surgeon.

Q. And do you recall the name of that study?

A. I don't. I don't. But I could get that. It was -- because I looked at it when we were doing our qualitative study. It was relevant. But I can. If you'd like me to pull that out and send it to you I can certainly do that.

Q. Do you recall what the focus of that study was?

A. I think it probably was gender, to look and see if male or female surgeons communicated differently. But I would really have to pull it. Again, as a physician- scientist, I want to make sure I'm citing the methodology correctly. But they did look at the behavior toward multiple members of the team.

Q. Dr. Carnes, do you believe that if a physician exhibits professional behavior in their interactions with their superiors that that means that they are more likely to behave professionally with people that they view as subordinates?

MR. BRISCHETTO: Objection. Foundation.

Go ahead.

THE DEPONENT: So you're asking me again, if people are respectful to their superiors do I think they would be more likely to be respectful to their learners; is that the question?

BY MS. THOMPSON:

Q. Correct.

You're using the term "learners." My question used the term subordinates.

A. Okay. Subordinates.

Q. People that they view as subordinates.

A. Okay. I don't think I have any -- I mean, except for that OR study I don't -- I'm not aware of any studies that would be relevant to answer that question. I'm trying to think.

Q. So is your response that you don't know?

A. I guess it would be, yeah, I don't know. I mean, I could look for you but I don't -- I'm not aware of studies that actually correlated behavior to your superiors to behavior to your subordinates other than that potentially relevant OR study. So yeah, I guess I don't.

Q. What would you consider unprofessional behavior by a surgeon or an invasive proceduralist

when they're performing a high-risk surgery or procedure? What would you consider unprofessional behavior?

A. Well, I mean, if we're bringing it back to the case, I think some of the most, what I would call unprofessional behavior was Kirsch's refusal to staff Bala's --

Q. Dr. Carnes, I'm sorry to interrupt. My question was not specific to these facts but your opinion as an expert in academic medicine, given your 30-plus years of experience as a practicing physician, what would you consider unprofessional behavior by a surgeon or invasive proceduralist when performing a high-risk procedure?

A. I guess it would be something that would put the patient at risk doing something that was not standard procedure. Yeah, doing something that was not standard practice. I guess that would be.

Q. Would you consider yelling at staff acceptable during a procedure?

A. Well, I think yelling is very subjective. Define yelling.

Q. Well, why do you think yelling is subjective?

MR. BRISCHETTO: Objection. Improper

foundation. Vague and ambiguous.

Go ahead.

THE DEPONENT: Yes, I agree that's vague and ambiguous because as I think I pointed out many times, and if you look at the figure, I think that figure that I drew really shows it the most. Any behavior of an individual is filtered through those stereotypes. So I could say something and people would say, oh, Carnes was yelling at me. And Brischetto could say the same thing and they would say, oh, he really has command of the situation. So yelling is very subjective.

BY MS. THOMPSON:

Q. Based on a whole host of things, separate from how we filter stereotypes, separate from our implicit biases; correct?

A. I'm sorry, what about separate from it?

MS. THOMPSON: Ms. Byrd, could you read back my question, please?

THE REPORTER: Stand by.

(WHEREUPON, the record was played back.)

BY MS. THOMPSON:

Q. Dr. Carnes, you are referring to the figure in your report and I think that you are referring to --

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

A. It should be --
Q. -- the schematic. I think it was table --
A. Yes. Yes. Because I think that really summarizes.
Q. Okay. But separate from how we filter information -- I'm going to dumb this down for myself. Okay?
A. Mm-hmm.
Q. Reading through your report, I think your opinion is, and studies have shown, that people perceive behavior through various lenses; right?
A. Mm-hmm.
Q. There are various filters. Is that correct?
A. Yes. And they don't realize they're doing it even when it contradicts their own conscious beliefs.
Q. Right. It can be completely unintentional.
A. Yes.
Q. So your report talks about stereotypes. Your report talks about implicit biases. Would you agree that in addition to those things resulting in the subjectivity of whether or not someone was yelling that there are other factors that would impact the subjective measurement of yelling? I know this question is confusing. What I'm trying to get to is tone. The tone of the words. That can impact whether or not someone perceives someone as yelling; correct?

A. Well, again, tone is a very gendered thing. In my own research, I did one of the first studies to look at how gender affected male and female internal medicine residents differently. How it impacted their training. And the issue of tone came up all the time. One of the male residents said, "I've seen men say things to nurses in just terrible tones but if a woman did that." I mean, that was an exact quote. So again, I think this tone thing is very, very gendered.
Q. Okay. How about would it matter at what stage the procedure was, whether or not it was at the beginning of a procedure, in the middle or the end?
A. I don't think so. I think -- I will say that if by tone you mean a directive communication style -- so there is research in the medical literature showing that in a time-sensitive, task-oriented setting, directive communication in a medical team is the most effective. And so we found it often put women in a bind because they knew they were in a situation where they had to engage in directive communication but they had this sort of, you know, gendered -- gendered issues, gendered norms which were -- they were afraid of backlash. That if they engaged in this directive communication style they'd be considered a bitch. And the literature supports this exact same, although we looked at it, and I'm speaking in a medical setting but research supports that.

Q. Do you believe that using demeaning terms during a high-risk procedure or surgery is acceptable conduct?
A. What would be a demeaning term?
Q. What do you think would be a demeaning term?
MR. BRISCHETTO: Objection. Vague. Ambiguous.
THE DEPONENT: Well, I'm asking you. Yeah, I'm asking you. I don't know what you would mean by a demeaning term.
BY MS. THOMPSON:
Q. Dr. Carnes, what are examples of demeaning terms that could be used during a procedure or a surgery?

MR. BRISCHETTO: Same objection.
Go ahead.
THE DEPONENT: I don't know. You've already established that I have never been in an EP procedure or an OR so I'll just have to say I don't know.
I guess it's like jazz. If I saw it I'd recognize it because there were demeaning terms that were used even in some of the materials I reviews but at this point in time a demeaning term does not come to mind.
BY MS. THOMPSON:
Q. Do you think making other staff members -- you are present in a procedure or surgery making them cry is acceptable behavior by a physician?
MR. BRISCHETTO: Objection. Calls for speculation.
Go ahead.
THE DEPONENT: Yes. I would say that does call for speculation. I mean, every -- every situation is different. You know, if you had an incompetent person and you have a patient that you're responsible for doing a high-risk procedure and they're putting, for example, the wrong dose of heparin, which is potentially lethal and you say,

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

you know, what the hell are you doing and they cry, would that be inappropriate? I'm not sure it would be. So it is highly speculative. I can't answer that.
BY MS. THOMPSON:
Q. Is your testimony that it depends on the context?
A. I guess that would be it. Yeah.
Q. Do you believe that male and female physicians should be held to different standards when evaluating their competence?
A. No.
Q. Do you believe that male and female physicians should be held to different standards when evaluating their professionalism?
A. You see, the professionalism thing is something that actually has recently come under assault even within academic medicine because there was this big push for professionalism about 10-15 years ago. And now people are kind of realizing that, you know, the kind of stereotypic professionalism that physicians were viewing was very much, you know, heterosexual, White, male, Christian and that it actually sometimes works against historically minoritized groups. So I'm not

going to say anything about professionalism related to its use in the abstract.
Q. Dr. Carnes, what is your definition of professionalism in academic medicine?
A. I don't have one. I'd have to give that thought. I've spent a lot of time thinking about it. I've searched the literature on it because of what I just said. I don't have a specific definition of it.
Q. If you derived a definition, do you believe that male and female physicians should be judged by different standards of professionalism?
MR. BRISCHETTO: Objection. Calls for speculation.
Go ahead.
THE DEPONENT: Yeah, it calls for a lot of -- I mean, I can give you a specific example.
BY MS. THOMPSON:
Q. I'm not asking for a specific example.
A. Okay. Well --
Q. My question asked --
A. Well, then I can't answer because again, everything is dependent on the situation and your evaluative standards. So you know, we had a patient satisfaction survey that included evaluation of the

cleanliness of the clinic. Okay? And we found our Black physicians were consistently being rated lower for cleanliness of the clinic even though the patients were in the exact same room. So people were getting merit raises based on that. So you know, it just -- I can't answer that.
Q. Dr. Carnes, if a physician is rude to attending staff should supervisors take into account the sex of the physician when deciding how to respond to the report?
A. I think rude -- rude is subjective, too. And in fact, I think you saw that. You know, some people said the communication was great. Other people said it was rude. Because you just can never take out the fact that you're viewing those individual behaviors through these implicit assumptions, through these stereotypic assumptions. Whether it's race, whether it's Asian-Indian American assumptions. Whether it's gender assumptions. And so what is rude? You know, there's that joke, you know, if a woman puts somebody on hold they're being rude. You know, if a man hangs up, they're rude. It's just a very different perception of the exact same behavior. Again, if you look at that figure where I really did

try to dumb it down, the exact same behavior not only is interpreted differently but has very different consequences because for one group it will be given dispositional attribution that is about them. They're rude people. They're unprofessional. The others will be given situational attribution. Oh, it was a hard case. It snowed that day. You know, they couldn't get the right equipment. So it's --
Q. Dr. Carnes, my question --
A. Rudeness is subjective.
Q. Understood.
A. I'm sure you --
Q. Assuming --
A. -- face that in your own field since a lot of this research comes from the legal profession.
Q. For the sake of this question, assuming what you say is true, which is whether or not something is rude is subjective and viewed through the lens of implicit biases and stereotypes and the like, do you believe supervisors should take into account the sex of a physician when deciding how to respond?
A. Consciously. Consciously take. I don't believe they should consciously take it into

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

account. I absolutely believe they unconsciously do. And that's where the institution needs to have come in place in the first place and explain to people how this might happen and give the person place in a situation where they're going to be sort of victimized by this. Sort of the external conferral of status.

Q. Dr. Carnes, should supervisors be more suspicious of accusations of unprofessional conduct lodged against female physicians than those lodged against male physicians? Based on what --

A. Yes.

Q. -- you just said, do you believe that supervisors should be more suspicious of accusations of unprofessional conduct lodged against female doctors?

A. Suspicious is an odd word. But yes, I believe they should -- when they receive these kinds of -- they don't fit, you know, their communication styles. As soon as you -- those are like red flag words. As soon as a supervisor hears that they should begin to look at a systems issue. Are there things going on here that we need to be aware of from a systems issue, systems perspective?

Q. But your testimony is that if a supervisor

receives any complaint about a doctor that the supervisor should immediately be thinking about gender as a potential influence?

MR. BRISCHETTO: Objection. Misstates the testimony. Improper foundation.

Go ahead.

THE DEPONENT: I think gender, along with other things, along with previous issues that a supervisor might have had, organizational culture in which the occurrence is happening. What is the chain of command? You know, there were multiple breaches of chain of command I think in this situation. So I think, again, a systems issue. Looking for why did this behavior happen and engaging good HR practices. Looking at, you know, OHSU has all these statements about what a great culture they have for learning and they value diversity and all this. So I think, you know, if you get a complaint, bring it back to those kinds of institutional principles and saying, you know, does this align with what we say we're doing? What's happening? But yes, I think gender is part of it. Race is part of it. The individual culture in the unit is part of it.

BY MS. THOMPSON:

Q. Dr. Carnes, have you ever been accused of treating other doctors poorly?

A. Not that I'm aware of.

Q. Have you ever been accused of treating nurses poorly?

A. Not that I'm aware of.

Q. Have you ever been accused of treating students or learners poorly?

A. Not that I'm aware of.

Q. Have you ever been accused of engaging in sex discrimination?

A. I don't -- no.

Q. I'm sorry; what was your answer?

A. No. I mean, not that I'm aware of. No.

Q. Have you ever been accused of engaging in racial discrimination?

A. Not that I'm aware of.

Q. Have you ever been accused of engaging in ethnic discrimination?

A. Not that I'm aware of.

Q. Have you ever felt that you experienced discrimination during your medical training or medical career?

A. Well, I became very interested in studying the issue, again, because there were so few women.

I guess, I mean, there were, for example, three gender pay equity exercises that the university engaged in while I was on the faculty and all three times it was determined that I was paid less than my male counterparts and my salary was raised. So I guess that would be data you can, I guess, conclude from that.

Q. Any other -- any other incidents where you felt that you were discriminated against as a woman during your medical training or medical career?

A. I'm not sure it's relevant. I can't think of any right now.

Q. Do you recall --

A. But the gender pay equity would be data.

Q. Okay. Do you recall during your third year of medical school being subjected to explicitly sexist statements by your surgery clerkship director?

A. Oh, yes, I do. Yeah. That was a long time ago before I studied it or was even aware of it. And remember, this was only two years or three years after Title IX. And yes, I do. He said I don't think women should be doctors.

Q. Was there anything else that was said to you by this surgery clerkship director that you

found to be sexist?
A. You know, I'm sure there were because, I mean, this was many years ago. Again, only two or three years after Title IX, so there were many explicit statements that were made. You know, it was -- this was back in a time when, you know, women basketball players were only allowed three dribbles so I'm not sure you can take anything that happened back then and make it relevant now. But yeah, there was a lot of explicit bias against women then. It was really overt sexism, not the more covert sexism that came later.
Q. And I don't want to put words in your mouth but I think you were starting to share -- is that -- was your experience as a medical student one of the reasons that you became interested in gender issues in academic medicine?
A. No. Not so much in medical school I would say because, you know, again, you just expected it back then. You have to realize it was just a few years after Title IX was passed. It was very different. But I think what really sparked my interest as a physician-scientist was when I got tenure. Because I had gotten tenure based on very different research. When I got tenure, and I was

the only tenured woman MD in the Department of Medicine which was the largest department in the university, and that really intrigued me. And that's when I went to get the masters in epidemiology. I wrote an NIH grant for sort of a career switch to allow me to actually study academic medicine.
MS. THOMPSON: Okay. I want to mark document B as Exhibit 2.
(WHEREUPON, Exhibit 2 was marked for identification.)
MS. THOMPSON: And I'm going to share that on my screen.
BY MS. THOMPSON:
Q. Dr. Carnes, I am sharing on my screen what we have marked as Exhibit 2, a February 8, 2012, article entitled "What would Patsy Mink think?"
Are you familiar with this document?
A. Yes.
Q. What is it?
A. It's a -- well, I had been invited to give the annual lecture to the medical students who were being inducted into AOA, which is a medical honor society. And I gave this talk. And because my advice in academic medicine was always to make

everything count twice I turned it into an editorial and submitted it to JAMA.
Q. Okay. And so on my screen you wrote, "When I was a third-year medical student, my surgery clerkship director told me on my first day, 'It won't affect your grade but I want you to know that I don't think women should be doctors.'"
A. Yeah. That's the quote I mentioned. "I don't think women should be doctors." Right?
Q. All right. And then you further write that you remember a small group discussion leader in psychiatry telling you that you were "too nice to go into academic medicine."
Did I read that correctly?
A. Yes.
Q. And you wrote that that struck you as odd. And you wrote, "Don't we want nice people in academic medicine?"
A. Yes. And then I went on to say I'd like to let him know you can be nice and go into academic medicine. You just have to move to the Midwest.
Q. Meaning what?
A. Well, there's Midwest nice here. There's a lot of nice people here.
Q. Is your -- are you making a statement that

there aren't nice people on the East Coast or the West Coast?
A. No. But I did go -- I was in Buffalo, New York, so there are -- oftentimes humor can use assumptions. So people in the Midwest do have assumptions about people in the east. So when I would make this statement to a Midwest audience they invariably laughed because they have assumptions about people who live in New York even though the people in New York, the people on the East Coast don't actually claim Buffalo. But in the Midwest, when you tell them you're from Buffalo, they think you're from the east. But the east doesn't claim Buffalo.
Q. Okay. A statement by -- I think, yeah, when you were a third-year medical student, this was a surgery clerkship director. Did this statement in any way dissuade you from going into surgery?
A. Wow, that's a long time ago. I don't know if it was so much that I was dissuaded from surgery is that I fell in love with internal medicine. I mean, it seemed to me the internists were the smartest people in the whole medical center. Of course, once I became one I realized we didn't know everything but as a student it seemed to me that the

internists knew everything. So I loved internal medicine.

Q. Did your experience with your surgery clerkship director, did that affect your expectations about how surgeons behave?

A. I can't -- I don't think so. I mean, because of the role that I had at the university, I advised shares of surgery, surgery faculty. I really had wonderful working relationships with not only pretty much all the specialties and subspecialties within the school of medicine and public health but across the university as well. So I don't think I prejudiced surgeons. I don't think I did.

Q. Okay.

A. At least not consciously.

Q. Dr. Carnes, have you ever lodged a formal or informal complaint for being subjected to any form of harassment or discrimination based on your gender?

A. I don't think so. Not that I remember.

Q. Is there anything I could do to refresh your memory as to whether or not you've ever made a formal or informal complaint about being subjected to harassment or discrimination because of your

gender?

A. Maybe you have materials I don't but I don't think I've ever -- I mean, I may have complained informally. I may have grumbled. Don't we all grumble? But I don't remember ever lodging a formal complaint.

Q. Can you describe your informal complaints of gender discrimination or harassment that you felt you were subjected to?

A. Well, you know, I've always tried to turn that grumbling into research and scholarship. So it usually wound up being a good thing. I was just reminded of one particular. When I was the acting division head of geriatrics, I was the only woman division head in the Department of Medicine at that time. I think there were 13 divisions. And we had a department meeting with all the division heads. And one of the division heads kept referring to all his faculty as he. Him, he. So when I spoke I just used the female gender pronoun. I said the same thing he did but just referred to she and her. So I obviously was aware that there was bias going on. But actually, at the end of the meeting he came up to me and he said, "God, Molly, you really made us all look like assholes."

So obviously, I was aware of it. But again, because I think I was interested in it from a scientific perspective it didn't -- it allowed me to have that distance so that I didn't really take -- I saw what it was. I saw the research behind it and didn't take it personally. I knew the people in this room had no personal vendetta against me. They were just, you know, victims of a society that envisioned all physicians and scientists in the masculine gender.

Q. Have you ever been party to a lawsuit, Dr. Carnes?

A. Oh, yes. As an expert or being sued?

Q. No. Either filing or a lawsuit yourself or having a lawsuit filed against you?

A. Oh, no, no. No. I did participate as an expert witness for my geriatrics expertise I think maybe twice. And then this one.

Q. Okay. In your CV you list one of your major research interests as "increasing the diversity of leadership in academic medicine, science, and engineering, as a means to affect institutional transformation."

Is that correct?

A. That's correct.

Q. What do you mean by increasing diversity of leadership?

A. Well, I would like to see a diversity of leaders of all kinds. So I mean, even disciplinary diversity. You know, there was a time when both our chancellor and our provost were engineers. I remember thinking that's probably not healthy. But I would say my particular slice of that has been gender and race ethnicity. That has been my particular slice in the diversity issue.

Q. What do you mean by institutional transformation?

A. So that's been defined. There was a whole series of papers on institutional transformation of academic institutions. It came out probably 20 years ago. And it's -- a transformation is where at every level of the organization, from policy all the way down to individual behaviors there are changes. And I always as a physician have used smoking as a metaphor for institutional transformation because nobody argues that our society has witnessed an institutional transformation when it comes to smoking.

Again, when I went to medical school back in the dark ages, and the students don't even

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

believe this now, but the professors smoked in the classroom. And when I was an intern, the nurses in the intensive care unit had a little room where they would leave lit cigarettes while they went to, you know, adjust oxygen. Now that would be unthinkable. And that's because all levels of our society have seen changes. From the individuals stopping smoking - - we he have the lowest rate of smoking we've seen in generations in this country, all the way up to policy. So that's what I mean by institutional transformation. All you have to do is think of smoking.
Q. Dr. Carnes, in the last 20-plus years your work has been devoted almost exclusively to increasing the number of women physicians in positions where they're underrepresented; correct?
A. Yes.
Q. And similarly, in the last 20-plus years your work has been devoted to increasing the number of racial or ethnically underrepresented doctors --
A. Yes.
Q. -- in medicine; correct?
A. Yes.
Q. Do you believe that you've been an effective advocate for women in the medical field?

A. Yes.
Q. Do you believe you've been an effective advocate for racial or ethnic -- I hate using the term "minority," but I'm going to use it here.
A. Yeah. I think, I mean, the terms keep changing but I think minoritized groups is sort of -- because women are not a minority but we're certainly a minoritized group.
Q. But you've certainly --
A. I've been less so. I've been certainly less effective in advocating for advancing racial and ethnic minorities. And of course, the intersectionality of race and gender is so complex. It's just -- but I did all I could. Yeah, I have to leave it for others to continue.
Q. When you hear that a female physician has been denied tenure or a promotion or has been terminated from their employment, do you assume that she was probably subjected to gender discrimination?
A. Well, I think that's a pretty broad generalization. Mostly what happened was if a chair -- if any chair had a faculty member turned down for tenure I became sort of the institutional advisor on it because I had served as chair of the Biological Sciences Tenure Committee for the campus. So I had

a kind of in-depth understanding of how oftentimes the members, which included, you know, plant pathologists and botanists. I had an understanding of how to help them see research and scholarship that physicians were engaged in. So I often consulted when anybody, male or female, was denied tenure.
Q. My question is a little different.
When you hear that a female physician has been denied tenure or a promotion or their employment has been terminated, do you assume that she was probably subjected to discrimination based on gender?
A. No. I would never make that. I'm a scientist. I would have to see the data. You know, maybe she didn't publish. Maybe, you know, she was unable to obtain grants. But I would say that I advised as many male tenure turndowns in the medical school as I did female.
Q. Dr. Carnes, do you agree that both male and female physicians sometimes engage in rude or unprofessional conduct?
A. I think anybody sometimes has a bad day.
Q. Do you believe that some complaints about female doctors are not the result of gender bias?

A. Of course.
Q. Do you believe that some complaints about non- minoritized physicians are not the result of racial or ethnic bias?
A. Of course.
Q. Have you ever raised concerns or made a complaint about any colleague with whom you have worked related to their professionalism, however you define that?
A. I don't think so. No.
Q. In your 30-plus years you have never raised any concern about a colleague being unprofessional; is that your testimony?
A. Not that I recall.
Q. Is it your testimony that in your CV, you know, it is very impressive how many students you have mentored over the years. I think you were mentoring undergraduate and graduate and medical students; did I get that correct?
A. And residents, fellows. I'm on the Mentor Committee of many of the junior faculty. Yeah.
Q. Okay. Have you ever had concerns about any of their professionalism?
MR. BRISCHETTO: Objection. Vague.
Go ahead.

THE DEPONENT: I don't -- I don't -- I don't recall. I don't think so. And I'm not sure what -- if you just told me what you were trying to establish maybe I could be more helpful.

So, I mean, I chaired -- when I was vice chair for faculty development at the Department of Medicine, I chaired the annual review of all the assistant professors. And sometimes at that review the division head would note that one of their faculty members had had complaints made against them. And we would come up as a group with kind of a professional -- a plan to help either further evaluate or address that. You know. So I mean, that's the best I can tell you. That I was often involved in the review of faculty. It wasn't personally toward me. It was at a department level.

BY MS. THOMPSON:

Q. And at the department level when you were helping maybe direct supervisors who were receiving reports of unprofessionalism, I think what you said was you developed a plan to address those issues; correct?

A. Yes. We would make recommendations to the division head -- excuse me, the division head.

Q. Would you agree that it's important for

supervisors to address concerns about professionalism?

MR. BRISCHETTO: Objection. Vague.

Go ahead.

THE DEPONENT: Yeah, again, professionalism, hard. But it would be specific behaviors. You know, if somebody -- if they were showing up late. If they were, I don't know, I guess, yeah, let's take that. They were consistently showing up late.

BY MS. THOMPSON:

Q. Okay.

A. So then that would be a specific behavior and we would, you know, say, well, here's what you need to do to address that.

Q. In your 30-plus years of experience in academic medicine, in your role, and you have multiple leadership positions in academic medicine; correct?

A. Yes.

Q. Did you ever receive reports related to doctors, residents, fellows, being unprofessional in their communication with staff?

A. Not direct, no. I guess no.

Q. Would you agree that if a physician was

engaging in unprofessional conduct that that conduct should be addressed?

MR. BRISCHETTO: Objection. Vague.

Go ahead.

THE DEPONENT: Yeah, again, unprofessional. The specific behavior. If the specific behavior was in any way adversely affecting patient care, the learning environment, the culture of the division. If the behavior was adversely affecting that, yes, we would make it, advice of the division head that it needed to be addressed. So but again, I think a lot of what you're asking is in the clinical realm. And my expertise was more in the research realm. So I was more involved in advising people how they could publish, how they could conduct research, how they could identify a research question to follow. I think that was more how I was seen as being helpful. If there was clinical issues, the whole health -- the UW health side, the hospital side would be involved. I probably would not be involved in that.

BY MS. THOMPSON:

Q. But you are a physician?

A. Yes.

Q. And so why do you think in a clinical

setting it would be important to immediately address any unprofessional behaviors?

MR. BRISCHETTO: Objection. Misstates the testimony.

Go ahead.

THE DEPONENT: Well, I was just -- you asked me if I was involved. And I was trying to explain that --

BY MS. THOMPSON:

Q. I understand. I'm asking --

A. -- I was involved in the more academic side. If there were complaints clinically -- because you had asked if I was involved. That chain of command -- there were other experts there. There were ombuds people. There were HR people. There were other people who would probably be tapped into if there were clinical issues. It would not generally have been me.

Q. Understood. And I'm asking a different question.

A. Okay. What was that question?

Q. I believe you testified that it would be important to address behaviors that impacted patient care.

A. Yes.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Q. That's a clinical issue; correct?
A. Yes.
Q. Okay. So on the clinical side, why is it important -- is it important in your opinion to address unprofessional behavior that might impact patient care?
MR. BRISCHETTO: Objection.
THE DEPONENT: Well, unprofessional again is in there. But I would say behavior, yes. Like showing up late. You know, throwing instruments across the room. Yes, those behaviors would need to be addressed. I don't think anybody would argue that.
THE REPORTER: Mr. Brischetto, was that an objection that I heard?
MR. BRISCHETTO: It was. Objection. Foundation. Vague. Ambiguous. Thank you.
THE REPORTER: Thank you.
BY MS. THOMPSON:
Q. Dr. Carnes, would you agree that patient care teams need to communicate effectively with one another to provide good patient care?
A. Yes. There's a lot of research showing that from Amy Edmondson, from the group that's looked at team communication. Yes.

Q. Okay.
MS. THOMPSON: I would like to take a comfort break again. So, and we've been going for almost two hours, so maybe we can take 10 minutes if that's okay and we'll come back on.
THE DEPONENT: All right.
MR. BRISCHETTO: That's okay.
MS. THOMPSON: Okay.
THE VIDEOGRAPHER: Please stand by. The time is 11:48 a.m., and we are off the record.
(WHEREUPON, a recess was taken.)
THE VIDEOGRAPHER: We are on the record. The time is 11:57 a.m.
You may now proceed.
MS. THOMPSON: Thank you.
BY MS. THOMPSON:
Q. Dr. Carnes, would you agree that as members of the medical profession, that doctors should be expected to work collaboratively to maximize patient care?
A. Yes.
Q. Would you agree that members of the medical profession should be expected to be respectful to one another?
A. Yes.

Q. And to participate in processes of self-regulation, including remediation and discipline of members who have not met professional standards?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: Yeah. Again, it gets difficult because the professional standards have a lot of bias built into them. And academic medicine is increasingly aware of this and, you know, the AAMC is considering like how do -- how do you evaluate physicians? But I guess if there is an agreed upon standard that is viewed by being relatively free of bias that can be applied and everybody agrees it's a good measure of professionalism, yes, I think that if somebody violates that then they should be reprimanded. I would agree with that then.
BY MS. THOMPSON:
Q. Would you also agree that as members of the medical profession there's an obligation to engage in internal assessment of one's own professionalism?
A. Yes. And I actually think physicians -- and this has been written -- actually, lawyers have written about this, how the system of training and

self-evaluation of physicians is a model of what might be adapted in other professions because that professional review is embedded in physician practice. It's very much part of being a physician and in training.
Q. And as part of that, that external review, or self-assessment, oftentimes -- I don't want to get too far into the lane of peer review and all of that, but in the medical profession people sit down. They talk about cases. That is how we improve health care; correct?
A. Yep. Absolutely. Yep.
Q. Right.
A. Yep. Root cause analysis and yep, yep.
Q. And as part of that, as an individual physician, would you agree that individual physicians have an obligation to accept external scrutiny of their professional performance?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: Again, if there is an agreed upon standard that is felt to be unbiased and is applied across the board.
BY MS. THOMPSON:
Q. And so Dr. Carnes, is your testimony then

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

that you do not believe that existing professional standards that are agreed upon by medical professionals that people should not be held to those standards?

MR. BRISCHETTO: Assumes facts not in evidence.

Go ahead.

THE DEPONENT: Yeah. I think it's a moving target right now. I think -- I think, in fact, I was so interested in this I surveyed informally just my contacts through my research. I have a lot of contacts at other universities and I just asked them, you know, if your physician is -- if a complaint is lodged against one of your physicians, say a patient safety, PSN, if something is lodged, what is the process for evaluating that physician? It was all over the map. So --

BY MS. THOMPSON:

Q. Dr. Carnes, I don't mean to interrupt you but I do want to be respectful of your time.

A. Yes.

Q. I have a limited amount of time.

A. Yes. I'm just trying to say that there isn't an agreed upon standard.

Q. Are you -- so your testimony is there are

not professional standards for doctors?

A. For evaluating physicians who have a complaint lodged against them there is not an agreed upon --

Q. That's not my question.

So are there currently agreed upon professional standards by which physicians need to operate?

A. I'm sure there are. I'm sure the AMA has some. But they're vague and every institution has to interpret them separately.

Q. Okay. But is your -- I don't think but maybe I'm wrong, is your testimony that doctors do not need to follow the AMA guidelines or professional standards?

A. No. They do but they're vague. Yes, they do. Okay, yes. I'm supposed to keep it short. Yes.

Q. Dr. Carnes, before preparing Exhibit 1, your expert report in this case, did you interview anyone involved in this case?

A. No.

Q. Why not?

A. Well, I don't know any of them. Who would I interview?

Q. Did you -- did you administer any survey

or test to any of the persons involved in this case --

A. No.

Q. -- to assess their attitudes towards women?

A. No.

Q. Did you administer any survey or test to any of the persons involved in this case to assess whether gender -- excuse me. Let me rephrase that.

Did you administer any survey or test to any of the persons involved in this case to assess what gender stereotypes they may hold?

A. No.

Q. Did you administer any survey or test to any of the persons involved in this case to assess their attitudes towards racial or ethnic minorities?

A. No.

Q. Did you administer any survey or test to any of the persons involved in this case to assess what racially or ethnically based stereotypes they may hold?

A. No. But you're aware of the fact that there's a lot of research showing that people will explicitly renounce racism or sexism but then in -- but then also show that they are aware of the

societal stereotypes about various groups. And I cited much of the research that documents that in my report, including the UCLA study of Ghavami and Peplau. We are aware of the stereotypes even if on a survey we say, you know, we're not biased in any way. So surveys would be irrelevant. Living in this society we are all aware of the stereotypes and all it takes is being aware of them to allow them to serve as a filter.

Q. Dr. Carnes, did you test any of the persons involved in this case to determine whether they hold any implicit biases?

A. Not this case. We did Implicit Association Tests of faculty at the University of Wisconsin, who I imagine would be similar to those involved in the case. And 70 percent of them showed an implicit bias favoring male gender stereotypes and leader.

Q. Dr. Carnes, is imagination a reliable and -- a reliable scientific principle?

A. Imagination?

Q. Yep.

A. I don't know.

Q. You're a scientist.

A. I have not studied imagination.

Q. So is it your testimony that surveys are irrelevant to determining what biases or stereotypes people may hold?
A. Well, surveys are very relevant for explicit beliefs. You know, you have a chance to thoughtfully think about that answer. Do I believe this or not? But they do not tape into these more implicit kinds of cognitive processes. These automatic processes. And this has been known. Actually, one of my collaborators, Patricia Devine first showed this in 1989, in one of the most well cited papers in the world in which she called it the automatic and controlled aspects of prejudice.
Q. Dr. Carnes, so you've testified that you did not conduct any tests on any person involved in this case; correct?
A. Of course.
Q. Why did you not test Dr. Bala for any biases?
A. Well, why would I? I mean, we all have the same -- men and women, we all have the same biases. We live in a society that has assumptions about groups of people. We learn these stereotypes. And just because we know them they are easily activated. So men and women have the same biases.

Blacks and Whites have the same biases. We all have these societal -- this knowledge of group stereotypes.
Q. If someone --
ZOOM TECHNICIAN: Counsel, sorry. Counsel, sorry to interrupt. I have an Emily Schultz in the waiting room. Would you like me to admit them in?
MS. THOMPSON: Please.
ZOOM TECHNICIAN: Okay. Thank you. Sorry about that.
(WHEREUPON, Emily Shults joined the deposition.)
BY MS. THOMPSON:
Q. Dr. Carnes, if someone holds a negative attitude towards me could that affect how they interact with men?
A. An explicit negative attitude?
Q. Yes.
A. I mean, I guess. I'm trying to think of the research. I mean, I guess so. Right? If you don't -- explicitly, yes, I guess that's true. If you're explicit. And I was trying to think in this case, Kirsch, I guess, had explicitly made negative comments about women so I would imagine, yes, that

could probably affect the way he interacts with women. Yeah, I guess that's true. But I mean, that's guessing. I am not thinking of research which would show that right now but yes, I suppose that's true.
Q. If someone holds an implicit negative attitude towards men, could that affect how they interact with men?
A. Yes. Yes, I think. Of course. Yes. Of course it would. Yes.
Q. If someone holds negative --
A. Yes.
Q. -- stereotypes about male physicians or male nurses, could that affect how they interact with male physicians or male nurses?
A. I think what I'm reacting to is the term "negative," because within the stereotypes, the societal stereotypes about men and women, there are both negatives and positives, so.
Q. And I'm asking you about negative stereotypes.
A. So, so, the negative stereotypes would be things like aggressive, commanding. I mean, what would be the negative stereotypes about men that you're -- abuse?

Q. Dr. Carnes, you're the expert on gender stereotypes. So if someone holds negative stereotypes about male physicians or male nurses could that affect how they interact with male physicians or male nurses?
MR. BRISCHETTO: Objection. Counsel introduced the term "negative." Not the witness. Improper foundation. Vague and ambiguous.
Go ahead.
THE DEPONENT: Yes. Because if they -- if they know those negative stereotypes, they also know the positive ones. They are part and parcel. You know, the positive stereotypes about men. Anyway, all right. Go ahead. Sorry.
BY MS. THOMPSON:
Q. Dr. Carnes, could a bias against men affect interpretations of male behavior?
A. Yes.
Q. Is it possible that Dr. Bala's perceptions of how people treated her were influenced by biases that she holds?
A. Well, it is possible, but you have mountains of documents, emails, and other things which would suggest that her communication, her tone was very collaborative. You used that word. And

trying to take a systems approach. The more negative things were coming at her.
Q. And Dr. Carnes, we're going to get to that. My questions are specific to Dr. Bala right now. And so I want to be clear.
Is your testimony that Dr. Bala is free of bias?
A. No. None of us are free of bias. I mean, I went into geriatrics, and when I take that IAT I'm biased against old people. I mean, it's -- these are societal biases that -- and that's, in my opinion, the knowledge of this is so pervasive, OHSU should absolutely have come forth with processes to help Dr. Bala when clearly they were placing her in a setting where any kind of societal biases against women in powerful leadership positions, women of color, women of Asian-Indian descent. I mean, it was obvious that these biases would come into play in this setting.
Q. Getting back to my question, Dr. Carnes.
So is it your testimony that Dr. Bala herself is immune to the effects of bias?
A. No. Of course not. We all have biases.
Q. And so -- but you didn't administer any tests with Dr. Bala; correct?

A. I did not.
Q. Okay. You did not conduct any examination of how Dr. Bala's biases may have affected her behavior at OHSU; correct?
A. Correct.
Q. Okay. Did you conduct any observational studies at OHSU for the purpose of forming your opinions in this case?
A. No.
Q. Did you review any video --
A. I've never been to OHSU.
Q. Sorry to speak over you.
A. I'm sorry; I just said I've never been to OHSU.
Q. Did you review any video or audio that captured Dr. Bala's interactions with others on the job while she was employed by OHSU?
A. No.
Q. If you haven't observe Dr. Bala's behavior in her workplace, how can you determine whether Dr. Bala acted professional or unprofessional while working at OHSU?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: I can't -- all I can say is

that the occurrences that happened to Dr. Bala and the behaviors that were -- that occurred in the whole situation, basically replicate multiple, multiple experimental studies.
BY MS. THOMPSON:
Q. And Dr. Carnes, we'll get to that. We'll get to that.
Do you believe that you or Dr. Bala's coworkers are in a better position to judge whether Dr. Bala acted appropriately while employed at OHSU?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: I don't -- I wasn't there. Yeah.
BY MS. THOMPSON:
Q. Dr. Carnes, what standards or criteria of professional behavior did you use to judge Dr. Bala's behavior at OHSU?
MR. BRISCHETTO: Same objection.
Go ahead.
THE DEPONENT: I don't -- I don't think I know. I mean, just the fact that, again, research would show the exact -- if Dr. Bala had been a man in the exact same situation things would have been different based on many studies in which, you know,

that happened. They're identically credentialed people, a man or a woman, the evaluation is different. So I don't know.
BY MS. THOMPSON:
Q. So is your testimony that you did not apply any criteria or standards in judging whether or not Dr. Bala's behavior at OHSU was professional or not?
MR. BRISCHETTO: Improper foundation. Misstates testimony.
Go ahead.
THE DEPONENT: Just the fact that, again, I can only say based on research, experimental studies in which the same actors, either male or female, the criteria of judging the behavior would be that they're treated the same.
BY MS. THOMPSON:
Q. I understand that there are studies. I'm asking you about your assessment of Dr. Bala's behavior at OHSU. Because you reached conclusions and stated multiple opinions about Dr. Bala's behavior at OHSU. So I'm asking you, what standards or criteria did you use to judge Dr. Bala's behavior at OHSU?
MR. BRISCHETTO: Assumes facts not in

94

evidence.
Go ahead.
THE DEPONENT: What standards did I use to judge her behavior? I would have to return to the research. You know, studies show that the most effective clinical leader in that kind of situation where it's task oriented, under pressure, is a directive communicator, and that research shows when women communicate in a direct manner they tend to be evaluated negatively.
BY MS. THOMPSON:
Q. I'm not asking you about other people's evaluation of Dr. Bala. I'm asking you about your assessment that you stated repeatedly in your report, Exhibit 1, that Dr. Bala behaved professionally. So as a scientist, what reliable standards or criteria did you use to draw those conclusions?
MR. BRISCHETTO: Vague. Ambiguous. Improper foundation.
Go ahead.
THE DEPONENT: Yeah, I'm -- I am not sure how to answer that. It just, again, I have to go back to the research. Her behavior, asking for quiet when she's -- direct communication. Asking

95

for systems to be put in place that she knew from her previous work. She was hired to bring this mediocre program up to high standards. She behaved that way. She recommended all kinds of system changes. I think her behavior was -- I think she was behaving the way she was recruited to behave. But she was kind of undercut at every turn.
BY MS. THOMPSON:
Q. Dr. Carnes, I'm asking you as a scientist, what standards or criteria did you use to assess that Dr. Bala behaved professionally while employed at OHSU?
MR. BRISCHETTO: Continuing objection.
Go ahead.
THE DEPONENT: As a scientist I would say her behavior aligned with research showing how the team leader should behave in the kinds of situations that Dr. Bala found herself. I think she behaved in the way one would expect she would behave when they're brought in to implement a systems change. They need to implement changes at all levels, which she did. So I guess my standard would be, based on research showing how a leader should behave when they're brought in to improve the function of a clinical program, she behaved as one would hope.

96

BY MS. THOMPSON:
Q. Which of the studies cited in your report addressed a situation where a leader was brought in to change a system?
A. I would have to go back and see because I don't think that I was particularly asked to bring in research to support that, but I can. I have published a paper that looked at gender in physicians leading cardiopulmonary resuscitation events, which are also very stressful, task-oriented, time-sensitive situations, similar to what Dr. Bala would have been in.
Q. What's the name of that study?
A. It's called "Witchy with a B." It's in the Journal of General Internal Medicine. The first author is Kolehmainen, K-O-H-L-E-M-A-I-N-E-N (sic). It actually received an award. And we looked at their experiences and we reviewed in that some of the research on leadership which did conclude that the most effective leadership style in those situations is directive. And then, it was a qualitative study and we found many of the women residents feared backlash when they had to communicate in a directive manner.
Q. So Dr. Carnes, I can pull that study up

97

now, but as a scientist, I am willing to bet money that if you published a study, that you used certain criteria or standards to make assessments; correct? In that study that you just mentioned.
A. Yes.
Q. So again, I'm asking you, what standards or criteria did you use in forming your opinions about Dr. Bala's case? What standards or criteria did you use?
A. It would be my knowledge of that research that I believed her behavior met the criteria of somebody who would be leading a team in those kinds of situations.
Q. And what are those criteria, Dr. Carnes?
A. Directive communication style. I would have to go back and pull some of those studies to give you the exact things. I think this has been studied by a group in simulation at Northwestern University. But --
Q. Are these studies that you're referring to now, and specifically this "Witchy with a B," did you rely on that study in forming your opinions in this case?
A. Well, I wasn't specifically asked to comment on Dr. Bala's behavior. At least the way

you're asking me the question did not lead me to bring in that research.
Q. So is it fair to say that you did not rely on any standards or criteria when you opined in your report repeatedly that Dr. Bala's behavior at OHSU was professional?
MR. BRISCHETTO: Misstates the testimony. Asked and answered. Improper foundation.
Go ahead.
THE DEPONENT: Yeah. I would say that does misstate the testimony because it seems to me I've said several times that I did have some knowledge of the research on leadership.
BY MS. THOMPSON:
Q. I'm not asking about your knowledge of research.
A. And I think she would meet that. I think I actually may have said that she was behaving in a directive communication style but maybe I didn't. Anyway, I feel like I've answered the question, so.
Q. So let me ask you again. What standards or criteria of professional behavior did you use to judge Dr. Bala's behavior at OHSU.
MR. BRISCHETTO: Objection. Asked and answered.

Go ahead.
THE DEPONENT: I guess I don't know what you want. I just have to say then I don't know.
BY MS. THOMPSON:
Q. Let me ask it a different way.
Did you disclose in your report any standards or criteria of professional behavior that you relied upon to judge Dr. Bala's behavior at OHSU?
MR. BRISCHETTO: Objection. Improper foundation.
Go ahead.
THE DEPONENT: No. I didn't reference any professional behavior that I know of. But in terms of her trying to implement a system change --
BY MS. THOMPSON:
Q. Dr. Carnes, I'm not asking you --
A. -- her behavior to implement a system change was what one would expect.
Q. Okay. Did you conduct any experiments to gather information that may be relevant to this case?
A. I mean, my experimental research would be kind of indirectly relevant, not probably specifically relevant. So no.

Q. So going to Exhibit 1, which is a copy of your report which you have, on page 2 of your report you refer to "rigorous experimental designs for the differences in evaluation of a male and female employee can only be attributed to their differences in gender."
A. Mm-hmm.
Q. Is that correct?
A. Yeah.
Q. Okay. What rigorous -- what do rigorous experimental designs mean to you?
A. So a rigorous experimental design would be a randomized controlled study where the only variable that's different would be sex or gender.
Q. Do you think that it is important that the designs relied on by studies be rigorously conducted?
A. Yes.
Q. Why?
A. Well, I mean, there are different study designs. It depends on what your research question is. But if you are looking for causality, really the randomized control design is the only design that will give you causality. So that's why it's the only design where you can 100 percent say it was

gender because everything else is held constant. So in a clinical setting, for example, when you're testing a drug and you do a randomized control trial, the participants are identical in everything except some get the drug and some get placebo. And in the gender realm that drug would be gender. You've got male or female. Everything else being identical.
Q. Dr. Carnes, does using a certain amount of rigor or meticulousness in one's study or experiment help ensure that the conclusion is valid?
A. Yes.
Q. On the flip side, if you are reviewing research that seemed to be based on incomplete or imprecise or questionable experimental designs you might question that research; correct?
A. Well, or at least you, I mean, every study has flaws. So you would just expect that in the discussion the authors acknowledged, you know, maybe there was a low response rate. Maybe, you know, so there is no perfect study. But as long as the researcher has acknowledged the limitations of the study and the applicability of the results then I would consider that fair.
Q. Would you question a study's results if

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

there were no experimental design at all?
A. Well, no, because it all depends on the research question. So for example, I've done a number of studies that use qualitative methods, and qualitative methods are also, I mean, there's books written on qualitative methods. So but it often provides the context to understand some of the quantitative results. And they're quite rigorous, too. So it's not just an anecdotal talking to somebody but most qualitative research they'll do in-depth interviews and then they'll synthesize quotes from the interviews, look for themes that emerge. And they often provide context for more quantitative studies.
Q. Understood. And even in qualitative research there is still some experimental design?
A. Not experimental. No. Never use the word "experimental" when you're talking qualitative researchers.
Q. Okay.
A. Their hackles will go up. But there's certainly rigor. Yes, there's rigor. And they're not experimental.
Q. Okay. And thank you for clarifying that.
Would you say though that there is

research design, certainly?
A. Yes. Absolutely.
Q. Even when we are doing qualitative research we are asking participants the same questions; correct?
A. No, not always. When you're doing qualitative research, say the first three people you interview there is something that's coming up that wasn't in your initial guide. Qualitative research allows you to further probe that and then perhaps with the next person you interview include that. So it's --
Q. Understood.
A. Yes.
Q. But there's an initial guide that --
A. Yes. There's an initial interview guide. And that guide --
Q. And that's --
A. Yep.
Q. Yes. There is research design; correct?
A. Absolutely.
Q. Even qualitative research?
A. Absolutely. Yep.
Q. Okay. And so if there was no research design at all in a study, you wouldn't rely on that,

would you?
A. Rely on it for what?
Q. For forming any sort of opinion?
A. So if you just have like an anecdotal -- an anecdote? No, but it might stimulate you to go further.
Q. Okay. If there is a -- if there was research or a study conducted -- let me back up.
If there was qualitative research or a qualitative study that was conducted without any research design it likely would not be published; correct?
A. It probably wouldn't even be conducted. Right.
Q. Because if there's no research design, it's not research; is that correct?
A. Right. That's right.
Q. If there's no research design, it is not a true study; correct?
A. No. It might be -- it might be quality improvement. A lot of projects to try to improve the quality of patient care go on but they don't even have to go through the IRB. They're not considered research.
Q. Okay.

A. They're still important for systems change but they're not considered research.
Q. And if there was some sort of activity that was not based on research design that likely would not withstand peer review for purposes of publication; is that correct?
A. That is true. I'm not sure where you are going with this but one of the purposes of at least experimental research is that it is generalizable outside of the study.
Q. So what is the purpose of research design then?
A. To answer a research question.
Q. And to, when you create the design you are intending to research reliable results; correct?
A. Yes.
Q. And again, you did not conduct any study with respect to the Bala case; correct?
A. No. But again, there are -- because there are so many experimental studies relevant to it, those experimental studies can be generalizable outside of the bounds of an individual study.
Q. Dr. Carnes, did you identify any female or male physicians at OHSU who were identical in all respects except for their gender?

A. No.
Q. Did you identify any female or male physicians at OHSU who were identical in all respects except for their race or ethnicity?
A. No.
Q. Did you conduct any statistical analysis of any data from this case?
A. No.
Q. Did you compare the contract renewals of female physicians and male physicians at OHSU?
A. No.
Q. Did you compare contract renewals of female and male physicians at the Knight Cardiovascular Institute?
A. No.
Q. Did you compare performance reviews of female physicians and male physicians at OHSU?
A. No. But again --
Q. Did you --
A. -- there are, you know, I think the study I cited by Shelley Correll is directly relevant though because she had over, I mean, she had thousands of evaluations in the IT sector. Again, quite a male-dominated field. And some of the terms that were used to evaluate women and men were very

different. And there was a lot of gender policing. So the findings from experimental studies are directly relevant but no, I didn't -- obviously did not study OHSU or any of the things you're asking.
Q. So similarly, you also didn't compare the performance evaluations of female or male staff at the Knight Cardiovascular Institute; correct?
A. No, I did not. But there were many gender terms that emerged from the information I had about Dr. Bala. But no, I didn't do any of that.
Q. Dr. Carnes, did you use any program or piece of software, such as a linguistic inquiry word count program, or I saw in some of your research papers repeatedly you were using NVivo, NVivo?
A. NVivo. Yeah.
Q. Okay. Did you use any such program to conduct intentional analysis of the records in this case?
A. No. Not this case at all. But again, that research has been done in other cases in other settings that are relevant. But no, not anything -- nothing at OHSU.
Q. Okay. And so you just mentioned that in other settings they use this sort of textual software to do a textual analysis of records;

correct?
A. Yes. Yes.
Q. And that is -- would it be fair to say that is standard in your field? Because I saw it is routinely used in multiple studies that you cited in your report and that you have authored. It's kind of the gold standard; correct?
A. To do textual analysis? Well, I think we were one of the first to do it. We looked in grant reviews and also looked at letters of recommendation. But I do think that it has been more and more widely used. It started off, I think, in psychology, but I have seen a number of papers since that do use the linguistic LAWC, whatever it is. And certainly NVivo is standard. University of Wisconsin makes it available to all faculty for free. I mean, it's a very widely used qualitative analysis program.
Q. So you had access to that program?
A. Mm-hmm.
Q. Yes? And you did not use it or any other sort of textural analysis program to evaluate the materials in this case, did you?
A. No.
Q. Okay. Did you use any coding system or a

code book for analyzing the case documents that you reviewed in this case?
A. No.
Q. In a study on assessing bias during team-based clinical decision-making, you and your fellow researchers used the de Groot Critically Reflective Diagnoses Protocol to code transcripts of meetings at which decisions about treatment were made for patients with advanced heart failure; correct?
A. Mm-hmm.
Q. Okay. And I --
THE REPORTER: I'm sorry, Dr. Carnes, was that a yes?
THE DEPONENT: Yes.
MS. THOMPSON: Give me one second. I'm putting into the chat now Document E which I would like to mark as --
THE REPORTER: Exhibit 3.
(WHEREUPON, Exhibit 3 was marked for identification.)
MS. THOMPSON: Thank you.
BY MS. THOMPSON:
Q. Dr. Carnes, do you have access to Exhibit --
A. Is that the Breathett paper? I can't

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

actually see which one it is.
Q. Here, I'll screenshare.
This is an article, "This happens all the time."
A. Yes. Yeah, Amy's paper. Yep. Uh-huh.
Q. Okay. You're familiar with this publication; right?
A. Yep. It was her dissertation. Yep.
Q. Okay. And there was a research design; correct?
A. Yes.
Q. And there were four coders who analyzed and transcribed interview text; correct?
A. Yes.
Q. Okay. So even if you're not using software, developing coding systems, that is standard in qualitative research; correct?
A. Yep. I mean, I did not conduct any research on OHSU people. You can just take that. I did not conduct any -- I have conducted the kind of research that you mentioned but I didn't study anybody at OHSU. I applied research that I was aware of to the situation.
MS. THOMPSON: Give me a moment. I'm going to introduce Document F, which I'm marking as

Exhibit 4.
(WHEREUPON, Exhibit 4 was marked for identification.)
BY MS. THOMPSON:
Q. Dr. Carnes, let me know when you have F open.
A. Can you share it? Because I can't see which one it is.
Q. Yes.
A. Is it the study with Khadijah Breathett?
Yeah. So Khadijah Breathett is a cardiologist. She was at Arizona and then went to Indiana University. And I was kind of mentoring and then collaborated with her on an NIH grant.
Q. Okay. So Exhibit 4, which is an article published online on May 9, 2023, entitled, "A novel approach for assessing bias during team-based clinical decision-making," you helped to author this article; correct?
A. Yes. Yes. I had been unfamiliar with the de Groot tool before that and I found it and thought it was interesting.
Q. Did you find that it was helpful in your research?
A. I thought it was interesting in this

research. I had not been familiar with it before. Before then.
Q. Okay. So, and I'm sorry, did you use any coding system or any code book for analyzing the documents in this case?
A. No.
Q. Okay. Why not? Why did you not use a coding protocol to review the records in this case?
A. Well, I wasn't approaching it as a research project. I was asked to provide testimony based on my expertise. I was not asked to conduct a study on the work. I mean, then I would have probably asked for many other documents. And I would have had to have funding for a graduate student so I wasn't in any way resourced to undertake a study. I simply was asked to review the documents, and in light of the research that I have conducted and the research that I'm aware of, evaluate how this situation fit into that research framework.
Q. So are you saying that the opinions that you've provided in this case are not based on any scientific or reliable methodology?
MR. BRISCHETTO: Objection. Misstates the testimony.

Go ahead.
THE DEPONENT: Well, I think, I mean, I would think -- again, this is my first time being deposed and providing expertise in this area. But I believe I was invited to do that because my knowledge was felt to be applicable. I was not asked to conduct a study. I was asked, here's all these documents. Review them. And based on your, I would say, considerable expertise of gender and race bias in academic medicine, what do you think happened here? And provide us expert testimony. And I did to the best of my ability do that. I was not asked to conduct a research study.
BY MS. THOMPSON:
Q. But you were asked to provide an expert opinion.
A. And I think I did that.
Q. Okay. Based on what reliable --
A. Based on my research and --
Q. It's --
A. I'm sorry. Yes. Go ahead. Sorry.
Q. Sorry. We shouldn't talk over one another.
A. I know. I'm sorry.
Q. Ms. Byrd, it gets hard for her.

Actually, go ahead. Go ahead. Finish your sentence.
A. I forgot what it was now.
Q. Okay.
A. Oh, no, I was just going to say, based on my expertise -- and maybe I'm misunderstanding what you mean by an expert. I was not aware of the fact that being brought in as an expert you were expected to actually apply your expertise to study the case because in the two cases I did for my expertise as a geriatrician way in the past I was asked that and did that. I did not conduct a study in the nursing home where I was asked to evaluate whether a patient would have fallen. I was only asked as an expert in geriatrics to, and my expertise in the research in that, to evaluate whether I thought adequate protections were put in place to prevent them from falling, just like in this case I was asked for my expert opinion, did I think that Dr. Bala had been treated unfairly and not renewed unfairly. So I was not asked to study this. I was asked as an expert just like in the geriatrics case.
Q. So is it fair to say that you did not understand that you had to apply -- you had to apply reliable principles and methods within your area of

expertise to be the facts of this case?
MR. BRISCHETTO: Objection.
THE DEPONENT: I didn't think I was supposed to conduct a study. No, I did not. And I didn't conduct a study. I applied my expertise to this case. I did not study this case. I mean, I did not -- I did not conduct a research study involving this case. No, I did not. I would have had to go through my IRB. I would have to get consent from OHSU for a memoranda of sharing data. There are all kind of things that would have to have been put in place for me to conduct a study at OHSU from my university, from OHSU. It's a very different ballpark --
BY MS. THOMPSON:
Q. So let's take -- let's take --
A. -- than serving as an expert witness.
Q. So let's take the word "study" out because I understand that the word "study" is a term of art in your field. And let's just talk generally about reliable principles and methods, reliable principles and methods that academic researchers like yourself employ. Okay? So let's take the word "study" out.
A. Okay.
Q. Did you understand that you, in providing

expert testimony, are required to provide an opinion that is based on the reliable application of the principles and methods in your field of expertise to this case?
A. No. Not the principles and methods to this case. No.
Q. You did not?
A. No.
Q. Okay.
A. I would have had to conduct -- okay, don't use the word "study." Use the word "research." I would have been unable to conduct a study unless my university got a memoranda to share data from OHSU. I had gone through the IRB of both OHSU and the University of Wisconsin.
Q. Understood, Dr. Carnes. Let's take the word "study" out of it.
A. No, research. I could not conduct research without --
Q. Okay. Let's take the word "research."
A. -- going through this.
Q. Let's take the word "study" out and let's take the word "research" out. Okay?
A. Okay.
Q. And let's focus on reliable principles and

methods. Did you apply reliable principles and methods that are used within your field of study to the facts of this case?
A. Yes, I believe I did.
Q. Okay. What --
A. Given the context of what I was asked to do I did exactly that.
Q. What were the principles that you used? What reliable principles in your field of study did you apply to the facts of this case?
A. I asked myself were there randomized controlled experimental studies which are known by the very methodology they use to be generalizable? Were there generalizable studies that I could apply to the situation at OHSU? And I tried to the best of my ability to do exactly that. I went through the materials I was given and looked for examples of things that happened and said does this imitate an experimental study? Or can this be supported by findings in qualitative studies? And that's what I did. So yes, I would say I applied reliable methods.
Q. Is it fair to say that you applied other studies to the facts?
A. Which in this case I would say would be

methods.

Q. Okay.

A. You were using the term "methods" loosely. I will use the term "methods" loosely.

Q. Dr. Carnes, why do researchers use study protocols or code books when performing archival research? Or research involving review of files? Why do they use protocols or code books?

A. So that as much as possible they can come up with generalizable findings. So because, again, because you cannot do a study in every naturally occurring case, the goal is to do research that does help explain these phenomenon in naturally occurring settings like OHSU. You can't -- you can't always conduct a study. So you do a code book in qualitative research so that you can find themes so that you can develop a conceptual model which can be applied more broadly or upon which other research can be built. So the goal is always to help explain phenomenon beyond the study. You can't study every single time a question comes up. I think the resources that would be required for Mr. Brichetto and his group to conduct a study every time they were asked to be involved in a case would just be -- it would be too great to do. That's the purpose of

doing research is to get findings that can be generalizable.

Q. Dr. Carnes, I'm not asking you about studies and I'm not asking you about research. I want to focus on coding systems.

Would you agree that researchers use coding systems as part of a scientific article to ensure an objective assessment to fairly test a theory or hypothesis?

A. Yes. Yes.

Q. Before you reviewed the documents in this case did you prepare any list of terms or behaviors that you determined would signal the operation of gender or racial bias?

A. Well, I did review again the papers I've cited, many of which list the content of gender stereotypes and has been documented again, and again, and again, Heilman and Ghavami and Peplau, Devine. You know, there are many studies that show, again, we know the content of these stereotypes. So yes, I did review those again. When I was looking at some of the terms that were leveled at Bala to reaffirm to myself that I had research supporting my contention.

Q. Dr. Carnes, I'm going to ask my question

again.

Did you prepare a list of terms or behaviors -- did you prepare a list of terms or behaviors that you determined would signal the operation of gender or racial bias in this case?

MR. BRISCHETTO: Objection. Asked and answered.

Go ahead.

THE DEPONENT: Did I prepare them separate from the studies? No, I had the studies in front of me. No, I didn't. I had the studies.

BY MS. THOMPSON:

Q. So is it -- so which studies did you rely upon? What terms did you rely upon based on the studies? I want to know which studies. What were the terms?

A. Well, I think I cited -- I think I did cite that Correll study that I was mentioning. And there was also one, a study out of -- some CEO looked at performance evaluations and found the term "abrasive," for example, was a very gender imbalanced term. And some of the statements that were pulled out of the qualitative research, I think that was one of the papers. Murti was one of the papers specifically looking at the experience of

Asian-Indian women physicians. So again, that would be a group that Bala was very much a member of. And some of the terms, the descriptions used almost exactly mimicked the terms that were in some of the materials I was given from the Bala case to review. I think I actually quoted some of them. You know, one specifically said, you know, a brown Indian woman is expected to be warm and soft and submissive. And if she gives an order she's considered to be a bitch. And I looked at that statement and then some of the statements coming out of the Bala and I thought, you know, this is replicated.

Q. Okay. So the record is clear, you did not yourself prepare a list --

A. No.

Q. -- of --

A. -- I had lists from other researchers. Yeah. I had lists from other researchers.

Q. Okay. And the resources that you mentioned, there's a Correll study, a Bhatt study. Any others?

A. Well, the Shelley Correll one from Stanford, that was a big one I think, although it was in the IT sector but she looked at like

thousands of performance evaluations. It was a brilliant study. And then the B-H-A-T-T was a qualitative study looking at Indian physicians, and the M-U-R-T-I was the first author of another qualitative study. And I believe she specifically looked at Asian- Indian women physicians practicing in the U.S.

Q. Okay. And is it your testimony that you relied on the list of terms or those studies code books, you used those studies, code books, or terms?

A. Terms. Well, not from the qualitative study. Yeah. Sorry, go ahead. I didn't use the terms in the qualitative study to evaluate the content of -- well, I guess I'm not sure what you're asking. I looked at all those studies to see how relevant they were to the case. I don't know what you're meaning by code book. No, I didn't use their code book.

Q. Do you know what I mean by the phrase "code book"?

A. Well, I do but I'm not sure how it applies to this case. I mean, what would I have -- what would I have applied the code book to? To the emails? I mean, what would I have applied it to?

Q. How are -- how are code books used, Dr.

Carnes?

A. Well, the way I use them, and the way they were used in those qualitative studies I referred to, they were in-depth interviews using a guideline to interview. And then they were transcribed and then the code book would then be applied to pull out various phrases that were then grouped into some theme. And then regrouped and a consensus derived. And eventually themes would emerge. And then those themes would generally be used to build some kind of conceptual model. And I did not do any of that. You can just cut to the chase. I didn't do any research regarding the case. It was not a research study.

Q. Dr. Carnes, can you please describe all training that you have received to distinguish between statements that are gender neutral and statements that reflect gender bias?

A. I don't know what you mean by training, but I think I have, I mean, I have reviewed much research and conducted research related to gender bias. I guess I'm not sure what you're asking me.

Q. My question is, do you have any training? Did you receive any training? I mean, you have a master's degree; right? I would like to know all training that you've received to distinguish between

gender neutral statements and statements that reflect gender bias.

A. Well, I can't -- training has a certain meaning. I don't have a master's degree in sociolinguistics. But whenever I, as a physician- scientist, when I would have a research question, I had the luxury of being at the University of Wisconsin where I had access to some of the top research in the world. So for example, I collaborated with a sociolinguist. And that sociolinguist is very much steeped in the science of analyzing language that would have like gender imbalances.

Q. So if I --

A. So, you know, like bossy is a gender imbalance word. So I collaborated with people who had deep expertise. I didn't ask them to train to be a physician- scientist when I collaborated with them. I collaborated with sociolinguists, experimental social psychologists, industrial systems engineers, computer scientists, education scientists. I collaborated with many people who have deep, deep training and expertise in areas. I, myself, didn't have to train in all those areas because that's the beauty of working at a big

research institution.

Q. I totally understand. I work in a big law firm. I'm not a tax attorney but I can reach out to --

A. Exactly. Yeah, exactly.

Q. Okay. So is it fair to say then that you are not an expert -- there are other experts -- but you, yourself, don't have extensive training or expertise in determining what is a gender neutral statement versus a gender bias statement?

A. I guess that's true. I mean, in academic medicine I would be viewed as one of the top experts in this area because I have -- in learning and collaborating from my colleagues in other areas I have brought a lot of that into academic medicine. So even if I, in a gendered way, would be modest because we know modesty is part of a female gender stereotype, if I were to be modest and say I'm not an expert in this area, I think you would actually have many people around the country in academic medicine who would disagree with you and say Carnes is actually an expert in that area.

Q. And, okay. I'm not going to ask you to speculate but I think we've already established you have no training or expertise in distinguishing

between gender neutral and gender bias statements; correct?
MR. BRISCHETTO: Objection. Misstates the testimony.
Go ahead.
THE DEPONENT: Yeah. I mean, just from my reading, I mean, there's a lot of research that I cited. Correll, for example. Madeline Heilman, a lot. She has that wonderful review paper on gender stereotypes in the workplace. I mean, there are many people. Laurie Rudman at Rutgers. There are many people who have done research who have identified gendered language, gendered statements, gendered stereotypes. And I am familiar with that research. Now --
BY MS. THOMPSON:
Q. Okay.
A. -- that is not training but I have had -- and I had funding to support my work in this area which some people would argue would give you more credentials than actually training.
Q. Dr. Carnes, can speech tone, and I know we spoke a little bit earlier today about tone, but can speech tone or inflection have a bearing on whether words spoken reflect gender bias or racial bias?

A. I don't know.
Q. Let me give you an example. Can the same words be spoken in a polite tone or a condescending tone?
A. I guess.
Q. And again, we've already established you did not personally observe any of the interactions at issue in this case, did you?
A. No.
Q. Is speculation about how people will behave towards women versus men acceptable data in studies of sex discrimination?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: Yeah. Speculation is generally not. Generalization of one study to another study --
BY MS. THOMPSON:
Q. I'm not asking about that. I'm asking about speculation.
A. But is that, I mean, it's just a term. Is that called speculation? I mean, you might call that speculation. I would call that generalizing research to another setting.
Q. Okay. What is your definition of

speculation?
A. I'd have to think about that.
Q. Take a moment.
A. I guess, I don't know. I don't have a definition of speculation.
Q. But it just seemed when you were using the word "speculation" that you were meaning what I was using by generalization. So I guess speculation would be more really having nothing to go by. Just, you know, out of the blue. In my mind, speculation is more just out of the blue, whereas generalization would be taking the results of research and attempting to apply it to another situation. I guess that's how I would define speculation. More out of the blue, so.
Q. Okay. And you would agree then using your definition of speculation that that would not be an acceptable form of data to use in studying gender bias or discrimination; correct?
A. Well, if that was all it was. I suppose one could start with speculation and then search for data to support it, in which case it would be less speculative. But speculation on its own probably is not very useful.
Q. So let me give you an example. If a

researcher wanted to know whether rude behavior by a woman would be treated the same as rude behavior by a man, can the researcher just imagine how people would react to each person and then use those imaginary data points as the basis for their research?
A. Well, I would go the other way. I would say if this was something that would be supported by the research as having bias, they would bring the research to support that.
Q. Okay. In what studies have you used data based on speculation about how people might behave?
A. So didn't we already go through some of these?
Q. So you use speculation in your studies?
A. No. I try to generalize the findings from other studies which would be applicable to explain the situation at OHSU.
Q. Dr. Carnes, have you ever published a study in which you created the data for the study based on thought experiments?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: I don't know. I don't -- I don't know if I ever. I don't think so.

BY MS. THOMPSON:
Q. You don't think so why?
A. Have I done research based on thought experiments? I don't think so. I mean, you could -- I might say to somebody, you know, in a thought experiment if you switch the gender, you know, if you imagine, for example, a man walking in high heels and with lipstick on, if you do that thought experiment it would seem odd. It might even make people laugh, like Tootsie or movies have used this, because just do a thought experiment if you switch the gender. So I might have invited people to do a thought experiment in some of my workshops or lectures. But did I ever do research based on a thought experiment? I don't know. I don't think I have. But I would often use that to explain how these automatic processes happen. And you're not aware of them sometimes until there's a counter stereotype -- counter stereotypic thing happening as I just mentioned. You know, putting a man in high heels. That looks odd. Why? Because we don't expect men to wear high heels.
Q. Dr. Carnes, can you describe exactly how you go about reading case materials to determine whether past decisions about an employee were

influenced by the employee's sex or race?
A. Okay. Say that again.
Q. Can you please describe exactly how you go about reading case materials to determine whether past decisions about an employee were influenced by race or gender?
A. How I go about doing it. Well, I guess since this was the first one, I guess I started by reading the volumes of material that I was sent and taking notes on it. And then in the notes that I took reading that case material I would jot myself little notes about studies that I thought would be relevant. And then later I went back and looked up those studies and pulled in notes to myself how I thought those studies would be relevant. So I guess that was my approach. I can't say how I usually do it since it's the first one I've done but I reviewed the volumes of materials, took notes on them, and then sometimes I knew studies that were there. Sometimes I would make a little note to myself to further search the literature to see if there was something that would support. So I guess I was pretty systematic in the way I did it.
Q. You were looking for studies to support what?

A. Well, to support whether or not I thought the same treatment would be applied to Bala had she been a man.
Q. In what published studies, and you have many articles in your CV, in which of your published studies have you used the method that you just described to reach opinions?
A. Well, I tend to take that kind of critical appraisal approach to anything that I do. At least I try to. Again, as a physician-scientist I like to think that I, you know, apply research, that I critically appraise things. So, yeah, I think I do try to use those methods. And I mean, in my -- you asked which particular studies. So I mean, all of them we tried to be very systematic. I published two systematic reviews where, you know, we did a lit review. We reviewed all the studies. We, you know, looked for themes in the studies. Came to conclusions. So I do. I try to be quite systematic and critically appraise any kind of data I'm reviewing. And I suppose if you looked at the case as data that's exactly what I did. I reviewed the data. I took notes. I looked for how it fit into the broader context of the existing research, relevant research.

Q. And the relevant research that you're familiar with is again, you are an advocate for advancing women in medicine, science, and engineering; correct?
A. Yes. Experimental studies though.
Q. Okay.
A. I mean, not just ones that would be looking for gender bias but those that look, again, to see, like for example, we did a systematic review on 27 studies, experimental studies in high-rank settings where the only variable changed was gender. Identically credentialed applicants and consistently the women was least likely to be hired, least likely to be advanced, recommended for a lower salary. Her work was evaluated of lower quality.
Q. Dr. Carnes, have any of your published studies ever examined the past motivations of decision makers with respect to employment decisions?
A. No. Nothing to look at motivations. Only the outcomes which I think are the most important. Motivations. I mean, motivation is part of behavior but the actual behavior is what's measured in the studies. It's, you know, how the applicant was evaluated.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Q. So would it be fair to say that in your past research you have not drawn conclusions about past employment decisions being made with respect to employees based on gender?

A. In my -- say it again.

MS. THOMPSON: Ms. Byrd, could you read back my question, please?

It may not have been a good one, Dr. Carnes.

THE REPORTER: Stand by.

(WHEREUPON, the record was played back.)

MR. BRISCHETTO: Objection. Vague.

Go ahead.

THE DEPONENT: Yeah, I guess that's fair to say.

BY MS. THOMPSON:

Q. Dr. Carnes, do you know what claims Dr. Bala has brought against OHSU? What legal claims she has made?

A. No, I don't. I don't think -- I don't know. If I did I don't remember exactly, just that there was -- I think I was asked to comment whether I thought there was race and gender bias and whether in her experiences and whether OHSU could have done anything to prevent it. So I think those were the

two things I was asked. And I don't think -- I mean, I know that her contract was not renewed and that was the reason she was suing. But I think that's all I know.

THE DEPONENT: Unless, if you told me more, Steve, I'm sorry, I don't remember.

BY MS. THOMPSON:

Q. At the time that you wrote your report, which I recognize you wrote in 2021, but in your report, Exhibit 1, we already went over the sentence where you said that you reviewed all the case materials that were provided to you by Dr. Bala's counsel; correct?

A. Mm-hmm.

Q. Do you recall that you were provided a copy of Dr. Bala's Second Amended Complaint that was filed in the District of Oregon?

A. I'm sure I was. I would have to go back and look at it I'm afraid.

MS. THOMPSON: So I've just put into the chat Document I, which will be Exhibit --

THE REPORTER: Exhibit 5.

MS. THOMPSON: Exhibit 5, I think?

THE REPORTER: Yes.

(WHEREUPON, Exhibit 5 was marked for

identification.)

THE DEPONENT: Oh, yeah, I recognize the title of it. It was in the list. I did have it. I just, I'm sorry, I don't remember it.

BY MS. THOMPSON:

Q. Okay. And just for consistency, I just want to make sure that we're all looking at the same thing while we're on the record. Dr. Carnes --

A. Yeah, I'm sure I did have this. Yeah.

Q. Exhibit 5.

A. And what --

Q. Are you familiar with this document?

A. Yes. I did have that. Yes, I apologize for not remembering.

Q. What steps -- so I'm sorry. When you reviewed the documents in this case then, you were aware that Dr. Bala was suing OHSU for sex and race discrimination?

A. Oh, yes, I was aware of that. Yes.

Q. Okay. And so when you reviewed documents in this case, what steps did you take to prevent that information from affecting your conclusions?

A. I didn't take any steps because I thought I was being brought in as an expert on gender bias in medicine. And so since that -- what the suit was

looking for, again, as I went through the materials that I reviewed, as I said, I took notes for when I saw something that I thought could be supported by the research showing gender bias, or particularly gender bias in academic medicine to see this is what gender bias looks like from the research, did I see that reflected in what was going on in that situation. In Bala's situation.

Q. Dr. Carnes, did you have -- and I think I know the answer to this but I would like an answer on the record.

Did you have anyone who was not aware of Dr. Bala's claims review the documents, the case materials, to see if they reached the same conclusions?

A. No. No.

Q. I want to be respectful of time and the time difference. Do I have it right, Dr. Carnes, that it's about 1:15 your time?

A. Yes.

Q. Okay. Are you good continuing a little bit more or would now be a good time to take a short lunch break?

A. This would be a good time to take a short lunch break for me if that's all right.

Q. Okay. I want to be -- I want to be respectful of time and I've been watching the weather, Dr. Carnes. Depending on which website I look at it's kind of unclear to me whether Madison is just Snowmageddon or if things are okay.
A. Well, it's snowing outside but I'm in my house so I'm good.
Q. Oh, okay. Good. Okay. All right.
A. I'm good.
Q. All right. So --
A. It is beautiful though. It's just gorgeous. It's really pretty.
Q. It's gorgeous?
MR. BRISCHETTO: We could have been there.
MS. THOMPSON: Well, it's gorgeous and beautiful when you're tucked at home safe and sound; right?
THE DEPONENT: That's true.
MS. THOMPSON: Okay. Maybe we could take 20 minutes. Does that --
THE DEPONENT: Yeah, that's fine.
MS. THOMPSON: -- sound good?
THE DEPONENT: Or even 15. If you want to shorten it, it's fine.
MS. THOMPSON: Okay.

MR. BRISCHETTO: Let's go 20.
THE DEPONENT: Twenty? Okay.
MS. THOMPSON: So yeah, and we'll be back.
THE DEPONENT: Great. Sounds good.
MR. BRISCHETTO: All right.
MS. THOMPSON: We'll be back.
THE VIDEOGRAPHER: Please stand by. The time is 1:18 p.m., and we are off the record.
(WHEREUPON, a recess was taken.)
THE VIDEOGRAPHER: We are on the record. The time is 1:46 p.m.
You may now proceed.
MS. THOMPSON: Thank you.
Dr. Carnes, I'm putting into the chat Document D, which I would like to mark as Exhibit 6.
(WHEREUPON, Exhibit 6 was marked for identification.)
BY MS. THOMPSON:
Q. Dr. Carnes, let me know when you have access to the document.
A. Again, it just comes up as a save. Yeah, I think it's best if you share it. Sorry.
Q. Oh, no problem.
Can you see on the screen, "Methods for the development of NICE public health guidance

(third edition), Appendix H Quality appraisal checklist for qualitative studies"?
A. Yes.
Q. Are you familiar with this document? And I can kind of scroll through it for you.
A. Yeah. There are several checklists for qualitative studies. I don't think this is the one we used for our study, the one with Filut, et al., but they're all similar. I believe we used a different checklist but they're all kind of similar. Yes.
Q. Okay. And would you agree that the National Institute for Health and Clinical Excellence is an esteemed organization?
A. Yes.
Q. Okay. So what I'd like you to do is let's turn -- sorry, I'm so used to doing this in person when we have paper. I'm going to go to page 214.
MS. THOMPSON: Mr. Brischetto, are you able to get the documents via chat? I just want to make sure you're also getting them.
MR. BRISCHETTO: I have it. Yes.
MS. THOMPSON: Okay, good.
BY MS. THOMPSON:
Q. All right. So Dr. Carnes, these

checklists, which you describe as there are many checklists, five, one of the questions for -- I don't know if you would find this as a recommendation is that the role of the researcher is clearly described.
Can you read the highlighted portion?
A. I can read it or I can just acknowledge, yes, this is an important part of any qualitative research to acknowledge that you as the researcher are evaluating the data through your own personal lens. That's always a part of qualitative research.
Do you want me to still read it?
Q. No.
A. Okay.
Q. Because I think that your statement captures what this document says. And if you agree with that we don't need to have you read it.
In Exhibit 1, nowhere in your report do you discuss how your possible biases or preconceptions may have affected your analysis or conclusions; correct?
A. Well, I wasn't asked to conduct a qualitative research study of the materials I was given. I was asked to render my opinion as an expert on gender and race bias in academic medicine

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

142

which I think are two very different roles.
Q. So what do you view your --
A. So my lens was as an expert on research and academic medicine. That was my lens. I guess I did acknowledge that when I provided all that upfront information of my expertise to provide -- to provide an evaluation of the case. I would say that was actually multiple paragraphs acknowledging the lens that I was viewing the data through.
Q. Okay. In this highlighted portion of Exhibit 6, this NICE checklist says, "It is important that we can determine a clear audit trail from respondent all the way through to reporting why the author reported what they did report and that we can follow the reasoning from the data to the final analysis or theory."
Did I read that correctly?
A. Yes.
Q. Did you include a clear audit trail in Exhibit 1, your expert report, so that we know why you decided to emphasize some pieces of the record and not others?
A. I was not asked to conduct a qualitative research study of the materials I was given, so I actually think this checklist is irrelevant. I was

143

asked based on my own research and my knowledge of the existing research to assess whether I thought gender and race bias had occurred in this case, so that's what I did. And I think in terms of an audit trail, I think I provided substantial supporting research data. I don't think I provided -- I don't think I once said based on my own experience. I think I cited my research or others to support the statements I made. And that could be considered an audit trail.
Q. An audit trail that would identify for us or, yeah, would identify for us what information you decided not to highlight; is that your testimony?
A. No. I believe I did a very thorough review of the literature. I did not just pick studies that show gender bias. It just happens that all the studies do show gender bias in academic medicine. So I pretty much picked all the studies.
Q. I'm sorry, I spoke over you.
A. No. No. Go ahead. My fault.
Q. My question related to the factual records that you were provided by Dr. Bala's counsel. Your report does not include any information about what factual information you chose not to emphasize; correct?

144

A. I did not comment on every single document I was given. That is true. I tried to pick out the ones that I thought were relevant.
Q. Relevant to what?
A. Relevant to showing that, in fact, Dr. Bala was a victim of gender bias and that it played out in exactly the way one would predict from 30 years of experimental research examining gender bias in employment settings.
Q. I think when I originally showed you Exhibit 6, this NICE checklist, you testified that researcher bias is something that should always be acknowledged; correct?
A. In qualitative studies. Yes. It is not generally done in experimental studies because of the randomization process.
MS. THOMPSON: Okay. And so just so we have it in the record, I'm going to put into the chat Document G as in George. And that will be marked as Exhibit 7.
(WHEREUPON, Exhibit 7 was marked for identification.)
BY MS. THOMPSON:
Q. And I'll share it on my screen, Dr. Carnes, as well.

145

A. Thank you.
Q. Oh, yeah.
Dr. Carnes, so Exhibit 7 -- is that what I said?
THE REPORTER: Yes.
BY MS. THOMPSON:
Q. Exhibit 7 is a 2010 article from the Journal of Women's Health entitled, "A Qualitative Study of Faculty Members' Views of Women Chairs" of which you're one of the co-authors; correct?
A. Yes.
Q. And you're familiar with the study and with the report; yes?
A. Mm-hmm.
THE REPORTER: I'm sorry, Dr. Carnes, was that a yes?
THE DEPONENT: Oh, yes. Yes. I am familiar with the study. Yes. Carol Isaac was a post-doc working with me and she was a qualitative researcher. Yes.
BY MS. THOMPSON:
Q. We spoke a little bit about this earlier, Dr. Carnes. In this research paper, appropriately, there is a discussion of limitation related to the findings of this study; correct?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

146

A. Yes.
Q. And that is a fairly standard and expected portion of qualitative study reports; is that accurate?
A. Yes.
Q. Okay. And you and your fellow researchers wrote, "Qualitative research paradigms believe that the researcher is an important part of the research and that analysis is invariably and directly influenced by the researcher's perspectives. This is openly acknowledged as 'researcher bias.'"
Did I read that correctly?
A. Yes. Yes. I think we're saying the same thing as we said in the checklist.
Q. Right.
Is one of the concerns in qualitative research that relying on researchers to categorize or interpret things instead of just counting things in a more quantitative research study is that researchers' own beliefs and values might affect their interpretations better?
A. Well, qualitative -- I mean, you're focusing a lot on qualitative studies. Qualitative studies are very limited in their generalizability. They're often used to explore human phenomenon that

147

are of interest but can't, you know, a randomized controlled experiment has to control so many things. You usually don't start off with one. You might staff off -- you might start off with anecdotes and then move to a qualitative study. The qualitative study then often provides a guidepost for the experimental study. So you're focusing a lot on qualitative studies. They're important, and I did pull some quotes from qualitative studies. But I think more relevant are the, I mean, hundreds of experimental studies, probably dozens within the context of academic medicine which are almost directly applicable to the Bala situation. I mean, really, they mimic it. The situation almost could be if you described it one of these experimental studies. You know, you say, you know, so-and-so was hired to be the only woman leading this highly male environment, an EP study, male or female, how do you evaluate her? I mean, it almost is an experimental study. So I mean, I'm glad you're interested in qualitative research. In my opinion it hasn't gotten enough play in academic medicine. In fact, it was hard even 15 years ago to get a qualitative study published in academic medicine. So I'm glad you're taking it seriously. But in terms of the

148

generalizability, it is widely known that qualitative research is not very generalizable.
Q. And Dr. Carnes, is one of the concerns with qualitative research that researcher bias may impact how qualitative information is interpreted?
A. Well, that is one concern. Other concerns are the sample size is not -- it's not a sample size where -- of like a probability sample where anybody in a certain population would have the ability to participate. If you select very carefully -- the analogy I was given when I started doing some qualitative research was if there was a fire on the block on a street and you wanted to know about that fire, would you take a random sample of people who were on that block or would you talk to the one person who witnessed the fire? And so in qualitative research you're actually trying specifically to get people who have experienced this phenomenon or who have biases so that they can explain what they've seen. And then you try as much as possible to then set yourself up for the experimental research question to actually see if what has been observed in a study really is in fact there.
Q. Research bias, researcher bias in

149

qualitative studies is something that we need to acknowledge and be mindful of. Is that fair?
A. That is fair. Yes.
Q. Okay. And then going back to your example of -- I think what you were saying is the best person to talk to is the person who was there at the fire. Is that right?
A. Right. Who has experienced the bias. Absolutely. And in fact, when we developed our first climate survey, which has been borrowed by many universities. We call it the Study of Faculty Work Life at the University of Wisconsin. It has been through eight waves. And when we developed that survey, we interviewed faculty and stuff. And of course, we reviewed the literature and interviewed people so that we could get the right research questions to get at what their experience had been. So qualitative research is very important but I think more relevant to this case are again the literally hundreds of experimental studies manipulating only gender in employment settings and what they have found.
Q. Just to follow up on that, you did not speak to anyone at OHSU; correct?
A. No. I mean, not about this. I served on

an NIH panel with Sharon, on a council, NIH Council with Sharon Anderson but that was way before this happened.

Q. And did you disclose that previously to Mr. Brischetto that you had personal experience with Dr. Anderson?

A. Yeah, I think -- yes, I did tell him that I knew her. I knew her back when she was chair, I believe. But anyway, we served on a council but it was before any of this happened.

Q. Okay. So I think we have established, and again, taking out the word "survey," taking out the word "research," you did not use any method for coding the case documents in this case; correct?

A. I did not code any documents. But I would say I used a systematic process in evaluating the data that was put before me as I would in any data. As I said, I read through the documents. I took notes. I made notes to myself about relevant research. I looked at that research. I read the papers to see if indeed I thought they were applicable. So I did have a systematic process in reviewing the data I was given. I did not have a code book.

Q. And there is no mention in your report of

any evidence that would be inconsistent with your conclusion that Dr. Bala was subjected to gender and racial discrimination; correct?

A. No. There would not be anything. That's what I was asked to evaluate.

Q. You were asked to provide an opinion that she had been discriminated against because of her gender and race?

A. Yes. And whether I thought OHSU had put into place any kind of system, process, anything that would mitigate the likelihood that this whole thing would have happened given that it would be so clearly predicted to have happened from not only the available research but from surveys within cardiology itself which particularly called out discrimination.

You know, if you look at the American College of Cardiology in itself evaluating its third Professional Life Survey published in 2016 I believe in the American College of Cardiology, their headline is, you know, there's discrimination in cardiology. Their opening paragraph describing that report is that women and ethnic racial minority cardiologists are victims of discrimination. So they concluded that themselves. So I think OHSU

should have done something to prevent what happened to Bala.

Q. So going back to Exhibit 1, your report, and we went over this this morning. You stated that you reviewed documents that were sent to you by Dr. Bala's counsel; correct?

A. Yes.

Q. And but you did not review the entire -- all documents that have been exchanged between the parties or all of the court filings; is that fair?

A. That's probably fair. Yes.

Q. Okay. Did you request from Dr. Bala's attorneys any additional documents that they had not provided you to rely on?

A. I think I did ask for additional evaluations from learners.

THE DEPONENT: Didn't I, Steve? I think I did ask for some additional evaluations because I wanted to assess how she was viewed by learners. And as I recall, and again, it was two years ago, because I recall then you did send me some evaluations. I believe there was one from a female cardiology fellow that was a very positive evaluation. And then as I recall, you sent me her ratings. The ratings of her teaching relative to the

ratings of other teachers and she was quite high as I recall. So that was the one thing I did request was additional evidence, additional evaluative evidence of her teaching. And it was pretty uniformly positive.

BY MS. THOMPSON:

Q. And why did you ask for that additional information?

A. Well, because when you're in academic medicine teaching is so important. I mean, it's embedded in everything we do. And so I thought it would be a reflection on just overall how she was viewed. You know, clearly, we had a lot of stuff from her supervisors. Some of the other staff people in the EP suite. But I wanted to see how she was viewed by a very other important sector within academic medicine and that's the learners.

Q. And why did you want to have that perspective?

A. Why did I want that perspective? Well, I thought it would give me a fuller picture of the validity, I guess, of some of the criticisms of her superiors and others because I thought, we call it a 360 in medicine. It's a well-known way of evaluating physicians. I don't know if it's in the

legal practice as well. But in order to assess a member of the team you like to get a 360 and see how they're evaluated not just by one segment of that team but by the whole team. And I just really felt that looking at the learner evaluations would give me a good sense of that. And I also would like to say I think it shows how the whole field of academic cardiology has lost a really important mentor, teacher. You know, the fact that Bala is now, to my understanding, practicing in just a clinical community setting and is not in a position to influence former training. She'll never become a chair. She'll never be a division head. She has no access to being a dean. I mean, this is a huge loss to academic medicine because her learners really thought she was good.

Q. Going back to your comment about receiving 360 reviews, and I'm familiar with that term, you used the term "validity." Were you seeking evaluations from others to have a 360 view to validate whether or not some of the complaints in the EP lab were justified or not?

A. Well, I didn't want to use the word "validity." It's funny because I knew you would come back and I was trying to think of a different word

than validity. But I think more the 360 evaluation, you get a sense from the whole team. And I was reluctant to use the word "validity," but another one didn't come to mind. So I'm taking back my use of the word "validity," and I'm putting back -- I wanted to say the 360.

Can I rescind my use of the word "validity"?

Q. And why did you -- and again, I think what you stated was you wanted to see the 360.

A. Yes, I did. I did.

Q. So you could validate whether or not the reports from people with whom she worked in the lab were valid. Sorry to be circular.

A. Yeah. Well, I mean, validate because it has other meanings. That's why I avoided the term "validity." I guess I wanted to see if they aligned with the criticisms, recognizing that learners can be, obviously have the same kinds of gender biases. You know, we all have the same biases. So, but I was interested to see because a learner being in a subordinate position, because gender is a stature thing, too. But in the academic hierarchy she was high stature regardless of her gender. So I wanted to see with that status differential did those

beneath her find that her -- was she like House? You know, was her teaching style viewed as difficult? But it wasn't at all. You know, people thought she was -- or the learners thought that she was very good. So anyway, it was just something I wanted to see because I'm in academic medicine and the learners' perspective is important to me.

Q. And Dr. Carnes, do you know whether you received all evaluations of Dr. Bala while she was employed by OHSU?

A. I don't.

Q. How much time did you spend reviewing the case materials in this case? Not the studies but the information --

A. Oh, my God.

Q. -- that was provided to you?

A. Well, they tried to keep track of my hours but honestly, I was embarrassed at how long it took me. So I don't even think I put in all the hours that it actually took me because I kept, you know, I'd read it and then I'd go back to it and I'd think -- so, I mean, I don't -- it was hours. I don't -- I can't remember. But whatever I put in the number of hours that I sent Steve, it was actually probably double that. Because I was, you know, I was living

with it. I was thinking about it and, you know, you put yourself in the person's position and you think -- so I can't tell you. I don't know if it's important how many hours but I will tell you I took it very seriously because I've never been asked to provide this kind of expert testimony before. I knew a person's life was at stake so I took it very seriously. I put many hours into it. I can't tell you the exact number.

Q. And who's life was at stake?

A. Well, a career. I mean, her career.

Q. Did you consider the careers of others?

A. Well, it seemed to me that the others actually did pretty well. I think one of her bosses assumed her position, became head of the EP cardiology. And they're all still there. Their academic -- their academic advancement has not been in any way limited by this case. But Bala --

Q. Dr. Carnes --

A. -- who was at University of Pennsylvania and University of Chicago, a leader in the field, she's practicing in a community program.

Q. Dr. Carnes, you mentioned that you took notes as you were reviewing documents. Do you still have those notes?

A. No. They were just informal notes to myself. And then once I had synthesized everything into the report I just threw them away.
Q. So you destroyed your notes?
A. Well, I guess, I recycled them.
Q. Okay. And forgive me that some of these questions may seem repetitive. I'm going to try to move more quickly.
Did you ever observe Dr. Bala in the workplace?
A. No.
Q. Do you believe that verbal descriptions of past behaviors provide the same amount of information as direct observation of behavior?
A. No. Different information. But no. It provides somebody's interpretation of their behavior. But no.
Q. What aspects of interactions can be lost when we're just relying on the verbal descriptions of past behaviors?
A. Well, I think as I pointed out in my report, verbal descriptions are a means of reinforcing stereotypes. So again, I'll come back to -- I think -- I think dispositional or situational attribution kind of explains it if you get into some

of that research. So --
Q. My question is different, Dr. Carnes.
A. Okay.
Q. My question is, what aspects of interactions can be lost when we're just relying on somebody's second-hand description of what happened?
A. Well, I guess mine was a long-winded way of saying because in remembering it, it's much more likely to be informed by these stereotypes. So I was getting at it in a long-winded way but you tend to remember things that align with a stereotype.
So if you find that a woman leader is behaving in a counter stereotypic way that might engender some negative feeling, when you remember it you would describe it in the negative way because you remember that stereotype.
Q. Dr. Carnes, as you reviewed documents in this case what effort did you make to find evidence that contradicted or did not support Dr. Bala's theory in her case?
A. Well, you know, as I reviewed the research I did look to see if there were any studies that didn't find gender bias in academic medicine that would be relevant. And I didn't find any.
Q. How about setting aside the studies, the

documents that you were provided, in your report you say that you "reviewed all the documents sent to me by the law firm representing Dr. Bala and included PDFs of copies of multiple emails, depositions, text messages, and handwritten notes."
A. Mm-hmm.
Q. Did you encounter any factual evidence in those materials that did not support Dr. Bala's theory of the case?
A. No.
Q. So is it your testimony that all the persons deposed in this case agreed that Dr. Bala's sex or race contributed to her contract not being reviewed -- renewed? Excuse me.
A. Well, they said -- they may have said it didn't. I believe there were some statements that said race or gender has nothing to do with it. But again, if you look at the research, just as an example, there are two studies by Uhlmann and Cohen from Yale, that came out of Yale, that showed people who explicitly thought they were unbiased actually gave the most gender biased evaluation. That was in a hiring setting. So the fact that they said --
Q. I understand --
A. The fact that they said race and gender

wasn't involved doesn't mean race and gender wasn't involved. I guess that's what I'm saying.
Q. And so it did not -- the fact that there was evidence in the record that did not support Dr. Bala's theory of the case, you did not consider that?
A. Was there evidence that didn't support her case? I guess I didn't see any.
MR. BRISCHETTO: I'm going to object to the question. It's argumentative.
Go ahead.
THE DEPONENT: I didn't see any evidence that didn't support her case.
BY MS. THOMPSON:
Q. Dr. Carnes, I believe you just testified that you read in deposition transcripts that other witnesses described reasons for nonrenewal of her contract that were gender neutral.
A. No. I don't think I said that. I didn't say that. Did I say that?
MR. BRISCHETTO: Misstates her testimony.
THE DEPONENT: No, I didn't say that.
BY MS. THOMPSON:
Q. Did you -- so Dr. Carnes, is it your testimony that all of the persons who were deposed

in this case agreed that Dr. Bala's sex or race contributed to her contract not being renewed?
MR. BRISCHETTO: Objection. Argumentative.
Go ahead.
THE DEPONENT: They explicitly did not -- of course they're not going to say that. No. There were people who said it didn't. But that doesn't mean it didn't. I mean, there's no -- those two things are not -- that's like apples and oranges. But again, it replicates the research. Even surveys of physicians, when they're shown to have no explicit racial or gender bias --
BY MS. THOMPSON:
Q. Dr. Carnes --
A. -- they have it.
Q. Dr. Carnes, I apologize, and I apologize to Ms. Byrd, I'm not trying to interrupt you. I want to be mindful of time and I'm asking very specific questions which sometimes can be a yes or no and then you continue to provide additional information about studies. And I'm not asking about studies. I'm asking specifically about your report and what's contained in your report.
A. Okay.

Q. To clarify the scope of my questions.
A. Okay.
Q. So specific to your report, your report does not mention any evidence that does not support Dr. Bala's theory of the case; correct?
A. Correct.
Q. Do you consider yourself a scientist?
A. I do. Physician-scientist.
Q. Are scientists supposed to consider only evidence that supports a theory?
A. So I believe I fulfilled my role in examining the data I was given and looking at the full body of relevant research that would apply to this case. As a scientist that's what I did.
Q. And I'm asking not about your specific role. I'm asking generally, are scientists supposed to consider only evidence that supports a theory?
A. No.
Q. In fact, it's not a reliable methodology to ignore evidence that contradicts a theory; correct?
A. That would be correct. And that's why I did a full review of the research.
Q. So is it your testimony that in reviewing all of the records that Dr. Bala's attorneys

provided you, which was all deposition transcripts, the Second Amended Complaint, do you recall also reviewing OHSU's answer to the complaint where it denied allegations?
A. Yes.
Q. -- provided additional information?
A. Yes.
Q. Okay. And even acknowledging that you've seen all of the things, is it still your sworn testimony that you did not encounter any factual disputes in those materials?
MR. BRISCHETTO: Objection. Misstates the testimony.
Go ahead.
THE DEPONENT: So just because they said it, I mean, the way I reviewed -- no. Their statements did in no way contradict that there was gender bias. So I guess -- I can't -- I don't know if that's a no or a yes. I reviewed those. They said there was no race or gender bias. So my reading of the research, that doesn't mean there was no race and gender bias. If anything it means it's more likely there was bias.
BY MS. THOMPSON:
Q. Did you review Dr. Bala's deposition

transcript?
A. I must have. Honestly, I can't remember. I'm sure I did. I remember pieces of it. Was that -- was that Exhibit 17? I know multiple times in her communications said that she thought she was a victim of gender bias. She actually rarely brought up race which I thought was too bad. But gender bias, in multiple emails she says it. So it's probably in the deposition, too. But do I specifically remember the deposition? I can't say that I do.
I remember -- I remember I thought it was --
Q. There's no question. There's no question pending.
A. Okay.
Q. One moment.
A. All right. I thought it was interesting that despite the fact that she complained of gender bias that the usual protocol that was supposed to be followed by Straus wasn't followed.
Q. Who is Straus?
A. Not Straus, the HR person. That she even acknowledge that she was supposed to move on -- there was a hierarchy for reporting when somebody

complained of gender bias that she didn't follow.
Q. And Dr. Carnes, again, you did not request from Dr. Bala's attorneys to review all records in this case; correct?
MR. BRISCHETTO: Objection. Asked and answered.
BY MS. THOMPSON:
Q. Is that correct, Dr. Carnes?
A. I was assuming that I had been given all of the relevant material. The only thing I asked for were additional teaching evaluations.
Q. Do you have any opinion on whether or not Dr. Bala is credible?
A. Yes. I think somebody who has trained at Georgetown, University of Chicago, University of Pennsylvania, which is like the fifth top medical school in the country, and been recruited assuming from a national pool to head an EP, complex EP cardiology program, head and develop, I would say yes, she's credible. By all the criteria that are known in academic medicine she would be a credible person.
Q. When I use the term "credible," I'm referring to you believe that her testimony, for example, during her deposition, credible meaning

truthful, do you believe what Dr. Bala testified to during her deposition?
A. Yes. I believe she would recount her experiences truthfully. Yes.
Q. Okay. What is your error rate in making credibility judgments?
A. I can't answer that.
Q. Why not?
A. I don't -- I don't even know what that means.
Q. Do you know what an error rate is?
A. Well, I know what an error rate is but I don't know how an error rate would apply to credibility.
Q. Do you -- are you claiming to be an expert in witness credibility?
A. Am I claiming to be a witness in expert credibility? No.
Q. Is it your testimony that all the witnesses in this case agreed with Dr. Bala's account of the events at issue in all respects?
A. Well, of course not. Isn't that why we're here, because of the filtering. Everybody reported what their truth may have been. But because what we experience, what we view, what we perceive, what we

judge is consistently filtered through processes in our interpersonal interactions, in our judgments of people, these stereotypes really distort the way we perceive things. So yes, I believe everybody reported what they thought was their truth. I don't know what that has to do with my error rate.
Q. But do you have an error rate for making credibility determinations?
A. I have no idea what that means.
Q. Okay.
MS. THOMPSON: I'm posting to the chat Document I. No, hold on.
I am posting to the chat Document J, which is OHSU's Answer to the Second Amended Complaint, which I will share on my screen.
THE REPORTER: And is this Exhibit 8?
MS. THOMPSON: This is Exhibit 8. Yes.
THE REPORTER: Thank you.
MS. THOMPSON: Thank you.
(WHEREUPON, Exhibit 8 was marked for identification.)
BY MS. THOMPSON:
Q. Dr. Carnes, can you see my screen?
A. Yes.
Q. Okay. And does this -- are you familiar

with this document?
A. It looks familiar but I can't say I know it chapter and verse.
Q. Okay. But is this one of the documents that you reviewed when you were reviewing case materials?
A. If it was on that list then yes.
Q. Okay. I'm not going to go through the entire document but you reviewed it?
A. Mm-hmm.
Q. Okay. Dr. Carnes, how many formal or informal complaints were made about Dr. Bala's behavior while she was working at OHSU?
A. How many?
Q. Yes.
A. Well, there were complaints from some of the anesthesia staff. Complaints from the head of anesthesia. I don't know how many. Four? But it was done -- I mean, the way it was done it was sort of --
Q. I'm not asking about how it was done.
A. Yeah.
Q. I just wanted --
A. Yeah. Well, the way it was done would be predicted to exaggerate the number because, you

know, if you're in a position of authority and you ask somebody how is her behavior? She's, like I showed in that figure, look at that figure again. It shows the behavior results in heightened scrutiny and that's exactly what happened. So I don't -- I don't know how many. Four? I don't know.

Q. Okay. And the only sources of those complaints that you can recall today are from anesthesia?

A. Well, there was a lot of back and forth. There was another nurse who complained. They got a complaint from one of the -- I think it was a fourth year anesthesia resident. I'm trying to remember how many. Yeah, I think it was four. I don't remember.

Q. Okay. Were any of the complaints made about doctor's behavior in the work -- sorry, let me restate that.

Were any complaints made about Dr. Bala's behavior in the workplace before Dr. Bala began working at OHSU?

A. I don't know.

Q. Were you provided any documents from Dr. Bala's attorneys that showed complaints about Dr. Bala's workplace behavior before she was employed at

OHSU?

A. I don't think -- no. I don't think so.

Q. The complaints that you recall I think you said from anesthesia staff, the head of anesthesia, one nurse, and one anesthesia resident -- did I get that right?

A. Well, I think so. I can't remember his name. But then, you know, there was a lot of back and forth. There was -- I think it was a retreat and then there was a summary of things to improve for Dr. Bala. And then she had a list of things to improve. And most of the suggestions for her improvement were really very personally, behaviorally oriented. Her suggestions all were about improving patient care, improving the system. So --

Q. Dr. Carnes, I'm asking --

A. The complaints about her -- like many of the things she suggested were called complaints by her supervisor. So was that somebody complaining about her or was that genderizing her recommendations as complaints?

Q. My question is a little bit different, Dr. Carnes. What I'm trying to understand from you is your understanding of who was making complaints

about Dr. Bala. That's what I'm trying to get to. Who do you understand was complaining about Dr. Bala?

A. I think some of the staff that worked with her in EP. Anesthesia staff, maybe nursing staff complained about her because she was trying to improve patient care in --

Q. I'm not asking why.

A. -- a mediocre program.

Q. I just want to know who.

A. Well, I think that was it. I think it was the staff in the EP program. And then the head of anesthesia because the anesthesia staff went and complained to him.

Q. Are you aware of complaints by fellows?

A. Was there anything from the fellows? There was one fellow who really liked working with her. I don't -- I honestly don't recall if there was a complaint from a fellow.

Q. Did you review any documents that demonstrated that there complaints about Dr. Bala from outside of OHSU while she was employed by OHSU?

A. No, I don't think so.

Q. You talked about a 360 review; right?

A. Mm-hmm.

Q. If we're getting complaints from multiple sources from within an organization and outside of an organization, would you agree with me that the constant factor, the constant like control factor would be the person who's being complained about?

MR. BRISCHETTO: Objection. Vague.

THE DEPONENT: Yeah. It's very hard to answer because the whole EP cardiology landscape is very male tight. Only 7 percent of EP -- the lowest percentage of any subspecialty like in internal medicine. You know, geriatrics is like 50 percent. EP cardiology, 7 percent women. So the whole landscape of EP cardiology nationally would be set up to evaluate a powerful woman, a woman leader negatively.

BY MS. THOMPSON:

Q. Dr. Carnes, you work in academic medicine; right?

A. Mm-hmm.

Q. And are you aware that Dr. Bala was providing services not just in the EP lab but was also servicing general cardiology?

A. Well, that would make sense. That's what most cardiologists do.

Q. Right. So they're not just interacting

with their little EP crew. They are often interacting with all facets of a hospital.

A. Well, within cardiology. So EP cardiology is a subspecialty. Subspecialty. But cardiology within internal medicine has the lowest percentage of women. It's only about 15 percent women. So again, even if you broaden the landscape to all of cardiology nationally, and again, I'm not making this up. Their own report in 2016 said women and ethnic racial minorities are subject to discrimination and inequities within cardiology. So that's well known.

Q. If there were complaints about Dr. Bala that arose from folks who were not specifically tied to cardiology, would that change your opinion in any way?

A. Well, I would have to do critical appraisal of that piece of data.

Q. And you're --

A. You were criticizing me before for not taking a systematic approach but that would be part of my systematic approach. If I was given additional data I would do the same kind of thing. I would look. I would take notes on it. I would look at it in the broader scheme of research and

then form my opinion of it.

Q. And you don't recall being provided any information from Dr. Bala's counsel related to complaints from either OHSU employees or people outside of OHSU about Dr. Bala's behavior; correct?

A. Correct. I'm recalling emails actually from within OHSU, being concerned that she wasn't given due process and being concerned that the normal channels of evaluation were not being followed. And --

Q. Dr. Carnes, again, I really do not mean to interrupt you.

A. No, no. Go ahead. I know we don't have much time.

Q. Dr. Carnes, if multiple witnesses report seeing the same thing, doesn't that make it more likely that that thing is real?

MR. BRISCHETTO: Objection. Vague. Go ahead.

THE DEPONENT: Yeah. Yeah. I appreciate the objection because while it would seem like a simple yes to that, because we all swim in the same ocean and because many of the people involved in this case also reported to these male leaders. So if they all said the same thing, again, they're all

swimming in the same sea. So I'm not going to give a simple yes answer to that. It's complicated.

BY MS. THOMPSON:

Q. It's complicated. And your answer also cannot be complete if you are not provided all of the information; correct?

A. Right.

Q. Are you aware, Dr. Carnes, that many people brought complaints about Dr. Bala before she was employed by OHSU?

A. I don't believe I was aware of that. But that wasn't what I was asked to evaluate. I was asked to evaluate the experience at OHSU.

Q. Would your opinion, however, be impacted if you learned that there had been numerous and extensive complaints about Dr. Bala's behavior -- for example, by learners at the University of Pennsylvania?

A. Well, I was asked to evaluate the experience at OHSU. So I would have to not include that data in my evaluation.

Q. Do you think that complaints about Dr. Bala's behavior by multiple learners at the University of Pennsylvania is not relevant to your assessment of whether or not Dr. Bala experienced

gender discrimination or race discrimination at OHSU?

A. Well, I mean, it would be a separate question; right? I think I would have to be given all of the information at the University of Pennsylvania to systematically review in the same way. I mean, who knows? Maybe it was a problem at the University of Pennsylvania. So I can't just give a quick answer to that. That was not in the information I was given to review and that was not the question I was asked to provide expert testimony on.

Q. Dr. Carnes, so is it your testimony you did not review any evaluations of Dr. Bala from the University of Pennsylvania?

A. That is true. I did not.

Q. Okay. Did you review any documentation from Dr. Bala's subsequent employer, the University of Arizona --

A. I do -- I do think --

Q. -- after she left OHSU?

A. Yeah. I think when I was reviewing the material that I was given to review there was something from Arizona. Because I remember reading it and thinking, oh, this is odd. This is not from

NAEGELI DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

OHSU. But I -- I remember just kind of glancing at it and dismissing it because it wasn't from OHSU. So yes, I did -- I did get that but I don't think I really reviewed that in detail. Plus, I remember in I think it must have been Dr. Bala's testimony that she described how she had -- she was trying -- she was seeking employment in other academic institutions and the leaders at OHSU in EP cardiology were kind of interceding and offers were withdrawn. So that was another reason when I saw the Arizona I just -- I didn't really pay any attention to it.

Q. So you ignored certain evidence that was in the record?

A. If it was -- if it was not from OHSU I didn't really evaluate it in the same systematic way. No.

MS. THOMPSON: Okay. I'd like to take two minutes. Just a two minute break. I'll be right back.

THE VIDEOGRAPHER: Okay. Please stand by. The time is 2:42 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 2:45 p.m.

You may now proceed.

BY MS. THOMPSON:

Q. Dr. Carnes, I just want to confirm, is it correct that you can only do a systematic analysis of a situation when you have complete information?

A. Yes, I would say that's true. Or at least a majority of the information. Or the relevant information I guess. Yeah.

Q. Would you agree that all people have biases of some type?

A. Absolutely.

Q. And do people differ in the strength and content of those biases?

A. In the strength of them I would say yes. In our culture, the content of the biases is often pretty predictable because the major groups that we're exposed to, societal stereotypic messages is pretty similar. In fact, in that one study I cited from Ghavami and Peplau, many people were from other countries and they still were aware of the major stereotypes in the U.S. So I guess the biases we all hold, the content of them are pretty similar but the strength would be different. Yeah.

Q. Okay. And is it your testimony that every complaint about Dr. Bala's behavior that you're

aware of, and we've established you're not aware of all of the complaints about Dr. Bala's behavior; correct?

MR. BRISCHETTO: Misstates the testimony. Go ahead.

BY MS. THOMPSON:

Q. So is it your testimony that every complaint about Dr. Bala's behavior that you were made aware of was the product of bias?

A. Reinforced by the behaviors of those involved.

Q. Okay. I'm not asking about whether or not the bias was reinforced. My question is, is it your testimony that every complaint that you're aware of about Dr. Bala's behavior was the product of bias?

A. I would say yes.

Q. Okay. And so is it your assessment that none of the complaints that you've been made aware of have any validity or truth to them?

A. Well, I think in the experience of the person reporting them they probably were true. And this is where OHSU really let her down because they --

Q. I'm not asking --

A. -- could have come in and mitigated a lot

of that. You know, there's one study simply by having somebody say I realize there aren't very many women leaders in -- I think it was, yeah, mechanical engineering -- simply making --

Q. Dr. Carnes --

A. -- that explicit.

Q. I'm sorry. Again, I do not mean to interrupt you but I'm asking very specific questions.

A. Okay.

Q. Did you conduct any investigation to determine which complaints that you were made aware of about Dr. Bala were valid or invalid?

A. I'm sure they were all valid to the people reporting them.

Q. On page 1 of your report, this is Exhibit 1, and let me see if I can screenshare with you.

Can you see your report?

A. Yes.

Q. Okay. So on page 1 --

A. Mm-hmm.

Q. Okay.

A. Yes.

Q. You write that you have, "No doubt that Dr. Bala endured relentless sex and race



discrimination."
A. Mm-hmm.
Q. Did I get that right?
A. Yes.
Q. Does that mean that you concluded that Dr. Bala was subjected to sex and/or race discrimination every day she worked at OHSU?
A. I don't know about every day.
Q. Okay.
A. But it was certainly frequent.
Q. Do you know when, and let me be clear on the record, we are not conceding, of course, that any discrimination took place but I'm referring to your report. You have -- your opinion is that there is no doubt that she endured relentless sex and race discrimination.
So based on that, when did the gender discrimination begin?
A. Well, I -- what, was she hired in January? I think the emails started, what, maybe six months after she was there.
Q. What emails are you referring to?
A. The complaint. The interactions in the EP lab, problems with anesthesia. If I'm recalling, was that about six months later? So maybe she was

in honeymoon period the first few months. I don't know. But certainly, there were months of her employment there where indeed it was pretty relentless.
Q. So you do not know when gender discrimination began?
A. No.
Q. In what percentage of Dr. Bala's interactions with men at OHSU did sex discrimination occur?
A. I have no idea.
Q. In what percentage of Dr. Bala's interactions with women at OHSU did sex discrimination occur?
A. I have no idea.
Q. In what percentage of Dr. Bala's interactions with other workers at OHSU did race or ethnic discrimination occur?
A. I have no idea.
Q. How many of Dr. Bala's supervisors and coworkers hold biases against female electrophysiologists?
A. Against? I would say all of them because of the very male typed role that it is.
Q. Okay. All of them.

A. Whether they act on them or whether they acknowledge them because of the very tight alignment with an EP cardiologist with male gendered stereotypes it would be predicted that everybody would hold a bias against women, particularly powerful women, EP cardiologists, because it so violates those male gendered norms.
Q. Okay. So your testimony is that every one -- every one of Dr. Bala's supervisors and coworkers held biases against female electrophysiologists?
A. Well, not consciously. But yes, I think that they would all implicitly view the image of an EP cardiologist as male because only 7 percent of EP cardiologists are women. And as Glick himself, maybe he'll testify tomorrow, has published --
Q. I don't want to talk about -- we don't need to talk about Dr. Glick --
A. Well, his -- but once a field becomes 75 percent of any gender then the assumption is that to perform in that field requires male gendered stereotypes. So yes, they would all hold biases against a female EP cardiologist, particularly one leading, in a leadership position. Yes. So yes, they all have biases.
Q. What methodology are you relying on to

state that all of Dr. Bala's supervisors and coworkers hold biases against female electrophysiologists --
A. Well, again, I'm extrapolating -- oh.
MR. BRISCHETTO: Objection. Assumes a fact -- assumes a fact not in evidence.
Go ahead.
THE DEPONENT: I'm just extrapolating as we said before from the existing research and also from the American College of Cardiology Professional Work Life survey which has gone through three waves. And all of them show that women cardiologists experience discrimination and that it is the procedural disciplines where women are particularly discriminated against.
BY MS. THOMPSON:
Q. Which is not what I asked about but I'll just --
A. Well, I think one can extrapolate from that and say, yes, because of this, I mean, what would make OHSU cardiologists different from all other cardiologists?
Q. Okay. So our testimony is that all cardiologists everywhere hold biases against females and that --

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

A. In cardiology. As evidenced by their own report.
Q. Based on the evidence of female physicians self- reporting; correct?
A. And men. I mean, it was not just a survey of women. It was a survey of men and women.
Q. Okay.
A. And it found women in cardiology reported gender bias to a far greater extent than women physicians in other specialties.
Q. How many of Dr. Bala's supervisors and coworkers hold biases against people of East Indian descent?
A. Well, again, if one can extrapolate from research, these are widespread biases. And I would have no reason to think that the physicians at OHSU have somehow escaped the biases that are prevalent throughout the U.S. and prevalent throughout academic medicine. And documented by the American College of Cardiology within cardiology.
Q. So you're just extrapolating from some studies to conclude that everyone in OHSU's EP department held biases against East Indian people?
A. Absolutely.
Q. Okay.

A. Because that is what the research would suggest.
Q. How many of Dr. Bala --
A. But I don't think they were aware of them. I don't think they were aware of these biases.
Q. Because they're unconscious?
A. Yes, because they're unconscious.
Q. How many of Dr. Bala's supervisors and coworkers dislike being treated rudely by both male and female physicians?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: Well, rude again is very subjective. A statement by a woman might be considered rude.
BY MS. THOMPSON:
Q. That's not what I'm asking. I'm asking --
A. Yeah, but I don't --
Q. I'm asking --
A. Yeah.
Q. I'll re-read the question.
A. Okay.
Q. How many of Dr. Bala's supervisors and coworkers dislike being treated rudely by both male and female physicians?

A. Dislike being victims of behavior they perceived as rude. Yes, I would say that's true.
Q. Okay. Now, I'm asking you how many. How many --
A. I would say all of them. Nobody likes to be a victim of behavior that they perceive as rude.
Q. Regardless of whether the person who is being rude is a male or a female, White, Black --
A. That is true regardless. Right. Nobody likes to --
Q. Regardless of race, regardless of gender?
A. Right. Right. Nobody likes to be a victim of what they perceive as rude.
Q. How many of Dr. Bala's coworkers dislike being spoken down to by both male and female doctors?
MR. BRISCHETTO: Objection. Improper foundation.
Go ahead.
THE DEPONENT: Yes. I mean, it's, again, it's perception. Nobody likes to be treated with the perception that they're being put down, whatever the term you used. But that perception could have been mitigated if OHSU had taken proper steps.
BY MS. THOMPSON:

Q. What percentage of the complaints about Dr. Bala that you're aware of, and we've established you aren't aware of all complaints, what percentage of the complaints that you're aware of about Dr. Bala were motivated by gender bias?
MR. BRISCHETTO: Objection. Misstates the testimony. Vague, ambiguous.
Go ahead.
THE DEPONENT: What percent of statements were motivated by race and gender bias?
BY MS. THOMPSON:
Q. Well, let's stick with gender bias. What percentage of the complaints that you're aware of were motivated by gender bias?
A. What percent of the statements were motivated by gender bias? Well, it snowballed, I think as often happens. Maybe it started off a smaller percent but by the end it was probably a large percent.
Q. And I'm asking what percentage.
A. What percentage? I don't know.
Q. What percentage of complaints that you're aware of about Dr. Bala were motivated by racial or ethnic bias?
A. Well, I think there's - at the

intersection of race and gender bias, you know, she looked so totally different from the --
Q. That's not what I'm asking about, Doctor, please.
A. Okay.
Q. I'm asking you what percentage --
A. Well, I don't know what percentage.
Q. Okay.
A. You can make that up yourself.
Q. Dr. Carnes, what was the first date on which Dr. Bala reported any concern about her treatment at OHSU?
A. I would have to go back and look at the date.
Q. Were the persons who hired Dr. Bala the same persons who decided not to renew her contract at OHSU?
A. That's my understanding.
Q. Do you believe that the decision to hire Dr. Bala was influenced by Dr. Bala's gender?
A. The decision to hire her? No. I think she was hired because she was at a top EP program in the country and they felt that she was capable of developing a top- notch program at OHSU.
Q. Did you -- and again, you reviewed all the

deposition testimony in this case. In your 30-plus years in this field you have been an advocate for and have been pushing for more women in medicine; correct?
A. Yes.
Q. And so do you believe that Dr. Bala's gender may have played a causative factor in her hiring at OHSU?
A. Well, there is research that would suggest that. That the biases that sort of work against women on the way up, and this comes out of I think the business school at Duke University. Once they get to the top, and I guess one would argue she was pretty much at the top, those biases work in their favor. So it is possible that there was a positive bias because she was a woman to bring her to OHSU. It is possible. There would be research to support that.
Q. And isn't part of the advocacy work that you do to help open doors for women in medicine?
A. Yes. Although, you know, you have used the word "advocacy" a number of times. And I don't necessarily view myself in an advocacy role because more often than not what I have been consulted with is the knowledge of the research. So like a woman

might contact me and say this is happening to me. Do you have any research studies that would be useful? And I will give them the research. In my mind, I mean, it is true I advocate but I view pure advocacy more as somebody who has kind of a position whereas I really try to take an academic view, a research- based, an evidence-based approach to it. I don't know if that matters but it matters to me.
Q. Okay.
A. So yes, I have advocated but not in a pure advocacy role. More in evidence. Right?
Q. Your research is focused on supporting --
A. Yes.
Q. -- inclusions that -- for a whole host of things.
A. Right.
Q. Related to women's health, related to retention of medical -- female medical students.
A. Right.
Q. Retention of minoritized --
A. Right.
Q. -- to use your term.
A. Right. With evidence-based strategies to improve the system for everyone, not just women.
Q. Speaking of leadership, and you keep -- I

think you've mentioned a couple times that Dr. Bala was at the top. On page 2 of your report you describe Dr. Bala as being placed into a leadership role.
A. Mm-hmm.
Q. Would you agree that Dr. Bala was hired into a leadership position by the same persons that did not renew her contract?
A. Yes.
Q. And would you agree that if these decisionmakers were subject to the racial and gender biases discussed in your report then they would not have hired Dr. Bala into this leadership position?
A. No. I don't know --
Q. Why not?
A. -- whether her gender worked for or against her. But I think her level of competence in the hiring setting probably trumped any concerns about gender or race. Because she was coming from Penn which, you know, top five medical school. OHSU, 30. And so, you know, they wanted to bring their program up to Penn's. So I think -- I don't know what the discussions were. I don't know if gender was a positive factor, again, although research might support that it was. But I think her

NAEGELI DEPOSITION & TRIAL (800)528-3335 NAEGELIUSA.COM

194

coming from Penn, having that kind of external conferral of status probably trumped any concern about gender or race.
Q. What do you base that opinion on?
A. The external conferral of status has been shown in a number of studies to help women.
Q. I'm sorry. My question wasn't clear.
You just made a number of sweeping statements about OHSU's motivations, why they may have wanted to do this or that. You made a comment about Penn's stature, its rank compared to OHSU's rank.
A. Right.
Q. Do you have any information --
A. On the rankings? Oh, yeah, the rankings are --
Q. I'm not asking about the rankings. I'm asking about OHSU's motivation behind hiring Dr. Bala. Do you have any information about that?
A. No. But you were asking me I thought -- if I thought gender was a factor. And I was saying I don't know whether it was. I thought I said that. But what I think - - if it was a concern, plus or minus, I would think the credentials that she brought from Penn would have been the reason she was

195

hired into a leadership position.
Q. Dr. Carnes, would you agree that when the hiring -- when the hiring decision was made -- so when OHSU decided to hire Dr. Bala, did those decisionmakers have more or less information about Dr. Bala than when they decided not to renew her contract?
A. Well, they would have more information about her because she would have worked there for a year.
Q. And is it your position that Dr. Bala's performance on the job at OHSU should not have been taken into account when deciding whether to renew her contract?
A. That's really a difficult question because obviously, if you have biased decision makers in charge. I mean, yeah, I guess, yeah. I mean, they had complete control. There wasn't a committee. They had, you know, complete charge to hire and fire which is, again, not what we recommend but, so yeah, they could -- they could take whatever they wanted and fire her. Yeah. They had that institutional authority.
Q. Dr. Carnes, here's my question again.
Is your position that Dr. Bala's

196

performance on the job should not have been taken into account when deciding whether to renew her contract?
A. Her performance on the job definitely needed to be taken into account. Most of the recommendations she made, although they were initially criticized, were put into place. So I would say her performance was actually pretty good.
Q. Dr. Carnes, do you recall how long Dr. Bala was employed by OHSU?
A. Well, let's see. She came, what, in January, was it 2015? And then she left, was it June 2017? Was that right? I think that's right.
Q. So just for purposes of my question let's assume two years of employment at OHSU.
A. Mm-hmm.
Q. Do you believe that the documents that you received to review, as extensive as they were, do you believe those documents represent two years' worth of work and interactions that Dr. Bala had with her coworkers at OHSU, with community doctors outside of OHSU, with people within the hospital? Do you believe that the number of documents that you received and reviewed reflects her entire tenure -- and I know tenure is not a good word to use in this

197

setting. But --
A. No. They couldn't -- no, they couldn't --
Q. -- you have to acknowledge you don't have a complete --
A. No, I'm sure I don't. Yeah.
Q. Okay.
A. I'm sure I don't.
Q. What expectation did those who hired Dr. Bala have about how she would behave on the job, do you know?
MR. BRISCHETTO: Objection. Calls for speculation.
Go ahead.
THE DEPONENT: Well, she was hired to build an EP program, one that mimicked the program at Penn. So I am speculating that they would want her behaviors to be such that that's what she did. So even though they --
BY MS. THOMPSON:
Q. But you don't know. But you don't know --
A. -- blocked her --
Q. You're just speculating?
A. I am totally speculating.
Q. Okay.
A. I think you asked me to speculate.

Q. I didn't. That was Mr. Brischetto's objection.
A. Oh, okay. I'm sorry.
Q. You just testified that she was hired to mimic the program at the University of Pennsylvania. Did I hear that correctly?
A. Yeah. That's my understanding.
Q. And where does that understanding come from?
A. I thought there was a statement from one of her bosses, Cigarroa or Kaul that they were pleased that she was coming on board. She was at one of the top-notch programs in the country and she was certainly hired to lead and develop an EP program at OHSU, so.
Q. Okay. But did you see anything at all that suggested that OHSU wanted to mimic the University of Penn program?
A. No. I didn't see that.
Q. Is it possible for someone to react negatively to a female physician's behavior without that reaction being the product of gender bias?
A. Yes.
Q. What reliable method did you use to distinguish between biased and unbiased reactions to

Dr. Bala's behavior in this case?
A. I think it was the repeated behaviors and the words that were used in emails that were unnecessarily, yo know, attacking of her.
Q. So what you are characterizing as a reliable method to distinguish between biased and unbiased reactions to Dr. Bala's behavior are the words used?
A. Well, I guess just the pattern, the repetitiveness. It wasn't just a single episode. It was repeated. And the processes -- she was undermined. Rather than support her, you know, it was allowed that she be bypassed in the chain of command. So there were just systems, issues which happened --
Q. That's not -- I'm not asking about --
A. -- which allowed the gender bias to occur.
Q. And I'm sorry. I'm not asking you a question about the environment in which something may or may not have been allowed. What I'm asking is, I think you already testified that someone can react negatively to a female doctor and it's not necessarily the product of gender bias; right?
A. Mm-hmm. Mm-hmm.
Q. Okay. So what reliable method did you use

to distinguish between biased and unbiased reactions by others to Dr. Bala's behavior?
MR. BRISCHETTO: Objection. The answer was responsive and interrupted.
Go ahead.
THE DEPONENT: Well, I think it was, again, the repetitive nature of the occurrences and the fact that they aligned so directly with the large body of experimental research. I think that was my rationale for saying, yes, this is clearly gender bias.
BY MS. THOMPSON:
Q. If a nurse feels insulted by a female doctor who makes an insulting comment, should that nurse not express that feeling to the physician?
MR. BRISCHETTO: Objection. Vague.
Go ahead.
THE DEPONENT: Well, I think it's a complicated relationship between doctors and nurses. There's been large literature on that. And as more women have entered medical school there's growing literature on interactions between nurses who are mostly women and female physicians. And it' a complicated reaction. But because they share one low status position but not another in the medical

hierarchy. And I quoted a few papers --
BY MS. THOMPSON:
Q. Dr. Carnes, I recognize --
A. -- because the nursing --
Q. I'm asking --
A. Go ahead. Go ahead.
Q. -- a very different question. Please listen to my question.
So you know, I have spent considerable time with your report. I have spent considerable time -- this is neither here nor there -- you know, my undergrad degree was in sociology. I have done a lot of -- I understand the work that you do, the methodology, all of that. Okay? So I've read the studies. I don't need you to continue to parrot the results of studies.
What I need are answers to my very specific questions because what I don't -- you don't want, Mr. Brischetto doesn't want -- I don't want us to run out of time because you're not answering the questions because I don't want to have to go to our judge in this case and ask to depose you for a second day. I don't. I don't think you want that either.
So here's my question again.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

A. Okay.
Q. If a nurse feels insulted by a female physician who makes an insulting comment, should the nurse not express that feeling to the doctor?
MR. BRISCHETTO: Objection. The response was responsive. And it's argumentative.
Go ahead.
THE DEPONENT: Sure. Yeah. Feedback is good.
BY MS. THOMPSON:
Q. So a nurse should express her feelings to the doctor?
A. Yes.
Q. Okay. If supervisors are receiving complaints about the behavior of a female -- I'm going to use a term -- well, let me back up.
If supervisors are receiving complaints about the behavior of the female electrophysiologist, should supervisors ignore those complaints because they might be the product of bias?
A. They should view it as a systems issue. It should be treated like a near miss in surgery. I mean, this is a systems issue and they did not approach it that way.

Q. So your testimony is if a supervisor receives a complaint about a female physician, is it your testimony that supervisors should ignore those complaints because they could be the product of gender bias?
MR. BRISCHETTO: Objection.
THE DEPONENT: No. The supervisor should --
MR. BRISCHETTO: Objection. Misstates the testimony and it's argumentative.
Go ahead.
THE DEPONENT: The supervisor should meet with the person and then meet with the person and the nurse that was making the complaint as one would do sort of a root cause analysis. Find out what happened. Then see if one can fix the system. That is, make sure the anesthesia residents were trained. That is, put somebody to cover the night consultations for EPs so when somebody is getting ready for a complex procedure they're not asked to staff the evening consults. You know, one needs to change --
BY MS. THOMPSON:
Q. Dr. Carnes --
A. -- the system.

Q. So is it your testimony then that there can never be a complaint about a female doctor that is -- that should be addressed with the individual female doctor? That all complaints about female doctors are all related to systemic issues within a health system? Is that --
MR. BRISCHETTO: Objection.
BY MS. THOMPSON:
Q. I don't think that's your testimony; correct?
MR. BRISCHETTO: Objection. Misstates the testimony.
Go ahead.
THE DEPONENT: Yeah. I mean, no. You can't do an always or never. But when it's this consistent it's a systems issue.
BY MS. THOMPSON:
Q. So again, if supervisors are receiving complaints about the behavior of a female electrophysiologist, should supervisors ignore those complaints --
A. No.
Q. -- because they might be the product of bias?
MR. BRISCHETTO: Continuing objection.

Go ahead.
THE DEPONENT: That's like did you beat your wife. They should address them because they might be the cause of bias, or they might not be. They need to address them either way.
BY MS. THOMPSON:
Q. Thank you.
Is it possible for someone to react negatively to a minoritized physician's behavior without that reaction being the product of racial or ethnic bias?
A. Yes.
Q. I asked you this question earlier with respect to gender. What method did you use to distinguish between biased and unbiased reactions to Dr. Bala's behavior based on her race or ethnicity?
MR. BRISCHETTO: Objection. Asked and answered a number of times over.
Go ahead.
THE DEPONENT: I mean, just, again, placing it in the context of existing research and existing data.
BY MS. THOMPSON:
Q. I previously asked you about gender bias. And now I'm asking you about racial or ethnic bias.

MS. THOMPSON: Mr. Brischetto, just to be clear, these are different questions.
BY MS. THOMPSON:
Q. If a nurse feels insulted by a non-Caucasian physician who makes an insulting comment should the nurse not express that feeling to the doctor?
A. No, the nurse should.
Q. If a supervisor is -- if supervisors are receiving complaints about the behavior of a non-Caucasian electrophysiologist, should the supervisors ignore those complaints because they might be the product of racial or ethnic bias?
A. No. They shouldn't -- they shouldn't ignore them. If they are the root of bias or if they're not, they shouldn't ignore them either way.
Q. Why shouldn't they ignore them?
A. Because a team doesn't function well if there's negative dynamics within the team. So if you want the best patient care, if you want the best outcome, and again, there is research on function of teams in health care that would show, you know, you want communication to be collegial.
Q. On page 4 of your report you write, "In addition, as the de facto expert on high-risk EP

ablations, her opinions differed from the prevailing practices and opinions held by men."
Do you recall writing that?
A. Yeah.
Q. What evidence did you have review to lead you to that conclusion?
A. Well, she -- like, there was one email that some of Bala's suggestions are good, some not so good. She had many suggestions for how to improve EP and was met with negative resistance for many of them, although in the end many of her suggestions were adopted. But --
Q. So Doctor --
A. -- I mean, you've asked me not to cite the research but research shows when women's opinion differs it's often used as evidence to show she doesn't know what she's talking about. And it seemed to me that the situation here exactly replicated that Thomas and Hunt paper.
Q. And you've hit on the point that I'm trying to get to which is you state that her opinions differed from the prevailing practices and opinions held by men. By men.
A. Well, the two men there. I was referring to the men, Cigarroa and Henrikson. So yeah.

Q. Okay.
A. Yeah.
Q. Did you ignore or discount the fact that many, many women worked in the EP lab and were involved in creating lab processes and protocols?
MR. BRISCHETTO: Objection. Misstates the evidence.
Go ahead.
THE DEPONENT: She was brought in to implement a program. So whether they were involved in practices that were ongoing, she was supposed to be there to implement and change practice, to improve practice.
BY MS. THOMPSON:
Q. What I'm trying to get to is in your report you say that her opinions differed from the prevailing practices --
A. Yeah.
Q. -- and opinions held by men.
A. Yes.
Q. What -- what evidence do you -- did you review that demonstrated what male opinions were on the prevailing practices?
A. Oh. Well, the prevailing practices were implemented by Cigarroa and Henrikson. So the

prevailing practices that were there before she came she wanted to change. For example, having dedicated EP staff trained from anesthesia. Having some -- an attending assigned to supervise the EP consultations at night so that the person doing --
Q. And I'm not asking about Dr. --
A. All of those were in place by men. Her opinions differed. She wanted to change the system. I feel like I keep saying the same thing over and over so we must just be missing each other.
Q. Okay. And going back to my question, did you ignore or discount the fact that many women worked in the lab and helped develop protocols and procedures within the EP lab?
MR. BRISCHETTO: Objection. Assumes facts not in evidence.
THE DEPONENT: The existing ones. The existing procedures. Right. Okay. Yeah. But they weren't in charge. They weren't in charge. They weren't in the hierarchy. It was Cigarroa and Kaul who were -- I mean, Henrikson and Cigarroa who were in charge. So they were staff. Yes, there was a nurse. There were many staff but the people in charge were responsible for the way things were and she was brought in to change them. So her opinions

differed.
BY MS. THOMPSON:
Q. And I think this was a while ago so forgive me. But you haven't practiced surgery, you haven't practiced invasive procedures; correct?
A. Yes.
MR. BRISCHETTO: Objection. Asked and answered.
BY MS. THOMPSON:
Q. Okay. So you don't know, in fact, while somebody may have the title of being head of something, you don't know on the ground how nurses or lab managers, how their opinions factor into implementation of protocol and practices, do you?
A. No. I'm only aware of the medical hierarchy which generally puts the physician at the top of that hierarchy.
Q. All right. On page -- on pages 4 and 5 of your report you provide examples of conduct that supposedly excluded Dr. Bala and devalued her expertise.
Do you recall that?
A. Yes.
Q. Okay. What criteria did you use to decide whether conduct or behavior devalued Dr. Bala's expertise?

A. Well, that one email for example. Some of Dr. Bala's ideas are good, some are not so good.
Q. I'm not asking about the facts. I'm asking about what criteria did you, as a scientist, in forming an opinion based on reliable principles and methods, what criteria did you use to decide whether conduct in the examples that you gave devalued Dr. Bala's expertise.
A. Well, I think just reviewing the text. Reviewing what happened. Reviewing the fact that, you know, she was no longer invited to the recruitment dinners. Reviewing the fact that the leaders allowed this breach in the chain of command. I mean, that should never happen in the organization. That's organizational change 101. If you are -- if you have a chain of command, if somebody in a subordinate position bypasses the chain of command that leader is supposed to send them back and then meet with all three if they need to. But consistently, they undermined her by allowing that to happen. That's just one thing.
Q. Dr. Carnes, do you know whether Dr. Henrikson ever texted the staff about male or Caucasian physicians?

A. I do not.
Q. How did you conclude that Dr. Henrikson's comment that Dr. Bala has lots of ideas, some good, some not so much, devalued her expertise?
A. Well, I think that's a rather patronizing thing to say for somebody who has been brought in as the expert leader. I also think it was inappropriate that he made this statement to somebody who was below her in the chain of command. He was going -- it was an administrative reporting chain that shouldn't have happened.
Q. So much of your -- I keep hearing hierarchy and chain of command. Are your opinions based on your notion of hierarchy and how teams should work at OHSU?
A. No. I would say I don't know how things work at OHSU. But just the general functioning of teams and the general hierarchy in academic medicine. I guess that's what I'm giving my statements on.
Q. Do you know whether Dr. Bala had lots of ideas related to the EP lab?
A. Oh, yeah. She stated them repeatedly saying, you know, I think we should have this. I think we should have this. They had a retreat and

she had lots of ideas for change, many of which wound up being implemented. And some of which made perfect sense. Some of which were triggered by near misses. You know, patient safety issues --
Q. Dr. Carnes --
A. -- often triggered that.
Q. So you have no experience with electrophysiology; correct?
A. No.
MR. BRISCHETTO: Objection. Asked and answered.
BY MS. THOMPSON:
Q. You've never worked in an EP lab; correct?
MR. BRISCHETTO: Same objection.
THE DEPONENT: No.
BY MS. THOMPSON:
Q. How are you qualified to have an opinion about whether or not Dr. Bala's ideas were good ones or bad ones?
A. Well, I know what a lethal dose of heparin is, and I know that that was a near miss. There were also a couple of near misses that she cited in terms of training within the EP lab.
Q. I'm not asking about near misses. I'm asking about your qualification, your qualification

as a geriatric specialist and someone who is a scientific researcher to provide an opinion on whether Dr. Bala's suggestions or ideas were good ones or bad ones in an electrophysiology lab.
A. Well, don't forget I also have an adjunct appointment in industrial and systems engineering. And --
Q. Does that --
A. -- her ideas were exactly what one would like to see put in place in a complex, dynamic system like an EP lab. So no, I do not have experience in an EP lab, but I have experience in research about institutional change. I have collaborated with industrial systems engineers. And some of the near misses that occurred in that EP lab she was trying to prevent from happening again with her ideas about changing the current practices.
Q. Dr. Carnes, is it your opinion that Dr. Henrikson should not be communicating directly with staff?
A. Not when it involves them complaining about Bala. No, I don't. I think that's inappropriate. It undermines her supervisory authority.
Q. Have you ever heard a man being described

as having a meltdown?
A. I have not.
Q. Is it your --
A. That to me is a gender term.
Q. Why?
A. Well, these gender imbalanced terms, like being boss, abrasive, and I think having a meltdown, is something that is much more likely to be leveled at a woman for certain behavior than a man with certain behaviors.
Q. Based on what?
A. Well, again, I would, I mean, based on, again, the -- based on the training in -- the sociolinguistic research. But also, again, I'd refer to Shelley Correll's paper. You asked me not to refer to studies but, you know, if you look at her work, these gender terms, the kind -- meltdown might not have been a specific word but these kinds of terms were much more likely -- the gender policing happened quite a lot.
Q. Okay. And Dr. Carnes, just to clarify, I don't want you to -- you've said a couple times that I've asked you not to cite to studies. If there are studies with methodology that you relied upon in reaching a conclusion feel free. But what I was

referring to previously is I was essentially asking you some yes or no questions, and rather than you just answering the question you would go into a discussion of various studies.
Do you understand the distinction I'm trying to make?
A. Yes. The professorial aspect of my job. I apologize.
Q. I'm not -- I want -- like I said at the beginning, I want your full testimony but I'm also trying to keep us on track, recognizing --
A. Yeah. No, I appreciate that.
Q. Okay.
A. I appreciate that. Long-winded professor.
MR. BRISCHETTO: Is this an appropriate time for a 15-minute break?
MS. THOMPSON: Didn't we just come back from lunch?
THE DEPONENT: Yeah, I think we're good. I'm good.
MS. THOMPSON: Are you good, Dr. Carnes?
THE DEPONENT: Yep.
MR. BRISCHETTO: All right. My record is that we've been going about an hour and 45 but maybe I'm wrong.

All right, if you're good, Molly, fire away.
THE DEPONENT: I'm good. I'm good. Let's just keep going.
BY MS. THOMPSON:
Q. Okay. Is it your opinion, Dr. Carnes, that junior faculty members should not feel free to express their opinions about more senior faculty or department leadership?
A. Of course not.
Q. You refer in your report to recruitment dinners that Dr. Bala did not attend. Do you --
A. Was not invited to attend.
Q. All right. Was not invited.
Do you know who was invited to attend those dinners?
A. I would have to go back and look but I think the statement somebody made was that generally all members of the division were invited and she was not invited.
Q. That's your recollection?
A. That's my recollection. Yes.
Q. So is it your testimony that you believe that everyone within the department was invited to these dinners except Dr. Bala?

A. I don't know if it was department-wide or division-wide or if it was just EP. But whatever it was, it was a group of which she was a member.
Q. And your recollection is that every member of this group was invited --
A. Yes.
Q. -- except Dr. Bala?
A. Yes.
Q. Do you recall any explanation as to why Dr. Bala was not invited to a particular dinner?
A. I do not recall.
Q. Do you know if anyone else was excluded or not invited from any of these recruitment dinners?
A. I do not know that.
Q. Do you know if Dr. Bala was ever invited to recruitment dinners?
A. I don't.
Q. Do you know how many -- do you know how many recruitment dinners Dr. Bala attended?
A. I don't.
Q. Do you know how Dr. Bala behaved during these recruitment dinners?
A. No.
Q. In your report on page 4, you include a parenthetical comment, quote, and I've got it up on

my screen. "Rather than piling on to exclude Dr. Bala (to the extent of not inviting her to recruitment dinners!)"
A. Right. Mm-hmm.
Q. Okay.
A. Yes.
Q. Why did you use an exclamation point there?
A. Well, because I thought it was just so -- such a vivid example of her being excluded. I discussed quite a bit, you know, the sort of in group, out group and how she was otherized, which is something described by women in academic medicine. So I thought this was just a very clear example of being otherized to not be invited to the dinners.
Q. Do you routinely use exclamation points and parentheticals like these in your academic research papers?
A. Oh, yeah. I'm a big user of exclamation points. I like exclamation points.
Q. And the exclamation point is intended to convey what?
A. Well, I guess it's just to draw attention to it because I did think that this was, you know, a clear example of otherizing which, you know, some of

the other things you might say were, you know, softer. The chain of command, some of these other things. But to not be invited to the recruitment dinners, I thought that was really quite a stark example of otherizing.
Q. On page 4 of your report you describe the importance of common identity messaging and you provided some examples, "(e.g., 'we are all members of the OHSU EP team.' 'We are all here to work together as a team to provide safe and excellent patient care.'"
Did I get that right?
A. Yep.
Q. And you concluded that OHSU contributed to messages that reinforced that Dr. Bala was a member of the "out group."
Was that your conclusion?
A. Yes.
Q. Okay. Do you believe that Dr. Bala wearing a University of Pennsylvania fleece, coming to OHSU wearing a UPenn logoed jacket on a daily basis might signal to her coworkers that she did not view herself as a member of the OHSU EP team?
A. Well, I don't know. That could be, I suppose, added as -- if one is looking to mount

evidence of otherizing somebody I supposed somebody could point to that. I know that that was one thing that was requested of her, to stop wearing her Penn sweatshirts. So they were asking her, I guess, to mitigate some things that would otherize her. So I suppose she could have contributed to that. But I think more importantly were the absence of these kinds of statements from the high authority male figures who were known to the system who could have definitely come in and helped make her -- make others see her as a valued member of the team. And they could have even, you know, made fun of the t-shirt in a way to say that, you know, even though she's a member of OHSU she continues to wear this t-shirt just to remind us that she's from Penn. You know, they could have made it -- they could have even mitigated that behavior of othering rather than to kind of amplify it.
Q. Do you think, Dr. Carnes, that others at OHSU might interpret Dr. Bala's continued wearing of Penn gear as a slight? As a way of demonstrating that she was better than them because she came from an Ivy League school?
A. Well, I think that's putting a lot of assumptions on a sweatshirt. But again, as I said,

they might have, if they were looking to mount evidence to otherize her, they may have included this, you know, oh, she has an East Coast communication style. And look, she wears that Penn sweatshirt. Rather than sort of, you know, making a joke out of that sweatshirt, and again, reinforcing the other. We've recruited her from a great program which she keeps reminding us with her sweatshirt but she's here now and we're all going to work together to improve EP care at OHSU. To bring us up to the highest quality. They should have done that repeatedly.

Q. And so you're -- and I appreciate you have done a good job of inserting into your answers what OHSU in your opinion could have done.

My question is related to how others who saw Dr. Bala every day wearing a UPenn fleece, do you agree that others might interpret that as a slight?

MR. BRISCHETTO: Objection. Asked and answered.

Go ahead.

BY MS. THOMPSON:

Q. Yes or no?

A. I suppose they could have but I do not

think in isolation they would have.

Q. On page 5 of your report, Dr. Carnes, you write, "Everyone who lives in this society knows the content of gender and race stereotypes -- even if they do not consciously endorse them."

Did I get that right?

A. Yes.

Q. And I think that you've testified a few times today, you would agree that gender stereotypes, they're common knowledge?

A. Yes.

Q. That racial stereotypes are common knowledge?

A. Yes. And I've cited papers to show that.

Q. And cultural stereotypes are common knowledge?

A. Mm-hmm.

Q. Would you agree that the existence of gender bias in our society is also common knowledge?

A. Yes. It should have been. Again, why they should have done something. Yes.

Q. Would you agree that the existence of racial bias in our society is common knowledge?

A. Yes.

Q. Okay. On page 6 of your report you

provide examples that you contend show that Dr. Bala's behavior was treated differently than the behavior of male colleagues. And you provide only three examples.

Are you aware of any other instances of alleged -- other differential treatment? Any other examples?

A. Well, I think I pulled out the one that really showed it the best. I think in the one interview with I believe it was the -- was it the nurse coordinator where she specifically -- she is very specific about it. She says, you know, she worked with some male physicians -- I forget where it was, maybe it was Hopkins -- who were worse than Dr. Bala but everybody ignored it because, you know, they were men.

Q. Dr. Carnes, I have the portion of your report that I'm referring to up on the screen.

A. Oh, okay.

Q. The example that you just described is not part of this portion of your report.

A. Oh, okay.

Q. So in the first example you state that Dr. Bala was harshly criticized for requesting that staff be quiet.

A. Oh, yeah. Okay. Yeah.

Q. How did you determine that the criticism was harsh?

A. Well, I think because it was referred to so many times.

Q. Okay. How did you --

A. A complaint was made about her. It was referred to again and again. And here she was trying to do a complex procedure and just asked for quiet.

Q. How did you determine that male colleagues behaved in the same way that Dr. Bala did when requesting quiet?

A. I think she said that in one of her statements.

Q. Right. And so you relied solely on Dr. Bala's description?

A. Well, and the nurse. Maybe I didn't cite it here but it's in one of the other examples that I do cite relevant to her case which was that nurse who talked about working at another institution and she specifically said, you know, I saw men behave even worse than Dr. Bala but, you know, basically --

Q. That's not what she said but we'll get to that --

A. Okay.
Q. -- because I do want to ask about that.
Your second example, here you're describing an email to Dr. Kirsch. You don't mention any comparable behaviors by men; correct?
A. Right.
Q. Okay. Instead, you speculate that Dr. Kirsch would have reacted differently to a man but you have no way of knowing how Dr. Kirsch would have reacted to similar behavior by a man, do you?
A. I do --
MR. BRISCHETTO: Objection. Argumentative.
THE DEPONENT: I do not.
MR. BRISCHETTO: Misstates facts in the record.
Go ahead.
THE DEPONENT: Yeah, I don't know that. There was a statement someplace that Kirsch had actually made explicit negative gender remarks but, no, I don't know that.
BY MS. THOMPSON:
Q. In your third example you describe an interaction between Dr. Bala and a cardiology fellow as "perfectly reasonable."

A. Mm-hmm.
Q. Again, you weren't present for this interaction; correct?
A. I was not present for the interaction --
Q. And you have no idea --
A. -- but she was trying to focus on the -- preparing for a complex case.
Q. You have no idea how Dr. Bala actually behaved during that procedure, do you?
A. No, but I thought it was really a positive thing that recognizing this was an issue. She requested that there be an attending to cover night EP consults and that that actually wound up happening.
Q. In your third example you also contain no comparison to how men in a similar position as Dr. Bala were treated. So how did the EP fellow who wrote the letter to Dr. Cigarroa react to male physicians?
A. Yeah, I don't know.
Q. So pages 6 through 10 of your report, which you have a copy in front of you -- I believe that was the first exhibit of the day that you were able to download -- you discuss research showing that female leaders in predominantly male fields are

evaluated negatively for exhibiting identical behaviors that go unnoticed or receive praise from male leaders; correct?
A. Yes. That is true.
Q. Okay. So on page 7 you write, "Research shows that we are generally unaware of these implicit biases but that they can influence the way we process information, interact with, and judge people, respond emotionally to another person's behavior, and make decisions."
Do you agree with that research?
A. Yes.
Q. Okay. You go ono to write that, "Stereotypes also lead us to implicitly judge how men and women 'should not' behave." Correct?
A. Mm-hmm.
Q. "Even if we consciously disavow these beliefs."
A. Mm-hmm.
Q. So we've, I think, established today that people hold unconscious biases that they're not even aware of.
Is that fair?
A. Yes.
Q. Okay. And in fact, people may hold

unconscious biases that may be completely opposite to what they believe in; right?
A. Mm-hmm.
Q. You cited for yourself that you consistently show a pro-male leadership bias in your report.
A. Mm-hmm.
Q. And it's on your very sensitive CV in all of the work that you've done to advance women in medicine.
Am I safe to assume that you wish that you wish that your biases were -- your last 30 years of your career has been to demonstrate that female leaders are just as effective, if not more effective?
A. But we know, I mean, the research does show that. But no, I think that you just accept that living in this society -- and then you have to implement what I think I referred to there is, you know, motivated self-regulation. You know, recognizing you have these biases and practicing that. Or in your field, judicial reasoning, intuitive override they call it in your field. Yeah.
Q. On page 7, you also write, "The small

group functioning in the EP suite with Dr. Bala as leader of the team essentially replicates." And you're talking about a 1990 and 2005 study. And I can get to page 7.
A. Yeah, that was the -- that's the Butler and Geis. Yeah.
Q. Butler and Geis.
A. Mm-hmm.
Q. And then Sabine Koch.
A. Sabine Koch. Yep. Mm-hmm.
Q. All right. And you wrote, "The small group functioning in the EP suite with Dr. Bala as leader of the team essentially replicates this study."
A. Mm-hmm.
Q. What reliable method or principle did you use to make that conclusion?
A. Well, I think I stated it here. It was -- that's exactly the kind of study they used. They took small groups of people. They had a trained actor, scripted, to come in and be either a male or female leader. And then they had people code the nonverbal behaviors of the participants. And they also surveyed them afterwards. And when the leader was a male they had positive, head nodding, you

know, good things. And when the identically behaving leader was a female they were grimacing. They were not, you know, shaking their head no. And probably totally unaware of it. But I thought this study was very -- these studies were very relevant because, again, it was a small team, male versus female leader and one could say that is highly relevant.
Q. And Dr. Carnes, you started to answer some of my next questions. But you just testified that in these studies that you describe there were male and female actors who were given scripts; correct?
A. Mm-hmm.
Q. And part of this type of research, the reason that we provide scripts to people who are playing roles is to control; right? For variance and what is said; right? So that the results related to gender may be more relied upon; right?
A. Yeah. Because that's the only variable that's changed. So then one can say with considerable confidence this negative evaluation of the leader was due to her being a female leader.
Q. Okay. So how do you -- and you're saying that this essentially replicates a study. But how do you know what was said in the procedure rooms or

within the EP suite with regard to Dr. Bala?
A. Well, and again, that's the generalizability. You're never going to have the exact same conditions that you would have in an experimental study. But generalizing, yes, I think the EP suite as close as any experiment could come is to that Butler and Geis one.
Q. And you don't know -- you don't know that Dr. Bala used the same language or had the same demeanor as males in the EP suite, do you?
A. No.
Q. Okay. So you -- okay. So do you want to walk back what you wrote in your report? Because you just testified that you can make generalizations but here you write that "The small group functioning in the EP suite with Dr. Bala as leader of the team essentially replicates this study."
A. Yes. I think that it essentially does. It doesn't have --
MR. BRISCHETTO: Before -- before -- before you go on, Dr. Carnes.
THE DEPONENT: -- the script.
MR. BRISCHETTO: Objection. Misstates the testimony. And compound question.
Go ahead.

BY MS. THOMPSON:
Q. Go ahead.
A. I think it does essentially replicate that study. As much as you're ever going to have an experimental study being generalizable.
Q. Okay. But you don't know what was said in the procedure rooms or in the EP suite; correct?
A. No.
Q. Okay.
A. All you can assume is that it was directive leadership because that's the kind of communication that would be the most effective in that kind of setting.
Q. Okay. On page 8 you cite to a 2004 article that found male and female employees deemed more likeable. Sorry, let me restate that.
On page 8 of your report you cite to a 2004 article that found male and female employees were deemed more likeable and were evaluated more favorably than those deemed unlikeable.
A. Yes, that's true.
Q. But only women were deemed unlikeable for being competent in their job.
Did I get that right?
A. Yep, that's true from Heilman.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Q. Okay. In a 2010 study, in fact, this was Exhibit 7 that you helped author with Carol Isaac, your study found that female department chairs were praised over prior male leadership; correct?
A. Mm-hmm.
Q. And that study found that these female department chairs were praised for being direct and not afraid of confrontation; correct?
A. Mm-hmm.
Q. And didn't that 2010 study also conclude that questioning the competency of female leaders had significantly changed in academic medicine?
A. So I think there's a lot of different facets of what you're stating. First of all, that was a qualitative study of seven chairs. And as I think we both agreed, qualitative studies are quite limited in their generalizability. And these were relatively new women chairs that had taken over after disastrous male chairs had been there. So it was a very specific setting. Very hard to generalize.
But in terms of competence, yes, I think there is an acknowledgement that women can be very competent. But that doesn't mean they're likeable. That's where Heilman's work I think again is so

relevant. Because identically credentialed men and women may be viewed as comparably competent. But being viewed as competent, there was an assumption, particularly in leadership roles, that the competent women with identical credentials would be less likeable than the male leaders, more interpersonally hostile, harder to work for. So there's already this assumption that women leaders are less likeable.
Q. But there's also competing literature authored by you in 2010 that did find in a qualitative review, right, that female leaders were viewed more favorably. They were liked more than the prior male department chairs; right?
MR. BRISCHETTO: Objection.
THE DEPONENT: In that -- in that --
MR. BRISCHETTO: Asked and answered.
THE DEPONENT: -- small qualitative study.
MR. BRISCHETTO: Argumentative.
THE DEPONENT: Yeah. Small qualitative study at the University of Wisconsin.
BY MS. THOMPSON:
Q. Yes. And, in fact, some of the attributes that were assigned to these female department chairs, some of the attributes that were assigned to

these female department chairs as being positive attributes were the fact that these women were direct, they were transparent, they were not afraid of confrontation; correct?
A. As I recall that is true. But it was quite a site and time-specific qualitative study. I would really be careful with generalizing across other sites. But yes, that is true.
Q. On page 9 of your report you go on to write, "Being the most technically demanding, highest paid, and prestigious subspecialty within cardiology with the lowest percentage of women, assumptions about EP doctors would be predicted to be strongly male-typed."
Did I get that right?
A. Yep.
Q. You then conclude, "Dr. Bala, a woman and a woman of color in an extraordinarily White and male profession, will be viewed as not fitting regardless of her behavior."
Did I get that right?
A. That is true.
Q. And that is your opinion that --
A. That is, yeah.
Q. Regardless?

A. Based on my review of the literature. Yes.
Q. Okay. Regardless of her behavior, she would never -- she would not fit in?
A. Unless OHSU had an evidence-based specific strategy for helping her fit in.
Q. Okay. Do you know what the gender makeup of OHSU's cariology department was at the time Dr. Bala was employed?
A. I thought there was one statement that said she was the only woman in EP but I don't know. Or if I did know, I don't remember.
Q. And my question is a little different.
Do you know what the gender makeup of OHSU's cardiology department was at the time Dr. Bala was employed?
A. No.
Q. Do you know the gender makeup of the Knight Cardiovascular Institute at the time Dr. Bala was employed?
A. No.
Q. Do you know any of the races or ethnicities of any of the persons involved in this case other than Dr. Bala?
A. Well, that Kaul, Cigarroa, Henrikson,

Kirsch were men, White. Actually, I'm assuming they were White. I do not know if they were White.
Q. So you do not know -- let me ask you the question again. Do you know any of the races or ethnicities of any of the persons involved in this case other than Dr. Bala?
A. No, I don't, actually. That was probably my own -- my own assumption was that they were White. I acknowledge that.
Q. What reliable principle or methodology did you use to come to the conclusion that regardless of her behavior, Dr. Bala would not have fit in at OHSU?
A. I think I stated that. Because she was female and she was Asian-Indian.
Q. Okay. On pages 9 and 10 of your report you discuss supposed examples of this phenomena at work. Is that correct?
A. Yes.
Q. Okay. And only one of these examples, Example 5 on page 10. And this is the email that I think you were referring to earlier.
A. Yes. Yes. This is it.
Q. Do you state that a male surgeon engaged in the same behavior as Dr. Bala was evaluated

differently?
A. I think it would be. Yes.
Q. My question is, did you write that in your report?
A. That --
Q. And I have it up on the screen.
A. That Dr. Bala's behaviors, if they had been engaged in by a White man would have been interpreted differently, is that what you're asking? I do believe that.
Q. Okay. But is it in your report?
A. I think it is.
Q. I'm focused on -- I'll highlight it for you. Sub 5.
A. Yeah. Describe a male surgeon she worked with which she perceived the same manner as Dr. Bala. Behaviors were reviewed and interpreted differently through a gender lens. She described how she excused the same behavior in a man. I mean, she brought up the fact that it was a male physician. That she excused the behavior because he's an extremely skilled surgeon with zero tolerance for incompetence. If he was angered, he merely expected us all to perform to our highest level. But Dr. Bala, an extremely skilled physician

with little tolerance for incompetence, the behavior was experienced as demeaning and belittling. Yes.
Q. Do you know that Ms. Barton actually had much more experience working with the male surgeon than she did with Dr. Bala? Do you know that?
A. No.
Q. How do you know that the male doctor described by Ms. Barton behaved the same way as Dr. Bala knew of Ms. Barton's interactions with Dr. Bala?
A. I don't know that.
Q. For your other examples, what evidence do you have that male physicians engaged in the same conduct as Dr. Bala but were evaluated differently?
A. I just would take you back to that figure that I put. And again, synthesizing much of the research that the same exact behavior, the same credentials are evaluated differently when they're enacted by a male or female, particularly in a leadership position.
Q. My question is a little. For these other examples that you list, and you've got I think 1 through 10 -- let's see, 1 through 8.
A. Mm-hmm. What evidence do you have that male physicians engaged in the same conduct as Dr.

Bala that were evaluated differently?
MR. BRISCHETTO: Objection. Asked and answered.
Go ahead.
THE DEPONENT: Yeah. I guess I feel like I've answered that question.
BY MS. THOMPSON:
Q. You didn't.
Do you have any evidence about how male physicians engaged in the EP lab?
MR. BRISCHETTO: Objection. Asked and answered.
Go ahead.
THE DEPONENT: Oh, because the other physician wasn't in the EP lab. Is that the problem? That she's talking about a male physician at another institution? Is that the problem?
BY MS. THOMPSON:
Q. I'm not saying there's a problem or not, Dr. Carnes. I'm here to understand from you how you reached your conclusion. So I'm not here to judge whether your conclusions are valid or not.
A. Well, it seemed to me then that because this nurse anesthetist spontaneously -- or herself brought up that she had worked with this male

242

physician who engaged in these kinds of behaviors but people excused me and that she experienced them with Bala as belittling. To me that was evidence of similar behaviors being interpreted differently.

Q. Okay. But you have eight examples. So set aside Ms. Barton's description of the other male cardiologist. For your other examples, what evidence -- what evidence do you have that male physicians engaged in the same conduct as Dr. Bala but were evaluated differently?

A. Okay. So I guess you're right. I guess I wasn't there. I did not actually have evidence that other male cardiologists. I am just extrapolating from the research.

Q. In three of the examples that you gave in this section of your report you referred to gender policing.

A. Mm-hmm.

Q. What reliable method or principle used in your field of expertise did you apply to reach the conclusion that gender policing was involved in the three examples that you gave?

A. So the gender policing is described and illustrated very well in that study by Correll is trying to guide women to behave more like female

243

stereotypes and men to behave more like male stereotypes. So I think in the suggestion that she, you know, have coaching and that she work on her communication style, that she be softer, you know, all these ways to kind of make her sort of more communal. You know, more in line with the female gender stereotype. That would be referred to as gender policing. And I think we saw quite a lot of evidence of that.

Q. Do you know whether Dr. Henrikson made similar comments to men?

A. I do not know if he gender policed men.

Q. In your third example you contend that -- well, you contend that it is "Difficult to envision this patronizing and belittling comment ever being made to a male leader with Dr. Bala's stature."

A. I think that's true. I mean to, you know, again, someone of her stature, she's head of the EP lab, to receive an email saying the staff let me know how present you were in lab today. So being pleasant, again, I think that's policing her, you know, into the communal role. And it just seemed to me very odd that, you know, I was trying to think, you know, if I would ever send something like that to my chair. You know, if you would ever send

244

something like that to a leader in the academic institution about how pleasant they were, it just seemed out of line.

Q. Would you think it was still out line if you were sending an email like that to provide positive reinforcement after receiving complaint after complaint after complaint about how unpleasant someone is in the lab?

A. Well, you have to take the whole thing in context. I mean, again, if all that is biased then, you know, it's just a perpetuation of the kind of bias that I thought it was --

Q. Okay.

A. I thought it was patronizing.

Q. What reliable method or principle did you use here to conclude that the comment was patronizing and belittling?

MR. BRISCHETTO: Objection. Asked and answered.

Go ahead.

THE DEPONENT: Yeah. I think just knowing the kinds of communication that are used in academic medicine, it just seemed to be odd that a comment like that would be given to somebody of Bala's stature.

245

BY MS. THOMPSON:

Q. Okay. You thought it was odd but you didn't apply a reliable method or principle to reach that conclusion; correct?

MR. BRISCHETTO: Objection. Misstates the testimony.

Go ahead.

THE DEPONENT: Yes. I think that does misstate it because I think I've answered before that I did not do a research study at OHSU but that as I saw evidence of things in the text that I reviewed, if I thought it reflected the research or could be supported by research I pulled it out. And this was a statement I thought showed a gender imbalance that I did not think this kind of email would be sent to a male in the same kind of position that Dr. Bala was in.

BY MS. THOMPSON:

Q. Did you interview Dr. Henrikson to determine his intent behind sending this email?

A. No. I never interviewed Dr. Henrikson. But again, you know, remember intent. I mean, a lot of people don't intend to offend. They don't intend to be racist or sexist. They just, you know, their behavior has a negative impact on the target of that



bias.
Q. And it can be completely unintentional.
A. It can be unintentional. Most microaggressions are unintentional.
Q. Do you know if Dr. Henrikson has ever made similar comments to male doctors?
A. No, I do not.
Q. Dr. Carnes, on page 9 of your report you refer to -- you use the phrase "thought experiment." And I'm sorry if I already asked you this.
What is a thought experiment?
A. Oh, I think we mentioned it before. So it would be just taking a situation in which a male or female actor did something and then just flip it and say would I have the same reaction if a man did this? And then, you know, just sort of -- in fact, we often recommend that as a way of doing what we could call motivated self-regulation of bias. You know, if you find yourself doing something and you flip the gender and it seems odd to you probably there were stereotypes at work.
Q. And is this type of though experiment used routinely in your field of expertise?
A. It is. Yeah. In the workshops we did a cluster randomized controlled study at 19

departments of medicine, all of which had divisions of cardiology. And within the workshop we often encourage people to do these little thought experiments as a way of helping to recognize when bias might be occurring.
Q. I understand that in your workshops you may employ the use of thought experiments with participants.
A. Mm-hmm.
Q. But those workshops, they're not -- they're not research or studies, qualitative or quantitative; correct?
A. Well, that was the intervention. The workshop was the intervention. And we found that it actually did work.
Q. On page 10 of your report you describe OHSU's EP ablation program as mediocre and not up to current standards.
What is the basis for that opinion?
A. Well, I have to say I viewed that largely from the comments made by Dr. Bala of things that should be in place, that had been in place at Penn that were not in place. And her consistent frustration at trying to implement what she viewed as standard procedures and the resistance that she

encountered in trying to implement that. So that's what I based that on. She kept trying to make these improvements in the program and it needed improvements. These improvements were needed.
Q. Do you believe that a leader who describes a program as mediocre is likely to be well received by staff?
A. Well, I actually don't know if she used the word "mediocre." But I can't say. I don't know what she said to them.
Q. I'm not asking about Dr. Bala. I'm asking about your opinion. You held multiple leadership roles in academic medicine. You have a very impressive CV. Do you believe that a leader who describes a program as mediocre is going to be well received by staff?
A. Well, it depends on the context. I mean, I would -- I could imagine a leader coming in and saying right now we have a mediocre program and our goal is to be in the top five. No. I think it depends on the context.
Q. In your many years in academic medicine are you aware of male leaders who are criticized, who are not well liked because of their management or communication style?

A. Ineffective. I don't know if they're criticized so much on communication style. That tends to be more gender. I think ineffective leaders. I have certainly seen men who are ineffective leaders. Because most of the leaders are men. But I've also seen very good leaders. I don't know where we're going with that but there's good -- there are good and bad men and women leaders.
Q. And my question is, are you aware of male leaders ever being criticized because of their management or communication style?
A. Yes.
Q. On page 11 of your report you state that nurses and physician assistants who lodged complaints about Dr. Bala would have perceived similar conduct by a male attending to have been "perfectly acceptable."
How do you know that?
A. I mean, again, I think because it mimics the research in which those kinds of communication styles are either ignored or dismissed or viewed as being just a sign of in-charge leader.
Q. Can you please identify all instances where male attendings engaged in the same behavior

as Dr. Bala but those behaviors were perceived as perfectly acceptable?
A. So again, I don't have that specific information from OHSU. I am only extrapolating from research that would be applicable to this setting.
Q. On page 11 you discussed things that you think OHSU should have done to prevent or mitigate bias. One of your recommendations was to have made public comments in support of Dr. Bala.
Did I get that right?
A. Mm-hmm.
Q. How -- how often --
THE REPORTER: I'm sorry, Dr. Carnes, was that a yes?
THE DEPONENT: Yes.
BY MS. THOMPSON:
Q. How often did Dr. Henrikson make comments in support of Dr. Bala?
A. Well, I don't know but not in any of the materials I received.
Q. How often did Dr. Cigarroa make comments in support of Dr. Bala?
A. I don't know.
Q. How often --
A. It's not in any of the materials I

received. There was concern I think by Kaul in one of the emails that she was not being given due process.
Q. How often did Dr. Kaul make comments in support of Dr. Bala?
A. I don't know.
Q. On page 11 of your report you state that Dr. Henrikson sided with Dr. Bala's subordinates in ways that undermined her. If the complaints about Dr. Bala's conduct were valid, how would responding to those complaints undermine Dr. Bala?
A. Again, it's the chain of command or process. She should have -- it should have involved discussions with the whole unit, implementing processes which would support patient care rather than, for example, insisting that Dr. Bala fill out forms that nurses should have filled out when she said the male attendings didn't have to fill them out. So I guess that would be a specific example of where male cardiologists were treated differently than female cardiologists. So I think there were a number of ways in which she was undermined with nurses.
Q. And have you concluded that all the complaints against or about Dr. Bala were not valid?

MR. BRISCHETTO: Objection. Vague.
THE DEPONENT: Yeah. I mean, I don't -- I think we've been over this. You know, people perceived what they perceived and reported what they perceived. And it got out of hand before people put in processes to improve patient care in ways that she wanted. She kept tirelessly advocating for improved patient care and encountered resistance, which they blamed on her behavior and communication style rather than stepping back and saying how can we make sure processes are smooth, efficient, patient care is good, anesthesia staffs our cases.
BY MS. THOMPSON:
Q. I'm sorry to interrupt.
And those conclusions that you just shared, those are based on the information that you were provided, recognizing that you don't have the two years' worth of department meetings, EP meetings, group meetings, discussing procedures, processes; correct?
A. Right.
Q. Okay. You describe the conduct of Dr. Bala's coworkers -- excuse me.
You describe the conduct of Dr. Bala's coworkers as, "absurd and discriminatory behavior."

MR. BRISCHETTO: What page are we on, counsel?
MS. THOMPSON: Should be on page 11, I believe.
MR. BRISCHETTO: Thank you.
BY MS. THOMPSON:
Q. Do you recall that, Dr. Carnes?
A. Well, if I'm talking about, you know, some of the, for example, recommendations following I believe it was the retreat, you know, for her to stop wearing the Penn sweater and, you know, soften her -- work on her communication style, all these things to work on her communication style, the fact that they were going to bring her up on violence in the workplace when she was the one who was being targeted, you know, some of the overreaction by some of the staff, yes, I think some of it was absurd. Not inviting her to the recruitment dinners.
Q. So Dr. Carnes, referring to information, for example, you just made a comment about like reporting her as a safety concern, that is nowhere in your report.
A. Well, I guess it was just another one that I remembered now. I guess it perhaps didn't seem as relevant, or perhaps I thought I had enough

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

examples.
Do you want me to add that as an example of absurd behavior?
Q. Well, you had enough examples for what purpose?
A. Well, to show that she was targeted, I guess, and treated unfairly.
Q. Okay.
MS. THOMPSON: Mr. Brischetto, I just highlighted on page 11 the phrase that I'm referring to.
MR. BRISCHETTO: Yes. Thank you. I found it also.
MS. THOMPSON: Okay.
BY MS. THOMPSON:
Q. And Dr. Carnes, this comment that you made was in respect to what steps might have been taken once -- I guess I have to ask, Dr. Carnes, how did you conclude that Dr. Bala was a target or had become targeted?
A. Isn't that pretty much what all of this is about, how she was a target of gender and race bias? That's what my expert opinion was. The whole report.
Q. The whole report what?

A. I think that's what I was asked to show was she a target of gender and race bias and I think that I have demonstrated that in my opinion as an expert, yes, she was a target of gender and race bias.
Q. What reliable principles or specific methodology did you apply to conclude that the behavior of Dr. Bala's coworkers was absurd?
A. I think the examples I gave illustrate that. That, you know, I keep repeating myself so I must be getting tired but, you know, not inviting her to meetings and telling her she had to get a coach and telling her that -- although coach might not have been a bad idea early on. I mean, some departments are giving female chairs coaches right away which I think would have been something OHSU might have considered. But you know, the thing about softening her communication style, things like that, I thought that was simply absurd.
Q. Okay. Which Caucasian or non-minoritized male physicians did you identify who engaged in the same behavior as Dr. Bala that were treated differently?
A. Well, at OHSU I think we've been through this, none. But again, it mimics much of the

research and would be predicted from much of the research.
Q. During the time period at issue in this case, what measures did OHSU take to ensure that employees are treated fairly?
A. Well, I mean, from the information I was given it was the lack, the absence. Because Bala specifically complained to HR that she felt, you know, there was gender bias. And there was a process by which this was supposed to be moved up the -- an EEOC type evaluation. And the HR head admitted she didn't do that.
Q. My question is different, Dr. Carnes.
During the time period in question, what measures did OHSU take to ensure that employees are treated fairly?
A. I don't think --
MR. BRISCHETTO: Objection. Assumes facts not in evidence.
THE DEPONENT: I don't know of any. There's a lack of evidence. I don't see that they did anything.
THE REPORTER: I'm sorry, Mr. Brischetto, would you please state your objection?
MR. BRISCHETTO: Sure. Objection.

Assumes a fact not in evidence.
THE REPORTER: Thank you.
BY MS. THOMPSON:
Q. Dr. Carnes, are you aware of any measures that OHSU takes to ensure that its employees are treated fairly?
A. I am not aware. No. They have a statement on their website that they value diversity and have a wonderful learning environment but I don't know what specific processes they take to ensure.
Q. How do you know what's on OHSU's website?
A. Well, I just was looking at it last night. I thought, oh, I wonder if OHSU -- and I just looked and they have like a diversity statement.
Q. But you did not rely on your review of OHSU's web page --
A. No, no, no, no.
Q. -- in forming your opinions included in your 2021 report; correct?
A. No. Unh-unh.
Q. Okay. Did you ask for any information about what measures OHSU had in place at the time to ensure that employees were treated fairly?
A. No.

Q. Is --
A. But they are a public institution so I think that it is imperative that people in protected groups are treated the same. So they should have had something in place to ensure that that happened. And it did not appear to me that whatever it was they had in place was invoked in this situation.
Q. Is your -- and I don't know if I should say your former or your current -- is the University of Wisconsin at Madison, is that a public institution?
A. Yes. Yes. We're the land grant institution.
Q. So as a public institution, are all of your policies available online for the public?
A. Including our salaries. Yep.
Q. Yes.
A. Yep.
Q. Okay. So at the time that you authored your report you had access to a publicly available website for OHSU.
A. Mm-hmm.
Q. Did you go to that website to research or look at any of OHSU's policies related to ensuring that employees are treated fairly, equally, and with

respect?
A. No. If I did I have no memory of doing it.
Q. Okay.
A. So if I did, it didn't inform my testimony.
Q. And I think we already went over this. You don't remember specifically how many complaints were received by OHSU about Dr. Bala; correct?
MR. BRISCHETTO: Objection. Asked and answered.
THE DEPONENT: Four, maybe.
BY MS. THOMPSON:
Q. Do you know how many complaints about Dr. Bala were received from persons who are not employed by OHSU?
A. No.
Q. Are you aware of any complaints that OHSU received from people who are not employed by OHSU?
A. No.
Q. Do you know how many times Human Resources met with Dr. Bala and Dr. Henrikson?
A. No.
Q. Do you agree that professional coaches -- actually, you just testified about this -- can

sometimes be beneficial to physicians regardless of gender or race?
A. Yeah. And I think it was, you know, kind of too late. I think that came like right at the end but I think had they approached this situation up front, like saying, you know, what can we do to help Bala be successful, I think many organizations are hiring like executive coaches for the first year. And I think Ohio State, I believe, published on a program they did with executive coaching that was out of their NSF ADVANCE program which showed that it was highly effective.
Q. Have you ever used a professional coach yourself?
A. I actually did. After I did the ELAM program, they had a coach there and I thought, oh, this is fun. So I did hire a coach for six months.
Q. And did you find it beneficial?
A. Yes, I did. Yeah.
Q. And have you ever recommended the services of a professional coach to anyone?
A. I have. I have recommended it to a number of people. And some of them have come back to me and said it was very helpful.
Q. Again, this isn't reliable or scientific

but anecdotally, what did people report? What was your experience? What was beneficial about working with a professional coach?
A. Well, my impression was they're almost like a subspecialist in medicine. You know, it's a pattern of behavior they've seen again and again. And so when you approach them and say, oh, I'm having trouble navigating this they're like, oh, have you tried this? And they would actually give you a specific behavior to try and you're like, wow, that really worked. So they were really very, you know, action oriented. Very helpful.
Q. The professional coach that you hired, was any of that coaching provided through a -- I'm trying to find the right word -- through a lens recognizing that everyone holds gender and racial biases?
A. Well, I did specifically choose somebody who had -- she was one of the first women chairs in academic medicine in a basic science department so I thought she'd really understand. She's since passed away. But I had referred a couple of other people to her, too. She was very good. She understood all -- she understood all that even though she hadn't studied it.

Q. And why did you seek out someone who understood how gender or racial biases operate in academic medicine as a professional coach.
A. Well, I don't know if it's useful to get into my personal experience. I had a very large NIH grant and it was sort of taken away from me and given to a male PI. So it was kind of a low point in my life. And so I met with her. And then I kind of redirected my research and actually, it was the best thing that ever happened, so.
Q. Did you think that that grant was taken away from you because of your gender?
A. Well, it was complicated.
Q. So was your gender one of your factors that you think that led to your grant being moved to a man?
A. It was more complicated than that. It was retention. There were a lot of things involved.
Q. Okay.
A. I can't say for sure if I had been a man if it wouldn't have also been taken away from me if that's what you're asking.
Q. Okay.
MS. THOMPSON: Mr. Brischetto, I know that you had requested a break. I'm in a good place to

take a break. Do you want to -- I guess I'm going to ask for me and I think it'll be short but I'd like a comfort break.
MR. BRISCHETTO: How long are you going to take?
MS. THOMPSON: Five minutes.
MR. BRISCHETTO: Five minutes?
Molly, how long do you want to take?
THE DEPONENT: Yeah, five minutes will work.
How much more do you think we have?
MS. THOMPSON: Well, it kind of depends on you, Dr. Carnes.
THE DEPONENT: Well, let's not talk any more about my personal history. That could go on forever. So how many more questions do you have?
MS. THOMPSON: It depends on you, Dr. Carnes.
THE DEPONENT: Okay. I'll try to be real short.
MS. THOMPSON: We'll take a five minute break and we'll come back on.
THE DEPONENT: All right. Sounds good.
THE VIDEOGRAPHER: All right. Please stand by. The time is 4:30 p.m., and we are off the

record.
(WHEREUPON, a recess was taken.)
THE VIDEOGRAPHER: We are on the record. The time is 4:39 p.m.
You may now proceed.
MS. THOMPSON: Thank you.
BY MS. THOMPSON:
Q. Dr. Carnes, I want to go back to page 1 of your report. You state on page 1 of your report, "There is no doubt that Dr. Bala endured relentless sex and race discrimination due to her status as a woman physician of Asian-Indian descent in ways that are supported by a large body of experimental research and that have been well- documented to occur within academic medicine."
Did I read that correctly?
A. Yes.
Q. Okay. How exactly did you arrive at that conclusion
A. I think the whole testimony, the whole written testimony speaks to that.
Q. What written testimony are you referring to?
A. The written report I mean. The report that follows that statement I think provides

evidence to support the conclusion that I drew.
Q. Okay. Ms. Carnes, do you have a law degree?
A. No.
Q. Sorry, Dr. Carnes. Please forgive me.
Dr. Carnes, do you have a law degree?
A. No.
Q. Do you have any legal training?
A. No.
Q. When you use the term "discrimination" in your report, what are you referring to?
A. I'm referring to the term "discrimination" the way it's understood in academic medicine. So for example, the American College of Physicians statement on gender bias which came out in 2018. In the Annals of Internal Medicine, the American College of Physicians is the professional group of all internists. So it's over 160,000 members. They use the term "discrimination." I had a paper. I was going to read it to you exactly. Also in the American College of Cardiology description of their 2016 wave of the Professional Life Survey, the lead statement says that, "Women and minority physicians experienced discrimination." So I'm using the term "discrimination" based on the way it is used

throughout academic medicine, including in cardiology.
Q. Okay. And given that this is your area of expertise, what is that definition of discrimination?
A. Where individuals who identify as women or who identify as non-white ethnic racial minority would be treated differently in some way in terms of opportunities that exist within academic medicine. So opportunities for pay, education, academic advancement, all of the opportunities that are provided within academic medicine that would be provided to one group over another. That would be viewed as discrimination against the group that didn't get them.
Q. So when you're using the term "discrimination" throughout your report, is it fair for me to assume that the term "discrimination" means when one group is treated differently than another group with respect to opportunities within academic medicine?
A. To their detriment. Yes.
Q. Do you know what the legal elements of a race discrimination claim are?
A. No.

Q. Do you know what the legal elements of gender discrimination are?
A. No.
Q. Do you think that it is your role to instruct a jury as to whether Dr. Bala endured gender or racial discrimination?
A. Well, given that it occurred within academic medicine I think one could simply pull the definition from the primary documents that show that it occurs within academic medicine. So I think it would be -- I don't know if the legal definition of it could be that much different. But anyway, my use of the term is as it is used in academic medicine.
Q. Which is that one group is treated differently with respect to opportunities within academic medicine to their detriment?
A. Yes. I would say that's true.
Q. Okay. Do you think it is your role as an expert to instruct a jury as to whether or not Dr. Bala endured sex or race discrimination?
A. I don't know how the legal process works so I can't say what my role would be. My role would be to affirm what I interpreted from the materials I was given in the context of the research that I know, and using the term "discrimination" in the way

that I know it is in academic medicine. I can't -- I don't know what my role is in the legal profession. I would look to Mr. Brischetto to instruct me to what I should do.
Q. Dr. Carnes, what level of probability is the phrase "no doubt" meant to convey?
A. That I feel very confident in my assessment from the materials I was given that she did endure sex and race discrimination. So I feel quite confident.
Q. Is that 100 percent certainty?
A. Yes.
Q. How did your arrive at that probability?
A. No doubt would generally mean 100 percent, wouldn't it? So from my report. From the materials I reviewed. The research that I'm aware of. The research I've done. I think there was evidence to support the fact that left me with no doubt that she had endured sex and race discrimination.
Q. And again, that opinion was formed based on the -
-
A. On the materials I reviewed. Yes.
Q. Right. And, okay. And you didn't -- you didn't ask for -- you didn't review all the

materials?
A. I guess not.
Q. Okay. Are there any authoritative sources on empirical methodology that explain how to arrive at a conclusion that there is no doubt about a finding?
A. No. Not that I know of.
Q. In what publications have you used the term "no doubt" to describe your findings?
A. Well, in this case, I was asked to be an expert. So, obviously, when I'm conducting a research study I put the limitations. I wasn't asked to describe the limitations. I was asked to give my expert opinion. Opinion. Right? And in my opinion I have no doubt from the things I reviewed that Dr. Bala endured sex and race discrimination. So that is my opinion.
If it was a research study I would have limitations. I would say I haven't reviewed all the materials. I haven't done dah, dah, dah. But I was asked for my opinion from what I was given to review and I have no doubt. Is that fair enough?
Q. Yes. Absolutely.
And so is it your personal opinion that you're providing that there's no doubt that she was



subjected to relentless discrimination? Or are you providing an opinion with scientific certainty?

MR. BRISCHETTO: Objection. Argumentative and it's been asked and answered.

Go ahead.

THE DEPONENT: Well, I'm not just providing my personal opinion as somebody on the street. I'm providing an informed opinion as the expert on gender bias in academic medicine.

BY MS. THOMPSON:

Q. Are you providing an opinion with scientific certainty? Are you providing an opinion with 100 percent scientific certainty that Dr. Bala experienced relentless sex and race discrimination?

MR. BRISCHETTO: Objection. Asked and answered multiple times.

Go ahead.

THE DEPONENT: It seems like you're pushing apples and oranges. I was asked to provide expert testimony, which by its very nature has got to be an opinion. So is it a personal opinion? Well, yes, I guess if it's my opinion it's personal. But it's my opinion based on my expertise as somebody who has studied gender bias in academic medicine and who is familiar with the body of

research in that realm. So I guess I'm not sure what you're asking. Is that a scientific process? I don't think providing an expert opinion is a scientific -- it's not a research study. I think we went through that like hours ago. So I don't know. I don't know what you're asking. I did the best I could with what I was given. I was left with no doubt that what she experienced would be supported by a large body of experimental research as evidence of gender bias and race bias.

BY MS. THOMPSON:

Q. Let me ask it a little different way if my question is not clear.

Is it your expert opinion that there is 100 percent scientific certainty that Dr. Bala experienced relentless sex and race discrimination?

MR. BRISCHETTO: Objection. Argumentative. Asked and answered multiple times over.

Go ahead.

THE DEPONENT: Yeah. So can you just go on to the next question then?

BY MS. THOMPSON:

Q. The way this process works, Dr. Carnes, and Mr. Brischetto may have explained this to you,

he states objections on the record so that they can be reviewed later. But during the deposition you do have to answer the question.

A. So 100 --

MR. BRISCHETTO: Yes.

THE DEPONENT: So I guess, yeah, I don't know.

MR. BRISCHETTO: I just want to, you know, object to the instruction. You are perfectly within your rights to stay within your answer and neither attorney should be arguing with you about your answer.

So I object again. It was asked and answered.

Go ahead.

THE DEPONENT: Okay. So then I think I've answered it.

MS. THOMPSON: Ms. Byrd, could you read back my last question to the witness, please?

THE REPORTER: Stand by.

(WHEREUPON, the record was played back.)

MR. BRISCHETTO: Same objection as I stated before.

BY MS. THOMPSON:

Q. Dr. Carnes?

A. Well, an opinion is an opinion. So yes, that is my opinion.

Q. So let me confirm. Is your expert opinion not a scientific opinion?

MR. BRISCHETTO: Objection. You're arguing with the witness.

Go ahead.

THE DEPONENT: An opinion is an opinion. Yeah. An opinion is an opinion. That's my opinion. I don't understand what you're asking.

BY MS. THOMPSON:

Q. Well, Dr. Carnes, you're a scientist.

A. Yes.

Q. And scientists use reliable principles and methods, right, to test hypotheses, to collect information and the like; correct?

A. Mm-hmm.

Q. That's why you received and have been so successful in obtaining grants to conduct research and studies to promote the advancement of women in medicine; correct?

A. Mm-hmm. Mm-hmm.

Q. Okay. And so you are here not as just a layperson providing your opinion. You are here as an expert witness.

274

A. Mm-hmm.
Q. And as I understand from your report, you have put yourself forward as an expert --
A. Mm-hmm.
Q. -- in a particular area of academic medicine.
A. Mm-hmm.
Q. Specifically, with respect to gender, racial, and ethnic biases and how they impact women and minoritized doctors in academic medicine. Is that fair?
A. Yes.
Q. Okay. I'm not trying to be cute. I'm not trying to be argumentative. An opinion isn't just an opinion in this type of arena. You are being proffered as an expert.
A. Right. And it is my expert opinion. I have no doubt. I'm not -- I have no doubt that Dr. Bala endured relentless sex and race discrimination. So as a scientist I have no doubt. Is that fair? But when you say -- but the way you were using scientist it just didn't -- it didn't sound right or scientific. But as a scientist, yes. My opinion, I have no doubt based on what I reviewed that Dr. Bala endured race and sex discrimination.

275

Q. Have you ever published a study in which you describe your finding as being beyond a doubt or being absolutely correct?
MR. BRISCHETTO: Objection. Asked and answered.
Go ahead.
THE DEPONENT: Yeah. I mean, I can't -- I do not remember if I have used those words so I don't know.
BY MS. THOMPSON:
Q. Have you ever reviewed a study in which authors describe their findings as being beyond a doubt or as being absolutely correct?
A. I probably have. I mean, every study cites the limitations but I do believe in opinion pieces from experts which often occur in JAMA and, you know, all journals have opinion pieces. And in the opinion pieces experts will often say they have no doubt that something is the way it is.
Q. And those opinion pieces, are those similar to like an editorial article?
A. Yeah. Yeah. It could be an editorial. Yeah.
Q. Okay.
A. And those would be experts. So I guess

276

that would be the closest thing. Yeah.
Q. Recognizing that you haven't reviewed all facts in this case, do you still feel confident that you will be able to say under oath that you have no doubt that Dr. Bala endured relentless sex and race discrimination with 100 percent certainty?
MR. BRISCHETTO: Objection. Misstates the evidence. Asked and answered.
Go ahead.
THE DEPONENT: I do think I would be able to say that. That based on my expert opinion I don't -- I have no doubt anyway that there was race and sex discrimination.
BY MS. THOMPSON:
Q. Dr. Carnes, when you prepared your report, did you seek to provide an objective, unbiased presentation of the research in your field of study that may be relevant to this case?
A. Yes.
Q. In preparing your report did you seek to present the relevant research in an evenhanded way without favoring one party over the other?
A. I would say yes.
Q. Did you omit any details about the research that might not be favorable to Dr. Bala's

277

case?
A. I don't -- I don't think so. No.
Q. When you were conducting your literature review, were you specifically looking for studies to support Dr. Bala's case?
A. No. I looked for any studies that looked at gender. It just happens that they are pretty unanimous in showing the existence of bias against women and non-white physicians.
Q. Okay. Would you agree that there are other factors beyond gender, race, or ethnicity that might impact people's perceptions of behavior by others?
A. Sure. Yes.
Q. Did you review any of that literature in forming your conclusions in your report?
A. I'm not sure I'm aware of other studies. What kinds of studies? In academic medicine, like what kind of studies are you talking about? I'm not aware of -- well, class. I guess there's studies looking at class bias. LGBTQ. I probably did not review the LGBTQ literature. No, you're right. There probably is research in academic medicine looking at other biases that I did not review. You're probably right.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Q. Did you omit any findings or studies that might not be favorable to Dr. Bala's case?
A. No.
Q. On page 2 of your report you state, "Multiple academic studies over the last 30 years have documented discrimination against women physicians in academic medicine."
Did I get that right?
A. Yes.
Q. Do you know if any of these studies used a legal definition of the term "discrimination"?
A. I would doubt it. I think discrimination is used pretty much as we said in academic medicine.
Q. Okay. At the beginning of your report, and actually I'll go to it.
Here it is.
MS. THOMPSON: And Mr. Brischetto, I'm on page 2 and I'm highlighting for you right now what I'm going to be asking about.
BY MS. THOMPSON:
Q. Why did you use the phrase "to make the case" that leaders at OHSU have no excuse for being unaware of the challenges Dr. Bala faces as a woman of color?
A. Well, because I think at the top where it

says the two things I was asked to do, one was to look to see if there was evidence of bias. And the second was to comment on whether OHSU should have done something. So I was -- perhaps the word -- just like evidence has a different meaning in medicine and law, it sounds like discrimination has a difference. And "make the case," I was simply saying -- I was simply responding to that request that I evaluate whether OHSU should have done something. So I think the word "case" is interpreted differently than legal terms. I was simply answering that question that I was asked to.
Q. When you -- why did you use the phrase here, "then I will more specifically show." Why did you use that phrase?
A. Well, because that's what I did, isn't it? I showed how -- what happened to Dr. Bala is what would be predicted by that research.
Q. On page 7 of your report you state -- excuse me.
On page 7 of your report you state that, "Research shows that we are generally unaware of these implicit biases but they can influence the way we process information, interact with and judge people, respond emotionally to another person's

behaviors, and make decisions."
And I think we've been over this. And I'm not going to keep trying to ask you the same questions. We've already established that, yes, implicit biases, that they operate unconsciously. We're not aware of them; right?
A. Yes. Yes.
Q. Okay.
A. Sorry. I was nodding.
Q. That's all right.
On page 3 of your report you discuss various research about women physicians of color experiencing discrimination in the workplace. And we touched on this briefly earlier. But would you agree that many, if not all of the studies cited in your report rely on self-reporting by physicians?
A. Most of it relies on self-reporting. Yes. But the data from the AAMC relies on data from academic medicine -- the 140-some academic medical centers looking at the percentage of women at various rank and in various specialties. So the perception of bias in discrimination is subjective in surveys but objective in the data about lack of promotion. NIH looks at data on the awarding of grants. So, you know, large, multicenter grants are

much more likely to have male PIs than women PIs. So there is objective data as well but yes, most of the studies are survey self-report, and certainly, qualitative studies are individual human interviews.
Q. So on page 3 you have a long list and I have it up on my screen, but you have a long list of citations related to the sort of qualitative research based on self- reporting.
A. But that's not all qualitative. Some of those were surveys.
Q. Okay.
A. Some is qualitative but some are surveys.
Q. Okay. So for the surveys, do you know how discrimination was defined in those surveys?
A. I think like Nunez-Smith has done a lot of work in this area. And it was surveys, again, largely the survey questions arise from qualitative work. I don't know exactly what surveys she used but it would include questions that would get at experiences that have been described in qualitative work and then the surveys would look at the prevalence of this kind of research. I mean, of this kind of discrimination.
Q. So you don't know how discrimination was defined in these particular surveys or studies?

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

A. No. But I would say if you were using that umbrella definition of unequal opportunities that wound up disadvantaging individuals from one group over another I would say that is pretty consistent. I mean, I would say that definition would be endorsed by members of all these studies. Authors all these studies.
Pololi. Linda Pololi has done a lot of work both with survey and interview. And they tend to triangulate. They tend to reinforce each other in terms of the experience of women and ethnic racial minority physicians.
MS. THOMPSON: I've just placed into the chat Document C, which I think will be Exhibit --
THE REPORTER: Exhibit 9.
MS. THOMPSON: -- 9.
Ms. Byrd, did I have that correct?
THE REPORTER: Yes.
(WHEREUPON, Exhibit 9 was marked for identification.)
BY MS. THOMPSON:
Q. Dr. Carnes, do you have access to what I just pasted into the chat? I've also --
A. Yes, I see it. Uh-huh. By Patricia Devine. Uh- huh.

Q. Are you familiar with this outline?
A. No. No, this is -- this comes from Patricia's own work. We collaborated on one study but it looks like this is stuff she's done on her own I think.
Q. Did you work with Dr. Devine to develop a bias intervention program?
A. We -- I invited her in as a collaborator on the first cluster randomized control study I conducted, developing that intervention, developing a bias habit reduction workshop, and we tested it at the University of Wisconsin involving 92 departmental-type units. So yes, I worked with her, not on this particular study. It looks like this involves high school students. But I worked with her on a study, developing that workshop and studying at the University of Wisconsin. And then she was not part of the multisite study in which we kind of took elements of that successful workshop and adapted it specifically for academic medicine.
Q. Okay. So --
A. Why are you asking about Patricia's work? She's, I mean, she's a pioneer in this work.
But why are you asking about Patricia's work?

MR. BRISCHETTO: You don't get to ask the questions, Dr. Carnes.
THE DEPONENT: Oh, sorry. I'm sorry. But she's, yeah, she's a powerhouse. She's amazing.
BY MS. THOMPSON:
Q. Well, Dr. Carnes, one of the reasons I'm asking you about Dr. Devine's work is because of your many collaborations with her; right? You've collaborated with her significantly; is that fair?
A. Oh, yeah. She's amazing. She was the first person to define the difference between what we now call implicit and explicit bias. She called it the automatic and controlled aspects of prejudice. In 1989, she published that.
Q. Are you familiar with the concept of individuating instead of generalizing?
A. Mm-hmm.
Q. Could you describe what individuating is?
THE REPORTER: I'm sorry, Dr. Carnes, was that a yes?
THE DEPONENT: Oh, yes. Yes. Yes.
So that's one of the strategies that we suggest people use to help break the bias habit. So it's sort of rather than just jumping to an assumption about somebody based on their group, you

know, so like if you see somebody from the Midwest you say, oh, they're going to have Midwest nice. So instead of that you practice getting individuating information about that person. Are they from Ohio? Are they from a big -- or Minneapolis? Are they -- are they White? Are they of Scandinavian descent? So you get more, you know, are they a professor? Are they a farmer? You get more individuating information. And it turns out that particularly if you get that information early before you have a chance to come to a snap judgment, it can really help reduce bias.
BY MS. THOMPSON:
Q. This individuation, I don't know what to call it. Individuation theory, does it --
A. Individuating. That's what we call it.
Q. Individuating. Does that help reduce the impact of implicit biases or reliance on stereotypes?
A. Yes.
Q. And is it the concept that the more you know about an individual the less likely you are to rely on implicit biases, unconscious biases, is that correct?
A. Yes. That is true. A lot of it depends

on the order of information presentation though because it could be the fact that if you've already made that assumption you might selectively attend to information that could actually reinforce a bias. So one has to be a little bit careful of that because you could actually use individuation to reinforce biases. So we always kind of have that caveat in our workshop. The order of information is important.

Q. Right. But it also -- it also could work the other way; right? Which is, you have an initial impression of someone based on unconscious biases and stereotypes, but that through learning more about them as individuals, right, applying this individuating theory, that we may perceive people differently because we actually know them as people, as individuals. Is that fair?

A. That is fair. But again, the caveat being it will depend on which individuating information you attend to. Because if it's very neutral information -- they're a professor, they're a farmer, they're 35 years old. But if it's information that could selectively reinforce the stereotype, right, like what? Well, like directive communication. Oh, she's from the East. She's

going to be real abrasive in her communication style and then she engages in directive communication, you might actually use that information to reinforce the stereotype. So you do have to be somewhat careful. But yes, in the right situation, done right, individuating can help mitigate the automatic application of stereotypes. But you have to be careful because it could also be used to actually reinforce prejudicial behaviors.

Q. Thank you.

A. Assumptions.

Q. But this concept of individuating is recognized as a potential intervention --

A. Yes.

Q. -- within your field of study?

A. Yes. I mean, we even recommend it to, you know, the residents. That's why we ask them to take race out of the initial description of their patient. You know, instead of a 45-year-old Black man, a 45-year old man. Bring in race later because if you see race at the beginning it may bring up assumptions based on racial stereotypes, so.

Q. In your work with Dr. Devine and others, did you identify individuation and contact with members of minoritized groups as two strategies for

overcoming bias?

A. Yes. Yes.

Q. Are you aware of any research that examines how implicit biases are impacted by geographical location?

A. I do believe that Mazarin Banaji has published work looking at the implicit association score across the country but I would have to go back and review that work. So you asked if I'm aware of it. I am aware of it but I can't cite chapter and verse what she found. But I do know that there is some geographic variation in the IAT scores.

Q. Okay. Are you aware of any research that examines how implicit biases are impacted by socioeconomic status?

A. There probably is but I am not -- I would have to look it up. I can't cite that.

Q. Are you aware of any research that examines how implicit biases are impacted by people's educational background?

A. I'm sure that the people who house the IAT, Brian Nosek and others have that data. And they may have published it in that paper in the European Journal of Psychology, I think, which looked at like worldwide IAT scores. But I can't --

I would have to look that up to tell you what it found.

Q. So you're aware of the research but you don't know, for example, if --

A. Yeah. Not off the top of my head. Sorry.

Q. I'm not -- let me finish my question.

You're not aware of whether or not results from participants on the West Coast, for example, differ from participants on the East Coast?

A. No. I'd have to look. My vague memory of it is that it was more in the South where there were differences from the rest of the country but I'd have to look it up.

Are you familiar with that? Was there a difference? I don't remember. I'm not allowed to ask. I'm curious now. You've got me curious.

Q. What is the Implicit Association Test, Dr. Carnes?

A. So this is a timed test developed by Anthony Greenwald, I believe, at University of Washington, and colleagues. And it's usually done on a computer screen where participants are asked to very quickly push one computer key or another depending on what words or pictures they see. And they're asked to match it when the words or pictures

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

align with a cultural stereotype or don't. And generally, the vast majority, usually about 70 percent of takers of this test will more quickly match the words and pictures that align with a cultural stereotype than those that do not. So that is the way the Implicit Association Test works.

Q. Okay. Do you know whether when Dr. Bala's contract came up for renewal, whether her supervisors and coworkers had large amounts of information about her individual characteristics?

A. I'm sure they did. But again, that's that caveat. You know, did they have some biases but then they just used this individuating information to reinforce or not. So I -- but yes, I'm sure they had lots of information about her.

MS. THOMPSON: Okay. Steve, this is going to make you feel better. I would like to take a break.

MR. BRISCHETTO: Oh. Can we get a read from Michelle where we are on time?

MS. THOMPSON: Yeah.

THE REPORTER: 6:25. Well, it's basically 6:26.

MR. BRISCHETTO: Okay.

MS. THOMPSON: All right. So 30 more

minutes.

MR. BRISCHETTO: Yeah.

THE VIDEOGRAPHER: Okay. Please stand by. The time is 5:18 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 5:33 p.m.

You may now proceed.

MS. THOMPSON: Give me one second. I just wanted to get to the right page of your report that I wanted to ask you about.

BY MS. THOMPSON:

Q. Dr. Carnes, earlier I asked you some questions about whether or not you knew that race or ethnicity of any of the persons involved in this case other than Dr. Bala, and you testified that you did not; correct?

A. Correct.

Q. If one of the individuals who either complained about Dr. Bala or made employment decisions with respect to Dr. Bala were not Caucasian, would that impact your opinion in any way?

A. No. Again, we all swim in the same sea,

and research has shown, you know, women have the same gender biases as men. Black individuals overall have the same biases as those who identify as White. So it would not surprise me at all.

Q. So are you saying that the research shows that -- so for example, Asian women will hold biases against other Asian women in the same way that a White male will hold biases against Asian women?

A. Well, I mean, I'm sure not explicitly. But in terms of the cognitive processes that occur because we know the content of these stereotypes, that same kind of filtering would happen in everybody because we all absorb the content of these stereotypes simply by living in this culture.

Q. And when you refer to "this culture," which culture are you referring to?

A. The United States. And it's been shown, for example, even people who move from other countries within a relatively short time are aware of the content of stereotypes about various ethnic and racial groups and about men and women as a binary. They pick it up very quickly. You know, because you're bombarded with these messages. Magazines and movies, you know, social media. You're bombarded with messages that reaffirm these

stereotypes, you know, from the time you're born.

Q. Okay. So regardless of a person's individual characteristics or experience, is it your opinion that regardless of individual experience or individual characteristics that their implicit biases are the same as everyone else?

A. Pretty much. I mean, at least 70 percent of a group would show that kind of bias.

Q. Seventy percent?

A. That's about what it usually is. Seventy percent. At least if you're looking at the Implicit Association Test as a measure of the strength of the association between stereotypes and the speed with which you answer on that test. It's usually about 70 percent. So 70 percent of faculty at the University of Wisconsin were strongly linked. Female gender names with a subordinate role and male gendered names with a leadership role.

Q. Which meant that 30 percent did not possess these same implicit biases?

A. Right. Yeah. They were either neutral or even slightly favored the men.

Q. Okay. So I'm glad I asked that question because I think throughout the day you have said that everyone holds the same biases regardless of

who they are. Men and women hold the same biases against women. Men and women hold the same biases against men.
Is it your testimony now that that's not accurate?
A. Well, that's what an Implicit Association Test, which is only one.
Q. Okay.
A. And it's been highly criticized, too. It's only one little measure but it just shows you how prevalent they are. And also, you know, people have stronger prejudices against some groups than others. But generally, we are all aware of the content of stereotypes. And yes, generally, it tends to influence the way we evaluate individuals from those groups. All of us. Yes.
Q. But the research also shows that there are individuals where those stereotypes or biases are not present? At least --
A. Where they do not show them on an Implicit Association Test, which is only one -- right. I don't -- I don't -- there are other measures. You know, how many times you blink when you talk to somebody from another group. How much eye contact you have. How close or far away you sit. There are

other measures, too.
Q. And do those other measures also demonstrate that there are some people who are not impacted by the characteristics of the other person that one is interfacing with?
A. Well, there's certainly a range of the strength of any kind of measure. But I mean, I think generally the conclusion is that even if you may be less biased on one particular social category because of your life experiences, you're probably going to shift bias on some other -- toward some other group simply because we are all aware of the stereotype.
Q. Okay. I'm going to screenshare this table that you referred to.
Can you see it?
A. Yes.
Q. In this table, I see that you have a White male listed. And then you have woman of color. And so --
A. I was trying to bring in the intersectionality of race and gender. To put a lot of information in one figure.
Q. Okay. And can you -- why did you choose White male?

A. Well, again, just to put a lot of information in one table. Because in our society, male is men and roles associated with males, characteristics associated with male are viewed as higher status than women and things associated with female. White skin. White is viewed as -- has higher status. And then skins of color. And so I wanted to draw the biggest polarity by comparing White male with women of color to get that intersectionality of two relatively different status groups.
Q. Okay. This will sound similar to a question that I asked you previously but it's different.
If the -- if we had an Asian male being compared to a woman of color, would this model stand? Like if we just crossed out White male and we wrote Asian male, would this table be accurate?
A. It would be different. The content of stereotypes about Asians is also known. People can list stereotypes about Asians. In fact, in the study by Ghavami and Peplau that I cited, many of the participants were Asian, and they were well aware of Asian stereotypes. In fact, there's some interesting gender intersectionalities there because

Asian men are viewed as actually more sort of stereotypically female. And some of the negative evaluation may actually get attribute to that. But it could potentially be negative. Yes. Because the stereotypes about Asians would intersect with the stereotypes about male.
Q. And so I don't -- that would be true if we swapped in, for example, Hispanic male, that there would be a shift?
A. There would be -- there are stereotype -- it's very interesting because when you ask people stereotypes about men and women, again, binary. We know gender doesn't exist as a binary. But as a binary, they basically will off the top of their head say things about White men and women. And again, Peplau showed -- Ghavami and Peplau show this in their study. But then if you subsequently say, well, what about -- you know, what about Asian men and women? What about Hispanic Asian women? They go, oh. Black men and women? Oh. And then they can give you additional stereotypes. But off the top of the head it is generally White males and females that people list.
Q. Okay. So I just wanted to confirm that the table that you included in your report on page

298

12.
A. The figure.
Q. Sorry. Figure. Figure 1. This is to illustrate a concept --
A. Yeah.
Q. -- but it does not encompass or provide any sort of opinion or insight into the facts of this case because you don't know the race or ethnicities of some of the other players involved. Is that fair?
A. I guess that would be fair to say. I was just trying to show how the exact same behavior, and again, I picked White male land woman of color because Bala is a woman of color and I wanted to show the contrast. But just how the exact same behavior when filtered unintentionally, unconsciously through these stereotypes can result in extraordinarily different interpretations, and then wind up with very different institutional responses. And I think the institutional response that happened to Bala, I mean, we've seen it repeatedly, and it would be supported by the resurge. That, you know, heightened scrutiny, disciplinary action, gender policing, much more likely to occur.

299

Q. Between a White male and a woman of color?
A. Yes.
Q. All right. Dr. Carnes, did you take any notes today during your deposition?
A. Well, I wrote down that you wanted me to look up that one study of the operating room. Do you still want me to find that? Is it still relevant?
Q. Did you rely upon it in your report?
A. No. Unh-unh. It just came up when we were discussing behavior in small groups where there was kind of high-risk technical stuff going on.
Q. If it wasn't relied upon in your report I will defer to Mr. Brischetto on that, whether or not he would like to request that from you and share that with us.
MS. THOMPSON: But Mr. Brischetto, Dr. Carnes testified that you had provided her some research that I don't believe we have received. And so we will be keeping Dr. Carnes's deposition open because we do not have all documents that Dr. Carnes relied upon.
THE DEPONENT: Yeah. I didn't rely upon those more recent papers. I didn't think they added anything. But I think -- I'm not sure if I kept

300

them. But do you know which three you sent me, Steve?
MR. BRISCHETTO: I do.
THE DEPONENT: Okay.
MR. BRISCHETTO: Are you done, Andrea?
MS. THOMPSON: I'm done for today.
MR. BRISCHETTO: Okay. I have just two questions.
EXAMINATION
BY MR. BRISCHETTO:
Q. And those are, Dr. Carnes, I looked over the attachment to your report and there are 134 documents listed that were provided to you. There are 232 deposition exhibits that were provided to you. There are 11 depositions that were provided to you, including those taken by the plaintiff and the defense.
A. Yeah.
Q. And do you recall each of those individual documents as you were testifying today?
A. Oh, I do recall reviewing them in detail when I first wrote the report because I remember I found it intriguing that you also had Sharon Anderson's little handwritten notes. But I did not review them again before this session today. I did

301

not.
Q. Okay. So when you gave your testimony as to whether you had seen a variety of documents, whether it be complaints from people in the community outside of OHU -- OHSU, student evaluations from UPenn, more than four complaints from OHSU, when you gave that testimony would you be surprised if those documents were amongst all of the documents that you were provided and reviewed three years ago?
A. I would not be surprised, Steve. And if I forgot them I'm sorry.
Do you need me to go back and review them again?
Q. I do not need you to go back and review them again. I just needed to go over those three questions with you.
A. Okay. I apologize.
MR. BRISCHETTO: Do those raise any additional questions for you, Andrea?
MS. THOMPSON: Yes. Thank you, Mr. Brischetto.
FURTHER EXAMINATION
BY MS. THOMPSON:
Q. Dr. Carnes, did you just say that you

would be surprised if you learned that you hadn't received evaluations from the University of Pennsylvania?
A. I guess I wouldn't be surprised if they were in all the documents that I was sent. But I have to say I don't remember them.
Q. If you received documents from the University of Pennsylvania and reviewed documents from the University of Pennsylvania --
MS. THOMPSON: And I will represent on the record, Mr. Brischetto, that we do not believe that Dr. Carnes was provided with OHSU's production of Dr. Bala's faculty evaluations from the University of Pennsylvania.
MR. BRISCHETTO: Yeah. We think that she was provided those.
THE DEPONENT: I'm sure you did.
MS. THOMPSON: I'm sorry?
THE DEPONENT: Yeah, I'm sure you did. I've just forgotten.
MS. THOMPSON: I'm sorry. We were talking over one another.
THE DEPONENT: Oh, sorry. I was just saying I'm sure you did but I just couldn't remember.

THE REPORTER: Mr. Brischetto, did you have --
MS. THOMPSON: All righty.
MR. BRISCHETTO: We can deal off the record with whether or not those are there, Andrea. I think they are. You think they aren't.
THE DEPONENT: I'm sure they are. Yeah.
MR. BRISCHETTO: You know.
MS. THOMPSON: Well, no. This is our opportunity.
So I'm looking at -- I want to look at the list of documents that you provided to Dr. Carnes. Unless the list that we were provided is not complete.
MR. BRISCHETTO: You will note in the list it's all depositions which included Dr. Bala's, where the UPenn student faculty evaluations were gone over. It includes Exhibits 1 through 232. I believe you marked the UPenn student faculty evaluations as Exhibit 23.
MS. THOMPSON: Correct. Correct.
MR. BRISCHETTO: And those are all in the information that are listed in the documents that were given to you. We also gave you a file with all those documents in them, too.

MS. THOMPSON: Give me one second.
MR. BRISCHETTO: Sure.
MS. THOMPSON: I don't want to misstate. Give me one second.
MR. BRISCHETTO: Sure.
BY MS. THOMPSON:
Q. So Dr. Carnes, I actually have -- so if you did receive, and I think I was wrong. I understand based on the list that Dr. Bala's attorneys prepared, that you did receive a copy of Exhibit 23 to a deposition. This is Bates numbers OHSURB001524 through 1531. And these are narrative raw comments about Dr. Bala.
I was asking you questions earlier about did you review or receive any documents that may have been critical of Dr. Bala, your testimony was no. And I appreciate -- I appreciate that your memory today, two years after you wrote the report, probably is not as good as when you did write the report; right?
A. Yes. I honestly don't remember that. I apologize.
Q. Okay. Do you remember me asking you questions about was there any evidence that you thought might be less favorable to Dr. Bala in the

records that you reviewed? Do you recall me asking that?
A. Yes. You did ask it several times and I simply did not remember reviewing material. All I remember is that one thing from the University of Arizona and not paying much attention. And I do not remember -- I don't remember the material from Penn.
Q. Did you rely on it --
A. Not at all.
Q. I'm sorry. I didn't finish my question.
A. Yeah. Oh, sorry.
Q. Did you rely on the University of Pennsylvania evaluations of Bala in forming your opinions that you expressed in your June 2021 report?
A. No.
Q. And why not?
A. Because I don't even remember them. I can't say, honestly, Andrea, I apologize, but I cannot say -- I don't know if I made a conscious decision just to stick to the OHSU material. I just do not remember them.
Q. Well, if you were using a rigorous methodology to review the case materials, would you have -- why wouldn't you take into consideration

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

multiple negative evaluations about Dr. Bala from the University of Pennsylvania?
A. Well, it's a good question. The only thing I can think of is that I must have made a decision just to stick with the OHSU stuff because that was what I was asked to evaluate. So it is a very good question, and I may have just made that decision because I think had I used them, had I used them to inform my written statement I would remember them.
Q. So if I'm understanding correctly, you saw them but you ignored them for the purposes of forming your opinion in the report?
A. Yeah. That makes the most sense.
MR. BRISCHETTO: Object to the form. Object -- object to the form of the question. That's not what she testified to. And it's improper foundation. And because she doesn't recall.
THE DEPONENT: That is true. I don't recall. But I'm assuming that must have been it. Because if I actually used them I would have remembered them. Or I would have referred to them.
BY MS. THOMPSON:
Q. Why would you have referred to them?
A. If I thought it was relevant. And I must

not have thought it was relevant.
Q. You testified earlier today that you thought -- getting a 360 review. Do you remember us talking about a 360 review?
A. At OHSU. Yes.
Q. Okay. So while you think that receiving 360 reviews from within OHSU was relevant to your opinion, is it your testimony that you do not believe reviews from her prior employer, the University of Pennsylvania, might be relevant to Dr. Bala's credibility or the validity of the complaints made about her at OHSU?
A. I actually don't think it's relevant. And the 360 would only be in the -- usually done in the clinical or setting in which the person is working. So it would be very specific to the EP lab, cardiology. So no, I don't think it's relevant.
Q. Why not?
A. Because it's a whole different institution. And I was being asked to provide my opinion about what happened at OHSU.
Q. Understood. But this case is about Dr. Bala. You understand that, Dr. Carnes; correct?
A. Mm-hmm.
Q. Okay. And although University of

Pennsylvania is a different institution from OHSU, the constant, if we're talking about control factors as a scientist, the constant is Dr. Bala. Dr. Bala is at the University of Pennsylvania. She receives evaluations about her, many of which include -- and we can go through them if we have to, dozens and dozens of extremely critical comments by learners. By learners. And I'm trying to understand why you don't think that information would be relevant to the opinion you formed with respect to how Dr. Bala was treated at OHSU when she's the constant.
MR. BRISCHETTO: Objection. Misstates the exhibit. And it's argumentative.
Go ahead.
THE DEPONENT: Well, that -- and honestly, I have to say I don't remember but that may have also been one of the reasons I asked to see the learner evaluations at OHSU because I was focusing on what happened at OHSU. But I honestly do not remember. I don't remember is all I can say.
BY MS. THOMPSON:
Q. And Mr. Brischetto asked you, I think, forgive me, it's the end of the day, about -- or you mentioned actually a document from the University of Arizona.

A. Yeah. That was the only one I remember that was outside. And I remember specifically saying, well, that's from the University of Arizona. That's the only one I specifically remember. And I remember that because I know Nancy Sweitzer because she was a faculty member here and she's head of cardiology there. So that's why it stuck with me because I thought, oh, this one's got Nancy's name on it. But otherwise, I don't think I would have remembered that one either.
Q. And you haven't talked to anyone at the University of Arizona about Dr. Bala, have you?
A. No.
Q. Okay. And again, similar question, why did you not think that the termination letter that Dr. Bala received from the University of Arizona citing her problematic communications and interactions with staff and others was not relevant to your opinion that you gave in the OHSU case?
MR. BRISCHETTO: Already been discussed. Asked and answered.
THE DEPONENT: Yeah. I was trying to focus on OHSU material.
MS. THOMPSON: All right. So I don't have any more questions for today, but Mr. Brischetto, we

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

will be keeping the deposition open until we receive the studies that you provided to Dr. Carnes as I believe that that information may have impacted her testimony today.

MR. BRISCHETTO: Can we get a reading from Michelle as to the length of the testimony?

THE REPORTER: Six fifty-three.

MR. BRISCHETTO: Okay. Thank you.

Yeah, we object to keeping the deposition open and, yeah, that's all I've got to say. Thanks.

MS. THOMPSON: Will you be producing those records, Mr. Brischetto?

MR. BRISCHETTO: Yeah, we're happy to give you the studies that we cited to -- we asked Dr. Carnes to review and that she didn't rely on.

I should also note we gave her those studies years after the report was prepared. I mean, so there's really -- there's no even chronological relationship to the report. But yeah, we're happy to give them to you.

MS. THOMPSON: And Mr. Brischetto, we need those documents. It's only 4 o'clock our time but we need those documents before close of business today, please.

MR. BRISCHETTO: I don't know if I can get

them to you before close of business, Andrea, but we'll get them to you as soon as we can.

THE DEPONENT: Is it just those three papers? I may have -- I might have PDFs of those. Is that all you want?

MR. BRISCHETTO: Well, yeah. I know that I don't have the papers.

MS. THOMPSON: Yeah.

MR. BRISCHETTO: I have the citations, and we're happy to give you the citations. Molly, she's capable of kind of getting the papers on her own.

THE DEPONENT: Okay. All right. Because you gave me the citations and I went and I pulled the papers and I probably have them but I'd have to dig.

MR. BRISCHETTO: All right. Well --

MS. THOMPSON: Mr. Brischetto, we are requesting the papers. It is your witness. Your witness has possession and custody of those papers. Please send them to us by close of business today. We have another deposition --

MR. BRISCHETTO: I'm not going to do that, Andrea.

MS. THOMPSON: -- tomorrow and we want to be --

MR. BRISCHETTO: You want them for the deposition tomorrow? That's fair. I'll get them -- I'll certainly get them, you know, by the end of the evening. I can do that for you.

MS. THOMPSON: Thank you. Thank you.

MR. BRISCHETTO: Yeah. I didn't realize you wanted to use them tomorrow. But yeah, we can accommodate that.

MS. THOMPSON: We don't know what we don't know, Mr. Brischetto, and that's why we like to have documents before depositions.

MR. BRISCHETTO: You are absolutely right. We don't know --

MS. THOMPSON: I think you taught me that early on so right back at you.

MR. BRISCHETTO: I'm sure that it was not me who taught you.

MS. THOMPSON: All right.

MR. BRISCHETTO: But thank you.

MS. THOMPSON: Dr. Carnes, thank you very much for your time today. I know it was a long day. I so appreciate your time.

THE DEPONENT: You're very welcome. And then I think Michelle wants me to stay on for spelling. Is that right, Michelle? Okay, yeah. We

can do that.

MR. BRISCHETTO: And Molly, I do hate to do this to you but if you'll pull out the PDFs of the three studies and email them to us.

THE DEPONENT: If you could just send me the authors. Because I have them in my file alphabetically. If you send me the citations then I can get the PDFs really fast.

MR. BRISCHETTO: We'll do that.

THE DEPONENT: Okay, great.

THE VIDEOGRAPHER: Before we go off the record our court reporter will take orders for the transcript.

THE REPORTER: Ms. Thompson, would you like to order the original?

MS. THOMPSON: Yes.

THE REPORTER: And Mr. Brischetto, would you like to order a copy?

MR. BRISCHETTO: Yes.

THE VIDEOGRAPHER: Okay. And Mr. Brischetto, Ms. Thompson will get getting today's video deposition. Would you like a copy of today's video deposition?

MR. BRISCHETTO: We would.

THE VIDEOGRAPHER: Okay. All right.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Perfect.

The time is 6:04 p.m., and we are off the record.

(WHEREUPON, the deposition of MOLLY CARNES, M.D., was concluded at 6:04 p.m.)

CERTIFICATE

I the undersigned, Vincent Guerrera, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Molly Carnes, M.D., in the above captioned matter on the 9th day of January, 2024, taken at the location of 2014 Chamberlain Ave., Madison, WI 53726.

No alterations, additions or deletions were made thereto.

I further certify that I am not related to any of the parties in the action and have no financial interest in the outcome of this matter.

Vincent Guerrera

CERTIFICATE

I, Michelle Byrd, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true, and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any part to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 25th day of January, 2024.

/S/ Michelle Byrd

CORRECTION SHEET

Deposition of: Molly Carnes, M.D. Date: 01/09/24
Regarding: Bala vs OSU et al
Reporter: Byrd/Morrison
________________________________________

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number. If there are no changes, write "none" across the page. Sign this sheet on the line provided.

| Page | Line | Reason for Change |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Signature__________________________
Molly Carnes, M.D.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING
40
YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

DECLARATION

Deposition of: Molly Carnes, M.D. Date: 01/09/24
Regarding: Bala vs OSU et al
Reporter: Byrd/Morrison
______________________________________________________

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Page herein.

Signed at _____________________________, ____________
on the ______________ day of ________________, 2024.

Signature___________________________
Molly Carnes, M.D.

1

**1** 21:24 21:25 24:7 24:9 42:12 83:18 94:15 100:1 135:10 141:18 142:20 152:3 181:16 181:17 181:20 240:22 240:23 264:8 264:9 298:3 303:18

**1:15** 137:19

**1:18** 139:8

**1:46** 139:11

**10** 79:4 227:21 238:16 238:21 240:23 247:16

**10:06** 5:5 5:8

**100** 39:3 100:25 268:11 268:14 270:13 271:15 272:4 276:6

**101** 211:16

**10-15** 54:19

**11** 20:6 249:14 250:6 251:7 253:3 254:10 300:15

**11:48** 79:10

**11:57** 79:13

**12** 298:1

**13** 67:16

**134** 300:12

**140-some** 280:19

**15** 38:7 38:11 38:12 38:16 39:1 39:18 138:23 147:23 174:6

**1531** 304:12

**15-minute** 216:16

**160,000** 265:18

**17** 165:4

**19** 20:2 246:25

**1973** 29:1

**1978** 29:11

**1989** 86:11 284:14

**1990** 230:3

2

**2** 63:9 63:10 63:16 100:2 193:2 278:4 278:18

**2:42** 178:22

**2:45** 178:25

**20** 32:17 69:15 138:20 139:1

**2001** 29:14

**2004** 233:14 233:18

**2005** 230:3

**2010** 145:7 234:1 234:10 235:11

**2011** 31:22

**2012** 63:16

**2015** 196:12

**2016** 151:19 174:9 265:22

**2017** 196:13

**2018** 265:15

**2019** 31:24 32:18 32:20

**2020** 31:23 32:18 32:20

**2021** 19:12 20:21 24:1 24:12 25:4 26:25 28:14 135:9 257:20 305:14

**2023** 20:2 111:16

**2024** 5:4 5:8

**20-plus** 70:13 70:18

**214** 140:18

**23** 303:20 304:11

**232** 300:14 303:18

**27** 133:10

**29** 19:12 20:21 24:1

3

**3** 109:18 109:19 280:11 281:5

**30** 12:3 30:15 38:7 38:11 38:12 39:1 39:18 144:7 193:21 229:12 278:5 290:25 293:19

**30-plus** 48:11 73:11 75:16 191:1

**35** 286:22

**360** 153:24 154:2 154:18 154:20 155:1 155:6 155:10 172:24 307:3 307:4 307:7 307:14

4

**4** 111:1 111:2 111:15 206:24 210:18 218:24 220:6 310:22

**4:30** 263:25

**4:39** 264:4

**45** 216:24

**45-year** 287:20

**45-year-old** 287:19

5

**5** 135:22 135:23 135:25 136:10 210:18 223:2 238:21 239:14

**5:18** 291:4

**5:33** 291:8

**50** 30:13 173:11

**50-60** 40:6

6

**6** 139:15 139:16 142:11 144:11 223:25 227:21

**6:04** 314:2 314:5

**6:25** 290:22

**6:26** 290:23

7

**7** 144:20 144:21 145:3 145:7 173:9 173:12 184:13 228:5 229:25 230:4 234:2 279:19 279:21

**70** 85:16 290:2 293:7 293:15 293:15

**70s** 35:6

**75** 184:18

8

**8** 63:16 168:16 168:17 168:20 233:14 233:17 240:23

**8:13** 12:15

9

**9** 5:4 5:8 111:16 236:9 238:16 246:8 282:15 282:16 282:19

**92** 283:12

A

**a.m** 5:5 5:8 79:10 79:13

**AAMC** 80:10 280:18

**abatable** 38:22

**abdominal** 38:4

**ability** 10:23 11:1 27:12 113:12 117:16 148:9

**ablate** 37:10

**ablated** 39:12

**ablation** 37:5 37:15 37:19 37:25 38:15 39:16 39:17 39:23 39:25 247:17

**ablations** 207:1

**able** 22:9 22:17 26:8 26:11 28:2 140:20 227:24 276:4 276:10

**abnormal** 38:24

**abnormalities** 38:21

**abrasive** 120:21 215:7 287:1

**absence** 221:7 256:7

**absent** 12:21

**absolutely** 27:17 35:15 58:1 81:12 90:13 103:2 103:21 103:23 149:9 179:11 186:24 269:23 275:3 275:13 312:12

**absorb** 292:13

**abstract** 55:2

**absurd** 252:25 253:17 254:3 255:8 255:19

**abuse** 88:25

**academic** 18:13 18:22 19:15 26:7 26:12 30:4 31:8 33:22 45:3 45:6 45:11 48:10 54:18 55:4 62:17 63:6 63:25 64:13 64:18 64:20 68:21 69:15 75:17 75:18 77:11 80:8 113:10 115:22 125:11 125:15 125:20 137:5 141:25 142:4 143:17 147:12 147:22 147:24 153:9

153:17 154:7 154:15 155:23 156:6 157:17 157:17 159:23 166:21 173:17 178:7 186:19 192:6 212:18 219:13 219:17 234:12 244:1 244:22 248:13 248:22 261:20 262:3 264:15 265:13 266:1 266:9 266:10 266:12 266:21 267:8 267:10 267:13 267:16 268:1 270:9 270:24 274:5 274:10 277:18 277:23 278:5 278:7 278:13 280:19 280:19 283:20

**accept** 81:17 229:17

**acceptable** 48:20 52:13 53:15 127:11 128:18 249:18 250:2

**access** 22:6 27:2 108:19 109:23 124:8 139:20 154:14 258:20 282:22

**accessed** 27:3

**accommodate** 312:8

**account** 56:8 57:22 58:1 167:21 195:13 196:2 196:5

**accurate** 7:7 146:4 294:5 296:18

**accusations** 58:9 58:14

**accused** 60:1 60:4 60:7 60:10 60:15 60:18

**acknowledge** 141:7 141:9 142:5 149:2 165:24 184:2 197:3 238:9

**acknowledged** 101:19 101:22 144:13 146:11

**acknowledgement** 234:23

**acknowledging** 142:8 164:8

**across** 66:12 78:11 81:23 236:7 288:8

**act** 184:1

**acted** 91:21 92:10

**acting** 67:13

**action** 261:12 298:24

**activated** 86:25

**actively** 32:19

**activity** 105:3

**actor** 230:21 246:14

**actors** 93:14 231:12

**actual** 27:7 133:23

**actually** 22:5 26:5 26:11 30:10 32:15 32:24 33:4 37:10 47:20 54:17 54:24 63:6 65:11 67:23 80:23 80:24 86:10 96:17 98:18 110:1 114:1 114:9 121:6 125:19 125:22 126:21 142:8 142:25 148:17 148:22 156:20 156:24 157:14 160:21 165:6 175:6 196:8 226:20 227:8 227:13 238:1 238:7 240:3 242:12 247:15 248:8 259:25 260:15 261:9 262:9 278:15 286:4 286:6 286:16 287:3 287:8 297:1 297:3 304:7 306:21 307:13 308:24

**adapted** 81:2 283:20

**add** 26:9 26:10

26:11 254:2
**added** 220:25 299:24
**addition** 50:23 206:25
**additional** 10:17 18:7 18:25 20:9 20:11 152:13 152:15 152:18 153:3 153:3 153:7 162:21 164:6 166:11 174:23 297:21 301:20
**address** 74:13 74:21 75:1 75:15 77:1 77:23 78:5 205:3 205:5
**addressed** 76:2 76:11 78:12 96:3 204:3
**addressing** 6:17
**adequate** 114:16
**adjunct** 214:5
**adjust** 70:5
**administer** 5:25 83:25 84:7 84:10 84:14 84:18 90:24
**administered** 6:6 7:13
**administering** 7:9
**administrative** 32:13 212:10
**administrator** 32:7
**admirer** 24:18 25:25
**admit** 45:19 87:8
**admitted** 32:4 256:12
**adopted** 207:12
**advance** 229:9 260:11
**advanced** 109:9 133:14
**advancement** 157:17 266:11 273:20
**advancing** 71:11 133:3
**adversely** 76:7 76:9
**advice** 63:25 76:10
**advised** 66:8 72:18
**advising** 76:15
**advisor** 71:23
**advocacy** 191:19 191:22 191:23 192:5 192:11
**advocate** 70:25 71:3 133:2 191:2 192:4
**advocated** 192:10
**advocating** 71:11 252:7
**affect** 11:1 40:18 41:5 64:6 66:4 68:22 87:16 88:1 88:7 88:14 89:4 89:17 146:20
**affected** 51:8 91:3 141:20
**affecting** 76:7 76:10 136:22
**affects** 41:13
**affirm** 7:18 267:23
**affirmation** 7:10 7:12
**affirmed** 7:25
**afraid** 52:5 135:19 234:8 236:3
**afterwards** 230:24
**against** 6:19 54:25 58:10 58:11 58:15 61:9 62:10 68:7 68:15 74:10 82:14 83:3 89:16 90:10 90:15 134:18 151:7 183:21 183:23 184:5 184:10 184:22 185:2 185:15 185:24 186:12 186:23 191:10 193:17 251:25 266:14 277:8 278:6 292:7 292:8 294:2 294:3 294:12
**ages** 69:25
**aggressive** 88:23
**ago** 17:23 18:21 19:14 54:20 61:20 62:3 65:19 69:16 147:23 152:20 210:3 271:5 301:10
**agreed** 6:4 6:9 6:15 80:12

81:22 82:2 82:24 83:3 83:6 160:12 162:1 167:20 234:16

**agreeing** 6:1

**agreement** 13:11

**ahead** 41:22 44:19 47:2 49:2 53:2 53:18 55:15 59:6 73:25 75:4 76:4 77:5 80:5 81:20 82:7 89:9 89:14 91:24 92:12 92:20 93:11 94:2 94:21 95:14 98:9 99:1 99:12 113:1 113:21 114:1 114:1 120:8 122:12 126:5 127:14 129:23 134:13 143:20 161:11 162:5 164:14 175:13 175:19 180:5 185:7 187:12 188:19 189:8 197:13 200:5 200:17 201:6 201:6 202:7 203:11 204:13 205:1 205:19 208:8 222:22 226:17 232:25 233:2 241:4 241:13 244:20 245:7 270:5 270:17 271:20 272:15 273:7 275:6 276:9 308:14

**al** 140:8

**align** 59:21 159:11 290:1 290:4

**aligned** 95:16 155:17 200:8

**alignment** 46:4 184:2

**allegations** 164:4

**alleged** 224:6

**allotted** 6:19

**allow** 63:6 85:8

**allowed** 14:22 62:7 68:3 199:13 199:17 199:20 211:14 289:15

**allowing** 211:22

**allows** 103:10

**alphabetically** 313:7

**already** 43:25 53:4 125:24 127:6 129:13 135:10 199:21 235:7 246:10 259:7 280:4 286:2 309:20

**am** 7:3 8:7 14:22 20:3 22:15 25:24 26:10 33:22 63:15 88:3 94:22 97:1 126:14 145:17 167:17 168:13 197:16 197:23 229:11 242:13 250:4 257:7 288:10 288:16

**AMA** 83:9 83:14

**amazing** 284:4 284:10

**ambiguous** 49:1 49:4 52:18 78:17 89:8 94:19 189:7

**Amended** 135:16 164:2 168:14

**American** 56:19 151:17 151:20 185:10 186:19 265:14 265:16 265:21

**amongst** 301:8

**amount** 82:22 101:9 158:13

**amounts** 290:9

**amplify** 221:18

**Amy** 78:24

**Amy's** 110:5

**analogy** 148:11

**analysis** 81:14 106:6 107:17 107:25 108:8 108:18 108:22 141:20 142:16 146:9 179:4 203:15

**analyzed** 110:12

**analyzing** 109:1 112:4 124:12

**and/or** 10:8 12:12 182:6

**Anderson**

150:2 150:6

**Anderson's** 300:24

**Andrea** 5:15 8:6 22:15 300:5 301:20 303:5 305:19 311:1 311:23

**anecdotal** 102:9 104:4

**anecdotally** 261:1

**anecdote** 104:5

**anecdotes** 147:4

**anesthesia** 169:17 169:18 170:9 170:13 171:4 171:4 171:5 172:5 172:13 172:13 182:24 203:17 209:3 252:12

**anesthetist** 241:24

**angered** 239:23

**Annals** 265:16

**annual** 63:22 74:7

**answer** 10:15 11:7 11:18 11:21 18:19 19:24 41:7 47:15 54:3 55:22 56:6 60:13 86:6 94:23 105:13 137:10 137:10 164:3 167:7 168:14 173:8 176:2 176:4 177:9 200:3 231:9 272:3 272:10 272:12 293:14

**answered** 30:6 36:8 98:8 98:20 98:25 120:7 166:6 205:18 210:8 213:11 222:21 235:17 241:3 241:6 241:12 244:19 245:9 259:11 270:4 270:16 271:18 272:14 272:17 275:5 276:8 309:21

**answering** 201:20 216:3 279:12

**answers** 11:15 24:25 30:5 201:17 222:14

**Anthony** 289:20

**anticipate** 12:2

**anybody** 14:4 24:5 26:1 27:13 28:8 36:23 36:25 40:23 41:12 72:6 72:23 78:12 110:22 148:8

**anyone** 13:12 14:9 14:12 15:8 16:25 24:9 25:3 83:20 137:12 149:24 218:12 260:21 309:11

**anything** 10:21 13:2 25:15 33:6 55:1 61:24 62:8 66:22 107:21 132:9 134:25 151:4 151:10 164:22 172:16 198:16 256:22 299:25

**anyway** 89:13 98:20 150:9 156:5 267:12 276:12

**AOA** 63:23

**aorta** 38:4

**apologize** 24:24 136:13 162:17 162:17 216:8 301:18 304:22 305:19

**appear** 258:6

**appears** 31:20

**Appendix** 140:1

**apples** 162:10 270:19

**applicability** 101:23

**applicable** 113:6 129:17 147:13 150:22 250:5

**applicant** 133:24

**applicants** 133:12

**application** 116:2 287:7

**applied** 30:2 80:13 81:23 110:22 115:5 117:21 117:23 118:18 122:23

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

122:24 123:6 132:2
**applies** 122:21
**apply** 30:3 93:6 114:9 114:24 114:24 117:1 117:10 117:14 128:13 132:11 163:13 167:13 242:20 245:3 255:7
**applying** 29:19 30:24 31:9 286:14
**appointment** 31:22 31:23 214:6
**appraisal** 132:9 140:1 174:18
**appraise** 132:12 132:20
**appreciate** 175:20 216:12 216:14 222:13 304:17 304:17 312:22
**approach** 90:1 111:17 131:16 132:9 174:21 174:22 192:7 202:25 261:7
**approached** 260:5
**approaching** 112:9
**appropriate** 216:15
**appropriately** 92:10 145:23
**archival** 118:6
**area** 40:15 41:24 113:4 114:25 125:13 125:19 125:22 126:19 266:3 274:5 281:16
**areas** 124:23 124:24 125:14
**arena** 274:15
**aren't** 12:6 12:23 65:1 181:2 189:3 303:6
**argue** 78:12 126:20 191:13
**argues** 69:21
**arguing** 272:11 273:6
**argumentative** 161:10 162:4 202:6 203:10 226:13 235:19 270:3 271:18 274:14 308:13
**arise** 281:17
**Arizona** 111:12 177:19 177:24 178:11 305:6 308:25 309:3 309:12 309:16
**arose** 174:14
**arrhythmias** 40:2
**arrive** 264:18 268:13 269:4
**arrow** 23:11 28:6
**art** 115:19
**article** 63:17 110:3 111:15 111:19 119:7 145:7 233:15 233:18 275:21
**articles** 20:6 132:5
**arts** 28:25
**Asian** 122:6 292:6 292:7 292:8 296:15 296:18 296:23 296:24 297:1 297:18 297:19
**Asian-Indian** 56:18 90:17 121:1 238:15 264:12
**Asians** 296:20 296:21 297:5
**aside** 159:25 242:6
**aspect** 216:7
**aspects** 86:13 158:18 159:4 284:13
**assault** 54:18
**assess** 84:4 84:8 84:11 84:15 84:19 95:10 143:2 152:19 154:1
**assessed** 39:16
**assessing** 109:4 111:17
**assessment** 39:21 80:21 93:19 94:14 119:8 176:25 180:17 268:8
**assessments** 97:3
**assholes**

67:25
**assigned** 209:4 235:24 235:25
**assistant** 74:8
**assistants** 249:15
**associated** 39:17 40:18 41:4 296:3 296:4 296:5
**association** 85:14 288:7 289:17 290:6 293:12 293:13 294:6 294:21
**assume** 11:19 71:18 72:11 196:15 229:11 233:10 266:18
**assumed** 157:15
**assumes** 82:5 93:25 185:5 185:6 209:15 256:18 257:1
**assuming** 36:3 57:14 57:17 166:9 166:17 238:1 306:20
**assumption** 184:19 235:3 235:8 238:8 284:25 286:3
**assumptions** 56:17 56:17 56:19 56:20 65:5 65:6 65:8 86:22 221:25 236:13 287:11 287:22
**atrial** 40:2
**attached** 31:21
**attachment** 300:12
**attacking** 199:4
**attempting** 128:13
**attempts** 14:12
**attend** 217:12 217:13 217:15 286:3 286:20
**attended** 218:19
**attending** 32:22 45:4 56:8 209:4 227:12 249:17
**attendings** 249:25 251:18
**attention** 178:12 219:23 305:6
**attitude** 87:16 87:18 88:7
**attitudes** 84:4 84:16
**attorney** 8:7 125:3 272:11
**attorneys** 152:13 163:25 166:3 170:24 304:10
**attribute** 297:3
**attributed** 100:5
**attributes** 235:23 235:25 236:2
**attribution** 57:4 57:6 158:25
**audibly** 11:7
**audience** 65:7
**audio** 19:6 91:15
**audit** 142:12 142:19 143:4 143:10 143:11
**author** 20:4 20:5 96:16 111:18 122:4 142:14 234:2
**authored** 108:6 235:11 258:19
**authoritative** 269:3
**authority** 170:1 195:23 214:24 221:8
**authors** 101:19 275:12 282:7 313:6
**automatic** 86:9 86:13 130:17 284:13 287:6
**available** 108:16 151:14 258:15 258:20
**avoid** 38:24
**avoided** 155:16
**award** 96:17
**awarding** 280:24
**aware** 9:9 25:20 47:14 47:20 58:23 60:3 60:6 60:9 60:14 60:17 60:20 61:20

67:22 68:1 80:9 84:22 84:25 85:4 85:7 85:8 110:23 112:18 114:7 130:18 136:17 136:19 137:12 172:15 173:20 176:8 176:11 179:20 180:1 180:1 180:9 180:14 180:18 181:12 187:4 187:5 189:2 189:3 189:4 189:13 189:23 210:15 224:5 228:22 248:23 249:10 257:4 257:7 259:18 268:16 277:17 277:20 280:6 288:3 288:9 288:10 288:13 288:18 289:3 289:7 292:19 294:13 295:12 296:24

**away** 13:6 158:3 217:2 255:16 261:22 262:6 262:12 262:21 294:25

**awry** 37:9

B

**bachelor** 28:25

**background** 16:2 16:12 288:20

**backlash** 52:5 96:23

**bad** 72:23 165:7 213:19 214:4 249:8 255:14

**Bala** 5:10 16:25 18:15 25:6 25:8 40:11 42:16 45:7 86:18 90:4 90:6 90:14 90:21 90:25 91:21 92:1 92:10 92:23 94:13 94:15 95:11 95:18 96:12 105:18 107:10 114:19 119:22 121:2 121:5 121:12 132:2 134:18 136:17 144:6 147:13 151:2 152:2 154:9 156:9 157:18 158:9 160:3 166:13 167:1 170:20 171:11 172:1 172:3 172:21 173:20 174:13 176:9 176:25 177:14 181:13 181:25 182:6 187:3 189:2 189:5 189:23 190:11 190:15 190:20 193:1 193:3 193:6 193:13 194:19 195:4 195:6 196:10 196:20 197:9 210:20 212:3 212:21 214:22 217:12 217:25 218:7 218:10 218:15 218:19 218:21 219:2 220:15 220:19 222:17 224:15 224:24 225:12 225:23 226:24 227:8 227:17 230:1 230:12 232:1 232:9 232:16 236:17 237:9 237:16 237:19 237:24 238:6 238:12 238:25 239:17 239:25 240:5 240:9 240:10 240:14 241:1 242:3 242:9 245:17 247:21 248:11 249:16 250:1 250:9 250:18 250:22 251:5 251:11 251:16 251:25 254:19 255:22 256:7 259:9 259:15 259:22 260:7 264:10 267:5 267:20 269:16 270:13 271:15 274:19 274:24 276:5 278:23 279:17 291:17 291:21 291:22 298:14

298:21
304:13
304:16
304:25
305:13 306:1
307:23 308:3
308:3 308:10
309:12
309:16

**Bala's**
17:19 25:9
25:17 48:7
89:19 91:3
91:16
91:19 92:8
92:18 93:7
93:19
93:21
93:23 97:8
97:25 98:5
98:23 99:8
135:12
135:16 137:8
137:13
143:22 152:6
152:12
159:19 160:8
160:12 161:5
162:1
163:5 163:25
164:25 166:3
167:20
169:12
170:19
170:24
170:25 175:3
175:5 176:16
176:23
177:18 178:5
179:25 180:2
180:8 180:15
183:8 183:12

183:16
183:20 184:9
185:1 186:11
187:8 187:23
188:14
190:20 191:6
195:11
195:25 199:1
199:7
200:2 205:16
207:8 210:25
211:3
211:9 213:18
214:3 221:20
224:2 225:17
239:7 243:16
244:24 251:8
251:10
252:23
252:24 255:8
276:25 277:5
278:2
290:7 302:13
303:16 304:9
307:11

**ballpark**
115:14

**Banaji** 288:6

**bar** 23:7

**Barton**
240:3 240:8

**Barton's**
240:9 242:6

**base** 194:4

**based** 28:14
42:14
45:16
49:14 56:5
58:11 62:24

66:19
72:12
84:20
92:25
93:13
95:22 101:14
105:4
109:5 112:11
112:22 113:8
113:18
113:19 114:5
116:2 120:14
129:12
129:21 130:3
130:14 134:4
143:1
143:7 182:17
186:3
192:7 205:16
211:6 212:14
215:11
215:12
215:13 237:1
248:2 252:16
265:25
268:20
270:23
274:24
276:11 281:8
284:25
286:12
287:22 304:9

**basic** 261:20

**basically**
18:16 92:3
225:23
290:22
297:14

**basis** 129:5
220:22
247:19

**basketball**
62:7

**Bates** 304:11

**bear** 9:15

**bearing**
126:24

**beat** 37:13
38:24 205:2

**beautiful**
15:22 138:11
138:16

**beauty** 124:25

**became**
29:25
60:24
62:16
65:24
71:23 157:15

**become**
31:12 154:12
254:20

**becomes**
25:1 184:18

**becoming**
30:10

**begin** 58:22
182:18

**beginning** 5:9
51:18 216:10
278:14
287:21

**behave**
40:19 41:6
41:13
43:20
43:24
46:24 66:5
95:6 95:17



95:19 95:23 127:11 129:12 197:9 225:22 228:15 242:25 243:1

**behaved** 94:15 95:3 95:11 95:18 95:25 218:21 225:12 227:9 240:8

**behaving** 95:6 98:18 159:13 231:2

**behavior** 36:17 41:17 41:19 42:1 42:4 43:1 43:9 43:12 43:23 44:7 44:13 44:15 45:22 46:4 46:19 46:22 47:20 47:21 47:25 48:3 48:6 48:13 49:7 50:11 53:15 56:24 57:1 59:14 75:13 76:6 76:7 76:9 78:5 78:9 89:17 91:4 91:19 92:17 92:18 93:7 93:15 93:20 93:22 93:23 94:4 94:24 95:5 95:16 97:11 97:25 98:5 98:22 98:23 99:7 99:8 99:14 99:18 129:1 129:2 133:22 133:23 158:14 158:17 169:13 170:2 170:4 170:17 170:20 170:25 175:5 176:16 176:23 179:25 180:2 180:8 180:15 188:1 188:6 198:21 199:1 199:7 200:2 202:15 202:18 204:19 205:9 205:16 206:10 210:25 215:9 221:17 224:2 224:3 226:10 228:10 236:20 237:3 238:12 238:25 239:19 239:21 240:1 240:17 245:25 249:25 252:9 252:25 254:3 255:8 255:22 261:6 261:10 277:12 298:12 298:16 299:11

**behaviorally** 171:14

**behaviors** 44:24 56:16 69:18 75:7 77:2 77:23 78:11 92:2 119:12 120:3 120:4 158:13 158:20 180:10 197:17 199:2 215:10 226:5 228:2 230:23 239:7 239:17 242:1 242:4 250:1 280:1 287:9

**behind** 16:8 68:5 194:18 245:20

**beliefs** 50:17 86:5 146:20 228:18

**believe** 12:11 12:11 18:6 31:24 42:23 43:18 46:21 52:11 54:9 54:13 55:11 57:21 57:25 58:1 58:13 58:18 70:1 70:24 71:2 72:24 73:2 77:22 82:1 86:6 92:8 113:5 117:4 122:5 140:9 143:14 146:7 150:9 151:19 152:22 158:12 160:16 161:15 163:11 166:24 167:1 167:3 168:4 176:11 190:19 191:6 196:17 196:19 196:23 217:23 220:19 224:10 227:22 229:2 239:10 248:5 248:14 253:4 253:10 260:9

275:15 288:6 289:20 299:19 302:11 303:19 307:9 310:3

**believed** 97:11

**belittling** 240:2 242:3 243:15 244:17

**beneath** 156:1

**beneficial** 260:1 260:18 261:2

**benefit** 39:12

**best** 10:11 16:10 74:14 113:12 117:15 139:22 149:5 206:20 206:20 224:9 262:10 271:6

**bet** 97:1

**better** 35:11 92:9 146:21 221:22 290:17

**beyond** 18:5 18:15 118:20 275:2 275:12 277:11

**Bhatt** 121:21

**B-H-A-T-T** 122:2

**bias** 18:12 18:23 19:14 62:10 67:22 72:25 73:4 80:8 80:13 85:17 89:16 90:7 90:8 90:22 109:4 111:17 113:10 119:14 120:5 123:17 123:21 124:2 125:10 126:1 126:25 126:25 128:19 129:9 133:8 134:23 136:24 137:4 137:5 137:6 141:25 143:3 143:16 143:17 144:6 144:8 144:12 146:11 148:4 148:25 148:25 149:8 159:23 162:13 164:18 164:20 164:22 164:23 165:6 165:8 165:20 166:1 180:9 180:13 180:15 184:5 186:9 189:5 189:10 189:12 189:14 189:16 189:24 190:1 191:16 198:22 199:17 199:23 200:11 202:21 203:5 204:24 205:4 205:11 205:24 205:25 206:13 206:15 223:19 223:23 229:5 244:12 246:1 246:18 247:5 250:8 254:22 255:2 255:5 256:9 265:15 270:9 270:24 271:10 271:10 277:8 277:21 279:2 280:22 283:7 283:11 284:12 284:23 285:12 286:4 288:1 293:8 295:11

**biased** 85:5 90:10 160:22 195:16 198:25 199:6 200:1 205:15 244:10 295:9

**biases** 49:16 50:22 57:20 85:12 86:2 86:19 86:22 86:25 87:1 89:20 90:11 90:15 90:18 90:23 91:3 141:19 148:19 155:19 155:20 179:10 179:13 179:15 179:21 183:21 184:10 184:21 184:24 185:2 185:24 186:12 186:15 186:17 186:23 187:5 191:10 191:14 193:12 228:7 228:21 229:1 229:12 229:21 261:17 262:2 274:9 277:24 279:23 280:5 285:18 285:23 285:23 286:7 286:12 288:4

288:14 288:19 290:12 292:2 292:3 292:6 292:8 293:6 293:20 293:25 294:1 294:2 294:18

**biggest** 296:8

**binary** 292:22 297:12 297:13 297:14

**bind** 52:1

**Biological** 71:24

**birth** 8:13

**bit** 26:11 30:7 126:23 137:22 145:22 171:23 219:11 286:5

**bitch** 52:7 121:10

**Black** 56:2 188:8 287:19 292:2 297:20

**Blacks** 87:1

**blamed** 252:9

**blink** 294:23

**block** 148:13 148:15

**blocked** 197:21

**blue** 23:10 128:10 128:11 128:15

**blurred** 16:5

**board** 34:10 34:13 34:16 34:19 81:23 198:12

**body** 163:13 200:9 264:13 270:25 271:9

**bombarded** 292:23 292:25

**book** 109:1 112:4 118:15 122:17 122:18 122:20 122:23 123:6 150:24

**books** 16:2 102:5 118:6 118:8 122:10 122:10 122:25

**bookshelves** 16:1

**born** 293:1

**borrowed** 149:10

**boss** 215:7

**bosses** 157:14 198:11

**bossy** 124:15

**botanists** 72:3

**bottom** 20:25

**bounds** 105:22

**breach** 211:14

**breaches** 59:12

**break** 12:10 12:10 14:23 14:23 14:25 15:1 20:13 79:3 137:23 137:25 178:19 216:16 262:25 263:1 263:3 263:22 284:23 290:18

**breakout** 12:13

**breaks** 12:14 12:17 13:17 13:23

**Breathett** 109:25 111:10 111:11

**Brian** 288:22

**Brichetto** 118:22

**briefly** 15:12 280:14

**brilliant** 122:2

**bring** 59:19 95:2 96:6 98:2 129:9 191:16 193:21 222:10 253:14 287:20 287:21 295:21

**bringing** 48:4

**Brischetto** 5:13 5:13 5:23 6:4 6:9 6:15 6:21 12:12 13:15 13:19 13:22 14:13 14:21 18:6 18:21 19:5 19:8 19:10 19:19 19:21 20:2 20:7 20:16 20:19 20:24 21:8 21:17 22:11 23:16 23:20 25:1 25:18 25:25 26:13 26:17 28:11 31:14 41:21 43:3 44:17 47:1 48:25

49:10 52:17 53:1 53:16 55:13 59:4 73:24 75:3 76:3 77:3 78:7 78:14 78:16 79:7 80:4 81:19 82:5 89:6 91:23 92:11 92:19 93:9 93:25 94:19 95:13 98:7 98:24 99:10 112:24 115:2 120:6 126:3 127:13 129:22 134:12 138:14 139:1 139:5 140:19 140:22 150:5 161:9 161:21 162:3 164:12 166:5 173:6 175:18 180:4 185:5 187:11 188:17 189:6 197:11 200:3 200:16 201:19 202:5 203:6 203:9 204:7 204:11 204:25 205:17 206:1 208:6 209:15 210:7 213:10 213:14 216:15 216:23 222:20 226:12 226:15 232:20 232:23 235:15 235:17 235:19 241:2 241:11 244:18 245:5 252:1 253:1 253:5 254:9 254:12 256:18 256:23 256:25 259:10 262:24 263:4 263:7 268:3 270:3 270:15 271:17 271:25 272:5 272:8 272:22 273:5 275:4 276:7 278:17 284:1 290:19 290:24 291:2 299:14 299:17 300:3 300:5 300:7 300:10 301:19 301:22 302:11 302:15 303:1 303:4 303:8 303:15 303:22 304:2 304:5 306:15 308:12 308:22 309:20 309:25 310:5 310:8 310:12 310:13 310:21 310:25 311:6 311:9 311:16 311:17 311:22 312:1 312:6 312:10 312:12 312:16 312:19 313:2 313:9 313:17 313:19 313:21 313:24

**Brischetto's** 198:1

**broad** 37:1 71:20

**broaden** 174:7

**broader** 132:24 174:25

**broadly** 118:18

**brought** 26:7 95:20 95:24 96:3 114:8 125:15 134:18 136:24 165:6 176:9 194:25 208:9 209:25 212:6 239:20 241:25

**brown** 121:7

**Buffalo** 65:3 65:11 65:12 65:14

**build** 123:10 197:15

**built** 16:1 80:8 118:19

**bundles** 37:8 37:9

**business** 191:12 310:23 311:1 311:20

**Butler** 230:5 230:7 232:7

**button** 23:6

**bypassed** 199:13

**bypasses** 211:18

**Byrd** 6:7 6:23 11:6 11:12 49:18 113:25 134:6 162:18 272:18 282:17

C

**camera** 15:15 15:19

**campus** 71:25

**cancellations**

9:14
**cancer** 31:4 31:7
**capable** 190:23 311:11
**capacity** 32:22
**caption** 5:10
**captured** 91:16
**captures** 141:16
**cardiac** 37:5 37:14 37:25 39:15 39:17
**cardiologist** 37:6 37:20 39:14 111:12 184:3 184:13 184:22 242:7
**cardiologists** 37:23 41:9 151:24 173:24 184:6 184:14 185:12 185:21 185:22 185:24 242:13 251:20 251:21
**cardiology** 34:20 35:18 38:6 151:15 151:18 151:20 151:22 152:23 154:8 157:16 166:19 173:8 173:12 173:13 173:22 174:3 174:3 174:4 174:8 174:11 174:15 178:9 185:10 186:1 186:8 186:20 186:20 226:24 236:12 237:15 247:2 265:21 266:2 307:17 309:7
**cardiopulmonary** 96:9
**Cardiovascular** 106:14 107:7 237:19
**care** 70:3 76:8 77:24 78:6 78:21 78:22 79:20 81:11 104:22 171:15 172:7 206:20 206:22 220:11 222:10 251:15 252:6 252:8 252:12
**career** 60:23 61:10 63:6 157:11 157:11 229:13
**careers** 157:12
**careful** 236:7 286:5 287:4 287:8
**carefully** 37:9 148:10
**cariology** 237:8
**Carnes** 5:2 5:10 5:25 7:16 7:19 7:25 8:4 8:11 10:10 11:18 13:21 16:5 16:16 17:8 20:1 20:3 20:10 20:18 20:23 21:19 22:25 24:8 24:24 26:14 26:20 27:18 28:18 31:20 33:11 34:9 39:9 39:16 39:24 40:5 40:17 41:16 42:8 42:11 45:16 46:21 48:8 49:9 49:23 52:23 55:3 56:7 57:10 58:8 60:1 63:15 66:17 68:12 70:13 72:20 78:20 79:17 81:25 82:19 83:18 85:10 85:19 86:14 87:15 89:1 89:16 90:3 90:20 92:6 92:16 95:9 96:25 97:14 99:17 101:9 105:23 107:11 109:12 109:23 111:5 116:16 118:5 119:3 119:25 123:1 123:14 125:21 126:22 129:19 130:23 133:16 134:9 134:17 136:8 137:9 137:18 138:3 139:14 139:19 140:25 144:25 145:3

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

145:15 145:23 148:3 156:8 157:19 157:23 159:2 159:17 161:15 161:24 162:15 162:17 166:2 166:8 168:23 169:11 171:17 171:24 173:17 175:11 175:15 176:8 177:13 179:3 181:5 190:10 195:2 195:24 196:9 201:3 203:24 211:23 213:5 214:18 215:21 216:21 217:6 221:19 223:2 224:17 231:9 232:21 241:20 246:8 250:13 253:7 253:19 254:16 254:18 256:13 257:4 263:13 263:18 264:8 265:2 265:5 265:6 268:5 271:24 272:25 273:12 276:15 282:22 284:2 284:6 284:19 289:18 291:14 299:3 299:18 299:21 300:11 301:25 302:12 303:12 304:7 307:23 310:2 310:15 312:20 314:5

**C-A-R-N-E-S** 8:11

**Carnes's** 6:2 299:20

**Carol** 145:18 234:2

**carries** 10:2

**case** 5:10 16:24 17:3 19:14 24:20 25:21 26:22 34:8 42:20 48:5 57:7 83:19 83:20 84:1 84:8 84:11 84:15 84:19 85:11 85:13 85:16 86:16 87:24 91:8 97:8 97:23 99:22 105:18 106:7 107:18 107:19 108:23 109:1 109:2 112:5 112:8 112:22 114:9 114:18 114:22 115:1 115:6 115:6 115:8 116:4 116:6 117:3 117:10 117:25 118:12 118:24 119:12 120:5 121:5 122:16 122:22 123:13 127:8 128:22 130:24 131:4 131:11 132:21 135:11 136:16 136:21 137:13 142:7 143:3 149:19 150:14 150:14 156:13 156:13 157:18 159:18 159:20 160:9 160:12 161:5 161:8 161:13 162:1 163:5 163:14 166:4 167:20 169:5 175:24 191:1 199:1 201:22 225:20 227:7 237:24 238:6 256:4 269:10 276:3 276:18 277:1 277:5 278:2 278:22 279:7 279:10 291:17 298:8 305:24 307:22 309:19

**cases** 81:10 107:20 114:10 252:12

**categorize** 146:17

**category** 295:9

**catheter** 36:1 37:21

**Caucasian** 206:5 206:11 211:25 255:20 291:23

**caught** 16:3

**causality** 100:22 100:24

**causative** 191:7

**cause** 81:14 203:15 205:4

**cautery** 37:11

**caution** 26:13
**caveat** 286:8 286:18 290:12
**cell** 13:2 13:5
**cells** 37:11
**center** 33:23 65:23
**centers** 280:20
**CEO** 120:19
**certain** 12:21 97:2 101:9 124:3 148:9 178:13 215:9 215:10
**certainly** 20:12 38:17 39:13 46:11 71:8 71:9 71:10 102:22 103:1 108:15 182:10 183:2 198:14 249:4 281:3 295:6 312:3
**certainty** 268:11 270:2 270:12 270:13 271:15 276:6
**certificate** 8:13
**certified** 7:15 34:10 34:13 34:16 34:19
**chain** 59:11 59:12 77:13 199:13 211:14 211:17 211:19 212:9 212:11 212:13 220:2 251:12
**chair** 71:21 71:22 71:24 74:6 150:8 154:13 243:25
**chaired** 74:5 74:7
**chairs** 145:9 234:3 234:7 234:15 234:18 234:19 235:14 235:25 236:1 255:15 261:19
**challenges** 278:23
**chance** 86:5 285:11
**chancellor** 69:6
**change** 20:20 95:20 96:4 99:15 99:19 105:1 174:15 203:22 208:12 209:2 209:8 209:25 211:16 213:1 214:13
**changed** 133:11 231:20 234:12
**changes** 69:18 70:7 95:5 95:21
**changing** 71:6 214:17
**channels** 175:9
**chapter** 169:3 288:10
**characteristics** 290:10 293:3 293:5 295:4 296:4
**characterizing** 199:5
**charge** 37:7 195:17 195:19 209:19 209:19 209:22 209:24
**Charles** 5:16
**chase** 123:12
**chat** 14:20 15:2 20:24 21:7 21:9 21:22 22:21 22:23 23:1 23:7 109:16 135:21 139:14 140:20 144:19 168:11 168:13 282:14 282:23
**checked** 26:2
**checklist** 140:2 140:10 142:11 142:25 144:11 146:14
**checklists** 140:6 141:1 141:2
**Chicago** 157:21 166:15
**choose** 261:18 295:24
**chose** 143:24
**Christian** 54:24
**chronological** 310:19
**cigarettes** 70:4
**Cigarroa** 5:17 8:8 8:25 198:11 207:25 208:25

209:20 209:21 227:18 237:25 250:21

**circular** 155:14

**circumstances** 12:21

**citations** 28:12 281:7 311:9 311:10 311:13 313:7

**cite** 120:18 207:14 215:23 225:18 225:20 233:14 233:17 288:10 288:17

**cited** 18:18 18:25 24:15 26:5 27:9 85:2 86:12 96:2 106:21 108:5 119:16 120:17 126:8 143:8 179:18 213:22 223:14 229:4 280:15 296:22 310:14

**cites** 275:15

**citing** 46:18 309:17

**claim** 65:11 65:13 266:24

**claiming** 167:15 167:17

**claims** 134:17 134:18 137:13

**clarify** 11:25 163:1 215:21

**clarifying** 102:24

**class** 277:20 277:21

**classroom** 70:2

**clean** 16:13 36:9

**cleanliness** 56:1 56:3

**clear** 24:23 25:3 35:10 90:5 121:14 142:12 142:19 182:11 194:7 206:2 219:14 219:25 271:13

**clearly** 7:6 90:14 141:5 151:13 153:13 200:10

**clerkship** 61:17 61:25 64:5 65:17 66:4

**click** 21:2 22:11 23:10 27:20

**clicked** 22:7 28:6

**clicking** 27:24

**client** 16:7

**climate** 149:10

**clinic** 56:1 56:3

**clinical** 32:1 32:7 33:6 34:7 76:13 76:19 76:25 77:17 78:1 78:3 94:6 95:25 101:2 109:5 111:18 140:13 154:10 307:15

**clinically** 77:12

**close** 232:6 294:25 310:23 311:1 311:20

**closest** 276:1

**club** 45:9

**clunky** 9:12 9:16 12:20 21:21

**cluster** 246:25 283:9

**coach** 255:13 255:13 260:13 260:16 260:17 260:21 261:3 261:13 262:3

**coaches** 255:15 259:24 260:8

**coaching** 243:3 260:10 261:14

**Coast** 65:1 65:2 65:10 222:3 289:8 289:9

**co-authors** 145:10

**code** 109:1 109:7 112:4 118:6 118:8 118:15 122:9 122:10 122:17 122:18 122:20 122:23 122:25 123:6 150:15 150:24 230:22

**coders** 110:12

**coding** 108:25 110:16 112:4 112:8

119:5 119:7 150:14
**coffee** 12:16
**cognitive** 86:8 292:10
**Cohen** 160:19
**collaborated** 111:14 124:10 124:16 124:18 124:19 124:22 214:14 283:3 284:9
**collaborating** 125:14
**collaborations** 284:8
**collaborative** 89:25
**collaboratively** 79:19
**collaborator** 283:8
**collaborators** 86:10
**colleague** 73:7 73:12
**colleagues** 24:12 125:14 224:3 225:11 289:21
**collect** 273:15
**College** 151:18 151:20 185:10 186:20 265:14 265:17 265:21
**collegial** 206:23
**color** 90:17 236:18 278:24 280:12 295:19 296:7 296:9 296:16 298:13 298:14 299:1
**comes** 57:16 69:22 118:21 139:21 191:11 283:2
**comfort** 12:14 12:17 79:3 263:3
**coming** 90:2 103:8 121:11 193:19 194:1 198:12 220:20 248:18
**command** 49:11 59:11 59:12 77:14 199:14 211:14 211:17 211:19 212:9 212:13 220:2 251:12
**commanding** 88:23
**comment** 97:25 134:22 144:1 154:17 194:10 200:14 202:3 206:5 212:3 218:25 243:15 244:16 244:23 253:20 254:16 279:3
**commentary** 26:20
**comments** 87:25 243:11 246:6 247:21 250:9 250:17 250:21 251:4 304:13 308:7
**committee** 71:25 73:21 195:18
**committing** 13:16
**common** 220:7 223:10 223:12 223:15 223:19 223:23
**communal** 243:6 243:22
**communicate** 13:12 14:13 15:1 43:15 78:21 94:9 96:24
**communicated** 46:15
**communicates** 43:13 44:1
**communicating** 214:19
**communication** 42:24 51:21 51:24 52:3 52:6 56:13 58:19 75:23 78:25 89:24 94:25 97:15 98:19 206:23 222:4 233:12 243:4 244:22 248:25 249:2 249:12 249:21 252:9 253:12 253:13 255:18 286:25 287:1 287:2
**communications** 165:5 309:17
**communicator** 94:8
**community** 154:11 157:22 196:21 301:5
**comorbidities** 40:3 40:7

40:14

**comparable** 226:5

**comparably** 235:2

**compare** 106:9 106:12 106:16 107:5

**compared** 194:11 296:16

**comparing** 36:17 36:21 296:8

**comparison** 227:16

**competence** 54:11 193:17 234:22

**competency** 234:11

**competent** 233:23 234:24 235:2 235:3 235:4

**competing** 235:10

**complained** 67:4 165:19 166:1 170:11 172:6 172:14 173:5 256:8 291:21

**complaining** 171:20 172:2 214:21

**complaint** 59:1 59:19 66:18 66:24 67:6 73:7 82:14 83:3 135:16 164:2 164:3 168:14 170:12 172:19 179:25 180:8 180:14 182:23 203:2 203:14 204:2 225:7 244:6 244:7 244:7

**complaints** 67:7 72:24 73:2 74:10 77:12 154:21 169:12 169:16 169:17 170:8 170:16 170:19 170:24 171:3 171:18 171:19 171:22 171:25 172:15 172:21 173:1 174:13 175:4 176:9 176:16 176:22 180:2 180:18 181:12 189:1 189:3 189:4 189:13 189:22 202:15 202:17 202:20 203:4 204:4 204:19 204:21 206:10 206:12 249:16 251:9 251:11 251:25 259:8 259:14 259:18 301:4 301:6 307:11

**complete** 11:21 176:5 179:5 195:18 195:19 197:4 303:14

**completely** 27:12 50:18 229:1 246:2

**complex** 40:12 40:14 41:12 71:13 166:18 203:20 214:10 225:9 227:7

**complicated** 33:7 33:14 176:2 176:4 200:19 200:24 262:13 262:17

**compound** 232:24

**computer** 13:1 27:18 124:21 289:22 289:23

**conceding** 182:12

**concentrate** 41:14

**concentration** 40:25

**concept** 284:15 285:21 287:12 298:4

**conceptual** 118:17 123:11

**concern** 73:12 148:6 190:11 194:2 194:23 251:1 253:21

**concerned** 175:7 175:8

**concerns** 73:6 73:22 75:1 146:16 148:3 148:6 193:18

**conclude** 61:6 96:19 186:22 212:2 234:10 236:17 244:16 254:19 255:7

**concluded** 18:10 18:13 151:25 182:5 220:14 251:24 314:5

**conclusion** 45:18 101:11 151:2 207:6 215:25 220:17

230:17 238:11 241:21 242:21 245:4 264:19 265:1 269:5 295:8

**conclusions** 93:20 94:18 132:19 134:2 136:22 137:15 141:21 241:22 252:15 277:16

**condescending** 45:23 127:3

**conditions** 232:4

**conduct** 44:3 52:13 58:9 58:15 72:22 76:1 76:1 76:16 86:15 91:2 91:6 99:20 105:17 106:6 107:17 110:18 110:20 112:11 113:7 113:13 114:12 115:4 115:5 115:7 115:12 116:10 116:12 116:18 118:15 118:23 141:22 142:23 181:11 210:19 210:25 211:8 240:14 240:25 242:9 249:17 251:10 252:22 252:24 273:19

**conducted** 36:16 36:20 100:17 104:8 104:10 104:13 110:20 112:18 123:20 283:10

**conducting** 12:4 41:19 269:11 277:3

**confer** 13:17

**conference** 17:10

**conferral** 58:7 194:2 194:5

**confidence** 231:21

**confident** 268:7 268:10 276:3

**confirm** 12:11 14:2 15:17 179:3 273:3 297:24

**confrontation** 234:8 236:4

**confusing** 51:2

**conscious** 50:16 305:20

**consciously** 57:24 57:24 57:25 66:16 184:11 223:5 228:17

**consensus** 123:8

**consent** 115:10

**consequences** 57:3

**consider** 44:9 47:24 48:2 48:12 48:19 101:24 157:12 161:5 163:7 163:9 163:17

**considerable** 113:9 201:9 201:10 231:21

**consideration** 305:25

**considered** 52:7 104:24 105:2 121:10 143:9 187:15 255:17

**considering** 80:10

**consistency** 136:6

**consistent** 204:16 247:23 282:5

**consistently** 56:2 75:10 133:12 168:1 211:21 229:5

**constant** 101:1 173:4 173:4 308:2 308:3 308:11

**consult** 37:19

**consultation** 12:14 39:14

**consultations** 203:19 209:4

**consulted** 72:6 191:24

**consults** 203:21 227:13

**consumed** 12:16

**contact** 192:1 287:24 294:24

**contacts** 82:11 82:12

**contain** 20:9 227:15

**contained** 162:24

**contend** 224:1 243:13

243:14
**content** 24:9 24:12 119:16 119:20 122:14 179:13 179:15 179:22 223:4 292:11 292:13 292:20 294:14 296:19
**contention** 119:24
**context** 42:5 54:7 102:7 102:13 117:6 132:24 147:12 205:21 244:10 248:17 248:21 267:24
**continue** 71:15 162:21 201:15
**continued** 221:20
**continues** 19:15 221:14
**continuing** 44:17 95:13 137:21 204:25
**contract** 106:9 106:12 135:2 160:13 161:18 162:2 190:16 193:8 195:7 195:14 196:3 290:8
**contradict** 164:17
**contradicted** 159:19
**contradicts** 50:16 163:20
**contrast** 298:15
**contributed** 160:13 162:2 220:14 221:6
**contributing** 20:5
**control** 100:23 101:3 147:2 173:4 195:18 231:16 283:9 308:2
**controlled** 86:13 100:13 117:12 147:2 246:25 284:13
**conversations** 26:14
**converse** 43:18 43:25
**convey** 219:22 268:6
**coordinator** 224:11
**copies** 160:4
**copy** 22:10 23:25 100:1 135:16 227:22 304:10 313:18 313:22
**correct** 9:21 13:17 13:18 15:4 24:1 27:9 29:1 29:3 31:22 34:11 34:20 37:3 44:4 47:8 49:16 50:14 51:5 68:24 68:25 70:16 70:22 73:19 74:22 75:19 78:1 81:11 86:16 90:25 91:4 91:5 97:3 100:8 101:16 103:5 103:20 104:12 104:16 104:19 105:6 105:15 105:18 107:7 108:1 108:7 109:9 110:10 110:13 110:17 111:19 126:2 128:19 133:4 135:13 141:21 143:25 144:13 145:10 145:25 149:24 150:14 151:3 152:6 163:5 163:6 163:21 163:22 166:4 166:8 175:5 175:6 176:6 179:4 180:3 186:4 191:4 204:10 210:5 213:8 213:13 226:5 227:3 228:3 228:15 231:12 233:7 234:4 234:8 236:4 238:18 245:4 247:12 252:20 257:20 259:9 273:16 273:21 275:3 275:13 282:17 285:24 291:18 291:19 303:21 303:21

307:23

**correctly** 36:11 46:18 64:14 142:17 146:12 198:6 264:16 306:11

**correlated** 44:21 47:20

**Correll** 106:21 120:18 121:21 121:23 126:8 242:24

**Correll's** 215:15

**correspondence** 41:18

**council** 150:1 150:1 150:9

**counsel** 5:11 10:7 13:17 16:25 17:19 23:1 25:9 25:17 26:15 31:14 87:5 87:6 89:6 135:13 143:22 152:6 175:3 253:2

**count** 36:4 64:1 107:13

**counted** 6:18

**counter** 130:18 130:19 159:13

**counterparts** 61:5

**counting** 146:18

**countries** 179:20 292:19

**country** 70:9 125:20 166:17 190:23 198:13 288:8 289:12

**couple** 193:1 213:22 215:22 261:22

**course** 6:21 41:10 65:24 71:12 73:1 73:5 86:17 88:9 88:10 90:23 149:15 162:7 167:22 182:12 217:10

**court** 5:20 6:7 6:25 7:3 11:6 152:10 313:12

**courtroom** 9:24

**cover** 203:18 227:12

**covert** 62:11

**coworkers** 92:9 183:21 184:9 185:2 186:12 187:9 187:24 188:14 196:21 220:22 252:23 252:25 255:8 290:9

**create** 105:14

**created** 129:20

**creating** 208:5

**credentialed** 93:1 133:12 235:1

**credentials** 126:21 194:24 235:5 240:18

**credibility** 167:6 167:14 167:16 167:18 168:8 307:11

**credible** 166:13 166:20 166:21 166:23 166:25

**crew** 174:1

**crime** 10:3

**criteria** 92:16 93:6 93:15 93:23 94:17 95:10 97:3 97:7 97:8 97:11 97:14 98:4 98:22 99:7 166:20 210:24 211:5 211:7

**critical** 132:8 174:17 304:16 308:7

**critically** 109:6 132:12 132:20

**criticism** 225:2

**criticisms** 153:22 155:18

**criticized** 196:7 224:24 248:23 249:2 249:11 294:9

**criticizing** 174:20

**crossed** 296:17

**crosstalk** 11:14

**cry** 53:15 54:1

**cultural** 223:15 290:1 290:5

**culture** 59:9 59:17 59:23 76:8 179:15 292:14 292:15 292:16

**curious** 289:16 289:16

**current** 28:18 214:17 247:18 258:9

**currently** 83:6

**custody** 311:19

**cut** 123:12

**cute** 274:13

**CV** 28:24 31:20 34:9 68:19 73:15 132:5 229:8 248:14

D

**dah** 269:20 269:20 269:20

**daily** 220:21

**dark** 69:25

**data** 39:9 61:6 61:14 72:15 106:7 115:10 116:13 127:11 128:18 128:22 129:5 129:11 129:20 132:20 132:22 132:23 141:10 142:9 142:15 143:6 150:17 150:17 150:23 163:12 174:18 174:23 176:21 205:22 280:18 280:18 280:23 280:24 281:2 288:22

**date** 5:8 190:10 190:14

**day** 57:7 64:5 72:23 182:7 182:8 201:23 222:17 227:23 293:24 308:23 312:21

**de** 109:6 111:21 206:25

**deal** 303:4

**dean** 154:14

**death** 29:23 30:8

**deceased** 30:10

**decide** 210:24 211:7

**decided** 142:21 143:13 190:16 195:4 195:6

**deciding** 56:9 57:22 195:13 196:2

**decision** 133:18 190:19 190:21 195:3 195:16 305:21 306:5 306:8

**decisionmakers** 193:11 195:5

**decision-making** 109:5 111:18

**decisions** 109:8 130:25 131:5 133:19 134:3 228:10 280:1 291:22

**dedicated** 209:2

**deemed** 233:15 233:19 233:20 233:22

**deep** 124:17 124:23 124:23

**defense** 300:17

**defer** 299:14

**define** 48:22 73:9 128:14 284:11

**defined** 69:13 281:14 281:25

**definitely** 34:21 35:21 196:4 221:10

**definition** 55:3 55:8 55:10 127:25 128:5 128:17 266:4 267:9 267:11 278:11 282:2 282:5

**degree** 29:1 29:7 29:11 29:14 123:24 124:4 201:12 265:3 265:6

**demanding** 236:10

**demeaning** 52:11 52:14 52:15 52:21 52:23 53:8 53:10 240:2

**demeanor** 232:10

**demonstrate** 229:13 295:3

**demonstrated** 172:21 208:22 255:3

**demonstrating** 221:21

**denied** 71:17 72:6 72:10 164:4

**department** 30:21 63:1 63:2 67:15 67:17 74:6 74:16 74:18 186:23 217:9 217:24 234:3 234:7 235:14 235:24 236:1 237:8 237:15 252:18 261:20

**departmental-type** 283:13

**departments** 247:1 255:15

**department-wide** 218:1

**depend** 286:19

**dependent** 55:23

**depending** 21:3 138:3 289:24

**depends** 44:10 54:6 100:21 102:2 248:17 248:21 263:12 263:17 285:25

**DEPONENT** 7:22 21:1 21:5 21:10 21:14 22:2 22:7 22:13 23:8 23:12 23:14 23:21 26:16 27:20 27:23 28:5 41:23 43:4 44:20 47:3 49:3 52:19 53:3 53:19 55:16 59:7 74:1 75:5 76:5 77:6 78:8 79:6 80:6 81:21 82:8 89:10 91:25 92:13 92:21 93:12 94:3 94:22 95:15 98:10 99:2 99:13 109:14 113:2 115:3 120:9 126:6 127:15 129:24 134:14 135:5 136:2 138:18 138:21 138:23 139:2 139:4 145:17 152:17 161:12 161:22 162:6 164:15 173:7 175:20 185:8 187:13 188:20 189:9 197:14 200:6 200:18 202:8 203:7 203:12 204:14 205:2 205:20 208:9 209:17 213:15 216:19 216:22 217:3 226:14 226:18 232:22 235:16 235:18 235:20 241:5 241:14 244:21 245:8 250:15 252:2 256:20 259:12 263:9 263:14 263:19 263:23 270:6 270:18 271:21 272:6 272:16 273:8 275:7 276:10 284:3 284:21 299:23 300:4 302:17 302:19 302:23 303:7 306:19 308:15 309:22 311:3 311:12 312:23 313:5 313:10

**depose** 201:22

**deposed** 113:4 160:12 161:25

**deposition** 5:1 5:9 6:2 6:19 8:17 9:5 9:10 10:14 12:9 12:18 12:24 13:13 14:17 14:20 15:9 16:17 17:9 21:20 21:24 31:18 34:8 87:13 161:16 164:1 164:25 165:9 165:10 166:25 167:2 191:1 272:2 299:4 299:20 300:14 304:11 310:1 310:9 311:21 312:2 313:22 313:23 314:4

**depositions** 9:11 42:17 160:4 300:15 303:16 312:11

**derive** 45:18

**derived** 55:10 123:8

**descent** 90:17 186:13 264:12 285:6

**describe** 67:7 123:14 130:23 131:3 141:1 159:15 193:3 220:6 226:23 231:11 239:15 247:16 252:22 252:24 269:9 269:13 275:2 275:12 284:18

**described** 132:7 141:5 147:15 161:17 178:6 214:25 219:13 224:20 239:18 240:8 242:23 281:20

**describes** 248:5 248:15

**describing** 151:22 226:4

**description** 159:6 225:17 242:6 265:21 287:18

**descriptions** 121:3 158:12 158:19 158:22

**design** 100:12 100:23 100:23 100:25 102:1 102:16 103:1 103:20 103:25 104:11 104:15 104:18 105:4 105:11 105:14 110:9

**designs** 100:3 100:11 100:16 100:21 101:15

**desk** 15:20 17:13 18:1

**desktop** 27:18

**despite** 165:19

**destroyed** 158:4

**detail** 178:4 300:21

**details** 276:24

**determinations** 168:8

**determine** 85:11 91:20 130:24 131:4 142:12 181:12 225:2 225:11 245:20

**determined** 61:4 119:13 120:4

**determining** 86:2 125:9

**detriment** 266:22 267:16

**devalued** 210:20 210:25 211:9 212:4

**develop** 118:17 166:19 198:14 209:13 283:6

**developed** 32:8 74:21 149:9 149:13 289:19

**developing** 110:16 190:24 283:10 283:10 283:16

**development** 74:6 139:25

**devices** 12:23 13:3

**Devine** 86:10 119:19 282:25 283:6 287:23

**Devine's** 284:7

**devoted** 70:14 70:19

**diabetes** 40:4 40:9

**Diagnoses** 109:7

**differ** 179:12 289:9

**differed** 207:1 207:22 208:16 209:8 210:1

**difference** 137:18 279:7 284:11 289:15

**differences** 100:4 100:5 289:12

**different** 37:7 53:21 54:10 54:14 55:12 56:24 57:3 62:22 62:25 72:8 77:19 92:25 93:3 99:5 100:14 100:20 107:1 115:14 140:10 142:1 154:25 158:15 159:2 171:23 179:23 185:21 190:2 201:7

206:2 234:13 237:13 256:13 267:12 271:12 279:5 296:10 296:14 296:19 298:18 298:19 307:19 308:1

**differential** 155:25 224:6

**differently** 46:16 51:9 57:2 224:2 226:8 239:1 239:9 239:18 240:14 240:18 241:1 242:4 242:10 251:20 255:23 266:8 266:19 267:15 279:11 286:16

**differs** 207:16

**difficult** 80:7 156:3 195:15 243:14

**dig** 311:15

**digital** 7:14

**dinner** 218:10

**dinners** 211:13

217:12 217:16 217:25 218:13 218:16 218:19 218:22 219:3 219:15 220:4 253:18

**direct** 74:19 75:24 94:9 94:25 158:14 234:7 236:3

**directed** 32:14

**directive** 51:21 51:24 52:3 52:6 94:8 96:21 96:24 97:15 98:19 233:11 286:24 287:2

**directly** 106:21 107:3 146:9 147:13 200:8 214:19

**director** 61:18 61:25 64:5 65:17 66:4

**directs** 37:13

**disadvantaging** 282:3

**disagree** 125:21

**disastrous**

234:19

**disavow** 228:17

**disciplinary** 69:4 298:24

**discipline** 80:2

**disciplines** 185:14

**disclose** 26:14 99:6 150:4

**disclosure** 19:22

**disconcerting** 28:8

**discount** 208:3 209:12

**discriminated** 61:9 151:7 185:15

**discrimination** 60:11 60:16 60:19 60:22 66:19 66:25 67:8 71:19 72:12 127:12 128:19 136:18 151:3 151:16 151:21 151:24 174:11 177:1 177:1 182:1 182:6 182:13

182:16 182:18 183:6 183:9 183:14 183:18 185:13 264:11 265:10 265:12 265:19 265:24 265:25 266:5 266:14 266:17 266:18 266:24 267:2 267:6 267:20 267:25 268:9 268:19 269:16 270:1 270:14 271:16 274:19 274:25 276:6 276:13 278:6 278:11 278:12 279:6 280:13 280:22 281:14 281:23 281:24

**discriminatory** 252:25

**discuss** 141:19 227:24 238:17 280:11

**discussed** 16:24 24:20 193:12

219:11 250:6 309:20
**discussing** 252:19 299:11
**discussion** 24:11 64:11 101:19 145:24 216:4
**discussions** 193:23 251:14
**disease** 29:23
**dislike** 187:9 187:24 188:1 188:14
**dismissed** 249:22
**dismissing** 178:2
**display** 42:25
**dispositional** 57:4 158:24
**disputes** 164:11
**disruption** 19:6
**dissertation** 110:8
**dissuade** 65:18
**dissuaded** 65:20
**distance** 68:4
**distinction** 35:14 216:5
**distinguish** 123:15 123:25 198:25 199:6 200:1 205:15
**distinguishing** 125:25
**distort** 168:3
**distractions** 16:11
**District** 135:17
**diversity** 59:18 68:21 69:1 69:3 69:5 69:10 257:8 257:15
**division** 67:14 67:15 67:17 67:18 74:9 74:24 74:24 76:9 76:11 154:13 217:19
**divisions** 67:16 247:1
**division-wide** 218:2
**doctor** 19:4 19:4 19:4 19:5 34:2 42:23 43:13 44:14 59:1 190:3 199:22 200:14 202:4 202:12 204:2 204:4 206:7 207:13 240:7
**doctors** 8:19 58:16 60:2 61:23 64:7 64:9 70:20 72:25 75:22 79:18 83:1 83:13 188:16 196:21 200:19 204:5 236:13 246:6 274:10
**doctor's** 170:17
**document** 21:23 22:6 23:1 28:4 63:9 63:18 109:16 110:25 135:21 136:12 139:15 139:20 140:4 141:16 144:1 144:19 168:12 168:13 169:1 169:9 282:14 308:24
**documentation** 177:17
**documented** 119:17 186:19 264:14 278:6
**documents** 17:2 17:16 17:18 17:18 42:15 85:2 89:23 109:1 112:5 112:13 112:17 113:8 119:11 136:16 136:20 137:13 140:20 150:14 150:15 150:18 152:5 152:9 152:13 157:24 159:17 160:1 160:2 169:4 170:23 172:20 196:17 196:19 196:23 267:9 299:21 300:13 300:20 301:3 301:8 301:9 302:5 302:7 302:8 303:12 303:23 303:25 304:15 310:22 310:23 312:11
**done** 17:15 35:20

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

35:20 102:3 107:20 126:12 130:3 131:17 134:24 144:15 152:1 169:19 169:19 169:21 169:24 201:12 222:11 222:14 222:15 223:21 229:9 250:7 268:17 269:20 279:4 279:9 281:15 282:8 283:4 287:5 289:21 300:5 300:6 307:14

**door** 15:21

**doors** 191:20

**dose** 53:24 213:20

**double** 156:25

**doubt** 181:24 182:15 264:10 268:6 268:14 268:18 269:5 269:9 269:15 269:22 269:25 271:8 274:18 274:18 274:20 274:24 275:2 275:13 275:19 276:5 276:12 278:12

**download** 23:2 227:24

**downloads** 23:2

**downward** 23:11

**dozens** 147:11 308:6 308:7

**Dr** 5:10 5:25 6:2 7:16 7:19 8:4 8:25 8:25 10:10 11:18 13:21 13:22 16:5 16:16 16:25 17:8 17:19 18:15 20:1 20:2 20:9 20:18 20:23 21:19 22:25 24:8 24:14 24:21 24:23 25:6 25:8 25:9 25:16 25:20 26:13 26:20 26:21 27:17 28:18 31:20 33:11 34:9 40:11 40:17 41:16 42:8 42:11 42:16 45:16 46:21 48:8 49:23 52:23 55:3 56:7 57:10 58:8 60:1 63:15 66:17 68:11 70:13 72:20 78:20 79:17 81:25 82:19 83:18 85:10 85:19 86:14 86:18 87:15 89:1 89:16 89:19 90:3 90:4 90:6 90:14 90:20 90:21 90:25 91:3 91:16 91:19 91:20 92:1 92:6 92:8 92:10 92:16 92:17 92:23 93:7 93:19 93:21 93:23 94:13 94:15 95:9 95:11 95:18 96:12 96:25 97:8 97:14 97:25 98:5 98:23 99:8 99:17 101:9 105:23 107:10 107:11 109:12 109:23 111:5 114:19 116:16 118:5 119:3 119:25 122:25 123:14 126:22 129:19 130:23 133:16 134:8 134:17 134:17 135:12 135:16 136:8 136:17 137:9 137:13 137:18 138:3 139:14 139:19 140:25 143:22 144:5 144:24 145:3 145:15

145:23 148:3
150:6
151:2
152:5 152:12
156:8
156:9 157:19
157:23 158:9
159:2 159:17
159:19 160:3
160:8 160:12
161:4 161:15
161:24 162:1
162:15
162:17 163:5
163:25
164:25 166:2
166:3
166:8 166:13
167:1 167:20
168:23
169:11
169:12
170:19
170:20
170:23
170:24
171:11
171:17
171:23 172:1
172:2 172:21
173:17
173:20
174:13 175:3
175:5 175:11
175:15 176:8
176:9 176:16
176:22
176:25
177:13
177:14
177:18 178:5
179:3 179:25
180:2
180:8 180:15
181:5 181:13
181:25 182:5
183:8 183:12
183:16
183:20 184:9
184:17 185:1
186:11 187:3
187:8 187:23
188:14 189:2
189:4 189:23
190:10
190:11
190:15
190:20
190:20 191:6
193:1
193:3
193:6 193:13
194:18 195:2
195:4
195:6 195:11
195:24
195:25 196:9
196:9 196:20
197:8
199:1
199:7
200:2
201:3 203:24
205:16 209:6
210:20
210:25 211:3
211:9 211:23
211:23 212:2
212:3 212:21
213:5 213:18
214:3 214:18
214:18
215:21
216:21 217:6
217:12
217:25 218:7
218:10
218:15
218:19
218:21 219:1
220:15
220:19
221:19
221:20
222:17 223:2
224:1 224:15
224:17
224:23
225:12
225:16
225:23 226:4
226:7
226:9 226:24
227:8 227:16
227:18 230:1
230:12 231:9
232:1
232:9 232:16
232:21
236:17 237:8
237:15
237:19
237:24 238:6
238:12
238:25 239:7
239:16
239:25 240:5
240:8
240:9 240:14
240:25
241:20 242:9
243:10
243:16
245:17
245:19
245:21 246:5
246:8 247:21
248:11
249:16 250:1
250:9 250:13
250:17
250:18
250:21
250:22 251:4
251:5
251:8
251:8 251:10
251:11
251:16
251:25
252:22
252:24 253:7
253:19
254:16
254:18
254:19 255:8
255:22
256:13 257:4
259:9 259:14
259:22
259:22
263:13
263:17 264:8
264:10 265:5
265:6
267:5 267:19
268:5 269:16
270:13
271:15
271:24
272:25
273:12
274:18
274:24 276:5
276:15
276:25 277:5
278:2 278:23
279:17

282:22 283:6 284:2 284:6 284:7 284:19 287:23 289:17 290:7 291:14 291:17 291:21 291:22 299:3 299:17 299:20 299:21 300:11 301:25 302:12 302:13 303:12 303:16 304:7 304:9 304:13 304:16 304:25 306:1 307:10 307:22 307:23 308:3 308:3 308:10 309:12 309:16 310:2 310:14 312:20

**drafting** 19:12

**draw** 94:17 219:23 296:8

**drawn** 134:2

**drew** 49:6 265:1

**dribbles** 62:7

**Dropping** 30:12

**Drs** 5:16 8:7

**drug** 101:3 101:5 101:6

**due** 175:8 231:22 251:2 264:11

**Duke** 191:12

**dumb** 50:6 57:1

**during** 12:9 13:13 13:17 13:22 14:16 14:20 14:23 14:23 14:25 14:25 15:2 15:8 20:12 43:1 43:15 44:3 44:15 48:20 52:12 52:24 60:22 61:10 61:15 109:4 111:17 166:25 167:2 218:21 227:9 256:3 256:14 272:2 299:4

**dying** 29:21 29:25 30:8

**dynamic** 214:10

**dynamics** 206:19

E

**e.g** 220:8

**earlier** 8:7 21:12 126:23 145:22 205:13 238:22 280:14 291:14 304:14 307:2

**early** 12:17 255:14 285:10 312:15

**easily** 86:24

**east** 65:1 65:6 65:10 65:13 65:13 186:12 186:23 222:3 286:25 289:9

**edition** 140:1

**editor** 20:5

**editorial** 64:1 275:21 275:22

**Edmondson** 78:24

**education** 32:14 124:21 266:10

**educational** 288:20

**EEOC** 256:11

**effective** 51:25 70:25 71:2 71:11 94:6 96:20 229:14 229:15 233:12 260:12

**effectively** 78:21

**effects** 90:22

**efficient** 252:11

**effort** 159:18

**eight** 149:13 242:5

**either** 8:14 20:4 21:10 32:17 68:14 74:12 93:14 175:4 201:24 205:5 206:16 230:21 249:22 291:20 293:21 309:10

**ELAM** 260:15

**electric** 12:22

**electrical** 37:7

**electricity** 38:10

**electronic** 12:22 13:3

**electrophysiologist**

202:19 204:20 206:11

**electrophysiologists** 36:18 36:22 183:22 184:10 185:3

**electrophysiology** 35:24 36:2 36:13 213:8 214:4

**elements** 266:23 267:1 283:19

**Ellis** 12:12 14:14 31:15 31:17

**eloquent** 26:4

**else** 10:14 10:16 14:2 14:5 15:17 23:22 24:5 31:2 61:24 101:1 101:7 218:12 293:6

**email** 14:16 18:7 19:22 20:1 20:8 41:17 42:3 42:24 43:9 207:7 211:2 226:4 238:21 243:19 244:5 245:15 245:20 313:4

**emails** 42:17 42:19 43:19 89:23 122:24 160:4 165:8 175:6 182:20 182:22 199:3 251:2

**embarrassed** 156:18

**embedded** 81:3 153:11

**emerge** 102:13 123:9

**emerged** 107:9

**Emily** 87:6 87:12

**emotionally** 228:9 279:25

**emphasize** 142:21 143:24

**empirical** 269:4

**employ** 115:23 247:7

**employed** 28:20 91:17 92:10 95:11 156:10 170:25 172:22 176:10 196:10 237:9 237:16 237:20 259:15 259:19

**employee** 100:5 130:25 131:5

**employees** 134:4 175:4 233:15 233:18 256:5 256:15 257:5 257:24 258:25

**employee's** 131:1

**employer** 177:18 307:9

**employment** 71:18 72:11 133:18 134:3 144:9 149:21 178:7 183:3 196:15 291:21

**enacted** 240:19

**encompass** 8:18 298:6

**encounter** 160:7 164:10

**encountered** 248:1 252:8

**encourage** 247:3

**endorse** 223:5

**endorsed** 282:6

**endure** 268:9

**endured** 181:25 182:15 264:10 267:5 267:20 268:19 269:16 274:19 274:25 276:5

**engage** 14:19 43:11 44:3 52:2 72:21 80:21

**engaged** 52:6 61:3 72:5 238:24 239:8 240:13 240:25 241:10 242:1 242:9 249:25 255:21

**engages** 287:2

**engaging** 42:4 59:15 60:10 60:15 60:18 76:1

**engender** 159:14

**engineering** 28:23 68:22 133:4 181:4 214:6

**engineers** 69:6 124:21 214:14

**ensure** 101:11 119:8 256:4 256:15 257:5 257:11 257:24 258:5

**ensuring** 258:24

**enter** 14:9

**entered** 200:21

**entire** 152:8 169:9 196:24

**entitled** 10:10 63:17 111:16 145:8

**environment** 76:8 147:18 199:19 257:9

**envision** 33:25 243:14

**envisioned** 68:8

**EP** 36:12 36:13 37:6 37:20 37:22 38:6 38:15 38:25 39:14 39:23 41:9 53:4 147:18 153:15 154:22 157:15 166:18 166:18 172:5 172:12 173:8 173:9 173:12 173:13 173:21 174:1 174:3 178:8 182:23 184:3 184:6 184:13 184:13 184:22 186:22 190:22 197:15 198:14 206:25 207:10 208:4 209:3 209:4 209:14 212:22 213:13 213:23 214:11 214:12 214:15 218:2 220:9 220:23 222:10 227:13 227:17 230:1 230:12 232:1 232:6 232:10 232:16 233:7 236:13 237:11 241:10 241:15 243:18 247:17 252:18 307:16

**epidemiology** 29:15 29:16 29:19 30:1 30:3 30:23 63:5

**episode** 199:10

**EPs** 203:19

**equally** 258:25

**equipment** 57:8

**equity** 61:2 61:14

**error** 167:5 167:11 167:12 167:13 168:6 168:7

**escape** 23:6

**escaped** 186:17

**essentially** 216:1 230:2 230:13 231:24 232:17 232:18 233:3

**establish** 32:10 74:4

**established** 53:4 125:24 127:6 150:11 180:1 189:2 228:20 280:4

**establishing** 32:11

**esteemed** 140:14

**et** 140:8

**ethnic** 60:19 71:3 71:12 73:4 84:16 151:23 174:10 183:18 189:24 205:11 205:25 206:13 266:7 274:9 282:11 292:20

**ethnically** 70:20 84:20

**ethnicities** 237:23 238:5 298:9

**ethnicity** 69:9 106:4 205:16 277:11 291:16

**European** 288:24

**evaluate** 74:13 80:11 106:25 108:22 112:19 114:13 114:16 122:13 147:19 151:5 173:14 176:12 176:13 176:19 178:16 279:9

294:15 306:6

**evaluated** 94:10 133:15 133:25 154:3 228:1 233:19 238:25 240:14 240:18 241:1 242:10

**evaluating** 54:11 54:15 82:16 83:2 141:10 150:16 151:18 153:25

**evaluation** 55:25 93:2 94:13 100:4 142:7 152:24 155:1 160:22 175:9 176:21 231:21 256:11 297:3

**evaluations** 106:23 107:6 120:20 122:1 152:16 152:18 152:22 154:5 154:20 156:9 166:11 177:14 301:6 302:2 302:13 303:17 303:20 305:13 306:1 308:5 308:18

**evaluative** 55:24 153:3

**evenhanded** 276:21

**evening** 203:21 312:4

**events** 96:10 167:21

**eventually** 123:9

**everybody** 23:22 27:16 45:10 80:14 167:23 168:4 184:4 224:15 292:13

**everyone** 7:5 186:22 192:24 217:24 223:3 261:16 293:6 293:25

**everything** 5:20 11:6 16:14 17:5 55:23 64:1 65:25 66:1 101:1 101:4 101:7 153:11 158:2

**everywhere** 185:24

**evidence** 18:12 82:6 94:1 151:1 153:3 153:4 159:18 160:7 161:4 161:7 161:12 163:4 163:10 163:17 163:20 178:13 185:6 186:3 192:11 207:5 207:16 208:7 208:21 209:16 221:1 222:2 240:12 240:24 241:9 242:3 242:7 242:8 242:12 243:9 245:11 256:19 256:21 257:1 265:1 268:17 271:9 276:8 279:2 279:5 304:24

**evidence-based** 192:7 192:23 237:5

**evidenced** 186:1

**exact** 51:14 52:8 56:4 56:24 57:1 92:23 92:24 97:17 157:9 232:4 240:17 298:12 298:15

**exactly** 117:7 117:16 121:4 125:5 125:5 130:23 131:3 132:22 134:21 144:7 170:5 207:18 214:9 230:19 264:18 265:20 281:18

**exaggerate** 169:25

**examination** 8:2 91:2 300:9 301:23

**examined** 8:1 133:17

**examines** 288:4 288:14 288:19

**examining** 144:8 163:12

**example** 17:7 29:20 30:13 30:18 31:3 40:1 45:22 53:24 55:17 55:19 61:1 101:2 102:3 120:21 124:9 126:8 127:2 128:25 130:7 133:9 149:4 160:19 166:25

176:17 209:2 211:2 219:10 219:14 219:25 220:5 224:20 224:23 226:3 226:23 227:15 238:21 243:13 251:16 251:19 253:9 253:20 254:2 265:14 289:4 289:8 292:6 292:18 297:8

**examples** 52:23 117:17 210:19 211:8 220:8 224:1 224:4 224:7 225:19 238:17 238:20 240:12 240:22 242:5 242:7 242:15 242:22 254:1 254:4 255:9

**Excellence** 140:14

**excellent** 13:10 220:10

**except** 47:14 101:5 105:25 106:4 217:25 218:7

**exchanged** 152:9

**exclamation** 219:7 219:16 219:19 219:20 219:21

**exclude** 219:1

**excluded** 210:20 218:12 219:10

**exclusively** 70:14

**excuse** 13:22 16:19 74:24 84:9 160:14 252:23 278:22 279:20

**excused** 239:19 239:21 242:2

**executive** 260:8 260:10

**exercises** 61:2

**exhibit** 21:24 21:25 24:6 24:9 41:19 42:12 44:14 44:24 63:9 63:10 63:16 83:18 94:15 100:1 109:18 109:19 109:23 111:1 111:2 111:15 135:10 135:21 135:22 135:23 135:25 136:10 139:15 139:16 141:18 142:11 142:20 144:11 144:20 144:21 145:3 145:7 152:3 165:4 168:16 168:17 168:20 181:16 227:23 234:2 282:14 282:15 282:19 303:20 304:11 308:13

**exhibiting** 228:1

**exhibits** 17:22 41:17 42:23 44:6 44:13 46:22 300:14 303:18

**exist** 266:9 297:13

**existence** 18:12 223:18 223:22 277:8

**existing** 82:1 132:24 143:2 185:9 205:21 205:22 209:17 209:18

**expect** 95:19 99:19 101:18 130:22

**expectation** 197:8

**expectations** 66:5

**expected** 62:19 79:19 79:23 114:8 121:8 146:2 239:24

**experience** 12:3 31:1 31:3 48:11 62:15 66:3 75:16 120:25 143:7 149:17 150:5 167:25 176:13 176:20 180:20 185:13 213:7 214:12 214:12 240:4 261:2 262:5 282:11

293:3 293:4

**experienced** 18:15 60:21 148:18 149:8 176:25 240:2 242:2 265:24 270:14 271:8 271:16

**experiences** 96:18 134:24 167:4 281:20 295:10

**experiencing** 280:13

**experiment** 101:10 130:6 130:9 130:11 130:13 130:15 147:2 232:6 246:9 246:11 246:22

**experimental** 92:4 93:13 99:23 100:3 100:11 100:12 101:15 102:1 102:16 102:17 102:18 102:23 105:9 105:20 105:21 107:2 117:12 117:19 124:20 133:5 133:10 144:8 144:15 147:7 147:11 147:15 147:19 148:22 149:20 200:9 232:5 233:5 264:13 271:9

**experiments** 99:20 129:21 130:4 247:4 247:7

**expert** 19:22 25:13 25:21 42:9 48:10 68:13 68:17 83:19 89:1 113:11 113:15 114:7 114:8 114:14 114:19 114:21 115:17 116:1 125:7 125:19 125:22 136:24 141:25 142:3 142:20 157:6 167:15 167:17 177:11 206:25 212:7 254:23 255:4 267:19 269:11 269:14 270:9 270:20 271:3 271:14 273:3 273:25 274:3 274:16 274:17 276:11

**expertise** 33:6 34:7 40:15 41:24 68:17 76:13 112:11 113:4 113:9 114:6 114:9 114:10 114:15 115:1 115:5 116:3 124:17 124:23 125:9 125:25 142:6 210:21 211:1 211:9 212:4 242:20 246:23 266:4 270:23

**experts** 77:14 125:7 125:12 275:16 275:18 275:25

**explain** 58:3 77:8 118:13 118:19 129:17 130:16 148:20 269:4

**explained** 271:25

**explains** 158:25

**explanation** 218:9

**explicit** 62:5 62:10 86:5 87:18 87:23 162:13 181:6 226:20 284:12

**explicitly** 61:16 84:24 87:22 87:24 160:21 162:6 292:9

**explore** 146:25

**exposed** 179:17

**express** 200:15 202:4 202:11 206:6 217:8

**expressed** 25:7 25:10 305:14

**extensive** 37:2 125:8 176:16 196:18

**extent** 186:9 219:2

**external** 58:6 81:6 81:17 194:1 194:5

**extraordinarily** 236:18 298:18

**extrapolate**



185:19 186:14

**extrapolating** 185:4 185:8 186:21 242:13 250:4

**extremely** 239:22 239:25 308:7

**eye** 294:24

F

**face** 57:15

**faces** 278:23

**facets** 174:2 234:14

**fact** 24:15 38:19 42:13 56:12 56:15 82:10 84:22 92:22 93:12 114:7 144:5 147:22 148:23 149:9 154:9 160:23 160:25 161:3 163:19 165:19 179:18 185:6 185:6 200:8 208:3 209:12 210:10 211:11 211:13 228:25 234:1 235:23 236:2 239:20 246:16 253:13 257:1 268:18 286:2 296:21 296:24

**facto** 206:25

**factor** 173:4 173:4 191:7 193:24 194:21 210:13

**factors** 29:17 30:24 31:7 31:8 50:25 262:14 277:11 308:2

**facts** 48:9 82:5 93:25 115:1 117:3 117:10 117:24 209:15 211:4 226:15 256:18 276:3 298:7

**factual** 143:21 143:24 160:7 164:10

**faculty** 27:1 27:4 29:22 29:25 30:17 33:7 61:3 66:8 67:19 71:22 73:21 74:6 74:10 74:15 85:14 108:16 145:9 149:11 149:14 217:7 217:8 293:15 302:13 303:17 303:19 309:6

**failure** 40:10 109:9

**fair** 8:22 11:21 11:25 98:3 101:24 108:3 114:23 117:23 125:6 134:1 134:14 149:2 149:3 152:10 152:11 228:23 266:17 269:22 274:11 274:20 284:9 286:17 286:18 298:10 298:11 312:2

**fairly** 119:8 146:2 256:5 256:16 257:6 257:24 258:25

**fallen** 114:14

**falling** 114:18

**familiar** 63:18 110:6 112:1 126:14 133:2 136:12 140:4 145:12 145:18 154:18 168:25 169:2 270:25 283:1 284:15 289:14

**farmer** 285:8 286:22

**fast** 313:8

**fault** 143:20

**favor** 191:15

**favorable** 276:25 278:2 304:25

**favorably** 233:20 235:13

**favored** 293:22

**favoring** 85:17 276:22

**feared** 96:23

**February** 63:16

**Feedback** 202:8

**feel** 98:20 209:9 215:25 217:7 241:5 268:7 268:9

276:3 290:17

**feeling** 159:14 200:15 202:4 206:6

**feelings** 202:11

**feels** 200:13 202:2 206:4

**fell** 65:21

**fellow** 109:5 146:6 152:23 172:17 172:19 226:24 227:17

**fellows** 32:23 33:24 44:8 73:20 75:22 172:15 172:16

**fellowship** 32:15

**felt** 60:21 61:9 67:8 81:22 113:6 154:4 190:23 256:8

**female** 30:9 36:17 36:21 46:15 51:9 54:9 54:13 55:11 58:10 58:15 67:20 71:16 72:6 72:9 72:19 72:21 72:25 93:15 100:4 101:7 105:23 106:2 106:10 106:13 106:17 107:6 125:17 147:18 152:22 183:21 184:10 184:22 185:2 186:3 187:10 187:25 188:8 188:15 192:18 198:21 199:22 200:13 200:23 202:2 202:15 202:18 203:2 204:2 204:4 204:4 204:19 227:25 229:13 230:22 231:2 231:7 231:12 231:22 233:15 233:18 234:3 234:6 234:11 235:12 235:24 236:1 238:15 240:19 242:25 243:6 246:14 251:21 255:15 293:17 296:6 297:2

**females** 185:24 297:22

**fibrillation** 40:2

**field** 57:15 70:25 106:24 108:4 115:20 116:3 117:2 117:9 154:7 157:21 184:18 184:20 191:2 229:22 229:23 242:20 246:23 276:17 287:15

**fields** 227:25

**fifth** 166:16

**fifty-three** 310:7

**figure** 49:5 49:6 49:24 56:25 170:3 170:3 240:15 295:23 298:2 298:3 298:3

**figures** 221:9

**file** 303:24 313:6

**filed** 68:15 135:17

**files** 118:7

**filing** 68:14

**filings** 152:10

**fill** 251:16 251:18

**filled** 251:17

**filter** 43:23 49:15 50:5 85:9

**filtered** 49:7 168:1 298:16

**filtering** 167:23 292:12

**filters** 50:13

**Filut** 140:8

**final** 142:15

**finding** 269:6 275:2

**findings** 107:2 117:20 118:10 119:1 129:16 145:25 269:9 275:12 278:1

**fine** 24:5 138:21 138:24

**fingertips** 17:6

**finish** 114:1

289:6 305:10
**fire** 148:12 148:14 148:16 149:7 195:19 195:22 217:1
**firm** 42:15 125:3 160:3
**first** 20:4 26:9 51:7 58:3 64:5 86:11 96:15 103:7 108:9 113:3 122:4 131:8 131:17 149:10 183:1 190:10 224:23 227:23 234:14 260:8 261:19 283:9 284:11 300:22
**fit** 58:19 112:19 132:23 237:4 237:6 238:12
**fitting** 236:19
**five** 141:2 193:20 248:20 263:6 263:7 263:9 263:21
**fix** 203:16
**flag** 58:20
**flaws** 101:18
**fleece** 220:20 222:17
**flight** 9:13
**flip** 101:13 246:14 246:20
**focus** 46:12 116:25 119:5 227:6 309:23
**focused** 192:12 239:13
**focusing** 146:23 147:7 308:18
**folder** 23:3
**folks** 19:3 174:14
**forever** 263:16
**forget** 24:24 214:5 224:13
**forgive** 36:8 158:6 210:4 265:5 308:23
**forgot** 114:3 301:12
**forgotten** 302:20
**form** 66:19 128:18 175:1 306:15 306:16
**formal** 66:17 66:24 67:6 169:11
**formed** 268:20 308:10
**former** 154:12 258:9
**forming** 28:13 91:7 97:7 97:22 104:3 211:6 257:19 277:16 305:13 306:13
**forms** 251:17
**forth** 90:13 170:10 171:9
**forward** 274:3
**forwarding** 20:3
**foundation** 41:21 44:18 47:1 49:1 59:5 78:17 89:8 93:9 94:20 98:8 99:11 188:18 306:18
**fourth** 170:12
**framework** 112:20
**free** 16:11 80:13 90:6 90:8 108:17 215:25 217:7
**freely** 13:22
**frequent** 182:10
**front** 17:2 17:11 17:18 24:4 120:10 227:22 260:6
**frustration** 247:24
**fulfilled** 163:11
**full** 8:9 10:10 10:23 11:21 22:6 23:5 30:17 30:19 31:12 31:25 163:13 163:23 216:10
**fuller** 153:21
**fun** 221:12 260:17
**function** 20:24 95:24 206:18 206:21
**functioning** 212:17 230:1 230:12 232:15
**funding** 112:14 126:19
**funny** 154:24
**furniture**

15:22

G

**gather** 99:21

**gear** 221:21

**Geis** 230:6 230:7 232:7

**gender** 18:12 18:23 19:14 46:14 51:8 56:19 59:3 59:7 59:22 61:2 61:14 62:16 66:20 67:1 67:8 67:20 68:10 69:9 71:13 71:19 72:13 72:25 84:9 84:12 85:17 89:1 96:8 100:6 100:14 101:1 101:6 101:6 105:25 107:1 107:8 113:9 119:14 119:16 120:5 120:21 123:16 123:17 123:20 124:1 124:2 124:12 124:15 125:9 125:10 125:17 126:1 126:1 126:9 126:25 128:18 130:6 130:12 131:6 133:8 133:11 134:4 134:23 136:24 137:4 137:5 137:6 141:25 143:3 143:16 143:17 144:6 144:8 149:21 151:2 151:8 155:19 155:22 155:24 159:23 160:17 160:22 160:25 161:1 161:18 162:13 164:18 164:20 164:22 165:6 165:7 165:19 166:1 177:1 182:17 183:5 184:19 186:9 188:11 189:5 189:10 189:12 189:14 189:16 190:1 190:20 191:7 193:11 193:16 193:19 193:24 194:3 194:21 198:22 199:17 199:23 200:11 203:5 205:14 205:24 215:4 215:6 215:17 215:19 223:4 223:9 223:19 226:20 231:18 237:7 237:14 237:18 239:18 242:16 242:21 242:23 243:7 243:8 243:12 245:14 246:20 249:3 254:22 255:2 255:4 256:9 260:2 261:16 262:2 262:12 262:14 265:15 267:2 267:6 270:9 270:24 271:10 274:8 277:7 277:11 292:2 293:17 295:22 296:25 297:13 298:24

**gendered** 51:6 51:15 52:4 52:4 52:4 125:16 126:13 126:13 126:14 184:3 184:7 184:20 293:18

**genderizing** 171:21

**general** 37:23 96:15 173:22 212:17 212:18

**generalizability** 146:24 148:1 232:3 234:17

**generalizable** 105:9 105:21 117:13 117:14 118:10 119:2 148:2 233:5

**generalization** 71:21 127:16 128:8 128:11

**generalizations** 232:14

**generalize** 129:16 234:21

**generalizing** 127:23 232:5 236:7 284:16

**generally** 30:1 37:16 77:18 115:20 123:10 127:16 144:15 163:16 210:16 217:18 228:6 268:14

279:22 290:2 294:13 294:14 295:8 297:22

**generations** 70:9

**geographic** 288:12

**geographical** 288:5

**George** 144:19

**Georgetown** 166:15

**geriatric** 32:11 214:1

**geriatrician** 114:11

**geriatrics** 32:11 34:10 35:21 67:14 68:17 90:9 114:15 114:22 173:11

**gets** 80:6 113:25

**getting** 23:14 27:6 39:1 56:5 90:20 140:21 159:10 173:1 203:19 255:11 285:3 307:3 311:11 313:21

**Ghavami** 85:3

119:18 179:19 296:22 297:16

**given** 7:10 24:25 37:7 39:15 48:10 57:4 57:6 117:6 117:17 121:5 141:24 142:24 144:2 148:11 150:23 151:12 163:12 166:9 174:22 175:8 177:4 177:10 177:23 231:12 244:24 251:2 256:7 262:7 266:3 267:7 267:24 268:8 269:21 271:7 303:24

**gives** 121:9

**giving** 40:7 212:19 255:15

**glad** 147:20 147:24 293:23

**glancing** 178:1

**Glick** 24:14 24:21 25:20 26:10 184:14 184:17

**Glick's** 26:21

**goal** 118:12 118:19 248:20

**God** 67:24 156:15

**gold** 108:7

**gone** 116:14 185:11 303:18

**gorgeous** 138:12 138:13 138:15

**gotcha** 16:8

**gotten** 62:24 147:22

**grade** 64:6

**graduate** 73:18 112:14

**graduated** 28:25

**grant** 32:1 63:5 108:9 111:14 258:12 262:6 262:11 262:15

**grants** 32:10 72:17 273:19 280:25 280:25

**great** 8:15 56:13 59:16 118:25 139:4

222:7 313:10

**greater** 186:9

**green** 28:6

**Greenwald** 289:20

**grimacing** 231:2

**Groot** 109:6 111:21

**ground** 9:9 9:17 210:12

**group** 31:11 57:3 64:11 71:8 74:11 78:24 87:2 97:18 118:23 121:2 218:3 218:5 219:12 219:12 220:16 230:1 230:12 232:15 252:19 265:17 266:13 266:14 266:19 266:20 267:14 282:4 284:25 293:8 294:24 295:12

**grouped** 123:7

**groups** 30:25 31:2 31:10 54:25 71:6 85:1 86:23

179:16 230:20 258:4 287:25 292:21 294:12 294:16 296:11 299:11

**growing** 200:21

**grumble** 67:5

**grumbled** 67:4

**grumbling** 67:11

**guess** 26:1 41:7 43:4 44:22 47:18 47:23 48:15 48:18 53:7 54:8 61:1 61:6 61:6 75:9 75:24 80:11 87:20 87:21 87:22 87:24 88:2 95:22 99:2 122:14 123:21 125:11 127:5 128:4 128:8 128:13 131:7 131:8 131:15 131:22 134:14 142:4 153:22 155:17 158:5 159:7 161:2 161:8 164:18 179:8 179:21 191:13 195:17 199:9 212:19 219:23 221:4 241:5 242:11 242:11 251:19 253:23 253:24 254:7 254:18 263:1 269:2 270:22 271:1 272:6 275:25 277:20 298:11 302:4

**guessing** 88:3

**guidance** 139:25

**guide** 103:9 103:15 103:16 103:17 242:25

**guideline** 123:4

**guidelines** 83:14

**guidepost** 147:6

**gunshot** 38:4 38:14 39:3

H

**habit** 283:11 284:23

**hackles** 102:21

**hand** 7:17 21:4 252:5

**handwritten** 42:17 160:5 300:24

**hangs** 56:23

**happen** 58:4 59:14 130:17 211:15 211:22 292:12

**happened** 62:8 71:21 92:1 93:1 113:11 117:18 150:3 150:10 151:12 151:13 152:1 159:6 170:5 199:15 203:16 211:11 212:11 215:20 258:5 262:10 279:17 298:21 307:21 308:19

**happens** 110:3 143:16 189:17 277:7

**happy** 20:12 310:13 310:20 311:10

**harassment** 66:19 66:25 67:8

**hard** 57:7 75:6 113:25 147:23 173:7 234:20

**harder** 235:7

**harsh** 225:3

**harshly** 224:24

**hate** 15:11 71:3 313:2

**haven't** 24:20 32:5 37:21 91:19 210:4 210:5 269:19 269:20 276:2 309:11

**having** 7:25 33:1 33:16 34:1 38:24 68:15 128:9 129:9 181:2 194:1 209:2 209:3 215:1 215:7 261:8

**head** 11:4 11:8 67:14 67:15 74:9 74:24



74:24 76:11 154:13 157:15 166:18 166:19 169:17 171:4 172:12 210:11 230:25 231:3 243:18 256:11 289:5 297:15 297:22 309:6

**headline** 151:21

**heads** 67:17 67:18

**health** 5:16 30:2 31:2 32:9 66:12 76:19 76:19 81:10 139:25 140:13 145:8 192:17 204:6 206:22

**healthy** 29:21 29:22 39:22 39:23 39:24 40:8 69:7

**hear** 71:16 72:9 198:6

**heard** 78:15 214:25

**hearing** 212:12

**hears** 58:21

**heart** 37:8 37:13 38:8 38:9 40:9 109:9

**heels** 130:8 130:21 130:22

**heightened** 170:4 298:23

**Heilman** 119:18 126:8 233:25

**Heilman's** 234:25

**held** 54:10 54:14 82:3 101:1 184:10 186:23 207:2 207:23 208:19 248:12

**hell** 54:1

**he'll** 184:15

**help** 12:5 29:19 72:4 74:12 90:14 101:11 118:13 118:19 191:20 194:6 260:7 284:23 285:12 285:17 287:6

**helped** 111:18 209:13 221:10 234:2

**helpful** 74:4 76:18 111:23

260:24 261:12

**helping** 28:7 37:19 74:19 237:6 247:4

**Henrikson** 5:17 8:8 8:25 207:25 208:25 209:21 211:24 214:19 237:25 243:10 245:19 245:21 246:5 250:17 251:8 259:22

**Henrikson's** 212:2

**heparin** 53:25 213:20

**here's** 75:14 113:7 195:24 201:25

**herself** 90:22 95:18 220:23 241:24

**he's** 239:22

**heterosexual** 54:23

**hierarchy** 155:23 165:25 201:1 209:20 210:16

210:17 212:13 212:14 212:18

**high** 38:10 39:20 95:3 130:7 130:20 130:22 153:1 155:24 221:8 283:15

**higher** 296:5 296:7

**highest** 38:13 222:11 236:11 239:24

**highlight** 143:13 239:13

**highlighted** 141:6 142:10 254:10

**highlighting** 278:18

**highly** 54:3 147:17 231:7 260:12 294:9

**high-rank** 133:10

**high-risk** 37:25 39:19 41:20 44:15 48:1 48:14 52:12 53:23 206:25 299:12

**hire** 190:19

190:21 195:4 195:19 260:17

**hired** 95:2 133:13 147:17 182:19 190:15 190:22 193:6 193:13 195:1 197:8 197:14 198:4 198:14 261:13

**hiring** 160:23 191:8 193:18 194:18 195:3 195:3 260:8

**Hispanic** 297:8 297:19

**historically** 54:25

**history** 263:15

**hit** 23:5 207:20

**hold** 56:22 84:12 84:21 85:12 86:3 168:12 179:22 183:21 184:5 184:21 185:2 185:24 186:12 228:21 228:25 292:6 292:8 294:1 294:2

**holds** 87:15 88:6 88:11 89:2 89:21 261:16 293:25

**home** 14:5 27:15 114:13 138:16

**honestly** 20:10 29:8 156:18 165:2 172:18 304:21 305:19 308:15 308:19

**honeymoon** 183:1

**honor** 63:23

**hope** 30:5 33:15 36:5 95:25

**Hopkins** 224:14

**hospital** 31:21 31:23 32:4 76:20 174:2 196:22

**host** 49:14 192:14

**hostile** 235:7

**hour** 216:24

**hours** 6:20 79:4 156:17 156:19 156:22 156:24 157:4 157:8 271:5

**house** 14:5 15:23 138:7 156:1 288:21

**hover** 27:25

**HR** 59:15 77:15 165:23 256:8 256:11

**huge** 154:14

**huh** 282:25

**human** 40:24 41:12 41:25 146:25 259:21 281:4

**humor** 65:4

**hundreds** 147:10 149:20

**Hunt** 207:19

**husband** 14:5

**hypertension** 40:4 40:9

**hypotheses** 273:15

**hypothesis** 119:9

I

**IAT** 90:9 288:12 288:22 288:25

**icon** 27:19

**I'd** 38:15 53:7 55:5 64:19 128:2 140:16 156:21 156:21 156:21 178:18 215:14 263:2 289:10 289:12 311:14

**idea** 168:9 183:11 183:15 183:19 227:5 227:8 255:14

**ideas** 211:3 212:3 212:22 213:1 213:18 214:3 214:9 214:17

**identical** 101:4 101:8 105:24 106:3 228:1 235:5

**identically** 93:1 133:12 231:1 235:1

**identification** 22:1 63:11 109:20 111:3 136:1 139:17 144:22 168:21 282:20

**identified** 28:14 126:13

**identify** 30:14 76:16 105:23

106:2 143:11 143:12 249:24 255:21 266:6 266:7 287:24 292:3

**identity** 220:7

**ignore** 163:20 202:19 203:3 204:20 206:12 206:15 206:16 206:17 208:3 209:12

**ignored** 178:13 224:15 249:22 306:12

**I'll** 12:5 29:3 43:8 53:5 110:2 144:24 158:23 178:19 185:17 187:21 239:13 263:19 278:15 312:2 312:3

**illustrate** 255:9 298:4

**illustrated** 242:24

**I'm** 8:24 9:8 10:10 11:19 12:15 13:1 13:2 17:8 17:11 18:19 19:3 19:4 20:4 20:12 22:5 23:14 23:16 23:19 24:24 25:19 26:16 27:14 27:23 28:6 28:20 30:11 30:22 33:8 33:11 33:13 33:18 34:6 36:3 36:24 37:16 38:13 40:25 41:1 41:9 42:13 42:13 43:4 44:8 46:18 47:14 47:16 47:19 48:8 49:17 50:6 51:2 52:9 52:19 52:20 54:2 54:25 55:19 57:13 60:3 60:6 60:9 60:13 60:14 60:17 60:20 61:11 62:2 62:8 63:12 71:4 72:14 73:20 74:2 77:10 77:19 82:23 83:9 83:9 83:13 83:17 87:20 88:16 88:20 90:9 91:13 93:18 93:22 94:12 94:13 94:22 95:9 97:6 98:15 99:17 105:7 109:12 109:15 110:24 110:25 112:3 112:18 113:21 113:24 114:6 119:3 119:4 119:25 122:14 122:21 123:21 125:3 125:18 125:23 127:19 127:19 132:20 135:6 135:18 135:19 136:4 136:9 136:15 138:6 138:7 138:9 139:14 140:17 140:18 143:19 144:18 145:15 147:20 147:24 154:18 155:4 155:5 156:6 158:7 161:2 161:9 162:18 162:19 162:22 162:23 163:15 163:16 165:3 166:23 168:11 169:8 169:21 170:13 171:17 171:24 172:1 172:8 174:8 175:6 176:1 180:12 180:24 181:7 181:8 181:14 182:13 182:24 185:4 185:8 187:17 187:17 187:19 188:3 189:20 190:3 190:6 194:7 194:17 194:17 197:5 197:7 198:3 199:16

199:18
199:18
199:20 201:5
202:15
205:25
207:20
208:15 209:6
210:15 211:4
211:4 212:19
213:24
213:24 216:5
216:9 216:10
216:20
216:25 217:3
217:3 219:19
224:18 238:1
239:13
241:19
241:20
241:21
246:10
248:11
248:11
250:13
252:14 253:8
254:10
256:23 261:7
261:14
262:25 263:1
265:12
265:24
268:16
269:11 270:6
270:8
271:1 274:13
274:13
274:18
277:17
277:17
277:19
278:17
278:18
278:19 280:2
284:3
284:6 284:19
288:9 288:21
289:6 289:15
289:16
290:11
290:14 292:9
293:23
295:14
299:25 300:6
301:12
302:17
302:18
302:19
302:21
302:24 303:7
303:11
305:10
306:11
306:20 308:8
311:22
312:16

**image** 184:12

**imaginary** 129:5

**imagination** 85:19 85:21 85:25

**imagine** 13:23 85:15 87:25 129:3 130:7 248:18

**imbalance** 124:16 245:15

**imbalanced** 120:22 215:6

**imbalances** 124:13

**imitate** 117:18

**immediately** 14:10 14:14 59:2 77:1

**immune** 90:22

**impact** 51:1 51:4 78:5 148:5 245:25 274:9 277:12 285:18 291:23

**impacted** 51:10 77:23 176:14 288:4 288:14 288:19 295:4 310:3

**impede** 10:22

**imperative** 258:3

**implement** 95:20 95:21 99:15 99:18 208:10 208:12 229:19 247:24 248:1

**implementation** 210:14

**implemented** 208:25 213:2

**implementing** 251:14

**implicit** 49:16 50:22 56:16 57:20 85:12 85:13 85:17 86:8 88:6 228:7 279:23 280:5 284:12 285:18 285:23 288:4 288:7 288:14 288:19 289:17 290:6 293:5 293:11 293:20 294:6 294:20

**implicitly** 184:12 228:14

**importance** 220:7

**important** 11:7 11:12 74:25 77:1 77:23 78:4 78:4 100:15 105:1 133:21 141:8 142:12 146:8 147:8 149:18 153:10 153:16 154:8 156:7 157:4 286:9

**importantly** 221:7

**impossible** 11:14

**imprecise** 101:15
**impressed** 23:19
**impression** 261:4 286:12
**impressive** 28:25 73:16 248:14
**improper** 48:25 59:5 89:8 93:9 94:20 98:8 99:10 188:17 306:17
**improve** 81:10 95:24 104:21 171:10 171:12 172:7 192:24 207:10 208:13 222:10 252:6
**improved** 252:8
**improvement** 104:21 171:13
**improvements** 248:3 248:4 248:4
**improving** 171:15 171:15
**inappropriate** 54:2 212:8 214:23
**in-charge** 249:23
**incidents** 61:8
**include** 103:11 142:19 143:23 176:20 218:24 281:19 308:5
**included** 42:16 55:25 72:2 160:3 222:2 257:19 297:25 303:16
**includes** 303:18
**including** 80:2 85:3 258:16 266:1 300:16
**inclusions** 192:14
**incompetence** 239:23 240:1
**incompetent** 53:22
**incomplete** 101:14
**inconsistent** 151:1
**increasing** 68:20 69:1 70:15 70:19
**increasingly** 80:9
**indeed** 150:21 183:3
**in-depth** 37:20 72:1 102:11 123:4
**Indian** 121:7 122:3 122:6 186:12 186:23
**Indiana** 111:13
**indicates** 34:9
**indirectly** 99:24
**individual** 8:18 49:7 56:16 59:23 69:18 81:15 81:16 105:22 204:3 281:4 285:22 290:10 293:3 293:4 293:5 300:19
**individuals** 44:25 70:7 266:6 282:3 286:14 286:17 291:20 292:2 294:15 294:18
**individuating** 284:16 284:18 285:3 285:8 285:16 285:17 286:15 286:19 287:6 287:12 290:13
**individuation** 285:14 285:15 286:6 287:24
**inducted** 63:23
**industrial** 124:20 214:6 214:14
**ineffective** 249:1 249:3 249:5
**inequities** 174:11
**inflection** 126:24
**influence** 59:3 154:12 228:7 279:23 294:15
**influenced** 89:20 131:1 131:5 146:10 190:20
**inform** 259:5 306:9
**informal** 66:18 66:24 67:7 158:1 169:12
**informally**

67:4 82:11

**information** 10:18 50:6 99:21 107:9 136:22 142:6 143:12 143:23 143:24 148:5 153:8 156:14 158:14 158:15 162:22 164:6 175:3 176:6 177:5 177:10 179:5 179:7 179:8 194:14 194:19 195:5 195:8 228:8 250:4 252:16 253:19 256:6 257:22 273:16 279:24 285:4 285:9 285:10 286:1 286:4 286:8 286:19 286:21 286:23 287:3 290:10 290:13 290:15 295:23 296:2 303:23 308:9 310:3

**informed** 159:9 270:8

**initial** 32:10 103:9 103:15 103:16 286:11 287:18

**initially** 196:7

**input** 24:8 25:3 25:6 25:9 25:12

**inquiry** 107:12

**inserting** 222:14

**insight** 298:7

**insisting** 251:16

**instances** 224:5 249:24

**instead** 146:18 226:7 284:16 285:3 287:19

**Institute** 106:14 107:7 140:13 237:19

**institution** 30:19 58:2 83:10 125:1 225:21 241:17 244:2 258:2 258:11 258:13 258:14 307:20 308:1

**institutional** 59:20 68:23 69:11 69:14 69:20 69:22 70:10 71:23 195:22 214:13 298:19 298:20

**institutions** 69:15 178:8

**instruct** 267:5 267:19 268:4

**instruction** 272:9

**instruments** 78:10

**insulted** 200:13 202:2 206:4

**insulting** 200:14 202:3 206:5

**intend** 245:23 245:23

**intended** 219:21

**intending** 105:15

**intensive** 70:3

**intent** 245:20 245:22

**intentional** 107:17

**interact** 45:1 45:2 87:17 88:8 88:14 89:4 228:8 279:24

**interacted** 37:22

**interacting** 173:25 174:2

**interaction** 43:21 226:24 227:3 227:4

**interactions** 44:7 44:13 46:23 91:16 127:7 158:18 159:5 168:2 182:23 183:9 183:13 183:17 196:20 200:22 240:9 309:18

**interacts** 88:1

**interceding** 178:9

**interest** 62:23 147:1

**interested** 29:18 31:7 42:1 60:24 62:16 68:2 82:10 147:20 155:21

**interesting** 111:22 111:25 165:18 296:25 297:11

**interests** 68:20
**interfacing** 295:5
**intern** 70:2
**internal** 34:10 51:9 65:21 66:1 80:21 96:15 173:10 174:5 265:16
**internist** 35:21 37:22
**internists** 65:22 66:1 265:18
**interpersonal** 42:5 43:21 168:2
**interpersonally** 235:6
**interpret** 83:11 146:18 221:20 222:18
**interpretation** 158:16
**interpretations** 89:17 146:21 298:18
**interpreted** 57:2 148:5 239:9 239:17 242:4 267:23 279:11
**interrupt** 11:13 33:12 48:8 82:19 87:6 162:18 175:12 181:8 252:14
**interrupted** 200:4
**intersect** 297:5
**intersection** 190:1
**intersectionalities** 296:25
**intersectionality** 71:13 295:22 296:10
**intervention** 247:13 247:14 283:7 283:10 287:13
**interview** 83:19 83:24 103:8 103:11 103:16 110:13 123:5 224:10 245:19 282:9
**interviewed** 45:25 149:14 149:16 245:21
**interviewing** 46:2
**interviews** 102:11 102:12 123:4 281:4
**intrigued** 63:3
**intriguing** 300:23
**introduce** 5:11 21:23 110:25
**introduced** 8:6 89:7
**intuitive** 229:23
**invalid** 181:13
**invariably** 65:8 146:9
**invasive** 35:1 47:25 48:13 210:5
**invasiveness** 38:6
**investigation** 181:11
**invited** 63:21 113:5 130:12 211:12 217:13 217:14 217:15 217:19 217:20 217:24 218:5 218:10 218:13 218:15 219:15 220:3 283:8
**inviting** 219:2 253:18 255:11
**invoked** 258:7
**involved** 32:13 37:18 74:15 76:14 76:20 76:21 77:7 77:11 77:13 83:20 84:1 84:8 84:11 84:15 84:19 85:11 85:16 86:15 118:24 161:1 161:2 175:23 180:11 208:5 208:10 237:23 238:5 242:21 251:13 262:18 291:16 298:9
**involvement** 34:8
**involves** 214:21 283:15
**involving** 115:8 118:7 283:12
**IRB** 104:23 115:9 116:14
**irrelevant**

85:6 86:2 142:25

**Isaac** 145:18 234:2

**isn't** 43:9 82:24 167:22 191:19 254:21 260:25 274:14 279:16

**isolation** 223:1

**issue** 51:10 58:22 58:24 59:13 60:25 69:10 78:1 127:8 167:21 202:22 202:24 204:16 227:11 256:3

**issued** 25:20

**issues** 6:18 52:4 59:8 62:17 74:21 76:19 77:17 199:14 204:5 213:4

**it'll** 22:23 23:2 23:6 263:2

**I've** 12:16 15:19 21:17 24:17 24:22 25:8 35:19 35:20 36:14 51:12 55:6 55:7 67:3 67:10 71:10 71:10 91:11 91:13 98:12 98:20 102:3 119:15 131:17 135:20 138:2 157:5 201:14 215:23 218:25 223:14 241:6 245:9 249:6 268:17 272:16 282:13 282:23 302:20 310:10

**Ivy** 221:23

**IX** 61:22 62:4 62:21

J

**jacket** 220:21

**JAMA** 64:2 275:16

**January** 5:4 5:8 182:19 196:12

**jazz** 53:7

**Joaquin** 5:17

**job** 91:17 195:12 196:1 196:4 197:9 216:7 222:14 233:23

**joined** 31:17 87:12

**joke** 56:21 222:6

**jot** 131:11

**journal** 45:9 96:15 145:8 288:24

**journals** 275:17

**judge** 9:25 10:7 92:9 92:17 93:23 94:4 98:23 99:8 168:1 201:22 228:8 228:14 241:21 279:24

**judged** 55:12

**judging** 93:6 93:15

**judgment** 285:11

**judgments** 167:6 168:2

**judicial** 229:22

**jumping** 284:24

**June** 19:12 20:21 24:1 25:4 26:25 28:13 196:13 305:14

**junior** 73:21 217:7

**jury** 9:25 10:8 267:5 267:19

**justified** 154:22

K

**Kaul** 198:11 209:20 237:25 251:1 251:4

**key** 289:23

**Khadijah** 111:10 111:11

**kids** 16:12

**kill** 37:11

**kinds** 58:18 59:19 69:4 86:8 95:4 95:17 97:12 155:19 215:18 221:8 242:1 244:22 249:21 277:18

**Kirsch** 87:24 226:4 226:8 226:9 226:19 238:1

**Kirsch's** 48:6

**knew** 52:1 66:1 68:6 95:1 131:19 150:8 150:8 154:24 157:7 240:9 291:15

**Knight** 106:13 107:7 237:19

**knock** 15:14

**knowledge** 37:2 37:15 37:21 87:2 90:12 97:10 98:13 98:15 113:6 143:1 191:25 223:10 223:13 223:16 223:19 223:23

**known** 86:9 117:12 148:1 166:21 174:12 221:9 296:20

**Koch** 230:9 230:10

**K-O-H-L-E-M-A-I-N-E-N** 96:16

**Kolehmainen** 96:16

L

**lab** 35:24 36:1 37:21 154:22 155:13 173:21 182:24 208:4 208:5 209:13 209:14 210:13 212:22 213:13 213:23 214:4 214:11 214:12 214:15 241:10 241:15 243:19 243:20 244:8 307:16

**lack** 256:7 256:21 280:23

**land** 258:12 298:13

**landscape** 173:8 173:13 174:7

**lane** 81:8

**language** 124:12 126:13 232:9

**large** 32:1 32:11 189:19 200:9 200:20 262:5 264:13 271:9 280:25 290:9

**largely** 247:20 281:17

**largest** 30:20 63:2

**last** 8:11 28:21 31:21 31:23 32:3 34:22 34:25 35:3 35:8 70:13 70:18 229:12 257:13 272:19 278:5

**late** 75:8 75:10 78:10 260:4

**later** 10:13 10:16 14:6 62:12 131:13 182:25 272:2 287:20

**laugh** 130:10

**laughed** 65:8

**Laurie** 126:11

**law** 42:15 125:2 160:3 265:2 265:6 279:6

**LAWC** 108:14

**lawsuit** 68:11 68:14 68:15

**lawyers** 80:24

**layperson** 273:24

**lead** 40:12 98:1 198:14 207:5 228:14 265:22

**leader** 32:10 64:11 85:18 94:6 95:17 95:23 96:3 157:21 159:12 173:14 211:19 212:7 230:2 230:13 230:22 230:24 231:2 231:7 231:22 231:22 232:16 243:16 244:1 248:5 248:14 248:18 249:23

**leaders** 69:4 175:24 178:8 181:3 211:14 227:25 228:3 229:14 234:11 235:6 235:8 235:12 248:23 249:4 249:5 249:5 249:6 249:9 249:11 278:22

**leadership** 68:21 69:2 75:18 90:16 96:19 96:20

98:13 184:23 192:25 193:3 193:7 193:13 195:1 217:9 229:5 233:11 234:4 235:4 240:20 248:12 293:18

**leading** 96:9 97:12 147:17 184:23

**League** 221:23

**learn** 30:2 45:8 86:23

**learned** 176:15 302:1

**learner** 44:11 154:5 155:21 308:18

**learners** 44:11 44:12 44:14 44:23 45:6 45:10 45:12 47:6 47:9 60:8 152:16 152:19 153:17 154:15 155:18 156:4 156:7 176:17 176:23 308:7 308:8

**learning** 59:17 76:8 125:13 257:9 286:13

**least** 30:15 66:16 97:25 101:17 105:8 132:9 133:13 133:13 179:6 293:7 293:11 294:19

**leave** 70:4 71:15

**lecture** 63:22

**lectures** 130:14

**led** 262:15

**legal** 57:16 134:18 154:1 265:8 266:23 267:1 267:11 267:21 268:2 278:11 279:11

**length** 310:6

**lens** 57:20 141:11 142:3 142:4 142:9 239:18 261:15

**lenses** 50:11

**less** 61:4 71:10 71:11 128:22 195:5 235:5 235:8 285:22 295:9 304:25

**lethal** 53:25 213:20

**let's** 22:20 23:14 75:9 115:16 115:16 115:18 115:20 115:23 116:16 116:20 116:22 116:22 116:25 139:1 140:16 189:12 196:11 196:14 217:3 240:23 263:14

**letter** 42:24 227:18 309:15

**letters** 108:10

**level** 32:14 32:14 40:17 41:4 69:17 74:16 74:18 193:17 239:25 268:5

**leveled** 119:22 215:8

**levels** 70:6 95:21

**LGBTQ** 277:21 277:22

**library** 27:3

**life** 10:22 149:12 151:19 157:7 157:10 185:11 262:8 265:22 295:10

**light** 112:17

**lightly** 38:18

**likeable** 233:16 233:19 234:24 235:6 235:9

**likelihood** 44:23 151:11

**likely** 44:25 45:2 46:24 47:5 104:11 105:4 133:13 133:13 159:9 164:23 175:17 215:8 215:19 248:6 281:1 285:22 298:25

**limitation** 145:24

**limitations** 101:22 269:12 269:13 269:19 275:15

**limited** 82:22 146:24 157:18 234:17

**Linda** 282:8
**line** 243:6 244:3 244:4
**linguistic** 107:12 108:14
**linked** 293:16
**lipstick** 130:8
**list** 19:20 19:22 20:6 68:19 119:12 119:16 120:2 120:3 121:15 122:9 136:3 169:7 171:11 240:22 281:5 281:6 296:21 297:23 303:12 303:13 303:15 304:9
**listed** 295:19 300:13 303:23
**listen** 201:8
**listening** 31:16
**lists** 121:18 121:19
**lit** 70:4 132:16
**literally** 149:20
**literature** 27:5 28:15 51:23 52:8 55:7 131:21 143:15 149:15 200:20 200:22 235:10 237:1 277:3 277:15 277:22
**little** 9:12 12:20 15:18 15:20 15:24 21:20 28:6 28:8 30:7 40:22 70:3 72:8 126:23 131:12 131:20 137:21 145:22 171:23 174:1 237:13 240:1 240:21 247:3 271:12 286:5 294:10 300:24
**live** 65:9 86:22
**lived** 9:18
**lives** 223:3
**living** 85:6 156:25 229:18 292:14
**load** 33:17 33:19
**location** 288:5
**lodged** 58:10 58:10 58:15 66:17 82:14 82:16 83:3 249:15
**lodging** 67:5
**logoed** 220:21
**long** 17:22 19:14 26:1 32:5 32:25 32:25 61:19 65:19 101:21 156:18 196:9 263:4 263:8 281:5 281:6 312:21
**longer** 211:12
**long-winded** 159:7 159:10 216:14
**loosely** 118:3 118:4
**loss** 154:14
**lost** 27:12 41:1 154:8 158:18 159:5
**lot** 12:16 40:3 40:24 46:4 55:6 55:16 57:15 62:10 64:24 76:12 78:23 80:8 82:12 84:23 104:21 107:1 125:15 126:7 126:9 146:23 147:7 153:13 170:10 171:8 180:25 201:13 215:20 221:24 234:13 243:8 245:22 262:18 281:15 282:8 285:25 295:22 296:1
**lots** 212:3 212:21 213:1 290:15
**loudly** 7:6
**love** 65:21
**loved** 66:1
**low** 38:20 101:20 200:25 262:7
**lower** 30:18 42:3 43:21 56:2 133:14 133:15
**lowest** 38:15 70:8 173:9 174:5 236:12
**lunch**

137:23 137:25 216:18

**lung** 31:4 31:7

**luxury** 124:7

M

**M.D** 5:2 7:25 30:19 314:5

**Madeline** 126:8

**Madison** 138:4 258:10

**Magazines** 292:24

**major** 29:6 29:9 68:20 179:16 179:20

**majority** 179:7 290:2

**makers** 133:18 195:16

**makeup** 237:7 237:14 237:18

**male** 36:17 36:21 46:15 51:8 51:11 54:9 54:13 54:23 55:11 58:11 61:5 72:6 72:18 72:20 85:17 88:13 88:14 88:15 88:15 89:3 89:3 89:4 89:5 89:17 93:14 100:4 101:7 105:24 106:2 106:10 106:13 106:17 107:6 147:17 147:18 173:9 175:24 183:24 184:3 184:7 184:13 184:20 187:9 187:24 188:8 188:15 208:22 211:24 221:8 224:3 224:13 225:11 227:18 227:25 228:3 230:21 230:25 231:6 231:11 233:15 233:18 234:4 234:19 235:6 235:14 236:19 238:24 239:15 239:20 240:4 240:7 240:13 240:19 240:25 241:9 241:16 241:25 242:6 242:8 242:13 243:1 243:16 245:16 246:6 246:13 248:23 249:10 249:17 249:25 251:18 251:20 255:21 262:7 281:1 292:8 293:17 295:19 295:25 296:3 296:4 296:9 296:15 296:17 296:18 297:6 297:8 298:13 299:1

**male-dominated** 106:24

**males** 232:10 296:3 297:22

**male-typed** 236:14

**man** 56:23 92:23 93:2 129:3 130:7 130:20 132:3 214:25 215:9 226:8 226:10 239:8 239:19 246:15 262:16 262:20 287:20 287:20

**management** 248:24 249:12

**managers** 210:13

**manipulating** 149:21

**manner** 94:9 96:24 239:16

**map** 37:6 37:9 82:17

**mark** 63:8 109:17 139:15

**marked** 21:25 42:12 63:10 63:16 109:19 111:2 135:25 139:16 144:20 144:21 168:20 282:19 303:19

**marking** 24:6 110:25

**Mary** 8:13

**M-A-R-Y** 8:13

**masculine** 68:9

**Master** 29:13

**masters** 63:4

**master's** 123:24 124:4

**match** 289:25 290:4

**material** 131:9 131:11 166:10 177:23 305:4 305:7 305:21 309:23

**materials** 16:20 17:21 20:18 20:20 27:3 28:10 53:9 67:2 108:23 117:17 121:5 130:24 131:4 131:18 135:12 137:1 137:14 141:23 142:24 156:13 160:8 164:11 169:6 250:20 250:25 267:23 268:8 268:15 268:23 269:1 269:20 305:24

**matter** 51:16

**matters** 16:8 192:8 192:8

**maximize** 79:20

**may** 5:21 8:17 10:11 12:4 12:16 14:5 14:23 24:25 25:2 67:3 67:4 79:14 84:12 84:21 86:3 91:3 98:18 99:21 111:16 134:8 139:12 141:20 148:4 158:7 160:15 167:24 179:1 191:7 194:9 199:20 199:20 210:11 222:2 228:25 229:1 231:18 235:2 247:7 264:5 271:25 276:18 286:15 287:21 288:23 291:9 295:9 297:3 304:15 306:7 308:16 310:3 311:4

**maybe** 38:7 38:16 40:6 41:5 67:2 68:18 72:16 72:16 74:4 74:19 79:4 83:13 98:19 101:19 101:20 114:6 138:19 172:5 177:7 182:20 182:25 184:15 189:17 216:24 224:14 225:18 259:12

**Mazarin** 288:6

**MD** 63:1

**mean** 18:11 33:11 33:21 38:2 38:20 39:10 41:8 41:11 41:18 41:24 41:25 42:5 43:14 43:17 44:2 44:14 47:13 47:19 48:4 51:13 51:21 52:21 53:20 55:17 60:14 61:1 62:3 65:22 66:6 67:3 69:1 69:4 69:11 70:10 71:5 74:5 74:13 82:19 86:20 87:20 87:21 88:2 88:23 90:8 90:10 90:17 92:22 99:23 100:11 100:20 101:17 102:5 106:22 108:17 110:18 112:12 113:2 114:7 115:6 122:19 122:22 122:24 123:18 123:19 123:23 125:11 126:6 126:7 126:10 127:21 127:22 130:4 132:13 132:14 133:7 133:22 135:2 146:22 147:10 147:13 147:19 147:20 149:25 153:10 154:14 155:15 156:22 157:11 161:1 162:9 162:9 164:16 164:21 169:19 175:11 177:3 177:7 181:7 182:5 185:20 186:5 188:20

192:4 195:17
195:17
202:24
204:14
205:20
207:14
209:21
211:15
215:12
229:16
234:24
239:19
243:17
244:10
245:22
248:17
249:20 252:2
255:14 256:6
264:24
268:14 275:7
275:14
281:22 282:5
283:23
287:16 292:9
293:7
295:7 298:21
310:18
**meaning** 64:22
122:17 124:4
128:7 166:25
279:5
**meanings**
155:16
**means** 6:3
42:25
46:23
68:22 158:22
164:22
167:10 168:9
266:19
**meant** 268:6

293:19
**measure** 80:14
293:12
294:10 295:7
**measured**
133:23
**measurement**
51:1
**measures**
256:4 256:15
257:4 257:23
294:22 295:1
295:2
**mechanical**
181:3
**mechanics**
27:7
**media** 292:24
**medical**
12:3 29:10
29:20
29:24 30:9
30:14
30:14
33:23 35:5
51:22
51:25 52:9
60:22
60:23
61:10
61:10
61:16
62:15
62:18
63:22
63:23 64:4
65:16
65:23 69:24

70:25
72:18
73:18
79:18
79:23
80:20 81:9
82:2
166:16
192:18
192:18
193:20
200:21
200:25
210:15
280:19
**medically**
38:23
**medications**
10:25 38:23
**medicine**
18:13
18:22
19:15 26:7
26:12
28:22 30:4
31:9 34:10
37:3 45:3
45:6 45:11
48:10 51:9
54:18 55:4
62:17 63:2
63:7 63:25
64:13
64:18
64:21
65:21 66:2
66:11
67:15
68:21
70:22 74:7
75:17

75:18 80:8
96:15 113:10
125:12
125:15
125:21 133:3
136:25 137:5
141:25 142:4
143:18
147:12
147:22
147:24
153:10
153:17
153:24
154:15 156:6
159:23
166:21
173:11
173:17 174:5
186:19 191:3
191:20
212:19
219:13
229:10
234:12
244:23 247:1
248:13
248:22 261:5
261:20 262:3
264:15
265:13
265:16 266:1
266:9 266:12
266:21 267:8
267:10
267:13
267:16 268:1
270:9 270:25
273:21 274:6
274:10
277:18
277:23 278:7



278:13 279:6 280:19 283:20

**mediocre** 95:3 172:9 247:17 248:6 248:9 248:15 248:19

**meet** 98:17 203:12 203:13 211:20

**meeting** 67:17 67:23

**meetings** 109:7 252:18 252:19 252:19 255:12

**meltdown** 215:1 215:7 215:17

**member** 27:1 27:5 71:22 121:2 154:2 218:3 218:4 220:15 220:23 221:11 221:14 309:6

**members** 29:22 45:3 45:5 45:13 45:24 46:3 46:5 46:19 53:13 72:2 74:10 79:18 79:22 80:3 80:19 145:9 217:7 217:19 220:8 265:18 282:6 287:25

**memoranda** 115:10 116:13

**memory** 25:16 66:23 259:2 289:10 304:18

**men** 31:8 51:12 86:21 86:25 87:17 88:7 88:8 88:18 88:24 89:13 89:16 106:25 127:11 130:22 183:9 186:5 186:6 207:2 207:23 207:23 207:24 207:25 208:19 209:7 224:16 225:22 226:5 227:16 228:15 235:1 238:1 243:1 243:11 243:12 249:4 249:6 249:8 292:2 292:21 293:22 294:1 294:2 294:3 296:3 297:1 297:12 297:15 297:18 297:20

**mention** 150:25 163:4 226:5

**mentioned** 8:16 64:8 97:4 107:23 110:21 121:21 130:20 157:23 193:1 246:12 308:24

**mentioning** 120:18

**mentor** 73:20 154:8

**mentored** 73:17

**mentoring** 73:18 111:13

**merely** 239:24

**merit** 56:5

**message** 42:25

**messages** 42:17 160:5 179:17 220:15 292:23 292:25

**messaging** 220:7

**messy** 15:20 16:3

**met** 24:17 24:22 25:8 80:3 97:11 207:10 259:22 262:8

**metaphor** 69:20

**metaphorically** 30:11

**method** 6:12 132:6 150:13 198:24 199:6 199:25 205:14 230:16 242:19 244:15 245:3

**methodology** 45:18 46:18 112:23 117:13 163:19 184:25 201:14 215:24 238:10 255:7 269:4 305:24

**methods** 102:4 102:5 102:6 114:25 115:21 115:22 116:3 116:5 117:1 117:2 117:22 118:1 118:3

118:4 132:13 139:24 211:7 273:15
**meticulousness** 101:10
**Michelle** 290:20 310:6 312:24 312:25
**microaggressions** 246:4
**middle** 51:18
**Midwest** 64:21 64:23 65:5 65:7 65:11 285:1 285:2
**mimic** 147:14 198:5 198:17
**mimicked** 121:4 197:15
**mimics** 249:20 255:25
**mind** 38:16 53:11 128:10 155:4 192:4
**mindful** 149:2 162:19
**mindset** 45:6
**mine** 159:7
**minimize** 23:6
**Mink** 63:17
**Minneapolis** 285:5
**minorities** 71:12 84:16 174:10
**minoritized** 31:11 54:25 71:6 71:8 73:3 192:20 205:9 274:10 287:25
**minority** 71:4 71:7 151:23 265:23 266:7 282:12
**minus** 194:24
**minute** 178:19 263:21
**minutes** 79:4 138:20 178:19 263:6 263:7 263:9 291:1
**miss** 202:23 213:21
**misses** 213:4 213:22 213:24 214:15
**missing** 209:10
**misstate** 98:11 245:9 304:3
**Misstates** 59:4 77:3 93:10 98:7 112:24 126:3 161:21 164:12 180:4 189:6
203:9 204:11 208:6 226:15 232:23 245:5 276:7 308:12
**misunderstanding** 114:6
**mitigate** 151:11 221:5 250:7 287:6
**mitigated** 180:25 188:24 221:17
**Mm-hmm** 35:13 50:8 50:12 100:7 108:20 109:10 135:14 145:14 160:6 169:10 172:25 173:19 181:21 182:2 193:5 196:16 199:24 199:24 219:4 223:17 227:1 228:16 228:19 229:3 229:7 230:8 230:10 230:15 231:13 234:5 234:9 240:24 242:18 247:9 250:11 258:22 273:17 273:22 273:22 274:1
274:4 274:7 284:17 307:24
**mode** 23:5
**model** 81:1 118:17 123:11 296:16
**modest** 125:16 125:18
**modesty** 125:17
**Molly** 5:2 5:10 7:19 7:25 8:12 23:17 67:24 217:1 263:8 311:10 313:2 314:4
**M-O-L-L-Y** 8:12
**moment** 19:25 110:24 128:3 165:17
**money** 97:1
**months** 18:21 182:20 182:25 183:1 183:2 260:17
**morning** 5:23 7:2 8:4 8:5 152:4
**mostly** 32:21 71:21 200:23
**motivated** 189:5 189:10

189:14 189:16 189:23 229:20 246:18
**motivation** 133:22 194:18
**motivations** 133:17 133:20 133:22 194:9
**mount** 220:25 222:1
**mountains** 89:23
**mouth** 62:14
**move** 22:16 22:17 64:21 147:5 158:8 165:24 292:18
**moved** 31:25 256:10 262:15
**movies** 130:10 292:24
**moving** 82:9
**multicenter** 280:25
**multiple** 42:16 45:24 46:19 59:11 75:18 92:3 92:4 93:21 108:5 142:8 160:4 165:4 165:8 173:1 175:15 176:23 248:12 270:16 271:18 278:5 306:1
**multisite** 283:18
**Murti** 120:24
**M-U-R-T-I** 122:4
**muscle** 37:7 37:9
**myself** 7:13 8:7 12:17 50:7 117:11 119:23 124:24 131:11 131:14 131:20 150:19 158:2 191:23 255:10

N

**Nancy** 309:5
**Nancy's** 309:8
**narrative** 304:12
**national** 140:13 166:18
**nationally** 173:13 174:8
**naturally** 118:11 118:13
**nature** 200:7 270:20
**navigating** 261:8
**necessarily** 191:23 199:23
**negative** 87:15 87:18 87:24 88:6 88:11 88:17 88:20 88:22 88:24 89:2 89:7 89:11 90:1 159:14 159:15 206:19 207:10 226:20 231:21 245:25 297:2 297:4 306:1
**negatively** 94:10 173:15 198:21 199:22 205:9 228:1
**negatives** 88:19
**neither** 201:11 272:10
**neutral** 123:16 124:1 125:9 126:1 161:18 286:20 293:21
**nice** 64:12 64:17 64:20 64:23 64:24 65:1 139:25 142:11 144:11 285:2
**night** 203:18 209:5 227:12 257:13
**NIH** 63:5 111:14 150:1 150:1 262:5 280:24
**nobody** 69:21 188:5 188:9 188:12 188:21
**nodding** 11:5 230:25 280:9
**node** 37:12
**noise** 16:12
**non** 73:3 206:4 206:10
**none** 90:8 180:18 255:25
**non-**

**minoritized** 255:20
**nonrenewal** 161:17
**nonverbal** 230:23
**non-white** 266:7 277:9
**nor** 201:11
**normal** 37:12 175:9
**Normally** 9:12
**norms** 52:5 184:7
**Northwestern** 97:18
**Nosek** 288:22
**notch** 190:24
**note** 74:9 131:20 303:15 310:16
**notes** 14:1 42:18 131:10 131:10 131:12 131:14 131:18 132:23 137:2 150:19 150:19 157:24 157:25 158:1 158:4 160:5 174:24 299:4 300:24
**nothing** 7:21 17:11 18:11 19:16 33:5 34:7 107:22 128:9 133:20 160:17
**noticed** 24:16
**notify** 14:14
**notion** 212:14
**novel** 111:16
**nowhere** 141:18 253:21
**NSF** 260:11
**numerous** 176:15
**Nunez-Smith** 281:15
**nurse** 170:11 171:5 200:13 200:15 202:2 202:4 202:11 203:14 206:4 206:6 206:8 209:23 224:11 225:18 225:20 241:24
**nurses** 51:12 60:5 70:2 88:14 88:15 89:3 89:5 200:19 200:22 210:12 249:15 251:17 251:23
**nursing** 114:12 172:5 201:4
**NVivo** 107:14 107:14 107:15 108:15

O

**oath** 5:25 6:6 9:21 9:23 10:2 276:4
**obese** 40:4
**object** 161:9 272:9 272:13 306:15 306:16 306:16 310:9
**objection** 41:21 43:3 44:17 47:1 48:25 52:17 53:1 53:16 55:13 59:4 73:24 75:3 76:3 77:3 78:7 78:15 78:16 80:4 81:19 89:6 91:23 92:11 92:19 95:13 98:24 99:10 112:24 115:2 120:6 126:3 127:13 129:22 134:12 162:3 164:12 166:5 173:6 175:18 175:21 185:5 187:11 188:17 189:6 197:11 198:2 200:3 200:16 202:5 203:6 203:9 204:7 204:11 204:25 205:17 208:6 209:15 210:7 213:10 213:14 222:20 226:12 232:23 235:15 241:2 241:11 244:18 245:5 252:1 256:18 256:24 256:25 259:10 270:3 270:15 271:17 272:22 273:5 275:4 276:7 308:12
**objections** 272:1
**objective** 119:8 276:16 280:23 281:2

**obligation** 80:20 81:17
**observation** 45:20 158:14
**observational** 91:6
**obtain** 26:24 72:17
**obtaining** 273:19
**obvious** 90:18
**obviously** 13:21 17:6 67:22 68:1 107:3 155:19 195:16 269:11
**occupation** 28:19
**occur** 183:10 183:14 183:18 199:17 264:15 275:16 292:10 298:25
**occurred** 92:2 143:3 214:15 267:7
**occurrence** 59:10
**occurrences** 92:1 200:7
**occurring** 118:12 118:13 247:5
**occurs** 267:10
**ocean** 175:23
**o'clock** 310:22
**odd** 58:17 64:16 130:9 130:21 177:25 243:23 244:23 245:2 246:20
**offend** 245:23
**offers** 178:9
**office** 15:19 15:24 31:15
**official** 6:13 45:12
**oftentimes** 38:19 65:4 72:1 81:7
**oh** 13:8 14:25 15:16 22:13 22:14 26:16 27:20 32:5 35:5 49:9 49:11 57:7 61:19 68:13 68:16 114:5 136:2 136:19 138:8 139:23 145:2 145:17 156:15 177:25 185:4 194:15 198:3 208:24 212:23 219:19 222:3 224:19 224:22 225:1 241:14 246:12 257:14 260:16 261:7 261:8 284:3 284:10 284:21 285:2 286:25 290:19 297:20 297:20 300:21 302:23 305:11 309:8
**Ohio** 260:9 285:4
**OHSU** 5:10 8:7 8:17 8:18 10:7 59:16 90:12 91:4 91:7 91:11 91:14 91:17 91:22 92:10 92:18 93:7 93:20 93:22 93:24 95:12 98:5 98:23 99:9 105:24 106:3 106:10 106:17 107:4 107:22 110:19 110:22 115:10 115:12 115:13 116:13 116:14 117:15 118:14 129:18 134:18 134:24 136:17 149:24 151:9 151:25 156:10 169:13 170:21 171:1 172:22 172:22 175:4 175:5 175:7 176:10 176:13 176:20 177:2 177:21 178:1 178:2 178:8 178:15 180:22 182:7 183:9 183:13 183:17 185:21 186:16 188:24 190:12 190:17 190:24 191:8 191:16 193:21 195:4 195:12 196:10 196:15 196:21 196:22

198:15 198:17 212:15 212:17 220:9 220:14 220:21 220:23 221:14 221:20 222:10 222:15 237:5 238:13 245:10 250:4 250:7 255:16 255:24 256:4 256:15 257:5 257:14 257:23 258:21 259:9 259:16 259:18 259:19 278:22 279:3 279:9 301:5 301:7 305:21 306:5 307:5 307:7 307:12 307:21 308:1 308:11 308:18 308:19 309:19 309:23

**OHSURB001524** 304:12

**OHSU's** 164:3 168:14 186:22 194:9 194:11 194:18 237:8 237:15 247:17 257:12 257:17 258:24 302:12

**OHU** 301:5

**okay** 5:18 6:25 9:2 9:5 9:19 11:11 11:18 12:2 12:7 12:17 13:9 13:19 14:7 15:5 15:7 15:19 16:24 17:24 18:20 19:2 19:18 21:5 21:11 21:19 22:13 22:16 22:20 23:8 23:21 23:21 24:3 24:6 24:14 24:20 24:23 25:20 26:2 26:16 26:24 27:6 27:11 27:20 27:23 28:5 28:24 29:4 29:10 32:3 33:13 34:4 35:8 35:16 35:23 36:4 36:7 36:16 37:1 37:5 37:25 39:8 41:7 42:22 43:22 44:6 44:12 47:11 47:13 50:5 50:7 51:16 55:20 56:1 61:15 63:8 64:3 65:15 66:15 68:19 73:22 75:12 77:21 78:3 79:1 79:5 79:7 79:8 83:12 83:17 87:10 91:2 91:6 99:20 100:10 102:20 102:24 103:24 104:7 104:25 107:16 107:23 108:25 109:11 110:6 110:9 110:15 111:15 112:3 112:7 113:18 114:4 115:23 115:24 116:9 116:10 116:20 116:23 116:24 117:5 118:2 121:14 121:20 122:8 125:6 125:23 126:17 127:25 128:16 129:11 131:2 133:6 136:6 136:20 137:21 138:1 138:5 138:8 138:8 138:19 138:25 139:2 140:12 140:16 140:23 141:14 142:10 144:17 146:6 149:4 150:11 152:12 158:6 159:3 162:25 163:2 164:8 165:16 167:5 168:10 168:25 169:4 169:8 169:11 170:7 170:16 177:17 178:18 178:21 179:24 180:12 180:17 181:10 181:20 181:22 182:9 183:25 184:8 185:23 186:7 186:25 187:22 188:3 190:5

190:8 192:9 197:6 197:24 198:3 198:16 199:25 201:14 202:1 202:14 208:1 209:11 209:18 210:10 210:24 215:21 216:13 217:6 219:5 220:19 223:25 224:19 224:22 225:1 225:6 226:1 226:7 228:5 228:13 228:25 231:23 232:12 232:12 233:6 233:9 233:14 234:1 237:3 237:7 238:16 238:20 239:11 242:5 242:11 244:13 245:2 252:22 254:8 254:14 255:20 257:22 258:19 259:4 262:19 262:23 263:19 264:18 265:2 266:3 267:18 268:24 269:3 272:16 273:23 274:13 275:24 277:10 278:14 280:8 281:11 281:13 283:21 288:13 290:7 290:16 290:24 291:3 293:2 293:23 294:8 295:14 295:24 296:12 297:24 300:4 300:7 301:2 301:18 304:23 307:6 307:25 309:14 310:8 311:12 312:25 313:10 313:20 313:25

**old** 15:23 90:10 286:22 287:20

**ombuds** 77:15

**omit** 276:24 278:1

**ones** 20:11 40:12 40:13 89:12 133:7 144:3 209:17 213:18 213:19 214:4 214:4

**one's** 80:21 101:10 309:8

**ongoing** 208:11

**online** 14:19 111:16 258:15

**ono** 228:13

**open** 22:2 22:8 22:22 22:24 23:3 23:9 28:1 38:8 111:6 191:20 299:20 310:1 310:10

**opened** 22:13

**opening** 151:22

**openly** 146:11

**operate** 83:8 262:2 280:5

**operating** 35:4 45:22 46:3 299:6

**operation** 119:13 120:5

**opined** 98:4

**opinion** 20:20 26:21 42:14 48:10 50:10 78:4 90:12 104:3 113:16 114:19 116:1 141:24 147:21 151:6 166:12 174:15 175:1 176:14 182:14 194:4 207:15 211:6 213:17 214:2 214:18 217:6 222:15 236:23 247:19 248:12 254:23 255:3 268:20 269:14 269:14 269:15 269:17 269:21 269:24 270:2 270:7 270:8 270:11 270:12 270:21 270:21 270:22 270:23 271:3 271:14 273:1 273:1 273:2 273:3 273:4 273:8 273:8 273:9 273:9 273:9 273:24 274:14 274:15

274:17 274:23 275:15 275:17 275:18 275:20 276:11 291:23 293:4 298:7 306:13 307:8 307:21 308:10 309:19

**opinions** 20:21 25:2 25:7 25:10 25:13 28:13 91:8 93:21 97:7 97:22 112:21 132:7 207:1 207:2 207:22 207:23 208:16 208:19 208:22 209:8 209:25 210:13 212:13 217:8 257:19 305:14

**opportunities** 266:9 266:10 266:11 266:20 267:15 282:2

**opportunity** 10:12 303:10

**opposite** 229:1

**oranges** 162:10 270:19

**order** 121:9 154:1 286:1 286:8 313:15 313:18

**orders** 313:12

**Oregon** 5:15 12:15 135:17

**organization** 69:17 140:14 173:2 173:3 211:16

**organizational** 59:9 211:16

**organizations** 260:7

**oriented** 51:24 94:7 96:11 171:14 261:12

**original** 313:15

**originally** 144:10

**othering** 221:17

**otherize** 221:5 222:2

**otherized** 219:12 219:15

**otherizing** 219:25 220:5 221:1

**others** 36:21 57:6 71:15 91:16 121:22 142:22 143:8 153:23 154:20 157:12 157:13 200:2 221:11 221:19 222:16 222:18 277:13 287:23 288:22 294:13 309:18

**otherwise** 33:7 39:22 39:23 39:24 40:8 309:9

**outcome** 206:21

**outcomes** 133:21

**outline** 283:1

**outlined** 18:2 18:5

**outside** 105:10 105:22 138:6 172:22 173:2 175:5 196:22 301:5 309:2

**overall** 153:12 292:3

**overcoming** 288:1

**overreaction** 253:16

**override** 37:12 229:23

**overt** 62:11

**oxygen** 70:5

P

**p.m** 139:8 139:11 178:22 178:25 263:25 264:4 291:4 291:8 314:2 314:5

**page** 18:2 100:2 140:18 181:16 181:20 193:2 206:24 210:18 218:24 220:6 223:2 223:25 228:5 229:25 230:4 233:14 233:17 236:9 238:21 246:8 247:16 249:14 250:6 251:7 253:1 253:3 254:10 257:17 264:8 264:9 278:4 278:18 279:19 279:21 280:11 281:5

291:11 297:25

**pages** 210:18 227:21 238:16

**paid** 61:4 236:11

**pan** 15:15

**pandemic** 9:18

**panel** 150:1

**paper** 96:8 109:25 110:5 126:9 140:18 145:23 207:19 215:15 265:19 288:23

**papers** 16:22 17:12 18:22 18:23 18:25 69:14 86:12 107:14 108:13 119:15 120:24 120:25 150:21 201:1 219:18 223:14 299:24 311:4 311:7 311:11 311:14 311:18 311:19

**paradigms** 146:7

**paragraph** 151:22

**paragraphs** 142:8

**parcel** 89:12

**parenthetical** 218:25

**parentheticals** 219:17

**parrot** 201:15

**participants** 101:4 103:4 230:23 247:8 289:8 289:9 289:22 296:23

**participate** 68:16 80:1 148:10

**particular** 45:17 67:13 69:8 69:10 132:14 218:10 274:5 281:25 283:14 295:9

**particularly** 29:18 96:6 137:4 151:15 184:5 184:22 185:14 235:4 240:19 285:9

**parties** 152:10

**party** 68:11

276:22

**passed** 62:21 261:21

**passing** 14:1

**past** 114:11 130:25 131:5 133:17 134:2 134:3 158:13 158:20

**pasted** 282:23

**pathologists** 72:3

**patient** 32:4 33:16 33:18 34:2 36:3 39:11 48:16 53:22 55:24 76:8 77:23 78:6 78:20 78:22 79:20 82:15 104:22 114:13 171:15 172:7 206:20 213:4 220:11 251:15 252:6 252:8 252:12 287:19

**patients** 32:5 32:8 32:15 32:19 37:18 37:19 38:21 56:4 109:9

**Patricia** 86:10 282:24

**Patricia's** 283:3 283:22 283:24

**patronizing** 212:5 243:15 244:14 244:17

**Patsy** 63:17

**pattern** 199:9 261:6

**pay** 61:2 61:14 178:11 266:10

**paying** 305:6

**PDF** 21:6 21:8

**PDFs** 42:16 160:4 311:4 313:3 313:8

**peer** 81:8 105:5

**penalty** 7:18 10:3

**pending** 165:15

**Penn** 193:20 194:1 194:25 197:16 198:18 221:3 221:15 221:21 222:4 247:22 253:11 305:7

**Penn's** 193:22 194:11

**Pennsylvania** 157:20

166:16 176:18 176:24 177:6 177:8 177:15 198:5 220:20 302:3 302:8 302:9 302:14 305:13 306:2 307:10 308:1 308:4

**people** 13:25 27:14 29:21 30:25 31:1 31:2 31:4 31:5 38:21 39:22 40:1 42:2 43:24 44:21 44:25 45:11 46:25 47:4 47:12 49:8 50:10 54:20 56:4 56:13 56:14 57:5 58:4 64:17 64:24 65:1 65:5 65:6 65:9 65:10 65:10 65:23 68:6 76:15 77:15 77:15 77:16 81:9 82:3 84:23 86:3 86:23 89:20 90:10 93:2 103:7 110:19 124:16 124:22 125:20 126:11 126:12 126:20 127:10 129:3 129:12 130:10 130:12 148:14 148:18 149:16 153:15 155:13 156:3 160:20 162:8 168:3 175:4 175:23 176:9 179:9 179:12 179:19 181:14 186:12 186:23 196:22 209:23 228:9 228:21 228:25 230:20 230:22 231:15 242:2 245:23 247:3 252:3 252:5 258:3 259:19 260:23 261:1 261:22 279:25 284:23 286:15 286:16 288:21 292:18 294:11 295:3 296:20 297:11 297:23 301:4

**people's** 94:12 277:12 288:20

**Peplau** 85:4 119:18 179:19 296:22 297:16 297:16

**perceive** 50:11 167:25 168:4 188:6 188:13 286:15

**perceived** 188:2 239:16 249:16 250:1 252:4 252:4 252:5

**perceives** 51:4

**percent** 30:13 38:7 38:11 38:12 38:16 39:1 39:3 39:6 39:18 40:6 85:16 100:25 173:9 173:11 173:12 174:6 184:13 184:19 189:9 189:15 189:18 189:19 268:11 268:14 270:13 271:15 276:6 290:3 293:7 293:9 293:11 293:15 293:15 293:19

**percentage** 30:16 30:17 173:10 174:5 183:8 183:12 183:16 189:1 189:3 189:13 189:20 189:21 189:22 190:6 190:7 236:12 280:20

**perception** 56:24 188:21 188:22 188:23 280:22

**perceptions** 89:19 277:12

**perfect** 101:21 213:3 314:1

**perfectly** 226:25 249:18 250:2 272:9

**perform** 184:20

239:24

**performance** 81:18 106:16 107:6 120:20 122:1 195:12 196:1 196:4 196:8

**performed** 34:22 34:25

**performing** 40:19 41:6 48:1 48:14 118:6

**perhaps** 45:11 103:10 253:24 253:25 279:4

**period** 183:1 256:3 256:14

**perjury** 7:18 10:3

**perpetuation** 244:11

**person** 7:8 9:12 12:20 17:9 21:20 27:13 39:22 39:25 40:8 53:22 58:4 86:15 103:11 129:4 140:17 148:16 149:6 149:6 165:23 166:22 173:5 180:21 188:7 203:13 203:13 209:5 284:11 285:4 295:4 307:15

**personal** 68:7 141:10 150:5 262:5 263:15 269:24 270:7 270:21 270:22

**personally** 36:15 68:6 74:16 127:7 171:13

**persons** 84:1 84:8 84:11 84:15 84:19 85:11 160:12 161:25 190:15 190:16 193:7 237:23 238:5 259:15 291:16

**person's** 157:2 157:7 228:9 279:25 293:2

**perspective** 58:24 68:3 153:19 153:20 156:7

**perspectives** 146:10

**pervasive** 90:12

**Peter** 24:14 26:10

**pets** 16:12

**phenomena** 238:17

**phenomenon** 31:1 118:13 118:20 146:25 148:19

**phone** 13:5 15:10

**phones** 13:2

**phrase** 122:19 246:9 254:10 268:6 278:21 279:13 279:15

**phrased** 25:12

**phrases** 123:7

**physician** 32:22 33:25 37:16 41:16 41:17 41:18 42:10 44:6 44:12 46:17 46:22 48:12 53:15 56:7 56:9 57:22 69:19 71:16 72:9 75:25 76:23 81:3 81:4 81:16 82:13 82:17 124:5 124:18 200:15 202:3 203:2 206:5 210:16 239:21 239:25 241:15 241:16 242:1 249:15 264:12

**physicians** 33:8 40:19 40:22 41:5 41:10 41:11 54:10 54:14 54:22 55:11 56:2 58:10 58:11 68:9 70:15 72:5 72:21 73:3 80:11 80:23 81:1 81:17 82:15 83:2 83:7 88:13 88:15 89:3 89:5 96:9 105:24 106:3 106:10 106:10 106:13 106:17 106:17 121:1 122:3 122:6 153:25 162:12 186:3 186:10 186:16

187:10 187:25 200:23 211:25 224:13 227:19 240:13 240:25 241:10 242:8 255:21 260:1 265:23 277:9 278:7 280:12 280:16 282:12

**physician's** 198:21 205:9

**Physicians** 265:14 265:17

**physician-scientist** 33:8 41:25 62:23 132:10 163:8

**PI** 262:7

**pick** 143:15 144:2 292:22

**picked** 143:18 298:13

**picture** 153:21

**pictures** 289:24 289:25 290:4

**piece** 26:7 107:12 174:18

**pieces** 142:21 165:3 275:16 275:17 275:18 275:20

**piles** 16:4

**piling** 219:1

**pioneer** 283:23

**pipeline** 30:12

**PIs** 281:1 281:1

**placebo** 101:5

**placed** 193:3 282:13

**placing** 90:14 205:21

**plaintiff** 5:14 300:16

**plan** 74:12 74:21

**planned** 9:13

**plant** 72:2

**play** 90:18 147:22

**played** 49:21 134:11 144:6 191:7 272:21

**players** 62:7 298:9

**playing** 231:16

**pleasant** 243:21 244:2

**please** 5:11 7:5 7:7 7:16 7:24 8:9 8:10 9:15 10:17 12:7 13:7 17:12 20:15 22:4 34:5 49:19 79:9 87:9 123:14 131:3 134:7 139:7 178:21 190:4 201:7 249:24 256:24 263:24 265:5 272:19 291:3 310:24 311:20

**pleased** 26:3 26:4 26:6 26:8 26:10 198:12

**plus** 178:4 194:23

**point** 10:7 12:9 22:10 53:10 207:20 219:7 219:21 221:2 262:7

**pointed** 49:4 158:21

**points** 129:5 219:16 219:20 219:20

**polarity** 296:8

**policed** 243:12

**policies** 258:15 258:24

**policing** 107:1 215:20 242:17 242:21 242:23 243:8 243:21 298:24

**policy** 69:17 70:10

**polite** 127:3

**Pololi** 282:8 282:8

**pool** 166:18

**poorly** 60:2 60:5 60:8

**population** 29:21 31:4 31:6 148:9

**populations** 29:18 30:25

**portion** 141:6 142:10 146:3 224:17 224:21

**Portland** 12:15

**position** 28:21 31:25 92:9 154:11 155:22 157:2 157:15 170:1 184:23 192:5 193:7 193:13 195:1 195:11 195:25 200:25

211:18 227:16 240:20 245:16
**positions** 70:16 75:18 90:16
**positive** 89:12 89:13 152:23 153:5 191:15 193:24 227:10 230:25 236:1 244:6
**positives** 88:19
**possess** 293:20
**possession** 311:19
**possible** 15:12 15:14 89:19 89:22 118:9 141:19 148:21 191:15 191:17 198:20 205:8
**possibly** 16:14
**post-doc** 145:19
**posted** 21:22
**posting** 168:11 168:13
**potential** 59:3 287:13
**potentially** 38:22 47:22 53:25 297:4
**power** 12:22 13:7
**powerful** 90:16 173:14 184:6
**powerhouse** 284:4
**practice** 32:24 33:2 33:19 33:21 33:25 34:1 48:18 81:4 154:1 208:12 208:13 285:3
**practiced** 210:4 210:5
**practices** 59:15 207:2 207:22 208:11 208:17 208:23 208:24 209:1 210:14 214:17
**practicing** 48:11 122:6 154:10 157:22 229:21
**praise** 228:2
**praised** 234:4
234:7
**preconceptions** 141:20
**predict** 144:7
**predictable** 179:16
**predicted** 151:13 169:25 184:4 236:13 256:1 279:18
**predominantly** 227:25
**prejudice** 86:13 284:14
**prejudiced** 66:13
**prejudices** 294:12
**prejudicial** 287:9
**premed** 29:9
**preparation** 18:9 18:16 18:24
**prepare** 16:16 119:12 120:2 120:3 120:9 121:15
**prepared** 276:15 304:10 310:17
**preparing** 83:18 227:7 276:20
**present** 6:7
15:17 53:14 227:2 227:4 243:20 276:21 294:19
**presentation** 276:17 286:1
**pressure** 23:16 94:7
**prestigious** 236:11
**presumptive** 6:19
**presumptuous** 40:22
**pretty** 9:17 15:23 16:22 25:19 32:2 38:10 66:10 71:20 131:23 138:12 143:18 153:4 157:14 179:16 179:18 179:22 183:3 191:14 196:8 254:21 277:7 278:13 282:4 293:7
**prevailing** 207:1 207:22 208:17 208:23 208:24 209:1
**prevalence**

281:22
**prevalent** 186:17 186:18 294:11
**prevent** 10:22 114:17 134:25 136:21 152:1 214:16 250:7
**preview** 28:1
**previous** 59:8 95:2
**previously** 150:4 205:24 216:1 296:13
**primary** 267:9
**principle** 85:20 230:16 238:10 242:19 244:15 245:3
**principles** 29:19 30:1 30:3 59:20 114:25 115:21 115:21 116:3 116:5 116:25 117:1 117:8 117:9 211:6 255:6 273:14
**printers** 13:1
**prior** 19:11 234:4 235:14 307:9
**privileged** 26:15
**probability** 148:8 268:5 268:13
**probably** 23:5 28:3 38:7 45:20 46:14 69:7 69:15 71:19 72:12 76:21 77:16 88:1 99:24 104:13 112:13 128:23 147:11 152:11 156:24 165:9 180:21 189:18 193:18 194:2 231:4 238:7 246:20 275:14 277:21 277:23 277:25 288:16 295:10 304:19 311:14
**probe** 103:10
**problem** 41:3 139:23 177:7 241:16 241:17 241:19
**problematic** 309:17
**problems** 182:24
**procedural** 35:17 35:22 185:14
**proceduralist** 34:17 47:25 48:13
**procedure** 35:1 35:9 35:9 36:12 38:1 39:19 40:18 41:5 41:12 43:2 43:16 44:4 48:2 48:14 48:17 48:20 51:17 51:18 52:12 52:24 53:5 53:14 53:23 203:20 225:9 227:9 231:25 233:7
**procedures** 35:12 35:20 40:20 41:6 41:20 44:16 209:14 209:18 210:5 247:25 252:19
**proceed** 7:24 79:14 139:12 179:1 264:5 291:9
**process** 82:16 144:16 150:16 150:22 151:10 175:8 228:8 251:3 251:13 256:10 267:21 271:2 271:24 279:24
**processes** 80:1 86:8 86:9 90:13 130:17 168:1 199:11 208:5 251:15 252:6 252:11 252:20 257:10 292:10
**produced** 42:20
**producing** 310:11
**product** 180:9 180:15 198:22 199:23 202:20 203:4 204:23 205:10 206:13
**production** 302:12
**profession** 57:16 79:18 79:23

80:20 81:9 236:19 268:3

**professional** 7:13 12:3 41:17 41:19 42:23 44:3 44:7 44:13 44:15 46:22 74:12 80:3 80:7 81:3 81:18 82:1 83:1 83:7 83:15 91:21 92:17 93:7 98:6 98:22 99:7 99:14 151:19 185:10 259:24 260:13 260:21 261:3 261:13 262:3 265:17 265:22

**professionalism** 54:15 54:16 54:19 54:22 55:1 55:4 55:12 73:8 73:23 75:2 75:6 80:15 80:22

**professionally** 8:12 43:13 43:15 43:24 44:2 45:2 46:24 94:16 95:11

**professionals** 82:3

**professions** 81:2

**professor** 28:22 30:19 216:14 285:7 286:21

**professorial** 216:7

**professors** 30:17 31:12 70:1 74:8

**proffered** 274:16

**program** 32:9 32:12 32:15 95:3 95:25 107:11 107:13 107:16 108:18 108:19 108:22 157:22 166:19 172:9 172:12 190:22 190:24 193:22 197:15 197:15 198:5 198:15 198:18 208:10 222:7 247:17 248:3 248:6 248:15 248:19 260:10 260:11 260:16 283:7

**programmatic** 32:13

**programs** 32:7 198:13

**project** 112:10

**projects** 104:21

**pro-male** 229:5

**promote** 273:20

**promotion** 71:17 72:10 280:24

**pronoun** 67:20

**proper** 188:24

**protected** 258:3

**protections** 114:17

**protocol** 109:7 112:8 165:20 210:14

**protocols** 118:6 118:8 208:5 209:13

**provide** 10:5 10:17 19:11 19:20 26:20 78:22 102:13 112:10 113:11 113:15 116:1 142:6 142:7 151:6 157:6 158:13 162:21 177:11 210:19 214:2 220:10 224:1 224:3 231:15 244:5 270:19 276:16 298:6 307:20

**provided** 11:20 17:19 17:22 19:8 20:19 22:19 25:17 28:11 112:22 135:12 135:15 142:5 143:5 143:6 143:22 152:14 156:16 160:1 164:1 164:6 170:23 175:2 176:5 220:8 252:17 261:14 266:12 266:13 299:18 300:13 300:14 300:15 301:9 302:12

302:16 303:12 303:13 310:2

**provides** 102:7 147:6 158:16 264:25

**providing** 113:4 115:25 173:21 269:25 270:2 270:7 270:8 270:11 270:12 271:3 273:24

**provost** 69:6

**PSN** 82:15

**psychiatry** 28:22 64:12

**psychologists** 124:20

**psychology** 108:13 288:24

**public** 66:12 139:25 250:9 258:2 258:10 258:14 258:15

**publication** 105:6 110:7

**publications** 20:4 269:8

**publicly** 258:20

**publish** 72:16 76:15

**published** 96:8 97:2 104:11 111:16 129:19 132:4 132:5 132:15 133:16 147:24 151:19 184:15 260:9 275:1 284:14 288:7 288:23

**pull** 17:4 46:1 46:10 46:16 96:25 97:16 123:6 147:9 267:8 313:3

**pulled** 16:19 17:17 17:21 17:25 120:23 131:14 224:8 245:13 311:13

**pulmonology** 35:18

**pure** 40:8 192:4 192:10

**purpose** 91:7 105:11 118:25 254:5

**purposes** 105:5 105:8 196:14 306:12

**push** 54:19 289:23

**pushing** 191:3 270:19

**puts** 56:21 210:16

**putting** 53:24 109:16 130:20 139:14 155:5 221:24

Q

**qualification** 213:25 213:25

**qualified** 213:17

**qualitative** 46:2 46:9 96:22 102:4 102:5 102:6 102:10 102:15 102:18 103:3 103:7 103:9 103:22 104:9 104:10 108:17 110:17 117:20 118:16 120:23 122:3 122:5 122:11 122:13 123:3 140:2 140:7 141:8 141:11 141:23 142:23 144:14 145:8 145:19 146:3 146:7 146:16 146:22 146:23 146:23 147:5 147:5 147:8 147:9 147:21 147:23 148:2 148:4 148:5 148:12 148:17 149:1 149:18 234:15 234:16 235:12 235:18 235:20 236:6 247:11 281:4 281:7 281:9 281:12 281:17 281:20

**quality** 104:20 104:22 133:15 140:1 222:11

**quantitative** 102:8 102:14 146:19 247:12

**question** 8:25 10:13 10:15 11:20 11:25 19:24 30:5 30:6 33:15

41:1 42:10 42:22 43:7 47:6 47:10 47:16 48:9 49:19 51:2 55:21 57:10 57:17 72:8 76:17 77:20 77:21 83:5 90:20 98:1 98:20 100:21 101:16 101:25 102:3 105:13 118:21 119:25 123:22 124:6 134:7 143:21 148:22 159:2 159:4 161:10 165:14 165:14 171:23 177:4 177:11 180:13 187:21 194:7 195:15 195:24 196:14 199:19 201:7 201:8 201:25 205:13 209:11 216:3 222:16 232:24 237:13 238:4 239:3 240:21 241:6 249:10 256:13 256:14 271:13 271:22 272:3 272:19 279:12 289:6 293:23 296:13 305:10 306:3 306:7 306:16 309:14

**questionable** 101:15

**questioning** 234:11

**questions** 11:2 11:15 11:19 11:24 12:6 24:25 36:9 90:4 103:5 141:2 149:17 158:7 162:20 163:1 181:9 201:18 201:21 206:2 216:2 231:10 263:16 280:4 281:17 281:19 284:2 291:15 300:8 301:17 301:20 304:14 304:24 309:25

**quick** 7:3 7:4 177:9

**quickly** 158:8 289:23 290:3 292:22

**quiet** 41:14 94:25 224:25 225:10 225:13

**quite** 26:11 32:8 38:21 46:4 102:8 106:24 132:19 153:1 215:20 219:11 220:4 234:16 236:6 243:8 268:10

**quote** 51:14 64:8 218:25

**quoted** 121:6 201:1

**quotes** 102:12 147:9

R

**race** 56:18 59:23 69:9 71:13 106:4 113:9 131:1 131:6 134:23 136:17 141:25 143:3 151:8 160:13 160:17 160:25 161:1 162:1 164:20 164:22 165:7 177:1 181:25 182:6 182:15 183:17 188:11 189:10 190:1 193:19 194:3 205:16 223:4 254:22 255:2 255:4 260:2 264:11 266:24 267:20 268:9 268:19 269:16 270:14 271:10 271:16 274:19 274:25 276:5 276:12 277:11 287:18 287:20 287:21 291:15 295:22 298:8

**races** 237:22 238:4

**racial** 60:16 70:20 71:3 71:11 73:4 84:16 119:14 120:5 126:25 151:3 151:23 162:13 174:10 189:23 193:11 205:10 205:25 206:13 223:12 223:23 261:16 262:2 266:7 267:6 274:9 282:11

287:22 292:21

**racially** 84:20

**racism** 84:24

**racist** 245:24

**raise** 7:16 301:19

**raised** 61:5 73:6 73:12

**raises** 56:5

**random** 148:14

**randomization** 144:16

**randomized** 100:13 100:23 101:3 117:11 147:1 246:25 283:9

**range** 295:6

**rank** 194:11 194:12 280:21

**rankings** 194:15 194:15 194:17

**rarely** 165:6

**rate** 29:24 70:8 101:20 167:5 167:11 167:12 167:13 168:6 168:7

**rated** 56:2

**rather** 32:1 199:12 212:5 216:2 219:1 221:17 222:5 251:15 252:10 284:24

**ratings** 152:25 152:25 153:1

**rationale** 200:10

**raw** 304:13

**reach** 125:3 132:7 242:20 245:3

**reached** 93:20 137:14 241:21

**reaching** 215:25

**react** 129:4 198:20 199:22 205:8 227:18

**reacted** 226:8 226:10

**reacting** 88:16

**reaction** 198:22 200:24 205:10 246:15

**reactions** 36:21 198:25 199:7 200:1 205:15

**reading** 50:9 126:7 130:24 131:4 131:9 131:11 164:21 177:24 310:5

**ready** 203:20

**reaffirm** 119:23 292:25

**real** 7:2 40:12 175:17 263:19 287:1

**realize** 50:15 62:20 181:2 312:6

**realized** 65:24

**realizing** 54:20

**really** 11:24 18:11 19:16 23:20 26:6 33:24 45:5 46:16 49:6 49:11 50:3 56:25 62:11 62:22 63:3 66:9 67:24 68:4 100:22 128:9 138:12 147:14 148:23 154:4 154:8 154:15 168:3 171:13 172:17 175:11 178:4 178:11 178:16 180:22 192:6 195:15 220:4 224:9 227:10 236:7 261:11 261:11 261:21 285:11 310:18 313:8

**realm** 76:13 76:14 101:6 271:1

**reason** 135:3 178:10 186:16 194:25 231:15

**reasonable** 226:25

**reasoning** 142:15 229:22

**reasons** 62:16 161:17 284:6 308:17

**recall** 16:21 25:14 40:12 42:19 46:6 46:12 61:13 61:15 73:14 74:2 135:15 152:20 152:21 152:24 153:2 164:2

170:8 171:3 172:18 175:2 196:9 207:3 210:22 218:9 218:11 236:5 253:7 300:19 300:21 305:1 306:18 306:20

**recalling** 175:6 182:24

**receive** 29:6 58:18 75:21 123:23 228:2 243:19 304:8 304:10 304:15 310:1

**received** 25:3 29:10 29:13 96:17 123:15 123:25 156:9 196:18 196:24 248:6 248:16 250:20 251:1 259:9 259:15 259:19 273:18 299:19 302:2 302:7 309:16

**receives** 59:1 203:2 308:4

**receiving** 74:19 154:17 202:14 202:17 204:18

206:10 244:6 307:6

**recent** 20:3 299:24

**recently** 28:11 54:17

**recess** 79:11 139:9 178:23 264:2 291:6

**recognize** 53:8 135:9 136:2 201:3 247:4

**recognized** 287:13

**recognizing** 155:18 216:11 227:11 229:21 252:17 261:16 276:2

**recollection** 20:8 217:21 217:22 218:4

**recommend** 195:20 246:17 287:16

**recommendation** 108:11 141:4

**recommendations** 74:23 171:22 196:6 250:8 253:9

**recommended** 95:4 133:14 260:20 260:22

**record** 5:7 5:25 6:14 7:4 7:11 8:10 11:10 13:13 16:13 31:14 36:10 49:21 79:10 79:12 121:14 134:11 136:8 137:11 139:8 139:10 142:21 144:18 161:4 178:14 178:22 178:24 182:12 216:23 226:16 264:1 264:3 272:1 272:21 291:5 291:7 302:11 303:5 313:12 314:3

**recorded** 6:11

**records** 107:17 107:25 112:8 143:21 163:25 166:3 305:1 310:12

**recount** 167:3

**recruited** 40:11 40:16 95:6 166:17 222:7

**recruitment** 211:13 217:11 218:13 218:16 218:19 218:22 219:3 220:3 253:18

**recycled** 158:5

**red** 58:20

**redirected** 262:9

**reduce** 285:12 285:17

**reduced** 27:15

**reduction** 283:11

**refer** 8:17 30:8 37:19 39:18 45:17 100:3 215:15 215:16 217:11 246:9 292:15

**reference** 18:2 26:25 99:13

**references** 28:12

**referred** 16:20

16:22 19:21 67:21 123:3 225:4 225:8 229:19 242:16 243:7 261:22 295:15 306:22 306:24

**referring** 17:24 19:4 30:9 49:23 49:25 67:18 97:20 166:24 182:13 182:22 207:24 216:1 224:18 238:22 253:19 254:10 264:22 265:11 265:12 292:16

**reflect** 11:10 123:17 124:2 126:25

**reflected** 137:7 245:12

**reflection** 153:12

**Reflective** 109:6

**reflects** 196:24

**refresh** 25:16 66:22

**refreshed** 16:21

**refreshing** 20:7

**refusal** 48:6

**regard** 232:1

**regarding** 24:9 26:21 123:13

**regardless** 155:24 188:7 188:9 188:11 188:11 236:20 236:25 237:3 238:11 260:1 293:2 293:4 293:25

**regrouped** 123:8

**regularly** 37:13

**regulation** 80:2

**reinforce** 282:10 286:4 286:7 286:23 287:3 287:9 290:14

**reinforced** 180:10 180:13 220:15

**reinforcement** 244:6

**reinforcing** 158:23 222:6

**related** 17:3 17:21 25:4 31:1 33:10 36:2 37:3 55:1 73:8 75:21 123:20 143:21 145:24 175:3 192:17 192:17 204:5 212:22 222:16 231:17 258:24 281:7

**relationship** 200:19 310:19

**relationships** 66:9

**relative** 152:25

**relatively** 38:20 80:13 234:18 292:19 296:10

**relentless** 181:25 182:15 183:4 264:10 270:1 270:14 271:16 274:19 276:5

**relevant** 33:4 34:5 42:10 46:9 47:15 47:22 61:11 62:9 86:4 99:21 99:24 99:25 105:20 106:21 107:3 107:21 122:16 131:13 131:15 132:25 133:1 144:3 144:4 144:5 147:10 149:19 150:19 159:24 163:13 166:10 176:24 179:7 225:20 231:5 231:8 235:1 253:25 276:18 276:21 299:8 306:25 307:1 307:7 307:10 307:13 307:17 308:9 309:18

**reliable** 85:19 85:20 94:16 105:15 112:23 113:18 114:25 115:21 115:21 116:2 116:25 117:1 117:9 117:21 163:19 198:24 199:6 199:25 211:6 230:16

238:10 242:19 244:15 245:3 255:6 260:25 273:14

**reliance** 285:18

**relied** 28:13 99:8 100:16 122:9 215:24 225:16 231:18 299:13 299:22

**relies** 280:17 280:18

**reluctant** 155:3

**rely** 20:11 97:22 98:3 103:25 104:2 120:13 120:14 152:14 257:16 280:16 285:23 299:9 299:23 305:8 305:12 310:15

**relying** 146:17 158:19 159:5 184:25

**remarks** 226:20

**remediation** 80:2

**remember** 10:14 29:2 29:8 61:21 64:11 66:21 67:5 69:7 134:21 135:6 136:4 156:23 159:11 159:14 159:16 165:2 165:3 165:10 165:12 165:12 170:13 170:15 171:7 177:24 178:1 178:4 237:12 245:22 259:8 275:8 289:15 300:22 302:6 302:25 304:21 304:23 305:4 305:5 305:7 305:7 305:18 305:22 306:9 307:3 308:16 308:20 308:20 309:1 309:2 309:4 309:5

**remembered** 253:24 306:22 309:10

**remembering** 136:14 159:8

**remind** 221:15

**reminded** 67:13

**reminding** 222:8

**remote** 5:1 6:3 7:11 7:12 12:18 21:20

**remotely** 9:11 9:15

**render** 141:24

**renew** 190:16 193:8 195:6 195:13 196:2

**renewal** 290:8

**renewals** 106:9 106:12

**renewed** 114:20 135:2 160:14 162:2

**renounce** 84:24

**repairing** 38:3 38:14 39:2

**repeated** 199:2 199:11

**repeatedly** 94:14 98:5 107:14 212:23 222:12 298:22

**repeating** 255:10

**repetitive** 158:7 200:7

**repetitiveness** 199:10

**rephrase** 43:8 84:9

**replicate** 92:3 233:3

**replicated** 121:13 207:19

**replicates** 162:11 230:2 230:13 231:24 232:17

**report** 7:8 18:3 18:6 19:1 19:12 20:21 22:10 24:1 24:12 25:4 25:10 25:13 25:21 25:23 26:4 26:25 27:9 28:14 31:21 39:18 42:12 49:24 50:9 50:21 50:22 56:10 83:19 85:3 94:15 96:2 98:5 99:6 100:2 100:2 108:6 135:8 135:10

141:18 142:14 142:20 143:23 145:13 150:25 151:23 152:3 158:3 158:22 160:1 162:23 162:24 163:3 163:3 174:9 175:15 181:16 181:18 182:14 186:2 193:2 193:12 201:10 206:24 208:16 210:19 217:11 218:24 220:6 223:2 223:25 224:18 224:21 227:21 229:6 232:13 233:17 236:9 238:16 239:4 239:11 242:16 246:8 247:16 249:14 251:7 253:22 254:24 254:25 257:20 258:20 261:1 264:9 264:9 264:24 264:24 265:11 266:17 268:15 274:2 276:15 276:20 277:16 278:4 278:14 279:19 279:21 280:11 280:16 291:11 297:25 299:9 299:13 300:12 300:22 304:18 304:20 305:15 306:13 310:17 310:19

**reported** 7:13 142:14 167:23 168:5 175:24 186:8 190:11 252:4

**reporter** 5:20 6:7 6:24 7:1 7:2 7:3 7:14 7:23 11:6 49:20 78:14 78:18 109:12 109:18 134:10 135:22 135:24 145:5 145:15 168:16 168:18 250:13 256:23 257:2 272:20 282:15 282:18 284:19 290:22 303:1 310:7 313:12 313:14 313:17

**reporting** 142:13 165:25 180:21 181:15 186:4 212:10 253:21 281:8

**reports** 74:20 75:21 146:3 155:13

**represent** 5:12 8:16 196:19 302:10

**representing** 42:16 160:3

**reprimanded** 80:16

**request** 12:10 12:10 17:8 152:12 153:2 166:2 279:8 299:15

**requested** 221:3 227:12 262:25

**requesting** 224:24 225:13 311:18

**required** 116:1 118:22

**requires** 40:24 40:25 184:20

**re-read** 16:18 187:21

**re-review** 18:8

**rescind** 155:7

**research** 12:4 26:5 27:5 32:6 37:2 42:6 51:7 51:22 52:10 57:16 62:25 67:11 68:5 68:20 72:4 76:14 76:16 76:17 78:23 82:11 84:23 85:2 87:21 88:3 92:22 93:13 94:5 94:8 94:24 95:16 95:23 96:7 96:19 97:10 98:2 98:13 98:16 99:23 100:21 101:14 101:16 102:3 102:10

102:16 103:1 103:4 103:7 103:9 103:20 103:22 103:24 104:8 104:9 104:11 104:15 104:16 104:18 104:24 105:2 105:4 105:9 105:11 105:13 105:15 107:13 107:20 110:9 110:17 110:19 110:21 110:22 111:24 112:1 112:10 112:17 112:18 112:19 113:13 113:19 114:15 115:7 116:11 116:18 116:19 116:20 116:23 118:7 118:7 118:12 118:16 118:18 119:1 119:4 119:23 120:23 123:12 123:13 123:20 123:20 124:6 124:9 125:1 126:7 126:12 126:15 127:24 128:12 129:6 129:9 129:10 130:3 130:14 132:11 132:24 132:25 133:1 134:2 137:4 137:6 141:9 141:11 141:23 142:3 142:24 143:1 143:2 143:6 143:8 144:8 145:23 146:7 146:8 146:17 146:19 147:21 148:2 148:4 148:12 148:17 148:22 148:25 149:17 149:18 150:13 150:20 150:20 151:14 159:1 159:21 160:18 162:11 163:13 163:23 164:21 174:25 185:9 186:15 187:1 191:9 191:17 191:25 192:2 192:3 192:7 192:12 193:25 200:9 205:21 206:21 207:15 207:15 214:13 215:14 219:18 227:24 228:5 228:11 229:16 231:14 240:17 242:14 245:10 245:12 245:13 247:11 249:21 250:5 256:1 256:2 258:23 262:9 264:14 267:24 268:16 268:17 269:12 269:18 271:1 271:4 271:9 273:19 276:17 276:21 276:25 277:23 279:18 279:22 280:12 281:8 281:22 288:3 288:13 288:18 289:3 292:1 292:5 294:17 299:19

**researcher** 101:22 129:1 129:3 141:4 141:9 144:12 145:20 146:8 146:11 148:4 148:25 214:2

**researchers** 102:19 109:6 115:22 118:5 119:6 121:18 121:19 146:6 146:17 146:20

**researcher's** 146:10

**resident** 44:9 170:13 171:5

**residents** 32:23 33:23 51:9 51:11 73:20 75:22 96:23 203:17 287:17

**resistance** 207:10 247:25 252:8

**resourced** 112:15

**resources**

118:22 121:20 259:21

**respect** 45:12 45:13 105:18 133:18 134:3 205:14 254:17 259:1 266:20 267:15 274:8 291:22 308:10

**respectful** 19:3 47:4 47:5 79:24 82:20 137:17 138:2

**respectfully** 45:1

**respects** 105:25 106:4 167:21

**respond** 56:10 57:23 228:9 279:25

**respondent** 142:13

**responding** 251:10 279:8

**response** 47:17 101:20 202:5 298:20

**responses** 298:20

**responsible** 53:23 209:24

**responsive** 200:4 202:6

**rest** 289:12

**restate** 170:18 233:16

**result** 72:25 73:3 298:17

**resulting** 50:23

**results** 101:23 101:25 102:8 105:15 128:12 170:4 201:16 231:17 289:7

**resurge** 298:23

**resuscitation** 96:9

**retention** 192:18 192:20 262:18

**retired** 31:24 32:16

**retreat** 171:9 212:25 253:10

**retrieve** 27:7

**return** 94:4

**review** 17:14 19:10 19:11 28:15 42:11 42:14 74:7 74:8 74:15 81:3 81:6 81:8 91:10 91:15 105:5 112:8 112:16 113:8 118:7 119:15 119:21 121:5 126:9 132:17 133:9 137:13 143:15 152:8 163:23 164:25 166:3 172:20 172:24 177:6 177:10 177:14 177:17 177:23 196:18 207:5 208:22 235:12 237:1 257:16 268:25 269:21 277:4 277:15 277:22 277:24 288:9 300:25 301:13 301:15 304:15 305:24 307:3 307:4 310:15

**reviewed** 16:20 17:17 17:20 28:24 96:18 109:2 119:11 123:19 131:17 132:17 132:22 135:11 136:16 136:20 137:2 149:15 152:5 159:17 159:21 160:2 160:14 164:16 164:19 169:5 169:9 178:4 190:25 196:24 239:17 245:12 268:16 268:23 269:15 269:19 272:2 274:24 275:11 276:2 301:9 302:8 305:1

**reviewing** 42:19 101:13 132:21 150:23 156:12 157:24 163:24 164:3 169:5 177:22 211:10 211:11 211:11 211:13 300:21 305:4

**reviews** 27:4 53:9

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

106:16 108:10 132:16 154:18 307:7 307:9
**rhythms** 40:14
**ribbon** 21:4
**rights** 272:10
**righty** 303:3
**rigor** 101:10 102:22 102:22
**rigorous** 100:3 100:10 100:10 100:12 102:8 305:23
**rigorously** 100:16
**risk** 29:17 30:24 31:6 31:8 38:2 38:10 38:13 38:13 38:15 38:17 38:20 39:9 39:11 39:17 39:20 40:5 40:8 40:17 41:4 48:16
**role** 42:9 66:7 75:17 141:4 163:11 163:16 183:24

191:23 192:11 193:4 243:22 267:4 267:18 267:22 267:22 268:2 293:17 293:18
**roles** 142:1 231:16 235:4 248:13 296:3
**room** 12:13 13:25 14:2 14:8 14:10 15:15 17:9 17:10 35:4 35:9 35:9 41:14 46:3 56:4 68:7 70:3 78:11 87:7 299:6
**rooms** 45:22 231:25 233:7
**root** 81:14 203:15 206:15
**routinely** 108:5 219:16 246:23
**rude** 44:21 45:23 56:7 56:11 56:11 56:14 56:20 56:22 56:23 57:5 57:19 72:21 129:1

129:2 187:13 187:15 188:2 188:6 188:8 188:13
**rudely** 187:9 187:24
**Rudeness** 57:11
**Rudman** 126:11
**rules** 9:9 9:17 12:19
**run** 201:20
**ruptured** 38:3
**Rutgers** 126:11

S

**Sabine** 230:9 230:10
**safe** 138:16 220:10 229:11
**safety** 82:15 213:4 253:21
**sake** 57:17
**salaries** 258:16
**salary** 61:5 133:14
**sample** 148:7 148:7 148:8 148:14
**satisfaction** 55:25
**save** 22:12

22:21 22:23 23:9 139:21
**saw** 53:7 56:12 68:5 68:5 107:13 108:4 137:3 178:10 222:17 225:22 243:8 245:11 306:11
**scale** 38:2 38:7 39:2 39:7 39:9 39:16 39:24 40:5
**Scandinavian** 285:6
**schematic** 50:2
**scheme** 174:25
**scholarship** 67:11 72:4
**school** 30:15 61:16 62:18 66:11 69:24 72:19 166:17 191:12 193:20 200:21 221:23 283:15
**Schultz** 87:7
**science** 29:13 33:10 37:2

68:22 124:11 133:3 261:20

**Sciences** 5:16 71:25

**scientific** 68:3 85:20 112:23 119:7 214:2 260:25 270:2 270:12 270:13 271:2 271:4 271:15 273:4 274:23

**scientist** 42:10 46:17 72:15 85:24 94:16 95:9 95:15 97:1 124:6 124:18 163:7 163:14 211:5 273:12 274:20 274:22 274:23 308:3

**scientists** 68:9 124:21 124:22 163:9 163:16 273:14

**scope** 163:1

**score** 288:8

**scores** 288:12 288:25

**screen** 16:5 20:25 22:16 23:4 23:5 27:15 28:3 63:13 63:15 64:3 139:24 144:24 168:15 168:23 219:1 224:18 239:6 281:6 289:22

**screenshare** 22:5 110:2 181:17 295:14

**screenshared** 22:14

**screensharing** 42:13

**script** 232:22

**scripted** 230:21

**scripts** 231:12 231:15

**scroll** 140:5

**scrutiny** 81:18 170:4 298:23

**sea** 176:1 291:25

**search** 128:21 131:21

**searched** 55:7

**second** 109:15 135:16 164:2 168:14 201:23 226:3 279:3 291:10 304:1 304:4

**second-hand** 159:6

**section** 242:16

**sector** 106:23 121:25 153:16

**seeing** 32:15 32:19 37:18 175:16

**seek** 24:8 262:1 276:16 276:20

**seeking** 154:19 178:7

**seem** 130:9 158:7 175:21 253:24

**seemed** 65:22 65:25 101:14 128:6 157:13 207:18 241:23 243:22 244:3 244:23

**seems** 98:11 246:20 270:18

**seen** 20:19 25:23 29:24 32:5 51:12 70:7 70:8 76:18 108:13 148:20 164:9 249:4 249:6 261:6 298:21 301:3

**segment** 154:3

**select** 148:10

**selected** 27:8 28:14

**selectively** 286:3 286:23

**self** 80:1 186:4 281:8

**self-assessment** 81:7

**self-evaluation** 81:1

**self-regulation** 229:20 246:18

**self-report** 281:3

**self-reporting** 280:16 280:17

**send** 20:12 39:13 46:10 152:21 211:19 243:24 243:25 311:20 313:5 313:7

**sending** 244:5 245:20

**sends** 22:11

**senior** 20:5

217:8

**sense** 154:6 155:2 173:23 213:3 306:14

**sensitive** 229:8

**sent** 18:6 18:10 18:21 20:2 20:9 20:10 42:15 131:9 152:5 152:24 156:24 160:2 245:16 300:1 302:5

**sentence** 114:2 135:10

**separate** 12:13 49:14 49:15 49:17 50:5 120:9 177:3

**separately** 83:11

**September** 20:2

**series** 69:14

**seriously** 147:25 157:5 157:8

**serve** 85:9

**served** 71:24 149:25 150:9

**services** 173:21

260:20

**servicing** 173:22

**serving** 115:17

**session** 300:25

**setting** 45:25 51:24 52:9 77:1 90:15 90:19 101:2 127:24 154:11 159:25 160:23 193:18 197:1 233:13 234:20 250:5 307:15

**settings** 107:21 107:24 118:14 133:11 144:9 149:21

**setup** 15:13

**seven** 6:20 234:15

**Seventy** 293:9 293:10

**several** 98:12 140:6 305:3

**sex** 56:9 57:22 60:11 100:14 127:12 131:1 136:17 160:13 162:1 181:25 182:6

182:15 183:9 183:13 264:11 267:20 268:9 268:19 269:16 270:14 271:16 274:19 274:25 276:5 276:13

**sexism** 62:11 62:11 84:24

**sexist** 61:17 62:1 245:24

**shaking** 11:5 11:8 231:3

**share** 26:1 62:14 63:12 111:7 116:13 139:22 144:24 168:15 200:24 299:15

**shared** 252:16

**shares** 66:8

**sharing** 23:4 28:3 63:15 115:10

**Sharon** 150:1 150:2 300:23

**she'd** 261:21

**She'll** 154:12

154:13

**Shelley** 106:21 121:23 215:15

**she's** 94:25 121:9 157:22 166:20 170:2 207:17 221:14 221:15 222:9 241:16 243:18 261:21 283:4 283:23 283:23 284:4 284:4 284:4 284:10 286:25 286:25 308:11 309:6 311:10

**shift** 295:11 297:9

**shirt** 221:13 221:15

**short** 33:14 83:17 137:22 137:24 263:2 263:20 292:19

**shorten** 138:24

**shorthand** 36:13

**showed** 85:16 86:11 144:10

160:20 170:3 170:24 224:9 245:14 260:11 279:17 297:16

**showing** 51:23 75:8 75:10 78:10 78:23 84:23 95:16 95:23 137:4 144:5 227:24 277:8

**shown** 50:10 162:12 194:6 292:1 292:17

**shows** 49:6 94:8 154:7 170:4 207:15 228:6 279:22 292:5 294:10 294:17

**Shults** 87:12

**sic** 96:16

**sided** 251:8

**sign** 249:23

**signal** 119:13 120:4 220:22

**significantly** 234:12 284:9

**similar** 85:15 96:11 140:9 140:10 179:18 179:22 226:10 227:16 242:4 243:11 246:6 249:17 275:21 296:12 309:14

**similarly** 15:7 70:18 107:5

**simple** 33:15 175:22 176:2

**simply** 18:11 44:1 112:16 181:1 181:4 255:19 267:8 279:7 279:8 279:12 292:14 295:12 305:4

**simulation** 97:18

**single** 118:21 144:1 199:10

**sinoatrial** 37:12

**sit** 81:9 294:25

**site** 236:6

**sites** 236:8

**sitting** 17:10

**situation** 49:11 52:2 53:21 55:23 58:5 59:13 92:3 92:24 94:6 96:3 110:23 112:19 117:15 128:13 129:18 137:8 137:8 147:13 147:14 179:5 207:18 246:13 258:7 260:5 287:5

**situational** 57:6 158:24

**situations** 13:24 95:17 96:11 96:21 97:13

**six** 182:20 182:25 260:17 310:7

**size** 148:7 148:7

**skilled** 239:22 239:25

**skin** 296:6

**skins** 296:7

**slice** 69:8 69:10

**slight** 221:21 222:19

**slightly** 293:22

**slowly** 7:6

**small** 15:18 64:11 229:25 230:11 230:20 231:6 232:15 235:18 235:20 299:11

**smaller** 189:18

**smartest** 65:23

**smoked** 31:6 70:1

**smoking** 69:19 69:23 70:7 70:8 70:12

**smooth** 252:11

**snap** 285:11

**snowballed** 189:16

**snowed** 57:7

**snowing** 138:6

**Snowmageddon** 138:5

**so-and-so** 147:16

**social** 37:2 124:20 292:24 295:9

**societal** 85:1 87:2 88:18 90:11 90:15 179:17

**society** 63:24 68:8 69:21 70:6 85:7 86:22 223:3 223:19 223:23 229:18 296:2

**socioeconomic** 288:15

**sociolinguist** 124:10 124:11

**sociolinguistic** 215:14

**sociolinguistics** 124:5

**sociolinguists** 124:19

**sociology** 201:12

**soft** 121:8

**soften** 253:11

**softening** 255:18

**softer** 220:2 243:4

**software** 107:12 107:25 110:16

**solely** 225:16

**somebody** 42:1 44:1 56:22 75:7 80:15 97:12 102:10 130:5 165:25 166:14 170:2 171:20 181:2 192:5 203:18 203:19 210:11 211:18 212:6 212:9 217:18 221:1 221:1 244:24 261:18 270:7 270:24 284:25 285:1 294:24

**somebody's** 158:16 159:6

**somehow** 186:17

**someone** 50:24 51:4 51:4 87:4 87:15 88:6 88:11 89:2 198:20 199:21 205:8 214:1 243:18 244:8 262:1 286:12

**someplace** 17:13 226:19

**somewhat** 287:4

**sorry** 6:17 12:22 19:2 26:16 30:22 33:11 36:24 41:1 48:8 49:17 60:13 87:5 87:6 87:10 89:14 91:12 91:13 109:12 112:3 113:21 113:21 113:22 113:24 122:12 135:6 136:4 136:15 139:22 140:17 143:19 145:15 155:14 170:17 181:7 194:7 198:3 199:18 233:16 246:10 250:13 252:14 256:23 265:5 280:9 284:3 284:3 284:19 289:5 298:3 301:12 302:18 302:21 302:23 305:10 305:11

**sort** 52:3 58:5 58:6 63:5 71:6 71:23 104:3 105:3 107:24 108:22 169:19 191:10 203:15 219:11 222:5 243:5 246:16 262:6 281:7 284:24 297:1 298:7

**sound** 138:16 138:22 274:22 296:12

**sounds** 29:5 40:16 139:4 263:23 279:6

**sources** 170:7 173:2 269:3

**South** 289:11

**sparked** 62:22

**speak** 7:5 10:12 13:21 40:21 91:12 149:24

**speaking** 7:9 52:9 192:25

**speaks** 264:21

**specialist** 214:1

**specialties** 66:10 186:10 280:21

**specialty** 35:17 35:22

**specific** 8:24 25:7 25:10 41:1 48:9 55:8 55:17 55:19 75:6 75:13 76:6 76:7 90:4 162:20 163:3 163:15 181:8 201:18 215:18 224:12 234:20 237:5

250:3 251:19 255:6 257:10 261:10 307:16

**specifically** 9:1 40:11 40:21 41:8 46:1 97:21 97:24 99:25 120:25 121:7 122:5 148:18 162:23 165:10 174:14 224:11 225:22 256:8 259:8 261:18 274:8 277:4 279:14 283:20 309:2 309:4

**spectrum** 38:6 45:4

**speculate** 125:24 197:25 226:7

**speculating** 197:16 197:22 197:23

**speculation** 53:17 53:20 55:14 127:10 127:15 127:20 127:22 127:23 128:1 128:5 128:7 128:8 128:10 128:14 128:17 128:21 128:23 129:12 129:15 197:12

**speculative** 54:3 128:23

**speech** 126:22 126:24

**speed** 293:13

**spell** 8:9

**spelling** 312:25

**spend** 156:12

**spent** 6:17 6:17 55:6 201:9 201:10

**spoke** 67:19 126:23 143:19 145:22

**spoken** 126:25 127:3 188:15

**spontaneously** 241:24

**stack** 17:12

**staff** 44:24 45:8 45:24 48:7 48:19 53:13 56:8 75:23 107:6 147:4 153:14 169:17 171:4 172:4 172:5 172:5 172:12 172:13 203:21 209:3 209:22 209:23 211:24 214:20 224:25 243:19 248:7 248:16 253:17 309:18

**staffs** 252:12

**stage** 51:17

**stake** 157:7 157:10

**stand** 49:20 79:9 134:10 139:7 178:21 263:25 272:20 291:3 296:17

**standard** 48:17 48:18 80:12 81:22 82:24 95:22 108:4 108:7 108:15 110:17 146:2 247:25

**standards** 54:10 54:14 55:12 55:24 80:3 80:7 82:2 82:4 83:1 83:7 83:15 92:16 93:6 93:22 94:3 94:17 95:3 95:10 97:3 97:6 97:8 98:4 98:21 99:7 247:18

**Stanford** 121:24

**stark** 220:4

**start** 9:10 128:21 147:3 147:4

**started** 30:20 108:12 131:8 148:11 182:20 189:17 231:9

**starting** 62:14

**state** 5:12 8:9 9:1 185:1 207:21 224:23 238:24 249:14 251:7 256:24 260:9 264:9 278:4 279:19 279:21

**stated** 20:21 93:21 94:14 152:4 155:10 212:23

230:18 238:14 272:23

**statement** 7:4 17:7 64:25 65:7 65:15 65:17 121:11 125:10 125:10 141:15 187:14 198:10 212:8 217:18 226:19 237:10 245:14 257:8 257:15 264:25 265:15 265:23 306:9

**statements** 42:3 59:16 61:17 62:5 120:22 121:11 123:16 123:17 124:1 124:1 126:1 126:13 143:9 160:16 164:17 189:9 189:15 194:9 212:20 221:8 225:15

**states** 272:1 292:17

**stating** 234:14

**statistical** 106:6

**stature** 155:22 155:24 194:11 243:16 243:18 244:25

**status** 58:7 155:25 194:2 194:5 200:25 264:11 288:15 296:5 296:7 296:10

**stay** 272:10 312:24

**steeped** 124:11

**stepping** 252:10

**steps** 136:15 136:21 136:23 188:24 254:17

**stereotype** 125:18 130:19 159:11 159:16 243:7 286:24 287:4 290:1 290:5 295:13 297:10

**stereotypes** 49:8 49:15 50:21 57:20 84:12 84:20 85:1 85:4 85:7 85:17 86:2 86:23 87:3 88:13 88:17 88:18 88:21 88:22 88:24 89:2 89:3 89:11 89:13 119:17 119:20 126:10 126:14 158:23 159:9 168:3 179:21 184:4 184:21 223:4 223:10 223:12 223:15 228:14 243:1 243:2 246:21 285:19 286:13 287:7 287:22 292:11 292:14 292:20 293:1 293:13 294:14 294:18 296:20 296:21 296:24 297:5 297:6 297:12 297:21 298:17

**stereotypic** 54:21 56:17 130:19 159:13 179:17

**stereotypically** 297:2

**Steve** 5:13 23:18 135:6 152:17 156:24 290:16 300:2 301:11

**stick** 189:12 305:21 306:5

**stimulate** 104:5

**stipulate** 6:16 7:11 29:3 35:19

**stipulating** 6:2 6:6 6:11

**stipulations** 5:19 5:24

**stop** 33:1 33:16 221:3 253:11

**stopping** 70:7

**straighten** 16:2

**strategies** 192:23 284:22 287:25

**strategy** 237:6

**Straus** 165:21 165:22 165:23

**street** 148:13

270:8

**strength** 179:12 179:14 179:23 293:12 295:7

**stressful** 96:10

**stronger** 294:12

**strongly** 236:14 293:16

**struck** 64:16

**stuck** 309:7

**student** 35:5 44:10 62:15 64:4 65:16 65:25 112:15 301:5 303:17 303:19

**students** 29:25 30:9 30:14 44:7 44:8 45:1 60:8 63:22 69:25 73:16 73:19 192:18 283:15

**studied** 19:15 61:20 85:25 97:18 261:25 270:24

**studies** 17:20 17:25 17:25 18:2 18:5 18:7 19:8 19:11 19:20 19:23 20:9 26:24 27:8 27:8 28:12 29:20 36:16 36:20 45:21 46:1 47:15 47:20 50:10 51:8 91:7 92:4 92:25 93:14 93:18 94:5 96:2 97:16 97:20 100:16 102:4 102:14 105:20 105:21 107:2 108:5 117:12 117:14 117:20 117:24 119:4 119:19 120:10 120:10 120:11 120:13 120:15 120:15 122:9 122:10 122:15 123:3 127:12 129:11 129:15 129:17 131:12 131:14 131:15 131:19 131:24 132:4 132:6 132:14 132:17 132:18 133:5 133:10 133:10 133:17 133:24 140:2 140:7 143:16 143:17 143:18 144:14 144:15 146:23 146:24 147:8 147:9 147:11 147:16 149:1 149:20 156:13 159:22 159:25 160:19 162:22 162:23 186:22 192:2 194:6 201:15 201:16 215:16 215:23 215:24 216:4 231:5 231:11 234:16 247:11 273:20 277:4 277:6 277:17 277:18 277:19 277:20 278:1 278:5 278:10 280:15 281:3 281:4 281:25 282:6 282:7 310:2 310:14 310:17 313:4

**studying** 30:16 30:20 60:24 128:18 283:17

**study's** 101:25

**stuff** 16:4 149:14 153:13 283:4 299:12 306:5

**style** 51:22 52:7 96:20 97:15 98:19 156:2 222:4 243:4 248:25 249:2 249:12 252:10 253:12 253:13 255:18 287:1

**styles** 58:20 249:22

**Sub** 239:14

**subject** 174:10 193:11

**subjected** 61:16 66:18 66:24 67:9 71:19 72:12

151:2 182:6 270:1

**subjective** 48:21 48:24 49:12 51:1 56:11 57:11 57:19 187:14 280:22

**subjectivity** 50:24

**submissive** 121:9

**submitted** 16:19 64:2

**subordinate** 155:22 211:18 293:17

**subordinates** 46:25 47:10 47:11 47:12 47:21 251:8

**subsequent** 177:18

**subsequently** 297:17

**subspecialist** 261:5

**subspecialties** 37:3 66:11

**subspecialty** 173:10 174:4 174:4 236:11

**substantial** 143:5

**succeeding** 31:8 31:11

**successful** 32:6 260:7 273:19 283:19

**sued** 68:13

**suggest** 89:24 187:2 191:9 284:23

**suggested** 171:19 198:17

**suggestion** 243:2

**suggestions** 26:21 171:12 171:14 207:8 207:9 207:12 214:3

**suing** 135:3 136:17

**suit** 136:25

**suite** 153:15 230:1 230:12 232:1 232:6 232:10 232:16 233:7

**summarizes** 50:4

**summary** 171:10

**superiors** 46:23 47:4 47:21 153:23

**supervise** 209:4

**supervised** 33:23 33:24

**supervising** 32:23

**supervisor** 58:21 58:25 59:2 59:9 171:20 203:1 203:7 203:12 206:9

**supervisors** 56:8 57:21 58:8 58:14 74:19 75:1 153:14 183:20 184:9 185:1 186:11 187:8 187:23 202:14 202:17 202:19 203:3 204:18 204:20 206:9 206:12 290:9

**supervisory** 32:21 214:23

**supplemental** 18:7

**support** 96:7 126:19 128:22 129:10 131:22 131:24 132:1 143:8 159:19 160:8 161:4 161:7 161:13 163:4 191:17 193:25 199:12 250:9 250:18 250:22 251:5 251:15 265:1 268:18 277:5

**supported** 117:19 129:8 137:3 245:13 264:13 271:8 298:22

**supporting** 119:23 143:5 192:12

**supports** 52:8 52:10 163:10 163:17

**suppose** 88:4 128:20 132:21 220:25 221:6 222:25

**supposed** 33:13 83:17 115:4 163:9 163:16 165:20 165:24 208:11 211:19 221:1 238:17 256:10

**supposedly** 210:20

**suppress** 38:24

**sure** 6:1 9:8 12:8 15:5 15:16 18:19 20:16 25:19 33:18 46:18 54:2 57:13 61:11 62:2 62:8 74:2 83:9 83:9 94:22 105:7 122:14 122:21 123:21 135:18 136:7 136:9 140:21 165:3 181:14 197:5 197:7 202:8 203:17 252:11 256:25 262:20 271:1 277:14 277:17 288:21 290:11 290:14 292:9 299:25 302:17 302:19 302:24 303:7 304:2 304:5 312:16

**surgeon** 34:14 38:3 46:5 47:25 48:13 238:24 239:15 239:22 240:4

**surgeons** 45:23 46:15 66:5 66:13

**surgeries** 35:12 41:20 44:15

**surgery** 34:23 34:24 35:20 38:14 40:18 41:5 43:1 43:15 44:4 48:1 52:12 52:25 53:14 61:17 61:25 64:4 65:17 65:18 65:20 66:3 66:8 66:8 202:23 210:4

**surprise** 292:4

**surprised** 301:8 301:11 302:1 302:4

**survey** 55:25 83:25 84:7 84:10 84:14 84:18 85:5 149:10 149:14 150:12 151:19 185:11 186:5 186:6 265:22 281:3 281:17 282:9

**surveyed** 82:10 230:24

**surveys** 85:6 86:1 86:4 151:14 162:11 280:23 281:10 281:12 281:13 281:14 281:16 281:18 281:21 281:25

**surviving** 29:22

**suspicious** 58:9 58:14 58:17

**swapped** 297:8

**swear** 7:1

**swears** 5:20

**sweater** 253:11

**sweatshirt** 221:25 222:5 222:6 222:8

**sweatshirts** 221:4

**sweeping** 194:8

**Sweitzer** 309:5

**swim** 175:22 291:25

**swimming** 176:1

**switch** 63:6 130:6 130:11

**sworn** 164:9

**synthesize** 102:11

**synthesized** 158:2

**synthesizing** 240:16

**system** 33:7 80:25 95:4 96:4 99:15 99:18 108:25 112:4 151:10 171:15 192:24 203:16 203:25 204:6 209:8 214:11 221:9

**systematic** 131:23 132:15 132:16 132:19 133:9 150:16 150:22 174:21 174:22 178:16 179:4

**systematically** 177:6

**systemic**

204:5

**systems** 58:22 58:24 58:24 59:13 90:1 95:1 95:20 105:1 110:16 119:5 119:7 124:21 199:14 202:22 202:24 204:16 214:6 214:14

T

**table** 17:10 50:2 295:14 295:18 296:2 296:18 297:25

**takers** 290:3

**taking** 6:3 10:25 11:6 128:12 131:10 147:25 150:12 150:12 155:4 174:21 246:13

**talk** 7:7 63:24 81:10 113:22 115:20 148:15 149:6 184:16 184:17 263:14

294:23

**talked** 172:24 225:21 309:11

**talking** 13:1 13:2 40:6 102:9 102:18 207:17 230:3 241:16 253:8 277:19 302:21 307:4 308:2

**talks** 50:21 50:22

**tape** 86:7

**tapped** 77:16

**target** 82:9 245:25 254:19 254:22 255:2 255:4

**targeted** 253:16 254:6 254:20

**task** 51:23 94:7 96:10

**taskbar** 27:19

**taught** 312:14 312:17

**tax** 125:3

**teacher** 154:9

**teachers** 153:1

**teaching** 152:25 153:4 153:10 156:2

166:11

**team** 41:15 45:3 45:5 45:13 46:5 46:20 51:25 78:25 95:17 97:12 109:4 154:2 154:4 154:4 155:2 206:18 206:19 220:9 220:10 220:23 221:11 230:2 230:13 231:6 232:16

**team-based** 111:17

**teams** 78:21 206:22 212:14 212:18

**technical** 6:18 27:13 299:12

**technically** 236:10

**TECHNICIAN** 22:25 23:10 23:13 27:17 27:22 27:25 87:5 87:10

**technology**

9:16

**tend** 94:9 132:8 159:10 282:9 282:10

**tends** 249:3 294:15

**tenure** 62:24 62:24 62:25 71:17 71:23 71:25 72:7 72:10 72:18 196:24 196:25

**tenured** 27:4 63:1

**term** 36:13 47:9 47:10 52:14 52:16 52:21 53:10 71:4 88:16 89:7 115:19 118:3 118:4 120:20 120:22 127:21 154:18 154:19 155:16 166:23 188:23 192:22 202:16 215:4 265:10 265:12 265:19 265:24



266:16 266:18 267:13 267:25 269:9 278:11

**terminated** 71:18 72:11

**termination** 309:15

**terms** 38:17 52:11 52:24 53:8 71:5 99:14 106:24 107:9 119:12 119:22 120:2 120:3 120:14 120:16 121:3 121:4 122:9 122:10 122:11 122:13 143:4 147:25 213:23 215:6 215:17 215:19 234:22 266:8 279:11 282:11 292:10

**terrible** 51:13

**test** 21:12 84:1 84:7 84:10 84:14 84:18 85:10 86:18 119:8 273:15 289:17 289:19 290:3 290:6 293:12 293:14 294:7 294:21

**tested** 283:11

**testified** 8:1 44:1 77:22 86:14 144:11 161:15 167:1 198:4 199:21 223:8 231:10 232:14 259:25 291:17 299:18 306:17 307:2

**testify** 11:2 184:15

**testifying** 9:24 19:7 300:20

**testimony** 7:10 7:12 7:14 7:20 10:6 10:11 10:23 16:18 16:21 19:2 54:6 58:25 59:5 73:13 73:15 77:4 81:25 82:25 83:13 86:1 90:6 90:21 93:5 93:10 98:7 98:11 112:10 112:25 113:11 116:1 122:8 126:4 143:13 157:6 160:11 161:21 161:25 163:24 164:10 164:13 166:24 167:19 177:11 177:13 178:5 179:24 180:4 180:7 180:14 184:8 185:23 189:7 191:1 203:1 203:3 203:10 204:1 204:9 204:12 216:10 217:23 232:24 245:6 259:6 264:20 264:21 264:22 270:20 294:4 301:2 301:7 304:16 307:8 310:4 310:6

**testing** 101:3

**tests** 85:14 86:15 90:25

**text** 42:17 42:25 110:13 160:4 211:10 245:11

**texted** 211:24

**texting** 15:8

**textual** 107:24 107:25 108:8

**textural** 108:22

**thank** 5:22 7:23 8:15 10:20 11:11 13:10 15:25 15:25 20:7 26:17 28:7 28:8 28:17 31:13 34:4 78:17 78:18 79:15 87:10 102:24 109:21 139:13 145:1 168:18 168:19 205:7 253:5 254:12 257:2 264:6 287:10 301:21 310:8 312:5 312:5 312:19 312:20

**Thanks** 310:10

**theme** 123:8

**themes** 102:12 118:16 123:9 123:10 132:18

**themselves**

5:11 151:25

**theory**
119:9 142:16 159:20 160:9 161:5 163:5 163:10 163:17 163:20 285:15 286:15

**there's**
14:2 14:4 15:17 15:20 15:20 15:21 19:22 20:24 39:9 56:21 64:23 64:23 78:23 80:20 84:23 102:5 102:21 102:22 103:15 103:16 104:15 104:18 121:21 126:7 130:18 151:21 162:9 165:14 165:14 181:1 189:25 200:20 200:21 206:19 234:13 235:7 235:10 241:19 249:7 256:21 269:25 277:20 295:6 296:24 310:18 310:18

**they'd** 52:7

**they'll** 37:10 37:11 102:10 102:11

**they're**
38:9 40:4 40:19 48:1 50:15 53:24 56:22 56:23 57:5 57:5 58:5 70:16 83:10 83:16 93:1 93:16 95:20 95:24 102:8 102:22 104:23 105:1 105:2 140:9 140:10 146:25 147:8 154:3 157:16 162:7 162:12 173:25 175:25 187:6 187:7 188:22 203:20 206:16 223:10 228:21 234:24 240:18 247:10 247:11 249:1 261:4 261:8 285:2 286:21 286:21 286:22 289:25

**they've**
148:20 261:6

**third** 61:15
140:1 151:18 226:23 227:15 243:13

**third-year**
64:4 65:16

**Thomas** 207:19

**Thompson** 5:15
5:15 5:18 5:22 6:5 6:10 6:16 6:22 8:3 8:6 13:18 13:20 19:19 19:25 20:15 20:17 20:23 21:2 21:6 21:11 21:16 21:18 22:4 22:9 22:18 23:4 23:18 23:24 26:19 28:2 28:9 31:19 42:7 43:6 45:15 47:7 49:13 49:18 49:22 52:22 53:12 54:5 55:18 59:25 63:8 63:12 63:14 74:17 75:11 76:22 77:9 78:19 79:2 79:8 79:15 79:16 80:18 81:24 82:18 87:9 87:14 89:15 92:5 92:15 93:4 93:17 94:11 95:8 96:1 98:14 99:4 99:16 109:15 109:21 109:22 110:24 111:4 113:14 115:15 120:12 126:16 127:18 130:1 134:6 134:16 135:7 135:20 135:23 136:5 138:15 138:19 138:22 138:25 139:3 139:6 139:13

139:18 140:19 140:23 140:24 144:17 144:23 145:6 145:21 153:6 161:14 161:23 162:14 164:24 166:7 168:11 168:17 168:19 168:22 173:16 176:3 178:18 179:2 180:6 185:16 187:16 188:25 189:11 197:19 200:12 201:2 202:10 203:23 204:8 204:17 205:6 205:23 206:1 206:3 208:14 210:2 210:9 213:12 213:16 216:17 216:21 217:5 222:23 226:22 233:1 235:22 241:7 241:18 245:1 245:18 250:16 252:13 253:3 253:6 254:9 254:14 254:15 257:3 259:13 262:24 263:6 263:12 263:17 263:21 264:6 264:7 270:10 271:11 271:23 272:18 272:24 273:11 275:10 276:14 278:17 278:20 282:13 282:16 282:21 284:5 285:13 290:16 290:21 290:25 291:10 291:13 299:17 300:6 301:21 301:24 302:10 302:18 302:21 303:3 303:9 303:21 304:1 304:3 304:6 306:23 308:21 309:24 310:11 310:21 311:8 311:17 311:24 312:5 312:9 312:14 312:18 312:20 313:14 313:16 313:21

**Thompson's** 22:15

**thoracotomy** 38:9

**thorough** 143:14

**thoughtfully** 86:6

**thousands** 106:23 122:1

**threshold** 42:4 43:19

**threw** 158:3

**throughout** 18:13 186:18 186:18 266:1 266:17 293:24

**throwing** 78:10

**tied** 174:14

**tight** 173:9 184:2

**time-sensitive** 51:23 96:11

**time-specific** 236:6

**tired** 255:11

**tirelessly** 252:7

**title** 61:22 62:4 62:21 136:3 210:11

**today** 6:18 7:3 7:7 8:17 10:6 10:11 10:23 11:19 13:13 14:3 18:9 18:17 18:17 18:24 25:16 126:23 170:8 223:9 228:20 243:20 299:4 300:6 300:20 300:25 304:18 307:2 309:25 310:4 310:24 311:20 312:21

**today's** 313:21 313:22

**tolerance** 239:23 240:1

**tomorrow** 184:15 311:24 312:2 312:7

**tone** 51:3 51:3 51:6 51:10 51:15 51:21 89:24 126:22 126:23 126:24 127:3 127:4

**tones** 51:13
**tool** 111:21
**Tootsie** 130:10
**top** 45:5 46:5 124:8 125:12 166:16 190:22 190:24 191:13 191:14 193:2 193:20 210:17 248:20 278:25 289:5 297:14 297:21
**top-notch** 198:13
**totally** 125:2 190:2 197:23 231:4
**touched** 280:14
**toward** 44:23 44:24 46:4 46:19 74:16 295:11
**towards** 84:4 84:16 87:16 88:7 127:11
**track** 156:17 216:11
**trail** 142:12 142:19 143:5 143:10 143:11
**train** 124:17 124:24
**trained** 166:14 203:17 209:3 230:20
**training** 40:25 51:10 60:22 61:10 80:25 81:5 123:15 123:18 123:22 123:23 123:25 124:3 124:23 125:8 125:25 126:18 126:21 154:12 213:23 215:13 265:8
**transcribed** 7:14 110:13 123:5
**transcript** 7:7 165:1 313:13
**transcripts** 109:7 161:16 164:1
**transformation** 68:23 69:12 69:14 69:16 69:20 69:22 70:11
**transparent** 236:3
**treat** 45:10 45:12 45:13
**treated** 38:22 38:23 89:20 93:16 114:20 129:2 187:9 187:24 188:21 202:23 224:2 227:17 251:20 254:7 255:22 256:5 256:16 257:6 257:24 258:4 258:25 266:8 266:19 267:14 308:11
**treating** 60:2 60:4 60:7
**treatment** 109:8 132:2 190:12 224:6
**treats** 45:5
**trial** 6:14 10:13 101:4
**triangulate** 282:10
**tried** 16:1 17:4 45:8 67:10 117:15 132:15 144:2 156:17 261:9
**triggered** 213:3 213:6
**trouble** 34:6 261:8
**true** 43:18 43:25 45:14 45:24 57:18 87:22 88:2 88:5 104:19 105:7 125:11 138:18 144:2 177:16 179:6 180:21 188:2 188:9 192:4 228:4 233:21 233:25 236:5 236:8 236:22 243:17 267:17 285:25 297:7 306:19
**trumped** 193:18 194:2
**trust** 41:15
**truth** 7:20 7:21 7:21 8:1 9:21 167:24 168:5 180:19
**truthful** 10:6 10:23 167:1
**truthfully** 11:2 167:4
**try** 7:7 16:10

38:23 43:8 57:1 104:21 129:16 132:10 132:13 132:19 148:20 158:7 192:6 261:10 263:19

**trying** 45:7 45:9 47:16 51:2 74:3 77:7 82:23 87:20 87:23 90:1 99:15 148:17 154:25 162:18 170:13 171:24 172:1 172:6 178:6 207:21 208:15 214:16 216:6 216:11 225:9 227:6 242:25 243:23 247:24 248:1 248:2 261:15 274:13 274:14 280:3 295:21 298:12 308:8 309:22

**tucked** 138:16

**TUESDAY** 5:4

**turn** 67:10 95:7 140:17

**turndowns** 72:18

**turned** 15:10 64:1 71:22

**turns** 285:9

**Twenty** 139:2

**twice** 64:1 68:18

**type** 179:10 231:14 246:22 256:11 274:15

**typed** 183:24

**typically** 12:19

U

**U.S** 122:7 179:21 186:18

**UCLA** 85:3

**Uh** 282:25

**Uh-huh** 110:5 282:24

**Uhlmann** 160:19

**umbrella** 282:2

**unable** 72:17 116:12

**unanimous** 277:8

**unaware** 228:6 231:4 278:23 279:22

**unbeknownst** 13:24

**unbiased** 81:22 160:21 198:25 199:7 200:1 205:15 276:16

**unclear** 138:4

**unconscious** 187:6 187:7 228:21 229:1 285:23 286:12

**unconsciously** 58:1 280:5 298:17

**undercut** 95:7

**undergo** 38:18

**undergrad** 201:12

**undergraduate** 73:18

**undermine** 251:11

**undermined** 199:12 211:21 251:9 251:22

**undermines** 214:23

**underrepresented** 70:16 70:20

**understand** 8:20 9:3 9:20 9:23 10:2 10:5 11:1 11:16 11:23 12:5 12:6 18:19 29:20 30:22 30:25 35:10 35:11 35:14 36:11 43:8 77:10 93:18 102:7 114:24 115:19 115:25 125:2 160:24 171:24 172:2 201:13 216:5 241:20 247:6 261:21 273:10 274:2 304:9 307:23 308:8

**understanding** 37:14 37:23 43:5 72:1 72:3 154:10 171:25 190:18 198:7 198:8 306:11

**understood** 11:20 57:12 77:19 102:15 103:13 116:16 261:23 261:24 262:2 265:13 307:22

**undertake** 112:16

**unequal** 282:2
**unfairly** 114:20 114:20 254:7
**unfamiliar** 111:20
**Unh-unh** 35:25 257:21 299:10
**uniformly** 153:5
**unintentional** 50:19 246:2 246:3 246:4
**unintentionally** 298:16
**uniquely** 45:11
**unit** 59:24 70:3 251:14
**United** 292:17
**units** 283:13
**universities** 82:12 149:11
**university** 5:16 27:2 28:23 30:21 31:25 32:12 33:5 33:9 34:6 61:2 63:3 66:7 66:12 85:14 97:19 108:15 111:13 115:13 116:13 116:15 124:7 149:12 157:20 157:21 166:15 166:15 176:17 176:24 177:5 177:8 177:15 177:18 191:12 198:5 198:18 220:20 235:21 258:9 283:12 283:17 289:20 293:16 302:2 302:8 302:9 302:13 305:5 305:12 306:2 307:10 307:25 308:4 308:24 309:3 309:12 309:16
**unless** 116:12 135:5 237:5 303:13
**unlikeable** 233:20 233:22
**unnecessarily** 199:4
**unnoticed** 228:2
**unpack** 30:7
**unpleasant** 244:7
**unprofessional** 42:3 42:4 43:1 43:12 43:19 44:22 47:24 48:2 48:6 48:12 57:5 58:9 58:15 72:22 73:13 75:22 76:1 76:6 77:2 78:5 78:8 91:21
**unprofessionalism** 74:20
**unprofessionally** 43:20
**unthinkable** 70:5
**UPenn** 220:21 222:17 301:6 303:17 303:19
**upfront** 142:6
**upon** 28:13 80:12 81:22 82:2 82:24 83:4 83:6 99:8 118:18 120:14 120:14 215:24 231:18 299:9 299:13 299:22 299:23
**useful** 17:5 128:24 192:3 262:4
**user** 219:19
**usual** 165:20
**usually** 16:3 27:4 67:12 131:16 147:3 289:21 290:2 293:10 293:14 307:14
**UW** 76:19

V

**VA** 31:25 32:2 32:12 32:16
**vaccine** 38:5 38:15 39:5
**vague** 49:1 49:3 52:17 73:24 75:3 76:3 78:17 80:4 81:19 83:10 83:16 89:8 91:23 92:11 94:19 127:13 129:22 134:12 173:6 175:18 187:11 189:7 200:16 252:1 289:10
**valid** 101:11

155:14 181:13 181:14 241:22 251:10 251:25

**validate** 154:21 155:12 155:15

**validity** 153:22 154:19 154:24 155:1 155:3 155:5 155:8 155:17 180:19 307:11

**value** 59:17 257:8

**valued** 221:11

**values** 146:20

**variable** 100:14 133:11 231:19

**variance** 231:16

**variation** 288:12

**variety** 301:3

**various** 50:11 50:13 85:1 123:7 216:4 280:12 280:21 280:21 292:20

**vast** 27:2 290:2

**vendetta** 68:7

**ventricular** 40:1

**verbal** 158:12 158:19 158:22

**verse** 169:3 288:11

**versus** 38:4 125:10 127:11 231:6

**Veterans** 32:9

**via** 6:3 42:24 42:24 42:24 140:20

**vice** 74:5

**victim** 144:6 165:6 188:6 188:13

**victimized** 58:6

**victims** 68:8 151:24 188:1

**video** 6:11 6:13 6:14 11:4 15:14 16:11 91:10 91:15 313:22 313:23

**videoconferencing** 6:12

**videographer** 5:7 5:18 6:12 6:25 79:9 79:12 139:7 139:10 178:21 178:24 263:24 264:3 291:3 291:7 313:11 313:20 313:25

**videographer's** 6:13

**videorecording** 16:9

**VIDEOTAPED** 5:1

**view** 38:17 39:10 39:20 46:25 47:12 142:2 154:20 167:25 184:12 191:23 192:4 192:6 202:22 220:23

**viewed** 45:23 57:19 80:12 125:12 152:19 153:13 153:16 156:2 235:2 235:3 235:13 236:19 247:20 247:24 249:22 266:14 296:4 296:6 297:1

**viewing** 22:15 54:22 56:15 142:9

**Views** 145:9

**violates** 80:16 184:7

**violence** 253:14

**vivid** 219:10

**volumes** 131:9 131:18

**vulnerable** 31:10

W

**waiting** 87:7

**walk** 232:13

**walking** 130:7

**warm** 121:8

**Washington** 289:21

**wasn't** 74:15 92:13 97:24 103:9 112:9 112:15 141:22 156:3 161:1 161:1 165:21 175:7 176:12 178:2 194:7 195:18 199:10 241:15 242:12

269:12 299:13

**watching** 138:2

**wave** 265:22

**waves** 149:13 185:11

**ways** 243:5 251:9 251:22 252:6 264:12

**wear** 130:22 221:14

**wearing** 220:20 220:21 221:3 221:20 222:17 253:11

**wears** 222:4

**weather** 9:14 138:3

**web** 257:17

**website** 138:3 257:8 257:12 258:21 258:23

**welcome** 312:23

**we'll** 31:10 79:5 92:6 92:6 139:3 139:6 225:24 263:21 263:22 311:2 313:9

**well-known** 153:24

**we're** 6:1 6:2 6:10 9:12 9:14 12:20 16:9 21:19 24:6 35:10 40:6 48:4 59:21 71:7 85:5 90:3 136:7 136:8 146:13 158:19 159:5 167:22 173:1 179:17 216:19 222:9 249:7 258:12 280:6 308:2 310:13 310:20 311:10

**West** 65:2 289:8

**western** 29:23

**we've** 13:23 70:8 79:3 125:24 127:6 180:1 189:2 216:24 222:7 228:20 252:3 255:24 280:2 280:4 298:21

**whatever** 108:14 156:23 188:22 195:21 218:2 258:6

**whenever** 124:5

**whereas** 128:11 192:6

**WHEREUPON** 21:25 31:17 49:21 63:10 79:11 87:12 109:19 111:2 134:11 135:25 139:9 139:16 144:21 168:20 178:23 264:2 272:21 282:19 291:6 314:4

**whether** 25:16 41:11 41:11 50:24 51:4 51:17 56:18 56:18 56:19 57:18 66:23 84:9 85:11 91:20 92:9 93:6 114:13 114:16 126:24 129:1 130:25 131:4 132:1 134:22 134:23 134:24 138:4 143:2 151:9 154:21 155:12 156:8 166:12 176:25 180:12 184:1 184:1 188:7 193:16 194:22 195:13 196:2 208:10 210:25 211:8 211:23 212:21 213:18 214:3 241:22 243:10 267:5 267:19 279:3 279:9 289:7 290:7 290:8 291:15 299:14 301:3 301:4 303:5

**White** 54:23 188:8 236:18 238:1 238:2 238:2 238:9 239:8 285:6 292:4 292:8 295:18 295:25 296:6 296:6 296:9 296:17 297:15 297:22 298:13 299:1

**Whites** 87:1

**whole** 7:21 38:5 49:14 65:23 69:13

76:19 92:3 151:11 154:4 154:7 155:2 173:8 173:12 192:14 244:9 251:14 254:23 254:25 264:20 264:20 307:19

**whom** 73:7 155:13

**who's** 34:2 45:4 157:10 173:5

**widely** 108:12 108:17 148:1

**widespread** 18:12 186:15

**wife** 205:3

**willing** 42:2 43:18 97:1

**wind** 298:19

**window** 15:20 22:23

**Windows** 28:1

**Wisconsin** 27:2 28:23 30:21 85:15 108:16 116:15 124:8 149:12 235:21 258:10 283:12 283:17

293:16

**wish** 229:11 229:12

**Witchy** 96:14 97:21

**withdrawn** 178:10

**withstand** 105:5

**witness** 5:21 6:8 7:1 13:25 68:17 89:7 115:17 167:16 167:17 272:19 273:6 273:25 311:18 311:19

**witnessed** 69:21 148:16

**witnesses** 161:17 167:20 175:15

**woman** 30:19 51:13 56:21 61:9 63:1 67:14 93:2 121:8 129:2 147:17 159:12 173:14 173:14 187:14 191:16 191:25 215:9 236:17

236:18 237:11 264:12 278:23 295:19 296:16 298:13 298:14 299:1

**women** 29:20 29:24 30:14 30:16 30:17 31:9 31:10 31:11 32:9 52:1 60:25 61:23 62:6 62:10 64:7 64:9 70:15 70:25 71:7 84:5 86:21 86:25 87:25 88:2 88:18 90:16 90:16 90:17 94:9 96:22 106:25 121:1 122:6 127:11 133:3 133:13 145:9 151:23 173:12 174:6 174:6 174:9 181:3 183:13 184:5 184:6 184:14 185:12 185:14 186:6 186:6 186:8

186:9 191:3 191:11 191:20 192:24 194:6 200:21 200:23 208:4 209:12 219:13 228:15 229:9 233:22 234:18 234:23 235:2 235:5 235:8 236:2 236:12 242:25 249:8 261:19 265:23 266:6 273:20 274:9 277:9 278:6 280:12 280:20 281:1 282:11 292:1 292:6 292:7 292:8 292:21 294:1 294:2 294:2 296:5 296:9 297:12 297:15 297:19 297:19 297:20

**women's** 145:8 192:17 207:15

**wonder** 257:14

**wonderful** 66:9 126:9

257:9

**work** 24:15 24:18 25:25 26:12 32:2 70:14 70:19 79:19 95:2 112:12 125:2 126:19 133:15 149:12 170:17 173:17 185:11 191:10 191:14 191:19 196:20 201:13 212:15 212:17 215:17 220:9 222:9 229:9 234:25 235:7 238:18 243:3 246:21 247:15 253:12 253:13 263:10 281:16 281:18 281:21 282:9 283:3 283:6 283:22 283:23 283:25 284:7 286:10 287:23 288:7 288:9

**worked** 73:8 155:13 172:4 182:7 193:16 195:9 208:4 209:13 213:13 224:13 239:15 241:25 261:11 283:13 283:15

**workers** 183:17

**working** 66:9 91:22 124:25 145:19 169:13 170:21 172:17 225:21 240:4 261:2 307:15

**workplace** 91:20 126:10 158:10 170:20 170:25 253:15 280:13

**works** 54:24 267:21 271:24 290:6

**workshop** 247:2 247:14 283:11 283:16 283:19 286:8

**workshops** 130:13

246:24 247:6 247:10

**world** 29:23 86:12 124:9

**worldwide** 288:25

**worse** 224:14 225:23

**worth** 196:20 252:18

**wound** 38:4 38:14 39:3 67:12 213:2 227:13 282:3

**wow** 65:19 261:10

**write** 42:14 43:19 64:10 181:24 206:24 223:3 228:5 228:13 229:25 232:15 236:10 239:3 304:19

**writes** 20:3

**writing** 42:24 43:9 43:14 44:2 207:3

**written** 16:18 19:1 80:24 80:25 102:6 264:21 264:22 264:24 306:9

**wrong** 53:24

83:13 216:25 304:8

**wrote** 32:9 63:5 64:3 64:16 64:17 135:8 135:9 146:7 227:18 230:11 232:13 296:18 299:5 300:22 304:18

Y

**Yale** 160:20 160:20

**yelling** 48:19 48:21 48:22 48:23 49:9 49:12 50:25 51:1 51:5

**yep** 15:6 15:6 23:12 35:7 81:12 81:12 81:14 81:14 81:14 85:22 103:19 103:23 110:5 110:8 110:8 110:18 216:22 220:13 230:10 233:25 236:16

258:16 258:18
**yet** 19:13 20:20
**yo** 199:4
**York** 65:4 65:9 65:10
**you'll** 23:1 28:3 313:3
**yourself** 27:8 68:14 115:22 121:15 125:8 148:21 157:2 163:7 190:9 229:4 246:19 260:14 274:3
**you've** 24:25 33:20 36:8 36:11 43:25 53:3 66:23 70:24 71:2 71:9 86:14 101:7 112:22 123:25 164:8 180:18 193:1 207:14 207:20 213:13 215:22 223:8 229:9 240:22 284:8 286:2 289:16

Z

**zero** 39:5 239:22
**Zoom** 15:2 20:25 21:3 22:25 23:10 23:13 27:17 27:19 27:22 27:25 87:5 87:10

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM