**BROTEN AND ASSOCIATES, LLC**
4850 SW Scholls Ferry Road, Suite 105
Portland, Oregon 97225-1691
Office Phone: (503) 274-7051
Office Fax: (503) 296-5494

E. Lisa Broten, LCSW, ABVE-D, IPEC
Pam Donaldson

Cell Phone: (503) 407-1201
broten.associates@gmail.com

October 27, 2023

Matthew C. Ellis, Attorney at Law
621 SW Morrison Street, Suite 1025
Portland, OR 97205

Stephen L. Brischetto, Attorney at Law
Law Office of Stephen L. Brischetto
621 SW Morrison Street, Suite 1025
Portland, OR 97205

Re:    Dr. Rupa Bala v. OHSU
       Case #3:18-CV-00850-MH

### VOCATIONAL ANALYSIS:  EARNING CAPACITY

This counselor was asked to perform an earning capacity determination for Rupa Bala, MD in September 2023. Mr. Ellison requested I interview Dr. Bala. I was offered file material for review, which is outlined in the appropriate section. This counselor was requested to complete an analysis of Dr. Bala's education and work history and define her employability specifically with job prospects specific to her specialty, Cardiac Electrophysiology. I was asked to determine the wages Dr. Bala may have been able to garner if she was able to stay comfortably in her specialized medical field at OHSU without experiencing discrimination and what loss she suffered from the discrimination.

***Earning Capacity is defined as the potential of a worker possessing knowledge, skills, and abilities (KSA's), to work and earn money in a competitive labor market. The most commonly accepted definitions of earning capacity involve the amount of money a person can earn because of age, education, training, work experience and residual functional capacity (Duetsch & Sawyer, 1985; 1997; Field, Weed and Grimes, 1986; Field and Sink, 1981).***

In determining my opinion, I took into consideration Dr. Bala's education, employment history, age of 50 (DOB: 2/27/1973), abilities, transferable skills, physical and/or psychological limitations (if any), job search efforts, the current labor market and availability of jobs (looking nationally for work, but wanted to stay in the Pacific Northwest), and other factors and potential barriers that affect her earning capacity specifically in her field of expertise, Cardiac Electrophysiology, and considering other factors that affect her employability[1], placeability[2], and earning capacity.

### CREDENTIALS

My credentials include work as a Certified Vocational Rehabilitation Counselor in the State of Oregon and

---

[1] Employability is the ability to: (1) meet worker requirements, (2) have access to work KSA's and (3) have the traits or occupational familiarity necessary to perform a job or the kinds and types of jobs based on age, education, work experience and residual functional capacity (Field, 1999, pp 1-6; 1987; Field & Weed, 1998; Weed, 2000; 1990).

[2] Placeability is defined as the worker's potential to be hired or placed within a given job in the local labor market (Field, 1999, p. 1-12; 1987; Field & Weed, 1999; Weed, 2000, 1990) and by one's availability to interview and work (Deutsch & Sawyer, 2000; 1985).

Exhibit 5
Page 1 of 28

Page 2
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:      10/27/2023

formerly with the State of Washington to perform vocational assessments for workers' compensation claims, a Social Security Vocational Expert since 2016, and a Certified Forensic Vocational Expert (American Board of Vocational Experts-Diplomat level, 2018)[1] and a Certified International Psychometric Evaluator (2017). I prepare vocational assessments and wage-earning capacity evaluations for many court venues including wrongful death, employment discrimination, Americans with Disabilities Act, matrimonial matters and spousal support, Jones Act, Longshore and Harbors Act (serving both defense and claimant), personal injury including MVA's, Residual Employability Evaluations for workers' compensation, labor market surveys, and formal job analyses. I continue with case management activities in creating training plans, evaluating the job market for future trends by conducting labor market surveys, and placing people in jobs. I obtained a master's degree in social work in 1996 and received my Clinical License in Social Work (LCSW) in 2000. I have practiced continuously as a Vocational Rehabilitation Counselor in the field since 1986 serving thousands of workers with disabilities, and as a Vocational Expert since 2004 working on loss of earning capacity and employability issues. I am a member of several organizations, including Board Member for the Oregon-International Association of Rehabilitation Professionals for the last several years focused currently on the Legislative Committee; American Board of Vocational Experts-committee member in IPEC testing preparation and marketing; Portland Community College Occupational Skills Training Board member; and several other Boards over the years. I am asked to be a presenter occasionally in State of Oregon OR-OSHA presentations and at Portland State University in the Vocational Rehabilitation Master's program.

## METHODOLOGY

I follow accepted methodologies and standards of practice when conducting vocational assessments and earning capacity analyses. I generally follow the Vocational and Rehabilitation Assessment Model (VRAM)[4], which is an accepted empirically derived structural application for forensic services. Attached is a schematic and explanation of the VRAM model. I have used various methodologies in the past and current, depending on the case, including RAPEL and Labor Market Access Model, among others. This methodology is drawn from the following long-standing career and vocational rehabilitation models. This consultant's approach applies to clinical judgement[5], selected steps that have been adapted to my analysis and reporting style. The steps to this consultant's methodology include: (1) Collecting data and facts specific to the person(s) being evaluated and matters at issue; (2) Synthesizing information and data provided and obtained with an emphasis on employability; (3) Identifying problems, and applying metrics, factors, and criteria found in the literature, using vocational and medical source documents, and other material as cited in the text of this report; (4) Determining probable reasonable consequences of problems identified as well as examples of jobs, if any, that the evaluee can perform; and lastly, (5) Formulating vocational expert opinions.

This consultant also uses methodology relative to Field's Practical Approach (Field, 2008). What the vocational rehabilitation literature[6] suggests constitutes a valid foundation for vocational opinions. This consultant will also apply well-known vocational criteria that is described in the appropriate sections of the report. This consultant's vocational opinions in this matter are framed from relevant information, facts specific to the evaluee, circumstances, and data made known, objective information from reports and records, and professional and ethical processes of my discipline. This consultant will use this methodology to demonstrate an understanding of the evaluee's current situation and their employability. This consultant also utilizes, when appropriate or necessary, Traditional Vocational Source Documents (TSVDs) such as: *The Dictionary of Occupational Titles, the Handbook for Analyzing Jobs, the Occupational Outlook*

---

[3] To fulfill certification requirements E. Lisa Broten has submitted report work-product to the American Board of Vocational Experts (ABVE) for peer review.

[4] Robinson, The Vocational and Rehabilitation Assessment Model (VRAM), The Rehabilitation Professional 19(4), pp. 91-104.

[5] Field, 2008, Choppa & Weed, 2009, Field & Choppa, 2005, pp. 29-30.

[6] Field & Choppa, 2005, p. 30; Robinson, 2014, p.48.

Exhibit 5
Page 2 of 28

Page 3
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:      10/27/2023

*Handbook* and *A Guide to Rehabilitation* by Deutsch & Sawyer; LifeStep Transferable Skills Analysis software to document transferable skills as needed, job requirements and descriptions and regional or national wage figures as taken from the researched and verified data with the various Employment Departments and U.S. Bureau of Labor Statistics; the U.S. Census Bureau information and research as it applies; and article, Use of ACS to Estimate Lifetime Loss of Earning Capacity as a Result of Disability research if warranted.

In this assessment, I have reviewed several records which allowed me to determine an opinion. This counselor met with Dr. Bala in a Zoom appointment on October 3rd and October 5th, 2023. I have reviewed other pertinent documents listed below and reviewed research and qualified wage-earning data (labor market data from professional organizations) specifically for Dr. Bala's profession identified in the body of this report. Should additional relevant information become available, I would respectfully request an opportunity to update my opinion and report and make changes as needed. The information provided by this counselor finds to a reasonable degree the economic loss.

**Exhibits to Report:**

Exhibit "A" is Curriculum Vitae, Exhibit "B" is Record of Testimony (last five years), and Exhibit "C" is a Retainer Fee Agreement discussing my fees. Current fees are approximately $250.00 per hour and have not billed.

## REVIEW OF RECORDS AND OTHER DOCUMENTATION:

- 2/11/2019 United States District Court (USDC), District of Oregon, Portland Division, second amended complaint for deprivation of civil rights
- 4/15/2019 USDC, District of Oregon, Portland Division, Defendant's answer and affirmative defenses to second amended complaints for deprivation of civil rights
- 8/23/2021 USDC, District of Oregon, Portland Division, defendant's motion for summary judgment
- 9/30/2021 USDC, District of Oregon, plaintiff's opposition to defendant's motion for summary judgment, cross-motion for summary judgment
- 11/8/2021 USDC reply and support of defendant's motion for summary judgment.
- 7/9/2018, teaching evaluation data for Rupa Bala
- Several documents from Penn Medicine, University of Pennsylvania School of Medicine,
- Job offer 7/16/2014 from Oregon Health Sciences University (OHSU), compensation for clinician employment agreement, information regarding appointment and salary and job description, 11/1/2014.
- Several correspondences from OHSU Knight Cardiovascular Institute including educator performance evaluations, 12/4/2015.
- Student evaluation reports from OHSU
- Recommendation letters for Associate Professor of Medicine, 2015, including personal statement.
- Dr. Kaul, MD correspondence from OHSU regarding wage increase
- Tucson Lifestyles report, 2020
- Several Resumes of Rupa Bala, MD
- Employment Agreement, United Medical Associates, PC
- Exceptional Women in Medicine Magazine articles, March 2020 and 2021, Tucson Lifestyle Magazine.
- Copies of medical licenses and American Board of Internal Medicine Certificate
- Information regarding several reference documents regarding defendant's response to plaintiff's first set of interrogatories

Exhibit 5
Page 3 of 28

Page 4
Rupa Bala v. OHSU
Case #:   3:18-CV-00850-MH
Date:      10/27/2023

- Declaration of Dr. Rick Koch in opposition to defendant's motion for summary judgment, filed 9/29/2021.
- 11/15/2017 texts, September through November of 2017 from various staff members/others
- Deposition of Charles Hendrickson, MD, 8/7/2020
- Additional file support documents, Exhibit 174 Virginia Mason, September 2017
- 7/28/2020 deposition of Dr. Bala
- Job search efforts reporting from 7/7/2016 through 8/16/2022 from Dr. Bala's records, including extensive emails and texts from employers regarding potential interviews, canceled interviews, and applications submitted.
- Banner employment records
- W-2 Forms from 2015 to 2022
- Current employment from Citrus Cardiology (private practice)
- Miscellaneous compensation reports
- U.S. Bureau of Labor Statistics
- ONET On-line – Cardiologists research
- U.S. Equal Employment Opportunity Commission articles reviewed.
- American Sociological Association article 2022 reviewed
- AAMC (American Association of Medical Colleges) – faculty salary report 2021; 11/2022 AAMC Salary Equity Among Medical School Leadership; 2021 Pinnacle Health Group - MAGA – Physician Compensation Reports (private industry); 2023 MedAxiom Compensation Survey Report- private physician information; Sullivan Cotter 2020 Survey.
- Internet search of articles on Bala vs. OHSU including The Lund Reports 8/31/2018 and 4/10/2019. The Oregonian 8/31/2018; KOIN News article 5/16/2018 (one day after the lawsuit was filed); KATU News article 9/1/2018. Cardiovascular Business Magazine article, 9/4/2028.

