1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF OREGON

3                     PORTLAND DIVISION

4

5        DR. RUPA BALA,

6                    Plaintiff,

7            v.              Case No. 3:18-CV-00850-HZ

8        OREGON HEALTH AND SCIENCE

9        UNIVERSITY, an Oregon public

10       corporation; DR. CHARLES HENRIKSON,

11       an individual; DR. JOAQUIN CIGARROA,

12       an individual,

13                    Defendants.

14

15

16           VIDEOTAPED DEPOSITION OF LISA BROTEN

17            Taken on behalf of the Defendants

18                   January 5, 2024

19

20

21

22

23

24

25

                                          Page 1

1  BE IT REMEMBERED THAT pursuant to the Oregon
2  Rules of Civil Procedure, the deposition of
3  LISA BROTEN was taken before Julie A. Walter,
4  Registered Professional Reporter, Certified
5  Realtime Reporter, Oregon CSR No. 90-0173, on
6  January 5, 2024, commencing at the hour of 9:00
7  a.m., the proceedings being reported in the law
8  offices of Steve Brischetto, 1500 SW First Avenue,
9  Portland, Oregon.
10            * * *
11         APPEARANCES
12
13  MATTHEW ELLIS PC
14   Mr. Matthew C. Ellis
15   1500 SW First Avenue
16   Portland, Oregon 97201
17   and
18  LAW OFFICE OF STEPHEN BRISCHETTO
19   Mr. Stephen Brischetto
20   1500 SW First Avenue, Suite 1000
21   Portland, Oregon 97201
22   Counsel for the Plaintiff
23
24
25
Page 2

          EXHIBIT INDEX
Number     Description          Page
Exhibit 1    10/27/23 Letter to Ellis        11
             and Brischetto from Broten
Exhibit 2    Article "The Vocational and      70
             Rehabilitation Assessment
             Model (VRAM): Introduction
             of an Empirically Derived Model
             of Forensic Vocational and
             Rehabilitation Assessment
Exhibit 3    Rick Robinson Flow Chart        70
Exhibit 4    Physician Services Employment   120
             Agreement
Exhibit 5    Revised University of Chicago   122
             Residence Class 1998 Graph
Exhibit 6    Case Notes                      123
Exhibit 7    AAMC 2020 Western Comp by       144
             Medical School Type
Exhibit 8    AAMC 2021 Western Comp by       144
             Medical School Type
Exhibit 9    AAMC 2022 Private Comp by       144
             Medical School Type
Exhibit 10   AAMC 2022 Public Schools        144
             Comp by Medical School Type
Page 4

1  APPEARANCES CONTINUED:
2
3  STOEL RIVES
4   Ms. Brenda Baumgart
5   Ms. Megan Bradford
6   760 SW 9th Avenue, Suite 3000
7   Portland, Oregon 97205
8   Counsel for the Defendant
9
10  Also Present:
11  Emily Shults - Legal Counsel OHSU
12      (appearing remotely)
13  Cassandra Forbess - Legal Counsel OHSU
14      (appearing remotely)
15  Dano Capristo - Videographer
16
17
18
19
20
21
22
23
24
25
Page 3

Exhibit 11   AAMC 2022 All Schools Comp      144
             by Medical School Type
Exhibit 12   AAMC 2022 Western Comp          144
             by Medical School Type
Exhibit 13   Pinnacle Health Group           146
             Physician Compensation Reports
Exhibit 14   Summary Statistics on Medical   146
             School Faculty Compensation
             for All Schools MD or
             Equivalent Degree, Clinical
             Science Departments/Specialties
             Total Compensation (continued)
Exhibit 15   Faculty Evaluation of Rupa      177
             Bala University of
             Pennsylvania Clinical Teaching
Exhibit 16   1/17/20 Letter to Rupa Bala     189
             from Banner University
             Medical Group
Exhibit 17   Documented Verbal Discussion    191
Exhibit 18   12/14/23 Letter to Ellis and    222
             Brischetto from Broten
Exhibit 19   Broten Handwritten Notes        225
Page 5

2 (Pages 2 - 5)

1    P R O C E E D I N G S

2

3        THE VIDEOGRAPHER:  This is the video deposition

4    of Lisa Broten, taken by attorney Brenda Baumgart,

5    in the matter of Bala versus OHSU.  This deposition  09:15:20

6    is being held in the law offices of Matthew Ellis,

7    Portland, Oregon.  Today's date is January 5th,

8    2024.  We're going on record at 9:15.

9        Would you please swear in the witness.

10            LISA BROTEN

11    was thereupon produced as a witness and, after

12    having been duly sworn on oath, was examined and

13    testified as follows:

14            EXAMINATION

15    BY MS. BAUMGART:                            09:15:49

16  Q.  Good morning, Ms. Broten.

17  A.  Good morning.  Broten.  Just to tell you, it's

18      Broten.

19  Q.  Broten.  Thank you.  We've been mispronouncing it

20      for quite some time --                    09:15:56

21  A.  Oh.

22  Q.  -- so I will do my best, but thank you for

23      correcting me.

24  A.  Well, the hockey player, "Miracle on Ice," my

25      cousin, Neal Broten.                       09:16:04

Page 6

1  Q.  Okay.

2  A.  So Minnesota, just so you know.

3  Q.  Perfect.  Well, we met briefly off record.  My name

4      is Brenda Baumgart.  I'm the attorney for OHSU and

5      Dr. Cigarroa and Henrikson in this case.  You    09:16:14

6      understand that?

7  A.  Yes.

8  Q.  So I will be taking your deposition today in your

9      capacity as a disclosed vocational expert for

10      plaintiff Dr. Rupa Bala.  Correct?          09:16:24

11  A.  Yes.

12  Q.  You understand that our interests are adverse?

13  A.  Yes.

14  Q.  Have you had your deposition taken before?

15  A.  Very few times but yes.                     09:16:32

16  Q.  Okay.  Well, we'll go over a few ground rules.

17      You're probably familiar with this process, and I'm

18      sure you've spoken with counsel.  We have a

19      court reporter and a videographer here today that

20      are taking down everything that everybody says, so  09:16:46

21      when this case goes to trial, if your testimony is

22      different than it is today, we can use this record

23      to impeach you.  You understand that?

24  A.  Yes.

25  Q.  You understand that you took an oath to tell the    09:16:57

Page 7

1      truth and with that oath comes a penalty of

2      perjury.  Correct?

3  A.  Yes.

4  Q.  I'm not sure how long we'll be going today.  We'll

5      probably go into the afternoon.  Happy to take a    09:17:08

6      break any time that you need it.  I usually break

7      on the hour, but if you need a break beforehand,

8      totally fine.  Just let me know.  Happy to do that.

9      Okay?

10  A.  Um-hum (affirmative response).             09:17:17

11  Q.  Yes?

12  A.  Yes.

13  Q.  And one of the ground rules, if you will, that will

14      help us get through this smoothly today is if you

15      can answer audibly because the court reporter    09:17:25

16      cannot pick up the um-hum, hum-um, nods of the

17      head, so if you could use a yes or no, audible

18      answer to my question, that would be great.  Okay?

19  A.  Yes.

20  Q.  Similarly, and we talked a little bit about this    09:17:37

21      off the record, if you would allow me to finish my

22      question, and I will allow you to finish your

23      answer versus us talking over each other.  That's

24      difficult for Julie to get down in the transcript,

25      so we'll try and not speak over each other.  Okay?  09:17:51

Page 8

1  A.  I'll do my best.

2  Q.  Okay.  Very good.  Can you hear me okay?  Is my

3      volume okay?

4  A.  Yes, yes.

5  Q.  Okay.  Is there any reason today, whether it's    09:18:02

6      medication or anything going on in your life, that

7      would impact your memory or your ability to testify

8      here today fully and accurately?

9  A.  Not that I know of, no.

10  Q.  Okay.  The few times you've had your deposition    09:18:15

11      taken, do you remember, was it in your capacity as

12      a designated expert?

13  A.  Yes.

14  Q.  Do you remember the last time you had your

15      deposition taken?                           09:18:29

16  A.  I think it was the Jones case.

17  Q.  Who were you retained by, the plaintiff or

18      defendant?

19  A.  The plaintiff in that case.

20  Q.  What was the nature of that case?            09:18:42

21  A.  It was ADA issues, and it was against George Fox

22      University.

23  Q.  That was an employment case?

24  A.  Yes.

25  Q.  Have you been retained in any other employment    09:18:59

Page 9

3 (Pages 6 - 9)

Exhibit 6
Page 3 of 123

1   cases other than the Jones case?
2  A.  What do you mean by "employment case"?
3  Q.  A case -- a civil case that involved claims of
4      employment discrimination, wrongful discharge,
5      retaliation and the like.                09:19:19
6  A.  Maybe with Veterans, with Susan Jewell, the
7      attorney. It may be on my testimony, and that was
8      against the VA, I believe.
9  Q.  Okay.
10  A.  Does that make sense?                    09:19:45
11  Q.  Yes.
12  A.  And it was discrimination.
13  Q.  Okay. Very good. Any other cases that you
14      remember off the top of your head? And we'll look
15      at your CV in just a moment.              09:19:53
16  A.  There were two of those cases that I know of. City
17      of Salem, but that wasn't -- that wasn't
18      employment, so I think that's it.
19  Q.  Okay. Other than providing deposition testimony as
20      an expert, designated expert witness, have you ever 09:20:11
21      testified in a deposition in a lay capacity?
22  A.  No.
23  Q.  Have you ever been a party to a lawsuit?
24  A.  No.
25  Q.  Have you ever served as a juror?          09:20:22

Page 10

1  A.  No. I always got out of it because of my work.
2  Q.  True. Okay.
3          (Exhibit 1 marked)
4  Q.  BY MS. BAUMGART: Ms. Broten, we've handed you what
5      we've marked as Exhibit 1 to your deposition. Is   09:21:10
6      this your report that you prepared in this case?
7  A.  Yes, it is.
8  Q.  Okay. I'm going to start by reviewing your
9      credentials. If I'm looking at -- excuse me --
10      page 1 of your report, page 1 of your report, the   09:21:25
11      first paragraph -- or not the first paragraph.
12      Going down to the bottom of the first page under
13      the heading "CREDENTIALS," it looks to me like
14      there is four areas of work identified. One, a
15      certified vocational rehabilitation counselor in    09:21:44
16      the state of Oregon and formerly with the state of
17      Washington. Is that correct?
18  A.  Yes.
19  Q.  And then second, a Social Security vocational
20      expert. Is that correct?                  09:21:55
21  A.  Yes.
22  Q.  Third, certified forensic vocational expert.
23      Correct?
24  A.  Yes.
25  Q.  And then fourth, certified international    09:22:03

Page 11

1      psychometric evaluator. Correct?
2  A.  Yes.
3  Q.  Are the totality of your credentials?
4  A.  Yes.
5  Q.  In this case, based on the areas of work you were   09:22:13
6      asked to perform and resulting opinions, which
7      credentials were you relying upon to render your
8      opinions, if that question makes sense?
9  A.  Sure. And one credential that we didn't talk about
10      was my licensed clinical social work credential as  09:22:37
11      well, which is an important credential in terms of
12      being a certified forensic vocational expert.
13  Q.  Why is that an important credential?
14  A.  It's a requirement to have a counseling master's in
15      certain areas -- and that is one of the areas -- to  09:22:59
16      become credentialed as a diplomat. But I basically
17      use that credential primarily. I didn't use the
18      certified international psychometric evaluator, and
19      I also touch on my certified vocational rehab
20      counselor background just because I've been doing   09:23:26
21      it for 39, 40 years and that's where a lot of my
22      expertise comes across in -- especially in job
23      development, job search activities and evaluating
24      people and occupations.
25          Social Security is -- is just good to have, but 09:23:46

Page 12

1      it's specific to Social Security primarily.
2  Q.  So it's a no for that; that didn't sort of carry
3      into your work here?
4  A.  I mean, it all -- it all crosses together. I mean,
5      it all accumulates together. When you're a voc     09:24:03
6      rehab expert or a voc rehab counselor, you use all
7      of your experiences and education and training in
8      developing your theories and opinions.
9  Q.  And what about the certified forensic vocational
10      expert? I assume that's a credential you used in    09:24:25
11      this -- in your work in this matter.
12  A.  Yeah, that's -- I'm a American board vocational
13      expert diplomat.
14  Q.  Okay. So when you describe yourself sort of to
15      your point of your testimony that it's really the   09:24:38
16      totality, so when you describe your work in this
17      case, how would you describe your expert
18      designation? How would you refer to yourself?
19  A.  A vocational expert.
20  Q.  Okay. I want to ask a little bit more. You said    09:24:49
21      the work you did in this case touches on your
22      certification as a vocational rehabilitation
23      counselor. Can you first explain to me what a
24      certified vocational rehabilitation -- if I can
25      speak -- counselor does?                   09:25:17

Page 13

4 (Pages 10 - 13)

Exhibit 6
Page 4 of 123

1 A.   So primarily I started in the workers' comp arena,
2      and I was actually a designated job developer.
3      There were no requirements to be a job developer
4      other than working under certified voc rehab
5      counselor.  I obtained my voc rehab counselor          09:25:35
6      certification immediately, just because of my
7      background.  I wasn't yet a master's, and it didn't
8      require a master's degree at the time because that
9      was 40 years ago, 30 -- I think it is 40 years now
10     because I've just turned 65.                           09:25:52
11         So basically you work with insurance carriers
12     and employers, and when there is a disability with
13     an employer, you're assigned a case to evaluate
14     eligibility for vocational services, and you do a
15     vocational assessment covering several factors,        09:26:14
16     including education, work history, skills,
17     knowledge, abilities, and then you determine,
18     according to the rules that you're working under at
19     the time -- and this would be the Oregon
20     Administrative Rules -- whether or not that person     09:26:38
21     is eligible for vocational services.  At that
22     point, you begin working with them if agreed upon
23     by their attorney, which usually I'm always agreed
24     upon -- it's very rare I'm taken off a case -- to
25     assist that individual with developing what we         09:26:56

Page 14

1      consider a training plan or a return to work plan.
2          And in that, there is several steps, so in the
3      evaluation process, we're looking at transferable
4      skills; we're looking at what are some jobs that
5      might meet the requirements of that eligibility,       09:27:16
6      and then we move forward with interest testing with
7      other kinds of testing, academic and achievement
8      testing, if needed.  We initially start with an
9      interview, qualitative interview, and then we move
10     forward with research.                                 09:27:40
11         And once job goals are identified, then I
12     utilize different systems that are agreed upon by
13     the State of Oregon services to look at those job
14     goals, evaluate them, evaluate the labor market,
15     make calls to the labor market, conduct job            09:28:01
16     analyses, which are physical descriptions of the
17     job generally, and talk to the doctors about
18     whether or not that individual can perform the
19     chosen goal or goals and then -- and then move
20     forward with developing a training plan.               09:28:21
21         So a training plan consists --
22 Q.   Sorry to interrupt you there, but I want to be
23     mindful of your time and everyone's time.
24 A.   Oh, sure.
25 Q.   So I think -- let me just ask it this way, and        09:28:31

Page 15

1      thank you for that background.  That's helpful, and
2      I've been on the employment side of, right,
3      working, knowing how, so it's good to hear more
4      about how the voc rehab process works in the
5      workers' comp system.                                  09:28:43
6          The methodology and systems that you just
7      describe, right, you're working with disabled
8      individuals; you're working with doctors.  Did you
9      employ any of those same methodologies with your
10     work in this case?                                     09:28:56
11 A.   Some of the --
12 Q.   Which?  Just list them for me.
13 A.   Okay.  So primarily the qualitative interview, the
14     identification of occupation or transferable
15     skills, the identification of labor market and then    09:29:13
16     labor market surveys and contexts and research and
17     then whether or not this individual is employable
18     and placeable because I do return to work job
19     placement as well and monitor the placement of
20     individuals I work with.  And earning capacity is      09:29:42
21     discussed because, especially initially when I
22     first started, we look at wage at injury, and the
23     wage at injury currently now is adjusted wage at
24     injury, and we try to determine whether or not
25     there is another job out there that --                 09:30:06

Page 16

1 Q.   Okay.  I'm sorry to interrupt you again.  Just list
2      them.  That's okay.  So I think the earning
3      capacity.  Any other methodologies that you utilize
4      in your role as a vocational rehabilitation
5      counselor that you utilized in this case?              09:30:22
6 A.   Not that I -- not that I can think of.
7 Q.   Okay.  And you mentioned the qualitative interview.
8      Was that the interview or, I guess, the series of
9      interviews you conducted with Dr. Bala?
10 A.   Yes.                                                  09:30:36
11 Q.   Did you conduct a qualitative interview with anyone
12     else in your work in this case other than Dr. Bala?
13 A.   Not necessarily.  I researched the labor market and
14     contacted some individuals that way.
15 Q.   Sure.  That's different than a qualitative           09:30:51
16     interview, right?
17 A.   Um-hum (affirmative response).
18 Q.   Yes?
19 A.   Yes, it is.
20 Q.   Thank you.  Currently, if you could give me your     09:30:55
21     best estimate, Ms. Broten, what is the percentage
22     of your workload that involves this vocational
23     rehabilitation counselor work?
24 A.   I've gone down because I'm doing more forensic
25     work, so I would say 35 percent, maybe 40, and it     09:31:14

Page 17

5 (Pages 14 - 17)

Exhibit 6
Page 5 of 123

1  varies when I open and close cases.
2  Q.  Sure.  Understandable.  And so what percent of your
3  current workload right now is your forensic work?
4  A.  Including Social Security, civil, marital discord,
5  I'd say 60, 50 -- 50 to 60.          09:31:41
6  Q.  And of that 50 to 60 percent of forensic work,
7  which you mentioned includes your Social Security
8  work, looks like a lot of dissolution --
9  A.  Yeah.
10 Q.  -- marriage work --                09:31:59
11 A.  Yes.
12 Q.  -- and some civil, what percentage of that forensic
13 work includes civil matters?
14 A.  Maybe 20.
15 Q.  And has that 20 percent been pretty constant over   09:32:11
16 the last, say, five years?
17 A.  Oh, yes.  And I'd say maybe even 30 --
18 Q.  Okay.
19 A.  -- if you will.
20 Q.  20 to 30 percent of your forensic work is on civil   09:32:24
21 matters?
22 A.  Yeah.  Maybe even more, but it just depends on
23 referrals.  I'm thinking of my current caseload.
24 Q.  That's fine.  Just your best estimate is fine.
25 A.  Okay.                                09:32:36
                                                    Page 18

1  Q.  Thank you.  Okay.  And, again, I just want to sort
2  of start with not getting into the weeds but just
3  broader topics.  Your work as a Social Security
4  forensic expert, do you employ any methodologies --
5  any of the methodologies you employ working as a   09:32:58
6  Social Security voc expert did you use in this case
7  other than maybe what you've already described,
8  anything additional?
9  A.  I don't believe so.
10 Q.  Okay.  Your certification as a forensic vocational   09:33:09
11 expert, you mentioned that you are American Board
12 of Vocational Expert diplomat-level certified 2018.
13 Is that correct?
14 A.  Yes.
15 Q.  Is that when you first became certified as a     09:33:24
16 forensic vocational expert in 2018?
17 A.  With -- with that board, yes.
18 Q.  Prior to being certified with that board, did you
19 carry the certification as a forensic vocational
20 expert prior to 2018?                   09:33:41
21 A.  No.
22 Q.  Okay.  So 2018 is -- you have been a certified
23 forensic vocational expert just since 2018.
24 Correct?
25 A.  Yes.                                 09:33:53
                                                    Page 19

1  Q.  What did you need to do to obtain the certification
2  as a forensic vocational expert from the ABVE?
3  A.  It was kind of a long process.  You had to submit
4  reports.  You had to submit references and
5  referrals from persons that you worked with,     09:34:14
6  attorneys.  Mostly for me, it was all attorneys
7  that I worked with in the field and testified for
8  before.  My works were -- my reports were
9  peer-reviewed by, I'm sure, three, if not more,
10 other experts, and then I had to take a long      09:34:39
11 arduous test.
12 Q.  That you passed, I assume?
13 A.  That I had to study for, and I passed the first
14 time around.  A lot of people don't so -- and I --
15 I reached that diplomat status right away.        09:34:55
16 Q.  What is the diplomat status?
17 A.  It's the higher level.  It's the expert level that
18 gives you full credential notification or -- or --
19 for your experience in the field.
20 Q.  And so when you mentioned -- and I think you      09:35:15
21 mentioned this in Footnote 3 of your report as
22 well -- that you had to submit your work product
23 for peer review, was that just an initial
24 submission, or do you have to do that as part of
25 ongoing recertification?                  09:35:29
                                                    Page 20

1  A.  No.  You have to take CEUs, or continuing education
2  credits, that are required to keep your
3  certification active on an annual basis.
4  Q.  And in addition to that, do they do any additional
5  peer review, or was that just at the outset?      09:35:43
6  A.  That's just on the outset.
7  Q.  Have you become familiar with colleagues who are
8  also ABEV-certified?
9  A.  Some, yes.
10 Q.  Do you know DT North?                   09:36:01
11 A.  I don't.
12 Q.  You haven't met him through that organization?
13 A.  Not yet, but I have read some of his reports.
14 Q.  Sure.  And we'll talk about that.
15 A.  In the past.  Yeah.                    09:36:14
16 Q.  I was just wondering if you knew you him through
17 the -- through your affiliation?
18 A.  No.
19 Q.  I believe he is currently serving on their
20 leadership board.  Were you aware of that?        09:36:23
21 A.  I knew he was serving on something.
22 Q.  Okay.  Is this the first occasion you've had to be
23 opposite him on a case?
24 A.  No.  There was a federal case for Longshore.
25 Q.  Okay.  Where he was the designated voc expert on   09:36:38
                                                    Page 21

6 (Pages 18 - 21)

Exhibit 6
Page 6 of 123

| | |
|---|---|
| 1   the other side? | 1      MS. BAUMGART:  Okay.  Thank you.  Then if |
| 2  A.  Yes.  But I didn't testify.  We didn't testify | 2   counsel was present for that conversation, I do not |
| 3   against each other in that case.  It was just | 3   want -- you are not to testify about it.  That's |
| 4   reports. | 4   privileged.  So let me ask the question |
| 5  Q.  Okay.  Sorry, we'll try -- sorry, I interrupted    09:36:49 | 5   differently.                               09:39:25 |
| 6   you.  We'll try and let each other finish.  It was | 6      MR. BRISCHETTO:  Sure. |
| 7   just reports? | 7      MS. BAUMGART:  Thanks, Steve. |
| 8  A.  Um-hum (affirmative response). | 8  Q.  BY MS. BAUMGART:  So you first had contact with |
| 9  Q.  Yes? | 9   Dr. Bala, it sounds like, with counsel present in |
| 10  A.  Yes.  Sorry.                          09:36:55 | 10   April of 2023.  Other than that conversation, did    09:39:29 |
| 11  Q.  Is it fair to assume that folks like DT North who | 11   you have occasion to speak with Dr. Bala without |
| 12   have leadership roles with the American Board of | 12   counsel present at any time prior to interviewing |
| 13   Vocational Experts are well-qualified vocational | 13   her for your report? |
| 14   experts themselves? | 14  A.  No. |
| 15  A.  I -- yes.  I wouldn't -- I wouldn't argue that.    09:37:17 | 15  Q.  Why were you retained in this matter?           09:39:43 |
| 16  Q.  And I think you said earlier that you did not | 16  A.  I was retained to discuss the -- Ms. -- or |
| 17   utilize any of your expertise as an international | 17   Dr. Bala's issues in regards to her complaints |
| 18   psychometric evaluator in this case.  Is that | 18   regarding OHSU and to develop an opinion regarding |
| 19   correct? | 19   loss of earning capacity. |
| 20  A.  Yes.                                  09:37:37 | 20  Q.  So I understand the second piece of that, to     09:40:19 |
| 21  Q.  And you may have answered this, but let me see if I | 21   develop an opinion regarding loss of earning |
| 22   can ask it just as a summary question.  So, | 22   capacity, but I would like some clarification as to |
| 23   Ms. Broten, which of your credential or credentials | 23   the first part of that, Ms. Broten, that you -- I |
| 24   that we just discussed, in your opinion, qualify | 24   believe I may not get it quite correctly but that |
| 25   you to serve as an expert in this case on matters    09:38:01 | 25   you were retained to opine on issues regarding      09:40:36 |
| Page 22 | Page 24 |
| 1   that you were asked to render an opinion, complete | 1   complaints Dr. Bala had with respect to her |
| 2   an analysis or intend to testify at trial? | 2   employment at OHSU.  Is that correct? |
| 3  A.  All of them except the international psychometric | 3  A.  Yes. |
| 4   evaluator. | 4  Q.  Can you further describe to me what you mean by |
| 5  Q.  So you were retained by Dr. Bala and her attorneys    09:38:20 | 5   that?                                     09:40:46 |
| 6   in this case.  Correct? | 6  A.  I -- I believe it's -- it's basically the issues of |
| 7  A.  Yes. | 7   this case in regards to her statements regarding |
| 8  Q.  And prior to being retained -- and I think, based | 8   discrimination. |
| 9   on your agreement, it looks like the formal | 9  Q.  Oh, I see.  Okay.  So you were asked to evaluate |
| 10   retention happened in or around August of 2023.    09:38:39 | 10   and opine whether or not she had experienced         09:41:10 |
| 11   Does that seem right? | 11   discrimination at OHSU? |
| 12  A.  Yes. | 12  A.  I don't know if -- if I was asked to actually |
| 13  Q.  Had you ever had occasion to speak with Dr. Bala | 13   define the discrimination but to look at the legal |
| 14   before you were formally retained to serve as the | 14   reports in regards to -- and all the reports in |
| 15   vocational expert?                        09:38:50 | 15   regards to the complaint.                  09:41:38 |
| 16  A.  Yes. | 16  Q.  What do you mean by the "legal reports"? |
| 17  Q.  When did you first speak with Dr. Bala? | 17  A.  That was a miss- -- |
| 18  A.  I want to say it was in April perhaps. | 18  Q.  That's okay. |
| 19  Q.  Of 2023? | 19  A.  That's a misstatement. |
| 20  A.  2023.                                 09:38:58 | 20  Q.  That's okay.  You can correct it.  That's all     09:41:46 |
| 21  Q.  What do you remember from that conversation? | 21   right.  This isn't a test.  No, no. |
| 22      MR. BRISCHETTO:  I'm going to ask a question in | 22  A.  It's just reports on file -- |
| 23   aid of objection.  Is that a conversation with | 23  Q.  Okay. |
| 24   counsel participating? | 24  A.  -- essentially. |
| 25      THE WITNESS:  Yes.                     09:39:13 | 25  Q.  Okay.                                 09:41:56 |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

Exhibit 6
Page 7 of 123

1  A.  Reports of record.
2  Q.  Sure.  And you did render an opinion as to whether
3      or not she had experienced discrimination or
4      retaliation at OHSU.  Is that correct?
5  A.  I did, yes.                          09:42:08
6  Q.  What was your opinion with respect to that?
7  A.  Is that the experiences she had appeared to -- to
8      be harmful to her ability to obtain work.
9  Q.  And what methodology did you rely upon to reach
10     that conclusion?                      09:42:34
11 A.  I looked at employability and placeability in the
12     VRAM model, vocational rehabilitation assessment
13     model, and researched many articles and support
14     documents.
15 Q.  How did those -- and I'm not sure the -- so is that 09:43:01
16     the sum total of the methodology that you employed
17     to determine that Dr. Bala's experiences at OHSU
18     had appeared to be harmful to her employability?
19 A.  Say that one more time.
20 Q.  Sure.  Sure.  You just shared with me you had   09:43:18
21     consulted the VRAM, reviewed some articles.  My
22     question is that the totality of methodologies that
23     you employed to reach your conclusion that
24     Dr. Bala's experiences at OHSU were harmful to her
25     future employability?                  09:43:37
                                              Page 26

1      workplace?
2  A.  Well, again, I looked at the reports and the
3      exhibits that were offered.  I have worked on
4      several cases.  I've worked with employers a lot,
5      all the time, in regards to disability issues, ADA  09:45:34
6      issues and so on and so forth.
7  Q.  What about your work with employers in the
8      disability setting, workers' comp setting, Social
9      Security setting qualifies you to render an expert
10     opinion that an employee such as Dr. Bala has been  09:45:57
11     subjected to unlawful discrimination in the
12     workplace?
13 A.  I have worked on other reports with similar
14     circumstances and have interviewed individuals and
15     employers, and just being the American   09:46:27
16     board-certified counselor is a -- or evaluator is a
17     designation that allows me to look at those
18     situations.
19 Q.  What about your certification as a board counselor,
20     American Board of Vocational Experts counselor,    09:47:03
21     qualifies you to render an expert opinion as to
22     whether or not there has been discriminatory
23     conduct in the workplace?
24 A.  It's basically training.
25 Q.  What kind of training?                  09:47:18
                                              Page 28

1  A.  In -- in a nutshell, yes.
2  Q.  Okay.  And what qualifications or certifications do
3      you have that renders you an expert in determining
4      whether or not someone has experienced harmful or
5      discriminatory or retaliatory conduct in the   09:43:55
6      workplace?
7          MR. BRISCHETTO:  Objection.  Multiple
8      questions, and so it's vague.
9  Q.  BY MS. BAUMGART:  Okay.  I'll restate.
10         What qualifications or credentials do you have  09:44:11
11     that render you capable of performing an expert
12     analysis as to whether or not an employee such as
13     Dr. Bala has experienced harmful conduct in the
14     workplace?
15 A.  Well, all of my qualifications, all my   09:44:30
16     certifications, all the training I've had,
17     including all the continuing education credits that
18     allow us the opportunity to look at barriers to
19     employment.  I guess that's maybe enough.
20 Q.  Okay.  And same question, breaking that out.  And  09:44:54
21     your answer may be the same.  That's fine, but I
22     want to ask it for each.  What qualifications or
23     credentials do you possess that supports your
24     expert opinion as to whether or not an employee
25     like Dr. Bala has experienced discrimination in the 09:45:11
                                              Page 27

1  A.  The training that you go to in gaining CEUs and
2      looking at barriers and -- to employment, including
3      those of -- of research articles and determining
4      whether or not that might -- that there may have
5      been behaviors that were displayed by the employer  09:47:48
6      that could harm an individual's potential.
7  Q.  Even if you were observing through your, let's say,
8      qualitative interview with someone like Dr. Bala or
9      another employee and they share their experience
10     with you, how do you know that that's really what   09:48:20
11     happened?  You're just assuming that -- you're
12     basing your opinion on the experience that they're
13     sharing with you.  Is that correct?
14 A.  Well, that's partly true, yes.
15 Q.  What additional steps, if any, do you take to find  09:48:35
16     out if there actually was any harmful or
17     discriminatory conduct before you opine that it
18     did, in fact, occur and impact this individual's
19     future employability?
20 A.  Well, you look at -- again, I looked at the exhibit  09:48:53
21     list.  I looked at the depositions of other
22     parties, and some of those were with OHSU.  And I
23     look at the results of the employment search in
24     general and some of the statements offered.
25 Q.  So I just want to stay focused on your opinion   09:49:21
                                              Page 29

8 (Pages 26 - 29)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 8 of 123

**Page 30**

1 about whether or not Dr. Bala experienced
2 discriminatory, retaliatory or harmful conduct in
3 the workplace. I want to stay focused on that,
4 that portion of your report. Does that make sense?
5 Yes?                                          09:49:37
6 A. Okay.
7 Q. So it is your testimony that part of what informs
8 your decision as to whether or not there has been
9 discriminatory, retaliatory or harmful conduct in
10 the workplace is informed by their subsequent job   09:49:46
11 search?
12 A. In part, yes.
13 Q. And I think I need to go back to -- following
14 counsel's objection, I had split my question up, so
15 I'm going to ask you the same. What qualifications   09:50:02
16 or credentials do you possess that you believe
17 qualifies you to provide an expert opinion as to
18 whether or not an employee like Dr. Bala has
19 experienced retaliation in the workplace?
20 A. Just my review, my interview, my review of file   09:50:19
21 documents, the information -- primarily the file
22 documents are what I looked at.
23 Q. Thank you. And when you say -- excuse me, when you
24 say "file documents," I think that you've listed
25 those out in the report. These would be documents   09:50:45

**Page 31**

1 you had available to you to perform your work?
2 A. Yes.
3 Q. Okay. Anything in addition to those file
4 documents?
5 A. In the report, I think I got something yesterday   09:50:53
6 that was an MGMA EP salary.
7 Q. I'm sorry, what -- you received a document from
8 whom yesterday?
9 A. I received it from Mr. Ellis, who received it from
10 your office.                                    09:51:17
11 Q. Okay.
12 A. That's not listed.
13 Q. But if you just received it yesterday, that would
14 have been something you had when you prepared your
15 report. Correct?                               09:51:27
16 A. No.
17 Q. Do you have any training in human resources?
18 A. That's a good question. I work with human
19 resources.
20 Q. Do you have any training? Have you undertaken any   09:51:45
21 classes? Do you have any certifications, SPHR?
22 Ever --
23 A. No.
24 Q. No?
25 A. Of course not.                               09:51:53

**Page 32**

1 Q. Have you ever worked in human resources?
2 A. No.
3 Q. Do you have any legal training?
4 A. No. I am an employer. I do hire.
5 Q. How many employees do you have?             09:52:04
6 A. I have one employee right now, but I have hired a
7 couple others in the past --
8 Q. Yes.
9 A. -- five years, so --
10 Q. You've been on your own about five years,       09:52:13
11 Ms. Broten?
12 A. I'd say 2017, I believe.
13 Q. And sorry if I asked you this at the top of my
14 questioning, but just to confirm, was it -- is it
15 your opinion that Dr. Bala did experience          09:52:33
16 discrimination while she was at OHSU?
17 A. I believe she did.
18 Q. And do you base that opinion on anything other than
19 what we've just discussed?
20 A. No.                                          09:52:53
21 Q. Okay. Similar question. Is it your expert opinion
22 that Dr. Bala suffered retaliation while she was at
23 OHSU?
24 A. From my research, possibly.
25 Q. You're not sure about that one?             09:53:09

**Page 33**

1 A. Well, I believe I discuss it in the report
2 somewhere.
3 Q. Right. And I'm just wondering, as you sit here
4 today and thinking about your testimony at trial,
5 will your opinion and testimony at trial be that   09:53:21
6 OHSU retaliated against Dr. Bala?
7 A. Define "retaliation."
8 Q. You use it in your report. I'm just --
9 A. Okay.
10 Q. I'm just purely trying to understand your opinions   09:53:36
11 and whether or not -- so let me start with this,
12 Ms. Broten: Is it your opinion that Dr. Bala was
13 subjected to retaliation by OHSU?
14 A. Can I look in my report?
15 Q. We're going to look at it in a minute. I just   09:54:04
16 would like from your memory now, and then we'll go
17 through it in detail.
18 A. I'd like to defer that.
19 Q. Okay. That's fair enough.
20 A. Okay.                                        09:54:15
21 Q. But you do -- you are confident that you do -- you
22 have opined and do intend to testify at trial that
23 your expert opinion is that Dr. Bala was
24 discriminated against by OHSU. Correct?
25 A. Yes.                                         09:54:30

9 (Pages 30 - 33)

Exhibit 6
Page 9 of 123

1  MS. BAUMGART: Okay. Let's take a break.
2  (RECESS 9:54 to 10:05)
3  Q. BY MS. BAUMGART: Ms. Broten, we're back on the
4  record. You understand you're still under oath?
5  A. Yes.                    10:05:34
6  Q. Earlier we were talking about the first time that
7  you had occasion to speak with Dr. Bala, and you
8  testified about a meeting in or around April 2023
9  where counsel was also present. Correct?
10 A. Yes.                    10:05:47
11 Q. In that meeting -- and don't tell me what was
12 discussed, but in that meeting, were the facts of
13 this case discussed?
14 A. In general terms, yes.
15 Q. Okay. And was the data that you -- was data about  10:05:58
16 this case that you relied upon discussed? For
17 example, did Dr. Bala or her attorneys provide you
18 with facts or data that you considered in forming
19 your opinions?
20 A. No.                     10:06:15
21    MR. BRISCHETTO: I'm going to instruct --
22 instruct her not to answer that question.
23    MS. BAUMGART: Well, I mean, we can take this
24 up at a break, but, for the record, I think that
25 under FRCP 26C, that, while certain communications  10:06:24

Page 34

1  are protected regardless of the form of the
2  communications, communications that identify facts
3  or data that the parties' attorneys provided and
4  the expert considered in forming the opinions to be
5  expressed are not protected. So I think I'm       10:06:46
6  allowed to inquire. I'm not asking right now for
7  the substance, but I am entitled to inquire whether
8  or not.
9     MR. BRISCHETTO: I'm going to let you go ahead
10 and ask whether -- that question, whether you were  10:06:57
11 supplied facts or data in that initial conversation
12 that you relied upon to develop your report.
13    MS. BAUMGART: Well, thank you for asking my
14 question, Steve.
15    MR. BRISCHETTO: That's all right.         10:07:11
16 Q. BY MS. BAUMGART: That's a fair question.
17 A. No. They were interviewing me primarily.
18    MR. BRISCHETTO: And that's -- yeah.
19    THE WITNESS: I don't have to say that, right?
20    MR. BRISCHETTO: You don't have to say that.   10:07:20
21 Q. BY MS. BAUMGART: Okay. And that's fine. And
22 that's fine. So at any point, have you had any
23 conversations with Dr. Bala and counsel where you
24 were provided with facts or data that you
25 considered in forming your opinions?            10:07:32

Page 35

1  A. Well, I was -- I was provided all the file
2  documents.
3  Q. Right. And separate from that. We have --
4  everybody has the file documents. We understand
5  how that works. You were obviously given        10:07:46
6  documents --
7  A. Right.
8  Q. -- but I'm just talking about a conversation,
9  either a videoconference or a telephone call or
10 in-person meeting. Did you ever have a meeting     10:07:54
11 with Dr. Bala and counsel where you were provided
12 with any facts or data that you ultimately
13 considered in forming your opinions?
14 A. I don't believe so.
15 Q. Do you think it's possible?             10:08:09
16 A. Would this be after I was hired or --
17 Q. Yes, yes.
18 A. Oh, after I was hired.
19 Q. Yes.
20 A. I don't even know if we met together as a group. I  10:08:16
21 did my interviews with Dr. Bala and sought out
22 information from -- from her. So the interviews
23 themselves provide me much information. I attempt
24 to read the file. In this case, the file was very
25 huge, very large.                       10:08:44

Page 36

1  Q. Okay. And we're going to talk about that,
2  Ms. Broten.
3  A. Okay.
4  Q. I just want to stay focused on my question, which
5  was just if you learned at any time, from the time  10:08:52
6  you were retained up until today, any facts or data
7  that you relied upon in forming your opinions that
8  came to you through conversations with counsel?
9  A. Not that I -- not that I recollect.
10 Q. Okay. And if you think of something today, please  10:09:04
11 let me know.
12 A. Sure.
13 Q. This is my one opportunity to visit with you under
14 oath. Okay?
15 A. Sure.                    10:09:11
16 Q. Okay. And we'll talk about your conversations with
17 Dr. Bala.
18 A. Okay.
19 Q. We'll talk about those interviews.
20    Okay. Before the break, we were talking about  10:09:17
21 your expert opinion you intend to provide at trial
22 that Dr. Bala was subjected to discrimination by
23 OHSU. And I want to ask a few follow-up questions
24 about that, Ms. Broten. When I had asked you, I
25 think, a couple times what it is about your       10:09:38

Page 37

10 (Pages 34 - 37)

Exhibit 6
Page 10 of 123

**Page 38**

1  qualifications or what you relied upon that
2  qualifies you to give that expert opinion, my
3  interpretation of your answer -- and correct me if
4  I'm wrong -- was sort of everything, right?  This
5  is what you do.  You've been doing this for a long   10:09:56
6  time.  You read articles.  You go to conferences.
7  Things like that.  Is that correct?
8  A.  That's in part correct, yes.
9  Q.  Okay.  What am I missing?  Correct the other part
10  of that or add to the other part of that.          10:10:07
11  A.  So I believe your question was very poignant and
12  asked whether I believe she was discriminated
13  against.  Am I correct in saying that?
14  Q.  My question, which I think I asked you several
15  times and you answered in the affirmative several  10:10:21
16  times, was whether, in your expert opinion, you
17  concluded that Dr. Bala had been discriminated
18  against by OHSU, which I believe you answered in
19  the affirmative.  Is that still your testimony?
20  A.  So what I believe is Dr. Bala's story.  As a      10:10:33
21  vocational expert, we are ethically challenged to
22  believe our interviewee, our client.  I, on a
23  personal note, when reviewing all the documents
24  that I did, can make a, you know, a determination
25  that, yeah, there was some discrimination here, or  10:11:15

**Page 39**

1  I think you even mentioned retaliation, which you
2  know, as well in one of your questions.  But my job
3  was to discuss the harm that Dr. Bala had in terms
4  of when leaving OHSU, when at OHSU and when leaving
5  OHSU, the harm being loss of earning capacity, if   10:11:42
6  that makes sense.
7  Q.  I'm not sure that answered my question.  I need to
8  know if you changed your testimony and thus your
9  opinion.  So, Ms. Broten, is it your opinion as
10  stated in your report that Dr. Bala was subjected   10:12:05
11  to discrimination by OHSU?
12  A.  So I wasn't asked to determine if she was
13  discriminated against.
14  Q.  And even if you -- oh, I'm sorry.  Go ahead.
15  A.  So giving an opinion would be not a part of what I  10:12:23
16  was asked to do in this case.
17  Q.  So I just going to note for the record, which will
18  speak for itself, that I think your testimony has
19  changed from before the break.  Did you have an
20  opportunity to consult with counsel or did you      10:12:45
21  speak with counsel during the break?
22  A.  I did.
23  Q.  And now your testimony is that you were not asked
24  and did not form an opinion as to whether or not
25  Dr. Bala experienced discrimination at OHSU?        10:12:54

**Page 40**

1       MR. BRISCHETTO:  Objection.  Misstates the
2  record.
3       Go ahead.
4       THE WITNESS:  Oh, I don't want to change my
5  opinion --                              10:13:03
6  BY MS. BAUMGART:  Okay.
7  A.  -- because I do personally have an opinion
8  regarding discrimination, and so from what I saw
9  and reviewed and when interviewing Dr. Bala, I do
10  have an opinion regarding that, but it's more of a  10:13:23
11  personal nature.  It's not necessarily a part of
12  what I was asked to do in my loss-of-earning
13  capacity.
14  Q.  How do you differentiate whether or not you have a
15  personal opinion versus -- well, let me ask it this  10:13:43
16  way:  You are testifying here today and will
17  testify at trial as an expert vocational -- a
18  vocational expert.  Correct?
19  A.  Um-hum (affirmative response).
20  Q.  Yes?                              10:13:55
21  A.  Yes.
22  Q.  You understand that you will not be testifying in
23  any other capacity.  Is that right?
24  A.  Yes.
25  Q.  So when you take the stand, how do you intend to    10:14:00

**Page 41**

1  explain to the jury that your opinion is that
2  Dr. Bala experienced discrimination at OHSU?
3       MR. BRISCHETTO:  Objection.  Improper
4  foundation.
5       Go ahead.                       10:14:17
6  Q.  BY MS. BAUMGART:  Go ahead.
7  A.  So in formulating the opinion of loss of earning, I
8  took in all of the documents that I prior disclosed
9  to you, you know, the entire file review, interview
10  with Dr. Bala, and attempting to clarify and review  10:14:40
11  the job search records, which were very telling,
12  and had to establish harm based on some of the
13  issues that were presented, I believe, in the -- in
14  the complaint and in my conversations with
15  Dr. Bala.  Does that make sense?          10:15:22
16  Q.  Well, I'm just wanting to know how you will explain
17  your opinion that Dr. Bala was discriminated
18  against when you take the stand and testify before
19  the jury.
20       MR. BRISCHETTO:  Improper foundation.     10:15:32
21       Go ahead.
22  Q.  BY MS. BAUMGART:  I'll rephrase the question.
23       Do you intend to share your opinion with the
24  jury that you believe Dr. Bala was discriminated
25  against?  It sounds like you do.          10:15:41

11 (Pages 38 - 41)

Exhibit 6
Page 11 of 123

1  A.  The evidence that I read through the documents and
2      my conversations with Dr. Bala appear to reflect
3      discrimination.
4  Q.  Okay.  So you intend to share that with -- do you
5      intend to share that with the jury?  Sounds like    10:16:01
6      yes.
7  A.  If you're going asking to ask me the question,
8      probably.
9  Q.  Okay.  And how will you explain to the jury how you
10     arrived at that opinion?                             10:16:09
11 A.  And it would be through research of the documents,
12     you know, looking all the rec-- -- looking at all
13     the records reviews and in my discussions with
14     Dr. Bala primarily.
15 Q.  Okay.  And you'll share with the jury that -- how    10:16:23
16     you arrived at this conclusion was that you, in
17     your role as an expert, believe Dr. Bala's story?
18         MR. BRISCHETTO:  Objection.  Misstates the
19     testimony.
20 Q.  BY MS. BAUMGART:  Is that fair?                      10:16:35
21         MR. BRISCHETTO:  Go ahead.
22         THE WITNESS:  I do believe Dr. Bala's story,
23     yes.
24 Q.  BY MS. BAUMGART:  And you intend that share that
25     with the jury?                                       10:16:41

Page 42

1          MR. BRISCHETTO:  Objection.  Asked and
2      answered.
3          Go ahead.
4  Q.  BY MS. BAUMGART:  Go ahead.
5  A.  Yes.                                                 10:16:45
6  Q.  How will you explain to the jury the elements of --
7      well, first let me ask you this:  When we're
8      talking about discrimination broadly -- and I know
9      you've testified a lot of the work you do as a voc
10     rehab expert is about disability, right,             10:16:58
11     disability, ADA, things like that.  Correct?
12 A.  A lot of it, yes.
13 Q.  Are you aware of the underlying types of
14     discrimination claims in this particular case?  Do
15     they involve the ADA?                                10:17:12
16 A.  No, I'm not aware.
17 Q.  Okay.  You don't know what Dr. Bala is even
18     alleging by way of discrimination?
19 A.  No.  I read the file.  I don't recall all the facts
20     at this moment.                                      10:17:26
21 Q.  Sure.  And I know that's fair.  It's a big file,
22     and I'm certainly not asking you to have recalled
23     all the facts, but you stated that you have what
24     seems to be an unequivocal opinion that she was
25     discriminated against in the workplace, and I'm     10:17:39

Page 43

1      just asking do you know what she's even alleging by
2      way of discrimination?
3  A.  I -- again, I don't know.  I'd have to refer to the
4      file and look at all the documents --
5  Q.  Okay.                                                10:17:55
6  A.  -- and answer that question.
7  Q.  Well, I'll represent to you that some of her claims
8      involve discrimination based on race and gender.
9      Were you aware of that?
10 A.  Not necessarily.                                     10:18:06
11 Q.  Okay.
12 A.  Not totally, no.
13 Q.  If you took -- when you take the stand, how will
14     you explain the elements of why you conclude
15     Dr. Bala was subjected to race discrimination?  How 10:18:17
16     will you explain that to the jury?
17         MR. BRISCHETTO:  Objection.  Assumes a fact not
18     in evidence.
19         Go ahead.
20 Q.  BY MS. BAUMGART:  Go ahead.                          10:18:26
21 A.  I don't know if I would.
22 Q.  Okay.  And the same question:  Would you be able to
23     explain to the jury the legal elements of a gender
24     discrimination claim?
25 A.  No.                                                  10:18:39

Page 44

1          MR. BRISCHETTO:  Same objection.
2          Go ahead.
3  Q.  BY MS. BAUMGART:  Would you be able to explain to
4      the jury the elements of retaliation?
5          MR. BRISCHETTO:  Continuing objection.          10:18:47
6          Go ahead.
7          THE WITNESS:  I know some about that, but no.
8  Q.  BY MS. BAUMGART:  You had asked me earlier how I --
9      how I would define "retaliation."  Unfortunately, I
10     get to ask the questions today.  How do you define  10:19:01
11     "retaliation," Ms. Broten?
12 A.  Well, the research I have done -- and I think I --
13     I believe I spoke about it in the report somewhat,
14     and now I have to remember everything.
15 Q.  That's okay.  Just give me your best -- your        10:19:20
16     best -- sitting here today, you testified you've
17     been doing this for nearly 40 years.  I know you're
18     not a lawyer.  How do you define -- what does
19     "retaliation" mean to you?
20 A.  It's the behavior basically of an organization      10:19:31
21     and/or individuals within the organization that
22     maybe harm another -- an employee or a person
23     who -- I guess that's the big -- best explanation I
24     have at this moment.
25 Q.  Do you know any of the specific legal elements of a 10:19:59

Page 45

12 (Pages 42 - 45)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 12 of 123

1  retaliation claim?
2  A.  I don't.
3  Q.  Do you know any of the specific legal elements of a
4      gender discrimination claim?
5  A.  You know, I did some reading about it, but I    10:20:11
6      couldn't give you information, no.
7  Q.  Do you know any of the specific elements of a race
8      discrimination claim?
9  A.  No.
10 Q.  You testified earlier about sort of, again,    10:20:21
11     generally, trainings you had participated in or
12     articles you've read.  Can you point to me what
13     specifically -- what training specifically, whether
14     it was a conference or a continuing education
15     course, that taught you about discrimination or    10:20:46
16     retaliation in the workplace?
17 A.  I can't pinpoint one.  I have done this for 40
18     years, and I get 40 to 60 CEUs every year, and, I
19     mean, I took a class, even a master's class, in
20     multicultural -- anyway, so, no, I couldn't point    10:21:09
21     to one.
22 Q.  Okay.  What about the last five years, could you
23     point to any single continuing education class,
24     training, conference that you attended that
25     educated you on how to evaluate discrimination or    10:21:31

Page 46

1  Q.  All right.  And would those records that you just
2      described, Ms. Broten -- would they -- they would
3      encompass any training that you would have
4      undertaken that would cover this issue of
5      identifying discrimination or retaliation in the    10:23:03
6      workplace if, indeed, you took that type of course,
7      right?
8  A.  They should.
9  Q.  Okay.
10 A.  Yeah.                                    10:23:13
11 Q.  My question is really would there be any other
12     record where you might have taken that type of
13     course other than these records you just described?
14 A.  I don't believe so.
15 Q.  Thank you.  You testified that you believe    10:23:27
16     Dr. Bala's story.  Is that correct?
17 A.  Yes.
18 Q.  What is her story?
19 A.  It's a -- it's a long story.
20 Q.  Give me the condensed version.    10:23:43
21 A.  Okay.  I'll do my best.  Dr. Bala said that
22     essentially, while she was at OHSU, there were
23     incidents which were interesting maybe -- I don't
24     know if that's the right word.  I'm trying to think
25     of the right word.  That were concerning.  That's a    10:24:21

Page 48

1  retaliation in the workplace?
2  A.  I couldn't give you something, no.
3  Q.  And do you think that's because you didn't attend
4      any such class, or you just don't remember?
5  A.  I really just don't remember.    10:21:45
6  Q.  Would there be anything that would help refresh
7      your recollection?  Like do you keep -- you know, I
8      know for us, like we keep -- all of our continuing
9      legal education, for example, we --
10 A.  Sure.                        10:21:59
11 Q.  -- have to submit to the Oregon State Bar.  Do you
12     have to do a similar type of report?
13 A.  I do.  I send one to ABVE, and I send one to the
14     NASW, National Association of Social Workers, and I
15     send one in to the State of Oregon, so yes.    10:22:14
16 Q.  Do you have to do that -- all of those on an annual
17     basis?
18 A.  No.  ABVE is annual, and then NASW is every two
19     years, and VRC is every five years.
20 Q.  Do you keep records of those submissions?    10:22:37
21 A.  I do.
22 Q.  Do you have those in your possession currently?
23 A.  At my office.
24 Q.  Yes, no, sorry.  Not as you're sitting here.
25 A.  I have them at my office.    10:22:48

Page 47

1  better word -- to her in regards to behavior,
2  pointing out her behavior, discussions with -- I
3  guess statements from staff and statements
4  regarding her personality that she thought were odd
5  and maybe overexaggerated -- I don't think that's    10:25:02
6  the word she used -- and caused her to defend
7  herself frequently.
8      And in that process, she also indicated that
9  she was -- her contract would be terminated, not
10 renewed maybe.  I don't know the actual lingo at    10:25:28
11 this moment.  And she essentially left there,
12 resigned, because her opinion is that a terminated
13 contract and/or a non-renewed contract would
14 possibly harm her ability to obtain work, and she
15 also indicated that she wanted to stay at OHSU and    10:26:05
16 made many attempts to remedy or attempt to change
17 possibly the opinion of termination.
18     I'm trying to be short, and I'm not very short.
19 Q.  That's okay.  You're doing a great job.
20 A.  And then -- then her experiences afterwards, which    10:26:29
21 she didn't think would harm her ability to work.
22 She didn't even think about that as much until she
23 started getting a lot of no's, and persons were
24 indicating to her that she interviewed with that
25 there were concerns regarding her time at OHSU.    10:26:59

Page 49

13 (Pages 46 - 49)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 13 of 123

**Page 50**

1    And I believe she said about six months after she
2    started, maybe five to six months after she started
3    looking for work, even though some of that time was
4    on a vacation, extended vacation, I believe, that
5    she started putting two and two together or started    10:27:29
6    realizing that, gee, something isn't right here.
7    How come?  And that's basically the story and then
8    that it kind of continued throughout her job-search
9    process.
10 Q.  Thank you.  And I realize I started by asking you    10:27:51
11    to give me a brief version.  You said it's long.
12    But is there any other -- you know, obviously there
13    are more details, but is there anything else, in
14    your mind, that really stands out to you about her
15    story that was a primary influencer in your expert    10:28:06
16    opinion that you didn't share just now that you
17    want to share?
18      MR. BRISCHETTO:  Objection.  Vague.
19      Go ahead.
20      THE WITNESS:  If you want me to keep a brief    10:28:16
21    story, that's as brief as I can get.  There may be
22    more, and I can -- if I remember, how about if I
23    bring it up?
24 Q.  BY MS. BAUMGART:  That's great.  That's great.
25 A.  Okay.                            10:28:32

**Page 51**

1 Q.  And we'll go through some things in your report.
2    Thank you.
3      Ms. Broten, what, if anything, did you do to
4    verify Ms. -- excuse me, Dr. Bala's story about
5    what her experience was at OHSU?  What, if    10:28:43
6    anything, did you do to verify that?
7 A.  I didn't verify.
8 Q.  You took her at her word, it sounds like?
9 A.  I did.
10 Q.  Okay.                            10:28:54
11 A.  Yes.
12 Q.  Okay.  I want to turn back to your report.  You
13    have that still in front of you.  Exhibit 1.  And I
14    think you've already testified but just to confirm
15    that you were retained, as we see in the first    10:29:12
16    sentence of your report, to perform an
17    earning capacity determination.  Is that correct?
18 A.  Yes.
19 Q.  What qualifies you to perform that expert analysis?
20 A.  Well, that's my training and experience over the    10:29:27
21    years.
22 Q.  And you, indeed, did perform this analysis in this
23    case?
24 A.  I did.
25 Q.  The last sentence -- and I think that we've talked    10:29:37

**Page 52**

1    about this but just to follow up.  Looking
2    specifically at your report, Ms. Broten, that last
3    sentence of paragraph 1, "I was asked to determine
4    the wages Dr. Bala may have been able to garner if
5    she was able to stay comfortably in her specialized    10:30:09
6    medical field at OHSU without experiencing
7    discrimination and what loss she suffered from the
8    discrimination."  Do you see that?
9 A.  I do.
10 Q.  Is that an accurate statement of what you were    10:30:22
11    asked to opine upon in your expert capacity?
12 A.  Well, and I think the words were initially "harm,"
13    you know, from her experience at OHSU, so yes.
14 Q.  Yes, this is accurate?  Yes?
15 A.  Yes.                            10:30:43
16 Q.  Do you use the words -- for purposes of your
17    analysis and your work in this case and ultimately
18    your expert opinions, do you use the words "harm"
19    and "discrimination" interchangeably, or do those
20    mean different things to you?    10:31:00
21 A.  In this case, they meant the same thing.
22 Q.  So when you use the word "harm," you're really --
23    that means "discrimination" to you and vice versa?
24 A.  Yes.
25 Q.  Okay.  I think this is what I've heard you testify    10:31:14

**Page 53**

1    to, but I want to confirm that the expert opinions
2    you were asked to render, the earning capacity and
3    then the -- that last sentence.  I'm not just going
4    to reread the last sentence of the first paragraph.
5    So basically the work you were asked to do, which    10:31:44
6    is in the first paragraph of your report.  Correct?
7 A.  Right.
8 Q.  Okay.  So the scope of work you were retained to
9    perform, you did, in fact, render expert opinions
10    on these issues.  Correct?    10:31:58
11 A.  I rendered an opinion on loss of earning capacity.
12 Q.  Okay.  And you also rendered an expert opinion on
13    that -- the last piece where you were asked to
14    determine the wages, right, her, I think --
15 A.  Her ability to earn.    10:32:14
16 Q.  Right.  Okay.
17 A.  Yes.
18 Q.  So yes.  In performing your work and your analysis
19    to arrive at your opinions, all of that was through
20    the lens that Dr. Bala had been harmed or    10:32:30
21    discriminated against in her employment at OHSU.
22    Correct?
23 A.  Yeah.  I -- yes.
24 Q.  Okay.  Are you generally familiar -- and I know you
25    don't need to recite them, but are you generally    10:32:48

14 (Pages 50 - 53)

Exhibit 6
Page 14 of 123

**Page 54**

1  familiar, given your ongoing work as a forensic in
2  civil cases, what your written report must contain
3  under the applicable Federal Rules of Civil
4  Procedure?  Are you generally aware of that?
5  A.  Generally, yeah.  I'm often reminded by attorneys,    10:33:03
6  you need to include all this information.
7  Q.  Fair enough.  That's our job.  Do you believe that
8  your report complies with those requirements?
9  A.  I hope so.
10  Q.  Okay.  Do you know -- and if it's helpful to you,    10:33:18
11  again, not to -- I just want to sort of speed this
12  along.  I think you know that your report also
13  contains your CV --
14  A.  Right.
15  Q.  -- and your prior testimony list.  Is that correct?  10:33:31
16  A.  Yes.
17  Q.  And your CV, is your CV up to date?
18  A.  Yes.
19  Q.  And the list of testimony up to date?
20  A.  Yes.                                          10:33:45
21  Q.  Okay.
22  A.  Well, hold on.
23  Q.  Sure.
24  A.  Let me take a look.  There might have been one more
25  case, a divorce case, that I --              10:34:00

**Page 55**

1  Q.  Oh, that's okay.
2  A.  Oh.
3  Q.  It's not a civil case -- not a civil case?
4  A.  Okay.  No.
5  Q.  Okay.  That's fine.  That's fine.  If it needs to    10:34:12
6  be updated, that's fine.
7  A.  Oh, okay.
8  Q.  But for our purposes -- so I count, I think,
9  maybe -- maybe three civil cases where you have
10  authored -- either authored a report or testified.  10:34:30
11  Is that correct?  The McCrae versus City of Salem I
12  think is the first one I see unless I'm missing
13  something on the first page.
14  A.  Let's see.  I did testify in McCrae.  I testified
15  on Gargiulo.                                 10:34:56
16  Q.  Okay.  Sorry.  I'll just take these one at a time
17  and maybe -- I don't need to spend much time on
18  this.
19  A.  Oh, sure.
20  Q.  So the McCrae case was a civil case.  Were you    10:35:03
21  retained by the plaintiff or defense?
22  A.  By the plaintiff.
23  Q.  Do you remember just generally the nature of that
24  case?
25  A.  Yes.  Ms. McCrae was injured by a plastic or some  10:35:14

**Page 56**

1  type of a rubber bullet from a police, Salem
2  police.
3  Q.  Okay.
4  A.  And that was it.
5  Q.  Okay.  Thank you.  And then we go down to the    10:35:36
6  Gargiulo.  I'm probably mispronouncing that.
7  A.  I do too, yes.
8  Q.  Okay.  That was a civil case.  Is that right?
9  A.  Yes.
10  Q.  Was that an employment case?              10:35:48
11  A.  Yes.  Mr. Gargiulo was -- it was discrimination,
12  employment discrimination, against D&R Masonry.  I
13  think he was terminated.  Felt he was
14  terminated -- terminated wrongfully.
15  Q.  You testified on behalf of the defense in that    10:36:11
16  case?
17  A.  Yes.
18  Q.  And then the Jones v. George Fox case, which you
19  mentioned, I think, previously as a case you had
20  given a deposition, and it looks like you       10:36:26
21  testified.  Correct?
22  A.  Yes.
23  Q.  That was an employment case.  Correct?
24  A.  Yes.
25  Q.  So other than this case, the Jones case and the    10:36:31

**Page 57**

1  Gargiulo case, have you provided either an expert
2  report or testified in any other civil employment
3  case?
4  A.  Well, I don't always testify because very often the
5  people, person settle out of court.          10:36:51
6  Q.  Sure.  And I was just asking a report or authored a
7  report or testified.
8  A.  The 219 case against the Veterans' Administration
9  is another employment case.
10  Q.  Oh, thank you.  You had mentioned that earlier.    10:37:13
11  Who did you -- who were you retained by in that
12  case?
13  A.  By the plaintiff.
14  Q.  Okay.
15  A.  And I guess it's not on here.  Must have been    10:37:22
16  earlier, 218 or so.
17  Q.  Okay.  Have you ever been retained in any case that
18  involved a physician?
19  A.  Well, the Veterans', both Veterans' Administration
20  cases were physicians.                       10:37:45
21  Q.  Was there one or more Veterans' case?
22  A.  Well, there is another one, but it was earlier
23  than 218.
24  Q.  Oh, I see.  Okay.
25  A.  I believe it was in 218.  It was a year earlier.   10:37:54

15 (Pages 54 - 57)

Exhibit 6
Page 15 of 123

1  Q.  2018?

2  A.  Yeah, let me see.  Yeah, I don't see it on here.

3  Q.  That's fine.

4  A.  It might have been 218.

5  Q.  Sorry.  I don't want to be cross talking.          10:38:06

6       So let me ask you about the case that is on

7  here, the 2019 -- it looks like the Jewell -- well,

8  it's Veterans' Administration case, and it says

9  EEOC.  You said you were retained by the plaintiff.

10  Was the EEOC the plaintiff in this case?  Were they  10:38:23

11  stepping in the shoes of the plaintiff is probably

12  a better way to say that?

13  A.  Well, I was -- I was hired by the plaintiff so --

14  and it's against the Veterans' Administration.

15  Q.  Oh, I see.  Okay.  And you may be just -- I think  10:38:41

16  I'm making a wrong assumption about the reference

17  to the EEOC.

18  A.  Ms. Jewell did not want to put the name of the

19  party on there.

20  Q.  Okay.  So let me just focus you on this case     10:38:54

21  involved -- you rendered an expert opinion in

22  this -- doesn't look like you rendered a report.

23  You just testified --

24  A.  Just testified.

25  Q.  -- in the state court case.  Okay.               10:39:07

Page 58

1  A.  Yes.

2  Q.  And the plaintiff was a physician?

3  A.  Yes.  Plastic surgeon.

4  Q.  And what did you opine on in that case, just very

5  generally?  Was it the same sort of               10:39:23

6  earnings-capacity analysis?

7  A.  It was earning capacity analysis and how it

8  affected his employability in the future and

9  placeability.

10  Q.  And it looks like you didn't author a report, but  10:39:41

11  do you have a memory?  I know it's been a couple

12  years ago.  Do you have a memory of the analysis

13  that you performed to prepare to testify at trial?

14  A.  Well, it was very similar to what I did with

15  Dr. Bala, so I looked at -- I interviewed, looked  10:40:00

16  at materials, case materials, and then discussed --

17  it was primarily discussing his job and the -- and

18  I'm just going to use the word "harm" or

19  "discrimination" he felt, synonymous there, in

20  terms of obtaining or keeping his job through the  10:40:31

21  Veterans' Administration -- and I believe he was a

22  director of plastic surgery.  He was like the -- he

23  was fairly high up -- and how difficult it was once

24  he left there to obtain another job.  I think -- I

25  don't remember if he was terminated or not or if he  10:41:05

Page 59

1       lost a contract or --

2  Q.  Okay.

3  A.  -- if he quit.  I just don't remember.

4  Q.  Fair enough.  And sorry to interrupt, but I just

5       want to keep things moving.                     10:41:17

6  A.  Sure.

7  Q.  Let me ask you this question to the extent you

8       remember:  Do you remember evaluating any earnings

9       loss or doing any similar type of calculation you

10      did in this case?                               10:41:26

11  A.  We -- I know we talked about it at trial, and it's

12      more -- the Veterans' Administration is more

13      administrative.

14  Q.  Sure.

15  A.  Judge through the Veterans' Administration, and so  10:41:37

16      it was much like this, you know.

17  Q.  Pretty informal?

18  A.  Pretty informal.

19  Q.  No jury?

20  A.  No.                                              10:41:50

21  Q.  So my question was did you perform any sort of

22      earnings-loss calculations to prepare to testify at

23      that administrative hearing?

24  A.  You know, I can't remember.  It wasn't as formal as

25      this one.                                       10:42:04

Page 60

1  Q.  Okay.  Let me ask you this question, Ms. Broten.

2       Maybe this will get at it.  Other than this case

3       with Dr. Bala, have you ever had occasion -- and

4       then it likely would only be in this -- the

5       Veterans' cases -- to consult physician          10:42:17

6       compensation benchmark surveys like the AAMC or

7       others?  Have you ever had occasion to consult

8       those, or is this case the first time you've had

9       occasion to do that?

10  A.  This would be -- yeah, I've consulted them because  10:42:32

11      I've done them in these two cases, so I have

12      researched that material.  I'm trying to think if I

13      have done it in a -- in a divorce case.  I can't

14      remember if I have -- I think I may have done it in

15      a divorce case.  I just don't know.             10:42:56

16  Q.  Okay.

17  A.  And it would be more on earning potential rather

18      than loss of earning capacity.

19  Q.  And that's fair.  And so is this -- is this the

20      first time -- this case the first time you've had  10:43:09

21      an occasion to prepare an analysis and render an

22      opinion about a loss of earnings?

23  A.  For a physician.

24  Q.  For a physician.  Thank you.

25  A.  Yeah.  Yes.                                      10:43:21

Page 61

16 (Pages 58 - 61)

Veritext Legal Solutions

calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 16 of 123

1  Q.  Okay.  I think it's the last page of your report,
2      Ms. Broten, that's your retainer agreement.  If you
3      could just flip to that for me.  Is this your
4      standard retainer agreement?
5  A.  Yeah, it's the standard.                    10:43:51
6  Q.  Okay.  And do you have an estimate of fees you've
7      incurred to date on this matter?
8  A.  I really haven't, but we're working on it.
9  Q.  Okay.  You haven't invoiced yet?
10 A.  I haven't yet, but I know you asked for it.  The   10:44:02
11     bill is coming.
12 Q.  Very good.  Okay.
13 A.  My -- yeah.  My secretary said, Lisa, I'm working
14     on it.  I really am, because I wanted it for today,
15     but she couldn't get it done.                 10:44:14
16 Q.  That's okay.  Has any of the work you've done to
17     date been on -- it looks like your retainer
18     agreement differentiates a different hourly rate
19     and a higher hourly rate if there is a rush status?
20 A.  Right.                                        10:44:31
21 Q.  Has any of the work you've done on this case been a
22     rush status type of --
23 A.  This was not a rush status, right.
24 Q.  If you could turn to your CV, which is also part of
25     your report.  A few questions for you about that.   10:44:45

                                              Page 62

1      Do you know when you last revised this, Ms. Broten?
2  A.  Oh, maybe three months ago, six -- six -- six
3      months ago, three.  I'm not sure.
4  Q.  Okay.  And I think I now know from your earlier
5      testimony what the acronyms after your name means,   10:45:05
6      so we're good there.  Your professional
7      certifications, are those all current and complete?
8  A.  Yes, they're all current.  I am currently
9      submitting, yes, documents to keep them.
10 Q.  Okay.  If you could turn to page 3 of your CV,   10:45:24
11     please.  I will direct you to the "PROFESSIONAL
12     SKILLS" section.  Is this meant to be exhaustive of
13     all of your professional skills that you've the
14     thorough -- I think that you define as having a
15     "thorough working knowledge of"?              10:46:11
16 A.  Oh, you mean of the testing and some of the -- some
17     of the resource manuals and --
18 Q.  Yes.  Whatever --
19 A.  -- so forth.
20 Q.  -- is listed on --                            10:46:24
21 A.  Yeah.
22 Q.  -- your professional skills?
23 A.  Yes.
24 Q.  Okay.  Did you rely on any of these vocational
25     reference materials in forming your opinions in   10:46:35

                                              Page 63

1      this case?
2  A.  I looked at the "Dictionary of Occupational
3      Titles."  EP is not a job listed in there because
4      it's so old but still used today, especially by
5      Social Security.  I looked at O*NET.  I looked   10:46:51
6      at -- oh, I went into LifeStep, seeing if that
7      would come up with additional information on
8      occupation.  I went to the Oregon Employment
9      Department.  I went to the Department of Labor,
10     U.S. labor stats, and I also went on SkillTRAN.   10:47:21
11 Q.  It sounds like you were looking for labor data
12     on -- specifically on EPs, to begin with.  Correct?
13 A.  Right.  And then it morphed to a couple other
14     occupations.
15 Q.  What did it morph to?                         10:47:50
16 A.  One of them was surgeons, all other, standard
17     occupational code, SOC, and then it also kind of
18     centered on cardiologist.
19 Q.  The last page of your CV, your professional
20     activities, is that current and exhaustive, nothing   10:48:22
21     missing from that?
22 A.  Let's see.  That looks -- that looks about right
23     right now.
24 Q.  Okay.  I don't see, unless I have overlooked it,
25     that you've authored any publication, any   10:48:54

                                              Page 64

1      publications?
2  A.  I have not.
3  Q.  Have you ever authored any publications in your
4      field of expertise?
5  A.  No.  I haven't had time.  I'm very, very busy.   10:49:04
6      Plus I have children.
7  Q.  Slightly different question from what I asked you
8      earlier.  I asked you for an estimated breakdown
9      between your work, I should say, as a forensic in,
10     for example, civil cases and then Social Security   10:49:41
11     cases versus your voc rehab work, and I think you
12     said it could be about, I forget, 40 to 50 percent,
13     maybe, 30 to 40, whatever it was.
14 A.  Yeah.
15 Q.  My question is does that directly correlate to your   10:49:54
16     breakdown of income, or do you derive more income
17     from the forensic versus the non-forensic work?
18 A.  That's a really good question.  I wish I knew.  I
19     don't keep track, and it's partly because I'm just
20     so busy that I don't keep track.  I just do my job.   10:50:07
21 Q.  Okay.  You mentioned earlier you currently have one
22     employee.  Is that Pam Donaldson?
23 A.  No.  Actually, she left.  It is now Jennifer Green.
24 Q.  Jennifer?
25 A.  Green.                                        10:50:23

                                              Page 65

                                    17 (Pages 62 - 65)

Exhibit 6
Page 17 of 123

1 Q. Green?
2 A. Yes.
3 Q. What's Ms. Green's role with your organization?
4 A. She is an office assistant, and Pam I had worked
5    with for many, many years and actually retrained    10:50:33
6    her from being a paramedic to an administrative
7    person, but she left. She retired and -- at 72,
8    and then Jennifer came on, and now I'm training
9    Jennifer to do my administrative work, typing bills
10   and that kind of thing.    10:51:06
11 Q. Did Jennifer have any role in your preparation of
12   this -- of your report or rebuttal report in this
13   case?
14 A. You know, she -- her name isn't up here. It should
15   be, so -- so she probably didn't. It was probably    10:51:19
16   me.
17 Q. Well --
18 A. It is an old form.
19 Q. Okay. So, Ms. Broten, I want to -- my question is
20   did anyone other than you author this report that    10:51:29
21   we see in Exhibit 1?
22 A. Oh, no. Just me.
23 Q. Did anyone other than you author your rebuttal
24   report?
25 A. No, no. Just me.    10:51:38
                                        Page 66

1 Q. As you sit here today, do you have a best estimate
2    of how many reports you've prepared in your role as
3    a vocational expert?
4 A. I started doing more vocational expert work in, I
5    don't know, 212, 215, and then kind of    10:52:08
6    lessened -- 215 started lessening the workers' comp
7    side and gaining more expert work. I don't know.
8    I want to say a thousand. Feels like a thousand.
9 Q. Okay. And even though you were not certified
10   until 2018, sounds like you started doing some    10:52:35
11   voc -- vocational forensic work prior to that?
12 A. I did a lot of vocational forensic work. I can --
13   I actually have a record of all the reports, most
14   of the reports, on the forensic side.
15 Q. Have you had an opportunity to review your report    10:52:52
16   that's in Exhibit 1 or your -- obviously you just
17   did your rebuttal report, but have you had an
18   opportunity to review your report recently? Are
19   you familiar with it?
20 A. I started reviewing it in the last week, within the    10:53:06
21   last week.
22 Q. Okay. Is there anything inaccurate in your report?
23 A. Not -- not that I -- not that I can pinpoint at
24   this moment.
25 Q. Okay. We're going to talk in some detail about    10:53:24
                                        Page 67

1    certain portions of it, so as we're going through
2    things today, if you see anything, even if I don't
3    ask you about it, that you identify as now
4    inaccurate or where your opinion has changed, would
5    you please let me know.    10:53:36
6 A. Yes. Thank you.
7 Q. We talked -- you referenced a couple times today
8    the files or records in this case. If you turn to
9    page 3 of your report, you have a section that
10   states review of records and other documents. Do    10:53:54
11   you see that?
12 A. Yes.
13 Q. Is that what you've been referring to when you've
14   generally referenced the "file" or the "records"?
15 A. Yes.    10:54:03
16 Q. Other than what you list here on pages 3 and 4 of
17   your report, under review of records and other
18   documents, did you rely on anything else in
19   performing your analysis or reaching your expert
20   opinions?    10:54:18
21 A. I don't believe so. I did some extra reading but
22   didn't utilize it. I believe I didn't utilize any
23   of it in the report.
24 Q. Okay. So, to the best of your knowledge,
25   everything you relied upon in performing your    10:54:33
                                        Page 68

1    analysis and reaching your expert opinions is
2    identified under review of records and other
3    documents on pages 3 and 4 of your report?
4 A. I believe so.
5 Q. Okay. Turn to page 2, which you're welcome to    10:54:50
6    reference or not. I want to ask you a little bit
7    about your methodology that you employ as a
8    vocational expert, Ms. Broten. Just generally
9    speaking, what is a vocational assessment and how
10   do you perform one?    10:55:15
11 A. It's a -- basically it's a method of collecting
12   data -- and I think I probably describe it here a
13   little bit -- evaluating the issues, performing a
14   qualitative informational interview, identifying
15   any problems and then looking at resource documents    10:55:41
16   to come up with -- in this case, it would be a loss
17   of earning capacity or earning capacity and then
18   looking at all the barriers and discussing all
19   those in the assessment itself. It could include
20   many different aspects depending on the case, so,    10:56:12
21   you know, disability, personal injury. It just
22   depends on what the harm was.
23 Q. Okay. And you mention, I see, the VRAM. Am I
24   pronouncing that correctly?
25 A. Right.    10:56:31
                                        Page 69

                                        18 (Pages 66 - 69)

1  Q.  It's capital V-R-A-M.
2  A.  VRAM.
3  Q.  VRAM.
4  A.  Yeah.
5       (Exhibit 2 marked)          10:56:55
6  MR. BRISCHETTO:  Thank you.
7  THE REPORTER:  Exhibit 2.
8  MS. BAUMGART:  Matthew, do you want one?
9  MR. ELLIS:  Yes, please.
10      (Exhibit 3 marked)          10:57:22
11 Q.  BY MS. BAUMGART:  Ms. Broten, the court reporter
12     has handed you what we've marked as Exhibit 2,
13     which is entitled "The Vocational and
14     Rehabilitation Assessment Model (VRAM):
15     Introduction of an Empirically Derived Model of   10:57:40
16     Forensic Vocational and Rehabilitation Assessment."
17     Do you see that?
18 A.  I do.
19 Q.  Are you familiar with this document and this model?
20 A.  I am.                         10:57:51
21 Q.  Is this to what you're referring in your report in
22     Footnote 4?
23 A.  Yes.
24 Q.  Yes?  Okay.  So let's look at that.  I think you
25     reference a certain page, 91.  So just a couple   10:58:09

Page 70

1  questions about -- about this.  There are distinct
2  modules that are required under VRAM.  Is that
3  accurate?
4  A.  Yes.
5  Q.  And there -- I think, if I read this correctly,   10:58:28
6     there are three distinct modules.  Is that right?
7  A.  Where are you -- where are you reading?
8  Q.  Well, just generally.  I think that, if we're
9     looking at -- for the records review, there --
10    there is a records review, rehabilitation interview   10:58:46
11    and a labor market research.  Are those the
12    three -- and I may be summarizing -- the three
13    modules?
14 A.  I would believe so, but yes.
15 Q.  Okay.                         10:59:00
16 A.  I do -- I do all those things.
17 Q.  Okay.  And in this case, is it your testimony that
18     you followed that methodology, that you performed a
19     records review?  Correct?
20 A.  Yes.                          10:59:18
21 Q.  And you conducted what's described here as a
22     rehabilitation interview?
23 A.  Yes.
24 Q.  Is that the same thing as your qualitative
25     interview with Dr. Bala?                10:59:28

Page 71

1  A.  Yes.
2  Q.  You conducted a labor market research and inquiry?
3  A.  Yes.
4  Q.  And you undertook a rehabilitation analysis and
5     opinion formulation?                    10:59:38
6  A.  Yes.
7  Q.  And I think that final module -- let me see if I
8     can find it for you.  So if you look on page 99 for
9     me, please.  Again, you're probably more familiar
10    with this than I am, so bear with me.        11:00:09
11 A.  I haven't looked at it for a while.
12 Q.  Oh, you haven't?  Okay.  When is the last time you
13     looked at it?
14 A.  Oh, I think I looked at it briefly yesterday.  I
15     didn't read it, though.                 11:00:21
16 Q.  Did you look at it in the context of doing your
17     analysis for this case?
18 A.  I usually don't have to because it's standard.
19 Q.  Sure.  Okay.
20 A.  The process.                    11:00:30
21 Q.  Pretty standard for you?
22 A.  Right.
23 Q.  All right.  Page 99 on the left, the second
24     heading, "Rehabilitation Analysis and Opinion
25     Formulation."  It lists out several core analyses   11:00:42

Page 72

1  within it.  It looks like there is a "Psychometric
2  Measurement," "Future Medical Care Needs" on down
3  through page 1 -- it goes on to like page 100 and
4  ends in the -- finally the "Forensic Opinion
5  Formulation."  Is this all familiar to you?        11:01:07
6  A.  Um-hum.  Yes, it is.
7  Q.  Okay.
8  A.  Oh, I wrote on it.  I'm sorry.
9  Q.  That's okay.
10 A.  I'm checking marks.                11:01:16
11 Q.  That's okay.  So according to this article, which
12     is presenting the VRAM method, on page 101 -- so if
13     you could turn there with me, please.  And I'm
14     looking under the "Forensic Opinion Formulation."
15     It states that -- and then down at the bottom of   11:01:39
16     that paragraph -- "Each decision or conclusion
17     drawn within the rehabilitation analysis and
18     opinion formulation module should be summarized."
19     Do you see that?
20 A.  Um-hum, yes.                    11:01:57
21 Q.  Okay.  And you agree with this methodology?
22 A.  Well, I use this methodology.  I -- I use parts of
23     this methodology, and I include other parts of
24     different methodologies, but yes.
25 Q.  And so for this specific part of this methodology   11:02:12

Page 73

19 (Pages 70 - 73)

Exhibit 6
Page 19 of 123

**Page 74**

1 in relation to the work that you did in Dr. Bala's
2 case, do you see here that this -- this step that
3 we just talked about that I just read in the VRAM
4 model "allows opinions and conclusions to be
5 clearly stated with which minimizes error in    11:02:33
6 interpretation."  Do you --
7 A.  I do see that.
8 Q.  -- see that, and do you agree that that's a good
9 approach and practice to state your opinion as
10 clearly as possible?    11:02:46
11 A.  Oh, yes.
12 Q.  Yes, you agree with it?
13 A.  Um-hum (affirmative response).
14 Q.  Yes?
15 A.  Yes.    11:02:49
16 Q.  Do you agree that minimizing error in
17 interpretation is important to your expert
18 vocational assessment?
19 A.  Yes.
20 Q.  Okay.  But then when I look at your -- back to your    11:02:56
21 report -- and just so you know, you're welcome to
22 take notes, Ms. Broten, but we're going to mark
23 them as an exhibit to your deposition so just --
24 A.  Oh, okay.  Sure.
25 Q.  That's fine.  You're welcome to do that, but just    11:03:15

**Page 75**

1 know that they'll become part of the record.
2 A.  Sure.
3 Q.  Okay.  So looking back at your report, page 2,
4 "METHODOLOGY," after you talk about general
5 methodologies in your area of expertise, including    11:03:31
6 the VRAM, you go on to say that "This consultant's
7 approach applies to clinical judgment, selected
8 steps that have been adapted to my analysis and
9 reporting style.  The steps to this consultant's
10 methodology include," and then you end the    11:03:53
11 paragraph by listing five steps.  Do you see that?
12 A.  Where are you?
13 Q.  Oh, I'm sorry.  Page 2 of your report under your
14 methodology.
15 A.  First paragraph?    11:04:02
16 Q.  "Methodology."  Yeah, the first paragraph.
17 A.  Yes.  Okay.
18 Q.  Okay.  I can back up.  Sorry.
19 A.  That's okay.
20 Q.  I didn't realize you weren't there.  Next time,    11:04:10
21 just feel free to stop me if you're still trying to
22 find the --
23 A.  No.
24 Q.  -- place in the document.  Okay.  So the first part
25 of that paragraph you note that you follow accepted    11:04:17

**Page 76**

1 methodologies and standards of practice when you
2 conduct your vocational assessment and earning
3 capacity analysis.  Correct?
4 A.  Yes.
5 Q.  And you say that you generally follow the VRAM,    11:04:27
6 which we just looked at, right?
7 A.  Right.
8 Q.  And then you go on to say about halfway through
9 that paragraph that this consultant, who I assume
10 means yourself.  Yes?    11:04:42
11 A.  Yes.
12 Q.  "This consultant's approach applies to clinical
13 judgment, selected steps that have been adapted to
14 my analysis and reporting style."  You see that?
15 A.  Yes.    11:04:53
16 Q.  "The steps to this consultant's methodology
17 include," and then you list five steps.  Do you see
18 that?
19 A.  Yes.
20 Q.  So am I correct to understand that you've actually    11:05:01
21 created your own methodology and your own five-step
22 approach for conducting your vocational assessments
23 and earning capacity?  Is that right?
24 A.  Well, I generally follow accepted measures and then
25 adjust them to the case I'm working on.    11:05:19

**Page 77**

1 Q.  Right.  So you maybe, you know, have a base in VRAM
2 or other methodologies, but you, in fact, you know,
3 adjust those and create your own -- in this case, a
4 five-step approach for conducting your vocational
5 assessment and earning capacity analysis with    11:05:36
6 respect to Dr. Bala.  Correct?
7     MR. BRISCHETTO:  Objection.  Misstates the
8 testimony.
9     Go ahead.
10 Q.  BY MS. BAUMGART:  Well, I'll rephrase the question.    11:05:46
11     Is it correct that in this case, Ms. Broten, as
12 you state here in your report that I just read,
13 that you created your own five-step methodology
14 that we see on page 2 of Exhibit 1 to evaluate
15 Dr. Bala's -- to conduct your vocational assessment    11:06:04
16 and earning capacity analysis of Dr. Bala?
17 Correct?
18     MR. BRISCHETTO:  Objection.  Asked and
19 answered.
20     Go ahead.    11:06:16
21 Q.  BY MS. BAUMGART:  You may go ahead.
22 A.  Well, I use this method generally in most of my
23 assessments.  It's fairly general.
24 Q.  And when you say "this method," you're talking
25 about your five-step method that we see on page 2    11:06:30

20 (Pages 74 - 77)

Exhibit 6
Page 20 of 123

**Page 78**

1  of your report?

2    MR. BRISCHETTO: Objection. Improper

3  foundation. Misstates the testimony.

4    Go ahead.

5    THE WITNESS: I don't know if I'd call it "my   11:06:40

6  method," but it is an adjusted method, or I

7  generally follow the methods that are within VRAM

8  and/or others that I've reviewed, and, yes, that's

9  in part what I do.

10  Q. BY MS. BAUMGART: Okay. And I wanted to understand  11:07:04

11  that a little bit better. So you don't -- I think,

12  if I'm understanding you correctly and reading what

13  I think is pretty clear in your report, that you

14  don't just ascribe to the VRAM or other model. Is

15  that right?        11:07:20

16  A. Right.

17  Q. Okay. What you do is maybe take some steps from

18  the VRAM or other models and in this case have

19  created your five-step consultant's methodology.

20  Is that a fair --      11:07:35

21    MR. BRISCHETTO: Objection. Mis --

22    MS. BAUMGART: Go ahead and let me finish my

23  question, Steve. Thank you.

24    MR. BRISCHETTO: I will. Yeah, I will.

25    MS. BAUMGART: There is no --    11:07:40

**Page 79**

1    MR. BRISCHETTO: Go ahead.

2    MS. BAUMGART: -- indication of misstate here.

3  I'm just --

4    MR. BRISCHETTO: Go ahead.

5    MS. BAUMGART: The document speaks for itself,  11:07:43

6  number one.

7    MR. BRISCHETTO: It does. I agree.

8    MS. BAUMGART: So -- okay. Let me finish my

9  question, which I was interrupted.

10    MR. BRISCHETTO: I apologize.    11:07:51

11  Q. BY MS. BAUMGART: Okay. Let me see if we can do

12  this one more time.

13    I just want to understand how you do your work,

14  Ms. Broten, and this is really important, right? I

15  mean, this part of how you -- what methodology you  11:08:00

16  employ and whether or not you are following VRAM or

17  other -- I need to understand what methodology you

18  use, and I think it's pretty clear here, so I'm

19  just trying to confirm that. Okay?

20  A. Yes.        11:08:17

21  Q. Yes? Okay. So is it correct that you, for

22  purposes of evaluating Dr. Bala's vocational

23  assessment and earning capacity analysis, you

24  utilized the five steps to your consultant's

25  methodology?      11:08:35

**Page 80**

1    MR. BRISCHETTO: Objection. Misstates the

2  testimony.

3    Go ahead.

4  Q. BY MS. BAUMGART: Go ahead.

5  A. Those five steps are certainly a part of any   11:08:43

6  assessment that I write or author or form an

7  opinion to.

8  Q. And that was the case here as well. Correct?

9  A. I believe so.

10  Q. It says that's what you did, so did you do it, or  11:09:01

11  did you not do it?

12  A. I'm going to say at this -- this moment yes, but,

13  you know, I'm looking at it.

14  Q. Why don't you go ahead and take a moment to read to

15  yourself the five steps --      11:09:17

16  A. Thank you.

17  Q. -- that you stated you use to evaluate the

18  vocational assessment and earning capacity in this

19  case.

20  A. I didn't use medical source documents because that  11:09:59

21  wasn't part of this case. And, yes, I generally

22  use those methods when writing a report or

23  evaluating loss of earning.

24  Q. And when you say you generally use those methods,

25  you're referring to the specific five steps?  11:10:26

**Page 81**

1  A. Yes.

2  Q. Yes? In this case, did you use those five steps?

3  A. Mostly, yes.

4  Q. Okay. Let's talk about them. The first step you

5  list is "Collecting data and facts specific to the  11:10:42

6  person(s) being evaluated and matters at issue."

7  Correct?

8  A. Yes.

9  Q. What does that mean?

10  A. That means doing the interview, reviewing file  11:10:51

11  documents.

12  Q. Is that derived from the VRAM? Is it RAPEL? Is

13  that how you say that?

14  A. RAPEL.

15  Q. R-A-P-E-L. Or labor market model, or is this  11:11:11

16  something that you've defined --

17  A. Right.

18  Q. -- separately based on your -- to align with your

19  approach and reporting style?

20  A. It's -- it's necessary, and it's something I do in  11:11:26

21  every single case I work --

22  Q. Okay.

23  A. -- I work with.

24  Q. And that's great. I just wanted to know: Is this,

25  what we just read is the first step in your   11:11:40

21 (Pages 78 - 81)

Exhibit 6
Page 21 of 123

1  methodology, is it verbatim, lifted, aligned with
2  something like the VRAM or RAPEL, or is it
3  something that you have created to align with your
4  consultant's approach?
5     MR. BRISCHETTO: Objection. Assumes a fact not  11:11:58
6  in evidence.
7     Go ahead.
8     MS. BAUMGART: It's an open-ended question.
9     THE WITNESS: Almost every vocational
10 assessment will include that piece.        11:12:07
11 Q. BY MS. BAUMGART: And I'm asking do you know if
12 this piece, the collecting data and facts specific
13 to the persons being evaluated in matters at issue,
14 is that a standard methodology from any of these
15 specific --                    11:12:21
16 A. Yes.
17 Q. -- models?
18 A. Yes.
19 Q. Which one?
20 A. Well, every -- every model contains an interview.  11:12:28
21 Every model has file documents. Not every model
22 but most models have file document review.
23 Q. Okay. Let's look at Number 2, "Synthesizing
24 information and data provided and obtained with an
25 emphasis on employability." Do you see that?  11:12:49

Page 82

1  A. Yes.
2  Q. Is this something that derives from a model like
3  the VRAM, labor statistics otherwise, or is this
4  something you've created to align with your
5  consultant's approach and reporting style?    11:13:03
6     MR. BRISCHETTO: Objection. Assumes a fact not
7  in evidence.
8     Go ahead.
9     THE WITNESS: Every model that vocational
10 assessment authors has this step because it's all  11:13:15
11 based on employability. So we look at all the
12 facts. We look at all the interviews. We look at
13 everything to put together information that's
14 provided and obtained to look at employability.
15 And it's partly in VRAM. It's partly in RAPEL.    11:13:50
16 It's a lot to do with labor market access.
17 Q. BY MS. BAUMGART: And that's really the latter part
18 of that answer what I'm getting at, Ms. Broten.
19 I'm just trying to understand because -- and I'm
20 not sure of counsel's objection. When you say that  11:14:05
21 "This methodology is drawn from the following
22 long-standing career and vocational rehabilitation
23 models. This consultant's approach applies to
24 clinical judgment, selected steps that have been
25 adapted to my analysis and reporting style," and  11:14:20

Page 83

1  then you list what the five steps are. So I'm just
2  trying to understand, you know, sort of what's
3  something you've like taken and put together,
4  what's something that's outside of these reports,
5  so what you just answered is very -- very helpful.  11:14:32
6  And so the same with Question 3 -- or, excuse me,
7  the third step in your methodology. I'm not going
8  to read that into the record, but does this derive
9  from -- in whole or in part from one of the other
10 empirical models, or is this something you've    11:14:52
11 created?
12     MR. BRISCHETTO: Objection. Misstates the
13 testimony.
14     Go ahead.
15     THE WITNESS: This is derived from the models,  11:14:58
16 and it's just -- it's in part just provided to give
17 you more information, so --
18 Q. BY MS. BAUMGART: What about Number 4?
19 A. That's in all the models, or in some of the models,
20 I should say. Always identifying the problems,    11:15:23
21 what are they, and jobs, how they affect jobs, how
22 the evaluee or the interviewee or the person that
23 we're interviewing -- call it "evaluee" --
24 performs.
25 Q. And the last one I think we've already talked    11:15:49

Page 84

1  about, formulating the vocational expert opinion.
2  Certainly we've just looked at in the VRAM.
3  Correct?
4  A. Yes.
5  Q. So is there anything in your five-step methodology  11:15:59
6  that does not also appear in either the VRAM or the
7  labor statistic model or RAPEL?
8  A. Not that I -- not that I know of.
9  Q. Then help me understand why your approach and your
10 methodology is to select certain steps. Are there  11:16:17
11 certain steps that are contained in these models
12 that you have chosen not to utilize in evaluating
13 Dr. Bala's vocational assessment and earning
14 capacity analysis?
15 A. Well, in Dr. Bala's case, if I -- if I follow VRAM,  11:16:31
16 the way VRAM is expressed in the chart, then the
17 records review and rehabilitation interview is all
18 a part of that, but it doesn't contain every single
19 piece. I mean, I asked about military. I asked
20 about education. I asked about behavioral health.  11:16:55
21 There was no medical functional capacity, so that's
22 being left out essentially. Job acquisition and
23 maintenance. So we -- I talk about all those
24 things in the interview process, and then I review
25 the records.                    11:17:15

Page 85

22 (Pages 82 - 85)

1    So basically I do leave a few things out of the
2    model itself, but it's the most complete model that
3    I -- I believe someone could understand in
4    discussing methodology.
5 Q. And just so the record is clear, when you're          11:17:43
6    pointing to the model, you're pointing to the
7    flow chart that we've marked as Exhibit 3?
8 A. Yes.
9 Q. Okay. And I think is that what you reference, that
10   same paragraph in your report, Ms. Broten, where       11:17:55
11   you have -- you mentioned you had attached a
12   schematic and explanation of the VRAM model. Is
13   that Exhibit 3?
14 A. Yes.
15 Q. Okay. And other than maybe leaving out some steps     11:18:04
16   as you have just testified to, in your analysis
17   with respect to Dr. Bala's vocational assessment
18   and earning capacity, did you -- did you leave out
19   any other steps?
20 A. Well, I didn't do the psychometric measurement, and   11:18:24
21   I believe I made a statement in here saying I
22   didn't test Dr. Bala. I didn't need to.
23 Q. Why didn't you need to test her?
24 A. She's -- she's a board-certified physician. She
25   has education, skills and training to do the job --   11:18:42

Page 86

1 Q. Okay.
2 A. -- she was doing, so I had no need to test her.
3    I didn't -- I did look at current financial
4    information and some past on the W-2s and her
5    earning history. I -- you know, we talked about    11:19:04
6    that. I didn't talk a lot about household or
7    transportation resources or activities of daily
8    living. They didn't affect -- she wasn't affected
9    by any of those because she has -- she doesn't have
10   any medical issues.                                11:19:20
11      We did talk about avocational activities. I
12   think she knows a couple of languages. I know
13   where she currently lives, socioeconomic.
14 Q. So apart -- sorry, I'm just going to interrupt you
15   for a minute. So thank you, and this is helpful.   11:19:38
16   So this schematic, which is Exhibit 3, just -- this
17   is just a schematic of the actual rehabilitation or
18   qualitative interview, right?
19 A. No. It's the entire process.
20 Q. It's the entire process?                          11:19:50
21 A. Yeah.
22 Q. Okay.
23 A. We talk about labor market stat information. We
24   talk about sampling, if I did do any, which I don't
25   believe I did. I did look up some jobs for EPs and  11:20:00

Page 87

1    what they might pay. I didn't really use the
2    information. I didn't do future medical care
3    needs. I did look at transferable skills, but
4    essentially she's in the job she is doing, so those
5    are pretty standard. But I looked at employability  11:20:22
6    and placeability, and those are two fairly large
7    components of the assessment and in that, then you
8    form your opinion, and there is no rehabilitation
9    and planning services in her case because she
10   doesn't have a medical need. And then the wage      11:20:44
11   earning capacity and work-life participation.
12 Q. Thank you. Have you ever had your five-step
13   methodology that you used in this case
14   peer-reviewed?
15    MR. BRISCHETTO: Objection. Misstates the           11:21:10
16   testimony.
17    Go ahead.
18 Q. BY MS. BAUMGART: There is no reason -- let me
19   restate this.
20    Have you ever had the steps to this                11:21:17
21   consultant's methodology, the 1 through 5 that
22   you've just been testifying about, peer-reviewed?
23 A. There -- it's a part of the methodology practices,
24   and it's something that we talk about actually in
25   many of the CEU trainings, continuing education     11:21:37

Page 88

1    training. So when we're talking about
2    methodologies, you know, we bring up these points.
3    I'm not the only one that uses this five-step
4    process. I'm trying to think of somebody who --
5    who I spoke with about it actually, any of my       11:21:55
6    colleagues.
7 Q. Can you cite to anywhere that --
8 A. This?
9 Q. -- supports this specific five-step process that
10   you have utilized?                                  11:22:06
11 A. I -- I can't.
12 Q. Okay. So my question is has this consultant's
13   five-step methodology ever been peer-reviewed?
14 A. It's been -- it's a part of the vocational
15   assessment analyses methodologies, and it's         11:22:25
16   utilizing this information in this process, so, no,
17   it has not been peer-reviewed from me.
18 Q. Can you point to any literature where your
19   five-step methodology has been published?
20    MR. BRISCHETTO: I'm going to have a continuing      11:23:04
21   objection. I don't want to interrupt you
22   repeatedly, but the characterization of your --
23    MS. BAUMGART: You can just object to form,
24   Steve.
25    MR. BRISCHETTO: Of your own -- it's             11:23:16

Page 89

23 (Pages 86 - 89)

Exhibit 6
Page 23 of 123

1 continuing.
2     MS. BAUMGART:  I'm reading -- I'm reading
3 directly from the report.
4     MR. BRISCHETTO:  You have on occasion, and
5 you've also not, so --                    11:23:21
6     MS. BAUMGART:  Okay.  I want to read directly
7 from the report.
8     MR. BRISCHETTO:  All right.
9 Q.  BY MS. BAUMGART:  So has what you describe in your
10 words, Ms. Broten, "this consultant's approach,"    11:23:28
11 "this consultant's methodology," has that ever been
12 published in any sort of peer-reviewed literature?
13 A.  It may have.  I'd have to look for it or consult
14 with ABVE and find out.
15 Q.  Is there anything --                    11:23:54
16 A.  I may not -- oh, I'm sorry.
17 Q.  Go ahead.  Finish.
18 A.  Maybe not those exact words.
19 Q.  Is there anything you can point to me, as you sit
20 here today, that supports that what you describe as    11:24:04
21 "this consultant's approach" and "steps to this
22 consultant's methodology" has been scientifically
23 tested?
24 A.  This is derived from several assessment models, and
25 I can't point to one.                    11:24:36

                                    Page 90

1 Q.  So the answer is no, you can't point me to
2 anything?
3 A.  Yes.
4 Q.  Okay.  So that aside, you agree with me that it was
5 important to follow this consultant's approach and    11:24:53
6 the steps to this consultant's methodology when you
7 did your work in this case.  Correct?
8 A.  Yes.
9 Q.  And, to the best of your knowledge, you followed
10 those steps in performing the vocational and    11:25:07
11 earning capacity analysis with respect to Dr. Bala,
12 right?
13 A.  Yes.
14 Q.  What is an earning capacity analysis?
15 A.  It's a -- it's an analysis of a person's abilities,    11:25:25
16 skills, education, training, work history, age in
17 order to determine what their current ability is to
18 earn and possibly future, evaluation of past
19 financial records, et cetera.
20 Q.  What methods or principles did you rely on in    11:25:57
21 performing that analysis with respect to Dr. Bala?
22 A.  Well, I used the models that we discussed or that
23 are discussed in the plan, and I evaluated all of
24 those that I just talked with you about.  It's also
25 doing labor market analyses and research from    11:26:24

                                    Page 91

1 resource docs and my experiences in the market.
2     MS. BAUMGART:  Okay.  We've been going a little
3 over an hour.  Sorry.  We blew past a break.
4 Should we go off for five minutes?
5     MR. BRISCHETTO:  Sure.  It's up to you.    11:26:45
6     MS. BAUMGART:  And then until about -- I mean,
7 we're not going to finish before lunch obviously,
8 so we can go off the record.
9     (RECESS 11:26 to 11:37)
10 BY MS. BAUMGART:  Ms. Broten, we're back on the    11:37:44
11 record after a break.  Forgive me, I asked you this
12 earlier when you were testifying about your work in
13 the Social Security -- or excuse me, the Veterans'
14 case that involved a plastic surgeon, right?
15 A.  Yes.                                  11:38:02
16 Q.  And forgive me, did you conduct an earning capacity
17 analysis in that case?
18 A.  I didn't do a report, no.
19 Q.  Okay.  So you did not conduct an earning capacity
20 analysis of that physician?                  11:38:13
21 A.  I did an informal earning capacity eval.
22 Q.  So this case for Dr. Bala is the first time you've
23 had occasion to undertake a formal earning capacity
24 analysis of a physician.  Correct?
25 A.  Of a physician, yes.                    11:38:29

                                    Page 92

1 Q.  And the first time you've had occasion to perform
2 an earning capacity analysis of a cardiologist and
3 electrophysiologist.  Correct?
4 A.  Yes.
5 Q.  Would you agree that the physician job market is    11:38:44
6 fairly unique?
7 A.  It is unique in that -- and what do you mean by
8 "unique"?
9 Q.  I just asked if you would agree that the physician
10 job market is unique.                      11:39:07
11 A.  It's unique in that -- I don't -- I don't get that
12 question.  That's -- is it unique?
13 Q.  How would you describe the physician job market
14 compared to other job markets you regularly perform
15 earning capacity analyses in?                  11:39:22
16 A.  That's a better question.  So the physician job
17 market entails similar, as far as I'm concerned,
18 standards and job search.  There are components to
19 it that are more formal, including that of use of
20 recruiters in more -- more cases than not, but a    11:39:50
21 lot of the job search and job development
22 strategies are similar.
23 Q.  Could you expand on what -- what you mean by that?
24 What are the similar job search strategies and
25 developments in performing the earnings capacity    11:40:17

                                    Page 93

24 (Pages 90 - 93)

Exhibit 6
Page 24 of 123

**Page 94**

1    for a physician versus non-physician job market?
2  A.  So now you're saying in performing an earning
3    capacity assessment because your question, I
4    believe, was is it unique?  So --
5  Q.  Sure.  I can clarify.  Thank you.          11:40:37
6  A.  Yeah, clarify.
7  Q.  And I should have told you that at the beginning,
8    which I neglected to in my housekeeping rules.  I
9    may very well ask you a question that doesn't make
10   sense, and thank you for asking me to rephrase it.  11:40:47
11   I'm not --
12 A.  Thank you.
13 Q.  -- here to trick you today.  I want to be able
14   to -- you know, you to understand my questions and
15   me to understand your answers.  Is that fair?  11:40:55
16 A.  Yeah.
17 Q.  Okay.  So, again, if I ask something that doesn't
18   make sense or you don't understand, please ask me
19   to clarify or restate.  Okay?
20 A.  Okay.                                      11:41:03
21 Q.  Thank you.  All right.  So I was asking you about
22   whether or not you believe the physician -- how you
23   would compare the physician job market to other job
24   markets, and you said that there is some similar
25   standards for job search strategies but there are  11:41:18

**Page 95**

1    components in the physician job market that are
2    more formal, i.e., the use of recruiters.  Is that
3    a fair summary?
4  A.  Yes.
5  Q.  Okay.  And so what are some of those similar  11:41:27
6    standards?
7  A.  So when you're -- so you're talking about
8    job search.  When a physician does job search, a
9    physician would -- there is various steps, and they
10   would contact their network if they're already a  11:41:49
11   practicing physician and even those that are
12   fellows or students looking to get a job.  There is
13   developing a resume, solid resume, no spelling
14   errors.  There is developing cover letters
15   sometimes specific to the job that they're      11:42:13
16   applying.  There is contacting recruiters if that's
17   what they choose, and recruiters are -- they come
18   in different fashions.  There is private.  There is
19   recruiters in hospitals.  There is recruiters for
20   groups or human resource staff.  Sometimes they're  11:42:35
21   not recruiters.  They're basically human resource
22   staff.  A recruiter is part of the human resource
23   team, from my experience.  And sometimes they sign
24   contracts with recruiters; sometimes they don't.
25   Just depends on -- on what they -- what that      11:42:59

**Page 96**

1    individual chooses in their employment market.
2    They look toward their specialty in terms of their
3    occupation and their specific occupation to
4    physicians so -- and where do they want to live?
5    Location is very important.  So that's another  11:43:26
6    aspect of job search.
7  Q.  Okay.  And were you just describing similarities
8    between the physician job search and the
9    non-physician job search?
10 A.  The recruiters tend to be the only avenue that's  11:43:38
11   different.  And they do sign up AIs big now, so
12   they sign up with a lot of the Indeeds or the --
13   whatever they are, all the different --
14 Q.  Job boards?
15 A.  -- AI job boards out there.               11:43:53
16 Q.  Okay.
17 A.  PracticeLink, whatever they might be.  But in
18   general, that's exactly what non-physician
19   job searchers do as well.  They sign up with a lot
20   of different job boards as well.              11:44:07
21 Q.  Okay.  So is it fair, am I hearing your testimony
22   that really there aren't any differences, in your
23   opinion, between the job search for a physician
24   versus a non-physician?
25 A.  Well, I'm not saying that exactly.  You know, it  11:44:21

**Page 97**

1    can be more challenging just depending on the job
2    itself that the physician is applying for, so there
3    are differences for a cashier versus a physician.
4    So generally a lot of the principles are the same,
5    but -- but there are some differences.  So, no, I'm  11:44:44
6    not going to say that it's the same.
7  Q.  Can you identify any other differences that you've
8    come across in your experience?
9  A.  I would have to think about it.
10 Q.  Okay.  If you think about it and come up with any,  11:44:55
11   just holler.
12      Ms. Broten, have you had any training as it
13   relates specifically to the physician job market?
14 A.  I've researched the physician job market, so
15   "training," what do you mean?               11:45:12
16 Q.  Training, been to a continuing education course,
17   taken a class, attended a seminar, anything like
18   that about -- specifically relating to the
19   physician job market.
20 A.  Not that I'm aware of, no.                 11:45:26
21 Q.  Okay.  Have you had any training as it specifically
22   relates to the physician compensation market?
23 A.  From what I've looked at, resource guides, no
24   specific training.
25 Q.  Okay.  And when you say -- you've said a couple of  11:45:45

25 (Pages 94 - 97)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 25 of 123

1   times now that you've, you know, consulted some
2   resources, looked at some articles.  We'll talk
3   about this today.  Other than your work in
4   Dr. Bala's case, so before you were retained and
5   undertook an analysis of her job search,      11:46:00
6   employability, earning capacity in this case, had
7   you ever had occasion to research physician -- the
8   physician job market prior to this case?
9 A.  I have, yes.
10 Q.  Okay.  And that was in the context of the Veterans' 11:46:17
11   case we talked about?
12 A.  There were two --
13 Q.  Okay.
14 A.  -- veteran cases.  One was endro, and one was a
15   plastic surgeon, so --                        11:46:30
16 Q.  What was the first one, I'm sorry, the specialty?
17 A.  Endro -- we call them endros, but it's
18   "endro"-something-"ology."
19 Q.  Endocrinologist?
20 A.  Yes.                                         11:46:43
21 Q.  Something like that?
22 A.  You're good.
23 Q.  Well, okay.  So other than those two -- are those
24   the only two occasions other than Dr. Bala's -- the
25   work you've done on Dr. Bala's case where you've    11:46:55

Page 98

had occasion to evaluate physician job search
2   market?
3 A.  Yes.
4 Q.  And one of them involved a plastic surgeon and the
5   other was an endocrinologist.  Correct?       11:47:07
6 A.  Yes.
7 Q.  And for both of those situations, you did some
8   research but you did not prepare a formal report.
9   Correct?
10 A.  Right.                                       11:47:17
11 Q.  And at no time have you had any specific training
12   as it relates specifically to the physician job
13   market.  Is that correct?
14 A.  I'm going to say specific training, no.
15 Q.  Okay.  At any time, have you had any -- at any    11:47:41
16   time, have you had any training specifically
17   related to the physician compensation process?
18 A.  Other than speaking with some of the survey
19   material preparers for and/or with persons who
20   utilize that survey and resource docs, no.    11:48:09
21 Q.  Okay.  And maybe we can -- and tell me if this is
22   the way you would separate this out.  What you just
23   described, research, right, reviewing a survey,
24   talking to someone about a survey, that, in my
25   mind, is separate from formal training.        11:48:32

Page 99

1 A.  Yes.
2 Q.  Does that align with your thinking?  Yes?
3 A.  Yes.
4 Q.  Okay.  So these questions I'm just asking about the
5   training, not any, you know, article you may have   11:48:40
6   read.  Do you understand that distinction?
7 A.  Yes.
8 Q.  Okay.  And so have you ever had any training as it
9   specifically relates to the physician recruitment
10   market?                                       11:48:52
11 A.  So I have trained -- I guess this doesn't -- I've
12   not had any training, no.
13 Q.  Okay.  Sounds like maybe you've conducted some
14   training to physicians?
15 A.  I've -- I've trained recruiters through Good Sam,  11:49:06
16   Providence, PeaceHealth in terms of creating
17   training plans, working with the HR directors to
18   establish a curriculum and then help that
19   individual train.
20 Q.  When did you perform these sorts of trainings?    11:49:27
21 A.  Many times over the years.
22 Q.  Is it anything you do currently?
23 A.  I'm not working on one of those training programs
24   currently, no.
25 Q.  I don't think anything was mentioned in your CV    11:49:41

Page 100

1   about that.  Did I miss something?
2 A.  I think it -- it does mention in my CV that I
3   developed training programs, and that's part of the
4   workers' compensation work that I do.  Let me see.
5   And if it doesn't, then maybe I'll throw that in    11:49:58
6   there.
7 Q.  So these training programs that you've done from
8   time to time, you help HR in-house recruiters at
9   health systems do what?
10 A.  To -- they develop a placement, a training       11:50:20
11   placement for on-the-job training.  We develop a
12   curriculum that would include some classes through
13   SHRM, which you're aware of.  We -- I evaluate, and
14   there -- there are training prospects throughout
15   the time they're being trained.  Usually it's a    11:50:44
16   year, year and a half.  We make sure that that
17   individual has the education background to be able
18   to become a recruiter and then their earning
19   capacity once they are done with the training
20   program I can offer because I have a limited        11:51:02
21   budget, and then once that's -- that training is
22   done, they have the potential to move forward by
23   taking additional trainings through SHRMA or
24   whoever.  I forget all the acronyms of human
25   resource professionals.                         11:51:21

Page 101

26 (Pages 98 - 101)

1  Q.  Is this something you do as part of your role as a
2      vocational rehabilitation counselor on workers'
3      comp --
4  A.  Yes, it is.
5  Q.  -- type situations?                          11:51:33
6  A.  Yes.
7  Q.  And at any of these trainings, have you ever worked
8      with a program for a recruiter to talk about or
9      train on physician compensation?
10 A.  No.                                           11:51:44
11 Q.  Pertaining to physician compensation, you're aware
12     that it's standard in the industry to rely on
13     certain compensation surveys to determine
14     appropriate compensation levels for physicians?
15 A.  Yes.                                          11:52:08
16 Q.  Can you name some of those surveys.
17 A.  Well, the ones that I reviewed in my report were
18     AAMC, American -- I don't know the acronym.  And
19     MedAxiom is another.  MGMA is another.
20     SullivanCotter is another, and there are several  11:52:37
21     more that my professional organization, when we
22     have a list serve or a chat serve, that, you know,
23     if we have a question, we can say, hey, anybody,
24     have this information?  Can you -- can you tell me
25     what are the best -- the best compensation models?  11:52:56

Page 102

1      So -- and that was a question posed in my list
2      serve, but it wasn't from me, and those were some
3      of them that were brought up.  I think I looked at
4      some others, too, a few years back in both those VA
5      cases.                                         11:53:20
6  Q.  You mentioned the list serve.  What is -- is that
7      something among like a -- like we have lawyers list
8      serves.  Is it something among voc rehab
9      counselors?
10 A.  It's part of our ABVE forensic section, and it's --  11:53:32
11     you know, it's good for training.  It's good for
12     asking questions about specific cases and getting
13     responses from other professionals in the field.
14 Q.  Did you send or receive any communications on that
15     ABEV list serve pertaining to your work on       11:53:49
16     Dr. Bala's case?
17 A.  I didn't, no.
18 Q.  Were there communications that maybe you didn't
19     send but you reviewed that informed your analysis
20     and opinions in Dr. Bala's case?                 11:54:02
21 A.  There was -- there was one that talked about the --
22     basically the compensation surveys and the best
23     ones to use.
24 Q.  Is that part of your file?  I don't know that I've
25     seen that document.                             11:54:17

Page 103

1  A.  It's not something I considered, you know.  I
2      already did my research.  I already had my
3      compensation surveys picked out, so I didn't need
4      it.  It just confirmed.
5  Q.  So describe to me, would this be something you     11:54:36
6      would still have access to?  Like could you scroll
7      back and find the communication that you're
8      referring to?
9  A.  I'm sure.
10 Q.  Okay.  And what do you remember, sitting here     11:54:45
11     today, that that contained, or do you remember who
12     posted it?
13 A.  Sure.  John Berg posted it.  It was a list of some
14     of these compensation surveys.  The question came
15     from DT North, so it was -- it was, oh, I wonder if  11:55:00
16     this has to do with Bala, but I didn't ask.
17 Q.  And would this have been -- so sounds like from
18     what you just said you may have already had
19     reviewed DT North's report, or why would the fact
20     he sent that have been a trigger, in your mind, at  11:55:24
21     the time?
22 A.  Yeah, it might have been -- it might have been that
23     I had already reviewed the report.  I can't
24     remember.  Let me see.  And it's not like I go on
25     the list serve all the time.  It comes up in my    11:55:37

Page 104

1      email, pops up if there is a question.  Sometimes I
2      will go on it, and sometimes I won't.  And let me
3      see.  I don't know if I had reviewed his report
4      yet, but I was already reviewing my report, and I
5      had already confirmed that, oh, I'm using this one,  11:55:56
6      this one, this one, and then Mr. Berg, who I
7      respect very much in the -- in the field, you know,
8      said, this is the best one, you know, like AAMC.
9      This is the best one, but you can't get it unless
10     you pay $1,000, so --                           11:56:18
11 Q.  Is that where you got -- I think in your report you
12     referred to the double A --
13     I've heard it the "double A MC," so I'll call
14     it that.
15 A.  Oh, yeah, double A --                          11:56:27
16 Q.  But it's AAMC.
17     -- as the gold standard.
18 A.  Yes.
19 Q.  Is that where that came from?
20 A.  Yes.  Yes.  And people agree with him, so --    11:56:32
21 Q.  And when people agree with him, are you just
22     referring to sort of the chatter that you were --
23 A.  Yes.
24 Q.  -- reading on the list serve?
25 A.  Yes.                                           11:56:43

Page 105

27 (Pages 102 - 105)

Exhibit 6
Page 27 of 123

1  Q.  Okay.  Is there anything else you relied upon,
2      other than Mr. Berg referring to the AAMC as the
3      gold standard, for purposes of you characterizing
4      it as that in your report?
5  A.  No.                          11:56:58
6  Q.  What is the -- what does the AAMC relate to?  What
7      is it comprising?
8  A.  It is -- and I'm going to go in here, into the
9      report.
10 Q.  Sure.  That's fine.                11:57:19
11 A.  Thank you.  And it's a salary guide for physician
12     compensation, and this is specifically for the
13     academic -- in my term, the academic arena.
14 Q.  Right.  For the academic arena.  How does that
15     differ, for example, from the MGMA survey or the  11:57:48
16     AMGA survey or the other surveys that you've relied
17     upon in your report?
18 A.  Right.  So SullivanCotter is also where I got
19     information for the academic survey, and then the
20     other two that I utilized were the MGMA and the --  11:58:07
21     which I accessed because it also cost money,
22     access.
23 Q.  So can we do this?  Can I just have you -- I just
24     want to be -- we'll get through your report, and I
25     know that's a reference.            11:58:23

Page 106

1  A.  Okay.
2  Q.  But without referring to your report, can you tell
3      me the difference between the surveys that you
4      relied on?
5  A.  I'm not sure.  That's such a general question.   11:58:30
6  Q.  So without reviewing your report, would you be able
7      to talk even generally about describing the
8      difference between the AAMC versus the Sullivan --
9      I'm going to get wrong -- Cotter?  Could you
10     identify any differences between them?   11:58:52
11 A.  Well, not off the top of my head, no.
12 Q.  Okay.  And is that because you are -- you know, you
13     generally don't rely on these surveys in your
14     day-to-day job; this is analysis you did with them
15     with respect to evaluating Dr. Bala's earning   11:59:10
16     capacity; this is sort of the first time you've
17     done something like this.  Is that fair?
18     MR. BRISCHETTO:  Objection.  Vague.
19     Go ahead.
20 Q.  BY MS. BAUMGART:  That's okay.  You can answer.   11:59:22
21 A.  First time, you know, I look at survey material,
22     compensation material.  I look at wage data,
23     earning potential all the time, so --
24 Q.  Sure.  And that's fair.  I assume you do with the
25     work you, do but I'm not talking about the labor   11:59:39

Page 107

1      statistics.  I'm talking specifically about
2      physician compensation surveys that you relied on
3      in your report.  Is this the first time you've
4      really had occasion to evaluate this -- this type
5      of data?                          11:59:56
6  A.  No.  I think I told you I evaluated it both times
7      when I did the VA work, so --
8  Q.  Okay.  And I think you said in that case it was
9      informally because you didn't do a formal report,
10     right?                            12:00:09
11 A.  Right.
12 Q.  Okay.  So, again -- and if you can't, that's okay,
13     but before we consult your report, are you able to
14     describe any of the differences between the various
15     physician compensation surveys that you relied upon  12:00:22
16     in performing your analysis and reaching your
17     opinions?
18 A.  There were some differences in the percentages and
19     how they documented their findings.  I think I read
20     through AAMC's information and maybe even some of   12:00:40
21     MedAxiom, but I can't pinpoint the differences for
22     you.
23 Q.  Okay.  Do you know how often these benchmark --
24     physician compensation benchmark surveys are
25     published by the AAMC or the MGMA?  Do you have any  12:01:02

Page 108

1      sense of that?
2  A.  Most of them were annual, from what I reviewed.
3  Q.  I want to turn back to your report, Ms. Broten.  We
4      talked a little bit about this already.  Page 3
5      where you list the review of records and other   12:01:28
6      documentation.  You confirmed to me that these were
7      the totality of documents that you received.  My
8      question for you is did you actually review sort of
9      cover to cover all of the information listed on
10     pages 3 and 4 of your report?       12:01:49
11 A.  Well, the file was very big.
12 Q.  Agreed.
13 A.  So I am sure I looked at it, whether I took it all
14     in the several times I looked at it, and referred
15     back to it.  I hopefully looked at everything.  In  12:02:13
16     terms of the physician compensation reports, I
17     believe I looked at the information that I had
18     provided to me and that I found and -- and then I
19     read some of those articles on the internet that
20     are mentioned at the very last.      12:02:54
21 Q.  And we'll look at the -- with respect to the
22     physician compensation reports, that second to last
23     bullet point.  I think that's where you were
24     referring, right, Ms. Broten?
25 A.  Yes.                          12:03:08

Page 109

28 (Pages 106 - 109)

Exhibit 6
Page 28 of 123

1  Q.  Okay.  You mentioned that some were provided to
2      you.  If my understanding of the file is correct,
3      that would have been provided by Dr. Bala.  Is that
4      right?
5  A.  Yes.                              12:03:20
6  Q.  Okay.  And then other than the information that
7      Dr. Bala provided to you with respect to just the
8      physician compensation surveys, did you separately
9      access any other survey?
10 A.  I may have.  I'm looking at them now to see --     12:03:33
11 Q.  Sure.
12 A.  -- if any of them were -- no, I don't remember.
13 Q.  But you know that you reviewed the information
14     Dr. Bala provided to you.  Correct?
15 A.  Yes.  And she also provided me her password and --  12:04:02
16     and name, you know, user name, to get in --
17 Q.  Did you use that?
18 A.  -- to the AAMC.  Yeah, I did, actually.
19 Q.  And --
20 A.  I had to learn how to do it.  I don't remember how  12:04:17
21     at this moment.
22 Q.  Sticking with that for just a moment, how many
23     times did you log on through Dr. Bala's user name
24     and password to the AAMC?
25 A.  I think just once.  Maybe -- maybe twice.     12:04:30

Page 110

1  Q.  And what did you review?
2  A.  I went into the EP salary information.
3  Q.  Did you print anything or download anything?
4  A.  I sent everything to the attorneys for you.
5  Q.  Okay.  So anything -- and we'll look at that.     12:04:58
6      We're not going to spend much time with them, but
7      I'll show you the documents just so I'm clear what
8      you may have accessed versus what Dr. Bala --
9  A.  Sure.
10 Q.  -- sent, but is your testimony that anything -- I   12:05:09
11     should say everything you relied upon by way of
12     physician compensation surveys, whether it had been
13     obtained through your own access to something like
14     the AAMC or Dr. Bala providing you with
15     documentation, those are all documents contained in  12:05:24
16     your file that you provided to the lawyers?
17 A.  Yes.  I don't see the Boston Medical in here.  So I
18     didn't use it in the report, but I reviewed it.
19 Q.  Okay.  So we're looking at that same second to last
20     bullet point.  You said you looked at another     12:05:47
21     survey, Boston Medical?
22 A.  Yeah, Boston Medical which is similar to Pinnacle,
23     and it just provides compensation that they provide
24     to their physicians.  Boston Medical University.
25 Q.  Why didn't you rely on it and include it in your     12:06:06

Page 111

1      report?
2  A.  I had other documents, so I didn't need it.
3  Q.  Would it have --
4  A.  It has --
5  Q.  Let me just get my question out.  Sorry.  Would it  12:06:18
6      have -- I know it's hard not to anticipate.  It's
7      very natural.  Would it have changed your ultimate
8      calculation as to your assessment of Dr. Bala's
9      lost -- alleged lost earnings?
10 A.  No, it would not have.                  12:06:33
11 Q.  Anything else that you looked at by way of
12     physician compensation surveys or benchmarks that
13     you didn't ultimately include in your analysis or
14     conclusions?
15 A.  I don't believe so, no.                  12:06:47
16 Q.  Okay.  That last bullet, the articles, were these
17     articles that -- never mind.  I don't have a
18     question about that.
19         Did you review all of Dr. Bala's deposition?
20     Do you remember?                       12:07:11
21 A.  I did, and it was a while ago.
22 Q.  Okay.  Did you review all of the Banner employment
23     records, for example, that you were provided?
24 A.  I'm sure I did.
25 Q.  Okay.  What about all the University of Penn     12:07:23

Page 112

1      documents?  Did you review all those?
2  A.  I believe I did.
3  Q.  As you're looking through this list and knowing the
4      file you received was large, is there anything that
5      jumps out to you that maybe you didn't have time to  12:07:40
6      get to or maybe just skimmed?
7  A.  For this report, no.  I don't believe I missed
8      anything.  I believe I -- I touched on everything.
9  Q.  And just so I'm clear what you mean by "touched
10     on."  That means at least give it a glance?     12:08:19
11 A.  That means look at the page and glance through it
12     and then go to the next page and glance through it
13     and sometimes make, you know -- I write on my files
14     similar to how you're writing all over your report.
15     I wish I could do that because it's how I work.     12:08:34
16 Q.  And you're welcome if you want to make notes on the
17     exhibit.  That's just fine.  It's just marked in
18     the case, but it's up to you.
19 A.  Yeah, I'd rather not.  I would probably be advised
20     not to.                             12:08:48
21 Q.  Steve may have something to say about that.
22 A.  Don't touch it.
23 Q.  I just want you to know whatever is out in front of
24     you will be marked.
25         MR. BRISCHETTO:  Ms. Baumgart is just trying to  12:08:56

Page 113

29 (Pages 110 - 113)

1  be helpful.
2      THE WITNESS:  Yeah, yeah.
3      MS. BAUMGART:  I have my own notes.  I don't
4  need hers.  I have her report.
5      THE WITNESS:  I made check marks on some of    12:09:04
6  them.  I can't remember what it was.
7  Q.  BY MS. BAUMGART:  Okay.  So was there anything that
8  you asked to review to provide your analysis and
9  expert opinions that you were not provided with?
10 A.  Not that I know of.                           12:09:22
11 Q.  You reviewed documents related to Dr. Bala's
12 current employment with Citrus Cardiology.
13 Correct?
14 A.  Yes.
15 Q.  Do you know what her current status is with Citrus? 12:09:40
16 A.  Yes.  I just found out.
17 Q.  What did you just find out?
18 A.  I got a copy of her employment contract with a
19 couple of emails.  I think you have the same.
20 Q.  I don't think I do.                           12:09:57
21 A.  Oh.
22 Q.  I don't have any contract.
23 A.  Oh, sorry.
24 Q.  Go ahead.  No.  No.  You can answer the question.
25 We'll have it soon.                              12:10:03

                                                Page 114

1      MR. BRISCHETTO:  I think you do.
2      MR. ELLIS:  I think you do.
3      MS. BRADFORD:  We have emails, no contracts.
4      MR. ELLIS:  The contract was provided before
5  the emails.                                     12:10:13
6      MS. BRADFORD:  We don't have them.
7      MS. BAUMGART:  Anyway, we'll take this up at a
8  break.
9      MR. BRISCHETTO:  The original contract is the
10 same.                                           12:10:23
11     MS. BAUMGART:  Okay.
12     THE WITNESS:  Right.
13     MR. BRISCHETTO:  I mean, and what happened is
14 they switched her from a guaranteed minimum to an
15 extension under the original contract, so if you   12:10:30
16 have the email, recent emails, plus the original
17 contract, which you should have from the initial
18 production, you have everything.
19     MS. BAUMGART:  So that's the sum total of
20 her -- to explain her current -- at least in     12:10:43
21 writing the current --
22     MR. BRISCHETTO:  Correct.
23     MS. BAUMGART:  -- contractual arrangement with
24 Citrus?  Okay.
25     MR. BRISCHETTO:  You got everything we got.   12:10:51

                                                Page 115

1      MS. BAUMGART:  Okay.  All right.
2  Huh?
3      MR. BRADFORD:  We will ask for it.
4      MS. BAUMGART:  Yeah, we'll talk about it after.
5  Q.  BY MS. BAUMGART:  Okay.  Back to you.  So what did  12:10:57
6  you just learn about Dr. Bala's employment with
7  Citrus?
8  A.  So there is information there that I'm still trying
9  to, you know, digest, I guess, if you would, but it
10 appears from the -- from more from the emails that  12:11:11
11 the contract is being based more on productivity
12 than a guaranteed salary, and it just seems to me,
13 without knowing exacts, that it's quite a bit less
14 than her first contract and year with Citrus.
15 Q.  And is this an opinion you're staking out now, or   12:11:40
16 this is just a preliminary, I mean I just looked at it?
17 A.  I just looked at it.  I'm not saying any opinion at
18 this moment.  I can't.
19 Q.  Did you talk to Dr. Bala about it?  Have you asked
20 her any questions about it?                      12:11:54
21 A.  I have not talked with Dr. Bala about it.  It's
22 that new.
23 Q.  Apart from any conversation with Dr. Bala about her
24 new -- sounds like what may be a new amendment
25 maybe to her current contract, and we'll need to --  12:12:15

                                                Page 116

1  it's new to me, too, so I don't quite know what
2  that is, but apart from that, in your course of
3  conducting your qualitative interviews with her
4  during your analysis, did you talk about her Citrus
5  contract?                                       12:12:33
6  A.  We did some.  I'm not a contract expert and -- but
7  I do -- I had to understand how physicians get
8  paid, and there is various models, right, so
9  this -- so we talked about it somewhat.
10 Q.  And either from that conversation or other       12:12:54
11 knowledge you have, what's your general
12 understanding of how someone like Dr. Bala, a
13 physician in private practice, gets paid?
14 A.  Well, it's generally clinical and productivity,
15 from my understanding.  There might be a couple of  12:13:09
16 other things included, but if the company or the
17 health organization or the private practice is
18 making money, then she will make money.
19 Q.  So is it your general understanding that a
20 physician in private practice has the opportunity   12:13:35
21 to make more money over time versus someone --
22 versus a physician at an academic institution
23 because of that productivity piece?
24 A.  Well, that -- I think an academic institution also
25 can make money over time.  It's just more -- it's   12:13:53

                                                Page 117

                                    30 (Pages 114 - 117)

Exhibit 6
Page 30 of 123

1  not based on productivity necessarily. Sometimes
2  it could be, depending on where you're working, if
3  it's in a hospital, you know, there is certain --
4  like four different aspects and maybe more. It
5  just depends. It depends on where you're -- where   12:14:12
6  you're working.
7  Q.  Do you know -- are you familiar with the term
8  "RVUs"?
9  A.  I read about that. I don't know what it is at this
10  moment. I couldn't give you the acronym, but, yes,   12:14:29
11  I did read about that, so, no, I'm not super
12  familiar with it, but I did read about it.
13  Q.  Okay. Do you know how -- have you heard of the
14  work relative value unit, or a wRVU? Did you read
15  about that?                12:14:48
16  A.  Yeah, there is a little W in front of the RVU. I
17  read about it. I couldn't repeat it.
18  Q.  Okay. So I'll ask you this anyway, but you may
19  have already anticipate -- or previewed the answer,
20  but do you know how a wRVU translates to revenue   12:15:01
21  for an organization or the individual physician?
22  A.  No, I couldn't give you an answer on that. Again,
23  I read about it, but I didn't -- you know, it
24  didn't resonate.
25  Q.  Do you know whether a wRVU is reimbursed more or   12:15:23

Page 118

1  less based on the physician's specific specialty or
2  area of practice?
3  A.  I don't have an answer for that.
4  Q.  Do you have any knowledge as to what role the
5  government may or may not play in regulating        12:15:35
6  physician compensation?
7  A.  I do not know the answer to that.
8  Q.  But the time that you wrote your report -- and I
9  understand maybe there is some new information,
10  although based on counsel's representation, the     12:15:49
11  contract hasn't -- contract is the same. But at
12  the time that you wrote the report, you note that
13  Dr. Bala's wage at Citrus Cardiology -- her base
14  salary was $525,000. Correct?
15  A.  That -- that's what I understood, yes.        12:16:08
16  Q.  Okay. And did you review her Citrus contract in
17  conducting your analysis and reaching your
18  conclusions in your report?
19  A.  I did. I did, yes.
20  Q.  Okay. And did you look at -- was it important to   12:16:19
21  look at how her compensation was set by Citrus at
22  the time you wrote your report?
23  A.  It was.
24  Q.  Okay. And you knew, then, if you look at that,
25  that she had the ability to make more than         12:16:30

Page 119

1  that $525,000. Right?
2      MR. BRISCHETTO: Objection. Argumentative.
3      Go ahead.
4      THE WITNESS: I didn't consider it, but it --
5  if I remember the contract, which I don't, without   12:16:42
6  reviewing it again.
7  Q.  BY MS. BAUMGART: That's fair. We can take a look
8  at it.
9      (Exhibit 4 marked)
10     THE REPORTER: Exhibit 4.            12:17:12
11     THE WITNESS: Thank you.
12  Q.  BY MS. BAUMGART: This look familiar to you?
13  A.  No.
14  Q.  Okay. Well, I'll represent --
15  A.  I don't remember. It was part of a very large and   12:17:23
16  it's like this large file.
17  Q.  Okay. Well, let's turn to Exhibit A, if you would,
18  please, of -- this is, for the record, Dr. Bala's
19  physician services employment agreement with Citrus
20  Cardiology. You see the last page, "EXHIBIT A,"   12:17:41
21  "Productivity Compensation"?
22  A.  Where are you?
23  Q.  The last -- the last page, which is Exhibit A.
24  A.  Okay.
25  Q.  Did you look at this when you were performing your   12:18:09

Page 120

1  earnings analysis with respect to Dr. Bala?
2  A.  I may have looked at it. I don't believe I
3  considered much of it.
4  Q.  Why wouldn't you have considered much of it?
5  A.  Because it's a figure that we don't know. I mean,   12:18:24
6  she could -- she could work to this, but I didn't
7  consider that because she had a guarantee of 525 --
8  Q.  So I understand --
9  A.  My understanding.
10  Q.  You just, when you undertook your analysis and in   12:18:41
11  projecting what you considered to be a loss of
12  earning capacity -- is that correct?
13  A.  Yes.
14  Q.  And you did not take into account her ability to
15  earn additional compensation from Citrus through   12:18:55
16  the productivity compensation we see in Exhibit A.
17  Is that correct?
18  A.  That's right.
19  Q.  And, again, why didn't you do that?
20  A.  It's -- it would have been very difficult for me to   12:19:03
21  figure out those numbers.
22  Q.  Back to your report, Ms. Broten. So page 4 at the
23  bottom, under the -- I'll wait until you get there.
24  Let me know when you're there.
25      Okay. Page 4, are you there on your report?   12:20:08

Page 121

31 (Pages 118 - 121)

Exhibit 6
Page 31 of 123

1  A.  Um-hum, yes.

2  Q.  "POSTGRADUATE TRAINING," you were just going

3      through her education.  Then you have an asterisk

4      at the bottom where you state you included in the

5      file documents "a graph review developed by        12:20:22

6      Dr. Bala of the 35 resident physicians" in class --

7      "in the class of 1998 and where they are today."

8      Do you see that?

9  A.  Yes, I do.

10 Q.  Why did you include that information?              12:20:32

11 A.  Because --

12 Q.  Or why did you -- I should -- sorry.  Let me ask a

13     better question.

14 A.  Sure.

15 Q.  Did you request this information from Dr. Bala, or  12:20:40

16     did she suggest that she provide it to you?

17 A.  No.  It was in the file.

18 Q.  Oh, it was already in the file?

19 A.  Yeah.  It was -- it was file documents that I

20     reviewed.                                          12:20:52

21     MS. BAUMGART:  All right.  We're just going to

22 mark this.

23     (Exhibit 5 marked)

24     THE REPORTER:  Exhibit 5.

25 Q.  BY MS. BAUMGART:  Is Exhibit 5 the graph that      12:21:16

Page 122

1  you're referencing that we just discussed?

2  A.  I believe so.

3  Q.  Okay.

4      THE WITNESS:  Do you mind if I get a scarf?

5  I'm a little chilly.                                   12:21:27

6      MS. BAUMGART:  Oh, sure.  Yeah, we can go off

7  the record for just a moment.  Actually, why don't

8  we just break for lunch.

9      (RECESS 12:21 to 1:36)

10     (Exhibit 6 marked)                                 13:36:43

11 Q.  BY MS. BAUMGART:  Ms. Broten, we're back on the

12     record following lunch.  We have marked as

13     Exhibit 6 what I understand to be your case records

14     or case notes that were provided to us from your

15     file.  Is that correct?                            13:36:54

16 A.  Yes.

17 Q.  And just so you know, they did not come numbered,

18     and for ease of efficiency as we talk about them

19     today, our office added the numbers 1 through 58

20     below.                                             13:37:06

21 A.  Okay.

22 Q.  Okay.  So if I ask for a page number, that's what

23     I'm referring to.  Are these records -- and you're

24     free to flip through them -- the totality of your

25     handwritten notes that you kept during the course  13:37:19

Page 123

1  of your analysis in preparing your opinions and

2  report?

3  A.  They look like it, yes.

4  Q.  Okay.  It looks like you took some notes when you

5      interviewed Dr. Bala during the course of your     13:37:36

6      analysis?

7  A.  Yes.

8  Q.  Okay.  How many times did you interview Dr. Bala?

9  A.  Well, two more formidable interviews and then just

10     a couple of conversations past that, which should  13:37:50

11     be documented.

12 Q.  Great.  And I'll point you to a specific page if I

13     have a specific question.  Some may be just general

14     questions, and then, of course, if I ask you a

15     question and you would like to refer to your       13:38:05

16     report, just let me know.  When you interview and

17     evaluate a plaintiff like Dr. Bala, do you make

18     credibility assessments or consider credibility?

19 A.  Well, I look at past records, employment records,

20     and I attempt to determine whether or not the      13:38:22

21     information from the individual is -- matches the

22     information from the file records.

23 Q.  In addition to that, do you consider whether the

24     individual, particularly if the individual like

25     Dr. Bala is a plaintiff in a lawsuit seeking money, 13:38:46

Page 124

1  whether -- whether that influences them or the

2  information they're sharing with you that they're

3  hoping to be awarded, in this case, a large sum of

4  money?

5  A.  It's in the back of my mind, yes.                  13:38:59

6  Q.  And how do you, then, work through that when you

7      are -- if that's in the back of your mind, how does

8      that, if at all, factor into your analysis and

9      ultimate expert opinions?

10 A.  Well, what I -- I usually didn't know or don't     13:39:13

11     know, didn't know in this case, the sum of what she

12     was wanting to -- I still don't know what that sum

13     might be but -- wanting to try to -- to get.  But I

14     just ask open-ended questions, and when I ask the

15     questions regarding whether or not -- you know, why 13:39:39

16     did you go this route, what led you to this route,

17     what were your feelings, what are your emotions,

18     you know, that's -- that essentially gives me a

19     good picture.

20 Q.  All right.  We're going to work through the        13:39:54

21     Exhibit 6.  I want to start with page 3.  There is

22     some numbering, and then if we flip to the next

23     page, page 4, there is a note -- a Note 7 that I

24     think reads "Need AAMC if possible."  Do you see

25     that?                                              13:40:33

Page 125

32 (Pages 122 - 125)

1  A.  Yes.
2  Q.  Yes, and that's referring to the AAMC physician
3     compensation survey we've been talking about today?
4  A.  Yes.
5  Q.  Did Dr. Bala recommend that you review that if    13:40:39
6     possible?
7  A.  I think I already knew that I needed to rec- --- to
8     use it, but she had access.
9  Q.  Okay.  So it might have been you who knew or she
10    who recommended.  You're not sure?    13:40:52
11 A.  I don't think she actually had it yet, so I
12    recommended it, and I think she purchased it.
13 Q.  Okay.  Did she have to purchase it, or did she
14    already have an access?
15 A.  No, I think she had to purchase it.    13:41:06
16 Q.  Okay.
17 A.  I don't remember exactly, but I think it was $45,
18    if I'm correct.
19 Q.  Okay.  If you flip to page 6, please.  There is a
20    note.  Let me find it.  Under the "Return to Work    13:41:20
21    Attempts."  Let me just ask you:  These notes, all
22    the handwriting is yours.  Is that correct?
23 A.  Oh, yeah.
24 Q.  Okay.  No one else prepared these notes?
25 A.  Sorry.    13:41:34

Page 126

1  Q.  That's okay.  Did anybody else prepare these notes?
2  A.  No.
3  Q.  Okay.  So under the "Return to Work Attempts," the
4     second line, I think it reads "applied for 202,"
5     and would that be jobs?    13:41:44
6  A.  Yes.
7  Q.  Was that your understanding, that Dr. Bala told you
8     she applied for 202 jobs?
9  A.  It either came from Dr. Bala or I saw it in the
10    records.    13:41:56
11 Q.  Okay.  Did you do anything other than review it in
12    a record or receive this information from Dr. Bala
13    that she applied for 202 jobs -- anything to
14    independently verify that number?
15 A.  No.  I just reviewed it in the records and talked    13:42:11
16    with Dr. Bala --
17 Q.  Sure.
18 A.  -- about it.
19 Q.  Sure.  I mean, it sounds like she -- would this be
20    note -- would these be notes from your first    13:42:22
21    interview with Dr. Bala?
22 A.  I believe so, yes.
23 Q.  Okay.  So it looks like she's sharing with you in
24    that first interview that she applied for 202 jobs,
25    right?    13:42:32

Page 127

1  A.  Yes.
2  Q.  Okay.
3  A.  Or I said, it looks like you applied for 200 jobs.
4     She might have said, 202.  I don't know how that
5     came about.    13:42:41
6  Q.  Okay.  But either way, regardless of the impetus
7     for it, at some point you knew from the review of
8     the records and/or information from Dr. Bala that
9     she had applied for 202 jobs, and you relied on
10    that number.  Correct?    13:42:57
11 A.  Yes.
12 Q.  You also have some notes at the top, and they're
13    quotes, so if I -- is your note-taking practice, if
14    you put quotations around something, you're taking
15    down verbatim what the individual, in this case,    13:43:12
16    Dr. Bala, is saying to you?
17 A.  I try to do that in the interview, yes.
18 Q.  Okay.  And there is things like lost self-esteem,
19    traumatized, hard to process, those sorts of
20    things?    13:43:25
21 A.  Yes.
22 Q.  Were these Dr. Bala's words?
23 A.  Yes, I believe they were.  They're quoted, so I'm
24    sure they were.
25 Q.  Okay.  I want to have you turn to page 40, please.    13:43:34

Page 128

1     So I'm going to have a couple questions about a
2     text and just the format, and maybe I'll take this
3     up with counsel, but it looks like these
4     documents -- is it your handwriting at the top?
5     This says "10/20/2023 text from Rupa."  Are you on    13:43:56
6     page 40?
7  A.  Yes.
8  Q.  Okay.  And so -- but these are not in -- they're
9     sort of in a weird format, so we might talk
10    about -- do you still have these texts on your    13:44:08
11    phone?
12 A.  I don't know.
13 Q.  Okay.  Okay.  We'll talk about this on a break.  So
14    could you just read this -- read this to yourself
15    and let me know when you're done, please.    13:44:17
16 A.  Okay.
17 Q.  Did you get a chance to read -- this is all
18    information from Dr. Bala to you?
19 A.  Yes.
20 Q.  Okay.  Why did you ask her to tell you about her    13:45:00
21    experience at OHSU and what it did to her?
22 A.  Because -- and I asked it, I believe, in a phone
23    message because I couldn't reach her, and that's --
24    and then she just texted this to me because I was
25    looking for, you know -- trying to say, okay, when    13:45:18

Page 129

33 (Pages 126 - 129)

Exhibit 6
Page 33 of 123

**Page 130**

1  did I do this? I know I asked for it. Yeah, to.
2  So I asked her to do that because I was creating
3  the addendum and I wanted to make a reference to --
4  people that go through job search have different
5  emotions, and it's a part of the counseling process  13:45:43
6  to identify what those emotions are, and maybe
7  those can become barriers so -- and ways to improve
8  job search.
9  Q.  Did you ever form an opinion in your expert
10  capacity that Dr. Bala had emotional barriers to  13:46:06
11  future job search employability earning capacity?
12  A.  I did not. She is a very strong person and
13  personality, so I didn't see that it created a
14  barrier. What it may have created was -- were
15  parts of, you know, motivation in terms of, "Gosh,  13:46:27
16  I just can't do this today" type, which is very
17  normal for persons going through job search.
18  Q.  In having these conversations with Dr. Bala and
19  reading her sharing this with you, her experience
20  that we're looking at on page 40 of Exhibit 6, what  13:46:53
21  impact did that have on you, if any?
22  A.  You know, I sometimes just -- I didn't remember
23  reading the last part. I sometimes read these, and
24  it kind of goes in, but it doesn't really make a
25  difference in terms of my report. I wasn't  13:47:10

**Page 131**

1  commenting on mental health, so --
2  Q.  Did you find yourself or do you find yourself
3  sympathizing with her given what she shared with
4  you about her experience?
5  A.  I try really hard not to do that in all of my  13:47:25
6  cases.
7  Q.  But we're human, right?
8  A.  That's right. You go in and out once in a while.
9  No, I don't think it made a difference on my -- the
10  impact of my earning capacity analysis.  13:47:37
11  Q.  And maybe you've already answered this. If you
12  have, just tell me, but where did this, the inquiry
13  about her experience and her response, where, if at
14  all, did that fit into your methodology for
15  evaluation of her earning capacity?  13:47:58
16  A.  Say -- say that again --
17  Q.  Sure.
18  A.  -- in a different way.
19  Q.  Did this -- did this information from Dr. Bala that
20  we just looked at, her sharing her experience, what  13:48:11
21  her experience was at OHSU and the impact that had
22  on her, how, if at all, did that fit into your
23  methodology of evaluating her earning capacity?
24  A.  So her experience is given in a more factual term.
25  She's very matter of fact as a personality, in my  13:48:34

**Page 132**

1  opinion. And I'm pretty matter of fact as well.
2  So I could understand that. It's important for me,
3  though, to know, you know, the impacts of her
4  ability to obtain employment, and that's the only
5  way I would get that information is by asking  13:48:56
6  questions about how is your -- how are you doing
7  emotionally? How are you doing with this continued
8  what appears to be lack of interest in your -- in
9  obtaining work?
10  Q.  Okay. And correct me if I'm wrong. I think you  13:49:16
11  testified that the impact on her that she described
12  to you when you talked about her emotional and
13  mental state did not, in fact, impact her ability
14  to obtain work or future earning capacity. Is that
15  your conclusion?  13:49:35
16  A.  You know, I didn't mention it in my report, you
17  know, very -- I may have said a few things, but I
18  didn't make it sound as -- how can I say it?
19  Q.  Definitive?
20  A.  Right.  13:49:56
21  Q.  Maybe?
22  A.  Definitive as this.
23  Q.  Okay.
24  A.  So, yeah, so I touch on it, but I never make it a
25  big part if there is not a diagnosis to go with it.  13:50:04

**Page 133**

1  Q.  Okay. So even though it wasn't in your report --
2  and I appreciate that, right? I appreciate you,
3  you know, you have a right to clarify and
4  supplement your report, but just so the record is
5  clear, what you're now being definitive about is  13:50:17
6  that Dr. Bala's experience at OHSU, the impact it
7  had on her, was not a barrier to her employability?
8  MR. BRISCHETTO:  Object to the characterization
9  of the testimony.
10  Go ahead.  13:50:33
11  THE WITNESS:  Say it one more time.
12  MS. BAUMGART:  Sure. I'll have -- Julie can
13  read it back, if you don't mind.
14  THE WITNESS:  Thanks.
15  MS. BAUMGART:  If you can.
16  THE WITNESS:  Thanks, Julie.
17  (The reporter read as requested)
18  THE WITNESS:  Well, no. I think I was talking
19  about emotional and mental health.
20  Q.  BY MS. BAUMGART:  Okay. Thank you for clarifying.  13:51:08
21  So --
22  A.  That's what we were --
23  Q.  So let me just ask you what are you -- what is your
24  definitive statement now that was not clear in your
25  report with respect to Dr. Bala's emotional state  13:51:16

34 (Pages 130 - 133)

1  and mental health?
2  A.  I think she was fine when searching for work.
3  Q.  Okay.
4  A.  She -- yes.
5  Q.  So what you're -- what you're clarifying is that    13:51:25
6      your observation and opinion was that, with respect
7      to Dr. Bala's mental and emotional state or health
8      regarding her experience at OHSU, that that did not
9      impact -- that was not a barrier to her
10     employability and future earning capacity.  Did I    13:52:01
11     get that right?  I want to get it right.
12        MR. BRISCHETTO:  Objection.  Misstates the
13     testimony.  Asked and answered.
14        Go ahead.
15  Q.  BY MS. BAUMGART:  Go ahead.    13:52:08
16  A.  In a nutshell, yes.
17  Q.  Okay.  Thank you.  All right.  Let's flip back.  I
18     think -- yeah, we asked you about 40.  We were back
19     on page 9, please.  On page 9 it looks like your --
20     this is again notes from your conversation with    13:52:40
21     Dr. Bala.  Correct?
22  A.  Yes.
23  Q.  And it looks like you're talking a bit about her
24     work history, and Number 2, it's about -- it looks
25     like you're speaking about OHSU, and it looks like    13:52:48
Page 134

1      maybe there is a discussion about a promotion or
2      promotion timeline from associate professor to
3      professor to chief.  Is that sort of what I'm
4      getting the gist of based on your notes?
5         MR. BRISCHETTO:  Objection.  Vague.    13:53:10
6         Go ahead.
7         THE WITNESS:  Yes.  Was that a question?
8  Q.  BY MS. BAUMGART:  I'll rephrase.  Yeah.  Tell me
9      about what -- explain to me the basis of your notes
10     under that Section 2, OHSU, that are talking about    13:53:19
11     associate professor, some people get promoted in
12     two to five years, some in short time.
13  A.  Right.
14  Q.  What were you discussing with Dr. Bala?
15  A.  Right.  I think we were talking about her -- and    13:53:33
16     this is just from memory.
17  Q.  Sure.
18  A.  I think we were talking about her trajectory, and I
19     think she mentioned -- and I -- I don't want to say
20     this for certainty because I don't remember    13:53:46
21     exactly, but she was -- we were talking about the
22     path to become a chief, path to become a professor,
23     path to become -- stay as an associate professor,
24     and she just made the comment that sometimes people
25     get promoted quickly; some don't.  And essentially    13:54:05
Page 135

1      that's kind of what that was.
2  Q.  Oh, I see.  Okay.  And the information that
3      Dr. Bala shared that's documented here or if you
4      had other conversations with her about it, am I
5      correct that she was sharing her experience and her    13:54:22
6      impression of what her trajectory may -- had been
7      and maybe if she would have stayed at OHSU?
8  A.  Actually, no.  I think she was talking about
9      Mr. Henrikson, who I may have spelled wrong.  I
10     think he had a short projectory --    13:54:37
11  Q.  Oh, okay.  Okay.
12  A.  I think, but, again, I don't remember.
13  Q.  Sorry.  I didn't mean to take over you.  Fair
14     enough.  So let's just step away from this for the
15     moment and just generally.  Did Dr. Bala provide    13:54:50
16     you, either in this conversation or other
17     conversations, information about what she believed
18     her career trajectory and promotion progression and
19     timeline at OHSU would have been or could have been
20     had she stayed?    13:55:05
21  A.  Not once.
22  Q.  Don't you reference that in your report?  You make
23     some assumptions and based on opinions on what
24     would be a likely academic career progression had
25     Dr. Bala remained at OHSU?    13:55:21
Page 136

1  A.  Yes, but it wasn't from her.  That was my -- that
2      was my trajectory.  That was my resource research.
3      That was how I -- I develop earning capacities is I
4      come up with that trajectory.
5  Q.  Okay.  And so we'll talk about that in a    13:55:40
6      minute, and thank you for clarifying.
7      So 100 percent of your analysis and ultimate
8      opinions about a potential career trajectory time
9      for promotion to professor and chief had Dr. Bala
10     remained at OHSU was 100 percent based on your    13:55:57
11     research and 0 percent based on input from
12     Dr. Bala?
13  A.  Absolutely.
14  Q.  Did you ever speak with anyone at OHSU in your
15     process of evaluating a possible career trajectory    13:56:13
16     had Dr. Bala remained at OHSU?
17  A.  I did not.
18  Q.  Did you speak at any -- with anyone at any other
19     academic medical institution?
20  A.  I did not.  Let me think.  Who did I talk to?  No,    13:56:27
21     I don't believe I did.  No.  I can't think of
22     anybody.  It would have been in my notes probably.
23  Q.  And apart from your notes and what's in your
24     report, which speaks for itself obviously,
25     Ms. Broten, sitting here today, do you have a clear    13:56:49
Page 137

35 (Pages 134 - 137)

Exhibit 6
Page 35 of 123

1  memory of what it is you researched to ultimately
2  conclude this would have been her likely career
3  progression to professor and chief had she remained
4  at OHSU?
5  A.  Sure.  I took in a number of factors.  One was just  13:57:02
6  reading the compensation guides that I utilized.  I
7  looked at BLS data, Bureau of Labor Statistics
8  data.  I did talk to the Bureau of Labor Statistics
9  several times and also the -- was it the
10  community -- it's a part of Bureau of Labor and  13:57:32
11  stats -- community survey folks.
12 Q.  Sorry to interrupt.  This is just specifically with
13  the question of what a likely --
14 A.  Trajectory.
15 Q.  -- trajectory in the academic setting would be.  13:57:43
16  Okay.  Continue.
17 A.  No, I have to review that in order to determine --
18  I have to determine -- determine what a trajectory
19  might look like.  I also looked at the residency,
20  peer residency chart that you offered right before  13:58:03
21  lunch.  I looked at those folks and where they were
22  in their projectory -- trajectory, sorry.
23 Q.  Great.  Anything else?
24 A.  I don't think so.
25 Q.  So speaking of -- well, we'll come to -- we'll come  13:58:27

Page 138

1  back to that Exhibit 5 in a few minutes.  I will
2  keep going on this.
3     Okay.  So let's see.  Moving through your case
4  notes.  Page 12.  Just a quick question.  It looks
5  like Dr. Bala is sending you -- this is where maybe  13:58:48
6  she's sending you that Exhibit -- Exhibit 5 that we
7  talked about?
8  A.  Yes.
9  Q.  Okay.  So I think you may have testified earlier
10  that -- and this is fine.  I know you got a bunch  13:59:00
11  of documents.  I just want to clarify to the extent
12  we can with your memory.  I think your testimony
13  earlier was that Exhibit 5 sort of came to you in
14  the initial sharing of documents.  Does this
15  refresh your recollection that Dr. Bala sent it to  13:59:13
16  you as attached to this email on October 3rd?
17 A.  This probably is it.
18 Q.  Okay.  And do you know -- did you ask her to
19  prepare this, or how was it that this was sent to
20  you and something that you -- how was it that this  13:59:32
21  was sent to you?
22 A.  Oh, sure.  No, I don't believe I asked her to
23  prepare it.  I think she just prepared it and sent
24  it.
25 Q.  And why?  Did she say why she wanted you to review  13:59:45

Page 139

1  this or why she wanted to send it to you?
2  A.  Well, we may have -- I think we touched on -- this
3  was October 3rd.  We probably touched on it in the
4  interview, and she sent it.
5  Q.  Page 15, please, of your case notes.  So just to  14:00:20
6  clarify, the handwriting at the top, are you --
7  because the email -- we're sort of getting these in
8  a weird format, right?  It's an email that's dated
9  November 30th, which is, I think, probably when the
10  file was produced.  But at the top, you're  14:00:39
11  handwriting the dates and then if it's a text
12  message or who it's to.  Tell me the process you're
13  going through as you're reviewing the text thread
14  and making this notation.
15 A.  I tried to -- I tried to copy it on the date that  14:00:51
16  the text was there.  I really did.  But as it came
17  through, it said November 30.  I thought, oh, crap,
18  now I have to go through every single one, and you
19  know, find out when it was.
20 Q.  Okay.  14:01:06
21 A.  So that's kind of what I did.  I rarely have to
22  produce any text documents, but --
23 Q.  And is that because you rarely text the plaintiff
24  or the --
25 A.  I'm rarely asked.  I do text plaintiffs or --  14:01:19

Page 140

1  and/or defendant --
2  Q.  Okay.
3  A.  -- defense counsel on occasion.
4  Q.  So, to the best of your recollection, and you were  14:01:30
5  obviously, I would assume, trying to be --
6  attempting to be accurate in writing down when the
7  text was actually --
8  A.  Yes.
9  Q.  -- sent and to whom and from whom.  Is that
10  correct?  14:01:39
11 A.  Yes.
12 Q.  And so looks like this was sent on October 5th, you
13  to Dr. Bala, and you write, "Let me know when you
14  find out whether you are invasive, interventional,
15  med, or invasive, non-interventional.  Thank  14:01:51
16  you, Dr. Bala.  This is Lisa Broten."  Is that you,
17  your --
18 A.  Yes.
19 Q.  -- note to Dr. Bala?  And why are you -- so this is
20  on October 5th.  Why are you needing this  14:02:00
21  clarification from her?
22 A.  Because I wanted to clarify whether she was
23  invasive interventional because I think, when we
24  were talking earlier on -- on the 5th, she thought
25  she wasn't invasive, and I said, well, I think you  14:02:23

Page 141

36 (Pages 138 - 141)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 36 of 123

1  are. And so she said, well, I'm going to get a
2  hold of AAMC. And then she came back with saying
3  she -- I guess I'm invasive. So she doesn't
4  consider -- well, anyway. That's -- that's enough.
5  Q.  And why would it have been important for you to  14:02:43
6  know the difference between these -- whether she's
7  invasive or non-invasive?
8  A.  Well, when you're looking at the salary
9  compensation charts, it separates them out, and I
10  want to know which one she is.               14:03:01
11 Q.  So in the context of your analysis and ultimately
12  your opinion, it was important for you to know the
13  differences because the surveys, in fact, set
14  compensation benchmarks based on these categories,
15  right?                                       14:03:14
16 A.  Yes.
17 Q.  And not all of them have an EP-specific category,
18  do they?
19 A.  Most of them that I used I thought did but --
20  but --                                       14:03:24
21 Q.  Does the AAMC have a specific category for EPs?
22 A.  Well, I thought I used one for them.
23 Q.  Just from your recollection. We can --
24 A.  Yeah, I thought so.
25 Q.  Okay. Can you tell me what is it that Dr. Bala  14:03:34

1  does as an electrophysiologist?
2  A.  Yeah, I've been -- I've been trying to -- there is
3  some very short descriptions and so -- and I've
4  been trying to, you know, what does it look like?
5  And essentially she works on the electric --  14:03:55
6  electric, well, I guess the electro -- electric or
7  electronic -- electrical processes of the heart,
8  ablations. There is a lot of other things,
9  defibrillators, defibrillate.
10  THE REPORTER: Can you speak up a little.
11  THE WITNESS: I'm thinking defibrillate. I'm
12  not sure it's the right word. But she works on the
13  electrical processes of jump in the heart, A-fib,
14  those types of diagnoses.
15 Q.  BY MS. BAUMGART: And do you know how that differs  14:04:40
16  from the role of a cardiologist?
17 A.  A cardiologist is more general and works with
18  disease primarily.
19 Q.  Do you know what sorts of qualifications someone
20  like Dr. Bala has to possess to be an  14:04:54
21  electrophysiologist?
22 A.  I did review that, and I'm not sure I wrote it in
23  the report or not, but I think I even attached it
24  as part of my attached references. Yeah, she has
25  to have additional time after becoming a general  14:05:12

1  cardiologist, first internal medicine and then
2  general cardiologist, three years maybe of that
3  residency, or was it four? And then another two,
4  three years doing EP training.
5  Q.  Page 16. Page 16 appears to be -- looks like there  14:05:30
6  is a thread initially below from Dr. Bala to you
7  and then counsel with the subject "Matt — all of
8  these need to be added to Lisa's folder" and then a
9  number of what I think are Excel-type spreadsheets
10  compensation surveys, I think. Does this ring a  14:05:59
11  bell, this information being forwarded to you?
12 A.  Yep, yes.
13 Q.  And it looks like -- is this your understanding
14  that it was information that Dr. Bala had gathered
15  and through counsel sent on to you?          14:06:12
16 A.  Yes.
17  MS. BAUMGART: Okay. I'm just going to mark
18  these so they're in the record. I don't have any
19  questions, so maybe we'll go off the record, mark
20  them and have you identify them.             14:06:23
21  (RECESS 2:06 to 2:08)
22  (Exhibits 7 through 12 marked)
23 Q.  BY MS. BAUMGART: All right, Ms. Broten. We're
24  back on the record. We took a break to mark what I
25  believe are the attachments to the email we see on  14:08:51

1  page 16 of Exhibit 6, and we've marked them as
2  Exhibits 7 through 12 of your deposition. Are you
3  generally familiar with these documents?
4  A.  Well, you know, I didn't copy them like this, and I
5  have a paper file, so I copied them differently,  14:09:13
6  and I believe you have copies of my copies of what
7  I used and highlighted, so they're generally
8  familiar.
9  Q.  Okay. So let me just ask you this. So you already
10  testified that Exhibit 7 through 12 were, in fact,  14:09:29
11  sent to you by Dr. Bala. Correct?
12 A.  Yes.
13 Q.  And did you review them or rely on them in
14  performing your analysis and ultimate opinions?
15 A.  Some of them, yes.                           14:09:46
16 Q.  Okay. And do you know, sitting here today, which
17  of these Exhibits 7 through Exhibit 12 you would
18  have relied upon and which you didn't?
19 A.  You know, I would really like to see my copies
20  because these don't -- I don't know which ones.  14:09:58
21 Q.  Yeah. This is --
22 A.  This is not my -- this is not what I reviewed. I
23  don't have these.
24 Q.  Well, and I can represent to you we don't -- I can
25  show you something else that maybe you're thinking  14:10:09

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 37 of 123

**Page 146**

```
1    of.  This is the only way this information came to
2    us.  We did not get it printed in anything else,
3    but let me show you something else that maybe
4    you're referring to.
5         THE REPORTER:  Exhibit 13.          14:10:41
6         (Exhibit 13 marked)
7         MS. BAUMGART:  Let me mark one more thing.
8         (Exhibit 14 marked)
9  Q.  BY MS. BAUMGART:  So you were testifying that sort
10   of the format of Exhibit 7 through 12 didn't look   14:11:25
11   familiar to you.  Is Exhibit 13 something that
12   looks more familiar to you?
13 A.  You know, I think I printed my own and out of
14   this -- out of these copies, and mine just are much
15   different, so I'm sorry if I don't --        14:11:42
16 Q.  That's okay.  That's okay.  So when you say this,
17   let's go back to Exhibit 7 through 12.  Okay?
18 A.  Um-hum (affirmative response).
19 Q.  So these, even though you may have viewed them and
20   printed them in a different -- maybe a, you know,   14:11:54
21   portrait versus landscape, but do you remember
22   consulting at least some of this information that
23   Dr. Bala sent you that's represented in Exhibit 7
24   through 12?  Correct?
25 A.  Yes.                           14:12:10
```

**Page 147**

```
1  Q.  Okay.  And other than review it -- and maybe you
2    reviewed it in a different visual form, online or
3    printed -- did you do anything independently to
4    verify the information contained in the information
5    Dr. Bala sent you in Exhibit 7 through 12?      14:12:24
6  A.  No.
7  Q.  Okay.  We're done with these.  You can put these
8    aside.  Did she -- did Dr. Bala share with you what
9    she did to prepare Exhibit 7 through 12?  Did she
10   talk to you about in your conversation what she was  14:12:54
11   going to do or anything like that?
12 A.  Not in terms of the preparation, no.
13 Q.  What did she talk to you about?
14 A.  That I -- you know, I asked her -- basically I
15   said, can you share with me your memberships so   14:13:05
16   that I can get online and look -- look at it
17   myself, and then she sent this over.  So basically
18   I had this, and then I looked online and compared,
19   and then I printed my own copies, not from -- well,
20   it could have been from this, from her email,     14:13:29
21   but -- and maybe it was, but my printer just didn't
22   print it as beautifully as this.
23 Q.  Got it.  Okay.  So I want to go back because I
24   maybe heard something different than your answer to
25   my question a moment ago.  So we know that Dr. Bala  14:13:45
```

**Page 148**

```
1    sent you Exhibit 7 through 12.  Correct?
2  A.  Yes.
3  Q.  And she sent you these -- these are physician comp
4    surveys from AAMC.  They're all from AAMC.
5    Correct?                           14:14:04
6  A.  Yes.
7  Q.  Okay.  And my question was whether you, in fact,
8    relied on the information Dr. Bala sent you, and
9    you said -- I think you said some of it.  You
10   looked at some -- some you did; some you didn't.   14:14:18
11   Is that correct?
12 A.  Yes.
13 Q.  Okay.  So then my question was whether the
14   information that you relied upon that Dr. Bala sent
15   you, did you do anything independently to verify   14:14:26
16   these numbers or the accuracy of the information?
17   And I thought you said no.
18 A.  I don't -- other than going on AAMC myself, no.
19 Q.  Okay.  So tell me what you did when you went on --
20   you logged in -- I think you said maybe once or    14:14:45
21   twice -- under Dr. Bala's log-in on the AAMC.  Were
22   you looking at what she sent you?  Were you looking
23   at other information?  What is it that you were
24   accessing?
25 A.  I was accessing this information.            14:14:59
```

**Page 149**

```
1  Q.  And why were you going on to access
2    information when you already had it?
3  A.  Because I wanted to verify it and just look at it,
4    you know.  I wanted to go on AAMC.  I have not
5    actually been on it before, and it was a good way   14:15:15
6    for me to -- to get on and look.
7  Q.  And what, if any, records do you have that -- and I
8    don't mean this to question your veracity, but I
9    don't have any other records that would support
10   that you did that, so what, if any, records do you  14:15:30
11   have that would support that you independently
12   logged on, printed, reviewed this type of
13   information to verify what Dr. Bala sent you in
14   these raw Excel spreadsheets?
15 A.  I don't know.  I don't know how to answer that.   14:15:45
16 Q.  Well, you had mentioned you printed something that
17   looked different.
18 A.  Yeah.  I might -- I may have, and I don't know for
19   sure, but I may have printed this, but it just
20   looked different on my printer, so does that make   14:15:57
21   sense?
22 Q.  And when you say "printed this," we're still
23   talking about the same information Dr. Bala sent to
24   you, Exhibit 7 through 12.  It may have just
25   printed in a different type of format?          14:16:12
```

38 (Pages 146 - 149)

Exhibit 6
Page 38 of 123

1 A. Yes, I think that's what it was.

2 Q. Okay.

3 A. That's why this -- this doesn't look as -- doesn't

4   look the same as what I viewed.

5 Q. All right. So I think we're clear on that.    14:16:21

6 A. Okay.

7 Q. What I'm not clear on is what, if any, steps you

8   took to either verify the information Dr. Bala sent

9   you in Exhibit 7 through 12. What, if any, steps

10   did you take -- and maybe you didn't. I thought    14:16:34

11   you said earlier you didn't.

12 A. I don't think I did.

13 Q. Okay. Okay. Then you did log on once or twice

14   yourself to the AAMC website. Correct?

15 A. I did, yes.    14:16:49

16 Q. And when did you do that?

17 A. It would have been right around this same time.

18 Q. And do you have it --

19 A. So --

20 Q. Sorry. Go ahead.    14:16:59

21 A. I -- yeah, I'm just looking here to see if it was

22   charted. I would think that it would have been

23   around this same time, around the same day, but I

24   don't know. I guess I didn't document that I did

25   that. I'm missing some billing.    14:17:40

Page 150

1 Q. Okay. And apart from the billing documentation, do

2   you remember -- let me ask it this way: The

3   information, the survey information from the AAMC

4   that you relied on in forming your opinions and

5   ultimate -- excuse me, your analysis and ultimate    14:18:00

6   opinions in your report, did that come from what we

7   see in Exhibit 7 through -- 7 through 12?

8 A. I believe so because I'm recognizing the titles on

9   the top, and when you look inside, yes --

10 Q. Okay.    14:18:18

11 A. -- there is information in there that I utilized.

12 Q. Okay. Very good. Thank you. That's all I have, I

13   think, about those spreadsheets.

14    Can you look at Exhibit 14, please.

15   Exhibit 14, I believe, are also -- is also some    14:18:45

16   data from -- I think it's also data from the AAMC.

17   Yes, at the bottom. Faculty salary report. Does

18   this look familiar to you, these --

19 A. Yeah, that looks familiar as well.

20 Q. Some of these -- it looks like maybe a photo,    14:19:09

21   right? Somebody sent these photos or some fingers

22   on the side, a hand on the side of some of the

23   pages?

24 A. I'm thinking this was in the file documents that I

25   received.    14:19:23

Page 151

1 Q. Okay. So you're thinking this may have been when

2   you received the initial file from counsel that

3   this -- this was something in here?

4 A. Yes.

5 Q. Okay. And what's your understanding of who    14:19:37

6   prepared this? Is this something from Dr. Bala

7   again that was passed on ultimately to you?

8 A. I believe so.

9 Q. Okay. This wasn't -- these weren't excerpts that

10   you took from the AAMC and took a photo or printed?    14:19:47

11 A. No.

12 Q. Okay.

13 A. That's not my thumb.

14 Q. Did you rely on the information in Exhibit 14 in

15   preparing your analysis and ultimate conclusions?    14:19:56

16 A. I used this documentation from Exhibit 7

17   through 12.

18 Q. Okay.

19 A. So I did not rely on this information.

20 Q. Okay. Thank you. Back to your -- back to your    14:20:12

21   case notes, page 22. It looks like there is a

22   text. It looks like some SullivanCotter

23   information. Was Dr. Bala sending you

24   some SullivanCotter survey information?

25 A. Yes.    14:20:42

Page 152

1 Q. And did you rely on that information from Dr. Bala

2   in preparing your analysis and ultimate

3   conclusions?

4 A. I believe I did.

5 Q. Did you do anything independently to verify that    14:20:50

6   information once you received it or just -- just

7   utilized it as it came to you?

8 A. I went to the website, and I printed it.

9 Q. And where would those documents be?

10 A. You should have them.    14:21:09

11 Q. What would you expect we would have different than

12   what Dr. Bala sent to you? What do you expect we

13   would have different than what Dr. Bala sent to

14   you?

15 A. Oh, I don't think you have anything different.    14:21:21

16   This is -- this is MGMA. I don't know where the

17   SullivanCotter -- I have SullivanCotter in my

18   files, so --

19 Q. Oh, I see. You know, Ms. Broten, I think I

20   misunderstood you. Now that I see she sent you a    14:21:35

21   link, not an attachment.

22 A. Right.

23 Q. So is it your testimony that you clicked on the

24   link, went to the website, printed the information

25   Dr. Bala directed you to?    14:21:43

Page 153

39 (Pages 150 - 153)

Exhibit 6
Page 39 of 123

1  A.  Most likely, yes.
2  Q.  Very good.  Thank you.  Okay.  Page 23.  So this is
3      one, you know -- if you do still have the text, I
4      think this is one we would really like to be able
5      to look at because it looks like a back-and-forth,  14:22:02
6      and I don't know who said what.
7  A.  Okay.
8  Q.  Do you have the text on your phone?
9  A.  I may.  I don't know.  I'd have to look.  This
10     looks like a text back and forth from her and      14:22:21
11     myself.
12 Q.  And do you know -- and if you don't know with
13     certainty, I don't want to waste the time because
14     we'll just look at the text, but --
15 A.  Sure.                                 14:22:31
16 Q.  -- do you know, just sitting here, sort of who said
17     what, who said what?
18 A.  Yes.  Let's see.  So the first two sentences would
19     be from Dr. Bala.
20 Q.  So why don't you, just for a clear record, just    14:22:47
21     read -- maybe just read, Dr. Bala said, and read it
22     and then your response.  Let's just do it that way.
23 A.  Sure.  So "I found this also — salary data from
24     Sullivan Cotter.  They are like MGMA."  There
25     should be a period, but there isn't.               14:23:05

                                                Page 154

1      Thank you -- from me, from Lisa:  Thank you.
2      Please let me take a look at it probably in a
3      couple hours.  I'm going to head back into the
4      office and won't do anything with it until
5      tomorrow.  If it looks good, I'll add it to my     14:23:21
6      graph section of the report, and hopefully by
7      tomorrow evening, I'll have figures for the
8      economist to work on.  It could be used as one
9      more line --
10     Let me read it first.                  14:23:38
11 Q.  Sure.
12 A.  Oh, it could be used as -- that looks like from me,
13     too -- used at one more line of support for
14     figures, but I want to look at it first.  And I'm
15     currently using cardiology invasive interventional  14:23:52
16     medicine figures.
17     So that's all from me.
18 Q.  Okay.
19 A.  That whole paragraph.
20 Q.  So the best of your recollection and subject to    14:24:03
21     confirmation looking at the actual text is that
22     Dr. Bala -- the only portion you're attributing to
23     Dr. Bala is just the initial "I found this also —
24     salary data from Sullivan Cotter.  They are like
25     MGMA"?                                 14:24:19

                                                Page 155

1  A.  Yes.
2  Q.  And the rest is your text?
3  A.  Yes.
4  Q.  Okay.  When you wrote, if it looks good, I'll add
5      it to my graph section, meaning the converse; if it  14:24:28
6      doesn't look good or isn't helpful to Dr. Bala, you
7      weren't going to add it?
8  A.  Well, I don't know.  If it -- if it looked like it
9      would support the figures that I'm working with,
10     then I would add it, if I could determine if they   14:24:44
11     were actual figures that I needed to use.  I hadn't
12     looked at the information yet.
13 Q.  When you were doing your earnings analysis and
14     determining which data to use from which surveys,
15     did the fact whether or not it would sort of, for   14:25:03
16     lack of a better word, help or hurt Dr. Bala factor
17     into your decision-making what information went
18     into your graphs and analysis?
19 A.  I didn't think that way, no.
20 Q.  How did you decide what information to use and what  14:25:16
21     information not to use?  What looked good to use
22     and what did not look good to use?  How did you
23     make that determination?
24 A.  Well, I didn't necessarily do it that way.  I
25     looked at the information that was available, and   14:25:29

                                                Page 156

1      this wasn't available to me, or whatever -- which
2      one it is -- it isn't that one, the
3      SullivanCarter -- Cotter -- although I knew about
4      it, and -- and so basically I just used the figures
5      that were there.                       14:25:50
6  Q.  Were there any figures that you had available to
7      you, either your own access, information sent from
8      Dr. Bala, whether it's publicly available, that you
9      were aware of or looked at and then ultimately did
10     not use or factor into your analysis?              14:26:08
11 A.  There were -- there were none.
12 Q.  If you could just put your report next to you,
13     we'll be flipping back and forth a little bit,
14     Ms. Broten, and I'm looking to page -- what starts
15     on the very bottom of page 17 and continues onto    14:26:33
16     page 18.  The tables in your report --
17 A.  Um-hum (affirmative response).
18 Q.  -- did you --
19 A.  Yes.
20 Q.  Did you prepare these?                  14:26:45
21 A.  I did.
22 Q.  Did anybody assist you in preparing these?
23 A.  My typist.  I handwrote them, and I said, can you
24     please make this look good.
25 Q.  Okay.  So apart from someone typing them in, as far  14:26:57

                                                Page 157

40 (Pages 154 - 157)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 40 of 123

```
 1   as determining data to use, whether to use the mean
 2   or the median, what percentile, anyone assist you
 3   with making those determinations?
 4 A.  No.
 5 Q.  Did Dr. Bala suggest that her wage would be          14:27:13
 6   somewhere near the 75th percentile?  Is that why
 7   you used that in that first -- the first table, top
 8   of page 18?
 9 A.  Right.  Not at all.  She did not, and I did not
10   want her to have any say in my figures.            14:27:29
11 Q.  The numbers that we see, the calculations and
12   ultimate numbers that we see, again pages 18
13   through 20, on your -- on your table, did anything
14   about these change as you progressed through your
15   analysis, either, you know, we're higher at some    14:28:10
16   point; we're lower at some point?
17 A.  Well, the numbers were from these documents.
18 Q.  And when you say "these documents," Exhibit 7
19   through 12?
20 A.  Yes.                                14:28:23
21 Q.  Okay.
22 A.  And so what I did was attempt to put the
23   information in a graph form directly from what I
24   viewed here.  Then what -- in these documents, 7
25   through 12.  And then what I did was decide and    14:28:44
                                              Page 158
```

```
 1   make some decisions and opinions on where
 2   Dr. Bala's experience, skills, education lent her
 3   in terms of the percentiles used, you know, whether
 4   it would be a mean and/or the 75th percentile.
 5   THE WITNESS:  And I don't know.  This video    14:29:17
 6   starts -- it's looking at me, so is something wrong
 7   there?  Okay.  It's kind of odd to see myself.
 8   MS. BAUMGART:  Yeah, we can fix that.  Sure.
 9   (RECESS 2:29 to 2:30)
10 Q.  BY MS. BAUMGART:  Okay.  I think I got my -- I'm    14:30:50
11   going to ask you about your actual numbers in just
12   a minute, so I want to keep moving.  Back to your
13   case notes, page 30, Ms. Broten.  While you're
14   getting there, just one quick clarification.  I do
15   see on page 18 of your report, that first table,    14:31:30
16   that it does look like you relied on data from
17   SullivanCotter.  I thought you said a moment ago
18   you didn't have access to that.  Is that --
19 A.  No, I did say I had access.  I think it was in the
20   text, and we went over that.            14:31:46
21 Q.  Okay.  Sorry.  Maybe I misheard you.  All right.
22   Page 30, looks like Dr. Bala is sending you some
23   additional survey information from MedAxiom?
24 A.  Yes.
25 Q.  Did you rely on that information in performing your  14:32:01
                                              Page 159
```

```
 1   analysis and conclusions?
 2 A.  Yes.
 3 Q.  And similar to, I think, your prior testimony, that
 4   you reviewed what she sent you and, to the extent
 5   you thought it appropriate, used it.  Is that    14:32:15
 6   right?
 7 A.  Yes.
 8 Q.  Page 31 of your case notes.  Is this another
 9   back-and-forth text message between you and
10   Dr. Bala?                            14:32:28
11 A.  Looks like it is, and the first -- I'll just
12   repeat.  "Lisa:  I found" the salary or "this
13   salary report too.  If you look at the tables at
14   the end, you will see salary data for" Cotter --
15   Cardiology — EP Page 48 — salary info," period.    14:32:55
16   There should be a period there.
17   And then me:  Oh thank you.  I'll take a look
18   at it.  I'm hoping to have the report done by this
19   evening, at least a good draft.
20   I was on my way to Minnesota, so I -- I had to    14:33:15
21   work fast.
22   Dr. Bala may -- Dr. Bala may you -- maybe you
23   could answer this question quickly -- or answer
24   this quickly, but I'm looking at the MedAxiom
25   report, and what exactly is integrated    14:33:31
                                              Page 160
```

```
 1   electrophysiologist compared to private?  Does it
 2   have anything to do with teaching and research and
 3   academic?  I haven't read the whole report, and
 4   I've just been cruising through it.
 5   So that's all me.                        14:33:49
 6 Q.  Okay.  So it looks like the note starts or the text
 7   starts with Dr. Bala sending you another salary
 8   report?
 9 A.  Yes.
10 Q.  And, again, had you asked her to send these various  14:33:59
11   salary reports to you, including Exhibit 7
12   through 12, or she just sort of did it on her -- on
13   her own?
14 A.  You know, we talked about it because I was
15   searching for them, and then she was very        14:34:16
16   proactive.
17 Q.  And it also looks, in this page 31 that you just
18   read you asked Dr. Bala what exactly is an
19   integrated electrophysiologist compared to private.
20   Why were you asking her that, do you recall?      14:34:38
21 A.  Because I needed to know the difference.  It was --
22   I believe it's in the MedAxiom -- there was a
23   statement somewhere about integrated versus
24   private, and I needed to find out what that
25   difference was.                        14:34:50
                                              Page 161
```

41 (Pages 158 - 161)

Exhibit 6
Page 41 of 123

1  Q.  Okay.  And at this point, you were confirming, as
2     we look on page 33, confirming with Dr. Bala that
3     she, indeed, was working in private practice with
4     Citrus, right?
5  A.  Yes.                              14:35:03
6  Q.  Was that the first time, do you think, that you had
7     clarity on her current job, that it was in private
8     practice with Citrus?
9  A.  I knew that it was in private practice, looking at
10    the employment contract, but it helped me define    14:35:18
11    integrated versus private group.
12 Q.  The top of 33, is this you, "Awe, thanks for
13    finding that to me"?  Is that you writing to
14    Dr. Bala?
15 A.  I believe so.  Yeah.  And I was assuming she was    14:35:42
16    integrated, but --
17 Q.  And at this point, are you specifically -- are you
18    needing to look for more data for purposes of your
19    analysis, or is it Dr. Bala just continuing to send
20    you information?                    14:35:56
21 A.  Actually I wanted more data, so --
22 Q.  Page 38, please.  At the bottom right corner, it
23    looks like a note, "all was closed to her."  Do you
24    know what you were referring to?
25 A.  No, I'm not sure what that is.      14:36:36

Page 162

1  Q.  Okay.  And then if you go straight up that right
2     side towards the top, again we see that 202 jobs
3     applied for.  Correct?  Like before Dr. Bala is
4     sharing this number with you, right?
5  A.  Yes.                              14:36:52
6  Q.  Okay.  41.  We talked about 40.  41, please.  So I
7     think that the date of this October 23rd -- I think
8     your report is dated the 27th, so a couple days
9     before you finalized your report.  It looks like
10    from the notes that you're asking more questions    14:37:27
11    about what exactly it is she does.  Is that right?
12 A.  Yes.
13 Q.  So you've, I think, been working on this for about
14    two months, right?  I think you were engaged the
15    end of August?  That's what --        14:37:44
16 A.  No.
17 Q.  -- your retention agreement says?
18 A.  Well, I didn't start really working on it
19    until 9/30.
20 Q.  So 9/30 is when you started working on it?    14:37:52
21 A.  Yeah.
22 Q.  Okay.  And this is a couple -- couple days from the
23    finalizing of the report.  I assume you're sort of
24    heavy into your analysis by now?
25 A.  Yes.  I took some time off because my dad    14:38:05

Page 163

1     turned 91, so let's see.  I must have come back --
2     I don't remember the dates, but it was a good week.
3     And so I was getting back into my report, and when
4     I -- so what's your question?  I'm sorry.  I
5     forget.                            14:38:45
6        (The reporter read as requested)
7        THE WITNESS:  Yes, I'm still working on it.
8  Q.  BY MS. BAUMGART:  Working on it.  And still, it
9     looks like, from this note and then the next page,
10    page 42, still asking Dr. Bala for clarity about    14:38:54
11    what it is that an EP actually does, right?
12 A.  Right.  Yes.
13 Q.  And then on 42 -- let's see, 43.  46, please.
14    So 46, I think, if your dates are correct, this
15    looks like November 28th, so this would be notes    14:39:25
16    that pertain to the conversations you had related
17    to the rebuttal report.  Does that align?
18 A.  I'm going to read it --
19 Q.  Sure.
20 A.  -- real quick here, please.          14:39:40
21 Q.  I'm just looking at the date.
22 A.  I don't remember.
23 Q.  And my question is, while you're refreshing your
24    recollection, Ms. Broten, that starting at page 46,
25    given the date of November 28th, 2023, that this    14:39:59

Page 164

1     looks to be notes from additional conversations you
2     had with Dr. Bala after receiving defense expert
3     reports, including from Jennifer Moody and
4     DT North.  Correct?
5  A.  Possibly.  Do you see their names anywhere?    14:40:17
6  Q.  Well, did you receive and review rebuttal reports
7     from -- excuse me, I probably said the wrong thing.
8     Did you receive the expert reports from the defense
9     side and review those to prepare your rebuttal?
10 A.  I did.                            14:40:41
11 Q.  Okay.  And I believe you rebutted both Jennifer
12    Moody and DT North.  Correct?
13 A.  I did.
14 Q.  Okay.  So would these notes, starting on page 46 of
15    Exhibit 6 through the end, relate to the work you    14:40:53
16    did to prepare your rebuttal report?
17 A.  I don't know.  It looks like I'm talking to her in
18    more detail about her job search, so I don't see I
19    even used Moody's name or DT North's name, so --
20 Q.  Well, I guess the question is would there be any    14:41:12
21    reason other than to prepare your rebuttal and
22    supplemental report that you would be talking to
23    Dr. Bala about her job search starting on
24    November 28th?
25 A.  Right.  You know, I don't know exactly, but it    14:41:25

Page 165

42 (Pages 162 - 165)

Exhibit 6
Page 42 of 123

1    looks like I talked about PracticeLength here --
2    Link here on page 51, so most likely I was asking
3    her some questions regarding that.
4  Q.  Okay.  I think the last question on the case notes.
5    It's page 56, and the page number is a little --    14:41:52
6    it's off to the right.  It's not at the bottom, and
7    it's upside down.  But it looks like there is --
8    again, I think these are notes from a conversation
9    you're having with Dr. Bala, and correct me if I'm
10   wrong, but there is a number there that looks to    14:42:08
11   be $20 million maybe "from."  Does that -- what is
12   that number representing?
13 A.  I have no idea.  Yeah, I have no idea what that
14   was.
15 Q.  Well, I mean, you can look at the conversation    14:42:27
16   around it.  No idea why that number would be
17   handwritten by you?
18 A.  No, I really don't.
19 Q.  Could it be that that's a number Dr. Bala shared
20   with you that she was hoping to obtain in this    14:42:41
21   lawsuit?
22 A.  Oh, gosh, no.  She never -- she never did share
23   with me any number she was hoping to attain.  Not
24   once.  I don't know what that's there for.  Yeah,
25   the notes around it appear to be what her current    14:42:54

Page 166

1    situation is at Citrus and where she lives and her
2    dissatisfaction with the fact that she lives in a
3    small area in Florida.
4  Q.  Okay.  Separate question.  At any time since your
5    engagement through the present, have you had    14:43:16
6    conversations with any of the other experts
7    designated or disclosed by plaintiff?
8  A.  No.
9  Q.  Have you ever met or talked with Ms. Ostrofe?
10 A.  That, yes.  Is that what you meant?    14:43:30
11 Q.  Yeah.
12 A.  I'm sorry.
13 Q.  That's okay.  I'll reask that.
14 A.  Yes.
15 Q.  Have you had conversations with any of plaintiff's    14:43:35
16   other designated experts?
17 A.  No, just --
18 Q.  I don't mean to trick you.  I will represent to you
19   that Ms. Nora Ostrofe is a disclosed testifying
20   expert for --    14:43:50
21 A.  Yes.
22 Q.  -- Dr. Bala.
23 A.  And I did talk with her --
24 Q.  Okay.
25 A.  -- a few times, yes.    14:43:55

Page 167

1  Q.  When did you have conversations with Ms. Ostrofe?
2  A.  I had conversations with her when I sent her my
3    report and she looked at it, the initial report,
4    and wanted clarification on what my thoughts were
5    regarding Dr. Bala's experience and trajectory.    14:44:12
6  Q.  Did you ever share a draft of your initial report
7    with Ms. -- is it Ostrofe?  Did you ever share a
8    draft or just a final?
9  A.  Good question.  My reports were -- if I had any,
10   were shared with counsel.    14:44:37
11 Q.  Yeah, and I don't -- so apart from that, which is
12   fine.  We share reports with counsel, but I'm just
13   curious about your sharing directly with
14   Ms. Ostrofe.
15 A.  No.    14:44:49
16 Q.  Did you ever send her a draft report?
17 A.  No.
18 Q.  Who else was on the call, if anyone, when you
19   talked to her about your report?
20 A.  Just her.    14:44:57
21 Q.  Okay.
22 A.  I'm not sure if you were ever on a call.  I don't
23   remember.
24 Q.  Okay.  And what do you remember about that
25   conversation with Ms. Ostrofe?    14:45:06

Page 168

1  A.  Like I said, she just wanted clarification of
2    where -- you know, I highlighted numbers so that it
3    would be easy for the economist to pick the numbers
4    out that I highlighted on the -- on the report, and
5    so it was generally around, you know, was your    14:45:30
6    expectation that Dr. Bala would continue on as an
7    associate professor, and how long would that be
8    until she reached a higher level of professor?  How
9    long would that be until chief?  And it was more
10   clarification because I thought it was fairly clear  14:45:49
11   in my report, so -- so basically that was, I think,
12   the extent of our conversations.
13 Q.  And when you say highlighted the numbers sort of
14   for the ease of the economist use, I don't -- at
15   least the copy we have of your report does not have  14:46:08
16   highlighted numbers.  It has some bolded numbers.
17 A.  Well, bolded.  Bolded.
18 Q.  Okay.
19 A.  That's highlighted.
20 Q.  I just want -- well, they're two different things    14:46:17
21   to me.  I want to make sure I know what you're
22   talking about.
23 A.  Not to me.
24 Q.  After your conversation with Ms. Ostrofe, did you
25   change any numbers in your report or any of your    14:46:27

Page 169

43 (Pages 166 - 169)

Exhibit 6
Page 43 of 123

```
 1   analysis?
 2   A.  I did not.  I did not change any of my numbers.
 3   Q.  Okay.  And so do you recall this being one or
 4   multiple conversations that you've had with
 5   Ms. Ostrofe since you've been engaged?        14:46:36
 6   A.  I think only a couple.  I don't think I've talked
 7   to her very much at all.
 8   Q.  Did you take any notes from those conversations?
 9   A.  Probably.
10   Q.  Okay.  Where would those be if not in your case   14:46:50
11   file?
12   A.  In my -- probably my billing file.
13   Q.  Is your billing file separate from your -- separate
14   from what we looked at in Exhibit 6?
15   A.  Yes.                                      14:47:02
16   Q.  What else is in your billing file?
17   A.  Good question.  My billing.  My discussions with
18   counsel.
19      THE WITNESS:  And I was looking for a Kleenex
20   because my nose is dripping.  It's probably in my  14:47:14
21   pocket.  I'm sorry.
22      MS. BAUMGART:  That's fine.
23      THE WITNESS:  There we go.
24   Q.  BY MS. BAUMGART:  Okay.  So I want to stick with
25   the file.  You're aware that we had issued -- you  14:47:32
                                              Page 170
```

```
 1   had received what's called a subpoena duces tecum
 2   from our office, asking for your entire file, so if
 3   there is things I haven't gotten, I'm just asking
 4   about them.  So I don't think we got your billing
 5   file.  So what, to the best of your recollection,  14:47:44
 6   is in your billing file?
 7   A.  Well, all my contacts with counsel, contacts
 8   probably with Nora.  Sometimes you're working so
 9   fast you forget to write something down.  Maybe
10   that report you want from the link serve.         14:48:07
11   Q.  Anything else you can think of?
12   A.  I can't think of anything else.
13   Q.  So it sounds like your reference just now that the
14   report from link serve may be in there, that there
15   may be things in your billing file, as you call it,  14:48:33
16   that incorporate or include or comprise facts or
17   data that you may have relied upon in your analysis
18   and conclusions.  Is that right?
19   A.  Maybe.
20   Q.  Okay.  Do you remember anything else from your   14:48:48
21   conversations with Ms. Ostrofe that we haven't
22   discussed?
23   A.  No.  She mainly wanted clarity --
24   Q.  Okay.  Did you have any conversations with her
25   after reports were exchanged in the context of    14:49:07
                                              Page 171
```

```
 1   preparing your rebuttal report?  Did you consult
 2   with Ms. Ostrofe at all?
 3   A.  No.
 4   Q.  Other than speak with Ms. Ostrofe, have you ever
 5   talked with Dr. Glick or Dr. Carnes?           14:49:18
 6   A.  Oh, no.  And I did talk with Ms. Ostrofe a week
 7   ago.
 8   Q.  What was the nature of that conversation?
 9   A.  She called me and just wanted clarity again, were
10   you saying this?  And I just want to be sure.  And  14:49:33
11   I said, that's what I was saying, so --
12   Q.  What was she asking for clarity on?
13   A.  Good question.  It would be -- I don't know.  It
14   was on one of my figures.
15   Q.  One of your --                            14:49:49
16   A.  Yeah.
17   Q.  So figures meaning probably something looking at
18   page 18 through the end of your report?
19   A.  Yeah.  It was -- I don't know if it was on private
20   or was on the academic side.  I really can't     14:50:00
21   remember, but it was another question regarding
22   your -- you say here that it's, you know, five
23   years you're going to -- five -- five to eight
24   years, whatever, that she would be earning this.
25   And I just said, yes, that's what my opinion is.  14:50:16
                                              Page 172
```

```
 1   I'm not going to change that.
 2   Q.  Was she asking -- did she reference, for example,
 3   one of defendant's experts report?  I mean, was she
 4   asking you if you were going to change your opinion
 5   or --                                         14:50:33
 6   A.  Oh, no.  She didn't reference any of that.
 7   Q.  Okay.
 8   A.  No.
 9   Q.  I guess I'm a little confused why she was --
10   because she had already done her report, right?  I  14:50:38
11   mean, her report was done.  Why is she calling you
12   a week ago to ask you for clarity about your
13   opinions?  And I know you're not -- what is she
14   sharing with you?
15   A.  I didn't have the report in front of me.  I    14:50:49
16   just -- I was -- I don't even remember if I was at
17   my office.  It was -- it was essentially just I
18   just want to be clear that this is what you were
19   asking because that was it, you know.  That's how I
20   formulated my opinion, so I think she said that.  I  14:51:08
21   don't even remember.
22   Q.  Okay.  And last --
23   A.  It was a very short conversation.
24   Q.  And what specifically she wanted clarity about,
25   about how many years you were attributing to a    14:51:21
                                              Page 173
```

44 (Pages 170 - 173)

1    certain progression on the academic side, or what
2    is it that she was asking about?
3  A.  I think it was academic side, and it was -- now
4    that I kind of am remembering a little bit, it was
5    on -- did you mean she was going to stay -- this    14:51:32
6    was the question:  Did you mean she was going to
7    stay at OHSU this whole time when you wrote your
8    opinion or at -- or in the job in general?  And I
9    said, well, in that job in general.  I mean, who
10   knows if she would stay at OHSU.  I don't know.  So  14:51:46
11   when I formed my opinions, it wasn't based on OHSU.
12   It was based on being an associate professor and
13   how long.
14 Q.  Any academic medical institution?
15 A.  Any academic institution, yes.    14:52:03
16 Q.  Okay.  Any conversations with -- is it Mr. Glusman
17   or Gusman?  Did you ever talk to him?
18 A.  (Indicating).
19   MS. BAUMGART:  Okay.  All right.  Why don't we
20   take five.    14:52:25
21   (RECESS 2:52 to 3:04)
22 Q.  BY MS. BAUMGART:  Ms. Broten, we're back on the
23   record.  Are you ready to continue?
24 A.  Yes.
25 Q.  Okay.  Back to your report, page 5, please, which  15:04:10

Page 174

1    is Exhibit 1, and I want to direct your attention
2    to the -- what is the first full paragraph that
3    starts with "Dr. Bala has testified to" and direct
4    your attention to that second sentence where you
5    write, "Her student reviews with OHSU and at the    15:04:33
6    University of Pennsylvania have always been
7    exemplary via examples in the file documents."  Do
8    you see that?
9  A.  Yes.
10 Q.  Okay.  And did you review -- in addition to student  15:04:45
11   reviews, did you review the faculty evaluations as
12   well in -- from her prior places of employment,
13   including OHSU and the University of Pennsylvania?
14 A.  I know I did for sure University of Pennsylvania,
15   and I'm sure I looked at OHSU as well.    15:05:06
16 Q.  Okay.  And what was your impression from the
17   faculty evaluations about Dr. Bala from the
18   University of Pennsylvania?  Were they exemplary as
19   well?
20 A.  Yeah, I thought they were very good.  She, I think,  15:05:22
21   scored very good to exceptional -- was that the
22   right word that they used in a lot of the reviews?
23   Some were good, very good, exceptional.  Some
24   were -- so yes.
25 Q.  Okay.  And you don't remember any negative reviews  15:05:40

Page 175

1    about Dr. Bala from the University of Pennsylvania
2    in the documents you reviewed?
3  A.  Well, are you talking about the student reviews?
4  Q.  Student and faculty.
5  A.  A couple of the student reviews.    15:05:52
6  Q.  Student and faculty I was asking you about.
7  A.  Right.  I did review some of those, yes.
8  Q.  Some of what?
9  A.  The student reviews and the faculty reviews.
10 Q.  Okay.  Did you review all of the documents    15:06:03
11   pertaining to Dr. Bala's employment at the
12   University of Pennsylvania that you were provided?
13 A.  I should have.
14 Q.  Okay.
15 A.  Early on.    15:06:15
16 Q.  And do you believe her -- do you differentiate
17   between your assessment of the student reviews
18   versus faculty reviews at OHSU and University of
19   Pennsylvania?
20 A.  If you're meaning some of the reviews were not as  15:06:30
21   positive, yes, I did differentiate.
22 Q.  Okay.  And is that why you didn't mention the
23   faculty reviews because they weren't as positive?
24 A.  No.  Actually, I thought the faculty reviews were
25   fairly positive.    15:06:52

Page 176

1  Q.  Okay.  Including from the University of
2    Pennsylvania?
3  A.  Well, that's -- that's what I'm alluding to.
4  Q.  Okay.
5  A.  Not OHSU.    15:07:00
6    (Exhibit 15 marked)
7  Q.  BY MS. BAUMGART:  Exhibit 15, I'll represent to
8    you, are faculty evaluation of Dr. Bala from the
9    University of Pennsylvania that were in your file
10   and that I believe you testified you've reviewed.  15:07:34
11   Correct?
12 A.  I'm sure I did.
13 Q.  Okay.  Could you turn to the second page of
14   Exhibit 15, please, and the second -- I want to
15   start with the second paragraph that starts with  15:07:52
16   "Dr. Bala has been an attending physician for 8
17   months now."  Do you see that?
18 A.  Yes.
19 Q.  And could you go ahead and read that out loud,
20   please.    15:08:13
21 A.  Dr. Bala has been an attending physician for eight
22   months now, and she is exhibiting a concerning
23   pattern of attitude and behavior.  While she does
24   possess very good clinical judgment and does
25   clearly care about patients, she shows technical  15:08:30

Page 177

45 (Pages 174 - 177)

Exhibit 6
Page 45 of 123

1    skills that are marginal at best, manifesting as a
2    severe lack of confidence and an extremely
3    defensive attitude, and her overall treatment of
4    the fellow trainees and lab staff can be best
5    summarized as rude, demeaning, condescending,    15:08:49
6    paranoid and aggressively defensive and
7    accusational with multiple episodes of grossly
8    unprofessional behavior.  There are multiple
9    instances of her doing procedures without allowing
10   the fellow to even attempt any significant portions  15:09:07
11   of the case.
12       Efforts to give tempered feedback to her have
13   been met with defensive accusations of arrogance on
14   our part without clear rationale.  The degree of
15   antiprofessionalism is appalling, especially coming  15:09:24
16   from someone fresh out of training.
17       Taken together, these signs suggest an insecure
18   physician who is becoming increasingly paranoid and
19   provocative, making our working and training
20   environment counterproductive and overall    15:09:41
21   uncomfortable.  Unfortunately, her attitude and
22   behavior have only worsened as the year has
23   progressed, making it difficult to sympathize with
24   her even as new -- as a new attending.  Personally
25   I feel that working with Dr. Bala in the EP lab    15:09:58

Page 178

1    provides little educational value and a lot of
2    aggravation.
3  Q.  Okay.  And then let's skip down to the last bullet
4    there that starts with "a persistent issue."  Could
5    you read that, please.    15:10:14
6  A.  "A persistent issue has been teaching at the
7    appropriate level."  Lecture and material --
8    "lecture material was consistently above the head
9    of the general fellows and went too fast to be able
10   to absorb in any meaningful way.  needs to slow    15:10:28
11   down the pace and go over the basics which even
12   some of the EP fellows don't know."
13 Q.  Okay.  And then let's turn to the next page, which
14   is Bates-labeled 1526.  Sort of the middle bullet,
15   third bullet down, I guess, or third paragraph    15:10:54
16   down, "Dr. Bala did less teaching."
17 A.  You want me to read that?
18 Q.  Sure.
19 A.  Dr. Bala did less teaching than most attendings
20   I've seen.  Her feedback to house staff went beyond  15:11:08
21   critical to nearly confrontational.  She seemed
22   more interested in making people feel bad than
23   teaching them and helping them to learn.
24 Q.  Okay.  How would you characterize this feedback
25   about Dr. Bala?  Would you characterize this as    15:11:30

Page 179

1    exemplary or even positive?
2  A.  Well, those statements, not -- no.
3  Q.  Okay.  And why didn't -- why weren't these type of
4    statements referenced in your report?
5  A.  I don't -- I didn't think above all the other    15:11:42
6    statements they were as important.
7  Q.  So you saw them and were aware of them and made a
8    conscious decision not to reference anything but
9    positive statements about Dr. Bala and positive
10   feedback from her time at the University of    15:12:01
11   Pennsylvania?
12 A.  I was just making a conscious decision that it
13   was -- she had more positive contacts than -- or
14   statements rather than negative.
15 Q.  But that's not what your report says.  Your report  15:12:24
16   says unequivocal that at the University of
17   Pennsylvania have always -- her reviews with OHSU
18   and at the University of Pennsylvania have always
19   been exemplary.  Do you still agree with that
20   statement, or are you changing your opinion about    15:12:44
21   that?
22       And you can continue look through.  I'll
23   represent to you there is additional nonexemplary
24   feedback about Dr. Bala throughout Exhibit 15 that,
25   if, you know, you haven't seen it or need to    15:12:58

Page 180

1    refresh your recollection, you're welcome to
2    review.  But my question will be whether you're
3    maintaining your position that she has always
4    had -- always had exemplary reviews from the
5    University of Pennsylvania or if your opinion has    15:13:13
6    changed?
7  A.  I would like to know what year these evaluations --
8    was it in 2015?
9  Q.  Why would the year matter?  Because you don't
10   quantify a time in your unequivocal statement.    15:13:29
11 A.  Because, when Dr. Bala first started, I don't
12   believe she had all the skills necessary to teach
13   and teach as -- teach in a way -- people learn to
14   do their job better as they do their job, and it
15   looked like this was from early on, if I'm not    15:13:52
16   mistaken.
17 Q.  I think it's right before she left.  It's her last
18   year.  I'll represent to you it's the bottom.
19   It's 2015.  It's her last year.
20 A.  Oh, it is 2015.  Okay.  I just wanted to make sure  15:14:05
21   that that was the date.  I think Dr. Bala's -- my
22   opinion would be that Dr. Bala had excellent
23   reviews, even exemplary reviews, excellent
24   recommendations from colleagues, and there are some
25   statements from either students or faculty.  I'm    15:14:37

Page 181

46 (Pages 178 - 181)

Exhibit 6
Page 46 of 123

1  not sure who did this. Was this done by students?
2  Because I saw different reviews that were the
3  check-the-box kind of thing from students. And I
4  haven't looked at this close -- close for a couple
5  months.                                    15:15:05
6 Q. My question is do you stand by your opinion that
7  Dr. Bala has always received exemplary reviews
8  while she was at the University of Pennsylvania, or
9  is your opinion different?
10 A. I could take out the word "always."     15:15:19
11 Q. And would you also add that, in fact, she received
12  some fairly negative feedback? Is that accurate
13  for the trier of fact?
14 A. She received some, few, in my opinion.
15 Q. And why did you not include that in your report?  15:15:41
16  Why were you just -- why not?
17    Oh, okay. Would you consider reviews by
18  students at the University of Pennsylvania noting
19  Dr. Bala was, quote, rude and demeaning, quote,
20  "rude, demeaning/condescending, paranoid, and   15:16:51
21  aggressively defensive and accusational — with
22  multiple episodes of grossly unprofessional
23  behavior," quote, ability to work in teams is
24  limited, did you consider those to be exemplary
25  feedback about Dr. Bala?                    15:17:10
Page 182

1 A. I would refer those as subjective viewpoints from
2  students, and I don't know what their thinking is
3  when they do an eval.
4 Q. So you're only considering subject -- you would
5  agree that all of the feedback may be subjective,   15:17:29
6  right?
7 A. Yes.
8 Q. So you're fine considering the positive subjective
9  feedback but discounted the negative subjective
10  feedback? Was that how you approached your   15:17:40
11  analysis of Dr. Bala's employment records from the
12  University of Pennsylvania and OHSU?
13 A. Well, when I reviewed some of them, if I remember
14  correctly -- and I don't -- I'm trying to remember
15  correctly. Out of 17 positive, there might be 2   15:17:53
16  negative, including some of these that we're
17  looking at. Out of an additional 16 or 17
18  positive, 2 were -- 2 were negative. Or maybe 17
19  total, 2 were negative. So when I look at it, I
20  look at most of the reviews in most of the areas,   15:18:19
21  and if I remember correctly, communication -- I
22  don't remember the other two -- were marked lower
23  and in the poor to less good, less very good
24  category, but within those same student evals, some
25  of them were very positive as well.        15:18:57
Page 183

1 Q. And I understand. I mean, I've read them. There
2  is positive feedback, but I'm just curious, and I
3  just count -- my count -- and you're welcome to,
4  you know -- in Exhibit 15 alone, 20 separate
5  reviewers who don't have good things to say about   15:19:14
6  Dr. Bala. Do you think that's insignificant?
7    MR. BRISCHETTO: Objection. Assumes a fact not
8  in evidence.
9    Go ahead.
10    THE WITNESS: Where is the 20?       15:19:35
11 Q. BY MS. BAUMGART: Never mind. Same question. I
12  assume the same approach you took because
13  certainly, if you read the reports from student and
14  faculty reviews from OHSU, you would see similar,
15  some positive, some negative feedback about   15:19:49
16  Dr. Bala. Correct?
17 A. Yes.
18 Q. And, in fact, is your recollection that some of
19  these same -- some of the same feedback that we
20  just looked at in the University of Pennsylvania   15:19:59
21  with respect to her approach, some of the same
22  words were, in fact, observed and reported by OHSU
23  students and faculty as well. Correct?
24 A. I believe so.
25 Q. And similar --                         15:20:19
Page 184

1 A. I'd have to look.
2 Q. And similar at Banner, right? That there was some
3  similar type of feedback from some colleagues, some
4  fellow faculty, some students that described her in
5  the same -- same sort of ways that we just looked   15:20:32
6  at in Exhibit 15, right?
7 A. I would have to look but most likely.
8 Q. Okay. And none of that -- there is not one iota of
9  reference to that anywhere in your report or
10  rebuttal report, is there?                 15:20:43
11 A. No.
12 Q. Back to page 5 of your report, Ms. Broten. The
13  same paragraph I was asking you about but that
14  first sentence, which is the first full paragraph
15  that says "Dr. Bala has testified to and discussed   15:21:04
16  in our interview her desire to have remained in
17  Academic Medicine in teaching, research, and
18  performing clinical work." Is that correct?
19 A. Yes.
20 Q. And you stated that based on your discussion with   15:21:16
21  her and then review of her deposition testimony.
22  Is that right?
23 A. Yes.
24 Q. Didn't she also state in her deposition testimony
25  that she wouldn't be opposed to continuing in   15:21:28
Page 185

47 (Pages 182 - 185)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 47 of 123

1  private practice setting where she could work in
2  high volume?  Do you remember her saying that?
3  A.  I do.
4  Q.  Okay.  And that doesn't appear anywhere in your
5  report, does it?                    15:21:41
6  A.  Because her -- when interviewing her, she basically
7  said, my first choice is academic medicine.
8  Q.  Okay.  But you also were aware from reviewing the
9  record that, in fact, she had testified in her
10  deposition that she also would be interested      15:21:55
11  working in a high-volume private practice setting.
12  Correct?
13  A.  Yeah, she actually said that to me, too, but it
14  wasn't her first choice.
15  Q.  Okay.  But you didn't -- even knowing if it wasn't  15:22:07
16  her first choice, you did not factor that into your
17  analysis at all, did you?
18  A.  Well, I did when I made the earning capacity
19  because I looked at private practice.
20  Q.  Explain to me how you factored into your earning  15:22:25
21  capacity analysis that she would pursue a career in
22  private -- in a high-volume private practice
23  setting.  Where is that in your analysis?
24  A.  Well, I didn't say those words, but she is -- I
25  did -- she was working in private practice when I  15:22:43

Page 186

1  interviewed her, so she was accepting of that.
2  Q.  But isn't your -- give me one second.
3     All right.  Back to your report at page 6,
4  please.  And this is -- you're just going through
5  her employment history, and I want to look at the  15:23:40
6  middle of the page when you're referring to her
7  employment at Banner.  Do you see that?  She's
8  associate professor of medicine, director of
9  cardiac -- cardiac electrophysiology lab, Banner —
10  University Medical Group at the University of      15:23:56
11  Arizona.
12  A.  Yes.
13  Q.  You're aware she had employment there, right?
14  A.  Yes.
15  Q.  Okay.  And I'm looking at the -- you're writing --  15:24:00
16  you say, "Terminated:  Before returning from FMLA.
17  The employer indicated knowledge of a
18  discrimination lawsuit with OHSU (informally)."  Do
19  you see that?
20  A.  Yes, I do.                        15:24:30
21  Q.  Okay.  First of all, the second part of that, "The
22  employer indicated knowledge of a discrimination
23  lawsuit with OHSU (informally)," what do you mean
24  by that?  What's the facts or data that support
25  that statement?                    15:24:41

Page 187

1  A.  I believe Dr. Bala indicated to me that the
2  colleague who introduced her to Banner mentioned
3  it.
4  Q.  Who is that person?
5  A.  I don't know.  I don't know his name.        15:24:59
6  Q.  Okay.  So this --
7  A.  It was a gentleman.
8  Q.  Oh, sorry.  I didn't mean to interrupt you.  A
9  gentleman?
10  A.  I believe so.                      15:25:07
11  Q.  Okay.  And you say Dr. Bala mentioned this to you
12  in one of your conversations you had with her?
13  A.  Yes.
14  Q.  Did you do anything to independently verify the
15  accuracy of that statement from Dr. Bala?      15:25:18
16  A.  No.
17  Q.  As part of your analysis, did you review Dr. Bala's
18  termination letter from Banner?
19  A.  I did.
20  Q.  And what's your recollection as to why she was    15:25:35
21  terminated?
22  A.  They -- I don't remember totally.  In fact, I'm not
23  even going to testify because I don't remember it.
24  Q.  So help me understand.  You are evaluating in part
25  Dr. Bala's employability earnings capacity.      15:25:54

Page 188

1  Correct?
2  A.  Yes.
3  Q.  You know through the course of your analysis that
4  she was involuntarily fired from Banner Health.
5  Correct?                          15:26:09
6  A.  Yes.
7  Q.  How do you not know the reasons why she was fired?
8  A.  I probably do.  I just don't remember --
9  Q.  All right.
10  A.  -- at this moment.                    15:26:21
11     (Exhibit 16 marked)
12     THE REPORTER:  Exhibit 16.
13     THE WITNESS:  Thank you.
14  Q.  BY MS. BAUMGART:  Did you have occasion to review
15  Exhibit 16 in your course of your analysis in    15:26:57
16  forming your opinions, Ms. Broten?
17  A.  Yes, I did review it.
18  Q.  Why don't you take a look at the second paragraph
19  and go ahead and read that out loud, please.
20  A.  The faculty practice plan has made the difficult  15:27:10
21  decision to terminate your employment under
22  Section 5.1 based on your problematic
23  communications and interactions with staff and
24  others, period.  Oh, no period, comma, as well as
25  your extremely low productivity, as indicated by  15:27:26

Page 189

48 (Pages 186 - 189)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 48 of 123

1    your wRVUs.  Although these issues were brought to
2    your attention in June of 2019, the faculty
3    practice plan continued to receive staff complaints
4    about your behavior after that time, and your
5    productivity remained deficient.          15:27:46
6        In an attempt to enable you to be successful,
7    we offered you the services of a physician coach to
8    address these issues, but you declined that offer.
9    The faculty practice plan has now determined that
10   it is in the best interest of staff, patients and    15:28:02
11   organization to terminate this employment
12   relationship.
13 Q.  Do you remember being aware of this when you were
14   performing your analysis --
15 A.  Yes.                                15:28:16
16 Q.  -- and rendering your opinion?
17 A.  Yes.
18 Q.  Okay.  And the reference here to "problematic
19   communications and interactions with staff and
20   others" underlying Dr. Bala's termination from    15:28:25
21   Banner, does that sound fairly similar to what we
22   just talked about with certain feedback from peers
23   at both University of Pennyslvania and OHSU?
24 A.  Yes.
25 Q.  You're aware that Dr. Bala received a documented    15:28:39
                                            Page 190

1    any care team member is seeking clarity and
2    guidance, especially related to a clinical matter,
3    your role includes respectful education and
4    disciplined communication."  You knew she got that
5    feedback while at Banner?                  15:30:32
6 A.  Yes.
7 Q.  She also was given a documented verbal discussion
8    about her leadership.  Do you see that in this
9    document?
10 A.  Yes.                                15:30:43
11 Q.  And the next page, her interaction with her
12   trainees.  "Feedback from learners has suggested
13   interactions that are intimidating, contemptuous
14   and not conducive to a positive learning
15   environment."  Do you see that?            15:31:05
16 A.  Yes.
17 Q.  And then finally she's given feedback about her
18   productivity and her current RVUs not reflective of
19   acceptable level given the time in her role.  Do
20   you see that?                           15:31:21
21 A.  Yes.
22 Q.  So now we've talked about three different places of
23   employment, Banner Health, OHSU and University of
24   Pennsylvania, where numerous different colleagues,
25   including students, have provided this sort of    15:31:42
                                            Page 192

1    verbal discussion while at Banner that predated her
2    termination?
3 A.  Yes.
4 Q.  Did you review that in the course of your work?
5 A.  Probably.  If it was in the file.          15:28:56
6      (Exhibit 17 marked)
7      THE WITNESS:  Thank you.
8 Q.  BY MS. BAUMGART:  Exhibit 17, I'll represent, is
9    the documented verbal discussion issued to Dr. Bala
10   during her employment at Banner Health.  Does that    15:29:20
11   look familiar?
12 A.  I -- I believe it -- I -- sure I looked at it early
13   on.
14 Q.  Okay.  You're welcome to refresh your recollection,
15   but it looks like that this was addressing issues    15:29:33
16   with respect to Dr. Bala's communication,
17   communication style.  Correct?
18 A.  Communication, yes.
19 Q.  The way in which she communicates, being dismissive
20   and disrespectful.  You were aware of that?        15:29:53
21 A.  Yes.  I'm reading it now.
22 Q.  She's told that "feedback has been received from
23   most areas in which you work, suggesting this
24   communication style is pervasive and interfering
25   with achieving excellence in your practice.  When    15:30:18
                                            Page 191

1    feedback about Dr. Bala, about her communication
2    style.  Correct?
3      MR. BRISCHETTO:  Object to the form.
4      Go ahead.
5 Q.  BY MS. BAUMGART:  Yes?                   15:31:53
6 A.  Did you answer for me?
7 Q.  No.
8 A.  No, I didn't -- I didn't say anything yet.  I don't
9    know if I agree with the word "numerous," but, yes,
10   she has had subjective feedback that has not been    15:32:07
11   positive.
12 Q.  And you knew that at the time you were performing
13   your assessment and rendering your ultimate expert
14   opinions.  Correct?
15 A.  Yes.                                15:32:23
16 Q.  Do you view this as any sort of pattern of behavior
17   by Dr. Bala at three different institutions?
18 A.  I would like to compare that with other doctors who
19   have these types of reviews that seem more
20   subjective than objective.               15:32:48
21 Q.  Well, other doctors aren't plaintiffs in this case,
22   and you are not --
23 A.  I know.
24 Q.  -- retained to evaluate that.  I'm just asking with
25   respect to Dr. Bala, whose employment history you    15:33:00
                                            Page 193

1  were -- you reviewed as part of your expert
2  analysis and you were retained to and provided
3  opinion about her employability and barriers to her
4  employment, would this type of feedback about
5  Dr. Bala factor into your opinion about that there  15:33:20
6  may be barriers to her employment that you did not
7  mention in your report?
8  A.  I guess, in my opinion, I don't consider these
9  negative barriers to her employment in a way that
10  would affect her getting a job necessarily.  It     15:33:42
11  depends on the factors of the employer that is
12  going to hire her and whether or not they look at
13  these factors or have access to these factors.
14  Q.  Apart from the negative feedback that we've talked
15  about that Dr. Bala received while at University of  15:34:05
16  Pennsylvania, OHSU and Banner Health -- and these
17  are -- this is documents you reviewed in the course
18  of your work.  Correct?
19  A.  Yes.
20  Q.  We know that she was terminated -- you know that  15:34:19
21  she was terminated involuntarily from Banner
22  Health.  Correct?
23  A.  Yes.
24  Q.  And you knew that at the time you undertook your
25  analysis and rendered your opinions.  Correct?     15:34:31

Page 194

1  A.  Yes.
2  Q.  Yes or no, Ms. Broten, is her termination from
3  Banner Health a barrier to her future employment
4  and earning capacity?
5  A.  I did not factor that in with high regard.     15:34:46
6  Q.  I don't think that answered my question.  My
7  question was is it -- not whether you factored it
8  in.  We'll get to that in a minute because you
9  didn't, at least in your report.  My question is is
10  the fact that Dr. Bala was involuntarily terminated  15:35:02
11  from Banner Health after she was not renewed from
12  OHSU, was that involuntarily termination a barrier
13  to her employability or future earning capacity?
14  A.  I didn't consider that a barrier.
15  Q.  Separate question whether you considered it.  Is it  15:35:26
16  a barrier, in your expert opinion, someone such as
17  Dr. Bala being fired from a job, a barrier to her
18  future employability and earning capacity?
19  A.  It could be.
20  Q.  Is it in this situation?  Is it a barrier for  15:35:49
21  Dr. Bala?
22  A.  It also depends on the employers that are looking
23  at her record, employment history record.
24  Q.  That's not my question.  My question is simply you
25  were evaluating barriers.  Correct?  In your expert  15:36:10

Page 195

1  opinion --
2  A.  Yes.
3  Q.  -- what barriers might there be?  And I think the
4  barrier you're focused on, which we'll talk about
5  in a minute, are alleged references from OHSU and  15:36:21
6  the nonrenewal of the contract from OHSU.  Correct?
7  A.  Yes.
8  Q.  You opined that those were barriers to Dr. Bala's
9  future employability and earning capacity.  Yes?
10  A.  Yes.                                          15:36:33
11  Q.  Okay.  So putting that aside, which we'll get to in
12  a moment, my question for you is was the fact that
13  Dr. Bala was fired from Banner Health a barrier to
14  her future employability and earning capacity?
15  A.  It could have been, depending on where she applied.  15:36:45
16  Q.  I don't understand your answer.
17  A.  Okay.
18  Q.  How can a nonrenewal of a contract -- so you
19  don't -- your answer is it could be; you don't
20  know?                                            15:37:07
21  A.  It could be depending on the -- depending on how
22  she talks about Banner Health in her interview
23  processes.
24  Q.  Wouldn't that be the same for how she talks about
25  anything, how she talks about a nonrenewal of a  15:37:23

Page 196

1  contract, how she talks about why she wants to move
2  to a different geographic region?  I mean, isn't
3  that a -- I don't think that answers my question.
4  I don't want to think about how -- what a future
5  potential employer may ask, right?  Simply looking  15:37:41
6  at the fact that there is a termination, that she
7  experiences a termination, in the period of time
8  where you were evaluating barriers to her
9  employment and her future earning capacity, yes or
10  no, did you consider the Banner termination a     15:37:59
11  barrier?
12  A.  It -- no.
13  Q.  Why not?
14  A.  And it was primarily because it was a without-cause
15  termination, and in my discussion with Dr. Bala  15:38:15
16  about this, she had been going through a very
17  difficult time.  Her -- I believe it was during the
18  time her father was gravely ill, and she had asked
19  for -- from human resources, I believe, when she
20  got this and had this verbal discussion, a chance  15:38:42
21  to reply, from my recollection, and so I didn't
22  count it as a significant barrier to her
23  employability.
24  Q.  Unless I'm misreading your report, I don't think
25  you characterize it as a barrier at all.  So is  15:39:05

Page 197

50 (Pages 194 - 197)

Exhibit 6
Page 50 of 123

1   your opinion -- what is your opinion about it?
2       MR. BRISCHETTO: Object. Objection.
3       Argumentative and asked and answered.
4       Go ahead.
5   Q. BY MS. BAUMGART: I don't mean to argue with you.   15:39:15
6   I've read your -- read your report several times,
7   specifically looking for your opinion as to the
8   impact of her involuntarily termination from Banner
9   Health on her future employability and earning
10  capacity, and all I see are passing references in a   15:39:33
11  couple places, there was a not-for-cause
12  termination but no opinion as to whether or not
13  that was any sort of barrier at all, so I don't --
14  I don't see it in there. Is that consistent with
15  your opinion?                      15:39:53
16      MR. BRISCHETTO: Objection. Argumentative and
17  asked and answered.
18      Go ahead.
19  Q. BY MS. BAUMGART: Go ahead.
20  A. I believe as -- my opinion is, as think I already   15:39:58
21  said, was that it may have had some impact on some
22  jobs that she applied for, depending on how it was
23  discussed in the interview.
24  Q. So -- oh, excuse me. I didn't mean to interrupt
25  you. Okay. So fair enough. So on that point,   15:40:24

Page 198

1   Correct?
2   A. Yes.
3   Q. And do you have any data or facts at all what any
4   prospective employer -- what information they
5   obtained or didn't obtain from Banner Health about   15:41:50
6   the circumstances of Dr. Bala's separation?
7   A. No, I don't have any additional information.
8   Q. So certainly you can envision a situation, given
9   you've been doing this a very long time, right --
10  you're familiar with prospective employers checking   15:42:10
11  references and calling. It's quite possible, isn't
12  it, that, if an employer called Banner and asked
13  them why Dr. Bala was no longer working with them
14  and they shared with the prospective employer the
15  circumstances that we talked about in the   15:42:29
16  termination letter or in the discussion, the
17  discussion note, that that could, in fact, be a
18  barrier to her being hired, right?
19  A. Well, there is certain protocols that need to -- I
20  believe need to be followed by human resources,   15:42:44
21  especially from a larger agency, that includes
22  maybe a release for Dr. Bala to contact that
23  agency or employer and if -- I can't imagine HR
24  staff going in and picking out this and then start
25  talking to another employer, prospective employer,   15:43:08

Page 200

1   certainly if 1 of 202 of Dr. Bala's perspective
2   employers called Banner and said, hey, why isn't
3   Dr. Bala there anymore, and they share with her,
4   she was a problem, we had communication problems,
5   that could certainly be a barrier to her being   15:40:40
6   hired, couldn't it?
7   A. Well, I didn't see any of evidence in the file that
8   said that Banner actually created any bad reviews
9   on Dr. Bala, so if they're there, show me.
10  Q. So my question wasn't about a written review. My   15:41:01
11  question was --
12  A. Verbal or written.
13  Q. Let me ask my question.
14  A. Sorry.
15  Q. I just want you to think about this. So   15:41:10
16  perspective, I think we've already established the
17  number you worked from was that Dr. Bala applied
18  for approximately 202 positions. Correct?
19  A. Well, and that was over the course of --
20  Q. Sure. So majority of them, can we agree, came   15:41:24
21  after her termination from Banner?
22  A. Yes.
23  Q. Okay. I think there were about maybe 17-ish maybe
24  that predated her employment at Banner, and so the
25  vast majority were subsequent to her termination.   15:41:37

Page 199

1   about Dr. Bala. I can't imagine that.
2       So if there is information regarding that type
3   of interaction from Banner to prospective employers
4   or Dr. Bala did release a -- have a release
5   statement that said Banner can tell them anything   15:43:36
6   they want about Dr. Bala, then that would be
7   considered a barrier, but I don't have that -- any
8   evidence or documented statements about that in the
9   file.
10  Q. Right. The only documented statements you have in   15:43:55
11  the file are pertaining to three occasions of
12  purported negative references attributed to OHSU.
13  Correct?
14  A. I think there were three.
15  Q. Right. And so of the 202 job applications, your   15:44:08
16  opinion is it had to have been and only been those
17  three purported negative references from OHSU
18  in 2017 that were the barrier to Dr. Bala's future
19  employability and earning capacity. Is that
20  correct?                      15:44:35
21  A. Yes.
22  Q. You understood that Dr. Bala was not terminated
23  from OHSU, right?
24  A. Yes. She resigned.
25  Q. You knew that they gave her a year of notice of a   15:45:15

Page 201

51 (Pages 198 - 201)

Exhibit 6
Page 51 of 123

1    contract nonrenewal. Correct?
2  A.  I knew about that, yes.
3        MS. BAUMGART:  Can we take a quick break?
4        MR. BRISCHETTO:  Sure.
5        (RECESS 3:46 to 3:55)              15:46:23
6  Q.  BY MS. BAUMGART:  Ms. Broten, we're back on the
7    record.  Could I have you look back at Exhibit 15,
8    please, which was the University of Pennsylvania
9    documentation.
10  A.  It says 15 and 23.                  15:56:11
11  Q.  Oh, it's a little confusing.  That's it.  It has a
12    deposition -- the 23 is a deposition --
13  A.  Oh, okay.
14  Q.  -- or a trial court exhibit and then -- not
15    deposition, excuse me, trial court exhibit but    15:56:22
16    the -- maybe deposition exhibit.  15 is it.  You
17    have it?  Okay.
18  A.  Yes.
19  Q.  So could I have you turn -- the Bates label on the
20    bottom right hand, it's page 1527, please.  Okay.    15:56:31
21    So I have a couple questions, and then I want to
22    direct your attention to something on this page.
23    So you -- and we can look at your report if you
24    want to, but my recollection is that in your report
25    you pointed out that Dr. Bala as an        15:56:53

Page 202

1    electrophysiologist works -- is a small community
2    of professionals, right?
3  A.  Yes.
4  Q.  Okay.  And you also opined, as we talked about
5    today, about the barriers or potential barriers to    15:57:07
6    Dr. Bala's employability and earning capacity after
7    leaving OHSU.  Correct?
8  A.  Yes.
9  Q.  Okay.  If I could have you read aloud that bullet
10    point that starts "It is a bit confusing."      15:57:22
11  A.  "It is a bit confusing why this attending is
12    allowed to teach fellows.  She is clearly not
13    comfortable with the depth of her own skill set
14    during procedures."  She -- oh, "Her unpredictable
15    behavior, and inability to control her temper    15:57:40
16    during procedures, results in staff and fellow
17    spending more time worried" about their -- "about
18    her behavior and less time focused on the patient.
19    The result is the staff is more concerned about
20    being chastised by Dr. Bala and less concerned    15:57:57
21    about the patient.  This clearly results in a
22    dangerous situation for the patient."
23  Q.  Okay.  So this particular individual --
24    individual's feedback also touches on patient
25    safety.  Correct?                      15:58:16

Page 203

1  A.  Yes.  It appears, yes.
2  Q.  So if one of the 202 prospective employers Dr. Bala
3    applied to were to have connected with this
4    reviewer, this student or this faculty member, and
5    learned about this feedback, this person's    15:58:37
6    experience with Dr. Bala and opinion about patient
7    safety concerns, certainly you would agree that
8    could be a barrier to her future employment or
9    earning capacity.  Correct?
10  A.  Well, I'm confused how a future employer would get    15:58:51
11    this information.
12  Q.  That wasn't my question, Ms. Broten.  I'm not
13    asking how a future employer.  I'm just asking if a
14    future employer -- there were 202 allegedly of
15    them, right?                        15:59:07
16  A.  Yes.
17  Q.  Okay.  If a future employer were to know the
18    student -- it's a small community -- know this
19    faculty member, hear this feedback about Dr. Bala,
20    you agree that that could be a barrier to her    15:59:22
21    future employability or earning capacity.  Correct?
22  A.  It might be one point in that.
23  Q.  It might be a barrier?
24  A.  It might be.
25  Q.  Okay.  Back to your report.  I want to ask you -- I    15:59:35

Page 204

1    think we're going to go to pages -- at the end
2    where you have your calculations, starting on
3    page 18.  This is your earning capacity assessment
4    of Dr. Bala.  Correct?
5  A.  Yes.                              16:00:13
6  Q.  So let's go to page 19.  I'm going to ask you how
7    you reached some of your economic conclusions.  So
8    the first bolded sentence on page 19, you write,
9    her loss of income at the professor rank 245,216
10    annually, et cetera.  How did you arrive -- let's    16:01:03
11    pause there at the $245,000 number.  How did you
12    arrive at that number?
13  A.  Let me read.  There is -- there is calculations
14    that I had to do.
15        So what I did was attempt to discern what her    16:02:02
16    level of income would be if she were to be raised
17    to the rank of professor within five to eight
18    years -- and I'm going by the above paragraph of
19    the one that you alluded to in bold -- and as an
20    associate professor and then the level of time it    16:02:32
21    would take for her to work in that role before she
22    might -- and I think I always used "may" or "may be
23    able to" -- raise her rank within a certain age
24    frame.
25        And in this case, I used the figures for    16:02:58

Page 205

52 (Pages 202 - 205)

Exhibit 6
Page 52 of 123

1  SullivanCotter and AM -- AAMC, and I took the
2  figure of 559,641, which is the wage at the 75th
3  percentile -- find it here -- which you can see on
4  the graph on page 18, and I used that wage because
5  I made the decision that is what her wage        16:03:44
6  would be if she were to have worked 6.5 more years.
7  Then up to the average that was listed in
8  SullivanCotter, and I just took the two figures. I
9  didn't just take the 75th percentile because that
10 to me appeared to be quite high. And -- and then   16:04:15
11 she would work, and the loss of income would be the
12 loss between -- I believe it was the average of the
13 two minus the 559 and 245,216. I wish I could look
14 at my notes. So -- and then multiply that by
15 the 1 million -- or by five years to reach          16:04:58
16 the 1,226,000.
17 Q. Okay. So the last part of that, Ms. Broten, five
18 years, you just multiplied it by five, assuming she
19 would stay at the same, would have made the same
20 income for five years?                              16:05:17
21 A. Yes.
22 Q. You just said --
23 A. I believe so.
24 Q. Oh, excuse me. Yes, you believe so?
25 A. Yeah.                                            16:05:24
                                              Page 206

1  Q. You just mentioned you wish you had your notes.
2  What notes are you referring to?
3  A. Well, just some of my calculation notes, which
4  nobody would understand probably except myself.
5  Q. But those are part of your file?                16:05:33
6  A. (Indicating.)
7  Q. Okay. We did not get those either, so we have some
8  things we still need from your file.
9  A. Sure.
10 Q. Is there anything else from your file other than  16:05:43
11 your billing file, notes, really important notes
12 that you used to prepare your ultimate
13 calculations -- anything else from your file that
14 didn't get provided to the lawyers?
15 A. I don't believe so, but, you know, my file is kind 16:06:01
16 of thick.
17 Q. Okay. And did you bring that file with you today?
18 A. No.
19 Q. Okay. But you have it intact in your office?
20 A. Yeah. It's in my office.                         16:06:13
21 Q. Okay. When you said your notes for the
22 calculations, did you crunch these numbers via like
23 an Excel spreadsheet?
24 A. I wish.
25 Q. How did you --                                   16:06:23
                                              Page 207

1  A. No.
2  Q. -- do them?
3  A. I just did them on little stickies and pasted them
4  on my -- on my billing sheets.
5  Q. Okay. So those are on your billing sheets, too?  16:06:32
6  A. Yeah.
7  Q. And when you -- did you send Ms. Ostrofe any of
8  your work, if you will, your calculations, or did
9  she just get the report?
10 A. She just got the report.                         16:06:45
11 Q. Okay.
12 A. I'm assuming that's what the attorneys sent to her.
13 Q. Got it. And then how did you arrive at that --
14 sticking with that same portion on page 19, if she
15 were to remain a professor and not rise to the      16:07:02
16 ranks of chief, her loss is that $4.7 million, how
17 did you get to that number?
18 A. Essentially it was the same formula that I had used
19 on the other paragraph above, so it was just a
20 number of years, and I think that average -- let's  16:07:25
21 see. Chief. I averaged two numbers together. I
22 believe it was the mean and the 75th percentile.
23 Q. Anything else?
24 A. No, I don't believe so.
25 Q. Does this $4.7 million number you calculated take  16:07:59
                                              Page 208

1  into account any offset for earnings Dr. Bala has
2  received since leaving OHSU?
3  A. No, it did not.
4  Q. Why not?
5  A. I didn't put it in the calculations. I thought   16:08:12
6  that was for the economist to do.
7  Q. And then the next -- skipping down to the next
8  paragraph, that's where you're making the
9  assumption that Dr. Bala would achieve the rank of
10 a chief, a division chief. Let me ask you: Did      16:08:35
11 you do any independent research as to what it takes
12 to attain the status of a division chief in a
13 cardiology department at an academic medical
14 institution?
15 A. I did, and it's an arduous process, from what I    16:08:51
16 reviewed.
17 Q. What did you review to inform your opinion?
18 A. That might have been -- I'm not sure. I thought
19 there was something in the file documents that I
20 received, but I couldn't pinpoint. I know there     16:09:13
21 was one -- I reviewed the -- you know what I
22 reviewed? I reviewed the statements from the
23 residency peer-reviewed or peer report that
24 Dr. Bala had put together, Exhibit 5, in terms of,
25 you know, how many were chiefs, how many were       16:09:39
                                              Page 209

53 (Pages 206 - 209)

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 53 of 123

1  professors, et cetera, and then I also reviewed --
2  I believe it was one of the recommendation letters
3  that -- I don't believe we talked about any of the
4  referral or recommendation letters from other
5  cardiology staff. His name was Lee -- no, Jai,    16:10:01
6  J-A-I, and he made reference in his referral that
7  he had lots of friends who became professors and
8  even a couple of EPs that became chiefs, so that's
9  mostly. And I think -- let's see. It seemed like
10  there was something else I reviewed, but I don't --    16:10:34
11  I can't remember what it -- what it was. I
12  apologize.
13 Q. Okay. That's fine. So thank you for summarizing
14  what you reviewed. Did you undertake any efforts
15  to reach out and call OHSU or any other academic    16:10:44
16  medical institutions?
17 A. I usually do, but in terms of OHSU, I have called
18  them many times in research scenarios. I just
19  didn't feel it was good for me to do that.
20 Q. Okay. You referenced -- was it Exhibit 6 that's    16:11:05
21  Dr. Bala's residency?
22 A. Where are we? Oh, great. 5.
23 Q. 5. You just talked about Exhibit 5 that you relied
24  on that to inform your opinion about potential
25  progression by Dr. Bala to department -- or    16:11:30

Page 210

1  division, excuse me, chief. Is that correct?
2 A. Right.
3 Q. Are there any other EPs on this list?
4 A. I don't know. I don't -- I need to look at it
5  again.    16:11:46
6 Q. And while you're looking at it, my other question,
7  if we can kill two birds with one stone, is do any
8  of these folks -- have any of them achieved the
9  position of a chief?
10 A. Looks like there is one on the second page. Oh,    16:11:58
11  it's -- that's Rupa Bala. Sorry. It was
12  highlighted. Somebody must have highlighted it.
13  Maybe Rupa did. I'm not sure. There is one on
14  page 3, Pai Rakesh, and they're not even -- they're
15  a physician executive, so they're not working in    16:12:26
16  the field necessarily.
17 Q. Right. My question is is anyone on this list,
18  Dr. Bala's -- I think her residency class of 1998.
19  One, is any other EPs, and, two, has anyone
20  attained the title of chief of their department?    16:12:44
21 A. I don't -- I don't see that.
22 Q. Okay. Then how did this inform your opinion as to
23  what a progression to chief might look like for
24  Dr. Bala, how one becomes a chief, what's
25  involved -- how did this document, Exhibit 5,    16:13:02

Page 211

1  inform your expert opinion?
2 A. Oh, I see. I used this more for the professor, to
3  reach professorship, not chief, so my apologies.
4 Q. Okay. Back to your report. Still on page 19,
5  Ms. Broten, the next analysis we started talking    16:13:29
6  about, your evaluation of alleged loss earnings had
7  Dr. Bala reached the rank of chief, and you say
8  that there is -- you conclude that there was an
9  average that she would earn about 700 -- are you
10  with me?    16:13:51
11 A. No. Where are you?
12 Q. Sorry. Page 19.
13 A. Page 19.
14 Q. It's right where we were just looking. We looked
15  at that first set of calculations. I just wanted    16:13:57
16  to move down, so this --
17 A. Okay.
18 Q. -- this is, I guess, the second full paragraph of
19  page 19, "This counselor documented rank of
20  Chiefs," that paragraph.    16:14:08
21 A. Yes.
22 Q. Okay. So I just want to ask you similar questions,
23  how you arrived -- how did you get to that $751,000
24  number?
25 A. Right. So that would have been taking the average    16:14:18

Page 212

1  between -- I used the chief mean and 75th
2  percentile and used that and averaged those
3  together, I believe.
4 Q. Okay.
5 A. Yes, that's what I believe I used.    16:14:43
6 Q. And then it looks like you made the same assumption
7  that she would be in the professor rank for five
8  years and then work as a loss. Any
9  clarity you can shine for me on your calculations
10  in that --    16:15:05
11 A. Sure.
12 Q. -- paragraph would be helpful, how you arrived at
13  those numbers.
14 A. So the 14.4 years was the leftover years from the
15  day I determined she might become chief or the    16:15:16
16  month I thought she might become chief to the date
17  that she would retire at 70. And then -- and I
18  only included that after her professor role, after
19  she was in the professor role for five years.
20 Q. And then similar approach. You assumed that, if    16:15:39
21  she had achieved the chief role, she would have
22  received the same salary for that 14-ish years?
23 A. Right.
24 Q. I think you referenced your calculations -- in
25  reaching your calculations for both scenarios, both    16:16:04

Page 213

54 (Pages 210 - 213)

Exhibit 6
Page 54 of 123

1  the first one we talked about where Dr. Bala would
2  achieve the professor rank and then just now where
3  she would achieve the chief rank, I think you
4  talked about you averaged the mean and the 75th
5  percentile. Did I hear you correctly?        16:16:26
6  A.  I think that's what I did.
7  Q.  Why would you do that versus just use the mean?
8  A.  I think it was because the wages at the mean
9     were -- I'm not -- I would have to go back to my
10    notes, but I didn't want to use the 75th percentile 16:16:52
11    although she would have had, in my opinion, the
12    experience, knowledge, skills and abilities to do a
13    chief role after so many years as a professor.
14    Does that make sense?  So, again, I didn't want to
15    go the highest mark, and I didn't want to leave it  16:17:13
16    at the mean or the average.
17 Q.  In making that determination, did you rely on any
18    other study or methodology?  You just arrived at
19    this approach on your own?
20 A.  Well, I used the U.S. Bureau of Labor stats      16:17:34
21    information on percentiles and mean and median
22    wages, so in general terms.
23 Q.  I don't see those -- and point me if I'm missing
24    something, Ms. Broten.  I don't see any of those
25    statistics or data reflected in the -- in that     16:17:56

                                              Page 214

1  chart.
2  A.  No.  And it wouldn't be.  Are you talking the
3     BLS --
4  Q.  Right.
5  A.  -- that I just mentioned?  It wouldn't be.  It    16:18:04
6     would be just how do you -- how do you determine a
7     person's qualifications to be at one of those
8     levels, and usually it's -- it can be number of
9     years of experience along with education and skills
10    in a profession, if that makes sense.  I just do    16:18:34
11    that all the time.  I do that with Oregon
12    employment wages.  I do that with calculations of
13    earning capacity, utilizing the state of Oregon BLS
14    documentation that they use and transfer over to
15    Oregon.  I called BLS several times to ask them     16:18:54
16    questions.
17 Q.  And that would -- if I understood what you were
18    just saying, Ms. Broten, that may inform and be a
19    consistent practice with sort of figuring out how
20    many years it may take for one to progress.  Is     16:19:08
21    that what your testimony is?
22 A.  Yeah, that --
23 Q.  Okay.
24 A.  -- that would be relation -- would relate to that.
25 Q.  And I'm just wondering, other than what you       16:19:17

                                              Page 215

1  testified, your explanation why you averaged the
2  mean and the 75th percentile versus just using the
3  mean, in making that specific decision that
4  underlies your ultimate calculation we just talked
5  about, did you rely on any specific methodology,    16:19:38
6  report, survey --
7  A.  Right.
8  Q.  -- the like?
9  A.  Well, U.S. Bureau of Labor stats gives you
10    information, as does the Oregon Employment          16:19:52
11    Department, that says this is where a person can be
12    expected to earn if they were in this job for this
13    long and they obtained all the necessary skills and
14    knowledge and abilities to do that job.
15 Q.  So that gives you some actual salary -- benchmark  16:20:08
16    salary data?
17 A.  Yes.
18 Q.  And is that anywhere in your report or in your
19    supporting documentation?
20 A.  The use of BLS?                          16:20:17
21 Q.  Um-hum (affirmative response).
22 A.  No, I don't think so.
23 Q.  But it sounds like you used it to make the
24    decision -- at least in part to make the decision
25    to average the mean and the 75th percentile.  Am I  16:20:30

                                              Page 216

1  understanding that correctly?
2  A.  Well, it's standard for vocational counselors to
3     utilize that documentation, so I didn't think I had
4     to write it down.
5  Q.  I just asked if you used it or not.          16:20:44
6  A.  Oh, I did use it.
7  Q.  Okay.  But you didn't write it down?
8  A.  Right.
9  Q.  Was there anything else you used other than what we
10    see in your report and the BLS data that we don't   16:20:53
11    see in your report to arrive at any of your
12    calculations in your report?
13 A.  Nope.
14 Q.  Did you use the BLS data for all of your
15    calculations or just -- just this -- these first    16:21:07
16    two scenarios where Dr. Bala would achieve the rank
17    of professor and then where she would achieve the
18    rank of chief?
19 A.  So I think, you know, what you're talking about is
20    just a definition of what the 10th percentile is,   16:21:23
21    what the 25th percentile is, what the 50th
22    percentile is, what the mean and so on and so
23    forth.  That is the information from BLS that I
24    use.  So I didn't put that in the report, but
25    that's standard, you know, that we use as           16:21:41

                                              Page 217

                                    55 (Pages 214 - 217)

Exhibit 6
Page 55 of 123

1  vocational experts and vocational rehab counselors.
2  Q.  Right.  And just so I understand that you used
3     that -- you used that standard BLS information you
4     just explained in reaching all of your calculations
5     in your report?                        16:22:01
6  A.  Yes.
7  Q.  Okay.  And my question was other than the BLS and
8     the data we see within the four corners of the
9     report, did you rely on any other information,
10    methodology to complete your lost earning        16:22:15
11    calculations?
12 A.  No.
13 Q.  You mentioned experience.  What authority did you
14    rely on to support your opinion that a physician's
15    years of experience necessarily will result in   16:22:46
16    higher levels of compensation?  What authority do
17    you have to support that?
18 A.  Well, basically I just utilized the BLS data that I
19    referenced, that I have knowledge of and have used.
20 Q.  You didn't look into any -- whether or not that BLS 16:23:07
21    data that you had knowledge of and have used many
22    times actually supports how physicians are
23    compensated as they progress in their careers?
24 A.  No.
25 Q.  If, in fact, that didn't ring true and a        16:23:24

Page 218

1  physicians, particularly a specialty physician like
2     an electrophysiologist -- if the authority did not
3     support that years of experience necessarily
4     correlate to higher levels of compensation, would
5     that change your opinion and your calculations?   16:23:46
6  A.  If I found data to support that perhaps, but
7     generally speaking, as an individual in an
8     occupation progresses, their wage progresses with
9     that.
10 Q.  But you acknowledge that it may be different for  16:24:08
11    physicians; you just don't know?
12 A.  Yeah, I doubt it is, but I don't know for sure.
13 Q.  I know you didn't rebut it directly.  Did you
14    review -- have you reviewed Mr. Henski's reports in
15    this case?                             16:24:28
16 A.  Yes, I did.
17 Q.  Does that change your opinion about how physicians,
18    particularly specialty physicians like
19    electrophysiologists, are compensated as they
20    progress in their careers?             16:24:41
21 A.  No, it didn't change my opinion.  I looked at the
22    data that he wrote in his report.  I didn't see
23    supporting data.  And I believe he was using MGMA
24    stats of some sort, and he was also using the term
25    "surgical specialist" rather than EP directly   16:25:01

Page 219

1  because EP --
2  Q.  I just asked if it changed your opinion.
3  A.  Oh, sorry.  No.
4  Q.  But you didn't submit a rebuttal to his report, did
5     you?                                   16:25:14
6  A.  No.
7  Q.  Just to Jennifer Moody and DT North.  Correct?
8  A.  Yes.
9  Q.  And finally I think we have the table there, which
10    is the Pinnacle table.  What's your understanding  16:25:29
11    of what data Pinnacle -- what Pinnacle -- what this
12    Pinnacle Medical Group survey constitutes?
13 A.  Well, Pinnacle reported the survey from MGMA.
14 Q.  Okay.
15 A.  And I spoke with Pinnacle, the director of the    16:25:50
16    physician recruiters, so essentially they just use
17    MGMA --
18 Q.  Right.
19 A.  -- data.
20 Q.  Because they don't actually publish compensation   16:26:02
21    surveys?
22 A.  No.
23 Q.  Right.
24 A.  But they're like any other.  I think I talked about
25    the university -- or Boston Medical University or   16:26:10

Page 220

1  Boston University Medical.  They do the same.  Many
2     facilities do that.
3  Q.  And so this last -- on your final page of your
4     report, Ms. Broten, this covers -- and I think your
5     number is here.  It's your final full paragraph.    16:26:48
6     Those cover, I think -- correct me if I'm wrong --
7     her -- Dr. Bala's wages at Citrus Cardiology.  Is
8     that right?
9  A.  I believe so, yes.
10 Q.  Okay.  And based on your testimony here today that, 16:27:06
11    one, you didn't factor in the productivity portion
12    of her contract with Citrus and the new information
13    that perhaps there has been some change to her
14    compensation structure, this number is no longer
15    accurate.  Is that right?              16:27:33
16 A.  You know, I need to go over it because it's so new.
17    It may or may not change.
18 Q.  Right.  We don't know, I think --
19 A.  We don't know.
20 Q.  And it may be, you know, that -- we looked briefly, 16:27:53
21    and I'm happy to show you again.  I think it's an
22    exhibit, the final page of productivity of her
23    contract.  I mean, it may be that she could make
24    more now.  We just don't know, right?
25 A.  The productivity page to me when you asked was --   16:28:08

Page 221

56 (Pages 218 - 221)

Exhibit 6
Page 56 of 123

1  it didn't apply at the time because she had a
2  salary, but, yes, it could make a difference now.
3  Q.  Okay.  So basically right now I think you said
4      you'll need to look at it again, so, sitting here
5      today, I think you'd agree that you can't state    16:28:28
6      with any certainty how much she'll make this year,
7      let alone in five years, let alone in fifteen
8      years.  Is that right?
9  A.  Not until I look at the documents and put it
10     together.                    16:28:42
11 Q.  Okay.  I just want to introduce your rebuttal
12     report.  I don't have any questions about it, but I
13     just want it to be part of the record.
14         (Exhibit 18 marked)
15         (Pause in proceedings)        16:29:21
16 Q.  BY MS. BAUMGART:  Is Exhibit 18 your rebuttal
17     report that you prepared, Ms. Broten?
18 A.  Yes.
19 Q.  Did anyone assist you in preparation of this
20     report?                      16:29:37
21 A.  Absolutely not.
22 Q.  At any point in your work on this matter, have you
23     contacted anyone at Citrus directly?
24 A.  No.
25 Q.  Did you talk to Dr. Bala about the circumstances   16:30:04

Page 222

1  underlying her termination from Banner?
2  A.  I believe we did touch on it, you know, her --
3      yeah, I believe we touched on it.
4  Q.  And other than what you've stated in your report --
5      I think you referenced a family medical leave,    16:30:40
6      not-for-cause termination -- anything else you
7      remember her sharing with you about the
8      circumstances underlying her separation from Banner
9      Health?
10 A.  I may have written in that one section about I know  16:30:52
11     somebody talked with her about the court case.
12 Q.  Oh, well, she told you she may have heard that?
13 A.  She told me, yes.
14 Q.  Right.
15 A.  Yes.                         16:31:06
16 Q.  You didn't have confirmation one way or the other.
17     Correct?
18 A.  Right.  Sorry.
19 Q.  Did you record your interviews with Dr. Bala?
20 A.  Oh, no.                       16:31:16
21 Q.  Were they on video or on telephone?
22 A.  The first interview was on Zoom, not recorded.  I'm
23     not that technical.  And the second one was a
24     phone call that just turned into a longer
25     conversation.                  16:31:34

Page 223

1  Q.  Sure.  And the video was a videoconference?
2  A.  It was Zoom video, yes.
3  Q.  Zoom video.
4  A.  Most of it.  I mean, you can only go 40 minutes.  I
5      don't have a contract with Zoom, so --        16:31:46
6  Q.  I was wondering if that's why they were set in
7      two 40-minute increments.
8  A.  I had to do two, and I think we did both.
9  Q.  All right.  Just give me one second to look at my
10     notes.                       16:31:56
11     MS. BAUMGART:  I have no more questions.  We
12     will need to leave this open because we did not get
13     the entirety of your file, so we'll work with
14     counsel to get that, but otherwise we're done for
15     today.  Thank you.                16:32:51
16     THE WITNESS:  Thank you.
17     MR. BRISCHETTO:  I do have two questions I want
18     to ask you.
19     MS. BAUMGART:  Sorry.
20     THE WITNESS:  Sorry.             16:32:58
21     EXAMINATION
22 BY MR. BRISCHETTO:
23 Q.  And if you take out Exhibit 5 again, and you were
24     asked questions about whether any of the
25     individuals had achieved chief, and I want you to   16:33:16

Page 224

1      look at the third individual, Sumant Ranji, MD --
2  A.  Oh.
3  Q.  -- and go across to title.  Do you see the title he
4      has currently chief of the division of hospital
5      medicine?                     16:33:31
6  A.  I'm sorry, I missed that.  It looks like I missed
7      another one.
8  Q.  Yes.  And I just wanted to make sure to ask you.
9      Sounded like you didn't kind of look at the entire
10     document and each entry.  Correct?         16:33:49
11 A.  That's right.
12 Q.  All right.  Thank you.
13     MR. BRISCHETTO:  Yes.  And we aren't agreeing
14     to leave the deposition open, but we do acknowledge
15     defendant's statement.  I have nothing else.      16:34:06
16     MS. BAUMGART:  And we'll take that up.  I'm not
17     surprised by your response, but we did not get a
18     full responsive subpoena, so we'll have to talk
19     about that and see if we need to agree to come back
20     or where we go from there.           16:34:24
21     MR. BRISCHETTO:  We'll talk.
22     MS. BAUMGART:  Sounds good.  All right.  We're
23     done with you.
24     (Exhibit 19 marked)
25     (DEPOSITION ADJOURNED at 4:34)        16:34:31

Page 225

57 (Pages 222 - 225)

Exhibit 6
Page 57 of 123

```
1            C E R T I F I C A T E
2
3       I, Julie A. Walter, CSR No. 90-0173, do hereby
4    certify that LISA BROTEN appeared before me at the
5    time and place mentioned in the caption herein;
6    that the witness was by me first duly sworn on oath
7    and examined upon oral interrogatories propounded
8    by counsel; that said examination together with the
9    testimony of said witness was taken down by me in
10   stenotype and thereafter reduced to typewriting;
11   and that the foregoing transcript, Pages 1 to 225,
12   both inclusive, constitutes a full, true and
13   accurate record of said examination of and
14   testimony given by said witness and of all other
15   proceedings had during the taking of said
16   deposition, and of the whole thereof, to the best
17   of my ability.
18       Witness my hand at Portland, Oregon, this 19th
19   day of January, 2024.
20
21
22
23       Julie A. Walter
24       CSR No. 90-0173
25
                                         Page 226
```

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 58 of 123

**[0 - 2:08]**

| **0** |
|---|
| **0**   137:11 |
| **00850**   1:7 |
| **1** |
| **1**   4:3 11:3,5,10 |
| 11:10 51:13 |
| 52:3 66:21 |
| 67:16 73:3 |
| 77:14 88:21 |
| 123:19 175:1 |
| 199:1 206:15 |
| 226:11 |
| **1,000**   105:10 |
| **1,226,000** |
| 206:16 |
| **1/17/20**   5:16 |
| **10**   4:23 |
| **10/20/2023** |
| 129:5 |
| **10/27/23**   4:3 |
| **100**   73:3 137:7 |
| 137:10 |
| **1000**   2:20 |
| **101**   73:12 |
| **10:05**   34:2 |
| **10th**   217:20 |
| **11**   4:3 5:1 |
| **11:26**   92:9 |
| **11:37**   92:9 |
| **12**   5:3 139:4 |
| 144:22 145:2 |
| 145:10,17 |
| 146:10,17,24 |
| 147:5,9 148:1 |
| 149:24 150:9 |

151:7 152:17
158:19,25
161:12
**12/14/23**   5:20
**120**   4:12
**122**   4:14
**123**   4:16
**12:21**   123:9
**13**   5:5 146:5,6
146:11
**14**   5:7 146:8
151:14,15
152:14 213:22
**14.4**   213:14
**144**   4:17,19,21
4:23 5:1,3
**146**   5:5,7
**15**   5:13 140:5
177:6,7,14
180:24 184:4
185:6 202:7,10
202:16
**1500**   2:8,15,20
**1526**   179:14
**1527**   202:20
**16**   5:16 144:5,5
145:1 183:17
189:11,12,15
**17**   5:19 157:15
183:15,17,18
191:6,8 199:23
**177**   5:13
**18**   5:20 157:16
158:8,12
159:15 172:18

205:3 206:4
222:14,16
**189**   5:16
**19**   5:22 205:6,8
208:14 212:4
212:12,13,19
225:24
**191**   5:19
**1998**   4:15
122:7 211:18
**19th**   226:18
**1:36**   123:9

| **2** |
|---|
| **2**   4:5 69:5 70:5 |
| 70:7,12 75:3 |
| 75:13 77:14,25 |
| 82:23 134:24 |
| 135:10 183:15 |
| 183:18,18,19 |
| **20**   18:14,15,20 |
| 158:13 166:11 |
| 184:4,10 |
| **200**   128:3 |
| **2015**   181:8,19 |
| 181:20 |
| **2017**   32:12 |
| 201:18 |
| **2018**   19:12,16 |
| 19:20,22,23 |
| 58:1 67:10 |
| **2019**   58:7 |
| 190:2 |
| **202**   127:4,8,13 |
| 127:24 128:4,9 |
| 163:2 199:1,18 |

201:15 204:2
204:14
**2020**   4:17
**2021**   4:19
**2022**   4:21,23
5:1,3
**2023**   23:10,19
23:20 24:10
34:8 164:25
**2024**   1:18 2:6
6:8 226:19
**212**   67:5
**215**   67:5,6
**218**   57:16,23,25
58:4
**219**   57:8
**22**   152:21
**222**   5:20
**225**   5:22
226:11
**23**   154:2
202:10,12
**23rd**   163:7
**245,000**   205:11
**245,216**   205:9
206:13
**25th**   217:21
**26810**   226:22
**26c**   34:25
**27th**   163:8
**28th**   164:15,25
165:24
**2:06**   144:21
**2:08**   144:21

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 59 of 123

**[2:29 - aamc]**

**2:29**  159:9
**2:30**  159:9
**2:52**  174:21
**2s**  87:4

**3**

**3**  4:11 20:21
63:10 68:9,16
69:3 70:10
84:6 86:7,13
87:16 109:4,10
125:21 211:14
**30**  14:9 18:17
18:20 65:13
140:17 159:13
159:22
**3000**  3:6
**30th**  140:9
**31**  160:8
161:17
**33**  162:2,12
**35**  17:25 122:6
**38**  162:22
**39**  12:21
**3:04**  174:21
**3:18**  1:7
**3:46**  202:5
**3:55**  202:5
**3rd**  139:16
140:3

**4**

**4**  4:12 68:16
69:3 70:22
84:18 109:10
120:9,10

121:22,25
125:23
**4.7**  208:16,25
**40**  12:21 14:9,9
17:25 45:17
46:17,18 65:12
65:13 128:25
129:6 130:20
134:18 163:6
224:4,7
**41**  163:6,6
**42**  164:10,13
**43**  164:13
**45**  126:17
**46**  164:13,14,24
165:14
**48**  160:15
**4:34**  225:25

**5**

**5**  1:18 2:6 4:14
88:21 122:23
122:24,25
139:1,6,13
174:25 185:12
209:24 210:22
210:23,23
211:25 224:23
**5.1**  189:22
**50**  18:5,5,6
65:12
**50th**  217:21
**51**  166:2
**525**  121:7
**525,000**  119:14
120:1

**559**  206:13
**559,641**  206:2
**56**  166:5
**58**  123:19
**5th**  6:7 141:12
141:20,24

**6**

**6**  4:16 123:10
123:13 125:21
126:19 130:20
145:1 165:15
170:14 187:3
210:20
**6.5**  206:6
**60**  18:5,5,6
46:18
**65**  14:10

**7**

**7**  4:17 125:23
144:22 145:2
145:10,17
146:10,17,23
147:5,9 148:1
149:24 150:9
151:7,7 152:16
158:18,24
161:11
**70**  4:5,11
213:17
**700**  212:9
**72**  66:7
**751,000**  212:23
**75th**  158:6
159:4 206:2,9

208:22 213:1
214:4,10 216:2
216:25
**760**  3:6

**8**

**8**  4:19 177:16

**9**

**9**  4:21 134:19
134:19
**9/30**  163:19,20
**90-0173**  2:5
226:3,24
**91**  70:25 164:1
**97201**  2:16,21
**97205**  3:7
**99**  72:8,23
**9:15**  6:8
**9:54**  34:2
**9th**  3:6

**a**

**a.m.**  2:7
**aamc**  4:17,19
4:21,23 5:1,3
61:6 102:18
105:8,16 106:2
106:6 107:8
108:25 110:18
110:24 111:14
125:24 126:2
142:2,21 148:4
148:4,18,21
149:4 150:14
151:3,16
152:10 206:1

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 60 of 123

[aamc's - administrative]

**aamc's** 108:20
**abev** 21:8
  103:15
**abilities** 14:17
  91:15 214:12
  216:14
**ability** 9:7 26:8
  49:14,21 53:15
  91:17 119:25
  121:14 132:4
  132:13 182:23
  226:17
**ablations** 143:8
**able** 44:22 45:3
  52:4,5 94:13
  101:17 107:6
  108:13 154:4
  179:9 205:23
**above** 179:8
  180:5 205:18
  208:19
**absolutely**
  137:13 222:21
**absorb** 179:10
**abve** 20:2
  47:13,18 90:14
  103:10
**academic** 15:7
  106:13,13,14
  106:19 117:22
  117:24 136:24
  137:19 138:15
  161:3 172:20
  174:1,3,14,15
  185:17 186:7

209:13 210:15
**acceptable**
  192:19
**accepted** 75:25
  76:24
**accepting**
  187:1
**access** 83:16
  104:6 106:22
  110:9 111:13
  126:8,14 149:1
  157:7 159:18
  159:19 194:13
**accessed**
  106:21 111:8
**accessing**
  148:24,25
**account** 121:14
  209:1
**accumulates**
  13:5
**accuracy**
  148:16 188:15
**accurate** 52:10
  52:14 71:3
  141:6 182:12
  221:15 226:13
**accurately** 9:8
**accusational**
  178:7 182:21
**accusations**
  178:13
**achieve** 209:9
  214:2,3 217:16
  217:17

**achieved** 211:8
  213:21 224:25
**achievement**
  15:7
**achieving**
  191:25
**acknowledge**
  219:10 225:14
**acquisition**
  85:22
**acronym**
  102:18 118:10
**acronyms** 63:5
  101:24
**active** 21:3
**activities** 12:23
  64:20 87:7,11
**actual** 49:10
  87:17 155:21
  156:11 159:11
  216:15
**actually** 14:2
  25:12 29:16
  65:23 66:5
  67:13 76:20
  88:24 89:5
  109:8 110:18
  123:7 126:11
  136:8 141:7
  149:5 162:21
  164:11 176:24
  186:13 199:8
  218:22 220:20
**ada** 9:21 28:5
  43:11,15

**adapted** 75:8
  76:13 83:25
**add** 38:10
  155:5 156:4,7
  156:10 182:11
**added** 123:19
  144:8
**addendum**
  130:3
**addition** 21:4
  31:3 124:23
  175:10
**additional** 19:8
  21:4 29:15
  64:7 101:23
  121:15 143:25
  159:23 165:1
  180:23 183:17
  200:7
**address** 190:8
**addressing**
  191:15
**adjourned**
  225:25
**adjust** 76:25
  77:3
**adjusted** 16:23
  78:6
**administration**
  57:8,19 58:8
  58:14 59:21
  60:12,15
**administrative**
  14:20 60:13,23
  66:6,9

Page 3

[adverse - answer]

| | | | |
|---|---|---|---|
| **adverse** 7:12 | **agreed** 14:22 | **allegedly** | 91:15,21 92:17 |
| **advised** 113:19 | 14:23 15:12 | 204:14 | 92:20,24 93:2 |
| **affect** 84:21 | 109:12 | **alleging** 43:18 | 98:5 103:19 |
| 87:8 194:10 | **agreeing** | 44:1 | 107:14 108:16 |
| **affected** 59:8 | 225:13 | **allow** 8:21,22 | 112:13 114:8 |
| 87:8 | **agreement** 4:13 | 27:18 | 117:4 119:17 |
| **affiliation** | 23:9 62:2,4,18 | **allowed** 35:6 | 121:1,10 124:1 |
| 21:17 | 120:19 163:17 | 203:12 | 124:6 125:8 |
| **affirmative** | **ahead** 35:9 | **allowing** 178:9 | 131:10 137:7 |
| 8:10 17:17 | 39:14 40:3 | **allows** 28:17 | 142:11 145:14 |
| 22:8 38:15,19 | 41:5,6,21 | 74:4 | 151:5 152:15 |
| 40:19 74:13 | 42:21 43:3,4 | **alluded** 205:19 | 153:2 156:13 |
| 146:18 157:17 | 44:19,20 45:2 | **alluding** 177:3 | 156:18 157:10 |
| 216:21 | 45:6 50:19 | **aloud** 203:9 | 158:15 160:1 |
| **afternoon** 8:5 | 77:9,20,21 | **amendment** | 162:19 163:24 |
| **age** 91:16 | 78:4,22 79:1,4 | 116:24 | 170:1 171:17 |
| 205:23 | 80:3,4,14 82:7 | **american** 13:12 | 183:11 186:17 |
| **agency** 200:21 | 83:8 84:14 | 19:11 22:12 | 186:21,23 |
| 200:23 | 88:17 90:17 | 28:15,20 | 188:17 189:3 |
| **aggravation** | 107:19 114:24 | 102:18 | 189:15 190:14 |
| 179:2 | 120:3 133:10 | **amga** 106:16 | 194:2,25 212:5 |
| **aggressively** | 134:14,15 | **analyses** 15:16 | **annual** 21:3 |
| 178:6 182:21 | 135:6 150:20 | 72:25 89:15 | 47:16,18 109:2 |
| **ago** 14:9 59:12 | 177:19 184:9 | 91:25 93:15 | **annually** |
| 63:2,3 112:21 | 189:19 193:4 | **analysis** 23:2 | 205:10 |
| 147:25 159:17 | 198:4,18,19 | 27:12 51:19,22 | **answer** 8:15,18 |
| 172:7 173:12 | **ai** 96:15 | 52:17 53:18 | 8:23 27:21 |
| **agree** 73:21 | **aid** 23:23 | 59:6,7,12 | 34:22 38:3 |
| 74:8,12,16 | **ais** 96:11 | 61:21 68:19 | 44:6 83:18 |
| 79:7 91:4 93:5 | **align** 81:18 | 69:1 72:4,17 | 91:1 107:20 |
| 93:9 105:20,21 | 82:3 83:4 | 72:24 73:17 | 114:24 118:19 |
| 180:19 183:5 | 100:2 164:17 | 75:8 76:3,14 | 118:22 119:3,7 |
| 193:9 199:20 | **aligned** 82:1 | 77:5,16 79:23 | 147:24 149:15 |
| 204:7,20 222:5 | **alleged** 112:9 | 83:25 85:14 | 160:23,23 |
| 225:19 | 196:5 212:6 | 86:16 91:11,14 | 193:6 196:16 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 62 of 123

[answer - asking]

196:19
**answered**
22:21 38:15,18
39:7 43:2
77:19 84:5
131:11 134:13
195:6 198:3,17
**answers** 94:15
197:3
**anticipate**
112:6 118:19
**antiprofessio...**
178:15
**anybody**
102:23 127:1
137:22 157:22
**anymore** 199:3
**anyway** 46:20
115:7 118:18
142:4
**apart** 87:14
116:23 117:2
137:23 151:1
157:25 168:11
194:14
**apologies** 212:3
**apologize** 79:10
210:12
**appalling**
178:15
**appear** 42:2
85:6 166:25
186:4
**appearances**
2:11 3:1

**appeared** 26:7
26:18 206:10
226:4
**appearing** 3:12
3:14
**appears** 116:10
132:8 144:5
204:1
**applicable** 54:3
**applications**
201:15
**applied** 127:4,8
127:13,24
128:3,9 163:3
196:15 198:22
199:17 204:3
**applies** 75:7
76:12 83:23
**apply** 222:1
**applying** 95:16
97:2
**appreciate**
133:2,2
**approach** 74:9
75:7 76:12,22
77:4 81:19
82:4 83:5,23
85:9 90:10,21
91:5 184:12,21
213:20 214:19
**approached**
183:10
**appropriate**
102:14 160:5
179:7

**approximately**
199:18
**april** 23:18
24:10 34:8
**arduous** 20:11
209:15
**area** 75:5 119:2
167:3
**areas** 11:14
12:5,15,15
183:20 191:23
**arena** 14:1
106:13,14
**argue** 22:15
198:5
**argumentative**
120:2 198:3,16
**arizona** 187:11
**arrangement**
115:23
**arrive** 53:19
205:10,12
208:13 217:11
**arrived** 42:10
42:16 212:23
213:12 214:18
**arrogance**
178:13
**article** 4:5
73:11 100:5
**articles** 26:13
26:21 29:3
38:6 46:12
98:2 109:19
112:16,17

**ascribe** 78:14
**aside** 91:4
147:8 196:11
**asked** 12:6 23:1
25:9,12 32:13
37:24 38:12,14
39:12,16,23
40:12 43:1
45:8 52:3,11
53:2,5,13
62:10 65:7,8
77:18 85:19,19
85:20 92:11
93:9 114:8
116:19 129:22
130:1,2 134:13
134:18 139:22
140:25 147:14
161:10,18
197:18 198:3
198:17 200:12
217:5 220:2
221:25 224:24
**asking** 35:6,13
42:7 43:22
44:1 50:10
57:6 82:11
94:10,21 100:4
103:12 132:5
161:20 163:10
164:10 166:2
171:2,3 172:12
173:2,4,19
174:2 176:6
185:13 193:24

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 63 of 123

[asking - back]

204:13,13
aspect 96:6
aspects 69:20
  118:4
assessment 4:6
  4:10 14:15
  26:12 69:9,19
  70:14,16 74:18
  76:2 77:5,15
  79:23 80:6,18
  82:10 83:10
  85:13 86:17
  88:7 89:15
  90:24 94:3
  112:8 176:17
  193:13 205:3
assessments
  76:22 77:23
  124:18
assigned 14:13
assist 14:25
  157:22 158:2
  222:19
assistant 66:4
associate 135:2
  135:11,23
  169:7 174:12
  187:8 205:20
association
  47:14
assume 13:10
  20:12 22:11
  76:9 107:24
  141:5 163:23
  184:12

assumed
  213:20
assumes 44:17
  82:5 83:6
  184:7
assuming 29:11
  162:15 206:18
  208:12
assumption
  58:16 209:9
  213:6
assumptions
  136:23
asterisk 122:3
attached 86:11
  139:16 143:23
  143:24
attachment
  153:21
attachments
  144:25
attain 166:23
  209:12
attained 211:20
attempt 36:23
  49:16 124:20
  158:22 178:10
  190:6 205:15
attempting
  41:10 141:6
attempts 49:16
  126:21 127:3
attend 47:3
attended 46:24
  97:17

attending
  177:16,21
  178:24 203:11
attendings
  179:19
attention 175:1
  175:4 190:2
  202:22
attitude 177:23
  178:3,21
attorney 6:4
  7:4 10:7 14:23
attorneys 20:6
  20:6 23:5
  34:17 35:3
  54:5 111:4
  208:12
attributed
  201:12
attributing
  155:22 173:25
audible 8:17
audibly 8:15
august 23:10
  163:15
author 59:10
  66:20,23 80:6
authored 55:10
  55:10 57:6
  64:25 65:3
authority
  218:13,16
  219:2
authors 83:10

available 31:1
  156:25 157:1,6
  157:8
avenue 2:8,15
  2:20 3:6 96:10
average 206:7
  206:12 208:20
  212:9,25
  214:16 216:25
averaged
  208:21 213:2
  214:4 216:1
avocational
  87:11
awarded 125:3
aware 21:20
  43:13,16 44:9
  54:4 97:20
  101:13 102:11
  157:9 170:25
  180:7 186:8
  187:13 190:13
  190:25 191:20
awe 162:12

| b |
| --- |

back 30:13
  34:3 51:12
  74:20 75:3,18
  92:10 103:4
  104:7 109:3,15
  116:5 121:22
  123:11 125:5,7
  133:13 134:17
  134:18 139:1
  142:2 144:24

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 64 of 123

**[back - barrier]**

| | | | |
|---|---|---|---|
| 146:17 147:23 | 86:22 91:11,21 | 166:19 167:22 | 107:15 110:23 |
| 152:20,20 | 92:22 104:16 | 169:6 175:3,17 | 112:8,19 |
| 154:5,10 155:3 | 110:3,7,14 | 176:1 177:8,16 | 114:11 116:6 |
| 157:13 159:12 | 111:8,14 | 177:21 178:25 | 119:13 120:18 |
| 160:9 164:1,3 | 116:19,21,23 | 179:16,19,25 | 128:22 133:6 |
| 174:22,25 | 117:12 121:1 | 180:9,24 | 133:25 134:7 |
| 185:12 187:3 | 122:6,15 124:5 | 181:11,22 | 148:21 159:2 |
| 202:6,7 204:25 | 124:8,17,25 | 182:7,19,25 | 168:5 176:11 |
| 212:4 214:9 | 126:5 127:7,9 | 184:6,16 | 181:21 183:11 |
| 225:19 | 127:12,16,21 | 185:15 188:1 | 188:17,25 |
| **background** | 128:8,16 | 188:11,15 | 190:20 191:16 |
| 12:20 14:7 | 129:18 130:10 | 190:25 191:9 | 196:8 199:1 |
| 16:1 101:17 | 130:18 131:19 | 193:1,17,25 | 200:6 201:18 |
| **bad** 179:22 | 134:21 135:14 | 194:5,15 | 203:6 210:21 |
| 199:8 | 136:3,15,25 | 195:10,17,21 | 211:18 221:7 |
| **bala** 1:5 5:14 | 137:9,12,16 | 196:13 197:15 | **banner** 5:17 |
| 5:16 6:5 7:10 | 139:5,15 | 199:3,9,17 | 112:22 185:2 |
| 17:9,12 23:5 | 141:13,16,19 | 200:13,22 | 187:7,9 188:2 |
| 23:13,17 24:9 | 142:25 143:20 | 201:1,4,6,22 | 188:18 189:4 |
| 24:11 25:1 | 144:6,14 | 202:25 203:20 | 190:21 191:1 |
| 27:13,25 28:10 | 145:11 146:23 | 204:2,6,19 | 191:10 192:5 |
| 29:8 30:1,18 | 147:5,8,25 | 205:4 209:1,9 | 192:23 194:16 |
| 32:15,22 33:6 | 148:8,14 | 209:24 210:25 | 194:21 195:3 |
| 33:12,23 34:7 | 149:13,23 | 211:11,24 | 195:11 196:13 |
| 34:17 35:23 | 150:8 152:6,23 | 212:7 214:1 | 196:22 197:10 |
| 36:11,21 37:17 | 153:1,12,13,25 | 217:16 222:25 | 198:8 199:2,8 |
| 37:22 38:17 | 154:19,21 | 223:19 | 199:21,24 |
| 39:3,10,25 | 155:22,23 | **bala's** 24:17 | 200:5,12 201:3 |
| 40:9 41:2,10 | 156:6,16 157:8 | 26:17,24 38:20 | 201:5 223:1,8 |
| 41:15,17,24 | 158:5 159:22 | 42:17,22 48:16 | **bar** 47:11 |
| 42:2,14 43:17 | 160:10,22,22 | 51:4 74:1 | **barrier** 130:14 |
| 44:15 48:21 | 161:7,18 162:2 | 77:15 79:22 | 133:7 134:9 |
| 52:4 53:20 | 162:14,19 | 85:13,15 86:17 | 195:3,12,14,16 |
| 59:15 61:3 | 163:3 164:10 | 98:4,24,25 | 195:17,20 |
| 71:25 77:6,16 | 165:2,23 166:9 | 103:16,20 | 196:4,13 |

Page 7

[barrier - best]

197:11,22,25
198:13 199:5
200:18 201:7
201:18 204:8
204:20,23
**barriers** 27:18
29:2 69:18
130:7,10 194:3
194:6,9 195:25
196:3,8 197:8
203:5,5
**base** 32:18 77:1
119:13
**based** 12:5 23:8
41:12 44:8
81:18 83:11
116:11 118:1
119:1,10 135:4
136:23 137:10
137:11 142:14
174:11,12
185:20 189:22
221:10
**basically** 12:16
14:11 25:6
28:24 45:20
50:7 53:5
69:11 86:1
95:21 103:22
147:14,17
157:4 169:11
186:6 218:18
222:3
**basics** 179:11

**basing** 29:12
**basis** 21:3
47:17 135:9
**bates** 179:14
202:19
**baumgart** 3:4
6:4,15 7:4 11:4
24:1,7,8 27:9
34:1,3,23
35:13,16,21
40:6 41:6,22
42:20,24 43:4
44:20 45:3,8
50:24 70:8,11
77:10,21 78:10
78:22,25 79:2
79:5,8,11 80:4
82:8,11 83:17
84:18 88:18
89:23 90:2,6,9
92:2,6,10
107:20 113:25
114:3,7 115:7
115:11,19,23
116:1,4,5
120:7,12
122:21,25
123:6,11
133:12,15,20
134:15 135:8
143:15 144:17
144:23 146:7,9
159:8,10 164:8
170:22,24
174:19,22

177:7 184:11
189:14 191:8
193:5 198:5,19
202:3,6 222:16
224:11,19
225:16,22
**bear** 72:10
**beautifully**
147:22
**becoming**
143:25 178:18
**beginning** 94:7
**behalf** 1:17
56:15
**behavior** 45:20
49:1,2 177:23
178:8,22
182:23 190:4
193:16 203:15
203:18
**behavioral**
85:20
**behaviors** 29:5
**believe** 10:8
19:9 21:19
24:24 25:6
30:16 32:12,17
33:1 36:14
38:11,12,18,20
38:22 41:13,24
42:17,22 45:13
48:14,15 50:1
50:4 54:7
57:25 59:21
68:21,22 69:4

71:14 80:9
86:3,21 87:25
94:4,22 109:17
112:15 113:2,7
113:8 121:2
123:2 127:22
128:23 129:22
137:21 139:22
144:25 145:6
151:8,15 152:8
153:4 161:22
162:15 165:11
176:16 177:10
181:12 184:24
188:1,10
191:12 197:17
197:19 198:20
200:20 206:12
206:23,24
207:15 208:22
208:24 210:2,3
213:3,5 219:23
221:9 223:2,3
**believed** 136:17
**bell** 144:11
**benchmark**
61:6 108:23,24
216:15
**benchmarks**
112:12 142:14
**berg** 104:13
105:6 106:2
**best** 6:22 9:1
17:21 18:24
45:15,16,23

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 66 of 123

[best - bullet]

| | | | |
|---|---|---|---|
| 48:21 67:1 | **board** 13:12 | **brief** 50:11,20 | **broten** 1:16 2:3 |
| 68:24 91:9 | 19:11,17,18 | 50:21 | 4:4 5:21,22 6:4 |
| 102:25,25 | 21:20 22:12 | **briefly** 7:3 | 6:10,16,17,18 |
| 103:22 105:8,9 | 28:16,19,20 | 72:14 221:20 | 6:19,25 11:4 |
| 141:4 155:20 | 86:24 | **bring** 50:23 | 17:21 22:23 |
| 171:5 178:1,4 | **boards** 96:14 | 89:2 207:17 | 24:23 32:11 |
| 190:10 226:16 | 96:15,20 | **brischetto** 2:8 | 33:12 34:3 |
| **better** 49:1 | **bold** 205:19 | 2:18,19 4:4 | 37:2,24 39:9 |
| 58:12 78:11 | **bolded** 169:16 | 5:21 23:22 | 45:11 48:2 |
| 93:16 122:13 | 169:17,17 | 24:6 27:7 | 51:3 52:2 61:1 |
| 156:16 181:14 | 205:8 | 34:21 35:9,15 | 62:2 63:1 |
| **beyond** 179:20 | **boston** 111:17 | 35:18,20 40:1 | 66:19 69:8 |
| **big** 43:21 45:23 | 111:21,22,24 | 41:3,20 42:18 | 70:11 74:22 |
| 96:11 109:11 | 220:25 221:1 | 42:21 43:1 | 77:11 79:14 |
| 132:25 | **bottom** 11:12 | 44:17 45:1,5 | 83:18 86:10 |
| **bill** 62:11 | 73:15 121:23 | 50:18 70:6 | 90:10 92:10 |
| **billing** 150:25 | 122:4 151:17 | 77:7,18 78:2 | 97:12 109:3,24 |
| 151:1 170:12 | 157:15 162:22 | 78:21,24 79:1 | 121:22 123:11 |
| 170:13,16,17 | 166:6 181:18 | 79:4,7,10 80:1 | 137:25 141:16 |
| 171:4,6,15 | 202:20 | 82:5 83:6 | 144:23 153:19 |
| 207:11 208:4,5 | **box** 182:3 | 84:12 88:15 | 157:14 159:13 |
| **bills** 66:9 | **bradford** 3:5 | 89:20,25 90:4 | 164:24 174:22 |
| **birds** 211:7 | 115:3,6 116:3 | 90:8 92:5 | 185:12 189:16 |
| **bit** 8:20 13:20 | **break** 8:6,6,7 | 107:18 113:25 | 195:2 202:6 |
| 69:6,13 78:11 | 34:1,24 37:20 | 115:1,9,13,22 | 204:12 206:17 |
| 109:4 116:13 | 39:19,21 92:3 | 115:25 120:2 | 212:5 214:24 |
| 134:23 157:13 | 92:11 115:8 | 133:8 134:12 | 215:18 221:4 |
| 174:4 203:10 | 123:8 129:13 | 135:5 184:7 | 222:17 226:4 |
| 203:11 | 144:24 202:3 | 193:3 198:2,16 | **brought** 103:3 |
| **blew** 92:3 | **breakdown** | 202:4 224:17 | 190:1 |
| **bls** 138:7 215:3 | 65:8,16 | 224:22 225:13 | **budget** 101:21 |
| 215:13,15 | **breaking** 27:20 | 225:21 | **bullet** 56:1 |
| 216:20 217:10 | **brenda** 3:4 6:4 | **broader** 19:3 | 109:23 111:20 |
| 217:14,23 | 7:4 | **broadly** 43:8 | 112:16 179:3 |
| 218:3,7,18,20 | | | 179:14,15 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 67 of 123

[bullet - cases]

203:9
**bunch** 139:10
**bureau** 138:7,8
138:10 214:20
216:9
**busy** 65:5,20

**c**

**c** 2:14 6:1 226:1
226:1
**calculated**
208:25
**calculation**
60:9 112:8
207:3 216:4
**calculations**
60:22 158:11
205:2,13
207:13,22
208:8 209:5
212:15 213:9
213:24,25
215:12 217:12
217:15 218:4
218:11 219:5
**call** 36:9 78:5
84:23 98:17
105:13 168:18
168:22 171:15
210:15 223:24
**called** 171:1
172:9 199:2
200:12 210:17
215:15
**calling** 173:11
200:11

**calls** 15:15
**capable** 27:11
**capacities**
137:3
**capacity** 7:9
9:11 10:21
16:20 17:3
24:19,22 39:5
40:13,23 51:17
52:11 53:2,11
59:6,7 61:18
69:17,17 76:3
76:23 77:5,16
79:23 80:18
85:14,21 86:18
88:11 91:11,14
92:16,19,21,23
93:2,15,25
94:3 98:6
101:19 107:16
121:12 130:10
130:11 131:10
131:15,23
132:14 134:10
186:18,21
188:25 195:4
195:13,18
196:9,14 197:9
198:10 201:19
203:6 204:9,21
205:3 215:13
**capital** 70:1
**capristo** 3:15
**caption** 226:5

**cardiac** 187:9,9
**cardiologist**
64:18 93:2
143:16,17
144:1,2
**cardiology**
114:12 119:13
120:20 155:15
160:15 209:13
210:5 221:7
**care** 73:2 88:2
177:25 192:1
**career** 83:22
136:18,24
137:8,15 138:2
186:21
**careers** 218:23
219:20
**carnes** 172:5
**carriers** 14:11
**carry** 13:2
19:19
**case** 1:7 4:16
7:5,21 9:16,19
9:20,23 10:1,2
10:3,3 11:6
12:5 13:17,21
14:13,24 16:10
17:5,12 19:6
21:23,24 22:3
22:18,25 23:6
25:7 34:13,16
36:24 39:16
43:14 51:23
52:17,21 54:25

54:25 55:3,3
55:20,20,24
56:8,10,16,18
56:19,23,25,25
57:1,3,8,9,12
57:17,21 58:6
58:8,10,20,25
59:4,16 60:10
61:2,8,13,15,20
62:21 64:1
66:13 68:8
69:16,20 71:17
72:17 74:2
76:25 77:3,11
78:18 80:8,19
80:21 81:2,21
85:15 88:9,13
91:7 92:14,17
92:22 98:4,6,8
98:11,25
103:16,20
108:8 113:18
123:13,14
125:3,11
128:15 139:3
140:5 152:21
159:13 160:8
166:4 170:10
178:11 193:21
205:25 219:15
223:11
**caseload** 18:23
**cases** 10:1,13
10:16 18:1
28:4 54:2 55:9

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 68 of 123

[cases - clarify]

57:20 61:5,11
65:10,11 93:20
98:14 103:5,12
131:6
**cashier** 97:3
**cassandra** 3:13
**categories**
142:14
**category**
142:17,21
183:24
**cause** 197:14
198:11 223:6
**caused** 49:6
**centered** 64:18
**certain** 12:15
34:25 68:1
70:25 85:10,11
102:13 118:3
174:1 190:22
200:19 205:23
**certainly** 43:22
80:5 85:2
184:13 199:1,5
200:8 204:7
**certainty**
135:20 154:13
222:6
**certification**
13:22 14:6
19:10,19 20:1
21:3 28:19
**certifications**
27:2,16 31:21
63:7

**certified** 2:4
11:15,22,25
12:12,18,19
13:9,24 14:4
19:12,15,18,22
21:8 28:16
67:9 86:24
**certify** 226:4
**cetera** 91:19
205:10 210:1
**ceu** 88:25
**ceus** 21:1 29:1
46:18
**challenged**
38:21
**challenging**
97:1
**chance** 129:17
197:20
**change** 40:4
49:16 158:14
169:25 170:2
173:1,4 219:5
219:17,21
221:13,17
**changed** 39:8
39:19 68:4
112:7 181:6
220:2
**changing**
180:20
**characterizati...**
89:22 133:8
**characterize**
179:24,25

197:25
**characterizing**
106:3
**charles** 1:10
**chart** 4:11
85:16 86:7
138:20 215:1
**charted** 150:22
**charts** 142:9
**chastised**
203:20
**chat** 102:22
**chatter** 105:22
**check** 114:5
182:3
**checking** 73:10
200:10
**chicago** 4:14
**chief** 135:3,22
137:9 138:3
169:9 208:16
208:21 209:10
209:10,12
211:1,9,20,23
211:24 212:3,7
213:1,8,15,16
213:21 214:3
214:13 217:18
224:25 225:4
**chiefs** 209:25
210:8 212:20
**children** 65:6
**chilly** 123:5
**choice** 186:7,14
186:16

**choose** 95:17
**chooses** 96:1
**chosen** 15:19
85:12
**cigarroa** 1:11
7:5
**circumstances**
28:14 200:6,15
222:25 223:8
**cite** 89:7
**citrus** 114:12
114:15 115:24
116:7,14 117:4
119:13,16,21
120:19 121:15
162:4,8 167:1
221:7,12
222:23
**city** 10:16
55:11
**civil** 2:2 10:3
18:4,12,13,20
54:2,3 55:3,3,9
55:20 56:8
57:2 65:10
**claim** 44:24
46:1,4,8
**claims** 10:3
43:14 44:7
**clarification**
24:22 141:21
159:14 168:4
169:1,10
**clarify** 41:10
94:5,6,19

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 69 of 123

[clarify - conclude]

133:3 139:11
140:6 141:22
**clarifying**
133:20 134:5
137:6
**clarity** 162:7
164:10 171:23
172:9,12
173:12,24
192:1 213:9
**class** 4:15
46:19,19,23
47:4 97:17
122:6,7 211:18
**classes** 31:21
101:12
**clear** 78:13
79:18 86:5
111:7 113:9
133:5,24
137:25 150:5,7
154:20 169:10
173:18 178:14
**clearly** 74:5,10
177:25 203:12
203:21
**clicked** 153:23
**client** 38:22
**clinical** 5:10,15
12:10 75:7
76:12 83:24
117:14 177:24
185:18 192:2
**close** 18:1
182:4,4

**closed** 162:23
**coach** 190:7
**code** 64:17
**colleague** 188:2
**colleagues** 21:7
89:6 181:24
185:3 192:24
**collecting**
69:11 81:5
82:12
**come** 50:7 64:7
69:16 95:17
97:8,10 123:17
137:4 138:25
138:25 151:6
164:1 225:19
**comes** 8:1
12:22 104:25
**comfortable**
203:13
**comfortably**
52:5
**coming** 62:11
178:15
**comma** 189:24
**commencing**
2:6
**comment**
135:24
**commenting**
131:1
**communicates**
191:19
**communication**
104:7 183:21

191:16,17,18
191:24 192:4
193:1 199:4
**communicati...**
34:25 35:2,2
103:14,18
189:23 190:19
**community**
138:10,11
203:1 204:18
**comp** 4:17,19
4:21,24 5:1,3
14:1 16:5 28:8
67:6 102:3
148:3
**company**
117:16
**compare** 94:23
193:18
**compared**
93:14 147:18
161:1,19
**compensated**
218:23 219:19
**compensation**
5:6,8,12 61:6
97:22 99:17
101:4 102:9,11
102:13,14,25
103:22 104:3
104:14 106:12
107:22 108:2
108:15,24
109:16,22
110:8 111:12

111:23 112:12
119:6,21
120:21 121:15
121:16 126:3
138:6 142:9,14
144:10 218:16
219:4 220:20
221:14
**complaint**
25:15 41:14
**complaints**
24:17 25:1
190:3
**complete** 23:1
63:7 86:2
218:10
**complies** 54:8
**components**
88:7 93:18
95:1
**comprise**
171:16
**comprising**
106:7
**concerned**
93:17 203:19
203:20
**concerning**
48:25 177:22
**concerns** 49:25
204:7
**conclude** 44:14
121:11 138:2
212:8

Page 12

[concluded - contract]

concluded
  38:17
conclusion
  26:10,23 42:16
  73:16 132:15
conclusions
  74:4 112:14
  119:18 152:15
  153:3 160:1
  171:18 205:7
condensed
  48:20
condescending
  178:5 182:20
conducive
  192:14
conduct   15:15
  17:11 27:5,13
  28:23 29:17
  30:2,9 76:2
  77:15 92:16,19
conducted   17:9
  71:21 72:2
  100:13
conducting
  76:22 77:4
  117:3 119:17
conference
  46:14,24
conferences
  38:6
confidence
  178:2
confident   33:21

confirm   32:14
  51:14 53:1
  79:19
confirmation
  155:21 223:16
confirmed
  104:4 105:5
  109:6
confirming
  162:1,2
confrontational
  179:21
confused   173:9
  204:10
confusing
  202:11 203:10
  203:11
connected
  204:3
conscious
  180:8,12
consider   15:1
  120:4 121:7
  124:18,23
  142:4 182:17
  182:24 194:8
  195:14 197:10
considered
  34:18 35:4,25
  36:13 104:1
  121:3,4 195:15
  201:7
considering
  183:4,8

consistent
  198:14 215:19
consistently
  179:8
consists   15:21
constant   18:15
constitutes
  220:12 226:12
consult   39:20
  61:5,7 90:13
  108:13 172:1
consultant   76:9
consultant's
  75:6,9 76:12
  76:16 78:19
  79:24 82:4
  83:5,23 88:21
  89:12 90:10,11
  90:21,22 91:5
  91:6
consulted
  26:21 61:10
  98:1
consulting
  146:22
contact   24:8
  95:10 200:22
contacted
  17:14 222:23
contacting
  95:16
contacts   171:7
  171:7 180:13
contain   54:2
  85:18

contained
  85:11 104:11
  111:15 147:4
contains   54:13
  82:20
contemptuous
  192:13
context   72:16
  98:10 142:11
  171:25
contexts   16:16
continue
  138:16 169:6
  174:23 180:22
continued   3:1
  5:12 50:8
  132:7 190:3
continues
  157:15
continuing
  21:1 27:17
  45:5 46:14,23
  47:8 88:25
  89:20 90:1
  97:16 162:19
  185:25
contract   49:9
  49:13,13 60:1
  114:18,22
  115:4,9,15,17
  116:11,14,25
  117:5,6 119:11
  119:11,16
  120:5 162:10
  196:6,18 197:1

Page 13

[contract - course]

202:1 221:12
221:23 224:5
**contracts** 95:24
115:3
**contractual**
115:23
**control** 203:15
**conversation**
23:21,23 24:2
24:10 35:11
36:8 116:23
117:10 134:20
136:16 147:10
166:8,15
168:25 169:24
172:8 173:23
223:25
**conversations**
35:23 37:8,16
41:14 42:2
124:10 130:18
136:4,17
164:16 165:1
167:6,15 168:1
168:2 169:12
170:4,8 171:21
171:24 174:16
188:12
**converse** 156:5
**copied** 145:5
**copies** 145:6,6
145:19 146:14
147:19
**copy** 114:18
140:15 145:4

169:15
**core** 72:25
**corner** 162:22
**corners** 218:8
**corporation**
1:10
**correct** 7:10
8:2 11:17,20
11:23 12:1
19:13,24 22:19
23:6 25:2,20
26:4 29:13
31:15 33:24
34:9 38:3,7,8,9
38:13 40:18
43:11 48:16
51:17 53:6,10
53:22 54:15
55:11 56:21,23
64:12 71:19
76:3,20 77:6
77:11,17 79:21
80:8 81:7 85:3
91:7 92:24
93:3 99:5,9,13
110:2,14
114:13 115:22
119:14 121:12
121:17 123:15
126:18,22
128:10 132:10
134:21 136:5
141:10 145:11
146:24 148:1,5
148:11 150:14

163:3 164:14
165:4,12 166:9
177:11 184:16
184:23 185:18
186:12 189:1,5
191:17 193:2
193:14 194:18
194:22,25
195:25 196:6
199:18 200:1
201:13,20
202:1 203:7,25
204:9,21 205:4
211:1 220:7
221:6 223:17
225:10
**correcting** 6:23
**correctly** 24:24
69:24 71:5
78:12 183:14
183:15,21
214:5 217:1
**correlate** 65:15
219:4
**cost** 106:21
**cotter** 107:9
154:24 155:24
157:3 160:14
**counsel** 2:22
3:8,11,13 7:18
23:24 24:2,9
24:12 34:9
35:23 36:11
37:8 39:20,21
129:3 141:3

144:7,15 152:2
168:10,12
170:18 171:7
224:14 226:8
**counsel's** 30:14
83:20 119:10
**counseling**
12:14 130:5
**counselor**
11:15 12:20
13:6,23,25
14:5,5 17:5,23
28:16,19,20
102:2 212:19
**counselors**
103:9 217:2
218:1
**count** 55:8
184:3,3 197:22
**counterprodu...**
178:20
**couple** 32:7
37:25 59:11
64:13 68:7
70:25 87:12
97:25 114:19
117:15 124:10
129:1 155:3
163:8,22,22
170:6 176:5
182:4 198:11
202:21 210:8
**course** 31:25
46:15 48:6,13
97:16 117:2

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 72 of 123

[course - deficient]

| | | d | |
|---|---|---|---|

123:25 124:5
124:14 189:3
189:15 191:4
194:17 199:19
**court**   1:1 7:19
8:15 57:5
58:25 70:11
202:14,15
223:11
**cousin**   6:25
**cover**   48:4
95:14 109:9,9
221:6
**covering**   14:15
**covers**   221:4
**crap**   140:17
**create**   77:3
**created**   76:21
77:13 78:19
82:3 83:4
84:11 130:13
130:14 199:8
**creating**   100:16
130:2
**credential**   12:9
12:10,11,13,17
13:10 20:18
22:23
**credentialed**
12:16
**credentials**
11:9,13 12:3,7
22:23 27:10,23
30:16

**credibility**
124:18,18
**credits**   21:2
27:17
**critical**   179:21
**cross**   58:5
**crosses**   13:4
**cruising**   161:4
**crunch**   207:22
**csr**   2:5 226:3
226:24
**curious**   168:13
184:2
**current**   18:3,23
63:7,8 64:20
87:3 91:17
114:12,15
115:20,21
116:25 162:7
166:25 192:18
**currently**   16:23
17:20 21:19
47:22 63:8
65:21 87:13
100:22,24
155:15 225:4
**curriculum**
100:18 101:12
**cv**   1:7 10:15
54:13,17,17
62:24 63:10
64:19 100:25
101:2

**d**   6:1
**d&r**   56:12
**dad**   163:25
**daily**   87:7
**dangerous**
203:22
**dano**   3:15
**data**   34:15,15
34:18 35:3,11
35:24 36:12
37:6 64:11
69:12 81:5
82:12,24
107:22 108:5
138:7,8 151:16
151:16 154:23
155:24 156:14
158:1 159:16
160:14 162:18
162:21 171:17
187:24 200:3
214:25 216:16
217:10,14
218:8,18,21
219:6,22,23
220:11,19
**date**   6:7 54:17
54:19 62:7,17
140:15 163:7
164:21,25
181:21 213:16
**dated**   140:8
163:8

**dates**   140:11
164:2,14
**day**   107:14,14
150:23 213:15
226:19
**days**   163:8,22
**decide**   156:20
158:25
**decision**   30:8
73:16 156:17
180:8,12
189:21 206:5
216:3,24,24
**decisions**   159:1
**declined**   190:8
**defend**   49:6
**defendant**   3:8
9:18 141:1
**defendant's**
173:3 225:15
**defendants**
1:13,17
**defense**   55:21
56:15 141:3
165:2,8
**defensive**   178:3
178:6,13
182:21
**defer**   33:18
**defibrillate**
143:9,11
**defibrillators**
143:9
**deficient**   190:5

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 73 of 123

[define - different]

**define**  25:13
33:7 45:9,10
45:18 63:14
162:10
**defined**  81:16
**definition**
217:20
**definitive**
132:19,22
133:5,24
**degree**  5:10
14:8 178:14
**demeaning**
178:5 182:19
182:20
**department**
64:9,9 209:13
210:25 211:20
216:11
**departments**
5:11
**depending**
69:20 97:1
118:2 196:15
196:21,21
198:22
**depends**  18:22
69:22 95:25
118:5,5 194:11
195:22
**deposition**  1:16
2:2 6:3,5 7:8
7:14 9:10,15
10:19,21 11:5
56:20 74:23

112:19 145:2
185:21,24
186:10 202:12
202:12,15,16
225:14,25
226:16
**depositions**
29:21
**depth**  203:13
**derive**  65:16
84:8
**derived**  4:8
70:15 81:12
84:15 90:24
**derives**  83:2
**describe**  13:14
13:16,17 16:7
25:4 69:12
90:9,20 93:13
104:5 108:14
**described**  19:7
48:2,13 71:21
99:23 132:11
185:4
**describing**  96:7
107:7
**description**  4:2
**descriptions**
15:16 143:3
**designated**
9:12 10:20
14:2 21:25
167:7,16
**designation**
13:18 28:17

**desire**  185:16
**detail**  33:17
67:25 165:18
**details**  50:13
**determination**
38:24 51:17
156:23 214:17
**determinations**
158:3
**determine**
14:17 16:24
26:17 39:12
52:3 53:14
91:17 102:13
124:20 138:17
138:18,18
156:10 215:6
**determined**
190:9 213:15
**determining**
27:3 29:3
156:14 158:1
**develop**  24:18
24:21 35:12
101:10,11
137:3
**developed**
101:3 122:5
**developer**  14:2
14:3
**developing**
13:8 14:25
15:20 95:13,14
**development**
12:23 93:21

**developments**
93:25
**diagnoses**
143:14
**diagnosis**
132:25
**dictionary**  64:2
**differ**  106:15
**difference**
107:3,8 130:25
131:9 142:6
161:21,25
222:2
**differences**
96:22 97:3,5,7
107:10 108:14
108:18,21
142:13
**different**  7:22
15:12 17:15
52:20 62:18
65:7 69:20
73:24 95:18
96:11,13,20
118:4 130:4
131:18 146:15
146:20 147:2
147:24 149:17
149:20,25
153:11,13,15
169:20 182:2,9
192:22,24
193:17 197:2
219:10

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 74 of 123

**[differentiate - documents]**

| | | | |
|---|---|---|---|
| **differentiate** 40:14 176:16 176:21 | **disclosed** 7:9 41:8 167:7,19 | **discussing** 59:17 69:18 86:4 135:14 | 79:5 82:22 103:25 150:24 192:9 211:25 |
| **differentiates** 62:18 | **discord** 18:4 **discounted** 183:9 | **discussion** 5:19 135:1 185:20 | 225:10 **documentation** 109:6 111:15 |
| **differently** 24:5 145:5 | **discriminated** 33:24 38:12,17 | 191:1,9 192:7 197:15,20 200:16,17 | 151:1 152:16 202:9 215:14 |
| **differs** 143:15 **difficult** 8:24 | 39:13 41:17,24 43:25 53:21 | **discussions** 42:13 49:2 | 216:19 217:3 **documented** |
| 59:23 121:20 178:23 189:20 | **discrimination** 10:4,12 25:8 | 170:17 **disease** 143:18 | 5:19 108:19 124:11 136:3 |
| 197:17 **digest** 116:9 | 25:11,13 26:3 27:25 28:11 | **dismissive** 191:19 | 190:25 191:9 192:7 201:8,10 |
| **diplomat** 12:16 13:13 19:12 | 32:16 37:22 38:25 39:11,25 | **displayed** 29:5 **disrespectful** | 212:19 **documents** |
| 20:15,16 **direct** 63:11 | 40:8 41:2 42:3 43:8,14,18 | 191:20 **dissatisfaction** | 26:14 30:21,22 30:24,25 31:4 |
| 175:1,3 202:22 **directed** 153:25 | 44:2,8,15,24 46:4,8,15,25 | 167:2 **dissolution** | 36:2,4,6 38:23 41:8 42:1,11 |
| **directly** 65:15 90:3,6 158:23 | 48:5 52:7,8,19 52:23 56:11,12 | 18:8 **distinct** 71:1,6 | 44:4 63:9 68:10,18 69:3 |
| 168:13 219:13 219:25 222:23 | 59:19 187:18 187:22 | **distinction** 100:6 | 69:15 80:20 81:11 82:21 |
| **director** 59:22 187:8 220:15 | **discriminatory** 27:5 28:22 | **district** 1:1,2 **division** 1:3 | 109:7 111:7,15 112:2 113:1 |
| **directors** 100:17 | 29:17 30:2,9 **discuss** 24:16 | 209:10,12 211:1 225:4 | 114:11 122:5 122:19 129:4 |
| **disability** 14:12 28:5,8 43:10 | 33:1 39:3 **discussed** 16:21 | **divorce** 54:25 61:13,15 | 139:11,14 140:22 145:3 |
| 43:11 69:21 **disabled** 16:7 | 22:24 32:19 34:12,13,16 | **docs** 92:1 99:20 **doctors** 15:17 | 151:24 153:9 158:17,18,24 |
| **discern** 205:15 **discharge** 10:4 | 59:16 91:22,23 123:1 171:22 | 16:8 193:18,21 **document** 31:7 | 175:7 176:2,10 194:17 209:19 |
| **disciplined** 192:4 | 185:15 198:23 | 70:19 75:24 | 222:9 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 75 of 123

**[doing - earn]**

| | | | |
|---|---|---|---|
| **doing**   12:20 | 59:15 61:3 | 153:1,12,13,25 | 202:25 203:6 |
| 17:24 38:5 | 71:25 74:1 | 154:19,21 | 203:20 204:2,6 |
| 45:17 49:19 | 77:6,15,16 | 155:22,23 | 204:19 205:4 |
| 60:9 67:4,10 | 79:22 85:13,15 | 156:6,16 157:8 | 209:1,9,24 |
| 72:16 81:10 | 86:17,22 91:11 | 158:5 159:2,22 | 210:21,25 |
| 87:2 88:4 | 91:21 92:22 | 160:10,22,22 | 211:18,24 |
| 91:25 132:6,7 | 98:4,24,25 | 161:7,18 162:2 | 212:7 214:1 |
| 144:4 156:13 | 103:16,20 | 162:14,19 | 217:16 221:7 |
| 178:9 200:9 | 107:15 110:3,7 | 163:3 164:10 | 222:25 223:19 |
| **donaldson** | 110:14,23 | 165:2,23 166:9 | **draft**   160:19 |
| 65:22 | 111:8,14 112:8 | 166:19 167:22 | 168:6,8,16 |
| **double**   105:12 | 112:19 114:11 | 168:5 169:6 | **drawn**   73:17 |
| 105:13,15 | 116:6,19,21,23 | 172:5,5 175:3 | 83:21 |
| **doubt**   219:12 | 117:12 119:13 | 175:17 176:1 | **dripping** |
| **download** | 120:18 121:1 | 176:11 177:8 | 170:20 |
| 111:3 | 122:6,15 124:5 | 177:16,21 | **dt**   21:10 22:11 |
| **dr**   1:5,10,11 7:5 | 124:8,17,25 | 178:25 179:16 | 104:15,19 |
| 7:10 17:9,12 | 126:5 127:7,9 | 179:19,25 | 165:4,12,19 |
| 23:5,13,17 | 127:12,16,21 | 180:9,24 | 220:7 |
| 24:9,11,17 | 128:8,16,22 | 181:11,21,22 | **duces**   171:1 |
| 25:1 26:17,24 | 129:18 130:10 | 182:7,19,25 | **duly**   6:12 226:6 |
| 27:13,25 28:10 | 130:18 131:19 | 183:11 184:6 | **e** |
| 29:8 30:1,18 | 133:6,25 134:7 | 184:16 185:15 | **e**   6:1,1 81:15 |
| 32:15,22 33:6 | 134:21 135:14 | 188:1,11,15,17 | 226:1,1 |
| 33:12,23 34:7 | 136:3,15,25 | 188:25 190:20 | **earlier**   22:16 |
| 34:17 35:23 | 137:9,12,16 | 190:25 191:9 | 34:6 45:8 |
| 36:11,21 37:17 | 139:5,15 | 191:16 193:1 | 46:10 57:10,16 |
| 37:22 38:17,20 | 141:13,16,19 | 193:17,25 | 57:22,25 63:4 |
| 39:3,10,25 | 142:25 143:20 | 194:5,15 | 65:8,21 92:12 |
| 40:9 41:2,10 | 144:6,14 | 195:10,17,21 | 139:9,13 |
| 41:15,17,24 | 145:11 146:23 | 196:8,13 | 141:24 150:11 |
| 42:2,14,17,22 | 147:5,8,25 | 197:15 199:1,3 | **early**   176:15 |
| 43:17 44:15 | 148:8,14,21 | 199:9,17 200:6 | 181:15 191:12 |
| 48:16,21 51:4 | 149:13,23 | 200:13,22 | **earn**   53:15 |
| 52:4 53:20 | 150:8 152:6,23 | 201:1,4,6,18,22 | 91:18 121:15 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 76 of 123

[earn - employer]

| | | | |
|---|---|---|---|
| 212:9 216:12 | **easy** 169:3 | **electro** 143:6 | **emotions** |
| **earning** 16:20 | **economic** 205:7 | **electronic** | 125:17 130:5,6 |
| 17:2 24:19,21 | **economist** | 143:7 | **emphasis** 82:25 |
| 39:5 40:12 | 155:8 169:3,14 | **electrophysio...** | **empirical** 84:10 |
| 41:7 51:17 | 209:6 | 93:3 143:1,21 | **empirically** 4:8 |
| 53:2,11 59:7 | **educated** 46:25 | 161:1,19 203:1 | 70:15 |
| 61:17,18 69:17 | **education** 13:7 | 219:2 | **employ** 16:9 |
| 69:17 76:2,23 | 14:16 21:1 | **electrophysio...** | 19:4,5 69:7 |
| 77:5,16 79:23 | 27:17 46:14,23 | 219:19 | 79:16 |
| 80:18,23 85:13 | 47:9 85:20 | **electrophysio...** | **employability** |
| 86:18 87:5 | 86:25 88:25 | 187:9 | 26:11,18,25 |
| 88:11 91:11,14 | 91:16 97:16 | **elements** 43:6 | 29:19 59:8 |
| 92:16,19,21,23 | 101:17 122:3 | 44:14,23 45:4 | 82:25 83:11,14 |
| 93:2,15 94:2 | 159:2 192:3 | 45:25 46:3,7 | 88:5 98:6 |
| 98:6 101:18 | 215:9 | **eligibility** 14:14 | 130:11 133:7 |
| 107:15,23 | **educational** | 15:5 | 134:10 188:25 |
| 121:12 130:11 | 179:1 | **eligible** 14:21 | 194:3 195:13 |
| 131:10,15,23 | **eeoc** 58:9,10,17 | **ellis** 2:13,14 4:3 | 195:18 196:9 |
| 132:14 134:10 | **efficiency** | 5:20 6:6 31:9 | 196:14 197:23 |
| 137:3 172:24 | 123:18 | 70:9 115:2,4 | 198:9 201:19 |
| 186:18,20 | **efforts** 178:12 | **email** 105:1 | 203:6 204:21 |
| 195:4,13,18 | 210:14 | 115:16 139:16 | **employable** |
| 196:9,14 197:9 | **eight** 172:23 | 140:7,8 144:25 | 16:17 |
| 198:9 201:19 | 177:21 205:17 | 147:20 | **employed** |
| 203:6 204:9,21 | **either** 36:9 | **emails** 114:19 | 26:16,23 |
| 205:3 215:13 | 55:10 57:1 | 115:3,5,16 | **employee** 27:12 |
| 218:10 | 85:6 117:10 | 116:10 | 27:24 28:10 |
| **earnings** 59:6 | 127:9 128:6 | **emily** 3:11 | 29:9 30:18 |
| 60:8,22 61:22 | 136:16 150:8 | **emotional** | 32:6 45:22 |
| 93:25 112:9 | 157:7 158:15 | 130:10 132:12 | 65:22 |
| 121:1 156:13 | 181:25 207:7 | 133:19,25 | **employees** 32:5 |
| 188:25 209:1 | **electric** 143:5,6 | 134:7 | **employer** 14:13 |
| 212:6 | 143:6 | **emotionally** | 29:5 32:4 |
| **ease** 123:18 | **electrical** 143:7 | 132:7 | 187:17,22 |
| 169:14 | 143:13 | | 194:11 197:5 |

Exhibit 6
Page 77 of 123

[employer - exactly]

| | | | |
|---|---|---|---|
| 200:4,12,14,23 | endocrinolog... | errors 95:14 | 108:6 |
| 200:25,25 | 98:19 99:5 | especially | evaluating |
| 204:10,13,14 | endro 98:14,17 | 12:22 16:21 | 12:23 60:8 |
| 204:17 | 98:18 | 64:4 178:15 | 69:13 79:22 |
| employers | endros 98:17 | 192:2 200:21 | 80:23 85:12 |
| 14:12 28:4,7 | ends 73:4 | essentially | 107:15 131:23 |
| 28:15 195:22 | engaged 163:14 | 25:24 48:22 | 137:15 188:24 |
| 199:2 200:10 | 170:5 | 49:11 85:22 | 195:25 197:8 |
| 201:3 204:2 | engagement | 88:4 125:18 | evaluation 5:13 |
| employment | 167:5 | 135:25 143:5 | 15:3 91:18 |
| 4:12 9:23,25 | entails 93:17 | 173:17 208:18 | 131:15 177:8 |
| 10:2,4,18 16:2 | entire 41:9 | 220:16 | 212:6 |
| 25:2 27:19 | 87:19,20 171:2 | establish 41:12 | evaluations |
| 29:2,23 53:21 | 225:9 | 100:18 | 175:11,17 |
| 56:10,12,23 | entirety 224:13 | established | 181:7 |
| 57:2,9 64:8 | entitled 35:7 | 199:16 | evaluator 12:1 |
| 96:1 112:22 | 70:13 | esteem 128:18 | 12:18 22:18 |
| 114:12,18 | entry 225:10 | estimate 17:21 | 23:4 28:16 |
| 116:6 120:19 | environment | 18:24 62:6 | evaluee 84:22 |
| 124:19 132:4 | 178:20 192:15 | 67:1 | 84:23 |
| 162:10 175:12 | envision 200:8 | estimated 65:8 | evening 155:7 |
| 176:11 183:11 | ep 31:6 64:3 | et 91:19 205:10 | 160:19 |
| 187:5,7,13 | 111:2 142:17 | 210:1 | everybody 7:20 |
| 189:21 190:11 | 144:4 160:15 | ethically 38:21 | 36:4 |
| 191:10 192:23 | 164:11 178:25 | eval 92:21 | everyone's |
| 193:25 194:4,6 | 179:12 219:25 | 183:3 | 15:23 |
| 194:9 195:3,23 | 220:1 | evals 183:24 | evidence 42:1 |
| 197:9 199:24 | episodes 178:7 | evaluate 14:13 | 44:18 82:6 |
| 204:8 215:12 | 182:22 | 15:14,14 25:9 | 83:7 184:8 |
| 216:10 | eps 64:12 87:25 | 46:25 77:14 | 199:7 201:8 |
| enable 190:6 | 142:21 210:8 | 80:17 99:1 | exact 90:18 |
| encompass | 211:3,19 | 101:13 108:4 | exactly 96:18 |
| 48:3 | equivalent 5:10 | 124:17 193:24 | 96:25 126:17 |
| ended 82:8 | error 74:5,16 | evaluated 81:6 | 135:21 160:25 |
| 125:14 | | 82:13 91:23 | 161:18 163:11 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 78 of 123

[exactly - expert]

| | | | |
|---|---|---|---|
| 165:25 | 180:19 181:4 | 191:6,8 202:7 | 30:1,19 39:25 |
| **exacts**  116:13 | 181:23 182:7 | 202:14,15,16 | 41:2 |
| **examination** | 182:24 | 209:24 210:20 | **experiences** |
| 6:14 224:21 | **exhaustive** | 210:23 211:25 | 13:7 26:7,17 |
| 226:8,13 | 63:12 64:20 | 221:22 222:14 | 26:24 49:20 |
| **examined**  6:12 | **exhibit**  4:1,3,5 | 222:16 224:23 | 92:1 197:7 |
| 226:7 | 4:11,12,14,16 | 225:24 | **experiencing** |
| **example**  34:17 | 4:17,19,21,23 | **exhibiting** | 52:6 |
| 47:9 65:10 | 5:1,3,5,7,13,16 | 177:22 | **expert**  7:9 9:12 |
| 106:15 112:23 | 5:19,20,22 | **exhibits**  28:3 | 10:20,20 11:20 |
| 173:2 | 11:3,5 29:20 | 144:22 145:2 | 11:22 12:12 |
| **examples**  175:7 | 51:13 66:21 | 145:17 | 13:6,10,13,17 |
| **excel**  144:9 | 67:16 70:5,7 | **expand**  93:23 | 13:19 19:4,6 |
| 149:14 207:23 | 70:10,12 74:23 | **expect**  153:11 | 19:11,12,16,20 |
| **excellence** | 77:14 86:7,13 | 153:12 | 19:23 20:2,17 |
| 191:25 | 87:16 113:17 | **expectation** | 21:25 22:25 |
| **excellent** | 120:9,10,17,20 | 169:6 | 23:15 27:3,11 |
| 181:22,23 | 120:23 121:16 | **expected** | 27:24 28:9,21 |
| **except**  23:3 | 122:23,24,25 | 216:12 | 30:17 32:21 |
| 207:4 | 123:10,13 | **experience** | 33:23 35:4 |
| **exceptional** | 125:21 130:20 | 20:19 29:9,12 | 37:21 38:2,16 |
| 175:21,23 | 139:1,6,6,13 | 32:15 51:5,20 | 38:21 40:17,18 |
| **excerpts**  152:9 | 145:1,10,17 | 52:13 95:23 | 42:17 43:10 |
| **exchanged** | 146:5,6,8,10,11 | 97:8 129:21 | 50:15 51:19 |
| 171:25 | 146:17,23 | 130:19 131:4 | 52:11,18 53:1 |
| **excuse**  11:9 | 147:5,9 148:1 | 131:13,20,21 | 53:9,12 57:1 |
| 30:23 51:4 | 149:24 150:9 | 131:24 133:6 | 58:21 67:3,4,7 |
| 84:6 92:13 | 151:7,14,15 | 134:8 136:5 | 68:19 69:1,8 |
| 151:5 165:7 | 152:14,16 | 159:2 168:5 | 74:17 85:1 |
| 198:24 202:15 | 158:18 161:11 | 204:6 214:12 | 114:9 117:6 |
| 206:24 211:1 | 165:15 170:14 | 215:9 218:13 | 125:9 130:9 |
| **executive** | 175:1 177:6,7 | 218:15 219:3 | 165:2,8 167:20 |
| 211:15 | 177:14 180:24 | **experienced** | 193:13 194:1 |
| **exemplary** | 184:4 185:6 | 25:10 26:3 | 195:16,25 |
| 175:7,18 180:1 | 189:11,12,15 | 27:4,13,25 | 212:1 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 79 of 123

[expertise - figures]

**expertise**  12:22
    22:17 65:4
    75:5
**experts**  20:10
    22:13,14 28:20
    167:6,16 173:3
    218:1
**explain**  13:23
    41:1,16 42:9
    43:6 44:14,16
    44:23 45:3
    115:20 135:9
    186:20
**explained**
    218:4
**explanation**
    45:23 86:12
    216:1
**expressed**  35:5
    85:16
**extended**  50:4
**extension**
    115:15
**extent**  60:7
    139:11 160:4
    169:12
**extra**  68:21
**extremely**
    178:2 189:25

**f**

**f**  226:1
**facilities**  221:2
**fact**  29:18
    44:17 53:9
    77:2 82:5 83:6

104:19 131:25
    132:1,13
    142:13 145:10
    148:7 156:15
    167:2 182:11
    182:13 184:7
    184:18,22
    186:9 188:22
    195:10 196:12
    197:6 200:17
    218:25
**factor**  125:8
    156:16 157:10
    186:16 194:5
    195:5 221:11
**factored**
    186:20 195:7
**factors**  14:15
    138:5 194:11
    194:13,13
**facts**  34:12,18
    35:2,11,24
    36:12 37:6
    43:19,23 81:5
    82:12 83:12
    171:16 187:24
    200:3
**factual**  131:24
**faculty**  5:8,13
    151:17 175:11
    175:17 176:4,6
    176:9,18,23,24
    177:8 181:25
    184:14,23
    185:4 189:20

190:2,9 204:4
    204:19
**fair**  22:11
    33:19 35:16
    42:20 43:21
    54:7 60:4
    61:19 78:20
    94:15 95:3
    96:21 107:17
    107:24 120:7
    136:13 198:25
**fairly**  59:23
    77:23 88:6
    93:6 169:10
    176:25 182:12
    190:21
**familiar**  7:17
    21:7 53:24
    54:1 67:19
    70:19 72:9
    73:5 118:7,12
    120:12 145:3,8
    146:11,12
    151:18,19
    191:11 200:10
**family**  223:5
**far**  93:17
    157:25
**fashions**  95:18
**fast**  160:21
    171:9 179:9
**father**  197:18
**federal**  21:24
    54:3

**feedback**
    178:12 179:20
    179:24 180:10
    180:24 182:12
    182:25 183:5,9
    183:10 184:2
    184:15,19
    185:3 190:22
    191:22 192:5
    192:12,17
    193:1,10 194:4
    194:14 203:24
    204:5,19
**feel**  75:21
    178:25 179:22
    210:19
**feelings**  125:17
**feels**  67:8
**fees**  62:6
**fellow**  178:4,10
    185:4 203:16
**fellows**  95:12
    179:9,12
    203:12
**felt**  56:13 59:19
**fib**  143:13
**field**  20:7,19
    52:6 65:4
    103:13 105:7
    211:16
**fifteen**  222:7
**figure**  121:5,21
    206:2
**figures**  155:7
    155:14,16

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 80 of 123

[figures - forensic]

156:9,11 157:4
157:6 158:10
172:14,17
205:25 206:8
**figuring** 215:19
**file** 25:22 30:20
30:21,24 31:3
36:1,4,24,24
41:9 43:19,21
44:4 68:14
81:10 82:21,22
103:24 109:11
110:2 111:16
113:4 120:16
122:5,17,18,19
123:15 124:22
140:10 145:5
151:24 152:2
170:11,12,13
170:16,25
171:2,5,6,15
175:7 177:9
191:5 199:7
201:9,11 207:5
207:8,10,11,13
207:15,17
209:19 224:13
**files** 68:8
113:13 153:18
**final** 72:7 168:8
221:3,5,22
**finalized** 163:9
**finalizing**
163:23

**finally** 73:4
192:17 220:9
**financial** 87:3
91:19
**find** 29:15 72:8
75:22 90:14
104:7 114:17
126:20 131:2,2
140:19 141:14
161:24 206:3
**finding** 162:13
**findings** 108:19
**fine** 8:8 18:24
18:24 27:21
35:21,22 55:5
55:5,6 58:3
74:25 106:10
113:17 134:2
139:10 168:12
170:22 183:8
210:13
**fingers** 151:21
**finish** 8:21,22
22:6 78:22
79:8 90:17
92:7
**fired** 189:4,7
195:17 196:13
**first** 2:8,15,20
11:11,11,12
13:23 16:22
19:15 20:13
21:22 23:17
24:8,23 34:6
43:7 51:15

53:4,6 55:12
55:13 61:8,20
61:20 75:15,16
75:24 81:4,25
92:22 93:1
98:16 107:16
107:21 108:3
116:14 127:20
127:24 144:1
154:18 155:10
155:14 158:7,7
159:15 160:11
162:6 175:2
181:11 185:14
185:14 186:7
186:14,16
187:21 205:8
212:15 214:1
217:15 223:22
226:6
**fit** 131:14,22
**five** 18:16 32:9
32:10 46:22
47:19 50:2
75:11 76:17,21
77:4,13,25
78:19 79:24
80:5,15,25
81:2 84:1 85:5
88:12 89:3,9
89:13,19 92:4
135:12 172:22
172:23,23
174:20 205:17
206:15,17,18

206:20 213:7
213:19 222:7
**fix** 159:8
**flip** 62:3 123:24
125:22 126:19
134:17
**flipping** 157:13
**florida** 167:3
**flow** 4:11 86:7
**fmla** 187:16
**focus** 58:20
**focused** 29:25
30:3 37:4
196:4 203:18
**folder** 144:8
**folks** 22:11
138:11,21
211:8
**follow** 37:23
52:1 75:25
76:5,24 78:7
85:15 91:5
**followed** 71:18
91:9 200:20
**following** 30:13
79:16 83:21
123:12
**follows** 6:13
**footnote** 20:21
70:22
**forbess** 3:13
**foregoing**
226:11
**forensic** 4:9
11:22 12:12

Page 23

[forensic - give]

13:9 17:24
18:3,6,12,20
19:4,10,16,19
19:23 20:2
54:1 65:9,17
65:17 67:11,12
67:14 70:16
73:4,14 103:10
**forget** 65:12
101:24 164:5
171:9
**forgive** 92:11
92:16
**form** 35:1
39:24 66:18
80:6 88:8
89:23 130:9
147:2 158:23
193:3
**formal** 23:9
60:24 92:23
93:19 95:2
99:8,25 108:9
**formally** 23:14
**format** 129:2,9
140:8 146:10
149:25
**formed** 174:11
**formerly** 11:16
**formidable**
124:9
**forming** 34:18
35:4,25 36:13
37:7 63:25
151:4 189:16

**formula** 208:18
**formulated**
173:20
**formulating**
41:7 85:1
**formulation**
72:5,25 73:5
73:14,18
**forth** 28:6
63:19 154:5,10
157:13 160:9
217:23
**forward** 15:6
15:10,20
101:22
**forwarded**
144:11
**found** 109:18
114:16 154:23
155:23 160:12
219:6
**foundation**
41:4,20 78:3
**four** 11:14
118:4 144:3
218:8
**fourth** 11:25
**fox** 9:21 56:18
**frame** 205:24
**frcp** 34:25
**free** 75:21
123:24
**frequently** 49:7
**fresh** 178:16

**friends** 210:7
**front** 51:13
113:23 118:16
173:15
**full** 20:18 175:2
185:14 212:18
221:5 225:18
226:12
**fully** 9:8
**functional**
85:21
**further** 25:4
**future** 26:25
29:19 59:8
73:2 88:2
91:18 130:11
132:14 134:10
195:3,13,18
196:9,14 197:4
197:9 198:9
201:18 204:8
204:10,13,14
204:17,21

**g**

**g** 6:1
**gaining** 29:1
67:7
**gargiulo** 55:15
56:6,11 57:1
**garner** 52:4
**gathered**
144:14
**gee** 50:6
**gender** 44:8,23
46:4

**general** 29:24
34:14 75:4
77:23 96:18
107:5 117:11
117:19 124:13
143:17,25
144:2 174:8,9
179:9 214:22
**generally** 15:17
46:11 53:24,25
54:4,5 55:23
59:5 68:14
69:8 71:8 76:5
76:24 77:22
78:7 80:21,24
97:4 107:7,13
117:14 136:15
145:3,7 169:5
219:7
**gentleman**
188:7,9
**geographic**
197:2
**george** 9:21
56:18
**getting** 19:2
49:23 83:18
103:12 135:4
140:7 159:14
164:3 194:10
**gist** 135:4
**give** 17:20 38:2
45:15 46:6
47:2 48:20
50:11 84:16

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 82 of 123

[give - guess]

113:10 118:10
118:22 178:12
187:2 224:9
**given** 36:5 54:1
56:20 131:3,24
164:25 192:7
192:17,19
200:8 226:14
**gives** 20:18
125:18 216:9
216:15
**giving** 39:15
**glance** 113:10
113:11,12
**glick** 172:5
**glusman**
174:16
**go** 7:16 8:5
29:1 30:13
33:16 35:9
38:6 39:14
40:3 41:5,6,21
42:21 43:3,4
44:19,20 45:2
45:6 50:19
51:1 56:5 75:6
76:8 77:9,20
77:21 78:4,22
79:1,4 80:3,4
80:14 82:7
83:8 84:14
88:17 90:17
92:4,8 104:24
105:2 106:8
107:19 113:12

114:24 120:3
123:6 125:16
130:4 131:8
132:25 133:10
134:14,15
135:6 140:18
144:19 146:17
147:23 149:4
150:20 163:1
170:23 177:19
179:11 184:9
189:19 193:4
198:4,18,19
205:1,6 214:9
214:15 221:16
224:4 225:3,20
**goal** 15:19
**goals** 15:11,14
15:19
**goes** 7:21 73:3
130:24
**going** 6:8 8:4
9:6 11:8,12
23:22 30:15
33:15 34:21
35:9 37:1
39:17 42:7
53:3 59:18
67:25 68:1
74:22 80:12
84:7 87:14
89:20 92:2,7
97:6 99:14
106:8 107:9
111:6 122:2,21

125:20 129:1
130:17 139:2
140:13 142:1
144:17 147:11
148:18 149:1
155:3 156:7
159:11 164:18
172:23 173:1,4
174:5,6 187:4
188:23 194:12
197:16 200:24
205:1,6,18
**gold** 105:17
106:3
**good** 6:16,17
9:2 10:13
12:25 16:3
31:18 62:12
63:6 65:18
74:8 98:22
100:15 103:11
103:11 125:19
149:5 151:12
154:2 155:5
156:4,6,21,22
157:24 160:19
164:2 168:9
170:17 172:13
175:20,21,23
175:23 177:24
183:23,23
184:5 210:19
225:22
**gosh** 130:15
166:22

**gotten** 171:3
**government**
119:5
**graph** 4:15
122:5,25 155:6
156:5 158:23
206:4
**graphs** 156:18
**gravely** 197:18
**great** 8:18
49:19 50:24,24
81:24 124:12
138:23 210:22
**green** 65:23,25
66:1
**green's** 66:3
**grossly** 178:7
182:22
**ground** 7:16
8:13
**group** 5:5,18
36:20 162:11
187:10 220:12
**groups** 95:20
**guarantee**
121:7
**guaranteed**
115:14 116:12
**guess** 17:8
27:19 45:23
49:3 57:15
100:11 116:9
142:3 143:6
150:24 165:20
173:9 179:15

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 83 of 123

[guess - human]

194:8 212:18
**guidance** 192:2
**guide** 106:11
**guides** 97:23
138:6
**gusman** 174:17

**h**

**half** 101:16
**halfway** 76:8
**hand** 151:22
202:20 226:18
**handed** 11:4
70:12
**handwriting**
126:22 129:4
140:6,11
**handwritten**
5:22 123:25
166:17
**handwrote**
157:23
**happened**
23:10 29:11
115:13
**happy** 8:5,8
221:21
**hard** 112:6
128:19 131:5
**harm** 29:6 39:3
39:5 41:12
45:22 49:14,21
52:12,18,22
59:18 69:22
**harmed** 53:20

**harmful** 26:8
26:18,24 27:4
27:13 29:16
30:2,9
**head** 8:17
10:14 107:11
155:3 179:8
**heading** 11:13
72:24
**health** 1:8 5:5
85:20 101:9
117:17 131:1
133:19 134:1,7
189:4 191:10
192:23 194:16
194:22 195:3
195:11 196:13
196:22 198:9
200:5 223:9
**hear** 9:2 16:3
204:19 214:5
**heard** 52:25
105:13 118:13
147:24 223:12
**hearing** 60:23
96:21
**heart** 143:7,13
**heavy** 163:24
**held** 6:6
**help** 8:14 47:6
85:9 100:18
101:8 156:16
188:24
**helped** 162:10

**helpful** 16:1
54:10 84:5
87:15 114:1
156:6 213:12
**helping** 179:23
**henrikson** 1:10
7:5 136:9
**henski's** 219:14
**hey** 102:23
199:2
**high** 59:23
186:2,11,22
195:5 206:10
**higher** 20:17
62:19 158:15
169:8 218:16
219:4
**highest** 214:15
**highlighted**
145:7 169:2,4
169:13,16,19
211:12,12
**hire** 32:4
194:12
**hired** 32:6
36:16,18 58:13
199:6 200:18
**history** 14:16
87:5 91:16
134:24 187:5
193:25 195:23
**hockey** 6:24
**hold** 54:22
142:2

**holler** 97:11
**hope** 54:9
**hopefully**
109:15 155:6
**hoping** 125:3
160:18 166:20
166:23
**hospital** 118:3
225:4
**hospitals** 95:19
**hour** 2:6 8:7
92:3
**hourly** 62:18
62:19
**hours** 155:3
**house** 101:8
179:20
**household** 87:6
**housekeeping**
94:8
**hr** 100:17
101:8 200:23
**huge** 36:25
**huh** 116:2
**hum** 8:10,16,16
17:17 22:8
40:19 73:6,20
74:13 122:1
146:18 157:17
216:21
**human** 31:17
31:18 32:1
95:20,21,22
101:24 131:7
197:19 200:20

Page 26

**[hurt - information]**

**hurt**   156:16
**hz**   1:7

**i**

**i.e.**   95:2
**ice**   6:24
**idea**   166:13,13
   166:16
**identification**
   16:14,15
**identified**
   11:14 15:11
   69:2
**identify**   35:2
   68:3 97:7
   107:10 130:6
   144:20
**identifying**
   48:5 69:14
   84:20
**imagine**   200:23
   201:1
**immediately**
   14:6
**impact**   9:7
   29:18 130:21
   131:10,21
   132:11,13
   133:6 134:9
   198:8,21
**impacts**   132:3
**impeach**   7:23
**impetus**   128:6
**important**
   12:11,13 74:17
   79:14 91:5

96:5 119:20
132:2 142:5,12
180:6 207:11
**impression**
   136:6 175:16
**improper**   41:3
   41:20 78:2
**improve**   130:7
**inability**
   203:15
**inaccurate**
   67:22 68:4
**incidents**   48:23
**include**   54:6
   69:19 73:23
   75:10 76:17
   82:10 101:12
   111:25 112:13
   122:10 171:16
   182:15
**included**
   117:16 122:4
   213:18
**includes**   18:7
   18:13 192:3
   200:21
**including**   14:16
   18:4 27:17
   29:2 75:5
   93:19 161:11
   165:3 175:13
   177:1 183:16
   192:25
**inclusive**
   226:12

**income**   65:16
   65:16 205:9,16
   206:11,20
**incorporate**
   171:16
**increasingly**
   178:18
**increments**
   224:7
**incurred**   62:7
**indeeds**   96:12
**independent**
   209:11
**independently**
   127:14 147:3
   148:15 149:11
   153:5 188:14
**index**   4:1
**indicated**   49:8
   49:15 187:17
   187:22 188:1
   189:25
**indicating**
   49:24 174:18
   207:6
**indication**   79:2
**individual**   1:11
   1:12 14:25
   15:18 16:17
   96:1 100:19
   101:17 118:21
   124:21,24,24
   128:15 203:23
   219:7 225:1

**individual's**
   29:6,18 203:24
**individuals**
   16:8,20 17:14
   28:14 45:21
   224:25
**industry**
   102:12
**influencer**
   50:15
**influences**
   125:1
**info**   160:15
**inform**   209:17
   210:24 211:22
   212:1 215:18
**informal**   60:17
   60:18 92:21
**informally**
   108:9 187:18
   187:23
**information**
   30:21 36:22,23
   46:6 54:6 64:7
   82:24 83:13
   84:17 87:4,23
   88:2 89:16
   102:24 106:19
   108:20 109:9
   109:17 110:6
   110:13 111:2
   116:8 119:9
   122:10,15
   124:21,22
   125:2 127:12

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 85 of 123

[information - invasive]

| | | | |
|---|---|---|---|
| 128:8 129:18 | **injury** 16:22,23 | 192:13 | 41:9 69:14 |
| 131:19 132:5 | 16:24 69:21 | **interchangea...** | 71:10,22,25 |
| 136:2,17 | **input** 137:11 | 52:19 | 81:10 82:20 |
| 144:11,14 | **inquire** 35:6,7 | **interest** 15:6 | 85:17,24 87:18 |
| 146:1,22 147:4 | **inquiry** 72:2 | 132:8 190:10 | 124:8,16 |
| 147:4 148:8,14 | 131:12 | **interested** | 127:21,24 |
| 148:16,23,25 | **insecure** | 179:22 186:10 | 128:17 140:4 |
| 149:2,13,23 | 178:17 | **interesting** | 185:16 196:22 |
| 150:8 151:3,3 | **inside** 151:9 | 48:23 | 198:23 223:22 |
| 151:11 152:14 | **insignificant** | **interests** 7:12 | **interviewed** |
| 152:19,23,24 | 184:6 | **interfering** | 28:14 49:24 |
| 153:1,6,24 | **instances** 178:9 | 191:24 | 59:15 124:5 |
| 156:12,17,20 | **institution** | **internal** 144:1 | 187:1 |
| 156:21,25 | 117:22,24 | **international** | **interviewee** |
| 157:7 158:23 | 137:19 174:14 | 11:25 12:18 | 38:22 84:22 |
| 159:23,25 | 174:15 209:14 | 22:17 23:3 | **interviewing** |
| 162:20 200:4,7 | **institutions** | **internet** 109:19 | 24:12 35:17 |
| 201:2 204:11 | 193:17 210:16 | **interpretation** | 40:9 84:23 |
| 214:21 216:10 | **instruct** 34:21 | 38:3 74:6,17 | 186:6 |
| 217:23 218:3,9 | 34:22 | **interrogatories** | **interviews** 17:9 |
| 221:12 | **insurance** | 226:7 | 36:21,22 37:19 |
| **informational** | 14:11 | **interrupt** 15:22 | 83:12 117:3 |
| 69:14 | **intact** 207:19 | 17:1 60:4 | 124:9 223:19 |
| **informed** 30:10 | **integrated** | 87:14 89:21 | **intimidating** |
| 103:19 | 160:25 161:19 | 138:12 188:8 | 192:13 |
| **informs** 30:7 | 161:23 162:11 | 198:24 | **introduce** |
| **initial** 20:23 | 162:16 | **interrupted** | 222:11 |
| 35:11 115:17 | **intend** 23:2 | 22:5 79:9 | **introduced** |
| 139:14 152:2 | 33:22 37:21 | **interventional** | 188:2 |
| 155:23 168:3,6 | 40:25 41:23 | 141:14,15,23 | **introduction** |
| **initially** 15:8 | 42:4,5,24 | 155:15 | 4:7 70:15 |
| 16:21 52:12 | **interaction** | **interview** 15:9 | **invasive** 141:14 |
| 144:6 | 192:11 201:3 | 15:9 16:13 | 141:15,23,25 |
| **injured** 55:25 | **interactions** | 17:7,8,11,16 | 142:3,7,7 |
| | 189:23 190:19 | 29:8 30:20 | 155:15 |

Page 28

[invoiced - know]

**invoiced** 62:9
**involuntarily**
  189:4 194:21
  195:10,12
  198:8
**involve** 43:15
  44:8
**involved** 10:3
  57:18 58:21
  92:14 99:4
  211:25
**involves** 17:22
**iota** 185:8
**ish** 199:23
  213:22
**issue** 48:4 81:6
  82:13 179:4,6
**issued** 170:25
  191:9
**issues** 9:21
  24:17,25 25:6
  28:5,6 41:13
  53:10 69:13
  87:10 190:1,8
  191:15

**j**

**j** 210:6
**jai** 210:5
**january** 1:18
  2:6 6:7 226:19
**jennifer** 65:23
  65:24 66:8,9
  66:11 165:3,11
  220:7

**jewell** 10:6
  58:7,18
**joaquin** 1:11
**job** 12:22,23
  14:2,3 15:11
  15:13,15,17
  16:18,25 30:10
  39:2 41:11
  49:19 50:8
  54:7 59:17,20
  59:24 64:3
  65:20 85:22
  86:25 88:4
  93:5,10,13,14
  93:16,18,21,21
  93:24 94:1,23
  94:23,25 95:1
  95:8,8,12,15
  96:6,8,9,14,15
  96:19,20,23
  97:1,13,14,19
  98:5,8 99:1,12
  101:11 107:14
  130:4,8,11,17
  162:7 165:18
  165:23 174:8,9
  181:14,14
  194:10 195:17
  201:15 216:12
  216:14
**jobs** 15:4 84:21
  84:21 87:25
  127:5,8,13,24
  128:3,9 163:2
  198:22

**john** 104:13
**jones** 9:16 10:1
  56:18,25
**judge** 60:15
**judgment** 75:7
  76:13 83:24
  177:24
**julie** 2:3 8:24
  133:12,16
  226:3,23
**jump** 143:13
**jumps** 113:5
**june** 190:2
**juror** 10:25
**jury** 41:1,19,24
  42:5,9,15,25
  43:6 44:16,23
  45:4 60:19

**k**

**keep** 21:2 47:7
  47:8,20 50:20
  60:5 63:9
  65:19,20 139:2
  159:12
**keeping** 59:20
**kept** 123:25
**kill** 211:7
**kind** 20:3 28:25
  50:8 64:17
  66:10 67:5
  130:24 136:1
  140:21 159:7
  174:4 182:3
  207:15 225:9

**kinds** 15:7
**kleenex** 170:19
**knew** 21:16,21
  65:18 119:24
  126:7,9 128:7
  157:3 162:9
  192:4 193:12
  194:24 201:25
  202:2
**know** 7:2 8:8
  9:9 10:16
  21:10 25:12
  29:10 36:20
  37:11 38:24
  39:2,8 41:9,16
  42:12 43:8,17
  43:21 44:1,3
  44:21 45:7,17
  45:25 46:3,5,7
  47:7,8 48:24
  49:10 50:12
  52:13 53:24
  54:10,12 59:11
  60:11,16,24
  61:15 62:10
  63:1,4 66:14
  67:5,7 68:5
  69:21 74:21
  75:1 77:1,2
  78:5 80:13
  81:24 82:11
  84:2 85:8 87:5
  87:12 89:2
  94:14 96:25
  98:1 100:5

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 87 of 123

**[know - letter]**

| | | **l** | **leadership** |
|---|---|---|---|
| 102:18,22 | 165:17,25,25 | **l** 81:15 | 21:20 22:12 |
| 103:11,24 | 166:24 169:2,5 | **lab** 178:4,25 | 192:8 |
| 104:1 105:3,7 | 169:21 172:13 | 187:9 | **learn** 110:20 |
| 105:8 106:25 | 172:19,22 | **label** 202:19 | 116:6 179:23 |
| 107:12,21 | 173:13,19 | **labeled** 179:14 | 181:13 |
| 108:23 110:13 | 174:10 175:14 | **labor** 15:14,15 | **learned** 37:5 |
| 110:16 112:6 | 179:12 180:25 | 16:15,16 17:13 | 204:5 |
| 113:13,23 | 181:7 183:2 | 64:9,10,11 | **learners** 192:12 |
| 114:10,15 | 184:4 188:5,5 | 71:11 72:2 | **learning** |
| 116:9 117:1 | 189:3,7 193:9 | 81:15 83:3,16 | 192:14 |
| 118:3,7,9,13,20 | 193:23 194:20 | 85:7 87:23 | **leave** 86:1,18 |
| 118:23,25 | 194:20 196:20 | 91:25 107:25 | 214:15 223:5 |
| 119:7 121:5,24 | 204:17,18 | 138:7,8,10 | 224:12 225:14 |
| 123:17 124:16 | 207:15 209:20 | 214:20 216:9 | **leaving** 39:4,4 |
| 125:10,11,11 | 209:21,25 | **lack** 132:8 | 86:15 203:7 |
| 125:12,15,18 | 211:4 217:19 | 156:16 178:2 | 209:2 |
| 128:4 129:12 | 217:25 219:11 | **landscape** | **lecture** 179:7,8 |
| 129:15,25 | 219:12,13 | 146:21 | **led** 125:16 |
| 130:1,15,22 | 221:16,18,19 | **languages** | **lee** 210:5 |
| 132:3,3,16,17 | 221:20,24 | 87:12 | **left** 49:11 59:24 |
| 133:3 139:10 | 223:2,10 | **large** 36:25 | 65:23 66:7 |
| 139:18 140:19 | **knowing** 16:3 | 88:6 113:4 | 72:23 85:22 |
| 141:13 142:6 | 113:3 116:13 | 120:15,16 | 181:17 |
| 142:10,12 | 186:15 | 125:3 | **leftover** 213:14 |
| 143:4,15,19 | **knowledge** | **larger** 200:21 | **legal** 3:11,13 |
| 145:4,16,19,20 | 14:17 63:15 | **law** 2:7,18 6:6 | 25:13,16 32:3 |
| 146:13,20 | 68:24 91:9 | **lawsuit** 10:23 | 44:23 45:25 |
| 147:14,25 | 117:11 119:4 | 124:25 166:21 | 46:3 47:9 |
| 149:4,15,15,18 | 187:17,22 | 187:18,23 | **lens** 53:20 |
| 150:24 153:16 | 214:12 216:14 | **lawyer** 45:18 | **lent** 159:2 |
| 153:19 154:3,6 | 218:19,21 | **lawyers** 103:7 | **lessened** 67:6 |
| 154:9,12,12,16 | **knows** 87:12 | 111:16 207:14 | **lessening** 67:6 |
| 156:8 158:15 | 174:10 | **lay** 10:21 | **letter** 4:3 5:16 |
| 159:3,5 161:14 | | | 5:20 188:18 |
| 161:21 162:24 | | | |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 88 of 123

[letter - looking]

200:16
**letters** 95:14
210:2,4
**level** 19:12
20:17,17 169:8
179:7 192:19
205:16,20
**levels** 102:14
215:8 218:16
219:4
**licensed** 12:10
**life** 9:6 88:11
**lifestep** 64:6
**lifted** 82:1
**likely** 61:4
136:24 138:2
138:13 154:1
166:2 185:7
**limited** 101:20
182:24
**line** 127:4
155:9,13
**lingo** 49:10
**link** 153:21,24
166:2 171:10
171:14
**lisa** 1:16 2:3 6:4
6:10 62:13
141:16 155:1
160:12 226:4
**lisa's** 144:8
**list** 16:12 17:1
29:21 54:15,19
68:16 76:17
81:5 84:1

102:22 103:1,6
103:7,15
104:13,25
105:24 109:5
113:3 211:3,17
**listed** 30:24
31:12 63:20
64:3 109:9
206:7
**listing** 75:11
**lists** 72:25
**literature**
89:18 90:12
**little** 8:20 13:20
69:6,13 78:11
92:2 109:4
118:16 123:5
143:10 157:13
166:5 173:9
174:4 179:1
202:11 208:3
**live** 96:4
**lives** 87:13
167:1,2
**living** 87:8
**location** 96:5
**log** 110:23
148:21 150:13
**logged** 148:20
149:12
**long** 8:4 20:3
20:10 38:5
48:19 50:11
83:22 169:7,9
174:13 200:9

216:13
**longer** 200:13
221:14 223:24
**longshore**
21:24
**look** 10:14
15:13 16:22
25:13 27:18
28:17 29:20,23
33:14,15 44:4
54:24 58:22
70:24 72:8,16
74:20 82:23
83:11,12,12,14
87:3,25 88:3
90:13 96:2
107:21,22
109:21 111:5
113:11 119:20
119:21,24
120:7,12,25
124:3,19
138:19 143:4
146:10 147:16
147:16 149:3,6
150:3,4 151:9
151:14,18
154:5,9,14
155:2,14 156:6
156:22 157:24
159:16 160:13
160:17 162:2
162:18 166:15
180:22 183:19
183:20 185:1,7

187:5 189:18
191:11 194:12
202:7,23
206:13 211:4
211:23 218:20
222:4,9 224:9
225:1,9
**looked** 26:11
28:2 29:20,21
30:22 59:15,15
64:2,5,5 72:11
72:13,14 76:6
85:2 88:5
97:23 98:2
103:3 109:13
109:14,15,17
111:20 112:11
116:16,17
121:2 131:20
138:7,19,21
147:18 148:10
149:17,20
156:8,12,21,25
157:9 168:3
170:14 175:15
181:15 182:4
184:20 185:5
186:19 191:12
212:14 219:21
221:20
**looking** 11:9
15:3,4 29:2
42:12,12 50:3
52:1 64:11
69:15,18 71:9

Page 31

**[looking - marks]**

73:14 75:3
80:13 95:12
110:10 111:19
113:3 129:25
130:20 142:8
148:22,22
150:21 155:21
157:14 159:6
160:24 162:9
164:21 170:19
172:17 183:17
187:15 195:22
197:5 198:7
211:6 212:14
**looks**   11:13
18:8 23:9
56:20 58:7
59:10 62:17
64:22,22 73:1
124:4 127:23
128:3 129:3
134:19,23,24
134:25 139:4
141:12 144:5
144:13 146:12
151:19,20
152:21,22
154:5,10 155:5
155:12 156:4
159:22 160:11
161:6,17
162:23 163:9
164:9,15 165:1
165:17 166:1,7
166:10 191:15

211:10 213:6
225:6
**loss**   24:19,21
39:5 40:12
41:7 52:7
53:11 60:9,22
61:18,22 69:16
80:23 121:11
205:9 206:11
206:12 208:16
212:6 213:8
**lost**   60:1 112:9
112:9 128:18
218:10
**lot**   12:21 18:8
20:14 28:4
43:9,12 49:23
67:12 83:16
87:6 93:21
96:12,19 97:4
143:8 175:22
179:1
**lots**   210:7
**loud**   177:19
189:19
**low**   189:25
**lower**   158:16
183:22
**lunch**   92:7
123:8,12
138:21

---

**m**

**m**   70:1
**made**   49:16
86:21 114:5

131:9 135:24
180:7 186:18
189:20 206:5
206:19 210:6
213:6
**maintaining**
181:3
**maintenance**
85:23
**majority**
199:20,25
**make**   10:10
15:15 30:4
38:24 41:15
94:9,18 101:16
113:13,16
117:18,21,25
119:25 124:17
130:3,24
132:18,24
136:22 149:20
156:23 157:24
159:1 169:21
181:20 214:14
216:23,24
221:23 222:2,6
225:8
**makes**   12:8
39:6 215:10
**making**   58:16
117:18 140:14
156:17 158:3
178:19,23
179:22 180:12
209:8 214:17

216:3
**manifesting**
178:1
**manuals**   63:17
**marginal**   178:1
**marital**   18:4
**mark**   74:22
122:22 144:17
144:19,24
146:7 214:15
**marked**   11:3,5
70:5,10,12
86:7 113:17,24
120:9 122:23
123:10,12
144:22 145:1
146:6,8 177:6
183:22 189:11
191:6 222:14
225:24
**market**   15:14
15:15 16:15,16
17:13 71:11
72:2 81:15
83:16 87:23
91:25 92:1
93:5,10,13,17
94:1,23 95:1
96:1 97:13,14
97:19,22 98:8
99:2,13 100:10
**markets**   93:14
94:24
**marks**   73:10
114:5

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 90 of 123

[marriage - methodology]

| | | | |
|---|---|---|---|
| **marriage**  18:10 | 149:8 158:1 | 73:2 80:20 | 20:20,21 39:1 |
| **masonry**  56:12 | 159:4 166:15 | 85:21 87:10 | 56:19 57:10 |
| **master's**  12:14 | 167:18 173:3 | 88:2,10 111:17 | 65:21 86:11 |
| 14:7,8 46:19 | 173:11 174:5,6 | 111:21,22,24 | 100:25 103:6 |
| **matches**  124:21 | 174:9 184:1 | 137:19 174:14 | 109:20 110:1 |
| **material**  61:12 | 187:23 188:8 | 187:10 209:13 | 135:19 149:16 |
| 99:19 107:21 | 197:2 198:5,24 | 210:16 220:12 | 188:2,11 207:1 |
| 107:22 179:7,8 | 208:22 213:1 | 220:25 221:1 | 215:5 218:13 |
| **materials**  59:16 | 214:4,7,8,16,21 | 223:5 | 226:5 |
| 59:16 63:25 | 216:2,3,25 | **medication**  9:6 | **message**  129:23 |
| **matt**  144:7 | 217:22 221:23 | **medicine**  144:1 | 140:12 160:9 |
| **matter**  6:5 | 224:4 | 155:16 185:17 | **met**  7:3 21:12 |
| 13:11 24:15 | **meaning**  156:5 | 186:7 187:8 | 36:20 167:9 |
| 62:7 131:25 | 172:17 176:20 | 225:5 | 178:13 |
| 132:1 181:9 | **meaningful** | **meet**  15:5 | **method**  69:11 |
| 192:2 222:22 | 179:10 | **meeting**  34:8 | 73:12 77:22,24 |
| **matters**  18:13 | **means**  52:23 | 34:11,12 36:10 | 77:25 78:6,6 |
| 18:21 22:25 | 63:5 76:10 | 36:10 | **methodologies** |
| 81:6 82:13 | 81:10 113:10 | **megan**  3:5 | 16:9 17:3 19:4 |
| **matthew**  2:13 | 113:11 | **member**  192:1 | 19:5 26:22 |
| 2:14 6:6 70:8 | **meant**  52:21 | 204:4,19 | 73:24 75:5 |
| **mc**  105:13 | 63:12 167:10 | **memberships** | 76:1 77:2 89:2 |
| **mccrae**  55:11 | **measurement** | 147:15 | 89:15 |
| 55:14,20,25 | 73:2 86:20 | **memory**  9:7 | **methodology** |
| **md**  5:9 225:1 | **measures**  76:24 | 33:16 59:11,12 | 16:6 26:9,16 |
| **mean**  10:2 13:4 | **med**  141:15,15 | 135:16 138:1 | 69:7 71:18 |
| 13:4 25:4,16 | **medaxiom** | 139:12 | 73:21,22,23,25 |
| 34:23 45:19 | 102:19 108:21 | **mental**  131:1 | 75:4,10,14,16 |
| 46:19 52:20 | 159:23 160:24 | 132:13 133:19 | 76:16,21 77:13 |
| 63:16 79:15 | 161:22 | 134:1,7 | 78:19 79:15,17 |
| 81:9 85:19 | **median**  158:2 | **mention**  69:23 | 79:25 82:1,14 |
| 92:6 93:7,23 | 214:21 | 101:2 132:16 | 83:21 84:7 |
| 97:15 113:9 | **medical**  4:18 | 176:22 194:7 | 85:5,10 86:4 |
| 115:13 121:5 | 4:20,22,24 5:2 | **mentioned**  17:7 | 88:13,21,23 |
| 127:19 136:13 | 5:4,7,18 52:6 | 18:7 19:11 | 89:13,19 90:11 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 91 of 123

[methodology - nature]

90:22 91:6
131:14,23
214:18 216:5
218:10
**methods**  78:7
80:22,24 91:20
**mgma**  31:6
102:19 106:15
106:20 108:25
153:16 154:24
155:25 219:23
220:13,17
**middle**  179:14
187:6
**military**  85:19
**million**  166:11
206:15 208:16
208:25
**mind**  50:14
99:25 104:20
112:17 123:4
125:5,7 133:13
184:11
**mindful**  15:23
**mine**  146:14
**minimizes**  74:5
**minimizing**
74:16
**minimum**
115:14
**minnesota**  7:2
160:20
**minus**  206:13
**minute**  33:15
87:15 137:6

159:12 195:8
196:5 224:7
**minutes**  92:4
139:1 224:4
**miracle**  6:24
**mis**  78:21
**misheard**
159:21
**mispronounc...**
6:19 56:6
**misreading**
197:24
**missed**  113:7
225:6,6
**missing**  38:9
55:12 64:21
150:25 214:23
**misstate**  79:2
**misstatement**
25:19
**misstates**  40:1
42:18 77:7
78:3 80:1
84:12 88:15
134:12
**mistaken**
181:16
**misunderstood**
153:20
**model**  4:7,8
26:12,13 70:14
70:15,19 74:4
78:14 81:15
82:20,21,21
83:2,9 85:7

86:2,2,6,12
**models**  78:18
82:17,22 83:23
84:10,15,19,19
85:11 90:24
91:22 102:25
117:8
**module**  72:7
73:18
**modules**  71:2,6
71:13
**moment**  10:15
43:20 45:24
49:11 67:24
80:12,14
110:21,22
116:18 118:10
123:7 136:15
147:25 159:17
189:10 196:12
**money**  106:21
117:18,18,21
117:25 124:25
125:4
**monitor**  16:19
**month**  213:16
**months**  50:1,2
63:2,3 163:14
177:17,22
182:5
**moody**  165:3
165:12 220:7
**moody's**
165:19

**morning**  6:16
6:17
**morph**  64:15
**morphed**  64:13
**motivation**
130:15
**move**  15:6,9,19
101:22 197:1
212:16
**moving**  60:5
139:3 159:12
**multicultural**
46:20
**multiple**  27:7
170:4 178:7,8
182:22
**multiplied**
206:18
**multiply**
206:14

| n |
| --- |

**n**  6:1
**name**  7:3 58:18
63:5 66:14
102:16 110:16
110:16,23
165:19,19
188:5 210:5
**names**  165:5
**nasw**  47:14,18
**national**  47:14
**natural**  112:7
**nature**  9:20
40:11 55:23
172:8

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 92 of 123

**[neal - nutshell]**

| | | | |
|---|---|---|---|
| **neal** 6:25 | 182:12 183:9 | **north's** 104:19 | **november** |
| **near** 158:6 | 183:16,18,19 | 165:19 | 140:9,17 |
| **nearly** 45:17 | 184:15 194:9 | **nose** 170:20 | 164:15,25 |
| 179:21 | 194:14 201:12 | **notation** | 165:24 |
| **necessarily** | 201:17 | 140:14 | **number** 4:2 |
| 17:13 40:11 | **neglected** 94:8 | **note** 38:23 | 79:6 82:23 |
| 44:10 118:1 | **net** 64:5 | 39:17 75:25 | 84:18 123:22 |
| 156:24 194:10 | **network** 95:10 | 119:12 125:23 | 127:14 128:10 |
| 211:16 218:15 | **never** 112:17 | 125:23 126:20 | 134:24 138:5 |
| 219:3 | 132:24 166:22 | 127:20 128:13 | 144:9 163:4 |
| **necessary** | 166:22 184:11 | 141:19 161:6 | 166:5,10,12,16 |
| 81:20 181:12 | **new** 116:22,24 | 162:23 164:9 | 166:19,23 |
| 216:13 | 116:24 117:1 | 200:17 | 199:17 205:11 |
| **need** 8:6,7 20:1 | 119:9 178:24 | **notes** 4:16 5:22 | 205:12 208:17 |
| 30:13 39:7 | 178:24 221:12 | 74:22 113:16 | 208:20,25 |
| 53:25 54:6 | 221:16 | 114:3 123:14 | 212:24 215:8 |
| 55:17 79:17 | **no's** 49:23 | 123:25 124:4 | 221:5,14 |
| 86:22,23 87:2 | **nods** 8:16 | 126:21,24 | **numbered** |
| 88:10 104:3 | **non** 49:13 | 127:1,20 | 123:17 |
| 112:2 114:4 | 65:17 94:1 | 128:12 134:20 | **numbering** |
| 116:25 125:24 | 96:9,18,24 | 135:4,9 137:22 | 125:22 |
| 144:8 180:25 | 141:15 142:7 | 137:23 139:4 | **numbers** |
| 200:19,20 | **nonexemplary** | 140:5 152:21 | 121:21 123:19 |
| 207:8 211:4 | 180:23 | 159:13 160:8 | 148:16 158:11 |
| 221:16 222:4 | **nonrenewal** | 163:10 164:15 | 158:12,17 |
| 224:12 225:19 | 196:6,18,25 | 165:1,14 166:4 | 159:11 169:2,3 |
| **needed** 15:8 | 202:1 | 166:8,25 170:8 | 169:13,16,16 |
| 126:7 156:11 | **nope** 217:13 | 206:14 207:1,2 | 169:25 170:2 |
| 161:21,24 | **nora** 167:19 | 207:3,11,11,21 | 207:22 208:21 |
| **needing** 141:20 | 171:8 | 214:10 224:10 | 213:13 |
| 162:18 | **normal** 130:17 | **notice** 201:25 | **numerous** |
| **needs** 55:5 73:2 | **north** 21:10 | **notification** | 192:24 193:9 |
| 88:3 179:10 | 22:11 104:15 | 20:18 | **nutshell** 27:1 |
| **negative** | 165:4,12 220:7 | **noting** 182:18 | 134:16 |
| 175:25 180:14 | | | |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 93 of 123

**[o - okay]**

| o | | | |
|---|---|---|---|
| **o**  6:1 64:5 | 216:13 | **office**  2:18 | 225:2 |
| **oath**  6:12 7:25 | **obtaining** | 31:10 47:23,25 | **ohsu**  3:11,13 |
| 8:1 34:4 37:14 | 59:20 132:9 | 66:4 123:19 | 6:5 7:4 24:18 |
| 226:6 | **obviously**  36:5 | 155:4 171:2 | 25:2,11 26:4 |
| **object**  89:23 | 50:12 67:16 | 173:17 207:19 | 26:17,24 29:22 |
| 133:8 193:3 | 92:7 137:24 | 207:20 | 32:16,23 33:6 |
| 198:2 | 141:5 | **offices**  2:8 6:6 | 33:13,24 37:23 |
| **objection**  23:23 | **occasion**  21:22 | **offset**  209:1 | 38:18 39:4,4,5 |
| 27:7 30:14 | 23:13 24:11 | **oh**  6:21 15:24 | 39:11,25 41:2 |
| 40:1 41:3 | 34:7 61:3,7,9 | 18:17 25:9 | 48:22 49:15,25 |
| 42:18 43:1 | 61:21 90:4 | 36:18 39:14 | 51:5 52:6,13 |
| 44:17 45:1,5 | 92:23 93:1 | 40:4 55:1,2,7 | 53:21 129:21 |
| 50:18 77:7,18 | 98:7 99:1 | 55:19 57:10,24 | 131:21 133:6 |
| 78:2,21 80:1 | 108:4 141:3 | 58:15 63:2,16 | 134:8,25 |
| 82:5 83:6,20 | 189:14 | 64:6 66:22 | 135:10 136:7 |
| 84:12 88:15 | **occasions**  98:24 | 72:12,14 73:8 | 136:19,25 |
| 89:21 107:18 | 201:11 | 74:11,24 75:13 | 137:10,14,16 |
| 120:2 134:12 | **occupation** | 90:16 104:15 | 138:4 174:7,10 |
| 135:5 184:7 | 16:14 64:8 | 105:5,15 | 174:11 175:5 |
| 198:2,16 | 96:3,3 219:8 | 114:21,23 | 175:13,15 |
| **objective** | **occupational** | 122:18 123:6 | 176:18 177:5 |
| 193:20 | 64:2,17 | 126:23 136:2 | 180:17 183:12 |
| **observation** | **occupations** | 136:11 139:22 | 184:14,22 |
| 134:6 | 12:24 64:14 | 140:17 153:15 | 187:18,23 |
| **observed** | **occur**  29:18 | 153:19 155:12 | 190:23 192:23 |
| 184:22 | **october**  139:16 | 160:17 166:22 | 194:16 195:12 |
| **observing**  29:7 | 140:3 141:12 | 172:6 173:6 | 196:5,6 201:12 |
| **obtain**  20:1 | 141:20 163:7 | 181:20 182:17 | 201:17,23 |
| 26:8 49:14 | **odd**  49:4 159:7 | 188:8 189:24 | 203:7 209:2 |
| 59:24 132:4,14 | **offer**  101:20 | 198:24 202:11 | 210:15,17 |
| 166:20 200:5 | 190:8 | 202:13 203:14 | **okay**  7:1,16 8:9 |
| **obtained**  14:5 | **offered**  28:3 | 206:24 210:22 | 8:18,25 9:2,2,3 |
| 82:24 83:14 | 29:24 138:20 | 211:10 212:2 | 9:5,10 10:9,13 |
| 111:13 200:5 | 190:7 | 217:6 220:3 | 10:19 11:2,8 |
| | | 223:12,20 | 13:14,20 16:13 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 94 of 123

**[okay - open]**

| | | | |
|---|---|---|---|
| 17:1,2,7 18:18 | 78:10,17 79:8 | 134:17 136:2 | 188:6,11 |
| 18:25 19:1,10 | 79:11,19,21 | 136:11,11 | 190:18 191:14 |
| 19:22 21:22,25 | 81:4,22 82:23 | 137:5 138:16 | 196:11,17 |
| 22:5 24:1 25:9 | 86:9,15 87:1 | 139:3,9,18 | 198:25 199:23 |
| 25:18,20,23,25 | 87:22 89:12 | 140:20 141:2 | 202:13,17,20 |
| 27:2,9,20 30:6 | 90:6 91:4 92:2 | 142:25 144:17 | 203:4,9,23 |
| 31:3,11 32:21 | 92:19 94:17,19 | 145:9,16 | 204:17,25 |
| 33:9,19,20 | 94:20 95:5 | 146:16,16,17 | 206:17 207:7 |
| 34:1,15 35:21 | 96:7,16,21 | 147:1,7,23 | 207:17,19,21 |
| 37:1,3,10,14,16 | 97:10,21,25 | 148:7,13,19 | 208:5,11 |
| 37:18,20 38:9 | 98:10,13,23 | 150:2,6,13,13 | 210:13,20 |
| 40:6 42:4,9,15 | 99:15,21 100:4 | 151:1,10,12 | 211:22 212:4 |
| 43:17 44:5,11 | 100:8,13 | 152:1,5,9,12,18 | 212:17,22 |
| 44:22 45:15 | 104:10 106:1 | 152:20 154:2,7 | 213:4 215:23 |
| 46:22 48:9,21 | 107:1,12,20 | 155:18 156:4 | 217:7 218:7 |
| 49:19 50:25 | 108:8,12,12,23 | 157:25 158:21 | 220:14 221:10 |
| 51:10,12 52:25 | 110:1,6 111:5 | 159:7,10,21 | 222:3,11 |
| 53:8,12,16,24 | 111:19 112:16 | 161:6 162:1 | **old** 64:4 66:18 |
| 54:10,21 55:1 | 112:22,25 | 163:1,6,22 | **ology** 98:18 |
| 55:4,5,7,16 | 114:7 115:11 | 165:11,14 | **once** 15:11 |
| 56:3,5,8 57:14 | 115:24 116:1,5 | 166:4 167:4,13 | 59:23 101:19 |
| 57:17,24 58:15 | 118:13,18 | 167:24 168:21 | 101:21 110:25 |
| 58:20,25 60:2 | 119:16,20,24 | 168:24 169:18 | 131:8 136:21 |
| 61:1,16 62:1,6 | 120:14,17,24 | 170:3,10,24 | 148:20 150:13 |
| 62:9,12,16 | 121:25 123:3 | 171:20,24 | 153:6 166:24 |
| 63:4,10,24 | 123:21,22 | 173:7,22 | **ones** 102:17 |
| 64:24 65:21 | 124:4,8 126:9 | 174:16,19,25 | 103:23 145:20 |
| 66:19 67:9,22 | 126:13,16,19 | 175:10,16,25 | **ongoing** 20:25 |
| 67:25 68:24 | 126:24 127:1,3 | 176:10,14,22 | 54:1 |
| 69:5,23 70:24 | 127:11,23 | 177:1,4,13 | **online** 147:2,16 |
| 71:15,17 72:12 | 128:2,6,18,25 | 179:3,13,24 | 147:18 |
| 72:19 73:7,9 | 129:8,13,13,16 | 180:3 181:20 | **open** 18:1 82:8 |
| 73:11,21 74:20 | 129:20,25 | 182:17 185:8 | 125:14 224:12 |
| 74:24 75:3,17 | 132:10,23 | 186:4,8,15 | 225:14 |
| 75:18,19,24 | 133:1,20 134:3 | 187:15,21 | |

Page 37

[opine - page]

| | | | |
|---|---|---|---|
| **opine**  24:25 | 204:6 209:17 | 215:11,13,15 | 62:1 63:10 |
| 25:10 29:17 | 210:24 211:22 | 216:10 226:18 | 64:19 68:9 |
| 52:11 59:4 | 212:1 214:11 | **organization** | 69:5 70:25 |
| **opined**  33:22 | 218:14 219:5 | 21:12 45:20,21 | 72:8,23 73:3,3 |
| 196:8 203:4 | 219:17,21 | 66:3 102:21 | 73:12 75:3,13 |
| **opinion**  22:24 | 220:2 | 117:17 118:21 | 77:14,25 109:4 |
| 23:1 24:18,21 | **opinions**  12:6,8 | 190:11 | 113:11,12 |
| 26:2,6 27:24 | 13:8 33:10 | **original**  115:9 | 120:20,23 |
| 28:10,21 29:12 | 34:19 35:4,25 | 115:15,16 | 121:22,25 |
| 29:25 30:17 | 36:13 37:7 | **ostrofe**  167:9 | 123:22 124:12 |
| 32:15,18,21 | 52:18 53:1,9 | 167:19 168:1,7 | 125:21,23,23 |
| 33:5,12,23 | 53:19 63:25 | 168:14,25 | 126:19 128:25 |
| 37:21 38:2,16 | 68:20 69:1 | 169:24 170:5 | 129:6 130:20 |
| 39:9,9,15,24 | 74:4 103:20 | 171:21 172:2,4 | 134:19,19 |
| 40:5,7,10,15 | 108:17 114:9 | 172:6 208:7 | 139:4 140:5 |
| 41:1,7,17,23 | 124:1 125:9 | **outset**  21:5,6 | 144:5,5 145:1 |
| 42:10 43:24 | 136:23 137:8 | **outside**  84:4 | 152:21 154:2 |
| 49:12,17 50:16 | 145:14 151:4,6 | **overall**  178:3 | 157:14,15,16 |
| 53:11,12 58:21 | 159:1 173:13 | 178:20 | 158:8 159:13 |
| 61:22 68:4 | 174:11 189:16 | **overexaggera...** | 159:15,22 |
| 72:5,24 73:4 | 193:14 194:25 | 49:5 | 160:8,15 |
| 73:14,18 74:9 | **opportunity** | **overlooked** | 161:17 162:2 |
| 80:7 85:1 88:8 | 27:18 37:13 | 64:24 | 162:22 164:9 |
| 96:23 116:15 | 39:20 67:15,18 | **own**  32:10 | 164:10,24 |
| 116:17 130:9 | 117:20 | 76:21,21 77:3 | 165:14 166:2,5 |
| 132:1 134:6 | **opposed**  185:25 | 77:13 89:25 | 166:5 172:18 |
| 142:12 172:25 | **opposite**  21:23 | 111:13 114:3 | 174:25 177:13 |
| 173:4,20 174:8 | **oral**  226:7 | 146:13 147:19 | 179:13 185:12 |
| 180:20 181:5 | **order**  91:17 | 157:7 161:13 | 187:3,6 192:11 |
| 181:22 182:6,9 | 138:17 | 203:13 214:19 | 202:20,22 |
| 182:14 190:16 | **oregon**  1:2,8,9 | **p** | 205:3,6,8 |
| 194:3,5,8 | 2:1,5,9,16,21 | **p**  6:1 81:15 | 206:4 208:14 |
| 195:16 196:1 | 3:7 6:7 11:16 | **pace**  179:11 | 211:10,14 |
| 198:1,1,7,12,15 | 14:19 15:13 | **page**  4:2 11:10 | 212:4,12,13,19 |
| 198:20 201:16 | 47:11,15 64:8 | 11:10,12 55:13 | 221:3,22,25 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 96 of 123

**[pages - performing]**

pages  68:16
69:3 109:10
151:23 158:12
205:1 226:11
pai  211:14
paid  117:8,13
pam  65:22 66:4
paper  145:5
paragraph
11:11,11 52:3
53:4,6 73:16
75:11,15,16,25
76:9 86:10
155:19 175:2
177:15 179:15
185:13,14
189:18 205:18
208:19 209:8
212:18,20
213:12 221:5
paramedic  66:6
paranoid  178:6
178:18 182:20
part  20:24
24:23 30:7,12
38:8,9,10
39:15 40:11
62:24 73:25
75:1,24 78:9
79:15 80:5,21
83:17 84:9,16
85:18 88:23
89:14 95:22
101:3 102:1
103:10,24

120:15 130:5
130:23 132:25
138:10 143:24
178:14 187:21
188:17,24
194:1 206:17
207:5 216:24
222:13
participated
46:11
participating
23:24
participation
88:11
particular
43:14 203:23
particularly
124:24 219:1
219:18
parties  29:22
35:3
partly  29:14
65:19 83:15,15
parts  73:22,23
130:15
party  10:23
58:19
passed  20:12
20:13 152:7
passing  198:10
password
110:15,24
past  21:15 32:7
87:4 91:18
92:3 124:10,19

pasted  208:3
path  135:22,22
135:23
patient  203:18
203:21,22,24
204:6
patients  177:25
190:10
pattern  177:23
193:16
pause  205:11
222:15
pay  88:1
105:10
pc  2:13
peacehealth
100:16
peer  20:9,23
21:5 88:14,22
89:13,17 90:12
138:20 209:23
209:23
peers  190:22
penalty  8:1
penn  112:25
pennsylvania
5:15 175:6,13
175:14,18
176:1,12,19
177:2,9 180:11
180:17,18
181:5 182:8,18
183:12 184:20
190:23 192:24
194:16 202:8

people  12:24
20:14 57:5
105:20,21
130:4 135:11
135:24 179:22
181:13
percent  17:25
18:2,6,15,20
65:12 137:7,10
137:11
percentage
17:21 18:12
percentages
108:18
percentile
158:2,6 159:4
206:3,9 208:22
213:2 214:5,10
216:2,25
217:20,21,22
percentiles
159:3 214:21
perfect  7:3
perform  12:6
15:18 31:1
51:16,19,22
53:9 60:21
69:10 93:1,14
100:20
performed
59:13 71:18
performing
27:11 53:18
68:19,25 69:13
91:10,21 93:25

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 97 of 123

[performing - please]

94:2 108:16
120:25 145:14
159:25 185:18
190:14 193:12
**performs** 84:24
**period** 154:25
160:15,16
189:24,24
197:7
**perjury** 8:2
**persistent**
179:4,6
**person** 14:20
36:10 45:22
57:5 66:7 81:6
84:22 130:12
188:4 216:11
**person's** 91:15
204:5 215:7
**personal** 38:23
40:11,15 69:21
**personality**
49:4 130:13
131:25
**personally** 40:7
178:24
**persons** 20:5
49:23 82:13
99:19 130:17
**perspective**
199:1,16
**pertain** 164:16
**pertaining**
102:11 103:15
176:11 201:11

**pervasive**
191:24
**phone** 129:11
129:22 154:8
223:24
**photo** 151:20
152:10
**photos** 151:21
**physical** 15:16
**physician** 4:12
5:6 57:18 59:2
61:5,23,24
86:24 92:20,24
92:25 93:5,9
93:13,16 94:1
94:1,22,23
95:1,8,9,11
96:8,9,18,23,24
97:2,3,13,14,19
97:22 98:7,8
99:1,12,17
100:9 102:9,11
106:11 108:2
108:15,24
109:16,22
110:8 111:12
112:12 117:13
117:20,22
118:21 119:6
120:19 126:2
148:3 177:16
177:21 178:18
190:7 211:15
219:1 220:16

**physician's**
119:1 218:14
**physicians**
57:20 96:4
100:14 102:14
111:24 117:7
122:6 218:22
219:1,11,17,18
**pick** 8:16 169:3
**picked** 104:3
**picking** 200:24
**picture** 125:19
**piece** 24:20
53:13 82:10,12
85:19 117:23
**pinnacle** 5:5
111:22 220:10
220:11,11,12
220:13,15
**pinpoint** 46:17
67:23 108:21
209:20
**place** 75:24
226:5
**placeability**
26:11 59:9
88:6
**placeable** 16:18
**placement**
16:19,19
101:10,11
**places** 175:12
192:22 198:11
**plaintiff** 1:6
2:22 7:10 9:17

9:19 55:21,22
57:13 58:9,10
58:11,13 59:2
124:17,25
140:23 167:7
**plaintiff's**
167:15
**plaintiffs**
140:25 193:21
**plan** 15:1,1,20
15:21 91:23
189:20 190:3,9
**planning** 88:9
**plans** 100:17
**plastic** 55:25
59:3,22 92:14
98:15 99:4
**play** 119:5
**player** 6:24
**please** 6:9
37:10 63:11
68:5 70:9 72:9
73:13 94:18
120:18 126:19
128:25 129:15
134:19 140:5
151:14 155:2
157:24 162:22
163:6 164:13
164:20 174:25
177:14,20
179:5 187:4
189:19 202:8
202:20

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 98 of 123

**[plus - prior]**

plus 65:6
115:16
pocket 170:21
poignant 38:11
point 13:15
14:22 35:22
46:12,20,23
89:18 90:19,25
91:1 109:23
111:20 124:12
128:7 158:16
158:16 162:1
162:17 198:25
203:10 204:22
214:23 222:22
pointed 202:25
pointing 49:2
86:6,6
points 89:2
police 56:1,2
poor 183:23
pops 105:1
portion 30:4
155:22 208:14
221:11
portions 68:1
178:10
portland 1:3
2:9,16,21 3:7
6:7 226:18
portrait 146:21
posed 103:1
position 181:3
211:9

positions
199:18
positive 176:21
176:23,25
180:1,9,9,13
183:8,15,18,25
184:2,15
192:14 193:11
possess 27:23
30:16 143:20
177:24
possession
47:22
possible 36:15
74:10 125:24
126:6 137:15
200:11
possibly 32:24
49:14,17 91:18
165:5
posted 104:12
104:13
postgraduate
122:2
potential 29:6
61:17 101:22
107:23 137:8
197:5 203:5
210:24
practice 74:9
76:1 117:13,17
117:20 119:2
128:13 162:3,8
162:9 186:1,11
186:19,22,25

positions
189:20 190:3,9
191:25 215:19
practicelength
166:1
practicelink
96:17
practices 88:23
practicing
95:11
predated 191:1
199:24
preliminary
116:16
preparation
66:11 147:12
222:19
prepare 59:13
60:22 61:21
99:8 127:1
139:19,23
147:9 157:20
165:9,16,21
207:12
prepared 11:6
31:14 67:2
126:24 139:23
152:6 222:17
preparers
99:19
preparing
124:1 152:15
153:2 157:22
172:1
present 3:10
24:2,9,12 34:9

167:5
presented
41:13
presenting
73:12
pretty 18:15
60:17,18 72:21
78:13 79:18
88:5 132:1
previewed
118:19
previously
56:19
primarily
12:17 13:1
14:1 16:13
30:21 35:17
42:14 59:17
143:18 197:14
primary 50:15
principles
91:20 97:4
print 111:3
147:22
printed 146:2
146:13,20
147:3,19
149:12,16,19
149:22,25
152:10 153:8
153:24
printer 147:21
149:20
prior 19:18,20
23:8 24:12

Page 41

**[prior - providence]**

41:8 54:15
67:11 98:8
160:3 175:12
**private**  4:21
95:18 117:13
117:17,20
161:1,19,24
162:3,7,9,11
172:19 186:1
186:11,19,22
186:22,25
**privileged**  24:4
**proactive**
161:16
**probably**  7:17
8:5 42:8 56:6
58:11 66:15,15
69:12 72:9
113:19 137:22
139:17 140:3,9
155:2 165:7
170:9,12,20
171:8 172:17
189:8 191:5
207:4
**problem**  199:4
**problematic**
189:22 190:18
**problems**  69:15
84:20 199:4
**procedure**  2:2
54:4
**procedures**
178:9 203:14
203:16

**proceedings**
2:7 222:15
226:15
**process**  7:17
15:3 16:4 20:3
49:8 50:9
72:20 85:24
87:19,20 89:4
89:9,16 99:17
128:19 130:5
137:15 140:12
209:15
**processes**  143:7
143:13 196:23
**produce**  140:22
**produced**  6:11
140:10
**product**  20:22
**production**
115:18
**productivity**
116:11 117:14
117:23 118:1
120:21 121:16
189:25 190:5
192:18 221:11
221:22,25
**profession**
215:10
**professional**
2:4 63:6,11,13
63:22 64:19
102:21
**professionals**
101:25 103:13

203:2
**professor**  135:2
135:3,11,22,23
137:9 138:3
169:7,8 174:12
187:8 205:9,17
205:20 208:15
212:2 213:7,18
213:19 214:2
214:13 217:17
**professors**
210:1,7
**professorship**
212:3
**program**
101:20 102:8
**programs**
100:23 101:3,7
**progress**
215:20 218:23
219:20
**progressed**
158:14 178:23
**progresses**
219:8,8
**progression**
136:18,24
138:3 174:1
210:25 211:23
**projecting**
121:11
**projectory**
136:10 138:22
**promoted**
135:11,25

**promotion**
135:1,2 136:18
137:9
**pronouncing**
69:24
**propounded**
226:7
**prospective**
200:4,10,14,25
201:3 204:2
**prospects**
101:14
**protected**  35:1
35:5
**protocols**
200:19
**provide**  30:17
34:17 36:23
37:21 111:23
114:8 122:16
136:15
**provided**  35:3
35:24 36:1,11
57:1 82:24
83:14 84:16
109:18 110:1,3
110:7,14,15
111:16 112:23
114:9 115:4
123:14 176:12
192:25 194:2
207:14
**providence**
100:16

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 100 of 123

**[provides - rank]**

**provides**
111:23 179:1
**providing**
10:19 111:14
**provocative**
178:19
**psychometric**
12:1,18 22:18
23:3 73:1
86:20
**public**  1:9 4:23
**publication**
64:25
**publications**
65:1,3
**publicly**  157:8
**publish**  220:20
**published**
89:19 90:12
108:25
**purchase**
126:13,15
**purchased**
126:12
**purely**  33:10
**purported**
201:12,17
**purposes**  52:16
55:8 79:22
106:3 162:18
**pursuant**  2:1
**pursue**  186:21
**put**  58:18 83:13
84:3 128:14
147:7 157:12

158:22 209:5
209:24 217:24
222:9
**putting**  50:5
196:11

**q**

**qualifications**
27:2,10,15,22
30:15 38:1
143:19 215:7
**qualified**  22:13
**qualifies**  28:9
28:21 30:17
38:2 51:19
**qualify**  22:24
**qualitative**
15:9 16:13
17:7,11,15
29:8 69:14
71:24 87:18
117:3
**quantify**
181:10
**question**  8:18
8:22 12:8
22:22 23:22
24:4 26:22
27:20 30:14
31:18 32:21
34:22 35:10,14
35:16 37:4
38:11,14 39:7
41:22 42:7
44:6,22 48:11
60:7,21 61:1

65:7,15,18
66:19 77:10
78:23 79:9
82:8 84:6
89:12 93:12,16
94:3,9 102:23
103:1 104:14
105:1 107:5
109:8 112:5,18
114:24 122:13
124:13,15
135:7 138:13
139:4 147:25
148:7,13 149:8
160:23 164:4
164:23 165:20
166:4 167:4
168:9 170:17
172:13,21
174:6 181:2
182:6 184:11
195:6,7,9,15,24
195:24 196:12
197:3 199:10
199:11,13
204:12 211:6
211:17 218:7
**questioning**
32:14
**questions**  27:8
37:23 39:2
45:10 62:25
71:1 94:14
100:4 103:12
116:20 124:14

125:14,15
129:1 132:6
144:19 163:10
166:3 202:21
212:22 215:16
222:12 224:11
224:17,24
**quick**  139:4
159:14 164:20
202:3
**quickly**  135:25
160:23,24
**quit**  60:3
**quite**  6:20
24:24 116:13
117:1 200:11
206:10
**quotations**
128:14
**quote**  182:19
182:19,23
**quoted**  128:23
**quotes**  128:13

**r**

**r**  6:1 70:1 81:15
226:1
**race**  44:8,15
46:7
**raise**  205:23
**raised**  205:16
**rakesh**  211:14
**ranji**  225:1
**rank**  205:9,17
205:23 209:9
212:7,19 213:7

Page 43

**[rank - record]**

214:2,3 217:16
217:18
**ranks** 208:16
**rapel** 81:12,14
82:2 83:15
85:7
**rare** 14:24
**rarely** 140:21
140:23,25
**rate** 62:18,19
**rather** 61:17
113:19 180:14
219:25
**rationale**
178:14
**raw** 149:14
**reach** 26:9,23
129:23 206:15
210:15 212:3
**reached** 20:15
169:8 205:7
212:7
**reaching** 68:19
69:1 108:16
119:17 213:25
218:4
**read** 21:13
36:24 38:6
42:1 43:19
46:12 71:5
72:15 74:3
77:12 80:14
81:25 84:8
90:6 100:6
108:19 109:19

118:9,11,12,14
118:17,23
129:14,14,17
130:23 133:13
133:17 154:21
154:21,21
155:10 161:3
161:18 164:6
164:18 177:19
179:5,17 184:1
184:13 189:19
198:6,6 203:9
205:13
**reading** 46:5
68:21 71:7
78:12 90:2,2
105:24 130:19
130:23 138:6
191:21
**reads** 125:24
127:4
**ready** 174:23
**real** 164:20
**realize** 50:10
75:20
**realizing** 50:6
**really** 13:15
29:10 47:5
48:11 50:14
52:22 62:8,14
65:18 79:14
83:17 88:1
96:22 108:4
130:24 131:5
140:16 145:19

154:4 163:18
166:18 172:20
207:11
**realtime** 2:5
**reask** 167:13
**reason** 9:5
88:18 165:21
**reasons** 189:7
**rebut** 219:13
**rebuttal** 66:12
66:23 67:17
164:17 165:6,9
165:16,21
172:1 185:10
220:4 222:11
222:16
**rebutted**
165:11
**rec** 42:12 126:7
**recall** 43:19
161:20 170:3
**recalled** 43:22
**receive** 103:14
127:12 165:6,8
190:3
**received** 31:7,9
31:9,13 109:7
113:4 151:25
152:2 153:6
171:1 182:7,11
182:14 190:25
191:22 194:15
209:2,20
213:22

**receiving** 165:2
**recent** 115:16
**recently** 67:18
**recertification**
20:25
**recess** 34:2
92:9 123:9
144:21 159:9
174:21 202:5
**recite** 53:25
**recognizing**
151:8
**recollect** 37:9
**recollection**
47:7 139:15
141:4 142:23
155:20 164:24
171:5 181:1
184:18 188:20
191:14 197:21
202:24
**recommend**
126:5
**recommendat...**
210:2,4
**recommendat...**
181:24
**recommended**
126:10,12
**record** 6:8 7:3
7:22 8:21 26:1
34:4,24 39:17
40:2 48:12
67:13 75:1
84:8 86:5 92:8

Page 44

[record - relied]

| | | | |
|---|---|---|---|
| 92:11 120:18 | **reduced** 226:10 | 207:2 | **rehabilitation** |
| 123:7,12 | **refer** 13:18 | **reflect** 42:2 | 4:6,10 11:15 |
| 127:12 133:4 | 44:3 124:15 | **reflected** | 13:22,24 17:4 |
| 144:18,19,24 | 183:1 | 214:25 | 17:23 26:12 |
| 154:20 174:23 | **reference** 58:16 | **reflective** | 70:14,16 71:10 |
| 186:9 195:23 | 63:25 69:6 | 192:18 | 71:22 72:4,24 |
| 195:23 202:7 | 70:25 86:9 | **refresh** 47:6 | 73:17 83:22 |
| 222:13 223:19 | 106:25 130:3 | 139:15 181:1 | 85:17 87:17 |
| 226:13 | 136:22 171:13 | 191:14 | 88:8 102:2 |
| **recorded** | 173:2,6 180:8 | **refreshing** | **reimbursed** |
| 223:22 | 185:9 190:18 | 164:23 | 118:25 |
| **records** 41:11 | 210:6 | **regard** 195:5 | **relate** 106:6 |
| 42:13 47:20 | **referenced** 68:7 | **regarding** | 165:15 215:24 |
| 48:1,13 68:8 | 68:14 180:4 | 24:18,18,21,25 | **related** 99:17 |
| 68:10,14,17 | 210:20 213:24 | 25:7 40:8,10 | 114:11 164:16 |
| 69:2 71:9,10 | 218:19 223:5 | 49:4,25 125:15 | 192:2 |
| 71:19 85:17,25 | **references** 20:4 | 134:8 166:3 | **relates** 97:13 |
| 91:19 109:5 | 143:24 196:5 | 168:5 172:21 | 97:22 99:12 |
| 112:23 123:13 | 198:10 200:11 | 201:2 | 100:9 |
| 123:23 124:19 | 201:12,17 | **regardless** 35:1 | **relating** 97:18 |
| 124:19,22 | **referencing** | 128:6 | **relation** 74:1 |
| 127:10,15 | 123:1 | **regards** 24:17 | 215:24 |
| 128:8 149:7,9 | **referral** 210:4 | 25:7,14,15 | **relationship** |
| 149:10 183:11 | 210:6 | 28:5 49:1 | 190:12 |
| **recruiter** 95:22 | **referrals** 18:23 | **region** 197:2 | **relative** 118:14 |
| 101:18 102:8 | 20:5 | **registered** 2:4 | **release** 200:22 |
| **recruiters** | **referred** 105:12 | **regularly** 93:14 | 201:4,4 |
| 93:20 95:2,16 | 109:14 | **regulating** | **relied** 34:16 |
| 95:17,19,19,21 | **referring** 68:13 | 119:5 | 35:12 37:7 |
| 95:24 96:10 | 70:21 80:25 | **rehab** 12:19 | 38:1 68:25 |
| 100:15 101:8 | 104:8 105:22 | 13:6,6 14:4,5 | 106:1,16 107:4 |
| 220:16 | 106:2 107:2 | 16:4 43:10 | 108:2,15 |
| **recruitment** | 109:24 123:23 | 65:11 103:8 | 111:11 128:9 |
| 100:9 | 126:2 146:4 | 218:1 | 145:18 148:8 |
| | 162:24 187:6 | | 148:14 151:4 |

Page 45

**[relied - reporter]**

| | | | |
|---|---|---|---|
| 159:16 171:17 | 175:25 183:13 | 24:13 30:4,25 | 157:12,16 |
| 210:23 | 183:14,21,22 | 31:5,15 33:1,8 | 159:15 160:13 |
| **rely** 26:9 63:24 | 186:2 188:22 | 33:14 35:12 | 160:18,25 |
| 68:18 91:20 | 188:23 189:8 | 39:10 45:13 | 161:3,8 163:8 |
| 102:12 107:13 | 190:13 210:11 | 47:12 51:1,12 | 163:9,23 164:3 |
| 111:25 145:13 | 223:7 | 51:16 52:2 | 164:17 165:16 |
| 152:14,19 | **remembered** | 53:6 54:2,8,12 | 165:22 168:3,3 |
| 153:1 159:25 | 2:1 | 55:10 57:2,6,7 | 168:6,16,19 |
| 214:17 216:5 | **remembering** | 58:22 59:10 | 169:4,11,15,25 |
| 218:9,14 | 174:4 | 62:1,25 66:12 | 171:10,14 |
| **relying** 12:7 | **reminded** 54:5 | 66:12,20,24 | 172:1,18 173:3 |
| **remain** 208:15 | **remotely** 3:12 | 67:15,17,18,22 | 173:10,11,15 |
| **remained** | 3:14 | 68:9,17,23 | 174:25 180:4 |
| 136:25 137:10 | **render** 12:7 | 69:3 70:21 | 180:15,15 |
| 137:16 138:3 | 23:1 26:2 | 74:21 75:3,13 | 182:15 185:9 |
| 185:16 190:5 | 27:11 28:9,21 | 77:12 78:1,13 | 185:10,12 |
| **remedy** 49:16 | 53:2,9 61:21 | 80:22 86:10 | 186:5 187:3 |
| **remember** 9:11 | **rendered** 53:11 | 90:3,7 92:18 | 194:7 195:9 |
| 9:14 10:14 | 53:12 58:21,22 | 99:8 102:17 | 197:24 198:6 |
| 23:21 45:14 | 194:25 | 104:19,23 | 202:23,24 |
| 47:4,5 50:22 | **rendering** | 105:3,4,11 | 204:25 208:9 |
| 55:23 59:25 | 190:16 193:13 | 106:4,9,17,24 | 208:10 209:23 |
| 60:3,8,8,24 | **renders** 27:3 | 107:2,6 108:3 | 212:4 216:6,18 |
| 61:14 104:10 | **renewed** 49:10 | 108:9,13 109:3 | 217:10,11,12 |
| 104:11,24 | 49:13 195:11 | 109:10 111:18 | 217:24 218:5,9 |
| 110:12,20 | **repeat** 118:17 | 112:1 113:7,14 | 219:22 220:4 |
| 112:20 114:6 | 160:12 | 114:4 119:8,12 | 221:4 222:12 |
| 120:5,15 | **repeatedly** | 119:18,22 | 222:17,20 |
| 126:17 130:22 | 89:22 | 121:22,25 | 223:4 |
| 135:20 136:12 | **rephrase** 41:22 | 124:2,16 | **reported** 2:7 |
| 146:21 151:2 | 77:10 94:10 | 130:25 132:16 | 184:22 220:13 |
| 164:2,22 | 135:8 | 133:1,4,25 | **reporter** 2:4,5 |
| 168:23,24 | **reply** 197:21 | 136:22 137:24 | 7:19 8:15 70:7 |
| 171:20 172:21 | **report** 11:6,10 | 143:23 151:6 | 70:11 120:10 |
| 173:16,21 | 11:10 20:21 | 151:17 155:6 | 122:24 133:17 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 104 of 123

[reporter - review]

143:10 146:5
164:6 189:12
**reporting** 75:9
76:14 81:19
83:5,25
**reports** 5:6
20:4,8 21:13
22:4,7 25:14
25:14,16,22
26:1 28:2,13
67:2,13,14
84:4 109:16,22
161:11 165:3,6
165:8 168:9,12
171:25 184:13
219:14
**represent** 44:7
120:14 145:24
167:18 177:7
180:23 181:18
191:8
**representation**
119:10
**represented**
146:23
**representing**
166:12
**request** 122:15
**requested**
133:17 164:6
**require** 14:8
**required** 21:2
71:2
**requirement**
12:14

**requirements**
14:3 15:5 54:8
**reread** 53:4
**research** 15:10
16:16 29:3
32:24 42:11
45:12 71:11
72:2 91:25
98:7 99:8,23
104:2 137:2,11
161:2 185:17
209:11 210:18
**researched**
17:13 26:13
61:12 97:14
138:1
**residence** 4:15
**residency**
138:19,20
144:3 209:23
210:21 211:18
**resident** 122:6
**resigned** 49:12
201:24
**resonate**
118:24
**resource** 63:17
69:15 92:1
95:20,21,22
97:23 99:20
101:25 137:2
**resources**
31:17,19 32:1
87:7 98:2
197:19 200:20

**respect** 25:1
26:6 77:6
86:17 91:11,21
105:7 107:15
109:21 110:7
121:1 133:25
134:6 184:21
191:16 193:25
**respectful**
192:3
**response** 8:10
17:17 22:8
40:19 74:13
131:13 146:18
154:22 157:17
216:21 225:17
**responses**
103:13
**responsive**
225:18
**rest** 156:2
**restate** 27:9
88:19 94:19
**result** 203:19
218:15
**resulting** 12:6
**results** 29:23
203:16,21
**resume** 95:13
95:13
**retained** 9:17
9:25 23:5,8,14
24:15,16,25
37:6 51:15
53:8 55:21

57:11,17 58:9
98:4 193:24
194:2
**retainer** 62:2,4
62:17
**retaliated** 33:6
**retaliation** 10:5
26:4 30:19
32:22 33:7,13
39:1 45:4,9,11
45:19 46:1,16
47:1 48:5
**retaliatory**
27:5 30:2,9
**retention** 23:10
163:17
**retire** 213:17
**retired** 66:7
**retrained** 66:5
**return** 15:1
16:18 126:20
127:3
**returning**
187:16
**revenue** 118:20
**review** 20:23
21:5 30:20,20
41:9,10 67:15
67:18 68:10,17
69:2 71:9,10
71:19 82:22
85:17,24 109:5
109:8 111:1
112:19,22
113:1 114:8

Page 47

[review - rvus]

119:16 122:5
126:5 127:11
128:7 138:17
139:25 143:22
145:13 147:1
165:6,9 175:10
175:11 176:7
176:10 181:2
185:21 188:17
189:14,17
191:4 199:10
209:17 219:14
**reviewed**  20:9
26:21 40:9
78:8 88:14,22
89:13,17 90:12
102:17 103:19
104:19,23
105:3 109:2
110:13 111:18
114:11 122:20
127:15 145:22
147:2 149:12
160:4 176:2
177:10 183:13
194:1,17
209:16,21,22
209:22,23
210:1,10,14
219:14
**reviewer**  204:4
**reviewers**
184:5
**reviewing**  11:8
38:23 67:20

81:10 99:23
105:4 107:6
120:6 140:13
186:8
**reviews**  42:13
175:5,11,22,25
176:3,5,9,9,17
176:18,20,23
176:24 180:17
181:4,23,23
182:2,7,17
183:20 184:14
193:19 199:8
**revised**  4:14
63:1
**rick**  4:11
**right**  16:2,7
17:16 18:3
20:15 23:11
25:21 32:6
33:3 35:6,15
35:19 36:3,7
38:4 40:23
43:10 48:1,7
48:24,25 50:6
53:7,14,16
54:14 56:8
62:20,23 64:13
64:22,23 69:25
71:6 72:22,23
76:6,7,23 77:1
78:15,16 79:14
81:17 87:18
90:8 91:12
92:14 94:21

99:10,23
106:14,18
108:10,11
109:24 110:4
115:12 116:1
117:8 120:1
121:18 122:21
125:20 127:25
131:7,8 132:20
133:2,3 134:11
134:11,17
135:13,15
138:20 140:8
142:15 143:12
144:23 150:5
150:17 151:21
153:22 158:9
159:21 160:6
162:4,22 163:1
163:4,11,14
164:11,12
165:25 166:6
171:18 173:10
174:19 175:22
176:7 181:17
183:6 185:2,6
185:22 187:3
187:13 189:9
197:5 200:9,18
201:10,15,23
202:20 203:2
204:15 211:2
211:17 212:14
212:25 213:23
215:4 216:7

217:8 218:2
220:18,23
221:8,15,18,24
222:3,8 223:14
223:18 224:9
225:11,12,22
**ring**  144:10
218:25
**rise**  208:15
**rives**  3:3
**robinson**  4:11
**role**  17:4 42:17
66:3,11 67:2
102:1 119:4
143:16 192:3
192:19 205:21
213:18,19,21
214:13
**roles**  22:12
**route**  125:16,16
**rubber**  56:1
**rude**  178:5
182:19,20
**rules**  2:2 7:16
8:13 14:18,20
54:3 94:8
**rupa**  1:5 5:13
5:16 7:10
129:5 211:11
211:13
**rush**  62:19,22
62:23
**rvu**  118:16
**rvus**  118:8
192:18

Page 48

**[s - sending]**

| s |
|---|
| **s**  6:1 81:6 |
| **safety**  203:25 |
|    204:7 |
| **salary**  31:6 |
|    106:11 111:2 |
|    116:12 119:14 |
|    142:8 151:17 |
|    154:23 155:24 |
|    160:12,13,14 |
|    160:15 161:7 |
|    161:11 213:22 |
|    216:15,16 |
|    222:2 |
| **salem**  10:17 |
|    55:11 56:1 |
| **sam**  100:15 |
| **sampling**  87:24 |
| **saw**  40:8 127:9 |
|    180:7 182:2 |
| **saying**  38:13 |
|    86:21 94:2 |
|    96:25 116:17 |
|    128:16 142:2 |
|    172:10,11 |
|    186:2 215:18 |
| **says**  7:20 58:8 |
|    80:10 129:5 |
|    163:17 180:15 |
|    180:16 185:15 |
|    202:10 216:11 |
| **scarf**  123:4 |
| **scenarios** |
|    210:18 213:25 |
|    217:16 |

**schematic**
   86:12 87:16,17
**school**  4:18,20
   4:22,24 5:2,4,8
**schools**  4:23
   5:1,9
**science**  1:8 5:11
**scientifically**
   90:22
**scope**  53:8
**scored**  175:21
**scroll**  104:6
**search**  12:23
   29:23 30:11
   41:11 50:8
   93:18,21,24
   94:25 95:8,8
   96:6,8,9,23
   98:5 99:1
   130:4,8,11,17
   165:18,23
**searchers**
   96:19
**searching**
   134:2 161:15
**second**  11:19
   24:20 72:23
   109:22 111:19
   127:4 175:4
   177:13,14,15
   187:2,21
   189:18 211:10
   212:18 223:23
   224:9

**secretary**  62:13
**section**  63:12
   68:9 103:10
   135:10 155:6
   156:5 189:22
   223:10
**security**  11:19
   12:25 13:1
   18:4,7 19:3,6
   28:9 64:5
   65:10 92:13
**see**  22:21 25:9
   51:15 52:8
   55:12,14 57:24
   58:2,2,15
   64:22,24 66:21
   68:2,11 69:23
   70:17 72:7
   73:19 74:2,7,8
   75:11 76:14,17
   77:14,25 79:11
   82:25 101:4
   104:24 105:3
   110:10 111:17
   120:20 121:16
   122:8 125:24
   130:13 136:2
   139:3 144:25
   145:19 150:21
   151:7 153:19
   153:20 154:18
   158:11,12
   159:7,15
   160:14 163:2
   164:1,13 165:5

   165:18 175:8
   177:17 184:14
   187:7,19 192:8
   192:15,20
   198:10,14
   199:7 206:3
   208:21 210:9
   211:21 212:2
   214:23,24
   217:10,11
   218:8 219:22
   225:3,19
**seeing**  64:6
**seeking**  124:25
   192:1
**seem**  23:11
   193:19
**seemed**  179:21
   210:9
**seems**  43:24
   116:12
**seen**  103:25
   179:20 180:25
**select**  85:10
**selected**  75:7
   76:13 83:24
**self**  128:18
**seminar**  97:17
**send**  47:13,13
   47:15 103:14
   103:19 140:1
   161:10 162:19
   168:16 208:7
**sending**  139:5
   139:6 152:23

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 107 of 123

[sending - skill]

| | | | |
|---|---|---|---|
| 159:22 161:7 | series 17:8 | shared 26:20 | signs 178:17 |
| sense 10:10 | serve 22:25 | 131:3 136:3 | similar 28:13 |
| 12:8 30:4 39:6 | 23:14 102:22 | 166:19 168:10 | 32:21 47:12 |
| 41:15 94:10,18 | 102:22 103:2,6 | 200:14 | 59:14 60:9 |
| 109:1 149:21 | 103:15 104:25 | sharing 29:13 | 93:17,22,24 |
| 214:14 215:10 | 105:24 171:10 | 125:2 127:23 | 94:24 95:5 |
| sent 104:20 | 171:14 | 130:19 131:20 | 111:22 113:14 |
| 111:4,10 | served 10:25 | 136:5 139:14 | 160:3 184:14 |
| 139:15,19,21 | serves 103:8 | 163:4 168:13 | 184:25 185:2,3 |
| 139:23 140:4 | services 4:12 | 173:14 223:7 | 190:21 212:22 |
| 141:9,12 | 14:14,21 15:13 | she'll 222:6 | 213:20 |
| 144:15 145:11 | 88:9 120:19 | sheets 208:4,5 | similarities |
| 146:23 147:5 | 190:7 | shine 213:9 | 96:7 |
| 147:17 148:1,3 | serving 21:19 | shoes 58:11 | similarly 8:20 |
| 148:8,14,22 | 21:21 | short 49:18,18 | simply 195:24 |
| 149:13,23 | set 119:21 | 135:12 136:10 | 197:5 |
| 150:8 151:21 | 142:13 203:13 | 143:3 173:23 | single 46:23 |
| 153:12,13,20 | 212:15 224:6 | show 111:7 | 81:21 85:18 |
| 157:7 160:4 | setting 28:8,8,9 | 145:25 146:3 | 140:18 |
| 168:2 208:12 | 138:15 186:1 | 199:9 221:21 | sit 33:3 67:1 |
| sentence 51:16 | 186:11,23 | shows 177:25 | 90:19 |
| 51:25 52:3 | settle 57:5 | shrm 101:13 | sitting 45:16 |
| 53:3,4 175:4 | several 14:15 | shrma 101:23 | 47:24 104:10 |
| 185:14 205:8 | 15:2 28:4 | shults 3:11 | 137:25 145:16 |
| sentences | 38:14,15 72:25 | side 16:2 22:1 | 154:16 222:4 |
| 154:18 | 90:24 102:20 | 67:7,14 151:22 | situation 167:1 |
| separate 36:3 | 109:14 138:9 | 151:22 163:2 | 195:20 200:8 |
| 99:22,25 167:4 | 198:6 215:15 | 165:9 172:20 | 203:22 |
| 170:13,13 | severe 178:2 | 174:1,3 | situations |
| 184:4 195:15 | share 29:9 | sign 95:23 | 28:18 99:7 |
| separately | 41:23 42:4,5 | 96:11,12,19 | 102:5 |
| 81:18 110:8 | 42:15,24 50:16 | signature | six 50:1,2 63:2 |
| separates 142:9 | 50:17 147:8,15 | 226:22 | 63:2,2 |
| separation | 166:22 168:6,7 | significant | skill 203:13 |
| 200:6 223:8 | 168:12 199:3 | 178:10 197:22 | |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 108 of 123

**[skills - staff]**

**skills**  14:16
  15:4 16:15
  63:12,13,22
  86:25 88:3
  91:16 159:2
  178:1 181:12
  214:12 215:9
  216:13
**skilltran**  64:10
**skimmed**  113:6
**skip**  179:3
**skipping**  209:7
**slightly**  65:7
**slow**  179:10
**small**  167:3
  203:1 204:18
**smoothly**  8:14
**soc**  64:17
**social**  11:19
  12:10,25 13:1
  18:4,7 19:3,6
  28:8 47:14
  64:5 65:10
  92:13
**socioeconomic**
  87:13
**solid**  95:13
**somebody**  89:4
  151:21 211:12
  223:11
**somewhat**
  45:13 117:9
**soon**  114:25
**sorry**  15:22
  17:1 22:5,5,10

31:7 32:13
39:14 47:24
55:16 58:5
60:4 73:8
75:13,18 87:14
90:16 92:3
98:16 112:5
114:23 122:12
126:25 136:13
138:12,22
146:15 150:20
159:21 164:4
167:12 170:21
188:8 199:14
211:11 212:12
220:3 223:18
224:19,20
225:6
**sort**  13:2,14
  19:1 38:4
  46:10 54:11
  59:5 60:21
  84:2 90:12
  105:22 107:16
  109:8 129:9
  135:3 139:13
  140:7 146:9
  154:16 156:15
  161:12 163:23
  169:13 179:14
  185:5 192:25
  193:16 198:13
  215:19 219:24
**sorts**  100:20
  128:19 143:19

**sought**  36:21
**sound**  132:18
  190:21
**sounded**  225:9
**sounds**  24:9
  41:25 42:5
  51:8 64:11
  67:10 100:13
  104:17 116:24
  127:19 171:13
  216:23 225:22
**source**  80:20
**speak**  8:25
  13:25 23:13,17
  24:11 34:7
  39:18,21
  137:14,18
  143:10 172:4
**speaking**  69:9
  99:18 134:25
  138:25 219:7
**speaks**  79:5
  137:24
**specialist**
  219:25
**specialized**
  52:5
**specialties**  5:11
**specialty**  96:2
  98:16 119:1
  219:1,18
**specific**  13:1
  45:25 46:3,7
  73:25 80:25
  81:5 82:12,15

89:9 95:15
96:3 97:24
99:11,14
103:12 119:1
124:12,13
142:17,21
216:3,5
**specifically**
  46:13,13 52:2
  64:12 97:13,18
  97:21 99:12,16
  100:9 106:12
  108:1 138:12
  162:17 173:24
  198:7
**speed**  54:11
**spelled**  136:9
**spelling**  95:13
**spend**  55:17
  111:6
**spending**
  203:17
**sphr**  31:21
**split**  30:14
**spoke**  45:13
  89:5 220:15
**spoken**  7:18
**spreadsheet**
  207:23
**spreadsheets**
  144:9 149:14
  151:13
**staff**  49:3 95:20
  95:22 178:4
  179:20 189:23

Page 51

**[staff - subjected]**

190:3,10,19
200:24 203:16
203:19 210:5
**staking** 116:15
**stand** 40:25
41:18 44:13
182:6
**standard** 62:4
62:5 64:16
72:18,21 82:14
88:5 102:12
105:17 106:3
217:2,25 218:3
**standards** 76:1
93:18 94:25
95:6
**standing** 83:22
**stands** 50:14
**start** 11:8 15:8
19:2 33:11
125:21 163:18
177:15 200:24
**started** 14:1
16:22 49:23
50:2,2,5,5,10
67:4,6,10,20
163:20 181:11
212:5
**starting** 164:24
165:14,23
205:2
**starts** 157:14
159:6 161:6,7
175:3 177:15
179:4 203:10

**stat** 87:23
**state** 11:16,16
15:13 47:11,15
58:25 74:9
77:12 122:4
132:13 133:25
134:7 185:24
215:13 222:5
**stated** 39:10
43:23 74:5
80:17 185:20
223:4
**statement**
52:10 86:21
133:24 161:23
180:20 181:10
187:25 188:15
201:5 225:15
**statements**
25:7 29:24
49:3,3 180:2,4
180:6,9,14
181:25 201:8
201:10 209:22
**states** 1:1 68:10
73:15
**statistic** 85:7
**statistics** 5:7
83:3 108:1
138:7,8 214:25
**stats** 64:10
138:11 214:20
216:9 219:24
**status** 20:15,16
62:19,22,23

114:15 209:12
**stay** 29:25 30:3
37:4 49:15
52:5 135:23
174:5,7,10
206:19
**stayed** 136:7,20
**stenotype**
226:10
**step** 74:2 76:21
77:4,13,25
78:19 81:4,25
83:10 84:7
85:5 88:12
89:3,9,13,19
136:14
**stephen** 2:18,19
**stepping** 58:11
**steps** 15:2
29:15 75:8,9
75:11 76:13,16
76:17 78:17
79:24 80:5,15
80:25 81:2
83:24 84:1
85:10,11 86:15
86:19 88:20
90:21 91:6,10
95:9 150:7,9
**steve** 2:8 24:7
35:14 78:23
89:24 113:21
**stick** 170:24
**stickies** 208:3

**sticking** 110:22
208:14
**stoel** 3:3
**stone** 211:7
**stop** 75:21
**story** 38:20
42:17,22 48:16
48:18,19 50:7
50:15,21 51:4
**straight** 163:1
**strategies**
93:22,24 94:25
**strong** 130:12
**structure**
221:14
**student** 175:5
175:10 176:3,4
176:5,6,9,17
183:24 184:13
204:4,18
**students** 95:12
181:25 182:1,3
182:18 183:2
184:23 185:4
192:25
**study** 20:13
214:18
**style** 75:9 76:14
81:19 83:5,25
191:17,24
193:2
**subject** 144:7
155:20 183:4
**subjected**
28:11 33:13

Page 52

**[subjected - sworn]**

| | | | |
|---|---|---|---|
| 37:22 39:10 44:15 | **sullivancotter** 102:20 106:18 152:22,24 153:17,17 159:17 206:1,8 | 24:6 26:2,15 26:20,20 32:25 37:12,15 39:7 43:21 47:10 54:23 55:19 | **surgeon** 59:3 92:14 98:15 99:4 |
| **subjective** 183:1,5,8,9 193:10,20 | | | **surgeons** 64:16 |
| **submission** 20:24 | **sum** 26:16 115:19 125:3 125:11,12 | 57:6 60:6,14 63:3 72:19 74:24 75:2 | **surgery** 59:22 |
| **submissions** 47:20 | | | **surgical** 219:25 |
| **submit** 20:3,4 20:22 47:11 220:4 | **sumant** 225:1 | 83:20 92:5 | **surprised** 225:17 |
| | **summarized** 73:18 178:5 | 94:5 101:16 104:9,13 | **survey** 99:18 99:20,23,24 |
| **submitting** 63:9 | **summarizing** 71:12 210:13 | 106:10 107:5 107:24 109:13 | 106:15,16,19 107:21 110:9 |
| **subpoena** 171:1 225:18 | **summary** 5:7 22:22 95:3 | 110:11 111:9 112:24 122:14 | 111:21 126:3 138:11 151:3 |
| **subsequent** 30:10 199:25 | **super** 118:11 | 123:6 126:10 127:17,19 | 152:24 159:23 216:6 220:12 |
| **substance** 35:7 | **supplement** 133:4 | 128:24 131:17 133:12 135:17 | 220:13 |
| **successful** 190:6 | **supplemental** 165:22 | 138:5 139:22 143:12,22 | **surveys** 16:16 61:6 102:13,16 |
| **suffered** 32:22 52:7 | **supplied** 35:11 | 149:19 154:15 154:23 155:11 | 103:22 104:3 104:14 106:16 |
| **suggest** 122:16 158:5 178:17 | **support** 26:13 149:9,11 155:13 156:9 187:24 218:14 218:17 219:3,6 | 159:8 162:25 164:19 168:22 169:21 172:10 175:14,15 | 107:3,13 108:2 108:15,24 110:8 111:12 112:12 142:13 |
| **suggested** 192:12 | | 177:12 179:18 181:20 182:1 | 144:10 148:4 156:14 220:21 |
| **suggesting** 191:23 | **supporting** 216:19 219:23 | 191:12 199:20 202:4 207:9 | **susan** 10:6 |
| **suite** 2:20 3:6 | **supports** 27:23 89:9 90:20 218:22 | 209:18 211:13 213:11 219:12 | **sw** 2:8,15,20 3:6 |
| **sullivan** 107:8 154:24 155:24 | | 224:1 225:8 | **swear** 6:9 |
| | **sure** 7:18 8:4 12:9 15:24 17:15 18:2 20:9 21:14 | | **switched** 115:14 |
| **sullivancarter** 157:3 | | | **sworn** 6:12 226:6 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 111 of 123

**[sympathize - termination]**

**sympathize**
178:23
**sympathizing**
131:3
**synonymous**
59:19
**synthesizing**
82:23
**system**  16:5
**systems**  15:12
16:6 101:9

**t**

**t**  226:1,1
**table**  158:7,13
159:15 220:9
220:10
**tables**  157:16
160:13
**take**  8:5 20:10
21:1 29:15
34:1,23 40:25
41:18 44:13
54:24 55:16
74:22 78:17
80:14 115:7
120:7 121:14
129:2 150:10
155:2 160:17
170:8 174:20
182:10 189:18
202:3 205:21
206:9 208:25
215:20 224:23
225:16

**taken**  1:17 2:3
6:4 7:14 9:11
9:15 14:24
48:12 84:3
97:17 178:17
226:9
**takes**  209:11
**talk**  12:9 15:17
21:14 37:1,16
37:19 67:25
75:4 81:4
85:23 87:6,11
87:23,24 88:24
98:2 102:8
107:7 116:4,19
117:4 123:18
129:9,13
136:13 137:5
137:20 138:8
147:10,13
167:23 172:6
174:17 196:4
222:25 225:18
225:21
**talked**  8:20
51:25 60:11
68:7 74:3
84:25 87:5
91:24 98:11
103:21 109:4
116:21 117:9
127:15 132:12
139:7 161:14
163:6 166:1
167:9 168:19

170:6 172:5
190:22 192:22
194:14 200:15
203:4 210:3,23
214:1,4 216:4
220:24 223:11
**talking**  8:23
34:6 36:8
37:20 43:8
58:5 77:24
89:1 95:7
99:24 107:25
108:1 126:3
133:18 134:23
135:10,15,18
135:21 136:8
141:24 149:23
165:17,22
169:22 176:3
200:25 212:5
215:2 217:19
**talks**  196:22,24
196:25 197:1
**taught**  46:15
**teach**  181:12,13
181:13 203:12
**teaching**  5:15
161:2 179:6,16
179:19,23
185:17
**team**  95:23
192:1
**teams**  182:23
**technical**
177:25 223:23

**tecum**  171:1
**telephone**  36:9
223:21
**tell**  6:17 7:25
34:11 99:21
102:24 107:2
129:20 131:12
135:8 140:12
142:25 148:19
201:5
**telling**  41:11
**temper**  203:15
**tempered**
178:12
**tend**  96:10
**term**  106:13
118:7 131:24
219:24
**terminate**
189:21 190:11
**terminated**
49:9,12 56:13
56:14,14 59:25
187:16 188:21
194:20,21
195:10 201:22
**termination**
49:17 188:18
190:20 191:2
195:2,12 197:6
197:7,10,15
198:8,12
199:21,25
200:16 223:1,6

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 112 of 123

[terms - think]

| | | | |
|---|---|---|---|
| **terms** 12:11 | **testimony** 7:21 | 68:6 70:6 | 15:25 17:2,6 |
| 34:14 39:3 | 10:7,19 13:15 | 78:23 80:16 | 20:20 22:16 |
| 59:20 96:2 | 30:7 33:4,5 | 87:15 88:12 | 23:8 30:13,24 |
| 100:16 109:16 | 38:19 39:8,18 | 94:5,10,12,21 | 31:5 34:24 |
| 130:15,25 | 39:23 42:19 | 106:11 120:11 | 35:5 36:15 |
| 147:12 159:3 | 54:15,19 63:5 | 133:20 134:17 | 37:10,25 38:14 |
| 209:24 210:17 | 71:17 77:8 | 137:6 141:15 | 39:1,18 45:12 |
| 214:22 | 78:3 80:2 | 151:12 152:20 | 47:3 48:24 |
| **test** 20:11 | 84:13 88:16 | 154:2 155:1,1 | 49:5,21,22 |
| 25:21 86:22,23 | 96:21 111:10 | 160:17 189:13 | 51:14,25 52:12 |
| 87:2 | 133:9 134:13 | 191:7 210:13 | 52:25 53:14 |
| **tested** 90:23 | 139:12 153:23 | 224:15,16 | 54:12 55:8,12 |
| **testified** 6:13 | 160:3 185:21 | 225:12 | 56:13,19 58:15 |
| 10:21 20:7 | 185:24 215:21 | **thanks** 24:7 | 59:24 61:12,14 |
| 34:8 43:9 | 221:10 226:9 | 133:14,16 | 62:1 63:4,14 |
| 45:16 46:10 | 226:14 | 162:12 | 65:11 69:12 |
| 48:15 51:14 | **testing** 15:6,7,8 | **theories** 13:8 | 70:24 71:5,8 |
| 55:10,14 56:15 | 63:16 | **thereof** 226:16 | 72:7,14 78:11 |
| 56:21 57:2,7 | **text** 129:2,5 | **thick** 207:16 | 78:13 79:18 |
| 58:23,24 86:16 | 140:11,13,16 | **thing** 52:21 | 84:25 86:9 |
| 132:11 139:9 | 140:22,23,25 | 66:10 71:24 | 87:12 89:4 |
| 145:10 175:3 | 141:7 152:22 | 146:7 165:7 | 97:9,10 100:25 |
| 177:10 185:15 | 154:3,8,10,14 | 182:3 | 101:2 103:3 |
| 186:9 216:1 | 155:21 156:2 | **things** 38:7 | 105:11 108:6,8 |
| **testify** 9:7 22:2 | 159:20 160:9 | 43:11 51:1 | 108:19 109:23 |
| 22:2 23:2 24:3 | 161:6 | 52:20 60:5 | 110:25 114:19 |
| 33:22 40:17 | **texted** 129:24 | 68:2 71:16 | 114:20 115:1,2 |
| 41:18 52:25 | **texts** 129:10 | 85:24 86:1 | 117:24 125:24 |
| 55:14 57:4 | **thank** 6:19,22 | 117:16 128:18 | 126:7,11,12,15 |
| 59:13 60:22 | 16:1 17:20 | 128:20 132:17 | 126:17 127:4 |
| 188:23 | 19:1 24:1 | 143:8 169:20 | 131:9 132:10 |
| **testifying** 40:16 | 30:23 35:13 | 171:3,15 184:5 | 133:18 134:2 |
| 40:22 88:22 | 48:15 50:10 | 207:8 | 134:18 135:15 |
| 92:12 146:9 | 51:2 56:5 | **think** 9:16 | 135:18,19 |
| 167:19 | 57:10 61:24 | 10:18 14:9 | 136:8,10,12 |

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 113 of 123

**[think - tomorrow]**

137:20,21
138:24 139:9
139:12,23
140:2,9 141:23
141:25 143:23
144:9,10
146:13 148:9
148:20 150:1,5
150:12,22
151:13,16
153:15,19
154:4 156:19
159:10,19
160:3 162:6
163:7,7,13,14
164:14 166:4,8
169:11 170:6,6
171:4,11,12
173:20 174:3
175:20 180:5
181:17,21
184:6 195:6
196:3 197:3,4
197:24 198:20
199:15,16,23
201:14 205:1
205:22 208:20
210:9 211:18
213:24 214:3,6
214:8 216:22
217:3,19 220:9
220:24 221:4,6
221:18,21
222:3,5 223:5
224:8

**thinking**  18:23
33:4 100:2
143:11 145:25
151:24 152:1
183:2
**third**  11:22
84:7 179:15,15
225:1
**thorough**  63:14
63:15
**thought**  49:4
140:17 141:24
142:19,22,24
148:17 150:10
159:17 160:5
169:10 175:20
176:24 209:5
209:18 213:16
**thoughts**  168:4
**thousand**  67:8
67:8
**thread**  140:13
144:6
**three**  20:9 55:9
63:2,3 71:6,12
71:12 144:2,4
192:22 193:17
201:11,14,17
**throw**  101:5
**thumb**  152:13
**time**  6:20 8:6
9:14 14:8,19
15:23,23 20:14
24:12 26:19
28:5 34:6 37:5

37:5 38:6
49:25 50:3
55:16,17 61:8
61:20,20 65:5
72:12 75:20
79:12 92:22
93:1 99:11,15
99:16 101:8,8
101:15 104:21
104:25 107:16
107:21,23
108:3 111:6
113:5 117:21
117:25 119:8
119:12,22
133:11 135:12
137:8 143:25
150:17,23
154:13 162:6
163:25 167:4
174:7 180:10
181:10 190:4
192:19 193:12
194:24 197:7
197:17,18
200:9 203:17
203:18 205:20
215:11 222:1
226:5
**timeline**  135:2
136:19
**times**  7:15 9:10
37:25 38:15,16
68:7 98:1
100:21 108:6

109:14 110:23
124:8 138:9
167:25 198:6
210:18 215:15
218:22
**title**  211:20
225:3,3
**titles**  64:3
151:8
**today**  7:8,19,22
8:4,14 9:5,8
33:4 37:6,10
40:16 45:10,16
62:14 64:4
67:1 68:2,7
90:20 94:13
98:3 104:11
122:7 123:19
126:3 130:16
137:25 145:16
203:5 207:17
221:10 222:5
224:15
**today's**  6:7
**together**  13:4,5
36:20 50:5
83:13 84:3
178:17 208:21
209:24 213:3
222:10 226:8
**told**  94:7 108:6
127:7 191:22
223:12,13
**tomorrow**
155:5,7

Page 56

**[took - types]**

| | | | |
|---|---|---|---|
| **took** 7:25 41:8 | **trained** 100:11 | **transferable** | **turn** 51:12 |
| 44:13 46:19 | 100:15 101:15 | 15:3 16:14 | 62:24 63:10 |
| 48:6 51:8 | **trainees** 178:4 | 88:3 | 68:8 69:5 |
| 109:13 124:4 | 192:12 | **translates** | 73:13 109:3 |
| 138:5 144:24 | **training** 13:7 | 118:20 | 120:17 128:25 |
| 150:8 152:10 | 15:1,20,21 | **transportation** | 177:13 179:13 |
| 152:10 163:25 | 27:16 28:24,25 | 87:7 | 202:19 |
| 184:12 206:1,8 | 29:1 31:17,20 | **traumatized** | **turned** 14:10 |
| **top** 10:14 32:13 | 32:3 46:13,24 | 128:19 | 164:1 223:24 |
| 107:11 128:12 | 48:3 51:20 | **treatment** | **twice** 110:25 |
| 129:4 140:6,10 | 66:8 86:25 | 178:3 | 148:21 150:13 |
| 151:9 158:7 | 89:1 91:16 | **trial** 7:21 23:2 | **two** 10:16 |
| 162:12 163:2 | 97:12,15,16,21 | 33:4,5,22 | 47:18 50:5,5 |
| **topics** 19:3 | 97:24 99:11,14 | 37:21 40:17 | 61:11 88:6 |
| **total** 5:12 26:16 | 99:16,25 100:5 | 59:13 60:11 | 98:12,23,24 |
| 115:19 183:19 | 100:8,12,14,17 | 202:14,15 | 106:20 124:9 |
| **totality** 12:3 | 100:23 101:3,7 | **trick** 94:13 | 135:12 144:3 |
| 13:16 26:22 | 101:10,11,14 | 167:18 | 154:18 163:14 |
| 109:7 123:24 | 101:19,21 | **tried** 140:15,15 | 169:20 183:22 |
| **totally** 8:8 | 103:11 122:2 | **trier** 182:13 | 206:8,13 |
| 44:12 188:22 | 144:4 178:16 | **trigger** 104:20 | 208:21 211:7 |
| **touch** 12:19 | 178:19 | **true** 11:2 29:14 | 211:19 217:16 |
| 113:22 132:24 | **trainings** 46:11 | 218:25 226:12 | 224:7,8,17 |
| 223:2 | 88:25 100:20 | **truth** 8:1 | **type** 4:18,20,22 |
| **touched** 113:8 | 101:23 102:7 | **try** 8:25 16:24 | 4:24 5:2,4 |
| 113:9 140:2,3 | **trajectory** | 22:5,6 125:13 | 47:12 48:6,12 |
| 223:3 | 135:18 136:6 | 128:17 131:5 | 56:1 60:9 |
| **touches** 13:21 | 136:18 137:2,4 | **trying** 33:10 | 62:22 102:5 |
| 203:24 | 137:8,15 | 48:24 49:18 | 108:4 130:16 |
| **toward** 96:2 | 138:14,15,18 | 61:12 75:21 | 144:9 149:12 |
| **towards** 163:2 | 138:22 168:5 | 79:19 83:19 | 149:25 180:3 |
| **track** 65:19,20 | **transcript** 8:24 | 84:2 89:4 | 185:3 194:4 |
| **train** 100:19 | 226:11 | 113:25 116:8 | 201:2 |
| 102:9 | **transfer** 215:14 | 129:25 141:5 | **types** 43:13 |
| | | 143:2,4 183:14 | 143:14 193:19 |

Page 57

[typewriting - used]

**typewriting**
226:10
**typing**  66:9
157:25
**typist**  157:23

**u**

**u.s.**  64:10
214:20 216:9
**ultimate**  112:7
125:9 137:7
145:14 151:5,5
152:15 153:2
158:12 193:13
207:12 216:4
**ultimately**
36:12 52:17
112:13 138:1
142:11 152:7
157:9
**um**  8:10,16,16
17:17 22:8
40:19 73:6,20
74:13 122:1
146:18 157:17
216:21
**uncomfortable**
178:21
**under**  11:12
14:4,18 34:4
34:25 37:13
54:3 68:17
69:2 71:2
73:14 75:13
115:15 121:23
126:20 127:3

135:10 148:21
189:21
**underlies**  216:4
**underlying**
43:13 190:20
223:1,8
**understand**  7:6
7:12,23,25
24:20 33:10
34:4 36:4
40:22 76:20
78:10 79:13,17
83:19 84:2
85:9 86:3
94:14,15,18
100:6 117:7
119:9 121:8
123:13 132:2
184:1 188:24
196:16 207:4
218:2
**understandable**
18:2
**understanding**
78:12 110:2
117:12,15,19
121:9 127:7
144:13 152:5
217:1 220:10
**understood**
119:15 201:22
215:17
**undertake**
92:23 210:14

**undertaken**
31:20 48:4
**undertook**  72:4
98:5 121:10
194:24
**unequivocal**
43:24 180:16
181:10
**unfortunately**
45:9 178:21
**unique**  93:6,7,8
93:10,11,12
94:4
**unit**  118:14
**united**  1:1
**university**  1:9
4:14 5:14,17
9:22 111:24
112:25 175:6
175:13,14,18
176:1,12,18
177:1,9 180:10
180:16,18
181:5 182:8,18
183:12 184:20
187:10,10
190:23 192:23
194:15 202:8
220:25,25
221:1
**unlawful**  28:11
**unpredictable**
203:14
**unprofessional**
178:8 182:22

**updated**  55:6
**upside**  166:7
**use**  7:22 8:17
12:17,17 13:6
19:6 33:8
52:16,18,22
59:18 73:22,22
77:22 79:18
80:17,20,22,24
81:2 88:1
93:19 95:2
103:23 110:17
111:18 126:8
156:11,14,20
156:21,21,22
157:10 158:1,1
169:14 214:7
214:10 215:14
216:20 217:6
217:14,24,25
220:16
**used**  13:10 49:6
64:4 88:13
91:22 142:19
142:22 145:7
152:16 155:8
155:12,13
157:4 158:7
159:3 160:5
165:19 175:22
205:22,25
206:4 207:12
208:18 212:2
213:1,2,5
214:20 216:23

Page 58

**[used - walter]**

217:5,9 218:2
218:3,19,21
**user** 110:16,23
**uses** 89:3
**using** 105:5
155:15 216:2
219:23,24
**usually** 8:6
14:23 72:18
101:15 125:10
210:17 215:8
**utilize** 15:12
17:3 22:17
68:22,22 85:12
99:20 217:3
**utilized** 17:5
79:24 89:10
106:20 138:6
151:11 153:7
218:18
**utilizing** 89:16
215:13

**v**

**v** 1:7 56:18
70:1
**va** 10:8 103:4
108:7
**vacation** 50:4,4
**vague** 27:8
50:18 107:18
135:5
**value** 118:14
179:1
**varies** 18:1

**various** 95:9
108:14 117:8
161:10
**vast** 199:25
**veracity** 149:8
**verbal** 5:19
191:1,9 192:7
197:20 199:12
**verbatim** 82:1
128:15
**verify** 51:4,6,7
127:14 147:4
148:15 149:3
149:13 150:8
153:5 188:14
**versa** 52:23
**version** 48:20
50:11
**versus** 6:5 8:23
40:15 55:11
65:11,17 94:1
96:24 97:3
107:8 111:8
117:21,22
146:21 161:23
162:11 176:18
214:7 216:2
**veteran** 98:14
**veterans** 10:6
57:8,19,19,21
58:8,14 59:21
60:12,15 61:5
92:13 98:10
**vice** 52:23

**video** 6:3 159:5
223:21 224:1,2
224:3
**videoconfere...**
36:9 224:1
**videographer**
3:15 6:3 7:19
**videotaped**
1:16
**view** 193:16
**viewed** 146:19
150:4 158:24
**viewpoints**
183:1
**visit** 37:13
**visual** 147:2
**voc** 13:5,6 14:4
14:5 16:4 19:6
21:25 43:9
65:11 67:11
103:8
**vocational** 4:5
4:9 7:9 11:15
11:19,22 12:12
12:19 13:9,12
13:19,22,24
14:14,15,21
17:4,22 19:10
19:12,16,19,23
20:2 22:13,13
23:15 26:12
28:20 38:21
40:17,18 63:24
67:3,4,11,12
69:8,9 70:13

70:16 74:18
76:2,22 77:4
77:15 79:22
80:18 82:9
83:9,22 85:1
85:13 86:17
89:14 91:10
102:2 217:2
218:1,1
**volume** 9:3
186:2,11,22
**vram** 4:7 26:12
26:21 69:23
70:2,3,14 71:2
73:12 74:3
75:6 76:5 77:1
78:7,14,18
79:16 81:12
82:2 83:3,15
85:2,6,15,16
86:12
**vrc** 47:19

**w**

**w** 87:4 118:16
**wage** 16:22,23
16:23 88:10
107:22 119:13
158:5 206:2,4
206:5 219:8
**wages** 52:4
53:14 214:8,22
215:12 221:7
**wait** 121:23
**walter** 2:3
226:3,23

Veritext Legal Solutions
calendar-pnw@veritext.com 503.245.4552

Exhibit 6
Page 117 of 123

**[want - work]**

**want** 13:20
15:22 19:1
23:18 24:3
27:22 29:25
30:3 37:4,23
40:4 50:17,20
51:12 53:1
54:11 58:5,18
60:5 66:19
67:8 69:6 70:8
79:13 89:21
90:6 94:13
96:4 106:24
109:3 113:16
113:23 125:21
128:25 134:11
135:19 139:11
142:10 147:23
154:13 155:14
158:10 159:12
169:20,21
170:24 171:10
172:10 173:18
175:1 177:14
179:17 187:5
197:4 199:15
201:6 202:21
202:24 204:25
212:22 214:10
214:14,15
222:11,13
224:17,25
**wanted** 49:15
62:14 78:10
81:24 130:3

139:25 140:1
141:22 149:3,4
162:21 168:4
169:1 171:23
172:9 173:24
181:20 212:15
225:8
**wanting** 41:16
125:12,13
**wants** 197:1
**washington**
11:17
**waste** 154:13
**way** 15:25
17:14 40:16
43:18 44:2
58:12 85:16
99:22 111:11
112:11 128:6
131:18 132:5
146:1 149:5
151:2 154:22
156:19,24
160:20 179:10
181:13 191:19
194:9 223:16
**ways** 130:7
185:5
**we've** 6:19 11:4
11:5 32:19
51:25 70:12
84:25 85:2
86:7 92:2
126:3 145:1
192:22 194:14

199:16
**website** 150:14
153:8,24
**weeds** 19:2
**week** 67:20,21
164:2 172:6
173:12
**weird** 129:9
140:8
**welcome** 69:5
74:21,25
113:16 181:1
184:3 191:14
**went** 64:6,8,9
64:10 111:2
148:19 153:8
153:24 156:17
159:20 179:9
179:20
**western** 4:17
4:19 5:3
**wish** 65:18
113:15 206:13
207:1,24
**witness** 6:9,11
10:20 23:25
35:19 40:4
42:22 45:7
50:20 78:5
82:9 83:9
84:15 114:2,5
115:12 120:4
120:11 123:4
133:11,14,16
133:18 135:7

143:11 159:5
164:7 170:19
170:23 184:10
189:13 191:7
224:16,20
226:6,9,14,18
**wonder** 104:15
**wondering**
21:16 33:3
215:25 224:6
**word** 48:24,25
49:1,6 51:8
52:22 59:18
143:12 156:16
175:22 182:10
193:9
**words** 52:12,16
52:18 90:10,18
128:22 184:22
186:24
**work** 11:1,14
12:5,10 13:3
13:11,16,21
14:11,16 15:1
16:10,18,20
17:12,23,25
18:3,6,8,10,13
18:20 19:3
20:22 26:8
28:7 31:1,18
43:9 49:14,21
50:3 52:17
53:5,8,18 54:1
62:16,21 65:9
65:11,17 66:9

Page 60

[work - yesterday]

67:4,7,11,12
74:1 79:13
81:21,23 88:11
91:7,16 92:12
98:3,25 101:4
103:15 107:25
108:7 113:15
118:14 121:6
125:6,20
126:20 127:3
132:9,14 134:2
134:24 155:8
160:21 165:15
182:23 185:18
186:1 191:4,23
194:18 205:21
206:11 208:8
213:8 222:22
224:13
**worked** 20:5,7
28:3,4,13 32:1
66:4 102:7
199:17 206:6
**workers** 14:1
16:5 28:8
47:14 67:6
101:4 102:2
**working** 14:4
14:18,22 16:3
16:7,8 19:5
62:8,13 63:15
76:25 100:17
100:23 118:2,6
156:9 162:3
163:13,18,20

164:7,8 171:8
178:19,25
186:11,25
200:13 211:15
**workload**
17:22 18:3
**workplace** 27:6
27:14 28:1,12
28:23 30:3,10
30:19 43:25
46:16 47:1
48:6
**works** 16:4
20:8 36:5
143:5,12,17
203:1
**worried** 203:17
**worsened**
178:22
**write** 80:6
113:13 141:13
171:9 175:5
205:8 217:4,7
**writing** 80:22
113:14 115:21
141:6 162:13
187:15
**written** 54:2
199:10,12
223:10
**wrong** 38:4
58:16 107:9
132:10 136:9
159:6 165:7
166:10 221:6

**wrongful** 10:4
**wrongfully**
56:14
**wrote** 73:8
119:8,12,22
143:22 156:4
174:7 219:22
**wrvu** 118:14,20
118:25
**wrvus** 190:1

**y**

**yeah** 13:12
18:9,22 21:15
35:18 38:25
48:10 53:23
54:5 58:2,2
61:10,25 62:5
62:13 63:21
65:14 70:4
75:16 78:24
87:21 94:6,16
104:22 105:15
110:18 111:22
113:19 114:2,2
116:4 118:16
122:19 123:6
126:23 130:1
132:24 134:18
135:8 142:24
143:2,24
145:21 149:18
150:21 151:19
159:8 162:15
163:21 166:13
166:24 167:11

168:11 172:16
172:19 175:20
186:13 206:25
207:20 208:6
215:22 219:12
223:3
**year** 46:18
57:25 101:16
101:16 116:14
178:22 181:7,9
181:18,19
201:25 222:6
**years** 12:21
14:9,9 18:16
32:9,10 45:17
46:18,22 47:19
47:19 51:21
59:12 66:5
100:21 103:4
135:12 144:2,4
172:23,24
173:25 205:18
206:6,15,18,20
208:20 213:8
213:14,14,19
213:22 214:13
215:9,20
218:15 219:3
222:7,8
**yep** 144:12
**yesterday** 31:5
31:8,13 72:14

Page 61

**[zoom – zoom]**

| z |
|---|
| **zoom** 223:22 |
| 224:2,3,5 |

Page 62

Federal Rules of Civil Procedure

Rule 30

(e)  Review  By  the  Witness;  Changes.

(1)  Review;  Statement  of  Changes.  On  request  by  the
deponent  or  a  party  before  the  deposition  is
completed,  the  deponent  must  be  allowed  30  days
after  being  notified  by  the  officer  that  the
transcript  or  recording  is  available  in  which:

(A)  to  review  the  transcript  or  recording;  and

(B)  if  there  are  changes  in  form  or  substance,  to
sign  a  statement  listing  the  changes  and  the
reasons  for  making  them.

(2)  Changes  Indicated  in  the  Officer's  Certificate.
The  officer  must  note  in  the  certificate  prescribed
by  Rule  30(f)(1)  whether  a  review  was  requested
and,  if  so,  must  attach  any  changes  the  deponent
makes  during  the  30-day  period.


DISCLAIMER:  THE  FOREGOING  FEDERAL  PROCEDURE  RULES
ARE  PROVIDED  FOR  INFORMATIONAL  PURPOSES  ONLY.
THE  ABOVE  RULES  ARE  CURRENT  AS  OF  APRIL  1,
2019.  PLEASE  REFER  TO  THE  APPLICABLE  FEDERAL  RULES
OF  CIVIL  PROCEDURE  FOR  UP-TO-DATE  INFORMATION.

Exhibit 6
Page 121 of 123

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

Exhibit 6
Page 122 of 123

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 6
Page 123 of 123