**MATTHEW C. ELLIS, OSB No. 075800**
matthew@employmentlawpdx.com
**Matthew C. Ellis, PC**
1500 SW 1st Avenue, Suite 1000
Portland, Oregon 97201
Telephone: 503/345-5407

**STEPHEN L. BRISCHETTO, OSB No. 781564**
slb@brischettolaw.com
1500 SW 1st Avenue, Suite 1000
Portland, Oregon 97201

Telephone:  503 223-5814

Of Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **DR. RUPA BALA**,<br><br>          Plaintiff,<br><br>    v.<br><br>**OREGON HEALTH AND SCIENCE UNIVERSITY, an Oregon public corporation; DR. CHARLES HENRIKSON, an individual; DR. JOAQUIN CIGARROA, an individual.**<br><br>          Defendants. | **CASE NO. 3:18-CV-00850-HZ**<br><br>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE EXPERT OPINIONS |

Defendants have filed a Motion seeking to exclude the testimony of Dr. Peter Glick and Dr. Molly Carnes in their entirety; and seeking to exclude an opinion of Ms. Lisa Broten.  For the reasons set forth below, this Court should

    1.     Deny the motion to exclude Dr. Glick and Dr. Carnes from testifying regarding applicable literature regarding sex and race stereotyping;

**Page 1 – PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS**

2.      Deny the motion to exclude Dr. Glick's opinions under *Tulli v Women's & Brigham Hospital*, 591 F Supp2d 208 (D. Mass 2009) and *Merrill v MITCH Charter Tigard*, 2011 US Dist LEXIS 36497 (D. Or. April 4, 2011).

3.      Deny the motion to exclude Dr. Carnes first opinion (regarding Dr. Bala enduring discrimination) under *Merrill*; or alternatively permit Dr. Carnes to give an opinion as to whether, based upon the literature and facts cited in her report, the evidence is consistent with sex and race stereotyping.

4.      Deny the motion to exclude Dr. Carnes second opinion (whether medical leaders should have been aware they were placing Dr. Bala in a situation where she likely would face stereotyping) as a proper opinion an expert with "specialized knowledge" under *Kumho Tire Co.*

5.      Plaintiff will agree that Dr. Broten won't give an opinion as to whether Defendants discriminated or retaliated against the Plaintiff.

## I.      The Motion To Exclude Dr. Glick And Dr. Carnes Should Be Denied

Under FRE 702, a district court must determine "whether the expert witness is qualified and has specialized knowledge that will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Marshall v RS 2018 Float LLC*, 2024 US App LEXIS 3551 (9th Cir February 15, 2024).  Plaintiff establishes Dr. Carnes and Dr. Glick's qualifications in section A, that their testimony regarding the applicable research, (social framework testimony) should be admitted in subsection B, and the experts' opinions applying the research to the facts in the case should be admitted in subsection C.

### A.      Both Experts Are Qualified.

Defendants move to exclude all or portions of the testimony of Dr. Peter Glick and Dr. Molly Carnes.  Defendants do not challenge either expert's qualifications as an expert.

Nevertheless, Plaintiff establishes that each expert is highly qualified and an expert in the area of their testimony.

Dr. Peter Glick Ph.D. is a Social Sciences and Full Professor of Psychology, a 38 year member of the faculty member of Lawrence University.  He has co-edited books on prejudice, co-authored texts on the social psychology of gender and sexism and authored or co-authored more than 80 papers on prejudice, stereotypes, and discrimination including comprehensive reviews of sex discrimination in the workplace.  Dkt #217-1, Ex 1 at 3-4

His work has been cited on more than 40,000 occasions by other scholars, he has received scientific awards including an award for the development of an instrument to measure sexism, and, has been appointed to the editorial board of 5 scientific journals.    *Id.* at 4-5.  His Curriculum Vitea is set forth in the record at Dkt#217-1 Ex 1 at 95.  He has been retained to testify as an expert on more than 30 occasions in the last five years.  *Id* at 108.

Dr. Molly Carnes (now retire) is a physician-scientist uniquely qualified to testify in this case.  She is qualified both as a physician-scientist who has knowledge of medical and social science literature; and as physician-administrator who has specialized knowledge regarding the academic medicine workplace.  As a physician-scientist, Dr. Carnes has been funded for over 20 years by the National Institutes of Health and the National Science Foundation to study how to increase the participation and advancement of women in Science, Technology, Engineering, Mathematics, and Medicine (STEMM).  Much of her research has focused directly on "how deeply embedded cultural stereotypes give rise to 'implicit bias' that works to impede career advancement of women and ethnic/racial minority groups.  *Id*  Ex 3 at 1-2.  Dr. Carnes has received a number of awards for her research activities.  *Id.*    She has been invited to present her research to the National Academies of Science, the NIH, the American

Association for the Advancement of Science and the Association of Professors of Medicine.

