**MATTHEW C. ELLIS, OSB No. 075800**
matthew@employmentlawpdx.com
**Matthew C. Ellis, PC**
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone: 503/345-5407

**STEPHEN L. BRISCHETTO, OSB No. 781564**
slb@brischettolaw.com
1500 SW First Avenue, Suite 1000
Portland, Oregon 97201
Telephone:  503/223-5814

Of Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# DISTRICT OF OREGON

| | |
|---|---|
| **DR. RUPA BALA**,<br><br>                    Plaintiff,<br><br>v.<br><br>**OREGON HEALTH AND SCIENCE UNIVERSITY, an Oregon public corporation; DR. CHARLES HENRIKSON, an individual; DR. JOAQUIN CIGARROA, an individual.**<br><br>                    Defendants. | CASE NO. 3:18-CV-00850-HZ<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' OBJECTIONS TO PLAINTIFF'S WITNESS STATEMENTS** |

1. **DR. RUPA BALA**

Defendants' object to Plaintiff's testimony consistent with their motion in limine. See Motion in Limine 5. Plaintiff incorporates her response to Defendants Motions in limine in response to these objections. In addition, Plaintiff responds as follows:

Defendants object to testimony by Plaintiff about men who were treated better than her despite similar, if not more egregious behavior under FRE 403

and based on a lack of personal knowledge. First, Plaintiff has personal knowledge of all such topics and this court relied on this same personal knowledge of Plaintiff in denying Defendant's motion for summary judgment for disparate treatment sex and race discrimination. See Dkt No. 159 at 2-3 (noting that Plaintiff's declaration included personal knowledge eleven white male physicians at Oregon Health & Science University with similar communication styles for which she was disciplined. (Bala Decl. ¶ 13, Dkt No 121) and that "she reported the similarity of communication style to human resources ("HR") and that no one from HR ever contacted her to follow up regarding these physicians' communication. This type of 'stark pattern' of differential treatment based on race is sufficient to survive summary judgment." *See also* Dkt No 149, p 20-21, 25 (same, as to sex). If this sort of evidence creates an issue of fact for resolution at a trial, it must be relevant and admissible, assuming a proper foundation can be laid.

Defendants further object to Plaintiff testifying about the faculty survey under FRE 901 and hearsay grounds. Yet, Plaintiff read the survey while she still worked at OHSU when OHSU released it to the media. It also possesses the seal of OHSU, making it likely a self-authenticating public record (FRE 902). If not, it is certainly a public record and a business record of OHSU that Plaintiff can identify as such, as can others. Lastly, if she cannot admit it for the truth of the matter asserted, she can testify as to its effect on the listener, and to her emotional distress.

Defendants object to Plaintiff's testimony about other news articles that came out after Plaintiff's employment ended. These, too, are admissible also to show Plaintiff's damages. Both Plaintiff and numerous other witnesses will testify that every time another article came out that suggested that OHSU's problems with treatment of women continued, it exacerbated Plaintiff's emotional distress. Dr. Bala and others will testify that the articles made her feel like the

problems at OHSU that hastened her departure continued, and that OHSU was acknowledging that they had not made sufficient strides to make the workplace better for women. This testimony, with a limiting instruction, is relevant to Plaintiff's damages. Further, the testimony about the Covington Report is relevant to show that Plaintiff's treatment was not a one-off, but part of a systemic culture of discrimination. Indeed, the report addressed many of same systemic problems at issue in this case, such as inconsistent and confusing discrimination-related policies, a lack of uniformity in how HR handled concerns of discrimination and more. *See* Plaintiff's motion to supplement the record for the then newly issued Covington Report and Reply at Dkt Nos. 139,144.