**VOCATIONAL TESTING**:

No vocational testing was offered as Dr. Bala's education and work history record speaks for itself.

**EDUCATION**:

| | | |
|---|---|---|
| 8/1990 – 5/1994 | Georgetown University<br>Bachelor of Science, Awarded 5/28/1994<br>Major:  Biology | Washington, DC |
| 8/1994 – 5/1998 | Georgetown University School of Medicine<br>Doctor of Medicine, Awarded 5/23/1998<br>Cum Laude<br>*Alpha Omega Alpha* | Washington, DC |

**POSTGRADUATE TRAINING**:

| | | |
|---|---|---|
| 6/24/1998 – 6/30/2001 | University of Chicago Medical Center<br>Department of Internal Medicine<br>Internship and Residency in Internal Medicine | Chicago, IL |

*Included in file documents is a graph review developed by Dr. Bala of the 35 resident physicians in the class of 1998 and where they are today. It reflects her initial goals when taking on the Associate Professor of Medicine, Director of Complex Ablation job position with OHSU as this was her desired outcome of her profession and where she wanted to land as others had from her 1998 residency program.  It does not reflect

Exhibit 5
Page 4 of 28

Page 5
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:      10/27/2023

the forward path in the Academic arena. It has a trajectory of thirty-five residents and where they are today in their professional movement forward. Twenty-two of the 35 candidates pursued Academic Medicine with 12 reaching full Professorship (34%). Thirteen of those 35 (1/3rd) are in private practice including Dr. Bala. The remaining are in Other jobs.

Dr. Bala has testified to and discussed in our interview her desire to have remained in Academic Medicine in teaching, research, and performing clinical work. Her student reviews with OHSU and at the University of Pennsylvania have always been exemplary via examples in the file documents.

| 7/1/2002 – 6/30/2005 | Hospital of the University of Pennsylvania Department of Cardiovascular Medicine **Cardiology Fellowship** | Philadelphia, PA |
| 7/1/2005 – 6/30/2006 | Hospital of the University of Pennsylvania Division of Electrophysiology **Electrophysiology Fellowship** | Philadelphia, PA |

*Start of her career in Cardiac Electrophysiology. A specialty not held by many women in the cardiology field.

**WORK HISTORY / MEDICAL EXPERIENCE**:  Important to note that Dr. Bala has had a singular work history since 2006 utilizing the jobs noted below. Since 2006 she has been in the clinical field of Cardiac Electrophysiology and for 12 of those 17 years has been working in the academic settings on a path toward Professor and eventually Chief/Chair of a teaching university.

**Job Title 1:**            **Clinical Cardiac Electrophysiologist**
*There is no Dictionary of Occupational Title, or Standard Occupational Classification (SOC) recognized by the federal government for the specialty vocation of a Cardiac Electrophysiologist as it is a new field of work in cardiology.
**DOT**:                    070.101.014
**SVP**:                    9 (over 10 years) Meets.
**SOC**:                    29-2012 (Cardiologist)

**Job Title 2:**            **Associate Professor of Medicine**
**Job Title 3:**            **Assistant Professor of Medicine**
**DOT**:                    090.227-010
**SVP**:                    8 (highly skilled) Meets.
**SOC**:                    25-1011

**Job Title 4:**            **Director of Cardiac Electrophysiology Lab**
DOT                         022.161-010
SVP                         8 (highly skilled) Meets.
SOC:                        11-9121

1/30/2023 – current         **Clinical Cardiac Electrophysiology**
                            Citrus Cardiology Consultants PA (private practice)
                            The Villages, Florida
                            A Retirement Community

                            - One year contract
                            -Wage negotiated $525,000 annual + $12,000 relocation + CME $2500

Exhibit 5
Page 5 of 28

Page 6
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:    10/27/2023

She has no retirement plan since starting.
-Under pay scale via Pinnacle 2021 MGMA- Private Physicians Compensations report by 2021 figures only: Mean Wage of $715,309 and 75th% wage of $842,467 annually.
- no teaching or research

**Unemployed: Dr. Bala was unemployed from 5/13/2022 to 1/29/2023 (8 months and 17 days).**

3/29/2021 – 5/12/2022    **Clinical Cardiac Electrophysiology**
United Health Services (UHS Heart & Vascular Institute)
Department of Cardiology
Division of Electrophysiology
Johnson City, NY

-Wage negotiated $500,000 annually.
-Began employment under the pay scale via Pinnacle 2021 - MGMA Private Physicians Compensations report by Mean Wage of $715,309 and 75th% wage of $842,467 annually.
- no research, minimal teaching

- Was offered a short-term contract (5 months), a month-to-month contract, and a second contract. Offered $500,000 clinical base salary, prorated for 5-month term of employment.
- Dr. Bala continued with her job search in order to secure a more stable job with hopes to be employed as an Associate Professor or Professor in a public or private university again.

**Unemployed: Dr. Bala was unemployed from 4/20/2020 to 3/29/2021 (11 months and 9 days).**

7/1/2018 – 4/19/2020    **Associate Professor of Medicine**
**Director of Cardiac Electrophysiology Lab**
Banner University Medical Group
University of Arizona
Sarver Heart Center
Department of Electrophysiology
Banner Medical Center
Tucson, AZ

-Teaching, 10%.
-Terminated:    Before returning from FMLA. The employer indicated knowledge of a discrimination lawsuit with OHSU (informally).

- The discrimination lawsuit was filed on 5/15/2018 after leaving OHSU and shortly after accepting a position with Banner.

**Unemployed: Dr. Bala was unemployed from 6/20/2017 to 7/1/2018 (12 months and 11 days)**

1/5/2015 – 6/18/2017    **Associate Professor of Medicine (rank of Associate Professor 1/1/2016)**
**Director of Complex Ablation**
Department of Electrophysiology
Knight Cardiovascular Institute
Oregon Health & Sciences University
Portland, OR

Exhibit 5
Page 6 of 28

Page 7
Rupa Bala v. OHSU
Case #:   3:18-CV-00850-MH
Date:     10/27/2023

- 20% research
- 60-70% clinical and 10% of total with clinical administration
- 10% teaching/education
- Internal interpersonal struggles with staff and little support from management

2006 – 2014        **Clinical Cardiac Electrophysiologist**
                   **Assistant Professor of Medicine**
                   Division of Electrophysiology
                   Department of Cardiovascular Medicine
                   Hospital of the University of Pennsylvania
                   Philadelphia, PA

- 25% research
- 70% clinical
- 5% teaching/education
- excellent career with excellent reviews from patients, students, and staff for over 9 years

- Was building her career in the Academic Medicine community for twelve years.

**Job Title:**        **Electrophysiology Fellowship**
7/1/2005-6/30/2006    Department of Cardiovascular Medicine
                      Philadelphia, PA

**Job Title:**        **Cardiology Fellowship**
7/1/2002-6/30/2005    Hospital of the University of Pennsylvania
                      Philadelphia, PA

**Job Title:**        **Primary Care Physician**
2002 – 2002           Kaiser Permanente
                      Maui, HI

## ASSESSMENT OF EXPERIENCES SINCE LEAVING OHSU:

- Dr. Bala began job search in 2016 prior to resigning from OHSU when she finally realized her contract might not be renewed. She desired to stay in the Pacific Northwest applying for jobs in Oregon and Washington with various hospitals and with colleagues such as with St. Charles Hospital in Bend. She continued with applications to Bend Memorial Clinic and Virginia Mason in Seattle. Her references given as "cold" reviews and "no" reviews, when contacted.

- Dr. Bala was unemployed from 6/20/2017 to 7/1/2018 (12 months and 11 days), prior to accepting new employment at Banner University Medical Group. She submitted over 17 applications prior to and during that time. She inquired about additional potential possible openings with colleagues in the field from other institutions. Dr. Bala became curious about why she was given few interviews and few responses to her job search.

- Dr. Bala was terminated on 1/17/2020 and technically unemployed from 4/20/2020 to 3/29/2021 (11 months and 9 days), before accepting a locum job at UHS. She submitted approximately 154 applications from 1/19/2020 forward.

Exhibit 5
Page 7 of 28

Page 8
Rupa Bala v. OHSU
Case #:   3:18-CV-00850-MH
Date:    10/27/2023

- Dr. Bala was unemployed from 5/13/2022 to 1/29/2023 (8 months and 17 days) submitting over 41 applications before accepting the position at Citrus Cardiology.

- According to records on file OHSU human resources gave specific instructions to OHSU staff to only state dates of employment absent a signed release. This is a fairly common request most employers have of their management when issuing recommendations. There were inferences and statements from Dr. Cigarroa to Bend Memorial Hospital that Dr. Bala was not a "team player" (several times in a conversation) and Dr. Henrikson's text to staff at a Seattle employer suggesting that Dr. Bala was a "disgruntled employee," and they were "wise" not to hire her is another example. Statements made by Dr. Henrikson that Dr. Bala was similar to a Black former OHSU cardiologist whose contract was not renewed for alleged interpersonal difficulties is yet another example. All of these statements from management played a significant role in Dr. Bala being refused interviews, receiving no call backs or responses to inquiries, sudden cancellation of interviews, and more. Dr. Bala's reputation was on the line here and because of these actions by OHSU management was tarnished.