Further, Dr. Carnes has done research specific to physicians in academic medicine. She has

published studies for over 15 years examining how the treatment of female physicians

compared to men. In particular, she has conducted studies documenting the different

treatment of female physicians experiencing penalties "if they communicate in the same

directive manner as their male colleagues." *Id.* She has more than 150 papers in peer

reviewed scientific journals, and 18 book or chapters in books on topics including on topics

involving gender and cultural stereotypes in medicine. Id. Ex 3 at 2, 46 – 51.[1]

As a physician-administrator, she was a tenured professor at the University of Wisconsin

She held numerous leadership positions in academic medicine including Vice Chair for

Faculty Development in the Department of Medicine with over 300 faculty from 2005-2009;

and founding Director of a Center for Women's Health Research and the Women in Science

and Engineering Leadership Institute (WISELI). Dkt #217-3, Ex 3 at 1. Her co-Principal

Investigator in establishing WISELI went on to be President Obama's Science Advisor in the

Office of Science and Technology Policy. Dkt #217-3, Ex at 2. With her background

holding leadership positions in academic medicine, her research awards and publications

background, she is "well-qualified to offer evidence-based comment on why the exact same

behaviors and communication style that would go unnoticed or might even be valued as

evidence of effective leadership in a male electrophysiology (EP) would be criticized for

being 'aggressive', 'abrasive', or 'unprofessional' in a female cardiologist – particularly a

---

[1] Among Dr. Carnes publications are whether "Women are less likely than men to be full professors in cardiology: Why does this happen and how can we fix it"; "Why is John more likely to become department Chair than Jill", "Who resembles a scientific leader – Jack or Jill?" "How gender stereotypes may limit female faculty advancement…"; "Discrimination toward physicians of color": the impact of unconscious bias on women's career advancement" Dkt#217-3 Ex 3 at 46 – 50.

woman of color." *Id.* Dr. Carnes' Curriculum Vitae is set forth in the record at Dkt#217-3, Ex 3 at 24.

Given this background, Dr. Carnes is qualified both as an expert with "scientific knowledge" and as an expert with "technical" or "other specialized knowledge" under *Kumho Tire Co.v Carmichael,* 527 US 137, 149 (1999).

Given the lack of any objection by defendants and the evidence in the record, Dr. Glick and Dr. Carnes are uniquely qualified to testify on the subjects of race and gender stereotypes, their effect on a female physician of color in the workplace and what methods were available to medical leadership to correct the bias.

**B.     Social Framework Testimony Is Specialized Knowledge Regularly Admitted In Federal Courts**

The type of testimony both Plaintiff's experts will offer is "social framework testimony." Social framework testimony is "empirically validated principles" concerning the operation of discrimination and bias in the workplace. Dkt#217-1 Ex 1 at 3. In *Price Waterhouse v Hopkins*, 490 US 228 (1989), the Supreme Court held 35 years ago that an employer who permits sex stereotypes to play a role in an employment decision engages in unlawful discrimination. *Price Waterhouse, supra,* 490 US at 250. In arriving at its decision, the Supreme Court relied upon social framework testimony offered by Dr. Susan Fiske concerning the role that gender stereotyping played in a promotion process. *Id.*

Subsequent to *Price Waterhouse*, social framework testimony has been regularly admitted in the federal courts as reliable, relevant evidence that will assist juries in deciding discrimination cases. In 2011, the US District Court for the Western District of Washington found that "Social framework' analysis… has become commonplace (although not without

**STEPHEN L. BRISCHETTO**
1500 SW 1ˢᵗ Ave., Suite 1000
Portland, Oregon 97201
Telephone:  (503) 223-5814

controversy) and can assist the jury's understanding of 'the causes, manifestations, and consequences as well as the organizational circumstances which allow such stereotypes to flourish" *Apilado v N.A m. Gay Alliance*, 2011 US Dist LEXIS 159575 (WD Wash July 1, 2021) *quoting Butler v Home Depot, Inc.,* 984 F Supp 1257, 1264 (ND Cal 1997).  Subsequent to *Apilado,* the Western District Court has repeatedly admitted social framework testimony as evidence that assists the jury in understanding issues regarding discrimination.  In *Anstead v Va. Mason Med. Ctr.* 2023 US Dist LEXIS 125540 Sl. Op. at 3 (WD Wash July 20, 2023), the Court rejected a motion to exclude the testimony of Dr. Glick concluding his testimony was relevant, reliable and provided an "interpretive framework to help the jury understand how discrimination and bias manifest, so that they are equipped to draw informed conclusions on the evidence present at trial."  Sl. Op. at 3; see also, *Chinn v Whidbey Pub. Hosp. Dist.,* 2021 US Dist LEXIS 216975  Sl. Op. at 3 (WD Wash November 9, 2021)(finding social framework analysis has become commonplace).