Defendants object to Plaintiff testifying about specific procedures. Yet, Defendant intends to offer evidence as to the same kind of procedures in numerous exhibits, appropriately redacting out PHI. Second, Plaintiff should be able to testify about specific procedures—without disclosing PHI for the patient—since this goes to the good faith basis for Plaintiff's whistleblower claims. *See* Plt Opp to *Motion in Limine* No. 4. Plaintiff does not intend to have a "mini-trial" about the dozens of procedures she raised concerns about, but does need to be able to testify, on a basic level, she had a concern about the standard of care being violated and why. This helps provide context for her reports—and makes it clear that many of her reports were raised significant safety concerns—and to show the reports were in good faith.

Defendants also object to Plaintiff offering evidence that Defendant did not follow its only policies when it refused to let her practice in the wake of Kirsch's emails. This sort of evidence about the failure to follow one's own policies is classic circumstantial evidence of discrimination and pretext. The fact that Defendant had a policy that it was required to follow before she was forced out of the lab, but didn't follow, suggests they were more interested in

violating Plaintiff's rights than they were in following their own policies. Indeed, all parties intend to offer evidence of what occurred in the wake of the Kirsch report as part of this trial and that "due process" was not followed as part of the exclusion from the lab. This will not result in a "mini-trial"; this is central to *this* trial.

Defendants object to Plaintiff testifying that her behavior is "inconsistent with race or sex stereotypes" to the extent that her testimony runs afoul of Rule 701.[1] This is a proper subject of testimony for Plaintiff since it helps her state of mind in repeatedly alerting Defendants that she was being subjected to a double standard, that she believed she was being discriminated against. Indeed, as referenced in Ex 110, she even told Ms. Strahm that maybe she should "grow a moustache" since then she might be better respected and sent her a link with examples of sex stereotypes in the workplace. This, further, helps shed light on Defendants failure to follow its own policies in ignoring her concerns of double standard sex discrimination. She has personal knowledge of many of the double standards at play—she communicated with OHSU about them—and can testify about her understanding as of the time.

Plaintiff intends to offer evidence of the career trajectories of her medical school colleagues and colleagues at Penn to show her damages. Plaintiff does have knowledge of their trajectories since she researched them and has stayed in touch with her colleagues. Further, the testimony is not offered to show the truth of the matter asserted but to show Plaintiff's damages. Likewise, Plaintiff can offer evidence about Dr. Henrikson's negative references for the same reasons; not to show the truth of the matter asserted but to show her damages, and to address to Defendant's argument that Plaintiff failed to mitigate her damages.

---

[1] Defendants, in making this argument, implicitly concede that this is a proper topic of expert testimony under FRE 702.

2.  **DR. JILL M. GELOW**

Dr. Gelow may testify about the culture in cardiology regarding the treatment of women if the testimony if it based on her personal knowledge and experiences. Furthermore, the fact that she was accused of having "too much estrogen" by another male cardiologist is an example of evidence in support of that position.

As to her testimony about Dr. Albert's statements about OHSU and cardiology, Dr. Gelow arranged to have Dr. Albert speak at OHSU in large part because of the negative culture at OHSU for women. Further, Albert's statement to Gelow about the problems with OHSU's treatment of women are offered to show that OHSU was on notice of its problems with its treatment of women, since Dr. Gelow was, at the time, an associate professor at OHSU and Dr. Albert was brought in to provide comments in furtherance of improving that same culture. This shows Defendant was on notice of the problem with discrimination against women in Cardiology.

Dr. Gelow can testify about Cigarroa or Henrikson's promises to make OHSU the "Harvard of the West" to the extent she witnessed these statements, firsthand. Dr. Gelow can also testify as to her surprise with how long it took for Plaintiff to find a job as evidence of Plaintiff's damages. As a fellow cardiologist who has been in the job market on several occasions, she has personal knowledge for how long it typically takes someone of Plaintiff's pedigree and specialty to find work, and how long is atypical. In addition, Dr. Gelow likely also had involvement with hiring cardiologists both at OHSU and, presumably, in her current role in the heart transplant program at Providence, on top of her own personal experiences as a candidate in a similarly specialized job market for cardiologists. As a result, her testimony is not speculative and is based on personal knowledge of the job market.