- Dr. Bala experienced discrimination in the workplace set forth by examples in the formal complaints, as discussed in the depositions, and as reported in various news and professional reporting articles, exampled by comments on her personality, gender and behavior in the workplace, name calling from staff during medical procedures, comparisons to others, staff not respecting her orders in complex surgery procedures, petty unfounded complaints from staff (like saying hi in the hallway), rumors within the department by staff that were not handled by management overflowing to outside facilities and to the staff that make hiring decisions, and unfounded allegations from sub-staff found to be unsubstantiated with management telling her essentially to change her personality.

## LICENSURE AND CERTIFICATIONS:

### Medical Licenses

| | |
|---|---|
| 11/2/2023 - current | **Florida Medical License (ME159707)** |
| 2/22/2021 – 1/31/2024 | New York Medical License (308921) set to expire in January 2024. |
| 8/9/2021 – 7/31/2002 | Illinois Medical License (036-105391) |
| 9/24/2001 – 12/31/2014 | Pennsylvania Medical License (MD417638) |
| 11/29/2001 – 1/31/2004 | Hawaii Medical License (MD-11783) |
| 8/14/2014 – 12/31/2017 | Oregon Medical License (MD169147) |
| 5/3/2018 – 6/27/2021 | Arizona Medical License (55794) |

### Board Certifications

| | |
|---|---|
| 8/21/2001 – 12/31/2011 | Internal Medicine |
| 11/1/2006 – 12/31/2026 | Cardiovascular Disease |
| 11/12/2007 – 12/31/2027 | Clinical Cardiac Electrophysiology |

## HONORS AND AWARDS:

| | |
|---|---|
| 1990 | Accepted to Georgetown Medical School – Early Decision Program |
| 1998 | *Alpha Omega Alpha* |
| 1998 | Cum Laude, Georgetown University School of Medicine |
| 1998 | Janet Glasgow Memorial Achievement Citation |
| 6/2020 | Tucson Lifestyle Magazine:  Top Doc article |

Exhibit 5
Page 8 of 28

Page 9
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:      10/27/2023

6/2020                          Tucson Lifestyle Magazine: Exceptional Women in Medicine

**MEMBERSHIPS AND PROFESSIONAL SOCIETIES**: Dr. Bala reports she has stayed away from her professional organizations in terms of reaching out to colleagues and attending meetings that she used to enjoy.

| | |
|---|---|
| 1994 | American Medical Association |
| 1995 – 1996 | Chairman of Curriculum Committee – Georgetown Medical School |
| 1996 – 1997 | Executive Committee for Students – Georgetown Medical School |
| 1997 | Member, *Alpha Omega Alpha* Medical Honor Society |
| 1998 | American College of Physicians |
| 2004 | Heart Rhythm Society |

**RESEARCH ACTIVITIES**:

Dr. Bala's resume provides a record of her accomplishments and research articles and activities as well as defined in the many reference letters from professionals in her field that have indicated that Dr. Bala has had national and international acclaim for her research and innovative approaches to technology in her field. She had been active in research since 1993 participating and writing published research articles until 2014 when she left her job to be a part of the Cardiac Electrophysiology team at OHSU (see resume on file). This is an area for which Dr. Bala states she has substantial loss, as it is not available to her in the private practice community, which appears to be the only type of employment that she has been able to garner since leaving OHSU.

**TEACHING EXPERIENCE**: At least 12 years of experience from 2006 until leaving OHSU as an Associate Professor. She was on track to continue as either Associate Professor or graduate to Professor for at least 5 to possibly 8 more years before applying for Chief jobs in the academic arena. The path to professorship can take less or more time depending on the institution. This counselor has averaged that number based on a few research factors including review of her resident classmates from the University of Chicago and how her intern class is now employed.

| | |
|---|---|
| 1992 – 1993 | Teaching Assistant, Comparative Anatomy – Georgetown University |
| 1993 – 1994 | Teaching Assistant, Biochemistry – Georgetown University |
| 1998 – 2001 | Resident Preceptor, Basic Interviewing Skills |
| 1998 – 2001 | Resident Preceptor, Physical Diagnosis |
| 2002 – 2004 | Cardiology Fellow Preceptor, Resident and Medical Student Education |
| 2004 – 2006 | Electrophysiology Fellow Preceptor, Resident and Medical Student Education |
| 2006 – 2014 | Resident and Medical Student Education, Cardiology Fellow Preceptor, Electrophysiology Fellow Preceptor |
| 2015 – 2017 | Medical School ECG course; Family Practice Residents EP/ECG cases/ teaching, Cardiology Fellow Conference Lecturer, Medical Student Education, Electrophysiology Clinic; Electrophysiology Fellow Clinic Preceptor |
| *1/2020-current | Dr. Bala has not participated in formal Teaching and has lost nearly 3 years of experience in this area. |

**INTERVIEW WITH DR. BALA**:

This counselor spent time interviewing Dr. Bala on October 3rd and October 5th to discuss the file documents, to review information of her current status, and to get more details of her experiences. Dr. Bala remains committed to her occupation. She is currently working in private practice. Although she is happy

Exhibit 5
Page 9 of 28

Page 10
Rupa Bala v. OHSU
Case #:   3:18-CV-00850-MH
Date:      10/27/2023

she was able to find a job, it appears to be the only job she was offered after submitting over 200 applications over the course of a few years.

This counselor reviewed Dr. Bala's job search, and found that of extensive application submissions, especially the extent to which medical providers put in time and efforts for each application, had been frustrating. As reviewed in file documents Dr. Bala has reached out to over 200 jobs attempting to obtain employment in her field which included in the Academic arena. Because it is such a small field, there are always concerns of how your reputation is perceived.

Dr. Bala feels that her reputation in the profession has been damaged, and she finds it humiliating and degrading and sometimes very difficult to break through those feelings. She has changed much of her personality in terms of reaching out to friends (currently a small handful only) and attending professional workshops to comingle with other professionals. She is getting some enjoyment from her work and the people she serves.

While working at Banner University Medical Center, Dr. Bala's father became terminally ill and she went on FMLA leave and moved to the southeastern United States. Her father passed away in 12/2019 and she was subsequently terminated while on FMLA leave.

Dr. Bala currently lives in a retirement community in Florida as an Electrophysiologist in private practice with the job at Citrus Cardiology Consultants. It would be difficult for her to live outside of that area without having to make an extended commute. She enjoys seeing patients, and she believes her partners at the clinic are pleased with her work. She indicates that with this new job she is not able to complete clinical research or teaching. She is not at the cutting edge of advances in cardiac electrophysiology practices. She misses writing research articles. All of those opportunities were offered to her when at OHSU.

It is important to note that when asked how long she expected to work, Dr. Bala stated that when doing something she was passionate about she would work well past 70 if she was physically and mentally able indicating that she studied hard to get to her current place in life; indicating she does not have a family of her own and is able to relocate fairly easily. She desires to be on track again to reach her goal of becoming a Professor or Chief in an Academic Institution. This is not an uncommon goal in her specialty field. This is a field where new technology develops quickly and those with skills to teach and be on the forefront of change to better the life of patients is needed. Recent statistics indicate from MedAxiom 2023 report that three out of four Cardiologists are between the ages of 61 and 70. Dr. Bala could continue in her career and direct those who are learning well past 70 if she were in the right setting. She states she had a passion for this, and it continues to be her commitment to teach and train others; as noted by her employment reviews, her reviews in this area were exemplary, and her goal was to remain in this type of Academic position prior to the experience she endured at the OHSU campus.

Dr. Bala is from India, having reached Citizenship early in college. She is dark skinned. She reports being embarrassed and humiliated that she has not been able to garner employment easily in this small community of specialists in cardiology. Although she is working in a job now and since January 2023, she remains insecure about her future. She has not been able to find the type of employment in the Academic field and not easily even in the private sector after hundreds of applications presented. Her initial goal was to gain a position of her desired focus prior to working for OHSU in the Academic and Clinical areas of Cardiac Electrophysiology.

## TRANSFERABLE SKILLS ANALYSIS:

Based on Dr. Bala's education, training, work history, and academic transcripts, she has transferable skills that are related to her specialty. She has had essentially a singular work history with specialized training in

Exhibit 5
Page 10 of 28

Page 11
Rupa Bala v. OHSU
Case #:   3:18-CV-00850-MH
Date:     10/27/2023

Cardiac Electrophysiology since her residency.

## TAX INFORMATION (2014-2023):

**TABLE 1: Earning Records W-2 Tax Statements / Off Work**

| Date | Employer | Annual Wage |
|---|---|---|
| 2015 (1/5/2015 – 12/31/15) | OHSU – Academic<br><br>Contract included a base salary ($329,000) based on AAMC data and a 20% guaranteed incentive on each paycheck. | $390,180 |
| 2016 (1/2016 – 12/31/2016) | New contract<br><br>In 7/1/2016 the base salary was increased to $361,000 and a 20% incentive paid out at the end of the year. | $380,596 |
| 2017 (1/2017 – **6/19/2017**) | Prorated pay | $240,194 |

6/19/2017   Terminated Contract / Resigned Before Contract was Mature.

**Off Work from 6/19/2017 (bar a couple of speaking engagements) to 6/30/2018 (54 weeks) or 12 months and 12 days.**

| 2017 | 1099 – Workshop Presentations | $10,550 |
|---|---|---|
| | total in 2017 | $250,744 |
| 2018 (7/1/2018 – 12/31/2018) | Banner University Medical Center | $205,276 |
| 2019 (1/1/2019 – 12/31/2019) | Banner University Medical Center | $345,323 |
| 2020 (1/2020 – 4/19/2020) | Banner University Medical Center | $90,000 |

Terminated without cause according to Dr. Bala on 1/17/2020 FMLA leave with an official "termination date" of 4/19/2023". Due to the COVID pandemic, her job search slowed down. From 3/20/2020 COVID shut down surgery centers according to Stanford Medicine Researchers and the JAMA Network study published online December 8, 2021; it provides data of surgical activity during COVID.  Surgery bounced back to pre-pandemic levels once safety protocols were in place. However additional information from MedAxiom and others indicates that 25-50% of staff would be on unpaid leave while another 25-50% are on paid leave. New hires were down as many hospitals created staffing changes and schedule changes. Many hospitals and clinics had to close with priorities given to the most emergency based surgeries.