Social framework testimony has been admitted by a variety of courts throughout the nation in discrimination cases.  *MHANY Mgmt. v County of Nassau,* 943 F Supp 2d. 287 (EDNY 2012)(admitting academic professor's testimony regarding terms and expressions that are "euphemisms for race" in housing discrimination case):  *Int'l Healthcare Exch, Inc. v Global Healthcare Exch.,* 470 F Supp 2d 345, 354 (SDNY 2007)(admitting social psychologist opinion that a plaintiff's work assignments and termination were affected by gender stereotyping); *Jenson v. Eveleth Taconite Co*., 824 F Supp 847, 879, 882 (D. Minn 1993)(overruling objection to social scientist testimony regard sex stereotyping and its relationship to acts of sexual harassment); *Robinson v Jacksonville Shipyards, Inc.*, 760 F Supp 1486, 15002-03 (MD Fla 1991)(relying upon testimony of Social Psychologist Dr. Susan  Fiske regarding sex stereotyping

leading to discrimination);  *Tyus v Urban Search Mgmt*., 102 F3d 256, 263-64 (7th Cir

1996)(error to exclude social framework testimony in Fair Housing Act discrimination case.

Social framework analysis testimony has been admitted in this District.  *Merrill v MITCH*

*Charter School Tigard,* 2011 US Dist LEXIS 36497 Sl. Op. at 3 (D. Or. April 4, 2011).  In

*Merrill*, Judge Haggerty found a social scientists expert testimony helpful and relevant to assist

the jury evaluating the actions and statements of the plaintiff and her supervisor to decide

whether gender stereotyping played a role in a plaintiff's termination.  *Merrill, supra*, Sl Op at 3.

**C.    Social Framework testimony will assist the jury in evaluating the evidence in this case.**

In this case, both the testimony of Dr. Glick and Dr. Carnes will assist the jury in

understanding whether OHSU is an organization in which stereotyping flourishes; and whether

stereotyping lead to discrimination in this case.   Among the empirical research areas that will be

helpful to the jury's understanding of the issues in this case are:

1.    Research indicating stereotyping and discrimination are complex processes that

depend upon situational context, organizational climate and practices; and, organizations can

take steps to limit bias in personnel decisions by relying upon objective information and

behavioral benchmarks rather than subjective opinions and by holding decision-makers

accountable for making unbiased decision.  Dkt #217-1, Ex 1 at 14.  Medical research indicates

that less than 7% of the EP Cardiology physicians are female.  Dkt #217-3, Ex 3 at 2.  Here,

Plaintiff will offer significant evidence of OHSU's organizational climate (such staff surveys,

admissions of the President and the Provost, a report commissioned by OHSU ("the Covington

Report"); evidence of the situational context (a predominantly male culture in the Cardiology

Department; and evidence of OHSU's failure to limit bias in personnel decisions (such as

**STEPHEN L. BRISCHETTO**
1500 SW 1st Ave., Suite 1000
Portland, Oregon 97201
Telephone:  (503) 223-5814

reliance upon subjective information regarding the plaintiff, failure to investigate plaintiff's complaints of discrimination, OHSU's admission of the ineffectiveness of OHSU's complaint process, and OHSU's failure to hold male decision-makers such as Dr. Kirsch, Dr. Ma and others accountable. The research regarding the culture and context in which stereotyping occurs will assist the jury understanding whether OHSU is a culture where stereotyping is likely to occur and whether OHSU is an organization that has failed to limit bias in personnel decisions.

2.    Medical research confirms that the stereotype bias, gender prescription and backlash documented in social science literature occurs in medicine and more specifically in academic medicine. Multiple studies over a period of 30 years have documented discrimination against women physicians, and particularly in women physicians of color, in academic medicine. Dkt #217-3, Ex 3 at 2 – 3. One of the earliest studies done to document gender bias was a study done 28 years ago by the American College of Cardiology. Dkt#217-3, Ex 3 at 3. By 2016, the vulnerability of bias against women, and women of color, in academic medicine was well known and recommendations to prevent bias should have been in place. Dkt#217-3, Ex 3 at 2. By 2016, there was a body of research establishing strategies OHSU and the individual Defendants should have used to address Dr. Bala's complaints. Dkt# 217-3, Ex 3 at 11. Here, Plaintiff's evidence will be that she is a woman of color, she worked in a predominantly male cardiology department, she complained of different treatment to her supervisors, the Chair of her Department (Dr. Kaul), the Dean of the College (Dr. Anderson) and the Chief Medical Officer (Dr. Kilo) and no one took action on her complaints.