3.  **DR. MAUREEN MAYS**

Defendants object to Dr. Mays testimony based on FRCP 26(a). Yet, Plaintiff filed a declaration of Dr. Mays in this case (Dkt No. 124) less than a month after counsel first communicated with Dr. Mays. Thus, Plaintiff didn't only timely disclose her existence, she provided a detailed signed declaration by Dr. Mays, as re-summarized in the witness statement, which was properly relied on by the Court at summary judgment,  Dr. Mays should not be excluded since counsel disclosed her to Defendant very soon after first learning that Dr. Mays had information relevant to the case and provided far more information that was required pursuant to FRCP 26.   This objection should be overruled.

Furthermore, Dr. Mays' testimony about the culture at OHSU in Cardiology and the double standard for men and woman is highly relevant to this case, since her testimony is focused on both Cigarroa and Kaul, key witnesses in the case and key creators of the "double standard" operating procedure in Cardiology at OHSU. Her testimony of their dismissive treatment of her because of her sex, Kaul's repeated reliance on sex stereotypes and the backlash she suffered, as a woman, after reporting fraud to Cigarroa are consistent with there being systemic problems at OHSU that predated Plaintiff's employment by a few years.  The fact this predates Plaintiff's employment by a short period only reinforces that Defendants practices of ongoing double standard sex discrimination was truly its modus operandi. Thus, this testimony shows that OHSU, Kaul's and Cigarroa's treatment of Plaintiff is not accidental but their standard practice for strong women and women who complain about violations of policies.

   4. **DR. RICK F. KOCH**

Dr. Koch will testify that he checked references for Dr. Bala and that the information he received was negative. The very fact he checked her references suggests she had progressed to a

point where he was considering making hiring decisions. His testimony shows that Defendants were engaged in providing negative information to prospective employers—in violation of its own policies and admonitions by Ms. Strahm—further exacerbating Plaintiff's damages. In addition, if the jury finds that the negative references were an outgrowth of the discrimination or retaliation, the references themselves are adverse actions in this case. Alternately, they are clearly relevant to Plaintiff's damages since, on top of the other evidence Plaintiff has of negative references being provided, a jury could conclude that these handful of examples of negative references were not outliers but part of a plan by Defendants to essentially blacklist Plaintiff and crater her career. It is also relevant to Defendant's failure to mitigate defense as defendant cannot claim Plaintiff should have done more to find employment, and then lambast Plaintiff when prospective employers call; frustrating Plaintiff's mitigation efforts.

5. DR. CHARLES HENRIKSON

Plaintiff's questions as to patient outcomes and patient care are relevant for the reasons identified above, in response to MIL 4, including that the testimony is background to Plaintiff's complaints about substandard quality of care.

Plaintiff's questions as to the medical board and privileges relate to Defendant's decisions to sideline Plaintiff in the wake of Kirsch's complaints and are relevant to whether Defendant violates its own policies pertaining to those same topics in their treatment of Plaintiff, as also addressed in response to motions in limine.

Questions regarding Kirsch's communication style are consistent with Plaintiff's claims that men with similar, if not more egregious, communication styles were treated far better than Plaintiff. The fact that Kirsch, who many found to be a bully and extremely aggressive in his communication styles, had great success at OHSU for many years and, when he was finally forced

out after many years of complaints, was treated substantially better is relevant to show the double standard for men and women in the department. This tends to show that men are given a very long leash at OHSU, while their tolerance for women is much more curtailed; facts consistent with sex stereotyping evidence, backlash evidence and double-standard evidence in this case.

As to Defendants' objections to Plaintiff's deposition designations, Plaintiff has not decided whether she will call Dr. Henrikson through deposition designation, via live testimony or both. She may make this decision during trial depending on how the evidence comes out at trial, including what makes the most sense given the interests of time.