A June 2, 2023, statistic from Cardiology Magazine supported by the American College of Cariology who initiated an ACC Task Force with findings that "there are not enough cardiac clinicians available to meet the needs of an ever-increasing patient population, the cardiology profession is on the brink of a crisis." It is not the norm that a cardiologist with Dr. Bala's specialty and reputation prior to her time with OHSU is not hired immediately once she left OHSU or any other employment.

**Off work from 4/20/2020 to 3/29/2021 (49 weeks) or 11 months and 9 days**

| 2021 (3/29/2021 – 12/31/2021) | UHS - Medical Group (Hospital Employed) | $317,879 |
|---|---|---|

Exhibit 5
Page 11 of 28

Page 12
Rupa Bala v. OHSU
Case #:   3:18-CV-00850-MH
Date:      10/27/2023

| 2022 (1/2022 – 5/12/2022) | Pro-rated | $156,071 |
|---|---|---|

Gave notice as Dr. Bala did not feel UHS was secure placement for her; She continued to apply for many jobs during her employment with UHS Medical Group, with 7 interviews since 2021, and one offer.

**Off work from 5/13/2022 to 1/29/2023 (37 weeks and 3 days) or 8 months and 17 days**

| 2023 (1/30/2023 – present) | Citrus Cardiology (Private Practice) | $525,000 |
|---|---|---|
|  |  |  |

### JOB SEARCH EFFORTS (7/2016 through 8/2022):

Dr. Bala needed a job and because of her situation, she found that she has been offered less of a salary by employers since leaving OHSU. She states she tried not to appear desperate to obtain work in her field when searching, but she was not offered substantial employment since leaving OHSU. She finds it difficult to vie for herself and negotiate when she has felt the barriers stacked against her. Dr. Bala stated that her emotions over the last several years have left her in dismay. She had felt unsupported as a professional from the actions and reactions of her OHSU employer. She spent years building her career at the University of Pennsylvania in the Academic arena. She stated that although she did not have direct proof from all of the applications she submitted, the cost of defending herself from what she believes was wrongful termination of her contract and continued harassment in the form of negative references whether formal or informal has been a burden.

This counselor assessed the voluminous file of job search records submitted by Dr. Bala in the Job Search spread sheet from 7/2016 to 8/2022 with results of that search supported by the emails, texts, and other information of job announcements and jobs that she was not considered for. This is a dynamic representation of her efforts. During my 38 years of assisting people who are looking for work and reviewing job search records, this display is from someone who is well organized and has the ability to keep track of the many applications submitted. Looking for work is often described by me as a full-time job. It is important to keep track of the results and non-results of the efforts and attempt to find out what could be done differently or why the search was unsuccessful. It is important to make call backs to attempt to determine the reason for not being offered the job. Callbacks are much more difficult given the circumstances that Dr. Bala faced in this professional setting.

From my review of file documents, it is clear that there was a pattern of questionable references offered to employers as Dr. Bala after having initial interests expressed to her by employers in a field that needed experienced cardiologists, was soon gas lighted or denied the next step in the process of hire. For example, the following list outlines some of those attempts and this is not all inclusive:

-7/2016 the contact to St. Charles Hospital with an initial positive contact with the recruiter and then Dr. Bala was not contacted again, and the job remained open.
-There was a similar contact earlier with Dartmouth 7/7/2016 with interest from the recruiter and the cardiologist on staff with no follow-up contact to Dr. Bala.
-On 8/8/2017 it appears that East Carolina University was interested in Dr. Bala after having an on-site interview but was not offered more.
-On 9/4/2017 Dr. Bala had a positive in person interview with Charleston, SC, MUSC, however, references were given by OHSU on concerns of Dr. Bala's interpersonal skills comparing her to another professional. No follow-up interview was established.
-9/8/2017 Virginia Mason in Seattle, WA interviewed positively with Dr. Bala via telephone and with the statement to them of disturbing feedback from her managers, she was not offered a formal in person interview.

Exhibit 5
Page 12 of 28

Page 13
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:    10/27/2023

-11/1/2017 Dr. Bala spoke to the cardiologist from Bend Memorial Clinic who in turn contacted her OHSU managers with concerns emphasized of her ability to be a team player and/or with no response from Dr. Hendrikson.

-From 11/1/2017 to 12/26/2017 Dr. Bala applied for several more jobs with one interview scheduled then canceled abruptly until reaching out to her colleague at the Banner University Medical Center who offered her a job in a clinical position which she verbally accepted in January 2018. She signed a contract with Banner Medical Group on 3/28/2018. She did not start her job until 7/1/2018 due to her obtaining her Arizona Medical License. She worked in a clinical setting until she was terminated on 1/17/2020 (termination letter) with a termination date of 4/19/2020.

-Dr. Bala began searching for work post termination initially applying for jobs in Phoenix and Tucson, Arizona, where she lived with no call backs and jobs that remained open. She applied for many jobs with no call backs or interest other than an interview with Bassett Health in New York and a response of going with another candidate and an interview at South New Jersey Deborah Heart and Lung Hospital with no call back.

-This activity of applying for jobs continued through many months with an interest from First Coast Cardiovascular Institute on 10/23/2020 until the Business Manager indicated they offered the job to another, however, the job remained open. An interview was scheduled with Cape Cod Healthcare on 10/28/2020 with a cancelation just prior to the interview after flights had already been booked. There were over 12 applications submitted in October 2020.

-In November 2020 there were over 26 applications submitted with 2 interviews with Christus Health in Louisiana and Metro Health in Wyoming, Michigan; both positions remained open as of the date of the Job Search record in August 2022.

-In December 2020 Dr. Bala reached out to 19 employers with hopes to obtain a job and one arranged a zoom interview that was canceled with no explanation, and another was scheduled for an informational interview with the Chief of Cardiology that was canceled focusing on other candidates.

-Dr. Bala continued to apply for over 27 jobs in January 2021.

-In 2/2021, she was offered a 5-month locum position with United Health Services (UHS Medical Group); the Chief of Cardiology indicated there was concern over her lawsuit. She took the job and relocated to Binghampton NY and started work in 3/2021.

-Dr. Bala began to look for work again in June 2021 applying for many jobs throughout the year, approximately 28 jobs with either no response, recall notices from recruiters, and requested information about her pending lawsuit.

-In 2022 Dr. Bala applied for many more jobs (over 41) with interviews pending and not followed through with. One of the recruiters informed her that she had googled her and that she needed to be prepared to discuss the lawsuit. Another interview was scheduled, flights booked and cancelled the day before the flight.

-Another recruiter emailed her in 8/2022 regarding a job at Northside Hospital in Georgia and noted that "unfortunately the group is not able to move forward with your candidacy. There were extremely impressed with your CV/Credentials however feel that given the impending lawsuit it will be really difficult to get the overall system to buy into moving forward until that would be resolved."

It is evident that the implications from this job search record is that Dr. Bala was tagged as a professional cardiologist that was not looked at seriously because of the negative perceptions that employers received when contacting OHSU managers. In addition, it is clear from my research that cardiologists belong to a small community who have personal and professional contacts nationally and will speak amongst themselves when hiring new staff. Dr. Bala was "flagged" before given a chance at employment after leaving OHSU. It appears that Dr. Bala has attempted to change her strategy of job search from when she started to when the Job Search Record form was stopped. This counselor views her job search effort as above standard when compared to the several hundred job search records I have reviewed in my career, which is not surprising given Dr. Bala's prior history of attaining her goals and her recorded achievements.

## LOSS OF OPPORTUNITY and LOSS OF COMPETIVE ADVANTAGE:

Exhibit 5
Page 13 of 28

Page 14
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:    10/27/2023

Dr. Bala has applied for over 200 jobs formally and informally, and of those she received a job offer that began with a limited term locum contract in the private sector and another most recently. In review of the details of job search contacts presented, it appears all the jobs applied for are within her expertise. There is a proportion of those in the Academic field and those in the Private sector.

The field of cardiology is in desperate need for trained and seasoned cardiologists per articles researched. There is a shortage of cardiologist according to the American College of Cardiologists. It doesn't make sense that Dr. Bala would not have more opportunity than what she has found unless there is an underlying barrier that is causing questions to her abilities. As presented in her inquiries and responses to employers in emails and in her excitement to interview seems to fizzle out on the employer's end with no explanation or with a short excuse. Thus, leaving the applicant confused and dismayed. Dr. Bala could not understand why in a profession with an urgent need for experts she was not being called back.

Dr. Bala's job search record is extensive. She applied for jobs that were available with hospitals, with online formats such as Indeed, DocCafe, NEJM Career Center, with recruiters at Health e/Careers, WakeMed, direct hospital and clinic websites, word of mouth, and many other methods. Answering questions from colleagues and cohorts in the field has been embarrassing and degrading when she isn't supported by employment. Because she is in a small community of experts, whereby everyone knows everyone, reputation is everything. It seems her reputation has been offered by managers and related staff from OHSU as "hard to deal with", "difficult to get along with" and other statements made by personnel seems to have made its way around the community at large. Her reputation has been tarnished. Sure, she could work with a recruiter or two, but their job is to sell her skills and get her an interview and even that was difficult as stated to her by recruiters. Reputation is subjective and in a small community it stays with you for a long time. In many ways Dr. Bala has been blackballed and not seriously considered for jobs because of this lawsuit and the repercussions of the employer.

This counselor believes that Dr. Bala has experienced a loss of competitive advantage to the workforce, from the retaliation of the lawsuit and the image it leaves when employers are researching Dr. Bala's references. This affects her chance of acquiring competitive employment and so she is finding herself at a competitive disadvantage due to the injurious nature of the complaint and OHSU's lack of response to defend her during the initial inquiries around discrimination and patient care.