3.    Research concerning 'hostile sexism' relating to women who threaten a man's power, i.e., women who occupy powerful roles or those who are viewed as violating traditional norms of femininity tend to elicit sexual hostility. Dkt #217-1, Ex 1 at 20. Women who occupy

leadership roles in predominantly male files are evaluated negatively for identical behaviors that go unnoticed or receive praise for effective leadership. Dkt #217-3, Ex 3 at 6. Here, there will be evidence that higher level supervisors, Dr. Cigarroa and Dr. Kaul, were aware that Dr. Henrikson was treating Plaintiff differently than male physicians. The research concerning hostile sexism will assist the jury in evaluating whether Dr. Henrikson and his supervisors viewed Dr. Bala as a threat to their power. Defendants have argued that a legitimate non-discriminatory reason for Plaintiff's discipline was that complaints weren't made concerning males. The research concerning women in leadership roles will assist the jury in decide whether the lack of complaints regarding males for similar behaviors is evidence that supports Plaintiff or the Defendants.

       4.      Research concerning when, and in what circumstances, sex stereotypes act as gender prescriptions. The research indicates that male stereotypes prescribe men to show no weakness, be assertive and seek status while women risk disapproval for these same behaviors leading to double standards. Dkt # 217-1, Ex 1 at 26-27; Dlt #217-3, Ex 3 at 7. Research documents the concept of 'backlash' for gender prescriptions where women who talk about their accomplishments, point out others mistakes, show anger, or give commands are subjected to penalties in the workplace. Dkt #217-1, Ex 1 at 28-29; Dkt#217-3 Ex 3 at 8. This is commonly referred to as 'gender policing.' Dkt #217-3, Ex 3 at 8. Research indicates that stereotype-based bias is more likely to intrude on personnel evaluations when evaluations rely upon subjective judgments such as when evaluators judge someone as not a "fit" for an organization or a woman as abrasive. Interpersonally difficult, and selfish. Dkt#217-1, Ex 1 at 48-49; Dkt#217-3, Ex 3 at 7 - 8. Research indicates that stereotypes result in "situational attribution" where a male's abrupt behavior is perceived on something occurring in a situation (he's having a bad day) where a

woman's abrupt behavior in the same situation is perceived as a character deficiency (she's a bully, she is rude).  Dkt#217-3, Ex 3 at 9.

Here, there will be evidence that Plaintiff talked about the excellence of the program she attended, made repeated reports regarding deficiencies in patient care and staff mistakes, gave direction in the operating room, and instituted changes in protocols and procedures to address deficiencies; that these actions triggered complaints of being unprofessional, rude, abrasive and even harassing; and that Dr. Henrik based the decision to non-renew Plaintiff's contract on the concept that she wasn't a proper "fit" for the organization.  Defendants have argued, and will argue at trial, that complaints of unprofessional, rude, abrasive and harassing behavior are legitimate, non-discriminatory reasons for the actions taken against the Plaintiff. The social science research will assist the jury in understanding whether the complaints about plaintiff were the result of 'backlash' for violations of gender prescriptions or were legitimate, non-discriminatory reasons.

5.      Social science and medical research indicates that female leaders experience backlash from women as well as men.  Dkt #217-1, Ex 1 at 31; Dkt #217-3, Ex 3 at 11.  Here, Defendants have argued, and will argue, that women as well as men complained that Plaintiff's behavior was unprofessional, rude, abrasive and harassing and thus Plaintiff could not have been subjected to sex discrimination.  Social science research will assist the jury in evaluating the evidence, and the parties' divergent views, regarding women's complaints about the Plaintiff.

6      Social science research establishes that the tendency to accord women less status and authority combines with backlash to create a vicious cycle that manifests in uncooperative, resistant, or undermining behavior.  Dkt #217-1, Ex 1 at 37 – 40.  Behavioral research shows that discrimination toward an individual or group is encouraged when they are cast as a member of an

'out group.' Dkt #217-3, Ex 3 at 4.  Here, Plaintiff will introduce evidence Dr. Cigarroa and Dr.

Henrikson arranged meetings where nurse managers were permitted to treat her with disrespect;

that the individual Defendants and Dr. Kirsch repeatedly emailed staff in her procedures

requiring them to report communication issues; and as a result staff were uncooperative and

resistant in their work with her.  The social science research regarding the vicious cycle resulting

from the tendency to accord women less status and backlash will assist the jury in evaluating this

evidence.  The behavioral science research will assist the jury in evaluating whether the actions

of Dr. Cigarroa, Dr. Henrikson and Dr. Kirsch encourage discrimination by casting Plaintiff as a

member of an 'out-group."

      7.     Social Science and medical literature document physicians of color (including

Asian physicians) experience discrimination resulting from stereotypes.  A large body of

research from multiple disciplines has shown that cultural stereotypes are a root cause of the

perpetuation of gender inequities in STEMM.  Dkt #217-3, Ex 3 at 3.