Defendants object to Plaintiff's deposition designation on pages 27-28, where Henrikson admits he provided a negative reference for Plaintiff, when he compared Plaintiff with Dr. Shenje; another cardiologist of color who he, and the person asking for the reference, believed had problems with communication. This is highly relevant not only because it shows that Defendant provided Plaintiff with negative references, but that he referenced another provider of color as being similar as Plaintiff in communication styles; consistent with Plaintiff's evidence of race stereotyping.

As to the objections to Ex 33-35, Henrikson absolutely does have personal knowledge of the topics he was asked about because the emails clearly discuss the negative reference he provided to Rebekah McNeal, which was then sent to others causing Virginia Mason to not pursue Plaintiff as a candidate. Further, the underlying records were verified business records of Virginia Mason that were provided to Defendant OHSU and Henrikson in response to their subpoena to the hospital in Seattle.

As to the objections to Ex 39-40, these statements lay the foundation for the testimony on the following pages, p 41-42, which show that Henrikson did not disclose the negative references

in response to his interrogatory responses, which are required to be provided under Oath. A jury can see this evidence as is evidence of guilt; that Dr. Henrikson sought to hide the fact that her disparaged Plaintiff, despite certifying in pleadings that he had done the opposite. FRE 33.

As to Defendants objection to the testimony at 230:21-25, Plaintiff withdraws that from the deposition designation.

6. **LINDA STRAHM**

Ms. Strahm can testify about her part in addressing chronic complaints about Dr. Kirsch since this is consistent with the double standard for men and women at OHSU and because Strahm, a key fact witness, has personal knowledge of both Plaintiff and Kirsch's treatment and communication styles.

Ms. Strahm can testify as to what Plaintiff told her regarding her concerns at OHSU since it is not offered to show the truth of the matter asserted, but to show that Defendant fails to take concerns of sex discrimination seriously. Ms. Strahm will testify that Defendant did nothing to address the concerns, in violation of its own policies; evidence of a laissez faire attitude toward mistreatment of women.

Ms. Strahm can also testify about some of Plaintiff's concerns regarding quality of care. After all, some were of enough of a concern that she spoke with Dr. Anderson about the concerns, such as the case where a patient was repeatedly shocked while another EP watched and did not assist. This was discussed between Strahm and Anderson, as well as Bala's concerns of discrimination.

Strahm can testify as to her part in the investigation of Dr. Greenberg since the testimony is narrowly tailored to show the double standard with how men and women are treated, and with how OHSU gives short shrift to serious complaints of discrimination by men. This is consistent

with evidence that OHSU has a practice of protecting men to the detriment of women; a central issue in the case.

Lastly, Plaintiff does not intend to call Ms. Strahm to testify about what the Plaintiff thought. However, she can testify that Plaintiff believed she was being mistreated in the performance plan and that Strahm, and OHSU, ultimately agreed that some of the critiques were misplaced and downgraded the document to a coaching document. This tends to show that Defendants' critiques of Plaintiff were misguided, overstated and wrong.

7. **KATHY HEITMAN-ALLEN**

Self-employed

Ms. Heitman-Allen can testify that the reason she left employment was because of retaliation by Dr. Cigarroa. She can testify about her experience as a victim of unfair treatment by Dr. Cigarroa because she was a strong woman based on her own personal experience. Likewise, she can testify about other supervisors' statements to her about Dr. Cigarroa's negative attitude toward strong women since these statements are not hearsay. FRE 801(d)(2)(D). This is not improper proof of character evidence and it is evidence of retaliatory motive or intent by Defendant Cigarroa, specifically, against women at OHSU.

8. **DR. SHARON ANDERSON**

Dr. Anderson's testimony about her involvement in Dr. Kirsch's and Dr. Ma's departure are relevant for the reasons discussed in the parties' *motions in limine* as OHSU's treatment of both physicians are evidence that men with much more aggressive communication styles are treated significantly better than Plaintiff.