Dr. Bala has not been teaching and performing research actively for six years since leaving OHSU. This has weighed heavily on Dr. Bala's mental health as it has been her passion and a life goal for so long. This was her aspiration, and it has been difficult to give up. When applying for Professor or Associate Professor positions over the last 5 years, it is imperative that the applicant is actively performing teaching and research, otherwise it lends question to the employer as to why the applicant isn't moving forward with her goal, why has she not built her career toward that end. This information is clear in some of the descriptions of jobs that Dr. Bala has applied for.

## EMPLOYABILITY AND PLACEABILITY:

Dr. Bala is employable obviously, she has a job now in the private sector of cardiology after many disappointments and no call backs. She is earning below the wages offered to doctors that have a similar education and work history. She is experiencing wage loss due to this change in her career focus. She had difficulty in landing a job in her field of specialty after being sought after by OHSU to leave the University of Pennsylvania employment, whereby she was on track to continue in the Academic settings.

Dr. Bala is not placeable in her specialty field of academic clinical work, teaching and research in a college hospital setting as an Associate Professor, Professor, and/or Chief as she was on track to do; she is placeable only in what appears to be in the private sector in locum and limited contract work that do not reflect her

Exhibit 5
Page 14 of 28

Page 15
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:    10/27/2023

initial career goals.

This counselor opines that this experience of difficulty in finding employment will not end soon for Dr. Bala. She is essentially living on the edge of losing her job and any job she may garner at any moment. She was only offered jobs such as locums or short-term contracts since leaving OHSU (bar Banner whose termination is questionable). This counselor finds that Dr. Bala's loss in the profession that she worked hard for is substantial. She may never recoup the reputation she had and her desired outcomes from the goals she had (and still has). As indicated in the research, cardiology is a field that needs qualified specialists and Dr. Bala is not being considered for employment based on the records which outline the attempts to sabotage her reputation.

### EEOC – Equal Employment Opportunity Commission research:

According to the US Equal Employment Opportunity Commission (EEOC) reported that retaliation is the most common issue alleged by federal employees and the most common discrimination finding in the federal sector cases. Nearly half of all complaints filed during the fiscal year 2013 were retaliation complaints, with 42 percent of findings of discrimination based on retaliation. Most was based on a "managers response to the employees initiating a complaint?" "A manager may not fire, demote, harass, or otherwise retaliate against an individual for filing a complaint of discrimination, participating in a discrimination proceeding, or otherwise opposing discrimination. The same laws prohibit discrimination based on race, color, sex, religion, national origin, age, disability, and genetic information also prohibit retaliation against individuals who oppose unlawful discrimination or participate in an employment discrimination proceeding." There are many examples in Dr. Bala's testimony, in emails and texts during job search, in others testimony, and as described in news articles which outline her attempts to remedy concerns on patient well-being and her own treatment within the department by support staff and managers who appear to focus on her personality traits rather than the concerns on hand.

Retaliation is often "the cause an effect of interpersonal conflicts." This is common in reference checks once the individual who filed the complaint left the employment as noted in EEOC research. Because of the small community of cardiology specialists nationally, it is even more important to handle any concerns with the utmost of care. The EEOC found in the article reviewed that it was "the manager's fault for not recognizing the growing tension and failed to ensure that the coworkers understood and respected the employees' right to file a complaint". It appears almost systemic from OHSU that rumors were spreading like wildfire within the community of academic and non-academic institutions whether they knew all the details or not once Dr. Bala chose to resign rather than accept a terminated contract.

Additional research from the American Sociological Review 2022, Vol.87(2) 175-201 with the American Sociological Association in the article *Under the Radar: Visibility and the Effects of Discrimination Lawsuits in Small and Large Firms* documents that "Qualitative studies highlight the limited efficacy of lawsuits in the typical workplace, finding that litigation frequently elicits resistance and even retribution from employers. But quantitative studies find that lawsuits can increase workforce diversity." The research states "By painting plaintiffs as isolated troublemakers, managers resist the message that plaintiffs hope to send that the firm has systemic management problems requiring redress." As one corporate counsel recounted, cases are interpreted by employers as "meritless", and defendants are generally "confident that such (discriminatory behavior) is rare" (Berry et al.2017:189).

It is this counselor's opinion that Dr. Bala was not able to garner new employment after numerous attempts in job search and not at all in her field of Academic cardiac electrophysiology while offered wages below her trajected wage expectation because of the discriminatory nonrenewal of her contract with OHSU and the pre- and post-termination reference practices by department staff. The large number of lack of responses and negative responses from Dr. Bala's numerous application submissions and inquiries prove that her job search efforts were curtailed by the pending litigation rather than her merits as an esteemed cardiologist

Exhibit 5
Page 15 of 28

Page 16
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:      10/27/2023

(Cardiac Electrophysiologist) in the field.

## EARNING CAPACITY ASSESSMENT:

After assessing Dr. Bala's file documents including her work history, her age, and her trajectory for future earnings, the following loss of earning capacity was determined given the factors relating to the allegations of discrimination in the workplace and the responses from her managers in regard to her complaints.

This consultant was not able to use the Bureau of Labor Statistics data, as it supplied information that was related to Cardiologists on a whole not assessing actual wages but a median range instead and not specific to the specialty which Dr. Bala has. Cardiologists in general, according to Selected Occupational Classification (SOC Code) 29-1212, indicates that employment in this field will increase by 3% annually from 2022 to 2032. However, wages identified for Cardiologists in general are at the median annual wage of $239,200.00+, which does not give this consultant information needed for Dr. Bala's trajectory loss. This information was also confirmed following the US Department of Labor statistics. Therefore, I had to research detailed reports on wages and compensation for the profession and especially the highly regarded specialty of Cardiac Electrophysiology.

Reviewed were valid resources available in the field of Cardiology which have studied compensation rates for sub-specialties, collecting data and creating reports through in the medical community to be used by physicians and surgeons, and employers hiring them. This counselor reviewed several additional resources to determine wages that are typical of Cardiac Electrophysiologists that are specialists in the cardiology field. Each of the graphs is documented from resource material reviewed.

Prior to joining OHSU, Dr. Bala had a career as an Assistant Professor of Medicine in the Division of Electrophysiology from 2006 to 2014, gaining skill and working in an area she enjoyed, with 80% of her work focusing in the clinical setting and 20% divided between teaching and performing paid research. IN recommendation correspondence on file from the University of Pennsylvania, Dr. Bala had a growing national reputation in her field. She was pursued by Oregon Health & Sciences University and offered a wage that was consistent with the Association of American Medical Colleges as discussed in her employment contract. Dr. Bala was hired as an Associate Professor of Medicine and Director of Complex Ablation with OHSU.

The US Bureau of Labor Statistics data regularly includes contacts employers to develop their data. This information is often used in identifying jobs, labor market demands for those directed at career search and in forensic settings. It is used by employers who are identifying wages typically offered in the general market. Typically, wages are explained as percentage increases depending on skill and education level in most industries. The 10th percentile wage is the level at which 10 percent of the workers in that occupation earn less and 90 percent earn more. To determine the wage level that is likely to be the most appropriate for an applicant, we evaluate the experience and education of the individual. If an applicant is new to the occupation and meets the minimum education and experience requirements, the wage most appropriate to use is the 10th and up to the 25th percentile range. This is generally considered a level earned by those just starting an occupation. If you have worked in the field for a while (greater than 5-8 years) you may consider the median to 75th percentiles as appropriate. These guidelines are used similarly with the compensation reports offered through the AAMC, Sullivan Cotter, MedAxiom, and MGMA and other resource documents reviewed who collect employment data and are able to discern the wages often used by employers when offering salaries to specialty medical personnel.

## TABLE 2: 2022 AAMC Salary Guide and the Sullivan Cotter 2020 and 2021 Physician Compensation Report for work in the ACADEMIC arena, including clinical, teaching, and research work:

Exhibit 5
Page 16 of 28

Page 17
Rupa Bala v. OHSU
Case #:   3:18-CV-00850-MH
Date:     10/27/2023

Reviewed was the Association of Medical Colleges, providing articles on salary among medical school leadership, including that for public schools and for private schools, in various regions of the country. In addition, this counselor reviewed the salary equity among medical school leadership Association of American Medical Colleges (AAMC), specifically November of 2022 results by authors Valerie Dander, MA and Diana Lautenberger, MA. The AAMC is a non-profile association dedicated to improving the health of people everywhere through medical education, healthcare, medical research, and community collaborations. There are a total of 156 accredited U.S. medical schools, 14 accredited Canadian medical schools, and approximately 400 teaching hospitals and health systems, including the Department of Veterans' Affairs medical centers, and nearly 80 academic societies.   There are over 191,000 full-time faculty members and 95,000 medical students, among many others. Therefore, the information derived from the survey reviewed on salary equity among medical school leadership discusses their 2021 findings as reported by Dean's office staff (in colleges that have medical school deans). Aside from Dr. Bala being fearful that she would not be up on new technologies available for doctors in her specialty, she has lost the rank promotions available to Associate Professors, Professors, and Chiefs and Chairs. Most wages reported were from Associate Professors and Professors in this guide. There were wages offered from Chiefs, but it was rarely reported from Chairs.

AAMC is the primary source of wage and faculty salary guidelines reviewed by institutions, primarily public and private institutions and/or colleges, that provide wages to the medical profession, primarily in the clinical sciences. This information breaks down the percentiles which are generally associated with a number of years of experience in the field of specialty. It will provide information on summary statistics of medical school faculty compensation for all schools, specifically for cardiology, within clinical science departments, but have an MD or equivalent degree.

I also used the 2021 Sullivan Cotter -Phys, Cardiology-Invasive-Interventional information as a resource for salary negotiations with many Boston Medical Center employees to compare with the AAMC sources.