      While there are a large number of cases admitting or relying upon social framework

testimony (including one from Judge Haggerty in this District), Defendants point to two cases to

support its argument that the Court should prohibit Plaintiff's expert from testifying regarding

the social science and medical research.  Defendants point to *Nikolova v Univ. of Tex.*, 585 F

Supp 3d 936 (WD Tex 2022) and *Mullenix v University of Austin*, 2021 US District Lexis

180630 (WD Tex September 21, 2021) where U.S. Magistrate Susan Hightower granted motions

to exclude Dr. Glick's testimony in two discrimination cases.  Magistrate Hightower's opinion in

*Mullenix* was not reviewed by an Article III judge.  An article III judge did review her opinion in

*Nikolova* and found that Magistrate Hightower's opinion barring Dr. Glick from testifying was

clearly erroneous.  *Nikolova v Univ. of Tex.*, 2022 US Dist LEXIS 43679 Sl. Op. at 3 (WD Tex

**Page 11 – PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE EXPERT
OPINIONS**

**STEPHEN L. BRISCHETTO**
1500 SW 1ˢᵗ Ave., Suite 1000
Portland, Oregon 97201
Telephone:  (503) 223-5814

March 11, 2022).  Contrary to Defendants argument, *Nikolova* demonstrates it would be an abuse of discretion to exclude Plaintiff's expert from social framework testimony.

Finally, the Court should note that both Dr. Carnes and Dr. Glick should be able to discuss the social and medical science research related to this case.  Dr. Glick's report focuses on the social science related specifically to gender.   Dr. Carnes report focuses specifically on both gender and racial/cultural stereotypes in academic medicine as well as research that supervisors and leaders should know about and apply to address issues of bias against a female physician of color.

The Court should reject Defendants' request to preclude either expert from testifying.

**D.      Plaintiff's Experts Should Be Permitted To Give Opinions Applying The Science To This Case**

In addition to precluding Plaintiff's experts from testifying about scientific studies relevant to the case, Defendants move to preclude both experts from giving opinions applying the science to the case.  Dr. Glick and Dr. Carnes opinions differ and so Plaintiff discusses them separately.

**1.      Dr. Glick Should Be Allowed To Give Opinions As To Factual Disputes The Jury Should Consider**

Initially, Dr. Glick has carefully set forth the peer reviewed scientific literature that is the basis of his opinions in the first Section of his report.  Dkt #217-1, Ex 3 at 12-40.  While Defendants make a variety of arguments regarding the "reliability" of Dr. Glick's application of the research to the facts, Defendants make no argument that the social science literature is scientifically invalid or the Dr. Glick's opinions are inconsistent in some way with the social

science literature. Further, Defendants offer no expert testimony asserting that Dr. Glick's application of the social science literature to the facts in the case are incorrect.

Dr. Glick's opinions applying the scientific literature to the facts in this case are set forth at Dkt #217-1, Ex 1 at 50 – 93. Contrary to Defendants' assertions in the Motion, Dr. Glick's testimony will be to educate the jury and "point" to ways that research may inform their decision. He disavows resolving credibility issues or factual disputes and is careful to identify undisputed facts. Dkt # 217-1, Ex 1 at 50. He declines to opine with certainty whether discrimination occurred. *Id* at 51. He presents 4 questions the jury "should consider" to assist in deciding whether Dr. Bala was subjected to discrimination. *Id*. at 54. In posing these questions, he expressly tells the jury he does not intend to limit or restrict the jury's answer. *Id.* He points to behaviors by Dr. Bala in the record that are "similar to those known in the literature." Id. at 58. He discusses research regarding how people respond to criticism, and Dr. Bala's criticisms of some other staff's performance and training that are undisputed in the record. *Id*. at 59. He points to documents in the record that may suggest over-reactions. *Id*. at 62-63. He then discusses 3 incidents documented in the record and states that if decision-makers conclude there was a consistent pattern of overreaction, this suggests bias has occurred. *Id*. at 65.

Dr. Glick then give his opinions relating to the 4 questions he posed. His ultimate opinions are all framed as "Case decision-makers should consider whether ..." *Id* at 75, 79, 85, 93. Even upon consideration of his opinions, Dr. Glick asserts only that "such findings would be consistent with research on stereotype-motivated biases and discrimination." *Id.*

The Court should permit Dr. Glick to give the opinions set forth in his report. First, there is no prohibition on an expert linking reliable scientific principles to facts in a case. The requirement under *Daubert* is that the expert's opinion must have a "reliable basis in the

STEPHEN L. BRISCHETTO
1500 SW 1ˢᵗ Ave., Suite 1000
Portland, Oregon 97201
Telephone:  (503) 223-5814

knowledge and experience of the expert's field." *Kumho Tire Co. v Carmichael*, 526 US 137, 148-49 (1997).  In *Kumho Tire Co.*, the Court recognized that "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from .... specialized experience."  As discussed above, Dr. Glick's expert opinion are that the jury should "consider" the 4 questions he poses; that Dr. Bala's behaviors are "similar" to those represented in literature; and that certain findings, if made, are "consistent with" the literature on bias and discrimination.  Given that these opinions are based upon peer reviewed scientific principles in his field; and given that Dr. Glick tells the jury nothing more than that, based upon the literature, these are some things to "think about," it is difficult to argue that his opinions do not have a "reliable basis" in the knowledge of his field.