Likewise, Plaintiff can elicit testimony from Dr. Anderson that Plaintiff reported that Anesthesia was "harassing" her by unilaterally suspending her privileges. These are facts she that

are an adverse action in the case and have a lay meaning that exists independently of whether or not plaintiff has a legal claim for "hostile work environment." Plaintiff will not, of course, offer evidence that her feeling of being harassed constituted a "hostile work environment," nor will counsel argue as much. Lastly, Dr. Anderson can testify about her understanding of newspaper articles that she actually read and whether she agrees with them or not, including the statements of her colleagues about problems at OHSU regarding discrimination.

9. **DR. JOAQUIN CIGARROA**

Defendants object to Cigarroa testifying about whether that he angrily banged his hand on the table or whether he mistreated other employees. Yet, as discussed in response to Defendant's motions in limine, this evidence may be admissible depending on the circumstances, either to show that there is a double standard for men and women—Plaintiff was never accused of acting out in anger or banging her hand on tables—or to show that he and OHSU had a negative view of strong women, and a laissez-faire attitude toward men with more abusive communication styles and behaviors.

As to the email where Dr. Cigarroa concedes that the suspension of Plaintiff's ability to practice in the face of the Kirsch email violated "due process," Plaintiff agrees that she is not advancing a due process claim. However, Plaintiff agrees with defendant that this statement is admissible, in part because it shows that Defendant knew that there was a specific process it was supposed to follow—but did not follow—before preventing Plaintiff from performing procedures in the lab.

10. **DR. SANJIV KAUL**

Dr. Kaul's testimony about the circumstances of his stepping down from KCVI is relevant background evidence, given his key role in this case. Likewise, his testimony about Dr.

Kirsch's communication style, relating both to Plaintiff, specifically and in other instances over the years, is relevant for several reasons. First, as discussed earlier, it shows that there is a double standard with how men and women are treated, generally. Second, as it pertains to Plaintiff, specifically, it calls into question why Henrikson, Cigarroa, Kilo and Kaul—all men—went out their way to respect Kirsch's complaints regarding Plaintiff, even when they saw his complaint as being inappropriate and viewed him as a "loose cannon" who routinely blasts providers with whom he gets crosswise. Indeed, Dr. Kaul referenced this fact via email even as he bended to Kirsch's whims, which per Kilo, violated "due process."  This objection should be overruled.

11. **DR. CHUCK KILO**

Plaintiff agrees that Dr. Kilo's, Dr. Cigarroa's and Dr. Henrikson's testimony about whether their treatment of plaintiff comported with "due process", referring to OHSU internal policies regarding suspension of clinical privileges, is admissible.  Plaintiff does not intend to argue that the practice violated the due process clause of the 14th amendment.  Dr. Kilo can also testify about OHSU's bylaws related to clinical privileges, since this relates directly to the process that was due, which he referenced in his email, referenced above. This is relevant since it shows that Defendants knew there was a policy to follow if serious concerns about a doctor's behavior were raised before locking them out of the lab, but that Defendants deliberately chose not to follow the policy here. It also shows that if people were truly concerned about Dr. Bala sacrificing patient care by being "abusive" that there was a process to follow to address serious concerns, but which was not followed.

Dr. Kilo's testimony about Dr. Kirsch is admissible for the same reasons as discussed, above, and in the parties' *motions in limine*.

As to the faculty survey, Dr. Kilo can, if necessary, lay a foundation that faculty surveys are regularly created business records at OHSU, even if he doesn't recall if he did, or did not, receive the faculty survey that Plaintiff intends to offer into evidence.

Dr. Kilo, who helps manage the PSI database, can also testify about his understanding of Plaintiff's concerns regarding quality of care, as this squarely fell within his job responsibilities. Likewise, the fact that he didn't disagree with Plaintiff's concerns reinforces—indeed he thought they were well founded—underlines that Plaintiff's concerns were brought in good faith.

12. **DR. JEFFREY KIRSCH**

Defendants object to Dr. Kirsch statements on various pages of his witness statement but do not provide enough information about their objection for Plaintiff to know a) what the testimony is they find objectionable; nor b) the basis for the objections. Plaintiff should not have to guess as to the objections—that was part of the purpose of the very detailed witness statements—and Defendants' objections should be overruled.