Dr. Bala in her subspecialty would be considered Cardiology: Invasive Interventional – Medicine within the AAMC guidelines. In addition, the summary statistics will discuss wages for that subspecialty for all public schools and then for private schools and split to regions. Dr. Bala was geared for and desired to work in the academic field. She loves her specialty field of cardiology. She feels she is an excellent teacher and has gotten excellent reviews from her students in terms of her ability to teach and relay information in this specialty. She enjoys performing research, which has been lost with her new employment status. Aside from losing the technical skills needed in innovative research she is not able to develop academic teaching experience often required by university teaching hospitals.

Dr. Bala indicates that her counterparts when in residency at the University of Chicago have moved on to positions of academic stature, including Associate Professors, Professors, Program Directors, Assistant Directors, and Chiefs. Therefore, it is this counselor's opinion that that Dr. Bala would have qualified for these higher-level positions and would have been able to stay in her trajectory field of Academic cardiology had it not been for what transpired at OHSU and the employer's reference practices of Dr. Bala.

This counselor will discuss the loss of earnings that Dr. Bala has experienced from each of these transitions in the academic arena in public institutions and then to private institutions (where she is currently).

---

**AMERICAN ASSOCIATION OF MEDICAL COLLEGES**
**AAMC SALARY GUIDE**

Followed by OHSU when Dr. Bala was offered employment in the 2015 employment contract at the Median wage. Should she have stayed with OHSU her tenure as an Associate Professor would have ranked easily at the 75th % today, eight years later. However, if she were to have been elevated to rank of Professor 5-8 years post hire, her wage would be somewhere near the 75th% as she would not expect

Exhibit 5
Page 17 of 28

Page 18
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:      10/27/2023

| | Associate Professor | | Professor | | Chief | |
|---|---|---|---|---|---|---|
| | Mean | 75th % | Mean | 75th % | Mean | 75th% |
| 2022 All Schools Data | $531,978 | $585,704 | $535,158 | $611,464 | $775,150 | $836,677 |
| 2022 Public Schools | $489,094 | $544,534 | $505,110 | $559,641 | $699,688 | $803,094 |
| 2022 Private Schools | $564,022 | $615,692 | $567,099 | $648,850 | $865,704 | $836,677 |
| 2022 Western Region Data | $470,193 | $498,118 | $495,315 | $512,445 | No information | No information |
| 2021 Western Region Data | $458,596 | $474,995 | $479,986 | $493,413 | $479,986 | $493,413 |
| 2020 Western Region Data | $443,200 | $488,000 | $452,200 | $490,000 | No information | No information |

**Sullivan Cotter 2020 Physician Compensation and Productivity Survey Report** used by Boston Medical Center (detailed market data) for doctors in academic teaching and research positions

| Job Title | 25th% | 50th% | 75% |
|---|---|---|---|
| 2020 Cardiology-Invasive-Interventional-Professor | $534,989 | $667,552 | $824,791 |
| 2020 Cardiology-Invasive-Interventional-Chief | $650,929 | $834,118 | $1,115, 804 |

## EARNING LOSS CALCULATION SHOULD DR. BALA HAVE CONTINUED AT OHSU :

The following earning capacity was determined from the date of 6/20/2017 forward should Dr. Bala have been able to continue with her contract at OHSU. In my opinion Dr. Bala's trajectory of earnings are as follows if she were to have stayed at OHSU in her field of specialty performing clinical cardiac electrophysiology, teaching, and conducting research, without experiencing discrimination and feeling forced to leave or to be terminated.

Dr. Bala was 44 years and 3 months old when she left OHSU on 6/19/2017. Her entry wage was at an average of $385,388 (using the 2015 and 2016 tax statements only). She is now 50 years and 8 months old at the date of this report submission. She states her expectation if in the Academic arena was to work past 70 if she was healthy and able or 25 years and 9 months more when using the date of departure from OHSU. That figure is 19 years and 4 months more if using the current age. She reports that she does not have a family with few hobbies and enjoys her work in patient care currently but continues to want to contribute to research and teaching.

Dr. Bala would have likely continued with her trajectory and rank building to Professor within 5-8 years, and then, Chief within another 5-8 years of leaving OHSU. This counselor has chosen to use the conservative figures in determining loss. None the less, this counselor is also using what is considered current wage trajectory in this context of Academic Medicine cardiology through standard well-documented reference materials such as the AAMC and Sullivan Cotter salary guides.

It does not seem feasible that Dr. Bala would not gain the rank to Professor or Chief in the academic arena throughout her career path, therefore there is no loss using the Associate Professor job title only as it could

Exhibit 5
Page 18 of 28

Page 19
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:        10/27/2023

be expected that she would raise to the rank of Professor within 5 - 8 (approximately 6.5 average) years of the role as an Associate Professor. If using 6 years 6 months past 44 years and 3 months years old, she would be about the age she is now and be at least at the 75th% in wages for that job according to 2022 AAMC data. The Associate Professor at approximately 6 years and 6 months past 2017 is at $544,534.

At her current age she may have ranked as Professor in 2022 posted at $559,641 (2022) at the 75th% as she would not have been expected to take a cut in pay to raise rank up to an average of $746,171 ($667,552 2020 at the 50th% to $824,791 2020 at 75th%). She would then work as a Professor for a period of time of about 5 years depending on when openings occur, and the next level or rank would be Chief. **Her loss of income at the Professor rank is $245,216 annually or $1,226,080 for 5 years. If she were to remain a Professor and not raise ranks her loss is $4,740,844.**

This counselor documented rank of Chiefs as averaged as $751,391 annually and **includes a loss of her wages if she were a Professor for 5 years of $1,226,080 and then worked as a Chief with a loss of $366,003 annually for 14 years and 4 months or $5,246,046. Together that total is $6,472,126.**

This scenario is entirely possible as 34% of her cohorts from her 1998 residency class are Professors today.

## TABLE 3: 2021 PINNACLE Medical Group Report – Medical Group Management Association (MGMA) Earning Report 2021 and 2023 MedAxiom Cardiovascular Provider Compensation & Production Survey:

As noted, resource tools used by many employers and by professionals in the medical community when negotiating salaries in both the public and private sector includes research publications like the MGMA Compensation Report (Medical Group Management Association) for Physician Compensation, American Association of Medical Colleges, AAMC Salary Guide, Sullivan Cotter Physician Compensation Report as well as the 2023 MedAxiom Compensation Report. In 2020 it is entirely possible that Dr. Bala would be considered at the 75th % having worked in the field for 15 years in her specialty should she have kept working without periods of off-work status. She has, however, lost time in performing her specialty job for what appears to be 140 weeks or 2.69 years since leaving OHSU, and, therefore, her salary offers have suffered.

In this report, I chose the Mean and/or 50% wages (average wages) from the reports as well as the 75th%. MedAxiom has produced the 2023 11th Annual Comprehensive and Detailed Compensation Report detailing trends in the field of cardiology after several years of advancement and change. They use the MedAxcess database that relies on the information that is submitted by members. The information taken from this survey is researched and verified by medical survey databases. The lowest concentration (at 17%) of Cardiologists of the total nationally is in the Western region whilst the highest concentration is in the Northeast at 34%. (pg. 11). Specific to Cardiac Electrophysiologist, the wages are looked at and documented on pgs. 48-49 are posted below.

| 2020 and 2021 Earning Records | | | |
|---|---|---|---|
| **2021 Pinnacle Physician Compensation Report** (MGMA)– Medical Group Management Association (MGMA) data dive – Dr. Bala began Employment (Banner University Medical Center) on 7/1/2018 | | | |
| **Job Title** | **25th%** | **Mean** | **75th %** |
| 2021 Electrophysiology | | | |
| Annual Wages | $545,527 | $715,309 | $842,467 |
| Western Region | $564,208 | $732,592 | $828,277 |
| Southern Region | $569,173 | | |

Exhibit 5
Page 19 of 28

Page 20
Rupa Bala v. OHSU
Case #:    3:18-CV-00850-MH
Date:    10/27/2023

| MedAxiom Table:8 Physician Compensation-Cardiology for the years 2020 -2022 | | | |
|---|---|---|---|
| Job Title | 25th% | 50th% | 75th% |
| 2020 Electrophysiology-Private | $411,346 | $617,409 | $770,599 |
| 2021 Electrophysiology- Private | $474,081 | $631,752 | $872,244 |
| 2022 Electrophysiology-Private | $524,275 | $702,619 | $805,832 |

## EARNING LOSS WHEN DR. BALA ENTERED HOSPITAL EMPLOYMENT AND PRIVATE PRACTICE AT BELOW 25TH%:

Dr. Bala entered the private industry in what appears to be below the 25th% in 2021 when accepting a locum job with UHS in New York at $500,000 salary with the average of both resource guides $509,804 annually. She had already experienced employed work with Banner for over 1.5 years in hospital work. Banner salary was $409,500 and Annual Guaranteed Productivity payment ($40,500). The file indicates that her current wage at Citrus Cardiology (2023) of $525,000 which falls near or below the 2022 documented wages at 25th% of $534,901 average of the two resources viewed.

In my opinion Dr. Bala should be receiving wages of at least the 50th% at $708,964 average when hired in January 2023. This is a wage discrepancy of $183,964 from when she was offered the position. If using the lower percentile income when in the Private Practice if she retires at 65 is $2,649,081 or until she reaches the age of 70 at $3,568,901. However, if she were to have progressed in Private Practice once leaving OHSU without the barriers to employment described in this report, in 6.5 years or until about now **she feasibly would be at the 75th% in earned wages and compensation, thus creating a loss of $299,149 annually and if she retires at 65 is $4,287,802 and $5,783,547 if retiring at age 70.**

If you have any questions regarding this report, please do not hesitate to contact me direct at (503) 274-7051.