Second, Dr. Glick's approach to testimony is a strength of his testimony, not an indication of unreliability.  The court in *Tulli v Women's & Brigham Hospital*, 591 F Supp 2d 208 (D. Mass 2009) provides the most cogent discussion of Dr. Glick's opinions applying research to facts in a case.  In *Tulli*, a Massachusetts District Court Judge found that Dr. Glick does not purport to tell the jury whether discrimination was involved in a case and that is a strength of his testimony, not a weakness.  *Tulli, supra*, 591 F2d at 213.  The District Court Judge ruled:

> Professor Glick brings the insights of established scientific inquiry and social framework analysis, as to which he is an expert, to bear on the facts of this case. It is an area that the jury may well not have common knowledge. But Professor Glick does so in a way that has scientific validity: he cannot say whether a given act or word was discriminatory; he can only show the settings in which discrimination typically occurs and opine on whether the allegations in the case at bar are consistent with the observed patterns. He allows the jury to make the final decision and expressly disclaims the capacity to draw any conclusion in this particular case. His testimony is admissible.

*Tulli, supra*, 591 F2d at 215.

**Page 14 – PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS**

Third, the two cases where Dr. Glick was precluded from giving an opinion applying the research to a cases' facts, *Mullenix* and *Nikolova*, are inconsistent with a decision in this court. In *Mullenix*, Magistrate Higginbotham relied upon a law review article criticizing the application of social framework analysis to the facts of specific cases. *Mullenix, supra*, Sl. Op. at 4. (citing Monahan, Walker, & Mitchell, *Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks," 94 VA. L. REV. 1715 (2008)*). However, Judge Haggerty considered this very same article in the *Merrill* case. Judge Haggerty noted that the article's authors explain that while the authors believe the fact-finder should draw inferences from the research with a court's instructions, other social psychologists believe that experts should educate the fact-finder and assist in making the causal link between the conditions of stereotyping and the specific case. *Merrill, supra*, Sl. Op. at 4. Judge Haggerty rejected the proposition that the Monahan articles means an expert's opinion seeking to educate the jury is not reliable:

> Despite questions raised by the article, the existence of a disagreement among experts in the field does not render [social scientist] Dr. Halpert's testimony unreliable. Disputed expert testimony remains reliable as long as "it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" *See S.M. v. J.K., 262 F.3d 914, 921-22 (9th Cir. 2001)* (citations omitted). This court finds that Dr. Halpert's testimony falls within the range of reasonable expert opinion.

*Merrill, supra*, Sl. Op. at 4.

There is no basis for a finding in this case that no social science expert would reasonably give the opinions that Dr. Glick offers in this case.

Fourth, Dr. Glick's approach is consistent with the Ninth Circuit's approach to similar forms of expert testimony. The Ninth Circuit has allowed forensic investigators to testify on whether a criminal defendant's behavior is consistent with "grooming" a child abuse victim. *United States v Halamek*, 6 F4th 1061 9th Cir 2021); see also, *United States v Telles*, 6 F4th

1086, 1097 (9th Cir 2021).  The Ninth Circuit has allowed forensic experts to testify about whether a child's behaviors are consistent with the behavioral characteristics of a child abuse victim. *United States v Jones*, 2021 US App Lexis 37158 Sl. Op. at 3 (9th Cir December 16, 2021).  The Court should permit Dr. Glick to give his opinions applying the social science to the facts of the case.

**D.    Dr. Carnes should be permitted to give her opinions applying the research to the facts of the case**

Dr. Carnes give two opinions in her expert report applying the medical science and social science research to the facts of Dr. Bala's case.  First, she expresses her opinion that she has no doubt that Dr. Bala was subjected to relentless sex and race discrimination due to her status as a woman physician of Asian-Indian descent; and second, the leaders at OHSU should have been aware that they were placing Dr. Bala in a situation in which she was vulnerable to sex and race discrimination.  Dkt #217-3, Ex 3 at 1.