As to Defendants' objections to Dr. Kirsch's deposition testimony, Kirsch's testimony regarding the news article is not hearsay since the article is not offered for the truth of the matter asserted. While Plaintiff does intend to offer the article into evidence, and can lay a foundation, if necessary, to do so, the questions asked to Kirsch in the deposition about the article are admissible regardless of whether the article is admitted into evidence or not. For example, Plaintiff asked Kirsch in his deposition "In the article it says that, 'In a sudden move OHSU officials have demoted the head of their anesthesiology department'" . . . "*Is it your understanding you were demoted at OHSU at the time this article was published?*" Kirsch Dep. pp 9-10. This question and the subsequent answer is not offered to introduce the article or even the substance of the article, but to inquire as to whether what was reported was true or not; which is whether he was demoted. This

line of testimony is not hearsay and is admissible, with or without the newspaper article's admission.

### 13. DR. DANNY JACOBS

Dr. Jacobs is not being called as a witness to "badger" OHSU. Dr. Jacobs will authenticate, if needed, the faculty survey, the Covington Report and the reasons for why the report was created. Further, he will testify as to his statements he made about the culture at OHSU on the OHSU website or in the press with regard to discrimination and harassment and that the negative culture predated his start at OHSU. His testimony is highly relevant to Defendant's discriminatory practices, which, as addressed in the Covington report and as acknowledged by Dr. Jacobs, has been in place for many years.

### 14. DIANE LUND-MUZIKANT

Ms. Lund-Muzikant can lay the foundation for admission of articles she wrote. Furthermore, even if the articles are not admitted, she can testify that David Robinson and Gregory Moawad made the statements at issue in the article while both were employed at OHSU; statements that suggest that OHSU knows there is a system-wide problem with their treatment of women and people of color while Plaintiff worked at OHSU.

### 15. DR. DAVID ROBINSON

Dr. Robinson is expected to testify that he admits that, as quoted in the Lund Report online newspaper, that OHSU has had a problem with discrimination and harassment for many years, that it's something OHSU needs to deal with. These statements relate to the OHSU faculty survey, which occurred and was released while Plaintiff was still employed by OHSU.

### 16. MS. SETHURAMAN, DR. MOHILE, MS. MAGLIO, DR. DEMOS, MR. GODHA, MS. FAVA

The above witnesses are emotional distress witnesses. They will testify about their observations of Plaintiff's emotional distress and the basis for her emotional distress. None of their testimony about Plaintiff's statements to them are offered for the truth of the matter asserted, but to show that Plaintiff's state of mind at the time, and that Plaintiff had been damaged. Thus, to the extent they testify about Dr. Bala's statements to them, it is only to provide a basis for their observation of her emotional distress and Bala's state of mind. Defendants' objections should be overruled.

Lastly, a few of the witnesses are expected to testify about the impact of negative news stories about OHSU on Plaintiff's state of mine and, specifically, that Plaintiff's emotional distress flared significantly in the wake of those articles or news events. This is not an effort to "backdoor in inadmissible evidence" as Plaintiff does intend to even admit most of the subsequent newsworthy events into evidence, other than the Covington Report, which is not a news article, but a document commissioned and created by OHSU. This testimony shows how the subsequent events relating to ongoing discrimination and HR system failures caused Plaintiff's existing emotional distress to flare up in ways that were disruptive to her and her relationship with others; even many years after her employment terminated. This evidence is admissible with a limiting instruction that the evidence is only offered as to Plaintiff's state of mind, only.

DATED this 26th Day of March, 2024

s/Matthew C. Ellis
Matthew C. Ellis, OSB #075800
1500 SW First Avenue, Ste 1000
Portland, Oregon 97201
Ph: 503-345-5497
matthew@employmentlawpdx.com

Attorney for Plaintiff