Sincerely,

E. Lisa Broten, LCSW, ABVE-D, IPEC
Vocational Consultant/Vocational Expert
(503) 274-7051
Email: lisabroten@gmail.com

Exhibit 5
Page 20 of 28

# E. LISA BROTEN, LCSW, ABVE-D, IPEC

lisabroten@gmail.com

**(503) 274-7051 (office)     (503) 407-1201 (cell)     (503) 296-5494 (fax)**

## PROFESSIONAL CERTIFICATIONS

Licensed Clinical Social Worker, State of Oregon (2900)   2000
Certified Vocational Rehabilitation Counselor, State of Oregon (AE0130) 1986
Social Security Vocational Expert, SSA (1152-11-00081) 2015
International Psychometric Evaluation Certification - IPEC (11) 2017
American Board of Vocational Experts - Diplomate Certification – ABVE-D (11) 2018

## EDUCATION

| | |
|---|---|
| PORTLAND STATE UNIVERSITY; Portland, OR | 1996 |
| Master of Social Work | |
| Two-year Clinical Post-Graduate in Rehabilitation Counseling/Social Work | 1997-1999 |
| Rehabilitation Counseling master's program - post-Graduate course work | 2014-2015 |
| Mediation Domestic Relations – Negotiation and Mediation-24 Master level credits | 2002 |
| | |
| MARYLHURST COLLEGE; Portland, OR | 2001 |
| Coaching for Success - Life Coach Certification - International Coach Federation (ICF) | |
| | |
| UNIVERSITY OF MINNESOTA; Duluth, MN | 1981 |
| Bachelor of Arts Degree | |
| Major Concentration: Communications, Interpersonal and Group Counseling | |
| Coordinated Minors: Psychology, Art, and Special Education | |
| | |
| Certified Professional Disability Management (CPDM), Level I; Portland, OR | 1995 |

**Continuing Education:**

Obtain 20 to 40 C.E.U.'s (continuing education credits) each year since 1986 for accreditations valid for the State of Oregon Worker's Compensation-Vocational Rehabilitation Counselor Certification, Board of Licensed Clinical Social Workers, American Board of Vocational Expert-Diplomat, and International Psychometric Evaluation Certifications: majority of credits are retained from the Commission on Rehabilitation Counselors and American Board of Vocational Experts.

## RELEVANT WORK

**Certified Vocational Rehabilitation Counselor**

Progressive Rehabilitation and Associates; Portland, Oregon                 2016-2017
Provided vocational evaluation services and vocational testing to clients participating in a pain clinic setting; established parameters of service and assisted with motivation and coping strategies in short-term counseling atmosphere; provided adjustment and grief counseling services; staffed with multi-disciplinary team to provide a comprehensive treatment plan. (Contracted)

**Certified Vocational Rehabilitation Counselor/Vocational Expert**

| | |
|---|---|
| Broten and Associates, LLC; Portland, Oregon | 2018 - current |
| Reigel Vocational Consultation; Portland, Oregon | 2004 - 2020 |
| Wallace and Associates; Portland, Oregon | 2000 - 2004 |
| Employers Rehabilitation Services, Inc.; Portland/Salem, Oregon | 1989 - 2000 |
| C.M. Carney and Associates; Portland, Oregon | 1987 – 1989 |
| Medical Vocational Planning, Salem, Oregon | 1986 - 1987 |

Exhibit 5
Page 21 of 28

Resume: E.Lisa Broten                                                                                                2

Provide forensic vocational services and counsel regarding loss of earning capacity; evaluate medical files to provide future medical costs to agency/privately referred clients; provide vocational evaluations and expert witness testimony for personal injury, civil, social security, family law, Veteran's Administration, ADA compliance, Federal longshore cases, Jones Act, long-term disability, permanent total liability; wrongful death, employment discrimination. Worked with cases for plaintiff and defense for over sixteen years.

Prepare forensic vocational assessments utilizing standard practices in vocational rehabilitation counseling in the form of expert reports, testimony, depositions, and arbitration. Includes transferrable skills analysis (TSA) using of LifeStep software and SkillTran Job Browser Pro; conduct extensive clinical interviews; evaluate medical/ psychological reports; access labor market using BLS data; conduct extensive labor market surveys; analyze occupations onsite using standard measurement tools and offer detail Job Analysis reports for claim files; interviewed all parties (medical, family, employers) in making decisions and judgements of ability to work; facilitate worker's participation through vocational exploration using standard test measures; offer vocational testing to evaluate personality, aptitude, cognitive ability; evaluate degree of disability, eligibility for service, and recommend vocational direction; develop Return-to-Work Programs for large and small employers; provide academic advisement and job development; assist individuals with personal adjustment throughout rehabilitation process; provide job search skills instruction; perform evaluation of work site to assess individual needs for skills or modifications; conduct ergonomic assessments and make recommendations; work closely with insurers, employers, medical and mental health and state agencies to develop plans; recommend modifications for return-to-work; make policy suggestions; work with ADA compliance specifications; effective and active case management services for over 30 years throughout the State of Oregon, California, Alaska, Washington, Louisiana, Alabama, Montana and Idaho. Performed expert witness services additionally in Alaska, Idaho, Arizona, Washington, Montana and California.

Managed Salem and Hood River office operations and clientele; provided group workshops for Job Search. Performed as a Work Site Modification Consultant sub-contracted with Preferred Worker Program, State of Oregon; consulted with employers to develop Early Return-to-Work programs; hired to conduct Job Analyses to meet federal requirements for ADA for Georgia Pacific-Wauna, Brownsville and Hillsboro School District; assisted Kalama Exports and U.S. Barge with Job Analyses of their many occupations on-site.

**Program Consultant/Lead Counselor**

Bridges Adoption and Family Services; Portland, Oregon                                          1996 - 1999
Designed and implemented business operations, including licensing, interpreting Oregon Administrative Rules, and marketing; directed Board meetings; coordinated services for families interested in adoption or general counseling services; assessed eligibility; provided individual and family counseling to a broad range of clientele; worked with referring agencies and resource networks. (P/T)

**Mental Health Counselor**

Morrison Center, RAPP and SOAPP Programs; Portland, Oregon                              1994 - 1996
Responsible for counseling adolescent and pre-pubescent children and their families in areas associated with sex offenses, physical and emotional abuse, and parenting skills; wrote psychological/psychosexual reports; documented files; performed case management activities; recommended resource programs for youth involvement; held multi-disciplinary staff meetings with juvenile parole officers, supervisors, school representatives, parents and foster parents; used varied counseling techniques, including behavioral, cognitive, Bowen, family systems, self-psychology and play therapy. (P/T)

**Family Counselor**

Parrott Creek Family Counseling; Marylhurst, Oregon                                              1994 - 1995
Provided outpatient individual/family counseling to children/adolescents and their families using various counseling techniques in Clackamas County. Counseled individuals, couples and families involved with a variety of mental health outcomes. (P/T)

Exhibit 5
Page 22 of 28

Resume: E.Lisa Broten                                                                                    3

**Program Director/Coordinator/Resident Programmer**

Duluth Regional Care Center; Duluth, Minnesota                                          1979 - 1986
As Program Director, performed administrative functions in a residential care facility serving MI/DD adults; hired, trained, scheduled, evaluated and supervised staff; planned, established and worked within corporate budget; dealt with individual and program account ledgers; designed developmental, behavioral, leisure, intra-group and counseling programs; promoted and marketed organization; offered community awareness and in-service training policies; directed and participated in intra-disciplinary team; provided individual and group counseling; set up vocational training programs and educated community groups and businesses; provided outplacement services; directed DRCC Staff Development Committee.    As Program Coordinator, instructed academic, leisure, and independent living skills to developmentally disabled adults; trained ancillary staff; implemented individual program plans; organized and recorded resident files; assisted the program director and led program in director's absence.  As DRCC Day Instructor, developed vocational program for individual members.  As Resident Programmer, directed care contact with adults/teens with developmental disabilities in residential care, semi-independent and soft-hands instruction, recommended vocational training, provided individual and group counseling.

**Youth Coordinator Monitor**

Arrowhead Economic Opportunity Agency; Virginia, Minnesota                              1979
Planned and scheduled employment for youth (14-21) with economic, social and disabling disadvantages; assessed, screened and placed persons in jobs on the basis of skill; provided individual and group counseling on career/work habits; directed communication with community businesses; directed youth supervisors.

## PROFESSIONAL SKILLS

Certified International Psychometric Evaluation (IPEC)
Certified Administrator and Interpreter, General Aptitude Test Battery (GATB)

*I have a thorough working knowledge of the following vocational reference materials*:
- Dictionary of Occupational Titles (and supplement), U.S. Department of Labor
- Classification of Jobs According to Worker Trait Factors, VDARE Service Bureau, Inc.
- Selected Characteristics of Occupations, U.S. Department of Labor
- The Revised Handbook for Analyzing Jobs, U.S. Department of Labor
- O*NET Occupational Information Network
- Oregon Occupations, Oregon State Employment Service-Qualityinfo.org
- Guide for Occupational Exploration (GOE), U.S. Department of Labor
- LifeStep Transferrable Skills Analysis Software, U.S. Department of Labor approved.
- Oregon Employment Department - *qualityinfo.org*; i.e., Oregon Labor Market Information Systems
- Department of Labor - Article Research, Statistics Review
- SkillTRAN Job Browser Pro-Version 1.7/Occu-browser Web 1.7.4

*I have administered and/or interpreted the following tests and work samples:*
- General Aptitude Test Battery (GATB)
- Wide Range Achievement Test (WRAT)
- Raven Progressive Matrices
- USES Interest Inventory
- O*NET Ability Profiler
- Myers-Briggs Type Indicator
- COPS Interest Inventory
- Career Assessment Inventory (CAI)
- Adult Basic Learning Exam (ABLE)
- Gates-MacGinitie Reading Tests
- 16PF-Personality Profile
- Wonderlic Personnel Test

Exhibit 5
Page 23 of 28

Resume:  E.Lisa Broten                                                                              4

## PREVIOUS CERTIFICATIONS

REGISTERED VOCATIONAL REHABILITATION COUNSELOR, No. 150911, Department of Labor, and Industries, State of Washington.

CERTIFICATE OF CLINICAL SOCIAL WORK ASSOCIATE, No. 0496, State Board of Clinical Social Workers.