**1.    Dr. Carnes First Opinion**.  With respect to Dr. Carnes' opinion that Dr. Bala endured sex and race discrimination, while she references her opinion that Dr. Bala experienced sex and race discrimination as her conclusion, the balance of her report sets forth scientific studies and points to specific documented incidents that she relates to as relevant to the question of whether she experienced sex and race discrimination. Dkt #217-3, Ex 3 at 4 – 5, 6, 9-10; 11.

Dr. Carnes does not make determinations as to whether any individual, staff or supervisor had a conscious motive to discriminate.  Indeed, her report explicitly addresses how stereotypes operate and her self-awareness of her own stereotypes:

> "I have been studying women and leadership for years and have been a woman leaders for years, and I consistently show a pro-male leadership bias on this test.

**STEPHEN L. BRISCHETTO**
1500 SW 1st Ave., Suite 1000
Portland, Oregon 97201
Telephone:  (503) 223-5814

> Research shows that we are generally unaware of these implicit biases but that they can influence the way we process information, interact with and judge people, respond emotional to another person's behavior, and make decisions." "These stereotypes are so well engrained in our patterns of thinking that the lead to implicit assumptions about how men and women 'should' behave ... These stereotypes also lead us to implicitly judge how men and women 'should not' behave – again, even if we consciously disavow these beliefs."

Dkt #217-3 at 7.

Under the FRE 704, an expert opinion is not objectionable just because it embraces an ultimate issue to be decided by the trier of the facts. FRE 704((a). An expert may not testify to a legal conclusion. *Hangartner v Provident Accident & Life Ins. Co*., 373 F3d 998, 1016 (9th Cir 2004). However, a witness may properly be called upon to aid the jury in understanding the facts in evidence through reference to those facts couched in legal terms. *Peckham v Continental Casualty Ins. Co*., 895 F2d 830, 840-41 (1st Cir 1990). The Ninth Circuit has cited Peckham with approval. *Nationwide Trans. Ins. Co. v Cass Info. Sys*. 523 F3d 1051, 1059 (9th Cir 2008).

In the Ninth Circuit, FRE 702(a) instructs a judge to determine whether an expert had "sufficient factual grounds" to draw conclusions. The focus of the inquiry envisioned by Rule 702 is on principles and methodology, not on the conclusions. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, (9th Cir 2022)(reversing a district court order excluding an expert opinion as to what "caused" a fire).

Here, Dr. Carnes first opinion expresses an opinion as to whether Dr. Bala endured "relentless sex and race discrimination." While some courts have been reluctant to allow an expert testify on the issue of discrimination, other courts have been willing to permit such testimony. In *Merrill,* Judge Haggerty allowed an expert to testify that "gender stereotyping may have been a factor in the decision to terminate." Sl. Op. at 3. Similarly, in *International Healthcare Exchange, Inc.*, a federal court denied a motion to exclude social psychological

testimony that a plaintiff's work assignments and termination were a "product" of stereotyping. *International Healthcare Exchange, Inc., supra*, 470 F Supp 3d at 354; see also, *MHANY Mgmt. v County of Nassau,* 943 F Supp 2d. 287 (EDNY 2012)(admitting academic professor's testimony regarding terms and expressions that are "euphemisms for race" in housing discrimination case).

It is significant to note that Dr. Carnes gives no opinion on the legal question OHSU or the individuals Defendants are liable for such discrimination. Indeed, Dr. Carnes' opinion read in context with her discussion of unconscious biases is something that leaves to the jury the question whether OHSU, Dr. Cigarroa or Dr. Henrikson are liable for the bias Dr. Bala experienced.

Defendants argue at length that Dr. Carnes is functioning as an advocate, that she is making credibility assessments and that she is displacing the function of the jury. Initially, bias of an expert witness is not a grounds for exclusion in the Ninth Circuit. *United States v Thompson*, 2207 US App LEXIS 17355 (9th Cir July 16, 2007). Defendants claims that Dr. Carnes is an advocate for women is not a grounds for exclusion of her testimony. Defendants argue at length that Dr. Carnes displaces the role of the jury in evaluating credibility and makes findings regarding motive. However, read in context, Dr. Carnes' report establishes that women leaders who do not conform to cultural expectations placed on women face bias that is often unconscious.

Under *Merrill, International Healthcare Exchange*, and *MHANY Management*, the Court should permit Dr. Carnes to give her first opinion as it is based upon empirical science and she has established a sufficient foundation for the opinion she offers. Nevertheless, if the Court has a concern that Dr. Carnes' opinion goes too far, Plaintiff would agree to limit Dr. Carnes' first

opinion to whether, based upon the literature and facts cited in her report, the evidence is consistent with sex and race stereotyping. Finally, regardless of whether the Court permits Dr. Carnes to give an opinion as to whether Dr. Bala endured race and sex discrimination, the Court should permit Dr. Carnes to testify about how the scientific research applies to the documents and exhibits as discussed in the sections of her report marked "Relevance to Bala Case."