## PROFESSIONAL ACTIVITIES - CIVIC

| | |
|---|---|
| • Member of National Association of Social Workers - NASW | Current |
| • Member of International Association of Rehabilitation Professionals - IARPS | Current |
| • American Board of Vocational Experts - Associate Member - ABVE<br>      Committee member | Current |
| • Portland Community College Occupational Skills Training Advisory Board<br>      2018– 2022 | 2022 |
| • Oregon Association of Rehabilitation Professionals - OARP<br>      Board Member –various committees | 2014-2021 |
| • Portland State University - Guest Speaker - Masters of Rehabilitation Counseling | 2018-2020 |
| • Oregon Trial Lawyers Association - Presented Workshop - Vocational Rehabilitation<br>      State of Oregon | 2014 |
| • Governor's Occupational Safety & Health Conference (GOSH) - Panel Presenter<br>      Strategies for Effective Hiring Practices and Facilitating Return-to-Work Programs | 2001 |
| • Chemeketa Community College, Occupational Skills Training Advisory Board<br>      Board Member | 1996-1997 |
| • Business Advisory Council: GoodWill and Blue Cross/Blue Shield, Portland, OR<br>      Board Member | 1992-1994 |
| • Program to Aid Victims of Sexual Assault - Board of Directors - Duluth, MN<br>      Board Member | 1984-1986 |

Exhibit 5
Page 24 of 28

1

---

## E. Lisa Broten, MSW, LCSW, ABVE/D, IPEC – Testimony Expert Witness

4850 SW Scholls Ferry Rd, Ste #105
Portland, OR 97225-1691
Phone: (503) 274-7051

---

**Matters Placed into the Court as Indicated:**

**TP** - Trial Prep;  **T** - Testimony;  **D** - Deposition;  **A** - Affidavit;  **E** - Expert Report

| Date | Referral | Source | Case Name/Type | Case Number/Venue |
|------|----------|--------|----------------|-------------------|
| 2016 thru 2023 | Social Security Disability | Office of Disability and Review (ODAR) SSA<br><br>In person Portland, OR & Telephone hearings | SSA Hearings **TP/T**<br>Hundreds of cases | Federal Social Security October 2016 to current |
| 2023 | Alescia Davies, AAL | Harris Velazquez-Gibbens | R. Gross v D. Gross | Washington County Case#22OR21621 |
| 2023 | Barbara Aaby, Esq | Aaby Family Law | Doyle v. Doyle **E/TP/T** (divorce) | Washington County Case# C12-4332DRA |
| 2023 | Jamie Babcock, AAL Noah Jaffe, AAL | Babcock, Holloway, Caldwell, Stires, PC Nicoll, Black, Feig, PLLC | Harris v. Vigor Specialty and Signal Mutual Indemnity **E/TP/T** | OALJ#: 2020-LHC-00194 |
| 2023 | Alec Laidlaw, AAL | Laidlaw & Laidlaw, PC | Azorr v Azorr **E/TP/T** (divorce) | Clackamas County Case# 21DR10475 |
| 2022 | Alec Laidlaw, AAL | Laidlaw & Laidlaw, PC | Fowlkes v Fowlkes **E/TP/T** (divorce) | Clackamas County Case# 21DR20207 |
| 2022 | Courtney Bellio, AAL | McKinley Irvin Family Law | Stoddard v Stoddard **E/TP/T** | Clackamas County Case# 22DR12034 |

Updated 10/2023

Exhibit 5
Page 25 of 28

2

| 2022 | Kevin Brague, AAL | The Brague Law Firm | McCrae v City of Salem (civil)        E/TP/T | US District Court Case# 6:20-cv-01489-MC |
| 2022 | Michael Romano, AAL | Romano Law, PC | Michaelis v Michaelis (divorce)       E/TP/Tx2 | Klamath County Circuit Court Case# 21DR07064 |
| 2022 | Michael Romano, AAL | Romano Law, PC | Stewart v Stewart     E/TP/T (divorce) | Washington County Case# 21DR12414 |
| 2022 | Tara Lawrence, AAL | Lawrence Law Firm, PC | Marchand v Marchand   E/T (Observed trial waiting for testimony-case settled) | Washington County Case# 20DR20524 |
| 2022 | Jamie Babcock, AAL | Babcock,Holloway, Caldwell & Stires, PC | Davidson v Vigor-Cascade General        E/TP/T (longshore) | OWCP# 14-314854 |
| 2022 | Alex Hill, AAL Lloyd, Bernstein, AAL | Bernstein,      Hill, Bullivant, Houser, LLC | Gargiulo v D&R Masonry (civil)          TP/T | Multnomah County Case# 19CV20229 |
| 2022 | James McCurdy, AAL | Lindsey Hart, LLP | T. Jones v Jones-Stevedoring     E/TP/T (longshore) | Case# 2003-LHC-01657 OWCP# 14-134547 |
| 2022 | Holly Lloyd, AAL | Law Office of Judy Snyder | Jones v George Fox University (civil)       E/TP/D/T | US District Court Case# 3:19-CV-00005-JR |
| 2021 | Chris Burnett, AAL | Burnett Law, PC | Lohrasb and Frank (divorce)       E/TP/T | Columbia County Case# 18DR0384 |
| 2021 | Edward Kroll, AAL Mark Barzda, AAL | Gevurtz Menashe, PC | Ingram v Ingram (divorce)       E/TP/T | Washington County case#: 19DR08363 |
| 2021 | Andrew Levine, AAL | Levine Law Center, LLC | Rolin v Rolin (divorce)       E/TP/T | Clackamas County Case# 17DR01109 |
| 2021 | Jennifer Brown, AAL | LaMont Law Center | Vezina v Vezina     TP/T (divorce) | Deschutes County Case# 19DR14182 |

Updated 10/2023

Exhibit 5
Page 26 of 28

3

| 2021 | Michael Romano, AAL | Romano Law, PC | Romano v Shakiba **TP/T** (divorce) | Multnomah County Case#18DR21788 |
|------|---------------------|----------------|------------------------------------|---------------------------------|
| 2021 | Richard Mann, Esq | Brownstein, Rask, LLP | Savas v APS Stevedoring, LLC (longshore) **E/D/TP/T** | Case#87426.001 |
| 2021 | Ted Brindle, Esq | Brindle McCormack, PC | Croll v Croll **TP/T** (divorce) | Multnomah County Case# 18DR67912 |
| 2021 | Katie Gross, ESQ | Gevurtz Menashe, PC | Simko v Simko **E/TP/T** (divorce) | Multnomah County Case# 19DR22955 |
| 2021 | Sarah Bond, AAL | Zimmer, Bond, Fay, Overlund, LLC | Milazzo v Milazzo **E/TP/T** (divorce) | Multnomah County Case# C15-3984DRC |
| 2021/ 2020 | Lewis Landerholm, AAL | Landerholm Law, LLC | Smallman v Smallman (divorce) **E/TP/T** | Washington County Case# 20DR01553 |
| 2020 | Andrew Levine, AAL | Levine Law Center, LLC | O'Bryan v O'Bryan (divorce) **E/TP/T** | Washington County Circuit Court Case# 17DR16349 |
| 2020 | Jennifer Brown, AAL | LaMont Family Law | Thompson v Thompson (divorce) **E/TP/T** | Polk County Case# 20DR03701 |

| 2019 | Ted Brindle AAL | Brindle McCormack, PC | Quiros v Marin **TP/T** (divorce) | Clackamas County Case# 19DR01962 |
|------|-----------------|-----------------------|-----------------------------------|----------------------------------|
| 2019 | Brad Gerke, Esq. | Goldberg Jones | Boyd v Boyd **TP/T** (divorce) | Clackamas County Case# DR12030206 |
| 2019 | Andrew Newsom, AAL | Gerring, Rackner & McGrath, LLC | Kerr v Kerr **TP/T** (divorce) | Clackamas County Case# 18DR20799 |
| 2019 | Susan E. Jewell, AAL | Law Office of Susan E. Jewell | Veterans' Administration (EEOC) **TP/T** | Case – Veterans' Administration |

Updated 10/2023

Exhibit 5
Page 27 of 28

**BROTEN and ASSOCIATES, LLC**
4850 SW Scholls Ferry Road, Suite 105
Portland, Oregon  97225-1691
Office Phone:  (503) 274-7051
Office Fax:  (503) 296-5494

E. Lisa Broten, LCSW, ABVE-D, IPEC
Pam Donaldson

Cell Phone: (503) 407-1201
broten.associates@gmail.com

Attorney/Firm: Matthew C. Ellis, PC
Email:  matthew@employmentlawpdx.com
Case Name Bala v OHSU et al
Case#:__3:18-cv-00850_____
Court: USDC Oregon

### RETAINER AGREEMENT

By signing this agreement Matthew C Ellis PC has agreed to retain Broten and Associates, LLC to provide Vocational Expert services to begin when the **non-refundable** retainer of $1,000.00 is received. Work will continue until Attorney/Firm gives direction to end services.  All parties agree to the terms and conditions set forth in this Agreement. Work will normally be performed at the offices of Broten and Associates, LLC and occasionally may take place at other locations as requested.   Work   priority   and   scheduling   will   be   at   the   discretion   of referral agent.

Payment for these services will be at the rate of $250.00 per hour. Trial costs are billed at $300.00 per hour with a minimum of 4 hours billed within 3 days of cancelation or postponement of testimony or as otherwise agreed to. Should work be requested in a Rush Status, charges will be at $350.00 per hour with no exceptions (this is generally work requested within a two week period). Trial costs billed at $400.00 per hour. Payment of all services will be made within 30 days from the date of the invoice submitted. Authorization to work can be given verbally and confirmed with email and will be billed as above regardless of signed retainer.

Matthew C Ellis PC  **agrees that all fees incurred are to be paid in full by the Attorney/Firm to BROTEN and ASSOCIATES, LLC without exception within 30 days.**

By my signature below, I agree in full to the terms expressed in the above itemized professional fees, retainer amount, and cancelation fees.

Sign_____        Date: __8/24/23_____
       Attorney/Firm Signature

Please remit retainer to:        **BROTEN and ASSOCIATES LLC**
                                 **4850 SW Scholls Ferry Rd., Suite 105**
                                 **Portland, OR 97225-1691**
                                 **Broten.associates@gmail.com**

Exhibit 5
Page 28 of 28