        **2.**       **Dr. Carnes' Second Opinion**. With regard to her second opinion, that OHSU leaders should have been aware that they were placing Dr. Bala in a situation in which she was vulnerable to sex and race discrimination, there is nothing whatsoever objectionable with regard to this opinion. Her second opinion is detailed at Dkt #217-3, Ex 3 at 11-12. Her opinion is based upon both knowledge of the medical and social science literature, her own studies and publications, and her decades of experience as administrator and leader in an academic medical center. With respect to her second opinion, under *Kumho Tire Co.*, Dr. Carnes is an expert with "technical" or "other specialized knowledge" that will assist the trier of fact in resolving disputed issues in the case.

Dr. Carnes second opinion is based upon studies published over 20 years within the field of cardiology which should have made OHSU leaders cognizant that they were bringing Dr. Bala into a situation where there was a high likelihood she would face gender and race bias. Dkt #217-3, Ex 3 at 11. Dr. Carnes, with her background and experience is uniquely qualified to testify whether managers should have suspected that Dr. Bala would be subjected to sex and race stereotyping, how leaders and managers should have responded to staff complaints framed in sex and race stereotypical terms, what leaders in academic medicine could have, and should have done based upon the body of published science when encountering staff complaints regarding the

**STEPHEN L. BRISCHETTO**
1500 SW 1st Ave., Suite 1000
Portland, Oregon 97201
Telephone: (503) 223-5814

personality of a female physician of color placed into a leadership position in a predominantly male field.

Dr. Carnes' testimony will assist the jury in evaluating issues necessary to the resolution of this case. Defendants may argue at trial that they had no reason to suspect that staff complaints were based upon sex or race stereotypes. Defendants will argue that their goal was to support Dr. Bala. Defendants likely will argue that the number of complaints was a factor in their adverse decisions concerning Dr. Bala. These issues are complex issues particularly in the context of an academic hospital setting treating patients. Dr. Carnes' second opinion will assist the jury in evaluating whether Defendants should have recognized complaints about Dr. Bala's communication style as a fprm of stereotyping; whether Defendants' actions assisted Dr. Bala or undermined her and whether the existing scientific literature identified what actions they should have taken.

The Court should deny Defendants' Motion to exclude Dr. Carnes' second opinion.

**E.    Plaintiff's experts have a proper basis to give such opinions**

Finally, Defendants argue that Plaintiff's experts do not have an adequate foundation to express an opinion on the facts of the case. However, both experts were supplied with the pleadings in the case, all of the depositions taken in the case by either party through the date of their report; all the deposition exhibits marked in the case; together with additional documents selected by counsel. Dkt #217-1, Ex 1 at 11; 217-3, Ex 3 at 20-23. That is adequate foundation for the experts to render their opinion. *Merrill, supra*, Sl. Op. at 3.

**IV.    Defendants Motion To Exclude Ms. Broten's Opinion That Dr. Bala Was Subjected To Discrimination And Retaliation**

**STEPHEN L. BRISCHETTO**
1500 SW 1st Ave., Suite 1000
Portland, Oregon 97201
Telephone: (503) 223-5814

Defendants have not moved to exclude Ms. Broten's trial testimony giving her opinions as to whether the plaintiff's earning capacity was impaired by OHSU and the individual defendants.  Dkt # 218 at 15 (stating Defendants do not move to exclude Ms. Broten's earning capacity determinations).  Rather, Defendants move to preclude Ms. Broten from testifying as to whether Dr. Bala was subjected to discrimination and retaliation.  *Id.*

Plaintiff will agree that Ms. Broten will not give an opinion at trial as to whether Dr. Bala was or was not subjected to discrimination or retaliation.  Rather, she will testify whether the nonrenewal of plaintiff's contract, negative references and unsolicited public interest in the litigation impaired her earning capacity.

## SUMMARY

For the reasons set forth above, the Court should deny the Defendants Motion to Exclude the opinions and testimony of Dr. Glick, deny the Motion to Exclude the opinions and testimony of Dr. Carnes or alternatively, limit her Dr. Carnes' first opinion to testimony as to whether Dr. Bala's treatment was consistent with sex and race stereotyping.  With respect to the Motion to Exclude Ms. Broten's opinion of sex discrimination and retaliation, Plaintiff agrees that Ms. Broten won't give an opinion at trial as to whether Dr. Bala was subjected to discrimination or retaliation.

Dated this 24th day of March, 2024.

STEPHEN L. BRISCHETTO

  /s Stephen L. Brischetto_____
Stephen L. Brischetto, OSB #78154
Telephone:  (503) 223-5814

Attorneys for Plaintiff

**STEPHEN L. BRISCHETTO**
1500 SW 1st Ave., Suite 1000
Portland, Oregon 97201
Telephone:  (503) 223-5814